No. 25-1612

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————

COMMONWEALTH OF MASSACHUSETTS, *et al.*,

*Plaintiffs-Appellees,*

v.

ROBERT F. KENNEDY, JR., *et al.*,

*Defendants-Appellants.*

———————————

Appeal from the U.S. District Court for the District of Massachusetts

———————————

## PLAINTIFF STATES' OPPOSITION TO DEFENDANTS' MOTION FOR A STAY PENDING APPEAL

———————————

**ROB BONTA**
  *Attorney General of California*
Emilio Varanini
  *Supervising Deputy Atty. Gen.*
Daniel D. Ambar
Sophia TonNu
  *Deputy Attorney General*
455 Golden Gate Avenue
San Francisco, CA 94102

**ANTHONY G. BROWN**
  *Attorney General of Maryland*
Julia Doyle
  *Solicitor General*
Adam D. Kirschner
Michael Drezner
James C. Luh
  *Senior Asst. Attorneys General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

**ANDREA JOY CAMPBELL**
  *Attorney General of Massachusetts*
David C. Kravitz
  *State Solicitor*
Gerard J. Cedrone
  *Deputy State Solicitor*
Katherine Dirks
  *Chief State Trial Counsel*
Rachel M. Brown
Vanessa A. Arslanian
Phoebe M. Lockhart
  *Assistant Attorneys General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

**NICHOLAS W. BROWN**
  *Attorney General of Washington*
Andrew Hughes
  *Assistant Attorney General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104

(Additional counsel listed in signature block)

# TABLE OF CONTENTS

Introduction ............................................................................... 1

Statement of the Case ................................................................. 3

    I.   Background ............................................................... 3

        A.  The Challenged Directives ................................. 3

            1.  The Secretarial Directive ............................ 4

            2.  The Memoli Directive ................................. 5

            3.  Subsequent Directives ................................ 6

        B.  The Resulting Grant Terminations ...................... 8

    II.  Procedural History .................................................. 9

Argument .................................................................................. 11

    I.   Defendants are unlikely to succeed on appeal. ............ 12

        A.  The district court had jurisdiction. ...................... 12

            1.  Defendants do not challenge the district court's jurisdiction to vacate the Challenged Directives. .......... 12

            2.  The district court had jurisdiction to vacate the resulting grant terminations. ........................................ 13

                a.  Plaintiffs' APA claims are not contractual in nature. ................................................................. 14

                b.  The Tucker Act does not bar plaintiffs' relief. ..... 18

                c.  The Supreme Court's *California* order does not compel a different result. .............................. 20

        B.  Defendants' remaining merits arguments are forfeited and unavailing. .................................................... 22

            1.  The challenged actions are not "committed to agency discretion." .......................................... 23

            2.  Defendants' actions were arbitrary and capricious. ....... 24

    II.  The judgment does not irreparably harm defendants. .............. 27

    III.  Granting a stay will harm plaintiffs and the public. .................. 28

Conclusion ................................................................................ 30

# TABLE OF AUTHORITIES

**Cases:**

*AAU v. Dep't of Energy,*
2025 WL 1414135 (D. Mass. May 15, 2025) ........................................21

*ABA v. Dep't of Justice,*
2025 WL 1388891 (D.D.C. May 14, 2025)............................................21

*Am. Sci. & Eng'g, Inc. v. Califano,*
571 F.2d 58 (1st Cir. 1978) ....................................................14, 15, 16

*AMA v. Reno,*
57 F.3d 1129 (D.C. Cir. 1995)............................................................24

*Bowen v. Massachusetts,*
487 U.S. 879 (1988)............................................................15, 17, 22

*California v. Dep't of Educ.,*
132 F.4th 92 (1st Cir. 2025)................................................................20

*Chi. Women in Trades v. Trump,*
2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) ........................................21

*Climate United Fund v. Citibank, N.A.,*
2025 WL 1131412 (D.D.C. Apr. 16, 2025)............................................21

*Cmty. Legal Servs. v. HHS,*
137 F.4th 932 (9th Cir. 2025) ............................................................21

*Colorado v. HHS,*
2025 WL 1426226 (D.R.I. May 16, 2025)............................................21

*Dep't of Educ. v. California,*
145 S. Ct. 966 (2025)............................................................2, 20, 22

*Dep't of Educ. v. Louisiana,*
603 U.S. 866 (2024)........................................................................12

*Dep't of State v. AIDS Vaccine Advocacy Coal.,*
145 S. Ct. 753 (2025)........................................................................21

*DHS v. Regents of the Univ. of California,*
591 U.S. 1 (2020)............................................................................26

*Does 1-3 v. Mills,*
39 F.4th 20 (1st Cir. 2022)................................................................30

*Ferreiro v. United States,*
    501 F.3d 1349 (Fed. Cir. 2007) ............................................... 19

*Green & Healthy Home Initiatives, Inc. v. EPA,*
    2025 WL 1697463 (D. Md. June 17, 2025) ............................ 21

*Hubbard v. Adm'r,*
    982 F.2d 531 (D.C. Cir. 1992) ................................................ 18

*KalshiEX LLC v. CFTC,*
    119 F.4th 58 (D.C. Cir. 2024) ............................................... 27

*Katz v. Cisneros,*
    16 F.3d 1204 (Fed. Cir. 1994) ............................................... 19

*King County v. Turner,*
    2025 WL 1582368 (W.D. Wash. June 3, 2025) ..................... 21

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ................................................................ 23

*Maine v. USDA,*
    2025 WL 1088946 (D. Me. Apr. 11, 2025) ............................ 21

*Maryland v. CNCS,*
    2025 WL 1585051 (D. Md. June 5, 2025) .............................. 21

*Match-E-Be-Nash-She-Wish Band v. Patchak,*
    567 U.S. 209 (2012) ................................................................ 19

*Md. Dep't of Hum. Res. v. HHS,*
    763 F.2d 1441 (D.C. Cir. 1985) ............................................. 15

