# EXHIBIT 12

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, et al.

              Plaintiffs,

     v.

ROBERT F. KENNEDY, JR., et al.,

      Defendants.

Civil Action No. _____

## <u>DECLARATION OF DENISE BARTON</u>

      I, Denise Barton, declare as follows:

1.  I am a resident of the Commonwealth of Massachusetts. I am over the age of 18. I have been an attorney since 1994 and am licensed to practice in the Commonwealth of Massachusetts. If called as a witness, I could and would testify competently to the matters set forth below.

2.  I am currently employed by the University of Massachusetts, in its Office of the General Counsel, as its Chief Deputy General Counsel.

3.  As Chief Deputy General Counsel for the University of Massachusetts, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by University of Massachusetts employees and believe that information to be true.

4.  The University of Massachusetts includes its five campuses (the University of Massachusetts Amherst, the University of Massachusetts Boston, the University of Massachusetts Chan Medical School, the University of Massachusetts Dartmouth, and the University of Massachusetts Lowell), as well as the University of Massachusetts Office of the President.

1

**Supp. App. 2**

*See* M.G.L. c. 75. The University of Massachusetts maintains business records in the ordinary course of University of Massachusetts business which include, *inter alia*, records concerning grant proposals submitted to and funding received from the National Institutes of Health ("NIH") by the University of Massachusetts.

5. I am also providing this declaration to explain the irreparable harmful impacts of NIH's abrupt and ill-supported cancellation of certain grants to the University of Massachusetts.

6. I am also providing this declaration to explain the impacts of NIH's delay in evaluating applications for future grants, delay in funding projects that have passed peer review, and denial of grant applications without consideration of scientific merit.

7. The NIH funding blockade and outright grant cancellations severely impact the University of Massachusetts in its entirety: all five campuses have and will suffer short-term and long-term detriment. I have provided the following information to explain some of the impact on two of the University of Massachusetts' campuses and the people whose research they serve: the University of Massachusetts Amherst ("UMass Amherst") and the University of Massachusetts Chan Medical School ("UMass Chan Medical School"), reserving rights to supplement this declaration with further information concerning the impact on those campuses as well as the impacts on the remainder of the University of Massachusetts.

8. In federal fiscal year 2024, University of Massachusetts campuses received NIH funding to support over 501 projects, totaling $248 million dollars.

9. UMass Chan Medical School is the Commonwealth of Massachusetts' only public medical school. As such, UMass Chan Medical School serves a unique role in the education of physicians, nurses, and scientists as well as in the performance of research that serves the public good. In keeping with the University of Massachusetts' public mission, UMass Chan

**Supp. App. 3**

Medical School focuses its research efforts on addressing unmet medical needs in ways that benefit all people in the Commonwealth and beyond.  To carry out its public medical research mission, UMass Chan Medical School relies on NIH funding.

10. In fiscal year 2024, UMass Chan Medical School received 365 awards for approximately $197,039,162 in funding from NIH.

11. UMass Amherst is the flagship institution of the Commonwealth of Massachusetts and is a nationally ranked public land-grant research university that seeks to expand educational access, fuel innovation and creativity, and share and use its knowledge for the common good. UMass Amherst offers a full range of undergraduate, graduate and professional degrees, enrolling approximately 22,800 undergraduate students and nearly 7,500 master's and Ph.D. students across more than 200 degree programs and 60 departments.  Students are supported by nearly 1,800 faculty and 4,500 staff who play critical roles supporting teaching, research, discovery, and learning.  In the 2022 fiscal year, UMass Amherst generated $2.9 billion for the Massachusetts economy and supported more than 13,200 external jobs.

12. The work done by UMass Amherst on NIH funded projects provides education and training in Biomedical Engineering, Chemical Engineering, Civil Engineering, Electrical Engineering, Mechanical Engineering, Agriculture, Biology, Public Health and Health Sciences, Mathematics, Chemistry, Psychology, and other programs. UMass Amherst, along with other UMass campuses, is the largest provider of Science, Technology, Engineering and Mathematics ("STEM") workforce to the Massachusetts economy.

13. In fiscal year 2024, UMass Amherst received 130 awards for approximately $42 million dollars in funding from NIH.

**Supp. App. 4**

**UNLAWFUL TERMINATIONS**

14. As of March 27, 2025, the University of Massachusetts has had four active NIH grants unilaterally terminated:

    a. "Effect of Medicaid accountable care organizations on behavioral health care quality and outcomes for children," award number 3R01MH134176-02S1, with an award of $99,974, was terminated on March 21, 2025. Ex. B.

    b. "Optimizing an mHealth intervention to improve uptake and adherence of the HIV pre-exposure prophylaxis (PrEP) in vulnerable adolescents and emerging adults," award number 5R33HD107988-04, with an award of $278,952, was terminated on March 21, 2025. Ex. D.

    c. "Adapting mHealth interventions to improve self-management of HIV and substance use among emerging adults in Zambia," award number 5R34MH124081-02, with an award of $671,459, was terminated on March 21, 2025. Ex. F.

    d. "Applying deep learning for predicting retention in PrEP care and effective PrEP use among key populations at risk for HIV in Thailand," award number 5R03MH130275-02, with an award of $76,214, was terminated on March 21, 2025. Ex. H.

15. The research project leaders ("Principal Investigators," or "PIs") were notified of these terminations via a termination letter sent by NIH's Office of Extramural Research. Each letter stated that the termination was "pursuant to the 2024 National Institutes of Health

4

**Supp. App. 5**

('NIH') Grants Policy Statement, and 2 C.F.R. § 200.340(a)(2)," for failure to "effectuate[]
agency priorities."  Exs. B, D, F, H.

16. The four termination letters received by the University of Massachusetts purported to justify
the terminations with the following ostensibly boilerplate language:

    a.  NIH Grant Number 5R34MH124081-03: "It is the policy of NIH not to
prioritize research activities based on diversity, equity, and inclusion
("DEI") no longer effectuates agency priorities.  Therefore, this project is
terminated."

    b.  NIH Grant Number 3R01MH134176-02S1: "This award no longer
effectuates agency priorities.  Research programs based on gender identity
are often unscientific, have little identifiable return on investment, and do
nothing to enhance the health of many Americans.  Many such studies
ignore, rather than seriously examine, biological realities.  It is the policy
of NIH not to prioritize these research programs."

    c.  NIH Grant Number 5R33HD107988-04: "This award no longer
effectuates agency priorities.  Research programs based on gender identity
are often unscientific, have little identifiable return on investment, and do
nothing to enhance the health of many Americans.  Many such studies
ignore, rather than seriously examine, biological realities.  It is the policy
of NIH not to prioritize these research programs."

    d.  NIH Grant Number 5R03MH130275-02: "This award no longer
effectuates agency priorities.  Research programs based primarily on
artificial and non-scientific categories, including amorphous

**Supp. App. 6**

equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs."

17. Each termination letter also includes the following language, immediately subsequent to the language quoted in ¶ 16, *supra*: "Although 'NIH generally will suspend (rather than immediately terminate) a grant and allow the decision,' no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities."

18. Additionally, 2 awards in which the University of Massachusetts was a subawardee have been terminated.

   a. "Faithful response II: COVID-19 rapid test-to-treat with African American churches," award number U01MD018310, with an award of approximately $126,000, was terminated on March 21, 2025. This was a pass-through award via the University of Missouri at Kansas City to UMass Amherst.

   b. "Training the long-term services and supports dementia care workforce in provision of care to sexual and gender minority residents," award number 3R01AG075734-02S1, with an award of approximately $65,000, was

6

terminated on March 21, 2025. This was a pass-through award via the University of Minnesota to the University of Massachusetts Boston.

19. No PI for any of these projects was subjected to any inquiries from the NIH program officer or other officials.  No warning was provided that projects were at-risk to lose funding.

20. Terminations are actively being conducted by NIH, with new programs and projects being cut weekly if not daily.  For example, on April 2, 2025, a UMass Amherst PI was informed the Maximizing Opportunity for Scientific and Academic Independent Careers (MOSAIC) program—aimed at funding career development and research projects for scientists from underrepresented backgrounds—has been terminated, effectively ending future funding for grants administered under its auspices.

21. These terminations have set in motion far-ranging and potentially irreversible harms.  One of the terminated grants supplemented a project examining the impacts of Accountable Care Organizations in the state Medicaid program on quality of care and healthcare utilization for children with mental health disorders; in particular, this grant provided resources to include LGBTQIA+-identifying youth into the study to ensure their experiences were documented and informed the project's results.  As a result of the termination of this grant, those voices will not contribute to the study.

22. Additionally, this grant was led by a junior faculty member whose tenure track status relies in large part on this project.  This abrupt cancelation places this young scientist's future at UMass Amherst and his career in jeopardy.  Additionally, the grant contributed to the salaries for two full-time staff members; both are talented researchers now contemplating leaving UMass Amherst to find more secure employment.  One has a long-standing working relationship with the PI, and their departure would negatively impact the PI's other,

7

uncanceled research projects. Both employees have institutional knowledge and training that cannot be easily, cheaply, or quickly replaced, and multiple projects may have their research goals compromised as a result.

### DELAYS IN THE APPLICATION REVIEW PROCESS

23. A PI pursuing a grant for their research will submit an application to a member institute of NIH, known as "ICs," with a project proposal that includes, *inter alia*, a description of the project, the budget of the project, the funds sought, and the project start date.

24. The IC will review the application through 2 rounds of organized review: peer-review for scientific merit ("study section review") and advisory council review.

   a. In study section review, a group of non-federal scientists with a focus relevant to the proposed project will review the scientific merits of the project, then assign a project score (ranging from 10-90, with 10 being best); this score is then converted into a percentile, indicating how the scientific merit of that project is ranked against its peer applicants to the same IC for the same cycle. Typically, ICs will publicly release an annual "payline" number (ranging from 8%-20%), which indicates the cutoff point.[1] Projects scored such that their percentile ranking is superior to the payline number are considered to have "fundable scores," a term used by institutions of higher education ("IHE") and NIH.

---

[1] Some ICs do not publish a payline. Additionally, some study sections (often those focusing on projects with special emphases) only issue a score, not a percentile. Regardless, the University of Massachusetts has sufficient historical data from its own experiences and that of peer IHEs to predict what scores constitute "fundable" for each IC.

**Supp. App. 9**

b.  In advisory council review, the council confers with the program officer
(the employee at NIH tasked with interfacing with PIs and overseeing
NIH's relationship with awarded projects) to determine whether to
recommend a project to the IC administrator for funding.  It is exceedingly
rare for a project with a fundable score not to be recommended, and
almost unheard of for a project so recommended not to be funded.  Grants
that fall significantly below the pay line are typically not discussed by
advisory councils.

c.  Between the study section and the advisory council meeting, investigators
that have scores (typically) better than 40 are sent a request for "Just in
Time" information ("JIT").  As part of the JIT request, investigators are
asked to provide the most updated information about their other sources of
support for their research, confirm that they have approval by the
appropriate ethics boards (for work involving animals or human subjects),
and certify human subjects training for key personnel, if needed.

25. Once a project is given a fundable score, typically the IHE will undertake preparations
necessary to ensure timely commencement of a new project and efficient use of NIH funds.
These may include, *e.g.*, acquiring cell cultures, breeding animals (many of which must be
aged to certain requirements), and hiring staff.  Although these decisions often occur prior to
receipt of a Notice of Award, these preparations are necessary for scientific integrity and to
maximize efficient use of NIH funds.  For extant projects seeking competitive renewal of
funding, prior to the initiation of the new award period, the PI must make determinations
regarding extending contracts for researchers, maintaining cell cultures, and continued

9

expenses related to test subjects.  If the score is fundable, the project is expected to continue and to be supported by a renewal of the funding so that the work is not interrupted.

26. NIH has historically implemented a three-cycle schedule for accepting and evaluating grant applications.[2]  For example, in Cycle II, applications have deadlines ranging from May 25 – September 7; study section review is in October and November; advisory council review is in January; and projects may schedule start dates for April 1.  In Cycle III, applications have deadlines ranging from September 25 – January 7; study section review is in February and March; advisory council review is in May; and projects may schedule start dates for July 1.

**UNEXPLAINED AND UNREASONABLE DELAY OF REVIEW OF PENDING GRANT APPLICATIONS.**

27. As of April 3, 2025, UMass Chan Medical School has approximately 252 projects awaiting review that, per NIH's published schedule, is overdue.[3]

   a. 205 proposals totaling $538,785,366 ($112,828,561 in their first year) are awaiting NIH study section review.

   b. 29 proposals totaling $34,000,074 ($7,727,829 in the first year) that received fundable scores, awaiting NIH advisory councils that have been rescheduled and delayed and are, therefore, still awaiting Notice of Award.

---

[2] NIH lists its schedule of review for each of three annual cycles of grants. *Review and Award Cycles*, *available at* https://grants.nih.gov/grants-process/submit/submission-policies/standard-due-dates.

[3] The data pertaining to the status of each of UMass Chan Medical School's and UMass Amherst's pending grant applications, *see* ¶ 28, *infra*, are drawn from eRA Commons (the NIH reporting system), and reflect the University of Massachusetts' best estimates as of April 3, 2025.

    c. 18 proposals totaling $66,119,813 ($14,012,114 in the first year) that received fundable scores, were reviewed by NIH advisory council, and are awaiting a Notice of Award. These projects all had council review completed as of February 28, 2025, and anticipated start dates of April 1, 2025, or sooner.

28. As of April 3, 2025, UMass Amherst has approximately 92 projects awaiting review that, per NIH's published schedule, is overdue.

    a. 67 proposals totaling $137,198,101 ($30,343,184 in the first year) awaiting NIH study section review.

    b. 11 proposals totaling $33,114,431 ($6,873,456 in the first year) that received fundable scores, awaiting NIH advisory council and Notice of Award. These include 3 new proposals and one competitive renewal with start dates of April 1, 2025.

    c. 14 proposals totaling $39,115,113 ($8,636,336 in the first year) that received possibly fundable scores, awaiting NIH advisory council and possible Notice of Award.

29. Prior to January 20, 2025, the typical timeline for an NIH grant from submission through review, approval and project start date was about eleven months. The typical timeline of the evaluation process for grant applications at NIH looked like this:

    a. Submission at month 0.

    b. Assignment to a study section at months 1-3.

    c. Review at study section at months 4-5.

    d. Recommendation made at Council at months 7-8.

11

**Supp. App. 12**

e. Notice of award at months 9-11.

f. Award set-up at months 10-12.

30. Since January 20, 2025, the cadence of study section and/or council meetings has been significantly altered by the NIH. The NIH publishes a "NOTICE of Closed Meetings" in the Federal Register to schedule Study Sections or Council Meetings. NIH listed 63 study sections as scheduled between January 21, 2025, and March 8, 2025, through the Center for Scientific Review at NIH, 167 fewer than the same period in 2024. (This does not include reviews done by various institutes at NIH.) Indeed, UMass Amherst is aware of 6 study sections previously scheduled for this period and these do not appear on the NIH list.

31. NIH lists 387 study sections between March 9, 2025, and June 20, 2025, through the Center for Scientific Review at NIH, 69 more than the same period in 2024, suggesting that some, and possibly all, of the canceled study sections have been rescheduled. Each IC typically holds a meeting of its advisory council three times per year, at which time all applications that passed through study section review are considered. These meetings are typically held 1-2 months before the earliest permissible start date for projects in that cycle.

32. Cycle II advisory council meetings are typically scheduled for January. In 2025, 14 of the 15 Cycle II advisory council meetings—every meeting scheduled for after January 20, 2025—was canceled, only recently rescheduled for April and May. As of April 1, 2025, 16 Cycle II applications with fundable scores still have not received a date for an advisory council meeting (5 from UMass Chan Medical School, 11 from UMass Amherst). Of these, 4 had start dates of April 1, 2025.

33. Cycle III advisory council meetings are typically scheduled for May; to date, not a single Cycle III advisory council meeting has been noticed in the Federal Register. Due to the

backlog of Cycle III study sections, it is unclear whether those applications will have even completed their first round of review prior to May, and, as May will feature multiple advisory council meetings to review the backlog of Cycle II applications, it is unclear when those meetings will be able to occur.  Many Cycle III projects have start dates of July 1.

34. Due to the unpredictable and unplotted review schedule encumbering Cycle II and III applications, it is impossible to predict or plan around delays facing the Cycle I applications presently being submitted to NIH.

35. Since January 20, 2025, due to the continued cancellation, rescheduling, and re-cancellation of NIH study section and advisory council meetings, it is anticipated that the timeline for full review of grant applications could extend to 15-16 months at best.

36. Should advisory council meetings occur at the earliest possible opportunities and study section reviews face no further delays, the best-case scenario for evaluation schedule in 2025 would be:

   a.  Submission at month 0.

   b.  Assignment to a study section at months 1–3.

   c.  Review at study section at months 4—5 (assuming that study section is being held at the normal scheduled cadence).

   d.  Recommendation made at Council at months 11–13 (4–5-month delay) (approximately 1 month after the earliest permissible project start date).

   e.  Notice of award at months 13–15 (4–5-month delay, which is at least 3 months *after* the expiration of the current award in the case of competitive renewal application).

**Supp. App. 14**

    f.   Award set-up at months 14–16 (4–5-month delay) (approximately 4 months after the earliest permissible project start date).

37. Given the magnitude of the University of Massachusetts' grant activity in each cycle, four plus months of delay of expected funding has already created disruption in the operations of laboratories funded by those grants.  For example, at UMass Chan Medical School, the disruption of the anticipated flow of funds precipitated by the abrupt and unannounced change of usual practice has led to the planned furlough of hundreds of personnel and the cancellation of nearly all acceptances of new graduate students for the fall 2025 admissions cycle.

38. There are some differences, described below, between a new grant application and "competitive grant renewal" in that there is a practical difference for PI and lab personnel if the renewal is not awarded.

    a.   New applications are generally activities that have not yet been initiated and are extensions/new directions based on preliminary findings, data, and hypotheses that the lab has generated and plans to pursue with the new award funds.  Once an NOA is received, the work will commence. In a typical timeline, after receiving a fundable score, a PI will start to plan for initiation of the projects in the approximately 4 months between Study Section, Council approval and issuance of the NOA.

    b.   Competitive renewals are the next multi-year phase of work that has been previously funded. The activities planned are generally extensions of currently ongoing projects. Labs will usually have highly trained staff, students, postdocs, equipment, live cells, and animal models in place and

14

working that, without continued funding, will be terminated and/or shut down.

    c.   For example, one investigator who has a fundable score on a competing renewal application reached the end of their current NIH funding on March 31, 2025.  The relevant Council meeting, which was initially canceled indefinitely, has been rescheduled for May 22, 2025.  If the grant is recommended and subsequently approved in May, this will result in a funding gap of at least two to three months.  During this time, the PI, the academic department, and the college and central administration will divert funds from other budgets to continue salary payments to existing personnel and a limited amount of funding for critical supplies.  The research will certainly be disrupted by the funding interruption.

39. UMass Amherst currently has submitted 67 grant applications, totaling $137,198,101, as part of the upcoming Cycle I, all awaiting study section review.  UMass Chan Medical School currently has submitted 171 grant applications, totaling $503,520,399 as part of that same cycle, all awaiting study section review.  Because of the delays in study sections, the recent reductions in force at NIH, and the backlog of review sessions, it is highly likely that Cycle I applications will be materially delayed in being evaluated, to the detriment of the University of Massachusetts.

40. While the study section review for most projects is conducted through the NIH's centralized body, the Center for Scientific Review ("CSR"), many of the more complex and specialized projects were typically reviewed through study sections within the relevant IC, as well as applications solicited via that IC's requests for applications ("RFA").  NIH has recently

15

announced a "centralization" of study section review, meaning for non-CSR projects a potential limit to each IC's ability to direct/solicit specific research content areas, centralizing control of what gets funded. This runs counter to the Duties and Authority of the NIH Director, 42 U.S.C. § 282(b)(9) ("[NIH Director] shall ensure that research conducted or supported by the National Institutes of Health is subject to review in accordance with section 289a of this title and that, after such review, the research is reviewed in accordance with section 289a–1(a)(2) of this title by the appropriate advisory council under section 284a of this title before the research proposals are approved for funding," as well as the purpose of the councils, 42 U.S.C. § 284a.

41. There are numerous examples throughout the University of Massachusetts of the grants that have fallen behind, and the impacts of that delay, because of the NIH's arbitrary rolling blockade on the grant approval process. What follows are several examples of the UMass Chan Medical School grants that NIH is blocking by its abrupt cancellation and delay of advisory council meetings. These exemplar grants all concern significant unmet medical needs, including pediatric cancer, Alzheimer's Disease, and the biological basis of substance use disorder. NIH's administrative blockade is harmful to the advancement of research in these areas, to the training and development of the future generation of researchers, and to the people this research would help.

42. One example of research projects kneecapped by the funding delay are a series of projects administered by a UMass Chan Medical School PI, who, is conducting three research projects with NIH funding that will terminate over the next twelve months, focused on pediatric neuro-oncology and traumatic brain injury. The PI also has two applications for other projects under consideration that have been affected by NIH's evaluation delay—

Project A has received a fundable score that is well within the applicable payline, and Project B has received a favorable score that is potentially fundable, falling just within the funding range.

    a.  Project A had advisory council review scheduled for late January; that meeting was canceled, then in early March NIH updated the status of that grant to "Council review completed," the program officer confirmed that both levels of review had been conducted, and then, confusingly, an advisory council review was scheduled for April 22, 2025.

    b.  Project B had advisory council review scheduled for early February; that meeting was canceled. The program officer has not responded to multiple inquiries via email. The advisory council meeting has been rescheduled for May 22, 2025.

43. Because of the delays to decisions on these two fundable projects, the active research being engaged in this PI's lab has suffered. One researcher has been furloughed to 50%, with the expectation that he will be terminated in June. Several lines of investigation have been closed, including drug screening and therapeutic development work for the pediatric neuro-oncology projects. The PI has been forced to decline to hire a student that would have otherwise supported one of those projects because of the lack of funding. And nearly all new experimental work has been terminated, so as to preserve as much funding as possible to support salary of the members of the research team.

44. Due to the loss of personnel necessitated by delays to pending applications, active research is harmed: investigations into treatment for a form of pediatric brain tumor, and development of

**Supp. App. 18**

a commercially viable mechanism for delivery of gene therapy for pediatric neuro-oncology, new treatments for traumatic brain injury have been terminated.

45. Another example of a UMass Chan Medical School grant that has been hobbled by the NIH rolling blockade is a grant concerning one of the major obstacles to developing effective treatments for degenerative diseases of the brain: a paucity of genetic targets against which to direct therapeutic efforts.  Recent human studies have revealed a robust and reproducible link between polymorphisms (gene variants) in the MS4A family of genes and Alzheimer's Disease ("AD") or related neurodegenerative disorders.  In this grant, the PI, a UMass Chan Medical School Associate Professor, Program in Molecular Medicine will characterize the role of MS4A genes in degenerative brain diseases and anticipates that insights gained will inform the development of new treatments for these devastating disorders.

46. The NIH Grant number is R01AG089801, and it is entitled "Elucidation of the mechanisms by which Ms4a genes regulate neurodegeneration in Alzheimer's Disease and related disorders."

47. The application submission date was July 9, 2024.  The anticipated start date was April 1, 2025.  JIT information was submitted on March 21, 2025, and advisory council review was set for January 28, 2025.  That review session was canceled, then rescheduled for April 22, 2025.  In a typical year, the expected award notice date was March-April 2025.  This grant has a score of 28 (placing it in the 13th percentile). With NIH's National Institute of Aging's payline at 17th percentile, UMass Chan Medical School anticipated that this grant would pass Council review and be awarded.

48. In preparation for the start date of this grant, UMass Chan Medical School hired two postdoctoral fellows in anticipation of the funding using a combination of institutional funds

and existing foundation grants to be prepared for the start of the grant, which is the ordinary manner in which scientific research of this nature proceeds. In addition, the experiments associated with this grant involve a significant number of different genetically modified mouse cell lines and neurodegenerative mouse models that need to be bred and aged out so that neurodegenerative phenotypes appear. UMass Chan Medical School began this process in anticipation of this grant being awarded, paying for the animal costs associated with this research using other funding sources to be ready to go as soon as grant funding is received.

49. UMass Chan Medical School must take immediate action to ensure a timely start date. If NIH does not make a decision soon, the PI will have to terminate the mouse experiments that he had begun as well as lay off the people that were hired in anticipation of this work being funded. The PI has used existing funds to the extent possible to get this project started. However, if this grant is not funded, as those additional resources are finite and limited, the PI fears that it will not be possible to continue this line of investigation without some outside intervention, such as another funding source.

50. This work is critical. Alzheimer's disease ("AD") is a debilitating neurodegenerative disorder that affects more than 6 million Americans, and its incidence is only increasing as our population ages. Current therapeutic interventions for this disease are highly limited in both number and efficacy indicating that new approaches are needed. UMass Chan Medical School's work has led to the identification of a series of compounds that will form the basis of new therapies for diseases that devastate millions of Americans, their families, and cost the country untold billions of dollars annually. This work will provide significant insight into the role that Ms4a genes play across neurodegenerative diseases like AD and take a significant step closer to developing therapies targeting these genes. UMass Chan Medical

School's research represents exactly the kind of success story that funding of biomedical sciences strives for. The uncertainty caused by the NIH blockade has created significant stress and anxiety in those working on this important research, may lead to personnel terminations, and may require slowing down or cessation of work that has the potential to have a significant impact on human health for this country.

51. A third example of a UMass Chan Medical School grant that has been hobbled by the NIH blockade is a grant concerning adeno-associated viruses ("AAV") which have been used to successfully deliver life-saving gene therapies in children. The UMass Chan Medical School PI for this grant (number RO1GM155648), entitled "Interrogating the roles of truncated/mutated inverted terminal repeat sequences in adeno-associated virus vectors in transgene stability through episome formation and host cell genome integration" is an Assistant Professor in the Gene Therapy Center. This work seeks to further improve the safety and performance of the viral vectors and will specifically define whether mutations in inverted terminal repeat ("ITR") sequences, which are the last remnants of viral elements found in AAV-based gene therapy vectors, can influence the stability and safety of genes being delivered. Using advanced next-generation sequencing approaches and appropriate cell culture and animal models, this work will help to link a previously enigmatic feature of AAV genomes to imperfections observed in vector genomes that result from potentially avoidable manufacturing errors. The project will help to inform whether heterogeneity in ITRs are risk factors for host-cell integration and tumorigenesis.

52. The application date for this grant was July 05, 2024. Its anticipated start date was April 01, 2025. The JIT was submitted on December 05, 2024, and the Council date was scheduled for February 06, 2025. That date was canceled, then rescheduled for May 22, 2025. The

expected award notice date in a typical year was March-April, 2025. This grant has an Impact Score of 22 (placing it in the 5th percentile), which is a fundable score.

53. To ensure timely completion of the project aims, UMass Chan Medical School will need to hire a PhD-level (Postdoctoral Associate) Bioinformatician that has experience in analyzing next-generation sequencing data and a Research Technician, preferably with training in molecular biology, handling of laboratory mice, and cell culture-based assays. Both hires will need sufficient time to be trained on techniques needed to execute project goals. The project will also require the use of humanized mouse models, which will be new to the research group. Laboratory personnel will need to be trained on how to handle and care for these mice. Since these mice are costly (approximately $3,500 per animal), proper training is absolutely necessary to limit experimental error and waste.

54. Decisions concerning this grant need to be made immediately and UMass Chan Medical School needs to decide whether to cancel the project or risk its own resources. Delays in NIH funding, coupled with NIH's actions concerning indirect costs, have led to furloughs and layoffs of postdocs and research associates. At the risk of losing more essential personnel and support staff, the need for action is immediate.

55. Gene therapy has revolutionized how genetic diseases are being treated yet many unknowns still limit their wider use. This work will provide vital insights into the safety of AAV-based gene therapy vectors, specifically, whether mutations in ITR elements can drive vector integration into the host genome – a risk factor for tumorigenesis. More than 4,000 patients have received the Zolgensma gene therapy for spinal muscular atrophy since its approval by the FDA. The technologies and expertise developed by the PI at UMass Chan Medical School are unique to the field. They are the only research team in the world that can

21

immediately address whether mutations within ITR elements of AAV vectors are risk factors for cancer.  The high impact score received on this grant and favorable critiques by all three reviewers reflects the importance and urgency of this research.  Gene therapies based on AAV vectors have been a revolutionary medical advancement in treating human genetic diseases.  With a single dose, AAV-mediated gene therapies can confer long-term correction or abatement of disease for the lifetime of the patient.

## DENIAL OF APPLICATIONS WITHOUT SCIENTIFIC REVIEW

56. The University of Massachusetts has had multiple grant applications submitted in response to NIH-issued Notices of Funding Opportunities ("NOFO").  NIH subsequently withdrew several of those NOFOs, summarily denying related applications to study section review.  This has resulted in at least 10 grant applications submitted by the University of Massachusetts that were denied without assessment based on scientific merit, including:

   a. "The impact of ovarian hormones on sleep dependent emotional memory in younger and older adult women," submitted under PAR-23-271.

   b. "Understanding the role of morphology and the extracellular matrix in radial glial differentiation and polarity within cortical brain organoids," submitted under PAR-23-271.

   c. "Understanding socio-cultural and family-level biobehavioral processes that are associated with Hispanic/Latinx youth mental health disparities," submitted under PAR-21-358.

   d. "Advancing sexual orientation-based metabolic health disparities research among women through data integration," submitted under PAR-24-077.

**HARMS**

57. The impact of the NIH's capricious blockade of the grant process has already had, and will continue to have, a devastating impact.  Examples of the irreparable harm already caused and continuing to be caused includes, but is not limited to: significant damages to the career progression of students and faculty who depend on the financial support from these grants and who have had no notice and therefore no time to seek alternatives; individuals in the community who would have participated in these sponsored projects who are deprived of the benefits from the research—for instance, individuals at risk from COVID-19 exposure or individuals in need of dementia care, *see* ¶ 18, *supra*; extreme disruption to the research record of students and young faculty, impairing them from establishing careers in biomedical research; and the development of new understandings and treatments.

58. In the last decade, UMass Amherst has hired 37 new faculty members and 28 staff members in Life Sciences through strategic investment in the Institute for Applied Life Sciences, established with an investment of $95 million from the Commonwealth and more than $50 million from the University of Massachusetts for the Institute for Applied Life Sciences' facilities and equipment.  The Institute relies on a portion of the NIH funding provided to the campus for grants associated with the Institute.

59. There are 30 Life Sciences Core Facilities with professional staffing at UMass Amherst; in total, there are 90 such Core Facilities across the University of Massachusetts.  To operate its Core Facilities, UMass Amherst purchases necessary and sophisticated scientific equipment. This equipment, and the professional staff who work there, are administered by UMass Amherst's Institute for Applied Life Sciences.  Running the Core Facilities requires significant capital investments and also requires continuous funding for the operations that

support hundreds of researchers on not only the UMass Amherst campus, but across all University of Massachusetts campuses as well as small businesses in Massachusetts. Funding for the debt service on the University of Massachusetts' capital investment, staffing, and operations relies in part on NIH funding as well as funding from other federal agencies. The NIH funding slowdown will likely cause UMass Amherst to reduce the scope and support for Core Facilities.

60. Several research projects with a start date of April 1, 2025, with fundable scores for scientific merit, have not received a funding decision by NIH, discussed *supra*. Many of these projects underwent advisory council review *months ago*. For example, one such project has needed to acquire neurodegenerative mouse models, breed the animals, them age them to the point that neurogenerative phenotypes begin to appear, several researchers were hired to begin this process. *See* ¶¶ 45-50, *supra*. The unprecedented delay in rendering a funding decision for this project required the PI to begin these steps prior to receipt of the NOA or else compromise the efficiency and integrity of the entire project. Until that decision is rendered, UMass Amherst has chosen to absorb the costs of these expenses in the interim; the alternative would be to scrap the entire project, relegating to waste all preparatory steps taken and the time and resources that would have been directed toward more fruitful projects had a timely decision been made by NIH.

61. The pursuit of alternative sources of funding as a response to the harms caused by the delay in evaluating applications is not a practical solution. PIs typically learn of their fundable scores within a few months of the start date of their project; after receiving such a score, they begin to take the expensive preparations necessary to ensure a timely start. Applications for funding from alternative sources typically take 12-18 months and are not a practical method

of reducing waste and harm caused by an unprecedented short-notice failure to fund in the days leading up to that start date.

62. The NIH funding blockade has also significantly impacted the University of Massachusetts in numerous other ways, including but not limited to:

    a. The University of Massachusetts has been forced to reduce graduate admissions via rescission of accepted applications. UMass Chan Medical School has reduced acceptances to UMass Chan Medical School's PhD program in Biomedical Sciences from 80 to approximately 12, forcing it to rescind offers to the majority of accepted applicants. UMass Amherst has reduced graduate admissions to doctoral programs by 29% from last year, a loss of 285 admission spots (reducing from 997 to 712), and rescinded offers of financial support (including salary and tuition) to many of those admitted. The reductions are largest in programs that rely significantly on NIH support, including:

| | Fall 2024 | Fall 2025 | % Change |
|---|---|---|---|
| College of Engineering | 123 | 102 | -17% |
| College of Natural Sciences | 405 | 273 | -33% |
| College of Information & Computer Sciences | 147 | 83 | -44% |
| School of Public Health & Health Sciences | 62 | 29 | -53% |

    b. The termination of multiple active grants and the reduction of size of the incoming classes of graduate students also negatively affects the scientific integrity, efficiency, and cost of ongoing research projects that still have funding. First-year students rotate through three different labs before

attaching to one project.  These students provide multiple research projects

with access to qualified scientific professionals at relatively low costs.

Reduction of this pool, both immediately and necessarily in the future due

to enrollment cuts, simultaneously reduces the access of every research

project to this pool of qualified candidates while increasing the cost of

whatever research assistants take their place.

c.  UMass Amherst has announced that it will provide Emergency Funding to

cushion the immediate impact of interrupted federal funding.  This is not

to replace federal funding but to maintain salary support temporarily and

give students and other trainees a chance to finish their graduate programs

and/or find alternative sources of funding, or employment.  UMass

Amherst is diverting funds from other important needs such as deferred

maintenance and strategic investments to provide this emergency support.

d.  UMass Chan Medical School has ongoing financial obligations to support

its research facilities.  Part of these costs were covered by the indirect cost

payments from NIH grants.  The termination of several of those grants and

the delay in securing funding for future grants has forced the school to

dedicate an increased amount of its funds to maintain those facilities,

coming at the expense of suspending ongoing faculty searches, rescinding

outstanding offers to graduate students, and furloughing hundreds of

personnel across all areas of employment.  These restrictions in turn have

slowed the school's ability to perform critical research in multiple areas,

including gene therapy for life-threatening diseases that affect children

and research on treatments for pediatric brain tumors and ALS, among

others.

63. The NIH funding blockade is also likely to cause future harm to UMass Amherst in

numerous other ways, including but not limited to:

    a.  The delays in the NIH's grant approval process have already directly

        resulted in irreparable harm by reducing the number of applicants who can

        be accepted as doctoral students at UMass Amherst to do the research

        associated with the delayed grants.  If the delays in the NIH grant approval

        process continue, the future of these prospective students, their desired

        programs of study, and the critical research they would be performing will

        be irreparably and irretrievably damaged.  Furthermore, because the

        delays are so widespread nationally, opportunities at other universities will

        also be curtailed.

    b.  UMass Amherst is concerned that further recruiting of doctoral students,

        postdoctoral researchers, faculty and staff will be negatively impacted by

        diminished funding and by harm to the institution's reputation arising

        from limiting graduate admissions and rescinding financial offers of

        support to doctoral students.

    c.  UMass Amherst is also concerned about reduced ability to meet existing

        obligations to repay bond funds used to construct research facilities and

that rating agencies may reduce the University bond rating[4] making it more expensive to build research facilities in the future.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on April 3, 2025, at Westborough, Massachusetts.

/s/ *Denise Barton*
Denise Barton
Chief Deputy General Counsel
University of Massachusetts, Office of the General Counsel
50 Washington Street
Westborough, MA 01581

---

[4] On March 19, Moody's Ratings, "dropped its outlook for higher education in 2025 to negative from stable amid the Trump administration's financial attacks on the sector." *See* https://www.highereddive.com/news/moodys-negative-outlook-higher-ed-trump-cuts/743014/; *see also* https://www.forbes.com/sites/michaeltnietzel/2025/03/19/moodys-lowers-higher-ed-outlook-to-negative-citing-trump-policies/.

# EXHIBIT A

Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE OF MENTAL HEALTH

FAIN# R01MH134176
**Federal Award Date**
06/26/2024

## Recipient Information

**1. Recipient Name**
UNIVERSITY OF MASSACHUSETTS
101 COMMONWEALTH AVE
AMHERST, MA 01003

**2. Congressional District of Recipient**
02

**3. Payment System Identifier (ID)**
1043167352B5

**4. Employer Identification Number (EIN)**
043167352

**5. Data Universal Numbering System (DUNS)**
153926712

**6. Recipient's Unique Entity Identifier**
VGJHK59NMPK9

**7. Project Director or Principal Investigator**
Sarah L Goff, MD (Contact)

sgoff@umass.edu
413-545-7467

**8. Authorized Official**
SARA SANTOS
SARASANTOS@UMASS.EDU
413-545-0699

## Federal Agency Information

**9. Awarding Agency Contact Information**
CHRISTOPHER MIN-SIK Oh

NATIONAL INSTITUTE OF MENTAL HEALTH
chris.oh@nih.gov
(301) 480-1764

**10. Program Official Contact Information**
Jennifer Humensky

NATIONAL INSTITUTE OF MENTAL HEALTH
jennifer.humensky@nih.gov
301-480-1265

## Federal Award Information

**11. Award Number**
5R01MH134176-02

**12. Unique Federal Award Identification Number (FAIN)**
R01MH134176

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Effect of Medicaid Accountable Care Organizations on Behavioral Health Care Quality and Outcomes for Children

**15. Assistance Listing Number**
93.242

**16. Assistance Listing Program Title**
Mental Health Research Grants

**17. Award Action Type**
Non-Competing Continuation

**18. Is the Award R&D?**
Yes

### Summary Federal Award Financial Information

| | |
|---|---|
| **19. Budget Period Start Date** 07/01/2024 – **End Date** 06/30/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $552,484 |
| 20 a.  Direct Cost Amount | $377,949 |
| 20 b.  Indirect Cost Amount | $174,535 |
| **21.** Authorized Carryover | |
| **22.** Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $552,484 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $552,484 |
| **26. Project Period Start Date** 09/12/2023 – **End Date** 06/30/2028 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $1,350,259 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Theresa A. Mercogliano

## 30. Remarks

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Supp. App. 31



Notice of Award

 **RESEARCH**
Department of Health and Human Services
National Institutes of Health



NATIONAL INSTITUTE OF MENTAL HEALTH

---

**SECTION I – AWARD DATA – 5R01MH134176-02**

**Principal Investigator(s):**
Kimberley Lynn H Geissler, PHD
Sarah L Goff (contact), MD

**Award e-mailed to:** opam@umass.edu

Dear Authorized Official:

The National Institutes of Health hereby awards a grant in the amount of $552,484 (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to UNIVERSITY OF MASSACHUSETTS AMHERST in support of the above referenced project. This award is pursuant to the authority of 42 USC 241 42 CFR 52 and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute Of Mental Health of the National Institutes of Health under Award Number R01MH134176. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F. The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Theresa A. Mercogliano
Grants Management Officer
NATIONAL INSTITUTE OF MENTAL HEALTH

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

**Supp. App. 32**

| | |
|---|---|
| Salaries and Wages | $197,448 |
| Fringe Benefits | $58,214 |
| **Personnel Costs (Subtotal)** | $255,662 |
| Consultant Services | $5,000 |
| Materials & Supplies | $934 |
| Travel | $5,000 |
| Other | $14,200 |
| Subawards/Consortium/Contractual Costs | $94,153 |
| Publication Costs | $3,000 |

| | |
|---|---|
| Federal Direct Costs | $377,949 |
| Federal F&A Costs | $174,535 |
| Approved Budget | $552,484 |
| Total Amount of Federal Funds Authorized (Federal Share) | $552,484 |
| TOTAL FEDERAL AWARD AMOUNT | $552,484 |

| | |
|---|---|
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $552,484 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 2 | $552,484 | $552,484 |
| 3 | $568,728 | $568,728 |
| 4 | $565,231 | $565,231 |
| 5 | $541,288 | $541,288 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**Fiscal Information:**

| | |
|---|---|
| Payment System Identifier: | 1043167352B5 |
| Document Number: | RMH134176A |
| PMS Account Type: | P (Subaccount) |
| Fiscal Year: | 2024 |

| IC | CAN | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| MH | 8022585 | $552,484 | $568,728 | $565,231 | $541,288 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**NIH Administrative Data:**
**PCC**: 82-SEEC / **OC**: 41025 / **Released**: 06/25/2024
**Award Processed:** 06/26/2024 12:19:46 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 5R01MH134176-02**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 5R01MH134176-02**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

    a. The grant program legislation and program regulation cited in this Notice of Award.
    b. Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
    c. 45 CFR Part 75.
    d. National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
    e. Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
    f. This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

Supp. App. 33

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a consortium/subaward be issued under this award, a UEI requirement must be included. See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01MH134176. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-

Supp. App. 34

discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.
**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – MH SPECIFIC AWARD CONDITIONS – 5R01MH134176-02**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

### AWARD NOTICE:
This award has been made in response to the application submitted under the Funding Opportunity Announcement PA-20-185 which can be referenced at: PA-20-185: NIH Research Project Grant (Parent R01 Clinical Trial Not Allowed).

### CONSORTIUM / CONTRACTUAL COSTS:
This award includes funds for consortium activity with **Baystate Medical Center, Inc.**
Each consortium is to be established and administered in accordance with the NIH Grants Policy Statement (http://grants.nih.gov/grants/policy/nihgps/index.htm). No foreign performance site may be added to this project without the written prior approval of the National Institute of Mental Health.

### DATA SHARING PLAN:
This award is subject to the data sharing guidance outlined in NOT-MH-19-033 and can be found at: https://grants.nih.gov/grants/guide/notice-files/NOT-mh-19-033.html. The recipient will adhere to the resource and data sharing plan. Dissemination of study data will be in accord with the Recipient's accepted data sharing plan. **Please note that a statement of progress on the Sharing Plan must be included in the Research Performance Progress Report (RPPR) under section C.5 "Other Products and Resource Sharing."** Failure to adhere to the sharing plan as mutually agreed upon by the Recipient and the NIH/IC may result in Enforcement Actions as described in the NIH Grants Policy Statement.

Complete NIMH data sharing terms and conditions can be found at https://nda.nih.gov/contribute/sharing-regimen.html. Instructions are available at http://grants.nih.gov/grants/rppr/index.htm. Complete guidelines on data sharing are available at https://sharing.nih.gov/data-management-and-sharing-policy/about-data-management-and-sharing-policy/data-management-and-sharing-policy-overview#before.

### DATA AND SAFETY MONITORING:
This grant is subject to the clinical research policies outlined in NOT-MH-19-027. The recipient will adhere to the NIH (NIH GPS 4.1.15) and NIMH policies (NOT-MH-19-027) including appropriately providing adequate data and safety monitoring and timely reporting of key events as defined in the NIMH Reportable Events Policy. The level and frequency of human subject data and safety monitoring should always be commensurate with the risk and nature of the research.

### OTHER SUPPORT TIME COMMITMENT:
Commitment overlap is not permitted and occurs when an individual's time commitment exceeds 100 percent (I.e., 12 person months), whether or not salary is requested. Therefore, no individual's time commitment may exceed 100 percent. Reductions in NIH

**Supp. App. 35**

support due to commitment overlap must be made in accordance with NIH policy as outlined in the NIH Grants Policy Statement.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5R01MH134176-02

**INSTITUTION:** UNIVERSITY OF MASSACHUSETTS AMHERST

| Budget | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|
| Salaries and Wages | $197,448 | $197,448 | $192,350 | $192,350 |
| Fringe Benefits | $58,214 | $58,214 | $58,110 | $58,110 |
| Personnel Costs (Subtotal) | $255,662 | $255,662 | $250,460 | $250,460 |
| Consultant Services | $5,000 | $5,000 | $5,000 | $5,000 |
| Materials & Supplies | $934 | $3,184 | $934 | |
| Travel | $5,000 | $5,000 | $5,000 | $5,000 |
| Other | $14,200 | $20,200 | $25,500 | $11,700 |
| Subawards/Consortium/Contractual Costs | $94,153 | $94,153 | $94,153 | $94,153 |
| Publication Costs | $3,000 | $3,000 | $3,000 | $3,000 |
| TOTAL FEDERAL DC | $377,949 | $386,199 | $384,047 | $369,313 |
| TOTAL FEDERAL F&A | $174,535 | $182,529 | $181,184 | $171,975 |
| TOTAL COST | $552,484 | $568,728 | $565,231 | $541,288 |

| Facilities and Administrative Costs | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|
| F&A Cost Rate 1 | 61.5% | 62.5% | 62.5% | 62.5% |
| F&A Cost Base 1 | $283,796 | $292,046 | $289,894 | $275,160 |
| F&A Costs 1 | $174,535 | $182,529 | $181,184 | $171,975 |

Supp. App. 36

# EXHIBIT B

**From:** Bulls, Michelle G. (NIH/OD) [E]
**To:** Alene Denson
**Subject:** Grant Termination Notification
**Date:** Friday, March 21, 2025 12:38:13 PM
**Attachments:** image002.png

You don't often get email from michelle.bulls@nih.gov. Learn why this is important

 

3/21/2025

Alene Denson
University Of Massachusetts Amherst
ADENSON@UMASS.EDU

Dear Alene Denson:

Effective with the date of this letter, funding for Project Number 3R01MH134176-02S1 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 8/16/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle
G. Bulls -S

Digitally signed
by Michelle G.
Bulls -S

Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, NIMH Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9]

*See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT C

**Department of Health and Human Services**
National Institutes of Health
EUNICE KENNEDY SHRIVER NATIONAL INSTITUTE OF CHILD
HEALTH & HUMAN DEVELOPMENT

**Notice of Award**
FAIN# R33HD107988
**Federal Award Date**
08/12/2024

---

**Recipient Information**

**1. Recipient Name**
UNIVERSITY OF MASSACHUSETTS
MEDICAL SCHOOL
55 LAKE AVE N
WORCESTER, MA 01655

**2. Congressional District of Recipient**
02

**3. Payment System Identifier (ID)**
1043167352A1

**4. Employer Identification Number (EIN)**
043167352

**5. Data Universal Numbering System (DUNS)**
603847393

**6. Recipient's Unique Entity Identifier**
MQE2JHHJW9Q8

**7. Project Director or Principal Investigator**
Bo  Wang, PHD (Contact)
Professor
Bo.Wang@umassmed.edu
508-421-1419

**8. Authorized Official**
Melissa Siegel Spragens

---

**Federal Agency Information**

**9. Awarding Agency Contact Information**
Marianne Galczynski
Grants Management Specialist
EUNICE KENNEDY SHRIVER NATIONAL
INSTITUTE OF CHILD HEALTH & HUMAN
DEVELOPMENT
marianne.galczynski@nih.gov
(240) 276-5588

**10. Program Official Contact Information**
FRANKLIN WILLEM Yates

EUNICE KENNEDY SHRIVER NATIONAL
INSTITUTE OF CHILD HEALTH & HUMAN
DEVELOPMENT
franklin.yates@nih.gov
240-890-3679

---

**Federal Award Information**

**11. Award Number**
5R33HD107988-04

**12. Unique Federal Award Identification Number (FAIN)**
R33HD107988

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Optimizing an mHealth intervention to improve uptake and adherence of the HIV pre-exposure prophylaxis (PrEP) in vulnerable adolescents and emerging adults

**15. Assistance Listing Number**
93.865

**16. Assistance Listing Program Title**
Child Health and Human Development Extramural Research

**17. Award Action Type**
Non-Competing Continuation (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 08/01/2024 – **End Date** 07/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $2,790 |
| 20 a.  Direct Cost Amount | $2,162 |
| 20 b.  Indirect Cost Amount | $628 |
| **21.** Authorized Carryover | $0 |
| **22.** Offset | $0 |
| **23.** Total Amount of Federal Funds Obligated this budget period | $278,952 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $278,952 |
| ------------------------------------------------------------------- | |
| **26. Project Period Start Date** 08/13/2021 – **End Date** 07/31/2026 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $562,627 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Frances  Petti

---

**30. Remarks**

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Version:25 - 2/15/2024 9:51 AM | Generated on: 8/12/2024 12:06 AM

**Supp. App. 42**



Notice of Award



*EXPLORATORY DEVELOPMENT AWARD*
Department of Health and Human Services
National Institutes of Health

**EUNICE KENNEDY SHRIVER NATIONAL INSTITUTE OF CHILD HEALTH & HUMAN DEVELOPMENT**

---

**SECTION I – AWARD DATA – 5R33HD107988-04 REVISED**

**Principal Investigator(s):**
Karen  MacDonell, PHD
NITTAYA  PHANUPHAK, MD
Bo  Wang (contact), PHD

**Award e-mailed to:** Research.Funding@umassmed.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award to reflect an increase in the amount of $2,790 (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to Univ of Mass Chan Medical School in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the Eunice Kennedy Shriver National Institute Of Child Health & Human Development of the National Institutes of Health under Award Number R33HD107988. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.  The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Frances  Petti
Grants Management Officer
EUNICE KENNEDY SHRIVER NATIONAL INSTITUTE OF CHILD HEALTH & HUMAN DEVELOPMENT

Additional information follows

---

Version 25 - 3/15/2024 9:51 PM | Generated on 8/12/2024 12:06 AM

**Supp. App. 43**

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---|
| **Salaries and Wages** | $40,836 |
| **Fringe Benefits** | $17,290 |
| **Personnel Costs (Subtotal)** | $58,126 |
| **Consultant Services** | $30,000 |
| **Materials & Supplies** | $2,356 |
| **Travel** | $2,500 |
| **Subawards/Consortium/Contractual Costs** | $123,207 |
| | |
| **Federal Direct Costs** | $216,189 |
| **Federal F&A Costs** | $62,763 |
| **Approved Budget** | $278,952 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $278,952 |
| **TOTAL FEDERAL AWARD AMOUNT** | $278,952 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $2,790 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 4 | $278,952 | $278,952 |
| 5 | $273,994 | $273,994 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1043167352A1 |
| **Document Number:** | RHD107988B |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2024 |

| IC | CAN | 2024 | 2025 |
|---|---|---|---|
| HD | 8014710 | $278,952 | $273,994 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**NIH Administrative Data:**
**PCC**: MPIDB-FY / **OC**: 41025 / **Released**: 08/11/2024
**Award Processed:** 08/12/2024 12:06:03 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 5R33HD107988-04  REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 5R33HD107988-04  REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

    a.   The grant program legislation and program regulation cited in this Notice of Award.
    b.   Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
    c.   45 CFR Part 75.
    d.   National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
    e.   Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
    f.   This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Supp. App. 44**

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.   See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R33HD107988. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

This award provides support for one or more clinical trials. By law (Title VIII, Section 801 of Public Law 110-85), the "responsible party" must register "applicable clinical trials" on the ClinicalTrials.gov Protocol Registration System Information Website. NIH encourages registration of all trials whether required under the law or not. For more information, see http://grants.nih.gov/ClinicalTrials_fdaaa/

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see

**Supp. App. 45**

https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – HD SPECIFIC AWARD CONDITIONS – 5R33HD107988-04  REVISED**

---

Clinical Trial Indicator: Yes
This award supports one or more NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

***REVISION- Restore Reduction***
***This revised award restores the 1% administrative reduction applied to the previously issued Notice of Award.***

***The previous terms and conditions of award remain in effect as stated below.***

*****

**Clinical Trial - Dissemination Policy**
The clinical trial(s) supported by this award are subject to the Dissemination Plan specified in the **application** dated **12/03/2020** and the NIH policy on Dissemination of NIH-Funded Clinical Trial Information. The policy states that the clinical trial(s) funded by this award will be registered in ClinicalTrials.gov not later than 21 calendar days after enrollment of the first participant and that primary summary results will be reported in ClinicalTrials.gov n/ot later than one year after the trial completion date. The reporting of summary results is required even if the primary trial completion date occurs after the period of performance.

This award is subject to additional certification requirements with submission of the Annual, Interim and Final Research Performance Progress Reports (RPPR). The recipient must agree to the following annual certification when submitting each RPPR. By submitting the RPPR, the Signing Official (SO) signifies compliance, as follows:

In submitting this RPPR, the SO (or PD/PI with delegated authority), certifies to the best of his/her knowledge that, for all clinical trials funded under this NIH award, the recipient and all investigators conducting NIH-funded clinical trials comply with the recipient's plan addressing compliance with the Dissemination of NIH-Funded Clinical Trial Information policy. Any clinical trial funded in whole or in part under this award has been registered in ClinicalTrials.gov or will be registered not later than 21 calendar days after enrollment of the first participant. Summary results have been submitted to ClinicalTrials.gov or will be submitted not later than one year after the trial completion date, even if the trial completion date occurs after the period of performance.

**Clinical Trial - Risk Assessment**
Clinical Trial Study/Studies: **361607**

Supp. App. 46

The Clinical Trial Study or Studies listed above have been determined by NICHD to be considered **MEDIUM** risk requiring increased oversight by NICHD. An update on the status of the milestones included in Section 6 of the eRA Human Subjects System (HSS) and any additional agreed-upon milestones will be due **once a year (generally halfway through the budget period)** as well as being included in the annual RPPR. The update cycle due date is based on the budget period start date referenced in this Notice of Award. Information and procedures concerning these requirements are available on the NICHD Policies on Clinical Research site. Updates must be provided through the eRA HSS accessible through the eRA Commons.

## Foreign Component
This award includes foreign component at the following site(s): Institute of HIV Research and Innovation in THAILAND

## Notice Of Funding Opportunity
This award is subject to the requirements indicated in **PAR19-376**, which are hereby incorporated by reference. See the NIH Funding site for more information.

## Human Subjects
For all competing applications or new protocols, the NICHD expects investigators for ALL NICHD Clinical Trials to abide by the requirements stated in NIH Guide Notice NOT-HD-20-036 "NICHD Data Safety Monitoring Guidelines for Extramural Clinical Trials and Clinical Research". All NICHD applications which include Clinical Trials must include a Data Safety Monitoring Plan. All NIH-sponsored multi-site clinical trials, NIH-defined Phase III clinical trials and some single site clinical trials that pose potential risk to participants require Data and Safety Monitoring Board (DSMB) oversight. Applicants are expected to establish an independent, external DSMB when required by this policy.

For all competing applications or new protocols, the NICHD expects investigators for ALL human subject research to abide by the requirements stated in NIH Guide Notice NOT-HD-20-035 "NICHD Serious Adverse Event, Unanticipated Problem, and Serious Adverse Event Reporting Guidance".

## Multiple Principal Investigator
The recipient must follow the Multiple Principal Investigator Leadership Plan included in the **JIT** dated **06/03/2021** and may not implement any changes in the plan without written NICHD prior approval.

Although the signatures of all PI/PD(s) are not required on prior approval requests, the recipient institution must secure and retain the signatures of all of PI/PD(s) within their own internal processes. See NIH Guide Notice NOT-OD-06-054.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5R33HD107988-04 REVISED

**INSTITUTION:** Univ of Mass Chan Medical School

| Budget | Year 4 | Year 5 |
|---|---|---|
| Salaries and Wages | $40,836 | $38,794 |
| Fringe Benefits | $17,290 | $16,426 |
| Personnel Costs (Subtotal) | $58,126 | $55,220 |
| Consultant Services | $30,000 | $30,000 |
| Materials & Supplies | $2,356 | $1,734 |
| Travel | $2,500 | $2,500 |
| Subawards/Consortium/Contractual Costs | $123,207 | $124,159 |
| TOTAL FEDERAL DC | $216,189 | $213,613 |
| TOTAL FEDERAL F&A | $62,763 | $60,381 |

Supp. App. 47

| TOTAL COST | $278,952 | $273,994 |
| --- | --- | --- |

| Facilities and Administrative Costs | Year 4 | Year 5 |
| --- | --- | --- |
| F&A Cost Rate 1 | 67.5% | 67.5% |
| F&A Cost Base 1 | $92,982 | $89,454 |
| F&A Costs 1 | $62,763 | $60,381 |

**Supp. App. 48**

# EXHIBIT D

| From: | Gardiner, Karen |
|---|---|
| To: | Miarecki, Amy |
| Subject: | FW: Grant Termination Notification |
| Date: | Friday, March 21, 2025 3:24:40 PM |
| Attachments: | image002.png |

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 12:35 PM
**To:** Research Funding <Research.Funding@umassmed.edu>
**Subject:** Grant Termination Notification



3/21/2025

Spragens, Melissa Siegel
Univ Of Massachusetts Med Sch Worcester
research.funding@umassmed.edu

Dear Spragens, Melissa Siegel:

Effective with the date of this letter, funding for Project Number 5R33HD107988-04 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 8/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is

**Supp. App. 50**

incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,



Michelle G. Bulls, on behalf of Margaret Young, Chief Grants Management Officer, NICHD Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

---

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT E

Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE OF MENTAL HEALTH

NOTICE OF AWARD
FAIN# R34MH124081
**Federal Award Date**
06/19/2023

## Recipient Information

**1. Recipient Name**
UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
55 LAKE AVE N

WORCESTER, MA 01655

**2. Congressional District of Recipient**
02

**3. Payment System Identifier (ID)**
1043167352A1

**4. Employer Identification Number (EIN)**
043167352

**5. Data Universal Numbering System (DUNS)**
603847393

**6. Recipient's Unique Entity Identifier**
MQE2JHHJW9Q8

**7. Project Director or Principal Investigator**
Bo  Wang, PHD (Contact)
Professor
Bo.Wang@umassmed.edu
508-421-1419

**8. Authorized Official**
CHEIKH CAMARA
Cheikh.Camara@umassmed.edu
508-856-8126

## Federal Agency Information

**9. Awarding Agency Contact Information**
Maggie C. Paolini
Grants Management Specialist
NATIONAL INSTITUTE OF MENTAL HEALTH
maggie.paolini@nih.gov
301-443-2746

**10. Program Official Contact Information**
Susannah  Allison

NATIONAL INSTITUTE OF MENTAL HEALTH
allisonsu@mail.nih.gov
240-627-3861

## Federal Award Information

**11. Award Number**
5R34MH124081-03

**12. Unique Federal Award Identification Number (FAIN)**
R34MH124081

**13. Statutory Authority**
42 USC 241 42 CFR 52

**14. Federal Award Project Title**
Adapting effective mhealth interventions to improve uptake and adherence of the HIV pre- exposure prophylaxis (PrEP) in Thai young MSM

**15. Assistance Listing Number**
93.242

**16. Assistance Listing Program Title**
Mental Health Research Grants

**17. Award Action Type**
Non-Competing Continuation

**18. Is the Award R&D?**
Yes

### Summary Federal Award Financial Information

| | |
|---|---:|
| **19. Budget Period Start Date** 07/01/2023 – **End Date** 06/30/2024 | |
| **20.** Total Amount of Federal Funds Obligated by this Action | $202,639 |
| 20 a.  Direct Cost Amount | $167,000 |
| 20 b.  Indirect Cost Amount | $35,639 |
| **21.** Authorized Carryover | |
| **22.** Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $202,639 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $202,639 |
| **26. Project Period Start Date** 07/01/2021 – **End Date** 06/30/2024 | |
| **27.** Total Cost of the Federal Award including Approved Cost Sharing or Matching this Project Period | $671,459 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Maggie C. Paolini

**30. Remarks**

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Supp. App. 54





*CLINICAL TRIAL PLANNING GRANT*                                      Notice of Award
Department of Health and Human Services
National Institutes of Health

**NATIONAL INSTITUTE OF MENTAL HEALTH**

---

**SECTION I – AWARD DATA – 5R34MH124081-03**

**Principal Investigator(s):**
NITTAYA  PHANUPHAK, MD
Bo  Wang (contact), PHD

**Award e-mailed to:** Research.Funding@umassmed.edu

Dear Authorized Official:

The National Institutes of Health hereby awards a grant in the amount of $202,639 (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to Univ of Mass Chan Medical School in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241 42 CFR 52 and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute Of Mental Health of the National Institutes of Health under Award Number R34MH124081. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Maggie C. Paolini
Grants Management Officer
NATIONAL INSTITUTE OF MENTAL HEALTH

Additional information follows

---

Version: 13 - 8/3/2022 12:59 PM | Generated on: 6/19/2023 12:05 AM

**Supp. App. 55**

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---|
| **Federal Direct Costs** | $167,000 |
| **Federal F&A Costs** | $35,639 |
| **Approved Budget** | $202,639 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $202,639 |
| **TOTAL FEDERAL AWARD AMOUNT** | $202,639 |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $202,639 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 3 | $202,639 | $202,639 |

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1043167352A1 |
| **Document Number:** | RMH124081A |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2023 |

| IC | CAN | 2023 |
|---|---|---|
| MH | 8472592 | $202,639 |

**NIH Administrative Data:**
**PCC**: 9A-ASPA / **OC**: 41025 / **Released**: Paolini, Maggie 06/14/2023
**Award Processed**: 06/19/2023 12:05:31 AM

## SECTION II – PAYMENT/HOTLINE INFORMATION – 5R34MH124081-03

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

## SECTION III – STANDARD TERMS AND CONDITIONS – 5R34MH124081-03

This award is based on the application submitted to, and as approved by, NIH on the above-titled project
and is subject to the terms and conditions incorporated either directly or by reference in the following:

    a.  The grant program legislation and program regulation cited in this Notice of Award.
    b.  Conditions on activities and expenditure of funds in other statutory requirements, such as
       those included in appropriations acts.
    c.  45 CFR Part 75.
    d.  National Policy Requirements and all other requirements described in the NIH Grants Policy
       Statement, including addenda in effect as of the beginning date of the budget period.
    e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final
       progress report when applicable.
    f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain

**Supp. App. 56**

references cited above.)

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2**.** As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.   See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R34MH124081. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

This award provides support for one or more clinical trials. By law (Title VIII, Section 801 of Public Law 110-85), the "responsible party" must register "applicable clinical trials" on the ClinicalTrials.gov Protocol Registration System Information Website. NIH encourages registration of all trials whether required under the law or not. For more information, see http://grants.nih.gov/ClinicalTrials_fdaaa/
 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the eRA Commons (Commons) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the Payment Management System's (PMS) quarterly cash transaction data.  A final quarterly federal cash transaction report is not required for awards in PMS B subaccounts (i.e., awards to foreign entities and to Federal agencies). NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures or quarterly federal cash transaction reporting.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level. If the grantee submits a final expenditure FFR but does not reconcile any discrepancies between expenditures

**Supp. App. 57**

reported on the final expenditure FFR and the last cash report to PMS, NIH will close the award at the lower amount. This could be considered a debt or result in disallowed costs.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm. This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH strongly encourages electronic submission of the final invention statement through the Closeout feature in the Commons, but will accept an email or hard copy submission as indicated below.

Email: The final invention statement may be e-mailed as PDF attachments to: NIHCloseoutCenter@mail.nih.gov.

Hard copy: Paper submissions of the final invention statement may be faxed to the NIH Division of Central Grants Processing, Grants Closeout Center, at 301-480-2304, or mailed to:

National Institutes of Health
Office of Extramural Research
Division of Central Grants Processing
Grants Closeout Center
6705 Rockledge Drive
Suite 5016, MSC 7986
Bethesda, MD 20892-7986 (for regular or U.S. Postal Service Express mail)
Bethesda, MD 20817 (for other courier/express deliveries only)

NOTE: If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required. However, a final expenditure FFR is required and should be submitted electronically as noted above. If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-

Version: 13 - 8/3/2022 12:59 PM | Generated on: 6/19/2023 12:05 AM

**Supp. App. 58**

proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

### SECTION IV – MH SPECIFIC AWARD CONDITIONS – 5R34MH124081-03

Clinical Trial Indicator: Yes
This award supports one or more NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

### <u>AWARD NOTICE</u>:
This award has been made in response to the application submitted under the Funding Opportunity Announcement PA20-141 which can be referenced at: PA-20-141: Formative and Pilot Intervention Research for Prevention and Treatment of HIV/AIDS (R34 Clinical Trial Optional) (nih.gov)

### <u>CONSORTIUM / CONTRACTUAL COSTS</u>:
This award includes funds for consortium activity with **HIV Research and Innovation, Bangkok, Thailand, Wayne State University, University of California, San Francisco**. Each consortium is to be established and administered in accordance with the NIH Grants Policy Statement (http://grants.nih.gov/grants/policy/nihgps/index.htm). No foreign performance site may be added to this project without the written prior approval of the National Institute of Mental Health.

### <u>PARTICIPANT RECRUITMENT - MILESTONES</u>:
Future NIMH support for this study is contingent upon adequate participant recruitment based on projected milestones as approved in the Recruitment Milestone Reporting system (RMR) on 05/10/2021. It is expected that **120 of** the **120** total projected participants will be recruited by **08/01/2023**. This tri-yearly recruitment report should be submitted electronically to NIMH after each milestone period of April 1, August 1 and December 1 at: http://wwwapps.nimh.nih.gov/rmr/displayHome.action. In the event that actual recruitment falls

Supp. App. 59

significantly below projected milestones, NIMH may consider withholding future support and/or negotiating an orderly phase-out of this study. Information regarding the NIMH Policy for the Recruitment of Participants in Clinical Research is available at: https://grants.nih.gov/grants/guide/notice-files/NOT-MH-19-027.html.

### GCP TRAINING:
NIH expects that all NIH-funded investigators and staff who are involved in the conduct, oversight, or management of clinical trials should be trained in Good Clinical Practice (GCP), consistent with principles of the International Conference on Harmonization (ICH) as stated in NOT-OD-16-148.

### CLINICAL TRIAL DISSEMINATION PLAN:
The clinical trial(s) supported by this award is subject to the plan within the competing application dated 09/08/2020 submitted to NIH and the NIH policy on Dissemination of NIH-Funded Clinical Trial Information. The plan states that the clinical trial(s) funded by this award will be registered in ClinicalTrials.gov not later than 21 calendar days after enrollment of the first participant and primary summary results reported in ClinicalTrials.gov, not later than one year after the completion date. The reporting of summary results is required by this term of award even if the primary completion date occurs after the period of performance.

### CLINICAL TRIAL REQUIREMENTS:
This award is subject to additional certification requirements with each submission of the Annual, Interim, and Final Research Performance Progress Report (RPPR). The recipient must agree to the following annual certification when submitting each RPPR. By submitting the RPPR, the AOR signifies compliance, as follows:
In submitting this RPPR, the SO (or PD/PI with delegated authority), certifies to the best of his/her knowledge that, for all clinical trials funded under this NIH award, the recipient and all investigators conducting NIH-funded clinical trials are in compliance with the recipient's plan addressing compliance with the NIH Policy on Dissemination of NIH-Funded Clinical Trial Information. Any clinical trial funded in whole or in part under this award has been registered in ClinicalTrials.gov or will be registered not later than 21 calendar days after enrollment of the first participant. Summary results have been submitted to ClinicalTrials.gov or will be submitted not later than one year after the completion date, even if the completion date occurs after the period of performance.

### DATA AND SAFETY MONITORING:
This grant is expected to involve a Data and Safety Monitoring Board (DSMB). The recipient and Principal Investigator(s) should review the NIMH Policy Governing Independent Safety Monitors and Independent Data and Safety Monitoring Boards cited in NOT-MH-19-027. Each RPPR submitted should include copies of all DSMB reports in RPPR Section G.1 since the last annual award. The recipient is also reminded of required reporting pursuant to NIHGPS 4.1.15.3 and the NIMH Reportable Events Policy cited in NOT-MH-19-027, as appropriate.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5R34MH124081-03

**INSTITUTION:** Univ of Mass Chan Medical School

| Budget | Year 3 |
|---|---|
| TOTAL FEDERAL DC | $167,000 |
| TOTAL FEDERAL F&A | $35,639 |
| TOTAL COST | $202,639 |

| Facilities and Administrative Costs | Year 3 |
|---|---|
| F&A Cost Rate 1 | 67.5% |
| F&A Cost Base 1 | $52,798 |

Supp. App. 60

| F&A Costs 1 | $35,639 |
|---|---|

Version: 13 - 8/3/2022 12:59 PM | Generated on: 6/19/2023 12:05 AM
**Supp. App. 61**

EXHIBIT F

**Department of Health and Human Services**
National Institutes of Health
NATIONAL INSTITUTE OF MENTAL HEALTH

**Notice of Award**
FAIN# R34MH124081
**Federal Award Date**
03/21/2025

---

## Recipient Information

**1. Recipient Name**
UNIVERSITY OF MASSACHUSETTS
MEDICAL SCHOOL
55 LAKE AVE N
WORCESTER, MA 01655

**2. Congressional District of Recipient**
02

**3. Payment System Identifier (ID)**
1043167352A1

**4. Employer Identification Number (EIN)**
043167352

**5. Data Universal Numbering System (DUNS)**
603847393

**6. Recipient's Unique Entity Identifier**
MQE2JHHJW9Q8

**7. Project Director or Principal Investigator**
Bo  Wang, PHD (Contact)
Professor
Bo.Wang@umassmed.edu
508-421-1419

**8. Authorized Official**
CHEIKH CAMARA
Cheikh.Camara@umassmed.edu
508-856-8126

## Federal Agency Information

**9. Awarding Agency Contact Information**
Maggie C. Paolini
Grants Management Specialist
NATIONAL INSTITUTE OF MENTAL
HEALTH
maggie.paolini@nih.gov
301-443-2746

**10. Program Official Contact Information**
Susannah  Allison

NATIONAL INSTITUTE OF MENTAL
HEALTH
allisonsu@mail.nih.gov
240-627-3861

## Federal Award Information

**11. Award Number**
5R34MH124081-03

**12. Unique Federal Award Identification Number (FAIN)**
R34MH124081

**13. Statutory Authority**
42 USC 241 42 CFR 52

**14. Federal Award Project Title**
Adapting effective mhealth interventions to improve uptake and adherence of the HIV pre- exposure prophylaxis (PrEP) in Thai young MSM

**15. Assistance Listing Number**
93.242

**16. Assistance Listing Program Title**
Mental Health Research Grants

**17. Award Action Type**
Non-Competing Continuation (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 07/01/2023 – **End Date** 03/21/2025 | |
| 20. Total Amount of Federal Funds Obligated by this Action | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| **21.** Authorized Carryover | |
| **22.** Offset | |
| 23. Total Amount of Federal Funds Obligated this budget period | $202,639 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $202,639 |
| **26. Project Period Start Date** 07/01/2021 – **End Date** 03/21/2025 | |
| 27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $671,459 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Theresa R. Jarosik

## 30. Remarks

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Supp. App. 63



Notice of Award

CLINICAL TRIAL PLANNING GRANT
Department of Health and Human Services
National Institutes of Health

NATIONAL INSTITUTE OF MENTAL HEALTH



---

**SECTION I − AWARD DATA − 5R34MH124081-03 REVISED**

**Principal Investigator(s):**
NITTAYA  PHANUPHAK, MD
Bo  Wang (contact), PHD

**Award e-mailed to:** Research.Funding@umassmed.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to Univ of Mass Chan Medical School in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241 42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute Of Mental Health of the National Institutes of Health under Award Number R34MH124081. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Theresa R. Jarosik
Grants Management Officer
NATIONAL INSTITUTE OF MENTAL HEALTH

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

Supp. App. 64

| | |
|---|---|
| Federal Direct Costs | $167,000 |
| Federal F&A Costs | $35,639 |
| Approved Budget | $202,639 |
| Total Amount of Federal Funds Authorized (Federal Share) | $202,639 |
| TOTAL FEDERAL AWARD AMOUNT | $202,639 |

**AMOUNT OF THIS ACTION (FEDERAL SHARE)**     $0

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 3 | $202,639 | $202,639 |

**Fiscal Information:**
| | |
|---|---|
| Payment System Identifier: | 1043167352A1 |
| Document Number: | RMH124081A |
| PMS Account Type: | P (Subaccount) |
| Fiscal Year: | 2023 |

| IC | CAN | 2023 |
|---|---|---|
| MH | 8472592 | $202,639 |

**NIH Administrative Data:**
**PCC**: 9A-ASPA / **OC**: 41025 / **Released**: 03/21/2025
**Award Processed:** 03/22/2025 12:03:03 AM

## SECTION II – PAYMENT/HOTLINE INFORMATION – 5R34MH124081-03 REVISED

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

## SECTION III – STANDARD TERMS AND CONDITIONS – 5R34MH124081-03 REVISED

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

  a.  The grant program legislation and program regulation cited in this Notice of Award.
  b.  Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
  c.  45 CFR Part 75.
  d.  National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
  e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
  f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

**Supp. App. 65**

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a consortium/subaward be issued under this award, a UEI requirement must be included. See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R34MH124081. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

This award provides support for one or more clinical trials. By law (Title VIII, Section 801 of Public Law 110-85), the "responsible party" must register "applicable clinical trials" on the ClinicalTrials.gov Protocol Registration System Information Website. NIH encourages registration of all trials whether required under the law or not. For more information, see http://grants.nih.gov/ClinicalTrials_fdaaa/
This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures. It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm. This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE: If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required. However, a final expenditure FFR is required and must be submitted electronically as noted above. If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

**Supp. App. 66**

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.


**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – MH SPECIFIC AWARD CONDITIONS – 5R34MH124081-03  REVISED**


Clinical Trial Indicator: Yes
This award supports one or more NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.


**REVISION -TERMINATION**

It is the policy of NIH not to prioritize research activities based on diversity, equity, and inclusion ("DEI") no longer effectuates agency priorities. Therefore, this project is terminated. The UNIVERSITY OF MASSACHUSETTS may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you

Supp. App. 67

mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

SUPERSEDES NOTICE OF AWARD ISSUED 10/16/2024

### NO-COST EXTENSION:

This revised award provides a first no-cost extension through 6/30/2025 in accordance with the recipient's request dated 9/26/2024. The project period end date has been adjusted accordingly. In extending the final budget period, the recipient agrees to update all required certifications, including human subjects and animal welfare, in accordance with applicable regulations and policy.

THIS REVISED AWARD SUPERSEDES THE NOTICE OF AWARD ISSUED ON 6/19/2023. THE FOLLOWING TERMS & CONDITIONS REMAIN IN EFFECT.

### AWARD NOTICE:

This award has been made in response to the application submitted under the Funding Opportunity Announcement PA20-141 which can be referenced at: PA-20-141: Formative and Pilot Intervention Research for Prevention and Treatment of HIV/AIDS (R34 Clinical Trial Optional) (nih.gov)

### CONSORTIUM / CONTRACTUAL COSTS:

This award includes funds for consortium activity with **HIV Research and Innovation, Bangkok, Thailand, Wayne State University, University of California, San Francisco**. Each consortium is to be established and administered in accordance with the NIH Grants Policy Statement (http://grants.nih.gov/grants/policy/nihgps/index.htm). No foreign performance site may be added to this project without the written prior approval of the National Institute of Mental Health.

### PARTICIPANT RECRUITMENT - MILESTONES:

Future NIMH support for this study is contingent upon adequate participant recruitment based on projected milestones as approved in the Recruitment Milestone Reporting system (RMR) on 05/10/2021. It is expected that **120 of** the **120** total projected participants will be recruited by **08/01/2023**. This tri-yearly recruitment report should be submitted electronically to NIMH after each milestone period of April 1, August 1 and December 1 at: http://wwwapps.nimh.nih.gov/rmr/displayHome.action. In the event that actual recruitment falls significantly below projected milestones, NIMH may consider withholding future support and/or negotiating an orderly phase-out of this study. Information regarding the NIMH Policy for the Recruitment of Participants in Clinical Research is available at: https://grants.nih.gov/grants/guide/notice-files/NOT-MH-19-027.html.

### GCP TRAINING:

NIH expects that all NIH-funded investigators and staff who are involved in the conduct, oversight, or management of clinical trials should be trained in Good Clinical Practice (GCP), consistent with principles of the International Conference on Harmonization (ICH) as stated in NOT-OD-16-148.

### CLINICAL TRIAL DISSEMINATION PLAN:

The clinical trial(s) supported by this award is subject to the plan within the competing application dated 09/08/2020 submitted to NIH and the NIH policy on Dissemination of NIH-Funded Clinical Trial Information. The plan states that the clinical trial(s) funded by this award will be registered in ClinicalTrials.gov not later than 21 calendar days after enrollment of the first participant and primary summary results reported in ClinicalTrials.gov, not later than one year after the completion date. The reporting of summary results is required by this term of award even if the primary completion date occurs after the period of performance.

### CLINICAL TRIAL REQUIREMENTS:

This award is subject to additional certification requirements with each submission of the Annual, Interim, and Final Research Performance Progress Report (RPPR). The recipient must agree to the following annual certification when submitting each RPPR. By submitting the RPPR, the AOR signifies compliance, as follows:
In submitting this RPPR, the SO (or PD/PI with delegated authority), certifies to the best of his/her knowledge that, for all clinical trials funded under this NIH award, the recipient and all investigators conducting NIH-funded clinical trials are in compliance with the recipient's plan addressing compliance with the NIH Policy on Dissemination of NIH-Funded Clinical Trial Information. Any clinical trial funded in whole or in part under this award has been registered in ClinicalTrials.gov or will be registered not later than 21

**Supp. App. 68**

calendar days after enrollment of the first participant. Summary results have been submitted to ClinicalTrials.gov or will be submitted not later than one year after the completion date, even if the completion date occurs after the period of performance.

**DATA AND SAFETY MONITORING:**
This grant is expected to involve a Data and Safety Monitoring Board (DSMB). The recipient and Principal Investigator(s) should review the NIMH Policy Governing Independent Safety Monitors and Independent Data and Safety Monitoring Boards cited in NOT-MH-19-027. Each RPPR submitted should include copies of all DSMB reports in RPPR Section G.1 since the last annual award. The recipient is also reminded of required reporting pursuant to NIHGPS 4.1.15.3 and the NIMH Reportable Events Policy cited in NOT-MH-19-027, as appropriate.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5R34MH124081-03 REVISED

**INSTITUTION:** Univ of Mass Chan Medical School

| Budget | Year 3 |
|---|---|
| TOTAL FEDERAL DC | $167,000 |
| TOTAL FEDERAL F&A | $35,639 |
| TOTAL COST | $202,639 |

| Facilities and Administrative Costs | Year 3 |
|---|---|
| F&A Cost Rate 1 | 67.5% |
| F&A Cost Base 1 | $52,798 |
| F&A Costs 1 | $35,639 |

**Supp. App. 69**

# EXHIBIT G



Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE OF MENTAL HEALTH

Notice of Award
FAIN# R03MH130275
**Federal Award Date**
06/21/2024

## Recipient Information

**1. Recipient Name**
UNIVERSITY OF MASSACHUSETTS
MEDICAL SCHOOL
55 LAKE AVE N
WORCESTER, MA 01655

**2. Congressional District of Recipient**
02

**3. Payment System Identifier (ID)**
1043167352A1

**4. Employer Identification Number (EIN)**
043167352

**5. Data Universal Numbering System (DUNS)**
603847393

**6. Recipient's Unique Entity Identifier**
MQE2JHHJW9Q8

**7. Project Director or Principal Investigator**
Feifan Liu, PHD (Contact)
Assistant Professor
feifan.liu@umassmed.edu
774-455-4586

**8. Authorized Official**
Lindsey M Demerrit
lindsey.demeritt@umassmed.edu
407-919-9556

## Federal Agency Information
**9. Awarding Agency Contact Information**
Marla Dominguez
Grants Management Specialist
NATIONAL INSTITUTE OF MENTAL
HEALTH
marla.dominguez@nih.gov

**10. Program Official Contact Information**
Lori Scott-Sheldon

NATIONAL INSTITUTE OF MENTAL
HEALTH
lori.scott-sheldon@nih.gov

## Federal Award Information

**11. Award Number**
5R03MH130275-02

**12. Unique Federal Award Identification Number (FAIN)**
R03MH130275

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Applying Deep Learning for Predicting Retention in PrEP Care and Effective PrEP Use among Key Populations at Risk for HIV in Thailand

**15. Assistance Listing Number**
93.242

**16. Assistance Listing Program Title**
Mental Health Research Grants

**17. Award Action Type**
Non-Competing Continuation

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 07/01/2024 – **End Date** 06/30/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $76,214 |
| 20 a.  Direct Cost Amount | $51,497 |
| 20 b.  Indirect Cost Amount | $24,717 |
| **21.** Authorized Carryover | |
| **22.** Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $76,214 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $76,214 |
| **26. Project Period Start Date** 07/01/2023 – **End Date** 06/30/2026 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $162,404 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Rita Sisco

## 30. Remarks
Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Supp. App. 71



Notice of Award



SMALL RESEARCH GRANT
Department of Health and Human Services
National Institutes of Health

NATIONAL INSTITUTE OF MENTAL HEALTH

NIH
National Institutes
of Health

---

**SECTION I – AWARD DATA – 5R03MH130275-02**

**Principal Investigator(s):**
Rena  Janamnuaysook
Feifan  Liu (contact), PHD
NITTAYA  PHANUPHAK, MD

**Award e-mailed to:** Research.Funding@umassmed.edu

Dear Authorized Official:

The National Institutes of Health hereby awards a grant in the amount of $76,214 (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to Univ of Mass Chan Medical School in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute Of Mental Health of the National Institutes of Health under Award Number R03MH130275. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Rita  Sisco
Grants Management Officer
NATIONAL INSTITUTE OF MENTAL HEALTH

Additional information follows

---

**Supp. App. 72**

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---|
| Federal Direct Costs | $51,497 |
| Federal F&A Costs | $24,717 |
| Approved Budget | $76,214 |
| Total Amount of Federal Funds Authorized (Federal Share) | $76,214 |
| TOTAL FEDERAL AWARD AMOUNT | $76,214 |
| | |
| AMOUNT OF THIS ACTION (FEDERAL SHARE) | $76,214 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 2 | $76,214 | $76,214 |

**Fiscal Information:**
| | |
|---|---|
| Payment System Identifier: | 1043167352A1 |
| Document Number: | RMH130275A |
| PMS Account Type: | P (Subaccount) |
| Fiscal Year: | 2024 |

| IC | CAN | 2024 |
|---|---|---|
| MH | 8472592 | $76,214 |

**NIH Administrative Data:**
**PCC**: 9A-ASPI / **OC**: 41025 / **Released**: 06/20/2024
**Award Processed:** 06/21/2024 12:32:50 AM

**SECTION II – PAYMENT/HOTLINE INFORMATION – 5R03MH130275-02**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

**SECTION III – STANDARD TERMS AND CONDITIONS – 5R03MH130275-02**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

a. The grant program legislation and program regulation cited in this Notice of Award.
b. Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
c. 45 CFR Part 75.
d. National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
e. Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
f. This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

**Supp. App. 73**

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.  See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R03MH130275. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.


 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted electronically as noted above.  If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

**Supp. App. 74**

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.
**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – MH SPECIFIC AWARD CONDITIONS – 5R03MH130275-02**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

**AWARD NOTICE:**
This award has been made in response to the application submitted under the Funding Opportunity Announcement PA20-200 which can be referenced at: https://grants.nih.gov/grants/guide/pa-files/PA-20-200.html

**CONSORTIUM / CONTRACTUAL COSTS:**
This award includes funds for consortium activity with **Institute of HIV Research and Innovation, Thailand.** Each consortium is to be established and administered in accordance with the NIH Grants Policy Statement (http://grants.nih.gov/grants/policy/nihgps/index.htm). No foreign performance site may be added to this project without the written prior approval of the National Institute of Mental Health.

**RECIPIENT RELYING ON SUBAWARDEE'S IRB APPROVAL:**
This award acknowledges that Institute of HIV Research and Innovation, Thailand has accepted the responsibility for the IRB review and approval of this application. University of Massachusetts

**Supp. App. 75**

continues to be responsible for all human subjects research conducted under the award, and must provide oversight and monitoring of all human subjects research activities commensurate with its legal role and responsibilities to assure appropriate protections for human subjects in research. This includes, but is not limited to, ensuring that all institutions engaged in non-exempt human subject research conform to the DHHS policies for the Protection of Human Subjects research, which are a term and condition of award. Each institution engaged in the HHS-supported non-exempt human subjects research must hold or obtain an applicable OHRP-approved Federal Wide Assurance (FWA) as described in (45 CFR 46.103(a)). Failure to comply with the terms and conditions of award may result in the disallowance of costs and collected data and/or additional enforcement actions as outlined in Section 8.5 of the NIH Grants Policy Statement.

## DATA AND SAFETY MONITORING: Study ID 457247

This grant is subject to the clinical research policies outlined in NOT-MH-19-027. The recipient will adhere to the NIH (NIH GPS 4.1.15) and NIMH policies (NOT-MH-19-027) including appropriately providing adequate data and safety monitoring and timely reporting of key events as defined in the NIMH Reportable Events Policy. The level and frequency of human subject data and safety monitoring should always be commensurate with the risk and nature of the research.

## OTHER SUPPORT TIME COMMITMENT:

Commitment overlap is not permitted and occurs when an individual's time commitment exceeds 100 percent (I.e., 12 person months), whether or not salary is requested. Therefore, no individual's time commitment may exceed 100 percent. Reductions in NIH support due to commitment overlap must be made in accordance with NIH policy as outlined in the NIH Grants Policy Statement.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5R03MH130275-02

**INSTITUTION:** Univ of Mass Chan Medical School

| Budget | Year 2 |
|---|---|
| TOTAL FEDERAL DC | $51,497 |
| TOTAL FEDERAL F&A | $24,717 |
| TOTAL COST | $76,214 |

| Facilities and Administrative Costs | Year 2 |
|---|---|
| F&A Cost Rate 1 | 67.5% |
| F&A Cost Base 1 | $36,618 |
| F&A Costs 1 | $24,717 |

**Supp. App. 76**

# EXHIBIT H

| | |
|---|---|
| **From:** | Miarecki, Amy |
| **To:** | Miarecki, Amy |
| **Subject:** | FW: Grant Termination Notification |
| **Date:** | Friday, March 21, 2025 3:41:32 PM |
| **Attachments:** | image002.png |

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 12:31 PM
**To:** Camara, Cheikh <Cheikh.Camara@umassmed.edu>
**Subject:** Grant Termination Notification



3/21/2025

Cheikh Camara
Univ Of Massachusetts Med Sch Worcester
cheikh.camara@umassmed.edu

Dear Cheikh Camara:

Effective with the date of this letter, funding for Project Number 5R03MH130275-02 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 7/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms

the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,



Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, NIMH Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

EXHIBIT 14

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; et al., | |
| *Plaintiffs,* | No. 1:25-cv-_____ |
| v. | |
| ROBERT F. KENNEDY, JR., et al., | |
| *Defendants.* | |

## <u>DECLARATION OF HALA MADANAT</u>

I, Hala Madanat, Ph.D., declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.      I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated here or have knowledge of the matters based on my review of information and records gathered by me and my colleagues at San Diego State University ("SDSU") and the San Diego State University Research Foundation ("SDSURF").  If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed as the Vice President for Research and Innovation of San Diego State University.

3.      I submit this Declaration in support of the States' Motion for Temporary Restraining Order.

**Professional Background**

4.      I am a Vice President and Distinguished Professor at San Diego State University, one of the 23 campuses in the California State University system. I have held the position of

1

**Supp. App. 82**

Vice President for Research and Innovation since August 2022 after previously serving as Interim Vice President since 2020. I lead the university's research enterprise, fostering interdisciplinary collaboration, securing external funding and driving innovation. I work closely with other university administrators, campus academic deans and vice presidents, partners at other public universities that have agreements with SDSU, and also with the California State University system and nationwide associations to promote interdisciplinary work and research while driving innovative practices in support of faculty and student research, student engagement and community impact.

5.      Under my leadership, SDSU has expanded its research capabilities, strengthened partnerships with industry and government and, in spring 2025, officially achieved R1 classification as a top-tier research institution in the United States.

6.      As Vice President of Research and Innovation, I serve as the ex-officio Vice President of the Board of Directors of the SDSURF, which is the CSU auxiliary organization dedicated to supporting sponsored research at SDSU. In that capacity, I am responsible for the general focus of research activity and its integration with the academic mission of SDSU, oversight of the corporation's sponsored research functions as carried out by SDSURF's Chief Executive Officer, and ensuring SDSURF's support of the university vision for research and growth of the research enterprise.

7.      Before my appointment as Vice President, I served as the Director of SDSU's School of Public Health, where I was also a Principal Investigator overseeing grant-funded research projects and other initiatives to enhance student success, faculty development and community engagement.

**Supp. App. 83**

8.      I joined the SDSU faculty in 2008 in the School of Public Health and later served as the chief research officer at SDSU, overseeing all aspects of the university's research endeavors, including SDSURF.

9.      Prior to SDSU, I served in a faculty position at Utah Valley University and as a lecturer at Brigham Young University. As a university researcher, my expertise lies in chronic disease prevention and health disparities, with a particular focus on social determinants of health.

10.     As a Principal Investigator who has been a faculty researcher for 19 years, my work has been funded by agencies such as the National Institutes of Health (NIH) and the U.S. Centers for Disease Control and Prevention, and I have published extensively in leading academic journals throughout my career. In total, I have served as the principal investigator, co-principal investigator or co-investigator on 20 grants totaling more than $45 million. I also have and continue to serve on numerous boards, including the San Diego Economic Development Corporation, California Institute for Regenerative Medicine, Connect San Diego, and Biocom California, among others.

**Research Activity at SDSU**

11.     SDSU's statutory mission is to deliver high-quality undergraduate and graduate education, to drive research and innovation, and to contribute to workforce and economic development for the region and State of California. By equipping students with advanced knowledge and skills, SDSU fosters a well-educated workforce that drives economic development and strengthens California's leadership across industries.

12.     SDSURF is an officially recognized auxiliary corporation of the California State University system, established in accordance with California Education Code sections 89900 et seq. to benefit the California State University system. Pursuant to the Operating Agreement

**Supp. App. 84**

between California State University and SDSURF and in accord with Title 5 of the California

Code of Regulations, section 42500, SDSURF performs certain functions critical to the mission

of SDSU, including management of externally funded projects including research, workshops,

conferences and institutes at SDSU. Federal research grants, including those issued by NIH, are

managed by SDSURF.

13.    SDSU's mission is a catalyst for regional and state economic growth, workforce

development and social mobility and, in doing so, the university significantly contributes to

California's economy, strengthens industries across disciplines and fields, and also enhances the

state's competitive edge.

14.    SDSU is a major public research institution, ranking as the No. 1 institution in the

California State University system in federal research support, and as one of the top public

research universities in California. SDSU employs 4,578 faculty and staff (not including the

almost 3,300 student employees) who provide transformative experiences for nearly 40,000

students.

15.    In Fiscal Year 2023-24, 373 San Diego State University researchers received 867

grants and contracts valued at $226,218,374 to support research, scholarship, community service,

and creative activities. SDSURF employs approximately 3,800 employees annually in support of

these activities.

16.    SDSU offers bachelor's degrees in 97 areas, master's degrees in 87 fields and 25

doctoral programs. In addition to academic offerings at SDSU, SDSU Imperial Valley and SDSU

Georgia, SDSU Global Campus offers online training, certificates and degrees in areas of study

designed to meet the needs of students everywhere. Additionally, the development of SDSU

Mission Valley, a mixed-use, medium-density development about 5 miles from SDSU's main

**Supp. App. 85**

campus that is already home to Snapdragon Stadium and a river park, is currently under further development to expand the university's educational, research, entrepreneurial and technology transfer programs. Additional developments at SDSU Imperial Valley include the Sciences and Engineering Laboratories, a state-of-the-art teaching and research hub that will advance access to skill-building and career pathways to high-opportunity, high-demand jobs in California's Lithium Valley. Further, the SDSU Oaxaca Center for Mesoamerican Studies provides university faculty and students with classrooms, office space, outdoor spaces and administrative personnel to support new and ongoing programming, research and collaborations with colleagues and academic research partners in Oaxaca.

17.     At SDSU, students participate in transformational research, international experiences, entrepreneurship initiatives, internships and mentoring, and a broad range of student life and leadership opportunities. SDSU is also a long-standing federally recognized Hispanic-Serving Institution (HSI) and is also a federally recognized Asian American and Native American Pacific Islander-Serving Institution (AANAPISI). In 2024, the university celebrated the milestone of reaching 500,000 alumni with the spring graduating class and, in 2025, was officially classified as an R1 research institution, the highest distinction given to doctoral universities in the Carnegie Classification of Institutions of Higher Education.

18.     I am providing this declaration to explain the devastating impact of the abrupt cancellation of several grants awarded by NIH, as well as the disruptions caused by delays in the grant review and renewal process.

**<u>Reliance on NIH Funding</u>**

19.     Cuts to NIH funding have significant and long-lasting impacts on faculty's careers, student training, and our ability to recover actual research costs and build physical

**Supp. App. 86**

infrastructure to support scientific discovery. In addition, the cuts have a direct impact on the local San Diego economy and the broader U.S. global competitiveness in science and technology. Faculty rely on the funding from NIH to advance both scientific discovery and knowledge, train and support their students, and advance their careers.

20.     The cuts to the NIH funding have a profound and often underappreciated impact on graduate students. Cuts to NIH funding, especially cuts without warning, have immediate and consequential impacts on our graduate students, who often live paycheck to paycheck, putting their housing and basic needs at risk. Graduate students, who are at the core of the research laboratories, rely heavily on NIH grants not only for resources to support research, but also for their own stipends, tuition support, and training programs. Our graduate students complete their training and enter our regional workforce as public-school teachers, nurses, speech-language pathologists, aerospace engineers, public health officials, physical therapists, and psychologists, to name a few.

21.     Cuts to NIH funding not only affects our ability to provide critical labor needed in the community, but also limits access during training to research opportunities. With fewer resources available, labs will downsize or may halt projects altogether, reducing hands-on learning experiences that are essential for graduate and undergraduate training. This can significantly hinder students' scientific development and career advancement, especially in competitive fields that require technical expertise.

22.     Additionally, the lack of funding can restrict travel to research conferences, collaborations, and networking opportunities — key elements that help students establish themselves professionally.

23.     Importantly, current NIH funding cuts impact SDSU's ability to honor commitments already made to our graduate students when they joined our graduate programs. The funding insecurity created by the abrupt NIH cuts, terminations of grants, and delays in reviews of pending proposals and non-competing renewals results in an unstable environment with students either leaving their programs or having to find additional employment opportunities, thus reducing the time available to devote to their advanced study and training. This may lead to significantly delayed graduation times, increases in student loan debt, or decisions to abandon their graduate education altogether.

24.     In fiscal year 2024, San Diego State University received funding either directly through the NIH or as a subrecipient on awards to other institutions from the NIH to support 197 projects, totaling $48,593,078.

25.     San Diego State University receives NIH grants across a variety of institutes encompassed within the NIH, including the following:

National Institute of Arthritis/Musculoskeletal and Skin Diseases

National Institute on Minority Health and Health Disparities

National Cancer Institute

National Heart Lung and Blood Institute

National Institute of Child Health and Human Development

National Institute of Diabetes/Digestive and Kidney Diseases

National Institute on Deafness/Other Communication Disorders

National Institute of Aging

National Institute of Allergy and Infectious Diseases

National Institute of Environmental Health Sciences

**Supp. App. 88**

National Institute of General Medical Sciences

National Institute of Mental Health

National Institute of Neurological Disorders and Stroke

National Institute on Aging

National Institute on Alcohol Abuse and Alcoholism

National Institute on Drug Abuse

National Center for Complementary and Integrative Health

26.     Through those NIH grants, SDSU funds 93 researchers as principal investigators or co-investigators.

27.     The work done by SDSU researchers on NIH funded projects provides education and training in Public Health, Psychology, Speech, Language and Hearing, Social Work, Nursing, Exercise and Nutritional Sciences, Biology, Electrical Engineering, Mathematics, Chemistry, Child and Family Development, Special Education, Communications, and other programs.

28.     SDSU provides considerable employment benefits in the Science, Technology, Engineering and Mathematics ("STEM") workforce to the California economy.

29.     SDSU has already begun a major construction project in Imperial Valley, with the support of the California State University system that, once completed, will bolster STEM teaching and research, particularly in the areas of life sciences. Another Life Sciences building to replace the current outdated structure on the main campus is in the planning and initial construction stages. This building will eventually house lecture spaces, teaching and research labs, and faculty offices.

**Supp. App. 89**

30. The funding model for this active STEM infrastructure project relies on indirect cost recoveries from federal grants, which has long been an important source of predictable funding for universities to support the upkeep of research buildings, research laboratories and affiliated office spaces and to ensure safety measures, including environmental health and lab safety compliance, among many other benefits to both researchers and the university.

31. SDSURF owns, rents, or leases over 700,000 square feet of properties located adjacent to San Diego State University or in locations that support specific communities and participants in NIH funded research. These facilities provide much needed space to support NIH funded faculty that is not available on campus. The decrease in NIH funding and subsequent recovery of indirect costs has an immediate impact on the ability to maintain and allocate these facilities for research needs.

32. Federally supported STEM research drives innovation, improves quality of life and addresses nationwide and global challenges. Across disciplines, breakthroughs in STEM lead to real-world applications that benefit society. For example, research in biomedical engineering has led to life-saving technologies now widely used across medicine, such as MRI machines, prosthetic limbs and robotic surgery. Similarly, cancer research has improved early detection and treatment through targeted therapies, reducing mortality rates for many dozens of cancer types. Life sciences research is essential for addressing health crises, including infectious disease outbreaks, as well as chronic diseases like cancer and diabetes. Investments in fields such as cellular and molecular biology, genetics and evolutionary biology drive breakthroughs that deepen our understanding of living organisms. Cancer research benefits from diverse perspectives, improving the identification of genetic markers and mutations in specific populations, leading to more precise, personalized treatments.

**Supp. App. 90**

**Typical Timeline and Processes for NIH Grant Awards**

33.     The Sponsored Research Development office at SDSURF in collaboration with the Office of Research Advancement at SDSU works with researchers to submit grant applications and tracks grant applications and awards.

34.     Based on my work as a faculty researcher for 19 years, Director of the School of Public Health for four years, and Vice President of Research and Innovation for almost five years, I have a strong understanding of the NIH grant process.

35.     NIH grant applications are typically submitted via NIH's online portal, often in response to a Notice of Funding Opportunity ("NOFO"). From there, they are assigned to a "study section" where the grant application is subjected to peer review and judged on its scientific merit. The grant application is then given a score. If the grant receives what is called a "fundable score," there is a high probability that the grant will be funded.

36.     What constitutes a fundable score is dependent on several factors as every institute, sometimes referred to as an "IC," is different. Some publish paylines, meaning the percentiles of grants they will fund, and some do not. Paylines range from 8-20%. Most of the standing study sections result in an impact score and percentile for each proposal, but many others (special emphasis and non-CSR) will only result in an impact score, but not percentile. Program officers have latitude to recommend proposals with higher scores/percentiles in order to balance portfolios and meet specific directives. Generally, researchers would consider a percentile less than 10% as guaranteed to receive funding.

37.     After the study section, the grant application is sent to an "advisory council" where the ultimate decision on whether or not to recommend a grant for funding is made. After

10

the advisory council meets, the relevant institute's Director typically approves the recommended

grants, and a Notice of Award is promptly issued confirming the grant is funded.

The process for competitive renewals is very similar, but it is even more likely for a grant that

has been funded in the past to be renewed.

38.     Non-competing renewals for subsequent years funded on a multi-year project do

not need to go back through the study section or advisory council for review. NIH typically only

requires submission of a Research Performance Progress Report (RPPR). The report is reviewed

by the program officer for performance and then forwarded to the grants office who issues the

subsequent years funding Notice of Award.

39.     As an auxiliary organization, SDSURF submits proposals, and accepts and

administers NIH awards on behalf of SDSU. The budget process at SDSURF relies upon the

NIH grant application, review, and approval cycle. Historically, SDSU has relied on grants being

reviewed and scored within approximately nine months of submission. Non-competing renewals

typically are issued within 60 to 90 days of submission of the RPPR and are considered

guaranteed funding unless the Principal Investigator (PI) dies, is transferring to another

institution, there is a question about research performance such as lack of ability to recruit

sufficient subjects into a study, or in extremely rare cases, research misconduct.

40.     Once a grant receives a score, SDSURF is able to consider whether to include the

funding coming from that grant as part of its budget for the coming year.

**Delays and Irregularities in the Processing of NIH Grant Applications**

41.     Since late January 2025, the San Diego State University Research Foundation has

seen an unusual number of delays in the processing of NIH grant applications. Researchers have

had their grant application study sections and advisory councils canceled or otherwise not

11

**Supp. App. 92**

scheduled, and grant application scoring has been significantly delayed. Only one supplement and three non-competing renewals have been issued to San Diego State University Research Foundation directly by NIH since the change of administration on January 21, 2025.

42.     SDSURF has not received formal notice of changes for most of the non-competing renewals or new or competing renewals currently awaiting review. For others, SDSU has only been told that proposals are "paused" or "under review."

43.     In a few instances, faculty who have been asked to serve on study sections, have received communication that the study section has been postponed and will be rescheduled at a later date.

44.     As of April 1, 2025, the San Diego State University Research Foundation has 23 non-competing renewals totaling approximately $24.5 million pending action by the grants office to authorize the next segment of funding.

45.     As of April 1, 2025, the San Diego State University Research Foundation has 34 new proposals and competing renewals totaling approximately $16 million awaiting NIH study section review.

46.     As of April 1, 2025, the San Diego State University Research Foundation has 10 new proposals and competing renewals totaling approximately $3.2 million that received fundable scores, awaiting NIH advisory council and Notice of Award.

47.     As of April 1, 2025, the San Diego State University Research Foundation has 5 proposals totaling approximately $1.7 million that received possibly fundable scores, and 4 proposals totaling $2.4 million with a lower probability of funding, awaiting NIH advisory council and possible Notice of Award.

12

**Supp. App. 93**

48.     As of April 1, 2025, the San Diego State University Research Foundation has an additional 65 new proposals and 2 non-competing renewals totaling approximately $6.7 million awaiting action by NIH, where we are proposed subrecipients on proposals submitted by other universities and organizations.

49.     In total, San Diego State University has 143 new or competing proposals and non-competing renewals totaling approximately $54.4 million on hold due to NIH delays in proposal reviews.

**Terminations of NIH Grants**

50.     As of April 1, 2025, San Diego State University Research Foundation has had at least 12 NIH grants terminated (including subawards from other universities) and one non-competing renewal issued -- a no-cost extension for three months in place of receipt of the final year of funding.

51.     These terminations are attached hereto as Exhibits 1-12, and the action related to the non-competing renewal is attached hereto as Exhibit 13.

52.     These terminations will result in the loss of approximately $6.5 million in research money to San Diego State University.

53.     The termination notices for these grants have provided very little to explain the termination, instead noting that the research no longer "effectuates agency priorities." In my nearly 20 years working at San Diego State University, I have not seen this language previously used to cancel grants.

54.     The termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities. However, prior to receipt of the termination, San Diego State University Research Foundation had not been given notice of any

**Supp. App. 94**

opportunity to submit any "corrected" grant materials to align with agency priorities. Nor was San Diego State University Research Foundation provided with any updated "agency priorities" with which its research must align.

55.     In one case, the reason cited included reference to gender identity research, which in fact was not the subject of the research in question (see Exhibit 10). The research in question studies how societal mechanisms of systemic marginalization of sexual minorities (e.g., gay, lesbian, and bisexual individuals) give rise to urgent and sizeable mental health disparities in depression and suicide among sexual minority and heterosexual individuals in the United States. The project uses novel and state-of-the-science harmonization techniques to integrate ten large public health datasets totaling data from over 2.8 million individuals collected between 2008 and 2023 as a pivotal period that saw major societal change for sexual minorities in the US, to study how systemic oppression drives risk for depression and suicide among both sexual minority and heterosexual individuals.

56.     The 12 programs terminated focused primarily on sexual minority populations or vaccine hesitancy and included the following:

- The Socioecology of Sexual Minority Stigma: Data Harmonization to Address Confounding Bias and Investigate Cross-Level Mental Health Effects

- NEXUS: A novel social network approach to intersectional stigma on HIV prevention among Latino MSM

- Cardiovascular Health of Sexual and Gender Minorities in the Hispanic Community Health Study/Study of Latinos (SGM HCHS/SOL)

- Suicide Prevention for Sexual and Gender Minority Youth

**Supp. App. 95**

- Targeting Minority Stressors to Improve Eating Disorder Symptoms in Sexual Minority Individuals with Eating Disorders

- eSTEP: An integrated mHealth intervention to engage high-risk individuals along the full PrEP care continuum

- Minority Stress, Stimulant Use, and HIV among Sexual Minority Men: A Biopsychosocial Approach

- Adolescent Medicine Trials Network for HIV/AIDS Interventions (ATN) Scientific Leadership Center - SLG and LYPS

- Adolescent Medicine Trials Network for HIV/AIDS Interventions (ATN) Scientific Leadership Center - LYPS

- Proud to Quit (P2Q): A Person-centered mobile technology intervention for smoking cessation among transgender adults

- Faithful Response II: COVID-19 Rapid Test-to-Treat with African American Churches

- Increasing COVID-19 vaccine uptake among Latinos through a targeted clinical and community-behavioral intervention

57.     In all cases, the notice of termination stated it was effective immediately with no consideration of impact on employees, on the need to transition clinical trial participants to other resources, loss of research data collected to date, or other lost investment by the federal government by early termination of ongoing grants.

**Comparisons Across Administrations**

58.     In prior years, under both Democratic and Republican administrations, our institution never experienced this volume of unexplained delays or procedural breakdowns.

**Supp. App. 96**

Renewals were routine and predictable. This year, even long-standing, high-performing

programs are in limbo.

59.     Terminations were exceedingly rare and followed due process. The current

approach is without precedent in our experience.

**Impact on Institutional Operations**

60.     The San Diego State University Research Foundation provides the staffing and

administrative infrastructure to support the submission, administration, and financial compliance

requirements of all externally funded grants and contracts.

61.     For FY 2023-24, indirect cost recovery accounted for 70% of the resources

received to fund the San Diego State University Research Foundation operating budget. Of the

$33.2 million in indirect cost recovery earned, NIH accounted for $11.8 million or 36% of the

total recovered costs.

62.     Projecting how much indirect cost recovery will be received in future years is

dependent on many factors including awards received to date, the number and requested amount

of proposals submitted and waiting review by funding agencies, how much F&A is budgeted on

awards in process, and the spending rate on active awards as indirect costs are recovered only as

direct costs are expended.

63.     Even though NIH has begun to resume scheduling of study sections, an entire

quarter has been lost and it is unclear if sufficient study sections are being scheduled to make up

for that delay. The uncertainty around terminations, issuance of non-competing renewals, and

proposed reductions by NIH to indirect cost rates is making it extremely difficult to project a

budget for FY 2025-26.

**Supp. App. 97**

64.     SDSU Research Foundation has already implemented a hiring chill on open positions for its core staff, is reducing non-mandatory travel and professional development, and will not be able to issue any cost-of-living increases impacting staff retention and turnover.

65.     There is also an immediate impact on currently funded programs anticipating non-competing renewals. The SDSU Research Foundation normally would allow researchers to continue their research activities pending receipt of the Notice of Award for non-competing renewals through a prior authorization to spend process; however, SDSURF is unable to continue to provide the advance funding to offset ongoing activities given the uncertainty on whether non-competing renewals will be issued.

66.     There are very limited institutional resources available given projected cuts to the state budget. As a result, program activities are being forced to stop activities, reduce project personnel, and shutdown programs with the same effect as if a termination notice had been issued.

67.     In addition to grants received directly from NIH, San Diego State University Research Foundation receives a number of subawards from partnering universities, school districts, community health centers and other organizations that San Diego State University faculty collaborate with where those organizations are the prime recipient of funds from NIH.

68.     The impact of the delay in funding is compounded by the similar delays experienced by our collaborating partners. These delays have forced us to implement bridge funding for faculty, drawing from limited discretionary resources. As of April 1, 2025, San Diego State University has reallocated funding originally intended to support postdoctoral employees to provide emergency bridge funding of approximately $1,000,000.  This prevents the

17

use of these funds for any other purpose, including critically needed postdoctoral support on research of use for other planned improvements to our programs and research.

**Effect on Public-Facing or State-Supported Programs**

69.     Our institution operates multiple programs funded jointly by NIH and the State of California, including community health clinics and research addressing health disparities. We are unable to finalize contracts with collaborators including other universities, school districts and community partners until federal funds are secured. We are also experiencing that from other entities unable to finalize contracts to us. That has led to considerable uncertainty and the inability to continue to provide funding to partners who do not have the resources to continue to provide the services usually funded through NIH grants.

**Admissions, Training and Workforce Disruptions**

70.     San Diego State University uses information regarding NIH grant applications and award rates to inform its admissions process, particularly at the graduate student level. Graduate students are guaranteed stipends for the duration of their training based on already awarded NIH grants and anticipated non-competing renewals.

71.     NIH training grants, including T32 and F31 mechanisms, have been affected by review and award delays. These training grants are designed to provide resources to institutions so they can train individuals in certain shortage areas (T32 grants), as well as support through predoctoral dissertation research (F31 grants). Currently, we have one F31 terminated impacting the pre-doctoral student's training timeline and funding.

72.     We also currently have one international research faculty whose visa status is at risk due to termination of NIH awards supporting his research.

18

73.     This instability is affecting the recruitment and retention of quality research trainees. The inability to retain quality research trainees will have continuing effects on the research capabilities of San Diego State University, including by limiting the individuals qualified to conduct certain research.

**Concerns About FY25 Funds Being Obligated**

74.     We are increasingly concerned that NIH will not be able to process and obligate FY25 funds by the end of the fiscal year in September.

75.     Several proposals from our institution remain stuck at preliminary review stages, with no indication that the required advisory reviews or notices of award will occur in time. Our research administration staff have received informal feedback from NIH indicating that certain topic areas are being slowed due to "heightened scrutiny" or "internal concerns."

**Irreparable Harm**

76.     The delays have disrupted ongoing research, as well as setting back San Diego State University for research going forward. Funding gaps have forced researchers to abandon studies, miss deadlines, or lose key personnel. This is in spite of the use of limited research support funds provided to faculty by San Diego State University Research Foundation which are being used to keep certain research projects going. San Diego State University researchers have had to make decisions about which of these valuable programs to continue with these limited funds.

77.     Some of these studies involve clinical trials for life-saving medications or procedures, and their closure would endanger the lives of patients.

78.      For example, one of the projects terminated addresses the significant suicide and suicide attempt burden that exists among sexual minority youth and young adults. Research has

19

**Supp. App. 100**

demonstrated this risk: making a suicide attempt in their lifetime is 4 to 5 times higher among sexual minority youth, and 8 to 9 times higher among transgender youth, when compared to the general public.

79.    Of significant concern is the welfare of participants in this study. Currently, the project has over 85 active participants in the trial. The study participants are extremely vulnerable, ranging from age 15 to 29 years, and all identify as LGBTQ+. Participants all have a history of one or more suicide attempts with current suicidal ideation, and all participants assigned to the novel intervention have been promised six months of clinical and care intervention with regular risk assessments.

80.    The termination of the grant midway through the clinical trial would cease the provision of essential suicide prevention care and regular suicide risk assessments, putting every active participant at very high risk for death or injury due to suicide.

81.    The termination notice was received on Friday, March 21 and indicated the termination was effective immediately and that "costs resulting from financial obligations incurred after termination are not allowable."  This abrupt termination provided no leeway for identifying and safely transitioning participants to alternative resources if any exist. Requests for guidance from the grants officer and from the National Institute of Mental Health Data and Safety Monitoring Board have gone unanswered.

82.    Some of these studies had the potential to achieve breakthroughs, which would have advanced public health, and which will now not occur.

83.    Delays have also disrupted community services, student opportunities, and public programs. In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

**Supp. App. 101**

## Conclusion

84.    The abrupt terminations and irregularities in NIH grant funding are starting to have devastating consequences for institutional operations and planning, for researchers and students, and for study participants. With the current uncertainty surrounding NIH funding, early-career researchers and scientists are at risk of leaving STEM fields, thus weakening the pipeline of skilled talent.

85.    The ongoing terminations and delays with no explanation or remedy are undermining confidence in the system.  These harms are ongoing and, in many instances, irreparable.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of April, 2025, in Oakland, California.

Hala Madanat
Vice President for Research and Innovation
San Diego State University

**Supp. App. 102**

# EXHIBIT 15

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS; et al.,

                         *Plaintiffs,*

      v.

ROBERT F. KENNEDY, JR., et al.,

                        *Defendants.*

No. 1:25-cv-_____

1

## DECLARATION OF GANESH RAMAN, Ph.D.

I, Ganesh Raman, Ph.D., declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated here or have knowledge of the matters based on my review of information and records gathered by me and my colleagues at California State University ("CSU"). If called as a witness, I could and would testify competently to the matters set forth below.

2. I am currently employed by California State University as the Assistant Vice Chancellor for Research

3. I submit this Declaration in support of the States' Motion for a Temporary Restraining Order.

**Professional Background**

4. I serve as the Assistant Vice Chancellor for Research at the California State University (CSU) Office of the Chancellor, a role I have held for the past eight years. I am the senior academic official responsible for the systemwide advancement, and administration of CSU's research and scholarly mission, overseeing 10 systemwide research consortia and numerous multi-campus institutes and centers.

5. Prior to joining CSU, I served as Deputy Vice Provost for Research at the Illinois Institute of Technology, where I also held a professorship in the Mechanical, Materials, and Aerospace Engineering Department. I began my career at NASA Glenn Research Center. I am internationally recognized for my research in aeroacoustics and flow control, with over 150 articles published in leading scientific journals and conference publications. I earned my Ph.D. in

2

Mechanical Engineering from Case Western Reserve University. I serve on the Board of
Directors for the California Council on Science and Technology, California Life Sciences, and
the Long Beach Accelerator. I also have the distinction of being elected Fellow of the American
Society of Mechanical Engineers, American Institute of Aeronautics and Astronautics and the
Royal Aeronautical Society, UK.

**Research Activity in the CSU**

6.      The CSU is the largest four-year public university system in the United States and
is the state's greatest producer of bachelor's degrees – awarding nearly 127,000 degrees each
year – driving the economy in health care, agriculture, information technology, business,
hospitality, life sciences, public administration, education, media and entertainment.

7.      The CSU is responsible for providing higher education services to students across
the state of California and throughout the United States. Consisting of 23 university campuses,
nearly a dozen off-campus centers, and over 90 auxiliary organizations (several that are
dedicated to sponsored research), the CSU educates more than 450,000 undergraduate and
graduate students each year, and serves each of California's regions, from Humboldt to San
Diego. The CSU offers more than 4,000 degree programs that align with workforce demands,
including in health care and the sciences. CSU alumni make up a global network that is over four
million strong. One in twenty Americans with a college degree earned it at the CSU. The CSU
has more than 63,000 employees.

8.      The CSU receives extensive federal funding for research.  The CSU is distinctive
for its experiential learning model, in which students work directly with faculty scholars on a
broad array of research, scholarship and creative activities.  These hands-on, immersive
opportunities challenge students from all backgrounds to engage more deeply in their studies so

3

**Supp. App. 106**

that they can discover new passions, career paths and to push beyond conventional career possibilities. Working alongside our students, the CSU's faculty researchers apply their immeasurable talents to expand knowledge in their fields to explore and develop cutting-edge fields and to build deep connections with the communities we serve to address the most pressing challenges.

9.    A hallmark of CSU research is immersive student learning and discovery that addresses society's most urgent challenges, including those in health care, agriculture, water, fire prevention and cybersecurity. Undergraduate students who participate in faculty-mentored research are better prepared for future careers, graduate education and leadership roles that contribute to their respective communities.

10.    Supplementing the individual campuses' research activities, the CSU also has 10 multi-campus research consortia that provide experiential learning opportunities for students, to prepare them for the workforce and address vital needs in California and across the country.

11.    The research activities at CSU campuses are largely administered through non-profit, CSU auxiliary organizations.  The California Education Code authorizes the establishment of legally distinct, non-profit auxiliary organizations whose sole purpose is to support the mission of the CSU. These CSU auxiliary organizations are operationally integral to CSU and are authorized to perform limited, essential functions as defined by the California Code of Regulations and the operating agreement between CSU and each auxiliary. Permissible functions include the administration of externally funded projects for CSU campuses, including all grants awarded by the NIH. (See Cal. Educ. Code §§ 89900 et seq.; 5 Cal. Code Regs. § 42500.)

12.    As part of my responsibilities, I meet weekly with the Chief Research Officers at each of the 23 CSU universities and collect data and information regarding grant awards and

**Supp. App. 107**

cancellations.  The Chief Research Officers have reported significant delays in their dealings with NIH including delays in responding to grant award applications and general inquiries. Over the last month, the Chief Research Officers have reported that several grants awarded by the National Institutes of Health ("NIH") were abruptly cancelled. The Chief Research Officers also advised that several universities received a notice from NIH to cease all project activities associated with Undergraduate Research Training Initiative for Student Enhancement ("U-RISE"), which is funded through a grant from the National Institute of General Medical Sciences of NIH.

13.     I provide this declaration to explain the devastating impact on the CSU system and its universities as the result of the abrupt cancellation of several grants awarded by NIH, and from the notice to cease all project activities associated with U-RISE.

**Reliance on NIH Funding**

14.     CSU's budget relies on federal grant funding for its teaching and research mission, including, but not limited to, allocated funding for staffing, clinical trials, dissemination of results, public outreach, teaching and training students and others, equipment, and numerous other activities to fulfill its teaching and research mission, and serve the people of California and the United States.

15.     Federal funds are CSU's single most important source of support for its research, accounting for more than 60% of CSU's total research awards.

16.     For the fiscal year of July 1, 2023 to June 30, 2024 ("Fiscal Year 2024"), the total amount of all federal research awards to the CSU was $599,688,000.

17.     During Fiscal Year 2024, the CSU expended nearly $90 million in NIH contract and grant funding to support approximately 250 projects across 18 of our universities, with the

5

**Supp. App. 108**

total multi-year award funding in the hundreds of millions of dollars. With the current pace of grant terminations, CSU estimates this number will be dramatically reduced causing devastating impacts to CSU universities, faculty and students.

18.     NIH research funding supports the United States' scientific competitiveness worldwide and enables the U.S. to be a global innovation leader. NIH research funding has led to scientific breakthroughs that have improved human health, including new treatments for cancer, diabetes, and declining death rates for heart attack and stroke.  Funding also supports research in the biosciences and critical training grants to prepare the next generation of skilled workers.

19.     Research funding is typically awarded through a competitive grant process, meaning that the annual research budget varies from year to year and depends on the success of CSU's researchers in these competitions. Federally supported research comes to CSU universities through CSU auxiliary organizations in a combination of both single- and multi-year awards. NIH awards are typically multi-year projects. CSU's universities collectively receive and expend millions of dollars annually in multi-year awards for their projects, centers, and institutes, and establish critical budget estimates for planning purposes in reliance on awarded grant funds.

20.     CSU universities receive NIH grants across a variety of institutes and centers encompassed within the NIH.

21.     NIH grants provide essential training and hands-on learning opportunities for CSU students. Grant opportunities also provided stipend and other funding to CSU students, staff and faculty. We estimate that the grant terminations and notice to cease project activities related to U-RISE directly will impact more than 150 students, over 100 faculty, as well as several staff members at CSU university campuses and will indirectly impact many others.

**Supp. App. 109**

## Terminations of NIH Grants

22.     As part of my responsibilities, I meet weekly with the Chief Research Officers at each of the CSU universities and collect data regarding grant cancellations.  Over the last month, the Chief Research Officers have reported several grant cancellations by NIH. Based on my review of the documentation shared with me as of April 1, 2025, I understand that NIH has terminated 17 grants, including at least 5 grants where a CSU university auxiliary was the primary grantee and at least 12 grants where the CSU university auxiliary serves as sub-grantee. Examples of these terminations, include, but are not limited to the following:

  a.  San Francisco State University, through The University Corporation – San Francisco State, received 3 termination notices of multi-year grants, one where it served as the primary awardee, and two where it serves as a sub-awardee. These terminations have resulted in a loss of at least $4,527,437.24 in budgeted research funding to the university.

  b.  San Diego State University, through San Diego State University Research Foundation, received 11 termination notices from the NIH for multi-year grants, including 4 where it served as the primary awardee and 7 where it serves as sub-awardee. These terminations have resulted in a loss of at least $1,575,880.62 in budgeted research funding to the university.  These grants are described in greater detail in the accompanying declaration of Hala Madanat, Vice President for Research & Innovation, San Diego State University.

  c.  California State University, Fullerton, through CSU Fullerton Auxiliary Services Corporation, received one termination notice of a multi-year grant.

**Supp. App. 110**

This termination has resulted in a loss of at least $853,583.14 in budgeted research funding to the university.

 d. California State University, Northridge, through the University Corporation, received 2 sub-award termination notices of multi-year grants, resulting in the loss of at least $162,070.70 in budgeted research funding to the university.

 e. San José State University, through The Tower Foundation of San José State University, has received one sub-award termination notice of a multi-year grant, resulting in the loss of at least $15,316 in budgeted research funding to the university.

23. The Notices of Award for the 17 grants described in Paragraph 22 are attached as Exhibits 1-17.

24. The Termination Notices for the 17 grants described in Paragraph 22 are attached as Exhibits 18-34.

25. These terminations alone will result in the combined loss of nearly $7 million in budgeted research funding to CSU universities. CSU estimates that the total number is much higher -- many CSU universities are currently closed for Spring recess and were not able to provide information regarding the impacts to them. Additionally, while preparing this declaration, I have been alerted to additional NIH grant cancellations that have not yet been accounted for or reflected in the total number of grant cancellations or in the calculation of financial impact.

26. As reflected in Exhibits 18-34, the termination notices sent by NIH to primary grantees at CSU universities followed a template that offered minimal explanation and merely stated that the research no longer "effectuates agency priorities." I have spent many years

**Supp. App. 111**

overseeing the administration of university research programs, including eight years at CSU. In my experience, grant terminations are rare and typically occur only in cases involving misconduct or fraud. Prior to 2025, I had never encountered a federal agency canceling a grant solely due to a shift in agency priorities.

27.     The template termination notices also state that no corrective action can be taken to ensure the grant aligns with agency priorities.  Based on my communications with the Chief Research Officers and review of the records provided, I understand that with respect to the terminated grants, prior to receipt of the termination notice, no CSU universities were provided with or informed of updated "agency priorities," nor were CSU universities given an opportunity to submit "corrected" grant materials to align with these new agency priorities.

28.     The research grants awarded to CSU universities and terminated by NIH provided a direct benefit to the health of all Americans. For example, several terminated grants explored HIV prevention and outreach, including intervention to engage high-risk individuals along the full PrEP care continuum. While some interventions examine impact on specific communities, all efforts directly contribute to disease prevention in America. Mental health grants were terminated, including a grant providing suicide prevention services to sexual and gender minority youth. Notably, grant funding was terminated without any opportunity to bridge individuals at high-risk of suicide to new service providers. NIH also terminated a grant studying hazardous drinking and intimate partner aggression in a diverse sample of women and their partners.

**U-RISE**

29.     Beginning on March 24, 2025 through April 1, 2025, at least 9 CSU universities reported that NIH sent a notice to the university to "cease project activities" related to the grant

**Supp. App. 112**

program for Undergraduate Research Training Initiative for Student Enhancement ("U-RISE"). Notification letters to CSU universities concerning U-RISE are attached as Exhibits 35-43.

30. On April 2, 2025, two of these campuses advised that they received a notice from NIH terminating the U-RISE grant. The termination notices are attached as Exhibits 44 and 45. We anticipate that other CSU university campuses will receive similar termination notices.

31. U-RISE is funded through a grant from the National Institute of General Medical Sciences of NIH. The program aims to broaden perspectives in future scientific and biomedical research by identifying students interested in pursuing research as a career and by providing training opportunities to be competitive for entering graduate programs. This individual, student-centric approach for enhancing undergraduate education provide hands-on research training and mentorship for CSU students.

32. Students accepted into the U-RISE program receive trainee stipends as subsistence allowances to help defray living expenses during research training experiences. Trainee stipends are based on a full-time, 12-month appointment period and are built into the financial aid package of each student recipient.

33. Funding for the U-RISE program may also support student trainee travel expenses to attend and present at scientific meetings with their mentors, summer research experiences for extramural research, university personnel expenses and supplies.

34. At least 9 CSU universities received a notice from NIH stating that the university must "cease project activities as of the current budget period end date of 3/31/2025. Further, please reconcile expenditures with disbursements in the Payment Management System as soon as possible but no later than 4/4/2025, for project activities that occurred through 3/31/2025. Additionally, please amend all active appointments in xTrain to end as of 3/31/2025."

Supp. App. 113

35.     As a result of this notice, the 9 CSU universities must immediately terminate stipends for students in the middle of the semester. Based on the data I have received to date, I am aware that 123 students are impacted. I have not received data from all 9 campuses and expect that many more CSU students will be impacted.  As student financial aid packages account for U-RISE stipends, the mid-stream termination will cause direct and significant harm to participating students.

36.     If additional university campuses receive termination notices and U-RISE funding is not restored, CSU estimates a loss of at least $5.5 million to CSU universities.

**Comparisons Across Administrations**

37.     The recent activity by NIH is unprecedented. In prior years, under both Democratic and Republican administrations, our institution never experienced this volume of unexplained delays or procedural breakdowns.

38.     Renewals were routine and predictable. This year, even long-standing, high-performing programs are in limbo.

39.     Terminations were exceedingly rare and followed due process. The current approach is without precedent in our experience.

**Impact on Institutional Operations and Irreparable Harm**

40.     Reduced or cancelled NIH funding inflicts a multifaceted hardship upon regional public universities such as the CSU. Ongoing projects are forced to grind to a halt, wasting the valuable resources already expended and delaying scientific progress. Innovation is stifled, impeding the development of new medical treatments, technologies, and public health initiatives.

41.     CSU must grapple with maintaining essential research infrastructure, facing financial strain that can lead to layoffs of researchers, staff, and support personnel. Recently

**Supp. App. 114**

received grant terminations have placed CSU universities in an immediate state of review and analysis of non-cancellable financial obligations and mitigation efforts for each project. Mitigation efforts include identification of alternative fund sources both internal and external to the university, and employment placement. There are very limited institutional resources available given projected cuts to the state budget. As a result, program activities are being forced to stop activities, reduce project personnel, and shutdown programs.

42.     The economic repercussions extend well beyond the university, affecting local businesses and industries reliant on university research activities, creating a ripple effect of economic decline.

43.     The impact is particularly severe on training grants, such as the U-RISE program described above, and such programs are designed to train the next generation of the biomedical research workforce and offer crucial support to students. Abrupt funding cuts or pauses disrupt multi-year programs, leaving students in precarious situations mid-semester. The loss of stipends, scholarships, and living expenses creates significant financial hardship, forcing some to abandon their research and educational aspirations by dropping out of school. Reduced access to research opportunities and mentorship diminishes students' exposure to biomedical fields.

44.     The impact of pausing or terminating NIH grants extends far beyond the direct research outcomes, creating a substantial, yet often obscured, disruption to student education and training.  Traditional research grants, while primarily focused on project execution, typically provide essential funding for 2-5 students, enabling them to gain invaluable hands-on research experience and mentorship.  Specialized training grants, like U-RISE, amplify this effect, directly supporting cohorts of 12-18 students, and fostering their development as future scientists.  Furthermore, the indirect impact on student learning is substantial: funded professors

12

integrate their acquired knowledge and cutting-edge research findings into their curricula, enriching the educational experience for a much larger student body. Consequently, grant disruptions not only halt research progress but also impede the development of the next generation of researchers and limit the dissemination of vital scientific knowledge to a wider student audience.

45.    The long-term consequences are profound. Scientific and economic progress slows, and the U.S. risks losing its global leadership in medical research and innovation. Delays in developing treatments and cures negatively impact public health. The abrupt nature of funding cuts inflicts emotional and academic distress upon students, damaging the pipeline of future researchers. The CSU, with limited resources, bears a disproportionate burden, exacerbating financial strain and competitive disadvantages.

**Conclusion**

46.    The breakdown in NIH processes is affecting institutional operations, planning, and public health partnerships. Terminations and delays with no explanation or remedy are undermining confidence in the system. These harms are ongoing and, in many instances, irreparable.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of April, 2025, in Long Beach, California.

Ganesh Raman, Ph.D.
Assistant Vice Chancellor for Research
California State University

13

Supp. App. 116

EXHIBIT 18



Jennifer Sneed <jsneed@sdsu.edu>

---

## FW: [EXT] Grant Termination Notification
1 message

---

**Steve Torok** <steve.torok@sdsu.edu>          Fri, Mar 21, 2025 at 10:52 AM
To: sdsurf_federalimpacts@sdsu.edu

---

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 9:35 AM
**To:** steve.torok@sdsu.edu
**Subject:** [EXT] Grant Termination Notification

 

3/21/2025

Steve Torok

San Diego State University

steve.torok@sdsu.edu

Dear Steve Torok:

Effective with the date of this letter, funding for Project Number 5R34MH129279-03 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 7/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340. [5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective

**Supp. App. 118**

action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle
G. Bulls -S

Digitally signed
by Michelle G.
Bulls -S


Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, NIMH

Director, Office of Policy for Extramural Research Administration

Office of Extramural Research

_____

_____

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

**Supp. App. 119**

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

**Supp. App. 120**

EXHIBIT 19



**Jennifer Sneed <jsneed@sdsu.edu>**

---

## Fwd: [EXT] Grant Termination Notification
1 message

---

**SDSURF Awards** <sdsurfawards@sdsu.edu>                                    Fri, Mar 21, 2025 at 10:49 AM
To: SDSURF Federal Impact Responses <sdsurf_federalimpacts@sdsu.edu>

---------- Forwarded message ---------
From: **Bulls, Michelle G. (NIH/OD) [E]** <michelle.bulls@nih.gov>
Date: Fri, Mar 21, 2025 at 9:29 AM
Subject: [EXT] Grant Termination Notification
To: awards@foundation.sdsu.edu <awards@foundation.sdsu.edu>

 

3/21/2025

Torok, Steve

San Diego State University

awards@foundation.sdsu.edu

Dear Torok, Steve:

Effective with the date of this letter, funding for Project Number 5F31DA059345-02 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 8/17/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340. [5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected

**Supp. App. 122**

characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.[8]*

### Administrative Appeal

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle G. Bulls -S    Digitally signed by Michelle G. Bulls -S


Michelle G. Bulls, on behalf of Pamela Fleming, Chief Grants Management Officer, NIDA

Director, Office of Policy for Extramural Research Administration

Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

**Supp. App. 123**

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

**Supp. App. 124**

# EXHIBIT 20



Jennifer Sneed <jsneed@sdsu.edu>

---

## Fwd: [EXT] Grant Termination Notification
1 message

---

**SDSURF Awards** <sdsurfawards@sdsu.edu>                          Fri, Mar 21, 2025 at 10:50 AM
To: SDSURF Federal Impact Responses <sdsurf_federalimpacts@sdsu.edu>

---------- Forwarded message ---------
From: **Bulls, Michelle G. (NIH/OD) [E]** <michelle.bulls@nih.gov>
Date: Fri, Mar 21, 2025 at 9:33 AM
Subject: [EXT] Grant Termination Notification
To: sdsurfawards@sdsu.edu <sdsurfawards@sdsu.edu>




3/21/2025

Steve Torok

San Diego State University

sdsurfawards@sdsu.edu

Dear Steve Torok:

Effective with the date of this letter, funding for Project Number 5R33MH120236-04 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 4/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340. [5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected

**Supp. App. 126**

characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.[8]*

### Administrative Appeal

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle G. Bulls -S    Digitally signed by Michelle G. Bulls -S


Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, NIMH

Director, Office of Policy for Extramural Research Administration

Office of Extramural Research

––––––––––––––––––

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

**Supp. App. 127**

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

EXHIBIT 21

---------- Forwarded message ---------
From: **Renee Lechner** <rlechner@sdsu.edu>
Date: Fri, Mar 21, 2025 at 1:40 PM
Subject: Fwd: [EXT] SGM SOL Grant Termination Notice
To: SDSURF Federal Impact Responses <sdsurf_federalimpacts@sdsu.edu>

A termination notice for Dr. Gallos's award from the University of North Carolina Chapel Hill (fund 5A038E) was received this afternoon.
_____

**Renée Lechner**
**Interim Senior Director**
*Sponsored Research Administration*
*Sponsored Research Contracting & Compliance*
rlechner@sdsu.edu
O: 619-594-4349
**SDSU Research Foundation** | foundation.sdsu.edu
**5250 Campanile Drive** | San Diego, CA 92182-1934
Twitter | Facebook | Instagram | LinkedIn
Service - Collaboration - Innovation - Diversity – Integrity



Your feedback counts!  Did I help you today?  Please take this brief service survey.

---------- Forwarded message ---------
From: **Desmon Fields** <dfields2@sdsu.edu>
Date: Fri, Mar 21, 2025 at 1:29 PM
Subject: Fwd: [EXT] SGM SOL Grant Termination Notice
To: Renee Lechner <rlechner@sdsu.edu>

Hi Renee,

We have just received this termination notice in regards to Dr. Gallo's award with UNC Chapel Hill Fund #5A038E.

Thank you,

**Desmon Fields** | Analyst
Sponsored Research Contracting and Compliance

[dfields2@sdsu.edu](mailto:dfields2@sdsu.edu)

**SDSU Research Foundation** | [foundation.sdsu.edu](http://foundation.sdsu.edu)
[Twitter](#) | [Facebook](#) | [Instagram](#) | [LinkedIn](#)
Service - Collaboration - Innovation - Diversity - Integrity



Your feedback counts!  Did I help you today?  Please take this brief [service survey](#). If you have any questions, please feel free to reach out to the [Service Desk Team](#).


---------- Forwarded message ---------
From: **Groner, Lexie** <[lexie_groner@unc.edu](mailto:lexie_groner@unc.edu)>
Date: Fri, Mar 21, 2025 at 1:20 PM
Subject: [EXT] SGM SOL Grant Termination Notice
To: Linda Gallo <[lgallo@sdsu.edu](mailto:lgallo@sdsu.edu)>
Cc: [dfields2@sdsu.edu](mailto:dfields2@sdsu.edu) <[dfields2@sdsu.edu](mailto:dfields2@sdsu.edu)>, Ana Talavera <[atalavera@sdsu.edu](mailto:atalavera@sdsu.edu)>, Perreira, Krista <[krista_perreira@med.unc.edu](mailto:krista_perreira@med.unc.edu)>


Hello,

We wanted to let you know that we received a termination letter for the grant R01-HL149778 "Cardiovascular Health of Sexual and Gender Minorities in the Hispanic Community Health Study/Study of Latinos (SGM HCHS/SOL)" with a stop date of 3/20/2025. **We will not be able to accept any additional charges for work performed.** Krista will be in touch to discuss when she has more information.

Thank you and please let us know if you have any questions.

Lexie

**Lexie Groner**
Research Administrator
Carolina Population Center
The University of North Carolina at Chapel Hill
[lexie_groner@unc.edu](mailto:lexie_groner@unc.edu)
She/her

 

03/20/2025

R. David Paul
UNIV OF NORTH CAROLINA CHAPEL HILL
resadminosr@unc.edu

Dear R. David Paul:

Effective with the date of this letter, funding for Project Number 5R01HL149778-05 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 03/01/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs. Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] 2024 Policy Statement at IIA-156.

1

**Supp. App. 132**

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G.
Bulls -S

Digitally signed by
Michelle G. Bulls -S
Date: 2025.03.20
16:46:43 -04'00'

Michelle G. Bulls, on behalf of Anthony Agresti, Chief Grants Management Officer, National Heart, Lung, and Blood Institute
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

**Supp. App. 133**

# EXHIBIT 22

## Raman Paul

| | |
|---|---|
| **From:** | Susan Pelton |
| **Sent:** | Friday, March 21, 2025 10:01 AM |
| **To:** | Raman Paul; Rain Lee; Jocelyn B Tolentino; Kari Wong; Jenny Chau |
| **Cc:** | Joshua David Calder |
| **Subject:** | FW: Grant Termination Notification |

**From:** Joshua David Calder <jdcalder@sfsu.edu>
**Sent:** Friday, March 21, 2025 9:47 AM
**To:** Susan Pelton <spelton@sfsu.edu>
**Subject:** Fw: Grant Termination Notification

It must be Friday ... Here is a termination letter for Emma's U grant effective today ... Not sure if anybody else got it?

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 9:31 AM
**To:** Joshua David Calder <jdcalder@sfsu.edu>
**Subject:** Grant Termination Notification

 

3/21/2025

Joshua Calder
San Francisco State University
jdcalder@sfsu.edu

Dear Joshua Calder:

Effective with the date of this letter, funding for Project Number 5U01MH136574-02 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 8/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may ... terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency

Supp. App. 135

or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

## Administrative Appeal

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, NIMH
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

**Supp. App. 136**

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

**Supp. App. 137**

# EXHIBIT 23



**From:** Danielian, Anna <anna.danielian@csun.edu>
**Date:** Tuesday, March 25, 2025 at 8:39 AM
**To:** Manzueta, Charlene Rosenda <charlene.manzueta@csun.edu>
**Subject:** FW: Notice of Termination: Subaward 253405666 with UW-Milwaukee

**From:** Jeremy T Miner <minerj@uwm.edu>
**Date:** Monday, March 24, 2025 at 7:25 PM
**To:** Capous-Desyllas, Moshoula <moshoula@csun.edu>, Danielian, Anna <anna.danielian@csun.edu>, Quevedo, Sabrina Jessica <sabrina.quevedo@csun.edu>, RSP Awards <awards@csun.edu>
**Cc:** Priya Nambisan <nambisap@uwm.edu>, UWM Office of Sponsored Programs - Sub-Awards <or-osp-subawards@uwm.edu>, Carla Durand <durandc@uwm.edu>, Kristian M OConnor <krisocon@uwm.edu>, Monica L Wendel <wendel@uwm.edu>, Lance Weinhardt <weinhard@uwm.edu>, Michael D Laiosa <laiosa@uwm.edu>, Jennifer B Herzog <herzogj@uwm.edu>
**Subject:** Notice of Termination: Subaward 253405666 with UW-Milwaukee

Dr. Desyllas and colleagues,

The University of Wisconsin-Milwaukee has received official notice of termination for grant 1R01MH135498-01A1, titled "Using digital photovoice to explore the relationships between social media content and suicidality among transgender adolescents." As a result, we are

unable to proceed with the subaward agreement (253405666). The effective date of the termination was March 21, 2025.

We appreciate your collaboration with UW-Milwaukee.

Jeremy

***************************
Jeremy T. Miner
Associate Director of Pre-Award
Office of Sponsored Programs
University of Wisconsin-Milwaukee
414-251-9255
minerj@uwm.edu
***************************

 Outlook

---

**Fw: Grant Termination Notification**

---

**From** UWM Office of Sponsored Programs - Grant Notifications <grant-notice@uwm.edu>

**Date** Mon 3/24/2025 7:47 AM

**To** Office of Research Support <or-support@uwm.edu>

---

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 11:35 AM
**To:** UWM Office of Sponsored Programs - Grant Notifications <grant-notice@uwm.edu>
**Subject:** Grant Termination Notification



3/21/2025

Jeremy Miner
University Of Wisconsin Milwaukee
GRANT-NOTICE@UWM.EDU

Dear Jeremy Miner:

Effective with the date of this letter, funding for Project Number 1R01MH135498-01A1 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 9/5/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]," According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]," At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of

**Supp. App. 141**

many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle
G. Bulls -S

Digitally signed
by Michelle G.
Bulls -S

Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, NIMH
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

**Supp. App. 142**

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

**Supp. App. 143**

EXHIBIT 24



**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Date:** Monday, March 24, 2025 at 12:53 PM
**To:** Manzueta, Charlene Rosenda <charlene.manzueta@csun.edu>
**Subject:** Grant Termination Notification

 

3/24/2025

Ms. Manzueta, Charlene Rosenda
California State University Northridge
charlene.manzueta@csun.edu

Dear Ms. Manzueta, Charlene Rosenda:

Effective with the date of this letter, funding for Project Number 5U01MD017434-02 is hereby terminated pursuant to the Fiscal Year 2023 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2023 Policy Statement applies to your project because NIH approved your grant on 12/1/2022, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2023 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

**Supp. App. 145**

The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle G. Bulls -S    Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Priscilla Grant, Chief Grants Management Officer, NIMHD
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

**Wednesday, March 26, 2025 at 13:12:31 Pacific Daylight Time**

| | |
|---|---|
| **Subject:** | FW: Grant Termination Notification - Subaward A22-0039-S002 |
| **Date:** | Tuesday, March 25, 2025 at 7:19:23 PM Pacific Daylight Time |
| **From:** | Manzueta, Charlene Rosenda |
| **To:** | kimmy@sipacares.org |
| **CC:** | Bautista Lopez, Erika, Galvez, Joseph A, Kwan, Patchareeya P, Rillorta, Marie, Slavik, Grace Pauline |

**Attachments:** image001.jpg, image002.png, image003.png

Dear Executive Director Kimmy Maniquis:

We regret to inform you that California State University, Northridge, has received an official termination notice for grant 5U01MD017434-02. Below is the email notice regarding this matter.

As a result of this notice, we are unable to proceed with the subaward agreement A22-0039-S002. The effective date of termination is March 24, 2025. We will inform you of any updates as we seek legal guidance regarding this notice.

Due to this notice, please halt any expenditures beyond March 24, 2025, as they will be deemed unallowable. Additionally, we kindly request that your organization submit any unpaid invoices promptly so we can process them as soon as possible.

We appreciate your partnership with Dr. Patty Kwan and our institution. Please forward this notice to the appropriate contacts at your organization. If you have any questions, do not hesitate to reach out.

Thank you for your time and attention,

Charlene

**Charlene Rosenda Manzueta, EdD, MA, CRA**
Managing Director, Research and Sponsored Programs, AOR | IO
California State University, Northridge
18111 Nordhoff Street (Valera Hall 275), Northridge, CA 91330-8232
(Direct Tel) 818.677.5008 | (Office Tel) 818.677.2901 | (Fax) 818.677.4691
| Charlene.Manzueta@csun.edu



--

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Date:** Monday, March 24, 2025 at 12:53 PM
**To:** Manzueta, Charlene Rosenda <charlene.manzueta@csun.edu>
**Subject:** Grant Termination Notification

 

3/24/2025

Ms. Manzueta, Charlene Rosenda
California State University Northridge
charlene.manzueta@csun.edu

Dear Ms. Manzueta, Charlene Rosenda:

Effective with the date of this letter, funding for Project Number 5U01MD017434-02 is hereby terminated pursuant to the Fiscal Year 2023 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2023 Policy Statement applies to your project because NIH approved your grant on 12/1/2022, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2023 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the

**Supp. App. 148**    2 of 3

issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S    Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Priscilla Grant, Chief Grants Management Officer, NIMHD
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

**Wednesday, March 26, 2025 at 13:10:46 Pacific Daylight Time**

| | |
|---|---|
| **Subject:** | FW: Grant Termination Notification - Subaward A22-0039-S004 |
| **Date:** | Tuesday, March 25, 2025 at 7:34:42 PM Pacific Daylight Time |
| **From:** | Manzueta, Charlene Rosenda |
| **To:** | chancee@thaicdc.org |
| **CC:** | Bautista Lopez, Erika, Galvez, Joseph A, Kwan, Patchareeya P, Slavik, Grace Pauline, Rillorta, Marie |

**Attachments:** image001.jpg, image002.png, image003.png

Dear Executive Director Chancee Martorell:

We regret to inform you that California State University, Northridge, has received an official termination notice for grant 5U01MD017434-02. Below is the email notice regarding this matter.

As a result of this notice, we are unable to proceed with the subaward agreement A22-0039-S004. The effective date of termination is March 24, 2025. We will inform you of any updates as we seek legal guidance regarding this notice.

Due to this notice, please halt any expenditures beyond March 24, 2025, as they will be deemed unallowable. Additionally, we kindly request that your organization submit any unpaid invoices promptly so we can process them as soon as possible.

We appreciate your partnership with Dr. Patty Kwan and our institution. Please forward this notice to the appropriate contacts at your organization. If you have any questions, do not hesitate to reach out.

Thank you for your time and attention,

Charlene

**Charlene Rosenda Manzueta, EdD, MA, CRA**
Managing Director, Research and Sponsored Programs, AOR | IO
California State University, Northridge
18111 Nordhoff Street (Valera Hall 275), Northridge, CA 91330-8232
(Direct Tel) 818.677.5008 | (Office Tel) 818.677.2901 | (Fax) 818.677.4691
| Charlene.Manzueta@csun.edu


CALIFORNIA STATE UNIVERSITY NORTHRIDGE

--

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Date:** Monday, March 24, 2025 at 12:53 PM
**To:** Manzueta, Charlene Rosenda <charlene.manzueta@csun.edu>
**Subject:** Grant Termination Notification

 
National Institutes of Health
Office of Extramural Research

3/24/2025

Ms. Manzueta, Charlene Rosenda
California State University Northridge
charlene.manzueta@csun.edu

Dear Ms. Manzueta, Charlene Rosenda:

Effective with the date of this letter, funding for Project Number 5U01MD017434-02 is hereby terminated pursuant to the Fiscal Year 2023 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2023 Policy Statement applies to your project because NIH approved your grant on 12/1/2022, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2023 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards. [4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the

issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S    Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Priscilla Grant, Chief Grants Management Officer, NIMHD
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

EXHIBIT 25

| From: | Jennifer Sneed on behalf of SDSURF Awards |
|---|---|
| To: | SDSURF Federal Impact Responses |
| Subject: | Fwd: [EXT] Important Notice Regarding Subawards under NIH Prime Award UM2HD111102 |
| Date: | Wednesday, March 26, 2025 7:04:48 AM |
| Attachments: | Outlook-A close-up.jfif |
| | 5UM2HD111102-03-Noa.pdf |

Good morning.  I do not think this was forwarded yesterday. This is for Dr. Horvath's subawards, funds- 5B104C and 5B547B.  We did receive an update about this from Dr. Horvath yesterday and have already started our internal processes.

Yesterday we received the termination notices, this is now the matching NOA. We have not received the subaward end date amendments/termination notice directly  yet.

Thank you, Jenny

---------- Forwarded message ---------
From: **Aras Aziz** <asaziz@fsu.edu>
Date: Tue, Mar 25, 2025 at 1:55 PM
Subject: [EXT] Important Notice Regarding Subawards under NIH Prime Award UM2HD111102
To: Angie Eaton <aeaton2@fsu.edu>, Lisa Hightow-Weidman <lhightowweidman@fsu.edu>
Cc: Rose Driber <rdriber@fsu.edu>


Florida State University received the attached termination from the NIH for prime award UM2HD111102. Our records show that your institution has received a subaward from FSU under this prime award. The effective date of the termination is 3/21/2025.  While we determine our next steps, we ask for your cooperation and assistance. Additional information will be forthcoming as soon as possible.



A close-up of a logo

**Aras Aziz, MA, CRA**

***Subcontract Officer III***

Florida State University

(850) 644-8654

(850) 491-5799

asaziz@fsu.edu

Case: 25-11138  Date Filed: 04/25/2025  Page: 53 of 117  ID: 6734270

 

3/21/2025

Stacey Patterson
Florida State University
SRA-PRE@fsu.edu


Dear Stacey Patterson:

Effective with the date of this letter, funding for Project Number 5UM2HD111102-03 is hereby terminated pursuant to the Fiscal Year 2025 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2025 Policy Statement applies to your project because NIH approved your grant on 12/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2025 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Supp. App. 155**

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Margaret Young, Chief Grants Management Officer, NICHD
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] NIH Grants Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] NIH Grants Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

**Supp. App. 156**

EXHIBIT 26

| From: | Jennifer Sneed on behalf of SDSURF Awards |
|---|---|
| To: | SDSURF Federal Impact Responses |
| Subject: | Fwd: [EXT] Important Notice Regarding Subawards under NIH Prime Award UM2HD111102 |
| Date: | Wednesday, March 26, 2025 7:04:48 AM |
| Attachments: | Outlook-A close-up.jfif |
| | 5UM2HD111102-03-Noa.pdf |

Good morning.  I do not think this was forwarded yesterday. This is for Dr. Horvath's subawards, funds- 5B104C and 5B547B.  We did receive an update about this from Dr. Horvath yesterday and have already started our internal processes.

Yesterday we received the termination notices, this is now the matching NOA. We have not received the subaward end date amendments/termination notice directly  yet.

Thank you, Jenny

---------- Forwarded message ---------
From: **Aras Aziz** <asaziz@fsu.edu>
Date: Tue, Mar 25, 2025 at 1:55 PM
Subject: [EXT] Important Notice Regarding Subawards under NIH Prime Award UM2HD111102
To: Angie Eaton <aeaton2@fsu.edu>, Lisa Hightow-Weidman <lhightowweidman@fsu.edu>
Cc: Rose Driber <rdriber@fsu.edu>


Florida State University received the attached termination from the NIH for prime award UM2HD111102. Our records show that your institution has received a subaward from FSU under this prime award. The effective date of the termination is 3/21/2025.  While we determine our next steps, we ask for your cooperation and assistance. Additional information will be forthcoming as soon as possible.


A close-up of a logo

**Aras Aziz, MA, CRA**

***Subcontract Officer III***

Florida State University

(850) 644-8654

(850) 491-5799

asaziz@fsu.edu

**From:** Bulls, Michelle G (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 12:30:10 PM
**To:** SRA Pre-Award General Mailbox <SRA-PRE@fsu.edu>
**Subject:** Grant Termination Notification

 

3/21/2025

Stacey Patterson
Florida State University
SRA-PRE@fsu.edu

Dear Stacey Patterson:

Effective with the date of this letter, funding for Project Number 5UM2HD111102-03 is hereby terminated pursuant to the Fiscal Year 2025 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2025 Policy Statement applies to your project because NIH approved your grant on 12/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2025 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Supp. App. 159**

## Administrative Appeal

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle
G. Bulls -S

Digitally signed
by Michelle G.
Bulls -S

Michelle G. Bulls, on behalf of Margaret Young, Chief Grants Management Officer, NICHD
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] NIH Grants Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] NIH Grants Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

**Supp. App. 160**

EXHIBIT 27



Jennifer Sneed <jsneed@sdsu.edu>

---

## Fwd: Immediate Action Required - Termination Letter 1R61 MH133710-01A1
1 message

---

**Aaron J. Blashill** <ajblashill@sdsu.edu>                                        Fri, Mar 21, 2025 at 10:57 AM
To: sdsurf_federalimpacts@sdsu.edu, Michele Goetz <mgoetz@sdsu.edu>, Vanessa Malcarne <VMALCARNE@sdsu.edu>

Hi Michele--our sub award from Auburn, the R61 eating disorder treatment student was just cancelled--please see below and attached. I'm currently in Dallas, as my son was just born here a couple of days ago--I would like to speak to you today if possible, given the impact on Arjan, our fulltime coordinator (Nathaniel Holmes) and one of my PhD students (Em Chakkour) who are all funded on this grant. My cell is 857-998-3398. I'm including Vanessa Malcarne on this message as JDP director.

Thank you,
Aaron

*Aaron J. Blashill, Ph.D.*
*Professor, Department of Psychology*
*Director, BISH Lab*
*San Diego State University*
*SDSU/UCSD Joint Doctoral Program in Clinical Psychology*
*6363 Alvarado Court, Suite 101*
*San Diego, CA 92120*
*(T) 619-594-2245*
*https://bishlab.sdsu.edu*
*Pronouns: He/Him/His (What's this?)*

---------- Forwarded message ---------
From: **Tiffany Brown** <tiffanybrown@auburn.edu>
Date: Fri, Mar 21, 2025 at 12:49 PM
Subject: Fwd: Immediate Action Required - Termination Letter 1R61 MH133710-01A1
To: Aaron J. Blashill <ajblashill@sdsu.edu>


Sent from my iPhone

Begin forwarded message:


> **From:** Sponsor Programs <OSPADMN@auburn.edu>
> **Date:** March 21, 2025 at 9:21:21 AM CDT
> **To:** Tiffany Brown <tiffanybrown@auburn.edu>
> **Cc:** Cynthia Bowling <bowlicj@auburn.edu>, Savannah Mehren <shm0015@auburn.edu>, Konnie Pace
> <kdp0038@auburn.edu>, Ginger Phillabaum <phillgp@auburn.edu>, Gina Bailey <bailerh@auburn.edu>,
> Sheilah Wiley <ssw0044@auburn.edu>
> **Subject: FW: Immediate Action Required -  Termination Letter 1R61 MH133710-01A1**


Good morning Dr. Brown,


As I believe you may have already been notified, the attached letter provides the
termination of Award 1R16 MH133710-01A1 (AU Fund 201432) from NIH.  The
termination date is as of March 21, 2025.  Please ensure all expenditures are ceased at

**Supp. App. 162**

this point and that all charges prior to the termination date are in place for invoicing purposes. I have also copied the subaward team so that a modification can be issued to both San Diego State and Yale University.

While not unexpected, I am very sorry to have to share this news with you.  If I can be of any assistance, please do not hesitate to reach out.

Warm regards,
Tony

---

**From:** Ta, Kristin (NIH/OD) [E] <kristin.ta@nih.gov> **On Behalf Of** Bulls, Michelle G. (NIH/OD) [E]
**Sent:** Friday, March 21, 2025 6:19 AM
**To:** Sponsor Programs <OSPADMN@auburn.edu>
**Cc:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>; Ta, Kristin (NIH/OD) [E] <kristin.ta@nih.gov>; Jarosik, Theresa (NIH/NIMH) [E] <theresa.jarosik@nih.gov>
**Subject:** [EXT] Immediate Action Required - Termination Letter 1R61 MH133710-01A1

---

┌─────────────────────────────────────────────────────────┐
│         **CAUTION: Email Originated Outside of Auburn.**         │
└─────────────────────────────────────────────────────────┘

Please see attached.

---

📄 **TerminationLetter_1R61MH133710-01A1_03212025.pdf**
256K

 

March 21, 2025

James Weyhenmeyer
Auburn University
ospadmn@auburn.edu

Dear James Weyhenmeyer:

Effective with the date of this letter, funding for Project Number 1R61 MH133710-01A1 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on August 1, 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S
Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, National Institute of Mental Health
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

2

EXHIBIT 28



Office of Grants and Contracts
Research Administration
13001 East 17th Place
Aurora, CO 80045

San Diego State University Research Foundation
Attn: Sandra M. Nordahl | sdsurfawards@sdsu.edu

Re: Termination of Subaward number: FY24.1259.002

Project: *Proud to Quit (P2Q): A Person-centered mobile technology intervention for smoking cessation among transgender adults*

Prime #: 5R34DA058191-02

On March 21, 2025, National Institutes of Health issued the attached Notice to Terminate this project in full as of March 21, 2025 ("Termination Date"). Please cease all work on this project immediately. No new costs can be incurred on the subaward on or after the Termination Date.

Please communicate the above instructions to any lower-tier subrecipients you may have on this award.

Thank you,

Liz Causey
Assistant Director of Contracts
Office of Grants & Contracts

**Supp. App. 167**



Office of Grants and Contracts
Research Administration
13001 East 17th Place
Aurora, CO 80045

 

3/21/2025
Alex Franz
University Of Colorado Denver
ALEX.FRANZ@CUANSCHUTZ.EDU

Dear Alex Franz:

Effective with the date of this letter, funding for Project Number 5R34DA058191-02 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 9/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

University of Colorado

Office of Grants and Contracts
Research Administration
13001 East 17th Place
Aurora, CO 80045

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11] The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Pamela Fleming, Chief Grants Management Officer, NIDA Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

**Supp. App. 169**

EXHIBIT 29



# UNIVERSITY OF CALIFORNIA, SAN DIEGO

## UCSD

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ

SPONSORED PROJECTS OFFICE
University of California, San Diego
9500 Gilman Drive #0934
La Jolla, CA 92093-0934

March 20, 2025

To: San Diego State University Research Foundation

Subject: Termination of Subaward No: 703792 ("Subaward")

Dear San Diego State University Research Foundation colleagues,

We regret to inform you that the Regents of the University of California, San Diego ("UCSD") received an official notification of termination from NATIONAL INSTITUTE OF MENTAL HEALTH (NIMH) ("Agency") for the NEXUS: A novel social network approach to study the effects of intersectional stigma on HIV prevention among Latino MSM (*5R01MH123282*), effective 3/20/2025.

Accordingly, you are hereby notified that the Subaward is terminated. All work must stop immediately, including termination of all subcontracts and activities. Please follow close-out procedures specified in the Subaward, including Agency requirements. UCSD will only be able to reimburse Subrecipient for costs reimbursed by Agency.

 Please confirm receipt of this message on behalf of your organization.

It has been a privilege collaborating with you, and we look forward to the opportunity to work together again in the future.


Sincerely

Sheila K. Paul
Manager- Outgoing Subaward Team

**Supp. App. 171**

 

03/20/2025

Nina Quach
UNIVERSITY OF CALIFORNIA, SAN DIEGO
nihawards@ucsd.edu


Dear Nina Quach:

Effective with the date of this letter, funding for Project Number 5R01MH123282-05 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 05/01/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs. Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

**Supp. App. 172**

an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,



Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer,
National Institute of Mental Health
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

**Supp. App. 173**

# EXHIBIT 30

 

March 12, 2025

Rick Gulizia
San Diego State University
sdsurfawards@sdsu.edu

Dear Rick Gulizia:

Funding for Project Number 5R01MH133821-02 is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on May 1, 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

**Supp. App. 175**

decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to   *SAspending.gov.*

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle G. Bulls -S
Digitally signed by Michelle G. Bulls -S
Date: 2025.03.12 23:37:45 -04'00'

Michelle G. Bulls, on behalf Terri Jarosik, Chief Grants Management Officer, NIMH
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research


---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

**Supp. App. 176**

EXHIBIT 31



Jennifer Sneed <jsneed@sdsu.edu>

---

## Fwd: FW: Subcontract Amendment 00129241/00079361 - Terminated
1 message

**Jennifer Sneed** <jsneed@sdsu.edu>                                                    Sat, Mar 29, 2025 at 12:59 PM
To: Jennifer Sneed <jsneed@sdsu.edu>

---

---------- Forwarded message ---------
From: **Delwyn Catley** <dcatley@sdsu.edu>
Date: Fri, Mar 28, 2025 at 2:25 PM
Subject: FW: Subcontract Amendment 00129241/00079361 - Terminated
To: Annie Moore <amoore3@sdsu.edu>, jsneed@sdsu.edu <jsneed@sdsu.edu>

Well here's the first one of ours to get the chop. It wasn't on my radar b/c I thought we'd spent it out by the grant end date which I believe was back in Dec. But online it looks like there is $394 left. If I'm remembering right this was the amount left when the grant ended but we got a no-cost extension so I think we should have spent this out subsequently. In any event, I have been continually working on this project up until now so I see no reason why we can't bill for effort prior to March 21 to zero this out.

Delwyn

---

**From:** Health Sciences District Research Administration <hsdresearch@umkc.edu>
**Date:** Friday, March 28, 2025 at 11:51 AM
**To:** Annie Moore <amoore3@sdsu.edu>, Delwyn Catley <dcatley@sdsu.edu>, Sarah Harper <sharper@sdsu.edu>
**Cc:** Berkley Patton, Jannette <berkleypattonj@umkc.edu>, Hecker, Mark <heckerm@umkc.edu>
**Subject:** [EXT] Subcontract Amendment 00129241/00079361 - Terminated

Hello,

We are saddened to inform you that NIH Grant "Faithful Response II: COVID-19 Rapid Test-to-Treat with Kansas City Missouri Health African American Churches" has been terminated effective March 21st 2025. Therefore, our subcontract with (Principal Investigator Dr. Delwyn Catley) also needs to be terminated. UMKC Principal investigator, Dr. Berkley-Patton, plans to appeal the NIH decision, however, we wanted to let you know and to please submit any invoices for expenses prior to 3/21/2025, for payment.

Reason for termination stated in the updated NIH award letter dated 3/23/2025:

INFORMATION: It is the policy of NIH not to prioritize research activities that focus on DEI. This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to

Page 5 of 12

expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, this project is University of Missouri Kansas City may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

**Supp. App. 178**

Thank you,

Clare Carson

Grant Specialist

Cmkmv7@umkc.edu

University Health and the UMKC School of Medicine

Research Administration

2411 Holmes Street

Kansas City, MO  64108

☎  P: 816-235-5366

Office = UMKC School of Medicine, 4th floor (M4-309) Blue-unit





NIH_NOA_1U01MD018310-01_3.25.2025.pdf
320K

Supp. App. 179

# EXHIBIT 32

**Raman Paul**

| | |
|---|---|
| **From:** | Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov> |
| **Sent:** | Wednesday, March 26, 2025 11:25 AM |
| **To:** | Susan Pelton |
| **Subject:** | Grant Termination Notification |

 

3/26/2025

Susan Pelton
San Francisco State University
spelton@sfsu.edu

Dear Susan Pelton:

Effective with the date of this letter, funding for Project Number 5U01ES036366-03 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 7/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

**Supp. App. 181**

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.[8]*

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Jenny Greer, Chief Grants Management Officer, NIEHS
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] NIH Grants Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] NIH Grants Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

**Supp. App. 182**

**Raman Paul**
___

| | |
|---|---|
| **From:** | Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov> |
| **Sent:** | Wednesday, March 26, 2025 11:25 AM |
| **To:** | Susan Pelton |
| **Subject:** | Grant Termination Notification |

 

3/26/2025

Susan Pelton
San Francisco State University
spelton@sfsu.edu

Dear Susan Pelton:

Effective with the date of this letter, funding for Project Number 3U01ES036366-03S1 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 7/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

**Supp. App. 183**

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle
G. Bulls -S

Digitally signed
by Michelle G.
Bulls -S

Michelle G. Bulls, on behalf of Jenny Greer, Chief Grants Management Officer, NIEHS
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] NIH Grants Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] NIH Grants Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

**Supp. App. 184**

**Raman Paul**
___

| | |
|---|---|
| **From:** | Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov> |
| **Sent:** | Wednesday, March 26, 2025 11:25 AM |
| **To:** | Susan Pelton |
| **Subject:** | Grant Termination Notification |

 

3/26/2025

Susan Pelton
San Francisco State University
spelton@sfsu.edu

Dear Susan Pelton:

Effective with the date of this letter, funding for Project Number 3U01ES036366-03S2 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 11/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

**Supp. App. 185**

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle
G. Bulls -S

Digitally signed
by Michelle G.
Bulls -S

Michelle G. Bulls, on behalf of Jenny Greer, Chief Grants Management Officer, NIEHS
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] NIH Grants Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] NIH Grants Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

**Supp. App. 186**

EXHIBIT 33

**orsp@sfsu edu**

| | |
|---|---|
| **From:** | Columbia University – SPA <spa@cumc.columbia.edu> |
| **Sent:** | Saturday, March 22, 2025 7:16 AM |
| **To:** | orsp@sfsu edu |
| **Cc:** | Columbia University – SPA; grantreview@columbia.edu; Hughes, Tonda L. |
| **Subject:** | Important Information regarding your Subaward with Columbia University |

Re:     Prime award No. 5R01AA027252-05
        Subaward No. 1(GG014711-01)

Dear Partner:

The University received notice from the US Government, that it has terminated the above-referenced award in full, effectively immediately. Given the complexity of subaward management, we will be managing subawardees on a case-by-case approach, and will be in touch with you for further discussion and information.

In the meantime, you must immediately limit expenditures on the award only to those necessary to achieve a minimum level of research continuity. New equipment purchases and travel are prohibited. Columbia does not anticipate reimbursing expenditures that exceed a historical run-rate on the award (with the run-rate excluding travel, equipment and significant one-time purchases). If you anticipate your personnel expenses in the thirty-day period ending March 31, 2025 will exceed 5% of the total annual personnel budget, and you are concerned about research continuity at this level of expenditure, you must request advance approval for expenditure. You may submit any request for approval to the Columbia PI, who will escalate it within the University for appropriate approval.

Please confirm receipt of this communication and that you have understood and actioned the directive on the above-referenced award.

Thank you for your understanding and prompt attention to this matter.

Sincerely,


William Berger
Assistant Vice President
Sponsored Projects Administration
Columbia University

**Supp. App. 188**

# EXHIBIT 34

---------- Forwarded message ---------
From: **Research Foundation Office Sponsored Projects Mailbox**
<research-foundation-osp@sjsu.edu>
Date: Mon, Mar 3, 2025 at 9:43 AM
Subject: Fwd: Termination of Subaward No. KK2321
To: Jessica Trask <jessica.trask@sjsu.edu>, VP of Research and Innovation Mailbox
<vp.researchandinnovation@sjsu.edu>


Hi Jessica,
Please see below with the PTE. NIH is canceling an award. Laurie Drabble is the PI. Let me
know what information you need.
Thank you,
Deb


---------- Forwarded message ---------
From: **Daniela Gallardo** <gallardo@research.ucsb.edu>
Date: Fri, Feb 28, 2025 at 4:46 PM
Subject: Termination of Subaward No. KK2321
To: <research-foundation-osp@sjsu.edu>
Cc: Bethany Guerrero <baguerrero@ucsb.edu>, Ector Flores-Garcia
<efloresgarcia@ucsb.edu>, GGSE Contracts & Grants team <CG.team@education.ucsb.edu>


Hello,

NIH has decided to terminate the award titled, "Health Effects of Intersectional Stigma among
Sexual minority Women" on February 28, 2025, effective immediately.  With that said all
activities must be ceased and we must terminate all subawards, including subaward no.
KK2321, under this project (R21AA029513).   I have attached a copy of the notification for
reference.

We will provide you with an official notification in the coming days.

If you have any questions or would like to discuss further, please let me know.


best,
Daniela


                    Daniela Gallardo

Sr. Sponsored Projects Officer/Subaward Officer

Office of Research
Office: (805) 893-7027
Email: gallardo@research.ucsb.edu

Email Offline Day:  Thursday
Upcoming out of office:
Upcoming office closure:  March 21 (Holidays)



**NIH** National Institutes of Health

Public Health Service
National Institutes of Health

National Institute on
Alcohol
Abuse and Alcoholism
6700B Rockledge Drive
Bethesda, MD 20892-6902

February 28, 2025

Elizabeth Carrillo
Sponsored Projects Analyst
The Regents of the University of California, Santa Barbara
3227 Cheadle Hall, 3rd Floor
Santa Barbara, CA 931062050

Dear Elizabeth Carrillo,

      Funding for Project Number 5 R21 AA029513-02 is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2) (2024).  This letter constitutes a notice of termination.[2]

      The 2024 Policy Statement applies to your project because NIH approved your grant on 08/18/2023, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

      The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[4]  According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[5]  At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

      This award no longer effectuates agency priorities.  NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

**Supp. App. 192**

low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of Project Number 5 R21 AA029513-02 is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *SAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Matthew J. Memoli, MD, MS, Acting Director, National Institutes of Health no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Matthew J. Memoli, MD, MS, Acting Director, National Institutes of Health may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

*Judy S. Fox*

Judy S. Fox -S    Digitally signed by Judy S. Fox -S
Date: 2025.02.28 18:13:05 -05'00'

---

[6] 2024 Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D.
[11] *Id.* § 50.406(a).
[12] *Id.* § 50.406(b).

# EXHIBIT 35

**Friday, March 28, 2025 at 09:04:37 Pacific Daylight Time**

**Subject:** FW: Information regarding URISE award
**Date:** Thursday, March 27, 2025 at 11:06:25 Pacific Daylight Time
**From:** Imelda Hammes
**To:** Gillian Fischer, Chi Nguyen, Dakota Hughes

FYI

Imelda Hammes
Post Award Analyst
Office of Sponsored Research and Programs
(T) 310-243-2855
ihammes@csudh.edu

**From:** Rosenzweig, Justin (NIH/NIGMS) [E] <rosenzwj@nigms.nih.gov>
**Sent:** Thursday, March 27, 2025 11:00 AM
**To:** Imelda Hammes <ihammes@csudh.edu>
**Subject:** Information regarding URISE award

RE: T34 GM140930-03

Contact PI: MCCAULEY, ERIN PATRICIA

Organizational Representative IMELDA HAMMES,

NIH is currently undergoing a process to assess whether pending awards perpetuate current agency priorities. You are advised to cease project activities as of the current budget period end date of 3/31/2025. Further, please reconcile expenditures with disbursements in the Payment Management System as soon as possible but no later than 4/4/2025, for project activities that occurred through 3/31/2025. Additionally, please amend all active appointments in xTrain to end as of 3/31/2025.

Sincerely,

Justin Rosenzweig
Grants Management Team Leader, GAB
National Institute of General Medical Sciences, NIH/DHHS

# EXHIBIT 36

| From: | Vas Narayanaswami |
|---|---|
| To: | Bessie Strategos; Crystal Trocadero; Jason Schwans |
| Cc: | Cheyanne Ramon; Barbara Taylor; Curtis Bennett; Kelly Young; Yvette Castano |
| Subject: | Fw: Information regarding URISE award |
| Date: | Thursday, March 27, 2025 11:27:12 AM |

Hello everyone,

Here is the response I received when I prompted the T34 program officer about the future of the URISE program....

I am going to go take a deep breath and process this information.

Vas

---

**From:** Rosenzweig, Justin (NIH/NIGMS) [E] <rosenzwj@nigms.nih.gov>
**Sent:** Thursday, March 27, 2025 11:03 AM
**To:** Vas Narayanaswami <vas.narayanaswami@csulb.edu>
**Subject:** Information regarding URISE award

> You don't often get email from rosenzwj@nigms.nih.gov. Learn why this is important

CAUTION: This email was sent from an external source.

RE: T34 GM149378-02

Contact PI: NARAYANASWAMI, VASANTHY

Organizational Representative MS BESSIE STRATEGOS,

NIH is currently undergoing a process to assess whether pending awards perpetuate current agency priorities. You are advised to cease project activities as of the current budget period end date of 3/31/2025. Further, please reconcile expenditures with disbursements in the Payment Management System as soon as possible but no later than 4/4/2025, for project activities that occurred through 3/31/2025. Additionally, please amend all active appointments in xTrain to end as of 3/31/2025.

Sincerely,

Justin Rosenzweig
Grants Management Team Leader, GAB
National Institute of General Medical Sciences, NIH/DHHS

EXHIBIT 37

**Subject:** Information regarding URISE award

**Date:**   Thursday, March 27, 2025 at 11:01:31 AM Pacific Daylight Time

**From:**   Rosenzweig, Justin (NIH/NIGMS) [E]

**To:**   Manzueta, Charlene Rosenda

RE: T34 GM136450-04

Contact PI: ZAVALA, MARIAELENA B

Organizational Representative MICHAEL EPPING,

NIH is currently undergoing a process to assess whether pending awards perpetuate current agency priorities. You are advised to cease project activities as of the current budget period end date of 3/31/2025. Further, please reconcile expenditures with disbursements in the Payment Management System as soon as possible but no later than 4/4/2025, for project activities that occurred through 3/31/2025. Additionally, please amend all active appointments in xTrain to end as of 3/31/2025.

Sincerely,

Justin Rosenzweig
Grants Management Team Leader, GAB
National Institute of General Medical Sciences, NIH/DHHS

EXHIBIT 38


## Outlook

---

## FW: [External] NoA: 5R25AG076390-03 PI: Jennifer Piazza

---

**From** Weber, Myrna <myweber@Fullerton.edu>

**Date** Mon 3/24/2025 2:55 PM

**To** Tiwari, Binod <btiwari@fullerton.edu>

**Cc** Tranilla, Tina <ttranilla@Fullerton.edu>; Riveron, Olga <oriveron@fullerton.edu>

📎 1 attachment (235 KB)

5R25AG076390-03-Noa.pdf;

Hi Binod

We received a termination notice for Jennifer Piazza and Laura Zettel-Watson's R25.

---

**SECTION IV – AG SPECIFIC AWARD CONDITIONS – 5R25AG076390-03 REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

It is the policy of NIH not to prioritize DEI. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs. Therefore, this project is terminated. CALIFORNIA STATE UNIVERSITY FULLERTON may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), as applicable) within 120 days of the end of this grant.

Page 5 of 6

---

*Myrna A. Weber, M.B.A. CRA*

Sr Director, Sponsored Programs

1121 N. State College Blvd 2nd Floor ASC-213

Fullerton, CA 92831-3104

☎ 657-278-7679/Cell 714-864-8410

✉ myweber@fullerton.edu



**Supp. App. 201**

3/26/25, 5:25 PM NoA: 5R25AG076390-03 PI: Jennifer Piazza ID: 6734270

**From:** eraNotifications@mail.nih.gov <eraNotifications@mail.nih.gov>
**Sent:** Sunday, March 23, 2025 9:08 PM
**To:** Awards <awards@Fullerton.edu>
**Subject:** [External] NoA: 5R25AG076390-03 PI: Jennifer Piazza

Grant Number: 5R25AG076390-03
Principal Investigator: Piazza, Jennifer(Contact);  Zettel-Watson, Laura
Project Title: A Multidimensional Aging Science Program: MSTEM Scholars Trained in Aging Research (MSTEM STAR)
Institution: CSU Fullerton Auxiliary Services Corporation
CFDA: 93.866
OC: 41032
PCC: 2BTRNDT
Award Issue Date: 03/24/2025
Grants Management Officer: Melvin, E.
Program Official: Torres, Delany
Grants Specialist: McGraw, Tracie

***This is an automated notification - Please do not reply to this message.***

**Supp. App. 202**

# EXHIBIT 39



## FW: Information regarding URISE award

**From** Cuajungco, Math <mcuajungco@fullerton.edu>

**Date** Thu 3/27/2025 11:13 AM

**To** Tiwari, Binod <btiwari@fullerton.edu>; Johnson, Marie <mariejohnson@Fullerton.edu>

**Cc** Le, Tran <trannle@Fullerton.edu>; Jimenez Ortiz, Veronica <vjimenezortiz@Fullerton.edu>

Good morning Binod and Marie,

I'm forwarding message I just got from NIH/NIGMS. It appears Year 3 continuation is pending and likely to be terminated (but still hoping things will turn around). Still very disappointing!

Math

**From:** Rosenzweig, Justin (NIH/NIGMS) [E] <rosenzwj@nigms.nih.gov>
**Date:** Thursday, March 27, 2025 at 11:06 AM
**To:** Cuajungco, Math <mcuajungco@fullerton.edu>
**Subject:** [External] Information regarding URISE award

RE: T34 GM149493-02

Contact PI: CUAJUNGCO, MATH P

Organizational Representative MRS CATHERINE M ANDERS,

NIH is currently undergoing a process to assess whether pending awards perpetuate current agency priorities. You are advised to cease project activities as of the current budget period end date of 3/31/2025. Further, please reconcile expenditures with disbursements in the Payment Management System as soon as possible but no later than 4/4/2025, for project activities that occurred through 3/31/2025. Additionally, please amend all active appointments in xTrain to end as of 3/31/2025.

Sincerely,

Justin Rosenzweig
Grants Management Team Leader, GAB
National Institute of General Medical Sciences, NIH/DHHS

**Supp. App. 204**

EXHIBIT 40
[INTENTIONALLY OMITTED]

EXHIBIT 41

**Raman Paul**

| | |
|---|---|
| **From:** | Rosenzweig, Justin (NIH/NIGMS) [E] <rosenzwj@nigms.nih.gov> |
| **Sent:** | Thursday, March 27, 2025 11:00 AM |
| **To:** | Raman Paul |
| **Subject:** | Information regarding URISE award |

RE: T34 GM145400-03

Contact PI: ESQUERRA, RAYMOND M

Organizational Representative RAMAN PAUL,

NIH is currently undergoing a process to assess whether pending awards perpetuate current agency priorities. You are advised to cease project activities as of the current budget period end date of 3/31/2025. Further, please reconcile expenditures with disbursements in the Payment Management System as soon as possible but no later than 4/4/2025, for project activities that occurred through 3/31/2025. Additionally, please amend all active appointments in xTrain to end as of 3/31/2025.

Sincerely,

Justin Rosenzweig
Grants Management Team Leader, GAB
National Institute of General Medical Sciences, NIH/DHHS

**Supp. App. 207**

EXHIBIT 42

---------- Forwarded message ---------
From: **Rosenzweig, Justin (NIH/NIGMS) [E]** <rosenzwj@nigms.nih.gov>
Date: Thu, Mar 27, 2025 at 11:06 AM
Subject: Information regarding URISE award
To: cleber.ouverney@sjsu.edu <cleber.ouverney@sjsu.edu>


RE: T34 GM149461-02
Contact PI: OUVERNEY, CLEBER COSTA
Organizational Representative DEBORAH MALONEY,
NIH is currently undergoing a process to assess whether pending awards perpetuate current agency priorities. You are advised to cease project activities as of the current budget period end date of 3/31/2025. Further, please reconcile expenditures with disbursements in the Payment Management System as soon as possible but no later than 4/4/2025, for project activities that occurred through 3/31/2025. Additionally, please amend all active appointments in xTrain to end as of 3/31/2025.
Sincerely,
Justin Rosenzweig
Grants Management Team Leader, GAB
National Institute of General Medical Sciences, NIH/DHHS

EXHIBIT 43

 **Outlook**

---

**RE: Information regarding URISE award**

| | |
|---|---|
| **From** | Darya Veach <dveach@calpoly.edu> |
| **Date** | Thu 3/27/2025 1:52 PM |
| **To** | Dawn Brown Neill <dbneill@calpoly.edu>; Allie Bakaly Walter <abwalter@calpoly.edu>; Maral Kismetian <mkismeti@calpoly.edu>; Amy Velasco <aevelasc@calpoly.edu> |
| **Cc** | Trish Brock <pbrock@calpoly.edu>; Alexis Renee Sexton <arsexton@calpoly.edu> |

I'm including Trish and Alexis here as well. This if for Todd and Sarah Keadle's URISE project.

Summary of grant details:

Title: U-RISE at Cal Poly
Sponsor: NIH
Project: 45199
GDO: 22-289
Project period (as funded): 4/1/24-3/31/25 (originally awarded end date 3/31/2028)
Total awarded to date: $444,764.00 (total anticipated $1,334,291)
Expenditures as of 3/26/25: $352,914.84
Unspent balance: $91,849.16

Please let me know if you have specific questions. I'm sure additional information will be coming in the following days.

Thanks,
Darya

**DARYA VEACH, M.S.**
**pronouns** she/her
Director, Sponsored Programs Office
Division of Research
Cal Poly Partners
Cal Poly, San Luis Obispo, CA

———

Main: 805-756-1123
Direct: 805-756-5348
www.research.calpoly.edu
www.calpolypartners.org

---

**From:** Stephany Martin <smarti47@calpoly.edu>
**Sent:** Thursday, March 27, 2025 11:09 AM
**To:** Dawn Brown Neill <dbneill@calpoly.edu>; Allie Bakaly Walter <abwalter@calpoly.edu>; Darya Veach <dveach@calpoly.edu>; Maral Kismetian <mkismeti@calpoly.edu>; Amy Velasco <aevelasc@calpoly.edu>
**Subject:** FW: Information regarding URISE award
**Importance:** High

**Supp. App. 211**

Hi, just received this. 45199/22-289

Thank you,

**Stephany Martin**
Contract & Grants Analyst

Division of Research
Sponsored Programs
San Luis Obispo, CA  93407
Phone: (805) 756-7322

https://research.calpoly.edu
https://calpolypartners.org/

---

**From:** Tyler Alvord <talvord@calpoly.edu>
**Sent:** Thursday, March 27, 2025 11:07 AM
**To:** Stephany Martin <smarti47@calpoly.edu>
**Subject:** Fw: Information regarding URISE award

Stephany -

Just making sure this got sent to you as well.

Thanks,

Tyler Alvord

Research Administration Officer II

California Polytechnic State University

San Luis Obispo, CA 93407-0001

Direct: 805-756-1449

https://grants.calpoly.edu/

Register here to set up your ORCID: https://orcid.org/signin

NSF requires investigators to use SciENcv to manage their biosketches and current and pending documents.

---

**From:** Rosenzweig, Justin (NIH/NIGMS) [E] <rosenzwj@nigms.nih.gov>
**Sent:** Thursday, March 27, 2025 11:00 AM

**Supp. App. 212**

**To:** Tyler Alvord <talvord@calpoly.edu>
**Subject:** Information regarding URISE award

RE: T34 GM149492-02

Contact PI: HAGOBIAN, TODD ALAN

Organizational Representative STEPHANY MARTIN,

NIH is currently undergoing a process to assess whether pending awards perpetuate current agency priorities. You are advised to cease project activities as of the current budget period end date of 3/31/2025. Further, please reconcile expenditures with disbursements in the Payment Management System as soon as possible but no later than 4/4/2025, for project activities that occurred through 3/31/2025. Additionally, please amend all active appointments in xTrain to end as of 3/31/2025.

Sincerely,

Justin Rosenzweig
Grants Management Team Leader, GAB
National Institute of General Medical Sciences, NIH/DHHS

**Supp. App. 213**

EXHIBIT 44

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

National Institutes of Health
National Institute of
General Medical Sciences
Bethesda, Maryland 20892-6200

http://www.nigms.nih.gov

April 2, 2025

Raman Paul
1600 Holloway Ave.
San Francisco, CA 94132

Dear Raman Paul:

Funding for Project Number 5T34GM145400-03 is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on April 1, 2024 and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[4] According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[5] At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

decision,"[6] no corrective action is possible here.  The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7]  Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390.  NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

## Administrative Appeal

You may object and provide information and documentation challenging this termination.[9]  NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Matthew J. Memoli, M.D., M.S., Acting Director, NIH no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position.  In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

---

[6] 2024 Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D.
[11] *Id.* § 50.406(a).
[12] *Id.* § 50.406(b).

**Supp. App. 216**

EXHIBIT 45

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

National Institutes of Health
National Institute of
General Medical Sciences
Bethesda, Maryland 20892-6200

http://www.nigms.nih.gov

April 2, 2025


California State University Fullerton
1121 N. State College Blvd.
Fullerton, CA 92831-3014


Olga Riveron:

Funding for Project Number 5T34GM149493-02 is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on April 1, 2024 and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[4] According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[5]  At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

**Supp. App. 218**

decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Matthew J. Memoli, M.D., M.S., Acting Director, NIH no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

---

[6] 2024 Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D.
[11] *Id.* § 50.406(a).
[12] *Id.* § 50.406(b).

# EXHIBIT 17

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS; et al.,

              *Plaintiffs,*

    v.

ROBERT F. KENNEDY, JR., et al.,

              *Defendants.*

No. 1:25-cv-10814

## DECLARATION OF Vassilis L. Syrmos, Ph.D.

    I, Vassilis L. Syrmos, Ph.D., declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

    1.    I am the Vice President for Research and Innovation of the University of Hawai'i. I have personal knowledge of the facts set forth in this declaration, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If required to testify, I would and could competently do so.

    2.    I submit this Declaration in support of the States' Motion for Temporary Restraining Order.

### Professional Background

    3.    I am currently employed by the University of Hawai'i (UH) as the Vice President for Research and Innovation. In addition to my current role, I have a Ph.D. in electrical engineering and over 30 years of academic experience. My office (the Office of the Vice President for Research and Innovation) tracks federal funding received by the University of Hawai'i through grant awards, cooperative agreements, contracts and other agreements. My

1

office facilitates the research enterprise for our researchers, faculty, students, staff and administrators, funds system-wide initiatives, coordinates and executes our federal funding appropriations and programs, sets and monitors all policies for our research enterprise to comply with federal and state laws.

4. The University of Hawai'i is the only public higher education institution in the State of Hawai'i.

5. The University of Hawai'i has 10 campuses, with a total enrollment of more than 50,000 students and more than 3,000 researchers. UH is one of the leading research universities in the nation, ranking in the top 20% of all public universities in research expenditures by the National Science Foundation Higher Education Research and Development (HERD) survey.

6. The University of Hawai'i includes the John A. Burns School of Medicine (JABSOM), the University of Hawai'i Cancer Center (Cancer Center) (a National Cancer Institute-designated center), the Daniel K. Inouye College of Pharmacy, the School of Nursing and Dental Hygiene, the Thompson School of Social Work and Public Health, and several more Health Sciences programs across all campuses. All these Schools, Colleges, and Centers conduct fundamental, translational, clinical, and community-based participatory research in health sciences and healthcare.

7. I am providing this declaration to explain the impacts of NIH's delay and/or cancellation of study sections. NIH's abrupt cessation of NIH Advisory Council meetings in February 2025 has created a situation whereby grant proposals due for funding have remained unfunded indefinitely. These are grants that had previously been evaluated by the relevant scientific peer-review committee or "study section" (also known as scientific review group, initial review group) and given a priority score (based on scientific merit) that traditionally is

2

within a range that would result in the awarding of the grant funds. These ranges are based on the recent history of similar grants funded by the same institute/center within NIH.

8.      The NIH meeting blockade severely impacts the University of Hawaiʻi by causing tremendous budget uncertainty for non-competitive renewals awaiting the Notice of Award for the next project year (some of which were to start April 1, 2025), and for those grants that received notice of being within the fundable range, based on their scientific merit and meeting Institute/Center priorities. JABSOM alone has 157 faculty and staff employees on current NIH funding, with more than half on projects awaiting Notice of Awards expected within the next two months for the next budget year.

**Reliance on NIH Funding**

9.      In the university's fiscal year 2024, the University of Hawaiʻi received direct funding obligations through the National Institutes of Health ("NIH") to support 75 projects, totaling $65,449,960.

10.      The University of Hawaiʻi receives NIH grants across a variety of institutes encompassed within the NIH, including the Eunice Kennedy Shriver National Institute of Child Health and Human Development (NICHD), National Cancer Institute (NCI), National Heart, Lung, and Blood Institute (NHLBI), National Human Genome Research Institute (NHGRI), National Institute of Allergy and Infectious Diseases (NIAID), National Institute of Biomedical Imaging and Bioengineering (NIBIB), National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK), National Institute of General Medical Sciences (NIGMS), National Institute of Neurological Disorders and Stroke (NINDS), National Institute on Aging (NIA), National Institute on Drug Abuse (NIDA), National Institute on Minority Health and Health Disparities (NIMHD), and the National Library of Medicine (NLM).

3

11.     Through those NIH grants, the University of Hawaiʻi funds 98 researchers, most of whom are part of JABSOM and the University of Hawaiʻi Cancer Center, the state's only medical school and cancer center, respectively.

12.     The work done by the University of Hawaiʻi on NIH funded projects provides education, training, and research in Anatomy/Biochemistry/Physiology, Cancer Biology, Cancer Etiology/Epidemiology, Cell and Molecular Biology, Clinical Research, Data Science, Information and Computer Sciences, Library Sciences, Mechanical Engineering, Medicine, Nursing, Obstetrics/Gynecology, Pediatrics, Pharmacology, Public Health, Quantitative Health Sciences, Social and Behavioral Sciences, and Tropical Medicine.

13.     The University of Hawaiʻi provides considerable employment benefits to Hawaiʻi's economy in the Science, Technology, Engineering, and Mathematics ("STEM") workforce. In 2021, OVPRI commissioned the Economic Research Organization at the University of Hawaiʻi (UHERO) to produce a report on the economic impact of the UH on the state. Based on data from fiscal year 2020, the UHERO report provided a much-needed and clear snapshot of how UH research-related spending, whether direct, indirect, or induced, contributes to Hawaiʻi's economy. By using similar trends, the increase in UH research-related expenditures to $607.3 million in FY 2024 resulted in: $935.9 million in total business sales, $301.6 million in total employee earnings, $52.4 million in total state tax revenue, and 6,919 jobs supported.

**Typical Timeline and Processes for NIH Grant Awards**

14.     The Office of Research Services at the University of Hawaiʻi works with researchers to submit and track grant applications and awards.

4

**Supp. App. 224**

15. Based on my work as the Vice President for Research and Innovation, I have an understanding of the NIH grant process based on my 12 years in the role and 32 years as a funded investigator.

16. NIH grant applications are typically submitted via NIH's online portal, often in response to a Notice of Funding Opportunity ("NOFO"). From there, they are assigned to a "study section" where the grant application is subjected to peer review and judged on its scientific merit. The grant application is then given a score. If the grant receives what is called a "fundable score," there is a high probability that the grant will be funded.

17. What constitutes a fundable score is dependent on several factors, as every institute or center is different. Some publish paylines, meaning the percentiles of grants they will fund, and some do not. Paylines range from 8-20%. Most of the standing study sections result in an impact score and percentile for each proposal. Still, many others (special emphasis and non-CSR) will only result in an impact score without a percentile. Program officers have the latitude to recommend proposals with higher scores/percentiles to balance portfolios and meet specific directives. Generally, researchers would consider a percentile less than 10% as guaranteed to receive funding.

18. After the study section, the grant application is sent to an "advisory council" where the ultimate decision on whether or not to fund the grant is made. After the advisory council meets, a Notice of Award is issued confirming if the grant will be funded.

19. The process for competitive renewals is very similar, but it is even more consistent for a grant that has been funded in the past to be renewed.

5

20.     The budget process at the University of Hawai'i relies upon the NIH grant application, review, and approval cycle.  Historically, we have relied on grants being reviewed and scored within 4 to 5 months of submission.

21.     Once a grant receives a score, schools and colleges within the University of Hawai'i  can consider whether to include the funding coming from that grant as part of their budget for the coming year.

**Delays and Irregularities in the Processing of NIH Grant Applications**

22.     Since late January 2025, the University of Hawai'i has seen unusual delays in processing NIH grant applications.  Researchers have had their grant application study sections and advisory councils canceled or otherwise not scheduled, and grant application scoring has been significantly delayed. As of April 12, 2025, some NIH study sections have been scheduled, but the delays will impact timing and budgeting as noted below.

23.     The University of Hawai'i  has not received formal notice of changes for many of these grants.  For others, the University of Hawai'i has received only a notification that proposals are "paused" or "under review."

24.     As of March 30, 2025, the University of Hawai'i has approximately 65 proposals awaiting NIH study section review.

25.     As of March 30, 2025, the University of Hawai'i has 31 proposals that received fundable scores, awaiting NIH advisory council and Notice of Award.

26.     As of March 30, 2025, the University of Hawai'i has 39 proposals that received possibly fundable scores, awaiting NIH advisory council and Notice of Award.

6

**Terminations of NIH Grants**

27.     Since March 21, 2025, the University of Hawai'i has had three NIH grants terminated, not including subawards from other NIH-funded institutions.

28.     These terminations will result in the loss of approximately $403,000 in research money to the University of Hawai'i, assuming all funding for each grant is lost.

29.     The University of Hawai'i is also a site for the NIH RECOVER Initiative: A Multi-site Observational Study of Post-Acute Sequelae of SARS-CoV-2 Infection in Adults, the grant for which New York University, as the prime awardee, received a termination notice on March 24, 2025. If the University of Hawai'i's subaward is terminated, this would result in significant losses to UH of multiple hundreds of thousands of dollars. Additionally, based on notifications from Columbia University, two subawards from Columbia University have been terminated: (1) the long-term Diabetes Prevention Program Outcomes Study (DPPOS), which examines links between the highly common prediabetes and type 2 diabetes and Alzheimer's disease-related dementias, and studies on the impacts of diabetes prevention on cancer, heart disease, stroke, nerve damage, kidney disease, and eye disease and (2) the obesogenic origins of maternal and child metabolic health involving dolutegravir (ORCHID), which conducts specialized metabolic analysis for pregnant women living with HIV who are enrolled in this study.

30.     The termination notices for the three grants terminated by NIH have provided very little to explain the termination, instead noting that the research no longer "effectuates agency priorities." In my decades working at the University of Hawai'i, I have not seen this language previously used to cancel grants.

7

Supp. App. 227

31.     The termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities.  However, prior to receipt of the terminations, the University of Hawai'i  had not been given notice of any opportunity to submit any "corrected" grant materials to align with agency priorities.  Nor was the University of Hawai'i provided any updated "agency priorities" with which its research must align.

32.     The three terminated grants, which are based at JABSOM and Cancer Center, are further described as follows:

(1)  JABSOM's Minority Health Research Training (MHRT) T37 program, which has been continually funded for 12 years, engages undergraduate, post-baccalaureate, and graduate students from any discipline in national or international mentored research projects in tropical medicine, infectious diseases, community research, chronic disease, aging, substance abuse prevention and other high priority research topics. The T37 training programs are designed to help train the next generation of scientists from underrepresented backgrounds in science. The one-year training program includes mentoring and in-country training in locales throughout Asia, the Pacific, and Africa. MHRT has successfully trained students to pursue graduate and professional degrees with 66% of trainees pursuing graduate or professional studies, and one third (33%) who have earned doctoral level degrees, and are now working in the biomedical sciences practicing in their respective fields (e.g., academic faculty, physician, pharmacist). About 25% attend medical school.

(2)  JABSOM's "Evaluating HPV Vaccination Uptake Barriers and its Efficacy in PLWH" is a diversity supplement to the parent RCMI Specialized Center grant, Ola HAWAII. Because cancer caused by the human papillomavirus (HPV) can often be

8

prevented, this study examines how to increase proactive treatment in patients with pre-existing immune compromise (i.e., individuals living with an HIV infection). The early-stage investigator first developed a test that detects antibodies to the HPV types covered in the 9-valent HPV vaccine, along with three other high-risk types that cause cancer. The study seeks to help at-risk patients accept treatment from their physicians. The study will also examine the effectiveness of such treatment in raising antibody levels against HIV and preventing clinical evidence of cancer in this at-risk population. If successful, the approaches used in this study can help inform treatment guidelines to prevent numerous cancers caused by this virus.

(3) Cancer Center's "Longitudinal Study of Early NAFLD Progression and the Gut Microbiome in Asian Americans, Native Hawaiians and Whites" is a diversity supplement to the parent NIMHD grant. The study aims to provide evidence for the temporal relationship of the gut microbiome with the progression of non-alcoholic fatty liver disease (NAFLD) through population-based longitudinal studies. Findings may be used to inform novel targeted intervention strategies to prevent NAFLD progression and, ultimately, reduce liver cancer burden in multiple populations.

**Comparisons Across Administrations**

33. In prior years, under both Democratic and Republican administrations, our institution never experienced this volume of unexplained delays or procedural breakdowns.

34. Renewals were routine and predictable. This year, even long-standing, high-performing programs are in limbo.

35. Terminations were exceedingly rare and followed due process. The current approach is without precedent in our experience.

9

**Impact on Institutional Operations**

36.     The University of Hawai'i is starting the process to request new faculty positions and budgeting for Fiscal Year 2025-26. The uncertainty of whether a continuation award will be funded directly impacts the rest of that faculty member's department budget, the distribution of teaching workload among the entire department, and the ability to hire additional faculty, teaching assistants, and graduate assistants.

37.     The MHRT grant termination has forced us to implement bridge funding for impacted students, drawing from limited discretionary resources.  However, upon information and belief, such bridge funding is temporary and in no way represents a sustainable solution.  As of April 12, 2025, UH has implemented bridge funding of approximately $18,000 to cover the remainder of student payroll through the end of the academic year. Additionally, upon information and belief, $33,000 of departmental tuition funds are being used to support a faculty member and staff who previously received funding under a terminated grant. This prevents using these funds for any other purpose, including expanding the department's core instructional mission.

38.     For currently funded awards where start-up funding or institutional support was committed, we will withhold future payments until there is more certainty on the awarding of already-appropriated funds (i.e., non-competitive renewal). We will likely pause offering start-up packages as the indirect cost recovery amounts are the source of bridge funding through employee termination, if no other funding sources are available. Upon information and belief, long-term use of non-federal funding is simply not a viable option.  Upon information and belief, employee terminations will be necessary if federal funding does not materialize. The JABSOM has stopped recruitment for a permanent Associate Dean for Research. The funding uncertainties

10

have impacted offers for two clinical department chair searches, with both positions being critical for maintaining medical school accreditation. For other faculty recruitments in process, the delays and uncertainties of NIH funding limits our ability to offer start-up funding, which may result in those positions remaining unfilled.

39.     As of April 12, 2025, JABSOM researchers, funded by 18 awards, are awaiting their notice of awards (NOAs) for budget periods that start April 1-May 1, 2025.  This is well behind schedule of when these grants would typically be awarded, so, upon information and belief, JABSOM is facing the edge of a funding precipice.  This tranche of awards includes two large infrastructure grants totaling about $13 million for the next budget year, will partially or fully employ more than 40 employees, including graduate students.  Upon information and belief, use of alternative sources of funding for these employees is simply not a sustainable solution to replace delayed or lost funding of this magnitude. Major grants in "pending" status include the Centers of Biomedical Research Excellence (COBRE) Diabetes Phase II, which supports the Diabetes Research Center, which promotes basic science and translational research across the University of Hawaiʻi and at one of our largest affiliated health systems.  People living in Hawaiʻi and the  Pacific Islands have higher rates of pre-diabetes and diabetes compared to other populations living in the continental U.S. Additionally, Native Hawaiian and Pacific Islander populations have worse health outcomes from diabetes, including stroke and advanced heart disease. The other large grant pending its NOA is the Hawaiʻi IDeA Networks for Biomedical Research Excellence (INBRE), in its 23rd year of funding.  The Hawaiʻi INBRE focuses on research training, career development, and enhancement of investigators, postdoctoral fellows, and undergraduate students of the R1 institution (University of Hawaiʻi at Mānoa), two primarily undergraduate institutions, and five community colleges across the state. This network

provides opportunities for advanced undergraduate student research experiences across institutions and supports a state-of-the-art Data Sciences core to provide cutting-edge services to our INBRE students and investigators at all stages of development. Importantly, the Hawaiʻi INBRE's Developmental Research Project Program for investigator support and development strengthens community college faculty members' capacity to conduct advanced research and mentor undergraduate students. Due to NIH delays, this INBRE program is currently being paid through an advance account, but payment in this manner or through other sources, upon information and belief, is not sustainable.

40.     As of April 12, 2025, another 16 NIH awards, which include two large infrastructure grants, are awaiting review of their non-competitive renewal applications and receipt of their notice of award for the budget period starting June 1, 2025. This second tranche of NIH grants totals about $9 million for the next budget period and partially- or fully employs more than 80 people, including graduate students. Delays in or loss of this funding will jeopardize these positions, as there are currently no alternative sources to fund these positions sustainably, upon information and belief. One large infrastructure grant, the NIH Research Centers in Minority Institutions (RCMI) Specialized Center, Ola HAWAII, partners with other federally funded research and education programs across the University of Hawaiʻi at Mānoa to conduct biomedical (basic sciences), behavioral, and community-based research projects that target the highest priority health needs of medically underserved communities in Hawaiʻi. A major component of Ola HAWAII leverages other federally funded infrastructure grants to provide programmatic activities that enhance the career development of early-stage investigators, with an emphasis on enhancing their progress to become independent investigators. Faculty and post-doctoral fellows participate in these mentoring bootcamps, which include a unique focus on

12

health policy and community-based participatory research with Native Hawaiian, Pacific Islander, and Filipino communities. The diaspora of these populations spans the entire US and most of its territories. Hence, researchers from other states participate in this training since they lack the capacity to design research projects that can be maximally effective in these populations. Ola HAWAII funding fully or partially employs 67 people and provides subawards to experienced community partners and community principal investigators on Oʻahu and Maui. The Pacific Center for Genome Research (PCGR) is the other large infrastructure grant in this tranche awaiting timely review of non-competitive renewal applications and receipt of the NOA before May 31, 2025. The PCGR aims to grow and support the genomic research workforce at the University of Hawaiʻi at Manoa, a goal that has been identified as a high priority in the state, including by the two largest health systems in Hawaiʻi. The PCGR activities enhance all career levels of undergraduate students, master's and PhD students, postdoctoral fellows, and junior faculty members. The INBRE and PCGR activities focus on undergraduate and graduate students through broad categories of science that improve understanding of chronic diseases that afflict millions across the US. The COBRE programs and Ola HAWAII focus on cardiovascular diseases (diabetes, heart disease, obesity) and other high-need, high-impact research topics by building the next generation of independent basic science, translational research, public health, nursing, and clinical researchers. These infrastructure grant programs further leverage federal and state dollars by actively contributing to large national networks of scientists whose work improves population health in their communities and contributes to scientific advances and a workforce that benefits all populations in the United States.

41. Additionally, a total of 28 faculty, early-stage investigators, staff, and ten graduate students are funded on indirect cost recovery accounts at JABSOM, totaling about

13

**Supp. App. 233**

$835,000. These personnel include JABSOM's entire research administrative support office, some faculty and staff working to support shared services and cores that are critical to biomedical research across the University of Hawaiʻi at Mānoa, and projects developing improved undergraduate, graduate, and professional student support services. Such positions depend on continued NIH grant funding, as no viable alternative exists to fund these positions sustainably. Delays of or loss in funding jeopardizes such positions and programs that are critical to the University of Hawaiʻi at Mānoa as a whole.

    42. As of April 12, 2025, Cancer Center researchers have seen delays and uncertainty concerning several NIH awards, including most significantly a grant renewal pending for a U54 application, Pacific Island Partnership for Cancer Health Equity (PIPCHE), that received a priority score. This grant renewal has a start date of September 1, 2025, and a total award in year 1 of $1,931,931, and $9,479,508 over five years, but, upon information and belief, the applicable Request for Applications (RFA) was taken down by NIH, which strongly evidences that this long-term grant is now coming to an end, or minimally that there will be delays that will lead to large and immediate funding shortfalls that the University of Hawaiʻi will not be able to cover for any sustainable period. Upon information and belief, the end of this more than twenty-year program will have catastrophic effects on the employment and prospects of the 35 Cancer Center faculty, staff, and graduate students supported by this grant and the populations served through this grant. Since 2003, the Cancer Center and the University of Guam (UOG) have worked in partnership through PIPCHE to explore the reasons behind significant cancer health disparities among Pacific Islanders in Hawaiʻi, Guam, and the neighboring U.S. Affiliated Pacific Islands (USAPI). This partnership is one of only 15 NCI-sponsored partnerships that support cancer research capacity building at minority-serving institutions and collaborative

14

research addressing cancer health disparities and their impact on underserved and socio-economically disadvantaged populations. The partnership addresses cancer health disparities through research, research education, and community outreach and engagement. Again, upon information and belief, there is no viable option to support these employees and the services they provide through other sources of funding on a long-term sustainable basis. Any bridge funding that might be provided to soften the landing of employees will not be a long-term solution.

**Effect on Public-Facing or State-Supported Programs**

43.     The loss of the NIH RECOVER initiative impacts the comprehensive, coordinated care that patients suffering from long-term consequences receive. Patients with long COVID, who do not receive care in specialized multidisciplinary clinics, often experience delays in diagnosis and evidence-based treatments. Additionally, research results from the RECOVER initiative have led to an understanding of some mechanisms of illness, resulting in recently launched clinical trials to help with treatment or symptom reduction.

44.     Termination of JABSOM's pilot study "Evaluating HPV Vaccination Uptake Barriers and its Efficacy in PLWH" has severely impacted a population at high risk for significant illness caused by having HIV infection, which reduces the body's ability to clear the human papillomavirus (HPV), which is known to cause cancer of the cervical, anus, and posterior tonsils. Being unable to naturally kill the HPV virus places patients living with HIV at higher risk for developing HPV-related cancer. This research project was scheduled to recruit 50 men and women patients, conduct screening and biological sampling to determine what types of HPV patients have been exposed to, which identifies their risk level for developing cancer. Upon information and belief, this study is the main option for patients in Hawai'i to find out if they are at high risk for developing anal cancer, and patients who participate in this study have access to

15

**Supp. App. 235**

tests that are not available to patients in a clinical setting. Upon information and belief, there are no other options in a clinical setting in Hawaiʻi for this type of important screening and additional testing. Upon termination of the grant, the study was forced to shut down and cancel patient visits. Accordingly, individuals at very high risk for developing anal cancer are not receiving these critical screenings and additional testing, and, upon information and belief, as they have no other options available to them in Hawaiʻi, face a severe impact on their health.

**Admissions, Training and Workforce Disruptions**

45.     The University of Hawaiʻi uses information regarding NIH grant applications and award rates to inform its admissions process at the graduate student level.

46.     NIH training grants, including T32 and F31 mechanisms, have been affected by review and award delays. These training grants are designed to provide resources to institutions, enabling them to train individuals in specific shortage areas (T32 grants) and support predoctoral dissertation research through F31 grants. Certain training mechanisms aiming to increase the science workforce to include many groups traditionally underrepresented in science and medicine, as defined by the National Science Foundation, the Americans with Disabilities Act of 1990, and based on financial and educational backgrounds, are also being targeted for termination (T34) or  will not be renewed (MOSAIC K99/R00) at the end of this funding year. These training mechanisms are highly competitive and reviewed for scientific rigor, in the same manner as all NIH proposals. Notably, the Maximizing Access to Research Careers (MARC) program has also been terminated, with this to be the last funded year for all MARC grants across the country. At the University of Hawaiʻi, the MARC program funded a portion of the program staff, a graduate student, and six undergraduates in a two-year cohort, covering 60% of their tuition and a monthly stipend. As the MARC program is ending, these are concrete losses moving forward.

16

Loss of these training grants severely impacts the health and science workforce in our state, which suffers higher burdens of chronic diseases and environmental factors that increase the risk of developing chronic diseases.

47.     This instability is affecting the recruitment and retention of quality research trainees.  The inability to retain quality research trainees will continue to affect the research capabilities of the University of Hawaiʻi, including limiting the individuals qualified to conduct certain research. UH received notice that the highly competitive, high-value MOSAIC Pathways to Independence awards (MOSAIC K99/R00) is ending at the end of this funding period, and JABSOM has three such awards.

### Concerns About FY25 Funds Being Obligated

48.     We are increasingly concerned that NIH will not be able to process and obligate FY25 funds by the end of the fiscal year in September.

49.     Several major proposals from our institution remain stuck at preliminary review stages, with no indication that the required advisory reviews or notices of award will occur in time.

50.     Our research administration staff have received informal feedback from NIH indicating that certain topic areas are being slowed due to "heightened scrutiny" or "internal concerns."

### Irreparable Harm

51.     The delays have disrupted ongoing research and set back the University of Hawaiʻi for research going forward.  Funding gaps have forced researchers to abandon studies, miss deadlines, or lose key personnel.  This is despite the interim funding measures being taken

**Supp. App. 237**

by UH to keep certain research going for now. UH has had to plan which of these valuable programs to continue with limited funds.

52.     Some of these studies involve clinical trials for life-saving medications or procedures, and their closure would endanger the lives of patients. The NIH RECOVER initiative learns about the long-term effects of COVID. Thus far, all 110 Hawai'i participants suffering from long-term health conditions have not recovered after two years. Research understanding some of the mechanisms has improved to the point where clinical trials are being launched to help with treatment or symptom reduction. Some of these studies involve the use of animal test subjects, all of which would need to be terminated due to loss of funding.

53.     Delays have also disrupted research with the education of our community partners, which is critical to ensure our research is highly relevant. The results will be utilized by the populations we work with and influence health policy. Grant terminations and delays greatly reduce student opportunities, which impact the next generation of scientists and physicians.

54.     There is no way to make up for the lost time, the loss of research continuity, and the loss of training value for our current students.

**Conclusion**

55.     The breakdown in NIH processes affects institutional operations, planning, and population health partnerships. Terminations and delays without explanation or remedy undermine confidence in the system and research, in general. These harms are ongoing and, in many instances, irreparable.

Executed on April 13, 2025 at Honolulu, HI.

Vassilis L. Syrmos, Ph.D.

18

# EXHIBIT 18

Supp. App. 239

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, et al.,

*Plaintiffs,*

v.

ROBERT F. KENNEDY, JR., et
al.,

*Defendants.*

No. 1:25-cv-_____

## <u>DECLARATION OF DR. DARRYLL J. PINES</u>

I, Dr. Darryll J. Pines, hereby declare:

1.       I am President of the University of Maryland, College Park ("UMCP"), a constituent institution of the University System of Maryland ("USM"), the State of Maryland's public system of higher education. This is a position I have held since 2020. As President, I have statutory responsibility and accountability to the USM's governing board, the Board of Regents, for developing the mission and successful conduct of UMCP and for the supervision of each of UMCP's schools and colleges. Prior to holding this position, I was Dean of the A. James Clark School of Engineering at UMCP, a position I held for 11 years.

2.       As UMCP's President, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff, including Dr. Gregory Ball, UMCP's Vice President for Research, other campus research administrators, and faculty members who serve as Principal Investigators on various NIH awards.

1

**Supp. App. 240**

3.     I submit this Declaration in support of the States' Motion for Temporary Restraining Order.

### Background

4.     UMCP is the State of Maryland's flagship research university and is ranked by *Forbes* as #12 in the United States among public universities. UMCP enrolls over 40,000 students across twelve schools and colleges and an interdisciplinary Graduate School and offers over 300 degree programs. UMCP is a global leader in numerous areas of study, including mathematics, computer science, health, data science, climate science, and more. UMCP, along with its sister institution, the University of Maryland, Baltimore ("UMB"), engages in cross-cutting research that highlights the intersection of engineering, computer science, AI, and medicine. As one of the nation's leading research universities, UMCP is well positioned to advance and translate public health knowledge to improve health and well-being. Faculty and students are involved in a broad range of scientific endeavors and research centers whose focus spans from the cellular to the societal. UMCP's laboratories and research programs rely, in part, on NIH funding to make a difference in critical areas, such as understanding how respiratory viruses spread through air, climate change's impacts on health, physical activity's benefits to aging brains, innovative approaches to treating cancer, and advancing health equity, among others.

5.     UMCP's research is supported by several different federal agencies. UMCP's extramural funding totaled over $703 million in State Fiscal Year (FY) 2024, including $68 million in funding awarded directly by the NIH and $9 million in funding awarded on a pass-through basis from the NIH.

6.     I am providing this declaration to explain the impacts on UMCP of NIH's delays and/or cancellations of study sections and advisory council meetings and its terminations of grants.

**Supp. App. 241**

7.    NIH's abrupt cessation of NIH advisory council meetings in February 2025 has created a situation in which grant proposals due for funding have remained unfunded indefinitely. These are grants that had previously been evaluated by the relevant scientific peer-review committee or "study section" (also known as scientific review group or initial review group) and given a priority score (based on scientific merit) that traditionally is within a range that would result in the awarding of the grant funds.  These ranges are based on the recent history of similar grants funded by the same institute/center within NIH.

8.    The NIH meeting blockade has severely and negatively impacted a number of colleges and researchers across the UMCP campus.  Ongoing research, planning and implementation of new research projects as well as the recruitment of new graduate students and postdoctoral fellows are impacted.  These negative impacts are unique and have the potential for longstanding harm to the UMCP research enterprise, and to the collective biomedical and public health research of the State of Maryland and the United States.

### Reliance on NIH Funding

9.    In FY 2024, UMCP received funding through the National Institutes of Health ("NIH") to support 148 projects, totaling over $68 million.

10.    UMCP receives NIH grants from a variety of institutes within the NIH, including the National Cancer Institute, National Eye Institute, National Heart, Lung, and Blood Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis & Musculoskeletal & Skin Diseases, National Institute of Biomedical Imaging & Bioengineering, National Institute of Child Health and Human Development, National Institute of Dental & Craniofacial Research, National Institute of Diabetes & Digestive & Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences,

3

**Supp. App. 242**

National Institute of Mental Health, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health & Health Disparities, and Office of the Director.

11.     Through those NIH grants, UMCP funds 589 employees engaged in the research enterprise.

12.     The work done by UMCP on NIH-funded projects provides education and training in Biomedical Engineering, Chemical Engineering, Civil Engineering, Electrical Engineering, Mechanical Engineering, Agriculture, Biology, Public Health and Health Sciences, Neuroscience, Chemistry, Psychology, and Human Development and Quantitative Methodology. UMCP contributes to a highly skilled workforce in Science, Technology, Engineering and Mathematics ("STEM") fields, benefiting the Maryland economy.

### Typical Timeline and Processes for NIH Grant Awards

13.     NIH grant applications are typically submitted via NIH's online portal, often in response to a Notice of Funding Opportunity.  From there, they are assigned by the Center for Scientific Review to an institute or center with a program interested in funding the proposal and to a study section where the grant application is subjected to peer review and judged on its scientific merit. The study section evaluation is separate and occurs before the assessment by the institute or center. The grant applications in the upper 50% of applications are then given a score by the review panel. If the grant receives what is called a "fundable score," there is a high probability that the grant will be funded. The final funding decision is made by the advisory council or board in the institute or center to which the grant has been assigned for support.

**Supp. App. 243**

14.    What constitutes a fundable score is dependent on several factors and differs across institutes and centers. Some publish paylines, meaning the percentiles of grants they will fund. Typically, paylines range from 8-20%. Most of the standing study sections result in an impact score and percentile for each proposal, but many others result in an impact score but not a percentile. Program officers have the latitude to recommend proposals with lower/higher scores/percentiles in order to balance portfolios and meet specific directives. Generally, researchers would consider a percentile score of 10% or less as nearly certain to receive funding.

15.    After the study section, the grant application is sent to an "advisory council" that each institute or center maintains where the ultimate decision is made on whether to fund the grant. After the advisory council meets, a Notice of Award is issued confirming whether the grant will be funded.

16.    The process for competitive renewals of funded proposals is similar.  The budget process at UMCP relies upon the NIH grant application, review, and approval cycle.  Historically, UMCP has relied on grants being reviewed and scored within 6 to 8 months of submission.

17.    Once a grant receives a score,  UMCP can consider whether the funding impacts its budget for the coming year.

**Delays and Irregularities in the Processing of NIH Grant Applications**

18.    Since late January 2025, UMCP has seen severe and unprecedented delays in the processing of NIH grant applications. Researchers have had their grant application study sections and advisory councils canceled (in some cases, multiple times), or otherwise not scheduled, resulting in significant delays to grant application and scoring. For example, interruptions in NIH grant notices and reviews for UMCP's School of Public Health have impacted 9 pending NIH grant submissions on which UMCP is the prime recipient, plus four involving UMCP as

5

**Supp. App. 244**

subrecipient, totaling 13 pending actions. Principal investigators associated with 2 of 9 submissions were informed that their submissions were pulled from study section review until NIH priorities are realigned. UMCP's College of Behavioral and Social Sciences also has 9 pending grant applications (7 involving UMCP researchers under prime awards, 2 under subawards) awaiting a review date. Three have been postponed with no proposed future date; the others have been moved or postponed to April. In July 2024, UMCP's College of Education submitted a competitive application for continuation of a longitudinal award, the Bucharest Early Intervention Project. The proposal was reviewed by the Child Psychopathology and Developmental Disability study section in October 2024, where it received a score of 12th percentile. Initially, the National Institute of Mental Health Advisory Council was to meet in January 2025, but that meeting was cancelled. It was rescheduled twice (February and March) and cancelled both times. It is now scheduled for May 10, 2025.

19.     UMCP has not received formal notice of changes for many of these grants. For others, UMCP has received only a notification that proposals are "paused" or "under review."

20.     As of March 29, 2025, UMCP has approximately 200 pending proposals to NIH totaling approximately $354 million.

21.     The NIH meeting blockade will severely hamper UMCP's effort to leverage its NIH support to expand the collaborative partnership with the UMB School of Medicine through the newly established St. John Center for Translational Engineering and Medicine ("CTEM"). The CTEM is a collaboration uniting UMCP's A. James Clark School of Engineering's Fischell Department of Bioengineering with UMB's School of Medicine. NIH-funded investigators from both campuses would work at the center supporting the basic science infrastructure. Together, researchers from these distinct disciplines would tackle a broad spectrum of generational health

6

**Supp. App. 245**

challenges and drive medical innovations that benefit patients in Maryland and beyond. The current blockade of grant reviews means this CTEM collaboration will be delayed or potentially halted, with over $7 million in research funding at risk for State FY24.

### Terminations of NIH Grants

22.     Since March 20, 2025, UMCP has received termination notices from NIH with respect to nine grants.

23.     The termination notices received as of the date of this declaration are attached as Exhibits 1-14.[1]

24.     These terminations will result in the loss of approximately $1,000,000 in obligated research funding to UMCP.

25.     The termination notices for these grants provide very little information to explain the terminations, stating only that the research no longer "effectuates agency priorities."  In the last 30 years of research administration, UMCP has not seen this language previously used to terminate awards.

26.     The termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities. Prior to receipt of the notices, UMCP was not given notice of any opportunity to submit any "corrected" or amended grant materials to align with agency priorities, nor was UMCP advised of any updated "agency priorities" under which its research would be judged.

27.     Two of the terminated grants for which UMCP was an awardee include:

    a.  Research to estimate developmental trends in the prevalence of alcohol use and misuse across groups defined by sexual orientation and gender identity and the intersections of these identities with race/ethnicity, and to explore how sexual and

---

[1] UMCP email addresses and telephone numbers have been redacted from the exhibits to this declaration.

gender minorities specific and normative adolescent factors collectively shape alcohol use and misuse among sexual and gender minority youth.

b. Research that uses a combination of longitudinal and daily diary methods to examine the prospective associations between intersectional stress, structural oppression, protective and risk factors, and alcohol and other drug use over a 2.5-year period among sexual minority youth of color.

28. Terminated awards where UMCP where subawards that included:

a. Research studying the late diagnosis of autism and how the current diagnostic measures can be improved to be more sensitive to individual characteristics. The termination of this project significantly harms the national and global community of people with autism and their families.

b. Research performing a need assessment for those who suffer biological disorders in sex development (known to be intersex). The termination of this project significantly harms the intersex population, leaving them unacknowledged and untreated.

### Comparisons With Past Experience

29. In prior years, under both Democratic and Republican administrations, our institution never experienced this volume of unexplained delays or procedural breakdowns.

30. In past years, administrative actions and functions seemed to operate consistently and reliably, even through such disruptive events as the COVID-19 pandemic. This year, even longstanding, high-performing programs are in limbo.

31. Terminations were exceedingly rare and followed due process. The current approach is without precedent in our experience.

### Impact on Institutional Operations

32. In UMCP's School of Public Health, many faculty conduct research supported by the NIH, which includes funding for researchers and graduate assistants working on these projects. Previously, receiving a good score assured funding for the research, covering part of the principal investigator's salary and salaries of supporting personnel. Graduate assistants receive funding

8

commitments as part of their admission packages. Due to NIH funding uncertainty, researcher salaries and graduate assistants' stipends must be budgeted entirely from state funds, posing the risk that support faculty may face layoffs.

33.     Concerns related to risks of stop work orders and/or terminations of grants that support shared resources and facilities used by multiple faculty have deterred faculty from participation in multidisciplinary, multi-institutional efforts.

34.     Researchers in a university setting must plan their lab budgets and hiring 9 months to 1 year in advance, and for student hires they must plan to provide funding for at least 2 years to cover graduate degree activities. This long-term budget planning is related to the academic year and agency funding cycles. The uncertainty surrounding NIH funding and application processes is impacting researchers' ability to project costs and income, even for the next few months. Thus, the majority of the School of Public Health's departments are reducing doctoral student admissions by at least 50%. In the College of Education, the department most directly affected by uncertainty at NIH has also reduced its doctoral student admissions by 50%, and two doctoral student offers were not made because of the loss of NIH-funding.

35.     These delays have forced UMCP to implement bridge funding for dozens of faculty, drawing from limited discretionary resources. UMCP's School of Public Health has been forced to set aside approximately $50,000 to be used to potentially offset this loss of funding. Grant terminations in both the College of Education and the School of Public Health have made it necessary to redirect about $40,000 that could have been used to benefit other students, necessary research, and other activities. Similarly, the College of Behavioral and Social Sciences has had to set aside funds to offset the loss of NIH funding.

36.     UMCP may have to pause start-up funding for new hires whose research programs depend on timely NIH awards.

### Admissions, Training and Workforce Disruptions

37.     UMCP uses information regarding NIH grant applications and award rates to inform its admissions process, particularly at the graduate student level.

38.     Across the institution, UMCP has had to reduce its incoming class of graduate students due to uncertainty over incoming grant funding because of the delays in reviewing and awarding grants by NIH.  For example, the Bioengineering Ph.D. program is reducing the number of graduate students it will admit for fall 2025 from about 30 to about 15, due to uncertainty about the NIH grant review process. The Human Development program in the College of Education has reduced the number of graduate student admissions by 50%, due in part to uncertainty about NIH funding. In addition, the Department of Psychology has paused all recruiting for grant-funded research assistant positions given a lack of other institutional funding to support those positions should awards be terminated or not renewed.  Admissions to the Biological Sciences program and Neuroscience and Cognitive Science graduate programs have been curtailed severely to just around a fifth of what UMCP normally admits. This will have a severe ripple effect in future years, especially on junior faculty. An associate professor in Biology is unable to recruit graduate students because his NIH council meeting was delayed (his R01 research grant proposal was ranked in the top 1-percentile of all submissions).  Finally, the number of doctoral student offers was reduced by 50% in the Department of Human Development and Quantitative Methodology. This reduction was due to a combination of lost or threatened grant revenue and state budget cuts.

39.     NIH training/fellowship grants, including T32, R25, and F31 mechanisms, have been affected by review and award delays. These grants provide resources to institutions to train

10

**Supp. App. 249**

individuals in certain shortage areas (T32 and R25 grants), and support predoctoral dissertation research (F31 grants). Recruitment for training programs tend to follow the academic year so delays of even 2 months on new awards and non-competing continuations may set a training program back by a full year.

40.     UMCP has international postdocs whose visa status is now at risk due to pending NIH awards that were expected to renew this spring.

41.     This instability is affecting the recruitment and retention of quality research trainees. The inability to retain quality research trainees will have continuing effects on the research capabilities of UMCP, including by limiting the individuals qualified to conduct certain research. Many units, especially research centers, have limited to no financial resources to provide bridge funding for delayed awards. As such, the University is beginning to issue notices of termination and non-renewal to research professors, research scientists, postdoctoral researchers, and other individuals who support cutting edge public health research.

### Concerns About FY25 Funds Being Obligated

42.     UMCP is increasingly concerned that NIH will not be able to process and obligate FY25 funds by the end of the fiscal year in September.

43.     Several major proposals from UMCP remain stalled at preliminary review stages, with no indication that the required advisory reviews or notices of award will occur in time. In some cases, reviews have been rescheduled or reassigned multiple times without explanation.

44.     UMCP personnel have heard from peer institutions and agency personnel that NIH is slowing the processing of proposals and awards about certain topic areas due to "heightened scrutiny" or "internal concerns."

**Supp. App. 250**

**Irreparable Harm**

45.     The delays and grant terminations discussed above have disrupted ongoing research and have been a setback for research going forward. Funding gaps have forced researchers to abandon studies, miss deadlines, or lose key personnel. For example, one graduate assistant in the College of Education was supported by an NIH award that was abruptly terminated. The graduate assistant, who had been involved in the project for two years, was moved to another project but lost important experience in applied psychometric methods. It is uncertain whether funding will continue for the new project, so the student's learning gains will likely again be severely limited. The student will no longer have opportunities to attend conferences, write papers, and otherwise disseminate the findings from the NIH-funded grant work, all of which are important activities for professional learning and career advancement.

46.     Some of the studies involve the use of animal test subjects, and a loss of funding results in the loss of those animals, in addition to the loss of the potential scientific benefit and breakthroughs of those studies.

47.     Some of these studies had the potential to achieve breakthroughs which would have advanced public health but have now been disrupted.  One example is the Bucharest Early Intervention Project ("BEIP"), a landmark decades-long longitudinal study in child development. UMCP's application for continuation of the project is currently delayed at the advisory council level.  The BEIP supports the prevention of child neglect and the development of successful families in the United States and it has provided invaluable insights into how psychosocial neglect derails brain development, stress response systems and behavior. BEIP is a study about the effects of severe psychosocial deprivation experienced by children raised in institutions, in which half of these children were removed from institutions early in life and placed into families. They have

12

now been followed for more than two decades. BEIP findings have shown that even when children do not experience physical abuse, neglect can still have lasting consequences on their brain structure and overall health. And BEIP has identified the factors within the family that contribute to remediation of these early experiences. These findings are especially relevant to children in the United States who experience neglect, highlighting the need for effective policies and support systems to protect families, children and their well-being. As a result of the delay of approval to continue the project, expenditures are on hold and continued delay will result in significant negative impact to the project.

48.     Delays in the grant review process and termination of grants have also disrupted community services, student opportunities, and public programs for unknown reasons.  For example, a termination of an infectious disease grant and lack of support/uncertainty for support of infectious disease and vaccine research at the National Institute of Allergy and Infectious Diseases has resulted in reductions in the number of graduate students admitted for training in this area and work on a universal flu vaccine. Uncertainty in continued funding has resulted in the closing of a community health clinic and layoff of several staff. The funding focused on infectious disease. But non-communicable, chronic illnesses are prevalent in almost any community where infectious disease is prevalent. Thus, the clinic closure will result in long term chronic health impacts as a result.

49.     In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted. In the example provided above, uncertainty surrounding the continuity of a student fellowship program has resulted in loss of preventive public health measures for the community as well as interruption in student work. If the funding is permanently

**Supp. App. 252**

withdrawn, time toward earning a degree is lost and there will be no return on investment for funds spent to date.

50.　A summer undergraduate research program, funded continuously by NIH for many years, is also at risk and uncertain of its future. To date, 225 students have completed the program. The vast majority have or are finishing training for health professions serving communities or are on faculty at other universities. Long-term impacts will be felt by communities previously served by ending this pipeline of health care professionals.

51.　In another example of harm, a faculty member lost the opportunity to complete her work and contribute to co-authored publications regarding her research on the impacts of the late diagnosis of autism because the grant was terminated. The prime institution was relying on the UMCP faculty member to lead data analysis, so the results of any partial data collection will likely not be analyzed or disseminated. Thus, the researcher's efforts on earlier parts of the project (e.g., advising on study design) may have been wasted.

52.　A new assistant professor in Biology had his first solo NIH grant submission cancelled when the Request for Applications was withdrawn. Two Professors in the Department of Cell Biology and Molecular Genetics have a fundable research project (R01) from the National Institute of Allergy and Infectious Diseases at NIH that hasn't received funding due to the cancelation/postponement of an advisory council (now rescheduled for late April). This same issue has delayed funding of NIH exploratory/developmental research (R21) grants with outstanding scores for at least three other early career faculty. The cancellation and delay of NIH study sections for submitted and future grants has cast a pall on cutting-edge health and medical research, leading to restrictions on hiring and spending, further delaying progress.

14

**Supp. App. 253**

**Conclusion**

53.     The breakdown in NIH processes is affecting institutional operations, planning, and public health partnerships. Terminations and delays with no explanation, justification or remedy are undermining confidence in the system. These harms are ongoing and, in many instances, irreparable.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 1st day of April, 2025, in College Park, Maryland.

Dr. Darryll J. Pines
President and Glenn L. Martin Professor of
Aerospace Engineering
University of Maryland College Park

15

**Supp. App. 254**

# EXHIBIT 1



**EXHIBIT 1. 5R01HL165686**

Bridget Mullan █████████████

---

## Fwd: STOP WORK ORDER. University of Maryland Subaward 20820

Joeleen Grant-Paterniti ████████████████                                    Fri, Mar 21, 2025 at 9:11 AM
To: Bridget Mullan ████████████████

---------- Forwarded message ---------
From: **Lehner, Kelly** ████████████████
Date: Thu, Mar 20, 2025 at 6:23 PM
Subject: STOP WORK ORDER. University of Maryland Subaward 20820
To: Dyer, Typhanye (UMD) ████████████  Joeleen Grant-Paterniti █████████
Cc: Charurat, Manhattan ████████████  SPA-Subteam ██████████  Kinsler, Tony ██████████
████████ Brown, Tony ██████  Frankenfield, Jill ██████

**UMB PI**: Manhattan Charurat

**Subrecipient PI:** Typhanye Dyer

**Title:**  Synergistic epidemics of non-communicable diseases, stigma, depression, and material insecurities among sexual and gender minorities living with HIV in Nigeria

Dear Subrecipient:

The University received notice from the US Government on March 20, 2025, that it has terminated award 5R01HL165686-03 in full, effectively immediately.

**This email serves as an immediate stop work order on the above referenced Subaward due to this notice.**

Further information regarding this matter will be provide shortly.

Kindly confirm receipt of this message at your earliest convenience.

Thank you for your cooperation.

Respectfully,

Kelly

Kelly Lehner

Assistant Director

*Sponsored Programs Administration*

Office of Research and Development
University of Maryland, Baltimore
620 West Lexington Street, 4th Floor

Baltimore, MD. 21201

████████████████

**Supp. App. 257**

# EXHIBIT 2

<span style="color:red">**EXHIBIT 2. R01HG012697**</span>



03/20/2025

Wendy Beaver
UNIVERSITY OF IOWA
nih@uiowa.edu

Dear Wendy Beaver:

Effective with the date of this letter, funding for Project Number 5R01HG012697-03 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 08/01/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs. Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] 2024 Policy Statement at IIA-156.

**Supp. App. 259**

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls, on behalf of Deanna Ingersoll, Chief Grants Management Officer, National Human Genome Research Institute
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

**Supp. App. 260**

# EXHIBIT 3

**EXHIBIT 3. 5F32AA030194**

Danette Boone ████████████

---

## Grant Termination Notification
1 message

---

**Bulls, Michelle G. (NIH/OD) [E]** <michelle.bulls@nih.gov>            Fri, Mar 21, 2025 at 12:34 PM
To: "dboone14@umd.edu" ████████████████████

 

3/21/2025

Danette Boone

Univ Of Maryland, College Park

████████████████

Dear Danette Boone:

Effective with the date of this letter, funding for Project Number 5F32AA030194-03 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 9/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340. [5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations in *USASpending.gov.[8]*

**Supp. App. 262**

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Judy Fox, Chief Grants Management Officer, NIAAA

Director, Office of Policy for Extramural Research Administration

Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT 4



# UNIVERSITY OF MARYLAND

**ORA Mail (SHARED)** ▮▮▮▮▮▮▮▮▮

---

## NoA: 5F32AA030194-03 PI: Meg Bishop
1 message

---

**eraNotifications@mail.nih.gov** <eraNotifications@mail.nih.gov>                    Wed, Mar 26, 2025 at 12:13 AM
To: ▮▮▮▮▮▮▮▮▮▮▮

Grant Number: 5F32AA030194-03
Principal Investigator: Bishop, Meg
Project Title: Sexual orientation, gender identity, and alcohol use: A multi-method analysis of developmental differences and key mechanisms
Institution: UNIVERSITY OF MARYLAND
CFDA: 93.273
OC: 41013
PCC: AE FD
Award Issue Date: 03/25/2025
Grants Management Officer: Fox, Judy
Program Official: Freeman, Robert
Grants Specialist: Stringfield, Donna

***This is an automated notification - Please do not reply to this message.***

---



**5F32AA030194-03-Noa.pdf**
221K

**Supp. App. 265**

# EXHIBIT 5

Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

**Notice of Award**
FAIN# F32AA030194
**Federal Award Date**
03/25/2025

308472-00001

## Recipient Information

**1. Recipient Name**
UNIVERSITY OF MARYLAND, COLLEGE PARK
3112 LEE BUILDING
COLLEGE PARK, MD 20742

**2. Congressional District of Recipient**
04

**3. Payment System Identifier (ID)**
1520710851A1

**4. Employer Identification Number (EIN)**
520710851

**5. Data Universal Numbering System (DUNS)**
790934285

**6. Recipient's Unique Entity Identifier**
NPU8ULVAAS23

**7. Project Director or Principal Investigator**
Meg  Bishop, PHD

mbishop3@umd.edu
917-817-7856

**8. Authorized Official**
Bridget Mullan
bmullan@umd.edu
301-405-8061

## Federal Agency Information

**9. Awarding Agency Contact Information**
Donna Stringfield

NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM
donna.stringfield@nih.gov
(301) 443-3851

**10. Program Official Contact Information**
Robert  Freeman
Health Scientist Administrator
NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM
rfreeman@mail.nih.gov
301443-8820

## Federal Award Information

**11. Award Number**
5F32AA030194-03

**12. Unique Federal Award Identification Number (FAIN)**
F32AA030194

**13. Statutory Authority**
42 USC 288  42 CFR 66

**14. Federal Award Project Title**
Sexual orientation, gender identity, and alcohol use: A multi-method analysis of developmental differences and key mechanisms

**15. Assistance Listing Number**
93.273

**16. Assistance Listing Program Title**
Alcohol Research Programs

**17. Award Action Type**
Non-Competing Continuation (REVISED)

**18. Is the Award R&D?**
Yes

### Summary Federal Award Financial Information

| | |
|---|---|
| **19. Budget Period Start Date** 09/01/2024 – **End Date** 03/21/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| **21.** Authorized Carryover | |
| **22.** Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $76,047 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $76,047 |
| **26. Project Period Start Date** 09/01/2022 – **End Date** | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $215,194 |

**28. Authorized Treatment of Program Income**

**29. Grants Management Officer - Signature**
Judy  Fox

## 30. Remarks

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Supp. App. 267




Notice of Research Fellowship Award

*NATIONAL RESEARCH SERVICE AWARD*
Department of Heath and Human Services
National Institutes of Health

NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

---

**SECTION I – AWARD DATA – 5F32AA030194-03 REVISED**

**Principal Investigator(s):**
Meg  Bishop, PHD

**Award e-mailed to:** oraa@umd.edu

**Fellow's e-mail:**
Meg  Bishop mbishop3@umd.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to UNIV OF MARYLAND, COLLEGE PARK in support of the above referenced project.  This award is pursuant to the authority of 42 USC 288  42 CFR 66  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Alcohol Abuse And Alcoholism of the National Institutes of Health under Award Number F32AA030194. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Judy  Fox
Grants Management Officer
NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

Additional information follows

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**
| | |
|---|---|
| **Institutional Allowance** | $12,400 |
| **Other** | $1,763 |

Supp. App. 268

| Stipends | $61,884 |
| --- | --- |

| Federal Direct Costs | $76,047 |
| --- | --- |
| Total Award | $76,047 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $76,047 |
| **TOTAL FEDERAL AWARD AMOUNT** | $76,047 |

**AMOUNT OF THIS ACTION (FEDERAL SHARE)** $0

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
| --- | --- | --- |
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 3 | $76,047 | $76,047 |

**Fiscal Information:**

| | |
| --- | --- |
| **Payment System Identifier:** | 1520710851A1 |
| **Document Number:** | FAA030194A |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2024 |

| IC | CAN | 2024 |
| --- | --- | --- |
| AA | 8470473 | $76,047 |

**NIH Administrative Data:**
**PCC:** AE FD / **OC:** 41013 / **Released:** 2025-03-25
**Award Processed:** 03/26/2025 00:13:40 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 5F32AA030194-03 REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm.

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 5F32AA030194-03 REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and
is subject to the terms and conditions incorporated either directly or by reference in the following:

  a.  The grant program legislation and program regulation cited in this Notice of Award.
  b.  Conditions on activities and expenditure of funds in other statutory requirements, such as
       those included in appropriations acts.
  c.  45 CFR Part 75.
  d.  National Policy Requirements and all other requirements described in the NIH Grants Policy
       Statement, including addenda in effect as of the beginning date of the budget period.
  e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final
       progress report when applicable.
  f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain
references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the
definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH
awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor
should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that

**Supp. App. 269**

some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a consortium/subaward be issued under this award, a UEI requirement must be included. See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) F32AA030194. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

Fellowships that terminate early and awards in the final year are subject to NIH Closeout requirements. See Sections 8.6 and 11.2.11 of the NIH Grants Policy Statement Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final Federal Financial Report (FFR) (SF 425) on expenditures is not required for fellowships. NIH will close the fellowship using the last recorded cash drawdown level in the Payment Management System (PMS).

A Termination Notice is required in lieu of a final progress report. The termination notice must be submitted within 30 days of the termination date even if the fellow is not available for signature. In all cases, the information on the form must be verified by the sponsor and an institutional business official. The lack of timely and accurate information on this form could adversely affect data collected associated with aggregate NRSA support and the payback process. All Termination Notices for individual fellowships are required to be submitted electronically using the eRA Commons xTrain application.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's

Supp. App. 270

expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
· For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.


An individual's initial 12 months of NRSA postdoctoral support is subject to the payback service requirements of the authorization cited above.

Fellows are required to notify the awarding unit as soon as they are aware of any possible change in plans regarding their fellowship support.


**Childcare Costs**
If this award includes childcare costs of $3,000, the funds are restricted and may not be used for any other purpose without prior approval.


**SECTION IV – AA SPECIFIC AWARD CONDITIONS – 5F32AA030194-03  REVISED**

**REVISION:** It is the policy of NIH not to prioritize gender identity.  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  Therefore, this project is terminated. The University of Maryland (college Park) may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), as applicable) within 120 days of the end of this grant. As stated in section III of this NoA, a termination notice is due within 30 days of the termination date.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**STIPEND LEVELS**: Stipends must be paid in accordance with stipend levels established by NIH, which are based on a 12-month full-time training appointment. In the event of early termination, the stipend will be prorated per the amount of time spent in training, and NIH will issue a revised Notice of Research Fellowship Award.

No departure from the standard stipend provided by NIH under this fellowship award may be negotiated by the sponsoring institution with the fellow. This award reflects the stipend level currently in effect as stipulated in the April 23, 2024 NIH Guide Notice NOT-OD-24-104. (See https://grants.nih.gov/grants/guide/notice-files/NOT-OD-24-104.html)

**TERMINATION: This fellowship is entering its final year of support.**
NRSA policy requires the electronic submission of a Termination Notice (PHS 416-7) via the eRA Commons xTrain system immediately following the termination of support, whether support ends on the project period end date reflected on this Notice of Award or before the established end date if the fellow early terminates.

NOTE: As of January 1, 2011, the National Institutes of Health (NIH) requires the use of the eRA Commons xTrain system to electronically prepare and submit the PHS 416-7 Termination Notice for Kirschstein-NRSA fellowships. Paper termination notices will not be accepted. Paper submissions will be considered

Supp. App. 271

noncompliant. To comply with this requirement, potential xTrain users are encouraged to review the training resources and instructions for using the system available on the eRA Commons page at https://www.era.nih.gov/erahelp/xtrain/

**INSTITUTIONAL ALLOWANCE**: The Institutional Allowance is awarded at the current amount stipulated in the April 23, 2024 NIH Guide Notice NOT-OD-24-104. (See https://grants.nih.gov/grants/guide/notice-files/NOT-OD-24-104.html)

Please be reminded, in accordance with the NIH Grants Policy Statement (http://grants.nih.gov/grants/policy/policy.htm#gps), if an individual fellow is not in a training status for more than 6 months of the award year, only one-half of that year's institutional allowance may be charged to the grant.

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5F32AA030194-03 REVISED

**INSTITUTION**: UNIV OF MARYLAND, COLLEGE PARK

| Budget | Year 3 |
| --- | --- |
| Institutional Allowance | $12,400 |
| Other | $1,763 |
| Stipends | $61,884 |
| TOTAL FEDERAL DC | $76,047 |
| TOTAL FEDERAL F&A | $0 |
| TOTAL COST | $76,047 |

Supp. App. 272

# EXHIBIT 6

EXHIBIT 4. 1OT2 OD035669





March 21, 2025

Lindsay Lynch
Asian Community Health Coalition
████████████████████

Dear Lindsay Lynch:

Effective with the date of this letter, funding for Project Number 1OT2 OD035669-01 is hereby terminated pursuant to the terms of the OT award agreement. This letter constitutes a notice of termination.[1]

NIH has determined that a termination is in the Government's best interest, because this award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) awards and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[2] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities. To comply with the OT award conditions, the Division of Other Transactions Management will set up an official meeting to consultation to discuss the orderly closeout of the OT project.

Costs resulting from financial obligations incurred after termination are not allowable.[3] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[4]

---

[1] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[2] 2024 Policy Statement at IIA-156.
[3] *See* 2 C.F.R. § 200.343 (2024).
[4] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

1

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[5] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[6]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[7]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[8]

Sincerely,

Michelle G. Bulls -S
Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls
Director, Office of Policy for Extramural Research Administration, OER, NIH

---

[5] *See* 45 C.F.R. § 75.374.
[6] See 42 C.F.R. Part 50, Subpart D
[7] 11 *Id.* § 50.406(a)
[8] 12 *Id.* § 50.406(b)

Supp. App. 275

# EXHIBIT 7

**EXHIBIT 5. R01AA029989**

 UNIVERSITY OF
MARYLAND

Cathy Cuff ██████████

---

## Fwd: Grant Termination Notification - GR012500/309588-00001
1 message

**Dwayna K Dawkins** ██████████                    Mon, Mar 24, 2025 at 3:23 PM
To: Cathy Cuff ██████████

Award# GR012500/309588-00001
Add Time: Y/N - N
Add Money: Y/N - N
New Child Account Needed: Y/N -

Notes: (e.g. - adding time and money, there is cost share, special invoicing notes)

High Priority

This notification terminates this project. See department contacts below

Departmental Business Person - William (Bill) Liden ██████████
Chair Michael Dougherty ██████████
Dean  Susan Rivera ██████████

You can also include Rebecca Hunsaker ██████████

Thank you,

**Dwayna K Dawkins, M.S, M.A**
**Contract Administrator | Office of Research Administration**
University of Maryland | 7809 Regents Drive, 3112 Lee Bldg | College Park, MD 20742
██████████ |

---------- Forwarded message ---------
From: **Bulls, Michelle G. (NIH/OD) [E]** <michelle.bulls@nih.gov>
Date: Fri, Mar 21, 2025 at 12:35 PM
Subject: Grant Termination Notification
To: ██████████

 

3/21/2025

Bullock, Rose

Univ Of Maryland, College Park

██████████

**Supp. App. 277**

Dear Bullock, Rose:

Effective with the date of this letter, funding for Project Number 5R01AA029989-04 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 5/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340. [5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.[8]*

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle G. Bulls -S    Digitally signed by Michelle G. Bulls -S


Michelle G. Bulls, on behalf of Judy Fox, Chief Grants Management Officer, NIAAA

**Supp. App. 278**

Director, Office of Policy for Extramural Research Administration

Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT 8



**ORA Mail (SHARED)** ██████████

---

## NoA: 5R01AA029989-04 PI: Ethan Mereish

**ORA Mail (SHARED)** ██████████　　　　　　　　　　　　　　　　　　　Tue, Mar 25, 2025 at 1:10 PM
Draft To: ████████████████

**Institutional Proposal Number:** 25042337

Thank you,

Office of Research Administration
University of Maryland
301-405-6269

---------- Forwarded message ---------
From: <eraNotifications@mail.nih.gov>
Date: Tue, Mar 25, 2025 at 12:07 AM
Subject: NoA: 5R01AA029989-04 PI: Ethan Mereish
To: ██████████████

Grant Number: 5R01AA029989-04
Principal Investigator: Mereish, Ethan H.
Project Title: Long-term and Daily Associations among Intersectional Minority Stress, Structural Oppression, and Alcohol Use and Misuse among Sexual Minority Adolescents of Color
Institution: UNIVERSITY OF MARYLAND
CFDA: 93.273
OC: 41025
PCC: AE VD
Award Issue Date: 03/25/2025
Grants Management Officer: Fox, Judy
Program Official: Ruffin, Beverly
Grants Specialist: Zeigler, Kelvin

***This is an automated notification - Please do not reply to this message.***

---

📄 **5R01AA029989-04-Noa.pdf**
249K

**Supp. App. 281**

# EXHIBIT 9

Case: 25-1664 Case 8:25-cv-01154-DLB Document 72-18 Filed 04/14/25 Page 45 of 17 Notice of Award

Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

FAIN# R01AA029989
**Federal Award Date**
03/25/2025

## Recipient Information

**1. Recipient Name**
UNIVERSITY OF MARYLAND, COLLEGE PARK
3112 LEE BUILDING
COLLEGE PARK, MD 20742

**2. Congressional District of Recipient**
04

**3. Payment System Identifier (ID)**
1520710851A1

**4. Employer Identification Number (EIN)**
520710851

**5. Data Universal Numbering System (DUNS)**
790934285

**6. Recipient's Unique Entity Identifier**
NPU8ULVAAS23

**7. Project Director or Principal Investigator**
Ethan H. Mereish, PHD
Associate Professor
emereish@umd.edu
301-405-5874

**8. Authorized Official**
Rose Bullock
bullockr@umd.edu
301-405-6177

## Federal Agency Information

**9. Awarding Agency Contact Information**
Kelvin Zeigler

NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM
zeiglerk@mail.nih.gov
301-443-1119

**10. Program Official Contact Information**
Beverly Ruffin

NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM
beverly.ruffin@nih.gov
301-443-0281

## Federal Award Information

**11. Award Number**
5R01AA029989-04

**12. Unique Federal Award Identification Number (FAIN)**
R01AA029989

**13. Statutory Authority**
42 USC 241 42 CFR 52

**14. Federal Award Project Title**
Long-term and Daily Associations among Intersectional Minority Stress, Structural Oppression, and Alcohol Use and Misuse among Sexual Minority Adolescents of Color

**15. Assistance Listing Number**
93.273

**16. Assistance Listing Program Title**
Alcohol Research Programs

**17. Award Action Type**
Non-Competing Continuation (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 05/01/2024 – **End Date** 03/21/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a. Direct Cost Amount | $0 |
| 20 b. Indirect Cost Amount | $0 |
| 21. Authorized Carryover | |
| 22. Offset | |
| 23. Total Amount of Federal Funds Obligated this budget period | $729,606 |
| 24. Total Approved Cost Sharing or Matching, where applicable | $0 |
| 25. Total Federal and Non-Federal Approved this Budget Period | $729,606 |
| **26. Project Period Start Date** 05/10/2022 – **End Date** 03/21/2025 | |
| 27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $2,165,921 |
| **28. Authorized Treatment of Program Income** Additional Costs | |
| **29. Grants Management Officer - Signature** Judy Fox | |

## 30. Remarks

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Supp. App. 283

Notice of Award



*RESEARCH*
Department of Health and Human Services
National Institutes of Health



NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

---

**SECTION I – AWARD DATA – 5R01AA029989-04 REVISED**

**Principal Investigator(s):**
Ethan H. Mereish, PHD

**Award e-mailed to:** oraa@umd.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to UNIV OF MARYLAND, COLLEGE PARK in support of the above referenced project. This award is pursuant to the authority of 42 USC 241 42 CFR 52 and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Alcohol Abuse And Alcoholism of the National Institutes of Health under Award Number R01AA029989. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F. The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Judy Fox
Grants Management Officer
NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**
**Salaries and Wages**                                                  $75,295

Supp. App. 284

| | |
|---|---|
| **Fringe Benefits** | $13,979 |
| **Personnel Costs (Subtotal)** | $89,274 |
| **Other** | $401,124 |
| | |
| **Federal Direct Costs** | $490,398 |
| **Federal F&A Costs** | $239,208 |
| **Approved Budget** | $729,606 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $729,606 |
| **TOTAL FEDERAL AWARD AMOUNT** | $729,606 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 4 | $729,606 | $729,606 |

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1520710851A1 |
| **Document Number:** | RAA029989B |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2024 |

| IC | CAN | 2024 |
|---|---|---|
| AA | 8470415 | $729,606 |

**NIH Administrative Data:**
**PCC**: AE VD / **OC**: 41025 / **Released**: 03/24/2025
**Award Processed:** 03/25/2025 12:07:17 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 5R01AA029989-04 REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 5R01AA029989-04 REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

   a.  The grant program legislation and program regulation cited in this Notice of Award.
   b.  Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
   c.  45 CFR Part 75.
   d.  National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
   e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
   f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

**Supp. App. 285**

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a consortium/subaward be issued under this award, a UEI requirement must be included. See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01AA029989. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.


This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures. It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm. This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE: If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required. However, a final expenditure FFR is required and must be submitted electronically as noted above. If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Supp. App. 286

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

·    Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
·    For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
·    HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
·    For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.


**Treatment of Program Income:**
Additional Costs

---

**SECTION IV − AA SPECIFIC AWARD CONDITIONS − 5R01AA029989-04  REVISED**

---

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

**REVISION:** It is the policy of NIH not to prioritize gender identity.  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  Therefore, this project is terminated. The University of Maryland (College Park) may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), as applicable) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you

**Supp. App. 287**

mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

*******************************************************************************

This award is issued in accordance with NIH FY24 Fiscal Policies (see NIH Guide Notice NOT-OD-24-109 at https://grants.nih.gov/grants/guide/notice-files/NOT-OD-24-109.html including salary limitations as indicated below.

**SALARY LIMITATION:** None of the funds in this award shall be used to pay the salary of an individual at a rate in excess of the applicable salary cap. Current salary cap levels can be found at https://grants.nih.gov/grants/policy/salcap_summary.htm.

The research supported by this award involves a population of **human subjects identified as "vulnerable".** Investigators who conduct research involving vulnerable populations, including pregnant women, human fetuses and neonates, prisoners, or children must follow the provisions of the regulations in Subparts B, C, and D of 45 CFR Part 46, respectively, which describe the additional protections required for these populations (https://grants.nih.gov/policy/humansubjects/policies-and-regulations/vulnerable-populations.htm).

**INFORMATION:** This award includes funds awarded for consortium activity. Consortia are to be established and administered as described in the NIH Grants Policy Statement (see http://grants.nih.gov/grants/policy/policy.htm#gps).

**NIAAA DATA ARCHIVE (NIAAADA) DATA SHARING REQUIREMENT:** This award is subject to the data sharing guidance outlined in NOT-AA-23-002 (https://grants.nih.gov/grants/guide/notice-files/NOT-AA-23-002.html).

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 5R01AA029989-04 REVISED

**INSTITUTION:** UNIV OF MARYLAND, COLLEGE PARK

| Budget | Year 4 |
|---|---|
| Salaries and Wages | $75,295 |
| Fringe Benefits | $13,979 |
| Personnel Costs (Subtotal) | $89,274 |
| Other | $401,124 |
| TOTAL FEDERAL DC | $490,398 |
| TOTAL FEDERAL F&A | $239,208 |
| TOTAL COST | $729,606 |

| Facilities and Administrative Costs | Year 4 |
|---|---|
| F&A Cost Rate 1 | 54.5% |
| F&A Cost Base 1 | $438,914 |
| F&A Costs 1 | $239,208 |

Version: 25 - 2/15/2024 9:51 AM | Generated on: 3/25/2025 12:07 AM

**Supp. App. 288**

# EXHIBIT 10



**EXHIBIT 6.  R01HD114134**

111 Michigan Ave NW
Washington, DC 20010-2916
ChildrensNational.org

March 21, 2025

Katie Kemmerer
University of Maryland
Office of Research Administration
3112 Lee Building, 7809 Regents Drive
College Park, MD 20742-5141

Re: TERMINATION - Cost Reimbursable Subaward Agreement regarding study titled "Equitable
    Measurement of Care Disparities and Needs in Intersex Youth/Youth with Variations in Sex
    Development" dated June 13, 2024
Contract Number: **30008154-05**

Dear Office of Research Administration:

This letter serves as notice that Children's Research Institute ("CRI") hereby terminates the above-
referenced Cost Reimbursable Subaward Agreement ("Agreement") in accordance with the Agreement
terms and provisions, **effective March 20, 2025**, pursuant to early termination of the Prime Award.

University of Maryland ("Subrecipient") agrees to provide all results and findings, data collected,
generated or disseminated by Subrecipient to CRI to date of termination, and to return all confidential
information to CRI.

If you have any questions, please don't hesitate to contact us via email subs@childrensnational.org.


Sincerely,

Nellie Falconett
Agreements Manager, Grants and Contracts
Children's Research Institute/Children's National Medical Center
1 Inventa Place, West Tower, Floor 3
Silver Spring, MD 20910

# EXHIBIT 11

EXHIBIT 7.  R01 MH138335



March 20, 2025

Stephanie Boman
The Ohio State University
███████████████

Dear Stephanie Boman:

Effective with the date of this letter, funding for Project Number 1R01 MH138335-01 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on January 1, 2025, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] 2024 Policy Statement at IIA-156.

agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,


Michelle G. Bulls -S    Digitally signed by Michelle G.
                        Bulls -S
                        Date: 2025.03.20 17:02:10 -04'00'

Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, National Institute of Mental Health
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

**Supp. App. 293**

# EXHIBIT 12

Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE OF MENTAL HEALTH

Notice of Award
FAIN# R01MH138335
**Federal Award Date**
03/21/2025

**Recipient Information**

**1. Recipient Name**
OHIO STATE UNIVERSITY, THE
1960 KENNY RD
COLUMBUS, OH 43210

**2. Congressional District of Recipient**
03

**3. Payment System Identifier (ID)**
1316025986A1

**4. Employer Identification Number (EIN)**
316025986

**5. Data Universal Numbering System (DUNS)**
832127323

**6. Recipient's Unique Entity Identifier**
DLWBSLWAJWR1

**7. Project Director or Principal Investigator**
CHRISTINA  DYAR, PHD (Contact)
Assistant Professor
dyar.13@osu.edu
614-688-0623

**8. Authorized Official**
Stephanie Boman
boman.18@osu.edu

**Federal Agency Information**

**9. Awarding Agency Contact Information**
Lauren Nicole Cummings
Grants Management Specialist
NATIONAL INSTITUTE OF MENTAL
HEALTH
lauren.cummings@nih.gov

**10. Program Official Contact Information**
Eric Rousseau Murphy

NATIONAL INSTITUTE OF MENTAL
HEALTH
eric.murphy@nih.gov
(301) 443-9230

**Federal Award Information**

**11. Award Number**
1R01MH138335-01

**12. Unique Federal Award Identification Number (FAIN)**
R01MH138335

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Bisexual adolescents' and young adults' risk for depression and suicidal ideation:
Developmental trajectories, risk and protective factors, and underlying mechanisms

**15. Assistance Listing Number**
93.242

**16. Assistance Listing Program Title**
Mental Health Research Grants

**17. Award Action Type**
New Competing (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 01/01/2025 – **End Date** 03/20/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| **21.** Authorized Carryover | |
| **22.** Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $815,881 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $815,881 |
| **26. Project Period Start Date** 01/01/2025 – **End Date** 03/20/2025 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $815,881 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Theresa R. Jarosik

**30. Remarks**
Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or
otherwise requested from the grant payment system.

**Supp. App. 295**





Notice of Award

RESEARCH
Department of Health and Human Services
National Institutes of Health

NATIONAL INSTITUTE OF MENTAL HEALTH

**SECTION I – AWARD DATA – 1R01MH138335-01 REVISED**

**Principal Investigator(s):**
CHRISTINA  DYAR (contact), PHD
Brian  Feinstein, PHD

**Award e-mailed to:** NIHaward@osu.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to OHIO STATE UNIVERSITY in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute Of Mental Health of the National Institutes of Health under Award Number R01MH138335. The content is solely the responsibility of the authors and does not necessarily represent the official views of   the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.  The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Theresa R. Jarosik
Grants Management Officer
NATIONAL INSTITUTE OF MENTAL HEALTH

Additional information follows

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**
**Salaries and Wages**                                                                 $200,422

**Supp. App. 296**

| | |
|---|---:|
| **Fringe Benefits** | $66,876 |
| **Personnel Costs (Subtotal)** | $267,298 |
| **Materials & Supplies** | $5,400 |
| **Travel** | $5,000 |
| **Other** | $66,000 |
| **Subawards/Consortium/Contractual Costs** | $231,432 |
| | |
| **Federal Direct Costs** | $575,130 |
| **Federal F&A Costs** | $240,751 |
| **Approved Budget** | $815,881 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $815,881 |
| **TOTAL FEDERAL AWARD AMOUNT** | $815,881 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 1 | $815,881 | $815,881 |

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1316025986A1 |
| **Document Number:** | RMH138335A |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2025 |

| IC | CAN | 2025 |
|---|---|---|
| MH | 8022575 | $815,881 |

**NIH Administrative Data:**
**PCC**: B4-TBD / **OC**: 41021 / **Released**: 03/21/2025
**Award Processed**: 03/22/2025 12:10:33 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 1R01MH138335-01  REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 1R01MH138335-01  REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and
is subject to the terms and conditions incorporated either directly or by reference in the following:

  a.  The grant program legislation and program regulation cited in this Notice of Award.
  b.  Conditions on activities and expenditure of funds in other statutory requirements, such as
       those included in appropriations acts.
  c.  45 CFR Part 75.
  d.  National Policy Requirements and all other requirements described in the NIH Grants Policy
       Statement, including addenda in effect as of the beginning date of the budget period.
  e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final
       progress report when applicable.
  f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain
references cited above.)

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the
definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH
awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor
should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that
some awards may have another classification for purposes of indirect costs. The auditor is not required to
report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-

**Supp. App. 297**

research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a consortium/subaward be issued under this award, a UEI requirement must be included. See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01MH138335. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted

**Supp. App. 298**

electronically as noted above. If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – MH SPECIFIC AWARD CONDITIONS – 1R01MH138335-01 REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

**REVISION #1**
**TERMINATION**
It is the policy of NIH not to prioritize research activities based on gender identity as it no longer effectuates agency priorities. Therefore, this project is terminated. OHIO STATE UNIVERSITY may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

**Supp. App. 299**

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

SUPERSEDES NOTICE OF AWARD ISSUED 12/23/2024.

---

**AWARD NOTICE:**
This award has been made in response to the application submitted under the Notice of Funding Opportunity Announcement PA-20-185 which can be referenced at: https://grants.nih.gov/grants/guide/pa-files/PA-20-185.html and NOSI NOT-OD-22-166 and https://grants.nih.gov/grants/guide/notice-files/NOT-OD-22-166.html

**ADMINISTRATIVE REDUCTION:**
In order to meet Institute program objectives within Fiscal Year 2025 budget constraints, years 2 and 3 have been reduced by 10% and 5%, respectively.

**CONSORTIUM / CONTRACTUAL COSTS:**
This award includes funds for consortium activity with Rosalind Franklin University of Medicine and Science, University of Maryland and Washington University in St. Louis. Each consortium is to be established and administered in accordance with the NIH Grants Policy Statement (http://grants.nih.gov/grants/policy/nihgps/index.htm). No foreign performance site may be added to this project without the written prior approval of the National Institute of Mental Health.

**HUMAN SUBJECTS RESEARCH:**
This award includes human subject research studies and must conform to the DHHS policies for the Protection of Human Subjects research, which are a term and condition of award. Human subjects research is covered by the 2018 Common Rule, and may not be initiated until the associated protocols have received IRB approval as specified in 45 CFR 46. Failure to comply with the terms and conditions of award may result in the disallowance of costs and collected data and/or additional enforcement actions as outlined in Section 8.5 of the NIH Grants Policy Statement.

**PARTICIPANT RECRUITMENT - MILESTONES:**
Future NIMH support for this study is contingent upon adequate participant recruitment based on projected milestones as approved in the Recruitment Milestone Reporting system (RMR) on 12/11/2024. It is expected that 78 of the 500 total projected participants will be recruited by 8/01/2025. This tri-yearly recruitment report should be submitted electronically to NIMH after each milestone period of April 1, August 1 and December 1 at: http://wwwapps.nimh.nih.gov/rmr/displayHome.action. In the event that actual recruitment falls significantly below projected milestones, NIMH may consider withholding future support and/or negotiating an orderly phase-out of this study. Information regarding the NIMH Policy for the Recruitment of Participants in Clinical Research is available at: https://grants.nih.gov/grants/guide/notice-files/NOT-MH-19-027.html.

**DATA SHARING PLAN:**
This award is subject to the data sharing guidance outlined in NOT-MH-23-100 and can be found at: https://grants.nih.gov/grants/guide/notice-files/NOT-MH-23-100.html. The

Supp. App. 300

recipient will adhere to the resource and data sharing plan in the application. Dissemination of study data will be in accordance with the accepted data sharing plan. **Please note that a statement of progress on the Sharing Plan must be included in the Research Performance Progress Report (RPPR) under section C.5 "Other Products and Resource Sharing."** Failure to adhere to the sharing plan as mutually agreed upon by the Recipient and the NIH/IC may result in Enforcement Actions as described in the NIH Grants Policy Statement.

Complete NIMH data sharing terms and conditions can be found at https://nda.nih.gov/nda/sharing-regimen. Instructions are available at http://grants.nih.gov/grants/rppr/index.htm. Complete guidelines on data sharing are available at https://sharing.nih.gov/data-management-and-sharing-policy/about-data-management-and-sharing-policies/research-covered-under-the-data-management-sharing-policy#after.

## DATA AND SAFETY MONITORING:
This grant is subject to the clinical research policies outlined in NOT-MH-19-027. The recipient will adhere to the NIH (NIH GPS 4.1.15) and NIMH policies (NOT-MH-19-027) including appropriately providing adequate data and safety monitoring and timely reporting of key events as defined in the NIMH Reportable Events Policy. The level and frequency of human subject data and safety monitoring should always be commensurate with the risk and nature of the research.

## OTHER SUPPORT TIME COMMITMENT:
Commitment overlap is not permitted and occurs when an individual's time commitment exceeds 100 percent (I.e., 12 person months), whether or not salary is requested. Therefore, no individual's time commitment may exceed 100 percent. Reductions in NIH support due to commitment overlap must be made in accordance with NIH policy as outlined in the NIH Grants Policy Statement.

Data Management and Sharing Policy: Applicable

This project is expected to generate scientific data. Therefore, the Final NIH Policy for Data Management and Sharing applies. The approved Data Management and Sharing (DMS) Plan is hereby incorporated as a term and condition of award, and the recipient shall manage and disseminate scientific data in accordance with the approved plan. Any significant changes to the DMS Plan (e.g., new scientific direction, a different data repository, or a timeline revision) require NIH prior approval. Failure to comply with the approved DMS plan may result in suspension and/or termination of this award, withholding of support, audit disallowances, and/or other appropriate action. See NIH Grants Policy Statement Section 8.2.3 for more information on data management and sharing expectations.

| Budget | Year 1 |
|--------|--------|
| DMS Costs | $0 |

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 1R01MH138335-01 REVISED

**INSTITUTION:** OHIO STATE UNIVERSITY

| Budget | Year 1 |
|--------|--------|
| Salaries and Wages | $200,422 |
| Fringe Benefits | $66,876 |
| Personnel Costs (Subtotal) | $267,298 |

**Supp. App. 301**

| Materials & Supplies | $5,400 |
|---|---|
| Travel | $5,000 |
| Other | $66,000 |
| Subawards/Consortium/Contractual Costs | $231,432 |
| TOTAL FEDERAL DC | $575,130 |
| TOTAL FEDERAL F&A | $240,751 |
| TOTAL COST | $815,881 |

| Facilities and Administrative Costs | Year 1 |
|---|---|
| F&A Cost Rate 1 | 57.5% |
| F&A Cost Base 1 | $418,698 |
| F&A Costs 1 | $240,751 |

**Supp. App. 302**

# EXHIBIT 13

**EXHIBIT 8. R56AG079510**



Bridget Mullan ▮▮▮▮▮▮▮▮▮▮▮▮

---

## Notice of Termination - UCSF Subaward 14965sc

**Hussein, Karim**                                                        Tue, Mar 25, 2025 at 5:31 PM
To: ▮▮▮▮▮▮▮▮▮▮▮▮ ▮
Cc: "Schechter, Shannon" ▮▮▮▮▮▮▮▮▮▮, "Park, Van" <▮▮▮▮▮▮>, "Galanos, Nathan" <▮▮▮▮
"Fernandez, Frank" ▮▮▮▮▮▮▮▮

Greetings,

Please find attached a termination notice from NIH, effective 3/21/25. This applies to your subaward # 14965sc.

<u>UCSF will be appealing the decision</u>, but please be advised that until we receive a decision on the appeal, expenses under this project after 3/21/25 may not be reimbursed.

We will keep you informed if anything changes.

Regards,

Karim

**Karim Hussein, JD** (he/him)

Manager, Subcontracts | Office of Sponsored Research

**University of California, San Francisco**

▮▮▮▮▮▮▮▮▮▮ ▮ ▮▮▮▮▮

**UCSF**

📄 **EO_TERMN_A142269_PARK_V_NIH_NIA_1R56AG079510_01A1_REVISED.pdf**
170K

**Supp. App. 304**

# EXHIBIT 14

Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE ON AGING

FAIN# R56AG079510
**Federal Award Date**
03/24/2025

## Recipient Information

**1. Recipient Name**
REGENTS OF THE UNIVERSITY OF
CALIFORNIA, SAN FRANCISCO, THE
1855 FOLSOM ST STE 425
SAN FRANCISCO, CA 94103

**2. Congressional District of Recipient**
11

**3. Payment System Identifier (ID)**
1946036493A6

**4. Employer Identification Number (EIN)**
946036493

**5. Data Universal Numbering System (DUNS)**
094878337

**6. Recipient's Unique Entity Identifier**
KMH5K9V7S518

**7. Project Director or Principal Investigator**
Van My Ta Park, PHD

Van.Park@ucsf.edu
141-551-4331

**8. Authorized Official**
Magdalene Cho

## Federal Agency Information

**9. Awarding Agency Contact Information**
Ryan Blakeney

NATIONAL INSTITUTE ON AGING
blakeneyr@mail.nih.gov
301-451-9802

**10. Program Official Contact Information**
FRANK Bandiera

NATIONAL INSTITUTE ON AGING
frank.bandiera@nih.gov
301-496-3131

## Federal Award Information

**11. Award Number**
1R56AG079510-01A1

**12. Unique Federal Award Identification Number (FAIN)**
R56AG079510

**13. Statutory Authority**
42 USC 241 42 CFR 52

**14. Federal Award Project Title**
Asian Americans & Racism: Individual and Structural Experiences (ARISE)

**15. Assistance Listing Number**
93.866

**16. Assistance Listing Program Title**
Aging Research

**17. Award Action Type**
New Competing (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 09/21/2023 – **End Date** 03/21/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a. Direct Cost Amount | $0 |
| 20 b. Indirect Cost Amount | $0 |
| 21. Authorized Carryover | |
| 22. Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $3,432,146 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $3,432,146 |
| ------------------------------------------------------------------ | |
| **26. Project Period Start Date** 09/21/2023 – **End Date** 03/21/2025 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $3,432,146 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Philip E. Smith

## 30. Remarks

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

**Supp. App. 306**



Notice of Award

RESEARCH
Department of Health and Human Services
National Institutes of Health

NATIONAL INSTITUTE ON AGING



**SECTION I – AWARD DATA – 1R56AG079510-01A1 REVISED**

**Principal Investigator(s):**
Van My Ta Park, PHD

**Award e-mailed to:** cgrasteam@ucsf.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to The Regents of the UCSF in support of the above referenced project. This award is pursuant to the authority of 42 USC 241 42 CFR 52 and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Aging of the National Institutes of Health under Award Number R56AG079510. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F. The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Philip E. Smith
Grants Management Officer
NATIONAL INSTITUTE ON AGING

Additional information follows

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**
**Salaries and Wages**                                                    $621,610
**Fringe Benefits**                                                       $233,897

Version: 25 - 3/15/2024 9:31 AM | Generated on: 3/24/2025 12:03 AM

**Supp. App. 307**

| | |
|---|---:|
| **Personnel Costs (Subtotal)** | $855,507 |
| **Consultant Services** | $77,320 |
| **Materials & Supplies** | $25,834 |
| **Travel** | $13,645 |
| **Other** | $401,301 |
| **Subawards/Consortium/Contractual Costs** | $1,177,144 |
| **Publication Costs** | $3,639 |
| | |
| **Federal Direct Costs** | $2,554,390 |
| **Federal F&A Costs** | $877,756 |
| **Approved Budget** | $3,432,146 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $3,432,146 |
| **TOTAL FEDERAL AWARD AMOUNT** | $3,432,146 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 1 | $3,432,146 | $3,432,146 |

**Fiscal Information:**
**Payment System Identifier:**    1946036493A6
**Document Number:**    RAG079510A
**PMS Account Type:**    P (Subaccount)
**Fiscal Year:**    2023

| IC | CAN | 2023 |
|---|---|---|
| AG | 8033157 | $3,432,146 |

**NIH Administrative Data:**
**PCC:** 2CEPIFB / **OC:** 41021 / **Released:** 03/21/2025
**Award Processed:** 03/24/2025 12:03:20 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 1R56AG079510-01A1 REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 1R56AG079510-01A1 REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

    a.   The grant program legislation and program regulation cited in this Notice of Award.
    b.   Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
    c.   45 CFR Part 75.
    d.   National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
    e.   Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
    f.   This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to

report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

This institution is a signatory to the Federal Demonstration Partnership (FDP) Phase VII Agreement which requires active institutional participation in new or ongoing FDP demonstrations and pilots.

Carry over of an unobligated balance into the next budget period requires Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.  See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R56AG079510. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.


 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

Supp. App. 309

NOTE: If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required. However, a final expenditure FFR is required and must be submitted electronically as noted above. If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – AG SPECIFIC AWARD CONDITIONS – 1R56AG079510-01A1 REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

It is the policy of NIH not to prioritize DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.. Therefore, this project is terminated. The UNIVERSITY OF CALIFORNIA, SAN FRANCISCO may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly

**Supp. App. 310**

closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), as applicable) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

**Supersedes Notice of Award issued 10/17/2023. Previous Terms and Conditions apply:**

The sole purpose of this revised Notice of Award is to remove the restriction of funds due to the receipt and approval of Other Support for key personnel.

**Supersedes Notice of Award issued 9/20/2023. Previous Terms and Conditions apply:**

This Bridge award provides limited interim research support. This project is awarded for a period of one year.

See:  https://grants.nih.gov/grants/funding/r56.htm

R56 recipients are encouraged to submit a revision of their original competing application to be considered for future funding. Applicants are reminded that the limitations on time and the number of amendments described at https://grants.nih.gov/grants/guide/notice-files/NOT-OD-18-197.html apply to all subsequent revisions.  A Final Research Performance Progress Report, Final Financial Report, and Final Invention Statement will be required 120 days after the end of the R56 grant period if a revised competing application is not funded.

Funding for this award has been provided by Alzheimer's Disease Initiative funds.

None of the funds in this award shall be used to pay the salary of an individual at a rate in excess of the current salary cap.  Therefore, this award and/or future years are adjusted accordingly, if applicable.  Current salary cap levels can be found at the following URL: http://grants.nih.gov/grants/policy/salcap_summary.htm

In order to meet Institute Program objectives, direct costs awarded have been adjusted to a level determined to be compatible with the approved scope of the grant while also meeting NIA cost management objectives.

This award includes funds awarded for consortium activity with University of California, Davis in the amount of $356,339 ($222,480 direct costs + $133,859 facilities and administrative costs). Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS).  The referenced section of the NIH Grants Policy Statement is available at:
http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm

This award includes funds awarded for consortium activity with University of California, Irvine in the amount of $509,470 ($324,503 direct costs + $184,967 facilities and administrative costs). Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS).  The referenced section of the NIH Grants Policy Statement is available at:
http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm

This award includes funds awarded for consortium activity with University of California, Los Angeles in the amount of $38,229 ($24,506 direct costs + $13,723 facilities and administrative costs). Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS).  The referenced section of the NIH Grants Policy Statement is available at:
http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm

This award includes funds awarded for consortium activity with University of Maryland, College Park in the amount of $109,412 ($70,817 direct costs + $38,595 facilities and administrative costs). Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS).  The referenced section of the NIH Grants Policy Statement is available at:
http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm

This award includes funds awarded for consortium activity with University of Minnesota in the amount of $163,694 ($105,609 direct costs + $58,085 facilities and administrative costs). Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS).  The referenced

**Supp. App. 311**

section of the NIH Grants Policy Statement is available at:
http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 1R56AG079510-01A1 REVISED

**INSTITUTION:** The Regents of the UCSF

| Budget | Year 1 |
|---|---|
| Salaries and Wages | $621,610 |
| Fringe Benefits | $233,897 |
| Personnel Costs (Subtotal) | $855,507 |
| Consultant Services | $77,320 |
| Materials & Supplies | $25,834 |
| Travel | $13,645 |
| Other | $401,301 |
| Subawards/Consortium/Contractual Costs | $1,177,144 |
| Publication Costs | $3,639 |
| TOTAL FEDERAL DC | $2,554,390 |
| TOTAL FEDERAL F&A | $877,756 |
| TOTAL COST | $3,432,146 |

| Facilities and Administrative Costs | Year 1 |
|---|---|
| F&A Cost Rate 1 | 61.5% |
| F&A Cost Base 1 | $1,427,246 |
| F&A Costs 1 | $877,756 |

Version: 25 - 5/15/2024 9:31 AM | Generated on: 3/24/2025 12:03 AM

**Supp. App. 312**

# EXHIBIT 19

Case: 25-1612    Document: 00118310403    Page: 314    Date Filed: 07/08/2025    Entry ID: 6734270

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS; et al.,

*Plaintiffs,*

v.

ROBERT F. KENNEDY, JR., et al.,

*Defendants.*

No. 1:25-cv-_____

## <u>DECLARATION OF DR. BRUCE E. JARRELL</u>

I, Bruce E. Jarrell, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.    I am President of the University of Maryland, Baltimore ("UMB"), a constituent institution of the University System of Maryland ("USM"), the State of Maryland's public system of higher education. As President, I have statutory responsibility and accountability to the USM Board of Regents for developing the mission and successful conduct of UMB and for the supervision of each of UMB's departments. I am familiar with the information in the statements set forth below through personal knowledge or information provided to me in connection with my duties.

2.    I submit this Declaration in support of the States' Motion for Preliminary Injunction.

## <u>Professional Background</u>

3.    I have been President of UMB since 2020. From 2012 until my appointment as President, I served as UMB's chief academic and research officer and senior vice president,

1

**Supp. App. 314**

holding the title of Provost and Executive Vice President. I previously served as the institutional official for human research protection and animal research protections and have remained actively involved in research and medical student education throughout my career. I joined UMB in 1997 as chair of the University of Maryland School of Medicine's Department of Surgery.

4.      UMB's mission is to improve the human condition and serve the public good of Maryland and society at large through education, research, clinical care, and service.

5.      Opened in 1807, UMB is Maryland's public health, law, and human services university, dedicated to excellence in education, research, clinical care, and service. UMB enrolls nearly 6,700 students in six nationally ranked professional schools — dentistry, law, medicine, nursing, pharmacy, and social work — and an interdisciplinary School of Graduate Studies. The University offers 97 doctoral, master's, baccalaureate, and certificate programs and confers most of the professional practice doctoral degrees awarded in Maryland. UMB employs more than 8,200 employees working toward fulfillment of UMB's mission.

6.      UMB is a thriving academic health center combining cutting-edge biomedical research and exceptional patient care. UMB's extramural funding totaled $638 million in Fiscal Year 2024, and each tenured/tenure-track faculty member brings $1.45 million in research grants, on average, into UMB every year.

7.      I am providing this declaration to explain the impacts of NIH's delay and/or cancellation of study sections and advisory council meetings. NIH's abrupt cessation of NIH advisory council meetings in January 2025 created a situation in which grant proposals submitted for funding have remained unfunded indefinitely. These are grants that were previously evaluated by the relevant scientific peer-review committee or "study section" (also known as scientific review group or initial review group) and given a priority score (based on scientific merit) that

**Supp. App. 315**

Case: 25-1612    Document: 00118310403    Page: 316    Date Filed: 07/08/2025    Entry ID: 6734270

traditionally is within a range that would result in the awarding of the grant funds. These ranges are based on the recent history of similar grants funded by the same institute or center within NIH.

8.      The NIH meeting blockade severely impacts UMB by creating a domino effect of delays for review of newly submitted grant proposals, for review of previously submitted grant proposals, for notices of award of grant proposals that are in the queue for award, and for extensions of already approved awards. These delays create lapses in funding and make it impossible for UMB to plan and budget for personnel whose positions are funded, directly or indirectly, by extramural funding. Most of these personnel hold positions that require lengthy notice periods.

**Reliance on NIH Funding**

9.      In fiscal year 2024, UMB received funding through the National Institutes of Health ("NIH") to support 446 active NIH awards, totaling $213.9 million, and an additional 299 projects and $34.2 million in NIH pass-through funding.

10.     UMB receives NIH grants from 22 institutes or centers within NIH, including National Institute of Allergy and Infectious Diseases (NIAID), National Cancer Institute (NCI), National Heart, Lung, and Blood Institute (NHLBI), National Institute of Neurological Disorders and Stroke (NINDS), National Institute on Drug Abuse (NIDA), National Institute on Aging (NIA), National Institute of Mental Health (NIMH), National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK), Eunice Kennedy Shriver National Institute of Child Health and Human Development (NICHD), National Institute of General Medical Sciences (NIGMS), National Institute of Dental and Craniofacial Research (NIDCR), National Institute of Arthritis and Musculoskeletal and Skin Diseases (NIAMS), Fogarty International Center (FIC), National Institute on Alcohol Abuse and Alcoholism (NIAAA), National Eye Institute (NEI), National

**Supp. App. 316**

Case: 25-1612    Document: 00118310403    Page: 317    Date Filed: 07/08/2025    Entry ID: 6734270

Library of Medicine (NLM), National Institute on Deafness and Other Communication Disorders (NIDCD), National Human Genome Research Institute (NHGRI), National Institute on Minority Health and Health Disparities (NIMHD), National Center for Complementary and Integrative Health (NCCIH), National Institute of Environmental Health Sciences (NIEHS), National Institute of Biomedical Imaging and Bioengineering (NIBIB).

11.     Through those NIH awards, UMB funds approximately 955 FTEs (full-time equivalent positions), and through NIH passthrough awards, UMB funds an additional 161 FTEs.

12.     The work done by UMB on NIH-funded projects provides education and training in diseases such as cancer, metabolic disorders like diabetes, vaccinology, cardiovascular disease, neuroscience, schizophrenia, gastroenterology, aging, immunity, clinical and translational research, research ethics and integrity, oral and craniofacial health, muscle biology, immunology, infectious disease, and physician-scientist training.

13.     UMB contributes to a highly skilled workforce in Science, Technology, Engineering and Mathematics ("STEM") fields, benefiting Maryland's economy.

**Typical Timeline and Processes for NIH Grant Awards**

14.     Through my work as President, and previously as chief academic and research officer, I have a strong understanding of the NIH grant process, grounded in over 25 years of experience in research-related roles.

15.     Sponsored Programs Administration at UMB works with researchers to submit grant applications and tracks grant applications and processes awards. NIH grant applications are typically submitted via NIH's online portal, often in response to a Notice of Funding Opportunity. From there, they are assigned to a "study section" where the application is subjected to peer review

**Supp. App. 317**

Case: 25-1612    Document: 00118310403    Page: 318    Date Filed: 07/08/2025    Entry ID: 6734270

and judged on its scientific merit. The grant application is then given a score. If the grant receives what is called a "fundable score," there is a high probability that the grant will be funded.

16.     What constitutes a fundable score is dependent on several factors, as every institute is different. Most of the standing study section reviews result in an impact score and percentile score for each proposal. Others (e.g., special emphasis panels and non-CSR reviews) result only in an impact score. Impact scores run from 10 to 90; 10 is best (i.e., high impact). NIH's published grant review processes indicate that applications receiving an impact score of 10 to 30 are most likely to be funded. Percentile scores run from 1 to 99; a lower percentage indicates a better score. Researchers would consider a percentile score of less than 10% as virtually certain to receive funding.

17.     After the study section, the grant application is sent to an "advisory council" where the ultimate decision on whether to fund the grant is made. After the advisory council meets, a Notice of Award is issued confirming whether the grant will be funded.

18.     The process for competitive renewals is very similar, but it is even more common for a grant that has been funded in the past to be renewed.

19.     The budget process at UMB relies upon the NIH grant application, review, and approval cycle. Historically, UMB has relied on grants being reviewed and scored within 3 months of submission and awards starting 8 to 9 months after submission.

20.     Once a grant receives a score, UMB can consider whether to include the funding coming from that grant as part of its budget for the coming year.

**Delays and Irregularities in the Processing of NIH Grant Applications**

21.     Since late January 2025, UMB has seen severe and unprecedented delays in the processing of NIH grant applications. Researchers have had their grant application study sections

**Supp. App. 318**

Entry ID: 6734270    Date Filed: 07/08/2025    Page: 319    Document: 00118310403    Case: 25-1612

and advisory councils canceled or otherwise not scheduled, and grant application scoring has been significantly delayed.

22.    UMB has not received formal notice of changes to the review process or evaluation criteria or adoption of changes in agency priorities.

23.    As of March 28, 2025, UMB has approximately 380 proposals totaling $1.04 billion awaiting NIH study section review.

24.    As of March 28, 2025, UMB has 32 proposals totaling $21.4 million that received fundable scores awaiting NIH advisory council and Notice of Award.

25.    As of March 28, 2025, UMB has 10 proposals totaling $28.1 million which have received fundable scores and have been previously reviewed by NIH advisory council but remain listed as Pending Administrative Review and another 2 proposals totaling $9.4 million that have received fundable scores and were reviewed by NIH advisory council in September 2024 but have not even been placed in the Pending Administrative Review status. When UMB has inquired, the response provided indicated that actions are "paused" or "under review."

26.    As of March 28, 2025, UMB has 44 proposals totaling $33.2 million that received possibly fundable scores awaiting NIH advisory council and Notice of Award.

**Terminations of NIH Grants**

27.    As of April 10, 2025, UMB has received notices of termination of 14 NIH awards.

28.    The terminations received as of April 10, 2025 are attached as Exhibits 1-14.[1]

29.    These terminations will result in the loss of more than $33.3 million in research money to UMB.

---

[1] UMB email addresses and telephone numbers have been redacted from the exhibits to this declaration.

**Supp. App. 319**

Case: 25-1612    Document: 00118310403    Page: 320    Date Filed: 07/08/2025    Entry ID: 6734270

30.    The termination notices for these grants have provided very little information to explain the terminations, stating only that the research no longer "effectuates agency priorities." In my more than 25 years working at UMB, I have not seen this language previously used to cancel grants.

31.    The termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities.  However, prior to receipt of the termination, UMB was not given notice of any opportunity to submit any "corrected" grant materials to align with agency priorities, nor was it advised of any new priorities that grant materials should address.

32.    The terminated grants include:

a.    5R01DE032225-02: Research into the biological differences in brain mechanisms between males and females in mediating chronic orofacial and comorbid pain conditions. A key objective of the project was to explore the role of testosterone in modulating pain responses and brain circuitries involved in endogenous pain modulation. Testosterone is a crucial gonadal hormone with significant implications for pain management strategies in both men and women. This area of research is vastly understudied, yet it holds high translational potential for developing effective pain management strategies. The project's rigorous methodology and significant research potential earned it the highest score in the study section. This underscores the project's potential to drive meaningful advancements in the understanding of sex differences in chronic pain and the development of effective pain management strategies.

7

Case: 25-1612     Document: 00118310403     Page: 321     Date Filed: 07/08/2025     Entry ID: 6734270

b. 3R01MD019029-02S1 and 5R01MD019029-02: Using modern psychometric techniques and economic indicators, the research associated with these two grants was aimed at assessing how the wealth gap, influenced by racial and ethnic inequalities, affects health outcomes across different groups. The overall positive impact of the tool will be its use in research settings to find effective interventions to reduce racial health inequities.

c. 5UG1HD113162-02: In collaboration with NIH's AHISA, this implementation science study tests a youth-tailored intervention to improve HIV prevention and HIV care continuum for vulnerable youths at risk of HIV or living with HIV across West, East, and Southern African countries. Centralized resources for regulatory compliance, data management, data quality, and data analysis across the clinical research performing sites promote efficiency and quality.

d. 5R01HL165686-03: There is an increasing burden of HIV-associated noncommunicable (HIVNCD) diseases globally which often cluster among populations facing persistent social and economic inequalities. This research examines population-level clustering of systemic factors (stigma, depression, material insecurity, polysubstance use, intimate partner violence, and police and other violence) and HIVNCD in Nigeria. It will provide critical data for informing the development of integrated, multilevel interventions intended to remediate disparities in HIVNCD and their outcomes.

e. 3D43TW012274-03, -03S1, -03S2, and -03S3: These four grants supported the Integrated Networks of Scholars in Global Health Research Training (INSIGHT) which is a consortium formed among UMB, the University of Alabama at

**Supp. App. 321**

Case: 25-1612    Document: 00118310403    Page: 322    Date Filed: 07/08/2025    Entry ID: 6734270

Birmingham, the Baylor College of Medicine, and the University of Pittsburgh. The work includes 169 faculty members across a multidisciplinary and multi-institutional consortium that supports training for the next generation of global health scholars from the United States and low- and middle-income countries through mentored research experiences at 24 established partner institutions across 19 countries in Africa, Asia, and Latin America and the Caribbean. Strong emphases are on a broad range of global health research areas, including combatting the global HIV epidemic and associated co-morbidities, emerging and re-emerging infectious diseases, non-communicable diseases, and mental health.

f.  5R01MH134721-02: Based on the documented, continued disproportionate rates of HIV infection among certain populations, this is a public health project aimed at identifying scalable interventions to support pre-exposure prophylaxis use.

g.  1U19AI171443-01: This pass-through grant related to the multidisciplinary Center for Antiviral Medicines & Pandemic Preparedness which focuses on development of antiviral drugs to combat coronaviruses and other viruses with pandemic potential.

h.  5T32GM144951-04: To address the lack of diversity in the science, technology, engineering, and math (STEM) workforce, this program aims to increase the participation of underrepresented minorities in biomedical Ph.D. programs, increase their retention rates, and provide career development to prepare students for a career in STEM. The program supported 5 first-year students with fellowships each year (15 total supported during first three years of award).  In addition, the

Case: 25-1612    Document: 00118310403    Page: 323    Date Filed: 07/08/2025    Entry ID: 6734270

program supported a community of students (55) who, while not on the fellowships, benefited from program activities, such as seminars.

i.  5R25GM113262-10: The project addresses urgent needs and demands for workforce and experiential diversity for creative problem solving of increasingly complex issues in biomedical research and healthcare. As part of the grant, the university, with its partners, administers 20 unique and interactive research training and mentoring programs that form a training continuum beginning at the 4th grade with UMB's Mini Medical School and continuing to the FIRST program, described below. The grant supported 5 students and multiple faculty and staff.

j.  1UC2CA293782-01: This project provides localized technical assistance and scientific support for community-led, health equity structural interventions with a goal of completing these interventions in a rigorous scientific manner and in a way that demonstrates how patients and researchers can collaborate to address social determinants of health and advance health equity in neighborhoods and society at large.

k.  5U54CA272205-03: In 2011, a Congressionally mandated National Academies report, Expanding Underrepresented Minority Participation: *America's Science and Technology Talent at the Crossroads*, recommended, among other things, the establishment of a program like NSF's ADVANCE program for underrepresented minorities in Science and Engineering. The NIH established the NIH Common Fund's Faculty Institutional Recruitment for Sustainable Transformation (FIRST) program to enhance and maintain cultures of inclusive excellence in the biomedical research community. Because evidence suggests that participation in the field of

10

**Supp. App. 323**

Case: 25-1612    Document: 00118310403    Page: 324    Date Filed: 07/08/2025    Entry ID: 6734270

biomedical research by individuals with a variety of lived experiences can help to alleviate healthcare disparities, this program created a comprehensive model to encourage outstanding individuals to enter the academic profession. Initial work toward this goal focused on hiring multiple cohorts of promising early-stage investigators who bring new perspectives to biomedical research by encouraging applications from a broad range of applicants with backgrounds and life experiences to bring new perspectives to biomedical research. The award was intended to support funding of 11 faculty, 7 of whom have been hired already.

**Comparisons Across Administrations**

33.     In prior years, under both Democratic and Republican administrations, our institution never experienced this volume of unexplained delays or procedural breakdowns.

34.     Renewals were routine and predictable. This year, even long-standing, high-performing programs are in limbo.

35.     Terminations were exceedingly rare and followed due process. The current approach is without precedent in our experience.

**Impact on Institutional Operations**

36.     These delays make it impossible for UMB to forecast its budget and academic programming.

37.     These delays force UMB to use bridge funding for salaries of multiple faculty members, drawing from limited discretionary resources.

**Effect on Public-Facing or State-Supported Programs**

38.     Our institution operates multiple programs funded jointly by NIH and the State of Maryland, including community health clinics and research addressing health disparities.

**Supp. App. 324**

Case: 25-1612    Document: 00118310403    Page: 325    Date Filed: 07/08/2025    Entry ID: 6734270

39.    Grant terminations lead to diminished access to healthcare, including to individuals at risk of HIV and those from groups with documented disparities in health outcomes. For example, one terminated grant examined the benefits of client-centered care coordination in uptake and adherence to pre-exposure prophylaxis (PrEP) to prevent the spread of HIV. PrEP use reduces the risk of acquiring an HIV infection by 92%, but only about 19% of the targeted population used PrEP in 2019. Interventions that increase PrEP adherence in key populations can save many lives.

**Admissions, Training and Workforce Disruptions**

40.    UMB uses information regarding NIH grant applications and award rates to inform its admissions process, particularly at the graduate student level. Most doctoral students in the biomedical sciences are supported (tuition and living stipend) through NIH grants, due to the highly specialized and advanced nature of their education.  Ph.D. students play a critical role in research - not only for current research projects but also receive training to take on the most pressing scientific questions of the future.  A loss of Ph.D. training will lead to a loss in scientific discoveries and will ultimately degrade human health.

41.    UMB has had to reduce its incoming class of graduate students due to uncertainty over incoming grant funding because of the delays in reviewing and awarding grants by NIH. For example, UMB's School of Pharmacy decreased its offers by 30%.

42.    Similar to private industries, a stable and predictable infrastructure for biomedical research encourages long-term investments and commitments that enable major leaps forward in our understanding of human health and well-being. Earning a Ph.D. in the biomedical sciences is typically a 5- to 7-year commitment by the student and the university. Disruptions to this infrastructure drive talented and promising individuals out of biomedical research, depleting American competitiveness and economic growth.

**Supp. App. 325**

Case: 25-1612    Document: 00118310403    Page: 326    Date Filed: 07/08/2025    Entry ID: 6734270

43.    NIH training and research education grants, including T32, R25, and F31 mechanisms, have been affected by review and award delays or changed deadlines. These training grants are designed to provide resources to institutions so they can train individuals in certain shortage areas (T32 grants), as well as support postbaccalaureate research education activities that complement and/or enhance the training of a workforce to meet the nation's biomedical, behavioral and clinical research needs (R25), and predoctoral dissertation research (F31 grants).

44.    For example, the R25 NOFO (PAR-22-220) was suddenly closed a day before the deadline, which meant UMB could not submit its renewal application despite UMB receiving funding related to this program since 2016.

45.    We have international postdocs whose visa status is now at risk due to pending NIH awards that were expected to be renewed this spring.

46.    This instability is affecting the recruitment and retention of quality research trainees. The inability to retain quality research trainees will have continuing effects on the research capabilities of UMB, including by limiting the individuals qualified to conduct certain research.

**Concerns About FY25 Funds Being Obligated**

47.    We are increasingly concerned that NIH will not be able to process and obligate FY25 funds by the end of the fiscal year in September.

48.    Several major proposals from our institution remain stalled at preliminary review stages, with no indication that the required advisory reviews or notices of award will occur in time.

49.    Our principal investigators and research administration staff have received informal feedback from NIH indicating that certain topic areas are being slowed due to "heightened scrutiny" or "internal concerns."

**Supp. App. 326**

Case: 25-1612    Document: 00118310403    Page: 327    Date Filed: 07/08/2025    Entry ID: 6734270

**Irreparable Harm**

50.     The delays have disrupted ongoing research. Funding gaps have forced researchers to abandon projects, miss deadlines, or lose key personnel.

51.     Some of the studies for which UMB has suffered delays, including studies which are in limbo having already received fundable scores and advisory council review, involve clinical trials for life-saving medications or procedures. These delays harm lives of patients. For example, one is a trial involving assisted living residents with Alzheimer's disease and related dementias. Another relates to prescribing the best antidiabetic drug for each person (i.e. using genetics to determine who will respond best to different classes of drugs).

52.     One terminated grant funded a study involving more than 1000 human subjects who underwent diagnostic tests as part of the funded study. The human subjects consented to the study based on the understanding that they would be provided with test results that could be important to their health. The abrupt termination of the grant takes away federal funding for providing subjects with those test results.

53.     Some of the studies for which UMB has received terminations involve use of animal subjects, which would need to be euthanized due to loss of funding.

54.     Some of these studies had the potential to achieve significant breakthroughs which would have advanced public health, and which will now not occur.

55.     Delays have also disrupted community services, student opportunities, and public programs.

56.     In most cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

**Supp. App. 327**

Case: 25-1612    Document: 00118310403    Page: 328    Date Filed: 07/08/2025    Entry ID: 6734270

57.    These terminated grants consisted of awards for which funding was to be distributed by the government for specific "projects" or areas of research and were competitively awarded based on the university's qualifications. UMB followed Federal processes as provided in the Federal Grant and Cooperative Agreement Act; the Uniform Guidance (§ 200.204 Notices of funding opportunities and Appendix I to Part 200—Full Text of Notice of Funding Opportunity); and as further articulated by NIH specific guidance. The University, in good faith, commenced work, with an approved budget in place, relying on the funding to be reimbursed by NIH in accordance with award terms and conditions.

58.    Using alternative university funds to continue work solicited by an external entity is neither possible given the nature of public fund accounting (aligning allowed uses of funds to their funding sources) nor practical due to the extremely limited availability of cash flow given recent state and federal reductions in support.

**Conclusion**

59.    The breakdown in NIH processes is affecting institutional operations, planning, and public health partnerships. Terminations and delays with no explanation or remedy are undermining confidence in the system. These harms are ongoing and, in many instances, irreparable.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 13th day of April, 2025, in Baltimore, Maryland.

Dr. Bruce E. Jarrell, M.D., FACS
President
University of Maryland, Baltimore

15

**Supp. App. 328**

# EXHIBIT 1



March 11, 2025

Christine R. Toalepai
Authorized Organizational Official
University of Maryland Baltimore
220 Arch Street, Ofc Level 2
Baltimore, MD 21201
Redacted

Dear Christine R. Toalepai:

Funding for Project Number 3R01MD019029-02S1 (supplement) is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2).  This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on September 25, 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[4]  According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[5]  At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs. NIH is

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of Project Number 3R01MD019029-02S1 is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls on behalf of Priscilla Grant

Director, Office of Policy for Extramural Research Administration, OER

---

[6] 2024 Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D.
[11] *Id.* § 50.406(a).
[12] *Id.* § 50.406(b).

# EXHIBIT 2

 

03/20/2025

Kenneth Fahnestock
UNIVERSITY OF MARYLAND BALTIMORE
Redacted

Dear Kenneth Fahnestock:

Effective with the date of this letter, funding for Project Number 5R01HL165686-03 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 08/01/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs. Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls, on behalf of Anthony Agresti, Chief Grants Management Officer, National Heart, Lung, and Blood Institute
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

2

**Supp. App. 334**

# EXHIBIT 3

Supp. App. 335

 

3/21/2025

Gregory J Sorensen
University Of Maryland Baltimore
Redacted

Dear Gregory J Sorensen:

Effective with the date of this letter, funding for Project Number 5D43TW012274-03 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ( NIH ) Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 7/1/2024, and obligations generally should be determined by reference to the law in effect when the grants were made. [3]

The 2024 Policy Statement includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4] According to the Policy Statement, NIH may terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5] At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination [b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ( DEI ) studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3]                              r   , 470 U.S. 632, 638 (1985).
[4] NIH Grants Policy Statement at IIA-1.
[5]  d  at IIA-155.

**Supp. App. 336**

Although NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision, [6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget s regulations to *SAspending.gov.*

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Bruce Butrum, Chief Grants Management Officer, FIC

---

[6] NIH Grants Policy Statement at IIA-156.

[7]    2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9]    45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11  d  § 50.406(a)

[12] 12  d  § 50.406(b)

Supp. App. 337

Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

3

**Supp. App. 338**

# EXHIBIT 4

Department of Health and Human Services
National Institutes of Health
FOGARTY INTERNATIONAL CENTER

## Recipient Information

**1. Recipient Name**
UNIVERSITY OF MARYLAND, BALTIMORE
220 ARCH ST OFC LEVEL2
BALTIMORE, MD 21201

**2. Congressional District of Recipient**
07

**3. Payment System Identifier (ID)**
1526002036A1

**4. Employer Identification Number (EIN)**
526002036

**5. Data Universal Numbering System (DUNS)**
188435911

**6. Recipient's Unique Entity Identifier**
Z9CRZKD42ZT1

**7. Project Director or Principal Investigator**
Manhattan E Charurat, PHD (Contact)
Professor
Redacted
Redacted

**8. Authorized Official**
KENNETH E FAHNESTOCK
Redacted
Redacted

## Federal Agency Information

**9. Awarding Agency Contact Information**
SATABDI RAYCHOWDHURY
Grants Management Specialist
FOGARTY INTERNATIONAL CENTER
satabdi.raychowdhury@nih.gov
301-496-9750

**10. Program Official Contact Information**
Flora N Katz
Program
FOGARTY INTERNATIONAL CENTER
flora.katz@nih.gov
301-402-9591

## Federal Award Information

**11. Award Number**
3D43TW012274-03S1

**12. Unique Federal Award Identification Number (FAIN)**
D43TW012274

**13. Statutory Authority**
42 USC 287b 42 CFR 63a

**14. Federal Award Project Title**
INSIGHT Supplement June 2024

**15. Assistance Listing Number**
93.989

**16. Assistance Listing Program Title**
International Research and Research Training

**17. Award Action Type**
Supplement (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 07/02/2024 – **End Date** 03/21/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| 21. Authorized Carryover | |
| 22. Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $160,746 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $160,746 |
| **26. Project Period Start Date** 07/02/2024 – **End Date** 03/21/2025 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $3,563,052 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
BRUCE R BUTRUM

**30. Remarks**
Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Supp. App. 340



Notice of Award



*International Research Training Award*
Department of Health and Human Services
National Institutes of Health

FOGARTY INTERNATIONAL CENTER

---

**SECTION I – AWARD DATA – 3D43TW012274-03S1 REVISED**

**Principal Investigator(s):**
Manhattan E Charurat (contact), PHD
ANNA M MANDALAKAS, MD
Vishwajit Laxmikant Nimgaonkar, MD
Janet M Turan, PHD

**Award e-mailed to:** Redacted

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to UNIVERSITY OF MARYLAND BALTIMORE in support of the above referenced project.  This award is pursuant to the authority of 42 USC 287b 42 CFR 63a  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the Fogarty International Center of the National Institutes of Health under Award Number D43TW012274. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

BRUCE R BUTRUM
Grants Management Officer
FOGARTY INTERNATIONAL CENTER

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**
**Training related Expenses**                                                                                    $31,118

**Supp. App. 341**

| | |
|---|---|
| **Participant Other** | $124,470 |
| **Federal Direct Costs** | $155,588 |
| **Federal F&A Costs** | $5,158 |
| **Approved Budget** | $160,746 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $160,746 |
| **TOTAL FEDERAL AWARD AMOUNT** | $160,746 |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTAL FEDERAL AWARD AMOUNT YEAR ( 3 ) (for this Document Number) | |
|---|---|
| **AWARD NUMBER** | **TOTAL FEDERAL AWARD AMOUNT** |
| 3D43TW012274-03S1 | $160,746 |
| 5D43TW012274-03 | $1,036,244 |
| 3D43TW012274-03S2 | $100,000 |
| 3D43TW012274-03S3 | $75,000 |
| **TOTAL** | **$1,371,990** |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 3 | $160,746 | $1,371,990 |

**Fiscal Information:**
| | |
|---|---|
| **Payment System Identifier:** | 1526002036A1 |
| **Document Number:** | DTW012274A |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2024 |

| IC | CAN | 2024 |
|---|---|---|
| OD | 8027143 | $80,373 |
| OD | 8055783 | $80,373 |

**NIH Administrative Data:**
**PCC**: GLBLFELO / **OC**: 41012 / **Released**: 03/21/2025
**Award Processed**: 03/22/2025 12:12:03 AM

**SECTION II – PAYMENT/HOTLINE INFORMATION – 3D43TW012274-03S1 REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

**SECTION III – STANDARD TERMS AND CONDITIONS – 3D43TW012274-03S1 REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

a. The grant program legislation and program regulation cited in this Notice of Award.
b. Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
c. 45 CFR Part 75.
d. National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
e. Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
f. This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the

Supp. App. 342

definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is excluded from Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a consortium/subaward be issued under this award, a UEI requirement must be included. See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) D43TW012274. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.


This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures. It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm. This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

**Supp. App. 343**

NOTE: If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required. However, a final expenditure FFR is required and must be submitted electronically as noted above. If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

This award is funded by the following list of institutes. Any papers published under the auspices of this award must cite the funding support of all institutes.

| Office Of The Director, National Institutes Of Health (OD) |
| --- |

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – TW SPECIFIC AWARD CONDITIONS – 3D43TW012274-03S1 REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

<u>Grant Termination</u>
It is the policy of NIH not to prioritize Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are

**Supp. App. 344**

often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs. Therefore, this project is terminated. UNIVERSITY OF MARYLAND BALTIMORE may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as a part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

This revision is made per the letter dated March 21, 2025 and supersedes the Notice of Award, (NoA) issued: 08/27/2024
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*

**REVISED SUPPLEMENT TERM**
**This supplement provides a total award amount of $80,373 (ORWH) co-funding and a total award amount of $80,373 (OAR) co-funding.**

This supplement provides **$160,746** (total cost) of co-funding from The Office of Research on Women's Health (ORWH) in support of one trainees (Serah Gitome **$80,373**) working in Kenya and The Office of AIDS Research (OAR) in support of one trainees (Dr.Samuel Mwaniki **$80,373**) working at Kenya. Any change in the use of these funds requires FIC prior approval.

**SUPPLEMENT PROGRESS REPORT**
The progress report for the parent award must include separate progress update(s) for each supplement (including this one).

**ACKNOWLEDGEMENT OF FUNDING**
Each publication, press release, or other document about research supported by an NIH award must include acknowledgment of FIC and ORWH, OAR and NIH award support with the following or comparable footnote and disclaimer:

Research reported in this publication was supported by the Fogarty International Center and The Office of Research on Women's Health (ORWH) and The Office of AIDS Research (OAR) of the National Institutes of Health. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health.

Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

This publication requirement applies not only to the primary grantee, but also to any subcontractors and /or trainees involved with the project.

For additional information, please visit http://www.nih.gov/about/publicaccess/.

**HUMAN SUBJECT AND ANIMAL RESEARCH INFORMATION FOR TRAINING GRANTS – DELAYED ONSET**
FIC funded research must have the appropriate required NIH and HHS assurances before any research or research training involving human subjects begins. These assurances apply to all research grants, any

**Supp. App. 345**

research supported by training grants (including re-entry support for foreign scientists), and research supported under a cooperative agreement. All human subjects research projects must have had a scientific review either by a peer review panel or by another independent review mechanism. Activity in which human subjects are involved may be undertaken if the institution has an active FWA assurance and if the project has been reviewed and approved by the appropriate Institutional Review Board (IRB).

**Grant recipients must provide human subjects and IRB approval information in Section G.1 "Special NOA terms and FOA reporting requirements" of the RPPR for each trainee/scholar supported by the grant award during the reporting period. Additional information on this requirement can be found in the FIC Progress Report Supplemental Guidance on the FIC webpage: http://www.fic.nih.gov/Grants/Pages/progress-reports.aspx.**

## FOREIGN TRAVEL
U.S. Flag carriers must be used for departure from or entry into the U.S. and for other portions of the trip where available.  Please see the link for questions regarding Foreign Travel.
https://www.fic.nih.gov/Grants/Pages/Foreign-Travel.aspx

## UNIFORM GRANT GUIDANCE AND REVISED NIH GRANTS POLICY STATEMENT
Per Notice Number NOT-OD-15-046, the Department of Health and Human Services published an interim rule adapting OMB's final Uniform Grant Guidance in 2 CFR part 200 with certain amendments, based on existing HHS regulations, to supplement the guidance as needed for the Department effective December 26, 2014.  The current revised NIH Grants Policy Statement is applicable to all NIH grants and cooperative agreements.
Information regarding the NIH Grants Policy Statement can be found at:  https://grants.nih.gov/policy/index.htm
Highlighted below are some select items of costs of particular note to FIC grant recipients:

- F&A for Foreign and International Organizations: NIH and FIC continue to provide F&A costs under grants to foreign and international organizations will be funded at a rate of 8 percent of modified total direct costs, exclusive of equipment, tuition and related fees, and subawards in excess of $25,000. These funds are paid to support the costs of compliance with federal requirements. This applies to direct foreign awards and foreign subawards.
- F&A for Career/Fellowship/Training Awards: NIH and FIC continue to provide F&A costs under research training, some education grants, and Career (K) awards will be funded at a rate of 8 percent of modified total direct costs, exclusive of tuition and fees, health insurance (when awarded as part of tuition and fees), equipment, and consortiums in excess of $25,000, consistent with existing policy.
- Value Added Tax: Foreign taxes charged for the purchase of goods or services that a non-Federal entity is legally required to pay in country is an allowable expense under Federal awards.  However, for many countries an exemption of this tax for research exists.  Consequently, requesting this cost should be unallowable for research grants involving such countries as a performance site.
- Visa Costs: Visa costs may be allowable when identified in specific FOAs or when within the scope of an approved research project.  Generally, allowable direct cost as part of recruiting costs on an NIH grant, as long as the institution has an employee/employer relationship with the individual.

ALL OTHER TERMS AND CONDITIONS OF THIS PROGRAM AS NOTED IN THE FUNDING ANNOUNCEMENT, THE PARENT AWARD TERMS, AND THE NIH GRANTS POLICY STATEMENT ARE HEREBY INCORPORATED INTO THE TERMS OF THIS SUPPLEMENT.

**SPREADSHEET SUMMARY**
**AWARD NUMBER: 3D43TW012274-03S1 REVISED**

**INSTITUTION:** UNIVERSITY OF MARYLAND BALTIMORE

| Budget | Year 3 |
|---|---|
| Training related Expenses | $31,118 |
| Participant Other | $124,470 |
| TOTAL FEDERAL DC | $155,588 |
| TOTAL FEDERAL F&A | $5,158 |

Supp. App. 346

| TOTAL COST | $160,746 |
|---|---|

| Facilities and Administrative Costs | Year 3 |
|---|---|
| F&A Cost Rate 1 | 8% |
| F&A Cost Base 1 | $64,475 |
| F&A Costs 1 | $5,158 |

**Supp. App. 347**

# EXHIBIT 5

Department of Health and Human Services
National Institutes of Health
FOGARTY INTERNATIONAL CENTER

## Recipient Information

**1. Recipient Name**
UNIVERSITY OF MARYLAND, BALTIMORE
220 ARCH ST OFC LEVEL2
BALTIMORE, MD 21201

**2. Congressional District of Recipient**
07

**3. Payment System Identifier (ID)**
1526002036A1

**4. Employer Identification Number (EIN)**
526002036

**5. Data Universal Numbering System (DUNS)**
188435911

**6. Recipient's Unique Entity Identifier**
Z9CRZKD42ZT1

**7. Project Director or Principal Investigator**
Manhattan E Charurat, PHD (Contact)
Professor
Redacted
Redacted

**8. Authorized Official**
KENNETH E FAHNESTOCK
Redacted
Redacted

## Federal Agency Information

**9. Awarding Agency Contact Information**
SATABDI RAYCHOWDHURY
Grants Management Specialist
FOGARTY INTERNATIONAL CENTER
satabdi.raychowdhury@nih.gov
301-496-9750

**10. Program Official Contact Information**
Flora N Katz
Program
FOGARTY INTERNATIONAL CENTER
flora.katz@nih.gov
301-402-9591

## Federal Award Information

**11. Award Number**
3D43TW012274-03S2

**12. Unique Federal Award Identification Number (FAIN)**
D43TW012274

**13. Statutory Authority**
42 USC 287b 42 CFR 63a

**14. Federal Award Project Title**
INSIGHT Supplement (ODP) July 2024

**15. Assistance Listing Number**
93.989

**16. Assistance Listing Program Title**
International Research and Research Training

**17. Award Action Type**
Supplement (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 08/15/2024 – **End Date** 03/21/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| 21. Authorized Carryover | |
| 22. Offset | |
| 23. Total Amount of Federal Funds Obligated this budget period | $100,000 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $100,000 |
| --------------------------------------------------------------------- | |
| **26. Project Period Start Date** 08/15/2024 – **End Date** 03/21/2025 | |
| 27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $3,563,052 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
BRUCE R BUTRUM

## 30. Remarks

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Supp. App. 349



| | Notice of Award | |
|---|---|---|

*International Research Training Award*
Department of Health and Human Services
National Institutes of Health

FOGARTY INTERNATIONAL CENTER



---

**SECTION I – AWARD DATA – 3D43TW012274-03S2 REVISED**

**Principal Investigator(s):**
Manhattan E Charurat (contact), PHD
ANNA M MANDALAKAS, MD
Vishwajit Laxmikant Nimgaonkar, MD
Janet M Turan, PHD

**Award e-mailed to:** Redacted

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to UNIVERSITY OF MARYLAND BALTIMORE in support of the above referenced project.  This award is pursuant to the authority of 42 USC 287b 42 CFR 63a  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the Fogarty International Center of the National Institutes of Health under Award Number D43TW012274. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

BRUCE R BUTRUM
Grants Management Officer
FOGARTY INTERNATIONAL CENTER

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**
**Other**                                                                                        $37,037

Version: 25 - 2/15/2024 9:31 AM | Generated on 3/23/2025 12:00 AM

**Supp. App. 350**

| | |
|---|---|
| Stipends | $60,000 |
| | |
| **Federal Direct Costs** | $97,037 |
| **Federal F&A Costs** | $2,963 |
| **Approved Budget** | $100,000 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $100,000 |
| **TOTAL FEDERAL AWARD AMOUNT** | $100,000 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTAL FEDERAL AWARD AMOUNT YEAR ( 3 ) (for this Document Number) | |
|---|---|
| **AWARD NUMBER** | **TOTAL FEDERAL AWARD AMOUNT** |
| 3D43TW012274-03S2 | $100,000 |
| 5D43TW012274-03 | $1,036,244 |
| 3D43TW012274-03S1 | $160,746 |
| 3D43TW012274-03S3 | $75,000 |
| **TOTAL** | **$1,371,990** |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATIVE TOTALS** |
| 3 | $100,000 | $1,371,990 |

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1526002036A1 |
| **Document Number:** | DTW012274A |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2024 |

| IC | CAN | 2024 |
|---|---|---|
| OD | 8010093 | $100,000 |

**NIH Administrative Data:**
**PCC**: GLBLFELO / **OC**: 41012 / **Released**: 03/21/2025
**Award Processed**: 03/23/2025 12:00:39 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 3D43TW012274-03S2 REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 3D43TW012274-03S2 REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

a. The grant program legislation and program regulation cited in this Notice of Award.
b. Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
c. 45 CFR Part 75.
d. National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
e. Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
f. This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part § 75.2. As such, auditees should identify NIH

Supp. App. 351

awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is excluded from Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a consortium/subaward be issued under this award, a UEI requirement must be included. See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) D43TW012274. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.


 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted

**Supp. App. 352**

electronically as noted above. If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

This award is funded by the following list of institutes. Any papers published under the auspices of this award must cite the funding support of all institutes.

| Office Of The Director, National Institutes Of Health (OD) |
| --- |

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – TW SPECIFIC AWARD CONDITIONS – 3D43TW012274-03S2 REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

<u>Grant Termination</u>
It is the policy of NIH not to prioritize Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research

**Supp. App. 353**

programs. Therefore, this project is terminated. UNIVERSITY OF MARYLAND BALTIMORE may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

This revision is made per the letter dated March 21, 2025 and supersedes the Notice of Award, (NoA) issued: 08/19/2024
********************************************************************************************************
***

### SUPPLEMENT TERM
This supplement provides a total award amount of $100,000 ODP co-funding.

This supplement provides $100,000 (total cost) of co-funding from The Office of Disease Prevention (ODP) in support of two trainees (Dr. Sujata Sapkota and Dr. Josephine Tumuhamye) working in Nepal and Uganda. Any change in the use of these funds requires FIC prior approval.

### SUPPLEMENT  PROGRESS REPORT
The progress report for the parent award must include separate progress update(s) for this supplement.

### ACKNOWLEDGEMENT OF FUNDING
Each publication, press release, or other document about research supported by an NIH award must include acknowledgment of FIC and ODP and NIH award support with the following or comparable footnote and disclaimer:
Research reported in this publication was supported by the Fogarty International Center and The Office of Disease Prevention (ODP) of the National Institutes of Health. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health.
Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.
This publication requirement applies not only to the primary grantee, but also to any subcontractors and /or trainees involved with the project.
For additional information, please visit http://www.nih.gov/about/publicaccess/.

### HUMAN SUBJECT AND ANIMAL RESEARCH INFORMATION FOR TRAINING GRANTS − DELAYED ONSET
FIC funded research must have the appropriate required NIH and HHS assurances before any research or research training involving human subjects begins. These assurances apply to all research grants, any research supported by training grants (including re-entry support for foreign scientists), and research supported under a cooperative agreement. All human subjects research projects must have had a scientific review either by a peer review panel or by another independent review mechanism. Activity in which human subjects are involved may be undertaken if the institution has an active FWA assurance and if the project has been reviewed and approved by the appropriate Institutional Review Board (IRB).

**Grant recipients must provide human subjects and IRB approval information in Section G.1 "Special NOA terms and FOA reporting requirements" of the RPPR for each trainee/scholar supported by the grant award during the reporting period. Additional information on this requirement can be found in the FIC Progress Report Supplemental Guidance on the FIC webpage: http://www.fic.nih.gov/Grants/Pages/progress-reports.aspx.**
FOREIGN TRAVEL
U.S. Flag carriers must be used for departure from or entry into the U.S. and for other portions of the trip where available.  Please see the link for questions regarding Foreign Travel.
https://www.fic.nih.gov/Grants/Pages/Foreign-Travel.aspx

Supp. App. 354

**UNIFORM GRANT GUIDANCE AND REVISED NIH GRANTS POLICY STATEMENT**

Per Notice Number NOT-OD-15-046, the Department of Health and Human Services published an interim rule adapting OMB's final Uniform Grant Guidance in 2 CFR part 200 with certain amendments, based on existing HHS regulations, to supplement the guidance as needed for the Department effective December 26, 2014. The current revised NIH Grants Policy Statement is applicable to all NIH grants and cooperative agreements.

Information regarding the NIH Grants Policy Statement can be found at: https://grants.nih.gov/policy/index.htm

Highlighted below are some select items of costs of particular note to FIC grant recipients:

· F&A for Foreign and International Organizations: NIH and FIC continue to provide F&A costs under grants to foreign and international organizations will be funded at a rate of 8 percent of modified total direct costs, exclusive of equipment, tuition and related fees, and subawards in excess of $25,000. These funds are paid to support the costs of compliance with federal requirements. This applies to direct foreign awards and foreign subawards.

· F&A for Career/Fellowship/Training Awards: NIH and FIC continue to provide F&A costs under research training, some education grants, and Career (K) awards will be funded at a rate of 8 percent of modified total direct costs, exclusive of tuition and fees, health insurance (when awarded as part of tuition and fees), equipment, and consortiums in excess of $25,000, consistent with existing policy.

· Value Added Tax: Foreign taxes charged for the purchase of goods or services that a non-Federal entity is legally required to pay in country is an allowable expense under Federal awards. However, for many countries an exemption of this tax for research exists. Consequently, requesting this cost should be unallowable for research grants involving such countries as a performance site.

· Visa Costs: Visa costs may be allowable when identified in specific FOAs or when within the scope of an approved research project. Generally, allowable direct cost as part of recruiting costs on an NIH grant, as long as the institution has an employee/employer relationship with the individual.

**ALL OTHER TERMS AND CONDITIONS OF THIS PROGRAM AS NOTED IN THE FUNDING ANNOUNCEMENT, THE PARENT AWARD TERMS, AND THE NIH GRANTS POLICY STATEMENT ARE HEREBY INCORPORATED INTO THE TERMS OF THIS SUPPLEMENT.**

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 3D43TW012274-03S2 REVISED

**INSTITUTION:** UNIVERSITY OF MARYLAND BALTIMORE

| Budget | Year 3 |
|---|---|
| Other | $37,037 |
| Stipends | $60,000 |
| TOTAL FEDERAL DC | $97,037 |
| TOTAL FEDERAL F&A | $2,963 |
| TOTAL COST | $100,000 |

| Facilities and Administrative Costs | Year 3 |
|---|---|
| F&A Cost Rate 1 | 8% |
| F&A Cost Base 1 | $37,037 |
| F&A Costs 1 | $2,963 |

Supp. App. 355

# EXHIBIT 6

Case: 25-1612 Document: 36-19 Filed: 04/14/2025 Page: 45 of 76

| | |
|---|---|
| **Department of Health and Human Services**<br>National Institutes of Health<br>FOGARTY INTERNATIONAL CENTER | **Notice of Award**<br>FAIN# D43TW012274<br>**Federal Award Date**<br>03/24/2025 |

**Recipient Information**

**1. Recipient Name**
UNIVERSITY OF MARYLAND, BALTIMORE
220 ARCH ST OFC LEVEL2
BALTIMORE, MD 21201

**2. Congressional District of Recipient**
07

**3. Payment System Identifier (ID)**
1526002036A1

**4. Employer Identification Number (EIN)**
526002036

**5. Data Universal Numbering System (DUNS)**
188435911

**6. Recipient's Unique Entity Identifier**
Z9CRZKD42ZT1

**7. Project Director or Principal Investigator**
Manhattan E Charurat, PHD (Contact)
Professor
Redacted
Redacted

**8. Authorized Official**
KENNETH E FAHNESTOCK
Redacted
Redacted

**Federal Agency Information**

**9. Awarding Agency Contact Information**
SATABDI RAYCHOWDHURY
Grants Management Specialist
FOGARTY INTERNATIONAL CENTER
satabdi.raychowdhury@nih.gov
301-496-9750

**10. Program Official Contact Information**
Flora N Katz
Program
FOGARTY INTERNATIONAL CENTER
flora.katz@nih.gov
301-402-9591

**Federal Award Information**

**11. Award Number**
3D43TW012274-03S3

**12. Unique Federal Award Identification Number (FAIN)**
D43TW012274

**13. Statutory Authority**
42 USC 287b 42 CFR 63a

**14. Federal Award Project Title**
Supplement_INSIGHT_Orientation

**15. Assistance Listing Number**
93.989

**16. Assistance Listing Program Title**
International Research and Research Training

**17. Award Action Type**
Supplement (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 08/30/2024 – **End Date** 03/21/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| 21. Authorized Carryover | |
| 22. Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $75,000 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $75,000 |
| **26. Project Period Start Date** 08/30/2024 – **End Date** 03/21/2025 | |
| 27. Total Amount of the Federal Award including Approved Cost<br>Sharing or Matching this Project Period | $3,563,052 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
BRUCE R BUTRUM

**30. Remarks**

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Supp. App. 357



Notice of Award



*International Research Training Award*
Department of Health and Human Services
National Institutes of Health

FOGARTY INTERNATIONAL CENTER



---

**SECTION I – AWARD DATA – 3D43TW012274-03S3 REVISED**

**Principal Investigator(s):**
Manhattan E Charurat (contact), PHD
ANNA M MANDALAKAS, MD
Vishwajit Laxmikant Nimgaonkar, MD
Janet M Turan, PHD

**Award e-mailed to:** Redacted

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to UNIVERSITY OF MARYLAND BALTIMORE in support of the above referenced project.  This award is pursuant to the authority of 42 USC 287b 42 CFR 63a  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the Fogarty International Center of the National Institutes of Health under Award Number D43TW012274. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

BRUCE R BUTRUM
Grants Management Officer
FOGARTY INTERNATIONAL CENTER

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**
**Other**                                                                                                      $69,444

Version: 25 - 2/15/2024 9:51 AM | Generated on 3/24/2025 12:08 AM

**Supp. App. 358**

| Federal Direct Costs | $69,444 |
| Federal F&A Costs | $5,556 |
| Approved Budget | $75,000 |
| Total Amount of Federal Funds Authorized (Federal Share) | $75,000 |
| TOTAL FEDERAL AWARD AMOUNT | $75,000 |
| | |
| AMOUNT OF THIS ACTION (FEDERAL SHARE) | $0 |

| SUMMARY TOTAL FEDERAL AWARD AMOUNT YEAR ( 3 ) (for this Document Number) | |
| --- | --- |
| AWARD NUMBER | TOTAL FEDERAL AWARD AMOUNT |
| 3D43TW012274-03S3 | $75,000 |
| 5D43TW012274-03 | $1,036,244 |
| 3D43TW012274-03S1 | $160,746 |
| 3D43TW012274-03S2 | $100,000 |
| **TOTAL** | **$1,371,990** |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
| --- | --- | --- |
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 3 | $75,000 | $1,371,990 |

**Fiscal Information:**

| | |
| --- | --- |
| Payment System Identifier: | 1526002036A1 |
| Document Number: | DTW012274A |
| PMS Account Type: | P (Subaccount) |
| Fiscal Year: | 2024 |

| IC | CAN | 2024 |
| --- | --- | --- |
| TW | 8476367 | $75,000 |

**NIH Administrative Data:**
**PCC**: GLBLFELO / **OC**: 41012 / **Released**: 03/21/2025
**Award Processed:** 03/24/2025 12:08:10 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 3D43TW012274-03S3  REVISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 3D43TW012274-03S3  REVISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

   a.   The grant program legislation and program regulation cited in this Notice of Award.
   b.   Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
   c.   45 CFR Part 75.
   d.   National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
   e.   Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
   f.    This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor

Supp. App. 359

should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is excluded from Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a consortium/subaward be issued under this award, a UEI requirement must be included. See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) D43TW012274. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.


This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures. It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm. This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE: If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required. However, a final expenditure FFR is required and must be submitted

**Supp. App. 360**

electronically as noted above.  If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – TW SPECIFIC AWARD CONDITIONS – 3D43TW012274-03S3  REVISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

Grant Termination
It is the policy of NIH not to prioritize Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs. Therefore, this project is terminated. UNIVERSITY OF MARYLAND BALTIMORE may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance

**Supp. App. 361**

Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

This revision is made per the letter dated March 21, 2025 and supersedes the Notice of Award, (NoA) issued: 09/05/2024
*************************************************************************************************************
***

## AWARD FOR ORIENTATION SUPPLEMENT
**This supplement provides $75,000 (total cost), as requested, in support to the Global Health Program for Fellows and Scholars LAUNCH 2025 Orientation Activities for the seven Support Centers (UNC, UMD, UW, Harvard, UCSF, Yale and WU in St. Louis) held on NIH campus or Virtual. Any change in the use of these funds requires FIC prior approval. These funds can not be used for Honoria costs.**

## SUPPLEMENT PROGRESS REPORT
The progress report for the parent award must include separate progress update(s) for this supplement.

## ACKNOWLEDGEMENT OF FUNDING
Each publication, press release, or other document about research supported by an NIH award must include acknowledgment of FIC and NIH award support with the following or comparable footnote and disclaimer: Research reported in this publication was supported by the Fogarty International Center of the National Institutes of Health. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health.
Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.
This publication requirement applies not only to the primary grantee, but also to any subcontractors and /or trainees involved with the project.
For additional information, please visit http://www.nih.gov/about/publicaccess/.

## UNIFORM GRANT GUIDANCE AND REVISED NIH GRANTS POLICY STATEMENT
Per Notice Number NOT-OD-15-046, the Department of Health and Human Services published an interim rule adapting OMB's final Uniform Grant Guidance in 2 CFR part 200 with certain amendments, based on existing HHS regulations, to supplement the guidance as needed for the Department effective December 26, 2014. The current revised NIH Grants Policy Statement is applicable to all NIH grants and cooperative agreements.
Information regarding the NIH Grants Policy Statement can be found at: https://grants.nih.gov/policy/index.htm
Highlighted below are some select items of costs of particular note to FIC grant recipients:

- F&A for Foreign and International Organizations: NIH and FIC continue to provide F&A costs under grants to foreign and international organizations will be funded at a rate of 8 percent of modified total direct costs, exclusive of equipment, tuition and related fees, and subawards in excess of $25,000. These funds are paid to support the costs of compliance with federal requirements. This applies to direct foreign awards and foreign subawards.
- F&A for Career/Fellowship/Training Awards: NIH and FIC continue to provide F&A costs under research training, some education grants, and Career (K) awards will be funded at a rate of 8 percent of modified total direct costs, exclusive of tuition and fees, health insurance (when awarded as part of tuition and fees), equipment, and consortiums in excess of $25,000, consistent with existing policy.
- Value Added Tax: Foreign taxes charged for the purchase of goods or services that a non-Federal entity is legally required to pay in country is an allowable expense under Federal awards. However, for many countries an exemption of this tax for research exists. Consequently, requesting this cost should be unallowable for research grants involving such countries as a performance site.

Supp. App. 362

· Visa Costs: Visa costs may be allowable when identified in specific FOAs or when within the scope of an approved research project.  Generally, allowable direct cost as part of recruiting costs on an NIH grant, as long as the institution has an employee/employer relationship with the individual.

**ALL OTHER TERMS AND CONDITIONS OF THIS PROGRAM AS NOTED IN THE FUNDING ANNOUNCEMENT, THE PARENT AWARD TERMS, AND THE NIH GRANTS POLICY STATEMENT ARE HEREBY INCORPORATED INTO THE TERMS OF THIS SUPPLEMENT.**

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 3D43TW012274-03S3 REVISED

**INSTITUTION:** UNIVERSITY OF MARYLAND BALTIMORE

| Budget | Year 3 |
|---|---|
| Other | $69,444 |
| TOTAL FEDERAL DC | $69,444 |
| TOTAL FEDERAL F&A | $5,556 |
| TOTAL COST | $75,000 |

| Facilities and Administrative Costs | Year 3 |
|---|---|
| F&A Cost Rate 1 | 8% |
| F&A Cost Base 1 | $69,444 |
| F&A Costs 1 | $5,556 |

**Supp. App. 363**

# EXHIBIT 7



03/20/2025

Gregory Sorensen
UNIVERSITY OF MARYLAND BALTIMORE
<span style="color:blue">Redacted</span>

Dear Gregory Sorensen:

Effective with the date of this letter, funding for Project Number 5R01DE032225-02 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 09/01/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs. Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] 2024 Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] 2024 Policy Statement at IIA-156.

1

**Supp. App. 365**

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle G. Bulls -S

Digitally signed by
Michelle G. Bulls -S
Date: 2025.03.20
13:32:12 -04'00'

Michelle G. Bulls, on behalf Gabriel Hidalgo, Chief Grants Management Officer, National Institute of Dental and Craniofacial Research
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

2

**Supp. App. 366**

# EXHIBIT 8

| Subject: | Grant Termination Notification |
|---|---|
| Date: | Friday, March 21, 2025 at 12:30:58 PM Eastern Daylight Time |
| From: | Bulls, Michelle G. (NIH/OD) [E] |
| To: | Redacted |
| Attachments: | image001.jpg, image002.png |

You don't often get email from michelle.bulls@nih.gov. Learn why this is important

**CAUTION:** This message originated from a non-UMB email system. Hover over any links before clicking and use caution opening attachments.

 **NIH** National Institutes of Health
Office of Extramural Research

3/21/2025

Christine R. Toalepai
University Of Maryland Baltimore
Redacted

Dear Christine R. Toalepai:

Effective with the date of this letter, funding for Project Number 5R01MH134721-02 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 7/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]," According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful

discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S          Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, NIMH
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2]
2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3]
*Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4]
NIH Grants Policy Statement at IIA-1.

[5]
*Id.* at IIA-155.

[6]
NIH Grants Policy Statement at IIA-156.

[7]
*See* 2 C.F.R. § 200.343 (2024).

[8]
2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9]
*See* 45 C.F.R. § 75.374.

[10]
See 42 C.F.R. Part 50, Subpart D

[11]
11 *Id.* § 50.406(a)

[12]
12 *Id.* § 50.406(b)

# EXHIBIT 9

| | |
|---|---|
| **Subject:** | Grant Termination Notification |
| **Date:** | Friday, March 21, 2025 at 12:30:33 PM Eastern Daylight Time |
| **From:** | Bulls, Michelle G. (NIH/OD) [E] |
| **To:** | Redacted |
| **Attachments:** | image001.jpg, image002.png |

You don't often get email from michelle.bulls@nih.gov. Learn why this is important

**CAUTION:** This message originated from a non-UMB email system. Hover over any links before clicking and use caution opening attachments.

 

3/21/2025

Toalepai, Christine R.
University Of Maryland Baltimore
Redacted

Dear Toalepai, Christine R.:

Effective with the date of this letter, funding for Project Number 5R01MD019029-02 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 4/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful

discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Priscilla Grant, Chief Grants Management Officer, NIMHD
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT 10

**Subject:** Fwd: Grant Termination Notification
**Date:** Friday, March 21, 2025 at 12:59:47 PM Eastern Daylight Time
**From:** Sorensen, Gregory J.
**To:** Frankenfield, Jill
**Attachments:** image001.jpg, image002.png

Here is another one

**Greg J. Sorensen**
Assistant Director, Sponsored Programs Admin.
Office of Research and Development
University of Maryland, Baltimore
620 W. Lexington Street, 4th Floor
Baltimore, Maryland 21201
Redacted

Email: Redacted
(AWS Every other Monday, work hours 7am to 4pm)

Begin forwarded message:

**From:** "Bulls, Michelle G. (NIH/OD) [E]" <michelle.bulls@nih.gov>
**Subject: Grant Termination Notification**
**Date:** March 21, 2025 at 12:30:12 PM EDT
**To:** "Redacted

You don't often get email from michelle.bulls@nih.gov. Learn why this is important

**CAUTION:** This message originated from a non-UMB email system. Hover over any links before clicking and use caution opening attachments.

 NIH National Institutes of Health
Office of Extramural Research

3/21/2025

Gregory J. Sorensen
University Of Maryland Baltimore
Redacted

Dear Gregory J. Sorensen:

Effective with the date of this letter, funding for Project Number 5UG1HD113162-02 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2] The 2024 Policy Statement applies to your project because NIH approved your grant on 7/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Margaret Young, Chief Grants Management Officer, NICHD
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT 11



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

National Institutes of Health<br>
National Cancer Institute<br>
Bethesda, Maryland 20892

04/07/2025

University of Maryland Baltimore
Sponsored Programs Administration
620 W. Lexington St, 4th Floor
Baltimore, MD 21201

Christine R. Toalepai:

Funding for Project Number 1UC2CA293782-01 is hereby terminated pursuant to the 2024 National Institutes of Health ( NIH ) Grants Policy Statement, and 2 C.F.R. § 200.340(a)(4). This letter serves as a termination notice.

The 2024 Policy Statement applies to your project because NIH approved your grant on 08/29/2024, and obligations for federal grants are generally determined by the laws, regulations, and terms in effect at the time the grant was awarded, as outlined in the Notice of Award (NOA) or grant agreement . This includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.

According to the Policy Statement, NIH may terminate the grant in whole or in part as outlined in 2 CFR Part 200.340. At the time your grant was issued, 2 C.F.R. § 200.340(a)(4) permitted termination [b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

This project no longer effectuates agency priorities. DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ( DEI ) studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs. Therefore, there is no modification of the project that would align with agency priorities.

Although NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision, no corrective action is possible here.

**Supp. App. 379**

Costs resulting from financial obligations incurred after termination are not allowable. Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §200.344. However, due to the immediate termination of this project, NIH may require a shortened timeframe to submit closeout reports. Details will be provided in the revised NOA issued by the Grants Management Official.

**Administrative Appeal**

Should you object to the termination, you may provide information and documentation challenging this action. You must submit a request for such review to Acting Principal Deputy Director Dr. Memoli (matthew.memoli_nih.gov) no later than 30 days after the date of this letter. You may submit an extension request to Dr. Memoli and provide good cause as to why an extension of time should be granted.

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.

Sincerely,

*Crystal Wolfrey*

Crystal Wolfrey
Chief Grants Management Officer
National Cancer Institute

cc:
OPERA Director
Deputy Director for Extramural Research

**Supp. App. 380**

# EXHIBIT 12

**Subject:** Grant Termination Notification
**Date:** Tuesday, April 8, 2025 at 3:33:40 PM Eastern Daylight Time
**From:** Bulls, Michelle G. (NIH/OD) [E]
**To:** Paffrath, Dennis
**Attachments:** image001.jpg, image002.png

**CAUTION:** This message originated from a non-UMB email system. Hover over any links before clicking and use caution opening attachments.

 

4/8/2025

Dennis Paffrath
University Of Maryland Baltimore
Redacted

Dear Dennis Paffrath:

Effective with the date of this letter, funding for Project Number 5U54CA272205-03 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 9/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S    Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Crystal Wolfrey, Chief Grants Management Officer, NCI
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT 13

Supp. App. 385

**Subject:** Fwd: NIGMS Funding Update
**Date:** Wednesday, April 2, 2025 at 1:38:14 PM Eastern Daylight Time
**From:** Sorensen, Gregory J.
**To:** Frankenfield, Jill

Here is another one. Not sure if you received it yet. Thanks

**Greg J. Sorensen**
Assistant Director, Sponsored Programs Admin.
Office of Research and Development
University of Maryland, Baltimore
620 W. Lexington Street, 4th Floor
Baltimore, Maryland 21201
Redacted

Begin forwarded message:

**From:** "Gibbs, Kenneth (NIH/NIGMS) [E]" <kenneth.gibbs@nih.gov>
**Subject: NIGMS Funding Update**
**Date:** April 2, 2025 at 1:15:12 PM EDT
**To:** Redacted

You don't often get email from kenneth.gibbs@nih.gov. Learn why this is important

**CAUTION:** This message originated from a non-UMB email system. Hover over any links before clicking and use caution opening attachments.

Re: GM113262-10

Dear Sorenson, Gregory,

As business official for the above referenced award, I am writing to let you know that due to changes in NIH/HHS priorities, the **Postbaccalaureate Research Education Program (PREP)** program has been terminated. Your institution can continue to draw funds on any active award for allowed costs that are within scope and consistent with the Grants Policy Statement. Further awards will not be made, and NIGMS will not permit no-cost extensions. We advise against recruiting future cohorts.

NIGMS grants management will follow up if there is any specific information or action needed regarding your award. For additional information regarding funding opportunities that NIGMS supports, see NIGMS TWD Webpage: https://www.nigms.nih.gov/training/Pages/TWDPrograms.

If you have specific follow up questions, please email nigmstrainingmail@nigms.nih.gov and include your grant number.

**Kenneth D. Gibbs, Jr., PhD, MPH**
Director, Division of Training and Workforce Development
National Institute of General Medical Sciences
National Institutes of Health

# EXHIBIT 14

**Subject:** Fwd: NIGMS Funding Update
**Date:** Wednesday, April 2, 2025 at 1:39:06 PM Eastern Daylight Time
**From:** Sorensen, Gregory J.
**To:** Frankenfield, Jill

And another one.  Thanks

**Greg J. Sorensen**
Assistant Director, Sponsored Programs Admin.
Office of Research and Development
University of Maryland, Baltimore
620 W. Lexington Street, 4th Floor
Baltimore, Maryland 21201
Redacted

Begin forwarded message:

**From:** "Gibbs, Kenneth (NIH/NIGMS) [E]" <kenneth.gibbs@nih.gov>
**Subject: NIGMS Funding Update**
**Date:** April 2, 2025 at 1:15:34 PM EDT
**To:** Redacted

You don't often get email from kenneth.gibbs@nih.gov. Learn why this is important

**CAUTION:** This message originated from a non-UMB email system. Hover over any links before clicking and use caution opening attachments.

Re: GM144951-04

Dear Christine R. Toalepai,

As business official for the above referenced award, I am writing to let you know that due to changes in NIH/HHS priorities, the **Initiative for Maximizing Student Development (IMSD)** program has been terminated. Your institution can continue to draw funds on any active award for allowed costs that are within scope and consistent with the Grants Policy Statement.  Further awards will not be made, and NIGMS will not permit no-cost extensions. We advise against recruiting future cohorts.

NIGMS grants management will follow up if there is any specific information or action needed regarding your award.  For additional information regarding funding opportunities that NIGMS supports, see NIGMS TWD Webpage: https://www.nigms.nih.gov/training/Pages/TWDPrograms.

If you have specific follow up questions, please email nigmstrainingmail@nigms.nih.gov and include your grant number.

**Kenneth D. Gibbs, Jr., PhD, MPH**
Director, Division of Training and Workforce Development
National Institute of General Medical Sciences
National Institutes of Health

EXHIBIT 20

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; et al., | |
| *Plaintiffs,* | No. 1:25-cv-_____ |
| v. | |
| ROBERT F. KENNEDY, JR., et al., | |
| *Defendants.* | |

**DECLARATION OF JOHN J. FARMER, JR.**

I, John J. Farmer, Jr., upon information and belief, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am the Interim Senior Vice President and General Counsel of Rutgers, the State University of New Jersey.

2.      I have compiled the information in the statements set forth below through review of Rutgers's records and other documents gathered by Rutgers personnel who have assisted me and on the basis of documents that have been provided to and/or reviewed by me in order to understand their immediate impact on Rutgers.

3.      I submit this Declaration in support of the States' Motion for Temporary Restraining Order.

**A.  Professional Background**

4.      I am the Interim Senior Vice President and General Counsel at Rutgers, the State University of New Jersey. I have served in this capacity since 2024.  I am the chief counsel for the

1

**Supp. App. 390**

university. Previously, I have served as Dean of Rutgers School of Law-Rutgers and Director of the Eagleton Institute. From 1999-2002 I was Attorney General of the State of New Jersey.

5.      Founded in 1766, Rutgers is the oldest, largest, and highest-ranked public university in the New York/New Jersey Metropolitan area and is among the nation's highest-ranked public research universities.

6.      As New Jersey's land-grant university, Rutgers has a significant academic and clinical health sciences presence across the state, including activity in each of the State's 21 counties and three campuses located in the cities of Camden, Newark, and New Brunswick, New Jersey.

7.      Rutgers is accredited as one university, and the president presides over the University as the chief executive officer. Reporting to the president are four chancellors: the Chancellors of Rutgers University–New Brunswick and Rutgers Health—whose units together compose the Association of American Universities (AAU) unit of Rutgers—and the chancellors of Rutgers University–Newark and Rutgers University–Camden.

8.      Within this four-unit structure are numerous research centers and institutes, academic medical centers, and 29 schools and colleges, including colleges of liberal arts and sciences, a school of environmental and biological sciences, a school of engineering, a school of the arts, other professional schools, and graduate programs. Rutgers presently serves over 69,000 students, 82% of whom are New Jersey residents.

9.      As one of the largest employers in the state, Rutgers has a workforce that includes more than 10,000 full- and part-time faculty members and more than 17,450 full- and part-time staff.

**Supp. App. 391**

10.     Each of the Rutgers units has its own distinct characteristics that contribute to the strength of our university; all are recognized within the U.S. News & World Report: America's Best Colleges top 50 public, national universities.

11.     Rutgers–New Brunswick, established in 1766, is New Jersey's leading public research university—a Research 1 designated institution and our largest chancellor-led unit.

12.     Rutgers–Newark, is an urban research (R2) university located in New Jersey's largest city that leverages its diversity and proximity to New York City. It is recognized as a driver of economic prosperity and social mobility and an anchor institution for its host city of Newark.

13.     Rutgers–Camden, our southern-most and smallest campus, is located in the Delaware Valley, which affords its community access not just to a personalized, close-knit, and robust experience on campus but also to the academic, cultural, and career resources available just across the Delaware River in Philadelphia.

14.     The University's fourth chancellor-led unit, Rutgers Health, is one of the nation's largest academic health centers, integrating education, research, and clinical care. It is also the largest academic health center within the state. Rutgers Health offers the broadest scope of programs for educating doctors, nurses, dentists, pharmacists, and other healthcare professionals in medicine, nursing, dentistry, pharmacy, and other health professions, making it a leading institution for healthcare education in New Jersey. It is home to Rutgers Cancer Institute of New Jersey, the State of New Jersey's only National Cancer Institute-designated Comprehensive Cancer Center.

15.     In addition to providing higher education to students from New Jersey and across the nation, Rutgers also supports significant medical and behavioral research and clinical trials

**Supp. App. 392**

across its colleges and schools. Rutgers conducts vital research across a wide range of areas including heart disease, cancer, neuroscience and brain health, and infectious disease.

16.    To fund these crucial medical research programs, Rutgers is the recipient of federal funding, including annual funding from NIH in the total amount of approximately $250 million. NIH funding at Rutgers currently supports nearly 1,200 separate grants and more than 2,200 employees.

**B.  <u>Reliance on NIH Funding</u>**

17.    In fiscal year 2024, Rutgers received funding through the National Institutes of Health ("NIH") to support approximately 1,200 projects, totaling approximately $250 million.

18.    Rutgers receives NIH grants across a variety of institutes encompassed within the NIH**,** including but not limited to the National Institutes on Aging, National Institute on Minority Health and Health Disparities, and National Heart Lung and Blood Institute.

19.    Through those NIH grants, Rutgers funds over 2,400 faculty and staff positions in whole or in part.

20.    Rutgers provides considerable employment benefits in the Science, Technology, Engineering and Mathematics ("STEM") workforce to the New Jersey economy.

**C.  <u>Terminations of NIH Grants</u>**

21.    Since January 20th, 2025, Rutgers has had four NIH grants terminated.

22.    The terminations received through March 31, 2025, are attached hereto as Exhibits A, C, E, and G.

23.    These terminations will result in a prospective loss of $4,580,826 across the remaining grants years associated with these grants.

**Supp. App. 393**

24.     The four NIH grants currently support, in whole or in part, the personnel expenses of 20 faculty and staff members.

25.     These terminations have triggered a loss of $1,966,042.44 across the four grants for the current budgetary period as discussed in more detail below, subject to the final close out process.

26.     The termination notices for these grants have provided very little to explain the termination, instead noting that the research no longer "effectuates agency priorities."

27.     The termination notices have also stated that there is "no corrective action" that can be taken to ensure the grant aligns with agency priorities.  However, prior to receipt of the termination, Rutgers had not been given notice of any opportunity to submit any "corrected" grant materials to align with agency priorities despite policy guidance from NIH that "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision." 2024 NIH Grants Policy Statement at IIA-156.  Nor was Rutgers provided with any updated "agency priorities" with which its research must align.

**Social Networks and Cognitive Health Among Black and Latino Sexual Minority Men in NJ (NIH Project Number 1R01AG089099)**

28.     NIH terminated grant funding for a study by Rutgers School of Public Health researchers of the social networks and cognitive health among Black and Latino sexual minority men in New Jersey, Project Number 1R01AG089099-01 on March 11, 2025. The Notice of Award ("NOA") for this grant is attached as Exhibit B. This study sought to understand how interpersonal processes and social network characteristics affect health behaviors related to cognitive performance. The study aimed to assess how social networks in the sample population are constructed and how social and physical activities in those networks may be protective for

5

cognitive performance. The project period for this grant spans from September 23, 2024 to August 31, 2029.

29.     This grant was approved in response to a Notice of Funding Opportunity, RFA-AG-24-025, from the National Institute on Aging made available on June 8, 2023.

30.     The National Institute on Aging's leads a national program of research on the biomedical, social, and behavioral aspects of the aging process; the prevention of age-related diseases and disabilities; and the promotion of a better quality of life for all older Americans.

31.     The grant was for a five-year period and awarded on September 20, 2024. This funding was intended to pay research faculty and staff, the preparation and distribution of materials, and other incidental research costs associated with the study. Five faculty members and two staff members are affiliated with the project.

32.     The first budget period for this grant covered September 23, 2024 to August 31, 2025.  At the time of termination, the total amount spent in this first budget period was $270,020, while the total amount awarded for this timeframe was $739,827. Therefore, for this period of time, the total funding lost upon the grant's termination was $469,807, subject to the final close out and adjustment process. The total estimated future loss due to termination is $2,833,758. This estimated loss includes the full grant award of $702,062 in 2026, $708,670 in 2027, and $711,412 in 2028. The project was scheduled to end on August 31, 2029. The reason for termination was that "programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans." *See* Exhibit A. Rutgers researchers were not referred to any new policy statement or regulation that described the new agency priorities.

6

33.    This project includes a community advisory board, who were integral in the development of the community-engagement portions of the study. Loss of funding would mean that the study fails to fulfill its agreed-upon expectations, meetings, and engagement with the community advisory board. This has the potential to damage trust between the academic institution and critical community partners, undermining years of relationship building. Participants who required any diagnostic assessments will no longer be able to receive those assessments.

34.    This award also includes funds awarded for consortium activity with the University of Pittsburgh in the amount of $44,504 and NJ Community Research Initiative ("NJCRI") in the amount of $115,842.  Seven faculty and five staff members are affiliated with subcontracted consortium activities.  Consortiums are established and administered as described in the NIH Grants Policy Statement.

### Stigma and the Non-Communicable Disease Syndemic in Aging HIV Positive and HIV Negative MSM (NIH Project Number 5R01HL160326-05)}

35.    NIH also terminated funding for Rutgers School of Public Health researchers to perform a mixed-methods study of factors associated with HIV prevention among Latino/x migrant men, Project Number 5R01HL160326-05, on March 19, 2025. The NOA for this grant is attached as Exhibit D. This study aimed to address the prevalence of HIV infection among Latino/x sexual minority men by examining how social ecological factors magnify HIV infection risks in this population. The project received its funding from the National Heart, Lung, and Blood Institute in response to a Funding Opportunity Announcement, RFA-HL-21-018.

36.    The National Heart, Lung, and Blood Institute (NHLBI) provides global leadership for a research, training, and education program to promote the prevention and treatment of heart, lung, and blood diseases and enhance the health of all individuals so that they can live longer and more fulfilling lives. The NHLBI stimulates basic discoveries about the causes of disease, enables

7

**Supp. App. 396**

the translation of basic discoveries into clinical practice, fosters training and mentoring of emerging scientists and physicians, and communicates research advances to the public.

37.     This announcement was aimed at identifying strategies that foster holistic approaches in the clinical management of people living with HIV who also have heart, lung, blood, and sleep ("HLBS") comorbidities, and to utilize existing data to assess the feasibility and cost-effectiveness of such approaches. The grant was awarded on February 1, 2023. This funding was intended to pay research faculty and staff, the preparation and distribution of materials, and other incidental research costs associated with the study.  One faculty member and one staff member are affiliated with this project.

38.     At the time of termination, the total amount spent in the current budget period, which spanned February 1, 2024 until August 31, 2024, was $344,995, and the total budget awarded for this period of time was $497,040. Therefore, in this timeframe, the total funding lost was $152,045, subject to the final close out and adjustment process. The total estimated future loss due to termination is $487,894, which reflects remaining funding awarded under the grant through the projected end date of August 31, 2026. The reason given for termination was that the program was based on "artificial and non-scientific categories, including amorphous equity objectives." See Exhibit C. Rutgers researchers were not referred to any new policy statement or regulation that described the new agency priorities.

39.     The termination of this funding will have significant and immediate consequences for the 1020 study participants who have been receiving resources for the prevention or treatment of HIV and disrupt the continuum of care for a variety of associated co-morbidities. The loss of funding will also require the waste of biospecimens and the termination of electrocardiography

**Supp. App. 397**

studies for participants. The loss of funding also forecloses future work on interventions in these critical health contexts.

40.     This award includes funds awarded for consortium activity with the Georgetown University, Massachusetts General Hospital, Johns Hopkins University, University of Miami, Northwestern University, University of Alabama at Birmingham, The George Washington University, The Regents of the University of California, Los Angeles, University of Mississippi Medical Center, University of Pittsburgh, Hektoen Institute, and Whitman-Walker Institute, Inc. 12 faculty and 9 staff are affiliated with subcontracted consortium activities. Rutgers, as the direct and primary recipient of NIH grant funds, is accountable to NIH for the performance project, the appropriate expenditures of grant funds by all parties, and all other obligations of the recipient, as specified in the NIH Grants Policy Statement.

**Understanding the Role of Structural Oppression for Suicide Risk among Black Sexual and Gender Minority Adolescents and Young Adults (NIH Project Number 5R01MD018679)**

41.     NIH also terminated the grant funding for a study by Rutgers School of Public Health researchers on the suicide risk of Black sexual and gender minority adolescents and young adults, Project Number 5R01MD018679 on March 20, 2025. The Notice of Award ("NOA") for this grant is attached as Exhibit F. This study aimed to utilize longitudinal research to assess how stigma and systemic racism affect suicidal thoughts and behaviors. The project received its funding from the National Institute on Minority Health and Health Disparities ("NIMHD") in response to a Funding Opportunity Announcement, RFA-MH-22-140, which was aimed at advancing research to better understand risk and resiliency factors for suicide among Black Youth.

42.     The mission of NIMHD is to lead scientific research to improve minority health and eliminate health disparities. To accomplish its mission, NIMHD plans, reviews, coordinates, and evaluates all minority health and health disparities research and activities of the National

9

Institutes of Health; conducts and supports research in minority health and health disparities; promotes and supports the training of a diverse research workforce; translates and disseminates research information; and fosters innovative collaborations and partnerships.

43. The grant was awarded on May 17, 2024 and was intended to fund research faculty and staff, the preparation and distribution of materials, and other incidental research costs associated with the study. Three faculty members and one staff member are affiliated with this project.

44. This grant provided four years of funding and is scheduled to terminate on December 31, 2027. At the time of termination, the total amount spent in the current budget period (May 17, 2024 to December 31, 2024) for this project was $302,860, while the total budget awarded for that time period was $1,131,947. Therefore, the funding lost in 2025 was $829,087, subject to the final close out and adjustment process. The total estimated future loss due to termination is $1,259,174. This includes losses of prospective awards associated with the grant of $633,470 in 2026 and $625,704 in 2027. The reason given for termination was that the program was based on "artificial and non-scientific categories, including amorphous equity objectives." *See* Exhibit E. Rutgers researchers were not referred to any new policy statement or regulation that described the new agency priorities.

45. The termination of the grant results in a loss of funding for two community-based organizations, the Hetrick-Martin Institute and the Whitman-Walker Institute that provide social support and healthcare resources to LGBTQ+ youth. Four faculty members and three staff engaged in subcontracted grant work through the Whitman-Walker Institute will also be adversely impacted. The loss of funding also impedes the study's ability to provide suicide prevention

**Supp. App. 399**

resources, including referrals to mental healthcare, crisis response, and social services for youth found to be at risk for suicide.

### Development of Dual Inhibitors Targeting the Viral Main Protease and the Host Cathepsin L as SARS-CoV-2 Antivirals (NIH Project Number 5R01AI158775-04)

46.     NIH also terminated the grant funding for a study by Rutgers Ernest Mario School of Pharmacy researchers on the development of an antiviral to treat SARS-CoV-2, Project Number 5R01AI158775-04, on March 24, 2025. The Notice of Award ("NOA") for this grant is attached as Exhibit H. The project received its funding from the National Institute of Allergy and Infectious Diseases ("NIAID") in response to a Funding Opportunity Announcement, PAR-20-178, which was aimed at advancing research about SARS-CoV-2 and Coronavirus Disease 2019 ("COVID-19").

47.     NIAID research strives to understand, treat, and ultimately prevent the myriad infectious, immunologic, and allergic diseases that threaten millions of human lives.

48.     The grant was awarded on January 4, 2022, and was intended to fund the development of potent antivirals against severe acute respiratory syndrome coronavirus 2 (SARS-CoV2).  One faculty member and two staff members are affiliated with this project.

49.     This grant provided three years of funding totaling $2,142,404 over that period. At the time of termination, the total amount spent for this project was $1,627,301. Therefore, the funding lost in 2025 was $515,103, subject to the final close out and adjustment process. The reason given for termination was that "[The] grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary." See Exhibit G. Rutgers researchers were not referred to any new policy statement or regulation that described the new agency priorities.

50.     This grant award also includes subcontracted funds for Oklahoma State University, University of Arizona, and the University of South Florida.

**D.  Impacts from NIH Funding Terminations and Delays and Irreparable Harm**

51.     Due to the delays and funding uncertainty, and seeking alternative sources of funding, Rutgers faculty and researchers may be forced to:

   a.   Suspend hiring and reduce research staff hours, which risks the loss of key personnel who may be forced to seek other employment due to these cuts;

   b.   Terminate employment of research staff, who will be forced to seek other employment, and who may also face deportation as a result of a loss of sponsored visas;

   c.   Stop ongoing experiments, compromising time-sensitive components of the research;

   d.   Pause community-based partnerships, disrupting services;

   e.   Delay work on clinical translation, including potential therapeutic development;

52.     Students working in these labs who are relying on research conducted there to obtain their PhDs may see delays in their progression and career development.

53.     Shared research core facilities may need to lay off staff and close.

54.     These delays may cause slowdowns or pauses in hiring new faculty and staff.

**E.  Comparisons Across Administrations**

55.     In prior years, under both Democratic and Republican administrations, our institution never experienced this volume of unexplained delays or procedural breakdowns.

56.     Renewals were routine and predictable. This year, even long-standing, high-performing programs are in limbo.

**Supp. App. 401**

57.     Terminations were exceedingly rare and followed due process. The current approach is without precedent in our experience.

### F.  Admissions, Training and Workforce Disruptions

58.     Rutgers may reduce the number of undergraduate and graduate students admitted.

59.     NIH training grants, including T32 and F31 mechanisms, may be affected by review and award delays.  These training grants are designed to provide resources to institutions so they can train individuals in certain shortage areas (T32 grants), as well as support through predoctoral dissertation research (F31 grants).

60.     The visa status of international postdocs may be at risk visa status due to pending NIH awards that were expected to renew this spring.

### G.  Irreparable Harm

61.     The delays have disrupted and may disrupt ongoing research, as well as setting back Rutgers for research going forward.  Funding gaps may force researchers to abandon studies, miss deadlines, or lose key personnel.

62.     Impacts to studies involving clinical trials for life-saving medications or procedures, and their closure could endanger the lives of patients.

63.     Some of these studies may have the potential to achieve breakthroughs which would have advanced public health, and which may not occur.

64.     Delays may also disrupt community services, student opportunities, and public programs.

65.     In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

**Supp. App. 402**

**Conclusion**

66.    The breakdown in NIH processes is affecting institutional operations, planning, and public health partnerships.    Terminations and delays with no explanation or remedy are undermining confidence in the system.    These harms are ongoing and, in many instances, irreparable.

Signed by:

_John J. Farmer, Jr._  _____
5400300516C24C0...

John J. Farmer, Jr.
Interim Senior Vice President and General Counsel
Rutgers, The State University of New Jersey

Date:  04/02/2025

14

**Supp. App. 403**

# EXHIBIT A



March 11, 2025

Rutgers Biomedical and Health Sciences
Gregory Werhner
Authorized Organizational Official
65 Bergen St. Suite 1 Neward, NJ 07107
Email: gregory.werhner@rutgers.edu

Dear Greg Werhbner:

Funding for Project Number 1R01AG089099-01 is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on September 20, 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[4] According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[5] At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

termination decision,"[6] no corrective action is possible here. The premise of Project Number 1R01AG089099-01 is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls on Behalf of Dr. Ken Santora
Office of Policy for Extramural Research Administration
Office of Extramural Research Administraiton

---

[6] 2024 Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D.
[11] *Id.* § 50.406(a).
[12] *Id.* § 50.406(b).

# EXHIBIT B

Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE ON AGING

Notice of Award
FAIN# R01AG089099
**Federal Award Date**
09/20/2024

| Recipient Information | Federal Award Information |
|---|---|

**Recipient Information**

**1. Recipient Name**
RUTGERS THE STATE UNIVERSITY OF NEW JERSEY
65 BERGEN ST
STE 1
NEWARK, NJ 07107

**2. Congressional District of Recipient**
10

**3. Payment System Identifier (ID)**
1226001086A1

**4. Employer Identification Number (EIN)**
226001086

**5. Data Universal Numbering System (DUNS)**
090299830

**6. Recipient's Unique Entity Identifier**
YVVTQD8CJC79

**7. Project Director or Principal Investigator**
Cui Yang, PHD (Contact)
Associate Professor
cy360@rutgers.edu
732-235-9754

**8. Authorized Official**
Gregory Werhner
gregory.werhner@rutgers.edu

**Federal Agency Information**
**9. Awarding Agency Contact Information**
KRISTINA MICHELLE Smith

NATIONAL INSTITUTE ON AGING

**10. Program Official Contact Information**
Melissa S Gerald
Health Science Administrator
NATIONAL INSTITUTE ON AGING
geraldmel@nia.nih.gov
301-402-4156

**Federal Award Information**

**11. Award Number**
1R01AG089099-01

**12. Unique Federal Award Identification Number (FAIN)**
R01AG089099

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Social Networks and Cognitive Health among Black and Latino sexual minority men in NJ

**15. Assistance Listing Number**
93.866

**16. Assistance Listing Program Title**
Aging Research

**17. Award Action Type**
New Competing

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 09/23/2024 – **End Date** 08/31/2025 | |
| **20.** Total Amount of Federal Funds Obligated by this Action | $739,827 |
| 20 a.  Direct Cost Amount | $511,814 |
| 20 b.  Indirect Cost Amount | $228,013 |
| **21.** Authorized Carryover | |
| **22.** Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $739,827 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $739,827 |
| **26. Project Period Start Date** 09/23/2024 – **End Date** 08/31/2029 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $739,827 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Philip E. Smith

| 30. Remarks |
|---|

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

**Supp. App. 408**



RESEARCH

Notice of Award

Department of Health and Human Services
National Institutes of Health



NATIONAL INSTITUTE ON AGING

---

**SECTION I – AWARD DATA – 1R01AG089099-01**

**Principal Investigator(s):**
Mackey R Friedman, PHD
Henry Fisher Raymond, DPH
Cui  Yang (contact), PHD

**Award e-mailed to:** rsp-rbhs@research.rutgers.edu

Dear Authorized Official:

The National Institutes of Health hereby awards a grant in the amount of $739,827 (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to RUTGERS BIOMEDICAL AND HEALTH SCIENCES in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52 and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute On Aging of the National Institutes of Health under Award Number R01AG089099. The content is solely the responsibility of the authors and does not necessarily represent the official views of   the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Philip E. Smith
Grants Management Officer
NATIONAL INSTITUTE ON AGING

Additional information follows

---

Supp. App. 409

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---:|
| Salaries and Wages | $249,712 |
| Fringe Benefits | $77,709 |
| Personnel Costs (Subtotal) | $327,421 |
| Consultant Services | $1,900 |
| Materials & Supplies | $5,976 |
| Travel | $3,800 |
| Other | $10,925 |
| Subawards/Consortium/Contractual Costs | $161,792 |
| | |
| Federal Direct Costs | $511,814 |
| Federal F&A Costs | $228,013 |
| Approved Budget | $739,827 |
| Total Amount of Federal Funds Authorized (Federal Share) | $739,827 |
| TOTAL FEDERAL AWARD AMOUNT | $739,827 |
| | |
| AMOUNT OF THIS ACTION (FEDERAL SHARE) | $739,827 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 1 | $739,827 | $739,827 |
| 2 | $711,614 | $711,614 |
| 3 | $702,062 | $702,062 |
| 4 | $708,670 | $708,670 |
| 5 | $711,412 | $711,412 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**Fiscal Information:**
| | |
|---|---|
| Payment System Identifier: | 1226001086A1 |
| Document Number: | RAG089099A |
| PMS Account Type: | P (Subaccount) |
| Fiscal Year: | 2024 |

| IC | CAN | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|
| AG | 8470694 | $739,827 | $711,614 | $702,062 | $708,670 | $711,412 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**NIH Administrative Data:**
**PCC**: 2BFAMGE / **OC**: 41021 / **Released**: 09/19/2024
**Award Processed:** 09/20/2024 12:16:23 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 1R01AG089099-01**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 1R01AG089099-01**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

   a. The grant program legislation and program regulation cited in this Notice of Award.
   b. Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
   c. 45 CFR Part 75.
   d. National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
   e. Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
   f. This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

**Supp. App. 410**

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM). Should a consortium/subaward be issued under this award, a UEI requirement must be included. See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01AG089099. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-

**Supp. App. 411**

discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – AG SPECIFIC AWARD CONDITIONS – 1R01AG089099-01**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

**RESTRICTION:** The present award is being made without a currently valid certification of IRB approval for this project with the following restriction: Only activities that are clearly severable and independent from activities that involve human subjects may be conducted pending the National Institute on Aging's acceptance of the certification of IRB approval.
No funds may be drawn down from the payment system and no obligations may be made against Federal funds for any research involving human subjects prior to the National Institute on Aging's notification to the grantee that the identified issues have been resolved and this restriction removed.

Failure to respond within the 60-day period and/or to otherwise comply with the above requirements may result in suspension and/or termination of this award, audit/or disallowances, and/or other appropriate action.

See the NIH Grants Policy Statement, Chapter 4.1.15 Human Subjects Protections (http://grants.nih.gov/grants/policy/nihgps/HTML5/section_4/4_public_policy_requirements__objectives_and_other_appropriation_mandates.htm), for specific requirements related to the protection of human subjects, which are applicable to and a term and condition of this award.
 ******

This award includes funds awarded for consortium activity with **University of Pittsburgh** in the amount of $44,504 ($27,990 direct costs + $16,514 facilities and administrative costs). Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS).  The referenced section of the NIH Grants Policy Statement is available at:
http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm

This award includes funds awarded for consortium activity with **NJCRI** in the amount of $115,842 ($93,046 direct costs + $22,796 facilities and administrative costs). Consortiums are to be established and administered as described in the NIH Grants Policy Statement (NIH GPS).  The referenced section of the NIH Grants Policy Statement is available at:

Supp. App. 412

http://grants.nih.gov/grants/policy/nihgps/HTML5/section_15/15 consortium_agreements.htm
******

In keeping with NOT-OD-06-054 (http://grants.nih.gov/grants/guide/notice-files/NOT-OD-06-054.html), as this grant has multiple Principal Investigators (PIs), although the signatures of the PIs are not required on prior approval requests submitted to the agency, the grantee institution must secure and retain the signatures of all of the PIs within their own internal processes.

Data Management and Sharing Policy: Applicable

This project is expected to generate scientific data. Therefore, the Final NIH Policy for Data Management and Sharing applies. The approved Data Management and Sharing (DMS) Plan is hereby incorporated as a term and condition of award, and the recipient shall manage and disseminate scientific data in accordance with the approved plan. Any significant changes to the DMS Plan (e.g., new scientific direction, a different data repository, or a timeline revision) require NIH prior approval. Failure to comply with the approved DMS plan may result in suspension and/or termination of this award, withholding of support, audit disallowances, and/or other appropriate action. See NIH Grants Policy Statement Section 8.2.3 for more information on data management and sharing expectations.

| Budget | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| DMS Costs | $0 | $0 | $0 | $0 | $0 |

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 1R01AG089099-01

**INSTITUTION:** RUTGERS BIOMEDICAL AND HEALTH SCIENCES

| Budget | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Salaries and Wages | $249,712 | $263,026 | $259,606 | $259,606 | $249,711 |
| Fringe Benefits | $77,709 | $81,852 | $80,788 | $80,788 | $77,709 |
| Personnel Costs (Subtotal) | $327,421 | $344,878 | $340,394 | $340,394 | $327,420 |
| Consultant Services | $1,900 | $950 | $950 | $950 | $2,850 |
| Materials & Supplies | $5,976 | $1,716 | | | $977 |
| Travel | $3,800 | $25,793 | $23,228 | $27,287 | $26,505 |
| Other | $10,925 | $4,275 | $1,900 | $4,275 | $19,950 |
| Subawards/Consortium/Contractual Costs | $161,792 | $118,763 | $126,701 | $115,750 | $110,962 |
| Publication Costs | | | | $4,750 | $4,750 |
| TOTAL FEDERAL DC | $511,814 | $496,375 | $493,173 | $493,406 | $493,414 |
| TOTAL FEDERAL F&A | $228,013 | $215,239 | $208,889 | $215,264 | $217,998 |
| TOTAL COST | $739,827 | $711,614 | $702,062 | $708,670 | $711,412 |

| Facilities and Administrative Costs | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| F&A Cost Rate 1 | 57% | 57% | 57% | 57% | 57% |
| F&A Cost Base 1 | $400,022 | $377,612 | $366,472 | $377,656 | $382,452 |
| F&A Costs 1 | $228,013 | $215,239 | $208,889 | $215,264 | $217,998 |

**Supp. App. 413**

# EXHIBIT C

 

03/20/2025

Gregory Werhner
RUTGERS BIOMEDICAL AND HEALTH SCIENCES
rsp-rbhs@research.rutgers.edu


Dear Gregory Werhner:

Effective with the date of this letter, funding for Project Number 5R01HL160326-05 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 09/01/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs. Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

**Supp. App. 415**

an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,



Michelle G. Bulls, on behalf of Anthony Agresti, Chief Grants Management Officer, National Heart, Lung, and Blood Institute
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT D

National Institutes of Health
NATIONAL HEART, LUNG, AND BLOOD INSTITUTE

---

## Recipient Information

**1. Recipient Name**
RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY
65 BERGEN ST

NEWARK, 07107

**2. Congressional District of Recipient**
10

**3. Payment System Identifier (ID)**
1226001086A1

**4. Employer Identification Number (EIN)**
226001086

**5. Data Universal Numbering System (DUNS)**
090299830

**6. Recipient's Unique Entity Identifier**
YVVTQD8CJC79

**7. Project Director or Principal Investigator**
Mackey R Friedman, PHD
Associate Professor
mf1061@rutgers.edu
973-972-1465

**8. Authorized Official**
Gregory Werhner

## Federal Agency Information

**9. Awarding Agency Contact Information**
FATU Kamara
Grants Management Specialist
NATIONAL HEART, LUNG, AND BLOOD INSTITUTE
fatima.kamara@nih.gov
301-435-7916

**10. Program Official Contact Information**
Sean Coady
Program Officer
NATIONAL HEART, LUNG, AND BLOOD INSTITUTE
coadys@mail.nih.gov
301-453-1289

## Federal Award Information

**11. Award Number**
7R01HL160326-03

**12. Unique Federal Award Identification Number (FAIN)**
R01HL160326

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Stigma and the non-communicable disease syndemic in aging HIV positive and HIV negative MSM

**15. Assistance Listing Number**
93.837

**16. Assistance Listing Program Title**
Cardiovascular Diseases Research

**17. Award Action Type**
Change of Recipient Organization

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 02/01/2023 – **End Date** 08/31/2023 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $716,170 |
| 20 a.  Direct Cost Amount | $551,597 |
| 20 b.  Indirect Cost Amount | $164,573 |
| **21.** Authorized Carryover | |
| **22.** Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $716,170 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $716,170 |
| ------------------------------------------------------------------- | |
| **26. Project Period Start Date** 02/01/2023 – **End Date** 08/31/2026 | |
| **27.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $716,170 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
John Diggs

**30. Remarks**

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

**Supp. App. 418**



Notice of Award

RESEARCH
Department of Health and Human Services
National Institutes of Health



NATIONAL HEART, LUNG, AND BLOOD INSTITUTE

---

**SECTION I – AWARD DATA – 7R01HL160326-03**

**Principal Investigator(s):**
Mackey R Friedman, PHD

**Award e-mailed to:** rsp-rbhs@research.rutgers.edu

Dear Authorized Official:

The National Institutes of Health hereby awards a grant in the amount of $716,170 (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to RUTGERS BIOMEDICAL AND HEALTH SCIENCES in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Heart, Lung, And Blood Institute of the National Institutes of Health under Award Number R01HL160326. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

John  Diggs
Grants Management Officer
NATIONAL HEART, LUNG, AND BLOOD INSTITUTE

Additional information follows

---

**Supp. App. 419**

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---|
| Salaries and Wages | $9,715 |
| Fringe Benefits | $5,998 |
| Personnel Costs (Subtotal) | $15,713 |
| Subawards/Consortium/Contractual Costs | $535,884 |
| | |
| Federal Direct Costs | $551,597 |
| Federal F&A Costs | $164,573 |
| Approved Budget | $716,170 |
| Total Amount of Federal Funds Authorized (Federal Share) | $716,170 |
| TOTAL FEDERAL AWARD AMOUNT | $716,170 |
| | |
| AMOUNT OF THIS ACTION (FEDERAL SHARE) | $716,170 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 3 | $716,170 | $716,170 |
| 4 | $599,297 | $599,297 |
| 5 | $507,184 | $507,184 |
| 6 | $487,894 | $487,894 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**Fiscal Information:**

| | |
|---|---|
| Payment System Identifier: | 1226001086A1 |
| Document Number: | RHL160326B |
| PMS Account Type: | P (Subaccount) |
| Fiscal Year: | 2022 |

| IC | CAN | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| HL | 8475158 | $716,170 | $599,297 | $507,184 | $487,894 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**NIH Administrative Data:**
**PCC**: HHEF A / **OC**: 41025 / **Released**: Diggs, John 01/27/2023
**Award Processed**: 02/01/2023 12:18:56 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 7R01HL160326-03**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 7R01HL160326-03**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

    a.   The grant program legislation and program regulation cited in this Notice of Award.

Version: 13 - 8/3/2022 12:59 PM | Generated on: 2/1/2023 12:18 AM
**Supp. App. 420**

    b.   Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.

    c.   45 CFR Part 75.

    d.   National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.

    e.   Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.

    f.   This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.**2.** As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.   See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01HL160326. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

**Supp. App. 421**

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.
**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – HL SPECIFIC AWARD CONDITIONS – 7R01HL160326-03**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

**CHANGE OF RECIPIENT INSTITUTION**
This award reflects an approved change of recipient institution. The funds released by University of Pittsburgh are in accordance with the relinquishing statement dated December 1, 2022 and are an estimated balance. If the unobligated balance from University of Pittsburgh has been overestimated, it may be necessary to reduce the amount of this award.

**NHLBI FUNDING GUIDELINES**
This award is being issued in accordance with the NHLBI FY 2022 Operating Guidelines which can be found at: https://www.nhlbi.nih.gov/current-operating-guidelines

**CONSORTIUM/CONTRACTUAL**
This award includes funds awarded for consortium activity with the Georgetown University, Massachusetts General Hospital, Johns Hopkins University, University of Miami, Northwestern University, University of Alabama at Birmingham, The George Washington University, The Regents of the University of California, Los Angeles, University of Mississippi Medical Center, University of Pittsburgh, Hektoen Institute, and Whitman-Walker Institute, Inc. The recipient, as the direct and primary recipient of NIH grant funds, is accountable to NIH for the performance

Supp. App. 422

project, the appropriate expenditures of grant funds by all parties, and all other obligations of the recipient, as specified in the NIH Grants Policy Statement. In general, the requirements that apply to the recipient, including the intellectual property requirements also apply to consortium participant(s).

**MILESTONE ACCRUAL PLAN (MAP)**
NHLBI support of this study is contingent upon adequate participant recruitment based on the recipient's Milestone Accrual Plan dated (9/8/21). The recipient is expected to demonstrate best effort compliance in accordance with the NHLBI Milestone Accrual Policy (https://www.nhlbi.nih.gov/grants-and-training/policies-and-guidelines/accrual-of-human-subjectsmilestones-policy.) Failure to achieve minimally acceptable milestone recruitment levels may result in the withholding of future support and/or negotiating an orderly close-out of this study.

**FOREIGN COMPONENT**
This award includes funding for the following foreign sites:

- Technische University Dresden (Dresden, Germany)

Any additions of foreign sites requires NIH prior approval.

**FOREIGN TRAVEL**
Recipients must comply with the requirements of the Fly America Act (49 U.S.C. 40118) which generally provides that foreign air travel funded by Federal funds may only be conducted on U.S. flag air carriers and under applicable Open Skies Agreements.

**PRIOR APPROVAL REQUEST**
It is recommended that applicable prior approval requests be submitted via the eRA Commons Prior Approval Module (link: prior_approval (nih.gov)). Please refer to Part II Chapter 8 of the NIH Grants Policy Statement for the activities and/or expenditures that require NIH approval at http://grants.nih.gov/grants/policy/nihgps/nihgps.pdf

**NON-COMPETING RENEWAL (SNAP)**
The NIH requires the use of the Research Performance Progress Report (RPPR) for all Type 5 progress reports. The RPPR and other documents applicable to this SNAP grant are due the 15th of the month preceding the month in which the budget period ends (e.g., if the budget period ends 11/30, the due date is 10/15). Please see http://grants.nih.gov/grants/rppr/index.htm for additional information on the RPPR.

**SPREADSHEET SUMMARY**
**AWARD NUMBER: 7R01HL160326-03**

**INSTITUTION:** RUTGERS BIOMEDICAL AND HEALTH SCIENCES

| Budget | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|
| Salaries and Wages | $9,715 | $1,889 | $9,310 | $4,183 |
| Fringe Benefits | $5,998 | $1,166 | $5,748 | $2,582 |
| Personnel Costs (Subtotal) | $15,713 | $3,055 | $15,058 | $6,765 |
| Subawards/Consortium/Contractual Costs | $535,884 | $579,117 | $483,543 | $477,273 |
| TOTAL FEDERAL DC | $551,597 | $582,172 | $498,601 | $484,038 |
| TOTAL FEDERAL F&A | $164,573 | $17,125 | $8,583 | $3,856 |
| TOTAL COST | $716,170 | $599,297 | $507,184 | $487,894 |

Supp. App. 423

| Facilities and Administrative Costs | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|
| F&A Cost Rate 1 | 57% | 57% | 57% | 57% |
| F&A Cost Base 1 | $288,725 | $30,043 | $15,058 | $6,765 |
| F&A Costs 1 | $164,573 | $17,125 | $8,583 | $3,856 |

**Supp. App. 424**

# EXHIBIT E

 

03/20/2025

Gregory Werhner
RUTGERS BIOMEDICAL AND HEALTH SCIENCES
rsp-rbhs@research.rutgers.edu

Dear Gregory Werhner:

Effective with the date of this letter, funding for Project Number 5R01HL160326-05 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 09/01/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs. Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

**Supp. App. 426**

an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls, on behalf of Anthony Agresti, Chief Grants Management Officer, National Heart, Lung, and Blood Institute
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

**Supp. App. 427**

# EXHIBIT F

Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE ON MINOFIT# HEALTH ANR HEALTH
RISPAFITIES

8AINY F01MR01WJ69
**Federal Award Date**
05/16/2024

## Recipient Information

**1. Recipient Name**
FUTGEFS THE STATE UNIVEFSIT# O8 NEB
KEFSE#
J5 , EFGEN ST
STE 1
NEB AF73NK 06106

**2. Congressional District of Recipient**
10

**3. Payment System Identifier (ID)**
122J0010WJA1

**4. Employer Identification Number (EIN)**
22J0010WJ

**5. Data Universal Numbering System (DUNS)**
090299WQ0

**' . Recipients Uni7ue Entity Identifier**
#VVTDRWCKC69

**6. Project Director or Principal Investigator**
Re( in English3PHR cConta) ty

de( in@nglish. rutgers@du
96Q-962-1655

**8. Authorized Official**
GregorwB erhner

## Federal Agency Information

**9. Awarding Agency Contact Information**
SwSha) mteford

NATIONAL INSTITUTE ON MINOFIT#
HEALTH ANR HEALTH RISPAFITIES
sha) mtefords. v ail@ih@o(
Q01-402-1QJJ

**10. Program Official Contact Information**
Crwstal , armsdale
Health S) ientist Adv inistrator/krograv
Offi) ial
NATIONAL INSTITUTE ON MINOFIT#
HEALTH ANR HEALTH RISPAFITIES
) rwstal@arnsdale. nih@o(
Q01-402-1QJJ

## Federal Award Information

**11. Award Number**
1F01MR01WJ69-01A1

**12. Uni7ue Federal Award Identification Number (FAIN)**
F01MR01WJ69

**13. Statutory Authority**
42 USC 241 42 C8F 52

**14. Federal Award Project Title**
Understanding the Fole of Stru) tural Okkression for Sui) ide Fismav ong , la) mSepual
and Gender MinoritwAdoles) ents and #oung Adults

**15. Assistance Listing Number**
9Q@06

**1' . Assistance Listing Program Title**
MinoritwHealth and Health Riskarities Fesear) h

**16. Award Action Type**
Ne$ Cov keting

**18. Is the Award R&D?**
#es

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 05/16/2024 **– End Date** 12/Q1/2024 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | b6023 45 |
| 20 a@Rire) t Cost Av ount | b5293 1W |
| 20 x@Indire) t Cost Av ount | b16Q026 |
| **21.** Authorized Carrwo( er | |
| **22.** Offset | |
| **23.** Total Av ount of 8ederal 8unds Oxligated this xudget keriod | b6023 45 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | b0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | b6023 45 |
| **2' . Project Period Start Date** 05/16/2024 **– End Date** 12/Q1/2026 | |
| **26.** Total Av ount of the 8ederal A$ ard in) luding Akkro( ed Cost Sharing or Mat) hing this Proje) t Period | b6023 45 |
| **28. Authorized Treatment of Program Income** Additional Costs | |
| **29. Grants Management Officer - Signature** Pris) illa Grant | |

## 30. Remarks

A) ) ektan) e of this a$ ard3in) luding the "Terv s and Conditions3 is a) nno$ ledged xwthe re) ikient $ hen funds are dra$ n do$ n or
other$ ise requested frov the grant kaw ent swstev @

**Supp. App. 429**



Noti) e of A$ ard

RESEARCH
Rekartv ent of Health and Huv an Ser(i) es
National Institutes of Health



NATIONAL INSTITUTE ON MINOFIT# HEALTH ANR HEALTH RISPAFITIES

---

**SECTION I – AWARD DATA – 1R01MD018' 69-01A1**

**Principal Investigator(s):**
Ranielle FeNaw, usxw8PHR
Re(in English c) onta) ty3PHR

**Award e-mailed to:** rsk-rxhs. resear) h@utgers@du

Rear Authorized Offi) ial:

The National Institutes of Health herexwa$ ards a grant in the av ount of b6023¡45 csee "A$ ard Cal) ulation" in Se) tion I and "Terv s and Conditions" in Se) tion IIIy to FUTGEFS , IOMERICAL ANR HEALTH SCIENCES in sukkort of the axo( e referen) ed kroje) t@This a$ ard is kursuant to the authoritwof 42 USC 241 42 C8F 52 and is suxje) t to the requirev ents of this statute and regulation and of other referen) ed3in) orkorated or atta) hed terv s and ) onditions@

A) ) ektan) e of this a$ ard3in) luding the "Terv s and Conditions"3 is a) mo$ ledged xwthe re) ikient $ hen funds are dra$ n do$ n or other$ ise requested frov the grant kaw ent swstev @

Ea) h kuxli) ation3kress release3or other do) uv ent axout resear) h sukkorted xwan NIH a$ ard v ust in) lude an a) mo$ ledgv ent of NIH a$ ard sukkort and a dis) laiv er su) h as "Fesear) h rekorted in this kuxli) ation $ as sukkorted xwthe National Institute On MinoritwHealth And Health Riskarities of the National Institutes of Health under A$ ard Nuv xer F01MR01W69@The ) ontent is solelwthe reskonsixilitwof the authors and does not ne) essarilwrekresent the offi) ial (ie$ s of  the National Institutes of Health@Prior to issuing a kress release ) on) erning the out) ov e of this resear) h3klease notifwthe NIH a$ arding IC in ad( an) e to allo$  for ) oordination@

A$ ard re) ikients v ust krov ote oxje) ti( itwin resear) h xwestaxlishing standards that kro( ide a reasonaxle epke) tation that the design3) ondu) t and rekorting of resear) h funded under NIH a$ ards $ ill xe free frov xias resulting frov  an In( estigator's 8inan) ial Confli) t of Interest c8COIy3in a) ) ordan) e $ ith the 2011 re( ised regulation at 42 C8F Part 50 Suxkart 8@The Institution shall suxv it all 8COI rekorts to the NIH through the eFA Cov v ons 8COI Module@The regulation does not akklwto Phase I Sv all , usiness Inno( ati( e Fesear) h cS, IFy and Sv all , usiness Te) hnologwTransfer cSTTFya$ ards@Consult the NIH $ exsite [httk://grants@ih@o( /grants/koli) w) oi/](htt://grants@ih@o( /grants/koli) w) oi/) for a linmto the regulation and additional iv kortant inforv ation@

If wou ha( e anwquestions axout this a$ ard3klease dire) t questions to the 8ederal Agen) w) onta) ts@

Sin) erelwwours3

Pris) illa Grant
Grants Managev ent Offi) er
NATIONAL INSTITUTE ON MINOFIT# HEALTH ANR HEALTH RISPAFITIES

Additional inforv ation follo$ s

---

Version: 35 - 3/15/2024 9:51 AM | Generated on: 5/16/2024 12:25 AM

Supp. App. 430

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---|
| Salaries and Wages | bJW4JQ |
| Fringe Benefits | bQ239W |
| Personnel Costs (Subtotal) | b1005J1 |
| Consultant Services | bQ4300 |
| Materials & Supplies | b955W |
| Travel | b1594 |
| Other | bJ63JJ |
| Subawards/Consortium/Contractual Costs | bQ1J0Q9 |
| | |
| Federal Direct Costs | b5293J1W |
| Federal F&A Costs | b16Q026 |
| Approved Budget | b6023J45 |
| Total Amount of Federal Funds Authorized (Federal Share) | b6023J45 |
| TOTAL FEDERAL AWARD AMOUNT | b6023J45 |
| | |
| AMOUNT OF THIS ACTION (FEDERAL SHARE) | b6023J45 |

| SUMMARY TOTALS FOR ALL YEARS (for this Ro) uv ent Nuv xery | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 1 | b6023J45 | b6023J45 |
| 2 | bJ463J0W | bJ463J0W |
| Q | bJQQ3460 | bJQQ3460 |
| 4 | bJ253604 | bJ253604 |

Fe) ov v ended future wear total ) ost sukkort3suxje) t to the a( ailaxilitwof funds and satisfa) torwkrogress of the kroje) t

**Fiscal Information:**

| | |
|---|---|
| Payment System Identifier: | 122J0010WJA1 |
| Document Number: | FMR01WJ69A |
| PMS Account Type: | P (Suxa) ) ounty |
| Fiscal Year: | 2024 |

| IC | CAN | 2024 | 2025 | 202J | 2026 |
|---|---|---|---|---|---|
| MR | W462JW6 | b6023J45 | bJ463J0W | bJQQ3460 | bJ253604 |

Fe) ov v ended future wear total ) ost sukkort3suxje) t to the a( ailaxilitwof funds and satisfa) torwkrogress of the kroje) t

**NIH Administrative Data:**
**PCC**: CPS02 / **OC**: 41021 / **Released**: 05/10/2024
**Award Processed**: 05/16/2024 12:25:1J AM

## SECTION II – PAYMENT/HOTLINE INFORMATION – 1R01MD018' 69-01A1

8or kaw ent and HHS Offi) e of Inske) tor General Hotline inforv ation3see the NIH Hov e Page at
[httk://grants@ih@o(/grants/koli) waS ard) onditions@tv](httk://grants@ih@o(/grants/koli) waS ard) onditions@tv)

## SECTION III – STANDARD TERMS AND CONDITIONS – 1R01MD018' 69-01A1

This aS ard is xased on the akkli) ation suxv itted to3and as akkro( ed xw8NIH on the axo( e-titled kroje) t and is suxje) t to the terv s and ) onditions in) orkorated either dire) tlwor xwreferen) e in the follo$ ing:

a@ The grant krograv legislation and krograv regulation ) ited in this Noti) e of AS ard@
x@ Conditions on a) ti( ities and epkenditure of funds in other statutorwrequirev ents3su) h as
those in) luded in akkrokriations a) ts@
) @ 45 C8F Part 65@
d@ National Poli) wFequirev ents and all other requirev ents des) rixed in the NIH Grants Poli) w
Statev ent3in) luding addenda in effe) t as of the xeginning date of the xudget keriod@
e@ 8ederal AS ard Perforv an) e Goals: As required xwthe keriodi) rekort in the FPPF or in the final
krogress rekort $ hen akkli) axle@
f@ This aS ard noti) e3INCLURING THE TEFMS ANR CONRITIONS CITER , ELOB @

**Supp. App. 431**

cSee NIH Hov e Page at http://grants.nih.go(/grants/koli) wa$) ard) onditions@tv for ) ertain referen) es ) ited axo( e@

**Research and Development (R&D):** All a$ ards issued xwthe National Institutes of Health cNIHy v eet the definition of "Fesear) h and Re( elokv ent" at 45 C8F Part§ 65@. As su) h3auditees should identifwNIH a$ ards as kart of the F&R ) luster on the S) hedule of Epkenditures of 8ederal A$ ards cSE8Ay@The auditor should test NIH a$ ards for ) ov klian) e as instru) ted in Part V3Clusters of Prograv s@NIH re) ognizes that sov e a$ ards v awha( e another ) lassifi) ation for kurkoses of indire) t ) osts@The auditor is not required to rekort the dis) onne) t d @@.the a$ ard is ) lassified as F&R for 8ederal Audit Fequirev ent kurkoses xut non-resear) h for indire) t ) ost rate kurkosesy3unless the auditee is ) harging indire) t ) osts at a rate other than the rate csyske) ified in the a$ ard do) uv ent csy@

An unoxligated xalan) e v awxe ) arried o( er into the nept xudget keriod $ ithout Grants Managev ent Offi) er krior akkro( al@

This grant is suxje) t to Streav lined Non) ov keting A$ ard Pro) edures cSNAPy@

This a$ ard is suxje) t to the requirev ents of 2 C8F Part 25 for institutions to oxtain a unique entitwidentifier dJEIy and v aintain an a) ti( e registration in the Swstev for A$ ard Managev ent cSAMy@Should a ) onsortiuv /suxa$ ard xe issued under this a$ ard3a UEI requirev ent v ust xe in) luded@See http://grants.nih.go(/grants/koli) wa$) ard) onditions@tv for the full NIH a$ ard terv iv klev enting this requirev ent and other additional inforv ation@

This a$ ard has xeen assigned the 8ederal A$ ard Identifi) ation Nuv xer c8AINy F01MR01WJ69@Fe) ikients v ust do) uv ent the assigned 8AIN on ea) h ) onsortiuv /suxa$ ard issued under this a$ ard@

, ased on the kroje) t keriod start date of this kroje) t3this a$ ard is linelwsuxje) t to the Transkaren) wA) t suxa$ ard and epe) uti( e ) ov kensation rekorting requirev ent of 2 C8F Part 160@There are ) onditions that v awep) lude this a$ ard; see http://grants.nih.go(/grants/koli) wa$) ard) onditions@tv for additional a$ ard akkli) axilitwinforv ation@

In a) ) ordan) e $ ith P(@010-1J13) ov klian) e $ ith the NIH Puxli) A) ) ess Poli) wis no$ v andatorw@8or v ore inforv ation3see NOT-OR-0W0QQ and the Puxli) A) ) ess $ exsite: http://kuxli) a) ) ess.nih.go(/@

Fe) ikients v ust adv inister the kroje) t in ) ov klian) e $ ith federal ) i( il rights la$ s that krohixit dis) riv ination on the xasis of ra) e3) olor3national origin3disaxilitw3age3and ) ov klw$ ith akkli) axle ) ons) ien) e krote) tions@The re) ikient $ ill ) ov klw$ ith akkli) axle la$ s that krohixit dis) riv ination on the xasis of sep3$ hi) h in) ludes dis) riv ination on the xasis of gender identitw3sepual orientation3and kregnan) w@Cov klian) e $ ith these la$ s requires taning reasonaxle steks to kro( ide v eaningful a) ) ess to kersons $ ith liv ited English krofi) ien) wand kro( iding krograv s that are a) ) essixle to and usaxle xw kersons $ ith disaxilities@The HHS Offi) e for Ci( il Fights kro( ides guidan) e on ) ov klwing $ ith ) i( il rights la$ s enfor) ed xwHHS@See https://$ $ $ @hhs.go( /) i( il-rights/for-kro( iders/kro( ider-oxligations/indep@tv l and https://$ $ $ @hhs.go( /@

- Fe) ikients of 88A v ust ensure that their krograv s are a) ) essixle to kersons $ ith liv ited English krofi) ien) w@8or guidan) e on v eeting the legal oxligation to tane reasonaxle steks to ensure v eaningful a) ) ess to krograv s or a) ti( ities xwliv ited English krofi) ient indi( iduals3 see https://$ $ $ @hhs.go( /) i( il-rights/for-indi( iduals/ske) ial-toki) s/liv ited-english-krofi) ien) wfa) t-sheet-guidan) e/indep@tv l and https://$ $ $ @lek.go( /@
- 8or inforv ation on an institution's ske) ifi) legal oxligations for ser( ing qualified indi( iduals $ ith disaxilities3in) luding kro( iding krograv a) ) ess3reasonaxle v odifi) ations3and to kro( ide effe) ti( e ) ov v uni) ation3see http://$ $ $ @hhs.go( /o) r/) i( ilrights/understanding/disaxilitwindep@tv l@
- HHS funded health and edu) ation krograv s v ust xe adv inistered in an en( ironv ent free of sepual harassv ent; see https://$ $ $ @hhs.go( /) i( il-rights/for-indi( iduals/sep-dis) riv ination/indep@tv l@ 8or inforv ation axout NIH's ) ov v itv ent to sukkorting a safe and reske) tful $ ormen( ironv ent3 $ ho to ) onta) t $ ith questions or ) on) erns3and $ hat NIH's epke) tations are for institutions and the indi( iduals sukkorted on NIH-funded a$ ards3klease see https://grants.nih.go( /grants/koli) wharassv ent@tv @
- 8or guidan) e on adv inistering krograv s in ) ov klian) e $ ith akkli) axle federal religious nondis) riv ination la$ s and akkli) axle federal ) ons) ien) e krote) tion and asso) iated anti-

Version: 35 - 2/15/2024 4:51 AM | Generated on: 5/16/2024 12:25 AM

**Supp. App. 432**

dis) riv ination la$ s3see httks://$ $ $ @hs@o(/) ons) ien) e/) ons) ien) e-krote) tions/indep@tv l and httks://$ $ $ @hs@o(/) ons) ien) e/religious-freedov /indep@tv l@

In a) ) ordan) e $ ith the regulatorwrequirev ents kro( ided at 45 C8F 65@1Q and Akkendip XII to 45 C8F Part 653re) ikients that ha( e ) urrentlwa) ti( e 8ederal grants3) ookerati( e agreev ents3and kro) urev ent ) ontra) ts $ ith ) uv ulati( e total ( alue greater than b10300030 v ust rekort and v aintain inforv ation in the Swstev for A$ ard Managev ent cSAMy axout ) i( il3) riv inal3and adv inistrati( e kro) eedings in ) onne) tion $ ith the a$ ard or kerforv an) e of a 8ederal a$ ard that rea) hed final diskosition $ ithin the v ost re) ent fi( e-wear keriod@The re) ikient v ust also v ane sev iannual dis) losures regarding su) h kro) eedings@Pro) eedings inforv ation $ ill xe v ade kuxli) lwa( ailaxle in the designated integritwand kerforv an) e swstev c) urrentlw the 8ederal A$ ardee Perforv an) e and IntegritwInforv ation Swstev c3APIISy@6ull rekorting requirev ents and kro) edures are found in Akkendip XII to 45 C8F Part 65@This terv does not akklwto NIH fello$ ships@

**Treatment of Program Income:**
Additional Costs

---

### SECTION IV – MD SPECIFIC AWARD CONDITIONS – 1R01MD018' 69-01A1

Clini) al Trial Indi) ator: No
This a$ ard does not sukkort anwNIH-defined Clini) al Trials@See the NIH Grants Poli) wStatev ent Se) tion 1@ for NIH definition of Clini) al Trial@

<u>INFORMATION</u>: In accordance with the National Institute on Minority Health and Health Disparities' (NIMHD's) Fiscal Year (FY) 2024 funding policies, this award has been issued at 85% of the adjusted requested level. Future year committed levels* have been adjusted accordingly.

 *committed level: The level of support calculated by applying the NIMHD funding plan to the corrected recommended level for each budget category for all years of the project period.

<u>REQUIREMENT</u>: This award is subject to the conditions set forth in RFA-MH-22-140, Understanding Suicide Risk and Protective Factors among Black Youth (R01 Clinical Trial Not Allowed), NIH Guide to Grants and Contracts, 03/22/2022, which is hereby incorporated by reference as special terms and conditions of this award.

Copies of this RFA may be accessed at the following internet address: https://grants.nih.gov/grants/guide/rfa-files/RFA-MH-22-140.html

Copies may also be obtained from the Grants Management Contact indicated in the terms of award.

<u>REQUIREMENT</u>: The awardee is required to follow the Data Management and Sharing Plan included in the 4/29/24 JIT and may not implement any changes in the plan without the written prior approval of the National Institute on Minority Health and Health Disparities.

<u>INFORMATION</u>: In order to redistribute awards more evenly throughout the year, budget periods are being adjusted. This award is issued with a shortened budget period and with 12 months of support. Continuation awards will cycle each year on January 1st.

<u>INFORMATION</u>: Although the budget period start date for this award is May 17th, this award includes funds for 12 months of support. Future year budget periods will cycle on January 1st. Allowable pre-award costs may be charged to this award, in accordance with the conditions outlined in the NIH Grants Policy Statement, and with

institutional requirements for prior approval. The NIH GPS can be found on the internet at http://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

**INFORMATION**: This award reflects the NIMHD's acceptance of the certification that all key personnel have completed education on the protection of human subjects, in accordance with NIH policy, "Required Education in the Protection of Human Research Participants," as announced in the June 5, 2000 NIH Guide (revised August 25, 2000) (http://grants.nih.gov/grants/guide/notice-files/NOT-OD-00-039.html).

Any individual involved in the design and conduct of the study that is not included in the certification must satisfy this requirement prior to participating in the project. Failure to comply can result in the suspension and/or termination of this award, withholding of support of the continuation award, audit disallowances, and/or other appropriate action.

**INFORMATION**:  Unobligated balances may be used by the NIMHD to reduce or offset funding for a subsequent budget period.

Rata Managev ent and Sharing Poli) w Akkli) axle

This kroje) t is epke) ted to generate s) ientifi) data@Therefore3the 8inal NIH Poli) wfor Rata Managev ent and Sharing akklies@The akkro( ed Rata Managev ent and Sharing dRMSy Plan is herexwin) orkorated as a terv  and ) ondition of a$ ard3and the re) ikient shall v anage and dissev inate s) ientifi) data in a) ) ordan) e $ ith the akkro( ed klan@Anwsignifi) ant ) hanges to the RMS Plan œ@@ne$ ) ientifi) dire) tion3a different data rekositorw3or a tiv eline re( isionywill require NIH krior akkro( al@8ailure to ) ov klw$ ith the akkro( ed RMS klan v awresult in suskension and/or terv ination of this a$ ard3$ ithholding of sukkort3audit disallo$ an) es3 and/or other akkrokriate a) tion@8ee NIH Grants Poli) wStatev ent Se) tion W@@ for v ore inforv ation on data v anagev ent and sharing epke) tations@

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 1F01MR01WJ69-01A1

**INSTITUTION:** FUTGEFS , IOMERICAL ANR HEALTH SCIENCES

| , udget | #ear 1 | #ear 2 | #ear Q | #ear 4 |
|---------|--------|--------|--------|--------|
| Salaries and B ages | bJW$ 4JQ | bJW$ 4JQ | bJW$ 4JQ | bJW$ 4JQ |
| 8ringe , enefits | bQ2 09W | bQ2 09W | bQ2 09W | bQ2 09W |
| Personnel Costs cSuxtotaly | b1005 J1 | b1005 J1 | b1005 J1 | b1005 J1 |
| Consultant Ser( i) es | bQ4 000 | b16 000 | b12 650 | b12 650 |
| Materials & Sukklies | b9 55W | b1 Q3 J6 | bW 60W | bW 60W |
| Tra( el | b1 594 | b2 096 | b1 399 | b4 652 |
| Other | bJ6 0JJ | b65 5JJ | b69 M1 J | b61 Q1 J |
| Suxa$ ards/Consortiuv /Co ntra) tual Costs | bQ1 J 0Q9 | bQ14 606 | bQ14 606 | bQ14 606 |
| TOTAL 8EREFAL RC | b529 01W | b52Q 09W | b516 641 | b512 694 |
| TOTAL 8EREFAL 8&A | b16Q 026 | b124 210 | b115 629 | b112 910 |
| TOTAL COST | b602 045 | bJ46 J0W | bJQQ 460 | bJ25 604 |

| 8a) ilities and Adv inistrati( e Costs | #ear 1 | #ear 2 | #ear Q | #ear 4 |
|---------|--------|--------|--------|--------|
| 8&A Cost Fate 1 | 56% | 56% | 56% | 56% |
| 8&A Cost , ase 1 | bQ0 0556 | b216 91Q | b20Q 0Q4 | b19 W0W6 |
| 8&A Costs 1 | b16Q 026 | b124 210 | b115 629 | b112 910 |

**Supp. App. 434**

# EXHIBIT G

| From: | Bulls, Michelle G. (NIH/OD) [E] |
| To: | Cathy Rivera |
| Subject: | Grant Termination Notification |
| Date: | Monday, March 24, 2025 3:51:41 PM |
| Attachments: | image002.png |

 

3/24/2025

Cathy Rivera
Rutgers Biomedical And Health Sciences
carivera@ored.rutgers.edu

Dear Cathy Rivera:

Effective with the date of this letter, funding for Project Number 5R01AI158775-04 is hereby terminated pursuant to the Fiscal Year 2023 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2023 Policy Statement applies to your project because NIH approved your grant on 8/1/2023, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2023 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations

**Supp. App. 437**

imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle
G. Bulls -S

Digitally signed
by Michelle G.
Bulls -S

Michelle G. Bulls, on behalf of Emily Linde, Chief Grants Management Officer, NIAID Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11]
    11 *Id.* § 50.406(a)

[12]
    12 *Id.* § 50.406(b)

# EXHIBIT H

DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Notice of Award**

FAIN# R01AI158775

National Institutes of Health

NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES

**Federal Award Date**
03/25/2025

| Recipient Information | Federal Award Information |
|---|---|

**Recipient Information**

**1. Recipient Name**
RUTGERS THE STATE UNIVERSITY OF NEW JERSEY
65 BERGEN ST
STE 1
NEWARK, NJ 07107

**2. Congressional District of Recipient**
10

**3. Payment System Identifier (ID)**
1226001086A1

**4. Employer Identification Number (EIN)**
226001086

**5. Data Universal Numbering System (DUNS)**
090299830

**'. Recipient␣s Uni7ue Entity Identifier**
YVVTQD8CJC79

**6. Project Director or Principal Investigator**
Jun  Wang, PHD
Associate Professor
junwang@pharmacy.rutgers.edu
848-445-6493

**8. Authorized Official**
Cathy Rivera
carivera@ored.rutgers.edu
848-932-1080

**Federal Agency Information**

**9. Awarding Agency Contact Information**
FABIOLA Chacon
Grants Management Specialist
NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES
fabiola.chacon@nih.gov
301-761-7938

**10. Program Official Contact Information**
Mary Katherine Bradford Plimack

NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES
kate.plimack@nih.gov
(240) 447-9748

**Federal Award Information**

**11. Award Number**
5R01AI158775-04

**12. Uni7ue Federal Award Identification Number (FAIN)**
R01AI158775

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Development of dual inhibitors targeting the viral main protease and the host cathepsin L as SARS-CoV-2 antivirals

**15. Assistance Listing Number**
93.855

**1'. Assistance Listing Program Title**
Allergy and Infectious Diseases Research

**16. Award Action Type**
Non-Competing Continuation (REVISED)

**18. Is the Award R&D?**
Yes

| Summary Federal Award Financial Information | |
|---|---|
| **19. Budget Period Start Date** 08/01/2023 **– End Date** 03/24/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $0 |
| 20 a.  Direct Cost Amount | $0 |
| 20 b.  Indirect Cost Amount | $0 |
| **21.** Authorized Carryover | |
| **22.** Offset | |
| **23.** Total Amount of Federal Funds Obligated this budget period | $730,106 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $730,106 |
| **2'. Project Period Start Date** 01/04/2022 **– End Date** 03/24/2025 | |
| **26.** Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $1,864,117 |
| **28. Authorized Treatment of Program Income** | |
| Additional Costs | |
| **29. Grants Management Officer - Signature** | |
| Emily  Linde | |

| 30. Remarks |
|---|

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

**Supp. App. 441**





Notice of Award

*RESEARCH*
Department of Health and Human Services
National Institutes of Health

NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES

---

**SECTION I – AWARD DATA – 5R01AI158665-04 RE: ISED**

**Principal Investigator(s)/**
Jun  Wang, PHD

**Award e-mailed to/** rsp-rbhs@research.rutgers.edu

Dear Authorized Official:

The National Institutes of Health hereby revises this award  (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to RUTGERS BIOMEDICAL AND HEALTH SCIENCES in support of the above referenced project.  This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute Of Allergy And Infectious Diseases of the National Institutes of Health under Award Number R01AI158775. The content is solely the responsibility of the authors and does not necessarily represent the official views of  the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Emily  Linde
Grants Management Officer
NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

Supp. App. 442

| | |
|---|---:|
| **Salaries and Wages** | $107,786 |
| **Fringe Benefits** | $50,310 |
| **Personnel Costs (Subtotal)** | $158,096 |
| **Materials & Supplies** | $92,661 |
| **Travel** | $2,000 |
| **Other** | $6,414 |
| **Subawards\Consortium\Contractual Costs** | $294,716 |
| **Tuition Remission** | $14,242 |
| | |
| **Federal Direct Costs** | $568,129 |
| **Federal F&A Costs** | $161,977 |
| **Approved Budget** | $730,106 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $730,106 |
| **TOTAL FEDERAL AWARD AMOUNT** | $730,106 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $0 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| **YR** | **THIS AWARD** | **CUMULATI: E TOTALS** |
| 4 | $730,106 | $730,106 |

**Fiscal Information/**

| | |
|---|---|
| **Payment System Identifier/** | 1226001086A1 |
| **Document Number/** | RAI158775BC6 |
| **PMS Account Type/** | P (Subaccount) |
| **Fiscal Year/** | 2023 |

| IC | CAN | 2023 |
|---|---|---|
| AI | 8055771 | $730,106 |

**NIH Administrative Data/**
**PCC:** M51C SR / **OC:** 41025 / **Released:** 03/25/2025
**Award Processed/** 03/26/2025 12:03:39 AM

**SECTION II – PAYMENT\HOTLINE INFORMATION – 5R01AI158665-04  RE: ISED**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at
http://grants.nih.gov/grants/policy/awardconditions.htm

**SECTION III – STANDARD TERMS AND CONDITIONS – 5R01AI158665-04  RE: ISED**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

  a.  The grant program legislation and program regulation cited in this Notice of Award.
  b.  Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
  c.  45 CFR Part 75.
  d.  National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
  e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
  f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development)/** All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that

**Supp. App. 443**

some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.  See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01AI158775. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

 This award represents the final year of the competitive segment for this grant. See the NIH Grants Policy Statement Section 8.6 Closeout for complete closeout requirements at: http://grants.nih.gov/grants/policy/policy.htm#gps.

A final expenditure Federal Financial Report (FFR) (SF 425) must be submitted through the Payment Management System (PMS) within 120 days of the period of performance end date; see the NIH Grants Policy Statement Section 8.6.1 Financial Reports, http://grants.nih.gov/grants/policy/policy.htm#gps, for additional information on this submission requirement. The final FFR must indicate the exact balance of unobligated funds and may not reflect any unliquidated obligations. There must be no discrepancies between the final FFR expenditure data and the real-time cash drawdown data in PMS. NIH will close the awards using the last recorded cash drawdown level in PMS for awards that do not require a final FFR on expenditures.  It is important to note that for financial closeout, if a grantee fails to submit a required final expenditure FFR, NIH will close the grant using the last recorded cash drawdown level.

A Final Invention Statement and Certification form (HHS 568), (not applicable to training, construction, conference or cancer education grants) must be submitted within 120 days of the expiration date. The HHS 568 form may be downloaded at: http://grants.nih.gov/grants/forms.htm.  This paragraph does not apply to Training grants, Fellowships, and certain other programs—i.e., activity codes C06, D42, D43, D71, DP7, G07, G08, G11, K12, K16, K30, P09, P40, P41, P51, R13, R25, R28, R30, R90, RL5, RL9, S10, S14, S15, U13, U14, U41, U42, U45, UC6, UC7, UR2, X01, X02.

Unless an application for competitive renewal is submitted, a Final Research Performance Progress Report (Final RPPR) must also be submitted within 120 days of the period of performance end date. If a competitive renewal application is submitted prior to that date, then an Interim RPPR must be submitted by that date as well. Instructions for preparing an Interim or Final RPPR are at: https://grants.nih.gov/grants/rppr/rppr_instruction_guide.pdf. Any other specific requirements set forth in the terms and conditions of the award must also be addressed in the Interim or Final RPPR. *Note that data reported within Section I of the Interim and Final RPPR forms will be made public and should be written for a lay person audience.*

NIH requires electronic submission of the final invention statement through the Closeout feature in the Commons.

NOTE:  If this is the final year of a competitive segment due to the transfer of the grant to another institution, then a Final RPPR is not required.  However, a final expenditure FFR is required and must be submitted

**Supp. App. 444**

electronically as noted above. If not already submitted, the Final Invention Statement is required and should be sent directly to the assigned Grants Management Specialist.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

· Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
· For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
· HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
· For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements, and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period. The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income/**
Additional Costs

---

**SECTION I: – AI SPECIFIC AWARD CONDITIONS – 5R01AI158665-04 RE: ISED**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

**<u>REVISED AWARD:</u>** The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary. Therefore, this project is terminated.

Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), as applicable within 120 days of the end of this grant.

Supp. App. 445

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

Supersedes previous Notice of Award dated **07/02/2024**. All other terms and conditions still apply to this award.

**********

REVISED AWARD: This revised Notice of Award (NoA) is issued to extend the -14 year as agreed to in the correspondence dated **6/10/2024**. This is the only mid-project extension that will be allowed for the remainder of the project period.

This award also removes the no-cost extension authority of the NIH Standard Terms and Conditions of Award. NIAID prior approval is required to extend the project period end date for this award.

Supersedes previous Notice of Award dated **5/26/2023**. All other terms and conditions still apply to this award.

**********

This award provides funds of **$730,106** Total Costs (**$568,129** Direct Costs and **$161,977** F&A Costs) to prevent, prepare for, and respond to viral variant or disease with potential for creating a pandemic, domestically or internationally. These funds provide support for the period **08/01/2023-06/31/2024**. These funds are restricted to prevent, prepare for, and respond to coronavirus domestically or internationally only as described in the application submitted **on 06/12/2020** and subsequent documentation submitted **05/12/2023**, and may not be rebudgeted or used for any other purpose without NIAID prior approval.

**********

This Notice of Award (NoA) includes funds for **Oklahoma State University.**
This Notice of Award (NoA) includes funds for **University of Arizona.**
This Notice of Award (NoA) includes funds for **University of South Florida.**

**********

Highly Pathogenic Agents:
NIAID defines a Highly Pathogenic Agent as an infectious Agent or Toxin that may warrant a biocontainment safety level of BSL3 or higher according to the current edition of the CDC/NIH Biosafety in Microbiological and Biomedical Laboratories (BMBL) (https://www.cdc.gov/labs/BMBL.html). Research funded under this grant must adhere to the BMBL, including using the BMBL-recommended biocontainment level at a minimum. If the Institutional Biosafety Committee (IBC) (or equivalent body) or designated institutional biosafety official recommends a higher biocontainment level, the higher recommended containment level must be used.
When submitting future Progress Reports indicate at the beginning of the report:

> If no research with a Select Agent (see 42 CFR 73 for the relevant human Select Agents and Toxins; and 7 CFR 331 and 9 CFR 121 for the relevant animal and plant Select Agents and Toxins at https://www.selectagents.gov/regulations/ and https://www.selectagents.gov/sat/list.htm) and/or has been performed or is planned to be performed under this grant.

**Supp. App. 446**

If the IBC or equivalent body or official has determined, for example, by conducting a risk assessment, that the work being planned or performed under this grant may be conducted at a biocontainment safety level that is lower than BSL3.

If the work involves Select Agents and/or Highly Pathogenic Agents, also address the following points:

Any NIAID pre-approved changes in the use of the Select Agents and/or Highly Pathogenic Agents including its restricted experiments that have resulted in a change in the required biocontainment level, and any resultant change in location, if applicable, as determined by the IBC or equivalent body or official.

If work with a new or additional Select Agents and/or Highly Pathogenic Agents is proposed in the upcoming project period, provide:

o A list of the new and/or additional Agent(s) that will be studied;
o A description of the work that will be done with the Agent(s), and whether or not the work is a restricted experiment;
o The title and location for each biocontainment resource/facility, including the name of the organization that operates the facility, and the biocontainment level at which the work will be conducted, with documentation of approval by the IBC or equivalent body or official. It is important to note if the work is being done in a new location;
o Any biosafety incidents that occurred and were reported to NIH/NIAID.

**SPREADSHEET SUMMARV**
**AWARD NUMBER/** 5R01AI158775-04 REVISED

**INSTITUTION/** RUTGERS BIOMEDICAL AND HEALTH SCIENCES

| Budget | Year 4 |
|---|---|
| Salaries and Wages | $107,786 |
| Fringe Benefits | $50,310 |
| Personnel Costs (Subtotal) | $158,096 |
| Materials & Supplies | $92,661 |
| Travel | $2,000 |
| Other | $6,414 |
| Subawards/Consortium/Contractual Costs | $294,716 |
| Tuition Remission | $14,242 |
| TOTAL FEDERAL DC | $568,129 |
| TOTAL FEDERAL F&A | $161,977 |
| TOTAL COST | $730,106 |

| Facilities and Administrative Costs | Year 4 |
|---|---|
| F&A Cost Rate 1 | 57% |
| F&A Cost Base 1 | $284,171 |
| F&A Costs 1 | $161,977 |

**Supp. App. 447**

# EXHIBIT 25

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS; et al.,

                                    *Plaintiffs,*

    v.

ROBERT F. KENNEDY, JR., et al.,

                                    *Defendants.*

No. 1:25-cv-_____ _____

## DECLARATION OF AMY HEQUEMBOURG

I, Amy Hequembourg, PhD, declare under the penalty of perjury pursuant to 28 U.S.C. §
1746 that the foregoing is true and correct:

1.      I am an associate professor of the State University of New York University at
Buffalo in the School of Nursing.

2.      I am familiar with the information in the statements set forth below either through
personal knowledge, in consultation with the University at Buffalo staff including my Co-
Principal Investigator Jennifer Livingston, PhD, or from documents that have been provided to
and reviewed by me.

3.      I submit this Declaration in support of the States' Motion for Temporary
Restraining Order.

### Professional Background

4.      I am an associate professor at the University at Buffalo School of Nursing,
dedicated to investigating health disparities among sexual and gender minoritized (SGM)
populations. My research has identified risks associated with sexual victimization among sexual

1

**Supp. App. 449**

minority women, offering insights into their unique post-assault disclosure and coping experiences. I have also contributed to understanding the distinct health challenges faced by bisexual women. Collaborating with interdisciplinary teams, my work explores the link between alcohol use and violence within SGM communities. My current funded research examines mechanisms linking peer victimization and alcohol use among lesbian, gay, bisexual queer and individuals who identify as something other than exclusively heterosexual (LGBQ+) adolescents.

5.      The University at Buffalo is a scholarly community dedicated to bringing the benefits of our research, scholarship, creative activities and educational excellence to local and global communities in ways that impact and positively change the world.

The University views the three traditional pillars of the public higher education mission—research, education and service—as interdependent endeavors that continually enrich and inform each other. Groundbreaking research, transformative educational experiences and deeply engaged service to our communities define the University at Buffalo's mission as a premier, research-intensive public university.

6.      University at Buffalo, a flagship of the State University of New York, has three campuses, over 32,000 students, almost 12,000 employees, and performs over $544,000,000.00 in vital research annually.

**Reliance on NIH Funding**

7.      In fiscal year 2024, University at Buffalo received funding through the National Institutes of Health ("NIH") to support 224 projects, totaling $60,654,347.

8.      University at Buffalo receives NIH grants across a variety of institutes encompassed within the NIH, including the National Institute on Minority Health and Health

**Supp. App. 450**

Disparities, the National Institute of Mental Health, and the National Institute for Alcohol Abuse & Alcoholism.

9.    Through those NIH grants, University at Buffalo funds 1,003 researchers.

10.    The work done by University at Buffalo on NIH funded projects provides education and training in Biomedical Engineering, Biochemistry, Chemistry, Dentistry, Family Medicine; Internal Medicine; Microbiology and Immunology, Neurology, Nursing, Ophthalmology, Pathology, Pediatrics, Pharmacology, Psychology, Public Health and Health Professions, Radiology, and other programs.

11.    University at Buffalo provides considerable employment benefits in the Science, Technology, Engineering and Mathematics workforce to the New York State economy.

**Terminations of NIH Grants**

12.    Since March 12, 2025, University at Buffalo has had three NIH grants terminated, not including terminated grants for which the University was a sub-awardee.

13.    The terminations received as of March 28, 2025 are attached hereto as Exhibits A–C.

14.    These terminations will result in the loss of at least $4,481,711 in research funding to University at Buffalo.

15.    The termination notices for these grants have provided very little to explain the termination, instead noting that the research is no longer consistent with newly conceived agency priorities. Specifically, the termination notices state that: "This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do

3

not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs."

16.    In my 19 years working in NIH funded research at University at Buffalo, I have not seen this language previously used to cancel grants.

17.    The termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities. However, prior to receipt of the termination, University at Buffalo had not been given notice of any opportunity to submit any "corrected" grant materials to align with agency priorities. Nor was University at Buffalo provided with any updated "agency priorities" with which its research must align.

18.    I am the Co-Principal Investigator (with Jennifer Livingston, PhD, Associate Professor, School of Nursing, University at Buffalo) on one of the terminated grants. This grant, Award No. 92615, is titled Peer Victimization and Risky Alcohol Use among Sexual Minority Youth: Understanding Mechanisms and Contexts. In this grant we investigate the impact of peer victimization (PV) on health outcomes among LGBQ+ youth. These youth experience significant health disparities, including higher risk for suicide, greater mental health symptoms, and riskier alcohol and other substance use behaviors compared to exclusively heterosexual youth. These disparities are due, in part, to the exposure to unique and chronic minority stressors targeting their sexual identities. The relationship between PV and adverse health outcomes has been well-established for heterosexual youth, but the role of PV on these outcomes when accounting for sexual minority stressors is understudied. In this grant, we seek a better understanding of the complex and unique factors that elevate and ameliorate harmful outcomes for LGBQ+ youth in

4

**Supp. App. 452**

the presence of minority stress and PV. Our study is novel in that we are using a developmental lens to assess participants over an 18-month period during which data are collected using surveys administered every 6 months, daily reports collected over two 4-week bursts, and qualitative interviews with a targeted subsample. This research is vital to improving the public health of millions of American youth who identify as LGBQ+ thereby reducing economic burden related to healthcare costs for these youth as they mature into adulthood. We have recruited 325 participants, representing 81.3% of the target sample. To date, only 11.4% of these participants have progressed through all phases of study. Preliminary unpublished results from this study underscore the negative impact of PV on health outcomes among LGBQ+ youth and identify heterogeneity of risks among these youth based on their sexual identity. Interviews with these youth underscore the negative emotional and psychological impact of PV on LGBQ+ youth, while also identifying factors that protective against these poor outcomes. Results indicate that parental support, LGBQ+ friendly school climate, and receipt of care from educated and culturally competent health providers are critical factors to consider as targets for future interventions to improve the health and well-being of these youth.

## Comparisons Across Administrations

19.     In prior years, under both Democratic and Republican administrations, our institution never experienced this volume of unexplained delays or procedural breakdowns.

20.     Renewals were routine and predictable. This year, even long-standing, high-performing programs are in limbo.

21.     Terminations were exceedingly rare and followed due process. The current approach is without precedent in our experience.

5

**Impact on Research-Related Operations**

22.     Termination of this grant has halted recruitment of new participants and ongoing longitudinal data collection, thereby jeopardizing our ability to achieve the stated aims. We are currently in the fourth year of the grant award, and anticipated an additional year of direct costs funding, which would have allowed us to complete participant recruitment and the follow-up assessments necessary to achieve the stated aims. Our grant supports the salaries of three highly trained research staff, all of whom were to be terminated without any warning and without cause. This termination renders them immediately unemployed, resulting in their loss of benefits accrued over years of service in the State University of New York (SUNY) system. Furthermore, loss of these three staff members impedes our ability to conduct activities in coordination with our staff to close out the grant as per NIH requirements, as instructed in the termination notice (i.e., closing records, notifying participants, paying final bills, reconciling expenses, preparing data for analysis and archiving). Loss of the project data analyst would also disrupt dissemination and scholarship, thereby hindering our team's contributions to the research and scholarship central to the University at Buffalo's mission. Overall, our inability to complete the study represents a significant loss of investment already made by the NIH and the American taxpayers.

23.     These terminations have forced the dean of our school to implement bridge funding to support our staff and compensate participants who have recently completed their assessments but were not compensated prior to receipt of the termination notice. Our school's capacity is limited to providing two weeks of bridge funds, after which our three staff members will be unemployed, preventing the completion of the project close-out. These staff were long-term SUNY Research Foundation employees and have been supported by our grant funding for

6

nearly four years. The sudden loss of employment with no due cause is economically and psychologically damaging to them.

**Admissions, Training and Workforce Disruptions**

24.     The instability resulting from unanticipated grant terminations will affect the recruitment and retention of quality Ph.D. students in the School of Nursing and the University at Buffalo. Nursing Ph.D. students are required to participate in research as part of their program and a loss of the grant and the data that it would generate would adversely impact training opportunities. The inability to retain quality Ph.D. student research trainees will have continuing effects on the research capabilities of the University at Buffalo and will undermine the advancement of nursing science and public health.

**Irreparable Harm**

25.     These termination notices have forced us and other researchers at the University at Buffalo and across the nation to abandon studies, miss deadlines, and/or lose key personnel. In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

26.     The termination of our grant and thousands of other NIH-funded grants across the nation will undermine and stagnate scientific progress to understand the nature of health disparities among LGBQ+ populations. Recent estimates indicate that 9.3% of the U.S. adult population is LGBQ+, and the numbers of adolescents identifying as LGBQ+ is higher now than any time in prior history. The terminations have broad implications for the future of LGBQ+ research and the health of significant numbers of Americans. The impact is unmeasurable and has implications that will be seen far into the future for today's LGBQ+ youth. The health and well-being of a sizeable and vulnerable segment of our population is in jeopardy.

7

27.    Given the longitudinal and developmental nature of the current research, the study had the potential to contribute to prevention and intervention efforts to improve the health and well-being of millions who identify as LGBQ+ in our nation. Such breakthroughs would have advanced public health and will now not occur.

**Conclusion**

28.    The breakdown in NIH processes is affecting institutional operations, planning, and public health partnerships. Terminations and delays with no explanation or remedy are undermining confidence in the system. These harms are ongoing and, in many instances, irreparable.

29.    The termination of the NIH R01 grant has halted critical research investigating the impact of peer victimization on health outcomes among LGBQ+ youth, disrupting participant recruitment and data collection in the study's final year. The abrupt loss of funding has left three highly trained research staff unemployed without warning, preventing the completion of required closeout activities such as data reconciliation and analysis. The resulting instability has also jeopardized Ph.D. student research opportunities in the School of Nursing, undermining both immediate and long-term contributions to nursing science and public health.

30.    Beyond institutional disruptions, this termination undermines scientific progress in understanding health disparities among LGBQ+ populations. With growing numbers of adolescents identifying as LGBQ+, this research had the potential to inform vital prevention and intervention strategies. The premature termination not only wastes prior NIH investments but also has long-term consequences for public health, leaving a vulnerable population without the

**Supp. App. 456**

benefits of evidence-based policy and healthcare improvements. Many of these harms—

particularly the loss of data continuity, personnel, and research momentum—are irreparable.

_____
Amy Hequembourg, PhD

Date:  4-1-25

**Supp. App. 457**

# EXHIBIT A

Supp. App. 458

 

March 12, 2025

Amy Lagowski
Research Foundation for the State University of New York
Amy.Lagowski@buffalo.edu

Dear Amy Lagowski:

Funding for Project Number 1P50MD019473-01 is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on July 19, 2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

**Supp. App. 459**

decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S
Date: 2025.03.12 22:17:03 -04'00'

Michelle G. Bulls, on behalf Priscilla Grant, Chief Grants Management Officer, NIMHD
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

**Supp. App. 460**

# EXHIBIT B

Wshen7@buffalo.edu

---

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 12:31 PM
**To:** Wei Shen <wshen7@buffalo.edu>
**Subject:** Grant Termination Notification

3/21/2025

Wei Shen
State University Of New York At Buffalo
wshen7@buffalo.edu

Dear Wei Shen:

Effective with the date of this letter, funding for Project Number 5K01MH130270-03 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 8/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents[12]

**Supp. App. 462**

supporting your claim.

Sincerely,



Michelle G. Bulls, on behalf of Theresa Jarosik, Chief Grants Management Officer, NIMH
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

_____

_____

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT C

3/21/2025

Mical, Alison
State University Of New York At Buffalo
alodojew@buffalo.edu

Dear Mical, Alison:

Effective with the date of this letter, funding for Project Number 5R01AA028810-04 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 7/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,



Michelle G. Bulls, on behalf of Judy Fox, Chief Grants Management Officer, NIAAA Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

# EXHIBIT 27

Supp. App. 467

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS; et al.,

                     Plaintiffs,

    v.

ROBERT F. KENNEDY, JR., et al.,

                     Defendants.

No. 1:25-cv-_____

## DECLARATION OF MARI OSTENDORF

I, Mari Ostendorf, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.    I am the Vice Provost of Research of University of Washington. I have personal knowledge of the facts set forth in this declaration, and if required to testify, would and could competently do so.

2.    I submit this Declaration in support of the States' Motion for Temporary Restraining Order.

**Professional Background**

3.    I am the Vice Provost for Research in the Office of Research at the University of Washington, a position I have held since 2021. As Vice Provost for Research, I have oversight over the pre-award process, reporting of institution-wide research statistics, and several research compliance offices. In addition, I oversee two major research units: the Applied Physics Laboratory and the Washington National Primate Research Center. Prior to holding this position, I served as Associate Vice Provost for Research in the Office of Research since 2017.

1

**Supp. App. 468**

4.      The University of Washington is the flagship university of the state of Washington. Since its founding in 1861, it has been a hub for learning, innovation, problem solving, economic development and community building. Driven by a mission to serve the greater good, our students, faculty and staff tackle today's most pressing challenges with courage and creativity, making a difference across Washington state—and around the world. As part of its mission, the UW engages in research and direct service, which frequently rely in whole or in part on federal financial assistance.

5.      The University of Washington School of Medicine is dedicated to improving the general health and well-being of the public. In pursuit of its goals, the School is committed to excellence in biomedical education, research and healthcare. The School is also dedicated to ethical conduct in all its activities.

6.      As the pre-eminent academic medical center in our region and as a national leader in biomedical research, we place special emphasis on educating and training physicians, scientists and allied health professionals dedicated to two distinct goals: 1) Meeting the healthcare needs of our region, especially by recognizing the importance of primary care and providing service to underserved populations; and 2) Advancing knowledge and assuming leadership in the biomedical sciences and in academic medicine.

7.      The UW receives more federal research dollars than any other U.S. public university. In particular, funding from the National Institutes of Health is critical to UW's mission. In fiscal year 2024, UW received more than 1,220 NIH grants, totaling over $648 million. However, recent actions by NIH, including cancelling study sections, delaying grant renewals, and terminating grants, have severely impacted UW's ability to accomplish its mission. Because of NIH's actions in delaying and cancelling grant awards, UW is now facing funding disruptions

**Supp. App. 469**

which are forcing it to furlough and potentially lay off research staff and faculty, cut admissions to graduate programs, including not taking any new undergraduate researchers in labs during the summer semester, and causing unprecedented budget uncertainty. These cuts have also led individual researchers to scale back their research or to limit their research to less complex experiments.

**UW Relies on NIH Funding**

8.     As noted, UW currently has over 1,200 NIH grants. These grants come from 23 different funding institutes within NIH.

9.     Through those NIH grants, UW funds over 3000 researchers (faculty, graduate students, and research staff).

10.     NIH grants support research, education, and training, into project areas spanning a dizzying array, from biomedical engineering, to suicide reduction, to health equity, to protein design using artificial intelligence, diabetes, cancer treatments, kidney disease, and countless other examples.

**Typical Timeline and Processes for NIH Grant Awards**

11.     The Office of Sponsored Programs at UW works with researchers to submit grant applications and tracks grant applications and awards.

12.     As detailed elsewhere, NIH grant applications are evaluated by study sections, who determine whether a project has scientific merit. Applications are scored, and if a grant application receives a "excellent priority score", it will likely be funded.

13.     After the study section, the grant application is sent to an "advisory council" where the ultimate decision on whether or not to fund the grant is made. After the advisory council meets,

3

**Supp. App. 470**

a Notice of Award is issued confirming whether or not the grant will be funded after all administrative review steps are completed.

14.     The process for competitive renewals is very similar.

15.     The budget process at UW relies upon the regular NIH grant application submission, review, and approval cycle. Typically, we rely in grants being reviewed and scored within three to six months of submission and funding is generally awarded within nine to twelve months for meritorious grants.

16.     Based upon those published NIH timelines, UW is able to make educated decisions around hiring research staff and graduate students. The regularity of the grant cycle is thus critical for UW in setting its budget.

**Delays and Irregularities in the Processing of NIH Grant Applications**

17.     Since the Inauguration, UW has experienced unprecedented delays in the processing of NIH grant applications. NIH study sections and advisory councils have been canceled, delayed or otherwise not scheduled, and grant application scoring has been significantly delayed.

18.     As of April 1, 2025, UW has more than 500 proposals awaiting NIH study section review.

19.     As of April 1, 2025, UW has 54 proposals for $138 million in total funding requested that received fundable scores, awaiting NIH advisory council and Notice of Award.

20.     As of April 1, 2025, UW has 76 proposals for $260 million in total funding requested with fundable scores that for which the NIH advisory council has met or voted electronically to approve a grant for funding, but the NOA has not yet been issued.

4

**Supp. App. 471**

21.    On top of that, UW is also experiencing significant delays in so-called non-competing or Type 5 renewals. These are grant awards for which NIH has issued an award for a given year (called the "award year"), with a commitment to fund further years (called "out years"), so long as the grantee demonstrates adequate progress. The out years typically require a new notice of award (NOA) after submission of a progress report (RPPR). This is generally pro forma, and unless the grantee gets nothing done or does not submit the progress report, the next year of funding is awarded. This decision is made by the NIH program officer without peer review. Type 5 NOAs are generally received at least one week (often more) before the start of the new budget period. There can be delays with a new administration or while on continuing resolution, however, the more common practice is to award them at 90% of the budgeted amount and then to increase to full budget once the FY budget is passed (assuming no major cuts to NIH).

22.    As of April 1, 2025, UW has 73 overdue non-competing renewals totaling over $61 million that have yet to receive NOAs.

23.    I want to highlight four important research centers that are at risk because of delays in the grants review and award processes at NIH. They are the Alzheimer's Disease Research Center (ADRC), the Nathan Shock Center of Excellence (NSC) in the Basic Biology of Aging, the joint UW/Allen Center "*A multimodal brain cell atlas and community resource of Alzheimer's disease and comorbid dementias," and* the Institute for Translational Health Science (ITHS), Three of these Centers are funded by the National Institute on Aging (NIA) and received excellent scores during their reviews in study section in the fall. Because the NIA Council did not meet as scheduled in the January, these large grants were not approved for award. They all end in March, April or May and would leave large research teams without support. The work being done by these

5

**Supp. App. 472**

centers is longitudinal and lapse in funding will mean loss of critical cohorts that have been studied in some cases up to 40 years.

### UW Alzheimer's Disease Research Center (ADRC)

24.    The    NIH-funded    University    of    Washington    Alzheimer's Disease Research Center ("ADRC"; P30 AG066509 ) is the main platform for Alzheimer's disease research in Washington state. Alzheimer's disease processes start 15 years before symptoms occur and run their course across decades. Serious study of Alzheimer's disease biology and treatment requires following research participants for years, characterizing their trajectories with genetic, cognitive, imaging, and biomarker tests, and doing detailed biological studies on brain tissue after death. The cycle of recruitment, long term evaluation and brain donation is the cornerstone of research that leads to effective new drugs. The Alzheimer's Disease Centers program maintains a stable network of 35 ADRC Centers and supporting programs that cooperate to study Alzheimer's disease and related disorders in a standard, long term way. The resulting data is pooled for widespread scientific analysis. The University of Washington ADRC has been continuously funded for 40 years and is one of the leading centers. We contributed key research identifying genetic causes of Alzheimer's disease and continue to study tissue and data from our families with ever more powerful techniques. We focus on the biology of degenerative dementia and the factors that counter degeneration and dementia. Many other studies depend on our UW ADRC and its sister ADRCs for participants and biospecimens like blood, spinal fluid, and brain tissue, to advance their work more powerfully and less expensively. In addition, the ADRC is part of the UW Medicine Memory and Brain Wellness Center that ensures state of the art care for patients with memory loss and dementia. As disease-modifying treatments,

6

**Supp. App. 473**

like lecanemab and donanemab are now available, the ADRCs are becoming more tightly connected to their clinics.

25.     Currently, the UW ADRC is in its renewal cycle, with a fundable score, but unable to move forward into the next five years of funding without NIA Advisory Council action. Lapse of funding for the ADRC, which appears likely, will mean serious interruption of the longitudinal research, loss of key personnel who have developed expertise over years of devoted service, and loss of availability of key resources, like appropriately curated brain tissue, that are essential for the affiliated studies. For example, we have a major project with the Allen Institute for Brain Science (U19 AG060909) that depends on our brain tissue. NIH funding means stability and longevity of resource centers like ours and is irreplaceable.

**Nathan Shock Center of Excellence (NSC) in the Basic Biology of Aging**

26.     I would like to highlight our NIA P30 Nathan Shock Center of Excellence (NSC) in the Basic Biology of Aging and its companion training grant (T32) the Biological Mechanisms of Healthy Aging (BMHA) Training grant. We submitted the renewals last year and the NSC received an impact score of 15 and the BMHA received an impact score of 13. These scores reflect the outstanding impact the NSC and BMHA continue to have on aging research in both scientific discovery and training the next generation. Both grants have been "recommended for funding" but, like the ADRC, are awaiting final decision at the January NIA Advisory Council that has been postponed. Funding for the NSC and BMHA ends in May and April 2025, respectively.

27.     The UW NSC is one of eight NSCs and is the longest running one in the country (over 30 years). It provides critical funding for pilot programs for junior investigators and collaborative projects with other centers from around the country to provide access to state-of-the-art expertise in protein phenotypes, metabolite phenotypes, invertebrate models and artificial

**Supp. App. 474**

intelligence to understand the basic mechanisms of human aging. Three of these four cores have been part of the NSC for 15 years and the newer AI core is a world leader in state-of-the-art AI tools for health and medicine. They have ongoing collaborations both within the UW and across the country working to establish new biomarkers, identify new biological mechanisms, and testing new interventions to improve health in the aging population. Without timely renewal of the NSC these ongoing studies will be jeopardized, and our core laboratories face the risk of losing staff with critical expertise. The BMHA is a rigorous training program closely affiliated with the NSC that currently supports 6 predoctoral and 6 postdoctoral fellows. The training program not only includes laboratory-based research in aging biology, but career development programs, mentoring, and networking opportunities to help prepare the next generation of scientists to become independent scientists in basic and translational aging biology. A delay in renewal of the BMHA runs the risk of not only losing this current cohort of trainees but also risks dismantling the training program and staff. These are both critical centers to the UW infrastructure and educational programs and, with the ADRC, are key drivers of the international recognition of the UW as a leader in driving new treatments for improved health with age. We are extremely anxious about the impact of the ongoing delays at the NIH on their futures.

### U19 UW/Allen Institute "*A multimodal brain cell atlas and community resource of Alzheimer's disease and comorbid dementias*"

28.     The goal of this U19 Center Collaboration with UW and Allen Institute for Brain Science is to build a national brain tissue and data resource to stimulate cutting edge research in Alzheimer's Disease (AD). A unique aspect of this project is the tight integration with the NIH BRAIN Initiative's flagship Cell Census projects, which has allowed us to rapidly build on cutting edge advances in the BRAIN Initiative and use them to understand Alzheimer's disease in unprecedented detail, and also to disseminate these advances to the larger AD research and medical

8

**Supp. App. 475**

communities. Over the first five years of this center, we developed techniques and tools to optimally preserve and characterize human brain tissue from the UW ADRC and affiliated studies. The Center has produced advances in our ability to manage, process, and analyze brain tissue for AD/ADRD that have led to substantial progress in our understanding of the cell type basis of these diseases. This has led to an openly accessible highly multimodal data resource that serves as a reference for the entire field of human AD research. The goal of this center is to identify early vulnerable cells in AD using cutting edge genomics tools and to identify potential therapeutic strategies to protect those cells. The renewal extends this study to build a national network of ADRCs to adopt these cutting-edge techniques across multiple cohorts to build this resource around Alzheimer's Disease related dementias (ADRD) including Lewy body dementia, Parkinson's disease, vascular dementia, etc. The renewal integrates new technology, including multimodal spatial genomics applications, to continue to understand AD and AD/ADRD mechanisms. The renewal proposes to develop a neuropathology consensus panel to improve existing or develop new ways to diagnose and differentiate AD and AD/ADRD. A critical aspect of this work is that all of the data is openly accessible, and has already served as a resource for many highly impactful studies across the US and internationally (https://portal.brain-map.org/explore/seattle-alzheimers-disease) with more than 29,000 users. The platform paper for SEA-AD was published last year (https://www.nature.com/articles/s41593-024-01774-5) and this work has been featured in local and national media (reaching over 70M people). But all of this work is now jeopardized by NIH's funding delays.

**Institute of Translational Health Sciences (ITHS)**

29.    A partnership between the University of Washington, Fred Hutchinson Cancer Center, Seattle Children's, and regional institutions ITHS promotes the translation of scientific

**Supp. App. 476**

discovery to clinical practice by fostering innovative research, cultivating multi-disciplinary research partnerships, and ensuring a pipeline of next generation researchers through robust educational and career development programs throughout the Washington, Wyoming, Alaska, Montana, and Idaho (WWAMI) region.

30.     One example of the innovative work performed at ITHS' is the Gene & Cell Therapy Lab's (GCTL) acceleration of medical discoveries to clinical environments through partnerships. One such partnership involved a biopharmaceutical company that developed a therapy to treat advanced ovarian cancer, called UltraCAR-T Cell therapy. Scientists in the GCTL worked with the company to transfer the technology so that the product could be made quickly and effectively. A separate unit of ITHS, the Translational Research Unit, conducted the rigorous clinical trials necessary to advance the technology towards a clinical use.

31.     ITHS supports collaboration between primary care practices and academic researchers that improves the health and well-being of patients in their communities and enhances primary care clinical practice through its WWAMI Practice and Research Network. This practice-based research network, known as the WPRN, spans 34 organizations and over 90 clinics in the five-state WWAMI region.

32.     ITHS is supported by a $10.5 million annual grant from NIH. UW did not receive an expected NOA generated by a non-competing renewal for ITHS on March 1, 2025. Without funding for over thirty days, UW was forced to institute staff reductions, furloughs, and elimination of positions at ITHS.

**Terminations of NIH Grants**

**Supp. App. 477**

33.     Since February 28, UW has had at least seven NIH grants terminated on which a UW researcher was the prime grantee.[1] UW has also had multiple grants terminated in which a UW researcher is a subgrantee.

34.     The prime grantee terminations received as of April 1 are attached hereto as Exhibits A-G.

35.     These terminations will result in the loss of over $2.9 million in research money to UW.

36.     The termination notices do not explain why the grants are being terminated, instead claiming that the research no longer "effectuates agency priorities." Of course, these grants were initially approved through NIH's rigorous process—some as recently as last year, while others have been continually funded for multiple years—and NIH failed to explain what changed. In my experience, I have never before seen NIH cancel a grant because it supposedly no longer comports with agency priorities.

37.     The termination notices claim that there is no corrective action that can be taken to ensure the grant aligns with agency priorities. However, prior to the terminations, UW was not given any opportunity to submit revised grant materials to align with agency priorities, nor were grantees even given an opportunity to explain what their work was and how it might align with agency priorities. Nor was UW provided with any updated definition of "agency priorities" with which its research must align.

38.     These grants all funded amazing work by UW researchers. For example, NIH terminated Grant No. 5R01MD017573-03 to UW Professor Emily Dworkin. That grant funded a groundbreaking study on the impact of anti-LGBTQ policies on sexual minority health across the

---

[1] This does exclude one grant that NIH terminated and then subsequently reinstated.

11

**Supp. App. 478**

nation. Dr. Dworkin's study sought to understand the causes of disproportionately high rates PTSD and other mental health issues among sexual minority women who have experienced sexual assault with an eye toward understanding how the political and social environment affects people, and, consequently, how changing people's environments can improve mental health. This was year three of the project, meaning that significant work had already been done—which will now be wasted if funding is not restored.

39.     In its cancellation letter, NIH wrote: "This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs." Given that Dr. Dworkin's research sought to understand, and hopefully address, significant mental health issues among sexual minority women, it is hard to see how NIH could possibly have concluded that her research was unlikely to contributed to public health.

40.     As another example, NIH terminated Grant No. 1F31 AI181431-01A1. That grant, to UW graduate student Gregory Zane, funded research into prophylactic antibiotic treatment for Chlamydia trachomatis, a bacterium that "causes roughly 128 million sexually transmitted infections globally each year." And, in light of "concerns of antibiotic resistance," Zane's research also sought to assess whether "CT vaccination a cost-effective prevention strategy compared to current screen-and-treat practices in the United States[.]" "To answer these questions," the NIH

grant funded research into "the frequency and factors associated with antibiotic use among" men who have sex with men to "predict the 50-year impact of national rollout of a theoretical vaccine."

41.     But yet again, the termination letter declared that this research—which was approved just eight months ago—"no longer effectuates agency priorities." According to the letter, "[i]t is the policy of NIH not to prioritize research activities that focuses [on] gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment." NIH otherwise offered no explanation for this about-face.

42.     In addition to these outright terminations, I am also aware of at least two instances (so far) in which a UW researcher lost funding because of NIH's new decision to no longer fund Diversity Supplements. Diversity Supplements are workforce development grants meant to increase diversity in the scientific profession by providing training, mentorship and career development opportunities to individuals from underrepresented populations.[2]

43.     However, my understanding is that NIH has recently decided to cancel NOFOs for Diversity Supplements, meaning that researchers who have applied for, and in many cases, already received funding under a Diversity Supplement are now getting their funding pulled.

44.     In one case, a research scientist at Seattle Children's Hospital was awarded a $177,553 diversity supplement grant to support a study on lupus aimed at developing new targeted therapies for the treatment of lupus. However, on January 28, NIH sent an email cancelling the researcher's grant with no explanation.

---

[2] NIH has defined diversity broadly, to include not only "[i]ndividuals from racial and ethnic groups that have been shown by the NSF to be underrepresented in health-related sciences on a national basis," but also "[i]ndividuals with disabilities," and "[i]ndividuals from disadvantaged backgrounds," including those who have experienced homelessness, who were in foster care, who experienced poverty, or who are from rural areas. https://grants.nih.gov/grants/guide/pa-files/pa-20-222.html.

**Supp. App. 480**

45.     In another case, a UW postdoctoral fellow lost their funding because a diversity NOFO was cancelled.  This postdoctoral fellow had received funding under a K99 grant, which help post-docs transition to faculty roles. The K99 phase funds 1-2 years of postdoc, and then, if the researcher gets a faculty job, they receive 3 years of R00 funding at the institution where their faculty job is located (often a different institution). This researcher had received a $132,381 K99, funded in response to a Diversity NOFO, to study the impact of air pollution on Alzheimer's disease and related dementias. However, when UW submitted the researcher's R00 transition application, it was rejected by NIH within a few hours. The email rejecting the application said, merely: "Because your application was in response to a Diversity NOFO that has been expired and is no longer a priority to the NIH, we will not be able to award the R00 phase of this grant."

46.     In other words, this researcher had her funding cut off mid-stream not because of anything she had done or failed to do but because she had applied for a grant through a previously approved funding mechanism designed to increase participation of diverse individuals in research careers.

**Impact on Institutional Operations**

47.     The failure of NIH to communicate deviation from the normal funding application cycle for reviews and approval of funding means that research team which often plan grant applications years in advance to maintain necessary funding to support their research teams are left without consistent funding and in some cases are needing to furlough or layoff research team members.

48.     We have paused some new hires whose research programs depend on timely NIH awards to conserve funding to allow us to support research staff that would normally be funded on NIH grants. This includes several faculty searches that were underway for the 2024–2025

14

**Supp. App. 481**

academic year, which had already been advertised and in some cases multiple candidates had already been interviewed on campus.

49.     UW has also been forced to cut admissions to graduate programs across the University. Depending on the department, the cutbacks in admissions have ranged between 25 and 50%.

50.     Moreover, the terminations, delays, and unprecedented disruptions in funding have had a profoundly negative effect on morale University wide. Faculty and staff don't know if their funding will be cut, if their research will be terminated, whether they will be able to attend conference, or even whether they will continue to have jobs. The stress of these funding disruptions is palpable, and even if I cannot measure it, I am certain it has negatively affected our mission as a University. Research staff that are stressed about losing their jobs on a daily basis are not able to focus their full creative energy on innovation and discovery.

**Irreparable Harm**

51.     The delays have disrupted ongoing research, as well as setting back UW for research going forward. Funding gaps have forced researchers to abandon studies, miss deadlines, or lose key personnel. This is in spite of the interim measures being taken by UW to keep certain research going. UW has had to make decisions about which of these valuable programs to continue with these limited funds.

52.     Some of these studies involve clinical trials for life-saving medications or procedures, and their closure would endanger the lives of patients. The Department of Neurology has had to provide interim funding to ensure patient safety in a clinical trial of sleep apnea treatment for stroke patients. Department of Medicine was not able to enroll any patients in a clinical trial for HIV patients.

Supp. App. 482

53.    At bottom, NIH's actions have fundamentally undermined UW's mission to pursue scientific research. In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 1st day of April 2025, in Seattle, Washington.

_____
MARI OSTENDORF
Vice Provost of Research
University of Washington

**Supp. App. 483**

# Exhibit A

 **Outlook**

---

### FW: Grant Termination Notification | A160406 [5UG4LM013725-04]

**From** Office Of Sponsored Programs <osp@uw.edu>
**Date** Fri 3/21/2025 3:22 PM
**To** Carol Rhodes <carhodes@uw.edu>
**Cc** Jenny Muilenburg <jmuil@uw.edu>

---

Hi Carol,

MOD47947 was created for this, assigned to you and is in  OSP Setup  status.

Best,

Dianna

---

**From:** Michael Snow <mi  esnow@uw.edu>
**Sent:** Friday, March 21, 2025 10:41 AM
**To:** Of ce Of Sponsored Programs <osp@uw.edu>
**Cc:** Ariadna A. Santander <  limus@uw.edu>  Amanda C Snyder <acs229@uw.edu>  Josy S Combs <combsj3@uw.edu>
**Subject:** FW: Grant Termination Noti  cation  A1  040   5UG4LM013725-04

Hi Dianna,

Another NIH termination letter, please set this up as a MOD to AWD-005078. I believe there are subawards.

Than  s,
Mi  e

MICHAEL SNOW / Manager, Proposals and Awards  Team Gold , Of ce of Sponsored Programs /
20  .221.0553

---

**From:** Jonathan N. Geraghty <geraghti@uw.edu>
**Sent:** Friday, March 21, 2025 10:30 AM
**To:** Ariadna A. Santander <  limus@uw.edu>  Michael Snow <mi  esnow@uw.edu>
**Subject:** FW: Grant Termination Noti  cation  A1  040   5UG4LM013725-04

Hi Ari / Mi  e:

I must have received this because I was listed as AOR at some point.

A1  040   5UG4LM013725-04

Let me  now how I should proceed.

Jon

---

**Supp. App. 485**

**OSP contacts:** https://www.washington.edu/research/contact-us/
Jonathan Geraghty   Compliance Analyst   UW Of ce of Sponsored Programs   20 - 85-4842   geraghti@uw.edu

**From:** Bulls, Michelle G.  NIH/OD  E  <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 9:30 AM
**To:** Jonathan N. Geraghty <geraghti@uw.edu>
**Subject:** Grant Termination Noti  cation

 

3/21/2025

Jonathan Nicklen Geraghty
University Of Washington
geraghti   uw.edu

Dear Jonathan Nicklen Geraghty:

Effective with the date of this letter, funding for Project Number 5UG4LM013725-04 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ( NIH ) Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 5/1/2024, and  obligations generally should be determined by reference to the law in effect when the grants were made. [3]

The 2024 Policy Statement  includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4] According to the Policy Statement,  NIH may    terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]   At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination  [b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ( DEI ) studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although  NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision, [6] no corrective action is possible here. The premise of this award is incompatible with

**Supp. App. 486**

agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget s regulations to

d ___

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle
G. Bulls -S

Digitally signed
by Michelle G.
Bulls -S

Michelle G. Bulls, on behalf of Andrea Culhane, Chief Grants Management Officer, NLM
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

_____

_____

_____

_____

1 https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
2 2 C.F.R.  200.341 a  45 C.F.R.  75.373
3 *Bennett v. New Jersey*, 470 U.S.  32,  38  1985 .
4 NIH Grants Policy Statement at IIA-1.

**Supp. App. 487**

<sup>5</sup> *Id.* at IIA-155.

___ NIH Grants Policy Statement at IIA-15 .

<sup>7</sup> *See* 2 C.F.R.   200.343  2024 .

<sup>8</sup> 2 C.F.R.   200.341 c  45 C.F.R.   75.373 c

<sup>9</sup> *See* 45 C.F.R.   75.374.

<sup>10</sup> See 42 C.F.R. Part 50, Subpart D

<sup>11</sup> 11 *Id.*   50.40  a

<sup>12</sup> 12 *Id.*   50.40  b

**Supp. App. 488**

# Exhibit B

**Emily R Dworkin**

| | |
|---|---|
| **From:** | Office Of Sponsored Programs <osp@uw.edu> |
| **Sent:** | Friday, March 21, 2025 3:01 PM |
| **To:** | Carol Rhodes |
| **Cc:** | Emily R Dworkin |
| **Subject:** | FW: Grant Termination Notification |
| | |
| **Categories:** | Blue |

Hello Carol,

MOD47944 has been created for this, assigned to you and is in "OSP Setup".

Best,

Dianna

---

**From:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
**Sent:** Friday, March 21, 2025 9:30 AM
**To:** Office Of Sponsored Programs <osp@uw.edu>
**Subject:** Grant Termination Notification



3/21/2025

Rhodes, Carol
University Of Washington
osp@uw.edu

Dear Rhodes, Carol:

Effective with the date of this letter, funding for Project Number 5R01MD017573-03 is hereby terminated pursuant to the Fiscal Year 2025 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2025 Policy Statement applies to your project because NIH approved your grant on 12/1/2024, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2025 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the

**Supp. App. 490**

time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.[8]*

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle G. Bulls -S
Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf of Priscilla Grant, Chief Grants Management Officer, NIMHD
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

Supp. App. 491

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

**Supp. App. 492**

# Exhibit C



March 18, 2025

Carol Rhodes
University of Washington
osp  uw.edu

Dear Carol Rhodes:

Effective with the date of this letter, funding for Project Number 1F31 AI181431-01A1 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health (  NIH  ) Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 08/16/2024, and   obligations generally should be determined by reference to the law in effect when the grants were made.  [3]

The 2024 Policy Statement   includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]  According to the Policy Statement,   NIH may      terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]  At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination   [b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

This award no longer effectuates agency priorities. It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria.

Although   NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,  [6] no corrective action is possible here. The premise of this award is incompatible with

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] 2024 Policy Statement at IIA-156.

1

agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget s regulations to          d

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

**Michelle G. Bulls -S**

Digitally signed by
Michelle G. Bulls -S
Date: 2025.03.18
09:26:19 -04'00'

Michelle G. Bulls, on behalf Emily Linde, Chief Grants Management Officer, National Institute of Allergy and Infectious Diseases
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

**Supp. App. 495**

# Exhibit D



03/20/2025

Lester Warnac Villaflor
UNIVERSITY OF WASHINGTON
gcsfund   uw.edu

Dear Lester Warnac Villaflor:

Effective with the date of this letter, funding for Project Number 5R01LM013301-05 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health (  NIH  ) Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 08/01/2023, and   obligations generally should be determined by reference to the law in effect when the grants were made.  [3]

The 2024 Policy Statement   includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]  According to the Policy Statement,   NIH may      terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]  At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination   [b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion (  DEI  ) studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs. Although  NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

an opportunity to take appropriate corrective action before NIH makes a termination decision, [6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget s regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S
Date: 2025.03.20 16:19:56 -04'00'

Michelle G. Bulls, on behalf of Andrea Culhane, Chief Grants Management Officer, National Library of Medicine
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

2

# Exhibit E



March 12, 2025

Carole Rhodes
University of Washington
carhodes   uw.edu

Dear Carol Rhodes :

Funding for Project Number 1G13LM014426-01  is hereby terminated pursuant to the 2024
National Institutes of Health ( NIH ) Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2).
This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on August
15, 2024, and  obligations generally should be determined by reference to the law in effect when
the grants were made. [3]

The 2024 Policy Statement  includes the terms and conditions of NIH grants and cooperative
agreements and is incorporated by reference in all NIH grant and cooperative agreement
awards.[4]  According to the Policy Statement,  NIH may    terminate the grant in whole or in
part as outlined in 2 CFR Part 200.340.[5]  At the time your grant was issued, 2 C.F.R. §
200.340(a)(2) permitted termination   [b]y the Federal awarding agency or pass-through entity, to
the greatest extent authorized by law, if an award no longer effectuates the program goals or
agency priorities.

This award no longer effectuates agency priorities. Research programs based primarily on
artificial and non-scientific categories, including amorphous equity objectives, are antithetical to
the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns
on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-
called diversity, equity, and inclusion ( DEI ) studies are often used to support unlawful
discrimination on the basis of race and other protected characteristics, which harms the health of
Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

Although  NIH generally will suspend (rather than immediately terminate) a grant and allow the
recipient an opportunity to take appropriate corrective action before NIH makes a termination

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

**Supp. App. 500**

decision, [6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget s regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle G.
Bulls -S

Digitally signed by
Michelle G. Bulls -S
Date: 2025.03.12 23:15:18
-04'00'

Michelle G. Bulls, on behalf Andrea Culhane, Chief Grants Management Officer, NLM
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

**Supp. App. 501**

# Exhibit F

UW-AOR on behalf of Tracking Grants.gov AOR emails via UW-AOR
uw-aor@u.washington.edu
[UW-AOR] Grant Termination Notification
Friday, March 21, 2025 9:38:52 AM
image001.jpg
image002.png
ATT00001.txt



3/21/2025

Rhodes, Carol
University Of Washington
uw-aor   u.washington.edu

Dear Rhodes, Carol:

Effective with the date of this letter, funding for Project Number 1R21AI183907-01A1 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ( NIH ) Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on 6/10/2024, and   obligations generally should be determined by reference to the law in effect when the grants were made.[3]

The 2024 Policy Statement  includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]   According to the Policy Statement,  NIH may    terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]   At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination  [b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

Although  NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget s regulations to  d

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,



Michelle G. Bulls, on behalf of Emily Linde, Chief Grants Management Officer, NIAID
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373

[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

[4] NIH Grants Policy Statement at IIA-1.

[5] *Id.* at IIA-155.

[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9]

*See* 45 C.F.R. § 75.374.

[10]
See 42 C.F.R. Part 50, Subpart D

[11]
11 *Id.* § 50.406(a)

[12]
12 *Id.* § 50.406(b)

# Exhibit G



March 20, 2025

Carol Rhodes
University of Washington
uw-aor  u.washington.edu


Dear Carol Rhodes:

Effective with the date of this letter, funding for Project Number 1R01 TW012904-01 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ( NIH ) Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on August 9, 2024, and  obligations generally should be determined by reference to the law in effect when the grants were made.  [3]

The 2024 Policy Statement  includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]  According to the Policy Statement,  NIH may  terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]  At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination  [b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ( DEI ) studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

**Supp. App. 507**

Although NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision, [6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget s regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]


Sincerely,

Michelle G. Bulls -S
Digitally signed by Michelle G. Bulls -S
Date: 2025.03.20 17:04:13 -04'00'

Michelle G. Bulls, on behalf of Bruce Butrum, Chief Grants Management Officer, Fogarty International Center
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[6] 2024 Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)

[9] *See* 45 C.F.R. § 75.374.

[10] See 42 C.F.R. Part 50, Subpart D

[11] 11 *Id.* § 50.406(a)

[12] 12 *Id.* § 50.406(b)

EXHIBIT 34

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS; et al.,

*Plaintiffs,*

v.

ROBERT F. KENNEDY, JR., et al.,

*Defendants.*

No. 1:25-cv-_____

## DECLARATION OF PETER G. BARR-GILLESPIE

I, Peter G. Barr-Gillespie, Ph.D, declare under the penalty of perjury pursuant to 28

U.S.C. § 1746 that the foregoing is true and correct:

1.      I am the Executive Vice President and Chief Research Officer of Oregon Health

& Science University ("OHSU"). In addition, I am a Professor with the OHSU Oregon Hearing

Research Center and an affiliated scientist with the Vollum Institute. I am familiar with the

information in the statements set forth below either through personal knowledge, in consultation

with the OHSU staff, or from documents that have been provided to and reviewed by me.

2.      I submit this Declaration in support of the States' Motion for Temporary

Restraining Order.

**Professional Background**

3.      I am the Executive Vice President and Chief Research Officer at OHSU, having

held that position or an equivalent one for seven and a half years. I am also a Professor in the

Department of Otolaryngology, and I have been running a research lab at OHSU since 1999.

Prior to that I was an Assistant, then Associate Professor in the Department of Physiology at

**Supp. App. 510**

Johns Hopkins University, where I was from 1993-1999. I received my postdoctoral training in neuroscience from Dr. James Hudspeth at the University of California San Francisco from 1988-1989 and at the University of Texas Southwestern Medical Center from 1989-1993. I earned a BA in chemistry from Reed College in 1981 and a PhD in pharmacology from the University of Washington in 1988.

4.      OHSU's statutory mission is to provide healthcare, education and conduct research that supports the people of the State of Oregon.

5.      OHSU houses a robust research program with approximately 1,415 faculty investigators and 262 postdoctoral scholars.

6.      I am providing this declaration to explain the impacts of NIH's delay and/or cancellation of study sections. NIH's abrupt cessation of NIH Advisory Council meetings in February 2025 has created a situation whereby grant proposals due for funding have remained unfunded. These are grants that had previously been evaluated by the relevant scientific peer-review committee or "study section" (also known as scientific review group, initial review group) and given a priority score (based on scientific merit) that traditionally is within a range that would result in the awarding of the grant funds.  These ranges are based on the recent history of similar grants funded by the same institute/center within NIH.

7.      The NIH meeting blockade severely impacts OHSU by cutting off funding to research faculty members, preventing their ability to continue to support their own salaries and those of the research staff in their labs. This funding shortfall will both lead to faculty layoffs and negatively impact OHSU's budget to support research.

**Reliance on NIH Funding**

2

Docusign Envelope ID: B983D609-F9FF-491A-B9CF-2B837D79360C

8.      In fiscal year 2024, OHSU received funding through the National Institutes of Health ("NIH") to support 784 projects, totaling $353.33 million.

9.      OHSU receives NIH grants across a variety of institutes encompassed within the NIH, including National Institute of Allergy & Infectious Diseases, National Institute on Aging, National Cancer Institute, National Heart, Lung, and Blood Institute, National Institute of Child Health and Human Development, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute on Drug Abuse, National Institute of Neurological Disorders and Stroke, National Eye Institute, National Institute of General Medical Science, National Human Genome Research Institute, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Mental Health, National Institute on Deafness and Other Communication Disorders, and the National Institute of Dental and Craniofacial Research, amongst others.

10.      Through those NIH grants, OHSU funds approximately 1,415 researchers.

11.      The work done by OHSU on NIH funded projects provides education and training in PhD-granting graduate programs in Behavioral Neuroscience, Biomedical Engineering, Biomedical Sciences, Clinical Psychology, and Neuroscience.

12.      OHSU provides considerable employment benefits in the Science, Technology, Engineering and Mathematics ("STEM") workforce to the OREGON economy.

13.      As an example of impact on OHSU infrastructure, we have submitted a C06 construction grant to the NIH to support construction of a Biosafety Level 3 (BSL-3) laboratory, but that project is on hold while the grant review has been postponed.

**Typical Timeline and Processes for NIH Grant Awards**

**Supp. App. 512**

Docusign Envelope ID: B983D699-F9EE-491A-B9CF-2BE37D793605

14.     The Office of Proposal & Award Management at OHSU works with researchers to submit grant applications and tracks grant applications and awards.

15.     Based on my work as Professor and Chief Research Officer, I have an understanding of the NIH grant process based on my 25 years in those roles.

16.     NIH grant applications are typically submitted via NIH's online portal, often in response to a Notice of Funding Opportunity ("NOFO").  From there, they are assigned to a "study section" where the grant application is subjected to peer review and judged on its scientific merit.  The grant application is then given a score.  If the grant receives what is called a "fundable score," there is a high probability that the grant will be funded.

17.     What constitutes a fundable score is dependent on several factors as every institute, sometimes referred to as an "IC," is different. Some publish paylines, meaning the percentiles of grants they will fund, and some do not. Paylines range from 8-20%. Most of the standing study sections result in an impact score and percentile for each proposal, but many others (special emphasis and non-CSR) will only result in an impact score, but not percentile. Program officers have latitude to recommend proposals with higher scores/percentiles in order to balance portfolios and meet specific directives. Generally, researchers would consider a percentile less than 10% as guaranteed to receive funding

18.     After the study section, the grant application is sent to an "advisory council" where the ultimate decision on whether or not to fund the grant is made.  After the advisory council meets, a Notice of Award is issued confirming whether or not the grant will be funded.

19.     The process for competitive renewals is very similar, but it is even more likely for a grant that has been funded in the past to be renewed.

**Supp. App. 513**

20.     The budget process at OHSU relies upon the NIH grant application, review, and approval cycle.  Historically, we have relied on grants being reviewed and scored within six months of submission.

21.     Once a grant receives a score, OHSU is able to consider whether to include the funding coming from that grant as part of its budget for the coming year.

## Delays and Irregularities in the Processing of NIH Grant Applications

22.     Since late January 2025, OHSU has seen an unusual number of delays in the processing of NIH grant applications.  Researchers have had their grant application study sections and advisory councils be canceled or otherwise not scheduled, and grant application scoring has been significantly delayed.

23.     OHSU has not received formal notice of changes for many of these grants.  For others, OHSU has gotten only a notification that proposals are "paused" or "under review."

24.     As of March 31, 2025, OHSU has approximately 280 proposals totaling $731.6 million awaiting NIH study section review.

25.     As of March 31, 2025, OHSU has 70 proposals totaling $172.4 million that received fundable scores, awaiting NIH advisory council and Notice of Award.

26.     As of March 31, 2025, OHSU has 90 proposals totaling $194.9 million that received possibly fundable scores, awaiting NIH advisory council and Notice of Award.

## Terminations of NIH Grants

27.     Since March 24, 2025, OHSU has received a notice of termination of one NIH grant awarded directly to OHSU, as well as seven subawards issued from other institutions which had their NIH award terminated. We have received multiple notifications from NIH that additional terminations are imminent.

**Supp. App. 514**

28.     The notice of termination received as of March 24, 2025 is attached hereto as Exhibit A.  The overall goal of this project is to utilize the nonhuman primate model to identify the mechanisms responsible for the metabolic disorders associated with long COVID. The termination states, "The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

29.     The notice of termination for one of the subawards involved an antiviral drug discovery project.

30.     These terminations will result in the loss of $2.4 million in research money to OHSU.

31.     The termination notices for these grants have provided very little to explain the termination, instead noting that the research no longer "effectuates agency priorities."  In my 25 years working at OHSU, I have not seen this language previously used to cancel grants.

32.     The termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities.  However, prior to receipt of the termination, OHSU had not been given notice of any opportunity to submit any "corrected" grant materials to align with agency priorities.  Nor was OHSU provided with any updated "agency priorities" with which its research must align.

**Comparisons Across Administrations**

33.     In prior years, under both Democratic and Republican administrations, our institution never experienced this volume of unexplained delays or procedural breakdowns.

34.     Renewals were routine and predictable. This year, even long-standing, high-performing programs are in limbo and renewals have been delayed.

6

**Supp. App. 515**

35.     Terminations were exceedingly rare and followed due process. The current approach is without precedent in our experience.

**Impact on Institutional Operations.**

36.     These delays have forced us to implement bridge funding for dozens of faculty, drawing from limited discretionary resources.  As of April 1, 2025, OHSU has implemented bridge funding of approximately $1 million during the FY25 fiscal year.  This prevents the use of these funds for any other purpose, including other planned improvements to our programs and research.

37.     We have paused start-up funding for new hires whose research programs depend on timely NIH awards.  This includes several new hires we had provided offer letters to and for whom OHSU had taken steps to prepare for their arrival.

**Admissions, Training and Workforce Disruptions**

38.     OHSU uses information regarding NIH grant applications and award rates to inform its admissions process, particularly at the graduate student level.

39.     NIH training grants, including T32 and F31 mechanisms, have been affected by review and award delays.  These training grants are designed to provide resources to institutions so they can train individuals in certain shortage areas (T32 grants), as well as support through predoctoral dissertation research (F31 grants).

40.     We have international postdocs whose visa status is now at risk due to pending NIH awards that were expected to renew this spring.

41.     This instability is affecting the recruitment and retention of quality research trainees.  The inability to retain quality research trainees will have continuing effects on the

**Supp. App. 516**

research capabilities of OHSU, including by limiting the individuals qualified to conduct certain research.

**Concerns About FY25 Funds Being Obligated**

42.   We are increasingly concerned that NIH will not be able to process and obligate FY25 funds by the end of the fiscal year in September.

43.   Several proposals from our institution remain stuck at preliminary review stages, with no indication that the required advisory reviews or notices of award will occur in time.

44.   Our research administration staff have received informal feedback from NIH indicating that certain topic areas are being slowed due to "heightened scrutiny" or "internal concerns."

**Irreparable Harm**

45.   The delays have disrupted ongoing research, as well as setting back OHSU for research going forward.  Funding gaps have forced researchers to abandon studies, miss deadlines, or lose key personnel.  This is in spite of the interim funding measures being taken by OHSU to keep certain research going.  OHSU has had to consider which of these valuable programs to continue with these limited funds.

46.   Some of these studies involve the use of animal test subjects, all of which would need to be euthanized due to loss of funding.

47.   Some of these studies had the potential to achieve breakthroughs in many different disciplines, which would have advanced public health, and which will now not occur.

48.   Delays have also disrupted community services, student opportunities, and public programs.

8

**Supp. App. 517**

Docusign Envelope ID: B983D699-E9FF-491A-B9CF-2B937D793C0C

49.    In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

**<u>Conclusion</u>**

50.    The breakdown in NIH processes is affecting institutional operations, planning, and public health partnerships.  Terminations and delays with no explanation or remedy are undermining confidence in the system.  These harms are ongoing and, in many instances, irreparable.



Peter G. Barr-Gillespie, Ph.D,

Date:    4/3/2025

9

# EXHIBIT A

## Kellie Guentert

| | |
|---|---|
| **Subject:** | FW: Grant Termination Notification |
| **Attachments:** | 1015566-002_Roberts_3R01DK122843-05S1-APRC01318_50224 (2).pdf |

---

Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>
Monday, March 24, 2025 12:52 PM
Jason Jaworski <jaworski@ohsu.edu>
    [EXTERNAL] Grant Termination Notification

 

3/24/2025

Jaworski, Jason N
Oregon Health & Science University
jaworski@ohsu.edu


Dear Jaworski, Jason N:

Effective with the date of this letter, funding for Project Number 3R01DK122843-05S1 is hereby terminated pursuant to the Fiscal Year 2023 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The 2023 Policy Statement applies to your project because NIH approved your grant on 7/1/2023, and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2023 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

Michelle
G. Bulls -S

Digitally signed
by Michelle G.
Bulls -S

Michelle G. Bulls, on behalf of Dee Doherty, Chief Grants Management Officer, NIDDK
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] NIH Grants Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] NIH Grants Policy Statement at IIA-156.

[7] *See* 2 C.F.R. § 200.343 (2024).
[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

# EXHIBIT 36

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS; et al.,

*Plaintiffs,*

v.

No. 1:25-cv-_____

ROBERT F. KENNEDY, JR., et al.,

*Defendants.*

## <u>DECLARATION OF THERESA A. MALDONADO</u>

I, Theresa A. Maldonado, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.      I am the system-wide Vice President for Research & Innovation at the University of California (UC), Office of the President. I am familiar with the information in the statements set forth below either through personal knowledge, in consultation with UC staff, or from documents that have been provided to and reviewed by me.

2.      I submit this Declaration in support of the States' Motion for Temporary Restraining Order.

## <u>Professional Background</u>

3.      I have served as the Vice President for Research & Innovation at UC since 2020. In addition to my current role, I have a Ph.D. in electrical engineering and over 30 years' academic experience.   As Vice President for Research & Innovation, I lead UC researchers and administrators in research policy, funding for systemwide programs, and the innovation and entrepreneurship ecosystem. We work to build UC-wide partnerships, help shape effective

1

**Supp. App. 524**

policies and provide a strong voice nationally for research and innovation on behalf of UC. As the systemwide leader for research and innovation, I work very closely with the Vice Chancellors for Research from each UC campus, and I am in regular contact with them to identify any issues impacting UC systemwide research, including concerns related to research funding.

**UC and Its Research Mission.**

4.     The University of California ("UC") has 10 research-intensive campuses, 21 health professional sciences schools, five NCI-designated cancer centers, and six academic medical centers are widely recognized as among the best in the nation. They are international leaders in the education of health professionals, in research that develops new cures and treatments, and in public service that provides healthcare for all Californians regardless of ability to pay. The University of California is one of the nation's leading research institutions, with almost 9% of all U.S. academic research being conducted by UC researchers. Biomedical advancements at UC include the first radiation treatment for cancer, research contributing to the first flu vaccine, the discovery of the role of LDL and HDL cholesterol in heart disease, the invention of modern gene editing, and much more.

5.     Every year, UC and its researchers submit thousands of grant applications for review, approval, and funding by the NIH. As world leading researchers, more than 1,000 UC faculty members serve annually on numerous NIH study sections and advisory councils to assess grant applications for scientific and technical merit. NIH contract and grant funding support many of the clinical trial studies at UC's six medical centers.

6.     The research mission at UC includes, but is not limited to, allocated funding for staffing, clinical trials, dissemination of results, public outreach, teaching and training students

**Supp. App. 525**

Docusign Envelope ID: FE42G3GE-FE35-40DD-9677-395E2P5P0F9A

and others, equipment, and numerous other activities to fulfill the research mission and serve the people of California and the United States.

**Reliance on NIH Funding**

7.      In fiscal year 2024, UC was awarded over $2 billion through the National Institutes of Health ("NIH") to support more than 5000 research projects.

8.      The work done by UC's research-intensive campuses, academic medical centers, and health professional sciences schools on NIH funded projects provides education and training in Biomedical Engineering, Chemical Engineering, Civil Engineering, Electrical Engineering, Mechanical Engineering, Agriculture, Biology, Public Health and Health Sciences, Mathematics, Chemistry, Psychology, and other programs.

9.      UC's campuses, academic medical centers, health professional schools, cancer centers and the laboratories it manages and operates provide considerable employment benefits in the Science, Technology, Engineering, Mathematics, and Medicine ("STEMM") workforce to the California economy.  UC estimates that NIH funding supports thousands of employees at its medical centers and campuses, including clinical and professional staff, post-doctoral and graduate student researchers, laboratory technicians, and engineers.

**Typical Process for NIH Grant Awards**

10.      The Sponsored Projects Office at each UC location works with researchers to submit grant applications and tracks grant applications and awards.  NIH grant applications are typically submitted via NIH's online portal, often in response to a Notice of Funding Opportunity ("NOFO").  From there, they are assigned to a "study section" where the grant application is subjected to peer review and judged on its scientific merit.  The grant application is

**Supp. App. 526**

then given a score. If the grant receives what is called a "fundable score," there is a high probability that the grant will be funded.

11.     After the study section, the grant application is sent to an "advisory council" where the ultimate decision on whether to recommend a grant for funding is made. After the advisory council meets, the relevant institute's Director typically approves the recommended grants, and a Notice of Award is promptly issued confirming the grant will be funded.

12.     The budget process at UC research institutions relies, in part, upon the NIH grant application, review, and approval cycle.

**Delays and Irregularities in the Processing of NIH Grant Applications**

13.     Since late January 2025, UC has seen an unusual number of delays in the processing of NIH grant applications. Researchers have had their grant application study sections and advisory councils canceled or not scheduled, and grant application scoring has been significantly delayed.

14.     The estimated value of just the NIH grant proposals that have been submitted for review by the five UC Health Centers as of December 31, 2024, and that have not yet been acted upon is approximately $563 million. Grant applications awaiting study sections before July 1, 2025, had an annual value of approximately $312 million, while grant applications awaiting NIH advisory councils and Notices of Awards amounted to approximately $251 million in annualized value.

15.     UC has not received formal notices of awards for many of these grant proposals. For others, UC has only received a notification that proposals are "paused" or "under review."

**Supp. App. 527**

**Terminations of NIH Grants.**

16.     Since February 20, 2025, UC's research institutions have had at least thirty-one NIH grants terminated, amounting to over $37 million.  Among these was a grant for over $50 million in funding for a UC Davis research project investigating the biological risk factors for dementia among target populations with early signs of cognitive dysfunction, including white, Hispanic, and black participants that had already enrolled over 1,700 participants, and a grant to UCSF for a project studying the effectiveness and adverse consequences of a vaccine for shingles, a disease that one in three Americans are likely to develop in their lifetimes.

17.     The termination notices for these grants typically state that the "award no longer effectuates agency priorities."  In my time at UC, to the best of my knowledge, NIH grants have not generally been terminated on this basis.

18.     Many of the termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities.  However, prior to receipt of the termination, most UC Principal Investigators were not given notice of any opportunity to submit "corrected" grant materials to align with agency priorities.

**Impacts of Funding Delays and Grant Terminations**.

19.     The delays in funding decisions and evaluation of grant applications as well as the grant terminations have already caused numerous and critical harms to UC.

20.     The delays and terminations have disrupted ongoing research, as well as setting back significant UC research projects.  Funding gaps have forced researchers to abandon important research studies and terminate key personnel.  Some of these studies involve clinical trials of medications or procedures, and terminations will delay UC's ability to identify and

Docusign Envelope ID: FE42C3CF-EE35-40DB-8677-395E3D5D0F9A

deliver life-changing care for patients suffering from diseases such as Alzheimer's disease, Type 2 Diabetes, and HIV.

21.     Once canceled, much research cannot immediately resume.  Many of these projects entail longitudinal studies.  When scientific studies stop in full swing, their partial results often lose validity.  Without funding, labs languish, and specimens spoil.  And once laid off, people with project-specific knowledge and experience may not return.

22.     The UC system has instituted a system-wide hiring freeze on new faculty and staff. Top-ranked departments across UC campuses in chemistry, biology, public health, and more have reduced their graduate student classes. UC departments have had to consider rescinding offers of funding to some students admitted to doctoral programs. To the extent possible, UC has arranged for emergency funding to cushion the impact of interrupted federal funding and maintain salary support for affected graduate students and trainees. This relief is aimed at bridging those personnel to give them time to complete their graduate programs or to secure other funding or employment.

23.     These funds are being diverted from other important needs, such as deferred maintenance and strategic investments. Without expected grant funds, UC will be challenged in meeting the expenses associated with overseeing research facilities which make these significant research projects possible and economically viable.

24.     The delays in funding and terminations also have harmed the UC's educational and research mission. Doctoral students, postdoctoral researchers, faculty, and staff from around the world collaborate with or come to California to join the UC research enterprise. Future recruitment of these young scientists and researchers will be negatively impacted by diminished funding and arbitrary terminations aimed at international collaboration and research projects.

**Supp. App. 529**

Further, terminations have specifically impacted the communities that come to UC for clinical trials and other community health interventions. Midstream terminations of long-term projects meant to reduce health disparities in projects like maternal mortality, the spread of HIV/AIDS, and services to other underserved communities directly undermines the trust necessary to convince individuals to participate in UC research projects.

April 3, 2025

DocuSigned by:

*Theresa A. Maldonado*

537FE74B2CD94F8...

THERESA A. MALDONADO

**Supp. App. 530**

# EXHIBIT 45

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, et al.

        Plaintiffs,

     v.

ROBERT F. KENNEDY, JR., et al.,

    Defendants.

Civil Action No. 1:25-cv-10814

## <u>DECLARATION OF DENISE BARTON</u>

I, Denise Barton, declare as follows:

1.  I am a resident of the Commonwealth of Massachusetts. I am over the age of 18. I have been
    an attorney since 1994 and am licensed to practice in the Commonwealth of Massachusetts.
    If called as a witness, I could and would testify competently to the matters set forth below.

2.  I am currently employed by the University of Massachusetts, in its Office of the General
    Counsel, as its Chief Deputy General Counsel.

3.  As Chief Deputy General Counsel for the University of Massachusetts, I have personal
    knowledge of the matters set forth below or have knowledge of the matters based on my
    review of information and records provided to me by University of Massachusetts employees
    and believe that information to be true.

4.  The University of Massachusetts includes its five campuses (the University of Massachusetts
    Amherst, the University of Massachusetts Boston, the University of Massachusetts Chan
    Medical School, the University of Massachusetts Dartmouth, and the University of
    Massachusetts Lowell), as well as the University of Massachusetts Office of the President.

1

**Supp. App. 532**

*See* M.G.L. c. 75. The University of Massachusetts maintains business records in the ordinary course of University of Massachusetts business which include, *inter alia*, records concerning grant proposals submitted to and funding received from the National Institutes of Health ("NIH") by the University of Massachusetts.

5. I am providing this supplemental declaration in furtherance of my declaration (Dkt. 12-12, filed in this matter on April 4, 2025) to explain the mounting irreparable harmful impacts of NIH's abrupt and ill-supported cancellation of certain grants to the University of Massachusetts as well as the impacts of NIH's delay in evaluating applications for future grants, delay in funding projects that have passed peer review, and denial of grant applications without consideration of scientific merit.

6. The University of Massachusetts does not have available funds to replace the funds that NIH already committed to provide to it (as to the grants that were already awarded but which NIH abruptly terminated) nor does the University of Massachusetts have the funds necessary to proceed forward with paying for the costs (such as those for laboratory equipment and supplies, faculty salaries and fringe costs, and graduate student stipends and related funding) associated with the grants with fundable scores (see Dkt 12-12) for which NIH should already have finalized, or be close to finalizing, funding awards.

7. The University of Massachusetts cannot fund all of the costs associated with grants that NIH has terminated or delayed while this litigation proceeds and, as NIH continues to terminate and/or delay grant funding, the universe of the harm NIH is causing continues to expand, making it impossible to even calculate how much emergency funding would be required.

8. While the University of Massachusetts and its researchers are diligently endeavoring to identify alternative funding sources, given the nationwide impact of NIH's arbitrary and

**Supp. App. 533**

abrupt action, all institutions and their researchers are seeking funds from the same finite

potential replacement sources simultaneously and, as a result, it is a certainty that alternative

external funding sources will be insufficient at best and wholly unavailable at worst.

9.  Put plainly, the minimal emergency funding that the University of Massachusetts can provide

to try to ameliorate a fraction of the harm caused by NIH's termination and delay of grant

funding is at best, a glide path to different (but as yet unsecured) funding support for the

same project, a switch to a different project or, in the worst case, a complete shutdown of the

project.  Cessation of work caused by NIH's conduct includes, but is not limited to, the

termination of all of the work associated with the project, termination of the uniquely

talented researchers who perform that work, and recission of students' admission to the

programs of study that perform this work: in sum, NIH's conduct has caused and will

continue to cause if left unchecked deep and irreparable harm to the students who have

worked hard their entire academic careers to be admitted to these programs of study, the

researchers who have completed those academic programs and are now devoted to the

furtherance of not only the work but to the education of students in the work, and to the

benefits the work will provide to the Commonwealth and, in many cases, all corners of the

globe.

10. For example, because of NIH's arbitrary termination of some grants and its unexplained

rolling blockade causing delay, at best, in the well-established approval process of other

grants, as detailed in Dkt. 12-12, and because there are no other funds budgeted or available

for expenses associated with these terminated and delayed grants, the University of

Massachusetts Chan Medical School ("UMass Chan Medical School") has been forced to:

    a.      Terminate and/or furlough 209 employees;

**Supp. App. 534**

      b.  Cut the Fall 2025 incoming graduate student class size from 70 students to just 10 students;

      c.  Freeze all faculty and staff hiring; and

      d.  Stop other discretionary funding.

11. With the limited emergency funds that UMass Chan Medical School has been able to re-allocate, it has made a decision that it will use those funds to pay the stipends of current graduate students and post-baccalaureate scholars for the remainder of FY25 (through June 30, 2025).

12. UMass Chan Medical School does not have emergency funds to pay the costs associated with the grants NIH abruptly terminated nor does UMass Chan have emergency funds to pay the costs associated with the grant awards that NIH has improperly and arbitrarily delayed.

13. The University of Massachusetts Amherst ("UMass Amherst") does not have the funds to replace the financial deficit caused solely by NIH's arbitrary termination of some grants and rolling blockade of other grants, as detailed in Dkt. 12-12.

14. As circumstances currently stand, UMass Amherst will use its available emergency funds, currently projected to last through August 31, 2025, to support students, staff, and research faculty (whose salary is derived entirely from grants) so that they do not immediately have to be terminated. UMass Amherst also currently intends to use available emergency funding to support certain critical costs to preserve valuable research materials and/or pay for supplies to complete in-progress experiments through August 31, 2025.

15. To do this, UMass Amherst has been forced to reduce graduate admissions via rescission of funding offers to the human beings who had been accepted into various graduate programs. UMass Amherst has reduced graduate offers of admission to doctoral programs by 27%

**Supp. App. 535**

for Fall 2025, and has rescinded funding offers from 100 accepted applicants. The reductions in offers of admission are largest in programs that rely significantly on NIH support, as set forth in the below table:

| School/College & Program | Fall 2025 PhD Offers of Admission | Fall 2024 PhD Offers of Admission | Percentage Change |
|---|---|---|---|
| College of Engineering | 112 | 160 | -30% |
| College of Natural Sciences | 283 | 405 | -30% |
| Manning College of Information and Computer Sciences | 84 | 147 | -43% |
| School of Public Health & Health Sciences | 31 | 62 | -50% |
| Campus wide PhD Offers of Admission | 805 | 1099 | -27% |

16. In sum, UMass Amherst will use the emergency funding it has available to give those impacted by NIH's abrupt actions time to either finish up a degree, find a new project, or secure a new (or delayed) source of funding but, to do so, it has had to significantly reduce the number of incoming students.

17. NIH continues to worsen the depth and breadth of irreparable harm to the University of Massachusetts, its researchers, its faculty, its students, the Commonwealth, and the forward progress of scientific knowledge.

18. For example, in addition to the exemplars set forth in Dkt. 12-12, NIH cancelled NIH AG077672-04S1 on April 7, 2025, a diversity supplemental award to UMass Amherst entitled "Deciphering the Molecular Features Underlying LRP1-Mediated Tau Spread (Parent Grant)" stating, "The Diversity Supplement program is no longer supported by NIH/HHS priorities."

**Supp. App. 536**

19. Also by way of example, since submission of the original declaration (Dkt. 12-12), NIH has sent "program cancellation notifications" to UMass Chan Medical School on the following:

    a.  1F31GM157877-01: "Engineering bacterial group I introns for efficient production of safe and durable nucleoside-modified circular mRNA therapeutics."

    b.  2T32GM135751-06: "IMSD at the University of Massachusetts Chan Medical School."

    c.  5R25GM121220-08: "Pathway to graduate study post-baccalaureate training program."

20. Since submission of the original declaration (Dkt. 12-12) UMass Chan Medical School has received information that NIH will be cancelling the following grants:

    a.  Subaward from Harvard School of Public Health: IMPAcTB 75N93019C00071: On April 5, 2025, UMass Chan Medical School was notified by Harvard School of Public Health that the award was under review and likely to be cancelled by NIH.

    b.  On April 10, 2025, UMass Chan Medical School received a notification from the University of Alabama that their program, on which UMass Chan Medical School is a subawardee, is being cancelled by NIH.

    c.  5R01MD019235-02 "TANGO Program" cancellation notice received on April 3, 2025 at 4:04 p.m. by the University of Alabama at Birmingham from NIH which stated: "I am writing to inform you of an important update regarding funding for the TANGO project. As of April 1, 2025, the National Institutes of Health (NIH) will no longer be providing funding

6

**Supp. App. 537**

for this initiative. Consequently, enrollment activities at the University of Massachusetts (UMass) and Brigham and Women's Hospital (BWH) will need to cease effective immediately. Given this update, we will be cancelling the TANGO Investigators meeting tomorrow."

21. In addition, a UMass Chan Medical School senior faculty member and administrator was scheduled to chair an ad hoc study section for the National Heart Lung and Blood Institute ("NHLBI") of NIH on April 23, 2025 for the National Gene Vector Biorepository ("NGVB"), which is an NHLBI funded core supporting the NHLBI's gene therapy portfolio. Like any other NIH grant, this matter is subject to the process of peer review, study section, and advisory council as described in the original declaration (Dkt. 12-12). On April 9, 2025, NIH held the "pre-review orientation" and there was no mention of any delay. Then, on April 10, 2025, NIH sent an email stating, "I have received information that we may need to pause the NGVB review. Please pause your reviewing activities until I receive further guidance." As of April 14, 2025, NIH has sent no follow-up communication regarding this study section.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on April 14, 2025, at Westborough, Massachusetts.

/s/ *Denise Barton*
Denise Barton
Chief Deputy General Counsel
University of Massachusetts, Office of the General Counsel
50 Washington Street
Westborough, MA 01581

**Supp. App. 538**

EXHIBIT 59

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS; et al.,

                    *Plaintiffs,*

    v.

ROBERT F. KENNEDY, JR., et al.,

                    *Defendants.*

No. 1:25-cv-10814-BEM

_____

### Declaration of Vice President Anshuman Razdan, Ph.D.

I, Anshuman Razdan, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.      I am the Vice President for Research and Innovation of The University of Oregon. I have personal knowledge of the facts set forth in this declaration, and if required to testify, would and could competently do so.  I submit this Declaration in support of the States' Motion for Preliminary Injunction.

**Professional Background**

2.       I am the Vice President for Research and Innovation at the University of Oregon ("UO") in Eugene, Oregon.  I have held that position since July 1, 2022, and I also hold a tenured full professor position in the Department of Computer Information Science at UO. Previously, I was the Associate Vice President for Research at the University of Delaware (2016 – 2022) and held faculty and administrative positions at Arizona State University (1996 – 2016).

1

**Supp. App. 540**

3.      UO's statutory mission is to strive for excellence in education, research, clinical practice, scholarship and community service while maintaining compassion, personal, and institutional integrity and leadership in carrying out its missions.

4.      The University of Oregon has two campuses, one in Eugene and one in Portland, with over 24,000 enrolled students, which employs roughly 1,000 people on federal research projects.  UO has over 200 employees that support the research enterprise.  I am providing this declaration to explain the impacts of NIH's delay and/or cancellation of study sections. NIH's abrupt cessation of NIH Advisory Council meetings in February 2025 has created a situation whereby grant proposals due for funding have remained unfunded indefinitely. These are grants that had previously been evaluated by the relevant scientific peer-review committee or "study section" (also known as scientific review group, initial review group) and given a priority score (based on scientific merit) that traditionally is within a range that would result in the awarding of the grant funds.  These ranges are based on the recent history of similar grants funded by the same institute/center within NIH.

5.      The NIH meeting blockade severely impacts the University of Oregon by delaying and terminating funding that is vital to the University's mission, particularly the focus on excellence in education and research. Due to the blockade, we are having to pause research hires and faculty are waitlisting graduate students, depriving those students of exposure and training in research.

**Reliance on NIH Funding**

6.      In fiscal year 2024, the University of Oregon expended $54 million of funding through the National Institutes of Health ("NIH") to support over 250 projects.

**Supp. App. 541**

7.      The University of Oregon receives NIH grants across a variety of institutes encompassed within the NIH, including, National Human Genome Research Institute (NHGRI), National Institute of Allergy and Infectious Diseases (NIAID), National Institute of Arthritis and Musculoskeletal and Skin Diseases (NIAMS), National Institute of Child Health and Human Development (NICHD), National Institute of General Medical Sciences (NIGMS), National Institute of Neurological Disorders and Stroke (NINDS), National Institute of Mental Health (NIMH), National Cancer Institute (NCI), National Institute on Aging (NIA), National Institute on Drug Abuse (NIDA), National Institute on Deafness and Other Communication Disorders (NIDCD), National Institute of Neurological Disorders and Stroke (NINDS), National Center for Advancing Translational Sciences (NCATS), National Institute of Biomedical Imaging and Bioengineering (NIBIB), and National Eye Institute (NEI).

8.      Through those NIH grants, UO funds approximately 150 researchers and supports approximately 100 graduate students.

9.      The work done by the University of Oregon on NIH funded projects provides education and training in fundamental life sciences, biomedical research, behavioral health and biomedical engineering. NIH-funded investigators at the University of Oregon have a demonstrated track record of high impact publication and dissemination of discoveries enabled by active NIH grants, as well as significant community partnerships with schools, mental and community health agencies, and medical schools. The University of Oregon provides considerable employment benefits in the Science, Technology, Engineering and Mathematics ("STEM") workforce to the Oregon economy, both through direct employment of researchers, but also contributions to new small business growth and associated jobs through spinout companies emerging from innovations at the University.

Supp. App. 542

**Typical Timeline and Processes for NIH Grant Awards**

10.     The Sponsored Projects Services office at the University of Oregon works with researchers to submit grant applications and tracks grant applications and awards.

11.     Based on my work as Vice President for Research and Innovation, I have an understanding of the NIH grant process based on my three years in the role. Further, I have been a researcher and held other research-focused administrative positions which provides me with almost 30 years of experience with NIH processes.

12.     NIH grant applications are typically submitted via NIH's online portal, often in response to a Notice of Funding Opportunity ("NOFO"). From there, they are assigned to a "study section" where the grant application is subjected to peer review and judged on its scientific merit. The grant application is then given a score. If the grant receives what is called a "fundable score," there is a high probability that the grant will be funded.

13.     What constitutes a fundable score is dependent on several factors, as every institute, sometimes referred to as an "IC," is different. Some publish paylines, meaning the percentiles of grants they will fund, and some do not. Paylines range from 8-20%. Most of the standing study sections result in an impact score and percentile for each proposal, but many others (special emphasis and non-CSR) will only result in an impact score, but not percentile. Program officers have latitude to recommend proposals with higher scores/percentiles in order to balance portfolios and meet specific directives. Generally, researchers would consider a percentile less than 10% as guaranteed to receive funding. In addition, competitive proposals submitted by Early-Stage Investigators are prioritized, so may be considered for funding even if outside the typical payline or impact score given the NIH's desire to support early career scholars. After the study section, the grant application is sent to an "advisory council" where the

4

**Supp. App. 543**

ultimate decision on whether to fund the grant is made.  After the advisory council meets, a Notice of Award is issued confirming whether or not the grant will be funded.

14.     The process for competitive renewals is very similar, but it is even more consistent for a grant that has been funded in the past to be renewed.

15.     The budget process at University of Oregon relies upon the NIH grant application, review, and approval cycle.  Historically, we have relied on grants being reviewed and scored within nine months of submission.

16.     Once a grant receives a score, faculty at University of Oregon are able to consider whether the grant will likely be able to fund the students and staff in their lab.  Additionally, the University of Oregon will use the negotiated reimbursement for "indirect costs" associated with the likely award as part of the budget to support the research infrastructure.

**Delays and Irregularities in the Processing of NIH Grant Applications**

17.     Since late January 2025, the University of Oregon has seen an unusual number of delays in the processing of NIH grant applications.  Researchers have had their grant application study sections and advisory councils canceled or otherwise not scheduled, and grant application scoring has been significantly delayed. Advisory councils were cancelled and have not been rescheduled until late April, May, and June. The University of Oregon has not received formal notice of changes for the majority of these grants.  For others, UO has gotten only a notification that proposals are "paused" or "under review."

18.     As of April 10, 2025, the University of Oregon has 12 proposals totaling $36,562,025 that received fundable scores, awaiting NIH advisory council and Notice of Award.

**Terminations of NIH Grants**

19.     As of April 11, 2025, the University of Oregon has had six NIH grants terminated.

**Supp. App. 544**

20. These terminations will result in the loss of approximately $2.7 million in research money to UO.

21. The termination notices for these grants have provided very little to explain the termination, instead noting that the research no longer "effectuates agency priorities." In my almost ten years working at UO and University of Delaware, I have not seen this language previously used to cancel grants.

22. The termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities. However, prior to receipt of the termination, the University of Oregon had not been given notice of any opportunity to submit any "corrected" grant materials to align with agency priorities. Nor was the University of Oregon provided with any updated "agency priorities" with which its research must align.

23. As of April 11th, we have received 8 termination notices, of which 6 are still in effect: A) Two termination notices were received for graduate fellowships funded via the Ruth L. Kirschstein National Research Service Award (NRSA) Individual Predoctoral Fellowship to Promote Diversity in Health-Related Research. These fellowships are designed to provide funding for research education and mentorship and facilitate the success of future NIH independent researchers. The project titles for these grants are "The Development of Novel Anion Receptors for Reactive Sulfur, Oxygen, and Nitrogen Species" and "Fibroblast-lineage cell state transitions during zebrafish fin regeneration." No other active F31 NRSA awards at UO received termination notices. B) A termination notice was received for the UO PREP Program, funded via the Postbaccalaureate Research Education Program (R25) mechanism. The intent of this program is to empower postbaccalaureate students to achieve their academic and professional goals by using a multifaceted, mentored educational framework that allows students

**Supp. App. 545**

to build and develop core competencies in experimental knowledge and inquiry, professional

skills, and scientific identity. C) A termination notice was received for an award made via the

Mentored Clinical Scientist Research Career Development Award mechanism (K08). The

project, "Predicting acute and dynamic suicide risk in rural sexual minorities," aims to reduce

current significant disparities in suicidal thoughts and behaviors among rural sexual minorities,

who experience a disproportionate burden of suicidal thoughts and behaviors, often reside in

high-stigma environments, and have limited access to healthcare resources. D) A termination

notice was received for a subaward at the UO for an R01 NIH grant to the Center for Innovative

Public Health Research for, "Transcendent Health - Adapting an LGB+ inclusive teen pregnancy

prevention program for transgender boys." This study is designed to develop a text message

program to prevent pregnancy in adolescent transgender boys and other gender diverse youth

assigned female at birth across the United States. E) a termination notice was received for a

diversity supplement on a R01, titled "Computational roles of inhibition in human action

control." This supplement provided support for a graduate student to work on the project which

characterizes physiological and neurochemical contributions to the neural computations

underlying human motor behavior and understands how disease-related disruption of these

mechanisms contributes to motor impairments.

## Comparisons Across Administrations

24.    In prior years, under both Democratic and Republican administrations, our

institution never experienced this volume of unexplained delays or procedural breakdowns.

25.    Renewals were routine and predictable. This year, even long-standing, high-

performing programs are in limbo.

**Supp. App. 546**

26. Terminations were exceedingly rare and followed due process. The current approach is without precedent in our experience.

**Impact on Institutional Operations**

27. UO does not have an available endowment or other sources of funds to provide significant bridge funding for the researchers impacted by funding delays and terminations. This will result in smaller research labs of associate faculty and prevent career development and growth of young faculty. Any bridge funding support that UO is able to provide to researchers will prevent the use of these funds for any other purpose, including other planned improvements to our programs and research.

28. We have paused start-up funding for new hires whose research programs depend on timely NIH awards. This includes several new hires we had provided offer letters to and for whom the University of Oregon had taken steps to prepare for their arrival.

**Effect on Public-Facing or State-Supported Programs**

29. Our institution operates multiple programs funded by NIH that directly partner with and/or generate data that is directly used by K-12 schools, community health agencies, mental health clinics, and other public-facing initiatives, primarily in the state of Oregon (although faculty have partners across the country). For example, one pending P50 grant (that was submitted in May 2024, reviewed with a fundable score, and should have been considered for funding at a council in January 2025) seeks to increase scientific understanding, public awareness, and delivery of effective school-based interventions that prevent and reduce mental health distress during early adolescence.

**Admissions, Training and Workforce Disruptions**

8

30.     UO uses information regarding NIH grant applications and award rates to inform its admissions process, particularly at the graduate student level.

31.     This 2025 admission year, UO's Division of Graduate Studies has rescinded 55 not-yet-accepted offers of admission and funding to doctoral applicants in chemistry and biology; the University would primarily use NIH money to fund these students. This number is expected to rise as the current administration cuts more federal funding. Despite a 17.5% increase in submitted graduate program applications (master's and doctoral), the number of doctoral admissions offers at UO has decreased by approximately 50%.

32.     NIH training grants, including T32 and F31 mechanisms, have been affected by review and award delays.  These training grants are designed to provide resources to institutions so they can train individuals in certain shortage areas (T32 grants), as well as support through predoctoral dissertation research (F31 grants). The University of Oregon currently has two T32 proposals that, under typical timelines prior to January 2025, should have progressed to study section or advisory council. These awards fund several graduate positions. Thus, the delay in funding or award impacts the number of graduate positions participating departments can feasibly recruit for.

33.     This instability is affecting the recruitment and retention of quality research trainees.  The inability to retain quality research trainees will have continuing effects on the research capabilities of the University of Oregon, including by limiting the individuals qualified to conduct certain research.

**Concerns About FY25 Funds Being Obligated**

34.     We are increasingly concerned that NIH will not be able to process and obligate FY25 funds by the end of the fiscal year in September.

**Supp. App. 548**

35.     Several major proposals from our institution remain stuck at preliminary review stages, with no indication that the required advisory reviews or notices of award will occur in time.

36.     Our research administration staff have received informal feedback from NIH indicating that certain topic areas are being slowed due to "heightened scrutiny" or "internal concerns."

**<u>Irreparable Harm</u>**

37.     The delays have disrupted ongoing research, as well as setting back the University of Oregon for research going forward.  Funding gaps have forced researchers to abandon studies, miss deadlines, or lose key personnel, including graduate students.

38.     Some of these studies involve the use of animal test subjects, all of which would need to be terminated due to loss of funding and would require destruction of colonies of animals, an expense which will have to be borne by UO, and loss of research done so far. When the projects finally get funded, they will have to start from scratch.

39.     Delays have also disrupted community services, student opportunities, and public programs.  We have had at least five researchers report they have waitlisted or not hired graduate students because they haven't received the funding they expected by now.   They cite concerns about training graduate students and post-docs, and one post-doc reported to UO that she will pursue a career outside of research.

40.     In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

**Supp. App. 549**

**Conclusion**

41.     The breakdown in NIH processes is affecting institutional operations, planning, and public health partnerships.  Terminations and delays with no explanation or remedy are undermining confidence in the system.  These harms are ongoing and, in many instances, irreparable.

_____
Anshuman Razdan, Ph.D.

Date:  April 13, 2025

11

EXHIBIT 64

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS; et al., | |
| *Plaintiffs,* | No. 1:25-cv-10814-BEM |
| v. | |
| ROBERT F. KENNEDY, JR., et al., | |
| *Defendants.* | |

## <u>DECLARATION OF SHASHANK PRIYA</u>

I, Shashank Priya, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.      I am the Vice President for Research and Innovation at the University of Minnesota (the "University"). The University's flagship campus is located in Minneapolis/St. Paul and there are four other campus locations in Minnesota. I have held this position since September 2022. Prior to that time, I served as Associate Vice President for Research at The Pennsylvania State University.

2.      As Vice President for Research and Innovation, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by University of Minnesota personnel. I offer this declaration in support of the request of the States' Motion for a Preliminary Injunction.

3.      On February 17,  2025, I executed a declaration in support of judicial relief in the matter of *Association of American Universities, et al. v. Department of Health & Human Services, et al.*, Case No. 1:25-cv-10346. That declaration is attached as Exhibit 1 to this

1

Declaration and details the substantial funding received by the University from NIH and provides examples of the critical and cutting-edge medical research performed due to this funding. The declaration also details the potential impacts of a reduction in funding, which apply as well to the termination, suspension, and other delays relating to individual NIH grants.

4.     There is also impact from NIH's delay and/or cancellation of study sections. NIH's abrupt cessation of NIH Advisory Council meetings in February 2025 has created a situation whereby significant numbers of grant proposals due for funding have remained unfunded for at least one grant cycle, and potentially indefinitely. These are grants that had previously been evaluated by the relevant scientific peer-review committee or "study section" (also known as scientific review group, initial review group) and given a priority score (based on scientific merit) that traditionally is within a range that would result in the awarding of the grant funds. These ranges are based on the recent history of similar grants funded by the same institute/center within NIH.

**Terminations of NIH Grants**

5.     Since March 10, 2025, the University has had 21 NIH grants and subawards terminated.

6.     These terminations will result in the loss of approximately $8.5 million in research money to the University.

7.     The termination notices for these grants have provided vague reasons for the terminations, including noting that the research no longer "effectuates agency priorities." In my time working at the University, I have not seen this language previously used to terminate grants.

8.     For many of the grants, the termination notices have also stated that there is no corrective action that can be taken to ensure the grant aligns with agency priorities. In those

2

**Supp. App. 553**

cases, prior to receipt of the termination, the University had not been given notice of any opportunity to submit any "corrected" grant materials to align with agency priorities.  Nor was the University provided with any updated "agency priorities" with which its research must align.

**Irreparable Harm**

9.      The delays have disrupted ongoing research, as well as setting back the University for research going forward.  The University will soon have to make decisions about which of these valuable programs to continue.

10.     Some of these studies involve clinical trials for life-saving medications or procedures, and their closure would endanger the lives of patients.  For example, the University is a major partner in the NIH U01 Diabetes Prevention Outcomes Study (DPPOS), serving as the central biochemistry lab for twenty-five clinical sites and serving on the project's Steering Committee.  This project addresses the National Alzheimer's Project Act goal to "prevent, halt or reverse Alzheimer's Disease" in the high-risk group of persons with pre-diabetes and type 2 diabetes, who represent over half of the population aged 60 years or older in the United States.

11.     Delays have also disrupted community services, student opportunities, and public programs.

12.     In many cases, there is no way to recover the lost time, research continuity, or training value once disrupted.

**Conclusion**

13.     The breakdown in NIH processes is affecting institutional operations, planning, and public health partnerships.  Terminations and delays with no explanation or remedy are undermining confidence in the system.  These harms are ongoing and, in many instances, irreparable.

**Supp. App. 554**

 /Shashank Priya

Shashank Priya

Date:  April 24, 2025

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSSETTS**

| | |
|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, AMERICAN COUNCIL ON EDUCATION, ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES, BRANDEIS UNIVERSITY, BROWN UNIVERSITY, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, THE CALIFORNIA INSTITUTE OF TECHNOLOGY, CARNEGIE MELLON UNIVERSITY, THE UNIVERSITY OF CHICAGO, CORNELL UNIVERSITY, THE GEORGE WASHINGTON UNIVERSITY, JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, UNIVERSITY OF ROCHESTER, and TRUSTEES OF TUFTS COLLEGE, | Case No. 1:25-cv-10346 **DECLARATION OF SHASHANK PRIYA** |
|        Plaintiffs, | |
|   v. | |
| DEPARTMENT OF HEALTH & HUMAN SERVICES, | |
| NATIONAL INSTITUTES OF HEALTH, | |
| DOROTHY A. FINK, M.D. in her official capacity as Acting Secretary, Department of Health and Human Services, and | |
| MATTHEW J. MEMOLI, M.D., M.S. in his official capacity as Acting Director, National Institutes of Health, | |
|        Defendants. | |

I, Shashank Priya, declare as follows:

1.      I am the Vice President for Research and Innovation at the University of Minnesota (the "University"). The University's flagship campus is located in Minneapolis/St. Paul and there are four other campus locations in Minnesota. I have held that position since

**Supp. App. 556**

**Exhibit 1**

September 2022.  Prior to that time, I served as Associate Vice President for Research at The Pennsylvania State University.

2.    As Vice President for Research and Innovation, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by University of Minnesota personnel.  I offer this declaration in support of the request of the Association of American Universities (AAU) for judicial relief from the directive issued by the National Institutes of Health (NIH) on February 7, 2024:  Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates (NOT-OD-25-068).

3.    The University of Minnesota receives substantial annual funding from the NIH.  In the University's fiscal year 2024 alone, the University received 808 awards directly from NIH which obligated funding to the University of approximately $355.6 million.  In addition, the University received NIH subawards from other entities.  Awards received are distinct from expenditures incurred.

4.    In any given fiscal year, the University of Minnesota is reimbursed for its expenditures on grants that were awarded in that year as well as in preceding years.  In fiscal year 2024, the University of Minnesota was reimbursed by NIH for a total of $497.8 million from NIH direct awards and pass-through awards from other entities on which NIH was the prime funder (subawards).  Of that, $135.9 million covered allowable indirect costs.

5.    Recovery of the University's indirect costs is based on predetermined rates that have been contractually negotiated with the federal government.  The University receives indirect costs calculated on a portion of its total direct costs referred to as "Modified Total Direct Costs" (MTDC).

**Supp. App. 557**

**Exhibit 1**

6.      Through fiscal year 2028, the University's negotiated indirect cost rate is 54% MDTC for on-campus research activities, 37% MTDC for other sponsored activities, 59% MTDC for the Hormel Institute, and 26% MTDC for all off-campus activities.

7.      The impact of any significant reduction in the indirect cost rate would be devastating.  For example, for fiscal year 2024, instead of $135.9 million in NIH reimbursement for indirect costs, a 15% MTDC cap on indirect costs would have resulted in the University receiving only $38.4 million in indirect costs.  This would have been a loss of $97.5 million in one fiscal year.

8.      Over the next five years, the University of Minnesota anticipates approximately $157.7 million in annual indirect costs based on the University's negotiated indirect cost rate.  If— contrary to what the University of Minnesota has negotiated with the federal government—the indirect cost rate is reduced to a cap of 15% MTDC, the University's anticipated annual indirect cost recovery for NIH awards would be reduced by 71.8%, an average loss of $113.2 million per year over five years.  This could result in a loss to the University of more than $565.7 million from fiscal year 2025 through fiscal year 2029.

9.      The funding the University of Minnesota receives from NIH supports critical and cutting-edge medical research, which millions of Americans benefit from and depend on.  For example:

  a.    **Cancer Research**: The University's cancer research includes the Cancer Center Support Grant (P30CA077598), which funds the Masonic Cancer Center to advance cancer prevention, detection, and treatment.  This grant enables the development of innovative approaches to suppress the disease at its earliest

**Supp. App. 558**

Exhibit 1

stages and fosters collaboration through shared resources and administrative support.

b. **Immunotherapy Research**: The University's immunotherapy research includes the Off-the-Shelf Immune Effector Cells for Hematological Malignancies (P01CA065493), which focuses on developing accessible and effective natural killer (NK) cell therapies for treating blood cancers. These therapies aim to improve patient outcomes by leveraging the immune system's ability to target cancer cells.

c. **Cancer Immunology Research**: The University's cancer immunology research includes NK Cells, Their Receptors, and Cancer Therapy (P01CA111412), which explores the biology of NK cells and their receptors to develop effective cancer therapies. This research seeks to harness NK cells' natural ability to detect and destroy cancer cells, offering new hope for treatment.

d. **Healthy Aging Research**: The University's healthy aging research includes the Minnesota Tissue Mapping Center for Senescent Cells (U54AG076041), which investigates the role of senescent cells in aging-related disorders. This research aims to develop interventions that promote healthier aging by identifying and targeting key mechanisms of cellular aging.

e. **Neurological Research and Imaging**: The University's neurological research (UM1NS132207 and P41EB027061)) leverages state-of-the-art ultra-high-field MRI instrumentation to study brain structure, function, and connectivity in unprecedented detail. This enables early detection of neurodegenerative

**Supp. App. 559**

Exhibit 1

diseases (Alzheimer's, Parkinson's, ALS), mapping of brain function in psychiatric disorders (schizophrenia, depression, PTSD), and insights into brain plasticity and development (aging, traumatic brain injury, autism).

10. Indirect costs are essential for supporting this research. The NIH's proposal to cut indirect cost rates to 15% would seriously jeopardize the research projects described in Paragraph 9.

11. Indirect costs include constructing and maintaining state-of-the-art facilities, such as laboratories, cleanrooms, and data centers, that meet the technical requirements of advanced research. They also cover the procurement and upkeep of essential equipment, such as ultra-high-field MRI machines, electron microscopes, advanced computing clusters, and specialized instrumentation for imaging, data analysis, and experimental setups. These investments ensure a safe and compliant environment for researchers to innovate, collaborate, and push the boundaries of discovery. Without these critical facilities and equipment, the research simply cannot be conducted, jeopardizing advancements that benefit society.

12. For example, with respect to the areas of research including those described in Paragraph 9:

    a. **Cancer and Immunotherapy Research:** The University's advanced immunotherapy research, including cell-based therapies, relies on highly controlled manufacturing environments (GMP facilities) to ensure compliance with FDA Current Good Manufacturing Practices (cGMP). These facilities are essential for producing safe and effective immune-based treatments. A reduction in the F&A rate to 15% would severely underfund GMP operations, limiting production capacity, delaying patient access to novel treatments, and

**Supp. App. 560**

jeopardizing quality control. This could increase costs, strain clinical trial infrastructure, slow development of next-generation therapies, and undermine the training of future scientists, ultimately reducing the University's ability to deliver cutting-edge therapies to patients and maintain global leadership in biomedical innovation.

b. **Healthy Aging Research:** Reduced funding due to a lower indirect cost rate could hinder data management, participant tracking, and multi-site diversity, leading to slower progress and diminished impact of these critical age-related interventions.

c. **Neurological Research and Imaging**: A 15% cap on indirect costs would severely impact the maintenance of MRI infrastructure, upgrades to advanced technology, and support for technical staff, leading to delays, data bottlenecks, and limited access to cutting-edge instruments. The massive datasets generated by high-field MRI research, often requiring petabyte-scale, HIPAA-compliant storage, would face funding shortfalls for secure and scalable solutions, increasing risks of data loss. Additionally, AI-powered MRI analysis, which relies on GPU clusters and cloud computing for early disease prediction, would be hampered by insufficient computing resources. These reductions would significantly impede progress in understanding and treating neurological disorders, undermining the University's leadership in MRI-based research and diagnostics.

13.     Physical space costs are one of the largest components of indirect costs, and the amount of space available to researchers has a direct and obvious impact on the amount of research

that can be done at the University of Minnesota. The University's planned construction for the Minnesota Bioimaging Center, the BioTechnology and Biomanufacturing Innovation Center, and the Translational Research and Innovation Facility are critical to advancing life-saving research and clinical innovation. However, if a 15% cap on indirect costs were implemented, these projects would face significant delays or very likely cancellation of these projects, causing immediate and long-term harm not only to the University's research capabilities on life-saving technologies but also to the public health outcomes.

14. A critical component of this challenge lies in the facilities reimbursement structure. Facilities costs, which are based on depreciation and interest for investments already made to support research, are not variable costs that can be adjusted based on the volume of research. Over the past several decades, the University has made multi-decade investments totaling hundreds of millions of dollars in research infrastructure, including laboratories, imaging facilities, and advanced capabilities. These are sunk costs, not discretionary expenditures, and they represent essential commitments to supporting the research mission.

15. Changing the reimbursement structure after institutions have made these substantial investments is untenable. Good facilities planning hinges upon reliable and consistent funding sources; sudden and disruptive disturbances to prior funding commitments jeopardizes the financial sustainability of research facilities already in operation.

16. For instance, the Minnesota Bioimaging Center is designed to provide advanced imaging tools essential for understanding diseases such as cancer and chronic and infectious diseases at the molecular and cellular levels. Delays in the construction of this facility would impede researchers' ability to develop new diagnostics and therapies, slowing progress in precision oncology and other fields. The BioTechnology and Biomanufacturing Innovation Center is

**Supp. App. 562**

**Exhibit 1**

designed to address key challenges in therapeutic development, biologics manufacturing, and scalable biomanufacturing processes by fostering collaborations between academic researchers, industry, and government stakeholders. Delaying the construction of this center would impede efforts to develop cutting-edge biologics and therapeutics, slowing the translation of research into scalable treatments and disrupting Minnesota's leadership in biotechnology and biomanufacturing innovation. Similarly, the Translational Research and Innovation Facility is essential for testing new therapeutics and advancing clinical trials. Delays in its completion would reduce the University's capacity to conduct early-phase trials and biomarker validation studies. This would directly impact the development pipeline for life-saving treatments, leading to longer timelines for FDA approval and reduced availability of new therapies for patients.

17. In addition to delaying new construction, the 15% cap would force institutions to reallocate funds to maintain existing facilities at the expense of research productivity and innovation. The depreciation and financing costs associated with decades-long infrastructure investments cannot simply be "turned off" or scaled down without jeopardizing research capacity. This structural shift in reimbursement undermines the foundational investments that make cutting-edge research possible.

18. The combined effect of these delays will hinder the University's ability to maintain its leadership in biomedical research and will negatively impact public health outcomes, patient care, and economic growth driven by biotech innovation. Without sufficient recovery of indirect costs, these crucial facilities and their potential contributions to medical science will remain unrealized.

19. In addition, indirect costs fund the administration of awards, including staff who ensure compliance with the regulatory mandates from agencies such as NIH. These mandates

**Supp. App. 563**

Exhibit 1

serve many important functions, including protecting human and animal subjects involved in research; ensuring research integrity; properly managing and disposing of chemical and biological agents used in research; preventing financial conflicts of interest; managing funds; preventing intellectual property, technologies, or national security expertise from being inappropriately accessed by foreign adversaries; and providing the high level of cybersecurity, data storage, and computing environments mandated for regulated data.

20.    A reduction in the indirect cost rate will have deeply damaging effects on the University's ability to conduct research from day one of an implemented change to existing and new awards. Most critically, it will necessarily and immediately result in staffing reductions across the board. For example:

> The University's clinical trials program relies heavily on indirect cost recovery to support specialized infrastructure, regulatory oversight, and patient engagement activities. Without appropriate funding, the institution would be forced to implement immediate reductions in essential staffing and resources, causing significant harm to research and patient care outcomes. For example, the University's Institutional Review Board (IRB) oversees the ethical review and compliance of all clinical trials, ensuring patient safety and adherence to federal regulations. A 15% cap on indirect costs would necessitate a reduction of  staff members from the IRB. This reduction would delay the review of clinical trial protocols, hindering the timely initiation of critical studies, including early-phase trials for cancer therapies and precision medicine. These delays would also extend FDA approval timelines, slowing the availability of life-saving treatments. Similarly, patient recruitment and retention efforts

**Supp. App. 564**

Exhibit 1

would be severely impacted. The University's patient navigator program, which supports rural and underserved populations in accessing clinical trials, would lose funding for navigators and outreach staff. This would result in a decline in recruitment from these populations, reducing trial diversity and generalizability of results. In rare disease and pediatric trials, which require long-term follow-ups and multisite collaborations, indirect cost reductions would force the University to cut back on the coordination staff and specialized research nurses critical to these efforts. This would make participation in multisite trials less viable, jeopardizing advancements in these highly vulnerable patient populations. Finally, the University's ability to ensure data security and deploy AI-driven trial monitoring systems—essential for real-time analysis and adverse event detection—would be impaired by reductions in cloud computing resources. This would increase risks to patient safety and trial reliability, further compromising research integrity.

21. The University has for decades relied on the payment of indirect costs. Until now, we have been able to rely on the well-established process for negotiating indirect cost rates with the government to inform our budgeting and planning. Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (*e.g.*, post-docs, PhD students, and other research staff), infrastructure support (*e.g.*, IT networks, regulatory compliance, and grant management support), and facility and equipment purchases. In some cases, University of Minnesota has long-term obligations for which it relies on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments.

**Supp. App. 565**

Exhibit 1

22.     In addition to the immediate impacts and reliance interests described above, there are longer term impacts that are both cumulative and cascading.

23.     The University's research also fuels spending in the regional economy, including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact.  A massive reduction in the University of Minnesota's research budget would immediately and seriously jeopardize these contributions to the local region.

24.     Finally, slowdowns or halts in research by the University of Minnesota and other U.S. universities will allow competitor nations that are maintaining their investments in research to surpass the United States on this front, threatening both our Nation's national security and its economic dominance.

25.     If required to absorb the cost of a reduced indirect cost rate, the University of Minnesota would be forced to immediately reduce key investments supporting the University of Minnesota's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain academic excellence.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2025, at Minneapolis, Minnesota.


     /s/ Shashank Priya
        Shashank Priya

**Exhibit 1**

**Supp. App. 566**