# United States Court of Appeals
## For the First Circuit

No. 25-1611

AMERICAN PUBLIC HEALTH ASSOCIATION; IBIS REPRODUCTIVE HEALTH;
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT WORKERS (UAW); BRITTANY CHARLTON; KATIE
EDWARDS; PETER LURIE; and NICOLE MAPHIS,

Plaintiffs, Appellees,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, in his official
capacity as Director of the National Institutes of Health;
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and
ROBERT F. KENNEDY, JR., in his official capacity as Secretary of
the United States Department of Health and Human Services,

Defendants, Appellants.

No. 25-1612

COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF
MARYLAND; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF
COLORADO; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF
MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE
ISLAND; and STATE OF WISCONSIN,

Plaintiffs, Appellees,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of
the United States Department of Health and Human Services;
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JAYANTA
BHATTACHARYA, in his official capacity as Director of the
National Institutes of Health; NATIONAL INSTITUTES OF HEALTH;
NATIONAL CANCER INSTITUTE; NATIONAL EYE INSTITUTE; NATIONAL
HEART, LUNG, AND BLOOD INSTITUTE; NATIONAL HUMAN GENOME RESEARCH
INSTITUTE; NATIONAL INSTITUTE ON AGING; NATIONAL INSTITUTE ON

ALCOHOL ABUSE AND ALCOHOLISM; NATIONAL INSTITUTE OF ALLERGY AND
INFECTIOUS DISEASES; NATIONAL INSTITUTE OF ARTHRITIS AND
MUSCULOSKELETAL AND SKIN DISEASES; NATIONAL INSTITUTE OF
BIOMEDICAL IMAGING AND BIOENGINEERING; EUNICE KENNEDY SHRIVER
NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT;
NATIONAL INSTITUTE ON DEAFNESS AND OTHER COMMUNICATION
DISORDERS; NATIONAL INSTITUTE OF DENTAL AND CRANIOFACIAL
RESEARCH; NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND
KIDNEY DISEASES; NATIONAL INSTITUTE ON DRUG ABUSE; NATIONAL
INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES; NATIONAL INSTITUTE
OF GENERAL MEDICAL SCIENCES; NATIONAL INSTITUTE OF MENTAL
HEALTH; NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH
DISPARITIES; NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND
STROKE; NATIONAL INSTITUTE OF NURSING RESEARCH; NATIONAL LIBRARY
OF MEDICINE; NATIONAL CENTER FOR ADVANCING TRANSLATIONAL
SCIENCES; JOHN E. FOGARTY INTERNATIONAL CENTER FOR ADVANCED
STUDY IN THE HEALTH SCIENCES; NATIONAL CENTER FOR COMPLEMENTARY
AND INTEGRATIVE HEALTH; and CENTER FOR SCIENTIFIC REVIEW,

Defendants, Appellants.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

————————————

Before

Montecalvo, Kayatta, and Rikelman,
Circuit Judges.

————————————

Brett A. Shumate, Assistant Attorney General, Leah B. Foley,
United States Attorney, Daniel Tenny and Benjamin C. Wei,
Attorneys, Appellate Staff, Civil Division, for appellants.

Jessie J. Rossman, Suzanne Schlossberg, American Civil
Liberties Union Foundation of Massachusetts, Inc., Olga Akselrod,
Alexis Agathocleous, Rachel Meeropol, Alejandro Ortiz, Leah
Watson, American Civil Liberties Union Foundation, Lisa S.
Mankofsky, Oscar Heanue, Center for Science in the Public Interest,
Shalini Goel Agarwal, Protect Democracy Project, Michel-Ange
Desruisseaux, Kenneth Parreno, Matthew D. Brinckerhoff, Ilann M.
Maazel, Max Selver, Sydney Zazzaro, and Emery Celli Brinckerhoff

Abady Ward & Maazel LLP, for appellees American Public Health Association, et al.

Andrea Joy Campbell, Attorney General of Massachusetts, David C. Kravitz, State Solicitor, Gerard J. Cedrone, Deputy State Solicitor, Katherine B. Dirks, Chief State Trial Counsel, Rachel M. Brown, Vanessa A. Arslanian, Phoebe M. Lockhart, Assistant Attorneys General, Rob Bonta, Attorney General of California, Emilio Varanini, Supervising Deputy Attorney General, Daniel D. Ambar, Sophia TonNu, Deputy Attorney General, Anthony G. Brown, Attorney General of Maryland, Julia Doyle, Solicitor General, Adam D. Kirschner, Michael Drezner, James C. Luh, Senior Assistant Attorneys General, Nicholas W. Brown, Attorney General of Washington, Andrew Hughes, Assistant Attorney General, Kristin K. Mayes, Attorney General of Arizona, Joshua G. Nomkin, Assistant Attorney General, Philip J. Weiser, Attorney General of Colorado, Shannon Stevenson, Solicitor General, Kathleen Jennings, Attorney General of Delaware, Ian R. Liston, Director of Impact Litigation, Vanessa L. Kassab, Deputy Attorney General, Anne E. Lopez, Attorney General of Hawai'i, David D. Day, Special Assistant to the Attorney General, Kaliko'onālani D. Fernandes, Solicitor General, Keith Ellison, Attorney General of Minnesota, Elizabeth Kramer, Solicitor General, Aaron D. Ford, Attorney General of Nevada, Heidi Parry Stern, Solicitor General, Matthew D. Platkin, Attorney General of New Jersey, Angela Cai, Executive Assistant Attorney General, Raúl Torrez, Attorney General of New Mexico, Astrid Carrete, Assistant Attorney General, Letitia James, Attorney General of New York, Judith N. Vale, Deputy Solicitor General, Dan Rayfield, Attorney General of Oregon, Robert Koch, Senior Assistant Attorney General, Peter F. Neronha, Attorney General of Rhode Island, Jordan Broadbent, Special Assistant Attorney General, Joshua L. Kaul, Attorney General of Wisconsin, and Lynn K. Lodahl, Assistant Attorney General, for appellees Commonwealth of Massachusetts, et al.