*Me. Cmty. Health Options v. United States,*
    590 U.S. 296 (2020) ................................................................ 17

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) ................................... 14, 15, 16

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022) ............................................................. 22

*MTA v. Duffy,*
    2025 WL 1513369 (S.D.N.Y. May 28, 2025) ........................ 21

*Nat'l Ctr. for Mfg. Scis. v. United States,*
    114 F.3d 196 (Fed Cir. 1997) ................................................ 18

*New Jersey v. Trump,*
131 F.4th 27 (1st Cir. 2025)..............................................2, 23

*New York v. Trump,*
133 F.4th 51 (1st Cir. 2025)....................................................29

*New York v. Trump,*
2025 WL 1098966 (D.R.I. Apr. 14, 2025)...............................21

*Nken v. Holder,*
556 U.S. 418 (2009)...................................................2, 12, 27

*Ohio v. EPA,*
603 U.S. 279 (2024)................................................................24

*Rhode Island v. Trump,*
2025 WL 1303868 (D.R.I. May 6, 2025)................................21

*S. Educ. Found. v. Dep't of Educ.,*
2025 WL 1453047 (D.D.C. May 21, 2025)..............................21

*S.F. AIDS Found. v. Trump,*
2025 WL 1621636 (N.D. Cal. June 9, 2025) ...........................21

*S.F. Unified Sch. Dist. v. AmeriCorps,*
2025 WL 1180729 (N.D. Cal. Apr. 23, 2025) ...................15, 21

*Tootle v. Sec'y of the Navy,*
446 F.3d 167 (D.C. Cir. 2006)................................................20

*Union of Concerned Scientists v. Wheeler,*
954 F.3d 11 (1st Cir. 2020) ....................................................24

*Weyerhaeuser Co. v. FWS,*
586 U.S. 9 (2018)..............................................................20, 23

*Woonasquatucket River Watershed Council v. USDA,*
2025 WL 1116157 (D.R.I. Apr. 15, 2025)...............................21

**Statutes:**

5 U.S.C. §551(4) ....................................................................13

5 U.S.C. §551(11)(A) .............................................................16

5 U.S.C. §551(13) ..................................................................13

5 U.S.C. §701(a)(2).................................................................23

28 U.S.C. §1491(a) .................................................................19

28 U.S.C. §1491(a)(1) ........................................................................ 16

**Regulations:**

2 C.F.R. §200.340 ............................................................................. 16

**Rules:**

Fed. R. App. P. 8(a)(1) ...................................................................... 23

Fed. R. Civ. P. 62(b) ......................................................................... 28

**Treatises:**

Matthew H. Solomson, *Court of Federal Claims: Jurisdiction, Practice, and Procedure* (2016) .......................................... 19

## INTRODUCTION

The agency actions underlying this case are, as the district court found, "breathtakingly arbitrary and capricious." App. 501. In a series of directives containing virtually no reasoning, defendants prohibited the National Institutes of Health from supporting any research into seven topic areas. Defendants then executed those directives by canceling hundreds of research grants to the 16 plaintiff states' public universities—a devastating blow with no precedent in NIH's history.

While defendants' actions were extraordinary, the district court's decision was not: it granted run-of-the-mill APA relief by setting aside the Challenged Directives and vacating the termination decisions that flowed from them. For several reasons, that unremarkable judgment— entered after a full trial of the merits—should not be stayed.

First, defendants are unlikely to succeed in challenging the district court's jurisdiction. Defendants do not dispute the court's jurisdiction to vacate the Challenged Directives, and the APA plainly allows a district court to review such generally applicable agency policies. As for the downstream termination decisions, defendants' jurisdictional objection rests on the false premise (Mot. 1) that the district court "order[ed]

1

[defendants] to pay money" based on "contractual obligation[s]." But the district court enforced statutes and regulations, not contract terms, and it granted vacatur under the APA, not money damages. Defendants try to draw support from the Supreme Court's recent order in *Department of Education v. California*, 145 S. Ct. 966 (2025), but that *per curiam* decision considered different relief awarded in a different posture. It does not guide the outcome here.

Second, defendants are unlikely to show that the challenged agency actions either were committed to agency discretion or satisfied the APA. Defendants did not present these arguments in their stay motion below, so they are forfeited. *New Jersey v. Trump*, 131 F.4th 27, 43 (1st Cir. 2025). And they fail in any event. Plaintiffs are not challenging discretionary funding decisions—they are challenging agency policies well within the APA's scope. And those policies were "bereft of reasoning virtually in their entirety" and "unsupported by factual development." App. 337, 501.

Third, the equities do not support a stay. Although the risk of harm is one of the "most critical" considerations in the stay analysis, *Nken v. Holder*, 556 U.S. 418, 434 (2009), defendants offer only limited and

unpersuasive arguments on that front, failing to explain why the available mechanisms for recovering any funds improperly paid to plaintiffs are inadequate. Defendants also cannot refute the significant harms to plaintiffs and the public: the undisputed record shows that enforcement of the Challenged Directives will destroy critical research programs, with lasting consequences for plaintiffs' institutions and vulnerable patients.

The Court should deny defendants' motion.

## STATEMENT OF THE CASE

### I.    Background

#### A.    The Challenged Directives

Widely acknowledged as a crown jewel of America's scientific institutions, NIH is the largest public funder of medical research in the world. App. 427. The agency's work has spurred life-changing advances, from the creation of the rubella vaccine to the development of treatments for HIV. App. 170. NIH fuels these breakthroughs largely through competitive research grants to non-federal scientists. App. 427. Historically, the process of awarding these grants has been governed by the apolitical assessment of proposed projects, as set forth in statutes, regulations, and decades of agency policy. App. 427-429.

That changed earlier this year with defendants' adoption of a suite

of policies—the Challenged Directives—prohibiting NIH from supporting various categories of research, including projects with a perceived connection to undefined terms like "DEI" or "transgender issues." The district court described the evolution of these directives in detail (App. 429-491); an abbreviated account follows.