Megan Barbero, Kyle H. Keraga, and Venable LLP, on brief for Biological and Biomedical Research Societies, amici curiae.

———————————

July 18, 2025

———————————

**RIKELMAN**, <u>Circuit Judge</u>.  In early 2025, the National Institutes of Health (NIH) and the Department of Health and Human Services (HHS) put into place a new policy that prohibits NIH from funding scientific research grants in certain categories.  Two groups of plaintiffs sued, alleging that the new policy and the research grant terminations that directly flowed from it violated the Administrative Procedure Act (APA) and the U.S. Constitution. The plaintiffs claimed, for example, that the new policy was arbitrary and capricious because NIH and HHS never defined the prohibited research categories and their explanation for discontinuing such research rested on circular reasoning.  The district court held a trial on the merits, ruled in the plaintiffs' favor, including on their arbitrary and capricious claims, and entered two orders setting aside the new policy and related grant terminations as "illegal" under the APA.  <u>See</u> <u>Am. Pub. Health Ass'n</u> v. <u>NIH</u>, Nos. 25-cv-10787, 25-cv-10814, 2025 U.S. Dist. LEXIS 125988, at *9-10 (D. Mass. July 2, 2025).  In reaching its ruling, the district court held that the agencies' actions had been "breathtakingly arbitrary and capricious" because of the disconnect between the decisions made and the rationale provided. <u>Id.</u> at *50.  The government appellants here (collectively "the Department") then moved the district court for a stay of its order pending appeal, which the district court denied.  We now deny the Department's request for a stay from our court.

## I.  BACKGROUND

This appeal involves two separate cases, which the district court informally consolidated.  The plaintiffs in the first case are private research and advocacy organizations and individual researchers who receive NIH funding.  The plaintiffs in the second case are states whose public universities and colleges depend on NIH funding to support research projects.  The plaintiffs brought APA claims under 5 U.S.C. §§ 706(1) and 706(2)(A), (B), and (C).  Because the district court's reasoning and the Department's arguments do not distinguish between the two groups of plaintiffs, neither do we.

After the plaintiffs filed their lawsuits, they moved for a preliminary injunction.  The district court treated part of the Department's briefing opposing the preliminary injunction as a motion to dismiss, including on jurisdictional issues.  After dismissing some of the plaintiffs' claims, the court consolidated the preliminary injunction hearing on the remaining claims with a trial on the merits under Federal Rule of Civil Procedure 65(a)(2).

Ultimately, the district court issued two decisions that are critical to this appeal.  First, the court determined that it had subject matter jurisdiction, rejecting the Department's argument that the case should have been brought in the U.S. Court of Federal Claims.  See Memorandum and Order on Subject Matter Jurisdiction, Massachusetts v. Kennedy, No. 25-cv-10814 (D. Mass.

May 12, 2025), Dkt. No. 105. In so ruling, the court distinguished the U.S. Supreme Court's recent per curiam order in Department of Education v. California, 145 S. Ct. 966 (2025). The district court reasoned that these cases are "not . . . action[s] for monetary damages" but instead are "action[s] to stop the [Department] from violating the statutory grant-making architecture created by Congress . . . and exercising authority arbitrarily and capriciously, in violation of federal law and the Constitution." Dkt. No. 105, at 22. Thus, it concluded that the cases belonged in federal district court. Second, the court issued a detailed decision recounting its findings of fact and conclusions of law on a subset of the plaintiffs' APA claims, and issued a partial final judgment under Federal Rule of Civil Procedure 54(b). See Am. Pub. Health Ass'n, 2025 U.S. Dist. LEXIS 125988, at *12 & n.4.

In its decision resolving those APA claims, the district court began by laying out the relevant legal background. NIH is authorized by statute to "make grants-in-aid to universities, hospitals, laboratories, and other public or private institutions, and to individuals" to "promote . . . research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man." 42 U.S.C. § 241(a), (a)(3). Other statutory provisions mandate that the agency consider certain criteria in selecting both the research projects

and the researchers it will fund. See, e.g., id. § 285a-6 (director of the National Cancer Institute "shall expand, intensify, and coordinate the activities of the Institute with respect to research on breast cancer, ovarian cancer, and other cancers of the reproductive system of women"); id. § 285t-1(a) (director of the National Institute on Minority Health and Health Disparities "shall make awards of grants . . . for the purpose of assisting the institutions in supporting programs of excellence in biomedical and behavioral research training for individuals who are members of minority health disparity populations").