### 1.    The Secretarial Directive

On February 10, the Acting Secretary of Health and Human Services issued a memorandum entitled "Secretarial Directive on DEI-Related Funding" (Secretarial Directive). App. 436-437. The memorandum contains several conclusory statements about "DEI"—a term the directive does not define. For example, the directive states, without any support or elaboration, that "grants that support DEI" are "inconsistent with the Department's policy of improving the health and well-being of all Americans," and that such grants "can cause serious programmatic failures." App. 436. Based on these pronouncements, the directive instructs NIH personnel to pause all payments for grants "related to DEI and similar programs" and advises that "grants may be terminated in accordance with federal law." *Id.*

The administrative record for the Secretarial Directive consists

solely of the two-page directive itself.  App. 437.  In other words, defend-
ants admit that they considered no other documents in promulgating the
directive or reaching the conclusions therein.  D. Ct. Doc. 118-1 (¶7) (cer-
tifying that the "complete administrative record for [the Secretarial Di-
rective] consists of [A.R. 4-5][1]).

### 2.    The Memoli Directive

On February 21, Acting NIH Director Matthew Memoli issued a
memorandum entitled "Directive on NIH Priorities" (Memoli Directive).
App. 446-447.  The first half of the directive offers various conclusions
about "studies based on diversity, equity, and inclusion (DEI) and gender
identity," including the assertion that such studies (1) "are antithetical
to the scientific inquiry, do nothing to expand our knowledge of living
systems, provide low returns on investment, and ultimately do not en-
hance health," (2) "are often used to support unlawful discrimination on
the basis of race and other protected characteristics," and (3) "ignore, ra-
ther than seriously examine, biological realities."  App. 446.  The memo-
randum offers no support for these conclusory assertions, nor does it

---

[1] Electronic copies of A.R. 1-3824 are being filed with this brief.  Copies
of A.R. 3825-4270 can be found at D. Ct. Docs. 131-6 to 131-15.

define their key terms (*e.g.*, "diversity, equity, and inclusion"). And, as with the Secretarial Directive, the administrative record reveals that Memoli did not consider any other documents or evidence in promulgating the memorandum.[2]

The second half of the Memoli Directive puts these conclusory statements into action, "direct[ing]" NIH offices to "conduct an internal review of all . . . existing awards" to "ensur[e]" that they "do not fund or support . . . DEI and gender identity research activities and programs." App. 447. The directive goes on to instruct that grants "deemed inconsistent with NIH's mission" may be "subject to funding restrictions, terminated or partially terminated, paused, and/or not continued or renewed, in compliance with all procedural requirements." *Id.*

### 3.  Subsequent Directives

Starting in March, several follow-on directives expanded and operationalized the foregoing policies. App. 464-491. Two aspects of these later directives are relevant here.

---

[2] The memorandum states that Memoli "issue[d] th[e] directive based on [his] expertise and experience," App. 446, but the record showed, and the district court found, that "much, if not all, of the content was provided to [Memoli] by HHS." App. 448.

First, these directives expanded the list of prohibited research subjects. As just discussed, the Memoli Directive blacklisted any projects related to "DEI" or "gender identity." Subsequent directives grew that list of forbidden topics to include "Vaccine Hesitancy," "COVID," "Climate Change," and "Influencing Public Opinion." App. 490.[3] The administrative record does not explain the origin of any of these new topics.

Second, these additional directives expressly instructed NIH officials to terminate awards with a perceived connection to the offending topics—and even provided the exact language for NIH officials to use in doing so. App. 461-463. For example, any decision terminating grants on "DEI" grounds was required to include the following language:

> "Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics ICO's [*sic*], which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs."

---

[3] The district court held that plaintiffs lacked standing to challenge a seventh category, "China." App. 491-492.

App. 490 (quotation marks in original); *see also id.* (reproducing the full menu of boilerplate termination language for all seven prohibited topics).

As with the Secretarial and Memoli Directives, the record for these follow-on directives reveals that defendants did not consider any materials in promulgating them.

### B.    The Resulting Grant Terminations

Defendants implemented the Challenged Directives by mass-terminating hundreds of grants to plaintiffs' public institutions.  Each termination letter follows the same format, plugging the addressee, grant number, and scripted basis for termination into a fill-in-the-blank template with no individualized discussion of the relevant project.  App. 462-463; *e.g.*, A.R. 2426-2427 (freestanding termination letter); A.R. 1785-1786 (termination language in revised notice of award).  Defendants issued these terminations, which took immediate effect, with no advance warning.

The administrative record reveals the haste with which defendants acted to execute these terminations.  Over the month of March, for example, Acting Director Memoli circulated spreadsheets containing anywhere from a dozen to several hundred grants, demanding that NIH

officials promptly terminate the listed projects.  *E.g.*, A.R. 2469 ("Please terminate the grants on the attached spreadsheet by COB today."); A.R. 3122 (demanding termination of 530 grants "by COB next Friday," with "daily evening update[s] on how many were terminated").  The administrative record does not show who selected these awards for termination, what criteria they used in identifying them, or how any specific program was deemed related to one of the blacklisted topics.

The terminated projects supported a wide range of research for our Nation's most underserved individuals.  In Massachusetts, for example, terminated studies sought to understand and reduce the spread of HIV among at-risk populations.  A.R. 2605-2612.  In California, cancelled studies sought to prevent suicide among children.  A.R. 2972-2979.  These are just examples: the terminated studies addressed numerous health conditions.  *E.g.*, A.R. 662-668 (Alzheimer's); A.R. 2716-2722 (cardiovascular disease).  Canceling these projects harmed—and continues to harm—both plaintiffs and the public.  *See infra*, pp. 28-30.