In January 2025, President Donald Trump issued three Executive Orders (EOs) limiting the ability of federal agencies to use federal funds to support research grants in certain categories.[1] Contrary to the stated goals of the EOs, the district court concluded that the Department had engaged in "pervasive racial discrimination in selecting grants for termination," as well as an "unmistakable pattern of discrimination against women's

---

[1] The first EO instructs government officials to terminate all "diversity, equity, inclusion, and accessibility[] (DEIA)" policies and programs. Exec. Order 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025). The second EO directs that "[f]ederal funds shall not be used to promote gender ideology." Exec. Order 14168, 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025). Finally, the third EO requires the Director of the Office of Management and Budget to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures." Exec. Order 14173, 90 Fed. Reg. 8633, 8634 (Jan. 21, 2025).

health issues." Am. Pub. Health Ass'n, 2025 U.S. Dist. LEXIS 125988, at *12 n.4.

The district court found that in the weeks after the EOs, officials at HHS and NIH issued several directives (the "Challenged Directives") prohibiting funding activities related to the broad categories targeted by the EOs. Initially, then-Acting Secretary of HHS, Dr. Dorothy Fink, released a directive explaining that the agency would no longer be funding activities "that support DEI and similar discriminatory programs," because such activities were "inconsistent with the Department's policy of improving the health and well-being of all Americans." Id. at *22.

Next, in mid-February, the Acting Director of NIH, Dr. Matthew Memoli, distributed a directive stating that NIH was no longer "supporting low-value and off-mission research programs, including but not limited to studies based on diversity, equity, and inclusion (DEI) and gender identity." Id. at *26-27. According to Dr. Memoli, all such grants were discriminatory and unscientific.[2] NIH then removed various notices of funding

---

[2] The district court highlighted several other guidance documents that were circulated by HHS and NIH officials during this period. See Am. Pub. Health Ass'n, 2025 U.S. Dist. LEXIS 125988, at *22-36 (discussing the "Pause Directive," "Lauer Memoranda," and "NIH Priorities Directives"). We focus primarily on Dr. Memoli's directive, given that its language was central to the district court's legal conclusions.

opportunities (NOFOs) that purportedly violated these directives. See id. at *27.

After a close review, the district court concluded that the Department's "unreasonable and unreasoned agenda of blacklisting certain topics, . . . on this Administrative Record, has absolutely nothing to do with the promotion of science or research." Id. at *18. The court determined that there was no evidence in the record to support Dr. Memoli's assertion that grants in the prohibited categories were "antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness." Id. at *55-56. To the contrary, the court found that "Dr. Memoli was taking advice" on what types of research aligned "with the new objectives" not from scientists, but from "official[s] in the so-called Department of Government Efficiency ('DOGE')." Id. at *27. The court also determined that DEI and "gender identity" were never defined in the Challenged Directives or subsequent memoranda. See id. at *52, *55.

The district court went on to make comprehensive findings about the grant terminations. It explained that grant recipients were informed of their funding termination via "template letter[s]" (the "Termination Letters"). Id. at *30. The court further determined that NIH was not involved in drafting

the Termination Letters.  See id. at *28-34.  For example, the court pointed to testimony by Michelle Bulls, the Chief Grants Management Officer (CGMO) at NIH, who signed each Termination Letter.  See id. at *30-33.  As the court highlighted, CGMO Bulls testified that "she did not create any of the language" in the letters and was "unaware whether NIH undertook any assessment at all as to whether a particular grant met the criteria being espoused in the letters."  Id. at *30.  Instead, she explained, the template Termination Letter was created by a DOGE staffer, Rachel Riley.  See id. at *34.  Thus, the court concluded that HHS and NIH were "being force-fed unworkable 'policy' supported with sparse pseudo-reasoning, and wholly unsupported statements."  Id. at *51.

    As the district court detailed, the template Termination Letter included a space to "INSERT EXPLANATION -- EXAMPLES BELOW" as to why the grant was being terminated.  Id. at *35.  That text was followed by a "reason-for-termination menu," that listed: "China," "DEI," and "Transgender issues."  Id.  "Vaccine Hesitancy," "COVID," "Gender-Affirming Care," "Climate Change," and "Influencing Public Opinion" were later added to the list of "examples for research activities that NIH no longer supports."  Id. at *40.  The court found that "usage of this list was mandatory."  Id.  The court also determined that the "boilerplate language" in the Termination Letter about DEI and gender identity

- 10 -

tracked "almost verbatim" the language in Dr. Memoli's February
directive.  Id. at *54.  The record includes examples of
Termination Letters sent to individual grant recipients; the court
found that those executed Termination Letters did not provide any
additional, grant-specific reasoning but merely adhered to the
template language.  See id. at *31, *50.

    The district court concluded that no NIH scientists were
involved in selecting the grants to be terminated.  See id. at
*54-57.  Rather, the evidence showed that DOGE staffers (who had
no affiliation with either NIH or HHS) decided which grants to
terminate, and that NIH leadership merely "followed orders . . .
on down the chain."  Id. at *29.  The court spotlighted an email
exchange between Riley and Dr. Memoli in which Riley sent him a
list of grants to terminate, and "within [two] minutes," he
approved the terminations.  Id. at *38.  The court also found that
Riley provided CGMO Bulls with lists of grants to be terminated.
See id. at *30.

    Finally, the district court determined that there was no
evidence in the administrative record that the Department
considered the "reliance interests that naturally inure to [the]
NIH grant process" in terminating the grants, contrary to the
requirements of the APA.  Id. at *59.  Those reliance interests
included, as the plaintiffs described in their submissions to the
district court, "the risk to human life as research and clinical

trials are suspended," and damage to "the overall scientific
endeavor" as a result of abruptly terminating hundreds of studies
that had been underway for years, representing millions of hours
of work.