## II.    Procedural History

Plaintiffs sued and sought a preliminary injunction.  Count 3 of the operative complaint—the only count relevant here—alleged that the

Challenged Directives were arbitrary and capricious in violation of 5 U.S.C. §706(2)(A). App. 234-245. Plaintiffs asked the district court to set aside the directives and any action taken to implement them. App. 255.

In an opinion on threshold issues, the district court rejected defendants' contention that the Tucker Act required the Court of Federal Claims to hear plaintiffs' claim. App. 268-283. The court acknowledged the Supreme Court's recent order in *California*, but explained that, whereas the *California* plaintiffs' "only claim was to sums awarded to them in previously awarded discretionary grants," here "the 'essence' of th[e] action [was] not one of contract" and plaintiffs did not seek "monetary damages." App. 275, 282. The district court also rejected defendants' argument that plaintiffs were challenging funding decisions committed to agency discretion. App. 286.

The court consolidated plaintiffs' preliminary-injunction motion with a trial on the merits and—after production of the administrative record and full briefing and argument—held that the Challenged Directives were neither "reasonable, nor reasonably explained." App. 509; *see* App. 332-347 (bench ruling), App. 416-518 (written decision). The court found that the directives were "bereft of reasoning virtually in their

entirety" and "unsupported by factual development." App. 337; *see, e.g.*, App. 502 (describing "sparse pseudo-reasoning" and "wholly unsupported statements"). The court also found that the directives arbitrarily ignored "the reliance interests of the many parties affected." App. 337. The court accordingly ruled that the Challenged Directives were arbitrary and capricious and ordered that the directives and resulting grant terminations be set aside. App. 338-339. Finding that there was no just reason for delay, the court entered partial final judgment on Count 3. App. 351-352.

Defendants moved the district court for a stay pending appeal, raising only their argument that the Tucker Act divested the court of jurisdiction. D. Ct. Doc. 154, at 1-2. The district court denied the motion the next day, reaffirming its jurisdictional ruling and finding, on the equities, that a stay would cause plaintiffs irreparable harm by "destroy[ing] the unmistakable legislative purpose" of supporting health research and "throw[ing] the entire process" of grant restoration "into limbo." App. 361-364.

## ARGUMENT

Because a stay "intru[des] into the ordinary processes of administration and judicial review," the issuance of a stay "is not a matter of

11

right." *Nken*, 556 U.S. at 427.  Instead, "the burden is on" the movant to demonstrate that it is "likel[y] [to] succe[ed]" on appeal and that "the equities favor a stay." *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024). Defendants cannot clear that bar.

## I.    Defendants are unlikely to succeed on appeal.

### A.    The district court had jurisdiction.

Plaintiffs asked the district court to set aside the Challenged Directives and to vacate the resulting grant terminations.  The district court had jurisdiction to do both.

#### 1.    Defendants do not challenge the district court's jurisdiction to vacate the Challenged Directives.

Defendants wrongly characterize this lawsuit as "aris[ing] from the termination of [plaintiffs'] grants." Mot. 2.  But plaintiffs' arbitrary-and-capricious claim centers on the Challenged Directives—agency policies upstream of any specific terminations. *See supra*, pp. 3-11.  Even defendants eventually acknowledge the point: they concede, as they must, that the judgment below (1) held unlawful and set aside the Challenged Directives and (2) vacated any terminations premised on the directives. Mot. 9.

Defendants do not challenge the district court's jurisdiction to do

the first of those things—*i.e.*, to review and vacate the Challenged Directives. Nor could they: under the APA, courts may review agency policies that prospectively govern agency decisions. 5 U.S.C. §551(13) ("agency action[s]" include "rule[s]"); *id.* §551(4) ("rule[s]" include "statement[s] of general . . . applicability and future effect" that "implement, interpret, or prescribe law or policy").[4] Accordingly, there is no jurisdictional impediment to Paragraph I of the judgment below, which vacated the Challenged Directives.

### 2.    The district court had jurisdiction to vacate the resulting grant terminations.

Because the district court had jurisdiction to vacate the Challenged Directives—and because the Challenged Directives were the *only* basis for the resulting grant terminations (App. 351 n. 2; A.R. 462-463)—it follows that the court had jurisdiction to vacate the terminations. Someone injured by an agency decision may sue under the APA for "relief other than money damages" unless another statute "expressly or impliedly forbids the relief which is sought." 5 U.S.C. §702. Plaintiffs' request to set

---

[4] The district court correctly held that the Challenged Directives are "final agency action" subject to APA review. App. 492-494. Defendants do not contest that holding here.

aside defendants' termination decisions satisfies these conditions.

### a. Plaintiffs' APA claims are not contractual in nature.

In determining whether a plaintiff's claim falls within the APA or the Tucker Act, courts ask whether the claim is "essentially a contract dispute." *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 61 (1st Cir. 1978). In doing so, courts examine (1) whether the "core determination" in the suit is the existence of "a breach of contract" and (2) the type of relief the plaintiff has requested. *Id.*; *accord Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); Defs.' Mot. 12. Here, both of these factors demonstrate that plaintiffs' arbitrary-and-capricious claim belonged in the district court under the APA—not the Court of Federal Claims under the Tucker Act.

*First*, "the 'essence' of this action is not one of contract," as the district court rightly recognized. App. 282. In ruling on the legality of the grant terminations, the sole question before the district court was, as discussed, whether the Challenged Directives were lawful. In resolving that question, the "core determination," *Am. Sci.*, 571 F.2d at 61, was whether defendants violated the APA's guarantee against arbitrary decisionmaking—not whether they violated any contract terms. App. 282-283. In

other words, the district court "decide[d] this case without ever reading the grant agreements." *S.F. Unified Sch. Dist. v. AmeriCorps*, 2025 WL 1180729, at *9 (N.D. Cal. Apr. 23, 2025) (brackets omitted); *cf. Am. Sci.*, 571 F.2d at 61 (explaining, by contrast, that where a claim "could not be resolved without reference to the contract, exclusive jurisdiction lay in the Court of Claims"). That is unsurprising: the Challenged Directives announce a freestanding agency policy that is independent of any individual grant.