Based on these findings, the district court concluded
that the Challenged Directives and resulting grant terminations
were arbitrary and capricious and contrary to law, all in violation
of the APA.  See id. at *60, *64 (citing 5 U.S.C. § 706(2)(A)).
The court entered a separate judgment in each of the two cases.
Each judgment provided:

> (1) "the [] Directives . . . are declared
> . . . arbitrary and capricious, and unlawful,
> in violation of 5 U.S.C. § 706(2)(A)";
> (2) "the Directives . . . are [] of no effect,
> void, illegal, set aside and vacated";
> (3) "[t]he Resulting Grant Terminations
> pursuant to the Directives are declared to be
> unlawful"; and
> (4) "the Resulting Grant Terminations
> are . . . of no effect, void, illegal, set
> aside and vacated."

The court specifically declined to enter an injunction and instead
limited its judgments to declaratory relief.[3]

The Department moved for a stay of those judgments
pending appeal.

---

[3] The district court's orders provided relief only to the
parties before it.  The Department has not argued otherwise.

## II. STANDARD OF REVIEW

As the party seeking a stay pending appeal, the Department bears the burden of justifying the extraordinary relief it requests.  See Nken v. Holder, 556 U.S. 418, 433-34 (2009).  To meet its burden, the Department must make: (1) "a strong showing that [it] is likely to succeed on the merits"; (2) a showing that it "will be irreparably injured absent a stay"; (3) a showing that the "issuance of the stay will [not] substantially injure the other parties interested in the proceeding"; and (4) a showing that "the public interest lies" with the Department, not the plaintiffs. Does 1-3 v. Mills, 39 F.4th 20, 24 (1st Cir. 2022) (quoting Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos., 996 F.3d 37, 44 (1st Cir. 2021)).  Because the district court held a trial on the merits and issued a partial final judgment, we review its findings of fact for clear error and its legal conclusions de novo.  See Aponte v. Calderón, 284 F.3d 184, 191 (1st Cir. 2002).

## III. DISCUSSION

In its stay motion, the Department focuses primarily on the first stay factor -- likelihood of success on the merits.  In particular, it leans heavily on its argument that the district court lacked subject matter jurisdiction to hear this case, claiming that it is a contract dispute about damages and thus belongs in the Court of Federal Claims.  The plaintiffs, for their part, respond that they have not brought a breach of contract

claim, and they do not seek damages against the United States. Instead, their claims rest on federal statutory and constitutional provisions that are independent of the terms of their research grants. According to the plaintiffs, their lawsuit challenges an overarching agency policy that precludes NIH from funding research grants in certain categories, and the district court's orders here provide only quintessential declaratory relief under the APA: They set aside agency action that is arbitrary and capricious.

We conclude that under Supreme Court precedent, the Department has not met its burden of establishing the grounds for a stay in this case.

## A. Likelihood of Success on the Merits

### 1. Jurisdiction

The Department begins by arguing, as it did in the district court, that the Tucker Act bars the district court from exercising jurisdiction in this case. See 28 U.S.C. § 1491(a). Because the Department focuses on this jurisdictional issue in its stay papers, and the parties vigorously dispute how to interpret the Supreme Court's precedent on the interplay between the APA and the Tucker Act, we examine in detail three key cases that guide our decision here: Bowen v. Massachusetts, 487 U.S. 879 (1988); Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204 (2002); and California. We note that the Department concentrates on California and Great-West but does not cite Bowen in its stay

motion to us, even though <u>Bowen</u> is the only case of the three that is a merits decision in an APA challenge.

In <u>Bowen</u>, the Supreme Court considered whether a federal district court had jurisdiction to review under the APA a final order by the Secretary of HHS refusing to reimburse Massachusetts for a category of expenditures under its Medicaid program.  <u>See</u> 487 U.S. at 882.  The Secretary of HHS claimed that the case should have been brought in the Court of Federal Claims.  <u>See</u> <u>id.</u> at 891. The Supreme Court disagreed.  After lengthy analysis, it held that Massachusetts could challenge the "disallowance" of a category of Medicaid expenditures under the APA in federal district court. <u>See</u> <u>id.</u> at 907, 912.  The Court explained that Massachusetts had requested declaratory and equitable relief, and thus it was bringing an action "seeking relief other than money damages" under § 702 of the APA, and "even the monetary aspects of the relief that [Massachusetts] sought [were] not 'money damages' as that term is used in the law."  <u>Id.</u> at 892-93 (citing 5 U.S.C. § 702).[4] The Court also pointed out that the orders in the cases before it were not money judgments; instead, the orders simply "reversed"

---

[4] As <u>Bowen</u> explained, the APA provides a limited waiver of sovereign immunity for certain types of suits against the federal government.  <u>See</u> 487 U.S. at 891-92.  To put it simply, the Supreme Court held in <u>Bowen</u> that the suit at issue fell within the scope of that waiver.  <u>See</u> <u>id.</u> at 910.

under the APA the disallowance decisions by the Secretary and did not require any amount to be paid.  Id. at 909.