Defendants respond by mischaracterizing plaintiffs' claim, arguing (Mot. 13) that "[t]he source of plaintiffs' purported rights to payment are the grant agreements." But plaintiffs have never asserted a "right to payment." Nor does the fact that defendants' unlawful conduct *affected* plaintiffs' reimbursements "automatically transform [this] action"—through "some mystical metamorphosis"—"into one on the contract." *Megapulse*, 672 F.2d at 968; *see also Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (*MDHR*) (Bork, J.) (claims that "turn[ed] on the interpretation of statutes and regulations rather than on the interpretation of an agreement" were "not contract claims for Tucker Act purposes"); *Bowen v. Massachusetts*, 487 U.S. 879, 894-901 (1988)

(adopting *MDHR*'s reasoning). After all, the APA recognizes that a "grant of money" is among the "agency action[s]" within the statute's ambit. 5 U.S.C. §551(11)(A).

Equally unavailing is defendants' argument (Mot. 15) that this is a contract case because "an express grant term"—by which defendants mean 2 C.F.R. §200.340—allowed them "to terminate grants that no longer advance 'program goals or agency priorities.'" Even if defendants are correct that §200.340 is incorporated into NIH grant agreements (*see* Mot. 4-5; *but see* D. Ct. Doc. 135, at 7-9), the source of plaintiffs' rights remains the regulation, and therefore plaintiffs' claim is not "founded" upon a contract as the Tucker Act requires. 28 U.S.C. §1491(a)(1).

*Second*, the relief that plaintiffs received further confirms that their claims are not contractual. *Am. Sci.*, 571 F.2d at 61; *Megapulse*, 672 F.2d at 968. In granting plaintiffs' claims, the district court ordered the Challenged Directives and resulting terminations vacated under §706(2)(A). App. 351-352. That relief resembles the relief in *Bowen*. Here, as there, plaintiffs did not receive money "in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated," but instead obtained "specific relief" setting aside the challenged government

16

action.   487 U.S. at 895, 900; *cf. Me. Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020) (holding that plaintiffs could proceed in the Court of Federal Claims where they sought "sums already calculated, past due, and designed to compensate for completed labors").

Defendants nevertheless insist (Mot. 14) that this suit is really one "for 'past due sums' from the government."  But if the "alpha and omega of this dispute" were money damages (*id.*), the district court would have entered a money judgment.  It obviously did not: the judgment below does not order defendants to pay anything.  App. 351-352.

To be sure, the judgment may have the downstream effect of allowing plaintiffs to seek reimbursements under their grant agreements: because the Challenged Directives are unenforceable, and because the resulting terminations have been set aside, plaintiffs' researchers may once again seek reimbursement consistent with the usual rules and regulations for doing so.  But that does not transform plaintiffs' claim into a contract claim: an "action for specific relief" under the APA does not become an action for damages merely because a judgment for the plaintiff might "require the payment of money by the federal government." *Bowen*, 487 U.S. at 893-894; *accord Hubbard v. Adm'r*, 982 F.2d 531, 536

17

(D.C. Cir. 1992) (reinstatement of federal employee "unquestionably a form of specific relief" under §702 even if it results in payment of contractually owed compensation).

Defendants' contention (Mot. 16) that plaintiffs are seeking "the classic contractual remedy of specific performance" fails for the same reasons. In awarding plaintiffs' requested relief, the district did not have to examine any contract terms to discern the scope of plaintiffs' rights or defendants' obligations. Nor did it order defendants to perform any part of a contract. *See Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 198-199 (Fed Cir. 1997) (rejecting a similar argument). Accordingly, plaintiffs' arbitrary-and-capricious claim is a claim "seeking relief other than money damages" within the meaning of §702.

### b.    The Tucker Act does not bar plaintiffs' relief.

The carveout in §702, which prevents a plaintiff from suing under the APA if another statute "expressly or impliedly forbids the [requested] relief," does not apply here. Defendants say the Tucker Act triggers that exception, but the Tucker Act covers only "(1) actions brought pursuant to money-mandating statutes, regulations, executive orders, or constitutional provisions; (2) actions to recover illegal exactions of money by the

United States; and (3) actions pursuant to contracts with the United States." Matthew H. Solomson, *Court of Federal Claims: Jurisdiction, Practice, and Procedure* at 3-2 (2016) (quotation marks omitted). Defendants have never suggested that this case falls into the first two categories, and it does not fall into the third category for the reasons discussed above: plaintiffs are not suing on a contract or seeking contractual remedies. Accordingly, "the Tucker Act is not applicable and cannot forbid the requested relief, either expressly or impliedly." *Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994); *see Match-E-Be-Nash-She-Wish Band v. Patchak*, 567 U.S. 209, 216 (2012).

Defendants' contrary arguments not only contradict the governing statutes—they would create an intolerable jurisdictional void. Defendants argue that the court below could not set aside the Challenged Directives and reinstate terminated grants. But neither can the Court of Federal Claims; its authority is generally limited to awarding retrospective monetary relief. 28 U.S.C. §1491(a); *Ferreiro v. United States*, 501 F.3d 1349, 1353 n. 3 (Fed. Cir. 2007). The upshot: on defendants' view, *no* court has the power to vacate an illegal agency policy relating to federal grants or to prospectively reinstate grants terminated based on such an

19

illegal policy. So even if, for example, defendants issued a directive barring women from receiving NIH grants (and cancelled all outstanding grants to women researchers), defendants' theory would mean that no court could grant prospective relief. That result would violate the APA's "basic presumption of judicial review." *Weyerhaeuser Co. v. FWS*, 586 U.S. 9, 22 (2018); *see Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006) (describing as "troublesome" the government's "claim that *neither* the Court of Federal Claims *nor* the District Court has jurisdiction").

### c.    The Supreme Court's *California* order does not compel a different result.

The district court correctly rejected defendants' contention (Mot. 12-15) that "[*California*] is virtually indistinguishable from the instant case." App. 275; *see* App. 268-283.