In language that has been cited for decades, the Court in Bowen held that although the district court's orders ultimately would lead to the disbursement of funds by the federal government, that "outcome is a mere by-product of that court's primary function of reviewing the Secretary's interpretation of federal law" and did not negate the district court's jurisdiction.  Id. at 910. Separately, the Court concluded that the state's claim was not barred by § 704 of the APA, which precludes review where plaintiffs have some other "adequate remedy."  See id. (citing 5 U.S.C. § 704).  It reasoned that the Court of Federal Claims could not be an adequate alternative forum because it lacked the "general equitable powers of a district court" to grant the relief requested by Massachusetts.  Id. at 905.

We now turn to Great-West, which did not involve the APA.  Instead, Great-West concerned a lawsuit against an individual to recover "money past due under a contract," 534 U.S. at 210-11, based on a provision in that individual's employee benefit plan; the question before the Court was whether the case had been properly brought in federal court as an action seeking declaratory and injunctive relief under ERISA, see id. at 208.  The Court explained that a reimbursement provision in the employee benefit plan was "the basis for the present lawsuit."  Id.  That provision

specified that "the Plan shall have the right to recover from the [beneficiary] any payment for benefits paid by the Plan that the beneficiary [was] entitled to recover from a third party." Id. at 207 (quotation marks omitted).  Thus, the Court reasoned, the case was "quintessentially an action at law," not an action for equitable relief, and could not be brought in federal court under ERISA.  Id. at 210.  In distinguishing Bowen, the Court noted, in part, that Bowen was not a suit "merely for past due sums, but for an injunction to correct the method of calculating payments going forward," and therefore involved prospective relief.  Great-West, 534 U.S. at 212.

Finally, the Supreme Court recently issued a decision in California, granting the government's application for a stay pending appeal, which our court had denied.  The critical language in the Court's short decision states:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Nor does the waiver apply to claims seeking "money damages." Id.  True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. Bowen v. Massachusetts, 487 U.S. 897, 910 (1988).  But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212 (2002).  Instead, the Tucker

> Act grants the Court of Federal Claims
> jurisdiction over suits based on "any express
> or implied contract with the United States."
> 28 U.S.C. § 1491(a)(1).

California, 145 S. Ct. at 968 (emphasis added).  Because of the

emergency posture of that case, we focus on the arguments the

parties presented in their stay papers to the Court to understand

the rationale behind its decision.  See New Jersey v. Trump, 131

F.4th 27, 35 (1st Cir. 2025) ("[W]e 'rely on the parties to frame

the issues for decision,' given our reluctance to definitively

opine on issues for which we have been deprived of 'the benefit of

vigorous adversarial testing.'" (citations omitted)); cf. Labrador

v. Poe, 144 S. Ct. 921, 930 (2024) (Kavanaugh, J., concurring in

the grant of stay) (the "tight timeline" for resolving stay motions

is "not always optimal for orderly judicial decisionmaking").

        In California, the Court framed Bowen (a case that

belonged in federal district court) and Great-West (a case that

did not) as representing two ends of the jurisdictional spectrum,

so we follow that approach in our analysis.  Further, we note that

Bowen remains binding upon us because only the Supreme Court is

granted "the prerogative of overruling its own decisions,"

Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484

(1989), so we endeavor to harmonize these three cases.

        With that framework in mind, we turn to the district

court's judgments issued here in response to the plaintiffs'

request that the court declare and set aside as illegal both the
Challenged Directives and the grant terminations. First, the court
declared that the Challenged Directives violate the APA and are
thus void. Second, the court declared that the grant terminations
made pursuant to the Challenged Directives violate the APA and are
thus void. We treat these declaratory judgments separately, given
that "a judicial order vacating an agency rule does not
automatically void every decision the agency made pursuant to
[that] rule." D.A.M. v. Barr, 486 F. Supp. 3d 404, 414 (D.D.C.
2020).

    As to the declaratory judgment vacating the Challenged
Directives, the Department does not develop an argument that the
district court lacked jurisdiction to order such relief. Thus, we
conclude that the Department has waived that particular argument.
See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).
Regardless, the district court clearly had jurisdiction to grant
"prospective relief" that will govern "the rather complex ongoing
relationships" between the Department and grant recipients.
Bowen, 487 U.S. at 905.

    The declaratory judgment vacating the grant terminations
presents a closer question. Nevertheless, we conclude the
Department has not established a strong likelihood of success on
its jurisdictional argument as to the grant terminations for two
key reasons: (1) the district court's orders here did not award

"past due sums," but rather provided declaratory relief that is
unavailable in the Court of Federal Claims; and (2) neither the
plaintiffs' claims nor the court's orders depend on the terms or
conditions of any contract.  These facts put this case much closer
to Bowen than Great-West and distinguish it from California.  We
flesh out each of these points below.

First, the district court's orders -- both as to the
Challenged Directives and the grant terminations -- provide
declaratory relief that is well within the scope of the APA.  See
U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship, 513 U.S. 18, 25
(1994) (describing the "equitable remedy of vacatur").  Indeed,
Bowen made clear that this kind of "specific relief," the effect
of which is to "undo the [Department's] refusal to reimburse the
[plaintiffs]," is not equivalent to "money damages."  487 U.S. at
910.  Instead, it is a type of declaratory relief that will guide
an agency as it decides upon its future course of conduct, and
such relief is available only in the district court, not in the
Court of Federal Claims.  See id. at 905.