*First*, as the district court recognized, the claims in *California* were "somewhat different than the claims presented here." App. 275. In that case, "the terms and conditions of each individual grant award [were] at issue," *California v. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025), and the district court's TRO "enforce[d] a contractual obligation to pay money" by requiring "the Government to pay out past-due grant obligations," *California*, 145 S. Ct. at 968. As already explained, none of that

is true here: plaintiffs did not secure a money judgment, and their claims did not require the district court to review any contract terms to understand plaintiffs' rights or defendants' obligations. *See supra*, pp. 14-20.

These factual differences render *California* inapposite. Indeed, in recent weeks, numerous courts (including the Supreme Court) have rejected the federal government's efforts to bring every case involving funding within the Tucker Act.[5] These decisions prove that each case must be evaluated on its own terms.

---

[5] *Dep't of State v. AIDS Vaccine Advocacy Coal.*, 145 S. Ct. 753, 753 (2025); *Cmty. Legal Servs. v. HHS*, 137 F.4th 932, 939 (9th Cir. 2025); *Green & Healthy Home Initiatives, Inc. v. EPA*, 2025 WL 1697463, at \*14-15 (D. Md. June 17, 2025); *S.F. AIDS Found. v. Trump*, 2025 WL 1621636, at \*12 (N.D. Cal. June 9, 2025); *Maryland v. CNCS*, 2025 WL 1585051, at \*27-28 (D. Md. June 5, 2025); *King County v. Turner*, 2025 WL 1582368, at \*12 (W.D. Wash. June 3, 2025); *MTA v. Duffy*, 2025 WL 1513369, at \*25-26 (S.D.N.Y. May 28, 2025); *S. Educ. Found. v. Dep't of Educ.*, 2025 WL 1453047, at \*9 (D.D.C. May 21, 2025); *Colorado v. HHS*, 2025 WL 1426226, at \*9 (D.R.I. May 16, 2025); *AAU v. Dep't of Energy*, 2025 WL 1414135, at \*7 (D. Mass. May 15, 2025); *ABA v. Dep't of Justice*, 2025 WL 1388891, at \*6 (D.D.C. May 14, 2025); *Rhode Island v. Trump*, 2025 WL 1303868, at \*6-7 (D.R.I. May 6, 2025); *S.F. Unified*, 2025 WL 1180729, at \*6-11; *Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at \*9-12 (D.D.C. Apr. 16, 2025); *Woonasquatucket River Watershed Council v. USDA*, 2025 WL 1116157, at \*12-15 (D.R.I. Apr. 15, 2025); *Chi. Women in Trades v. Trump*, 2025 WL 1114466, at \*8-10 (N.D. Ill. Apr. 14, 2025); *New York v. Trump*, 2025 WL 1098966, at \*1-3 (D.R.I. Apr. 14, 2025); *Maine v. USDA*, 2025 WL 1088946, at \*19-20 & n. 8 (D. Me. Apr. 11, 2025).

*Second,* this case arises in a meaningfully different posture from *California.* The Supreme Court's *per curiam* order in that case rested in part on the Court's uncertainty, at the TRO stage, whether the plaintiffs could establish irreparable harm warranting emergency interim relief. 145 S. Ct. at 968-969. This case stands on different footing: plaintiffs secured a final judgment after a full trial on the merits, and the undisputed record shows that plaintiffs will suffer irreparable harm if a stay enters. *See infra*, pp. 28-30.

*Third*, a stay order—even one from the Supreme Court—"is not a decision on the merits." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring). In nevertheless asking this Court to copy-and-paste *California*'s result, defendants are placing more weight on that order than it can bear. That is especially true given that *California* did not overturn, narrow, or distinguish *Bowen*—instead, it cited *Bowen* as good law. 145 S. Ct. at 968. *Bowen* thus applies with full force here. And, for the reasons already explained, that on-point decision confirms the district court's jurisdiction. *See supra*, pp. 16-17.

## B. Defendants' remaining merits arguments are forfeited and unavailing.

Defendants also argue (Mot. 16-20) that the disputed policies were

committed to agency discretion and satisfied the APA. Because defendants failed to include these arguments in the stay motion below, they are forfeited. *New Jersey*, 131 F.4th at 43; *see* Fed. R. App. P. 8(a)(1). And they are unpersuasive in any event.

### 1. The challenged actions are not "committed to agency discretion."

The APA bars judicial review for "agency action [that] is committed to agency discretion by law." 5 U.S.C. §701(a)(2). But the Supreme Court has "read the exception in §701(a)(2) quite narrowly, restricting it to those rare circumstances" in which "a court would have no meaningful standard against which to judge" the agency's actions. *Weyerhaeuser*, 586 U.S. at 23 (quotation marks omitted). This case does not present one of those "rare circumstances."

Defendants' contrary argument again mischaracterizes plaintiffs' claims. Plaintiffs are not challenging NIH's discretionary funding decisions—they are challenging the promulgation of specific directives as arbitrary and capricious. Citing *Lincoln v. Vigil*, 508 U.S. 182 (1993), defendants argue (Mot. 17) that *all* "decisions to discontinue a program funded by a lump sum appropriation" are committed to agency discretion. But nothing in *Lincoln* absolves agencies of their obligations under

§706(2)(A): discretion over resource allocation does not bar review of whether an agency gave a reasoned explanation and complied with statutory requirements. *AMA v. Reno*, 57 F.3d 1129, 1134-1135 (D.C. Cir. 1995); *see Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 18 n. 5 (1st Cir. 2020) (agency discretion over "individual hiring decisions" does not preclude review of "an agency-wide policy"). That is the sort of review the district court undertook here.