And, focusing on the grant terminations in particular,
the district court's orders afford the same type of relief that
the Supreme Court approved in Bowen.  The judgment in Bowen "did
not order [any] amount to be paid, and it did not purport to be
based on a finding that the Federal Government owed [the plaintiff]
that amount, or indeed, any amount of money."  Id. at 909-10.

- 20 -

Instead, "the judgment t[old] the United States that it may not disallow the reimbursement on the grounds given." Id. at 910. Thus, it simply effectuated the court's "primary function of reviewing the Secretary's interpretation of federal law." Id. That is an apt description of the district court's orders here.

Great-West, by contrast, is clearly distinguishable: It was a breach of contract case, where a party invoked a specific provision in a health insurance plan in seeking to recover payment for medical expenses made by a third party to a beneficiary under that plan. See 534 U.S. at 207. Thus, Great-West explicitly concerned the "enforce[ment] [of] a contractual obligation to pay money past due." Id. at 212.

We likewise have no difficulty distinguishing California. There, the Supreme Court construed the district court as having ordered "the Government to pay out past-due grant obligations." 145 S. Ct. at 968; see also id. (government likely to show that "the District Court lacked jurisdiction to order the payment of money under the APA"); Brief for Respondent at 26 n.3, California, 145 S. Ct. 966 (2025) (No. 24A910). Based on that understanding, the Court held that "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." California, 145 S. Ct. at 968 (quoting Great-West, 534 U.S. at 212). In this case, however, the

- 21 -

district court did not "enforce a contractual obligation to pay money." Rather, the court simply declared that the Department unlawfully terminated certain grants. Such relief does not constitute "money damages," nor would such declaratory relief be available in the Court of Federal Claims.

Second, neither the district court's orders nor the plaintiffs' claims in this case are premised upon the individual terms of the grant agreements. As an initial matter, the plaintiffs distinguish the "grants-in-aid" at issue here from traditional "contracts," given that relevant statutory and regulatory provisions treat the two differently. See, e.g., 42 U.S.C. § 241(a)(3), (7); 45 C.F.R. § 75.2. The Department's only response is that the same could have been argued in California, but it was not. Instead, the government emphasized in its stay papers to the Supreme Court that the plaintiffs in California, at least at that stage of the proceedings, did not dispute that the grants were equivalent to contracts for the purposes of the jurisdictional analysis. See Reply Brief for Petitioner at 7, California, 145 S. Ct. 966 (No. 24A910) [hereinafter "Reply Br."].

In any event, the district court neither examined any of the plaintiffs' grant terms nor interpreted them in reaching its ruling that the grant terminations must be set aside. Instead, as we have explained, the plaintiffs argued that the Challenged Directives are unlawful agency-wide policies because they violate

various federal statutes and the Constitution -- classic examples of claims that belong in federal district court -- and that the terminations flowed directly from those unlawful policies.  See 5 U.S.C. § 706; see also Bowen, 487 U.S. at 908 ("It would be nothing less than remarkable to conclude that Congress intended judicial review of these complex questions . . . in a specialized forum such as the Court of Claims.").  And the district court's judgments hinge entirely on intragovernmental communications -- the type of administrative record at the heart of the APA.

Again, Great-West and California are distinguishable. In Great-West, the Supreme Court specifically relied on the employee benefit plan's "reimbursement provision [as] the basis for the present lawsuit."  534 U.S. at 207.  And at least one of the respondents' claims for relief in California depended on the terms and conditions of the grant awards, a fact that the government highlighted for the Court.  See Application to Vacate at 16, California, 145 S. Ct. 966 (2025) (No. 24A910) [hereinafter "Appl."]; Reply Br. at 9.

In sum, we conclude that the Department is unlikely to succeed in showing that the district court lacked "jurisdiction to review [the challenged] agency action . . . and to grant the complete relief authorized by § 706" of the APA.  Bowen, 487 U.S. at 912.  Instead, the court likely had jurisdiction to enter the orders here -- which provided declaratory relief under the APA

independent of any contractual language -- to "set[] aside an agency's action[s]" as arbitrary and capricious; the fact that the orders "may result in the disbursement of funds" did not divest the court of its jurisdiction. California, 145 S. Ct. at 968 (citing Bowen, 487 U.S. at 910).[5]

## 2. Discretion

Next, the Department argues that the grant termination decisions were committed to agency discretion and are therefore unreviewable under the APA. It relies on Lincoln v. Vigil to assert that agency decisions to reallocate funds acquired via a lump sum appropriation (like NIH grant funds) are nonreviewable. See 508 U.S. 182, 184 (1993) (decisions "committed to agency discretion by law" are "not subject to judicial review under the [APA]" (quoting 5 U.S.C. § 701(a)(2))).