### 2. Defendants' actions were arbitrary and capricious.

"An agency action qualifies as 'arbitrary' or 'capricious' if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation marks omitted). In applying that standard, courts ask whether the agency "has offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (brackets omitted). The district court properly found that the Challenged Directives failed that test. There is absolutely nothing backing up the directives' conclusory assertions: the certified record consists almost exclusively of the directives themselves and boilerplate letters that parrot the directives. The district court did not mince words in describing what that threadbare record revealed: defendants' "edicts are

nothing more than conclusory, unsupported by factual development" and "bereft of reasoning virtually in their entirety." App. 337. Defendants are unlikely to overcome those findings on appeal.

Defendants distort both the record and plaintiffs' claims in arguing (Mot. 19) that they complied with §706(2)(A) because "the challenged grant terminations came after an individualized review." The record makes clear that defendants identified—as a matter of overarching agency policy, irrespective of any individual grant—certain topics that the agency decided to deem off-limits. App. 429-491. Plaintiffs' arbitrary-and-capricious claim challenges that centralized policy decision. App. 243-245.

Regardless, there was no process of "individualized review." The administrative record does not reflect any such process—and defendants' motion lacks a citation for their bald assertion that one took place. Defendants' equally citationless contention (Mot. 20) that they provided "an individual explanation" for each termination is even more brazen. As discussed above, defendants terminated plaintiffs' grants through hundreds of boilerplate letters that copied the same stock script. *See supra*, p. 8. Plaintiffs' challenge centers on that stock reasoning, which the

25

district court rightly found arbitrary and capricious.[6]

Defendants also faintly argue that they did not ignore plaintiffs' reliance interests, as the district court found, because "the grant terminations provided for additional funds, where necessary, to support patient safety and animal welfare." Mot. 20; *see* App. 510. That sidesteps the problem. As the district court recognized, plaintiffs' public institutions organize their affairs around grant awards—hiring staff, extending offers of admission to students, purchasing equipment, recruiting study participants, entering contracts with vendors, and more. App. 510-511. Shuttering these projects midstream destroys experiments, harms patients, and deprives students and researchers of opportunities. Defendants failed to consider these issues. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (requiring agencies to consider, when "chang[ing] course," that "longstanding policies may have engendered serious reliance interests").

---

[6] The district court did not "err[]" in including a single citation to the *California* dissent in its lengthy §706(2)(A) analysis. Defs.' Mot. 1; *see id.* at 19. The court merely quoted Justice Jackson's indisputable observation that the implementation of the policy in that case, like implementation of the Challenged Directives here, was "robotic" and "abrupt[]" (App. 502)—an observation with which the *California* majority did not disagree.

For all these reasons, defendants are unlikely to succeed on appeal.

## II.    The judgment does not irreparably harm defendants.

Even if defendants could establish a likelihood of success, "a show-ing of irreparable harm is a necessary prerequisite for a stay." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024); *see Nken*, 556 U.S. at 434. Defendants cannot make that showing.

Defendants' arguments on this point are, like the Challenged Di-rectives themselves, utterly conclusory. Defendants argue (Mot. 20-21) that the judgment will harm "the public fisc" through "the immediate outflow of significant amounts of money with limited prospects for recov-ery." As an initial matter, NIH grantees may not simply draw down large sums of money with abandon; they must, as always, comply with detailed rules and regulations governing how and when they may seek reimburse-ment. *E.g.*, A.R. 3987-4025. Regardless, as plaintiffs have previously ex-plained (D. Ct. Doc. 78, at 40), defendants have mechanisms to recover any funds improperly paid to grantees. *See* A.R. 4080 (describing circum-stances in which "NIH may identify and administratively recover funds"); 2 C.F.R. §200.345 (discussing post-closeout adjustments and refunds); *id.* §200.346 (explaining that excess payments to grantees "constitute a debt

to the Federal Government"); *id.* §200.410 (providing for collection of "un-allowable" costs). Defendants have *never* grappled with these mecha-nisms and *never* explained why they are insufficient here.

That failure is fatal. It is not enough for defendants merely to as-sert that they would suffer some harm absent a stay: they must actually *establish* that harm and show that it is *irreversible*. They have not done so.[7]

## III. Granting a stay will harm plaintiffs and the public.

The Court should also deny defendants' motion because a stay would jeopardize "health research already bought and paid for by the Congress of the United States." App. 363. As the district court explained, "[e]ven a day's delay" will cause irreparable harm to plaintiffs and the public. *Id.*

---

[7] Defendants contend (Mot. 20) that reinstatement of the illegally termi-nated grants will irreparably impede "the President's ability to execute core Executive Branch policies," but they fail to develop any argument on that point. As the district court made clear, "a new administration is certainly entitled to make changes," but it must "work within the confines of the law." App. 501. Defendants also complain (Mot. 21) that "the dis-trict court declined to order a bond," but they appear to be confused: the order below is a final judgment, not a preliminary injunction. The only party who could be required to post a bond is an *appellant* seeking a stay. Fed. R. Civ. P. 62(b).

The factual record is undisputed: plaintiffs will suffer significant and irreparable harm if a stay allows defendants to continue enforcing their unlawful directives. These harms include irreversible programmatic harms, such as the loss of data in longitudinal studies, euthanasia of animal test subjects, and spoiled specimens. *E.g.*, Supp. App. 397-398, 454, 517, 529. A stay would also cause irremediable harm to a highly specialized talent pool of researchers and students, including those affected by layoffs, reduced graduate enrollment, rescinded offers of admission, and withdrawn funding offers. *E.g.*, Supp. App. 114-115, 534-536, 548. Such "disruptions to research projects by state universities" and "impediments to planning, hiring, and operations" weigh against defendants' request for a stay. *New York v. Trump*, 133 F.4th 51, 73 (1st Cir. 2025).

A stay would also harm the public interest. Plaintiffs and their public institutions use the grants at issue to promote the health of underserved populations, including children, the elderly, racial and ethnic minorities, and members of the LGBTQ+ community. *See, e.g.*, Supp. App. 101, 398, 554. Staying the district court's partial judgment would damage individuals' health, impeding projects addressing cancer,

suicide, alcohol misuse, sexually transmitted diseases, COVID-19, and other serious health concerns.  *See, e.g.*, Supp. App. 7-8, 101, 235-236, 238, 246-247, 479-480.