The plaintiffs respond that the Department forfeited this argument because it did not raise it in its stay motion to

---

[5] The Department suggests that "the Tucker Act impliedly forbids the bringing of contract actions against the government in federal district court under the APA," regardless of the type of relief sought, citing Albrecht v. Committee on Employee Benefits of the Federal Reserve Employee Benefits System, 357 F.3d 62 (D.C. Cir. 2004). In making this argument, the Department assumes that the declaratory relief the district court granted here determined the contractual rights of the parties. As we have explained, however, that is incorrect. The district court's judgments address only the arbitrary and capricious nature of the agencies' policies as laid out in the Challenged Directives and the grant terminations that flowed from those policies. The court did not interpret the terms of any contracts between the parties.

the district court as required under Federal Rule of Appellate Procedure 8(a)(1).  See New Jersey, 131 F.4th at 43 (contention for relief advanced in the district court "is different from the contention that [the government] now makes" and was waived).  The Department insists that the discretion argument was preserved because its stay papers in the district court alluded to other arguments "made in [its] merits briefing" during the course of the litigation.  But if that were enough to incorporate by reference in a Rule 8(a)(1) stay motion every merits contention the party had ever made, district courts would regularly receive bare-bones papers, leaving judges to ferret out the parties' arguments.  See McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22-23 (1st Cir. 1991) ("Overburdened trial judges cannot be expected to be mind readers.").  That is contrary to our precedent.  Nor does the Department point us to any authority supporting its position.

In any event, the Department, quoting Lincoln, concedes that "an agency is not free simply to disregard its statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes."  508 U.S. at 193.  As the district court explained, that is exactly what Congress did here.  There are numerous statutory provisions that direct NIH to prioritize or to consider certain research objectives -- including many that would seem to fall within the categories proscribed by the Challenged

Directives.  See Am. Pub. Health Ass'n, 2025 U.S. Dist. LEXIS, 125988, at *65 (citing, among other provisions, 42 U.S.C. §§ 282(b)(4), 283(p), 283d, and 285f-5(a)).[6]  The district court also explained that governing regulations provide an exclusive list of reasons that NIH can unilaterally terminate grants.  See id. at *63 (citing 45 C.F.R. § 75.372(a)); cf. California v. Dep't of Educ., 132 F.4th 92, 98 (1st Cir. 2025) ("[A]pplicable regulations cabin [the agency's] discretion as to when it can terminate existing grants.").  Because there are appropriate, "judicially manageable standards" for evaluating the Department's actions, Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 21 (1st Cir. 2020) (citing 5 U.S.C. § 701(a)(2) and Heckler v. Chaney, 470 U.S. 821, 830 (1985)), we conclude that the grant terminations are reviewable under the APA.

### 3. Arbitrary and Capricious

Finally, the Department asserts that the grant terminations will ultimately be upheld under the arbitrary and capricious standard.  Based on the briefing we have received to date, we think the Department has failed to carry its burden of showing that result is likely.

---

[6] Contrary to the Department's suggestion, the district court's decision to resolve the legal question on APA grounds, rather than based on those potential statutory violations, does not mean its determination that those statutory provisions limit the agency's discretion was incorrect or irrelevant.

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021). To assess reasonableness, we look to whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (citation omitted). And, when the agency enacts a decision that "rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests," it must offer a "more detailed justification" than usual. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009); see DHS v. Regents of the Univ. of Cal., 591 U.S. 1, 33 (2020) (when agency is "not writing on a blank slate," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" (citation omitted)).

Although our decision is not a holding on the merits, we see no obvious error in the district court's conclusion that the Department's actions bear all the hallmarks of arbitrary and capricious decision-making. To recap, the district court concluded that the Department's decisions rested on circular reasoning, included no explanation for the about-face in agency-

wide policy, and entirely ignored significant reliance interests. For example, the court concluded that the prohibited categories of research grants were never defined, thus allowing the Department to terminate any grant that it wanted to, for any reason. See Am. Pub. Health Ass'n, 2025 U.S. Dist. LEXIS 125988, at *52, *57. It also concluded that there was no indication in the record that anyone at NIH performed any analysis to support the conclusion that the forbidden categories of grants -- let alone the grants selected for termination -- were unscientific and/or wasteful. See id. at *56-57. To the contrary, after reviewing the "sparse" administrative record and hearing live testimony, the district court found, as a matter of fact, that the decisions about the prohibited categories, as well as which grants fell into those categories, were being "force-fed" to NIH by DOGE. Id. at *51.

In its stay motion, the Department asserts that "NIH and its [Institutes and Centers] reviewed their grant portfolios to identify and cancel specific grants that no longer serve agency priorities." But the Department provides no record citation for this claim, and the district court found the exact opposite. To the extent the Department is leveling a challenge to the district court's factual determination, it does not cite to any contrary evidence in the record.

The Department also contends that the district court was wrong to conclude that grants were "indiscriminately terminated by

- 28 -

topic," pointing out that a few dozen "grants researching minority health" were permitted to continue.  But the Department does not dispute the court's critical findings that the terminations of hundreds of <u>other</u> grants were unreasonable.  For example, the court determined that the categorical language in the Termination Letters was not drafted by anyone at NIH; dozens of grants were terminated very shortly after being flagged by non-NIH staff members; and -- again -- no evidence of any individualized review of any grant material appears in the record.  See <u>Am. Pub. Health Ass'n</u>, 2025 U.S. Dist. LEXIS, 125988, at *30-34, *39, *50-51.

Finally, the Department contends that the grantees' reliance interests were adequately accounted for, because the "terminations provided for additional funds, where necessary."  The record citation the Department provides for this proposition is a single sentence in one of the Termination Letters that a university "may request funds to support patient safety and animal welfare to support an orderly phaseout of the project."  That sentence, which in any event is far from a guarantee of additional funds, does not account for the broad scope of financial and non-financial interests staked on the grant awards, including years of research and millions of hours of work.  Nor does it have any bearing on whether the Department considered those myriad interests before issuing and implementing its Directives, which it was required to do under the APA.  See <u>DHS</u>, 591 U.S. at 33.