These harms are not, as defendants contend (Mot. 21), redressable by a money judgment months or years from now.  By then, clinical trials will have long since been cancelled, setting back life-saving research by years if not decades; programs will have shuttered; highly-trained professionals will have lost their jobs; and vulnerable patients' health will have been put in grave peril.  For all these reasons, the balance of equities weighs against a stay.  *Does 1-3 v. Mills*, 39 F.4th 20, 25 (1st Cir. 2022) (emphasizing that a stay may be improper *even if* the movant faces irreparable harm).

## CONCLUSION

The Court should deny defendants' motion.

July 8, 2025

Respectfully submitted.

**ANDREA JOY CAMPBELL**
  *Attorney General of Massachusetts*

 /s/ *Gerard J. Cedrone*
David C. Kravitz
  *State Solicitor*
Gerard J. Cedrone
  *Deputy State Solicitor*
Katherine B. Dirks
  *Chief State Trial Counsel*
Rachel M. Brown
Vanessa A. Arslanian
Phoebe M. Lockhart
  *Assistant Attorneys General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for Massachusetts*

(Listing of counsel continued on next page)

**ROB BONTA**
  *Attorney General of California*

/s/ *Emilio Varanini*
Emilio Varanini
  *Supervising Deputy Atty. Gen.*
Daniel D. Ambar
Sophia TonNu
  *Deputy Attorney General*
455 Golden Gate Avenue
San Francisco, CA 94102
(415) 510-3541
emilio.varanini@doj.ca.gov

*Counsel for California*

**ANTHONY G. BROWN**
  *Attorney General of Maryland*

/s/ *Adam D. Kirschner*
Julia Doyle
  *Solicitor General*
Adam D. Kirschner
Michael Drezner**
James C. Luh**
  *Senior Asst. Attorneys General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Counsel for Maryland*

**NICHOLAS W. BROWN**
  *Attorney General of Washington*

/s/ *Andrew Hughes*
Andrew Hughes
  *Assistant Attorney General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
andrew.hughes@atg.wa.gov

*Counsel for Washington*

**KRISTIN K. MAYES**
  *Attorney General of Arizona*

/s/ *Joshua G. Nomkin*
Joshua G. Nomkin
  *Assistant Attorney General*
2005 N. Central Avenue
Phoenix, AZ 85004
(602) 542-3333
joshua.nomkin@azag.gov

*Counsel for Arizona*

(Listing of counsel continued on next page)

**PHILIP J. WEISER**
 *Attorney General of Colorado*

 /s/ *Shannon Stevenson*
Shannon Stevenson
 *Solicitor General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
shannon.stevenson@coag.gov

*Counsel for Colorado*

**KATHLEEN JENNINGS**
 *Attorney General of Delaware*

 /s/ *Vanessa L. Kassab*
Ian R. Liston*
 *Director of Impact Litigation*
Vanessa L. Kassab*
 *Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for Delaware*

**ANNE E. LOPEZ**
 *Attorney General of Hawaiʻi*

 /s/ *Kalikoʻonālani D. Fernandes*
David D. Day*
 *Special Asst. to the Atty. Gen.*
Kalikoʻonālani D. Fernandes*
 *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for Hawaiʻi*

**KEITH ELLISON**
 *Attorney General of Minnesota*

 /s/ *Elizabeth Kramer*
Elizabeth Kramer
 *Solicitor General*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1010
liz.kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

(Listing of counsel continued on next page)

**AARON D. FORD**
 *Attorney General of Nevada*

 /s/ *Heidi Parry Stern*
Heidi Parry Stern*
 *Solicitor General*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Counsel for Nevada*


**RAÚL TORREZ**
 *Attorney General of New Mexico*

 /s/ *Astrid Carrete*
Astrid Carrete**
 *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 270-4332
acarrete@nmdoj.gov

*Counsel for New Mexico*


**MATTHEW J. PLATKIN**
 *Attorney General of New Jersey*

 /s/ *Angela Cai*
Angela Cai
 *Executive Asst. Attorney General*
25 Market St, PO Box 080
Trenton, NJ 08611
(609) 414-5954
angela.cai@njoag.gov

*Counsel for New Jersey*


**LETITIA JAMES**
 *Attorney General of New York*

 /s/ *Judith N. Vale*
Judith N. Vale
 *Deputy Solicitor General*
28 Liberty Street
New York, NY 10005
(212) 416-6274
judith.vale@ag.ny.gov

*Counsel for New York*

(Listing of counsel continued on next page)

**DAN RAYFIELD**
 *Attorney General of Oregon*

 /s/ *Robert Koch*
Robert Koch
 *Senior Asst. Attorney General*
1162 Court Street, NE
Salem, OR 97301
(503) 378-4402
robert.a.koch@doj.oregon.gov

*Counsel for Oregon*


**JOSHUA L. KAUL**
 *Attorney General of Wisconsin*

 /s/ *Lynn K. Lodahl*
Lynn K. Lodahl**
 *Assistant Attorney General*
17 West Main Street
P.O. Box 7857
Madison, WI 53707
(608) 264-6219
lynn.lodahl@wisdoj.gov

*Counsel for Wisconsin*

**PETER F. NERONHA**
 *Attorney General of Rhode Island*

 /s/ *Jordan Broadbent*
Jordan Broadbent
 *Special Asst. Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2060
jbroadbent@riag.ri.gov

*Counsel for Rhode Island*


* Entry of appearance forthcoming
** Application for admission pending or forthcoming

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limits of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Rule 32(f), it contains 5,848 words.

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) because it has been prepared using Microsoft Word in Century Schoolbook, a proportionally spaced typeface.

July 8, 2025                                    /s/ *Gerard J. Cedrone*