Accordingly, we conclude that the Department has failed to meet its burden under the first Nken factor.

### B. Balance of Equities

The second Nken factor requires the Department to demonstrate it will suffer irreparable harm absent a stay.  See New York v. Trump, 133 F.4th 51, 71 (1st Cir. 2025).  On this point, the Department begins by asserting that the district court's orders will impair "the President's ability to execute core Executive Branch policies."  But we have rejected this as a basis for irreparable harm in the past, insofar as it relies on the premise that the challenged agency action was lawful, in cases where we have concluded that the government has failed to show a likelihood of success on the merits.  See id. at 71 (rejecting argument that court order irreparably harmed defendants by "intolerabl[y] intru[ding] on the prerogatives of the Executive Branch" because it rested on the premise that the challenged agency action was lawful).

Next, the Department contends that the district court's orders "will result in the immediate outflow of significant amounts of money with limited prospects for recovery."  The Department again relies on California to argue that this constitutes an irreparable harm.  See 145 S. Ct. at 969 (crediting the government's irreparable harm argument that "it is unlikely to recover the grant funds once they are disbursed").

The Supreme Court was relying on different facts to find irreparable harm in <u>California</u>. The plaintiffs here, unlike those in <u>California</u>, have cited specific federal regulations that provide for the Department's ability to recoup improperly expended funds, and the Department has not argued to us that those regulations are inapplicable. Further, the government's primary contention to the Court in <u>California</u> was that the short-term nature of a TRO would incentivize plaintiffs to draw down nearly $65 million in a matter of weeks. <u>See</u> Appl. at 25-26, 29. The district court's orders here, which are not time-limited, impose no such concentrated financial pressure.

Nevertheless, the Department is correct that in both <u>California</u> and in this case, the plaintiffs have not "promised to return all funds they receive[] as a result of the district court's order if it is ultimately reversed on appeal." <u>See</u> 145 S. Ct. at 969. So, to the extent that the Department may be unable to recover some funds disbursed during the pendency of this litigation, we conclude that the Department has demonstrated an irreparable harm as <u>California</u> defines it.

Even so, the "stay inquiry calls for assessing the harm to the opposing party." <u>Nken</u>, 556 U.S. at 435. The plaintiffs provided declarations explaining that the abrupt cutoff in funding will, among other things: cause their studies, some of which have been conducted over the course of many years, to "lose validity";

require animal subjects to be euthanized; force researchers with "project-specific knowledge and experience" to leave; delay treatment for patients enrolled in "clinical trials for life-saving medications or procedures"; and force the closure of community health clinics that provide preventative treatment for infectious diseases. Declarations submitted to the district court described that "[i]n many cases, there is <u>no way</u> to recover the lost time, research continuity, or training value once disrupted," because studies and researchers cannot be held in stasis. Some declarants explained that the emergency short-term funding provided by their universities was not a sustainable solution and has required layoffs and research cuts; one declarant emphasized that "[u]sing alternative university funds to continue work . . . is neither possible . . . nor practical." By contrast, the plaintiffs in <u>California</u> had "represented . . . that they ha[d] the financial wherewithal to keep their programs running" in the interim. 145 S. Ct. at 969.

In response, the Department fails to address any of the non-monetary harms that the plaintiffs detailed, which cannot be remedied by belated payment. Thus, the Department has failed to show that the plaintiffs would not suffer substantial harm if the district court's orders were stayed during the pendency of the litigation.

The final Nken factor asks us to consider "where the public interest lies."  556 U.S. at 434 (citation omitted).  The Department's one-sentence argument on this point is that "the district court exceeded its authority" by issuing its orders.  The Department cites Coggeshall Development Corp. v. Diamond, where we explained that "[f]ederal courts do not have the power to order specific performance by the United States of its alleged contractual obligations."  884 F.2d 1, 3 (1st Cir. 1989).  But, as we have already explained, we do not agree that the Department is likely to succeed on its arguments that this is a breach of contract case that belongs in the Court of Federal Claims or that it did not violate the APA.  And there is a substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations."  League of Women Voters of the U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up).

Further, the Department does not refute the plaintiffs' contentions that a stay would result in the setback of "life-saving research by years if not decades" and would eliminate funding for "urgent public health issues."  These are serious concerns that suggest the public's interest is aligned with the plaintiffs, at least at this stage of the proceedings, not with the Department.

Accordingly, we cannot say that the balance of equities favors the grant of a stay.  Although the Department may suffer

some financial loss in the interim, it has neither quantified that potential loss nor provided any evidence that it will occur imminently. By contrast, the plaintiffs have provided concrete examples of economic and non-economic harms to themselves, to the public at large, and to the scientific and medical advancements of the United States if the stay is granted. The Department has failed to rebut plaintiffs' arguments that these harms are weightier at this stage of the case, especially given our conclusion that the Department has failed to show a likelihood of success on the merits. See Nken, 556 U.S. at 427 ("A stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant." (cleaned up)).[7]

## IV. CONCLUSION

For all these reasons, the Department's motion for a stay is **denied**.

---

[7] A group of four medical societies has tendered a single amicus brief in support of the plaintiffs-appellees, representing that both sides have consented to the filing. We grant leave to file the amicus brief and have considered the amicus brief only insofar as it concerns legal issues and positions raised by the parties.