**Nos. 25-1611, 25-1612**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

AMERICAN PUBLIC HEALTH ASSOCIATION; IBIS REPRODUCTIVE HEALTH; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS (UAW); BRITTANY CHARLTON; KATIE EDWARDS; PETER LURIE; NICOLE MAPHIS,

*Plaintiffs-Appellees,*

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, in the official capacity as Director of the National Institutes of Health; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in the official capacity as Secretary of the United States Department of Health & Human Services,

*Defendants-Appellants.*

COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF MARYLAND; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF DELAWARE; STATE OF HAWAII; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WISCONSIN,

*Plaintiffs-Appellees,*

v.

ROBERT F. KENNEDY, JR., in the official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JAY BHATTACHARYA, in the official capacity as Director of the National Institutes of Health; NATIONAL INSTITUTES OF HEALTH; NATIONAL CANCER INSTITUTE; NATIONAL EYE INSTITUTE; NATIONAL HEART LUNG AND BLOOD INSTITUTE; NATIONAL HUMAN GENOME RESEARCH INSTITUTE; NATIONAL INSTITUTE ON AGING; NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM; NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES; NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES; NATIONAL INSTITUTE OF BIOMEDICAL IMAGING AND BIOENGINEERING; EUNICE KENNEDY SHRIVER NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT; NATIONAL INSTITUTE ON DEAFNESS AND OTHER COMMUNICATION

DISORDERS; NATIONAL INSTITUTE OF DENTAL AND CRANIOFACIAL RESEARCH; NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES; NATIONAL INSTITUTE ON DRUG ABUSE; NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES; NATIONAL INSTITUTE OF GENERAL MEDICAL SCIENCES; NATIONAL INSTITUTE OF MENTAL HEALTH; NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES; NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE; NATIONAL INSTITUTE OF NURSING RESEARCH; NATIONAL LIBRARY OF MEDICINE; NATIONAL CENTER FOR ADVANCING TRANSLATIONAL SCIENCES; JOHN E. FOGARTY INTERNATIONAL CENTER FOR ADVANCED STUDY IN THE HEALTH SCIENCES; NATIONAL CENTER FOR COMPLEMENTARY AND INTEGRATIVE HEALTH; NIH CENTER FOR SCIENTIFIC REVIEW,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Massachusetts

_____

## APPENDIX - VOLUME I

_____

BRETT A. SHUMATE
*Assistant Attorney General*

LEAH B. FOLEY
*United States Attorney*

DANIEL TENNY
BENJAMIN C. WEI
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-2875*

# <u>TABLE OF CONTENTS</u>

## ADDENDUM

Memorandum and Order on
Subject Matter Jurisdiction (25-cv-10814 Dkt. No. 105).....................................A1

Memorandum and Order on
Motion to Dismiss (25-cv-10787 Dkt No. 84)...................................................A29

Transcript of Consolidated June 16, 2025, Bench Trial
(25-cv-10787 Dkt. No. 143) (25-cv-10814 Dkt. No. 156)...............................A73

Partial Final Judgment 25-cv-10814
(25-cv-10814 Dkt. No.151)...........................................................................A161

Partial Final Judgment 25-cv-10787
(25-cv-10787 Dkt. No. 138)..........................................................................A163

Findings of Fact, Rulings of Law, and
Order for Partial Separate and Final Judgment
(25-cv-10787 Dkt. No. 151) (25-cv-10814 Dkt. No. 163).............................A166

Order Denying Motion to Stay Pending Appeal
(25-cv-10787 Dkt. No. 147) (25-cv-10814 Dkt. No. 160).............................A269

## VOLUME I

Docket Report for *American Public Health Association, et al. v.
National Institutes of Health, et al.*, Case No. 25-cv-10787 (APHA Case).........A275

Docket Report for *Commonwealth of Massachusetts, et al.
v. Robert F. Kennedy, Jr., et al.*, Case No. 25-cv-10814 (States Case).................A328

Complaint in APHA Case
(APHA Case Dkt. No. 1) ...............................................................................A380

Amended Complaint in States Case
(States Case Dkt. No. 75) ..............................................................................A458

Notice of Appeal APHA Case
(APHA Case Dkt. No. 139) ................................................................. A550

Notice of Appeal States Case
(States Case Dkt. No. 152) ................................................................. A553

NIH Review of Agency Priorities Based on the New Administration's Goals
February 12, 2025 (NIH_GRANTS_9) .......................................... A556

Supplemental Guidance to Memo
February 13, 2025 (NIH_GRANTS_16) ......................................... A557

Directive on NIH Priorities
February 21, 2025 (NIH_GRANTS_2930-31) ............................... A558

Award Assessments for Alignment with Agency Priorities
March 4, 2025 (NIH_GRANTS_2135-72) ....................................... A560

Award Revision Guidance
March 13, 2025 (NIH_GRANTS_1957-58) ..................................... A598

Award Assessments for Alignment with Agency Priorities
March 25, 2025 (NIH_GRANTS_3216-30) ..................................... A600

Alignment with Priorities
May 7, 2025 (NIH_GRANTS_3547-81) .......................................... A615

Alignment with Priorities
May 15, 2025 (NIH_GRANTS_3516-46) ........................................ A650

Transcript of Consolidated May 8, 2025, Hearing
(25-cv-10814 Dkt. No. 107) ............................................................... A681

Transcript of Consolidated May 13, 2025, Hearing
(25-cv-10814 Dkt. No. 110) ............................................................... A709

Transcript of Consolidated June 3, 2025, Status Conference
(25-cv-10814 Dkt. No. 107) ............................................................... A740

# VOLUME II - DECLARATIONS

| Declaration Index | | | |
|---|---|---|---|
| 25-cv-10787 ECF No. | Description | ECF Page Range | Page |
| 38-19 | Declaration of Plaintiff Brittany Charlton | All. | A768 |
| 38-20 | Declaration of Plaintiff Katie Edwards | 1–13 | A864 |
| 38-21 | Declaration of Plaintiff Nicole Maphis | 1–7 | A876 |
| 38-22 | Declaration of Plaintiff Peter Lurie | 1–6 | A883 |
| 38-23 | Declaration of Georges C. Benjamin On behalf of Plaintiff American Public Health Association (APHA) | All. | A888 |
| 38-24 | Declaration of Plaintiff Ibis Reproductive Health | 1–10 | A976 |
| 38-25 | Declaration of Neal Sweeney On behalf of Plaintiff United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) | All. | A985 |
| 38-26 | Declaration of Jeremy Berg | All. | A991 |
| 38-27 | Declaration of Scott Delaney | All. | A1009 |
| 38-28 | Declaration of APHA Member 1 | 1–10 | A1091 |
| 38-29 | Declaration of APHA Member 2 | 1–10 | A1100 |
| 38-30 | Declaration of APHA Member 4 | 1–9 | A1109 |
| 38-31 | Declaration of APHA Member 5 | 1–9 | A1117 |
| 38-32 | Declaration of APHA Member 7 | 1–24 | A1125 |
| 38-33 | Declaration of APHA Member 9 | All. | A1148 |
| 38-34 | Declaration of APHA Member 10 | 1–9 | A1204 |

| | | | |
|---|---|---|---|
| 38-35 | Declaration of UAW Pre-Member 1 | 1–7 | A1212 |
| 38-36 | Declaration of UAW Pre-Member 7 | 1–7 | A1218 |
| 38-37 | Declaration of UAW Member 3 | 1–8 | A1224 |
| 38-38 | Declaration of UAW Member 9 | 1–5 | A1231 |
| 38-39 | Declaration of UAW Member 10 | 1–8 | A1235 |
| 38-40 | Declaration of UAW Member 11 | All. | A1242 |
| 38-41 | Declaration of UAW Member 12 | 1–7 | A1286 |
| 38-42 | Declaration of UAW Member 13 | 1–5 | A1292 |
| 72-3 | Supplemental Declaration of Scott Delaney | All. | A1296 |
| 72-4 | Supplemental Declaration of Jeremy Berg | All. | A1305 |
| 72-10 | Supplemental Declaration of Plaintiff Nicole Maphis | 1–3 | A1316 |
| 72-12 | Supplemental Declaration of Plaintiff Katie Edwards | All. | A1318 |
| 103-3 | Second Supplemental Declaration Of Scott Delaney | All. | A1322 |
| 103-4 | Second Supplemental Declaration Of Katie Edwards | All. | A1352 |

## VOLUME III - EXHIBITS

| Exhibits Index | | | |
|---|---|---|---|
| 25-cv-10787 ECF No. | Description | ECF Page Range | Page |
| 38-01 | NIH Webpage titled "Institutes at NIH" | All. | A1356 |

| 38-02 | NIH webpage titled "Budget" (last updated on October 3, 2024) | All. | A1357 |
| 38-03 | NIH webpage for Notice Number: NOT-OD-25-084, "NIH Operates Under a Continuing Resolution" (published April 3, 2025) | All. | A1360 |
| 38-04 | Excerpt of NIH-wide Strategic Plan, Fiscal Years 2021-2025 | All. | A1361 |
| 38-05 | Excerpt of April 2024 NIH Grant Policy Statement | All. | A1405 |
| 38-06 | March 14, 2025, Article from *The Atlantic* by Katherine J. Wu, titled "The NIH's Grant Terminations are 'Utter and Complete Chaos.'" | All. | A1424 |
| 38-08 | Transcript of April 3, 2025, Deposition of Michelle Bulls in *Washington v. Trump*, No. 2:25-cv-00244-LK (W.D. Wash. 2025) | ECF Pages 3, 48-50, 68-76, 92-93, 99-102 | A1439 |
| 38-09 | Transcript of April 3, 2025, Deposition of Liza Bundesen in *Washington v. Trump*, No. 2:25-cv-00244-LK (W.D. Wash. 2025) | ECF Pages 3, 38-39 | A1458 |
| 38-16 | NIH Minority Health and Health Disparities Strategic Plan 2021-2025 | All. | A1461 |
| 72-01 | NIH webpage titled "Contracts" | All. | A1499 |
| 72-05 | March 2025 Kirschstein NRSA Funding Opportunity | All. | A1506 |
| 72-06 | January 2025 Kirschstein NRSA Funding Opportunity | All. | A1526 |
| 72-07 | NIH webpage titled "Updates to NIH Institutional Training Grant Applications" (last updated March 25, 2025) | All. | A1542 |

| 72-08 | March 11, 2025, Memo from Matthew Memoli with subject line "Initial Actions Regarding President Trump's Executive Orders – INFORMATION" | All. | A1550 |
| 72-09 | April 8, 2021, Document Titled "Research General Terms and Conditions Agency Specific Requirements for the National Institutes of Health (NIH)" | All. | A1597 |
| 138-1 | May 27, 2025, Spreadsheet of Grants | All. | A1603 |
| 138-2 | June 13, 2025, Spreadsheet of Grants | All. | A1619 |

## VOLUME IV - EXCERPTS FROM THE ADMINISTRATIVE RECORD

Excerpts from the Administrative Record
(from NIH_GRANTS_00001 to NIH_GRANTS_03578) ......................... A1636

## VOLUME V - ADDITIONAL EXCERPTS FROM THE ADMINISTRATIVE RECORD

Additional Excerpts from the Administrative Record
(from NIH_GRANTS_03585 to NIH_GRANTS_05676) ......................... A2334

# 1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

US District Court Docket

United States District Court, Massachusetts

(Boston)

**This case was retrieved on 09/24/2025**

## Header

**Case Number:** 1:25cv10787
**Date Filed:** 04/02/2025
**Assigned To:** Judge William G. Young
**Nature of Suit:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision (899)
**Cause:** Administrative Procedure Act
**Lead Docket:** None
**Other Docket:** 1:25cv10814, USCA - First Circuit, 25-01611
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open
**Statute:** 05:702
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision

## Participants

### Litigants

American Public Health Association
**Plaintiff**

### Attorneys

Kenneth Parreno
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED
Protect Democracy Project
15 Main Street Suite 312
Watertown, MA  02472
USA
202-579-4582
Email:Kenneth.Parreno@protectdemocracy.Org

Matthew Brinckerhoff
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Mbrinckerhoff@ecbawm.Com

Shalini Goel Agarwal
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Protect Democracy
2020 Pennsylvania Ave. Nw, Ste 163
Washington, DC  20006-1811
USA
850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org

A0275

| **Litigants** | **Attorneys** |
|---|---|

Alejandro Ortiz
ATTORNEY TO BE NOTICED
American Civil Liberties Union
125 Broad Street Ste 18th Floor
New York, NY  10004
USA
646-885-8332 Email:Ortiza@aclu.Org

Alexis Agathocleous
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10004
USA
646-885-8418 Email:Aagathocleous@aclu.Org

Ilann Margalit Maazel
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Imaazel@ecbawm.Com

Jennifer Herrmann
ATTORNEY TO BE NOTICED
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA  02110
USA
617-742-6020 Fax: 617-742-3269
Email:Jherrmann@aclum.Org

Jessie J. Rossman
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Suite 850
Boston, MA  02108
USA
617-482-3170 Fax: 617-451-0009
Email:Jrossman@aclum.Org

Leah Watson
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
USA
212-519-7855 Email:Lwatson@aclu.Org

Lisa Mankofsky
ATTORNEY TO BE NOTICED
Center For Science In The Public Interest
1250 I Street, Nw Suite 500
Washington, DC  20005-5979
USA

A0276

## Litigants

## Attorneys

202-777-8381 Email:Lmankofsky@cspinet.Org

Max Roller Selver
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5063 Email:Mselver@ecbawm.Com

Michel-Ange Desruisseaux
ATTORNEY TO BE NOTICED
The Protect Democracy Project, Inc.
8226 S Mozart
Chicago, IL  60652
USA
773-551-2411 Email:Michel-
Ange.Desruisseaux@protectdemocracy.Org

Olga Akselrod
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10004
USA
212-549-2659 Email:Oakselrod@aclu.Org

Oscar Heanue
ATTORNEY TO BE NOTICED
Center For Science IN The Public Interest
1250 I Street Nw Suite 500
Washington, DC  20005
USA
202-777-8361 Email:Oheanue@cspinet.Org

Rachel Anne Meeropol
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad St.
New York, NY  10004
USA
929-585-0061 Email:Rmeeropol@aclu.Org

Suzanne Schlossberg
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Ste 850
Boston, MA  02108
USA
617-482-3170 Email:Sschlossberg@aclum.Org

Sydney Kathryn Zazzaro
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza 8th Floor
New York, NY  10020
USA
212-763-5000 Email:Szazzaro@ecbawm.Com

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| Ibis Reproductive Health<br>**Plaintiff** | Kenneth Parreno<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Protect Democracy Project<br>15 Main Street Suite 312<br>Watertown, MA  02472<br>USA<br>202-579-4582<br>Email:Kenneth.Parreno@protectdemocracy.Org<br><br>Matthew Brinckerhoff<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza Ste 8th Floor<br>New York, NY  10020<br>USA<br>212-763-5000 Fax: 212-763-5001<br>Email:Mbrinckerhoff@ecbawm.Com<br><br>Shalini Goel Agarwal<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Protect Democracy<br>2020 Pennsylvania Ave. Nw, Ste 163<br>Washington, DC  20006-1811<br>USA<br>850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org<br><br>Alejandro Ortiz<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union<br>125 Broad Street Ste 18th Floor<br>New York, NY  10004<br>USA<br>646-885-8332 Email:Ortiza@aclu.Org<br><br>Alexis Agathocleous<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street<br>New York, NY  10004<br>USA<br>646-885-8418 Email:Aagathocleous@aclu.Org<br><br>Ilann Margalit Maazel<br>ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza Ste 8th Floor<br>New York, NY  10020<br>USA<br>212-763-5000 Fax: 212-763-5001<br>Email:Imaazel@ecbawm.Com<br><br>Jennifer Herrmann<br>ATTORNEY TO BE NOTICED<br>Zalkind Duncan & Bernstein LLP<br>65a Atlantic Avenue<br>Boston, MA  02110<br>USA |

A0278

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| **Litigants** | **Attorneys** |
|---|---|

617-742-6020 Fax: 617-742-3269
Email:Jherrmann@aclum.Org

Jessie J. Rossman
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Suite 850
Boston, MA  02108
USA
617-482-3170 Fax: 617-451-0009
Email:Jrossman@aclum.Org

Leah Watson
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
USA
212-519-7855 Email:Lwatson@aclu.Org

Lisa Mankofsky
ATTORNEY TO BE NOTICED
Center For Science In The Public Interest
1250 I Street, Nw Suite 500
Washington, DC  20005-5979
USA
202-777-8381 Email:Lmankofsky@cspinet.Org

Max Roller Selver
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5063 Email:Mselver@ecbawm.Com

Michel-Ange Desruisseaux
ATTORNEY TO BE NOTICED
The Protect Democracy Project, Inc.
8226 S Mozart
Chicago, IL  60652
USA
773-551-2411 Email:Michel-
Ange.Desruisseaux@protectdemocracy.Org

Olga Akselrod
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10004
USA
212-549-2659 Email:Oakselrod@aclu.Org

Oscar Heanue
ATTORNEY TO BE NOTICED
Center For Science IN The Public Interest
1250 I Street Nw Suite 500
Washington, DC  20005

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

## Litigants                                    ## Attorneys

USA
202-777-8361 Email:Oheanue@cspinet.Org

Rachel Anne Meeropol
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad St.
New York, NY  10004
USA
929-585-0061 Email:Rmeeropol@aclu.Org

Suzanne Schlossberg
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Ste 850
Boston, MA  02108
USA
617-482-3170 Email:Sschlossberg@aclum.Org

Sydney Kathryn Zazzaro
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza 8th Floor
New York, NY  10020
USA
212-763-5000 Email:Szazzaro@ecbawm.Com

United Auto Workers
**Plaintiff**

Kenneth Parreno
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Protect Democracy Project
15 Main Street Suite 312
Watertown, MA  02472
USA
202-579-4582
Email:Kenneth.Parreno@protectdemocracy.Org

Matthew Brinckerhoff
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Mbrinckerhoff@ecbawm.Com

Shalini Goel Agarwal
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Protect Democracy
2020 Pennsylvania Ave. Nw, Ste 163
Washington, DC  20006-1811
USA
850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org

Alejandro Ortiz
ATTORNEY TO BE NOTICED
American Civil Liberties Union
125 Broad Street Ste 18th Floor
New York, NY  10004

A0280

## Litigants

## Attorneys

USA
646-885-8332 Email:Ortiza@aclu.Org

Alexis Agathocleous
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10004
USA
646-885-8418 Email:Aagathocleous@aclu.Org

Ilann Margalit Maazel
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Imaazel@ecbawm.Com

Jennifer Herrmann
ATTORNEY TO BE NOTICED
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA  02110
USA
617-742-6020 Fax: 617-742-3269
Email:Jherrmann@aclum.Org

Jessie J. Rossman
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Suite 850
Boston, MA  02108
USA
617-482-3170 Fax: 617-451-0009
Email:Jrossman@aclum.Org

Leah Watson
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
USA
212-519-7855 Email:Lwatson@aclu.Org

Lisa Mankofsky
ATTORNEY TO BE NOTICED
Center For Science In The Public Interest
1250 I Street, Nw Suite 500
Washington, DC  20005-5979
USA
202-777-8381 Email:Lmankofsky@cspinet.Org

Max Roller Selver
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza Ste 8th Floor

| **Litigants** | **Attorneys** |
|---|---|
| | New York, NY  10020 |
| | USA |
| | 212-763-5063 Email:Mselver@ecbawm.Com |
| | |
| | Michel-Ange Desruisseaux |
| | ATTORNEY TO BE NOTICED |
| | The Protect Democracy Project, Inc. |
| | 8226 S Mozart |
| | Chicago, IL  60652 |
| | USA |
| | 773-551-2411 Email:Michel-Ange.Desruisseaux@protectdemocracy.Org |
| | |
| | Olga Akselrod |
| | ATTORNEY TO BE NOTICED |
| | American Civil Liberties Union Foundation |
| | 125 Broad Street |
| | New York, NY  10004 |
| | USA |
| | 212-549-2659 Email:Oakselrod@aclu.Org |
| | |
| | Oscar Heanue |
| | ATTORNEY TO BE NOTICED |
| | Center For Science IN The Public Interest |
| | 1250 I Street Nw Suite 500 |
| | Washington, DC  20005 |
| | USA |
| | 202-777-8361 Email:Oheanue@cspinet.Org |
| | |
| | Rachel Anne Meeropol |
| | ATTORNEY TO BE NOTICED |
| | American Civil Liberties Union Foundation |
| | 125 Broad St. |
| | New York, NY  10004 |
| | USA |
| | 929-585-0061 Email:Rmeeropol@aclu.Org |
| | |
| | Suzanne Schlossberg |
| | ATTORNEY TO BE NOTICED |
| | ACLU of Massachusetts |
| | One Center Plaza Ste 850 |
| | Boston, MA  02108 |
| | USA |
| | 617-482-3170 Email:Sschlossberg@aclum.Org |
| | |
| | Sydney Kathryn Zazzaro |
| | ATTORNEY TO BE NOTICED |
| | Emery Celli Brinckerhoff Abady Ward & Maazel LLP |
| | One Rockefeller Plaza 8th Floor |
| | New York, NY  10020 |
| | USA |
| | 212-763-5000 Email:Szazzaro@ecbawm.Com |
| BRITTANY CHARLTON<br>**Plaintiff** | Kenneth Parreno |
| | LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED |
| | Protect Democracy Project |
| | 15 Main Street Suite 312 |
| | Watertown, MA  02472 |
| | USA |

A0282

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| **Litigants** | **Attorneys** |
|---|---|

202-579-4582
Email:Kenneth.Parreno@protectdemocracy.Org

Matthew Brinckerhoff
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Mbrinckerhoff@ecbawm.Com

Shalini Goel Agarwal
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Protect Democracy
2020 Pennsylvania Ave. Nw, Ste 163
Washington, DC  20006-1811
USA
850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org

Alejandro Ortiz
ATTORNEY TO BE NOTICED
American Civil Liberties Union
125 Broad Street Ste 18th Floor
New York, NY  10004
USA
646-885-8332 Email:Ortiza@aclu.Org

Alexis Agathocleous
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10004
USA
646-885-8418 Email:Aagathocleous@aclu.Org

Ilann Margalit Maazel
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Imaazel@ecbawm.Com

Jennifer Herrmann
ATTORNEY TO BE NOTICED
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA  02110
USA
617-742-6020 Fax: 617-742-3269
Email:Jherrmann@aclum.Org

Jessie J. Rossman
ATTORNEY TO BE NOTICED
ACLU of Massachusetts

A0283

| Litigants | Attorneys |
|---|---|
| | One Center Plaza Suite 850 |
| | Boston, MA  02108 |
| | USA |
| | 617-482-3170 Fax: 617-451-0009 |
| | Email:Jrossman@aclum.Org |
| | |
| | Leah Watson |
| | ATTORNEY TO BE NOTICED |
| | American Civil Liberties Union Foundation |
| | 125 Broad Street, 18th Floor |
| | New York, NY  10004 |
| | USA |
| | 212-519-7855 Email:Lwatson@aclu.Org |
| | |
| | Lisa Mankofsky |
| | ATTORNEY TO BE NOTICED |
| | Center For Science In The Public Interest |
| | 1250 I Street, Nw Suite 500 |
| | Washington, DC  20005-5979 |
| | USA |
| | 202-777-8381 Email:Lmankofsky@cspinet.Org |
| | |
| | Max Roller Selver |
| | ATTORNEY TO BE NOTICED |
| | Emery Celli Brinckerhoff Abady Ward & Maazel LLP |
| | One Rockefeller Plaza Ste 8th Floor |
| | New York, NY  10020 |
| | USA |
| | 212-763-5063 Email:Mselver@ecbawm.Com |
| | |
| | Michel-Ange Desruisseaux |
| | ATTORNEY TO BE NOTICED |
| | The Protect Democracy Project, Inc. |
| | 8226 S Mozart |
| | Chicago, IL  60652 |
| | USA |
| | 773-551-2411 Email:Michel-Ange.Desruisseaux@protectdemocracy.Org |
| | |
| | Olga Akselrod |
| | ATTORNEY TO BE NOTICED |
| | American Civil Liberties Union Foundation |
| | 125 Broad Street |
| | New York, NY  10004 |
| | USA |
| | 212-549-2659 Email:Oakselrod@aclu.Org |
| | |
| | Oscar Heanue |
| | ATTORNEY TO BE NOTICED |
| | Center For Science IN The Public Interest |
| | 1250 I Street Nw Suite 500 |
| | Washington, DC  20005 |
| | USA |
| | 202-777-8361 Email:Oheanue@cspinet.Org |
| | |
| | Rachel Anne Meeropol |
| | ATTORNEY TO BE NOTICED |
| | American Civil Liberties Union Foundation |

A0284

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| **Litigants** | **Attorneys** |
|---|---|
| | 125 Broad St.<br>New York, NY  10004<br>USA<br>929-585-0061 Email:Rmeeropol@aclu.Org |
| | Suzanne Schlossberg<br>ATTORNEY TO BE NOTICED<br>ACLU of Massachusetts<br>One Center Plaza Ste 850<br>Boston, MA  02108<br>USA<br>617-482-3170 Email:Sschlossberg@aclum.Org |
| | Sydney Kathryn Zazzaro<br>ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>One Rockefeller Plaza 8th Floor<br>New York, NY  10020<br>USA<br>212-763-5000 Email:Szazzaro@ecbawm.Com |
| KATIE EDWARDS<br>**Plaintiff** | Kenneth Parreno<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Protect Democracy Project<br>15 Main Street Suite 312<br>Watertown, MA  02472<br>USA<br>202-579-4582<br>Email:Kenneth.Parreno@protectdemocracy.Org |
| | Matthew Brinckerhoff<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>1 Rockefeller Plaza Ste 8th Floor<br>New York, NY  10020<br>USA<br>212-763-5000 Fax: 212-763-5001<br>Email:Mbrinckerhoff@ecbawm.Com |
| | Shalini Goel Agarwal<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Protect Democracy<br>2020 Pennsylvania Ave. Nw, Ste 163<br>Washington, DC  20006-1811<br>USA<br>850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org |
| | Alejandro Ortiz<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union<br>125 Broad Street Ste 18th Floor<br>New York, NY  10004<br>USA<br>646-885-8332 Email:Ortiza@aclu.Org |
| | Alexis Agathocleous<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation |

A0285

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|-----------|-----------|

125 Broad Street
New York, NY  10004
USA
646-885-8418 Email:Aagathocleous@aclu.Org

Ilann Margalit Maazel
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Imaazel@ecbawm.Com

Jennifer Herrmann
ATTORNEY TO BE NOTICED
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA  02110
USA
617-742-6020 Fax: 617-742-3269
Email:Jherrmann@aclum.Org

Jessie J. Rossman
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Suite 850
Boston, MA  02108
USA
617-482-3170 Fax: 617-451-0009
Email:Jrossman@aclum.Org

Leah Watson
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
USA
212-519-7855 Email:Lwatson@aclu.Org

Lisa Mankofsky
ATTORNEY TO BE NOTICED
Center For Science In The Public Interest
1250 I Street, Nw Suite 500
Washington, DC  20005-5979
USA
202-777-8381 Email:Lmankofsky@cspinet.Org

Max Roller Selver
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5063 Email:Mselver@ecbawm.Com

Michel-Ange Desruisseaux
ATTORNEY TO BE NOTICED

A0286

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| | The Protect Democracy Project, Inc.<br>8226 S Mozart<br>Chicago, IL  60652<br>USA<br>773-551-2411 Email:Michel-Ange.Desruisseaux@protectdemocracy.Org |
| | Olga Akselrod<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street<br>New York, NY  10004<br>USA<br>212-549-2659 Email:Oakselrod@aclu.Org |
| | Oscar Heanue<br>ATTORNEY TO BE NOTICED<br>Center For Science IN The Public Interest<br>1250 I Street Nw Suite 500<br>Washington, DC  20005<br>USA<br>202-777-8361 Email:Oheanue@cspinet.Org |
| | Rachel Anne Meeropol<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad St.<br>New York, NY  10004<br>USA<br>929-585-0061 Email:Rmeeropol@aclu.Org |
| | Suzanne Schlossberg<br>ATTORNEY TO BE NOTICED<br>ACLU of Massachusetts<br>One Center Plaza Ste 850<br>Boston, MA  02108<br>USA<br>617-482-3170 Email:Sschlossberg@aclum.Org |
| | Sydney Kathryn Zazzaro<br>ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>One Rockefeller Plaza 8th Floor<br>New York, NY  10020<br>USA<br>212-763-5000 Email:Szazzaro@ecbawm.Com |
| Peter Lurie<br>**Plaintiff** | Kenneth Parreno<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Protect Democracy Project<br>15 Main Street Suite 312<br>Watertown, MA  02472<br>USA<br>202-579-4582<br>Email:Kenneth.Parreno@protectdemocracy.Org |
| | Matthew Brinckerhoff<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED |

A0287

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

## Litigants                                    ## Attorneys

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Mbrinckerhoff@ecbawm.Com

Shalini Goel Agarwal
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Protect Democracy
2020 Pennsylvania Ave. Nw, Ste 163
Washington, DC  20006-1811
USA
850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org

Alejandro Ortiz
ATTORNEY TO BE NOTICED
American Civil Liberties Union
125 Broad Street Ste 18th Floor
New York, NY  10004
USA
646-885-8332 Email:Ortiza@aclu.Org

Alexis Agathocleous
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10004
USA
646-885-8418 Email:Aagathocleous@aclu.Org

Ilann Margalit Maazel
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Imaazel@ecbawm.Com

Jennifer Herrmann
ATTORNEY TO BE NOTICED
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA  02110
USA
617-742-6020 Fax: 617-742-3269
Email:Jherrmann@aclum.Org

Jessie J. Rossman
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Suite 850
Boston, MA  02108
USA
617-482-3170 Fax: 617-451-0009
Email:Jrossman@aclum.Org

A0288

| **Litigants** | **Attorneys** |
|---|---|
| | Leah Watson |
| | ATTORNEY TO BE NOTICED |
| | American Civil Liberties Union Foundation |
| | 125 Broad Street, 18th Floor |
| | New York, NY 10004 |
| | USA |
| | 212-519-7855 Email:Lwatson@aclu.Org |
| | |
| | Lisa Mankofsky |
| | ATTORNEY TO BE NOTICED |
| | Center For Science In The Public Interest |
| | 1250 I Street, Nw Suite 500 |
| | Washington, DC 20005-5979 |
| | USA |
| | 202-777-8381 Email:Lmankofsky@cspinet.Org |
| | |
| | Max Roller Selver |
| | ATTORNEY TO BE NOTICED |
| | Emery Celli Brinckerhoff Abady Ward & Maazel LLP |
| | One Rockefeller Plaza Ste 8th Floor |
| | New York, NY 10020 |
| | USA |
| | 212-763-5063 Email:Mselver@ecbawm.Com |
| | |
| | Michel-Ange Desruisseaux |
| | ATTORNEY TO BE NOTICED |
| | The Protect Democracy Project, Inc. |
| | 8226 S Mozart |
| | Chicago, IL 60652 |
| | USA |
| | 773-551-2411 Email:Michel-Ange.Desruisseaux@protectdemocracy.Org |
| | |
| | Olga Akselrod |
| | ATTORNEY TO BE NOTICED |
| | American Civil Liberties Union Foundation |
| | 125 Broad Street |
| | New York, NY 10004 |
| | USA |
| | 212-549-2659 Email:Oakselrod@aclu.Org |
| | |
| | Oscar Heanue |
| | ATTORNEY TO BE NOTICED |
| | Center For Science IN The Public Interest |
| | 1250 I Street Nw Suite 500 |
| | Washington, DC 20005 |
| | USA |
| | 202-777-8361 Email:Oheanue@cspinet.Org |
| | |
| | Rachel Anne Meeropol |
| | ATTORNEY TO BE NOTICED |
| | American Civil Liberties Union Foundation |
| | 125 Broad St. |
| | New York, NY 10004 |
| | USA |
| | 929-585-0061 Email:Rmeeropol@aclu.Org |
| | |
| | Suzanne Schlossberg |

A0289

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|-----------|-----------|

ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Ste 850
Boston, MA  02108
USA
617-482-3170 Email:Sschlossberg@aclum.Org

Sydney Kathryn Zazzaro
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza 8th Floor
New York, NY  10020
USA
212-763-5000 Email:Szazzaro@ecbawm.Com

**Nicole Maphis**
**Plaintiff**

Kenneth Parreno
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Protect Democracy Project
15 Main Street Suite 312
Watertown, MA  02472
USA
202-579-4582
Email:Kenneth.Parreno@protectdemocracy.Org

Matthew Brinckerhoff
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Mbrinckerhoff@ecbawm.Com

Shalini Goel Agarwal
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Protect Democracy
2020 Pennsylvania Ave. Nw, Ste 163
Washington, DC  20006-1811
USA
850-860-9344 Email:Shalini.Agarwal@protectdemocracy.Org

Alejandro Ortiz
ATTORNEY TO BE NOTICED
American Civil Liberties Union
125 Broad Street Ste 18th Floor
New York, NY  10004
USA
646-885-8332 Email:Ortiza@aclu.Org

Alexis Agathocleous
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street
New York, NY  10004
USA
646-885-8418 Email:Aagathocleous@aclu.Org

Ilann Margalit Maazel

A0290

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| | ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
1 Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5000 Fax: 212-763-5001
Email:Imaazel@ecbawm.Com

Jennifer Herrmann
ATTORNEY TO BE NOTICED
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA  02110
USA
617-742-6020 Fax: 617-742-3269
Email:Jherrmann@aclum.Org

Jessie J. Rossman
ATTORNEY TO BE NOTICED
ACLU of Massachusetts
One Center Plaza Suite 850
Boston, MA  02108
USA
617-482-3170 Fax: 617-451-0009
Email:Jrossman@aclum.Org

Leah Watson
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
USA
212-519-7855 Email:Lwatson@aclu.Org

Lisa Mankofsky
ATTORNEY TO BE NOTICED
Center For Science In The Public Interest
1250 I Street, Nw Suite 500
Washington, DC  20005-5979
USA
202-777-8381 Email:Lmankofsky@cspinet.Org

Max Roller Selver
ATTORNEY TO BE NOTICED
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza Ste 8th Floor
New York, NY  10020
USA
212-763-5063 Email:Mselver@ecbawm.Com

Michel-Ange Desruisseaux
ATTORNEY TO BE NOTICED
The Protect Democracy Project, Inc.
8226 S Mozart
Chicago, IL  60652
USA
773-551-2411 Email:Michel-Ange.Desruisseaux@protectdemocracy.Org |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| **Litigants** | **Attorneys** |
|---|---|
| | Olga Akselrod<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street<br>New York, NY  10004<br>USA<br>212-549-2659 Email:Oakselrod@aclu.Org |
| | Oscar Heanue<br>ATTORNEY TO BE NOTICED<br>Center For Science IN The Public Interest<br>1250 I Street Nw Suite 500<br>Washington, DC  20005<br>USA<br>202-777-8361 Email:Oheanue@cspinet.Org |
| | Rachel Anne Meeropol<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad St.<br>New York, NY  10004<br>USA<br>929-585-0061 Email:Rmeeropol@aclu.Org |
| | Suzanne Schlossberg<br>ATTORNEY TO BE NOTICED<br>ACLU of Massachusetts<br>One Center Plaza Ste 850<br>Boston, MA  02108<br>USA<br>617-482-3170 Email:Sschlossberg@aclum.Org |
| | Sydney Kathryn Zazzaro<br>ATTORNEY TO BE NOTICED<br>Emery Celli Brinckerhoff Abady Ward & Maazel LLP<br>One Rockefeller Plaza 8th Floor<br>New York, NY  10020<br>USA<br>212-763-5000 Email:Szazzaro@ecbawm.Com |
| National Institutes of Health<br>**Defendant** | Anuj K. Khetarpal<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| Jay Bhattacharya<br>In his official capacity as Director of the National Institutes of Health \| | Anuj K. Khetarpal<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>United States Attorney's Office |

A0292

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| **Defendant** | 1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov<br><br>Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| United States Department of Health and Human Services<br>**Defendant** | Anuj K. Khetarpal<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov<br><br>Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| Robert  F. Kennedy, Jr.<br>In his official capacity as Secretary of the United States<br>Department of Health and Human Services \|<br>**Defendant** | Anuj K. Khetarpal<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov<br><br>Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| Association of American Medical Colleges<br>**Amicus** | Stephanie A. Webster<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE<br>NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com<br><br>Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| | Douglas Hallward-Driemeier<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP - DC<br>2099 Pennsylvania Avenue, Nw<br>Washington, DC  20006<br>USA<br>202-508-4776 Email:Douglas.Hallward-Driemeier@ropesgray.Com |
| | John P. Bueker<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray - MA<br>Prudential Tower 800 Boylston Street<br>Boston, MA  02199-3600<br>USA<br>617-951-7000 Fax: 617-951-7050<br>Email:John.Bueker@ropesgray.Com |
| American Association of State Colleges and Universities<br>**Amicus** | Stephanie A. Webster<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Douglas Hallward-Driemeier<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP - DC<br>2099 Pennsylvania Avenue, Nw<br>Washington, DC  20006<br>USA<br>202-508-4776 Email:Douglas.Hallward-Driemeier@ropesgray.Com |
| | John P. Bueker<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray - MA<br>Prudential Tower 800 Boylston Street<br>Boston, MA  02199-3600<br>USA<br>617-951-7000 Fax: 617-951-7050<br>Email:John.Bueker@ropesgray.Com |
| American Council on Education<br>**Amicus** | Stephanie A. Webster<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807 |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

## Litigants                                      ## Attorneys

USA
202-508-4859 Fax: 202-383-9334
Email:Stephanie.Webster@ropesgray.Com

Amish Aajay Shah
ATTORNEY TO BE NOTICED
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC  20006
USA
202-508-4791 Email:Amish.Shah@ropesgray.Com

Douglas Hallward-Driemeier
ATTORNEY TO BE NOTICED
Ropes & Gray LLP - DC
2099 Pennsylvania Avenue, Nw
Washington, DC  20006
USA
202-508-4776 Email:Douglas.Hallward-
Driemeier@ropesgray.Com

John P. Bueker
ATTORNEY TO BE NOTICED
Ropes & Gray - MA
Prudential Tower 800 Boylston Street
Boston, MA  02199-3600
USA
617-951-7000 Fax: 617-951-7050
Email:John.Bueker@ropesgray.Com

Association of American Universities           Stephanie A. Webster
**Amicus**                                     LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
                                               NOTICED
                                               Ropes & Gray LLP
                                               2099 Pennsylvania Avenue, N.W. Suite 1200
                                               Washington, DC  20006-6807
                                               USA
                                               202-508-4859 Fax: 202-383-9334
                                               Email:Stephanie.Webster@ropesgray.Com

Amish Aajay Shah
ATTORNEY TO BE NOTICED
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC  20006
USA
202-508-4791 Email:Amish.Shah@ropesgray.Com

Douglas Hallward-Driemeier
ATTORNEY TO BE NOTICED
Ropes & Gray LLP - DC
2099 Pennsylvania Avenue, Nw
Washington, DC  20006
USA
202-508-4776 Email:Douglas.Hallward-
Driemeier@ropesgray.Com

John P. Bueker
ATTORNEY TO BE NOTICED
Ropes & Gray - MA

A0295

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| | Prudential Tower 800 Boylston Street<br>Boston, MA  02199-3600<br>USA<br>617-951-7000 Fax: 617-951-7050<br>Email:John.Bueker@ropesgray.Com |
| Association of Governing Boards of Universities and Colleges<br>**Amicus** | Stephanie A. Webster<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Douglas Hallward-Driemeier<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP - DC<br>2099 Pennsylvania Avenue, Nw<br>Washington, DC  20006<br>USA<br>202-508-4776 Email:Douglas.Hallward-Driemeier@ropesgray.Com |
| | John P. Bueker<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray - MA<br>Prudential Tower 800 Boylston Street<br>Boston, MA  02199-3600<br>USA<br>617-951-7000 Fax: 617-951-7050<br>Email:John.Bueker@ropesgray.Com |
| Association of Public and Land-Grant Universities<br>**Amicus** | Stephanie A. Webster<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Douglas Hallward-Driemeier |

A0296

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| | ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP - DC<br>2099 Pennsylvania Avenue, Nw<br>Washington, DC  20006<br>USA<br>202-508-4776 Email:Douglas.Hallward-Driemeier@ropesgray.Com |
| | John P. Bueker<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray - MA<br>Prudential Tower 800 Boylston Street<br>Boston, MA  02199-3600<br>USA<br>617-951-7000 Fax: 617-951-7050<br>Email:John.Bueker@ropesgray.Com |
| COGR<br>**Amicus** | Stephanie A. Webster<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Douglas Hallward-Driemeier<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP - DC<br>2099 Pennsylvania Avenue, Nw<br>Washington, DC  20006<br>USA<br>202-508-4776 Email:Douglas.Hallward-Driemeier@ropesgray.Com |
| | John P. Bueker<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray - MA<br>Prudential Tower 800 Boylston Street<br>Boston, MA  02199-3600<br>USA<br>617-951-7000 Fax: 617-951-7050<br>Email:John.Bueker@ropesgray.Com |
| National Association of Independent Colleges and Universities<br>**Amicus** | Stephanie A. Webster<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334 |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

## Litigants                                    ## Attorneys

Email:Stephanie.Webster@ropesgray.Com

Amish Aajay Shah
ATTORNEY TO BE NOTICED
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC  20006
USA
202-508-4791 Email:Amish.Shah@ropesgray.Com

Douglas Hallward-Driemeier
ATTORNEY TO BE NOTICED
Ropes & Gray LLP - DC
2099 Pennsylvania Avenue, Nw
Washington, DC  20006
USA
202-508-4776 Email:Douglas.Hallward-
Driemeier@ropesgray.Com

John P. Bueker
ATTORNEY TO BE NOTICED
Ropes & Gray - MA
Prudential Tower 800 Boylston Street
Boston, MA  02199-3600
USA
617-951-7000 Fax: 617-951-7050
Email:John.Bueker@ropesgray.Com

American Society for Biochemistry and Molecular Biology     Megan Barbero
**Amicus**                                    LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-4540 Email:Mbarbero@venable.Com

Dismas Locaria
ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

Emily Rose Marcy
ATTORNEY TO BE NOTICED
Venable LLP
1850 Towers Crescent Plaza Suite 400
Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP
Commercial Litigation Maryland 750 East Pratt Street Suite
900
Baltimore, MD  21202
USA
410-244-7650 Email:Khkeraga@venable.Com

## Litigants

## Attorneys

American Society for Cell Biology
**Amicus**

Megan Barbero
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-4540 Email:Mbarbero@venable.Com

Dismas Locaria
ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

Emily Rose Marcy
ATTORNEY TO BE NOTICED
Venable LLP
1850 Towers Crescent Plaza Suite 400
Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP
Commercial Litigation Maryland 750 East Pratt Street Suite 900
Baltimore, MD  21202
USA
410-244-7650 Email:Khkeraga@venable.Com

American Society for Microbiology
**Amicus**

Megan Barbero
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-4540 Email:Mbarbero@venable.Com

Dismas Locaria
ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

Emily Rose Marcy
ATTORNEY TO BE NOTICED
Venable LLP
1850 Towers Crescent Plaza Suite 400
Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| | Commercial Litigation Maryland 750 East Pratt Street Suite 900<br>Baltimore, MD  21202<br>USA<br>410-244-7650 Email:Khkeraga@venable.Com |
| Federation of American Societies for Experimental Biology<br>**Amicus** | Megan Barbero<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-4540 Email:Mbarbero@venable.Com |
| | Dismas Locaria<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-8013 Email:Dlocaria@venable.Com |
| | Emily Rose Marcy<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>1850 Towers Crescent Plaza Suite 400<br>Tysons, VA  22182<br>USA<br>804-229-2927 Email:Ermarcy@venable.Com |
| | Kyle Keraga<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>Commercial Litigation Maryland 750 East Pratt Street Suite 900<br>Baltimore, MD  21202<br>USA<br>410-244-7650 Email:Khkeraga@venable.Com |
| American Institute of Biological Sciences<br>**Amicus** | Megan Barbero<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-4540 Email:Mbarbero@venable.Com |
| | Dismas Locaria<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-8013 Email:Dlocaria@venable.Com |
| | Emily Rose Marcy<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>1850 Towers Crescent Plaza Suite 400<br>Tysons, VA  22182<br>USA |

| Litigants | Attorneys |
|---|---|
| | 804-229-2927 Email:Ermarcy@venable.Com |

804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP
Commercial Litigation Maryland 750 East Pratt Street Suite 900
Baltimore, MD  21202
USA
410-244-7650 Email:Khkeraga@venable.Com

**American Sociological Association**
**Amicus**

Megan Barbero
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-4540 Email:Mbarbero@venable.Com

Dismas Locaria
ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

Emily Rose Marcy
ATTORNEY TO BE NOTICED
Venable LLP
1850 Towers Crescent Plaza Suite 400
Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP
Commercial Litigation Maryland 750 East Pratt Street Suite 900
Baltimore, MD  21202
USA
410-244-7650 Email:Khkeraga@venable.Com

**Association for Women in Science**
**Amicus**

Megan Barbero
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-4540 Email:Mbarbero@venable.Com

Dismas Locaria
ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

A0301

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| Litigants | Attorneys |
|---|---|
| | Emily Rose Marcy<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>1850 Towers Crescent Plaza Suite 400<br>Tysons, VA  22182<br>USA<br>804-229-2927 Email:Ermarcy@venable.Com |
| | Kyle Keraga<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>Commercial Litigation Maryland 750 East Pratt Street Suite 900<br>Baltimore, MD  21202<br>USA<br>410-244-7650 Email:Khkeraga@venable.Com |
| Ecological Society of America<br>**Amicus** | Megan Barbero<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-4540 Email:Mbarbero@venable.Com |
| | Dismas Locaria<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-8013 Email:Dlocaria@venable.Com |
| | Emily Rose Marcy<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>1850 Towers Crescent Plaza Suite 400<br>Tysons, VA  22182<br>USA<br>804-229-2927 Email:Ermarcy@venable.Com |
| | Kyle Keraga<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>Commercial Litigation Maryland 750 East Pratt Street Suite 900<br>Baltimore, MD  21202<br>USA<br>410-244-7650 Email:Khkeraga@venable.Com |
| Gerontological Society of America<br>**Amicus** | Megan Barbero<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-4540 Email:Mbarbero@venable.Com |
| | Dismas Locaria<br>ATTORNEY TO BE NOTICED<br>Venable LLP |

A0302

## Litigants

## Attorneys

600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

Emily Rose Marcy
ATTORNEY TO BE NOTICED
Venable LLP
1850 Towers Crescent Plaza Suite 400
Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP
Commercial Litigation Maryland 750 East Pratt Street Suite 900
Baltimore, MD  21202
USA
410-244-7650 Email:Khkeraga@venable.Com

Infectious Diseases Society of America
**Amicus**

Megan Barbero
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-4540 Email:Mbarbero@venable.Com

Dismas Locaria
ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
202-344-8013 Email:Dlocaria@venable.Com

Emily Rose Marcy
ATTORNEY TO BE NOTICED
Venable LLP
1850 Towers Crescent Plaza Suite 400
Tysons, VA  22182
USA
804-229-2927 Email:Ermarcy@venable.Com

Kyle Keraga
ATTORNEY TO BE NOTICED
Venable LLP
Commercial Litigation Maryland 750 East Pratt Street Suite 900
Baltimore, MD  21202
USA
410-244-7650 Email:Khkeraga@venable.Com

Society of Environmental Toxicology and Chemistry of North America
**Amicus**

Megan Barbero
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Venable LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA

A0303

| Litigants | Attorneys |
|---|---|
| | 202-344-4540 Email:Mbarbero@venable.Com |
| | Dismas Locaria<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>202-344-8013 Email:Dlocaria@venable.Com |
| | Emily Rose Marcy<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>1850 Towers Crescent Plaza Suite 400<br>Tysons, VA  22182<br>USA<br>804-229-2927 Email:Ermarcy@venable.Com |
| | Kyle Keraga<br>ATTORNEY TO BE NOTICED<br>Venable LLP<br>Commercial Litigation Maryland 750 East Pratt Street Suite 900<br>Baltimore, MD  21202<br>USA<br>410-244-7650 Email:Khkeraga@venable.Com |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 04/02/2025 | COMPLAINT For Declaratory and Injunctive Relief against All Defendants Filing fee: $ 405, receipt number AMADC-10928559 (Fee Status: Filing Fee paid), filed by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Civil Cover Sheet Exhibit A, # 2 Category Form Exhibit B)(Rossman, Jessie) Modified on 4/2/2025 to modify docket text (CEH). (Main Document 1 replaced on 4/4/2025) (MBM). (Entered: 04/02/2025) | |
| 2 | 04/02/2025 | ELECTRONIC NOTICE of Case Assignment. District Judge Patti B. Saris assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (JKK) (Entered: 04/02/2025) | |
| 3 | 04/02/2025 | Summons Issued as to Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service. (CEH) (Entered: 04/02/2025) | |
| 4 | 04/02/2025 | NOTICE of Appearance by Suzanne Schlossberg on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Schlossberg, Suzanne) (Entered: 04/02/2025) | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 5 | 04/02/2025 | District Judge Patti B. Saris: ENDORSED ORDER entered re 1 Complaint for Declaratory and Injunctive Relief against All Defendants filed by American Public Health Association, Nicole Maphis, United Auto Workers, Peter Lurie, Brittany Charlton, Ibis Reproductive Health, Katie Edwards.  "Pursuant to U.S. C. 455(a), I recuse myself on the ground my impartiality might reasonably be questioned." (CGK) (Entered: 04/02/2025) | |
| 6 | 04/02/2025 | District Judge Patti B. Saris: ORDER entered. ORDER OF RECUSAL. Pursuant to 28 U.S.C.  455(a), I recuse myself on the ground that my impartiality might reasonably be questioned and direct the clerk forthwith to reassign the case randomly to another District Judge.(CGK) (Entered: 04/02/2025) | |
| 7 | 04/02/2025 | ELECTRONIC NOTICE of Case Reassignment. Judge Brian E. Murphy assigned to case. (RN) (Entered: 04/02/2025) | |
| 8 | 04/07/2025 | NOTICE of Appearance by Anuj K. Khetarpal on behalf of United States Department of Health and Human Services, Robert F. Kennedy, Jr., National Institutes of Health, Jay Bhattacharya (Khetarpal, Anuj) (Entered: 04/07/2025) | |
| 9 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Olga Akselrod Filing fee: $ 125, receipt number AMADC-10945811 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 10 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Alexis Agathocleous Filing fee: $ 125, receipt number AMADC-10945813 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 11 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Shalini Goel Agarwal Filing fee: $ 125, receipt number AMADC-10945817 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 12 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Michel-Ange Desruisseaux Filing fee: $ 125, receipt number AMADC-10945818 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 13 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Oscar Heanue Filing fee: $ 125, receipt number AMADC-10945822 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 14 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Lisa S. Mankofsky Filing fee: $ 125, receipt number AMADC-10945823 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: | |

A0305

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
| | | 04/10/2025) | |
| 15 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Rachel Meeropol Filing fee: $ 125, receipt number AMADC-10945828 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 16 | 04/10/2025 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Alejandro Ortiz Filing fee: $ 125, receipt number AMADC-10945830 by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 04/10/2025) | |
| 17 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 9 Motion for Leave to Appear Pro Hac Vice Added Olga Akselrod. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 18 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 10 Motion for Leave to Appear Pro Hac Vice Added Alexis Agathocleous.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 19 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 11 Motion for Leave to Appear Pro Hac Vice Added Shalini Goel Agarwal.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 20 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 12 Motion for Leave to Appear Pro Hac Vice Added Michel-Ange Desruisseaux.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 21 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 13 Motion for Leave to Appear Pro Hac Vice Added Oscar Heanue.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 22 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 14 Motion for Leave to Appear Pro Hac Vice Added Lisa S. Mankofsky.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 23 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 15 Motion for Leave to Appear Pro Hac Vice Added Rachel Meeropol.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 24 | 04/11/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 16 Motion for Leave to Appear Pro Hac Vice Added Alejandro Ortiz.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/11/2025) | |
| 25 | 04/14/2025 | NOTICE of Appearance by Alexis Agathocleous on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Lurie, Nicole Maphis (Agathocleous, Alexis) (Entered: 04/14/2025) | |
| 26 | 04/14/2025 | NOTICE of Appearance by Olga Akselrod on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Akselrod, Olga) (Entered: 04/14/2025) | |
| 27 | 04/14/2025 | NOTICE of Appearance by Rachel Anne Meeropol on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Meeropol, Rachel) (Entered: 04/14/2025) | |
| 28 | 04/14/2025 | MOTION for Leave to File Excess Pages  by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis.(Schlossberg, Suzanne) (Entered: 04/14/2025) | |
| 29 | 04/14/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 28 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MBM) (Entered: 04/14/2025) | |
| 30 | 04/15/2025 | NOTICE of Appearance by Oscar Heanue on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Heanue, Oscar) (Entered: 04/15/2025) | |
| 31 | 04/16/2025 | NOTICE of Appearance by Alejandro Ortiz on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Ortiz, Alejandro) (Entered: 04/16/2025) | |
| 32 | 04/16/2025 | NOTICE of Appearance by Lisa Mankofsky on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Mankofsky, Lisa) (Entered: 04/16/2025) | |
| 33 | 04/23/2025 | MOTION to Seal  by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis.(Schlossberg, Suzanne) (Entered: 04/23/2025) | |
| 34 | 04/23/2025 | MEMORANDUM in Support re 33 MOTION to Seal   filed by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Schlossberg, Suzanne) (Entered: 04/23/2025) | |
| 35 | 04/24/2025 | NOTICE of Appearance by Shalini Goel Agarwal on behalf of American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis (Agarwal, Shalini) (Entered: 04/24/2025) | |
| 36 | 04/24/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 33 Motion to Seal. Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MBM) (Entered: 04/24/2025) | |
| 37 | 04/25/2025 | MOTION for Preliminary Injunction  by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Proposed Order)(Rossman, Jessie) (Entered: 04/25/2025) | |
| 38 | 04/25/2025 | DECLARATION re 37 MOTION for Preliminary Injunction   by American Public Health Association, Ibis Reproductive Health, | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42)(Rossman, Jessie) (Additional attachment(s) added on 5/7/2025: # 43 Sealed - Exhibit 19, # 44 Sealed - Exhibit 23, # 45 Sealed - Exhibit 24, # 46 Sealed - Exhibit 28, # 47 Sealed - Exhibit 29, # 48 Sealed - Exhibit 32, # 49 Sealed - Exhibit 35, # 50 Sealed - Exhibit 36, # 51 Sealed - Exhibit 37, # 52 Sealed - Exhibit 38, # 53 Sealed - Exhibit 39, # 54 Sealed - Exhibit 42) (MAP). (Entered: 04/25/2025) | |
| 39 | 04/25/2025 | MOTION for Protective Order Regarding Certain Organizational Declarants by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Attachments: # 1 Exhibit A-Proposed Order)(Rossman, Jessie) (Entered: 04/25/2025) | |
| 40 | 04/25/2025 | MEMORANDUM in Support re 39 MOTION for Protective Order Regarding Certain Organizational Declarants  filed by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Rossman, Jessie) (Entered: 04/25/2025) | |
| 41 | 04/25/2025 | MEMORANDUM in Support re 37 MOTION for Preliminary Injunction   filed by American Public Health Association, Ibis Reproductive Health, United Auto Workers, Brittany Charlton, Katie Edwards, Peter Lurie, Nicole Maphis. (Rossman, Jessie) (Entered: 04/25/2025) | |
| 42 | 04/28/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered. Defendants are ordered to respond to the Motion for Protective Order (Dkt. 39 ) by 5 p.m. on May 5, 2025.(MBM) (Entered: 04/28/2025) | |
| 43 | 04/28/2025 | Amicus Curiae APPEARANCE entered by Amish Aajay Shah on behalf of Association of American Medical Colleges, American Association of State Colleges and Universities, American Council on Education, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, COGR, National Association of Independent Colleges and Universities. (Shah, Amish) (Entered: 04/28/2025) | |
| 44 | 04/28/2025 | Amicus Curiae APPEARANCE entered by Douglas Hallward-Driemeier on behalf of American Association of State Colleges and Universities, American Council on Education, Association of American Medical Colleges, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, COGR, National Association of Independent Colleges and Universities. (Hallward-Driemeier, Douglas) (Entered: 04/28/2025) | |
| 45 | 04/28/2025 | Amicus Curiae APPEARANCE entered by John P. Bueker on behalf of American Association of State Colleges and Universities, American Council on Education, Association of American Medical Colleges, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, COGR, National Association | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | of Independent Colleges and Universities. (Bueker, John) (Entered: 04/28/2025) | |
| 46 | 04/28/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Stephanie A. Webster Filing fee: $ 125, receipt number AMADC-10976480 by American Association of State Colleges and Universities, American Council on Education, Association of American Medical Colleges, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, COGR, National Association of Independent Colleges and Universities.(Bueker, John) (Additional attachment(s) added on 4/29/2025: # 1 Certificate of Stephanie A. Webster) (MBM). (Entered: 04/28/2025) | |
| 47 | 04/28/2025 | MOTION for Leave to File AMICUS CURIAE BRIEF (Unopposed) by American Association of State Colleges and Universities, American Council on Education, Association of American Medical Colleges, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, COGR, National Association of Independent Colleges and Universities. (Attachments: # 1 Proposed AMICUS CURIAE BRIEF)(Bueker, John) (Entered: 04/28/2025) | |
| 48 | 04/29/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 46 Motion for Leave to Appear Pro Hac Vice Added Stephanie A. Webster.  Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.  Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/29/2025) | |
| 49 | 04/29/2025 | Amicus Curiae APPEARANCE entered by Stephanie A. Webster on behalf of American Association of State Colleges and Universities, American Council on Education, Association of American Medical Colleges, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, National Association of Independent Colleges and Universities. (Webster, Stephanie) (Entered: 04/29/2025) | |
| 50 | 04/29/2025 | NOTICE of Appearance by Michel-Ange Desruisseaux on behalf of Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Desruisseaux, Michel-Ange) (Entered: 04/29/2025) | |
| 51 | 05/01/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER OF RECUSAL - In accordance with 28 U.S.C.  455(a), I hereby recuse myself from this proceeding. The Clerk is directed to return the case for reassignment.Associated Cases: 1:25-cv-10814-BEM, 1:25-cv-10787-BEM(BIB) (Entered: 05/01/2025) | |
| 52 | 05/01/2025 | ELECTRONIC NOTICE of Reassignment. Judge William G. Young added. Judge Brian E. Murphy no longer assigned to case. (CM) (Entered: 05/01/2025) | |
| 53 | 05/02/2025 | Amicus Curiae APPEARANCE by Megan Barbero on behalf of American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, Federation of American Societies for Experimental Biology, American Institute of Biological Sciences, American Sociological Association, Association for Women in Science, | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Ecological Society of America, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America (Barbero, Megan) Modified on 5/2/2025to Correct Filing Event as Counsel Filed Their Appearance Under the Wrong Event in CM/ECF (MAP). (Entered: 05/02/2025) | |
| 54 | 05/02/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Dismas Locaria Filing fee: $ 125, receipt number AMADC-10985379 by American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America. (Attachments: # 1 Exhibit A - Certification of Dismas Locaria)(Barbero, Megan) (Entered: 05/02/2025) | |
| 55 | 05/02/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Kyle H. Keraga Filing fee: $ 125, receipt number AMADC-10985410 by American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America. (Attachments: # 1 Exhibit A - Certification of Kyle H. Keraga)(Barbero, Megan) (Entered: 05/02/2025) | |
| 56 | 05/02/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Emily R. Marcy Filing fee: $ 125, receipt number AMADC-10985426 by American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America. (Attachments: # 1 Exhibit A - Certification of Emily R. Marcy)(Barbero, Megan) (Entered: 05/02/2025) | |
| 57 | 05/02/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 54 Motion for Leave to Appear Pro Hac Vice Added Dismas Locaria. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. Amicus Curiae APPEARANCE must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 05/02/2025) | |
| 58 | 05/02/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 55 Motion for Leave to Appear Pro Hac Vice Added Kyle H. Keraga. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register- | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. Amicus Curiae APPEARANCE must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 05/02/2025) | |
| 59 | 05/02/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 56 Motion for Leave to Appear Pro Hac Vice Added Emily R. Marcy.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. Amicus Curiae APPEARANCE must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 05/02/2025) | |
| 60 | 05/02/2025 | MOTION for Leave to File AMICUS CURIAE BRIEF by American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America. (Attachments: # 1 Exhibit Proposed Amicus Curiae Brief)(Barbero, Megan) (Entered: 05/02/2025) | |
| 61 | 05/02/2025 | Assented to MOTION for Protective Order and Joint Motion for Briefing Schedule by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit Agreed Proposed Protective Order)(Rossman, Jessie) (Entered: 05/02/2025) | |
| 62 | 05/05/2025 | Judge William G. Young: ELECTRONIC ORDER entered allowed 61 Assented to MOTION for Protective Order and Joint Motion for Briefing Schedule. (Entered: 05/06/2025) | |
| 63 | 05/05/2025 | Judge William G. Young ORDER entered: PROTECTIVE ORDER Regarding Certain Organizational Declarants. (MAP) (Entered: 05/06/2025) | |
| 64 | 05/06/2025 | ELECTRONIC NOTICE Setting Hearing on Motion 37 MOTION for Preliminary Injunction  : Motion Hearing set for 5/22/2025 11:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.(KB) (Entered: 05/06/2025) | |
| 65 | 05/07/2025 | AFFIDAVIT OF SERVICE Executed by Nicole Maphis, Ibis Reproductive Health, American Public Health Association, Peter Lurie, United Auto Workers, Brittany Charlton, Katie Edwards. All Defendants. Acknowledgement filed by Nicole Maphis, Ibis Reproductive Health, American Public Health Association, Peter Lurie, United Auto Workers, Brittany Charlton, Katie Edwards. (Attachments: # 1 Exhibit A-National Institutes of Health, # 2 Exhibit B-Jay Bhattacharya, # 3 Exhibit C-U.S. Dept. of Health and Human Services, # 4 Exhibit D-Robert F. Kennedy Jr., # 5 Exhibit | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | E-U.S. Attorney General, # 6 Exhibit F-U.S. Attorney, District of MA)(Schlossberg, Suzanne) (Entered: 05/07/2025) | |
| 66 | 05/12/2025 | Opposition re 37 MOTION for Preliminary Injunction   filed by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. (Attachments: # 1 Lorsch Declaration, # 2 Exhibit A, # 3 Exhibit B)(Khetarpal, Anuj) (Entered: 05/12/2025) | |
| 67 | 05/13/2025 | Amicus Curiae APPEARANCE entered by Dismas Locaria on behalf of American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America (Locaria, Dismas) Modified on 5/13/2025 to Correct Docket as Counsel Filed the Appearance Under the Wrong Event in CM/ECF. (MAP). (Entered: 05/13/2025) | |
| 68 | 05/13/2025 | Amicus Curiae APPEARANCE entered by Kyle Keraga on behalf of American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America (Keraga, Kyle) Modified on 5/13/2025 to Correct Docket as Counsel Filed the Appearance Under the Wrong Event in CM/ECF. (MAP). (Entered: 05/13/2025) | |
| 69 | 05/13/2025 | Amicus Curiae APPEARANCE entered by Emily Rose Marcy on behalf of American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America (Marcy, Emily) Modified on 5/13/2025 to Correct Docket as Counsel Filed the Appearance Under the Wrong Event in CM/ECF. (MAP). (Entered: 05/13/2025) | |
| 70 | 05/16/2025 | STATUS REPORT Joint Status Report by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Schlossberg, Suzanne) (Entered: 05/16/2025) | |
| 71 | 05/19/2025 | REPLY to Response to 37 MOTION for Preliminary Injunction filed by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Agarwal, Shalini) (Entered: 05/19/2025) | |
| 72 | 05/19/2025 | DECLARATION re 71 Reply to Response to Motion,  by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit 43 - NIH Contracts webpage, # 2 Exhibit 44 - 2/21/25 Directive on NIH Priorities, # 3 Exhibit 45 - S Delaney Suppl Decl, # 4 Exhibit 46 - J Berg Suppl Decl, # 5 Exhibit 47 - 3/31/25 Kirschstein NRSA NOFO, # 6 Exhibit 48 - 1/22/25 Kirschstein NRSA NOFO, # 7 Exhibit 49 - Updates to NIH Institutional Training Grant Applications webpage, # 8 Exhibit 50 - | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 3/11/25 Memo re: NIH's Initial Actions re EOs, # 9 Exhibit 51 - NIH Research General Terms and Conditions, # 10 Exhibit 52 - N Maphis Suppl Decl, # 11 Exhibit 53 - Mallapty Nature article, # 12 Exhibit 54 - K Edwards Suppl Decl)(Agarwal, Shalini) (Entered: 05/19/2025) | |
| 73 | 05/20/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Kenneth Parreno Filing fee: $ 125, receipt number AMADC-11019317 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A-Certificate)(Rossman, Jessie) (Entered: 05/20/2025) | |
| 74 | 05/20/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 73 Motion for Leave to Appear Pro Hac Vice Added Kenneth Parreno.  Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.  Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MAP) (Entered: 05/20/2025) | |
| 75 | 05/22/2025 | Judge William G. Young ELECTRONIC ORDER entered: allowed 47 MOTION for Leave to File Amici Curiae Brief ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MAP) (Entered: 05/22/2025) | |
| 76 | 05/22/2025 | AMICUS BRIEF filed by American Association of State Colleges and Universities, American Council on Education, American Institute of Biological Sciences, Association of American Medical Colleges, Association of American Universities, Association of Governing Boards of Universities and Colleges, Association of Public and Land-grant Universities, National Association of Independent Colleges and Universities . (Bueker, John) (Entered: 05/22/2025) | |
| 77 | 05/22/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 5/22/2025 re 37 MOTION for Preliminary Injunction  filed by American Public Health Association, Nicole Maphis, United Auto Workers, Peter Lurie, Brittany Charlton, Ibis Reproductive Health, Katie Edwards. The motion is collapsed with trial on the merits in accordance with Rule 65(a). The parties agree to treat defendants' opposition as a motion to dismiss and wish to proceed with argument today. Court stands on its order on subject matter jurisdiction entered in related case 1:25-cv-10814-WGY. Court hears argument on the opposition treated as a motion to dismiss. Court takes the matter under advisement. Plaintiffs to provide spreadsheet of grants. Defendants to produce administrative records as to directives. The Court will hold a status conference in this case and the related case to coordinate case management. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Kenneth Parreno, Shalini Goel Agarwal, Jessie Rossman, Lisa Mankofsky, Olga Akselrod for plaintiffs and Anuj Khetarpal for defendants) (KB) (Entered: 05/23/2025) | |
| 78 | 05/23/2025 | ELECTRONIC NOTICE of Hearing. Status Conference re case management of related cases set for 6/3/2025 11:00 AM in Courtroom 18 (In person only) before Judge William G. Young. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 05/23/2025) | |
| 79 | 05/23/2025 | MEMORANDUM OF LAW by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers to 41 Memorandum in Support of Motion,. (Agarwal, Shalini) (Entered: 05/23/2025) | |
| 80 | 05/27/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 60 Motion for Leave to File Amici Curiae Brief ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (KB) (Entered: 05/27/2025) | |
| 81 | 05/27/2025 | AMICUS BRIEF filed by American Institute of Biological Sciences, American Society for Biochemistry and Molecular Biology, American Society for Cell Biology, American Society for Microbiology, American Sociological Association, Association for Women in Science, Ecological Society of America, Federation of American Societies for Experimental Biology, Gerontological Society of America, Infectious Diseases Society of America, Society of Environmental Toxicology and Chemistry of North America in Support of Plaintiffs' Motion for Preliminary Injunction. (Barbero, Megan) (Entered: 05/27/2025) | |
| 82 | 05/30/2025 | Transcript of Status Conference/Motion to Dismiss Hearing held on May 22, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 6/20/2025. Redacted Transcript Deadline set for 6/30/2025. Release of Transcript Restriction set for 8/28/2025. (DRK) (Entered: 05/30/2025) | |
| 83 | 05/30/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/30/2025) | |
| 84 | 05/30/2025 | Judge William G. Young: ORDER entered: MEMORANDUM AND ORDER: The Motion to Dismiss, ECF No. 66 is ALLOWED in Part as to Counts IV, VI, and VII, Which Are Dismissed Without Prejudice, and DENIED In Part as to The Remaining Counts. (Sonnenberg, Elizabeth) (Entered: 05/30/2025) | |
| 85 | 06/02/2025 | Notice of Production of Administrative Record by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services (Attachments: # 1 Certification of Administrative Record)(Khetarpal, Anuj) (Entered: 06/02/2025) | |
| 86 | 06/03/2025 | Amended Notice of Production of Administrative Record by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services (Attachments: # 1 Certification of Administrative Record)(Khetarpal, Anuj) Modified on 6/4/2025 (MAP). (Entered: | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 06/03/2025) | |
| 87 | 06/03/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Status Conference held on 6/3/2025. Government has produced administrative record in both cases. The Court hears from parties in both cases regarding schedule and June 16th hearing. Court will hear argument on Phase 1 from 10am-1pm on June 16th in both cases. The Court adopts the proposed schedule filed in 25-cv-10814 Document 113 at page 2. The Court modifies the proposed schedule at page 4 as follows: By June 20, 2025, defendants may move to dismiss plaintiffs' claims related to alleged reasonable delay. By July 9, 2025, defendants must lodge the administrative record. Court and parties discuss phase II. Record to be supplemented as to the challenged directives as directed by the Court. If the case(s) were to resolve the parties shall inform the Clerk. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Kenneth Parreno, Jessie Rossman, Olga Akselrod, Suzanne Schlossberg, Gerard Cedrone, Katherine Dirks, Phoebe Lockhart for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/04/2025) | |
| 88 | 06/04/2025 | ELECTRONIC NOTICE of Hearing. Oral argument on Phase I set for 6/16/2025 10:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.(KB) (Entered: 06/04/2025) | |
| 89 | 06/05/2025 | Transcript of Status Conference held on June 3, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 6/26/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/3/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/05/2025) | |
| 90 | 06/05/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 06/05/2025) | |
| 91 | 06/05/2025 | STIPULATION Regarding Phase One Schedule Modifications by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Rossman, Jessie) (Entered: 06/05/2025) | |
| 92 | 06/06/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Ilann Maazel Filing fee: $ 125, receipt number AMADC-11054656 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 06/06/2025) | |
| 93 | 06/06/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Matthew Brinckerhoff Filing fee: $ 125, receipt number AMADC- | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 11054673 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 06/06/2025) | |
| 94 | 06/06/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Max Selver Filing fee: $ 125, receipt number AMADC-11054681 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 06/06/2025) | |
| 95 | 06/06/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Sydney Zazzaro Filing fee: $ 125, receipt number AMADC-11054705 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 06/06/2025) | |
| 96 | 06/09/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 92 Motion for Leave to Appear Pro Hac Vice Added Ilann Maazel. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 06/09/2025) | |
| 97 | 06/09/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 93 Motion for Leave to Appear Pro Hac Vice Added Matthew Brinckerhoff.  Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.  Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MAP) (Entered: 06/09/2025) | |
| 98 | 06/09/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 94 Motion for Leave to Appear Pro Hac Vice Added Max Selver. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 06/09/2025) | |
| 99 | 06/09/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 95 Motion for Leave to Appear Pro Hac Vice Added Sydney Zazzaro.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 06/09/2025) | |
| 100 | 06/09/2025 | NOTICE of Appearance by Matthew Brinckerhoff on behalf of Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Brinckerhoff, Matthew) (Entered: 06/09/2025) | |
| 101 | 06/09/2025 | TRIAL BRIEF Defendants' Merits Brief Concerning Phase 1 Claims by All Defendants. (Khetarpal, Anuj) (Entered: 06/09/2025) | |
| 102 | 06/09/2025 | MOTION Complete the Administrative Record by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Supplement Plaintiffs' Memorandum of Law in Support of Motion to Complete the Administrative Record, # 2 Affidavit of Matthew D. Brinckerhoff, Esq., # 3 Exhibit 1 - Letter, dated June 5, 2025, # 4 Exhibit 2 - Email Exchange Between Jessie Rossman and Anuj Khetarpal)(Brinckerhoff, Matthew) (Entered: 06/09/2025) | |
| 103 | 06/09/2025 | PRETRIAL MEMORANDUM by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A - Proposed Order, # 2 Affidavit of Matthew D. Brinckerhoff, Esq., # 3 Exhibit 55 - Scott Delaney Second Supplemental Declaration, # 4 Exhibit 56 - Katie Edwards Second Supplemental Declaration)(Brinckerhoff, Matthew) (Entered: 06/09/2025) | |
| 104 | 06/10/2025 | APHA Plaintiffs' Exhibit List and Witness List for Phase 1 Proceeding by All Plaintiffs.. (Schlossberg, Suzanne) (Entered: 06/10/2025) | |
| 105 | 06/11/2025 | ELECTRONIC NOTICE of Hearing. Final Pretrial Conference set for 6/12/2025 11:00 AM in Courtroom 18 (Remote only) before Judge William G. Young. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/11/2025) | |
| 106 | 06/11/2025 | NOTICE of Appearance by Max Roller Selver on behalf of Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Selver, Max) (Entered: 06/11/2025) | |
| 107 | 06/11/2025 | NOTICE of Appearance by Sydney Kathryn Zazzaro on behalf of Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Zazzaro, Sydney) (Entered: 06/11/2025) | |
| 108 | 06/11/2025 | Certification of the Administrative Record (Updated) by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services re 86 Notice (Other), (Attachments: # 1 Email, # 2 Certification, # 3 Ex A to certification, # 4 Ex B to certification, # 5 Ex C to certification, # 6 NIH_GRANTS_003825-3910, # 7 NIH_GRANTS_003911-3995, # 8 NIH_GRANTS_003996-4081, # 9 NIH_GRANTS_004082-4165, # 10 NIH_GRANTS_004166-4251, # 11 NIH_GRANTS_004252, # 12 NIH_GRANTS_004253-54, # 13 NIH_GRANTS_004255-57, # 14 NIH_GRANTS_004258-69, # 15 NIH_GRANTS_004270)(Khetarpal, Anuj) Modified on 6/12/2025 (MAP). (Entered: 06/11/2025) | |
| 109 | 06/12/2025 | Opposition re 102 MOTION Complete the Administrative Record filed by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. (Attachments: # 1 Exhibit Exhibit A)(Khetarpal, Anuj) (Entered: 06/12/2025) | |

A0318

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 110 | 06/12/2025 | Judge William G. Young: ELECTRONIC ORDER entered re 102 Motion MOTION Complete the Administrative Record by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. Motion allowed in part and denied in part as follows: A. Grants not terminated- Denied as moot B. Termination forms- Allowed. "Guidance" is not "deliberation." C. HHS and DOGE imput: Denied on the representation that such search has been made. D. AI Use: Allowed. E. Metadata: Denied without prejudice to seeking such discovery beyond the APA claims. F. Certification. Denied as moot. SO ORDERED. (KB) (Entered: 06/12/2025) | |
| 112 | 06/12/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Final Pretrial Conference held on 6/12/2025. Court and the parties discuss the record in the case. Court has administrative record as it has been provided. Plaintiffs have also filed records. Court hears parties on the matter. Court will review defendants' opposition to the motions to Complete Record. Court will hear oral argument on phase 1 of the case on Monday, June 16th at 10am. Each side will have one hour for argument (plaintiffs in both cases will have one hour combined). Parties to discuss proposed phase 2 schedule on Monday. Court has off the record portion of hearing regarding possibility of settlement. If the case were to settle in part or in whole the parties shall inform the Clerk. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Matthew Brinckerhoff, Jessie Rossman, Lisa Mankofsky, Max Roller Selver, Olga Akselrod, Rachel Anne Meeropol, Sydney Kathryn Zazzaro, Gerard Cedrone, Christopher Pappavaselio, Phoebe Lockhart, Rachel Brown, Vanessa Azniv Arslanian, Nimrod Pitsker Elias, Astrid Carrete, Jordan Broadbent for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/12/2025) | |
| 111 | 06/13/2025 | TRIAL BRIEF in Response to Plaintiffs' Opening Briefs by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. (Khetarpal, Anuj) (Entered: 06/13/2025) | |
| 113 | 06/13/2025 | TRIAL BRIEF in Response to Defendants' Opening Brief on Phase 1 by All Plaintiffs. (Rossman, Jessie) (Entered: 06/13/2025) | |
| 114 | 06/13/2025 | Transcript of Final Pretrial held on June 12, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/7/2025. Redacted Transcript Deadline set for 7/14/2025. Release of Transcript Restriction set for 9/11/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/13/2025) | |
| 115 | 06/13/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 06/13/2025) | |
| 116 | 06/13/2025 | NOTICE of Appearance by Ilann Margalit Maazel on behalf of Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Maazel, Ilann) (Entered: 06/13/2025) | |
| 117 | 06/13/2025 | NOTICE by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Human Services of Production of Administrative Record (Attachments: # 1 Designation and Certification of Administrative Record)(Khetarpal, Anuj) (Entered: 06/13/2025) | |
| 118 | 06/13/2025 | NOTICE by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers of Service (Agarwal, Shalini) (Entered: 06/13/2025) | |
| 119 | 06/16/2025 | ELECTRONIC NOTICE of Hearing. Hearing set for 6/16/2025 at 2:00pm. (In person with remote access provided) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/16/2025) | |
| 120 | 06/16/2025 | Judge William G. Young: STIPULATED PROTECTIVE ORDER entered. Granting (140) Joint Motion for Protective Order in case 1:25-cv-10814-WGY Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(KB) (Entered: 06/16/2025) | |
| 121 | 06/16/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Bench Trial as to Phase 1 held on 6/16/2025.Court hears argument on Phase 1 of the case. Defendants ask Court to take Judicial Notice of the Federal Register Notices. Court takes Judicial Notice. Defendants move to admit into evidence 13 Certified records. No objection. Admitted as exhibit 1. Court takes the matter under advisement. Parties will inform the Court if they wish for the Court to reconvene in the afternoon or if they wish for the Court to hold off issuing a ruling as to Phase 1. The Court reconvenes in the afternoon. The Court announces the findings and rulings that it is able to make today. The challenged directives are vacated. A written order will issue. Defendants shall promptly comply with the order of the Court. Plaintiffs to submit a proposed partial but final judgment as to Phase 1 by June 17, 2025. The Court discusses evidence as to harm. The parties will meet and inform the Court if an evidentiary hearing regarding harm is necessary. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Kenneth Parreno, Jessie Rossman, Olga Akselrod, Rachel Anne Meeropol, Gerard Cedrone, Rachel Brown, Nimrod Pitsker Elias for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/17/2025) | |
| 122 | 06/17/2025 | Proposed Document(s) submitted by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. Document received: Rule 54(b) Partial Final Judgment. (Brinckerhoff, Matthew) (Entered: 06/17/2025) | |
| 123 | 06/18/2025 | ELECTRONIC NOTICE of Hearing. Status Conference set for 6/18/2025 02:00 PM in Courtroom 18 (Remote only) before Judge William G. Young. This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/18/2025) | |

A0320

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 124 | 06/18/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Status Conference re proposed judgments held on 6/18/2025. The Court hears from parties regarding proposed judgments and modifies judgments as stated. Plaintiffs' counsel shall re-submit the proposed judgments as modified by the Court. (Attorneys present: Olga Akselrod, Lisa Mankofsky, Suzanne Schlossberg, Jessie J. Rossman, Gerard Cedrone, Chris Pappavaselio, Phoebe Lockhart, Rachel M. Brown for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants)(Court Reporter: Richard Romanow at rhr3tubas@aol.com.) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/18/2025) | |
| 125 | 06/18/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Leah Watson Filing fee: $ 125, receipt number AMADC-11076182 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A - Certificate)(Schlossberg, Suzanne) (Entered: 06/18/2025) | |
| 126 | 06/18/2025 | MOTION to Seal Lists of Grant Terminations by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers.(Brinckerhoff, Matthew) (Entered: 06/18/2025) | |
| 127 | 06/18/2025 | MEMORANDUM in Support re 126 MOTION to Seal Lists of Grant Terminations  filed by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Brinckerhoff, Matthew) (Entered: 06/18/2025) | |
| 128 | 06/18/2025 | Proposed Document(s) submitted by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. Document received: Rule 54(b) Partial Final Judgment. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Brinckerhoff, Matthew) (Entered: 06/18/2025) | |
| 129 | 06/19/2025 | BRIEF by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers . (Meeropol, Rachel) (Entered: 06/19/2025) | |
| 130 | 06/20/2025 | MOTION to Dismiss for lack of jurisdiction and failure to state a claim by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services.(Khetarpal, Anuj) (Entered: 06/20/2025) | |
| 131 | 06/20/2025 | MEMORANDUM in Support re 130 MOTION to Dismiss for lack of jurisdiction and failure to state a claim  filed by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. (Khetarpal, Anuj) (Entered: 06/20/2025) | |
| 132 | 06/20/2025 | Opposition re 130 MOTION to Dismiss for lack of jurisdiction and failure to state a claim (Opposition as to Motion to Expedite) filed by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Parreno, Kenneth) (Entered: 06/20/2025) | |
| 133 | 06/22/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 125 Motion for Leave to Appear Pro Hac Vice Added Leah Watson.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be | |

A0321

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 06/22/2025) | |
| 134 | 06/23/2025 | Judge William G. Young: ORDER entered. re 126 MOTION to Seal Lists of Grant Terminations filed by American Public Health Association, Nicole Maphis, United Auto Workers, Peter Lurie, Brittany Charlton, Ibis Reproductive Health, Katie Edwards Motion to file under seal denied. Plaintiffs alternative proposal approved. (Sonnenberg, Elizabeth) (Entered: 06/23/2025) | |
| 135 | 06/23/2025 | Judge William G. Young: ELECTRONIC ORDER entered denying 126 Motion to Seal. See order 134 (Sonnenberg, Elizabeth) (Entered: 06/23/2025) | |
| 136 | 06/23/2025 | Judge William G. Young: ORDER entered. re 132 Opposition to Motion, filed by American Public Health Association, Nicole Maphis, United Auto Workers, Peter Lurie, Brittany Charlton, Ibis Reproductive Health, Katie Edwards  The presently agreed deadlines are satisfactory. Request denied. (Sonnenberg, Elizabeth) (Entered: 06/23/2025) | |
| 137 | 06/23/2025 | Proposed Document(s) submitted by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. Document received: Revised Proposed Partial Final Judgment. (Attachments: # 1 Exhibit Exhibit A - May 27 Spreadsheet, # 2 Exhibit Exhibit B - June 13 Spreadsheet)(Schlossberg, Suzanne) (Entered: 06/23/2025) | |
| 138 | 06/23/2025 | Judge William G. Young: ORDER entered.  RULE 54(b) PARTIAL FINAL JUDGMENT (Sonnenberg, Elizabeth) (Additional attachment(s) added on 6/23/2025: # 1 Exhibit A, # 2 Exhibit B) (MAP). (Main Document 138 replaced 6/23/2025) (MAP). (Entered: 06/23/2025) | |
| 139 | 06/23/2025 | NOTICE OF APPEAL as to 138 Order, 84 Memorandum & ORDER, by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. Fee Status: US Government. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals.  Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 7/14/2025. (Khetarpal, Anuj) (Entered: 06/23/2025) | |
| 140 | 06/23/2025 | MOTION to Stay re 138 Order  by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services.(Khetarpal, Anuj) (Entered: 06/23/2025) | |
| 141 | 06/23/2025 | MEMORANDUM in Support re 140 MOTION to Stay re 138 Order filed by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. (Khetarpal, Anuj) (Entered: 06/23/2025) | |
| 142 | 06/23/2025 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 139 Notice of Appeal. (MAP) (Entered: 06/23/2025) | |
| 143 | 06/23/2025 | Transcript of Bench Trial, Phase 1 (Closings) held on June 16, 2025, before Judge William G. Young. The Transcript may be | |

A0322

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/14/2025. Redacted Transcript Deadline set for 7/24/2025. Release of Transcript Restriction set for 9/22/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/24/2025) | |
| 144 | 06/23/2025 | Transcript of Status Conference held on June 18, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/14/2025. Redacted Transcript Deadline set for 7/24/2025. Release of Transcript Restriction set for 9/22/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/24/2025) | |
| 145 | 06/23/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/24/2025) | |
| 146 | 06/24/2025 | USCA Case Number 25-1611 for 139 Notice of Appeal,,, filed by Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services, Jay Bhattacharya. (MAP) (Entered: 06/24/2025) | |
| 147 | 06/24/2025 | Judge William G. Young:  ORDER entered.  (Sonnenberg, Elizabeth) (Entered: 06/24/2025) | |
| 148 | 06/24/2025 | Supplemental Record on Appeal transmitted to US Court of Appeals re 139 Notice of Appeal Documents included: ECF No. 147 (MAP) (Entered: 06/24/2025) | |
| 149 | 06/30/2025 | Opposition re 130 MOTION to Dismiss for lack of jurisdiction and failure to state a claim (Opposition as to Motion to Dismiss Phase 2 Claims) filed by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Parreno, Kenneth) (Entered: 06/30/2025) | |
| 150 | 07/01/2025 | NOTICE of Appearance by Leah Watson on behalf of Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Watson, Leah) (Entered: 07/01/2025) | |
| 151 | 07/02/2025 | Judge William G. Young: ORDER entered.  FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR PARTIAL SEPARATE AND FINAL JUDGMENTAssociated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(Sonnenberg, Elizabeth) (Entered: 07/02/2025) | |
| 152 | 07/07/2025 | Supplemental Record on Appeal transmitted to US Court of Appeals re 139 Notice of Appeal. (MAP) (Entered: 07/07/2025) | |
| 153 | 07/09/2025 | NOTICE by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services  (Attachments: # 1 Certification of the Administrative Record)(Khetarpal, Anuj) (Entered: 07/09/2025) | |
| 154 | 07/17/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Emily Gilman Filing fee: $ 125, receipt number AMADC-11127347 by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers. (Attachments: # 1 Exhibit A-Certificate)(Schlossberg, Suzanne) (Entered: 07/17/2025) | |

A0323

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 155 | 07/17/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 154 Motion for Leave to Appear Pro Hac Vice Added Emily Gilman. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 07/17/2025) | |
| 156 | 07/17/2025 | NOTICE of Appearance by Samuel Hobbs on behalf of Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services (Hobbs, Samuel) (Entered: 07/17/2025) | |
| 157 | 07/18/2025 | OPINION of USCA as to 139 Notice of Appeal, filed by Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services, Jay Bhattacharya. The Department's Motion for a Stay is DENIED. (MAP) (Entered: 07/20/2025) | |
| 158 | 07/18/2025 | ORDER of USCA as to 139 Notice of Appeal, filed by Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services, Jay Bhattacharya (MAP) (Entered: 07/20/2025) | |
| 159 | 07/21/2025 | NOTICE of Appearance by Emily Danya Gilman on behalf of Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Gilman, Emily) (Entered: 07/21/2025) | |
| 160 | 07/22/2025 | ELECTRONIC NOTICE of Hearing. Status Conference set for 7/28/2025 11:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 07/22/2025) | |
| 161 | 07/22/2025 | Assented to MOTION for Extension of Time to 7/25/2025 to Plaintiffs Submission of Motion to Complete Phase 2 Administrative Record by Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers.(Brinckerhoff, Matthew) (Entered: 07/22/2025) | |
| 162 | 07/23/2025 | Judge William G. Young: ELECTRONIC ORDER entered allowed 161 Assented to MOTION for Extension of Time to 7/25/2025 to Plaintiffs Submission of Motion to Complete Phase 2 Administrative Record/ (MAP) (Entered: 07/23/2025) | |
| 163 | 07/25/2025 | JOINT STATEMENT of counsel regarding schedule for further proceedings. (Brinckerhoff, Matthew) (Entered: 07/25/2025) | |
| 164 | 07/28/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Status Conference held on 7/28/2025. Parties discuss status of case and phase II. Court adopts schedule but modifies pretrial and bench trial date. Final Pretrial Conference set for September 2, 2025 at 10:00 AM. The Court will hear argument on motion to dismiss at the final pretrial conference. The Bench trial will occur no later than September 15, 2025. Court hears the parties on discovery. Court takes the legal arguments as to discovery under advisement. Court will issue an order on or after August 15th. Court hears parties on defendants' stipulation as to supplemental claims. If Court requires more data the Court will order it at that time, the stipulation may be sufficient. Court discusses application for stay in the Supreme Court and possible | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | outcomes. Final Pretrial Conference set for 9/2/2025 10:00 AM in Courtroom 18 (In person only with Remote Access Provided ) before Judge William G. Young. Bench Trial set for 9/15/2025 09:00 AM in Courtroom 18 (In person only with Remote Access Provided) before Judge William G. Young.(Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Max Roller Selver, Suzanne Schlossberg, Katherine B. Dirks, Phoebe Lockhart, Anuj K. Khetarpal and Samuel Hobbs ) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 07/29/2025) | |
| 165 | 07/30/2025 | Transcript of Status Conference held on July 28, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 8/20/2025. Redacted Transcript Deadline set for 9/2/2025. Release of Transcript Restriction set for 10/28/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 07/30/2025) | |
| 166 | 07/30/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 07/30/2025) | |
| 167 | 08/01/2025 | JOINT STATEMENT of counsel and Stipulation Concerning Phase 2 Schedule. (Schlossberg, Suzanne) (Entered: 08/01/2025) | |
| 168 | 08/14/2025 | Judge William G. Young: ELECTRONIC ORDER entered approving re 167 JOINT STATEMENT of counsel and Stipulation Concerning Phase 2 Schedule. (KB) (Entered: 08/14/2025) | |
| 169 | 08/15/2025 | MEMORANDUM OF LAW by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services. (Khetarpal, Anuj) (Entered: 08/15/2025) | |
| 170 | 08/19/2025 | NOTICE by Jay Bhattacharya, Robert F. Kennedy, Jr., National Institutes of Health, United States Department of Health and Human Services of Production of Phase 2 AR Certifications (Khetarpal, Anuj) (Entered: 08/19/2025) | |
| 171 | 08/26/2025 | NOTICE of Appearance by Jennifer Herrmann on behalf of Brittany Charlton, Katie Edwards, American Public Health Association, Peter Lurie, Nicole Maphis, Ibis Reproductive Health, United Auto Workers (Herrmann, Jennifer) (Entered: 08/26/2025) | |
| 172 | 08/29/2025 | NOTICE OF COURTROOM CHANGE: The hearing on 9/2/2025 will occur in Courtroom 17. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 08/29/2025) | |
| 173 | 09/02/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Final Pretrial Conference held on 9/2/2025. Court addresses Supreme Court order. Court takes recess for parties to confer. Court continues hearing until Thursday at 10:00AM. Pretrial deadlines are extended accordingly. Final Pretrial Conference set for 9/4/2025 10:00 AM in Courtroom 10 (In person with remote access provided) before Judge William G. Young. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | www.mad.uscourts.gov or contact the session here. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Kenneth Parreno, Alejandro Ortiz, Jessie J. Rossman, Olga Akselrod, Gerard J. Cedrone, Phoebe Lockhart, Vanessa Azniv Arslanian for plaintiffs and Samuel Hobbs and Anuj Khetarpal for defendants ) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 09/02/2025) | |
| 174 | 09/03/2025 | ELECTRONIC NOTICE OF RESCHEDULING: At request of the parties the Final Pretrial Conference is reset for 9/9/2025 03:30 PM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Bench trial is reset for 9/22/2025. Deadlines are extended accordingly. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 09/03/2025) | |
| 175 | 09/04/2025 | Transcript of Final Pretrial Conference held on September 2, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 9/25/2025. Redacted Transcript Deadline set for 10/6/2025. Release of Transcript Restriction set for 12/3/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 09/04/2025) | |
| 176 | 09/04/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 09/04/2025) | |
| 177 | 09/08/2025 | ELECTRONIC NOTICE OF RESCHEDULING: At request of the parties, the Final Pretrial Conference is reset for 9/18/2025 02:00 PM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Bench Trial is reset for 10/6/2025 09:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 09/08/2025) | |
| 178 | 09/17/2025 | ELECTRONIC NOTICE Canceling Hearing. Due to a conflict in the Court's schedule the Final Pretrial Conference set for 9/18/2025 is cancelled and will be rescheduled. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 09/17/2025) | |
| 179 | 09/18/2025 | ELECTRONIC NOTICE OF RESCHEDULING: At request of the parties, the Final Pretrial Conference is reset for 9/30/2025 02:00 PM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Bench Trial tentatively reset for 10/14/2025 09:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Final Pretrial Conference set for 9/30/2025 02:00 PM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 09/18/2025) | |

1:25cv10787, American Public Health Association Et Al V. National Institutes Of Health Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 180 | 09/25/2025 | ELECTRONIC NOTICE Cancelling Hearings. The Final Pretrial Conference set for 9/30/2025 and the Bench Trial set for 10/14/2025 are cancelled and will be rescheduled for dates to be determined. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 09/25/2025) | Events since last full update |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

A0327

**1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al**

US District Court Docket

United States District Court, Massachusetts

(Boston)

This case was retrieved on 09/25/2025

## Header

**Case Number:** 1:25cv10814
**Date Filed:** 04/04/2025
**Assigned To:** Judge William G. Young
**Nature of Suit:** Other Statutes - Administrative Procedure
Act/Review or Appeal of Agency Decision (899)
**Cause:** Administrative Procedure Act
**Lead Docket:** None
**Other Docket:** 1:25cv10787, USCA - First Circuit, 25-01612
**Jurisdiction:** Federal Question

**Class Code:** Open
**Statute:** 05:702
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure
Act/Review or Appeal of Agency Decision

## Participants

### Litigants

Commonwealth of Massachusetts
**Plaintiff**

### Attorneys

Gerard J. Cedrone
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Massachusetts Attorney General's Office
One Ashburton Place 20th Floor
Boston, MA  02108
USA
617-963-2282 Email:Gerard.Cedrone@mass.Gov

Allyson T Slater
ATTORNEY TO BE NOTICED
Massachusetts Attorney General's Office
1 Ashburton Place
Boston, MA  02108
USA
617-727-2200 Email:Allyson.Slater@mass.Gov

Chris Pappavaselio
ATTORNEY TO BE NOTICED
[Terminated: 08/22/2025]
Massachusetts Attorney General's Office
One Ashburton Place
Boston, MA  02108
USA
213-219-0765

Eric A. Martignetti
ATTORNEY TO BE NOTICED
Massachusetts Attorney General's Office
Mccormack Building One Ashburton Place

A0328

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| | Boston, MA  02108<br>USA<br>617-963-2314 Email:Eric.Martignetti@mass.Gov<br><br>Katherine B. Dirks<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>1 Ashburton Pl. Ste 20th Floor<br>Boston, MA  02478<br>USA<br>617-963-2277 Email:Katherine.Dirks@mass.Gov<br><br>Nadav S. Pearl<br>ATTORNEY TO BE NOTICED<br>Massachusetts Office of the Attorney General<br>Government Bureau, Trial Division One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2881 Email:Nadav.Pearl@mass.Gov<br><br>Phoebe Lockhart<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2663 Email:Phoebe.Lockhart@mass.Gov<br><br>Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov<br><br>Vanessa Azniv Arslanian<br>ATTORNEY TO BE NOTICED<br>Office of Massachusetts Attorney General<br>1 Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2107 Email:Vanessa.Arslanian@mass.Gov |
| State of California<br>**Plaintiff** | Daniel Ambar<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Office of The Attorney General<br>Healthcare Rights And Access Section 300 S. Spring St. Suite 1702<br>Los Angeles, CA  90013<br>USA<br>213-453-3598 Email:Daniel.Ambar@doj.Ca.Gov<br><br>Hilary Ann Burke Chan<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Office of The Attorney General<br>Public Rights Division 1515 Clay Street<br>Oakland, CA  94612 |

A0329

| Litigants | Attorneys |
|---|---|
| | USA<br>510-879-1499 Email:Hilary.Chan@doj.Ca.Gov<br><br>Sophia TonNu<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Office of The Attorney General<br>Healthcare Rights & Access 455 Golden Gate Avenue Suite #11000<br>San Francisco, CA  94102<br>USA<br>415-510-3529 Email:Sophia.Tonnu@doj.Ca.Gov<br><br>Emilio Eugene Varanini , IV<br>ATTORNEY TO BE NOTICED<br>Office of the California Attorney General<br>455 Golden Gate Avenue Suite 11000<br>San Francisco, CA  94102<br>USA<br>415-703-5908 Email:Emilio.Varanini@doj.Ca.Gov<br><br>Kathleen Boergers<br>ATTORNEY TO BE NOTICED<br>Office of The Attorney General<br>1515 Clay Street Ste 20th Floor<br>Oakland, CA  94612<br>USA<br>510-879-0011 Email:Kathleen.Boergers@doj.Ca.Gov<br><br>Ketakee Rajiv Kane<br>ATTORNEY TO BE NOTICED<br>Office of The Attorney General<br>1515 Clay Street<br>Oakland, CA  94612<br>USA<br>510-879-1519 Email:Ketakee.Kane@doj.Ca.Gov<br><br>Nimrod Pitsker Elias<br>ATTORNEY TO BE NOTICED<br>Office of the Attorney General<br>1515 Clay Street Ste. 2000<br>Oakland, CA  94612<br>USA<br>510-879-0012 Email:Nimrod.Elias@doj.Ca.Gov<br><br>Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Maryland<br>**Plaintiff** | James C. Luh<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Office of the Attorney General- State of Maryland<br>200 Saint Paul Place<br>Baltimore, MD  21202<br>USA<br>410-576-6411 Email:Jluh@oag.State.Md.Us |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

## Litigants                                              ## Attorneys

|  |  |
|---|---|
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA 02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| **State of Washington**<br>**Plaintiff** | Andrew R.W. Hughes<br>ATTORNEY TO BE NOTICED<br>State of Washington Attorney General's Office<br>Complex Litigation 800 Fifth Avenue Suite 2000<br>Seattle, WA 98104<br>USA<br>206-464-7744 Email:Andrew.Hughes@atg.Wa.Gov |
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA 02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| | Tyler S. Roberts<br>ATTORNEY TO BE NOTICED<br>State of Washington Attorney General's Office<br>800 Fifth Avenue Suite 2000<br>Seattle, WA 98104<br>USA<br>206-521-3683 Fax: 206-587-4229<br>Email:Tyler.Roberts@atg.Wa.Gov |
| **State of Arizona**<br>**Plaintiff** | Joshua Nomkin<br>ATTORNEY TO BE NOTICED<br>Arizona Attorney General's Office<br>2005 N. Central Avenue<br>Phoenix, AZ 85004<br>USA<br>602-542-4288 Fax: 602-542-8308<br>Email:Joshua.Nomkin@azag.Gov |
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA 02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| **State of Colorado**<br>**Plaintiff** | Shannon Wells Stevenson<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Colorado Department of Law<br>Office Of The Attorney General 1300 Broadway<br>Denver, CO 80203<br>USA<br>720-508-6749 Email:Shannon.Stevenson@coag.Gov |
| | Lauren Kelsey Peach |

| Litigants | Attorneys |
|---|---|
| | ATTORNEY TO BE NOTICED<br>Colorado Department of Law<br>1300 Broadway, 6th Floor<br>Denver, CO  80203<br>USA<br>720-508-6156 Fax: 720-508-6041<br>Email:Lauren.Peach@coag.Gov<br><br>Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Delaware<br>**Plaintiff** | Ian Liston<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Delaware Department of Justice<br>Fraud And Consumer Protection Division, White Collar Crime U 820 North French Street<br>Wilmington, DE  19801<br>USA<br>302-683-8875 Email:Ian.Liston@delaware.Gov<br><br>Vanessa L Kassab<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Delaware Department of Justice<br>Division Of Fraud And Consumer Protection Carvel State Building 820 N. French St.<br>Wilmington, DE  19801<br>USA<br>302-683-8881 Email:Vanessa.Kassab@delaware.Gov<br><br>Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Hawaii<br>**Plaintiff** | David Dana Day<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>State of Hawaii - Department of the Attorney General<br>Appellate Division 425 Queen Street<br>Honolulu, HI  96813<br>USA<br>808-586-1346 Email:David.D.Day@hawaii.Gov<br><br>Kalikoonalani Diara Fernandes<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Department of the Attorney General, State of Hawaii<br>425 Queen Street<br>Honolulu, HI  96813<br>USA<br>808-586-1360 Email:Kaliko.D.Fernandes@hawaii.Gov |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

## Litigants

## Attorneys

|  |  |
|---|---|
|  | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Minnesota<br>**Plaintiff** | Peter Farrell<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Office of the Minnesota Attorney General<br>445 Minnesota Street Suite 600<br>St. Paul, MN  55101-2127<br>USA<br>651-757-1424 Email:Peter.Farrell@ag.State.Mn.Us |
|  | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Nevada<br>**Plaintiff** | Heidi Parry Stern<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Nevada Attorney General's Office<br>Solicitor General 1 State Of Nevada Way Ste 100<br>Las Vegas, NV  89119<br>USA<br>702-486-3594 Email:Hstern@ag.Nv.Gov |
|  | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of New Jersey<br>**Plaintiff** | BRYCE KELLY HURST<br>ATTORNEY TO BE NOTICED<br>NEW JERSEY OFFICE OF THE ATTORNEY GENERAL<br>25 Market Street P.O. Box 112<br>Trenton, NJ  08625<br>USA<br>609-376-2960 Email:Bryce.Hurst@law.Njoag.Gov |
|  | Nancy Trasande<br>ATTORNEY TO BE NOTICED<br>New Jersey Office of the Attorney General<br>124 Halsey Street Ste 5th Floor<br>Newark, NJ  07102<br>USA<br>609-696-5371 Email:Nancy.Trasande@law.Njoag.Gov |
|  | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108 |

A0333

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| **Litigants** | **Attorneys** |
|---|---|
| | USA |
| | 617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of New Mexico<br>**Plaintiff** | Astrid Carrete<br>ATTORNEY TO BE NOTICED<br>NEW MEXICO DEPARTMENT OF JUSTICE<br>201 3rd Street Ste 300<br>Albuquerque, NM  87102<br>USA<br>505-859-6356 Email:Acarrete@nmdoj.Gov |
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of New York<br>**Plaintiff** | Molly Thomas-Jensen<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>NYS Office of The Attorney General<br>28 Liberty Street 18th Floor<br>New York, NY  10005<br>USA<br>212-416-8679 Email:Molly.Thomas-Jensen@ag.Ny.Gov |
| | Rabia Muqaddam<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>NYS Office of The Attorney General<br>28 Liberty St.<br>New York, NY  10005<br>USA<br>917-715-4172 Email:Rabia.Muqaddam@ag.Ny.Gov |
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Oregon<br>**Plaintiff** | Christina Beatty-Walters<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Oregon Department of Justice<br>100 Sw Market St<br>Portland, OR  97201<br>USA<br>971-673-1880 Email:Tina.Beattywalters@doj.Oregon.Gov |
| | Leanne E. Hartmann<br>ATTORNEY TO BE NOTICED<br>Oregon Department of Justice<br>100 Sw Market Street<br>Portland, OR  97201<br>USA<br>971-683-1880 Email:Leanne.Hartmann@doj.Oregon.Gov |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Rhode Island<br>**Plaintiff** | Jordan Broadbent<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>RI Department of Attorney General<br>150 South Main Street<br>Providence, RI  02903<br>USA<br>401-274-4400 Email:Jbroadbent@riag.Ri.Gov |
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| State of Wisconsin<br>**Plaintiff** | Lynn Kristine Lodahl<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Wisconsin Department of Justice<br>17 West Main Street<br>Madison, WI  53703<br>USA<br>608-264-6219 Email:Lodahllk@doj.State.Wi.Us |
| | Rachel M. Brown<br>ATTORNEY TO BE NOTICED<br>Massachusetts Attorney General's Office<br>Mccormack Building One Ashburton Place<br>Boston, MA  02108<br>USA<br>617-963-2382 Email:Rachel.Brown@mass.Gov |
| Robert  F. Kennedy, Jr.<br>in his official capacity as Secretary of Health and Human Services \|<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005 |

A0335

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| | USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| United States Department of Health and Human Services<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| Jayanta Bhattacharya<br>in his official capacity as Director of the National Institutes of Health |<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| National Institutes of Health<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED |

| Litigants | Attorneys |
|---|---|
| | United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| **National Cancer Institute**<br>**Defendant** | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov<br><br>Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov<br><br>Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| **National Eye Institute**<br>**Defendant** | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov<br><br>Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov<br><br>Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov<br><br>Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

## Litigants                                         ## Attorneys

National Heart, Lung, and Blood Institute            Thomas Ports , Jr
**Defendant**                                        LEAD ATTORNEY;ATTORNEY TO BE NOTICED
                                                     DOJ-Enrd
                                                     P.O. Box 875 Ben Franklin Station
                                                     Washington, DC  20044
                                                     USA
                                                     202-307-1105 Email:Thomas.Ports@usdoj.Gov

                                                     Anuj K. Khetarpal
                                                     ATTORNEY TO BE NOTICED
                                                     United States Attorney's Office
                                                     1 Courthouse Way Suite 9200
                                                     Boston, MA  02210
                                                     USA
                                                     617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

                                                     Samuel Hobbs
                                                     ATTORNEY TO BE NOTICED
                                                     DOJ-Civ
                                                     Corporate Financial Litigation 1100 L St Nw Room 7210
                                                     Washington, DC  20005
                                                     USA
                                                     202-616-8077 Email:Samuel.Hobbs@usdoj.Gov

National Human Genome Research Institute             Thomas Ports , Jr
**Defendant**                                        LEAD ATTORNEY;ATTORNEY TO BE NOTICED
                                                     DOJ-Enrd
                                                     P.O. Box 875 Ben Franklin Station
                                                     Washington, DC  20044
                                                     USA
                                                     202-307-1105 Email:Thomas.Ports@usdoj.Gov

                                                     Anuj K. Khetarpal
                                                     ATTORNEY TO BE NOTICED
                                                     United States Attorney's Office
                                                     1 Courthouse Way Suite 9200
                                                     Boston, MA  02210
                                                     USA
                                                     617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

                                                     Samuel Hobbs
                                                     ATTORNEY TO BE NOTICED
                                                     DOJ-Civ
                                                     Corporate Financial Litigation 1100 L St Nw Room 7210
                                                     Washington, DC  20005
                                                     USA
                                                     202-616-8077 Email:Samuel.Hobbs@usdoj.Gov

National Institute on Aging                          Thomas Ports , Jr
**Defendant**                                        LEAD ATTORNEY;ATTORNEY TO BE NOTICED
                                                     DOJ-Enrd
                                                     P.O. Box 875 Ben Franklin Station
                                                     Washington, DC  20044
                                                     USA
                                                     202-307-1105 Email:Thomas.Ports@usdoj.Gov

                                                     Anuj K. Khetarpal
                                                     ATTORNEY TO BE NOTICED
                                                     United States Attorney's Office
                                                     1 Courthouse Way Suite 9200
                                                     Boston, MA  02210
                                                     USA

A0338

| Litigants | Attorneys |
|---|---|
| | USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| National Institute on Alcohol Abuse and Alcoholism<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| National Institute of Allergy and Infectious Diseases<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| National Institute of Arthritis and Musculoskeletal and Skin Diseases | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED |

A0339

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

## Litigants                                          ## Attorneys

**Defendant**

DOJ-Enrd
P.O. Box 875 Ben Franklin Station
Washington, DC  20044
USA
202-307-1105 Email:Thomas.Ports@usdoj.Gov

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210
USA
617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

Samuel Hobbs
ATTORNEY TO BE NOTICED
DOJ-Civ
Corporate Financial Litigation 1100 L St Nw Room 7210
Washington, DC  20005
USA
202-616-8077 Email:Samuel.Hobbs@usdoj.Gov

National Institute of Biomedical Imaging and Bioengineering
**Defendant**

Thomas Ports , Jr
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
P.O. Box 875 Ben Franklin Station
Washington, DC  20044
USA
202-307-1105 Email:Thomas.Ports@usdoj.Gov

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210
USA
617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

Samuel Hobbs
ATTORNEY TO BE NOTICED
DOJ-Civ
Corporate Financial Litigation 1100 L St Nw Room 7210
Washington, DC  20005
USA
202-616-8077 Email:Samuel.Hobbs@usdoj.Gov

Eunice Kennedy Shriver National Institute of Child Health and
Human Development
**Defendant**

Thomas Ports , Jr
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
P.O. Box 875 Ben Franklin Station
Washington, DC  20044
USA
202-307-1105 Email:Thomas.Ports@usdoj.Gov

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210
USA
617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

A0340

| Litigants | Attorneys |
|---|---|
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| **National Institute on Deafness and Other Communication Disorders**<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| **National Institute of Dental and Craniofacial Research**<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| **National Institute of Diabetes and Digestive and Kidney Diseases**<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station |

A0341

## Litigants

## Attorneys

Washington, DC  20044
USA
202-307-1105 Email:Thomas.Ports@usdoj.Gov

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210
USA
617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

Samuel Hobbs
ATTORNEY TO BE NOTICED
DOJ-Civ
Corporate Financial Litigation 1100 L St Nw Room 7210
Washington, DC  20005
USA
202-616-8077 Email:Samuel.Hobbs@usdoj.Gov

National Institute on Drug Abuse
**Defendant**

Thomas Ports , Jr
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
P.O. Box 875 Ben Franklin Station
Washington, DC  20044
USA
202-307-1105 Email:Thomas.Ports@usdoj.Gov

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210
USA
617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

Samuel Hobbs
ATTORNEY TO BE NOTICED
DOJ-Civ
Corporate Financial Litigation 1100 L St Nw Room 7210
Washington, DC  20005
USA
202-616-8077 Email:Samuel.Hobbs@usdoj.Gov

National Institute of Environmental Health Sciences
**Defendant**

Thomas Ports , Jr
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
P.O. Box 875 Ben Franklin Station
Washington, DC  20044
USA
202-307-1105 Email:Thomas.Ports@usdoj.Gov

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210
USA
617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

A0342

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

## Litigants                                          ## Attorneys

|  |  |
|---|---|
|  | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| National Institute of General Medical Sciences<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
|  | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
|  | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| National Institute of Mental Health<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
|  | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
|  | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| National Institute on Minority Health and Health Disparities<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA |

A0343

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| | 202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| National Institute of Neurological Disorders and Stroke<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| National Institute of Nursing Research<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |
| | Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov |
| | Samuel Hobbs<br>ATTORNEY TO BE NOTICED |

A0344

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| Litigants | Attorneys |
|---|---|
| National Library of Medicine<br>**Defendant** | DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov<br><br>Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov<br><br>Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov<br><br>Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| National Center for Advancing Translational Sciences<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov<br><br>Anuj K. Khetarpal<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>1 Courthouse Way Suite 9200<br>Boston, MA  02210<br>USA<br>617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov<br><br>Samuel Hobbs<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| John E. Fogarty International Center for Advanced Study in the Health Sciences<br>**Defendant** | Thomas Ports , Jr<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>P.O. Box 875 Ben Franklin Station<br>Washington, DC  20044<br>USA<br>202-307-1105 Email:Thomas.Ports@usdoj.Gov |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

## Litigants

## Attorneys

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210
USA
617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

Samuel Hobbs
ATTORNEY TO BE NOTICED
DOJ-Civ
Corporate Financial Litigation 1100 L St Nw Room 7210
Washington, DC  20005
USA
202-616-8077 Email:Samuel.Hobbs@usdoj.Gov

National Center for Complementary and Integrative Health
**Defendant**

Thomas Ports , Jr
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
P.O. Box 875 Ben Franklin Station
Washington, DC  20044
USA
202-307-1105 Email:Thomas.Ports@usdoj.Gov

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210
USA
617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

Samuel Hobbs
ATTORNEY TO BE NOTICED
DOJ-Civ
Corporate Financial Litigation 1100 L St Nw Room 7210
Washington, DC  20005
USA
202-616-8077 Email:Samuel.Hobbs@usdoj.Gov

NIH Center for Scientific Review
**Defendant**

Thomas Ports , Jr
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
P.O. Box 875 Ben Franklin Station
Washington, DC  20044
USA
202-307-1105 Email:Thomas.Ports@usdoj.Gov

Anuj K. Khetarpal
ATTORNEY TO BE NOTICED
United States Attorney's Office
1 Courthouse Way Suite 9200
Boston, MA  02210
USA
617-823-6325 Email:Anuj.Khetarpal@usdoj.Gov

Samuel Hobbs
ATTORNEY TO BE NOTICED
DOJ-Civ

A0346

| Litigants | Attorneys |
|---|---|
| | Corporate Financial Litigation 1100 L St Nw Room 7210<br>Washington, DC  20005<br>USA<br>202-616-8077 Email:Samuel.Hobbs@usdoj.Gov |
| The Association of American Medical Colleges (AAMC)<br>**Amicus** | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| The American Association of State Colleges and Universities (AASCU)<br>**Amicus** | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| The American Council on Education (ACE)<br>**Amicus** | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC  20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| The Association of American Universities (AAU)<br>**Amicus** | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC  20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |

| Litigants | Attorneys |
|---|---|
| | Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC 20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| The Association of Governing Boards of Universities and Colleges (AGB)<br>**Amicus** | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC 20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC 20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| The Association of Public and Land-Grant Universities (APLU)<br>**Amicus** | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC 20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC 20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| COGR<br>**Amicus** | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W.<br>Washington, DC 20006<br>USA<br>202-508-4791 Email:Amish.Shah@ropesgray.Com |
| | Stephanie A. Webster<br>ATTORNEY TO BE NOTICED<br>Ropes & Gray LLP<br>2099 Pennsylvania Avenue, N.W. Suite 1200<br>Washington, DC 20006-6807<br>USA<br>202-508-4859 Fax: 202-383-9334<br>Email:Stephanie.Webster@ropesgray.Com |
| The National Association of Independent Colleges and Universities (NAICU) | Amish Aajay Shah<br>ATTORNEY TO BE NOTICED |

A0348

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

## Litigants

**Amicus**

## Attorneys

Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC  20006
USA
202-508-4791 Email:Amish.Shah@ropesgray.Com

Stephanie A. Webster
ATTORNEY TO BE NOTICED
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W. Suite 1200
Washington, DC  20006-6807
USA
202-508-4859 Fax: 202-383-9334
Email:Stephanie.Webster@ropesgray.Com

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 04/04/2025 | COMPLAINT For Declaratory and Injunctive Relief against All Defendants Filing fee: $ 405, receipt number AMADC-10933014 (Fee Status: Filing Fee paid), filed by State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Colorado, State of Delaware, State of Hawaii, State of Minnesota. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Cedrone, Gerard) Modified on 4/4/2025 to correct docket text (SP). (Entered: 04/04/2025) | |
| 2 | 04/04/2025 | ELECTRONIC NOTICE of Case Assignment. Judge Brian E. Murphy assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (NMC) (Entered: 04/04/2025) | |
| 3 | 04/04/2025 | Summons Issued as to All Defendants. Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service. (SP) (Entered: 04/04/2025) | |
| 4 | 04/04/2025 | NOTICE of Appearance by Rachel M. Brown on behalf of Commonwealth of Massachusetts (Brown, Rachel) (Entered: 04/04/2025) | |
| 5 | 04/04/2025 | NOTICE of Appearance by Chris Pappavaselio on behalf of Commonwealth of Massachusetts (Pappavaselio, Chris) (Entered: 04/04/2025) | |
| 6 | 04/04/2025 | NOTICE of Appearance by Vanessa Azniv Arslanian on behalf of Commonwealth of Massachusetts (Arslanian, Vanessa) (Entered: 04/04/2025) | |
| 7 | 04/04/2025 | NOTICE of Appearance by Allyson T Slater on behalf of Commonwealth of Massachusetts (Slater, Allyson) (Entered: 04/04/2025) | |
| 8 | 04/04/2025 | Emergency MOTION for Temporary Restraining Order  by State of Nevada, State of New Jersey, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Delaware, State of Hawaii. (Attachments: # 1 Text of Proposed Order)(Cedrone, Gerard) (Entered: 04/04/2025) | |
| 9 | 04/04/2025 | MEMORANDUM in Support re 8 Emergency MOTION for Temporary Restraining Order   filed by State of Nevada, State of New Jersey, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii. (Cedrone, Gerard) (Entered: 04/04/2025) | |
| 10 | 04/04/2025 | MOTION for Leave to File Excess Pages (re ECF No. 9, Memorandum in Support of Motion for Temporary Restraining Order) by State of Nevada, State of New Jersey, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii.(Cedrone, Gerard) (Entered: 04/04/2025) | |
| 11 | 04/04/2025 | NOTICE of Appearance by Katherine B. Dirks on behalf of Commonwealth of Massachusetts (Dirks, Katherine) (Entered: 04/04/2025) | |
| 12 | 04/04/2025 | DECLARATION re 8 Emergency MOTION for Temporary Restraining Order   by State of Nevada, State of New Jersey, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii. (Attachments: # 1 Exhibit 1, EO 14151, # 2 Exhibit 2, EO 14168, # 3 Exhibit 3, EO 14173, # 4 Exhibit 4, HHS Directive 2.10.25, # 5 Exhibit 5, Lauer Memo 2.12.25, # 6 Exhibit 6, NIH Guidance 2.13.25, # 7 Exhibit 7, DOGE Tweet 2.28.25, # 8 Exhibit 8, DEI Staff Guidance 3.4.25, # 9 Exhibit 9, Bulls Email 3.13.25, # 10 Exhibit 10, Staff Guidance and Appendices 3.25.25, # 11 Exhibit 11, NIHGPS Excerpts, # 12 Exhibit 12, MA Barton Dec., # 13 Exhibit 13, AZ Wilder Dec., # 14 Exhibit 14, CA Madanat Dec., # 15 Exhibit 15, CA Raman Dec., # 16 Exhibit 16, DE Garcia-Diaz Dec., # 17 Exhibit 17, HI Syrmos Dec., # 18 Exhibit 18, MD Pines Dec., # 19 Exhibit 19, MD Jarrell Dec., # 20 Exhibit 20, NJ Farmer Dec., # 21 Exhibit 21, NV Tracy Dec., # 22 Exhibit 22, NV Hatchett Dec., # 23 Exhibit 23, NY Murphy Dec., # 24 Exhibit 24, NY Shurtleff Dec., # 25 Exhibit 25, NY Hequembourg Dec., # 26 Exhibit 26, RI Jenkins Dec., # 27 Exhibit 27, WA Ostendorf Dec., # 28 Exhibit 28, WA Supp. Ostendorf Dec., # 29 Exhibit 29, WI Grejner-Brzezinska Dec., # 30 Exhibit 30, WI Moreno Dec., # 31 Exhibit 31, WI Nambisan Dec., # 32 Exhibit 32, WI OConnor Dec., # 33 Exhibit 33, WI Shorey Dec., # 34 Exhibit 34, OR Barr-Gillespie Dec., # 35 Exhibit 35, SF Philip Dec., # 36 Exhibit 36, CA Maldonado Dec., # 37 Exhibit 37, Berg Dec., # 38 Exhibit 38, Jaime Dec.)(Pappavaselio, Chris) (Entered: 04/04/2025) | |
| 13 | 04/04/2025 | NOTICE of Appearance by Gerard J. Cedrone on behalf of Commonwealth of Massachusetts (Cedrone, Gerard) (Entered: 04/04/2025) | |
| 14 | 04/04/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER granting 10 Motion for Leave to File Excess Pages. (BIB) (Entered: 04/04/2025) | |
| 15 | 04/04/2025 | Judge Brian E. Murphy: SHORT ORDER OF NOTICE...Plaintiffs' Complaint, Motion for Temporary Restraining Order and all supporting documents filed in this case shall be served on the Defendants, with a copy of this Order no later than Monday, April 7, 2025. Defendants shall file a response to the 8 Motion for Temporary Restraining Order no later than Wednesday, April 9, | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|  |  | 2025.A hearing is SCHEDULED for Tuesday, April 15, 2025 at 2:00 p.m. in Courtroom #12 before Judge Brian E. Murphy. (BIB) (Entered: 04/04/2025) |  |
| 16 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of James C. Luh and Michael Drezner Filing fee: $ 250, receipt number AMADC-10934368 by State of Maryland.(Brown, Rachel) (Additional attachment(s) added on 4/4/2025: # 1 Certificate of James C. Luh, # 2 Certificate of Michael Drezner) (MBM). (Entered: 04/04/2025) |  |
| 17 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Emilio Varanini, Sophia T. Tonnu, Daniel D. Ambar, Nimrod Pitsker Elias, and Ketakee R. Kane Filing fee: $ 625, receipt number AMADC-10934443 by State of California. (Attachments: # 1 Certificate of Daniel Ambar, # 2 Certificate of Emilio Varanini, # 3 Certificate of Ketakee R. Kane, # 4 Certificate of Nimrod Pitsker Elias, # 5 Certificate of Sophia T. Tonnu)(Brown, Rachel) (Entered: 04/04/2025) |  |
| 18 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Peter J. Farrell Filing fee: $ 125, receipt number AMADC-10934469 by State of Minnesota. (Attachments: # 1 Certificate of Peter J. Farrell)(Brown, Rachel) (Entered: 04/04/2025) |  |
| 19 | 04/04/2025 | Judge Brian E. Murphy: AMENDED SHORT ORDER OF NOTICE...Plaintiffs shall file a reply brief no later than 3:00 p.m. on Friday, April 11, 2025. (BIB) (Entered: 04/04/2025) |  |
| 20 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Shannon Stevenson and Lauren Peach Filing fee: $ 250, receipt number AMADC-10934509 by State of Colorado. (Attachments: # 1 Certificate of Shannon Stevenson, # 2 Certificate of Lauren Peach)(Brown, Rachel) (Entered: 04/04/2025) |  |
| 21 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Molly Thomas-Jensen and Rabia Muqaddam Filing fee: $ 250, receipt number AMADC-10934710 by State of New York. (Attachments: # 1 Certificate of Molly Thomas-Jensen, # 2 Certificate of Rabia Muqaddam)(Brown, Rachel) (Entered: 04/04/2025) |  |
| 22 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Christina L. Beatty-Walters Filing fee: $ 125, receipt number AMADC-10934742 by State of Oregon. (Attachments: # 1 Certificate of Christina L. Beatty-Walters)(Brown, Rachel) (Entered: 04/04/2025) |  |
| 23 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Andrew R.W. Hughes and Tyler S. Roberts Filing fee: $ 250, receipt number AMADC-10934780 by State of Washington. (Attachments: # 1 Certificate of Andrew R. W. Hughes, # 2 Certificate of Tyler S. Roberts)(Brown, Rachel) (Entered: 04/04/2025) |  |
| 24 | 04/04/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Hilary Chan Filing fee: $ 125, receipt number AMADC-10934896 by State of California. (Attachments: # 1 Certificate of Hilary Chan)(Brown, Rachel) (Entered: 04/04/2025) |  |
| 25 | 04/04/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 16 Motion for Leave to Appear Pro Hac Vice Added James C. Luh and Michael Drezner. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions |  |

A0351

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/04/2025) | |
| 26 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 18 Motion for Leave to Appear Pro Hac Vice Added Peter J. Farrell.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 27 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 22 Motion for Leave to Appear Pro Hac Vice Added Christina L. Beatty-Walters.  Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.  Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/07/2025) | |
| 28 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 23 Motion for Leave to Appear Pro Hac Vice Added Andrew R.W. Hughes and Tyler S. Roberts.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 29 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 24 Motion for Leave to Appear Pro Hac Vice Added Hilary Chan.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 30 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 20 Motion for Leave to Appear Pro Hac Vice Added Shannon Stevenson and Lauren Peach.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 31 | 04/07/2025 | Judge Brian E. Murphy entered ELECTRONIC ORDER granting 21 Motion for Leave to Appear Pro Hac Vice Added Molly Thomas-Jensen and Rabia Muqaddam.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 32 | 04/07/2025 | Judge Brian E. Murphy entered ELECTRONIC ORDER granting 17 Motion for Leave to Appear Pro Hac Vice Added Emilio Varanini, Sophia T. Tonnu, Daniel D. Ambar, Nimrod Pitsker Elias, and Ketakee R. Kane.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 33 | 04/07/2025 | NOTICE of Appearance by James C. Luh on behalf of State of Maryland (Luh, James) (Entered: 04/07/2025) | |
| 34 | 04/07/2025 | NOTICE of Appearance by Anuj K. Khetarpal on behalf of Robert F. Kennedy, Jr., United States Department of Health and Human Services, Jayanta Bhattacharya, National Institutes of Health, National Cancer Institute, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, Eunice Kennedy Shriver National Institute of Child Health and Human Development, National Institute on Deafness and Other Communication Disorders, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute on Drug Abuse, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute on Minority Health and Health Disparities, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Library of Medicine, National Center for Advancing Translational Sciences, John E. Fogarty International Center for Advanced Study in the Health Sciences, National Center for Complementary and Integrative Health, NIH Center for Scientific Review (Khetarpal, Anuj) (Entered: 04/07/2025) | |
| 35 | 04/07/2025 | NOTICE of Appearance by Molly Thomas-Jensen on behalf of State of New York (Thomas-Jensen, Molly) (Entered: 04/07/2025) | |
| 36 | 04/07/2025 | NOTICE of Appearance by Peter Farrell on behalf of State of Minnesota (Farrell, Peter) (Entered: 04/07/2025) | |

A0353

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 37 | 04/07/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Joshua G. Nomkin Filing fee: $ 125, receipt number AMADC-10937197 by State of Arizona. (Attachments: # 1 Certificate of Joshua G. Nomkin)(Brown, Rachel)(Entered: 04/07/2025) | |
| 38 | 04/07/2025 | NOTICE of Appearance by Daniel Ambar on behalf of State of California (Ambar, Daniel) (Entered: 04/07/2025) | |
| 39 | 04/07/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 37 Motion for Leave to Appear Pro Hac Vice Added Joshua G. Nomkin. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/07/2025) | |
| 40 | 04/07/2025 | NOTICE of Appearance by Rabia Muqaddam on behalf of State of New York (Muqaddam, Rabia) (Entered: 04/07/2025) | |
| 41 | 04/07/2025 | NOTICE of Appearance by Sophia TonNu on behalf of State of California (TonNu, Sophia) (Entered: 04/07/2025) | |
| 42 | 04/07/2025 | NOTICE of Appearance by Emilio Eugene Varanini, IV on behalf of State of California (Varanini, Emilio) (Entered: 04/07/2025) | |
| 43 | 04/07/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Kathleen Boergers Filing fee: $ 125, receipt number AMADC-10938287 by State of California. (Attachments: # 1 Certificate of Kathleen Boergers)(Brown, Rachel) (Entered: 04/07/2025) | |
| 44 | 04/08/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 43 Motion for Leave to Appear Pro Hac Vice Added Kathleen Boergers. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/08/2025) | |
| 45 | 04/08/2025 | NOTICE of Appearance by Lauren Kelsey Peach on behalf of State of Colorado (Peach, Lauren) (Entered: 04/08/2025) | |
| 46 | 04/08/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Lynn K. Lodahl Filing fee: $ 125, receipt number AMADC-10939698 by State of Wisconsin. (Attachments: # 1 Certificate of Lynn K. Lodahl)(Brown, Rachel) (Entered: 04/08/2025) | |
| 47 | 04/08/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Jordan Broadbent Filing fee: $ 125, receipt number AMADC-10939713 by State of Rhode Island. (Attachments: # 1 Certificate of Jordan Broadbent)(Brown, Rachel) (Entered: 04/08/2025) | |
| 48 | 04/08/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Kalikoonlani D. Fernandes and David D. Day Filing fee: $ 250, receipt number AMADC-10940489 by State of Hawaii. (Attachments: # 1 Certificate of Kalikoonlani D. Fernandes, # 2 Certificate of David D. Day)(Brown, Rachel) (Entered: 04/08/2025) | |
| 49 | 04/08/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 46 Motion for Leave to Appear Pro Hac Vice Added Lynn K. Lodahl. Attorneys admitted Pro Hac Vice must have an individual | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/08/2025) | |
| 50 | 04/08/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 47 Motion for Leave to Appear Pro Hac Vice Added Jordan Broadbent.  Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.  Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/08/2025) | |
| 51 | 04/08/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 48 Motion for Leave to Appear Pro Hac Vice Added Kalikoonlani D. Fernandes and David D. Day.  Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.  Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/08/2025) | |
| 52 | 04/08/2025 | NOTICE of Appearance by Jordan Broadbent on behalf of State of Rhode Island (Broadbent, Jordan) (Entered: 04/08/2025) | |
| 53 | 04/08/2025 | NOTICE of Appearance by Joshua Nomkin on behalf of State of Arizona (Nomkin, Joshua) (Entered: 04/08/2025) | |
| 54 | 04/08/2025 | SUMMONS Returned Executed by State of Delaware, State of California, Commonwealth of Massachusetts, State of Wisconsin, State of Oregon, State of Nevada, State of New Jersey, State of New York, State of Colorado, State of Maryland, State of Minnesota, State of New Mexico, State of Rhode Island, State of Hawaii, State of Washington, State of Arizona. (Attachments: # 1 Exhibit Declaration of Service)(Pappavaselio, Chris) (Entered: 04/08/2025) | |
| 55 | 04/08/2025 | NOTICE of Appearance by Kalikoonalani Diara Fernandes on behalf of State of Hawaii (Fernandes, Kalikoonalani) (Entered: 04/08/2025) | |
| 56 | 04/08/2025 | NOTICE of Appearance by David Dana Day on behalf of State of Hawaii (Day, David) (Entered: 04/08/2025) | |
| 57 | 04/08/2025 | NOTICE of Appearance by Thomas Ports, Jr on behalf of Robert F. Kennedy, Jr., United States Department of Health and Human Services, Jayanta Bhattacharya, National Institutes of Health, National Cancer Institute, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, Eunice Kennedy Shriver National Institute of Child Health and Human Development, National Institute on Deafness and Other Communication Disorders, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Digestive and Kidney Diseases, National Institute on Drug Abuse, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute on Minority Health and Health Disparities, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Library of Medicine, National Center for Advancing Translational Sciences, John E. Fogarty International Center for Advanced Study in the Health Sciences, National Center for Complementary and Integrative Health, NIH Center for Scientific Review (Ports, Thomas) (Entered: 04/08/2025) | |
| 58 | 04/08/2025 | Assented to MOTION to Set a Briefing Schedule on Plaintiffs' Motion for a Preliminary Injunction and NOTICE of Withdrawal of Plaintiffs' Motion for a Temporary Restraining Order re 8 Emergency MOTION for Temporary Restraining Order  by State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Colorado, State of Delaware, State of Hawaii, State of Minnesota.(Cedrone, Gerard) (Entered: 04/09/2025) | |
| 59 | 04/09/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER GRANTING 58 Assented to MOTION to Set a Briefing Schedule on Plaintiffs' Motion for a Preliminary Injunction and NOTICE of Withdrawal of Plaintiffs' Motion for a Temporary Restraining Order. The 8 Emergency Motion for Temporary Restraining Order is WITHDRAWN. Briefing schedule for the Motion for Preliminary Injunction is ADOPTED and hearing is set.BRIEFING SCHEDULE:Plaintiffs' Motion for Preliminary Injunction shall be filed 4/14/2025.Oppositions to Motion for Preliminary Injunction shall be filed by 4/30/2025.Replies shall be filed by 5/5/2025.NOTICE OF HEARING:Hearing on Motion for Preliminary Injunction is scheduled for 5/9/2025 at 1:30 p.m. in Courtroom 12 (In person only) before Judge Brian E. Murphy. (BIB) (Entered: 04/09/2025) | |
| 60 | 04/09/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Vanessa L. Kassab Filing fee: $ 125, receipt number AMADC-10942197 by State of Delaware. (Attachments: # 1 Certificate of Vanessa Kassab)(Brown, Rachel) (Entered: 04/09/2025) | |
| 61 | 04/09/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Astrid Carrete Filing fee: $ 125, receipt number AMADC-10942213 by State of New Mexico. (Attachments: # 1 Certificate of Astrid Carrete)(Brown, Rachel) (Entered: 04/09/2025) | |
| 62 | 04/09/2025 | NOTICE of Appearance by Nimrod Pitsker Elias on behalf of State of California (Elias, Nimrod) (Entered: 04/09/2025) | |
| 63 | 04/09/2025 | NOTICE of Appearance by Tyler S. Roberts on behalf of State of Washington (Roberts, Tyler) (Entered: 04/09/2025) | |
| 64 | 04/09/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Heidi Parry Stern Filing fee: $ 125, receipt number AMADC-10942950 by State of Nevada. (Attachments: # 1 Certificate of Heidi Parry Stern)(Brown, Rachel) (Entered: 04/09/2025) | |
| 65 | 04/09/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Nancy Trasande and Bryce K. Hurst Filing fee: $ 250, receipt number AMADC-10942961 by State of New Jersey. (Attachments: # 1 Certificate of Nancy Trasande, # 2 Certificate of Bryce K. Hurst)(Brown, Rachel) (Entered: 04/09/2025) | |
| 66 | 04/09/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 60 Motion for Leave to Appear Pro Hac Vice Added Vanessa L. Kassab.  Attorneys admitted Pro Hac Vice must have an individual | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account. Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/09/2025) | |
| 67 | 04/09/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 61 Motion for Leave to Appear Pro Hac Vice Added Astrid Carrete. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/09/2025) | |
| 68 | 04/09/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 64 Motion for Leave to Appear Pro Hac Vice Added Heidi Parry Stern. Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account. Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/09/2025) | |
| 69 | 04/09/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 65 Motion for Leave to Appear Pro Hac Vice Added Nancy Trasande and Bryce K. Hurst. Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/09/2025) | |
| 70 | 04/09/2025 | NOTICE of Appearance by Hilary Ann Burke Chan on behalf of State of California (Burke Chan, Hilary) (Entered: 04/09/2025) | |
| 71 | 04/10/2025 | NOTICE of Appearance by Shannon Wells Stevenson on behalf of State of Colorado (Stevenson, Shannon) (Entered: 04/10/2025) | |
| 72 | 04/10/2025 | NOTICE of Appearance by Heidi Parry Stern on behalf of State of Nevada (Stern, Heidi) (Entered: 04/10/2025) | |
| 73 | 04/14/2025 | NOTICE of Appearance by Bryce Kelly Hurst on behalf of State of New Jersey (Hurst, Bryce) (Entered: 04/14/2025) | |
| 74 | 04/14/2025 | NOTICE of Appearance by Nancy Trasande on behalf of State of New Jersey (Trasande, Nancy) (Entered: 04/14/2025) | |
| 75 | 04/14/2025 | AMENDED COMPLAINT for Declaratory and Injunctive Relief against All Defendants, filed by State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Colorado, State of Delaware, State of Hawaii, State of Minnesota. (Attachments: # 1 | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Exhibit 1 (Notice Pause Directive, # 2 Exhibit 2 (Secretarial Directive), # 3 Exhibit 3 (Lauer Memorandum), # 4 Exhibit 4 (Supplemental Lauer Memorandum), # 5 Exhibit 5 (Priorities Directive), # 6 Exhibit 6 (Award Revision Guidance), # 7 Exhibit 7 (Revised Priorities Directive))(Cedrone, Gerard) (Entered: 04/14/2025) | |
| 76 | 04/14/2025 | MOTION for Preliminary Injunction  by State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii, State of Minnesota. (Attachments: # 1 Text of Proposed Order)(Cedrone, Gerard) (Entered: 04/14/2025) | |
| 77 | 04/14/2025 | DECLARATION re 76 MOTION for Preliminary Injunction  by State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii, State of Minnesota. (Attachments: # 1 Exhibit 1, EO 14151, # 2 Exhibit 2, EO 14168, # 3 Exhibit 3, EO 14173, # 4 Exhibit 4, HHS Directive 2.10.25, # 5 Exhibit 5, Lauer Memo 2.12.25, # 6 Exhibit 6, NIH Guidance 2.13.25, # 7 Exhibit 7, DOGE Tweet 2.28.25, # 8 Exhibit 8, DEI Staff Guidance 3.4.25, # 9 Exhibit 9, Bulls Email 3.13.25, # 10 Exhibit 10, Staff Guidance and Appendices 3.25.25 (Updated), # 11 Exhibit 11, NIHGPS Excerpts (Updated), # 12 Exhibit 12, MA Barton Dec., # 13 Exhibit 13, AZ Wilder Dec., # 14 Exhibit 14, CA Madanat Dec., # 15 Exhibit 15, CA Raman Dec., # 16 Exhibit 16, DE Garcia-Diaz Dec., # 17 Exhibit 17, HI Syrmos Dec. (Updated), # 18 Exhibit 18, MD Pines Dec., # 19 Exhibit 19, MD Jarrell Dec. (Updated), # 20 Exhibit 20, NJ Farmer Dec., # 21 Exhibit 21, NV Tracy Dec., # 22 Exhibit 22, NV Hatchett Dec., # 23 Exhibit 23, NY Murphy Dec., # 24 Exhibit 24, NY Shurtleff Dec., # 25 Exhibit 25, NY Hequembourg Dec., # 26 Exhibit 26, RI Jenkins Dec., # 27 Exhibit 27, WA Ostendorf Dec., # 28 Exhibit 28, WA Supp. Ostendorf Dec., # 29 Exhibit 29, WI Grejner-Brzezinska Dec., # 30 Exhibit 30, WI Moreno Dec., # 31 Exhibit 31, WI Nambisan Dec., # 32 Exhibit 32, WI OConnor Dec., # 33 Exhibit 33, WI Shorey Dec., # 34 Exhibit 34, OR Barr-Gillespie Dec., # 35 Exhibit 35, SF Philip Dec., # 36 Exhibit 36, CA Maldonado Dec., # 37 Exhibit 37, Berg Dec., # 38 Exhibit 38, Jaime Dec., # 39 Exhibit 39 Jan 21 Pause Guidance, # 40 Exhibit 40 Hutchings Dec, # 41 Exhibit 41 Bulls Deposition, # 42 Exhibit 42 Atlantic Article, # 43 Exhibit 43 Advisory Council Agendas, # 44 Exhibit 44 AACR Article, # 45 Exhibit 45 MA Barton Supp Dec, # 46 Exhibit 46 AZ Morton Dec, # 47 Exhibit 47 AZ Wilder Supp Dec, # 48 Exhibit 48 CA Crawford Dec, # 49 Exhibit 49 CA Kitchell Dec, # 50 Exhibit 50 WI Pool Dec, # 51 Exhibit 51 NJ Kean Dec, # 52 Exhibit 52 NJ Pelesko Dec, # 53 Exhibit 53 NJ Farmer Supp Dec, # 54 Exhibit 54 NM Reddi Dec, # 55 Exhibit 55 NM Lusetti Dec, # 56 Exhibit 56 NM Richards Dec, # 57 Exhibit 57 OR Forrest Dec, # 58 Exhibit 58 OR Tankersly Dec, # 59 Exhibit 59 OR Razdan Dec, # 60 Exhibit 60 RI Jenkins Supp Dec, # 61 Exhibit 61 Berg Supp Dec, # 62 Exhibit 62 CA Raman Supp Dec, # 63 Exhibit 63 CA Riggs Supp Dec, # 64 Exhibit 64 MN Shashank Dec, # 65 Exhibit 65 CA Collard Dec)(Pappavaselio, Chris) (Entered: 04/14/2025) | |
| 78 | 04/14/2025 | MEMORANDUM in Support re 76 MOTION for Preliminary Injunction   filed by State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Wisconsin, Commonwealth of Massachusetts, | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
| | | State of California, State of Maryland, State of Washington, State of Arizona, State of Delaware, State of Hawaii, State of Minnesota. (Cedrone, Gerard) (Entered: 04/14/2025) | |
| 79 | 04/17/2025 | MOTION for Leave to File Amici Curiae Brief (unopposed) by The Association of American Medical Colleges, The American Association of State Colleges and Universities, The American Council on Education, The Association of American Universities, The Association of Governing Boards of Universities and Colleges, The Association of Public and Land-Grant Universities, The National Association of Independent Colleges and Universities, COGR. (Attachments: # 1 Proposed Brief of Amici Curiae)(Bueker, John) (Entered: 04/17/2025) | |
| 80 | 04/17/2025 | Amicus Curiae APPEARANCE entered by John P. Bueker on behalf of The Association of American Medical Colleges, The American Association of State Colleges and Universities, The American Council on Education, The Association of American Universities, The Association of Governing Boards of Universities and Colleges, The Association of Public and Land-Grant Universities, The National Association of Independent Colleges and Universities, COGR. (Bueker, John) (Entered: 04/17/2025) | |
| 81 | 04/17/2025 | Amicus Curiae APPEARANCE entered by Douglas Hallward-Driemeier on behalf of The Association of American Medical Colleges, The Association of State Colleges and Universities, The American Council on Education, The Association of American Universities, The Association of Governing Boards of Universities and Colleges, The Association of Public and Land-Grant Universities, The National Association of Independent Colleges and Universities, COGR. (Hallward-Driemeier, Douglas) (Entered: 04/17/2025) | |
| 82 | 04/17/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Stephanie A. Webster Filing fee: $ 125, receipt number AMADC-10959319 by The Association of American Medical Colleges, The American Association of State Colleges and Universities, The American Council on Education, The Association of American Universities, The Association of Governing Boards of Universities and Colleges, The Association of Public and Land-Grant Universities, The National Association of Independent Colleges and Universities, COGR.(Bueker, John) (Entered: 04/17/2025) | |
| 83 | 04/17/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Amish A. Shah Filing fee: $ 125, receipt number AMADC-10959604 by The Association of American Medical Colleges, The American Council on Education, The Association of American Universities, The Association of Governing Boards of Universities and Colleges, The Association of Public and Land-Grant Universities, The National Association of Independent Colleges and Universities, COGR.(Bueker, John) (Entered: 04/17/2025) | |
| 84 | 04/18/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 79 Motion for Leave to File Amici Curiae Brief ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MBM) (Entered: 04/18/2025) | |
| 85 | 04/18/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 82 Motion for Leave to Appear Pro Hac Vice Added Stephanie A. Webster.  Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.  Instructions on how to link CM/ECF accounts to | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MBM) (Entered: 04/18/2025) | |
| 86 | 04/18/2025 | AMICUS BRIEF filed by The Association of American Medical Colleges (AAMC), The American Association of State Colleges and Universities (AASCU), The American Council on Education (ACE), The Association of American Universities (AAU), The Association of Governing Boards of Universities and Colleges (AGB), The Association of Public and Land-Grant Universities (APLU), COGR, The National Association of Independent Colleges and Universities (NAICU) . (Bueker, John) (Entered: 04/18/2025) | |
| 87 | 04/18/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 83 Motion for Leave to Appear Pro Hac Vice Added Amish A. Shah.  Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at  https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MBM) (Entered: 04/18/2025) | |
| 88 | 04/18/2025 | Amicus Curiae APPEARANCE entered by Stephanie A. Webster on behalf of The Association of American Medical Colleges (AAMC), The American Association of State Colleges and Universities (AASCU), The American Council on Education (ACE), The Association of American Universities (AAU), The Association of Governing Boards of Universities and Colleges (AGB), The Association of Public and Land-Grant Universities (APLU), COGR, The National Association of Independent Colleges and Universities (NAICU). (Webster, Stephanie) (Entered: 04/18/2025) | |
| 89 | 04/18/2025 | Amicus Curiae APPEARANCE entered by Amish Aajay Shah on behalf of The Association of American Medical Colleges (AAMC), The American Association of State Colleges and Universities (AASCU), The American Council on Education (ACE), The Association of American Universities (AAU), The Association of Governing Boards of Universities and Colleges (AGB), The Association of Public and Land-Grant Universities (APLU), COGR, The National Association of Independent Colleges and Universities (NAICU). (Shah, Amish) (Entered: 04/18/2025) | |
| 90 | 04/22/2025 | NOTICE of Appearance by Ketakee Rajiv Kane on behalf of State of California (Kane, Ketakee) (Entered: 04/22/2025) | |
| 91 | 04/24/2025 | NOTICE of Appearance by Lynn Kristine Lodahl on behalf of State of Wisconsin (Lodahl, Lynn) (Entered: 04/24/2025) | |
| 92 | 04/28/2025 | NOTICE of Appearance by Astrid Carrete on behalf of State of New Mexico (Carrete, Astrid) (Entered: 04/28/2025) | |
| 93 | 04/28/2025 | NOTICE of Appearance by Astrid Carrete on behalf of State of New Mexico (Carrete, Astrid) (Entered: 04/28/2025) | |
| 94 | 04/28/2025 | NOTICE of Appearance by Andrew R.W. Hughes on behalf of State of Washington (Hughes, Andrew) (Entered: 04/28/2025) | |
| 95 | 05/01/2025 | Opposition re 76 MOTION for Preliminary Injunction   filed by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative | |

A0360

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (Attachments: # 1 Exhibit A - Examples of active, not terminated grants)(Ports, Thomas) (Entered: 05/01/2025) | |
| 96 | 05/01/2025 | Consent MOTION for Extension of Time to May 1, 2025 to file opposition  by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services.(Ports, Thomas) (Entered: 05/01/2025) | |
| 97 | 05/01/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER entered granting 96 Consent MOTION for Extension of Time to May 1, 2025 to file opposition. (MBM) (Entered: 05/01/2025) | |
| 98 | 05/01/2025 | Judge Brian E. Murphy: ELECTRONIC ORDER OF RECUSAL - In accordance with 28 U.S.C.  455(a), I hereby recuse myself from this proceeding. The Clerk is directed to return the case for reassignment.Associated Cases: 1:25-cv-10814-BEM, 1:25-cv-10787-BEM(BIB) (Entered: 05/01/2025) | |
| 99 | 05/01/2025 | ELECTRONIC NOTICE of Reassignment. Judge William G. Young added. Judge Brian E. Murphy no longer assigned to case. (CM) (Entered: 05/01/2025) | |
| 100 | 05/02/2025 | ELECTRONIC NOTICE Resetting Hearing on Motion 76 MOTION for Preliminary Injunction  : Motion Hearing reset for 5/8/2025 11:30 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young.  In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | and public notices of the Court available on www.mad.uscourts.gov or contact the session here.(KB) (Entered: 05/02/2025) | |
| 101 | 05/05/2025 | REPLY to Response to 76 MOTION for Preliminary Injunction filed by Commonwealth of Massachusetts, State of Arizona, State of California, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. (Attachments: # 1 Exhibit 1 (Declaration of Joshua Fessel), # 2 Exhibit 2 (Supp. Declaration of Ryan Hutchings), # 3 Exhibit 3 (Second Supp. Declaration of Jeremy M. Berg), # 4 Exhibit 4 (Supp. Declaration of Theresa A. Maldonado), # 5 Exhibit 5 (Declaration of Annika Barber))(Cedrone, Gerard) (Entered: 05/05/2025) | |
| 102 | 05/06/2025 | NOTICE of Appearance by Kathleen Boergers on behalf of State of California (Boergers, Kathleen) (Entered: 05/06/2025) | |
| 103 | 05/07/2025 | Notice of Supplemental Authorities re 76 MOTION for Preliminary Injunction   (Attachments: # 1 Exhibit A - Decision in Rhode Island v. Trump)(Cedrone, Gerard) (Entered: 05/07/2025) | |
| 104 | 05/08/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 5/8/2025 re 76 MOTION for Preliminary Injunction. Court hears argument on subject matter jurisdiction. Court takes the matter under advisement. If the Court determines it does have subject matter jurisdiction it will hold a case management conference May 13, 2025 at 2:00pm. Court requests plaintiffs to submit spreadsheet as discussed at the hearing by Tuesday, May 13th. Case Management Conference set for 5/13/2025 02:00 PM in Courtroom 18 (In person only with Remote Access Provided) before Judge William G. Young.). In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.(Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Gerard J. Cedrone, Chris Pappavaselio, Katherine B. Dirks, Rachel M. Brown, Vanessa Azniv Arslanian, and Sophia TonNu for plaintiffs and Thomas Ports, Jr, and Anuj K. Khetarpal for defendants) (KB) (Entered: 05/08/2025) | |
| 105 | 05/12/2025 | Judge William G. Young: ORDER entered.  MEMORANDUM AND ORDER  ON SUBJECT MATTER JURISDICTION (Sonnenberg, Elizabeth) (Entered: 05/12/2025) | |
| 106 | 05/12/2025 | ELECTRONIC NOTICE of Hearing. Case Management Conference set for 5/13/2025 02:00 PM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here. (KB) (Entered: 05/12/2025) | |
| 107 | 05/12/2025 | Transcript of Preliminary Injunction held on May 8, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | rhr3tubas@aol.com. Redaction Request due 6/2/2025. Redacted Transcript Deadline set for 6/12/2025. Release of Transcript Restriction set for 8/11/2025. (DRK) (Entered: 05/12/2025) | |
| 108 | 05/12/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/12/2025) | |
| 109 | 05/13/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Case Management Conference held on 5/13/2025. Court discusses next steps for the case. Court hears from the parties. The first portion of the case will focus on termination of grants. The defendants to file administrative records by June 2, 2025. Parties may file briefs. The Court sets a further hearing June 16, 2025 at 10:00am. The parties shall inform the Court if the June 16th hearing will be on the record submitted or if there is a dispute about whether evidence should be entered at the hearing. On the unreasonable delay issue the parties shall propose schedule(s) on this issue and the Court will set a further status conference on it. <Hearing set for 6/16/2025 10:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.(Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Katherine Dirks, Rachel Brown, Daniel Ambar for the plaintiffs and Thomas Ports, Jr. and Anuj Khetarpal for the defendants) (KB) (Entered: 05/14/2025) | |
| 110 | 05/16/2025 | Transcript of Case Management Conference held on May 13, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 6/6/2025. Redacted Transcript Deadline set for 6/16/2025. Release of Transcript Restriction set for 8/14/2025. (DRK) (Entered: 05/19/2025) | |
| 111 | 05/16/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/19/2025) | |
| 112 | 05/23/2025 | ELECTRONIC NOTICE of Hearing. Status Conference re case management of related cases set for 6/3/2025 11:00 AM in Courtroom 18 (In person only) before Judge William G. Young. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 05/23/2025) | |

A0363

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 113 | 05/29/2025 | JOINT STATEMENT of counsel regarding schedule for further proceedings. (Cedrone, Gerard) (Entered: 05/29/2025) | |
| 114 | 05/30/2025 | NOTICE of Appearance by Phoebe Lockhart on behalf of Commonwealth of Massachusetts (Lockhart, Phoebe) (Entered: 05/30/2025) | |
| 115 | 06/02/2025 | NOTICE of Appearance by Vanessa L Kassab on behalf of State of Delaware (Kassab, Vanessa) (Entered: 06/02/2025) | |
| 116 | 06/02/2025 | MOTION for Leave to Appear Pro Hac Vice for admission of Ian R. Liston Filing fee: $ 125, receipt number AMADC-11043181 by State of Delaware. (Attachments: # 1 Certificate of Ian R. Liston)(Brown, Rachel) (Entered: 06/02/2025) | |
| 117 | 06/02/2025 | Judge William G. Young: ELECTRONIC ORDER entered granting 116 Motion for Leave to Appear Pro Hac Vice Added Ian R. Liston. Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account. Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MAP) (Entered: 06/02/2025) | |
| 118 | 06/02/2025 | NOTICE of Production of Administrative Record by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services (Attachments: # 1 Certification of Administrative Record)(Khetarpal, Anuj) (Entered: 06/02/2025) | |
| 119 | 06/03/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Status Conference held on 6/3/2025. Government has produced administrative record in both cases. The Court hears from parties in both cases regarding schedule and June 16th hearing. Court will hear argument on Phase 1 from 10am-1pm on June 16th in both cases. The Court adopts the proposed schedule filed in 25-cv-10814 Document 113 at page 2. The Court modifies the proposed schedule at page 4 as follows: By June 20, 2025, defendants may move to dismiss plaintiffs' claims related to alleged reasonable delay. By July 9, 2025, defendants must lodge the administrative record. Court and parties discuss phase II. Record to be supplemented as to the challenged directives as directed by the Court. If the case(s) were to resolve the parties shall inform the Clerk. (Court Reporter: | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Kenneth Parreno, Jessie Rossman, Olga Akselrod, Suzanne Schlossberg, Gerard Cedrone, Katherine Dirks, Phoebe Lockhart for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/04/2025) | |
| 120 | 06/04/2025 | NOTICE of Appearance by Ian Liston on behalf of State of Delaware (Liston, Ian) (Entered: 06/04/2025) | |
| 121 | 06/05/2025 | Transcript of Status Conference held on June 3, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 6/26/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/3/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/05/2025) | |
| 122 | 06/05/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 06/05/2025) | |
| 123 | 06/05/2025 | STIPULATION Regarding Phase One Schedule Modifications by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. (Cedrone, Gerard) (Entered: 06/05/2025) | |
| 124 | 06/09/2025 | MOTION To Complete the Administrative Record by State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin.(Brown, Rachel) (Entered: 06/09/2025) | |
| 125 | 06/09/2025 | TRIAL BRIEF by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Services. (Ports, Thomas) (Entered: 06/09/2025) | |
| 126 | 06/09/2025 | MEMORANDUM OF LAW by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. (Cedrone, Gerard) (Entered: 06/09/2025) | |
| 127 | 06/09/2025 | APPENDIX/EXHIBIT re 126 Memorandum of Law, Proposed Order, Declaration, and Permanent Injunction by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. (Cedrone, Gerard) (Entered: 06/09/2025) | |
| 128 | 06/10/2025 | Judge William G. Young: ELECTRONIC ORDER entered allowed 124 MOTION To Complete the Administrative Record (MAP) (Entered: 06/10/2025) | |
| 129 | 06/10/2025 | NOTICE by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin regarding the June 16 Hearing (Cedrone, Gerard) (Entered: 06/10/2025) | |
| 130 | 06/11/2025 | ELECTRONIC NOTICE of Hearing. Final Pretrial Conference set for 6/12/2025 11:00 AM in Courtroom 18 (Remote only) before Judge William G. Young. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/11/2025) | |
| 131 | 06/11/2025 | Certification of the Administrative Record (Updated) by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services re 118 Notice (Other),,,,,,  (Attachments: # 1 Email, # 2 Certification, # 3 Ex A to certification, # 4 Ex B to certification, # 5 Ex C to certification, # 6 NIH_GRANTS_003825-3910, # 7 NIH_GRANTS_003911-3995, # 8 NIH_GRANTS_003996-4081, # 9 NIH_GRANTS_004082-4165, # 10 NIH_GRANTS_004166-4251, # 11 NIH_GRANTS_004252, # 12 NIH_GRANTS_004253-54, # 13 NIH_GRANTS_004255-57, # 14 NIH_GRANTS_004258- | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 69, # 15 NIH_GRANTS_004270)(Ports, Thomas) Modified on 6/11/2025 (MAP). (Entered: 06/11/2025) | |
| 132 | 06/12/2025 | Opposition re 124 MOTION To Complete the Administrative Record  filed by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (Attachments: # 1 Exhibit)(Khetrpal, Anuj) (Entered: 06/12/2025) | |
| 133 | 06/12/2025 | Judge William G. Young: ELECTRONIC ORDER entered vacating 128 Order on 124 Motion to Complete Administrative Record. Motion allowed in part and denied in part as follows: A. Grants not terminated- Denied as moot B. Termination forms- Allowed. "Guidance" is not "deliberation." C. HHS and DOGE imput: Denied on the representation that such search has been made. D. AI Use: Allowed. E. Metadata: Denied without prejudice to seeking such discovery beyond the APA claims. F. Certification. Denied as moot. SO ORDERED(KB) (Entered: 06/12/2025) | |
| 136 | 06/12/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Final Pretrial Conference held on 6/12/2025. Court and the parties discuss the record in the case. Court has administrative record as it has been provided. Plaintiffs have also filed records. Court hears parties on the matter. Court will review defendants' opposition to the motions to Complete Record. Court will hear oral argument on phase 1 of the case on Monday, June 16th at 10am. Each side will have one hour for argument (plaintiffs in both cases will have one hour combined). Parties to discuss proposed phase 2 schedule on Monday. Court has off the record portion of hearing regarding possibility of settlement. If the case were to settle in part or in whole the parties shall inform the Clerk. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Matthew Brinckerhoff, Jessie Rossman, Lisa Mankofsky, Max Roller Selver, Olga Akselrod, Rachel Anne Meeropol, Sydney Kathryn Zazzaro, Gerard Cedrone, Christopher Pappavaselio, Phoebe Lockhart, Rachel Brown, Vanessa Azniv Arslanian, Nimrod Pitsker Elias, Astrid Carrete, Jordan Broadbent for plaintiffs and Anuj Khetrpal and Thomas Ports, Jr. for defendants) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/13/2025) | |
| 134 | 06/13/2025 | TRIAL BRIEF in Response to Plaintiffs' Opening Briefs by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (Ports, Thomas) (Entered: 06/13/2025) | |
| 135 | 06/13/2025 | MEMORANDUM OF LAW by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin to 125 Trial Brief,,,,,,. (Attachments: # 1 Appendix A - Plaintiffs' Response to Defendants' Identification of Grants)(Cedrone, Gerard) (Entered: 06/13/2025) | |
| 137 | 06/13/2025 | Transcript of Final Pretrial held on June 12, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/7/2025. Redacted Transcript Deadline set for 7/14/2025. Release of Transcript Restriction set for 9/11/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/13/2025) | |
| 138 | 06/13/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 06/13/2025) | |
| 139 | 06/13/2025 | NOTICE by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of | |

A0368

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services of Production of Administrative Record (Attachments: # 1 Designation and Certification of Administrative Record)(Khetarpal, Anuj) (Entered: 06/13/2025) | |
| 140 | 06/15/2025 | Joint MOTION for Protective Order by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin.(Cedrone, Gerard) (Entered: 06/15/2025) | |
| 141 | 06/16/2025 | ELECTRONIC NOTICE of Hearing. Hearing set for 6/16/2025 at 2:00pm. (In person with remote access provided) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/16/2025) | |
| 142 | 06/16/2025 | Judge William G. Young: STIPULATED PROTECTIVE ORDER entered. Granting (140) Joint Motion for Protective Order in case 1:25-cv-10814-WGY Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(KB) (Entered: 06/16/2025) | |
| 143 | 06/16/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Bench Trial as to Phase 1 held on 6/16/2025.Court hears argument on Phase 1 of the case. Defendants ask Court to take Judicial Notice of the Federal Register Notices. Court takes Judicial Notice. Defendants move to admit into evidence 13 Certified records. No objection. Admitted as exhibit 1. Court takes the matter under advisement. Parties will inform the Court if they wish for the Court to reconvene in the afternoon or if they wish for the Court to hold off issuing a ruling as to Phase 1. The Court reconvenes in the afternoon. The Court announces the findings and rulings that it is able to make today. The challenged directives are vacated. A written order will issue. Defendants shall promptly comply with the order of the Court. Plaintiffs to submit a proposed partial but final judgment as to Phase 1 by June 17, 2025. The Court discusses evidence as to harm. The parties will meet and inform the Court if an evidentiary hearing regarding harm is necessary. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Kenneth Parreno, Jessie Rossman, Olga Akselrod, Rachel Anne Meeropol, Gerard Cedrone, Rachel Brown, Nimrod Pitsker Elias for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/17/2025) | |
| 144 | 06/17/2025 | Proposed Document(s) submitted by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. Document received: Proposed Rule 54(b) Final Judgment. (Cedrone, Gerard) (Entered: 06/17/2025) | |
| 145 | 06/18/2025 | ELECTRONIC NOTICE of Hearing. Status Conference set for 6/18/2025 02:00 PM in Courtroom 18 (Remote only) before Judge William G. Young. This hearing will be conducted by video | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/18/2025) | |
| 146 | 06/18/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Status Conference re proposed judgments held on 6/18/2025. The Court hears from parties regarding proposed judgments and modifies judgments as stated. Plaintiffs' counsel shall re-submit the proposed judgments as modified by the Court. (Attorneys present: Olga Akselrod, Lisa Mankofsky, Suzanne Schlossberg, Jessie J. Rossman, Gerard Cedrone, Chris Pappavaselio, Phoebe Lockhart, Rachel M. Brown for plaintiffs and Anuj Khetarpal and Thomas Ports, Jr. for defendants)(Court Reporter: Richard Romanow at rhr3tubas@aol.com.) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 06/18/2025) | |
| 147 | 06/18/2025 | Proposed Document(s) submitted by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. Document received: Proposed Rule 54(b) Final Judgment (Revised per Court's Instructions). (Attachments: # 1 Exhibit A - Spreadsheet)(Cedrone, Gerard) (Entered: 06/18/2025) | |
| 148 | 06/20/2025 | MOTION to Dismiss and to set an expedited response deadline of June 26 by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (Ports, Thomas) Modified on 6/22/2025 (MAP). (Entered: 06/20/2025) | |
| 149 | 06/20/2025 | Opposition re 148 MOTION to Dismiss and to set an expedited | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | response deadline of June 26 (Opposition as to Motion to Expedite) filed by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. (Cedrone, Gerard) (Entered: 06/20/2025) | |
| 150 | 06/22/2025 | MEMORANDUM in Support re 148 MOTION to Dismiss and to set an expedited response deadline of June 26 filed by Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (MAP) (Entered: 06/22/2025) | |
| 151 | 06/23/2025 | Judge William G. Young:  WGY RULE 54(b) FINAL JUDGMENT (Sonnenberg, Elizabeth) (Additional attachment(s) added on 6/23/2025: # 1 List of Grants) (MAP). (Main Document 151 replaced on 6/23/2025) (MAP). (Entered: 06/23/2025) | |
| 152 | 06/23/2025 | NOTICE OF APPEAL as to 105 Memorandum & ORDER, 151 Order by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Services. Fee Status: US Government. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals.  Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 7/14/2025. (Ports, Thomas) (Entered: 06/23/2025) | |
| 153 | 06/23/2025 | MOTION to Stay Pending Appeal by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services.(Ports, Thomas) (Entered: 06/23/2025) | |
| 154 | 06/23/2025 | MEMORANDUM in Support re 153 MOTION to Stay Pending Appeal  filed by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (Ports, Thomas) (Entered: 06/23/2025) | |

A0372

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 155 | 06/23/2025 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 152 Notice of Appeal. (MAP) (Entered: 06/23/2025) | |
| 156 | 06/23/2025 | Transcript of Bench Trial, Phase 1 (Closings) held on June 16, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/14/2025. Redacted Transcript Deadline set for 7/24/2025. Release of Transcript Restriction set for 9/22/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/24/2025) | |
| 157 | 06/23/2025 | Transcript of Status Conference held on June 18, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/14/2025. Redacted Transcript Deadline set for 7/24/2025. Release of Transcript Restriction set for 9/22/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/24/2025) | |
| 158 | 06/23/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 06/24/2025) | |
| 159 | 06/24/2025 | USCA Case Number 25-1612 for 152 Notice of Appeal, filed by National Institutes of Health, National Institute on Aging, Jayanta Bhattacharya, National Institute on Minority Health and Health Disparities, United States Department of Health and Human Services, National Institute of Mental Health, National Eye Institute, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute on Drug Abuse, National Institute of Diabetes and Digestive and Kidney Diseases, National Center for Advancing Translational Sciences, National Cancer Institute, National Heart, Lung, and Blood Institute, National Institute of Environmental Health Sciences, National Center for Complementary and Integrative Health, National Library of Medicine, Eunice Kennedy Shriver National Institute of Child Health and Human Development, National Institute of Nursing Research, National Institute of Neurological Disorders and Stroke, National Institute of General Medical Sciences, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., National Institute on Deafness and Other Communication Disorders, National Institute of Biomedical Imaging and Bioengineering, NIH Center for Scientific Review, National Human Genome Research Institute, National Institute of Dental and Craniofacial Research, National Institute on Alcohol Abuse and Alcoholism, National Institute of Allergy and Infectious Diseases. (MAP) (Entered: 06/24/2025) | |
| 160 | 06/24/2025 | Judge William G. Young:  ORDER entered.  (Sonnenberg, Elizabeth) (Entered: 06/24/2025) | |
| 161 | 06/24/2025 | Supplemental Record on Appeal transmitted to US Court of Appeals re 152 Notice of Appeal Documents included: ECF No. 160 (MAP) (Entered: 06/24/2025) | |
| 162 | 06/30/2025 | Opposition re 148 MOTION to Dismiss and to set an expedited response deadline of June 26  filed by Commonwealth of Massachusetts, State of Arizona, State of California, State of | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. (Attachments: # 1 Exhibit A - Supplemental Declaration of Ryan Hutchings, # 2 Exhibit B - Supplemental Declaration of Jeremy M. Berg)(Cedrone, Gerard) (Entered: 06/30/2025) | |
| 163 | 07/02/2025 | Judge William G. Young: ORDER entered. FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR PARTIAL SEPARATE AND FINAL JUDGMENTAssociated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(Sonnenberg, Elizabeth) (Entered: 07/02/2025) | |
| 164 | 07/07/2025 | Supplemental Record on Appeal transmitted to US Court of Appeals re 152 Notice of Appeal. (MAP) (Entered: 07/07/2025) | |
| 165 | 07/09/2025 | NOTICE by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services Notice of Production of Phase Two ARs (Attachments: # 1 Designation and Certification of the Administrative Records)(Ports, Thomas) (Entered: 07/09/2025) | |
| 166 | 07/11/2025 | NOTICE of Appearance by Nadav S. Pearl on behalf of Commonwealth of Massachusetts (Pearl, Nadav) (Entered: 07/11/2025) | |
| 167 | 07/17/2025 | NOTICE of Appearance by Samuel Hobbs on behalf of Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services (Hobbs, Samuel) (Entered: 07/17/2025) | |
| 168 | 07/18/2025 | OPINION of USCA as to 152 Notice of Appeal, filed by National Institutes of Health, National Institute on Aging, Jayanta Bhattacharya, National Institute on Minority Health and Health Disparities, United States Department of Health and Human Services, National Institute of Mental Health, National Eye Institute, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute on Drug Abuse, National Institute of Diabetes and Digestive and Kidney Diseases, National Center for Advancing Translational Sciences, National Cancer Institute, National Heart, Lung, and Blood Institute, National Institute of Environmental Health Sciences, National Center for Complementary and Integrative Health, National Library of Medicine, Eunice Kennedy Shriver National Institute of Child Health and Human Development, National Institute of Nursing Research, National Institute of Neurological Disorders and Stroke, National Institute of General Medical Sciences, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., National Institute on Deafness and Other Communication Disorders, National Institute of Biomedical Imaging and Bioengineering, NIH Center for Scientific Review, National Human Genome Research Institute, National Institute of Dental and Craniofacial Research, National Institute on Alcohol Abuse and Alcoholism, National Institute of Allergy and Infectious Diseases. The Department's Motion for a Stay is DENIED. (MAP) (Entered: 07/20/2025) | |
| 169 | 07/18/2025 | ORDER of USCA as to 152 Notice of Appeal, filed by National Institutes of Health, National Institute on Aging, Jayanta Bhattacharya, National Institute on Minority Health and Health Disparities, United States Department of Health and Human Services, National Institute of Mental Health, National Eye Institute, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute on Drug Abuse, National Institute of Diabetes and Digestive and Kidney Diseases, National Center for Advancing Translational Sciences, National Cancer Institute, National Heart, Lung, and Blood Institute, National Institute of Environmental Health Sciences, National Center for Complementary and Integrative Health, National Library of Medicine, Eunice Kennedy Shriver National Institute of Child Health and Human Development, National Institute of Nursing Research, National Institute of Neurological Disorders and Stroke, National Institute of General Medical Sciences, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., National Institute on Deafness and Other Communication Disorders, National Institute of Biomedical Imaging and Bioengineering, NIH Center for Scientific Review, National Human Genome Research Institute, National Institute of Dental and Craniofacial Research, National Institute on Alcohol Abuse and Alcoholism, National Institute of Allergy and Infectious Diseases (MAP) (Entered: 07/20/2025) | |
| 170 | 07/22/2025 | ELECTRONIC NOTICE of Hearing. Status Conference set for 7/28/2025 11:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 07/22/2025) | |

A0375

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
| 171 | 07/23/2025 | MOTION for Discovery and to Set a Phase Two Case Schedule and Trial Date by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin.(Cedrone, Gerard) (Additional attachment(s) added on 7/24/2025: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (MAP). (Main Document 171 replaced on 7/24/2025) (MAP). (Entered: 07/23/2025) | |
| 172 | 07/28/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Status Conference held on 7/28/2025. Parties discuss status of case and phase II. Court adopts schedule but modifies pretrial and bench trial date. Final Pretrial Conference set for September 2, 2025 at 10:00 AM. The Court will hear argument on motion to dismiss at the final pretrial conference. The Bench trial will occur no later than September 15, 2025. Court hears the parties on discovery. Court takes the legal arguments as to discovery under advisement. Court will issue an order on or after August 15th. Court hears parties on defendants' stipulation as to supplemental claims. If Court requires more data the Court will order it at that time, the stipulation may be sufficient. Court discusses application for stay in the Supreme Court and possible outcomes. Final Pretrial Conference set for 9/2/2025 10:00 AM in Courtroom 18 (In person only with Remote Access Provided ) before Judge William G. Young. Bench Trial set for 9/15/2025 09:00 AM in Courtroom 18 (In person only with Remote Access Provided) before Judge William G. Young.(Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Max Roller Selver, Suzanne Schlossberg, Katherine B. Dirks, Phoebe Lockhart, Anuj K. Khetarpal and Samuel Hobbs ) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 07/29/2025) | |
| 173 | 07/30/2025 | Transcript of Status Conference held on July 28, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 8/20/2025. Redacted Transcript Deadline set for 9/2/2025. Release of Transcript Restriction set for 10/28/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY (DRK) (Entered: 07/30/2025) | |
| 174 | 07/30/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 07/30/2025) | |
| 175 | 07/30/2025 | Opposition re 171 MOTION for Discovery and to Set a Phase Two Case Schedule and Trial Date  filed by Jayanta Bhattacharya, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (Khetarpal, Anuj) (Entered: 07/30/2025) | |
| 176 | 08/15/2025 | MEMORANDUM OF LAW by Jayanta Bhattacharya, COGR, Eunice Kennedy Shriver National Institute of Child Health and Human Development, John E. Fogarty International Center for Advanced Study in the Health Sciences, Robert F. Kennedy, Jr., NIH Center for Scientific Review, National Cancer Institute, National Center for Advancing Translational Sciences, National Center for Complementary and Integrative Health, National Eye Institute, National Heart, Lung, and Blood Institute, National Human Genome Research Institute, National Institute of Allergy and Infectious Diseases, National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institute of Biomedical Imaging and Bioengineering, National Institute of Dental and Craniofacial Research, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Environmental Health Sciences, National Institute of General Medical Sciences, National Institute of Mental Health, National Institute of Neurological Disorders and Stroke, National Institute of Nursing Research, National Institute on Aging, National Institute on Alcohol Abuse and Alcoholism, National Institute on Deafness and Other Communication Disorders, National Institute on Drug Abuse, National Institute on Minority Health and Health Disparities, National Institutes of Health, National Library of Medicine, United States Department of Health and Human Services. (Khetarpal, Anuj) (Entered: 08/15/2025) | |
| 177 | 08/21/2025 | NOTICE of Appearance by Leanne E. Hartmann on behalf of State of Oregon (Hartmann, Leanne) (Entered: 08/21/2025) | |
| 178 | 08/22/2025 | NOTICE of Withdrawal of Appearance by Chris Pappavaselio (Pappavaselio, Chris) (Entered: 08/22/2025) | |
| 179 | 08/25/2025 | NOTICE of Appearance by Eric A. Martignetti on behalf of Commonwealth of Massachusetts (Martignetti, Eric) (Entered: 08/25/2025) | |
| 180 | 08/25/2025 | STIPULATION re 171 MOTION for Discovery and to Set a Phase Two Case Schedule and Trial Date -- Joint Stipulation on Introduction of Evidence at Trial, Discovery, and Administrative Record for Phase Two by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Delaware, State of Hawaii, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Oregon, State of Rhode Island, State of Washington, State of Wisconsin. (Cedrone, Gerard) (Entered: 08/25/2025) | |
| 181 | 08/29/2025 | NOTICE OF COURTROOM CHANGE: The hearing on 9/2/2025 will occur in Courtroom 17. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 08/29/2025) | |

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 182 | 09/02/2025 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Final Pretrial Conference held on 9/2/2025. Court addresses Supreme Court order. Court takes recess for parties to confer. Court continues hearing until Thursday at 10:00AM. Pretrial deadlines are extended accordingly. Final Pretrial Conference set for 9/4/2025 10:00 AM in Courtroom 10 (In person with remote access provided) before Judge William G. Young. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Kenneth Parreno, Alejandro Ortiz, Jessie J. Rossman, Olga Akselrod, Gerard J. Cedrone, Phoebe Lockhart, Vanessa Azniv Arslanian for plaintiffs and Samuel Hobbs and Anuj Khetarpal for defendants ) Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 09/02/2025) | |
| 183 | 09/03/2025 | ELECTRONIC NOTICE OF RESCHEDULING: At request of the parties the Final Pretrial Conference is reset for 9/9/2025 03:30 PM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Bench trial is reset for 9/22/2025. Deadlines are extended accordingly. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 09/03/2025) | |
| 184 | 09/04/2025 | Transcript of Final Pretrial Conference held on September 2, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 9/25/2025. Redacted Transcript Deadline set for 10/6/2025. Release of Transcript Restriction set for 12/3/2025. Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 09/04/2025) | |
| 185 | 09/04/2025 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-10814-WGY, 1:25-cv-10787-WGY(DRK) (Entered: 09/04/2025) | |
| 186 | 09/08/2025 | ELECTRONIC NOTICE OF RESCHEDULING: At request of the parties, the Final Pretrial Conference is reset for 9/18/2025 02:00 PM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Bench Trial is reset for 10/6/2025 09:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 09/08/2025) | |
| 187 | 09/17/2025 | ELECTRONIC NOTICE Canceling Hearing. Due to a conflict in the Court's schedule the Final Pretrial Conference set for | |

A0378

1:25cv10814, Commonwealth Of Massachusetts Et Al V. Kennedy, Jr. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|   |      | 9/18/2025 is cancelled and will be rescheduled. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 09/17/2025) | |
| 188 | 09/18/2025 | ELECTRONIC NOTICE OF RESCHEDULING: At request of the parties, the Final Pretrial Conference is reset for 9/30/2025 02:00 PM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Bench Trial tentatively reset for 10/14/2025 09:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Final Pretrial Conference set for 9/30/2025 02:00 PM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 09/18/2025) | |
| 189 | 09/25/2025 | ELECTRONIC NOTICE Cancelling Hearings. The Final Pretrial Conference set for 9/30/2025 and the Bench Trial set for 10/14/2025 are cancelled and will be rescheduled for dates to be determined. Associated Cases: 1:25-cv-10787-WGY, 1:25-cv-10814-WGY(KB) (Entered: 09/25/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

A0379

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION; IBIS REPRODUCTIVE HEALTH; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS (UAW); BRITTANY CHARLTON; KATIE EDWARDS; PETER LURIE; and NICOLE MAPHIS<br><br>*Plaintiffs*,<br><br>v.<br><br>NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, *in his official capacity as Director of the National Institutes of Health*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the United States Department of Health and Human Services*,<br><br>*Defendants*. | Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.     The National Institutes of Health ("NIH") is the world's leading funder of biomedical and behavioral research, responsible for the discovery of new ways to diagnose, prevent, and treat the most challenging diseases including cancer, strokes, diabetes, and Alzheimer's disease. Long considered "the crown jewel" of the federal government, NIH has

1

A0380

funded research that has led to more than 100 Nobel Prizes and has supported more than 99 percent of the drugs approved by federal regulators from 2010 to 2019.[1]

2.     In late February 2025, Defendants upended NIH's enviable track record of rigor and excellence, launching a reckless and illegal purge to stamp out NIH-funded research that addresses topics and populations that they disfavor. Plaintiffs, who are leading health research organizations and research scientists, bring this case because they have been harmed by Defendants' unlawful grant terminations and midstream abandonment of grant application processes.

3.     Congress created NIH nearly 100 years ago and funds it through annual appropriations so that it can "improve health, revolutionize science, and serve society."[2] Congress has provided additional directives to NIH to ensure that its research accrues to the benefit of all Americans.

4.     NIH has carried out Congress's purpose and achieved its legendary successes through directing most of its budget to thousands of researchers at universities, medical schools, and other institutions in all 50 states. For decades, NIH has been guided by congressional mandate, regulatory requirements, and scientific expertise when determining what research to prioritize and fund. NIH also is subject to the Administrative Procedure Act's ("APA") requirement of reasoned decision-making, which it effectuates through rigorous grounding in scientific evidence. Pursuant to a congressional mandate, NIH develops and publishes a five-year Strategic Plan to direct its

---

[1] *See Nobel Laureates*, Nat'l Insts. of Health, (Oct. 9, 2024) https://www.nih.gov/about-nih/what-we-do/nih-almanac/nobel-laureates; E. Galkina Cleary et al., *Comparison of Research Spending on New Drug Approvals by the National Institutes of Health vs the Pharmaceutical Industry, 2010-2019*, 4 JAMA Health Forum e230511 (2023), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2804378.
[2] *Impact of NIH Research*, Nat'l Insts. of Health, https://www.nih.gov/about-nih/what-we-do/impact-nih-research.

A0381

priorities, "focused on science and good stewardship of research, guided by evidence, and informed by NIH's many stakeholders."[3]

5.      Under this legally established framework, thousands of researchers across the country regularly apply for NIH grants to fund their research. NIH makes grant decisions following a highly competitive and rigorous process involving layers of expert scientific review over many months. Consequently, for decades, terminations of ongoing NIH grants have been exceedingly rare.

6.      This all changed beginning in February of 2025, when Defendants issued a series of directives to terminate large numbers of grants and to refuse to consider certain categories of pending grant applications ("the Directives"). These Directives conflict with constitutional, statutory, and regulatory requirements. When issuing termination letters pursuant to the Directives, NIH has not referenced or met any of the standards in its governing statute or regulations. In fact, the sole legal basis that NIH cited for its authority to terminate the grants is inapplicable. It has not highlighted any genuine concerns with the rigor of projects or any underlying data; in a matter of weeks it has just declared them all "unscientific." More broadly, it has parroted the generalized and conclusory justification that the cancelled programs "no longer effectuate agency priorities." This is not a proper ground for termination under governing law.

7.      As a result of the Directives, hundreds of NIH-funded research projects—many of which have been underway for years, representing millions of hours of work and hundreds of millions of dollars in investment—have been abruptly cancelled without scientifically-valid explanation or cause. Grant application processes have been abandoned midstream and funding opportunities have been removed from NIH's website.

---

[3] *NIH-Wide Strategic Plan, Fiscal Years 2021–2025*, Nat'l Insts. of Health (July 2021), https://www.nih.gov/sites/default/files/about-nih/strategic-plan-fy2021-2025-508.pdf at 44.

A0382

8.      Defendants attempt to justify this ongoing ideological purge of hundreds of critical research projects because they assertedly have some connection to "gender identity" or "Diversity, Equity, and Inclusion" ("DEI") or other vague, now-forbidden language. Indeed, Defendants' campaign against peer-reviewed science has not stopped at topics deemed to be related to gender or DEI. Defendants' ideological purity Directives also seek to cancel research deemed related to "vaccine hesitancy," "COVID," and studies involving entities located in South Africa and China, among other things. Additionally, NIH has stopped considering submitted applications to programs designed to diversify the backgrounds of those in tenure-track positions at research universities. Defendants' actions have been taken in apparent disregard to Congress's express mandate that NIH fund research to address health equity and health disparities, include diverse populations in its studies, improve efforts to study the health of gender and sexual minorities, and enhance diversity in the biomedical research profession.

9.      The new arbitrary regime is not codified in any law or policy. The operative NIH Strategic Plan, developed in furtherance of congressional mandate, has been in effect since September 2021, and remains in effect today. Defendants have failed to develop any guidelines, definitions, or explanations to avoid arbitrary and capricious decision-making in determining the parameters of the agency's prohibitions against research with some connection to DEI, gender, and other topics that fail Defendants' ideological conformity screen. Nor do Defendants' actions take into consideration the vast harms they have caused to scientific research and public health.

10.     Plaintiffs are individual researchers and organizations whose members are researchers who have secured (or are in the process of securing) funding from NIH. For example, individual Plaintiffs have received NIH grants for research in the areas of Alzheimer's disease, disparities in pregnancy health, violence prevention among children, and the efficacy of

4

A0383

preventative HIV medications. Plaintiffs pursue careers in medical research to help discover new treatments, cure diseases, and improve the health of people and communities across the country.

11.    Plaintiffs have already suffered extensive harm from Defendants' unlawful actions, and those with grants that have yet to be cancelled wonder if they are soon to receive another vague, boilerplate termination letter. In just the past few weeks, for example, Plaintiffs and their members are facing the loss of jobs, staff, and income. Patients enrolled in NIH studies led by Plaintiffs face abrupt cancellations of treatment in which they have invested months of time with no explanation or plan for how to mitigate the harm. Over $2.4 billion is at stake just in grants recently purged, including $1.3 billion already spent on projects stopped midstream that is now wasted, and $1.1 billion—that Plaintiffs and others have acted in reliance on—has been revoked. As a result of Defendants' Directives, scientific advancement will be delayed, treatments will go undiscovered, human health will be compromised, and lives will be lost.

12.    Plaintiffs request that the Court declare unlawful Defendants' Directives; declare Defendants' termination of grants in this manner unlawful; order Defendants to end their arbitrary and capricious, unconstitutional, and unlawful actions; and order Defendants to restore funding to the terminated NIH grants.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution and the Administrative

A0384

Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*. This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because Defendants are officers and agencies of the United States, no real property is at issue in this case, and one or more Plaintiffs are residents of this District.

## PARTIES

*A. Plaintiffs*

15.     Plaintiff Dr. Brittany Charlton is an Associate Professor at Harvard Medical School and Harvard T.H. Chan School of Public Health. She is a resident of Massachusetts and the Founding Director of the LGBTQ Health Center of Excellence, a partnership of the Harvard Pilgrim Health Care Institute and Harvard T.H. Chan School of Public Health. Dr. Charlton is a leading scholar of LGBTQ health inequities, particularly in cancer and reproductive health, and also focuses on contraception use and family planning among people of all sexual orientations and gender identities. She has received continuous funding for her research for the last 15 years from NIH. Since February 2025, Dr. Charlton has had five grants terminated by NIH because each, allegedly, "no longer effectuates agency priorities."

16.     Plaintiff Dr. Katie Edwards is a professor at the University of Michigan School of Social Work. Dr. Edwards' research focuses on preventing sexual and related forms of violence among minority communities, using evidence-based, affirming, and culturally-grounded approaches. Her current work is focused on program development and evaluation with Indigenous youth and communities, as well as LGBTQ+ youth and young people. To date, she has published more than 220 peer-reviewed articles, which were made possible, in part, through obtaining millions of dollars in research funding over her career. Since February 2025, NIH has terminated

A0385

at least six grants in support of Dr. Edwards' research in projects where she is the principal investigator or co-investigator because, according to NIH, each of these grants "no longer effectuates agency priorities."

17.     Plaintiff Dr. Peter Lurie is an experienced research physician and the President and Executive Director of the Center for Science in the Public Interest, a 501(c)(3) nonprofit organization based in Washington, D.C. that advocates for improving public health through science-based policies and promoting scientific integrity. From 2014–17, he was an Associate Commissioner at the Food and Drug Administration, where he worked on the regulation of over-the-counter drugs, among other projects. Additionally, for decades, Dr. Lurie has participated in biomedical research and policy focused on the treatment and prevention of HIV and AIDS. Dr. Lurie was a consultant and advisor on an NIH-funded grant studying the impact of access to preventative HIV drugs that NIH terminated because, according to NIH, it "no longer effectuates agency priorities."

18.     Plaintiff Dr. Nicole Maphis is a postdoctoral fellow at the University of New Mexico's School of Medicine. Her research explores how alcohol usage affects the risk of developing Alzheimer's disease. She is the first and only person in her family to graduate college and comes from a low-income background. Dr. Maphis recently sought a grant through a program explicitly created to facilitate the transition of promising postdoctoral researchers from backgrounds underrepresented in the biomedical research workforce into independent, tenure-track or equivalent research-intensive faculty positions. Even though Dr. Maphis satisfies the eligibility criteria for the program and invested months into assembling her application, NIH is refusing to consider Dr. Maphis's grant application solely because the program is designed to help diversify the profession.

A0386

19.     Founded in 1872, Plaintiff American Public Health Association ("APHA") represents about 50,000 people through organizational and individual memberships and has more than 23,000 individual public health professional members. APHA acts to build capacity in the public health community and champions optimal, equitable health and well-being for all. APHA speaks out for public health issues and policies backed by science. APHA and its members also work to ensure that health services are distributed equitably to all communities and research how disease, injury, or health related issues affect marginalized populations. APHA receives grants from NIH for its *American Journal of Public Health*. In addition, APHA members conduct research that is funded by grants from NIH. APHA has members who have had NIH grants terminated because, according to NIH, each of the grants "no longer effectuates agency priorities." APHA also has members whose grant applications NIH refuses to consider, or who are unable to submit future NIH grant applications due to the uncertainty caused by NIH's actions.

20.     Founded in 2002, Plaintiff Ibis Reproductive Health ("Ibis") is a global research organization that drives change through bold, rigorous research and principled partnerships that advance sexual and reproductive autonomy, choice, and health worldwide. With offices in locations including Cambridge, Massachusetts, Ibis has a highly trained and committed staff of demographers, epidemiologists, and public health researchers leading projects with more than 100 partners in 30 countries. Research is core to the organization's work, and the organization's agenda is informed by a principled partnership approach with communities, including transgender and gender diverse community members, to identify key gaps in information and resources concerning reproductive health, autonomy, and health care access for these populations. In September 2023, Ibis was awarded a R01 grant providing about $2.5 million over five years, to study survey design

for diverse populations, including those who identify as transgender or gender diverse. In March 2025, NIH terminated the grant on the basis that it "no longer effectuates agency priorities."

21.    The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") is one of the largest and most diverse unions in North America, with members in the United States, Canada and Puerto Rico and in virtually every sector of the economy. From its earliest days, the UAW has been a leader in the struggle to secure economic and social justice for all people. It has a rich history of supporting inclusion, equity, and diversity in the higher education sector and in all workplaces. The UAW has nearly 1,000,000 active and retired members and represents approximately 120,000 workers in higher education—graduate students, postdoctoral scientists, researchers, university staff, and faculty—at institutions across the country including Northeastern University, Wellesley College, University of Southern California, Columbia University, Harvard University, University of Pennsylvania, Princeton University, and Worcester Polytechnic Institute, among many others. Tens of thousands of UAW members rely on NIH grant funding for their jobs and training. These members benefit from all NIH grant and fellowship types and play a variety of roles, including on NIH grant-funded projects as principal investigators. UAW has members whose grants have been cancelled because, according to NIH, each of the grants "no longer effectuates agency priorities." UAW also has members whose grant applications NIH refuses to consider, or who are unable to submit future NIH grant applications due to the uncertainty caused by NIH's actions.

A0388

B. *Defendants*

22.    Defendant the National Institutes of Health ("NIH") is an agency of the United States, established pursuant to 42 U.S.C. § 281, and is housed within the United States Department of Health and Human Services.

23.    Defendant Jay Bhattacharya is Director of NIH and is sued in his official capacity.

24.    Defendant the United States Department of Health and Human Services ("HHS") is an agency of the United States that houses NIH. HHS is a department of the executive branch of the United States.

25.    Defendant Robert F. Kennedy, Jr. is the Secretary of HHS and is sued in his official capacity.

## FACTUAL ALLEGATIONS

*A. Overview of the Structure and Priorities of NIH*

<u>1. History of NIH</u>

26.    In 1930, Congress enacted the Ransdell Act, establishing a "National Institute of Health" and appropriating funds to the newly-formed institute for the purpose of "ascertaining the cause, prevention, and cure of disease affecting human beings."[4] The Ransdell Act authorized the creation of "fellowships" for "individual scientists."

27.    Since then, Congress has repeatedly increased its investment in NIH, including by funding additional Institutes and Centers ("ICs") that operate within NIH.[5]

28.    Over these decades of expansion, research funded through NIH has led to medical breakthroughs. For example, NIH-funded research played a critical role in developing numerous lifesaving treatments, including chemotherapy drugs, heart valve transplants, medications for

---

[4] Ransdell Act, Pub. L. No. 71–251, 46 Stat. 379 (1930) (codified at 42 U.S.C. §§ 21 *et seq*.).
[5] *NIH Budget History*, Nat'l Insts. of Health (Aug. 2024), https://report.nih.gov/nihdatabook/category/1.

A0389

managing type 2 diabetes, and a clot-busting medicine that is used as a first-line treatment in stroke patients.[6]

29.    Today, NIH is the largest funder of biomedical research in the world, with an operating budget of $48 billion as allocated by Congress. The vast majority—83 percent—is allocated for funding research for institutions and organizations outside of the agency. NIH provides almost 50,000 competitive grants to more than 300,000 researchers at more than 2,500 universities, medical schools, and other research institutions in every state.[7]

2. NIH Structure and Funding

30.    NIH is comprised of the Office of the Director, as well as 27 ICs, which span a wide range of functions and focuses. Each of the ICs within NIH serves a particular purpose. For example, Congress established the National Cancer Institute to study and disseminate information about cancer causes, diagnosis, and treatment.

31.    Twenty-four of the 27 ICs, as well as several divisions within the Office of the Director, post opportunities for funding for researchers outside of the agency. Congress has also authorized the Director to set aside a portion of NIH's allocated budget for a "Common Fund" dedicated to research that spans across ICs.

32.    NIH is primarily funded through congressional appropriations, which includes both funding for agency-wide programs and dedicated budgets for each individual IC.[8] For example, each year, Congress delegates funding directly to the National Institute on Minority Health and Health Disparities to carry out specific legislative purposes, including to "conduct and support []

---

[6] *Impact of NIH Research: Improving Health*, Nat'l Insts. of Health (Dec. 30, 2024), https://www.nih.gov/about-nih/what-we-do/impact-nih-research/improving-health.

[7] *Budget*, Nat'l Insts. of Health (Oct. 3, 2024), https://www.nih.gov/about-nih/what-we-do/budget#:~:text=Research%20for%20the%20People%2C%20maintenance%2C%20or%20operational%20costs.

[8] *See* Kavya Sekar, Cong. Research Serv., *NIH Funding FY1996-FY2025,* (June 25, 2024), https://www.congress.gov/crs-product/.

A0390

research, training, dissemination of information, and other programs with respect to minority health conditions and other populations with health disparities."[9]

33.    Congress has also defined mandates on the purposes and aims for which NIH and the ICs must fund research. Four such mandates are of particular relevance here.

34.    First, Congress has long mandated that NIH must expend its funds to promote health equity and reduce health disparities across diverse populations. For instance, the Public Service Health Act requires that each IC "utilize diverse study populations, with special consideration to biological, social, and other determinants of health that contribute to health disparities."[10] The Minority Health and Health Disparities Research and Education Act of 2000 recognizes the presence of continuing racial disparities "in the burden of illness and death," and obligates NIH to identify and fund health equity research and to establish a center later reclassified as the National Institute on Minority Health and Health Disparities.[11] And the 21st Century Cures Act mandates that NIH consider "disease burden in the United States" and "biological, social, and other determinants of health that contribute to health disparities" in identifying "strategic research priorities and objectives across biomedical research."[12] This statute expressly expands NIH's congressional mandate to study diverse populations and the issues that affect them to encompass the LGBTQ+ population, that "[t]he Director of the National Institutes of Health *shall, as appropriate, encourage efforts to improve research related to the health of sexual and gender minority populations*."[13]

---

[9] 42 U.S.C. § 285t.
[10] 42 U.S.C. § 282(b)(8)(d)(ii).
[11] Affordable Care Act, Pub. L. No. 111-148, § 1707A(c), 124 Stat. 119, 973 (2010) (codified at 42 U.S.C. §§ 285t–285t-3). *See also* 42 U.S.C. § 285t(b) (National Institute on Minority Health and Health Disparities "shall in expending amounts appropriated under this subpart give priority to conducting and supporting minority health disparities research").
[12] *Id.* at § 282(m)(2)(b)(iii).
[13] 42 U.S.C. § 283p (emphasis added).

A0391

35.     Second, Congress has also mandated that NIH address the underrepresentation of certain groups in the medical field. For example, Congress requires that NIH "provide for an increase in the number of women and individuals from disadvantaged backgrounds (including racial and ethnic minorities) in the fields of biomedical and behavioral research" when "conducting and supporting programs for research, research training, recruitment, and other activities."[14] Likewise, NIH must make the Ruth L. Kirschstein National Research Service Award ("Kirschstein-NRSA")—the largest congressionally-mandated NIH training program—available in "a manner that will result in the recruitment of women, and individuals from disadvantaged backgrounds (including racial and ethnic minorities), into fields of biomedical or behavioral research and in the provision of research training to women and such individuals."[15]

36.     Third, Congress has required that NIH ensure "scientifically based strategic planning . . . through the development, implementation, and updating of [a] strategic plan," and that its resources "are sufficiently allocated for research projects identified in strategic plans."[16] Under this congressional mandate, NIH must develop its strategic plan no later than every six years and must submit that plan to Congress.[17] Congress also mandates specific strategic plans for each IC.[18] IC-specific strategic plans set forth research priorities within each institute, and by statute, each director must consider "the mission of the [IC] and . . . [its] strategic plan" "when review[ing] and mak[ing] the final decision with respect to making [a grant] award."[19]

37.     Fourth, Congress mandates that, in creating its strategic plan for identifying its research priorities, NIH identify emerging scientific opportunities, flag near-, mid-, and long-term

---

[14] *Id.* at § 282(h) (emphasis added).
[15] 42 U.S.C. § 288(a)(4).
[16] 42 U.S.C. § 282 (b)(5), (6).
[17] *Id.* at (m)(1).
[18] 42 U.S.C. § 282(m)(3).
[19] 42 U.S.C. § 284(b)(3)(A)–(B).

13

A0392

scientific needs, assess opportunities for multi-institute research, and consider the "biological, social, and other determinants of health that contribute to health disparities."[20] These plans must be developed "in consultation with the directors of the national research institutes and national centers, researchers, patient advocacy groups, and industry leaders."[21]

38.     Thus, Congress has long required NIH and ICs to set their priorities through science-based plans, and to study, understand, and address health equities and disparities in the field.

C.  *Types of NIH Grants*

1. Project-Based Grants

39.     Subject to the purposes and mandates articulated by Congress, NIH awards considerable funding for independent research through grants for scientific and biomedical research projects ("Project-Based Grants"), which usually are designated as part of the R-series of grants (*e.g.*, "R01," "R15," etc.). Though there are numerous categories of Project-Based Grants, the most typical designation for a Project-Based Grant is the R01, or "Research Project" grant. There are also certain grants that go to institutions that serve as coordinating centers that provide support, organize conferences, and assist researchers in applying for NIH funding in order to help advance studies in a particular field.

40.     Project-Based Grants are the lifeblood of American biomedical and public health research. The billions of dollars each year in funding they provide contribute to medical and scientific breakthroughs that save lives and vitalize the economy. NIH touts, for example, that its

---

[20] 42 U.S.C. § 282(m)(2)(iii).
[21] *Id.* at (m)(4).

funding supports scientists working on projects to develop new technologies for medical imaging, to prevent the spread of HIV/AIDS, and to understand the rising rates of colorectal cancer.[22]

41.     Such projects are critical to improving public health and have a demonstrable economic impact. For example, more than 30 percent of NIH-funded studies are later cited in an application for a commercial patent, demonstrating the vital role that Project-Based Grants play in fostering innovation.[23]

42.     The funding provided by NIH's Project-Based Grants also provides financial support for researchers and institutions who have devoted themselves to the study of important public health issues. Funding from a Project-Based Grant may cover everything from the salary and benefits paid to principal investigators and more junior researchers to the cost of the facilities in which research is conducted. As a result, the abrupt termination of Project-Based Grants can have catastrophic consequences for the individuals who rely on grant funding to make a living and the institutions where their work occurs, not to mention the participants enrolled in any study made possible by that funding.

### 2. Pipeline Grants

43.     In addition to Project-Based Grants, NIH also makes awards to institutions or individuals for career development or training ("Pipeline Grants"). Some Pipeline Grants are congressionally mandated, such as Kirschstein-NRSAs, which have the purpose of "training individuals" to conduct "biomedical and behavioral research . . . in matters relating to the cause,

---

[22] *NIH Science Highlights*, Nat'l Insts. of Health (Dec. 18, 2024), https://www.nih.gov/research-training/science-highlights.
[23] Elie Dolgin, *NIH research grants yield economic windfall*, 544 Nature 14 (2017).

A0394

diagnosis, prevention, and treatment of the diseases or other health problems to which the activities of the National Institutes of Health and Administration are directed."[24]

44.     There are numerous kinds of Pipeline Grants. For example, training awards—"institutional training grants" (T32s)—are typically applied for by the senior investigator who heads a training or research center on behalf of a larger set of researchers at an institution, and they can be used to cover the costs of predoctoral or postdoctoral students. There are also individual grants, typically classified as F-series ("Fellowship") grants, or K-series ("Career Development") grants, that can be used to provide stipends to researchers at all stages of their career, cover tuition and costs, and fund other expenses.

45.     Some Pipeline Grants are designed to promote recruitment of groups that are "underrepresented in the biomedical, clinical, behavioral and social sciences." For example, consistent with their congressional mandate, NIH protocols for Kirschstein-NRSA grants state that "[w]ithin the framework of the program's longstanding commitment to excellence and projected need for investigators in particular areas of research, attention must be given to recruiting prospective trainees from diverse backgrounds."[25]

46.     Another Pipeline Grant—Maximizing Opportunities for Scientific and Academic Independent Careers ("MOSAIC") K99/R00—is designed to help promising postdoctoral researchers from diverse backgrounds transition into independent, tenure-track or equivalent

---

[24] 42 U.S.C. § 288(a)(1)(A).
[25] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 11.3.3.3 (Apr. 2024). NIH identifies populations that are "underrepresented in the biomedical, clinical, behavioral and social sciences" to include racial and ethnic minorities, women, people with disabilities, and people from "disadvantaged backgrounds," determined by criteria such as current or prior homelessness, being in the foster care system, eligibility for free or reduced lunch or Pell grants, growing up in a rural area or low-income zip code, and having parents who did not complete higher education. *Id.* at § 11.3.3.4. All these categories are supported based on a reference to government data on educational or science workforce disparities. NIH's Grants Policy Statement further sets out the reasons for its policies to support the development of a diverse scientific workforce: "fostering scientific innovation, enhancing global competitiveness, contributing to robust learning environments, improving the quality of the research, advancing the likelihood that underserved or health disparity populations participate in, and benefit from health research, and enhancing public trust." *Id.*

16

research-intensive faculty positions. Likewise, the "F31 Diversity" grant provides a five-year fellowship to individuals from backgrounds "currently underrepresented in the biomedical, clinical, behavioral, and social sciences."[26] Still another is the "Faculty Institutional Recruitment for Sustainable Transformation (FIRST) initiative," which aims to transform culture at NIH-funded institutions through the recruitment of faculty cohorts who have a demonstrated commitment to diversity and inclusion.[27]

47.    Pipeline Grants are essential in shaping the careers of promising scientists, particularly those from disadvantaged backgrounds or from smaller institutions without significant private endowments. In 2022, more than 18,000 full-time graduate students received their primary federal funding support through NIH.[28] NIH funding programs provide essential support for promising undergraduate students at universities and colleges across the country.

48.    These awards also have substantial impacts on the productivity and long-term retention of promising scientists in the field. In a 2011 study, researchers found that "receipt of an NIH postdoctoral fellowship leads to about one additional publication over the next five years, which reflects a 20 percent increase in research productivity.[29] A later National Bureau of Economic Review working paper found that researchers who have received fellowship awards were significantly more likely to subsequently complete an NIH-funded research project, further

---

[26] *See, e.g.,* Nat'l Insts. of Health, *Ruth L. Kirschstein National Research Service Award (NRSA) Individual Predoctoral Fellowship to Promote Diversity in Health-Related Research (Parent F31-Diversity)* (July 6, 2020), https://grants.nih.gov/grants/guide/pa-files/PA-20-251.html.
[27] *Supra* note 4, at 17.
[28] Nat'l Insts. of Health, *National Statistics: Primary Source of Federal Support for Full-Time Graduate Students* (Mar. 2024), https://report.nih.gov/nihdatabook/category/20.
[29] Brian A. Jacob & Lars Lefgren, *The Impact of NIH Postdoctoral Training Grants on Scientific Productivity*, 40 Res. Policy 864 (2011).

A0396

concluding that "NRSA postdoctoral fellowship awards have the potential to promote retention of scientists in NIH-funded research and in the biomedical workforce pipeline."[30]

### D. The Grant Application Process

49.    To offer funding for researchers outside of NIH, ICs post "Notices of Funding Opportunities" ("NOFOs"), alerting researchers to the availability of funds. While in some cases, grant-funded research is "investigator-initiated," meaning that the researcher comes to the funding IC with a proposed area of research, ICs "regularly identify specific research areas and program priorities to carry out their scientific missions."[31]

50.    Funding awards are determined through a rigorous and competitive application process in which researchers submit their proposal and lengthy supporting documentation for review. Grant applications are substantial documents, often requiring months of effort and totaling 100 or more pages, including a detailed research plan, justifications of the proposed budget, information about facilities/locations, and letters of support from other researchers. Among other requirements, all applications must address how their research complies with NIH public policy requirements related to "inclusion of genders, members of minority groups, and individuals across the lifespan in clinical research."[32]

51.    Upon completion of an application, the vast majority of grants—both Project-Based and Pipeline Grants—are subjected to a two-step, highly standardized peer-review process, as set forth in the Public Health Service Act, its enacting regulations, and detailed NIH protocols. Specifically, the NIH Director must "require appropriate technical and scientific peer review" of

---

[30] Misty L. Heggeness *et al., The Impact of Postdoctoral Fellowships on a Future Independent Career in Federally Funded Biomedical Research,* NBER Working Paper No. 24508 (Apr. 2018), https://www.nber.org/papers/w24508.
[31] Nat'l Insts. of Health, *New to NIH,* (2024), https://grants.nih.gov/new-to-nih.
[32] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 2.3.6 (Apr. 2024).

A0397

"applications made for grants" for "biomedical and behavioral research."[33] NIH's stated policy is that "applications for funding submitted to NIH" will be "evaluated on the basis of a process that is fair, equitable, timely, and conducted in a manner that strives to eliminate bias."[34]

52.  In the initial phase, the Center for Scientific Review receives applications, and then assigns applications to relevant scientific review groups, where groups of approximately twenty scientific reviewers who are experts in their field analyze and score each proposal.[35]

53.  Scored applications are then moved on to IC-specific advisory councils, made up of "senior scientists with broad experience and members of the public with general knowledge of, and interest in, the IC's mission" where the IC determines which projects to move forward with funding.[36]

54.  For Pipeline Grants, reviewers also "gauge the likelihood the fellowship will enhance [the applicant's] potential for and commitment to a productive research career. For postdoctorals, they also assess whether [the applicant] has what it takes to be an independent researcher."[37]

55.  HHS regulations provide that "all" applications "shall be evaluated" and that the agency will either "1) approve, 2) defer because of either lack of funds or a need for further evaluation, or 3) disapprove support of the proposed project in whole or in part."[38] NIH policies

---

[33] 42 U.S.C. § 289a.
[34] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 2.4 (Apr. 2024).
[35] *See* 42 C.F.R. § 52h (describing requirements for membership in scientific review groups).
[36] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 2.4.3 (Apr. 2024).
[37] *See, e.g.*, Nat'l Inst. of Allergy & Infectious Diseases, Fellowship Grants (F) (Mar. 7, 2025), https://www.niaid.nih.gov/grants-contracts/fellowship-grants.
[38] 42 C.F.R. § 52.5.

effectuate these regulations.[39] NIH policy solely contemplates the agency withdrawing an application for consideration for "non-conformity with application requirements."[40]

56.     There are no provisions in NIH guidelines that allow ICs to halt review of applications in specific grant lines because the agency has determined that a NOFO no longer effectuates agency priorities. Instead, NIH policy provides for the review of applications for "relevance to the IC's programs and priorities" at the IC advisory board stage of the process, which as discussed further below are set through the IC's strategic plan.[41]

57.     After undergoing this rigorous, two-step peer review process, only a small percentage of all applications are selected to receive an award. Final authority to make an award belongs to the Director of the IC responsible for the grant.[42]

58.     Upon selection, a successful applicant receives a Notice of Award ("NOA"). The NOA identifies the institutional grantee, one or more principal investigators, and specifies the amount of the award, its duration, and all other terms and conditions with which the grantee must comply.

59.     The NOA also provides the grantee and principal investigators with contact information for their program officer, who is the main point of contact throughout the lifespan of the award. Generally, program officers are trained scientists well-versed in handling the subjects covered by the grants for which they are responsible.

---

[39] *See, e.g.*, Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 11.3.4.1 (Apr. 2024) ("*Each* initial and competing continuation application *will be* evaluated for scientific merit by an NIH peer review group. Kirschstein-NRSA institutional research training grant applications also must be reviewed by the National Advisory Council or Board of the IC") (emphases added); *see also* Nat'l Insts. of Health, *First Level: Peer Review* (Sept. 9, 2024), https://grants.nih.gov/grants-process/review/first-level ("Each grant application submitted to NIH is evaluated according to established review criteria that must be stated clearly in a notice of funding opportunity").
[40] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 2.3.9.5 (Apr. 2024).
[41] *Id.* at § 2.4.3.
[42] 42 U.S.C. § 284(b)(2).

20

60.    Throughout the duration of the grant, grantees are required to provide annual progress reports to ensure compliance with grant terms. In response to these reports, program officers and grants management specialists conduct annual assessments to ensure that grantees are satisfying the grant's goals, terms, and conditions.

E.    *HHS Regulations Specify the Limited Grounds on Which Grant Terminations Must Be Based*

61.    The HHS regulations that are currently in effect significantly limit the termination of a grant, in whole or in part, during the duration of the award to specific circumstances: (1) if the grantee "fails to comply with the terms and conditions of the award"; (2) "for cause"; or (3) "with the consent of" the grantee.[43] Critically, NIH cannot terminate grants based on its determination that a grant "no longer effectuates the program goals or agency priorities." This is because the provision for terminating grants based on changes in goals or priorities appears in OMB guidance that HHS regulations did not adopt until a recent notice and comment rulemaking, and the *change to HHS regulations will not become effective until October of 2025*.

62.    In 2013, OMB published the "Office of Management and Budget Guidance for Federal Financial Assistance, at 2 CFR part 200 ("OMB Uniform Guidance"). Though part of the CFR, this content, published in subtitle A, is "guidance, not regulation. Each Federal agency that awards grants has its own regulations in subtitle B. Federal agency regulations in subtitle B may

---

[43] 75 C.F.R. § 75.372. NIH written protocols are consistent with this regulatory limitation, providing for the process for termination solely on the request of a grantee or "if a recipient has failed to comply with the terms and conditions of award." Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 8.5.2 (Apr. 2024); *see also id.* at § 11.2.13.2, Termination Provision for Kirschstein-NRSA (solely provides for termination for individual awards upon awardee or trainee request or "if it determines that the recipient has materially failed to comply with the terms and conditions of the award or to carry out the purpose for which it was made."); *id.* at § 11.3.16.2 (same, for institutional Kirschstein-NRSA); *id.* at § 12.13.3 (same for Research Career Development ("K") awards).

21

A0400

give regulatory effect to the OMB guidance, if the agency regulations require compliance with all or portions of the OMB guidance."[44]

63.    The 2013 version of the OMB Uniform Guidance allowed for termination of a federal award solely under three limited conditions: (1) if the award recipient "fails to comply with the terms and conditions of a Federal award," (2) "for cause", or (3) "with the consent" of the grantee.[45]

64.    HHS adopted this guidance in 2014 *as a regulation* and maintained the limitation that grants could be terminated only in those three narrow circumstances.[46] HHS subsequently revised its regulations in 2016 and retained the three limited conditions for termination in 45 C.F.R. § 75.372.[47]

65.    In 2020, OMB made substantive amendments to the termination provision of the OMB Uniform Guidance.[48] The new termination provision—which is still only guidance without the effect of an agency regulation—continued to allow for termination for failure "to comply with the terms and conditions" of the award or upon the consent of the grantee.[49] However, OMB removed the third circumstance, which allows termination "for cause," and replaced it with language allowing for termination "to the greatest extent authorized by law, if an award no longer

---

[44] 2 C.F.R. § 1.105 (b)–(c) (2024).

[45] *See* 2 C.F.R. § 200.339 (2024) (OMB Uniform Guidance, 2013 version, available with subsequent 2020 redlines at infra note 48).

[46] *See Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 79 Fed. Reg. 75871 (Dec. 19, 2014) ("The Federal award may be terminated in whole or in part as follows:" if the award recipient "fails to comply with the terms and conditions of a Federal award," "for cause", or "with the consent" of the award recipient.)

[47] *See Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards; Technical Amendments*, 81 Fed. Reg. 3004 (Jan. 20, 2016).

[48] *See Office of Mgmt. & Budget, 2 CFR Revision Redline* 5 (Aug. 12, 2020), https://trumpadministration.archives.performance.gov/CAP/20200812-2-CFR-Revision-Redline_Final.pdf.

[49] 2 C.F.R. §§ 200.340(a)(1), (3).

effectuates the program goals or agency priorities."[50] OMB added a fourth condition, that the agency could terminate "pursuant to termination provisions included in the Federal award," and stated that the agency "should clearly and unambiguously specify termination provisions applicable to each Federal award, in applicable regulations or in the award, consistent with this section."[51]

66.    HHS amended its regulations in November 2020, *but did not adopt the changes that OMB made in 2020 to its termination provision*. Instead, HHS regulations continued to allow termination only under the three limited circumstances of non-compliance, for cause, or with the consent of the awardee.[52]

67.    In 2024, OMB again revised the termination provision in the OMB Uniform Guidance, effective October 1, 2025. Under the 2024 revision, agencies can terminate an award for non-compliance with the grant's terms and conditions, with the consent of the awardee, or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."[53] The OMB Uniform Guidance also states that the agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."[54]

68.    In October 2024, HHS published an interim final rule that will bring HHS regulations—*effective October 1, 2025*—into near total conformity with the OMB Uniform Guidance, including with 2 C.F.R. § 200.340. In the interim final rule, HHS stated that "HHS will forgo the separate codification, fully adopt 2 CFR part 200, reduce the total number of HHS-

---

[50] 2 C.F.R. § 200.340(a)(2) (2020).
[51] 2 C.F.R. §§ 200.340(a)(5), (b) (2020).
[52] *See* 45 C.F.R. § 75.373.
[53] 2 C.F.R. § 200.340(a) (1), (2), (4).
[54] 2 C.F.R. § 200.340(b).

23

A0402

specific changes, and codify those changes in 2 CFR part 300."[55] Therefore, beginning on October 1, 2025, *and not sooner*, HHS regulations will, for the first time, allow agencies to terminate grants "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

69.     Notwithstanding the termination letters and revised NOAs described below that NIH has sent to Plaintiffs and their members citing that the grants "no longer effectuate[] agency priorities" as the authority to terminate their grants, NIH does not have such authority under current HHS regulations. Nor is there anything in the terms and conditions of the NOAs that Plaintiffs initially received when the awards were made that provide or can provide NIH with such authority. Plaintiffs' original NOA lists various terms and conditions and explicitly incorporate 45 C.F.R. Part 75. The NOAs do not list 2 C.F.R. Part 200 explicitly as an applicable term or condition.

70.     The NOAs also state that they incorporate the Grants Policy Statement, which is not a formal regulation, but is instead "an aid to the interpretation of statutory and regulatory requirements."[56] In the revised NOAs that NIH sent to Plaintiffs when it terminated their grants, NIH stated that "NIH is taking this enforcement action in accordance with 2 CFR § 200.340 as implemented in NIH [Grants Policy Statement] Section 8.5.2." But this is an inaccurate statement of applicable regulations. Section 8.5.2 of the Grants Policy Statement did *not* implement the revised 2020 version of 2 C.F.R. 200.340 because HHS did not implement that revised version in its regulations. NIH Grants Policy Statement states: "These terms and conditions are intended to be compliant with governing statutes and the requirements of 2 CFR Part 200, *as modified by previously approved waivers and deviations*. However, in the case of a conflict, the statutes and

---

[55] *Health and Human Services Adoption of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, 89 Fed. Reg. 80,055, 80,056 (Oct. 2, 2024).
[56] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 3 (Apr. 2024) (emphasis added).

24

regulations govern."[57] Because HHS's adoption of 2 C.F.R. § 200.340 is not yet in effect, HHS's current termination regulation remains a "deviation" from 2 C.F.R. § 200.340 and HHS's limited grounds for termination still apply.

71.     Terminations at NIH are historically rare. In response to noncompliance, "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision. However, NIH may decide to terminate the grant if the recipient does not take appropriate corrective action during the period of suspension. NIH may immediately terminate a grant when necessary, such as to protect the public health and welfare from the effects of a serious deficiency."[58]

72.     As one NIH official stated, "Terminations are the *final* option." Indeed, reporting indicates that, prior to January 2025, NIH terminated around 20 grants a year on average, "and usually only because of serious problems, such as flagrant misconduct, fraud, or an ethical breach that could harm study participants." The standard approach at NIH has long been to not terminate existing grants even if they address a low programmatic or agency priority. As a former NIH official who worked at the agency for several years described, "I have been involved with legitimate grant terminations," and, "I can count them on the fingers of one hand."[59]

*F. NIH's Strategic Plan Guides the Review of Grants*

73.     The NIH-Wide Strategic Plan outlines NIH's vision for biomedical research direction, capacity, and stewardship by articulating the highest priorities of NIH for a 5-year

---

[57] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 3 (Apr. 2024).
[58] Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 8.5.2 (Apr. 2024).
[59] Katherine J. Wu, *The NIH's Grant Terminations Are 'Utter and Complete Chaos,'* THE ATLANTIC (Mar. 14, 2025), https://www.theatlantic.com/health/archive/2025/03/nih-grant-terminations/682039/.

period. The plan is designed to complement and harmonize IC strategic plans across NIH, which address their individual missions.[60]

74.      The current NIH-Wide Strategic Plan governs from July 2021 until September 30, 2025, but creation of the plan began well before then, in September 2019. The four-phase strategic planning process involved: (1) pre-planning, (2) gathering internal input and development of the Strategic Plan framework, (3) gathering input from external stakeholders, and (4) drafting and publishing the Strategic Plan.[61]

75.      The NIH Strategic Plan sets forth three objectives: (1) advancing biomedical and behavioral sciences; (2) developing, maintaining, and renewing scientific research capacity; and (3) exemplifying and promoting the highest level of scientific integrity, public accountability, and social responsibility in the conduct of science—across which NIH has identified several "crosscutting themes," which include "improving minority health and reducing health disparities."[62]

76.      In line with the congressional mandate to consider health disparities, the NIH Strategic Plan "prioritizes research that addresses the needs of underserved populations to address the factors that contribute to health disparities" including by "identifying key gaps in prevention science related to health disparities and promoting targeted research on appropriately tailored public health, clinical, and community preventive services in diverse settings and contexts."[63]

77.      Similarly, the NIH Strategic Plan describes research to effectuate Congress's mandate to consider the "disease burden in the United States."[64] Suicide, for example, is

---

[60] *NIH-Wide Strategic Plan*, *supra* note 4.
[61] *Id.*
[62] *Id.* at 3.
[63] *Id.* at 11.
[64] 42 U.S.C. § 282 (2)(b)(iii).

disproportionately prevalent in specific populations, including sexual and gender minority populations, and NIH research into suicide prevention illustrates how improvements in care can save lives.[65]

78.    The NIH Strategic Plan also recognizes that the "strength of the NIH workforce depends on its sustainability and diversity."[66] Through the congressionally required "Next Generation Researchers Initiative," NIH aims to achieve sustainability by "enhanc[ing] opportunities for early-stage researchers by prioritizing funding of independent research applications" of early-stage researchers "such as policies to . . . enhance workforce diversity."[67]

79.    ICs also go through a strategic planning process and have plans currently in place. For example, the National Institute for Minority Health and Health Disparities' strategic plan summarizes evidence demonstrating health disparities faced by people from minority racial and ethnic backgrounds, sexual and gender minorities, rural residents, and individuals of less privileged socioeconomic status including shorter life expectancy; higher rates of cardiovascular disease, cancer, diabetes, infant mortality, stroke, cognitive impairment, asthma, sexually transmitted infections, and dental diseases; and differences in prevalence and outcomes of mental illness. That plan also sets forth "a commitment by NIH to support research aimed at addressing risk and protective factors that operate and interact on multiple levels to impact the well-being of health disparity populations."[68]

---

[65] *NIH-Wide Strategic Plan*, *supra* note 4, at 9.
[66] *Id.* at 16.
[67] 42 U.S.C. § 283o; *id.*
[68] Nat'l Insts. of Health, *Minority Health and Health Disparities Strategic Plan 2021–2025* (2021), https://nimhd.nih.gov/docs/strategic-plan/NIH-Wide_MHHD_Strategic_Plan_2021-2025_508.pdf at 4, 8. The current version of the plan available on NIH's website states that it "is being implemented through December 31, 2025," https://nimhd.nih.gov/about/strategic-plan/.

A0406

*G. President Trump Issues Executive Orders that Ignite Chaos at NIH*

80.    Starting on January 20, 2025, President Donald. J. Trump issued a series of executive orders broadly seeking to end all efforts related to "equity"—including specifically with respect to any federal grants. Even after being enjoined, these executive orders nonetheless prompted Defendants to issue the unlawful Directives at NIH.

81.    Executive Order No. 14151, dated January 20, 2025 and entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing," instructs the Attorney General and others to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Additionally, it directs each federal agency head to "terminate, to the maximum extent allowed by law, all… 'equity-related' grants or contracts" within 60 days.[69]

82.    The next day, on January 21, 2025, President Trump issued Executive Order No. 14173, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." To address the purported "immoral race- and sex-based preferences under the guise of so-called [DEI] or [DEIA]," the order requires the Director of OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."[70] Provisions of

---

[69] *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025).
[70] *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633, 8634 (Jan. 21, 2025).

A0407

this executive order and Executive Order No. 14151 were enjoined between February 21 and March 14, 2025.[71]

83.     On January 20, 2025, President Trump also issued Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," directing that "federal funds shall not be used to promote gender ideology," instructing federal agencies to revise grant conditions accordingly, and defining "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex."[72] Provisions of this executive order were enjoined on February 28, 2025.[73]

84.     On January 27, 2025, OMB issued a memorandum directing all federal agencies— including NIH—to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and all other relevant agency activities that may be implicated by," among others, "[Executive Orders above], including, but not limited to, financial assistance for… DEI, woke gender ideology, and the green new deal." Provisions of this memorandum were enjoined on January 31, 2025.[74]

---

[71] *See Nat'l Assn. of Diversity Officers in Higher Education v. Trump*, No. 25-cv-0333-ABA (D. Md. Feb. 21, 2025) ECF No. 45 (preliminarily enjoining provisions requiring agencies to terminate equity-related grants); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025), ECF No. 29 (staying preliminary injunction pending appeal).

[72] *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[73] *Washington v. Trump*, No. 2:25-cv-244-LK (W.D. Wash. Feb. 28, 2025) ECF No. 50 (on February 28, 2025, preliminary enjoining sections that condition, withhold, or end federal funding in Plaintiffs states Colorado, Minnesota, Oregon, and Washington); *PFLAG, Inc. v. Donald J. Trump*, No. 8:25-cv-00337-BAH (D. Md. Mar. 4, 2025) ECF No. 116 (on March 4, 2025, preliminarily enjoining the same nationwide).

[74] *New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I Jan. 31, 2025), ECF No. 50 (preliminarily enjoining federal agency defendants from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations," based on both the OMB directive and Executive Orders, including the DEI and Gender Ideology executive orders).

29

*H.  NIH Issues Directives to Purge Research Grants*

85.    Historically, the longstanding firewall between an administration's *political* choices and NIH's *scientific* peer review process ensured the agency avoided the massive waste and disruption to researcher careers, participant well-being, and public health that would accompany mid-stream research terminations. But since January 20, 2025, NIH has veered sharply from this deliberative, reasoned, and methodical approach.

86.    The Executive Orders, although enjoined in part, have prompted a massive purge in NIH grants and funding streams untethered to congressional mandates, the operative NIH Strategic Plan, or any reasoned review process. As explained below, in response to the Executive Orders, NIH has issued a series of documents vaguely articulating areas of research that purportedly "no longer effectuate[] agency priorities." These documents—titled as "guidance" but including mandatory language and referred to herein as the Directives—include memoranda developed by HHS and NIH (issued on or around February 28, 2025 and on March 25, 2025) and other versions of these documents that convey the same mandate.

87.    This process began on February 12, 2025, when NIH issued a memorandum stating that it "is in the process of reevaluating the agency's priorities based on the goals of the new administration."[75] That memorandum goes on to say that "NIH will effectuate the administration's goals over time, but given recent court orders, this cannot be a factor in IC funding decisions at this time." The memorandum also indicates that, "[a]dditional details on future funding actions related to the agency's goals will be provided under a separate memo."

88.    NIH would provide those additional details over the next few weeks—including the very next day, when NIH issued another memorandum to IC chief grant management officers

---

[75] Judd Legum, *Breaking: NIH Admits Funding Freeze is Illegal,* POPULAR INFORMATION (Feb. 12, 2025), https://popular.info/p/breaking-nih-admits-funding-freeze.

("February 13 Memo"). That memo announced "hard funding restrictions" on "awards where the program promotes or takes part in diversity, equity, and includsion [sic] ('DEI') initiatives" with those restrictions applying "to new and continuation awards made on or after February 14, 2025."[76] The memorandum also states, "[i]f the sole purpose of the grant, cooperative agreement, other transaction award (including modifications), or supplement supports DEI activities, then the award must be fully restricted. The restrictions will remain in place until the agency conducts an internal review for payment integrity."

89.    Soon after, NIH took steps to inventory projects for its purge of disfavored grants—including the termination of Project-Based Grants and Pipeline Grants at issue here—across various ICs. As one NIH official described the agency's actions throughout this spree, "[i]t is such utter and complete chaos."[77] "In advance of the terminations… agency leadership solicited grants that might, for instance, 'promote gender ideology,' or that involved certain types of vaccine-behavior research."[78] NIH officials responded with lists of grants to terminate. One official described the lists as looking like "someone had performed a Ctrl+F search for certain terms, then copied and pasted the results" and directed the cancellation of those grants.[79]

90.    Directions to terminate grants came without warning to the typical NIH officials who would be involved in the process, without the usual level of rigor and deliberation that accompanies a potential termination, and without any allegations or findings of noncompliance by grantees. The directions "instructed grants-management officers to issue letters by the end of the

---

[76] Stephanie Mencimer, *NIH Is Defying a Federal Court and Freezing Research Funding Anyway*, MOTHER JONES (Feb. 24, 2025), https://www.motherjones.com/politics/2025/02/nih-defying-federal-court-freeze-research-funding-dei-temporary-restraining-order/; screenshot of February 13 Memo, MOTHER JONES (Feb. 24, 2025), https://substackcdn.com/image/fetch/f_auto,q_auto:good,fl_progressive:steep/https%3A%2F%2Fsubstack-post-media.s3.amazonaws.com%2Fpublic%2Fimages%2Fe7fe116a29-f20d-435d-a8ba-ba18cea529d8_1182x1236.png.

[77] Wu, *supra* note 59.

[78] *Id.*

[79] *Id.*

31

day they received them . . . leaving no time to push back, or even react," eliminating any meaningful role the grants-management officers could have played in these decisions.[80] "In at least one case, . . . a program officer learned that their grantee's award had been terminated from the grantee," *not from the NIH*.[81]

91.     Throughout February and March 2025, NIH issued Directives for assessing grant awards that expanded the scope of the purge.

92.     On or around February 28, 2025, NIH issued staff "guidance" ("February 28 Guidance") that rescinded the February 13 Memo but expanded on its core anti-DEI messaging, stating: "NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI) . . . Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims[,] assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities."[82] The memorandum also instructs officials to "completely excise all DEI activities[.]"

93.     The February 28 Guidance identifies four categories of awards and mandates actions for each category deemed "DEI related":

- "Category 1" — the "sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that was unpublished as outlined above." For projects construed as Category 1, "ICs must not issue the award."

- "Category 2" — the project "partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this [sic] means DEI activities are

---

[80] *Id.*

[81] *Id.*

[82] *See* Max Kozlov and Smriti Mallapaty, *Exclusive: NIH to terminate hundreds of active research grants*, NATURE (Mar. 6, 2025), https://www.nature.com/articles/d41586-025-00703-1; *see also* Carolyn Y. Johnson and Joel Achenbach, *NIH reels with fear, uncertainty about future of scientific research*, THE WASHINGTON POST (Mar. 5, 2025), https://www.washingtonpost.com/science/2025/03/05/nih-trump-turmoil-grants/.

ancillary to the purpose of the project [sic]. In some cases, not readily visible [sic]." For projects construed as Category 2, "[i]f the IC and the applicant/recipient cannot reach an agreement" to renegotiate the scope of the project, "or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award." For any such ongoing project, "the IC must work…to negotiate a bilateral termination of the project," but "[w]here bilateral termination cannot be reached, the IC must unilaterally terminate the project."

- "Category 3" — the project "does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities and Other Resources' attachment and terminology related to structural racism—this is not all-inclusive)." For projects construed as Category 3, ICs "must request an updated [application or progress report] with the DEI language removed," and only once the language has been removed may the IC "proceed with issuing the award."

- "Category 4" — the project does "not support any DEI activities." ICs "may proceed with issuing the award."

94.     The February 28 Guidance also provides "[g]uidance for staff to use when terminating awards identified by HHS or the IC." In those circumstances, NIH officials must "issue a revise[d] NOA." The February 28 Guidance also instructs NIH officials to "[u]se the following termination term" in the revised NOA: "This award related to *[select the appropriate example relevant to your project by choosing one of the highlighted examples DEI, China, or Transgender issues* (sic)*]* no longer effectuates agency priorities. It is the policy of NIH not to further prioritize these research programs. Therefore, the award is terminated [Refer to Appendix 3 for language provided to NIH by HHS.]" (emphasis added). The document also instructs NIH officials that "[t]ermination actions taken based on agency priorities do not require appeals language because the action was *not* based on administrative nor [sic] programmatic noncompliance" (emphasis added). In addition, the February 28 Guidance directs, "[i]f the grant is a no cost extension, and the HHS requests a termination, the project must be terminated."

95.     Appendix 3, in turn, lists "[l]anguage provided to NIH by HHS" with "examples for research activities that NIH no longer supports," and outlines three forbidden topics:

A0412

- "China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world. On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives."

- "DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ('DEI') studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harm the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs."

- "Transgender issues: Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs."

96.    On March 25, 2025, as part of its Directives, NIH issued another document (the "March 25 Guidance") with a header that warned, "INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT."[83]

97.    Like the February 28 Guidance, the March 25 Guidance outlines categories of projects and mandating action for certain forbidden categories:

- Category 1 projects remain the same, and the March 25 Guidance likewise requires that NIH officials terminate all such existing projects and not issue any such awards.

- Category 2 projects are those that "partially support[] non-NIH/HHS priority/authority activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope). This means the non-NIH/HHS priority/authority activities are ancillary to the purpose of the project, in some cases, not readily visible [sic]." The document also notes that, "Activities required to comply with NIH inclusion policies are not considered DEI activities."

---

[83]Max Kozlov, *Exclusive: NIH to cut grants for COVID research, documents reveal*, NATURE (Mar. 26, 2025), https://www.nature.com/articles/d41586-025-00954-y.

- Category 3 projects have a different definition and "do[] not support any DEI activities." The memo states that the "IC may proceed with issuing the award."

- Category 4 projects have a different definition and are designated "HHS Department Authority Terminations." The "Director, NIH or designee" provides a list of these projects to NIH officials, and the officials must in turn "issue termination letters" for these projects.

- Category 5 projects are those awarded "to [e]ntities in certain foreign countries." According to that part of the document, "Additional guidance on awards to foreign entities is forthcoming. At this time, ICs should hold all awards to entities located" in certain countries, including South Africa.

98.     This document repeats much of the substance of the February 28 Guidance, including that "NIH will no longer prioritize research and research training programs that focus on [DEI]," but expands the topics of research NIH purports to "no longer prioritize" to include "Vaccine Hesitancy" and "COVID-related" research. It directs NIH officials to include the following language (or language substantially similar) in correspondence regarding grant reviews: "It is the policy of NIH not to prioritize [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa, etc.]."

99.     The March 25 Guidance also identifies—in a section labeled "Appendix 3"—a list of forbidden topics for NIH grants and prescribes language to be included in termination letters. This document is identical to the March 25 Guidance with respect to identifying "China," "DEI," and "Transgender issues" as areas of forbidden research, but it also provides required language to terminate projects in the two additional forbidden topics—"Vaccine Hesitancy" and "COVID-related" research:

- "Vaccine Hesitancy: It is the policy of NIH not to prioritize research activities that focuses [sic] gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in

ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria."

- "COVID: The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary."

100.    Like the February 25 Guidance, the March 25 Guidance directs NIH officials to revise NOAs that are terminated pursuant to the Directives, and instructs NIH officials to include the following (or substantially similar) language in those revisions: "It is the policy of NIH not to prioritize [insert termination category language from Appendix 3, verbatim]. Therefore, this project is terminated."

101.    The March 25 Guidance also has an FAQ section that includes, among other instructions: "6. When ICs issue revised NOAs to terminate awards, do they have to use the exact language provided by HHS in the termination term? Yes, ICs must use the exact language provided in Appendix 3, with no edits."

102.    In addition, regarding "Notice of Funding Opportunity (NOFO) Guidance," the document has only the following text: "[pending]."

103.    The Directives—comprised of the February 28 Guidance, the March 25 Guidance, and other versions of these documents that articulated areas of research that purportedly "no longer effectuate[] agency priorities"—fail to define critical terms, such as "diversity, equity, and inclusion" or "DEI"; "artificial and non-scientific categories"; "amorphous equity objectives"; "[t]ransgender issues"; "gender identity"; or "COVID-related."

104.    The lack of clarity about the meaning of these and other forbidden terms has contributed to widespread confusion among NIH staff on how to implement the mandates outlined

A0415

in the Directives.[84] For example, as one NIH official asked, "is a grant providing culturally appropriate care specifically to Hispanic and Latino population 'discrimination'?"[85]

*I. Pursuant to Directives, NIH Issues Boilerplate Notices to Terminate Hundreds of Grants*

105.     Pursuant to the Directives, NIH adopted a script for grant termination notices. It did so without regard for the limited circumstances in which terminations may be made and its legal obligation to individually and rigorously review the varied and diverse projects under consideration for termination.

106.     Each termination notice begins by identifying the project number, identifying which year's Grants Policy Statement applies to the grantee's project, and stating that the letter "constitutes a notice of termination" purportedly pursuant to that Grants Policy Statement and 2 C.F.R. § 200.340(a)(2). The notice also emphasizes that "obligations generally should be determined by reference to the law in effect when the grants were made."

107.     Citing the pertinent year's Grants Policy Statement, each notice states, "At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination '[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.'"

108.     From there, each notice includes one of a few slightly different scripts stating, without explanation, that the grant "no longer effectuates agency priorities." The language in these notices repeats the mandatory language from the appendices, described above. Below are three examples:

- First, "This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of

---

[84] *See* Wu, *supra* at note 59.
[85] Kozlov et al. *supra* at note 82.

A0416

NIH not to prioritize these research programs. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria." ("Termination Section 1"). In some notices, "DEI" is substituted for "gender identity."

- The second script is the same as the first but omits the last two sentences ("Termination Section 2").

- The third script provides, "This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ('DEI') studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs." ("Termination Section 3").

109.     After that, the language across all notices is once again nearly identical, stating the following or something substantially similar, "Although NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision, no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities."

110.     After this emphasis on the futility of any appeal, each notice outlines the appeals process. But as one NIH staffer stated, "the language included in the terms of the terminated grants about the appeal process is CYA [to cover their asses] and any appeal will end up in the trash."[86]

111.     For the vast majority, if not all, terminated grants since February 28, 2025—including all terminated Project-Based Grants and Pipeline Grants supporting the research of

---

[86] Max Kozlov, Bluesky (Mar. 31, 2025, 2:24 PM), https://bsky.app/profile/maxkozlov.bsky.social/post/3llp6vhkvx22t.

A0417

Individual Plaintiffs, Plaintiff Ibis, and Associational Plaintiffs' members—the notices offer no other justifications for termination.

112.    The notices make no effort to explain how or why the relevant grant fails to "effectuate agency priorities" or otherwise warrant termination. The notices fail to cite any project-specific information or data, much less any reasons to disregard that information or data. Indeed, the assertions in the termination notices about the lack of scientific validity, rigor, or public health benefit of the studies contradict the conclusions of NIH and external scientists who previously reviewed these projects and helped award those grants in the first place, including the multiple panels of experts in the grantees' fields who judged the proposals on criteria such as the lead scientist's track record, the rigor of the study's design, and the project's likelihood of addressing a pressing biomedical-research issue.[87] These notices also do not address NIH's prior assessment that the projects *do* meet agency priorities and are aligned with the statutory mandate and goals of NIH and the pertinent IC.

113.    The notices also demonstrate that NIH failed to consider any reliance interests at stake for ongoing grants. For example, the notices say nothing about potential job losses that would result from the termination of the grant at issue or the effect the termination would have on study participants, the data being collected, the populations served by the research, or the broader goals furthered by the study. In short, the notices say nothing about how these terminations may affect the research endeavor or public health. Indeed, as one member of senior leadership at an NIH institute stated, grants are getting killed "without any scientific input anywhere."

114.    For grants that were terminated, NIH also issued revised NOAs with new end-of-project dates that reflected immediate or near-immediate termination. These revised NOAs also

---

[87] *See* Wu, *supra* at note 59.

included new termination language with statements that were substantively similar to the language included in Appendix 3 of the February 28 Guidance and March 25 Guidance, and made explicit reference to "2 C.F.R. §200.340 as implemented in NIH [Grants Policy Statement] Section 8.5.2" as its statutory authority for these terminations.

115.    Evidence suggests the language in the termination notices did not originate with NIH or HHS staff but was instead drafted by staff from the Department of Government Efficiency ("DOGE"). For example, metadata associated with at least one such notice shows it was authored by "JoshuaAHanley." An attorney named Joshua A. Hanley, a 2021 law school graduate, works at DOGE.[88]

116.    The terminations cut across diverse topics *that NIH is statutorily required to research*. At least 678 research projects have been terminated to date. These include projects on some of the most pressing public health issues of our time, including breast cancer, uterine cancer, anal cancer, stroke risk, cardiac health, Alzheimer's Disease, HIV prevention, suicide prevention, alcohol use disorder, smoking cessation, eating disorders, sexually transmitted infections, COVID-19, depression, psychopathology, pain, and many other conditions that disproportionately burden minority communities. Other terminated grants studied the harmful effects of discrimination, poverty, racism, loneliness, trans exclusionary policies, and social stress, as well as the health-protective effects of social support, education, and school-based mental health interventions. Still others have no clear or at most a tangential connection to DEI, gender identity, or the other now-disfavored topics that were the alleged basis for their termination. These terminations compromise

---

[88] Sara Reardon, *Trump officials will screen NIH funding opportunities*, SCIENCE (Mar. 26, 2025), https://www.science.org/content/article/trump-officials-will-screen-nih-funding-opportunities. More recently, media reported that after a two-month freeze on posting NOFOs, NIH will resume posting NOFOs, but only after review by HHS and DOGE for consistency with administration priorities.

A0419

NIH's ability to fulfill its statutory and other obligations. They also compromise the public's health and deprive minority communities of equal access to the benefits of government research.

117.    The terminations also directly conflict with NIH strategic priorities. For example, the 2021–25 Strategic Plan for the National Institute on Minority Health and Health Disparities prioritizes research, among other things, to "understand and to improve the health of racial/ethnic minority populations," to "[a]dvance scientific understanding of the causes of health disparities," and to "[d]evelop and test interventions to reduce health disparities."[89] Consistent with this goal, that institute issued Grant Number 5R01MD017509 for a five-year intervention beginning May 14, 2022, to test whether directly reducing the income gap among older African American men in rural communities enhances their health and wellbeing. The grant was scheduled to last through January 2027. However, on March 14, 2025, half-way through the project, the grant was terminated. In another instance, the institute funded a proposed multi-year grant entitled, "Development of a School-Based Prevention Intervention to Promote Adolescent Mental Health Equity." The grant began on January 31, 2025, but was terminated without explanation just 40 days later. These grants exemplify a pattern, in which IC-specific directors awarded grants consistent with their IC-specific strategic plans, after which the grants were summarily terminated despite no change to IC-specific or overall NIH strategic plans.

118.    The programs designed by NIH to implement Congress's statutory mandate to diversify the workforce are also being gutted. In the past four weeks, NIH has at least terminated seventeen F31 Diversity awards that support promising graduate students in their final years of dissertation research.

---

[89] *Nat'l Insts. of Health*, *supra* note 68 at 2.

A0420

119. Similarly, NIH has paused all work under the Undergraduate Research Training Initiative for Student Enhancement ("U-RISE"), a $23.1 million NIH initiative launched in 2019, "to develop a diverse pool of undergraduates" who plan to pursue higher education and careers in biomedical research.[90] U-RISE is a mirror program to the Minority Access to Research Careers program ("MARC"), created in 1977.[91] Universities develop, apply for, receive, and administer MARC and U-RISE grants. For nearly 50 years, these programs have operated to diversify the biomedical workforce, supporting thousands of students from underrepresented backgrounds.

120. In 2024, NIH supported 63 U-RISE and 34 MARC programs. On March 27, 2025, with no prior notice, NIH issued stop work orders for all U-RISE programs through an email stating that "NIH is currently undergoing a process to assess whether pending awards perpetuate current agency priorities." The email instructs the program directors to "cease project activities as of the current budget period end date of 3/31/25" with an additional four days to reconcile all expenditures. It appears that all U-RISE program directors have received the same communication, regardless of how many years were left on these five-year awards. MARC program officers have no idea if or when their identical programs will be paused or terminated.

121. U-RISE supports high-achieving undergraduate students, typically juniors and seniors, who have demonstrated academic promise in STEM disciplines. The program aims to increase the likelihood that these students will pursue and complete PhDs in biomedical research fields by providing tuition assistance, monthly stipends, research training, mentoring, and support

---

[90] Nat'l Insts. of Health, *Undergraduate Research Training Initiative for Student Enhancement* (expired) https://grants.nih.gov/grants/guide/pa-files/par-19-218.html.

[91] Nat'l Ctr. for Biotechnology Information, *Meeting the Nation's Needs for Biomedical and Behavioral Scientists, Appendix A, Historical Overview*, (1994), https://www.ncbi.nlm.nih.gov/books/NBK236727/. The program's name has since changed to "Maximizing Access to Research Careers," but its core goal has remained the same for 48 years, i.e., "to create and sustain inclusive [undergraduate] training environments for trainees from diverse backgrounds."

for lab-related expenses. The sudden termination of funding places participating students at immediate risk of losing housing, income, and academic continuity.

122.     Along with terminations, NIH is also violating its regulatory mandate to review all appropriately submitted applications.

123.     In February 2025, the F31 Diversity track opportunity disappeared from NIH websites.[92] While in the past NIH has maintained expired funding opportunities on its website with an indication that the opportunity has expired, links to the F31 Diversity track now result in a "page not found" message. NIH has not provided information on the fate of applications received for these unpublished opportunities, but the March Guidance indicates that applications "received in response to a NOFO that has been unpublished due to its focus on activities that are no longer an NIH/HHS priority/authority" will not be funded.

124.     These losses will render NIH incapable of meeting its congressionally required responsibilities. And they will deeply compromise the next generation of scientists, denying the public the contributions to health their promising careers would have yielded.

*J.  Terminations of Plaintiffs' Grants Cause Confusion, Chaos, and Other Ongoing Harm*

125.     The termination of the research funding of Individual Plaintiffs, Plaintiff Ibis, and Associational Plaintiffs' members provides a window into the devastation to medical and scientific research playing out across the nation right now. Their stories—just a fraction of the chaos and harm caused by the Directives—show how large the blast radius is from these terminations. And although the subject matter of their research spans all types of subject matter and populations, each termination notice is identical except for ever-so slightly different scripts stating that the grant "no

---

[92] F31 Diversity grants are far from the only programs impacted. Additional unpublished funding opportunities include the MOSAIC, U-RISE, MARC and dozens of others.

A0422

longer effectuates agency priorities" (*see* above descriptions of Termination 1, Termination 2, and Termination 3).

126.    As detailed further below, across Individual Plaintiffs, Plaintiff Ibis, and Associational Plaintiffs' members, these terminations have resulted in studies being postponed or cancelled, putting at risk the health of participants. And the terminations have severely diminished—if not eviscerated—the reliability of any data or statistical analyses from those years-long research efforts, crippling scientific advancement for years to come. Whether weighing the effects on study participants or the broader field of study, the lost benefits to the populations served by their research, or even the financial consequences on themselves and their staff, each researcher has suffered severe distress because of the Directives. Science may be a collective endeavor, but the harms here have also struck Individual Plaintiffs, Plaintiff Ibis, and Associational Plaintiffs' members on a personal level.

127.    What's more, based on the Directives and the conclusory nature of the termination letters, Individual Plaintiffs, Plaintiff Ibis, and Associational Plaintiffs' members do not know which of their current remaining projects—if any—are still eligible for NIH grants, and they fear that at least some of their ongoing NIH-funded projects are at risk of being terminated on similar grounds. Individual Plaintiffs, Plaintiff Ibis, and Associational Plaintiffs' members are also uncertain about how they may need to change their current and future research, what terminology they must avoid, as well as which populations their research can focus on to remain eligible for NIH funding. As such, although they intend to apply for future NIH grants, they have no idea how to propose research in their areas of expertise that would satisfy the "agency priorities."

44

1. Individual Plaintiffs

128.    Plaintiff Charlton has received terminations for her entire portfolio of five NIH grants, including a five-year $4.15 million R61 grant for an observational study of the mental health impact of legislative bills targeting the LGBTQ population; a five-year $4.42 million R01 grant for a longitudinal study of worse obstetrical outcomes for LGBQ women as compared to heterosexual women to inform targeted interventions to improve their health and the health of the approximately 800,000 children born each year to this population (a project that has nothing to do with gender identity and includes no transgender study participants); and an administrative supplement of $100,000 for the R01 grant to support an early-career trainee on the research team. These grants were terminated throughout March with notices that used Termination Section 2 (Gender Identity), Termination Section 3 (DEI), and Termination Section 2 (Gender Identity), respectively.

129.    Because of these terminations, Dr. Charlton has lost nearly all of her salary as well as the money to pay the salaries of 18 people on her staff. She had to terminate the LGBTQ Health Center's director the day after the terminations. And she has had to suddenly cancel appointments with impacted youth and other research subjects and wind down her projects.

130.    NIH has terminated at least six grants in support of Plaintiff Edwards' research. The total amount awarded across those grants is approximately $11.9 million. Included in those terminations is a five-year $3.8 million R01 grant for a longitudinal study among sexual minority men to identify factors predicting sexual assault experiences and outcomes to inform prevention and intervention efforts specific to this highly vulnerable group. Also among those cuts is a R34 research grant, titled *An Online Family-based Program to Prevent Alcohol Use and Dating and Sexual Violence among Sexual and Gender Minority Youth*, aiming to increase family support and

communication, enhance social-emotional skills, and increase awareness of accurate perceptions of alcohol and dating violence norms. Both programs were terminated in March 2025 with notices that used Termination Section 1 and 2 (Gender Identity), respectively.

131.    Due to the grant terminations, Dr. Edwards has had to suddenly stop or severely curtail research projects funded through the grants, potentially halting the intervention for the 22 families that are enrolled in one of her programs and impairing her ability to analyze data and build preventative interventions through the data collected in the projects. Further, one goal of her R34 research grant is to identify ways to implement programmatic recommendations for families in places like churches, community centers, and schools; now due to the termination, she will not have the data to evaluate or propose these types of recommendations from the project. Dr. Edwards has also lost a portion of her salary because of these terminations, as well as the ability to continue to pay a number of the approximately 50 staff members who are funded through her research grants.

132.    Plaintiff Lurie served as a paid consultant and advisor on a two-year $277,552 R21 grant to evaluate the impacts of over-the counter access to pre-exposure prophylaxis ("PrEP") on reduce the risk of HIV transmission. On March 21, 2025, the grantee institution, Harvard Pilgrim Healthcare, Inc., received a termination notice from NIH using Termination Section 2 (Gender Identity).

133.    As a result of the termination, the research into PrEP access being conducted under the grant has been discontinued, resulting in harms to public health in the form of reduced knowledge about how to effectively reduce the spread of HIV.

A0425

### 2. Plaintiff APHA Members

134.    Members of Plaintiff APHA have also received letters notifying them that NIH grants supporting their research had been terminated.

135.    For example, APHA Member 1 was awarded a five-year, $4 million grant in support of their research to study time-efficient ways to measure patients' exposure to discrimination based on race, sex, gender identity, sexual orientation, age, and weight. On February 28, 2025, APHA Member 1 received a notice of grant termination from NIH informing them that NIH would be terminating the last year installment of the grant, amounting to $650,000. That notice includes Termination Section 3 (DEI).

136.    Because of the termination, the study team, who were expecting to be employed until January 2026, have lost job security, and they cannot complete analyses of the study's key outcomes—measuring and analyzing the health impacts of discrimination—or share these findings with community health centers and study participants.

137.    APHA Member 2 served as principal investigator on a four-year, $6.8 million R24 grant establishing the Coordinating Center for National Pain Scientists ("Coordinating Center") with the purpose of connecting a growing network of nearly 5,000 pain researchers across the country to support collaboration, improve networking, and centralize trainings and educational resources.

138.    On March 21, 2025, APHA Member 2 received a notice of grant termination with Termination Section 3 (DEI). APHA Member 2 was alarmed and confused to see funding for the Coordinating Center cut because it does not support any study related to DEI and no hiring or scholarship decisions based on specific demographics have ever been made. To the contrary, the Coordinating Center is open to all researchers studying pain and no demographics have been

A0426

prioritized or excluded. The only reason APHA Member 2 can identify for why the grant was terminated is because the original NOFO required the Coordinating Center to include a diversity plan describing how its work would support the biomedical field broadly, including historically underrepresented researchers; however, this was ancillary to its operations and no financial resources have ever been devoted to it.

139.    As a result of this termination, four staff members working on the Coordinating Center have been furloughed, APHA Member 2 has lost nearly all of their salary, and approximately $1 million may now be wasted on pre-obligated spending toward an annual conference that can no longer occur. Without the Coordinating Center, fewer pain researchers will be trained to address chronic pain, and public health is harmed due to the reduced knowledge about how to treat and manage pain without running the risk of addiction.

140.    APHA Member 3 has had one grant terminated for which they are principal investigator, and three other grants terminated for which they are a co-investigator, including an R01 grant for a longitudinal study aimed at developing interventions to reduce drug use and promote mental and physical health in Black men. On March 20, 2025, with only five weeks left to complete this multi-year project, NIH canceled the grant, effective immediately, with a termination letter that includes Termination Section 3 (DEI).

141.    Due to the termination, APHA Member 3 has to wrap up a multi-year project five weeks early, and is unable to compensate three research team members who had already performed work on the project but had not yet submitted invoices for their hours worked. Collectively, these research assistants are owed compensation for their work on the grant for roughly 130 hours, an estimated $8,560.

142.    APHA Member 4 has had NIH terminate five grants that support their research, including an approximately $4 million grant for a randomized controlled trial with 375 participants using peer intervention to encourage the use of PrEP in order to address high rates of HIV in transgender men who have sex with men. On March 21, 2025, NIH terminated the grant through a notice including Termination Section 1 (Gender Identity).

143.    The impacts of the grant termination are severe. APHA Member 4 cannot pay their staff of six, has lost three months of their own salary, and will be restricted in their ability to work on a project that took years to develop and fund.

144.    NIH has terminated three grants supporting APHA Member 5's research, including an R01 grant aimed to develop new or modified caregiving measures for the nearly one million sexual and gender minority adults in the U.S. who are caregivers and to ensure that they are included in future research on caregiving for those with Alzheimer's disease. On March 21, 2025, NIH terminated this grant with a notice that includes Termination Section 1 (Gender Identity).

145.    The impacts of the grant termination are dire. APHA Member 5 has lost much of their salary and is in the process of laying off their staff of at least 35 people, and their co-investigators are doing the same. Beyond that, sudden termination of the study has broken the trust of the participants in the study—all LGBTQ caregivers for people with Alzheimer's who had each spent two years answering questions about their caregiving experiences for research that will now not be completed.

146.    NIH has also unlawfully terminated grants supporting the work of APHA Members 6 and 7, both principal investigators on a five-year, $2.45 million Kirschtein-NRSA T32 grant funding recruitment and training of postdoctoral scientists. The program increases the pipeline of scientists studying addiction and related conditions and provides training in treatments that reduce

A0428

overdose deaths by 50%, work critical to HHS priorities to address the opioid crisis. Consistent with the NOFO's listed purpose to ensure a "diverse and highly trained workforce," their grant proposal prioritized recruitment of postdoctoral fellows from groups excluded based on race and ethnicity, people with a disability, people who are LGBT+, people having a disadvantaged background, and those with "diverse training backgrounds." However, despite this intention, of the four offers made to postdoctoral trainees for acceptance into the training program to date, all four were made to white candidates. On March 21, 2025, before the conclusion of the first-year budget period, the APHA members received a notice that their grant was terminated including Termination Section 3 (DEI).

147.     As a result of the grant termination, APHA Members 6 and 7 have rescinded offers to postdoctoral fellows for entry into the training program. Fewer clinical researchers will be trained to address substance abuse, and trainees will not be able to pursue scientific inquiries that could have led to novel non-pharmacological approaches to reducing the risk of substance use disorders.

148.     APHA Member 8 is a postdoctoral fellow who had been in the first year of the three-year training program. The sudden withdrawal of the T32 grant funding has enormous consequences for their career path. The termination, at a time when the application period for most other T32 grants has ended, means they will be without employment in academia until at least July 2026.

149.     NIH has terminated at least two grants that support the research of APHA Member 9, totaling approximately $3 million, to better understand efforts that could promote HIV prevention and treatment, and to address health inequity experienced by gay, elderly, and racial

A0429

minority populations and populations living with or without HIV. The grants were terminated in March using a notice of termination that includes Termination Section 3 (DEI).

150.    Due to the grant terminations, APHA Member 9 will likely have to lay off at least three staff members, will lose approximately 20% of their annual salary, and will have to conclude the study before completing sufficient recruitment to achieve the sample size needed to conduct valid—and meaningful—statistical analyses. Cutting off these studies will prevent their contribution to the understanding of HIV and comorbidities (e.g., heart attacks, diabetes, or mental illness) across racial groups.

151.    APHA Members 10 and 11 were awarded an R15 grant for over $450,000 in support of their research on ways to improve healing for sexual and gender minority survivors of sexual violence, given the high rates of sexual violence they experience, and creating opportunities to train student researchers. In March, within the first year of the three-year grant, they received a notice of grant termination from NIH including Termination Section 1 (Gender Identity). Tied to this R15 grant was an application for a diversity supplement of approximately $162,000 to support an early career trainee on the research team that has been in limbo for the last three months.

152.    As a result of the grant termination, these APHA members will not have funds to pay their students and will lose a quarter of their own salaries. Nor will they be able to realize the project's aim of training people to better respond when a sexual or gender minority discloses that they have been a victim of sexual violence.

153.    APHA Member 12 received a 4.75-year, $3.4 million R01 Research Project Grant from NIH to fund their research on stigma around HIV testing and PrEP use among U.S. Latino men who have sex with men. On March 20, 2025, only about 40 days before the project's end date, the member received a notice that the grant was terminated. The grant termination notice includes

Termination Section 3 (DEI). Since not all participants completed interviews, it is impossible to complete the project's longitudinal analyses.

154.    As a result of the grant termination, almost $3,300,000 in sunk costs on the project have been wasted, two individuals hired to interview participants have already had their employment terminated, additional project team members may imminently lose their jobs and the 503 participants in the study will be harmed when they learn that the grant has been terminated, as it will create further stigma.

155.    APHA Member 13 was awarded an almost five-year, $1,487,916 International Research Training Grant from NIH funding the Malaysian Implementation Science Training program at the University of Malaya in collaboration with Yale University, a first of its kind initiative designed to address Malaysia's rapidly expanding HIV epidemic through training University of Malaya faculty and early career researchers.

156.    On March 21, 2025, in the fifth year of a five-year grant, the lead investigator received a notice that the grant was terminated. The grant termination notice includes Termination Section 1 (Gender Identity). A renewal of the grant was recently reviewed and received a highly competitive score that should have committed five years of continued funding; this will no longer happen.

157.    APHA Member 14 received a two-year, $428,270 R25 (research training and career development) award to fund training and mentorship of early-stage investigators on measurement rigor and ethical practices. The program's goal is to narrow the gap in research on perinatal intimate partner violence, which has marked effects on maternal health outcomes. It was proposed in response to a funding call for projects addressing intimate partner violence and intended to contribute to the NIH Implementing a Maternal Health and Pregnancy Outcomes Vision for

Everyone Initiative, launched in 2019 in response to high rates of pregnancy-related complications and deaths in the United States.

158.    On March 21, 2025, before the conclusion of the first-year budget period, APHA Member 14 received a notice that the award was terminated. The termination letter includes Termination Section 3 (DEI). As a result of the award termination, APHA Member 14 incurred over $50,000 in sunk costs on the project and forfeited valuable training and research outcomes. APHA Member 14 and another APHA Member working on the project may lose their jobs, as both positions are grant-funded.

159.    APHA Member 15 received a three-year, Kirschstein-NRSA fellowship aimed to develop and implement Rapid Start ART, an HIV treatment prescribed immediately after diagnosis. The fellowship's training component includes coursework, mentorship, and research on stigma, implementation science, and dyadic analysis. The fellowship bridges the gap between being a doctoral student and a professor. On March 18, 2025, only about a month after the project began, the member received a notice that the grant was terminated. The termination letter includes Termination Section 2 (DEI). Only a few hundred dollars of the grant funding had been withdrawn; the member has not yet received a paycheck. However, the member had already begun significant planning for the three-year grant, completing paperwork and meeting with the data collection team. The member had recently moved to live near the university and may lose their job.

3. Plaintiff Ibis

160.    In September 2023, Plaintiff Ibis was awarded a 5-year R01 research grant, with approximately $500,000 in funding per year for a project to study methods for improving the collection and quality of data in sexual and reproductive health research for people including those who identify as transgender and gender diverse. Plaintiff Ibis had applied for the grant two years

before that and scored in the top two percent of applications submitted. After years of developing and testing the survey methods, and on the eve of launch, Plaintiff Ibis received a termination notice from NIH in March 2025 using Termination Section 2 (Gender Identity). Even though the research supported by the grant specifically advances the priorities of NIH's National Institute of Child Health and Human Development, NIH terminated the grant for purportedly "no longer effectuat[ing] agency priorities."

161.    As a result of the grant termination, Plaintiff Ibis must restructure research teams because of staffing pressures and seek additional funding to cover the salaries of four employees staffed on the project. Plaintiff Ibis has also had to pause the next phase of the study, hindering collection of crucial data on sexual and reproductive health experiences and preferences from under-studied populations.

### K. NIH's Refusal to Consider Individual Plaintiffs' and Associational Members' Pending Grants, Extensions and Renewals of Existing Grants, and Stop Work Orders

162.    Pursuant to the Directives, NIH is refusing to consider pending Pipeline Grant applications that it deems DEI-related.

#### 1. Plaintiff Maphis

163.    Plaintiff Maphis's MOSAIC application is one such grant. On November 12, 2024, Dr. Maphis applied for a MOSAIC grant, intended to help diversify the profession. Her proposed research would, if funded, study the link between Alcohol Use Disorder and Alzheimer's Disease. It would provide five years of funding and help her transition from her mentored postdoctoral research position at the University of New Mexico to a junior faculty member elsewhere. It would have, in short, helped launch her career as an independent researcher.

164.    Dr. Maphis's application was assigned to a study group scheduled to score her proposal on March 4, 2025. The morning of March 4, however, she learned that her proposal had

A0433

been reassigned to a new generic group that was not scheduled to meet. Later that day NIH notified her that her proposal, along with others, had been pulled from its original study group. When Dr. Maphis asked whether her proposal would be reviewed, she was told "unfortunately not." Dr. Maphis was told by a member of her original study group, which had reviewed her application before March 4, that her application was highly regarded and likely would have received funding had it not been for NIH's changes. Dr. Maphis's current funding expires on September 30, 2025. Without additional funding, which the MOSAIC award would have provided, she will lose her job. She will also lose out on the training she would have received from the MOSAIC program. As a consequence, Dr. Maphis will be less competitive on the faculty job market, unlikely to secure a faculty position, and potentially forced to abandon a career in academia, which she has been training for and working towards for the last 17 years.

### 2. Plaintiff APHA Members

165.    APHA Member 16, who researches zinc's impact on health, is the recipient of a MOSAIC grant. Member 16 has recently completed the two year (post-doctoral training) K portion of the grant and was slated to transition to the R portion of the grant, in which NIH would fund the first three years of their position as a tenure-track Assistant Professor. APHA Member 16 began their faculty position in January but never received their NOA for the R portion, which normally would have been received in January or February.

166.    APHA Member 16 has not been getting responses from NIH about the status of their application, which is particularly concerning for APHA Member 16 because NIH has cancelled the MOSAIC program, removed it from the National Institute of General Medical Sciences website, and terminated the NOFO early. As a result of not receiving the NOA, APHA

55

Member 16 has not been able to obtain the necessary funding for completing their lab setup, hiring staff, and continuing this important research.

### 3. Plaintiff UAW Members

167.　UAW Member 1, a PhD candidate at a private university in California, submitted an F31 dissertation proposal that, if funded, would help inform intervention efforts for suicide prevention among LGBTQ youth experiencing homelessness—the leading cause of death for this population. They received a high score (14th percentile) on the proposal. However, they learned the project would likely not be funded because of new restrictions on LGBTQ research. This will harm UAW Member 1's ability to progress through their PhD program.

168.　UAW Member 2, a postdoctoral researcher at a private university in New York, has a pending application for an NIH Diversity Supplement. They research affect, sleep, and processes of embodied change (sleep health). They have received no updates from NIH on their application. Without this funding opportunity, they cannot remain at their university to complete their program. They will have to stop ongoing projects and forfeit the rest of a supplemental grant they received because they will no longer have institutional support. They will have to apply for new postdoctoral positions elsewhere that would require them to change their project and lose the research investments they have already made. This will make them less competitive for the next step of their research career and require they spend longer as a postdoctoral scholar, earning a salary as much as $25,000 lower than they would have had they remained at their current institution.

169.　As a result of NIH's refusal to consider their application, UAW Member 2 is in the position of having to choose between leaving their career as an academic researcher, for which they have trained for over 10 years, or moving to a position in a different part of the country or outside the country, away from their family, their partner, and the medical care they need as a

56

A0435

person with a physical disability. If they do not find an alternative position, they face a period of unemployment in one of the most expensive cities in the world.

170.    UAW Member 3, a postdoctoral researcher at a private university in New York, applied to the MOSAIC K99 program through the National Institute of General Medical Sciences. This five-year career transition award of $1 million would launch their career studying mechanisms of behavior (evolution of behavior). Their proposal received an impact score of 10 (a perfect score) last fall. NIH, however, will no longer communicate with UAW Member 3 about this award. UAW Member 3 has aged out of eligibility for the main K99, so reapplying is not an option for them. Because they thought they had secured the MOSAIC K99 award, UAW Member 3 did not apply to the Simons Foundation Fellows-to-Faculty Award. Without the K99 award, UAW Member 3 is in a strained financial position to finish their postdoctoral studies and will be much less competitive on the job market.

171.    UAW Member 4 is a graduate student at a private university in New York, where they research neurophysiology, in particular, the neurobiological mechanisms underlying maternal caregiving. They were awarded a transition grant known as a D-SPAN (F99/K00) intended to support a defined pathway across career stages for outstanding graduate students from diverse backgrounds, including those from groups that are underrepresented in neuroscience research.

172.    Despite having received a NOA for this program, their NIH program officer has since encouraged them to apply for other funding programs, citing uncertainty surrounding the future of the funding program. Consistent with this messaging, UAW Member 4 also noticed that language on the D-SPAN program website has changed, now referring to the D-SPAN grant in the past tense, and the pictures and bios of previous and current awardees have been removed. UAW

Member 4's potential lack of funding has created significant challenges for them in securing a postdoctoral position.

173.    UAW Member 5 is a graduate student worker at a private university in California. They applied for a two-year NIH Diversity Supplement to an existing R01 grant. This supplement is intended to support underrepresented researchers, with the goal of expanding UAW Member 5's skillset and substantiating their potential to become a productive investigator. The project was part of a multi-university collaboration and would fund the bulk of UAW Member 5's dissertation research, covering direct and indirect costs, materials and supplies, travel, and other essentials.

174.    UAW Member 5 completed the application process and corresponded with NIH coordinators, understanding that the supplement was officially under review. However, on the day Executive Order 14151 was announced, all communication ceased. The NIH website pages related to the diversity supplement were scrubbed, and the coordinators became unreachable. No formal notice of cancellation or termination was ever provided—only a sudden disappearance of any evidence that the supplement application existed. To date, UAW Member 5 is left to assume that the grant as a whole no longer exists, despite never receiving any official update regarding its status while under review and with no clarity on how to proceed.

175.    UAW Member 6 is a postdoctoral student at a private university in New York and a MOSAIC K99/R00 scholar whose grant studies how social cues guide emotions. This study was motivated by the need to understand how social processing is impaired in several neuropsychiatric disorders. UAW Member 6 had begun the process of requesting a no-cost extension but has been unable to communicate with the NIH program officer since January 2025 to begin this process. UAW Member 6 was well-situated to receive this grant given their extensive service in mentoring

and advocacy while simultaneously performing high-quality science—a feat not many scientists successfully undertake.

176.    UAW Member 6 is relying on the R00 portion of their MOSAIC grant to kickstart their tenure-track faculty lab and to continue and expand on their work to develop novel treatments for psychiatric disorders. Given NIH's complete silence, UAW Member 6 fears they will not receive their R00 when they apply for it in this year's upcoming job cycle, which could potentially restrict their nation-wide job search. This has caused immense stress and has created uncertainty in their research career progression in securing a tenure-track faculty position.

177.    UAW Member 7, a graduate student at a private university in New York, was preparing an F31 parent grant proposal to study the impacts of anti-transgender structural stigma (anti-transgender legislation). That funding opportunity, however, was cancelled as of March 10, 2025, depriving UAW Member 7 of the potential funding that grant would have provided.

178.    UAW Member 8, a graduate student at a private university in New York, sought an F31 Diversity grant to study developmental neurobiology. This research is crucial to gain insight into early risk factors of neurodevelopmental and psychiatric disease and enable the identification of timepoints for effective prevention and treatment. UAW Member 8's proposal was highly scored (Impact score: 18, Percentile: 2.0) and, accordingly, NIH issued a notice of award in August 2024. Their supervisor, however, was notified in March 2025 that F31 had been cancelled. UAW Member 8's application status has since been changed to "pending" and the budget period has been significantly shortened from the initial accepted budget period. NIH's decision to cancel this grant will hinder development on learning the neurodevelopmental factors preceding psychiatric disease onset, which is relevant to nearly half of the U.S. population. The lack of funding will also undermine UAW Member 8's ability to progress through their PhD program.

179.    UAW Pre-Member 1 is a postdoctoral fellow at a private university in Massachusetts and has been awarded a MOSAIC K99/R00 fellowship.[93] They are finishing the K99 phase of the award. They study how cells respond to signals outside the cell. By better understanding how this process is dysregulated, UAW Pre-Member 1 hopes to improve cancer therapeutic strategies in the future.

180.    As is standard for K99/R00 fellows, UAW Pre-Member 1 has been planning to apply to activate their R00 funding this summer, once they have found an independent position as an assistant professor. They have discussed this plan with their NIH program officer. This should be a routine process, as the scientific component has already been evaluated and positively reviewed. However, the status of the MOSAIC program has become unclear—the website has been deleted, and the program is not seeking new applicants.

181.    UAW Pre-Member 1 has been unable to get information from NIH about their ability to activate the R00 funding. They fear, like other MOSAIC scholars, that their grant will be terminated. These changes to NIH policy have created uncertainty in UAW Pre-Member 1's transition to an independent position. Not having this award would significantly weaken their ability to negotiate a job offer and impair their ability to begin an independent lab.

182.    UAW Pre-Member 2 is a postdoctoral scholar at a private university in Pennsylvania, where they are tracking outbreaks of newly emerging multi-drug-resistant pathogens and investigating new ways to treat and prevent infections. They are funded by an NIH K12 training and career development grant awarded to their home institution which has a stated goal of improving diversity, equity, and inclusion in the biomedical sciences. As part of their

---

[93] "Pre-member" means UAW is their exclusive bargaining representative in ongoing negotiations with their employer and that they intend to become dues-paying members once a collective bargaining agreement is in place.

A0439

training under this grant, they also taught science classes at minority-serving colleges and universities in their metropolitan area.

183.    When UAW Pre-Member 2 was accepted into this postdoctoral training program, they were told the tenure of the program was three years. Since January 21, 2025, however, they have been told that the status of their funding in the near future is unknown. The principal investigators of the training grant at their home institution have been unable to reach the assigned program officer, and they do not know whether the regularly anticipated non-competing renewal will be completed this summer.

184.    To UAW Pre-Member 2's knowledge, there has been no communication from the federal government about the status of this entire category of training grants, nor of individual grants in this funding category. As a result, UAW Pre-Member 2 does not know whether they will lose their funding in the next few months. UAW Pre-Member 2 chose this funding path because they want to research infectious disease that directly informs clinical outcomes, and because they want to educate future generations of biomedical researchers. They had planned to spend three years developing an infectious disease research program which they could bring to a faculty position. Now, this future is uncertain as their research training time may be cut short by 30%.

185.    UAW Pre-Member 3 is a third-year graduate student in the Cell and Molecular Biology Ph.D. program at a private university in Pennsylvania. They are currently performing a research project that seeks to understand how heterochromatin associated proteins impede changes to cell fate and how mutations in these proteins lead to defects in neuronal development. They applied for the F31 Diversity grant on December 8, 2024. On February 13, 2025, their proposal was assigned to the Molecular and Cellular Sciences and Technologies ZRG1 F05-A (20) study section, scheduled for review on March 26–27, 2025. However, on March 12, 2025, UAW Pre-

Member 3 was informed that the study section information had been removed from their proposal's status. To date, the NIH has not provided any clarification or a timeline regarding when—or even if—the application will be reviewed.

186.     This change is particularly perplexing given that the only difference between the standard F31 and the F31 Diversity grant is the inclusion of an additional statement recognizing that the applicant comes from an underrepresented community in the sciences. For early-career scientists, obtaining such grants does more than support a research project financially; it represents recognition of their dedication, hard work, and potential to become future primary investigators.

187.     UAW Pre-Member 4 is a postdoctoral associate at a private university in New York. They applied for a diversity supplement for a project grant that seeks to improve transport of protective antibodies from mother to child during Cytomegalovirus infection. The study was motivated by the idea that Cytomegalovirus infection could prevent this transfer, leaving neonates vulnerable to a variety of congenital infections in utero.

188.     UAW Pre-Member 4 met the supplement's DEI requirements as a first-generation college student and a Latina. As of January 2025, the proposal was under review. However, the funding mechanism was abruptly cancelled due to its DEI requirements. This has been a significant setback for UAW Pre-Member 4 as a first-year postdoctoral student, as the supplement would support the majority of their postdoctoral salary. The lack of funding is a barrier to the start of this project and is delaying their expected timeline for gaining independence as a scientific investigator.

189.     The cancellation of this funding mechanism robs the field of study of diverse perspectives and ideas. Ultimately, restricting access to funding for researchers from diverse backgrounds will limit the impact that academic institutions can make to biomedical research.

A0441

190.    UAW Pre-Member 5 is a postdoctoral research scholar at a private university in Pennsylvania. They are working on their K99/R00 "Pathway to Independence Award" from the Helping to End Addiction Long term ("HEAL") Initiative—a program co-sponsored by the National Institutes of Mental Health and the National Institute of Drug Abuse. This five-year, approximately 1 million dollar grant provides two years of advanced postdoctoral training followed by three years of start-up funds for an investigator to begin an academic lab. One of the goals of the HEAL initiative is to develop new medicines to treat pain without propensity to cause addiction, an issue of great importance to the opioid crisis.

191.    On March 10, 2025, UAW Pre-Member 5 was made aware that the Request for Applications (RFA) RFA-NS-22-025 (which contained a diversity component), had been eliminated. This was not communicated by NIH. The program was designed to allow applicants from disadvantaged backgrounds to apply for evaluation in smaller study sections. UAW Pre-Member 5 was raised in an American "rust belt" city that has long struggled with the opioid epidemic. The cancellation of NIH's interest in diversity means that UAW Pre-Member 5 will be competing against a larger applicant pool, which limits their chance of success in an already competitive grant mechanism.

192.    UAW Pre-Member 6, a graduate student at a private university in Pennsylvania, studies the replication mechanisms of viral diseases spread by mosquitoes to identify targets for drug therapeutics. They sought this course of study because of the lack of existing or approved vaccines and antivirals to counter viral disease in humans. A warming climate has also increased the geographic spread of these diseases as a consequence of a broader habitat for mosquitos. UAW Pre-Member 6 applied to the F31 Diversity Fellowship for the August 2024 deadline. After receiving a score and percentile well within the fundable range in December 2024, UAW Pre-

Member 6 and their principal investigator waited for a just in time request for information from NIH and notice of award. However, after NIH funding freezes were announced in January 2025, UAW Pre-Member 6's study section was canceled.

193.    On March 18, 2025, UAW Pre-Member 6 reached out to their assigned NIH program officer to ask about the status of their application. The program officer then informed UAW Pre-Member 6 that their grant had been terminated. The award would have funded UAW Pre- Member 6 and their principal investigator for three years, covering stipends, conference travel, and materials for their project.

194.    Completing an F31 grant application is excellent practice for the development of scientific writing and project presentation. Aside from this, the Diversity F31 is built to uplift minority researchers through financial support. Although other grant pathways exist, this grant gave UAW Pre-Member 6 the opportunity to showcase a broader part of their identity that can enhance their scientific research. Part of the F31 Diversity application process is writing about how you plan to uplift other scientists. For UAW Pre-Member 6, the cancellation of diversity fellowships feels like a devaluation of their scientific research and of their sense of self as a scientist. Funding may still be provided by their lab, but the termination of the grant has, to their knowledge, caused the principal investigator to limit expenditure of funds, including conference travel and reagent purchase, which affects UAW Pre-Member 6's ability to carry out their research, gain experience presenting their work, and network with other scientists.

## CAUSES OF ACTION

195.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

### COUNT I
### Violation of the Administrative Procedure Act – Arbitrary and Capricious

64

A0443

196.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

197.    Agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

198.    Defendants are acting in an arbitrary and capricious manner in violation of the APA.

*A. Grant Terminations*

199.    Individual Plaintiffs, Plaintiff Ibis, and members of Associational Plaintiffs' members whose grants have been terminated ("Terminated Plaintiffs") assert this portion of this cause of action against all Defendants.

200.    NIH's grant terminations pursuant to the Directives constitute final agency action under the APA for which there is no other adequate remedy in a court.

201.    These terminations are arbitrary and capricious for at least seven reasons.

202.    First, in its termination letters, NIH fails to provide adequate reasoning explaining how these studies fall below the agency's standards for scientific research. NIH's repetition of boilerplate and conclusory language across all the termination letters is not an adequate explanation as to how any specific study fails to meet agency priorities.

A0444

203.    Second, NIH fails to analyze any relevant data. The termination letters show that NIH did not consider individual, or any, data from the grants at issue or from any body of research that would contradict the value or rigor of the grants at issue.

204.    Third, NIH is not providing a reasoned explanation for its actions, as it is ignoring reliance interests. In the termination letters, NIH fails to mention, and does not appear to have considered, how these terminations will affect the reliance interests of researchers (including Plaintiffs), the institutions that host them, the participants in the terminated studies, and the body of research furthered by the terminated grants and the populations who would have benefitted from that research.

205.    Fourth, NIH relies on assertions contrary to its prior award review and policies, including the NIH Strategic Plan and IC Strategic Plans. NIH states that its terminations are based on an alleged change in priorities, but NIH has neither adopted, described, nor explained any new priorities, and the strategic plans under which the previous awards were made remain in effect.

206.    Fifth, the terminations run counter to available evidence and reflect NIH's failure to consider important aspects of the problems addressed by the terminated grants and the areas of research mandated by, among other things, Congress, NIH's Strategic Plan, and NIH's policy guidelines. As its stated change in priorities runs directly counter to congressional mandates, NIH is also relying on factors that Congress does not intend for NIH to consider.

207.    Sixth, NIH reliance on mandates by individuals outside the agency (including, for example, from DOGE individuals who drafted some number of the termination letters at issue), violates NIH's requirement to appropriately reach its own decision.

A0445

208.     Seventh, an agency acts arbitrarily and capriciously if it acts in a manner that is contrary to its own regulations or a congressional statute. For the reasons expressed in Counts II, III, and IV, Defendants have acted contrary to their own regulations or congressional statutes.

209.     For those and other reasons consistent with the allegations herein, Defendants' grant terminations are arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A).

*B. Refusal to Consider Applications*

210.     Individual Plaintiffs, Plaintiffs Ibis, and Associational Plaintiffs' members whose grant applications NIH has refused to consider pursuant to the Directives ("Applicant Plaintiffs") assert this portion of this cause of action against all Defendants.

211.     NIH's refusal to consider applications for published NOFOs that Defendants subsequently removed from publication constitutes final agency action under the APA.

212.     For the same reasons described above, NIH's refusal to consider properly submitted applications is arbitrary and capricious. That is, NIH (i) failed to adequately explain its reasons for this refusal; (ii) failed to analyze any relevant data; (iii) failed to consider reliance interests; (iv) has purported to rely on a change in priorities that has not occurred and that it has not explained; (v) failed to consider important aspects of the mandated areas of research addressed by the proposed grants and considered factors that Congress did not intend for it to consider; (vi) failed to appropriately reach its own decision; and (vii) acted contrary to its own regulations or congressional statute.

*C. The Directives*

213.     All Plaintiffs assert this cause of action against all Defendants.

214.     NIH's adoption of the Directives is final agency action under the APA.

A0446

215.    For the same reasons described above, NIH's adoption of the Directives is arbitrary and capricious. That is, NIH (i) failed to adequately explain its reasons for the adoption of the Directives; (ii) failed to analyze any relevant data; (iii) failed to consider reliance interests; (iv) has purported to rely on a change in priorities that has not occurred and that it has not explained; (v) failed to consider important aspects of the mandated areas of research addressed by the Directives and considered factors that Congress did not intend for it to consider; (vi) failed to appropriately reach its own decision; and (vii) acted contrary to its own regulations or congressional statute.

## COUNT II
### Violation of the Administrative Procedure Act – Not in Accordance with Law

216.    Terminated Plaintiffs assert this cause of action against all Defendants.

217.    The APA directs courts to hold unlawful and set aside agency actions that are not in accordance with law. 5 U.S.C. § 706(2)(A). Defendants fail to meet this standard in at least three ways.

218.    First, Defendants are purporting to terminate grants based on 2 C.F.R. § 200.340(a)(2) (2020), which allowed termination if an award "no longer effectuates the program goals or agency priorities." However, HHS did not adopt OMB guidance allowing for termination under 2 CFR Part 200.340 based on changes to agency priorities until October 2024, with an *effective date of October 1, 2025*. In the revised NOAs that NIH sent to Plaintiffs when it terminated their grants, NIH states that its action is "in accordance with 2 CFR § 200.340 as implemented in NIH GPS Section 8.5.2." But NIH Grants Policy Statement Section 8.5.2 did not implement the revised 2020 version of 2 CFR 200.340 because HHS did not implement that revised version in its regulations. This section purports "to be compliant with governing statutes

and the requirements of 2 CFR Part 200, *as modified by previously approved waivers and deviations*. However, in the case of a conflict, the statutes and regulations govern."[94]

219.    Second, even if 2 C.F.R. § 200.340(a)(2) (2020) applies, NIH's grant terminations are not in accordance with that regulation. 2 C.F.R. § 200.340(a)(2) (2020) provided that a federal award may be terminated in part or in its entirety "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." For the reasons stated in the preceding paragraph, NIH's termination was not "authorized by law." In addition, for the reasons already discussed in Count I (Arbitrary and Capricious), NIH's termination decisions were not consistent with the requirements of the APA—and therefore beyond "the extent authorized by law."[95]

220.    Further, the guidance accompanying the regulation indicates that any termination pursuant to 2 C.F.R. § 200.340(a)(2) must be based on the agency's consideration of evidence— and in particular, "additional evidence"—indicating that the "award no longer effectuates the program goals or agency priorities." *See* Guidance for Grants and Agreements, 85 FR 49506, 49507 (2020). But as already alleged, NIH's terminations are not based on *any* evidence regarding the specific grants.

221.    Moreover, 2 C.F.R. § 200.340(b) (2020) stated that the agency "should clearly and unambiguously specify termination provisions applicable to each Federal award, in applicable regulations or in the award, consistent with this section." Likewise, the OMB Uniform Guidance that NIH recently adopted to go into effect October 1, 2025 only allows for termination based on changes to agency priorities "pursuant to the terms and conditions of the Federal award," and states that the agency "must clearly and unambiguously specify all termination provisions in the terms

---

[94] *See* Nat'l Insts. of Health, *NIH Grants Pol'y Statement* § 3 (Apr. 2024) (emphasis added).
[95] *See* 2 C.F.R. § 200.340(a)(2) (2020).

A0448

and conditions of the Federal award."[96] Yet the original NOAs that Plaintiffs received did not include reference to the OMB Uniform Guidance and did not state that an award could be terminated for shifting agency priorities.

222.　　Third, the terminations are not in accordance with the terms of the pertinent NIH Grants Policy Statements. Section 8.5.2 allows involuntary termination solely "if a recipient has failed to comply with the terms and conditions of award." Across its termination notices, NIH has acknowledged that it "generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision," in accordance with the respective NIH Grants Policy Statement governing each award. While "NIH may immediately terminate a grant when necessary," "when necessary" is cabined by reference to circumstances "such as to protect the public health and welfare from the effects of a serious deficiency" and is only allowed under the limited circumstance where "a recipient has failed to comply with the terms and conditions of award."

223.　　NIH has failed to show that termination of any grants pursuant to the Directives met those circumstances. Defendants have not based termination of Plaintiffs' grants on a failure to comply with the terms and conditions of their awards. Even if termination were available to NIH where a grantee has met the terms and conditions of their award, NIH has failed to abide by its obligation under the NIH Grants Policy Statements to allow those grant recipients an opportunity to take appropriate corrective action before NIH terminated their grants.

224.　　Fourth, for the same reasons expressed below in Count III (APA – Exceeds Statutory Authority), Defendants' actions pursuant to the Directives—including the grant

---

[96] 2 CFR 200.340(a)(4),(b) (2024).

terminations and refusal to review submitted grant applications—run afoul of the mandates set forth by Congress.

225.    Thus, Defendants failed to act in accordance with law in violation of the APA. 5 U.S.C. § 706(2)(A).

## COUNT III
**Violation of the Administrative Procedure Act – Exceeds Statutory Authority**

226.    All Plaintiffs assert this cause of action against all Defendants.

227.    A reviewing court must hold unlawful and set aside agency actions that are found to be "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

228.    Through Section 301(a) of the Public Health Service Act, *see* 42 U.S.C. § 241(a), Congress delegated authority to NIH to "make grants-in-aid to universities" and other research institutions for the purpose of "promot[ing] the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man." *Id.*

229.    In addition, Congress has mandated the expenditure of funds by NIH and ICs to promote health equity across health disparity populations, including racial and ethnic minority populations, less privileged socioeconomic status populations, underserved rural populations, sexual and gender minorities, and any subpopulations that that can be characterized by two or more of these descriptions. Among those statutory mandates are:

    a.    42 U.S.C. § 281(b)(24), which created the National Institute on Minority Health and Health Disparities to "conduct and support…research, training, dissemination of information, and other programs with respect to minority health and conditions and other populations with health disparities." *Id.* at § 285t(a).

A0450

b.  42 U.S.C. § 285t, which mandates that the Director of the National Institute on Minority Health and Health Disparities "shall[,] in expending amounts appropriated under this subpart give priority to conducting and supporting minority health disparities research," and "ensure that the plan and budget serve as a broad, binding statement of policies regarding minority health disparities research and other health disparities research activities…" *Id.* at § 285t(b); (f)(1)(G).

c.  42 U.S.C. § 282(b)(8)(D)(ii), which requires the Secretary, acting through the Director of NIH, to ensure that each of the ICs within NIH "utilize diverse study populations, with specific consideration to biological, social, and other determinants of health that contribute to health disparities."

d.  42 U.S.C. § 282(h), which mandates that "[t]he Secretary, acting through the Director of NIH…, shall, in conducting and supporting programs for research, research training, recruitment, and other activities, provide for an increase in the number of women and individuals from disadvantaged backgrounds (including racial and ethnic minorities) in the fields of biomedical and behavioral research."

e.  42 U.S.C. § 282(m), which requires NIH to develop a strategic plan that, among other things, "shall…(B) consider…(iii) biological, social, and other determinants of health that contribute to health disparities…" *Id.* at § 282(m)(1),(2). The Director of NIH must "ensure that the resources of the National Institutes of Health are sufficiently allocated for research projects identified in strategic plans." *Id.* at §282(b)(6).

f. 42 U.S.C. § 283p, which mandates that "the Director of the National Institutes of Health shall, as appropriate, encourage efforts to improve research related to the health of sexual and gender minority populations."

g. 42 U.S.C. § 283*o*(b)(2) which requires the Director of NIH to "develop, modify, or prioritize policies, as needed, within the National Institutes of Health to promote opportunities for new researchers and earlier research independence, such as policies to…enhance workforce diversity."

230.    Those mandates, and NIH's policies and regulations to effectuate them, apply to the funding and review of both Project-Based Grants and Pipeline Grants.

231.    But Defendants' actions pursuant to the Directives—including the grant terminations and refusal to review submitted grant applications—run afoul of those statutory mandates.

232.    Accordingly, Defendants acted "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

## COUNT IV
### Violation of Administrative Procedure Act – Contrary to Constitutional Right

233.    All Plaintiffs assert this cause of action against all Defendants.

234.    A reviewing court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

235.    Defendants' grant terminations and refusal to consider grant applications constitute final agency actions under the APA.

236.    For the reasons described in Count VI (Void for Vagueness), Defendants' actions are contrary to constitutional rights, and the Court must hold them unlawful and set them aside.

A0452

## COUNT V
### Violation of the Administrative Procedure Act –
### Unlawfully Withheld, Unreasonable Delay, or Failing to Conclude Matter Presented

237.    Applicant Plaintiffs assert this cause of action against all Defendants.

238.    An agency must "proceed to conclude a matter presented to it," 5 U.S.C. § 555(b); accordingly, a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

239.    Defendants' refusal to consider submitted grant applications pursuant to the Directives constitutes final agency actions under the APA.

240.    Defendants' consideration of applications for Pipeline Grants has been unlawfully withheld or unreasonably delayed for the following reasons: (i) HHS regulations require NIH to accept, disapprove, or "defer because of either lack of funds or a need for further evaluation"; (ii) NIH policy requires that it consider each application submitted to it and does not allow the agency to withhold consideration of applications based on changes in agency priorities; (iii) large numbers of current and future biomedical researchers risk unexpected job loss that will harm not only them personally but also the development of biomedical research generally; and (iv) the applications' proposed research is essential to public health, making delays in this sphere less tolerable than in other spheres such as economic regulations. Thus, the Court must compel the agency to consider these applications.

## COUNT VI
### Violation of the Fifth Amendment – Void for Vagueness

241.    Terminated Plaintiffs assert this cause of action against all Defendants.

242.    Under the Fifth Amendment to the United States Constitution, a government enactment is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as to allow arbitrary and discriminatory enforcement.

A0453

243.    Defendants' Directives are filled with vague language that do not give clear notice of what is covered: prohibiting "DEI research activities," or even "giv[ing] the perception that NIH funds can be used to support these activities" as well as research programs "based primarily on…amorphous equity objectives" or "based on gender identity" or relating to "transgender issues." Likewise, the language of the various scripts in NIH termination notices include many of these same undefined terms: "gender identity"; "so-called diversity, equity, and inclusion ('DEI') studies"; "amorphous equity objectives"; "vaccine hesitancy"; or "COVID-related" matters, for example. The language of these Directives and terminations notices is unconstitutionally vague, depriving grantees of fair notice and encouraging arbitrary and discriminatory enforcement.

244.    Because of the vagueness in the language of Defendants' Directives and NIH's chaotic efforts to give effect to those Directives, Plaintiffs are unsure, for example, which areas of study they can pursue, which populations they can focus on as study subjects, what they might argue to appeal grant terminations, and what the demographics of study participants must be. This makes it impossible to determine how to reconfigure future research to stay within the bounds of NIH's newest "priorities."

245.    Defendants' Directives and efforts to purge certain research thus violate the Due Process Clause because its termination notices and related documents provide inadequate notice of what types of research it purports to prohibit.

**COUNT VII**
**Violation of Separation of Powers**

246.    All Plaintiffs assert this cause of action against all Defendants.

247.    The Constitution vests exclusive power over federal spending and lawmaking with Congress; the Constitution likewise requires the Executive branch to faithfully execute the law. These distinct roles of the co-equal branches of government are of critical importance, and "the

carefully defined limits on the power of each Branch must not be eroded." *I.N.S. v. Chadha*, 462 U.S. 919, 958 (1983).

248.    The Executive Branch has no constitutional power to unilaterally amend or repeal parts of duly elected statutes.

249.    Congress has exercised its Article I legislative power to mandate NIH carry out specific functions. Defendants' actions unlawfully usurp congressional legislative authority, including by ignoring and running counter to the mandates outlined in Count III (APA—Excess of Statutory Authority).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a.  Declare that the Directives—including the February 28 Guidance and March 25 Guidance—and Defendants' other actions to implement the Directives are unlawful and unconstitutional;

b.  Declare that NIH's termination of grants pursuant to the Directives, beginning on February 28, 2025, is unlawful and unconstitutional;

c.  Temporarily restrain and/or preliminarily and permanently enjoin Defendants from implementing or enforcing the Directives going forward, including from terminating any grants or withholding review of applications, based on allegedly no longer effectuating agency priorities or; in a manner that this Court has determined is unlawful;

d.  Order NIH to restore the grant awards, retroactive to the respective termination date, that NIH has terminated pursuant to the Directives or in a manner this Court has determined is unlawful or unconstitutional, including the grant terminations based on allegedly no longer effectuating agency priorities;

A0455

e.  Order NIH and all ICs to review all properly submitted applications as required by NIH policy and consistent with priorities set forth in the currently operative NIH-Wide Strategic Plan and the ICs Strategic Plans;

f.  Order Defendants to file status reports at regular intervals confirming their compliance with the Court's order(s) and judgment(s) in this case;

g.  Enjoin Defendants from imposing any negative consequences on Individual Plaintiffs, Plaintiff Ibis, or Associational Plaintiffs' Members and Pre-Members for involvement in this litigation;

h.  Award Plaintiffs' reasonable costs and attorneys' fees; and

i.  Issue such other relief as the Court deems proper.

[signatures on following page]

77

A0456

Dated: April 02, 2025

Shalini Goel Agarwal*
**Protect Democracy Project**
2020 Pennsylvania Ave., NW, Ste. 163
Washington, DC 20006
202-579-4582
shalini.agarwal@protectdemocracy.org

Michel-Ange Desruisseaux*
82 Nassau Street, #601
New York, NY 10038
michel-
ange.desruisseaux@protectdemocracy.org

Kenneth Parreno**
15 Main Street, Suite 312
Watertown, MA 02472
kenneth.parreno@protectdemocracy.org

Lisa S. Mankofsky*
Oscar Heanue*
**Center for Science in the Public Interest**
1250 I St., NW, Suite 500
Washington, DC 20005
202-777-8381
lmankofsky@cspinet.org
oheanue@cspinet.org

Respectfully submitted,

*/s/ Jessie J. Rossman*
Jessie J. Rossman
Suzanne Schlossberg
**American Civil Liberties Union
Foundation of Massachusetts, Inc.**
One Center Plaza, Suite 801
Boston, MA 02018
617-482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Olga Akselrod*
Alexis Agathocleous*
Rachel Meeropol*
Alejandro Ortiz*
**American Civil Liberties Union
Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212-549-2659
oakselrod@aclu.org
aagathocleous@aclu.org
rmeeropol@aclu.org
ortiza@aclu.org

*Attorneys for Plaintiffs*
*\*pro hac vice forthcoming*
*\*\*application for admission forthcoming*

78

A0457

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS; STATE OF
CALIFORNIA; STATE OF MARYLAND;
STATE OF WASHINGTON; STATE OF
ARIZONA; STATE OF COLORADO;
STATE OF DELAWARE; STATE OF
HAWAIʻI; STATE OF MINNESOTA;
STATE OF NEVADA; STATE OF NEW
JERSEY; STATE OF NEW MEXICO;
STATE OF NEW YORK; STATE OF
OREGON; STATE OF RHODE ISLAND;
and STATE OF WISCONSIN,

                *Plaintiffs,*

     v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services; UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES;
JAYANTA BHATTACHARYA, in his
official capacity as Director of the National
Institutes of Health; NATIONAL
INSTITUTES OF HEALTH; NATIONAL
CANCER INSTITUTE; NATIONAL EYE
INSTITUTE; NATIONAL HEART, LUNG,
AND BLOOD INSTITUTE; NATIONAL
HUMAN GENOME RESEARCH
INSTITUTE; NATIONAL INSTITUTE ON
AGING; NATIONAL INSTITUTE ON
ALCOHOL ABUSE AND ALCOHOLISM;
NATIONAL INSTITUTE OF ALLERGY
AND INFECTIOUS DISEASES;
NATIONAL INSTITUTE OF ARTHRITIS
AND MUSCULOSKELETAL AND SKIN
DISEASES; NATIONAL INSTITUTE OF
BIOMEDICAL IMAGING AND
BIOENGINEERING; EUNICE KENNEDY
SHRIVER NATIONAL INSTITUTE OF
CHILD HEALTH AND HUMAN
DEVELOPMENT; NATIONAL INSTITUTE

No. 1:25-cv-10814-BEM

A0458

ON DEAFNESS AND OTHER
COMMUNICATION DISORDERS;
NATIONAL INSTITUTE OF DENTAL
AND CRANIOFACIAL RESEARCH;
NATIONAL INSTITUTE OF DIABETES
AND DIGESTIVE AND KIDNEY
DISEASES; NATIONAL INSTITUTE ON
DRUG ABUSE; NATIONAL INSTITUTE
OF ENVIRONMENTAL HEALTH
SCIENCES; NATIONAL INSTITUTE OF
GENERAL MEDICAL SCIENCES;
NATIONAL INSTITUTE OF MENTAL
HEALTH; NATIONAL INSTITUTE ON
MINORITY HEALTH AND HEALTH
DISPARITIES; NATIONAL INSTITUTE OF
NEUROLOGICAL DISORDERS AND
STROKE; NATIONAL INSTITUTE OF
NURSING RESEARCH; NATIONAL
LIBRARY OF MEDICINE; NATIONAL
CENTER FOR ADVANCING
TRANSLATIONAL SCIENCES; JOHN E.
FOGARTY INTERNATIONAL CENTER
FOR ADVANCED STUDY IN THE
HEALTH SCIENCES; NATIONAL
CENTER FOR COMPLEMENTARY AND
INTEGRATIVE HEALTH; and CENTER
FOR SCIENTIFIC REVIEW,

*Defendants.*

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs the Commonwealth of Massachusetts, the State of California, the State of

Maryland, the State of Washington, the State of Arizona; the State of Colorado; the State of

Delaware; the State of Hawaiʻi, the State of Minnesota; the State of Nevada; the State of New

Jersey; the State of New Mexico; the State of New York; the State of Oregon; the State of Rhode

Island; and the State of Wisconsin allege as follows:

2

A0459

## INTRODUCTION

1.     The National Institutes of Health (NIH) is a federal agency responsible for conducting and supporting biomedical research.  Widely acknowledged as a "crown jewel" of America's scientific institutions—a characterization the agency's director recently reiterated[1]— NIH is the largest public funder of medical research in the world.

2.     NIH has "a long and illustrious history [of] supporting breakthroughs in biology and medicine."[2]  NIH scientists pioneered the rubella vaccine, eradicating a disease that, in the 1960s, killed thousands of babies and left thousands more with lifelong disabilities.[3]  NIH studies led to the discovery of the BRCA mutation, helping countless Americans reduce their risk of breast and ovarian cancer.[4]  And NIH research fueled the development of treatments for HIV and AIDS, transforming what was once a fatal disease into one with a nearly normal life expectancy.[5]  These are just a few of many, many examples: over the years, NIH-supported research has had a profound impact on Americans' health and wellbeing.  Indeed, it is hard to find a medical breakthrough in recent years that has *not* been assisted—whether directly or indirectly—by NIH.[6]

3.     NIH's activities have also contributed to our Nation's economic security and prosperity.  Today, the United States is a global leader in the health and life sciences—thanks, in

---

[1] Opening Statement of Dr. J. Bhattacharya, S. Comm. on Health, Educ., Lab. & Pensions (March 5, 2025), https:// bit.ly/Bhattacharya-Statement.

[2] *Id.*

[3] Lyons M., *IRP Vaccine Research Stretches Back to the NIH's Birth*, NIH Intramural Rsch. Prog. (May 18, 2020), https://irp.nih.gov/blog/post/2020/05/a-long-tradition-of-vaccine-breakthroughs.

[4] *Enhancing Breast and Ovarian Cancer Care: The Discovery of BRCA1 and BRCA2*, Nat'l Cancer Inst. (March 7, 2014), https://www.cancer.gov/research/progress/discovery/brca.

[5] *HIV/AIDS Treatment*, Nat'l Inst. of Allergy & Infectious Disease (Jun. 16, 2020), https://www.niaid.nih.gov/ diseases-conditions/hiv-treatment.

[6] *See, e.g.*, Cleary E.G. *et al.*, *Comparison of Research Spending on New Drug Approvals by the National Institutes of Health vs the Pharmaceutical Industry, 2010-2019*, 4 JAMA Health Forum, no. 4 (2023) (showing NIH funding contributing to 99.4% of FDA-approved drugs from 2010 to 2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC10148199.

A0460

no small part, to NIH.  The agency's grants have allowed America to train the next generation of doctors, researchers, and biomedical entrepreneurs.  And they have ensured that crucial innovations take place in American institutions—allowing the United States to reap the economic benefits of those discoveries.  The numbers speak for themselves: in Fiscal Year 2024 alone, NIH's more than $36 billion in awards spurred more than $94 billion in new economic activity—a return of $2.56 for every $1 invested.  These investments supported more than 407,000 jobs across every State and the District of Columbia.

4.      That critical work is now in jeopardy.  By law, NIH provides much of its support for scientific research and training in the form of grants to outside institutions.  Since his inauguration, however, the President has issued a barrage of executive orders prohibiting federal agencies from supporting any initiatives with a perceived nexus to certain subjects he opposes, such as "DEI" and "gender ideology."  Taking its cue from the executive orders, defendants have adopted a series of directives that curtail NIH's support for previously advertised funding opportunities and previously awarded grants relating to these and other blacklisted topics.

5.      These directives are unlawful—as are defendants' actions in developing, implementing, and enforcing them.  Plaintiffs bring this action to seek relief for the immediate harms that defendants and their directives are causing to state research institutions.[7]

6.      First, defendants' recent policies and actions violate the Administrative Procedure Act (APA).  In promulgating directives that prohibit research into certain politically disfavored subjects, defendants have flouted express statutory and regulatory provisions, including statutory

---

[7] In recent months, a number of the plaintiff states have brought lawsuits challenging other unlawful policies and decisions that affect NIH grants.  *See* Complaint, *Massachusetts v. NIH*, No. 1:25-cv-10338-AK (D. Mass. Feb. 10, 2025) (ECF No. 1) (challenging recent NIH guidance purporting to alter the methodology for calculating "indirect costs"); Complaint, *New York v. Trump*, No. 1:25-cv-39-JJM-PAS (D.R.I. Jan. 28, 2025) (ECF No. 1) (challenging an OMB directive instituting a temporary funding pause across federal agencies).  The agency actions at issue in those cases are distinct from the acts and omissions at issue here.

A0461

provisions directing NIH to support diversity in the scientific workforce and to promote the health of racial, ethnic, sexual, and gender minorities.  In this way, NIH's directives are contrary to law.  5 U.S.C. §706(2)(A), (C).  Defendants have also departed from NIH's own prior position on the now-blacklisted topics, without acknowledging—let alone providing "good reasons for"—their change in position.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  And what little reasoning that defendants have offered in support of their new blacklisting directives fails to grapple with relevant considerations and runs counter to the available evidence.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  For these reasons, defendants' directives are also arbitrary and capricious.  5 U.S.C. §706(2)(A).  Defendants' recent actions also violate the APA because they have led to unreasonable and intentional delays in the grant-application process, including cancellation of the "study sections" and "advisory councils" that review and approve requests for NIH funding.  Accordingly, defendants have "unlawfully withheld" and "unreasonably delayed" required action.  *Id.* §706(1).

7.     Second, defendants' policies and actions contravene Spending Clause and other separation-of-powers constraints and constitute *ultra vires* executive action.  The Constitution "grants the power of the purse to Congress, not the President."  *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  The purpose and effect of defendants' new blacklisting policies, however, is to refuse to spend duly appropriated funds.  These new policies also work to retroactively alter the terms of federal programs.  For these reasons, the challenged policies violate the Constitution.  And federal courts have well-established equitable powers to enjoin federal officials from exceeding the bounds of their constitutional and statutory authority.  *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

5

8.      In implementing and enforcing the challenged policies, defendants have caused—and, left unchecked, will continue to cause—direct, immediate, significant, and irreparable harm to plaintiffs and their public research institutions.  Plaintiffs are collectively awaiting NIH's decisions on billions of dollars in requested research funding, including millions of dollars in funding for projects that received top marks from the relevant NIH study section.  Despite securing a "fundable" score, these applications remain in suspended animation—neither approved nor denied—making it impossible for plaintiffs to plan for the future.  And now, NIH's enforcement of the blacklisting policies has led to the termination of millions of dollars (and counting) in grants already issued to plaintiffs' public institutions.  The result of these disruptions has been, in a word, devastating.  In Massachusetts, for example, the growing uncertainty has forced the Commonwealth's flagship public research institution, the University of Massachusetts, to rescind several dozen offers from prospective biomedical-sciences graduate students for the upcoming academic year, decimating its graduate student program and jeopardizing important lines of research and risking adverse generational impacts on public health research and innovation.

9.      For all these reasons, plaintiffs seek swift relief from this Court.  The Court should set aside NIH's unlawful blacklisting policies—and the actions taken to implement those policies—and compel the review of applications that the agency has unlawfully withheld.

## JURISDICTION AND VENUE

10.      This action arises under U.S. Constitution; the APA, 5 U.S.C. §701 *et seq.*; the Public Health Service Act (PHSA), 42 U.S.C. §201 *et seq.*; and federal regulations governing NIH grants.  This Court has jurisdiction under 28 U.S.C. §1331.

11.      Venue is proper in this district under 28 U.S.C. §1391(e)(1).  Defendants are federal agencies and officers sued in their official capacities.  The Commonwealth of Massachusetts is a

A0463

resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred within this district.

<center>**PARTIES**</center>

I.     **Plaintiffs**

12.     The Commonwealth of Massachusetts is a sovereign state of the United States of America.   Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

13.     The State of California is a sovereign state of the United States of America. California is represented by Attorney General Rob Bonta, the State's chief legal officer.

14.     The State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

15.     The State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown, the State's chief legal officer.

16.     The State of Arizona is a sovereign state of the United States of America.  Arizona is represented by Attorney General Kristin K. Mayes, the State's chief law enforcement officer.

17.     The State of Colorado is a sovereign state of the United States of America. Colorado is represented by and through its Attorney General Phil Weiser.  The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. §24-31-101 to pursue this action.

18.     The State of Delaware is a sovereign state in the United States of America. Delaware is represented by Attorney General Kathy Jennings, who is the State's chief law enforcement officer.

<center>7</center>

A0464

19.     The State of Hawai'i is a sovereign state of the United States of America.  Hawai'i is represented by Attorney General Anne Lopez, who is the State's chief law enforcement officer.

20.     The State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Attorney General Keith Ellison, the State's chief legal officer.

21.     The State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America.  The Attorney General is the chief law enforcement of the State and is authorized to pursue this action under Nev. Rev. Stat. §228.110 and Nev. Rev. Stat. §228.170.

22.     The State of New Jersey is a sovereign state in the United States of America.  New Jersey is represented by Attorney General Matthew Platkin, who is the State's chief law enforcement officer.

23.     The State of New Mexico is a sovereign state of the United States of America.  New Mexico is represented by Attorney General Raúl Torrez, the State's chief law enforcement officer.

24.     The State of New York is a sovereign state of the United States of America.  As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, and political subdivisions of New York.  Attorney General Letitia James is the chief law enforcement officer for New York.

25.     The State of Oregon is a sovereign state in the United States of America.  Oregon is represented by Attorney General Dan Rayfield, who is the State's chief legal officer.  Attorney General Rayfield is authorized by statute to file suit in federal court on behalf of the State of Oregon to protect the interests of the State.  Or. Rev. Stat. §180.060.

26.     The State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, the State's chief legal officer.

A0465

27.     The State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin, who is the chief law enforcement officer of Wisconsin and is authorized to sue on behalf of the State, including its public universities.

II.     **Defendants**

28.     Robert F. Kennedy, Jr., is the Secretary of Health and Human Services.  He is sued in his official capacity.

29.     The United States Department of Human and Health Services (HHS) is a federal cabinet department.

30.     Jayanta Bhattacharya is the Director of NIH.  He is sued in his official capacity.

31.     NIH is a federal agency organized under the PHSA, *see* 42 U.S.C. §§203, 281; it is housed within HHS.

32.     The following institutes and centers are federal agencies established under the PHSA, *see* 42 U.S.C. §281, and housed within NIH: the National Cancer Institute; the National Eye Institute; the National Heart, Lung, and Blood Institute; the National Human Genome Research Institute; the National Institute on Aging; the National Institute on Alcohol Abuse and Alcoholism; the National Institute of Allergy and Infectious Diseases; the National Institute of Arthritis and Musculoskeletal and Skin Diseases; the National Institute of Biomedical Imaging and Bioengineering; the Eunice Kennedy Shriver National Institute of Child Health and Human Development; the National Institute on Deafness and Other Communication Disorders; the National Institute of Dental and Craniofacial Research; the National Institute of Diabetes and Digestive and Kidney Diseases; the National Institute on Drug Abuse; the National Institute of Environmental Health Sciences; the National Institute of General Medical Sciences; the National Institute of Mental Health; the National Institute on Minority Health and Health Disparities; the

9

A0466

National Institute of Neurological Disorders and Stroke; the National Institute of Nursing Research; the National Library of Medicine; the National Center for Advancing Translational Sciences; the John E. Fogarty International Center for Advanced Study in the Health Sciences; the National Center for Complementary and Integrative Health; and the Center for Scientific Review.

## FACTUAL AND LEGAL BACKGROUND

**III.    Congressional Authorization and Appropriation for NIH Research**

### A.    Creation and Structure of NIH

33.    NIH traces its origins to the 1887 establishment of the Hygienic Laboratory, a component of the Marine Hospital Service dedicated to the study of epidemic diseases. Subsequent statutes have transformed that single laboratory into the multifaceted agency at the center of this suit.  In 1902, the laboratory assumed responsibility for testing and regulating vaccines and biologic products with the passage of the Biologics Control Act, ch. 1378, 32 Stat. 728.  In 1930, Congress redesignated the laboratory as the National Institute (singular) of Health and established fellowships for biological and medical research.  *See* Ransdell Act, ch. 251, 46 Stat. 379.  In 1937, Congress created the National Cancer Institute, authorizing the new institute to award research grants to nonfederal scientists and to fund fellowships for young researchers. *See* National Cancer Institute Act, ch. 565, 50 Stat. 559.  In 1944, Congress made the National Cancer Institute a division of NIH and expanded NIH's support for biomedical research.  PHSA, ch. 373, 58 Stat. 682.   And in 1948, following the creation of several additional subsidiary institutes, Congress gave the umbrella agency its current name: the National Institutes (plural) of Health.  *See* National Heart Act, ch. 481, 62 Stat. 464.

34.    Today, NIH is made up of 27 institutes and centers—or "ICs," in NIH parlance— that each specialize in discrete diseases or body systems or carry out distinct projects.  According to the agency, "NIH's mission is to seek fundamental knowledge about the nature and behavior of

A0467

living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability."[8]

35.    NIH carries out its mission through both "intramural" research (that is, research conducted in-house at NIH) and "extramural" research (that is, research conducted at outside institutions with NIH financial support).  Twenty-five of the agency's institutes and centers—all named as defendants in paragraph 32 above—are involved in issuing or reviewing applications for extramural funding opportunities.[9]

36.    NIH is the primary source of federal funding for biomedical and public health research in the United States.  In fiscal year 2024, NIH spent over $36 billion on over 60,000 research grants, awarded to recipients in each of the fifty States and the District of Columbia.[10]

37.    In addition to supporting numerous scientific breakthroughs (*see supra*, paragraph 2), NIH funds are also critical to the education and training of the next generation of scientists and researchers.  NIH's financial awards support postdoctoral fellows, graduate students, and early-career investigators whose work advances scientific discovery and innovation.  These funds not only provide financial support, but also enable mentorship, access to cutting-edge resources, and participation in collaborative research environments that are essential for developing the skills, experience, and professional networks needed to sustain the biomedical research enterprise.

---

[8] *Mission and Goals*, NIH (Oct. 24, 2024), https://www.nih.gov/about-nih/what-we-do/mission-goals.

[9] The remaining two are the NIH Clinical Center (a research hospital) and the NIH Center for Information Technology (an administrative component responsible for computing and information technology).

[10] *See* United for Medical Research, *NIH's Role in Sustaining the U.S. Economy*, United for Medical Research, at 5 (Mar. 2025), https://bit.ly/3Xz6Wry (tabulating NIH research grants awarded, FY2024); *see also NIH Awards by Location & Organization*, NIH, https://report.nih.gov/award/index.cfm (searchable results); *Research Project Grants*, NIH, https://report.nih.gov/nihdatabook/category/4 (Jan. 2024) (identifying historical data through 2023, and reporting more than 40,000 competitive grant awards in 2022 and 2023).

A0468

## B.   Congressional Authorization for NIH Research

38.   NIH's extramural research activities stem from statutory directives: Congress has enacted laws authorizing NIH and its constituent institutes and centers to conduct research and award grants, and it has supplied funding for those activities through regular appropriations.

39.   Section 301 of the PHSA, 42 U.S.C. §241, contains Congress's overarching authorization for NIH (as a component of the "Public Health Service") to conduct research and award grants.  Subsection (a) of that paragraph states:

> The Secretary [of Health and Human Services] shall conduct in the Service, and encourage, cooperate with, and render assistance to other appropriate public authorities, scientific institutions, and scientists in the conduct of, and promote the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man, including water purification, sewage treatment, and pollution of lakes and streams.

And subsection (a)(1) states that:

> The Secretary may make grants-in-aid to universities, hospitals, laboratories, and other public or private institutions, and to individuals for such research projects as are recommended by the advisory council to the entity of the Department supporting such projects and make, upon recommendation of the advisory council to the appropriate entity of the Department, grants-in-aid to public or nonprofit universities, hospitals, laboratories, and other institutions for the general support of their research.

40.   Section 405 of the PHSA, 42 U.S.C. §284, imposes similar responsibilities and confers similar authority on the directors of NIH's institutes and centers.  Among other things, each director "shall encourage and support research, investigations, experiments, demonstrations, and studies in the health sciences," *id.* §284(b)(1)(A), and, to that end, "may make grants and cooperative agreements . . . for research, training, or demonstrations," *id.* §284(b)(2)(A).  *See also* 42 U.S.C. §282 (similar, for the NIH director).

A0469

## C. Congressional Authorization for Specific Programs and Priorities

41.     Other sections of the PHSA provide more specific directives to each of NIH's constituent institutes and centers, detailing the ICs' general purposes and establishing initiatives and programs within each of them. *Cf.* 42 U.S.C. §284(b)(1) (providing that, in carrying out the purposes of section 301 of the PHSA, the Secretary, acting through the Director of each research institute within NIH, "shall encourage and support research, investigations, experiments, demonstrations, and studies in the health sciences" with respect to the human disease or disorder or other aspects of human health for which the national research institutes were established). Some of these statutory provisions are directly at odds with the "agency priorities" articulated in defendants' new blacklisting policies.

42.     To take just one example, as described in greater detail below (*see infra*, paragraphs 94-117), defendants have adopted a policy blacklisting research projects with a perceived connection to "DEI." This newly stated policy against diversity, equity, and inclusion is inconsistent with at least the following express statutory directives:

- Congress has provided that the NIH director "shall, in conducting and supporting programs for research, research training, recruitment, and other activities, provide for an increase in the number of women and individuals from disadvantaged backgrounds (including racial and ethnic minorities) in the fields of biomedical and behavioral research." 42 U.S.C. §282(h).

- Congress has provided that the NIH director shall "encourage efforts to improve research related to the health of sexual and gender minority populations, including by (1) facilitating increased participation of sexual and gender minority populations in clinical research supported by the National Institutes of Health, and reporting on such participation, as applicable; (2) facilitating the development of valid and reliable methods for research relevant to sexual and gender minority populations; and (3) addressing methodological challenges." *Id.* §283p.

- Congress has directed various NIH institutes and centers to conduct research related to women's health or reproductive health. For example, it has instructed the National Cancer Institute to "expand, intensify, and coordinate the activities of the Institute with respect to research on breast . . . cancers of the reproductive system of women." *Id.* §285a-6. And it has required the National Heart, Lung, and Blood Institute to conduct research into the

13

prevalence of certain heart conditions in women, "including African-American women and other women who are members of racial or ethnic minority groups." *Id.* §285b-7a(c)(1)

- Congress has established a National Institute on Minority Health and Health Disparities to support research and training "with respect to minority health conditions and other populations with health disparities." *Id.* §285t(a).[11]

- Congress has established an Office of Research on Women's Health within NIH to "determine the extent to which women are represented among senior physicians and scientists of the national research institutes and among physicians and scientists conducting research with funds provided by such institutes, and as appropriate, carry out activities to increase the extent of such representation." *Id.* §287d(e).

- Congress has instructed the Secretary of Health and Human Services to award Ruth L. Kirschstein National Research Service Awards "in a manner that will result in the recruitment of women, and individuals from disadvantaged backgrounds (including racial and ethnic minorities), into fields of biomedical or behavioral research and in the provision of research training to women and such individuals." *Id.* §288(a)(4).

### D. Congressional Directives Regarding NIH Priority-Setting

43.     In addition to the above directives, Congress has also established a public process to identify the research priorities of NIH and its institutes and centers. Every six years, the NIH director must "develop and submit to the appropriate committees of Congress and post on the [NIH's website] a coordinated strategy (to be known as the 'National Institutes of Health Strategic Plan') to provide direction to the biomedical research investments made by the National Institutes of Health, to facilitate collaboration across the institutes and centers, to leverage scientific opportunity, and to advance biomedicine." 42 U.S.C. §282(m)(1). Each of NIH's institutes and centers similarly develops and promulgates a strategic plan that publicly articulates its research priorities. *Id.* §282(m)(3).

---

[11] The statutory term "minority health conditions" is defined to mean conditions that are unique to, or more prevalent among, or treated differently in, or understudied with respect to "individuals who are members of" "racial and ethnic minority group[s]"—*i.e.*, "American Indians (including Alaska Natives, Eskimos, and Aleuts); Asian Americans; Native Hawaiians and other Pacific Islanders; Blacks; and Hispanics." 42 U.S.C. §§285t(c)(2)-(3), 300u-6(g)(1).

A0471

44.    NIH has previously followed Congress's direction and publicized its research priorities.  In September 2019, the NIH director began the process of updating the agency's priorities in biomedical and behavioral research areas, research capacity, and research conduct. Between October 2019 and July 2020, NIH gathered feedback from its institutes and centers, their advisory councils, external stakeholders, and the general public.  The final Strategic Plan, published in 2021, stated that, among other things, NIH would prioritize "improving minority health and reducing health disparities; enhancing women's health; addressing public health challenges across the lifespan; promoting collaborative science; and leveraging data science for biomedical discovery."[12]  Similarly, the plan stated that NIH "supports a comprehensive spectrum of immunology and infectious disease research focused on developing improved or novel vaccines, including the rapid development of new vaccines to mitigate emerging infectious disease outbreaks, such as COVID-19, Ebola virus disease (EVD), and influenza (flu)."[13]

### E.    Congressional Appropriations for NIH Extramural Research

45.    Most of NIH's funding comes from annual discretionary appropriations from Congress.[14]  For years, Congress has made appropriations for NIH research with this statutory and regulatory framework in mind and generally has appropriated specific amounts to each of NIH's institutes and centers to carry out the purposes set forth in the authorizing statutory provisions described above.[15]

---

[12] NIH, *NIH-Wide Strategic Plan, Fiscal Years 2021-2025* at 3 (2021), https://bit.ly/NIHSP2125.

[13] *Id.* at 8.

[14] Some of NIH's funding is from mandatory funding sources or available due to specific transfer or budgetary rules, but the "vast majority" comes from annual discretionary appropriations.  *National Institutes of Health Funding: FY1996-FY2025*, Cong. Research Serv. Rep. (June 25, 2024), https://www.congress.gov/crs-product/R43341.

[15] *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, tit. II, 136 Stat. 4459, 4861-65; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. H, tit. II, 136 Stat. 49, 448-52; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. H, tit. II, 134 Stat. 1182, 1573-77; Further Consolidated

A0472

46.     In recent years, Congress has specifically rejected efforts to significantly cut NIH's funding.  For example, in 2017, as part of its fiscal year 2018 budget proposal, the first Trump Administration sought to reduce NIH annualized spending by $5.8 billion, to $25.9 billion.[16]  The proposal's primary method of achieving these cuts was by slashing the "indirect cost rate" for NIH grants, capping it at 10% across the board.  This proposal drew bipartisan criticism.  The Senate Appropriations Committee reported that the proposal would "radically change the nature of the Federal Government's relationship with the research community," would "abandon[]" the Government's "long-established responsibility" for research infrastructure, and would jeopardize "biomedical research nationwide."  S. Rep. No. 115-150, at 109 (2017).  To avoid this possibility, Congress enacted statutory language (which it has readopted in every subsequent appropriations measure) barring NIH or any other agency from restructuring or modifying the existing approach to indirect costs.  *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. H, §226, 132 Stat. 348, 740.  And ultimately, rather than enacting the Administration's proposal of cutting NIH funding to $25.9 billion, Congress's all-in appropriation to NIH for fiscal year 2018 was $37.3 billion—higher than the prior fiscal year's appropriation.[17]

47.     In subsequent budget proposals, the Administration generally sought to increase, not decrease, NIH's funding.  Its Fiscal Year 2020 budget proposal touted the Administration's prioritization of "critical health research" and proposed a $33 billion appropriation to NIH—about

---

Appropriations Act, 2020, Pub. L. No. 116-94, div. A, tit. II, 133 Stat. 2534, 2562-65; Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, div. B, tit. II, 132 Stat. 2981, 3074-77; Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. H, tit. II, 132 Stat. 348, 720-23; Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. H, tit. II, 121 Stat. 135, 524-26; *see also, e.g.*, Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. G, tit. II, 121 Stat. 1844, 2173-77.

[16] *See* Off. of Mgmt. & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018*, at 43 (2017), https://bit.ly/OMBFY18.

[17] NIH, *History of Congressional Appropriations, Fiscal Years 2010-2019*, at 1, https://bit.ly/42p9Lya.

A0473

$6 billion higher than its 2017 proposal.[18]  Similarly, the Fiscal Year 2021 budget reiterated the Administration's commitment to prioritizing "critical health research" and "support[ing] innovation," and proposed providing $38 billion to NIH.[19]  Ultimately, Congress appropriated even more funds to NIH than the Administration requested for fiscal year 2021: about $42.9 billion.[20]

48.   Overall, from Fiscal Years 2017 through 2023, NIH funding increased annually, which is consistent with NIH's stable, and generally increasing, funding for more than 20 years:[21]



Figure 1. NIH Funding, FY1998-FY2025 Request
Program Level Funding in Current and Projected Constant (FY2023) Dollars.

---

[18] Off. of Mgmt. & Budget, *Budget of the U.S. Gov't, Fiscal Year 2020*, at 46, https://bit.ly/OMBFY20.

[19] Off. of Mgmt. & Budget, *A Budget for America's Future, Fiscal Year 2021*, at 54, bit.ly/OMBFY2021.

[20] NIH, *Supplementary Appropriation Data Table for History of Congressional Appropriations, Fiscal Years 2020-2025*, at 1, bit.ly/42dM1M4.

[21] *National Institutes of Health Funding: FY1996-FY2025*, Cong. Research Serv. Rep. (June 25, 2024), https://www.congress.gov/crs-product/R43341.

A0474

49. Congress's appropriations to NIH for Fiscal Year 2024 were no different. Consistent with past appropriations for NIH activities, the Further Consolidated Appropriations Act of 2024 (2024 CAA) appropriates to each of NIH's Institutes and Centers specific amounts "for carrying out section 301 and title IV of the [Public Health Service] Act" with respect to their specific, respective statutory purposes. Pub. L. 118-47, div. D, tit. II, 138 Stat. 460, 656-57. For example, the 2024 CAA appropriates $7,224,159,000 to the National Cancer Institute "for carrying out section 301 and title IV of the [PHSA] with respect to cancer"; $3,982,345,000 to the National Heart, Lung, and Blood Institute to carry out the same statutory purposes "with respect to cardiovascular, lung, and blood diseases, and blood and blood products"; and $2,603,925,000 to the National Institute for Neurological Disorders and Stroke to carry out the same statutory purposes "with respect to neurological disorders and stroke." *Id.*

50. Congress has not enacted a Consolidated Appropriations Act for Fiscal Year 2025, but on March 15, 2025, the President signed the Full-Year Continuing Appropriations and Extensions Act, 2025, commonly known as a "Continuing Resolution" or "CR" (2025 CR). Pub. L. 119-4, 139 Stat. 9. Pursuant to the 2025 CR, Congress appropriated "[s]uch amounts as may be necessary . . . under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024, for projects or activities . . . that are not otherwise specifically provided for, and for which appropriations, funds, or other authority were made available" in the specific appropriations Acts. *Id.*, div. A, §1101(a), 139 Stat. at 11. Congress made limited changes in the 2025 CR with respect to the appropriation to NIH, including rescission of a portion of NIH funding ($221,000,000 of a $1.25 billion appropriation) previously appropriated to the "NIH Innovation Account, CURES Act," which is separate from Congress's discretionary appropriations to NIH's

18

institutes and centers.  *Id.*, div. A, §1905, 139 Stat. at 32.[22]  Otherwise, Congress did not rescind any amounts appropriated to NIH's ICs and maintained the same level of funding as set forth in the 2024 CAA, through September 30, 2025.  *See id.*, div. A, §1101(a)(8), 139 Stat. at 11.

## IV.     The Grant Application and Award Process

51.     NIH generally awards extramural grants through a competitive process.  At any given time, NIH has over a thousand active funding opportunities supporting a broad range of programs.

52.     HHS has promulgated regulations at 45 C.F.R. part 75, governing the award of grants by HHS and its agencies, including NIH.  This includes 45 C.F.R. §52.6(c), which allows HHS to notice a grant award for a "project period," during which HHS intends to support the project "without requiring the project to recompete for funds."

53.     NIH uses three-character "activity codes" to group and classify these funding opportunities, with the first character typically identifying the major funding category or program type.  "For example, activity codes for research and development often start with 'R,' training with 'T,' fellowship with 'F,' and career development with 'K.'[23]  The "R01" code, for example, denotes grants "[t]o support a discrete, specified, circumscribed project to be performed by the named investigator(s) in an area representing his or her specific interest and competencies."

54.     The NIH competitive grantmaking process begins with a notice of funding opportunity (NOFO)—*i.e.*, a public announcement in which NIH declares its intention to award

---

[22] Appropriations to the account created by the Cures Act are, "[i]n effect," "not subject to discretionary spending limits."  *Nat'l Insts. of Health Funding: FY1996-FY2025*, Cong. Research Serv. Rep. (June 25, 2024), https://www. congress.gov/crs-product/R43341.  Funds may be transferred from the Cures Act account to other NIH accounts "only for the purposes specified in the Cures Act."  *Id.*  Congress exempted from any rescission amounts previously designated by Congress as for an "emergency requirement" under the Balanced Budget and Emergency Deficit Control Act of 1985.  2025 CR, div. A, §1101(a)(8), 139 Stat. at 11

[23] *Activity Codes*, NIH (March 28, 2025), https://grants.nih.gov/funding/activity-codes; *see Funding Categories*, NIH (Feb. 3, 2025), https://grants.nih.gov/funding/funding-categories.

A0476

funds and outlines the program goals and objectives and conditions for applying.  *See* NIH Grants

Policy Statement, U.S. Dep't of Health & Hum. Servs. §2.3.5, at I-51 (Apr. 2024) (NIHGPS).

55.     A researcher interested in responding to a NOFO will typically work with the

"sponsored research" department at his or her institution to understand what NIH requires in its

application submission.  At UMass Medical School, for example, the Office of Sponsored

Programs assists faculty and staff in locating sources of funding, reviewing and approving

proposals, and negotiating grants and contracts.

56.     Once a researcher develops a project proposal, that person then submits an

electronic grant application to NIH.  Applications must conform to 45 C.F.R. part 75, and must

include a detailed research plan outlining the study's objectives, methodology, and significance; a

proposed budget and justification; biosketches for key investigators; and any necessary compliance

documentation, such as Institutional Review Board approval for human subject research.

57.     A submitted grant application undergoes two layers of evaluation: an initial layer

of review by a "scientific review group" (also known as a "study section"), followed by a round

of review by an "advisory council."  *See* 42 U.S.C. §§284a, 289a; *see also* NIHGS §2.4, at I-71

("The peer review system used by NIH, often referred to as the 'dual review system,' is based on

two sequential levels of review for each application—initial review by [a study section], and a

second level of review for scientific merit by the IC National Advisory Council/Board.").

According to NIH, this process "is intended to ensure that applications for funding submitted to

NIH are evaluated on the basis of a process that is fair, equitable, timely, and conducted in a manner

that strives to eliminate bias."  NIHGS §2.4, at I-71.

58.     As noted, the first level of application review is carried out by a study section.  The

role of study sections is to assess applications' scientific merit and to determine the overall impact

A0477

that proposed projects will likely have on the relevant field. Governing statutes and regulations require this layer of review—*i.e.*, a favorable study-section recommendation is a prerequisite to a final award of any NIH grant. *See* 42 U.S.C. §§ 284(b)(2)(B), 289a(a); 42 C.F.R. pt. 52h.

59.     These groups consist primarily of non-federal scientists who have expertise in relevant scientific disciplines and current research areas. 42 C.F.R. §52h.4. NIH has hundreds of study sections, organized by specialty. In the field of Kidney, Urology, and Digestive Systems, for example, NIH maintains study sections on (a) Drug and Biologic Disposition and Toxicity; (b) Digestive System Host Defense, Microbial Interactions, and Immune and Inflammatory Diseases; (c) Digestive and Nutrient Physiology and Diseases; (d) Environmental Determinants of Disease (e) Hepatobiliary Pathophysiology; (f) Kidney and Urological Systems Function and Dysfunction; and Pathobiology of Kidney Disease, as well as two "special emphasis panels" on Digestive Sciences Small Business Activities and Renal and Urological Sciences Small Business Activities. Some study sections are housed in NIH's individual institutions and centers, while others are organized centrally in the agency's Center for Scientific Review.

60.     Study sections carry out their work—including review of pending applications—at regularly scheduled meetings. These meetings must be noticed in advance in the Federal Register. *See* 42 C.F.R. §52h.3 ("To the extent applicable, the Federal Advisory Committee Act, as amended . . . shall govern the establishment and operation of peer review groups."); 5 U.S.C. §1009(a)(2) ("[T]imely notice of each meeting [subject to the Federal Advisory Committee Act] shall be published in the Federal Register . . . .").

61.     Study sections review and score each grant application according to established criteria set forth in regulations and the NOFO. In particular, the study section assesses the overall impact that the project could have on the research field involved, taking into account:

A0478

(a) The significance of the goals of the proposed research, from a scientific or technical standpoint;

(b) The adequacy of the approach and methodology proposed to carry out the research;

(c) The innovativeness and originality of the proposed research;

(d) The qualifications and experience of the principal investigator and proposed staff;

(e) The scientific environment and reasonable availability of resources necessary to the research;

(f) The adequacy of plans to include both genders, minorities, children and special populations as appropriate for the scientific goals of the research;

(g) The reasonableness of the proposed budget and duration in relation to the proposed research; and

(h) The adequacy of the proposed protection for humans, animals, and the environment, to the extent they may be adversely affected by the project proposed in the application.

42 C.F.R. §52h.8; *see also* 42 C.F.R. §52a.5 (describing review criteria for NIH research center grants); 42 C.F.R. §52h.11 (describing review criteria for NIH research contracts).

62.   As a result of that review, each grant application receives an "overall impact score" from 10 (the best score, denoting high impact) to 90 (the worst score, denoting low impact). Each application also receives a percentile rank expressing the impact score in relation to other applications in that particular institute. Projects deemed "unfundable" by the study section are not given a score and are removed from further consideration.

63.   Each fiscal year, NIH's institutes and centers publish guidance called "paylines" to help applicants interpret their study-section results. These paylines reflect a sort of cutoff: for each category of grants, the payline shows the impact score (or percentile) above which a project is highly likely to be funded. In Fiscal Year 2025, for example, published guidance from the National Institute of Allergy and Infectious Diseases (NIAID) established a 12th-percentile payline for

A0479

"R01" awards with new or early-stage principal investigators.[24]  In other words, an applicant in that category who received a score from the relevant study section within the 12th percentile could anticipate that NIAID would likely fund his or her project.  Study-section scores that meet or exceed the payline in this way are commonly referred to as "fundable" scores.

64.    In addition to providing scores and percentiles, study sections also provide each applicant with a "summary statement" that contains, among other things, a brief summary of the study section's discussion, bulleted critiques from assigned reviewers, and any administrative comments.  Applicants can use these summary statements to revise applications and address concerns, if necessary.

65.    As noted, the second level of application review is carried out by an advisory council.  Unlike the numerous study sections, each NIH institute or center that funds grants has a single advisory council (*i.e.*, there is one advisory council for NIAID, one for the National Cancer Institute, and so on).  By statute, NIH advisory councils must meet at least three times per fiscal year.  42 U.S.C. §284a(3).  Like study section meetings, advisory council meetings must be noticed in advance in the Federal Register.  *See* 41 C.F.R. §102-3.150 (requiring 15 days' notice).

66.    Whereas a study section's review focuses on scientific merit, an advisory council's review weighs programmatic and institute-wide considerations.  A council considers, among other things, the extent to which an application aligns with the institute or center's priorities, public health needs, and overall funding availability.  The council also reviews the application for other potential barriers, such as ethical issues around human or animal test subjects.

67.    An advisory council makes one of three decisions on each application: an application is recommended for funding, not recommended for funding, or deferred for re-review

---

[24] *NIAID Paylines*, NIAID (Dec. 17, 2024), https://www.niaid.nih.gov/grants-contracts/niaid-paylines.

A0480

by the study section.  A favorable recommendation from the relevant institute's advisory council is a prerequisite to final award of any grant in excess of $50,000.  42 U.S.C. § 284(b)(2); *see also* §284a(a)(3)(A)(ii).

68.     The advisory council makes funding recommendations to the institute or center director, who ultimately makes the funding decision.  In making that decision, the institute or center director shall consider, consistent with the peer-review process: (i) the mission of the national research institute or national center and the scientific priorities identified in the institute or center's strategic plan; (ii) programs or projects funded by other agencies on similar research topics; and (iii) advice by staff and the advisory council or board of such national research institute or national center.  42 U.S.C. §284(b)(3).

69.     If the decision is in favor of funding, NIH issues a legally binding Notice of Award (NOA) to the selected grant recipients stating that funds may be requested.  NIHGMS §5, at IIA-59.

70.     NIH typically does not issue grants as lump-sum awards.  Instead, NIH uses a cost-based accounting system, under which grant recipients are authorized to recover their actual, documented costs for conducting research after the grant is awarded.  Institutions can then use awards—and indeed, rely on those awards—to obtain a line or letter of credit for the procurement of the resources needed for the project.

71.     If NIH approves a project with a multi-year period, the agency typically awards the grant for the first year (the "award year") at the outset, with funding for subsequent years (the "out years") subject to a renewal process.  In these "non-competing" renewals, the application does not undergo a fresh round of peer review—instead, applicants submit progress reports demonstrating that the grantee is making progress and complying with applicable policies and practices.  *See* 42

C.F.R. §52a.6.  So long as grantees demonstrate progress and compliance with applicable policies and practices, non-competing renewals are approved as a matter of course.

72.    NIH's application and award process follows a predictable calendar each year that is posted in advance.  The agency has three standard application cycles per year, with published schedules identifying application due dates, the timing of study section and advisory council review, and the earliest permissible start date for the project.  As reflected on the agency's website,[25] the current triannual schedule is as follows:

## Review and Award Cycles

|  | Cycle I | Cycle II | Cycle III |
|---|---|---|---|
| Application Due Dates | January 25 - May 7 | May 25 - September 7 | September 25 - January 7 |
| Scientific Merit Review | June - July | October - November | February - March |
| Advisory Council Round | August or October * | January | May |
| Earliest Project Start Date | September or December * | April | July |

73.    According to Michelle Bulls, NIH's Chief Grants Management Officer, before 2025, NIH typically only terminated grants either with the consent of the award recipient or where the recipient failed to comply with the terms and conditions of the award and NIH was unable to identify corrective action.  Mutual terminations can occur when the principal researcher associated with a grant can no longer undertake research.  According to Ms. Bulls, since 2012, NIH has terminated less than five grants for non-compliance with the terms and conditions of the original grant award.

---

[25] *Standard Due Dates*, NIH (Aug. 23, 2024), https://grants.nih.gov/grants-process/submit/submission-policies/standard-due-dates.

A0482

## V.    Plaintiffs' Receipt of NIH Grants

74.    Plaintiffs' state universities and colleges, as well as other research institutions, depend heavily on NIH funding to support biomedical and public health research.  At any given time, individual research universities may depend on thousands of NIH grants that support independent research projects across multiple university facilities.

75.    Plaintiff Massachusetts operates the University of Massachusetts (UMass), the Commonwealth's flagship public research institution, which consists of the UMass Amherst, UMass Boston, UMass Dartmouth, UMass Lowell, and the UMass Chan Medical School.  *See generally* Mass. G.L. c. 75, §1.  In Fiscal Year 2024, UMass campuses collectively received $248 million in NIH funding, supporting at least 501 projects.

76.    The University of California (UC) is a corporation established under article IX, §9, of the California Constitution and located within the State of California; it is an exempt state government entity.  The UC system consists of 10 research-intensive campuses, 21 health professional sciences schools, 5 NCI-designated cancer centers, and 6 academic medical centers. The UC system's constituent schools and institutions are widely recognized as among the best in the nation, serving as international leaders in the education of health professionals, the development of new cures and treatments, and the provision of healthcare for all Californians regardless of ability to pay.  The University of California is one of the nation's leading research institutions, with almost 9% of all U.S. academic research being conducted by UC researchers. Biomedical advancements at UC include the first radiation treatment for cancer, research contributing to the first flu vaccine, the discovery of the role of LDL and HDL cholesterol in heart disease, the invention of modern gene editing, and much more.  Every year, UC system researchers submit thousands of NIH grant applications, and the world-leading researchers on UC's faculty serve on numerous NIH study sections and advisory councils to assess grant applications for

A0483

scientific and technical merit. NIH contracts and grant funding support many of the clinical trial studies at UC's six medical centers.

77.     Federal funds are UC's single most important source of support for its research, accounting for more than half of UC's total research awards. In Fiscal Year 2024, UC received a total of over $2 billion in NIH contract and grant funding to support more than 5000 research projects. The estimated value of just the NIH grant proposals submitted by the five UC Health Centers as of December 31, 2024, that have not yet been acted upon is approximately $563 million. Grant proposals awaiting study sections before July 1, 2025, have an annual value of approximately $312 million, while grants awaiting advisory councils and Notices of Awards have an annual value of approximately $251 million. The UC Health Center in San Francisco (UCSF) alone is has 1,650 unique principal investigators with 4,110 active NIH awards.

78.     Plaintiff California also operates the California State Universities (CSU), the largest four-year public university system in the United States. The purpose of the CSU system as established by statute is to provide access to education and the opportunity for educational success for all qualified Californians. Cal. Educ. Code §66010.2. CSU consists of 23 campuses, nearly a dozen off-campus centers, and over 90 auxiliary organizations (several dedicated to sponsored research). During Fiscal Year 2024, the CSU expended nearly $90 million in NIH contract and grant funding to support approximately 250 projects across 18 universities with the total multi-year award funding in the hundreds of millions.

79.     Plaintiff Maryland operates the University System of Maryland (USM), a system of 12 constituent institutions, including leading research institutions at the University of Maryland, Baltimore (UMB), and the University of Maryland, College Park (UMCP). In fiscal year 2024, UMB received $213.9 million in active NIH awards and an additional $34.2 million in NIH pass-

A0484

through funding; UMCP received $68 million in funding awarded directly by the NIH and $9 million in funding awarded on a pass-through basis from the NIH.

80.    Plaintiff Washington operates the University of Washington, the largest recipient of federal research funding of any public university in the country.  In Fiscal Year 2024, University of Washington received over $648 million in NIH funding, supporting over 1,220 projects.

81.    Arizona State University, Northern Arizona University, and the University of Arizona are instrumentalities of the State of Arizona.  In Fiscal Year 2024, those universities together managed approximately 426 NIH awards totaling over $286 million.

82.    Colorado established the University of Colorado Anschutz Medical Campus (CU Anschutz) as the only academic medical research campus in Colorado.  *See generally* Colo. Rev. Stat. §23-21-101, *et. seq.*  In Fiscal Year 2024, CU Anschutz received $360 million in NIH funding, which represented 48% of all sponsored awards for the year.

83.    Plaintiff Delaware's flagship research institution, The University of Delaware, received $66 million in NIH funding, supporting 135 projects in Fiscal Year 2024.

84.    Plaintiff Hawaiʻi operates the University of Hawaiʻi, which houses some 3,000 researchers and enrolls around 30,000 students across 10 campuses.  The University of Hawaiʻi includes the John A. Burns School of Medicine, the University of Hawaiʻi Cancer Center, the Daniel K. Inouye School of Pharmacy, the School of Nursing and Dental Hygiene, the Thompson School of Social Work, and several other schools that conduct fundamental, translational, clinical and community-based participatory research in health sciences and health care.  In Fiscal Year 2024, the University of Hawaiʻi received more than $65 million in direct NIH funding, supporting 75 projects.

A0485

85.     With respect to Plaintiff State of Minnesota, NIH has awarded tens of millions of dollars to the University of Minnesota.  For example, in Fiscal Year 2024 alone, the University of Minnesota received 808 awards directly from NIH which obligated funding to the University of approximately $355.6 million.

86.     Nevada operates the Nevada System of Higher Education, which includes the University of Nevada, Las Vegas, and the University of Nevada, Reno.  In Fiscal Year 2024, the University of Nevada, Las Vegas received $11.9 million and the University of Nevada, Reno received $9.5 million dollars in NIH funding.

87.     With respect to Plaintiff New Jersey, three major State research institutions—Rutgers, the State University of New Jersey (Rutgers), New Jersey Institute of Technology (NJIT), and Kean University (Kean)—have a significant academic and clinical health sciences presence across the State, including numerous research centers and institutes, academic medical centers, and colleges of liberal arts and sciences, schools of environmental and biological sciences, engineering, and other professional schools and graduate programs.  In Fiscal Year 2024, these three institutions and their affiliated campuses collectively received approximately $250 million in NIH funding to support approximately 1,200 projects, including grants that support undergraduate students from under-represented populations pursuing biomedical sciences and engineering degrees and graduate programs.

88.     Plaintiff New Mexico operates the University of New Mexico (UNM), which is the state's flagship research university with research centers spanning the fundamental sciences, technology and engineering research, education, humanities and social sciences, and human health. UNM is the only academic health system in the state; it pursues research on improving human health, including substance use disorders, cardiovascular and metabolic disease, infectious

A0486

diseases and immunity, Alzheimer's disease, kidney disease, cancer, and pediatrics, and more. This research was supported by $107 million from the NIH in Fiscal Year 2024 and, through early February 2025, estimated NIH funding for Fiscal Year 2025 is over $126 million. Plaintiff New Mexico also operates New Mexico State University (NMSU), a university with over sixty research facilities focusing on fundamental sciences, physical sciences, agriculture, the arts, humanities and social sciences, economics, engineering, and human health. This research was supported by over $10 million from the NIH in Fiscal Year 2024 and, through early February 2025, estimated NIH funding for Fiscal Year 2025 is over $30 million.

89.     New York operates the State University of New York (SUNY), which is comprised of 64 colleges and universities, of which four campuses are designated R1 research institutions. In fiscal year 2024, SUNY received $237.5 million from NIH to support 894 projects.

90.     The Oregon Health and Science University (OHSU) is a public corporation of the State of Oregon and is Oregon's only public academic health center. OHSU is not the only public recipient of NIH funding in Oregon, but it receives the largest amount of NIH funding. In fiscal year 2024, OHSU received over $350 million in NIH funding to support 784 projects and over 1,400 researchers. The University of Oregon, Oregon State University, and Portland State University are also public recipients of NIH funding.

91.     The University of Rhode Island (URI) is Rhode Island's flagship public university. *See* 16 R.I. Gen. Laws Ann. §16-32-3. In fiscal year 2024, URI received $22.1 million in NIH funding to support over 90 projects.

92.     Plaintiff Wisconsin operates the Universities of Wisconsin, which includes prominent research institutions at the University of Wisconsin-Madison (UW-Madison) and University of Wisconsin-Milwaukee (UW-Milwaukee). UW-Madison's research enterprise is

A0487

particularly robust, encompassing more than $1.7 billion in annual research expenditures. Approximately one third of sponsored research at UW-Madison is awarded by the NIH.  In fiscal year 2024, UW-Madison received direct funding from NIH to support 588 projects, totaling more than $404 million.  UW-Madison funds 4,942 researchers and staff through direct NIH grants, and its work on NIH-funded projects provides scientific education and research training in medical and health sciences, biology, public health, biochemistry, psychology, and other disciplines.  In fiscal year 2024, UW-Milwaukee also received funding from NIH to support dozens of projects, totaling $7.9 million.

## CHALLENGED AGENCY ACTIONS

93.    This lawsuit arises because defendants are flouting the statutory and regulatory rules governing NIH grantmaking.  As explained below, defendants have adopted a series of directives that blacklist certain topics—*e.g.*, "DEI," "gender," or "vaccine hesitancy"—that the Administration disfavors.  In adopting, implementing, and enforcing those directives, defendants have systematically disrupted the review of pending grant applications, delayed the annual renewal of already-approved multi-year awards, and terminated huge tranches of grants in the middle of the project year.  Those disruptions have caused—and will continue to cause—significant harm to plaintiffs and their institutions.

## I.    The Administration's Adoption of Executive Orders and OMB Directives Identifying Politically Disfavored Topics

94.    The NIH-specific directives that plaintiffs challenge here (*see infra*, paragraphs 102-117) in large part implement a series of executive orders and Administration directives issued on or shortly after Inauguration Day.

95.     On January 20, 2025, President Trump signed Executive Order 14151, entitled "Ending Radical Government DEI Programs and Preferencing" (DEI Order).  The DEI Order aims

A0488

to terminate any federal programs that promote "diversity, equity, and inclusion," "diversity, equity, inclusion, and accessibility," and "environmental justice." The order does not define those terms. The order further directs "[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM" to "terminate, to the maximum extent allowed by law, . . . all . . . 'equity-related' grants or contracts." DEI Order §2(b)(1). The order does not define "equity-related."

96.     The same day, the President signed Executive Order 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Gender Ideology Order). The order denies the existence of transgender, nonbinary, intersex, or other gender-nonconforming people and rejects "gender ideology," which it vaguely defines as "replac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." Gender Ideology Order §§1-2. The order directs all federal agencies to "take all necessary steps, as permitted by law, to" strip federal funds from anyone who promotes "gender ideology," demanding that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Id. §3(e), (g).

97.     The following day, the President signed Executive Order 14173, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (Discrimination Order). The order targeted what it called "race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA),'" but again failed to define those terms. The order requires that "[t]he head of each agency shall include in every contract or grant award . . . [a] term requiring" any federal grant "recipient

to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* §3(b)(iv)(B). It also threatens civil False Claims Act enforcement against any grantee failing to comply with the Discrimination Order's vague and undefined terms. *Id.* §3(b)(iv)(A). Likewise, the Discrimination Order threatens lawsuits against private entities that promote DEI. *Id.* §4(b)(v).

98. On January 27, the acting director of the Office of Management and Budget (OMB) issued OMB Directive M-25-13 (OMB Directive). The OMB Directive targeted a broad swath of federal fund disbursements for a near-immediate freeze. This directive stated that all federal agencies "must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." While this analysis is ongoing, "[i]n the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal" (emphasis in original). The OMB Directive ordered that the temporary pause take effect the following day, on January 28, 2025, at 5:00 PM.

99. On January 28, the U.S. District Court for the District of Columbia ordered an administrative stay of the OMB Directive pending a hearing on a motion for a temporary restraining order. Order of Administrative Stay (ECF No. 13), *Nat'l Council of Nonprofits, et al. v. Trump, et al.*, No. 1:25-cv-239-LLA (D.D.C. filed Jan. 28, 2025). At approximately 1:00 PM Eastern Time on January 29, OMB issued M-25-14, a memorandum purportedly rescinding the OMB Directive in two sentences: "OMB Memorandum M-25-13 is rescinded. If you have

A0490

questions about implementing the President's Executive Orders, please contact your agency General Counsel."

100.     Shortly after OMB purported to rescind the OMB Directive, however, White House Press Secretary Karoline Leavitt stated that the federal funding freeze remained in place, notwithstanding the rescission of the OMB Memorandum.  Leavitt announced on social media: "This is NOT a rescission of the federal funding freeze.  It is simply a rescission of the OMB memo. Why? To end any confusion created by the court's injunction.  The President's EO's on federal funding remain in full force and effect and will be rigorously implemented."

101.     At a press conference that same day, Leavitt stated: "So, what does this pause mean?  It means no more funding for illegal DEI programs. It means no more funding for the Green New Scam that has . . . cost American taxpayers tens of billions of dollars.  It means no more funding for transgenderism and wokeness across our federal bureaucracy and agencies.  No more funding for Green New Deal social engineering policies."

## II.    Defendants' Adoption of NIH-Specific Directives Blacklisting Politically Disfavored Topics

102.     Defendants have subsequently issued directives to and within NIH that carry out and expand upon the foregoing executive orders and policy objectives.  Specifically, defendants formulated, adopted, and executed a series of policies blacklisting entire categories of research that the Administration disfavors for political reasons.  These categories originally focused on "DEI-related" projects, but have evolved to include other disfavored categories, including projects related to gender identity, vaccine hesitancy, COVID-19, and climate change.

103.     On January 21, Acting Secretary of Health and Human Services Dorothy Fink issued a memorandum to all HHS subcomponents entitled "Immediate Pause on Issuing Documents and Public Communications" (Notice Pause Directive).  A copy of the Notice Pause

A0491

Directive is attached as Exhibit 1 to this Amended Complaint and is incorporated herein by reference. The Notice Pause Directive instructed, among other things, that no notices be submitted for publication to the Federal Register unless approved by a presidential appointee.

104. On February 10, 2025, Acting Secretary of Health and Human Services Dorothy Fink issued a "Secretarial Directive on DEI-Related Funding" (Secretarial Directive). A copy of the Secretarial Directive is attached as Exhibit 2 to this Amended Complaint and is incorporated herein by reference.

105. The Secretarial Directive stated, in relevant part:

> The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

The Secretarial Directive went on to state:

> For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. §75.371-372, the Secretary of Health and Human Services hereby DIRECTS as follows:
>
> **Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

The Secretarial Directive did not define the term "related to DEI and similar programs."

106.    On February 12, Dr. Michael Lauer, then NIH's Deputy Director for Extramural Research, issued a memorandum entitled "NIH Review of Agency Priorities Based on the New Administration's Goals" (Lauer Memorandum).  A copy of the Lauer Memorandum is attached as Exhibit 3 to this Amended Complaint and is incorporated herein by reference.  The memorandum stated that "NIH is in the process of reevaluating the agency's priorities based on the goals of the new administration," but that, "given recent court orders" in federal court actions related to funding freezes, NIH institutes and centers were "authorized, along with their respective grant management staff, to proceed with issuing awards for all competing, non-competing continuation, and administrative supplements . . . grants."

107.    On February 13, Dr. Lauer issued a memorandum entitled "Supplemental Guidance to Memo Entitled- NIH Review of Agency Priorities Based on the New Administration's Goals" (Supplemental Lauer Memorandum).  A copy of the Supplemental Lauer Memorandum is attached as Exhibit 4 to this Amended Complaint and is incorporated herein by reference.  The memorandum instructed the ICs' Chief Grants Management Officers that "[i]f the sole purpose of the grant . . . supports DEI activities, then the award must be fully restricted."  It also called for "hard funding restrictions" where the program promotes initiatives that "discriminate" on the basis of race, sex, or other protected characteristics, without defining what constituted such discrimination in a research program.  The Supplemental Lauer Memorandum did not refer to terminations of awards, but rather NIH's funding of programs more generally.  That day, Dr. Lauer resigned from his position with NIH.

108.    On or about March 4, NIH issued a directive entitled "Award Assessments for Alignment with Agency Priorities—March 2025" (Priorities Directive).  A copy of the Priorities Directive—including the several appendices attached to the Priorities Directive— is attached as

Exhibit 5 to this Amended Complaint and is incorporated herein by reference. The Priorities Directive "rescind[ed]" the Supplemental Lauer Memorandum, attached and reaffirmed the Secretarial Directive, and provided further instructions related to "DEI" research.

109. Specifically, the Priorities Directive stated that "NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI)." To enforce that determination, the directive instructed that, "[p]rior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims [to] assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities." The directive further instructed ICs to "completely excise all DEI activities" using a list of predetermined categories, including awards that "ICs must not issue" (Category 1), awards that ICs could issue on certain conditions (Categories 2 and 3), and awards that ICs "may proceed with issuing" (Category 4).

110. The appendices to the Priorities Directive provided NIH staff with specific language "to use when terminating awards identified by HHS or the IC" related to politically disfavored topics. Among other things, NIH staff were instructed to inform grant recipients that "NIH is taking this enforcement action in accordance with 2 C.F.R. §200.340 as implemented in NIH GPS Section 8.5.2." The Priorities Directive's appendices also identified three specific disfavored topics by name: "China," "DEI," and "[t]ransgender issues."

111. The Priorities Directive classified "diversity supplements" as Category 1 awards— *i.e.*, it instructed that "ICs must not issue the award." Diversity Supplements are grants meant to increase diversity in the scientific profession by providing training, mentorship and career development opportunities to individuals from underrepresented populations. For recent notices of funding opportunity, NIH adopted a policy that defined diversity broadly, to include not only

"[i]ndividuals from racial and ethnic groups that have been shown by the [National Science Foundation] to be underrepresented in health-related sciences on a national basis," but also "[i]ndividuals with disabilities," and "[i]ndividuals from disadvantaged backgrounds," including those who have experienced homelessness, who were in foster care, who experienced poverty, or who are from rural areas.[26]

112.     By March 13, the list of scientific research disfavored by the Administration had grown to include yet another topic: vaccine hesitancy.  Specifically, Michelle Bulls, NIH's Chief Grants Management Officer, issued guidance entitled "Award Revision Guidance and List of Terminated Grants via letter on 3/12" (Award Revision Guidance).  A copy of the Award Revision Guidance is attached as Exhibit 6 to this Amended Complaint and is incorporated herein by reference.  The Award Revision Guidance again instructed the individual institutes on how to issue termination letters, and on what bases.  Ms. Bulls instructed that termination letters should include the following language: "It is the policy of NIH not to prioritize [insert termination category language].  Therefore, this project is terminated."  The termination category language that Ms. Bulls provided included terminations for a program's relation to China, DEI, gender, and vaccine hesitancy.  Hundreds of NIH grants were terminated in the ensuing days.[27]

113.     Upon information and belief, on or before March 19, the Office of Extramural Research and the Office of Policy for Extramural Research Administration provided additional guidance on how ICs should process grant terminations and communicate with grant recipients regarding such terminations.  Included in these instructions was the instruction to speak only of "changes in NIH and/or HHS priorities" and an instruction to "not refer to any Executive Orders."

---

[26] *PA-20-222: Research Supplements to Promote Diversity in Health-Related Research*, NIH, https://grants.nih.gov/grants/guide/pa-files/pa-20-222.html.

[27] *HHS Grants Terminated*, HHS, https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.

A0495

114.    On March 25, NIH issued a directive entitled "NIH Grants Management Staff Guidance—Award Assessments for Alignment with Agency Priorities—March 2025" (Revised Priorities Directive).  The Revised Priorities Directive and its appendices are attached as Exhibit 7 to this Amended Complaint and are incorporated herein by reference.  The Revised Priorities Directive continued to blacklist research related to DEI, transgender issues, and vaccine hesitancy, but now included yet another topic—COVID-19.  As to COVID, the guidance stated that: "The end of the pandemic provides cause to terminate COVID-related grant funds.  These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic.  Now that the pandemic is over, the grant funds are no longer necessary."

115.    Upon information and belief, sometime during mid-March, defendants issued a further directive adding research related to the health effects of climate change as a blacklisted topic (Climate Change Directive).[28]

116.    Upon information and belief, on or after January 20, 2025, defendants have issued other directives, including nonpublic and undisclosed directives, that curtail NIH's support for previously advertised funding opportunities and previously awarded grants relating to the blacklisted topics described above.

117.    For ease of reference, this Amended Complaint refers to the Secretarial Directive, the Lauer Memorandum, the Supplemental Lauer Memorandum, the Priorities Directive, the Award Revision Guidance, the Revised Priorities Directive, and the Climate Change Directive—as well as other nonpublic and undisclosed directives that curtail NIH's support for previously

---

[28] Waldman A., *NIH Ends Future Funding to Study the Health Effects of Climate Change*, ProPublica (March 24, 2025), https://www.propublica.org/article/nih-funding-climate-change-public-health.

A0496

advertised funding opportunities and previously awarded grants relating to those blacklisted topics—collectively as the "Challenged Directives."

III. **Defendants' Implementation of the Challenged Directives Through Elimination of Funding Opportunities and Disruption of Pending Applications**

A. **Delay and Withholding of Advisory Council and Study Section Meetings**

118. Defendants have also been systematically delaying and advisory council and study section meetings in a manner that contravenes prior regulatory notices and NIH's own guidance. As explained above, NIH's own guidance states that "Cycle II" grant applications, which underwent study-section review last fall, were originally scheduled to undergo advisory-council review in January of this year. *See supra*, paragraph 72. And "Cycle III" applications, which researchers submitted to NIH last fall, were scheduled to undergo study-section review in February and March of this year. *See id.* Almost none of that has happened.

119. Although meetings for the advisory councils of 21 different institutes and centers had been scheduled for January and February 2025 via publications in the Federal Register, all but one were abruptly canceled after Inauguration Day. (The remaining meeting, for the advisory council of the National Institute of Child Health and Human Development, had already taken place on January 13, 2025, *i.e.*, seven days before the change in Administration.)

120. In total, over 250 grant-related meetings that had been scheduled for January and February 2025 via publications in the Federal Register were likewise cancelled after Inauguration Day—often with just a day's notice (and no notice of cancellation in the Federal Register). In contrast, in prior years cancellations and amendments to noticed meetings were rare. According to an analysis of Federal Register notices, only an average of four cancellation notices were issued each year between Fiscal Years 2010 and 2024, and even amendments—which typically provide a new date immediately—were uncommon, with an average of around 100 each year.

A0497

121.    Between January 22 and March 3, defendants also suspended the scheduling of future advisory-council or study-section meetings; no notices for future meetings appeared in the Federal Register during that time.  As discussed above, on January 21, Acting Secretary Fink issued the Notice Pause Directive, instructing among other things, that no notices be submitted for publication to the Federal Register unless approved by a presidential appointee.

122.    On February 7, 2025, upon information and belief, an NIH official emailed a researcher that submissions to the Federal Register "are now on hold indefinitely."  Throughout February (and continuing into March), multiple webpages from the NIH institutes stated: "At the present time, all Federal advisory committee meetings have been canceled until further notice. Additional information will be forthcoming as it becomes available.  We apologize for any inconvenience."

123.    Defendants resumed publishing notices of upcoming study-section and advisory-council meetings in the Federal Register in early March, but the number of meetings scheduled for this fiscal year remains at a level far below the number of such meetings in every fiscal year since 2010, and even further below the number that would be required to make up for the meetings not held in January and February.

124.    Based on an analysis of notices posted in the Federal Register, defendants have held around 930 meetings to review grant applications in Fiscal Year 2025 to date.  That represents a sharp and unprecedented drop from prior years.  From Fiscal Years 2010 through 2024, NIH held between approximately 1,410 and 1,700 meetings over the same period, with an average of about 1,540.  The Fiscal Year 2025 figure thus reflects a decline of nearly 40% relative to that historical baseline.

A0498

125.     Despite the shortfalls and cancellations, defendants are not picking up the pace. As shown in the following figure, defendants remain well below the historical average meetings held, and the pace of new meetings scheduled from April to May is similar to that of previous years, when it would need to be substantially higher to make up the pace and spend the money appropriated by Congress:



Note: Values are plotted on the day of the scheduled meeting.

126.     According to NIH's contemplated schedule, some Cycle II projects were to start in April 2025.  For example, multiple UMass grant applications from Cycle II—with anticipated project start dates on or around April 1, 2025—received fundable scores from their study sections and yet remain in limbo because the relevant January advisory-council meeting was canceled.

127.     Upon information and belief, the continued delays described in the preceding paragraphs directly result from the implementation of the Challenged Directives.

A0499

## B.     Delay and Withholding of Final Disposition of Awards

128.    In addition to their frustration of the activity of study sections and advisory councils, defendants have also been systematically delaying and withholding final decisions on applications that have already received favorable scores and recommendations from the relevant study section and/or advisory council.

129.    Upon information and belief, defendants maintained a total freeze on the issuance of new notices of award, including for non-competing renewals, from January 28, 2025, to February 28, 2025.

130.    Defendants appear to no longer maintain a total freeze on the issuance of all new NOAs.  However, upon information and belief, defendants are still delaying final decisions on applications in order to implement the Challenged Directives by conducting a review of applications for their relation to subjects and topics disfavored by the Administration.  This review process has resulted in a delay on rendering final dispositions and award decisions on pending applications.

131.    Upon information and belief, NIH's layoffs of the grant management, programmatic, and scientific staff that advance the grant application and peer review process have exacerbated, and will further exacerbate, these funding delays.  NIHGPS §2.1.1, at I-44.  The current Administration fired approximately 1,200 probationary workers at NIH, including those scientific, programmatic, and grant management staff members who worked directly on, and were

A0500

in charge of, grant approvals, renewals, and disbursements. HHS has started to lay off an additional 1,200 NIH employees.[29] A third round of layoffs is expected by September 30, 2025.[30]

132. In addition, upon information and belief, the recent layoffs included the directors of individual NIH institutes and centers who are responsible for signing off on final grant funding decisions. 42 U.S.C. §284(b)(3). On April 1, 2025, the directors, including acting directors, of the National Institute of Allergy and Infectious Diseases (NIAID), the Eunice Kennedy Shriver National Institute of Child Health and Human Development (NICHD), the National Institute on Minority Health and Health Disparities (NIMHD), the National Institute of Nursing Research (NINR), and National Human Genome Research Institute (NHGRI) either were placed on administrative leave or offered reassignment to the Indian Health Service in distant States. These institutes' directors were responsible for at least $9 billion in annual Congressional appropriations.[31] These layoffs appear targeted at institutes and centers either established by Congress for purposes that conflict with policies disfavored by the Administration, or which have conducted research on topics disfavored by the Administration.

133. As described in greater detail below (*see infra*, paragraphs 160-207), plaintiffs are awaiting a decision on hundreds of applications currently pending before the agency—including many applications that received favorable reviews from the relevant study section and/or advisory council. For ease of reference, this Amended Complaint refers to the pending applications just described as the "Delayed Applications."

---

[29] Whyte L.E. *et al.*, *RFK Jr. Plans 10,000 Job Cuts in Major Restructuring of Health Department*, Wall Street J. (Mar. 27, 2025), https://www.wsj.com/politics/policy/rfk-jr-plans-10-000-job-cuts-in-major-restructuring-of-health-department-bdec28b0.

[30] Molteni M. *et al.*, *Five NIH Institute Directors and Numerous Lab Heads Ousted in Unprecedented Shake-up*, STAT (Apr. 2, 2025), https://www.statnews.com/2025/04/01/nih-rif-1200-layoffs-raise-concerns-health-medicine-biomedical-research.

[31] Kozlov M., *One of the Darkest Days': NIH Purges Agency Leadership amid Mass Layoffs*, Nature (Apr. 1, 2025), https://www.nature.com/articles/d41586-025-01016-z.

A0501

134.    Upon information and belief, the continued delays described in the preceding paragraphs directly result from the implementation of the Challenged Directives.

### C.    Delay and Withholding of Renewal of Awards

135.    Upon information and belief, the Challenged Directives have likewise governed NIH's review of applications for grant renewals by current grant recipients.  Upon information and belief, defendants have required NIH staff to review grant renewal applications to determine whether they relate to subjects that are disfavored by the Administration, which itself has resulted in substantial delays in rendering decisions on applications for grant renewals.

136.    As of April 1, plaintiffs are awaiting decision on non-competing renewals that otherwise meet the criteria for renewal but that defendants have declined to process in the ordinary course.  For ease of reference, this Amended Complaint refers to the non-competing renewals just described as the "Delayed Renewals."

137.    For example, as of April 1, University of Washington is experiencing delayed renewal of 73 grants totaling over $61 million.  Some of these renewals have been delayed for months, with the resulting funding disruptions undermining the University's budgeting, forcing pauses in research, and requiring the University to resort to furloughs, staff reductions, and planned layoffs.

138.    Upon information and belief, the continued delays described in the preceding paragraphs directly result from the implementation of the Challenged Directives.

### D.    Defendants' Removal of Notices of Funding Opportunities

139.    Upon information and belief, no later than January 31, NIH's institutes and centers were informed that specific Notices of Funding Opportunity were being withdrawn and cancelled.

A0502

Similarly, upon information and belief, NIH only published three NOFOs between January 20 and March 26.[32]

140.    The withdrawal of NOFOs continued on the grounds, *inter alia*, that the research opportunities involved DEI or gender.

141.    The withdrawal of NOFOs occurred in the form of "unpublishing" the NOFOs, referred at times to the "disappearing" of NOFOs.

142.    At least some of these NOFOs were withdrawn after grant applications had been submitted in response to them.

143.    Upon information and belief, the removal of NOFOs described in the preceding paragraphs directly result from the implementation of the Challenged Directives.

## IV.    Defendants' Implementation of the Challenged Directives Through Termination of Already-Issued Grants

144.    Defendants' implementation and enforcement of the Challenged Directives has also directly resulted in the termination of more than one hundred grants to plaintiffs' instrumentalities on the grounds that they relate to topics now blacklisted by the Challenged Directives.  For ease of, this Amended Complaint refers to the terminated grants just described as the "Terminated Grants."

145.    On or about February 10, NIH provided individual institutes with a list of grants that were to be terminated.  Upon information and belief, the decision to terminate these grants was based on Acting Secretary Fink's Secretarial Directive and on direction from the Executive Office of the President.

---

[32] Reardon S., *Trump Officials Will Screen NIH Funding Opportunities*, Science (Mar. 26, 2025) (stating that "NIH only published three NOFOs between 20 January and 26 March, compared with 163 in 2023 and 147 in 2024 between the same dates"), https://www.science.org/content/article/trump-officials-will-screen-nih-funding-opportunities.

A0503

146.     Upon information and belief, the lists of to-be-terminated grants provided by NIH to its individual institutes reflect list of grants to be terminated and template letters provided by HHS and personnel affiliated with the so-called Department of Government Efficiency (DOGE) to NIH.  Upon information and belief, shortly after the change in Administration, personnel associated with the DOGE initiative obtained access to NIH's internal grants databases.

147.     On February 28, a post on DOGE's official X account announced the cancellation of numerous NIH grants related to China, racial health disparities, and gender-affirming care:



148.     The decision to terminate Diversity Supplements not only undermines Congress's and NIH's previously stated goal to promote diversity among scientists, but it also actively harms diverse candidates.  This is because, until recently, NIH has been issuing NOFOs for workforce development grants in pairs, with both a "standard" NOFO and a "diversity" NOFO, allowing individuals to self-identify as diverse.  But now that Diversity Supplements are being cancelled and not funded, people who identified as diverse in their applications are not even eligible for funding, while people who did not identify as diverse remain eligible.

47

149.    Upon information and belief, on or about March 4, HHS identified additional NIH grants that were to be terminated based on the Challenged Directives, which NIH's Office of Extramural Research then communicated to the individual institutes.

150.    Upon information and belief, on or about March 12, 2025, NIH provided staff at the individual institutes with a list of grants to be terminated, which were identified based on the factors identified in the Priorities Directive.  NIH has used the Priorities Directive staff guidance to implement and assess the grant research portfolios of each of the ICs.

151.    As already discussed, in the March 13 Award Revision Guidance, Michelle Bulls instructed the ICs' Chief Grants Management Officers on how to issue termination letters.  Bulls instructed that termination letters should include the following language: "It is the policy of NIH not to prioritize [insert termination category language].  Therefore, this project is terminated."  The instructions included the language that termination letters should include for the disfavored category on which the termination was based, including the following:

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

- Gender:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

- Vaccine Hesitancy: It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment.  NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in

A0505

ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

152.    Upon information and belief, on or about March 14, Bulls met with the ICs' Chief Grants Management Officers and reported approximately 945 terminated grants. Bulls forwarded the grant terminations to ICs in batches for issuance of termination letters.

153.    Upon information and belief, NIH has terminated more than 100 grants at plaintiffs' public institutions since January 20, 2025, in accordance with the Challenged Directives.

154.    Plaintiffs' universities have received grant termination letters that include the boilerplate termination language provided by Bulls to the ICs.

155.    These grants support a wide range of scientific inquiry and were awarded after a thorough review process for scientific merit, consistency with agency priorities, and other qualities.

156.    Upon information and belief, actors outside NIH have identified the grants that should be terminated based on the Challenged Directives and their broad implementation, and the grants have been terminated without the input—and sometimes without the knowledge—of the NIH program officers who ordinarily manage the grants. In other words, NIH terminated these grants without consulting with the NIH career scientists with scientific knowledge about the research being funded.

157.    Upon information and belief, to date, defendants have yet to identify any basis for its alleged priorities, as reflected in the Challenged Directives, other than the Executive Orders and the Administration's political views on certain subjects.

158.    Upon information and belief, defendants have not made or finalized any change in NIH agency or IC priorities as identified in either the NIH's strategic plan or NIHGPS.

A0506

## IMPACT OF THE CHALLENGED AGENCY ACTIONS

159. Institutions in each of the plaintiff states have experienced delays and other funding disruptions as a result of defendants' adoption, implementation, and enforcement of the Challenged Directives and the other acts and omissions described above.

## I.     Harms to Massachusetts

160. UMass has directly experienced harm as a result of defendants' treatment of the Delayed Applications.

161. As of March 31, 2025, UMass has 353 applications for NIH funding that are overdue for review based on NIH's published schedule of cycles. Of these, (a) 272 are awaiting study section review; (b) 43 have received fundable scores from study section review and are awaiting advisory council review; (c) 14 have received possibly fundable scores from study section review and are awaiting advisory council review; and (d) 18 have received fundable scores and been reviewed an advisory council but have not been notified of a final determination on funding. In total, $848,332,898 in sought funding is awaiting approval across all active applications, $133,234,318 of which is for projects that have already been scored as fundable.

162. A project entitled, "Elucidation of the mechanisms by which Ms4a genes regulate neurodegeneration in Alzheimer's Disease and related disorders," grant number R01AG089801, is representative of the delays UMass has experienced. One major obstacle of treating Alzheimer's disease is the paucity of genetic targets against which to direct therapeutic efforts; this project aims to investigate a recent and promising gene which could inform the development of new treatments for this and other neurodegenerative diseases. UMass researchers submitted the application for this grant on July 9, 2024, with an anticipated start date of April 1, 2025. Study section review placed it in the 13th percentile of all contemporaneous projects submitted to the IC, which has a payline of 17th percentile—thus, this was a fundable study with an overwhelming likelihood of

receiving funding.  This project was scheduled for advisory council review on January 28, 2025; that session was canceled, then rescheduled for April 22, 2025, three weeks after the project was intended to begin.  In preparation for the start date of this grant, UMass Chan Medical School hired two postdoctoral fellows, which is standard practice and timing for this manner of research. Additionally, a significant number of genetically modified mouse cell lines had to be bred and aged so that neurogenerative phenotypes would appear.  Due to the delay in evaluating this grant, UMass must continue funding these preparatory steps well into the life of the project with the uncertainty that funding will arrive, or else scrap this promising research project entirely, foreclosing research into a promising area of new treatment for sufferers of Alzheimer's disease and related diseases.

163.    Delays in funding decisions and evaluation of applications have already caused numerous and critical harms to UMass.  Due to uncertainty of the funding of multiple projects ranked as fundable, UMass schools have made dramatic cuts to the size of programs that rely significantly on NIH support.  UMass Chan Medical School has rescinded acceptances to the vast majority of students admitted to its PhD program in Biomedical Sciences, reducing that program from 70 to approximately 10.  UMass Amherst has reduced Fall 2025 graduate admissions to its doctoral programs from 1099 admittees to 805, rescinding financial awards to 100 accepted applicants.  UMass Medical School has arranged for emergency funding to continue paying stipends of current graduate students and post-baccalaureate scholars through June 30, 2025, but does not have emergency funds sufficient to replace those lost in terminated grants or to pay further costs associated with delayed grant awards.  UMass Amherst will use available emergency funds to support students, staff, research faculty, and preservation of research materials for in-progress experiments until August 31, 2025, but projects that the funds will be exhausted by that date.  This

A0508

relief is intended to soften the impacts to staff and research efforts but is incapable of replacing lost federal funding. These funds are being diverted from other important needs, such as deferred maintenance, strategic investments, and repayment of bond funds.

164. Additionally, numerous irreparable harms impend. Future recruitment of doctoral students, postdoctoral researchers, faculty, and staff will be negatively impacted by diminished funding. And without incoming streams of grant funds and the attached facilities costs used to oversee the research facilities which make these projects possible and economically viable, UMass will risk a reduced ability to meet existing obligations to repay bond funds used to construct those facilities. Any reduction in the university's bond rating will in turn increase the expense of augmenting research facilities in the future.

165. As a result of defendants' implementation and enforcement of the Challenged Directives, UMass has had at least five active grants and at least three additional passthrough awards terminated, without warning or cause, since March 21, 2025. UMass has also received "program cancellation notifications" related to three grants. Terminated grants include a study on the effects of the quality of behavioral health care on children, "Effect of Medicaid accountable care organizations on behavioral health care quality and outcomes for children," award number 3R01MH134176-02S1, funded for $99,974; and three studies aimed at understanding and reducing the spread of HIV amongst different vulnerable populations: "Optimizing an mHealth intervention to improve uptake and adherence of the HIV pre-exposure prophylaxis (PrEP) in vulnerable adolescents and emerging adults," award number 5R33HD107988-04, with an award of $278,952; "Adapting mHealth interventions to improve self-management of HIV and substance use among emerging adults in Zambia," award number 5R34MH124081-02, with an award of $671,459; and "Applying deep learning for predicting retention in PrEP care and effective PrEP use among key

A0509

populations at risk for HIV in Thailand," award number 5R03MH130275-02, with an award of $76,214. In the two other terminated grants—"Faithful response II: COVID-19 rapid test-to-treat with African American churches," award number U01MD018310, with an award of approximately $126,000; and "Training the long-term services and supports dementia care workforce in provision of care to sexual and gender minority residents," award number 3R01AG075734-02S1, with an award of approximately $65,000—UMass was the subawardee.

166.    UMass has also had ten applications for grants summarily denied without any form of scientific review. These include grants submitted in response to subsequently withdrawn NOFOs, including PAR-23-271, PAR-21-358, and PAR-24-077.

## II.    Harms to California

167.    California has experienced direct and irreparable harm as a result of the Challenged Directives. Disruptions in the conduct of biomedical research and training in California directly impact the employment and economic well-being of the biotechnology and pharmaceutical industries headquartered in California. NIH grant terminations and funding delays have deterred prospective students and faculty who would have otherwise worked at universities and companies in California. Also, California has a direct interest in the health and safety of its residents, the prevention of both chronic and communicable diseases in the State, and in the State's economic wellbeing. The termination of NIH funding into research interventions to prevent or treat the spread of HIV/AIDS, sexually transmitted illnesses, COVID-19, and other virus families of pandemic concern—including diseases of emerging concern such as Dengue, Chikungunya, and Zika—and shingles, increases the risk of and incidence of these diseases in California. The terminations resulting from the enforcement of the Challenged Directives have specifically targeted some of the most vulnerable Californians, including women experiencing domestic violence, children at risk of suicide, and minorities at a higher risk of chronic or infectious diseases.

A0510

168.    Since February 20, 2025, as a result of the Challenged Directives, UC has had at least 52 NIH grants terminated, amounting to over $37 million.  The impact on UC Health Centers like UCSF that conduct clinical trials, its researchers, and the larger research community have been substantial.  When UCSF receives a research grant from the NIH, the funds must be used to support the specific research project identified in the grant consistent with the terms of the notice of award. The grant funds are used to support all aspects of the grant, including personnel costs, drug and medication costs, technology, and equipment.  When a grant is terminated, there are no longer any funds available to pay the salaries of the research staff or to cover significant expenses.  When research staff are laid off, the institution loses the knowledge and experience those research staff members possess and that was attained through the research project.  Once canceled, most research projects cannot immediately resume.  Many of these projects entail longitudinal studies.  When scientific studies stop in full swing, their partial results often lose validity.

169.    Among these terminations apparently for "gender identity" and "vaccine hesitancy" are studies key for understanding the health of all Americans.  They included a grant for a UC Davis research project investigating the biological risk factors for dementia among target populations with early signs of cognitive dysfunction, including white, Hispanic, and black participants that had already enrolled over 1,700 participants, and a grant to UCSF Professor Nisha Acharya who studied the effectiveness and potential adverse effects of a vaccine for shingles, a disease that one in three Americans are likely to develop in their lifetimes that cancelled $1,248,374 in funding.  A third study involved the study of doxycycline, a common antibiotic used to treat sexually transmitted diseases and serious infections; defendants cancelled $3,243,539 in funding.  The doxycycline study assesses the metabolization of the drug in men and women, supporting insights into whether microbial resistance will undercut the utility of the drug.  While

A0511

the study, consistent with prior NIH policy, allows transgender individuals to participate, the focus of the study was not on gender identity. The harms from these terminations underscore the damage that flow from the abrupt nature of defendants' terminations. Safety monitoring during and after doxycycline dosing is critical to protecting the safety of participants already enrolled in the study. Doxycycline may cause liver injury and allergic reactions days to weeks after administration of the drug. As a result of these terminations, UCSF is preparing to lay off the staff members responsible for clinical monitoring, full-time postdoctoral researchers responsible for analyzing research data, and is unable to pay salary owed to senior scientists and principal researcher for research. Thus, these categorical terminations have already caused numerous and critical harms to the UC.

170.    The delays in funding decisions and evaluation of applications have further harmed the UC system. First, the UC system has instituted a system-wide hiring freeze on new faculty and staff. Top-ranked departments across UC campuses in chemistry, biology, public health, and more may reduce their graduate student classes. UC departments have had to consider rescinding offers of funding to some students admitted to doctoral programs. The expected grant funds are also necessary to the research facilities that make these projects possible and economically viable.

171.    Second, the delays in funding and terminations harm the UC's educational and research mission. Doctoral students, postdoctoral researchers, faculty, and staff from around the world collaborate with or come to California to join the UC research enterprise. Future recruitment of these young scientists and researchers will be negatively impacted by diminished funding and arbitrary terminations aimed at international collaboration and research projects. Further, terminations have specifically impacted the communities that come to the UC system for clinical trials and other community health interventions. Midstream terminations of long-term projects

55

A0512

meant to reduce health disparities in projects like maternal mortality, the spread of HIV/AIDS, and services to other underserved communities directly undermines the trust necessary to convince individuals to participate in UC research projects.

172.    Since February 20, 2025, the CSU has received over 17 termination notices, including 5 where it serves as the primary awardee.  They collectively amount to a loss of over $20.2 million in budgeted funding to the CSU, but CSU estimates the number may be much higher as grants continue to be cancelled.  One of its universities, San Diego State University (SDSU) alone currently has 23 non-competing renewals pending action by the grants office to authorize the next segment of funding, 34 new proposals and competing renewals totaling approximate $16 million awaiting NIH study section review, and 10 new proposals and competing renewals totaling approximately $3.2 million that received fundable scores awaiting NIH advisory council and Notice of Award.

173.    Unless funding of each NIH grant is restored to each of the affected CSU university campuses, neither the California State University nor any of its auxiliary organizations will have the financial resources to keep the research programs running.  Neither does the CSU's operating budget have any available funds to cover these programs, should additional federal funding be terminated.  The CSU's operating budget has two main funding sources: the state General Fund (as appropriated by the Legislature annually) and student tuition and fees to cover the educational budget.  Due to ongoing gaps in annual funding, the CSU system has in past years already had to reduce student enrollment and suspend degree programs.  However, because the statutory purpose of CSU to provide education to all qualified Californians, CSU does not have the discretionary option not to spend its funds as required to fulfill its educational mission.  There is hence no

A0513

additional funding available to cover another $20 million in lost NIH grant program funding which, up to this point, has been reliably predictable as a funding source over multiple years.

174.    NIH terminations are particularly egregious when budget planning must be done years in advance.  CSU's education budget includes many items that are based on long-term commitments and planning efforts, including phased campus development under multi-year master plans, deferred maintenance schedules, and bond financing repayments.  These funds are already committed are not available to replace lost funds from the NIH programs.  NIH grant funding is also sought and secured well in advance of its use, necessitating personnel and equipment purchases based on those commitments.

175.    Over the last fifteen years, CSU campuses have made concerted investments in student training, faculty hiring, and institutional support of medical and public health research. Delays in NIH funding decisions and evaluation of applications and terminations now endanger all of those efforts.  SDSU, for example, has instituted a hiring freeze on new faculty and staff, and will now defer long-term research projects.  Terminations over grants studying health disparities and sexual and minority health have directly impacted the salaries of SDSU staff, faculty, and students.  Without NIH funding, some students may need to discontinue their studies and in the case of international students, leave the country.

176.    The damage from grant terminations to CSU campuses' relationship with the surrounding community and patients is similarly irreparable.  For example, federally funded studies establish that sexual and gender minority youth are at a higher risk of suicide and suicide ideation.[33]  Yet one of the grants terminated funded suicide prevention services to sexual and

---

[33] Luk J.W. *et al.*, *Sexual Minority Status and Age of Onset of Adolescent Suicide Ideation and Behavior*, 148 Pediatrics, no. 4 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC9446478.

A0514

gender minority youth, and was terminated in the middle of their multi-year period without any opportunity to bridge individuals at high-risk of suicide to new services providers.

177.    CSU campuses to date have received no funding or direction from NIH concerning the participants enrolled in terminated trials even where the potential for increased suicide attempts and subsequent death is high because every single participant in a study is at high risk for suicide. This is particularly damaging to CSU's relationship with the community health providers that often support enrollment in intervention studies.

178.    The termination of the grants often means that researchers cannot fully evaluate whether an intervention is statistically effective—essentially wasting the valuable resources already expended and delaying scientific progress, stifling innovation, and impeding the development of new medical treatments, technologies, and public health initiatives.

179.    Grant terminations, especially without warning, are also directly affecting students at the CSU.  Graduate students, who are at the core of research laboratories, rely on NIH grants not only for resources to support research, but also for their own stipends, tuition support, and training programs.  Sudden cuts have immediate and consequential impacts to these students, who often live paycheck to paycheck, putting their housing and basic needs at risk.

180.    NIH grants also support undergraduate students at CSU.  For example, the CSU U-RISE program is funded through a grant from the National Institute of General Medical Sciences and is meant to broaden perspectives in future scientific and biomedical research by identifying students' interest in pursuing research as a career and by providing training opportunities to be competitive for entering graduate programs.  Students accepted into the U-RISE program receive trainee stipends to defray living expenses during research training experiences, and also support student trainee travel expenses to attend scientific meetings with their mentors and help defray

A0515

university personnel expenses and supplies. At least 9 CSU universities received a notice from NIH stating that the university must "cease project activities as of the current budget period end date of 3/31/2025," and as a result these 9 CSU universities must immediately terminate stipends for students in the middle of the semester, causing participating students direct and significant harm, as their financial aid packages account for U-RISE stipends.

181. The impact from the termination of grants funding training programs like U-RISE is also profound. It inflicts emotional and academic distress upon students, damaging the pipeline of future researchers. The CSU, with limited resources, bears a disproportionate burden, exacerbating financial strain and competitive disadvantages.

182. At this point, delays in the review of NIH grant applications have also prevented the researchers from planning for the implementation of the grants and stalled important research programs from moving forward at multiple CSU campuses.

183. A five-year grant designed for universities without significant NIH funding that serve historically underrepresented student populations in communities with significant populations with unmet health needs in Fresno, California, has been delayed multiple times in its review and currently has no advisory-council review date. A grant of this size requires many people working collaboratively. The grant application has 12 staff associated with it. Faculty working on this grant will receive time released from teaching ranging from 25 percent to 50 percent but cannot plan for this while the grant remains under review with changing implementation dates.

184. Another five-year grant intended to study how cells differentiate themselves for specific uses, which would advance the understanding of certain genetically linked illnesses, has similarly been delayed. The proposal was written and submitted with review guidelines and

A0516

criteria that has since been changed after the grant has been submitted. Delays in review have similarly delayed graduate student hiring associated with the grant.

## III. Harms to Maryland

185. Delays in the grant review process and terminations of existing grants have disrupted valuable research at Maryland's research universities.

186. UMB has nearly 500 proposals totaling $1.1 billion in the NIH review pipeline. This includes 380 proposals totaling $1.04 billion awaiting study section review, 32 proposals totaling $21.4 million that received fundable scores and are awaiting advisory council review, 12 proposals totaling $37.5 million that received fundable scores and have been reviewed by NIH advisory councils, and 44 proposals totaling $33.2 million that received possibly fundable scores and are awaiting advisory council review. UMCP has approximately 200 proposals pending with NIH, totaling about $354 million.

187. The delays in the review process have harmed the universities in myriad ways, disrupting ongoing research, interfering with planning and budgeting, forcing the universities to divert resources from other needs, and restricting their ability to accept new graduate students and recruit and retain quality research trainees. The delays also directly harm patients and the public. Among the UMB studies that are stalled in the review process despite having already received fundable scores and undergone advisory council review are a clinical trial involving assisted living residents with Alzheimer's disease and related dementias and another study that seeks to assist selection of antidiabetic drugs for individual patients. One of UMCP's stalled submissions is the Bucharest Early Intervention Project, a landmark child development study that has followed a group of individuals, some of whom were raised in institutions, for more than 20 years. The study was reviewed by a study section in October 2024 and received a score of 12th percentile, but advisory council review has since been delayed three times.

60

188.     Arbitrary grant terminations have also devastated research at UMB and UMCP. UMB has received termination notices for 14 NIH awards representing about $33 million in lost research funding.  One terminated grant funded a study at UMB involving more than 1,000 human subjects who underwent diagnostic tests as part of the funded study.  The human subjects consented to the study based on the understanding that they would be provided with test results that could be important to their health.  The abrupt termination of the grant takes away federal funding for providing subjects with those test results.  Another affected UMB project examined differences in brain and hormonal mechanisms between males and females in relation to pain conditions.  The project earned the highest score in its study section.  UMCP has received notice of termination of nine grants, representing about $1 million in lost research funding.  Examples of the affected studies include a study examining alcohol use among sexual orientation and gender identity minority youth and another study assessing the needs of persons who suffer biological disorders in sex development.

**IV.    Harms to Washington**

189.     The University of Washington has experienced significant harms as a result of defendants' implementation of the Challenged Directives.

190.     As of April 1, the University of Washington has more than 500 proposals awaiting NIH study section review.  It has 54 proposals for $138 million in total funding requested that received fundable scores, awaiting NIH advisory council and Notice of Award.  And it has 76 proposals for $260 million in total funding requested with fundable scores that for which the NIH advisory council has met or voted electronically to approve a grant for funding, but the NOA has not yet been issued.

191.     Additionally, the University of Washington has 73 overdue non-competing renewals totaling over $61 million that have yet to receive NOAs.  Delays in this funding has

A0518

already had potentially irreversible effects on the University of Washington. To take just one example, the University of Washington's Institute of Translational Health Sciences (ITHS) has been awaiting an overdue non-competing renewal on a $10.5 million annual grant for over a month.

192.     ITHS is a partnership between the University of Washington, Fred Hutchinson Cancer Center, Seattle Children's, and regional institutions to promote the translation of scientific discovery to clinical practice. One example of the innovative work performed at ITHS is the Gene & Cell Therapy Lab's (GCTL) accelerated development of a therapy to treat advanced ovarian cancer, called UltraCAR-T Cell therapy. Scientists in the GCTL worked with a biopharmaceutical company to transfer the technology so that the product could be made quickly and effectively. A separate unit of ITHS, the Translational Research Unit, conducted the rigorous clinical trials necessary to advance the technology towards a clinical use. But now, without funding for over thirty days, the University of Washington has been forced to institute staff reductions, furloughs, and elimination of positions at ITHS.

193.     Other important research centers that are at risk because of delays in the grants review and award processes at NIH include the University of Washington's Alzheimer's Disease Research Center (ADRC), the Nathan Shock Center of Excellence (NSC) in the Basic Biology of Aging, and the joint University of Washington /Allen Center. These Centers are funded by the National Institute on Aging (NIA) and received excellent scores during their reviews in study section in the fall. Because the NIA Council did not meet as scheduled in the January, these large grants were not approved for award. They all end in April or May and would leave large research teams without support. The work being done by these centers is longitudinal and lapse in funding will mean loss of critical cohorts that have been studied in some cases up to 40 years.

194.    On top of these, University of Washington researchers have also had at least 11 grants terminated by NIH, totaling over $3 million to support innovative work in trauma research for victims of sexual assault, prevention of chlamydia infections, and the impact of air pollution on Alzheimer's disease and related dementias, among other topics.

195.    The implementation of the Challenged Directives, and the resulting delays and terminations, have not only disrupted this critical research, they have also led to University-wide harms.  The failure of NIH to communicate deviation from the normal funding application cycle for reviews and approval of funding means that research team which often plan grant applications years in advance to maintain necessary funding to support their research teams are left without consistent funding and in some cases are needing to furlough or layoff research team members. The University of Washington has paused some new hires whose research programs depend on timely NIH awards, including several where candidate interviews were already underway, and programs have been forced to reduce graduate admissions between 25 and 50%.  Moreover, the terminations, delays, and unprecedented disruptions in funding have had a profoundly negative effect on morale University wide.  Faculty and staff don't know if their funding will be cut, if their research will be terminated, whether they will be able to attend conference, or even whether they will continue to have jobs.  The stress of these funding disruptions is palpable and has negatively affected the University of Washington's mission.  Research staff that are stressed about losing their jobs on a daily basis are not able to focus their full creative energy on innovation and discovery.

## V.    Harms to the Remaining Plaintiffs

196.    In Arizona, five of Arizona State University's NIH-funded projects have been paused or terminated, and the university continues to receive new grant-related notices on an ongoing basis.  Arizona State University has more than 450 proposals with an estimated amount

A0520

of $771 million that have been submitted to NIH but for which it has not received a response. Northern Arizona University received a termination notification of an award, "*Bridging Arizona Native American Students to Bachelor Degrees*," which funds a transfer program of students from two-year associate degree programs at Coconino Community College to four-year baccalaureate degree programs at Northern Arizona University. This program will cease for current students, jeopardizing the likelihood that they transfer to Northern Arizona University and complete a baccalaureate degree. Northern Arizona University will forgo recruitment of the final cohort of students who would have benefitted from this program, and program activities will cease on July 31, 2025. Northern Arizona University has 34 proposals, representing approximately $47 million, submitted to NIH for which it has not received a response.

197. CU Anschutz is Colorado's only public academic medical center. CU Anschutz has more than 500 research laboratories on campus pursuing their research mission. This work supports important basic science and clinical research, graduate students, clinical trials, and other work in a broad array of areas on the health spectrum. Currently, 479 doctoral graduate students are reliant on the grant funding of the institution to complete their education and work toward finding new discoveries. Upon information and belief, because of NIH's actions, CU Anschutz has experienced direct harm, including but not limited to (a) a 23% decline in NIH grant awards for the period of time from January through March 2025 as compared to the period of time from January through March 2024, and (b) termination of numerous existing grant awards. CU Anschutz has received 18 NIH grant terminations to date with a total loss of funds of at least $8,455,794.17. CU is a direct grantee of seven of those grants, totaling $2,921,217.25 in funding loss. These grants would have funded CU Anschutz's continued work on a variety of health studies including hormones, vaccines, Alzheimer's disease and other important studies. CU is a

A0521

subgrantee on 11 additional grants terminated by NIH, totaling a funding loss of at least $5,534,576.92. These grants would have continued to fund CU Anschutz's work and partnership with their grant sponsors on work related to antiviral measures, impact of environmental toxicants on diabetes, and adolescent medicine trials for HIV/AIDS interventions, among other studies.

198.　The University of Delaware has directly experienced harm as a result of defendants' treatment of the Delayed Applications. As of March 31, 2025, the University of Delaware has (a) 77 proposals totaling $177 million awaiting NIH study section review; (b) at least 13 proposals totaling $59.8 million that received fundable scores, awaiting NIH advisory council and Notice of Award; and (c) 102 proposals totaling $234.9 million that received possibly fundable scores, awaiting NIH advisory council and Notice of Award. "Since late January 2025, the University of Delaware has seen an unusual number of delays in the processing of NIH grant applications. Researchers have had their grant application study sections and advisory councils be canceled or otherwise not scheduled, and grant application scoring has been significantly delayed." The University of Delaware uses information regarding NIH grant applications and award rates to inform its graduate admissions process. Due to uncertainty of incoming grant funding related to the delays in reviewing and awarding grants by NIH, the various PhD programs at the University of Delaware that rely on NIH funding for graduate student support have reduced admission offers for their incoming class of graduate students by up to 50%. Such instability in funding is affecting the recruitment and retention of high-caliber quality research trainees. The inability to retain quality research trainees will have ongoing effects on the research capabilities of the University of Delaware, including by limiting the individuals qualified to conduct certain research. The delays have disrupted ongoing research, as well as actively setting back the University of Delaware's ability to conduct critical research now and in the future. Funding gaps have already forced

A0522

researchers to abandon promising studies, miss key deadlines, or lose highly trained personnel. Some of these studies involve the use of animal test subjects, all of which would need to be terminated due to loss of funding. This results in not only ethical and financial losses but also wasted scientific opportunity, as experiments cannot simply be restarted once interrupted. In many cases, there is no way to recover the lost time, research continuity, or training value for graduate students and postdoctoral researchers once disrupted. Promising discoveries may be delayed indefinitely, and, in some cases, entirely lost.

199.    Between March 21 and 31, 2025, the University of Hawaiʻi received two notices of cancellation of direct NIH grants. The affected grants total approximately $344,000. In addition, since late January of 2025, pending University of Hawaiʻi grant applications have experienced unusual delays resulting in substantial uncertainty. As of March 30, 2025, the University of Hawaiʻi had approximately 65 proposals awaiting NIH study section review. As of the same date, the University of Hawaiʻi had 31 proposals that received fundable scores but are awaiting NIH advisory council review and a final decision whether to award the grant. These unusual delays in NIH processing are affecting University of Hawaiʻi budgeting and planning for fiscal year 2025-2026, creating uncertainty around department budgets, teacher workload, and the hiring of additional faculty, teaching assistants and graduate assistants. Although University of Hawaiʻi has deployed bridge funding for impacted students, those resources are limited. Long-term use of non-federal funding is not a viable option.

200.    In Minnesota, the University of Minnesota has had 21 NIH grants and subawards terminated. The terminations will result in the loss of approximately $8.5 million in research money to the University. In addition, NIH's delay and/or cancellation of study sections have had a negative impact because significant numbers of grant proposals due for funding have remained

unfunded for at least one grant cycle, and they will potentially be unfunded indefinitely.  These actions have been very disruptive to the University of Minnesota's ongoing research—including research involving clinical trials for life-saving medications or procedures.  For example, the University of Minnesota is a major partner in the NIH U01 Diabetes Prevention Programs Outcomes Study (DPPOS), serving as the central biochemistry lab for 25 clinical sites and serving on the project's Steering Committee.  This project addresses the National Alzheimer's Project Act's goal to "prevent, halt or reverse Alzheimer's Disease" in the high-risk group of persons with pre-diabetes and type 2 diabetes, who represent over half of the population aged 60 years or older in the United States.  The terminations and delays threaten the University of Minnesota's ability to proceed with important projects like DPPOS.

201.    As the result of three grant terminations, the University of Nevada, Las Vegas, has lost $2.4 million in research funding that supports projects focusing on, and advancing research related to, Alzheimer's disease.  The funding losses limit access to research and findings on Alzheimer's disease.  These grant terminations harm Nevada by defunding critical research that advances public health and educational opportunities in Nevada.  And although the University of Nevada, Reno, has not reported receipt of any grant terminations, ongoing delays in review of numerous research proposals are negatively impacting the University's recruitment and retention efforts.  This includes having to pause ongoing efforts to onboard new hires after the University had already provided those individuals with offer letters for positions with research programs that depend on timely NIH awards.

202.    In New Jersey, Rutgers has directly experienced harm stemming from its pursuit of scientific research blacklisted by defendants, specifically studies with a perceived connection to DEI and COVID.  As of April 10, 2025, faculty and staff at Rutgers have received termination

notices for at least six NIH grants, resulting in a loss of more than $7 million in funding. Rutgers will be unable to reallocate funds to offset these federal grant losses, triggering numerous irreparable harms. Ongoing experiments have stopped, suspending hiring and reducing staff research hours—all due to research perceived to be related to DEI and/or COVID. Such terminated grants relate to studies regarding HIV prevention, mental health, suicidal ideation, HPV vaccines, and COVID antiretroviral treatment. More broadly, the Challenged Directives have resulted in the cancellation of programs funded by NIH grants directed at supporting minority and underrepresented students pursuing training and graduate degrees in biomedical sciences and engineering at Rutgers, NJIT, and Kean—with NJIT and Kean losing approximately $1.2 million, respectively, as a result. Undergraduates at these institutions will lose out on opportunities to train in research excellence, unite in a diverse cohort to build identity, and prepare for the next phase of their biomedical research career pathway. In addition, since late January of 2025, pending grant applications at Rutgers, Kean, and NJIT have experienced unusual delays resulting in substantial uncertainty. As of April 11, 2025, Rutgers has approximately 13 proposals totaling $26,990,860 awaiting NIH study-section review; approximately six proposals totaling $19,608,265 that received fundable scores, awaiting NIH advisory-council review and Notice of Award; and 738 grant submissions under sponsor review with a total value of $1,387,066,143. As of April 11, 2025, NJIT has approximately 40 proposals totaling $70,683,171.27 awaiting NIH study-section review; 4 proposals totaling $3,269,729.47 that received fundable scores, awaiting NIH advisory-council review and Notice of Award; and 17 proposals totaling $26,602,999.51 that received possibly fundable scores, awaiting NIH advisory-council review and Notice of Award. As of April 11, 2025, Kean has six proposals totaling approximately $11 million awaiting NIH study-section review, advisory-council review and/or Notice of Award. These unusual delays in NIH processing

A0525

are affecting budgeting and planning for fiscal year 2025 at Rutgers, NJIT, and Kean, creating uncertainty around department budgets, teacher workload, and the hiring of additional faculty, teaching assistants and graduate assistants.

203. In New Mexico, NIH has terminated four research training grants at UNM representing over $9 million in lost research funding. These prestigious grants support vital biomedical workforce development programs that provide advanced training for UNM's students: (a) the Institutional Research and Academic Career Development Award (IRACDA) Post-Doctoral program trains post-doctoral fellows for research and teaching careers in academia; (b) the Leading Equity and Diversity in the Medical Scientist Training Program (LEAD MSTP) supports biomedical research training of UNM's MD/PhD students for developing the clinical research workforce, (c) the Initiative to Maximize Student Diversity at the University of New Mexico Health Sciences (IMSD) grant supports predoctoral trainees in the Biomedical Sciences Graduate Program and (d) the Undergraduate Research Initiative for Student Enhancement (U-RISE) trains and prepares undergraduate students for doctoral programs and careers in biomedical research. These training grants provide structured training and mentorship programs as well as financial support, including tuition and stipends, to advance students' education and career opportunities in biomedical research. UNM currently has approximately 50 students enrolled at different stages in these programs. Some of these programs have been at UNM for over 20 years. The aim of these training grants is to develop a group of professionals equipped with the technical, operational, and professional skills necessary for success as biomedical scientists, building capacity for groundbreaking research in New Mexico and representing our state's population in the biomedical workforce. At NMSU, NIH has terminated three research grants representing approximately $6.7 million in lost research funding. All three grants that were terminated funded

A0526

and promoted students' participation in the biomedical workforce by strengthening research training and preparing students for a successful transition into higher level biomedical degree programs and the biomedical workforce. NIH's termination of these grants impedes New Mexico's ability to continue developing breakthrough biomedical research and innovations.

204. SUNY has experienced direct harm as a result of the delays and terminations of NIH grants. For example, NIH had committed to five years of funding—a total of $3,596,263— for a project that established a center to train and develop health equity researchers focused on health disparities in and around Buffalo. The grant had met and exceeded all of its milestones, but it was terminated on March 28, 2025. NIH also canceled grants funding research into HIV treatment and care in Ghana; the impact of peer victimization on health outcomes for LGBQ+ youth; improving inclusivity of Alzheimer's disease research; and cardiovascular disease risks among sexual and gender minorities. Additionally, SUNY has been harmed by unexplained delays and procedural breakdowns. The uncertainty has led to reduced staff hours and other harms.

205. In Oregon, OHSU has experienced both NIH grant notices of terminations and delays in the processing of grant applications. Since March 24, 2025, OHSU received notices of termination of one NIH grant awarded directly to OHSU and seven NIH grants awarded to other institutions that issued subawards to OHSU. These terminations will result in the loss of $2.4 million in research funds to OHSU. OHSU has also experienced significant delay in its NIH application processing since January 2025. As of March 31, OHSU has approximately 280 proposals totaling over $730 million awaiting NIH study section review. As of March 31, OHSU has 70 proposals that received fundable scores totaling $172.4 million awaiting NIH advisory council meetings and notices of award. And it has 90 proposals that received possibly fundable scores totaling $194.9 million awaiting NIH advisory council meetings and notices of award.

A0527

These terminations and delays have disrupted ongoing research, graduate admissions processes, recruitment of key research personnel, and OHSU's ability to plan its operations. In many cases, once a study is disrupted, it is impossible to recover the lost time, research continuity, or training value of the study. As a result, studies with the potential to achieve breakthroughs in different disciplines and advance public health will simply not occur.

206.   In Rhode Island, as a result of defendants' implementation and enforcement of the Challenged Directives, NIH has terminated two research grants at URI representing $3.7 million in lost research funding. One grant funded innovative research that was aimed at advancing the public health of those living with HIV by contributing to the investigation of causal mechanisms among networks of populations at high risk for HIV infection compounded by illicit substance use. The other grant funded the University of Rhode Island's ESTEEMED Scholars Program, a program that provides students from underrepresented backgrounds with the skills and resources necessary to pursue advanced education and degree programs in bioengineering and related disciplines. The impact on student achievement and the inclusive environment at URI will be hit particularly hard. Without URI ESTEEMED, several of the current trainees would have had to drop out of URI due to the lack of academic support the program provided and the stipend that allowed them to focus on their academics and research instead of working an outside job. These grants funded research aimed at advancing public health research for some of the most vulnerable in Rhode Island and allowing those from underrepresented backgrounds unparalleled academic opportunities. NIH's termination of these grants harms Rhode Island by defunding research that advances public health and educational opportunities.

207.   In Wisconsin, as of March 31, 2025, NIH has terminated four research grants to UW-Madison. The total amount of funding anticipated under these awards is $25,149,959, and of

A0528

that amount, $12,631,870 has not been disbursed to UW-Madison. These grants are to fund research on infectious disease, vaccine development, minority health disparities, and child health and human development. NIH has also terminated two research grants funding research at UW-Milwaukee regarding substance abuse, violence, and suicide prevention. In addition, since late January 2025, UW-Madison has seen an unusual number of delays in the processing of NIH grant applications, rendering institution-wide budgetary planning especially difficult as the budget process at UW-Madison relies upon the NIH grant application, review, and approval cycle. Delays in the review of pending grant applications creates uncertainty and disrupts the funding cycle necessary to maintain continuity of research projects and consistent staffing of trained researchers. In many cases, there is no way to recover the lost time, research continuity, or training value once research is disrupted. Some researchers at UW-Madison have already been unable to commit to bringing on graduate students or maintaining current trainees due to funding uncertainty, and if funding that historically would have been expected is not forthcoming, or funding is indeed terminated, certain research projects will need to be abandoned. For one particular award—an NIH Research Program Grant (P01) supporting three co-investigators—termination with no funding alternative would necessitate the termination of ten research staff (including a postdoctoral trainee) and interrupt the progress of forty undergraduate, graduate, and medical students towards their degrees. NIH's delays and/or cancellations of study sections and advisory council meetings and grant terminations have thus harmed Wisconsin's universities. These actions further harm Wisconsin through the likely reduction of the future scientific workforce and by depriving Wisconsin and the broader community of critical biomedical research.

## VI.    Impact on Appropriated Funds

208.    Notwithstanding Congress's appropriation to NIH, as a result of the implementation and enforcement of the Challenged Directives as described above, NIH has not

A0529

awarded billions of dollars in appropriated funding, with only a few months left of available funding.

209.    Based on the publicly available NIH RePORTER database, in Weeks 4-11 of 2024 (*i.e.*, January 20, 2024, through March 14, 2024), NIH awarded a total of $4.08 billion to 8,071 projects.  By comparison, in Weeks 4-11 of 2025 (*i.e.*, January 20, 2025 through March 14, 2025), NIH awarded a total of $2.45 billion to 4,961 projects—a reduction of approximately 40%.

210.    Narrowing the focus to awards (and competing renewals) that require study section and advisory council review prior to award, in those same weeks, NIH awarded $740 million to 1,756 projects in 2024 but only $360 million to 781 projects in 2025.  Focusing further still just on Weeks 6-11, the comparison is even more striking: 1,342 projects for $576 million in 2024, compared with 395 projects for $180 million in 2025, a reduction of nearly 70%.

211.    The impact on appropriated funds continues to worsen.  Looking at multi-year grant awards with April 1 budget start dates, the estimated difference for Weeks 12-13 (*i.e.*, the period from March 14, 2025, to April 1, 2025) is $1.04 billion.  Of this, $780 million is due to non-competitive renewal awards that were anticipatable during this period—since many grants were due for renewal by April 1, 2025.  In addition, based on the new and competitive renewal awards made during this same period in 2023 and 2024, there is a $260 million reduction in anticipatable new and competitive renewal awards in 2025.

## CAUSES OF ACTION

### Count 1—Against All Defendants
### Administrative Procedure Act, 5 U.S.C. §706(2):
### Agency Action Contrary to Statute

212.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

213.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. §706(2)(C), or "otherwise not in accordance with law," *id.* §706(2)(A).

214.    In reviewing agency action, a court cannot accept "the agency's policy judgments . . . if they conflict with the policy judgments that undergird the statutory scheme." *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994); *see Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000) (explaining that "federal agencies" cannot "substitute their policy judgments for those of Congress").

215.    The Challenged Directives adopt, as a matter of final agency policy, the determination that projects with a perceived connection to "DEI" and other blacklisted topics "no longer effectuate[] agency priorities."  The Challenged Directives order defendants not to fund projects with a perceived connection to those blacklisted topics, resulting in the elimination of funding opportunities, disruption of pending applications, and termination of ongoing grants described above.

216.    The Challenged Directives are contrary to law and beyond statutory authority because they defy Congress's statutory directives to NIH to support research through publicly promulgated priorities, including those directed to "DEI."

217.    Specifically, the Challenged Directives defy statutory directives requiring NIH and its respective ICs to encourage and support research and authorizing them to make grants to institutions and researchers for that purpose, *see* 42 U.S.C. §284(b)(1) (A), (b)(2)(A), as well as statutory directives requiring the NIH Director to, for example, "encourage efforts to improve

A0531

research related to the health of sexual and gender minority populations," in conducting and supporting research. *Id.* §283p.

218.     The Challenged Directives also defy statutory directives that require NIH to articulate its priorities via the NIH Strategic Plan, which NIH must develop, submit to the appropriate Committees of Congress, and post publicly. *See* 42 U.S.C. §282(m)(1).

219.     The Challenged Directives are also contrary to law because they defy Congress's consistent appropriation of funding to NIH's Institutes and Centers to carry out their respective statutory purposes and public priorities.   NIH is flouting its statutory responsibilities by terminating so many grants with a dwindling opportunity to reallocate them, which will result in a substantial portion of Congress's appropriation going unspent.   The Challenged Directives are therefore contrary to the statutes authorizing and appropriating funds for NIH research and beyond defendants' statutory authority.

220.     Accordingly, plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the Challenged Directives and enjoining any action taken to enforce or implement the Challenged Directives.

### Count 2—Against All Defendants
**Administrative Procedure Act, 5 U.S.C. §706(2):**
**Agency Action Contrary to Regulation**

221.     Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

222.     The APA authorizes a court to "hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law."   5 U.S.C. §706(2).

A0532

223.     As discussed above, the Challenged Directives instruct defendants to take adverse action on research projects with a perceived connection to blacklisted subjects under 2 CFR §200.340(a)(2) (2020).  However, that regulation does not apply here and does not authorize the termination of any ongoing grants because (1) HHS-specific regulations, not §200.340, govern the termination of NIH awards, and (2) neither 2 C.F.R. §200.340(a)(2) nor 2 C.F.R. §200.340(a)(4) independently authorizes an awarding agency to terminate awarded grants on the grounds that NIH identified "agency priorities" after the award of the grant which the grant does not effectuate.

224.     Accordingly, plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the Challenged Directives, and enjoining any action taken to enforce or implement the Challenged Directives.

<u>**Count 3—Against All Defendants**</u>
**Administrative Procedure Act, 5 U.S.C. §706(2):**
**Arbitrary and Capricious Agency Action**

225.     Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

226.     The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).

227.     An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  An agency action is also arbitrary and capricious if, when departing from a prior policy, an agency does not "display awareness that it *is* changing position" or does not

"show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

228.　As described above, the Challenged Directives instruct defendants to take adverse action on research projects with a perceived connection to blacklisted subjects.

229.　The Challenged Directives are arbitrary and capricious because they do not acknowledge—let alone provide "good reasons for"—any official change in agency "priorities." *Fox Television Stations*, 556 U.S. at 515. Indeed, upon information and belief, defendants have deliberately chosen not to expressly acknowledge any changes in agency priorities regarding research into the blacklisted topics.

230.　The Challenged Directives are arbitrary and capricious for the additional reason that, in adopting and implementing them, defendants have not engaged in reasoned consideration of any individual project before terminating a grant.

231.　The Challenged Directives are arbitrary and capricious for the additional reason that, in adopting and implementing them, defendants failed to consider several important aspects of the issues before them, including, at a minimum, (1) plaintiffs' reliance interests in any announced research opportunities and awarded research grants; (2) whether those projects could be adjusted, rather than terminated, to comply with defendants' new "priorities" (assuming those new "priorities" and their application to existing funding opportunities and awards were otherwise lawful); (3) whether defendants could have adopted a measure other than across-the-board delay of the grant awards process and elimination of entire categories of programs to effectuate their new "priorities" (assuming those new "priorities" and their application to existing funding opportunities and awards were otherwise lawful); and (4) as to ongoing research projects, the harm that eliminating those projects would inflict on human test subjects participating in the studies.

A0534

232.     The Challenged Directives are arbitrary and capricious for the additional reason that they rely on factors which Congress has not intended defendants to consider, including considerations in conflict with the PHSA's directives in favor of diversity, equity, and inclusion.

233.     Accordingly, plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the Challenged Directives and enjoining any action taken to enforce or implement the Challenged Directives.

### Count 4—Against All Defendants
**U.S. Constitution, Separation of Powers**

234.     Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

235.     Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

236.     The Constitution "grants the power of the purse to Congress, not the President." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, §9, cl. 7 (Appropriations Clause); U.S. Const. art. I, §8, cl. 1 (Spending Clause). "Among Congress's most important authorities is its control of the purse." *Biden v. Nebraska*, 600 U.S. 477, 505 (2023). "The Appropriations Clause is thus a bulwark of the Constitution's separation of powers among the three branches of the National Government." *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.). If not for the Appropriations Clause, "the executive would possess an unbounded power over the public purse of the nation." *Id.*

237.     Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." *See Clinton v.*

A0535

*City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

238.    The Constitution further provides that the executive must "take Care that the Laws be faithfully executed."  U.S. Const. Art. II, Sec. 3; *see Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them." (brackets and quotation marks omitted)).

239.    The Executive Branch violates the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.  *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution"); *see also Util. Air. Reg. Grp.*, 573 U.S. at 327 (noting that the President "act[s] at time through agencies").

240.    The Executive's authority vis-à-vis Congress is particularly limited where, as here, no statutes authorize the Executive's action.  Congress consistently has appropriated funds to NIH's ICs to further their statutory purposes of advancing and promoting medical research and has not authorized the Executive to decline to spend vast swaths of funds.  Further, Congress has provided for a procedure by which the Executive may propose to Congress to either rescind or cancel funds.  *See* Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§682 *et seq*.  That statute likewise does not permit the Executive to take unilateral action, instead requiring the President must "propose[]" any rescission to Congress (which Congress must then affirmatively approve) and may not defer funding for the policy reasons defendants explicitly

A0536

invoke here. 2 U.S.C. §§683, 684(a). Accordingly, the Executive's authority is at its "lowest ebb." *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring).

241. Defendants' adoption, implementation, and enforcement of the Challenged Directives—including their pattern and policy of systematic delays and terminations—violates the foregoing separation-of-powers constraints. Through these actions, defendants have overridden the careful judgments of Congress by refusing to disburse duly appropriated funding.

242. Accordingly, plaintiffs are entitled to a preliminary and permanent injunction holding unlawful and setting aside, and to a declaration pursuant to 28 U.S.C. §2201 declaring unlawful, the Challenged Directives and any action taken to enforce or implement the Challenged Directives.

### Count 5—Against All Defendants
### U.S. Constitution, Spending Clause

243. Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

244. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326-27.

245. The Spending Clause of the U.S. Constitution, art. I, §8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

246. The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012). The funding conditions must be

A0537

set out "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). And the federal statute must be viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal statute] funds and the obligations that go with those funds." *Id*.

247. Defendants' adoption, implementation, and enforcement of the Challenged Directives—including their pattern and policy of systematic delays and retroactive terminations— has altered the terms upon which grants were obligated and disbursed to plaintiffs, contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the myriad grants affected.

248. Defendants' adoption, implementation, and enforcement of the Challenged Directives—including their pattern and policy of systematic delays and retroactive terminations— are also contrary to the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *S. Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987). Here, the delays and terminations are not related to the federal interest in NIH research—to support and encourage scientific research—and instead are related to policies and political factors. Indeed, the effect of these delays and terminations is to chill scientific research as they have subjected researchers and the administrators who support them to the fear that their ongoing research activities can and will be suspended based on shifting political objectives of the current Administration.

249. Accordingly, plaintiffs are entitled to a preliminary and permanent injunction holding unlawful and setting aside, and to a declaration pursuant to 28 U.S.C. §2201 declaring unlawful, the Challenged Directives and any action taken to enforce or implement the Challenged Directives.

## Count 6—Against All Defendants
### *Ultra Vires* Executive Action

250.    Plaintiffs incorporate by reference the foregoing paragraphs of this Amended Complaint as if set forth herein.

251.    The actions challenged herein are contrary to law and outside of defendants' authority because defendants lacked statutory or constitutional authority to issue or implement the Challenged Directives and because defendants' actions are contrary to statutory requirements.

252.    The Challenged Directives purport to restrict research on subjects that Congress has expressly required NIH to support.  The PHSA requires NIH and its ICs to conduct research related to the health of women, racial and ethnic minorities, and sexual and gender minorities.  42 U.S.C. §§282(h), 283p, 285a-6, 285b-7a(c)(1).  In declaring research related to DEI, gender identity, and transgender health off-limits, defendants' actions are contrary to congressional mandates.

253.    The Challenged Directives defy statutory provisions requiring NIH to articulate its research priorities through a formal and public strategic plan.  The PHSA contains detailed requirements governing this plan.  The agency must develop and formalize the plan every six years. 42 U.S.C. §282(m)(1).  It must consult with relevant stakeholders in doing so.  *Id.* §282(m)(4). The plan must contain a host of information, including "strategic research priorities and objectives," "priorities and objectives to advance the treatment, cure, and prevention of health conditions," and "near-, mid-, and long-term scientific needs."  *Id.* §282(m)(2)(A).  And the agency must submit the plan to Congress and post it on its website.  *Id.* §282(m)(1).  Defendants' promulgation and implementation of the Challenged Directives—which have effected large-scale changes in agencies priorities without the development and consultation called by for the creation of a new Strategic Plan—are contrary to this congressionally mandated process.

A0539

254.    The adoption and enforcement of the Challenged Directives exceed defendants' statutory authority because they conflict with duly enacted congressional appropriations. Congress appropriated funds to NIH's ICs so that those funds would be spent in accordance with the statutory purposes and public priorities just discussed. Congress allocated certain sums of money to NIH so that the agency could use those sums during the fiscal year. In implementing the Challenged Directives, defendants have interrupted the flow of funding to existing projects and precluded the prompt awarding of new grants—with a dwindling opportunity to reallocate funds before they are no longer available at the end of the fiscal year. These actions are contrary to the purpose for which the funds were appropriated and Congress's longstanding and well-established framework of NIH funding. *See* 31 U.S.C. §1301(a) (funds "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law"); *Gen. Land Office v. Biden*, 722 F. Supp. 3d 710, 732 (S.D. Tex. 2024) ("While agencies are afforded discretion for certain lump-sum appropriations decisions, their actions still must remain within the bounds of the statute." (citation omitted)); *California v. Trump*, 379 F. Supp. 3d 928, 953 (N.D. Cal. 2019), *aff'd*, 963 F.3d 926 (9th Cir. 2020) (judicial review is available under the APA where plaintiffs allege that funds are being used "in a statutorily *impermissible* manner"); *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . .")).

255.    Defendants cannot take any action that exceeds the scope of their constitutional and statutory authority.

256.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326-27. Indeed, the

Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

257.    Accordingly, plaintiffs are entitled to preliminary and permanent injunctive relief barring the actions challenged herein.  Pursuant to 28 U.S.C. §2201, plaintiffs are also entitled to a declaration that the actions challenged herein are contrary to law and outside of defendants' authority.

<u>**Count 7—Against All Defendants**</u>
**Administrative Procedure Act, 5 U.S.C. §706(1):**
**Unlawful Withholding and/or Unreasonable Delay of Agency Action**

258.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

259.    The APA authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. §706(1).  Relief is warranted under this provision where an agency completely fails to take, or unreasonably delays in taking, "a discrete agency action that it is required to take."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis omitted); *see id.* at 63 n. 1.

260.    The APA provides that, "within a reasonable time, each agency *shall* proceed to conclude a matter presented to it."  5 U.S.C. §555(b) (emphasis added).

261.    The PHSA provides that applications for NIH research grants shall undergo "technical and scientific peer review" by a study section, and that a favorable review is a prerequisite to a final award of any grant.  42 U.S.C. §§284(b)(2)(B), 289a(a).  The PHSA further states that each NIH institute's advisory council "*shall* meet . . . at least three times each fiscal year," *id.* §284(e) (emphasis added), and that it "*shall* advise, assist, consult with, and make recommendations to the Secretary and the Director of such institute" on areas within the council's

84

jurisdiction, *id.* §284(a)(1) (emphasis added). The PHSA also provides that sign-off from an advisory council is a prerequisite to a final award of any grant in excess of $50,000. *Id.* §284(b)(2); *see id.* §284a(a)(3)(A)(ii).

262. Under NIH regulations, "[a]ll applications" for NIH grants "*shall* be evaluated by the [HHS] Secretary [or his designee] through such officers and employees and such experts or consultants engaged for this purpose as the Secretary determines are specially qualified in the areas of research involved in the project, including review by an appropriate National Advisory Council." 42 C.F.R. §52.5(a) (emphasis added); *see also id.* §52a.5 ("NIH grants may be awarded generally only after approval recommendations from both appropriate scientific peer review groups and national advisory councils or boards."). The regulations further provide for the creation of study groups and reiterate that "no awarding official shall award a grant . . . unless the application has been reviewed by a peer review group . . . and the group has made recommendations concerning the scientific merit of that application." *Id.* §52h.7; *see generally id.*, pt. 52h. Moreover, the regulations provide that, "subject to approvals, recommendations or consultations by the appropriate National Advisory Council or other body as may be required by law, the Secretary *will* (1) approve, (2) defer because of either lack of funds or a need for further evaluation, or (3) disapprove support of the proposed project in whole or in part." *Id.* §52.5(b) (emphasis added).

263. For the foregoing reasons, the following are discrete agency actions that NIH is required to take: (a) the activities of NIH's advisory councils, including the holding of council meetings, the review of pending grant applications by the relevant council, and the making of a final recommendation on each application by the relevant council, (b) the activities of NIH's study sections, including the holding of section meetings, the review of pending grant applications by

A0542

the relevant study section, and the making of a final recommendation on each application by the relevant study section—are likewise discrete agency actions that NIH is required to take, and (c) the prompt review and issuance of a final decision on NIH grant applications and renewal requests.

264.   As discussed, in implementing the Challenged Directives, defendants have cancelled and/or substantially delayed the above-described required activities of NIH's advisory councils and study sections—a significant and unprecedented departure from the NIH's published review process and the agency's past practice.

265.   As discussed, in implementing the Challenged Directives, defendants have refused to process the Delayed Applications, including those of the Delayed Applications that have already received a "fundable" score from the relevant study section and/or a favorable recommendation from the relevant advisory council.

266.   As discussed, in implementing the Challenged Directives, defendants have failed to process the Delayed Renewals even though they meet the requirement for renewal.

267.   The above-described meeting cancellations and delays in application review constitute unlawful withholding and/or unreasonable delay of agency action within the meaning of §706(1). *See, e.g.*, *Rezaii v. Kennedy*, No. 1:24-cv-10838, 2025 WL 750215, at *5 (D. Mass. Feb. 24, 2025) (holding that a plaintiff had pleaded unreasonable delay where, among other things, the agency's delay in processing plaintiff's application was "at the outer edge of HHS's typical time for processing"); *Raouf v. U.S. Dep't of State*, 702 F. Supp. 3d 19, 33 (D.N.H. 2023) (finding that a plaintiff had pleaded unreasonable delay where she alleged that the "delay [was] attributable to . . . an *ultra vires* internal policy for intentionally delaying issuance of visas").

268.     As discussed above, the above-described meeting cancellations and delays in application review have caused, are causing, and imminently threaten to cause direct, concrete, and irreparable harm to plaintiffs.

269.     For the foregoing reasons, plaintiffs are entitled to an order, and to a preliminary and permanent injunction, compelling defendants to undertake: (a) the required unreasonably delayed and unlawfully withheld activities of NIH's advisory councils and study sections, and (b) the required unreasonably delayed and unlawfully withheld prompt review and issuance of a final decision on the Delayed Applications and Delayed Renewals.

### Count 8—All Defendants
### Declaratory Judgment

270.     Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

271.     An actual and substantial controversy exists between plaintiffs and defendants about whether 2 C.F.R. §200.340(a)(2) (2020) and 2 C.F.R. §200.340(a)(4) (2024) permit NIH to terminate awarded grants on the grounds that NIH identified "agency priorities" after the award of the grant which the grant does not effectuate.

272.     This action is presently justiciable because defendants have asserted: (a) that §200.340 permits NIH, as a matter of law, to terminate awarded grants on the grounds that NIH's "agency priorities" have changed since the award of the grant; and (b) that this interpretation of §200.340 permits NIH to terminate plaintiffs' awarded grants on the grounds that they relate to research areas that are no longer "agency priorities."

273.     Plaintiffs assert that while 2 C.F.R. §200.340(a)(2) (2020) and 2 C.F.R. §200.340(a)(4) (2024) permit the termination of a federal award if the award no longer effectuates agency priorities identified as of the time of the federal award, these provisions do not

A0544

independently permit or authorize such termination based on agency priorities identified after the time of the Federal award.

274. Declaratory relief will clarify the rights and obligations of the parties and, therefore, pursuant to 28 U.S.C. §2201, is appropriate to resolve this controversy.

## PRAYER FOR RELIEF

Wherefore, plaintiffs pray that the Court:

I. Enter an order pursuant to 5 U.S.C. §706(2) holding unlawful and setting aside the Challenged Directives, and any action taken to enforce or implement the Challenged Directives, on the ground that they are (a) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and/or otherwise not in accordance with governing statutes; (b) not in accordance with governing regulations; and (c) arbitrary and capricious;

II. Declare pursuant to 28 U.S.C. §2201 that the Challenged Directives, and any action taken to enforce or implement the Challenged Directives, are unconstitutional because they violate (a) the separation of powers and (b) the Spending Clause;

III. Enter a preliminary and permanent injunction barring defendants from carrying out the Challenged Directives and any actions to enforce or implement the Challenged Directives, including, without limitation, by directing defendants to: (a) reissue Notices of Funding Opportunities (NOFOs) withdrawn based on the Challenged Directives and to refrain from withdrawing NOFOs based on the Challenged Directives; (b) refrain from denying grant applications or renewal applications based on the Challenged Directives; (c) release reimbursements and other funding for awards that defendants have refused to pay based on the Challenged Directives; (d) rescind the termination of the Terminated Grants and refrain from eliminating funding for awards based on the Challenged Directives; and (e) promptly reschedule

A0545

and conduct all necessary steps in the review and disposition of plaintiffs' grant applications, including the Delayed Applications and Delayed Renewals;

IV.    Enter an order pursuant to 5 U.S.C. §706(1) compelling defendants to undertake: (a) the required unreasonably delayed and unlawfully withheld activities of NIH's advisory councils and study sections, and (b) the required unreasonably delayed and unlawfully withheld prompt review and issuance of a final decision on the Delayed Applications and Delayed Renewals;

V.    Declare pursuant to 28 U.S.C. §2201 that 2 C.F.R. §200.340(a)(2) (2020) and 2 C.F.R. §200.340(a)(4) (2024) do not independently permit or authorize termination of awarded grants based on agency priorities identified after the time of the Federal award; and

VI.    Award such additional relief as the interests of justice may require.

A0546

April 14, 2025

Respectfully submitted.

**ANDREA JOY CAMPBELL**
  *Attorney General of Massachusetts*

 /s/ Gerard J. Cedrone
Katherine B. Dirks (BBO No. 673674)
  *Chief State Trial Counsel*
Gerard J. Cedrone (BBO No. 699674)
  *Deputy State Solicitor*
Allyson Slater (BBO No. 704545)
  *Deputy Director, Reproductive Justice Unit*
Rachel M. Brown (BBO No. 667369)
Vanessa A. Arslanian (BBO No. 688099)
Chris Pappavaselio (BBO No. 713519)
  *Assistant Attorneys General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for the*
  *Commonwealth of Massachusetts*

**ANTHONY G. BROWN**
  *Attorney General of Maryland*

 /s/ James C. Luh
Michael Drezner*
James C. Luh*
  *Senior Assistant Attorneys General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Counsel for the State of Maryland*

**ROB BONTA**
  *Attorney General of California*

 /s/ Emilio Varanini
Neli Palma
  *Senior Assistant Attorney General*
Emilio Varanini*
Kathleen Boergers*
  *Supervising Deputy Attorneys General*
Nimrod Pitsker Elias*
Daniel D. Ambar*
Ketakee R. Kane*
Sophia TonNu*
Hilary Chan*
  *Deputy Attorneys General*
455 Golden Gate Avenue
San Francisco, CA 94102
(415) 510-3541
emilio.varanini@doj.ca.gov

*Counsel for the State of California*

**NICHOLAS W. BROWN**
  *Attorney General of Washington*

 /s/ Andrew Hughes
Andrew Hughes*
Tyler Roberts*
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
andrew.hughes@atg.wa.gov

*Counsel for the State of Washington*

90

A0547

**KRISTIN K. MAYES**
  *Attorney General of Arizona*

 /s/ *Joshua G. Nomkin*
Joshua G. Nomkin*
  *Assistant Attorney General*
2005 N. Central Avenue
Phoenix, AZ 85004
(602) 542-3333
joshua.nomkin@azag.gov

*Counsel for the State of Arizona*


**PHILIP J. WEISER**
  *Attorney General of Colorado*

 /s/ *Lauren Peach*
Shannon Stevenson*
  *Solicitor General*
Lauren Peach*
  *First Assistant Attorney General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Lauren.Peach@coag.gov

*Counsel for the State of Colorado*


**KATHLEEN JENNINGS**
  *Attorney General of Delaware*

 /s/ *Vanessa L. Kassab*
Ian R. Liston**
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*


**ANNE E. LOPEZ**
  *Attorney General of Hawai'i*

 /s/ *Kaliko'onālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kaliko'onālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai'i*


**KEITH ELLISON**
  *Attorney General of Minnesota*

 /s/ *Pete Farrell*
Peter J. Farrell*
  *Deputy Solicitor General*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1424
peter.farrell@ag.state.mn.us

*Counsel for the State of Minnesota*


**AARON D. FORD**
  *Attorney General of Nevada*

 /s/ *Heidi Parry Stern*
Heidi Parry Stern*
  *Solicitor General*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Counsel for the State of Nevada*

A0548

**MATTHEW J. PLATKIN**
 *Attorney General of New Jersey*

 /s/ *Nancy Trasande*
Nancy Trasande*
Bryce Hurst*
 *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 954-2368
Nancy.Trasande@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
 *Attorney General of New York*

 /s/ *Rabia Muqaddam*
Rabia Muqaddam*
 *Special Counsel for Federal Initiatives*
Molly Thomas-Jensen*
 *Special Counsel*
28 Liberty Street
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**PETER F. NERONHA**
 *Attorney General of Rhode Island*

 /s/ *Jordan Broadbent*
Jordan Broadbent*
 *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2060
jbroadbent@riag.ri.gov

*Counsel for the State of Rhode Island*

**RAÚL TORREZ**
 *Attorney General of New Mexico*

 /s/ *Astrid Carrete*
Astrid Carrete*
 *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 270-4332
acarrete@nmdoj.gov

*Counsel for the State of New Mexico*

**DAN RAYFIELD**
 *Attorney General of Oregon*

 /s/ *Christina L. Beatty-Walters*
Christina L. Beatty-Walters*
 *Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Tina.BeattyWalters@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSHUA L. KAUL**
 *Attorney General of Wisconsin*

 /s/ *Lynn K. Lodahl*
Lynn K. Lodahl*
 *Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, WI 53707
(608) 264-6219
lodahllk@doj.state.wi.us

*Counsel for the State of Wisconsin*

* admitted *pro hac vice*
** application for *pro hac vice* admission forthcoming

92

A0549

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN PUBLIC HEALTH
ASSOCIATION, *et al.*,

  Plaintiffs,

v.

NATIONAL INSTITUTES OF HEALTH, *et al.*,

  Defendants.

Civil Action No. 1:25-cv-10787-WGY

## <u>NOTICE OF APPEAL</u>

Pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, all Defendants[1]

hereby appeal to the United States Court of Appeals for the First Circuit from the order and

partial final judgment entered in this case on June 23, 2025, Doc No. 138, as well as from all

other interlocutory orders merged into that order and judgment.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

LEAH B. FOLEY
United States Attorney

KIRK T. MANHARDT
Director

MICHAEL J. QUINN
Senior Litigation Counsel

Dated: June 23, 2025

*/s/ Anuj Khetarpal*

---

[1] National Institutes of Health; Jay Bhattacharya, in his official capacity as Director of the
National Institutes of Health, United States Department of Health and Human Services, and
Robert F. Kennedy, Jr., in his official capacity as Secretary of the United States Department of
Health and Human Services.

1

A0550

ANUJ KHETARPAL
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3658
anuj.khetarpal@usdoj.gov

THOMAS W. PORTS, Jr. (Va. Bar No. 84321)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Corporate/Financial Section
P.O. Box 875
Ben Franklin Stations
Washington D.C. 20044-0875
(202) 307-1105
thomas.ports@usdoj.gov

*Attorneys for Defendants*

A0551

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 23, 2025                                    */s/ Anuj Khetarpal*
                                                         Anuj Khetarpal

3

A0552

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*,<br><br> Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br> Defendants. | Civil Action No. 1:25-cv-10814-WGY |

## <u>NOTICE OF APPEAL</u>

Pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, all defendants[1]

hereby appeal to the United States Court of Appeals for the First Circuit from the order and

partial final judgment entered in this case on June 23, 2025, Doc No. 151, as well as from all

other interlocutory orders merged into that order and judgment.

---

[1] Defendants Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services; United States Department of Health and Human Services; Jayanta Bhattacharya, in his official capacity as the Director of the National Institutes of Health; National Institutes of Health; National Cancer Institute; National Eye Institute;  National Heart, Lung, and Blood Institute; National Human Genome Research Institute; National Institute on Aging; National Institute on Alcohol Abuse and Alcoholism; National Institute of Allergy and Infectious Diseases; National Institute of Arthritis and Musculoskeletal and Skin Diseases; National Institute of Biomedical Imaging and Bioengineering; Eunice Kennedy Shriver National Institute of Child Health and Human Development; National Institute on Deafness and Other Communication Disorders; National Institute of Dental and Craniofacial Research; National Institute of Diabetes and Digestive and Kidney Diseases; National Institute on Drug Abuse; National Institute of Environmental Health Sciences; National Institute of General Medical Sciences; National Institute of Mental Health; National Institute on Minority Health and Health Disparities; National Institute of Neurological Disorders and Stroke; National Institute of Nursing Research; National Library of Medicine; National Center for Advancing Translational Sciences; John E. Fogarty International Center for Advanced Study in the Health Sciences; National Center for Complementary and Integrative Health; and Center for Scientific Review.

1

A0553

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

LEAH B. FOLEY
United States Attorney

KIRK T. MANHARDT
Director

MICHAEL J. QUINN
Senior Litigation Counsel

Dated: June 23, 2025                    */s/ Thomas W. Ports, Jr.*

THOMAS W. PORTS, Jr. (Va. Bar No. 84321)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Corporate/Financial Section
P.O. Box 875
Ben Franklin Stations
Washington D.C. 20044-0875
Tel: (202) 307-1105
Email: thomas.ports@usdoj.gov

ANUJ KHETARPAL
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3658
Anuj.Khetarpal@usdoj.gov

*Attorneys for Defendants*

2

A0554

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 23, 2025                    */s/ Thomas W. Ports, Jr.*
                                        Thomas W. Ports, Jr.

3

A0555



Date:           February 12, 2025

To:             Institute and Center Chief Grants Management Officers (IC CGMOs)

From:           Michael S. Lauer, MD   *Michael S. Lauer -S* Digitally signed by Michael S. Lauer -S Date: 2025.02.12 09:26:33 -05'00'
                Deputy Director for Extramural Research, National Institutes of Health (NIH)

                Michelle G. Bulls
                NIH Chief Grants Management Officer

Subject:        NIH Review of Agency Priorities Based on the New Administration's Goals


NIH is in the process of reevaluating the agency's priorities based on the goals of the new administration. NIH will effectuate the administration's goals over time, but given recent court orders, this cannot be a factor in IC funding decisions at this time. In consultation with NIH leadership and with the Office of General Counsel (OGC), we recognize that NIH programs fall under recently issued Temporary Restraining Orders (*New York et al. v. U.S. Office of Management and Budget* and *Commonwealth of Massachusetts et al. v. National Institutes of Health et al* see attached*)*. Therefore, with this memo, IC CGMOs are authorized, along with their respective grants management staff, to proceed with issuing awards for all competing, non-competing continuation, and administrative supplements (previously cleared through Office of Extramural Research) grants. Until further notice, as awards are issued, ICs must follow their existing FY25 IC funding policies and use the previously approved negotiated indirect cost rates. Additional details on future funding actions related to the agency's goals will be provided under a separate memo.

**Attachments**

1.  Temporary Restraining Order, *New York et al. v. U.S. Office of Management and Budget* (Jan. 31, 2025)

2.  Court Order Questions – HHS OGC Responses (February 4, 2025)

3.  Temporary Restraining Order, *Commonwealth of Massachusetts et al. v. National Institutes of Health et al.,* (February 10, 2025)

4.  Order Enforcing TRO, *New York et al. v. U.S. Office of Management and Budget* (February 10, 2025)

5.  Office of General Counsel Note, *New York et al. v. U.S. Office of Management and Budget* (February 10, 2025)


National Institutes of Health
Office of Extramural Research

Date:           February 13, 2025

To:             Institute and Center Chief Grants Management Officers (IC CGMOs)

From:           Michael S. Lauer, MD        Michael S. Lauer -S    Digitally signed by Michael S. Lauer -S
                                                                   Date: 2025.02.13 15:06:52 -05'00'
                Deputy Director for Extramural Research, National Institutes of Health (NIH)

                Michelle G. Bulls
                NIH Chief Grants Management Officer

Subject:        Supplemental Guidance to Memo Entitled- NIH Review of Agency Priorities Based on
                the New Administration's Goals

The Office of Extramural Research is issuing supplemental guidance to the memo, dated February 12, 2025, to Institute and Center (IC) Chief Grants Management Officers (CGMOs) and their respective staff to issue hard funding restrictions on awards and within the Payment Management System (PMS)/Program Support Center (PSC) on awards where the program promotes or takes part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or any other protected characteristics. The restriction requirement applies to new and continuation awards made on or after February 14, 2025. If the sole purpose of the grant, cooperative agreement, other transaction award (including modifications), or supplement supports DEI activities, then the award must be fully restricted. The restrictions will remain in place until the agency conducts an internal review for payment integrity. Such review shall include, but not be limited to a review for fraud, waste, abuse, of all grants, cooperative agreements, and Other Transactions that determines the funding of the activities/program are in the best interest of the government and consistent with current policy priorities.

**Attachments**

1.  Memo NIH Review of Agency Priorities Based on the New Administration's Goals, February 12, 2025

2.  UPDATE - Temporary Restraining Order in State of New York et al. v. Trump et al., 1:25-cv-00039 (D.R.I.), February 12, 2025

3.  Secretarial Directive on DEI Related Funding, February 10, 2025

**Directive on NIH Priorities**

Agency: National Institutes of Health

Office of the Director

Action: Directive

**FOR FURTHER INFORMATION CONTACT:**

National Institutes of Health

Office of the Director

EFFECTIVE DATE: February 21, 2025

**Restoring Scientific Integrity and Protecting the Public Investment in NIH Awards**

The National Institutes of Health (NIH) is the largest public funder of biomedical and behavioral research in the world. The public trusts NIH with substantial funds to foster creative discoveries that will improve health and prevent disease in this Country. Accordingly, NIH is committed to promoting only the highest level of scientific integrity, public accountability, and social responsibility in the programs it funds. And NIH promises to prioritize the funding of projects that will generate a high return on the public's investment, so that taxpayer dollars are not going to waste. Every dollar should be used to make Americans live longer, healthier lives.

This mission requires NIH to ensure that it is not supporting low-value and off-mission research programs, including but not limited to studies based on diversity, equity, and inclusion (DEI) and gender identity. While this description of NIH's mission is consistent with recent Executive Orders issued by the President, I issue this directive based on my expertise and experience; consistent with NIH's own obligation to pursue effective, fiscally prudent research; and pursuant to NIH authorities that exist independently of, and precede, those Executive Orders.

Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, DEI studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Likewise, research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs either.

For these reasons and pursuant to, among other authorities, 42 U.S.C. § 282(b) and 45 C.F.R. Part 75 (45 C.F.R. §§ 75.207, 75.210, 75.371–373),[1] the Director of NIH hereby directs:

> NIH personnel shall conduct an internal review of all contract solicitations and notices of funding opportunities; applications pending Type 1 and Type 2 awards; existing awards; cooperative agreements; and other transactions. Such review shall be aimed at ensuring NIH grants, contracts, cooperative agreements, and other transactions do not fund or support low-value and off-mission research activities or projects – including DEI and gender identity research activities and programs. NIH personnel should also ensure grants, contracts, cooperative agreements, and other transactions are free from fraud, abuse, and duplication, and are being implemented consistent with federal law.

This Directive shall be implemented by all relevant NIH personnel, including but not limited to those in the Office of Extramural Research, Office of Intramural Research, and the Division of Program Coordination, Planning, and Strategic Initiatives. Grants, contracts, cooperative agreements, and other transactions deemed inconsistent with NIH's mission may, where permitted by applicable law, be subject to funding restrictions, terminated or partially terminated, paused, and/or not continued or renewed, in compliance with all procedural requirements.

Notwithstanding this Directive, and consistent with any court orders that may apply, no open award disbursements may be paused in reliance upon Office of Management and Budget Memorandum M-25-13 or any Executive Order underlying that Memorandum. Previous instructions ordering the immediate release of such funds remain in effect. Also, consistent with any court orders that may apply, this Directive does not instruct personnel to condition or withhold federal funding pursuant to Section 4 of Executive Order 14,187 (Protecting Children from Chemical and Surgical Mutilation) based on the fact that a healthcare entity or health professional provides care or treatment.

Dated: February 21, 2025

Matthew J. Memoli, M.D.
Acting Director of NIH

---

[1] To be clear, these citations are illustrative, not exhaustive. Further explanation of the range of statutory and regulatory authorities that support actions taken pursuant to this Directive will be issued as appropriate.

| | |
|---|---|
| **From:** | Bulls, Michelle (NIH/OD) [E] |
| **To:** | Chief GMOs |
| **Cc:** | Bulls, Michelle (NIH/OD) [E]; Ta, Kristin (NIH/OD) [E]; Sass-Hurst, Brian (NIH/OD) [E] |
| **Subject:** | DEI Staff Guidance - Final - March 4 2025 |
| **Date:** | Tuesday, March 04, 2025 11:02:00 AM |
| **Attachments:** | DEI Staff Guidance - Final 3.4.25.pdf |

Good morning,

Attached is staff guidance that includes the DEI term along with details on when the term must be applied. Let's plan to talk through this guidance and note Dr. Memoli has **approved** the DEI term for immediate use. I have also added the process for terminating awards based in DEI as provided to us by HHS. I will follow up with a few of you to pull out the details needed to address terminations that were made yesterday—just to pull the information out and to address specific questions. Finishing up meetings and then, I will that information out to all that were impacted by yesterday's termination list provided to us by HHS/ASA.

Thanks,

Michelle

## Staff Guidance –Award Assessments for Alignment with Agency Priorities - March 2025

**Background**

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI).  Terminations that result from science that no longer effectuates NIH's priorities must follow the appeals guidance below. All other terminations for noncompliance require, always, appeal language.

Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities. To avoid issuing awards, in error, that support DEI activities ICs must take care to completely excise all DEI activities using the following categories.

> **Category 1:** The sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that was unpublished as outlined above.
>
> o   Action: ICs must not issue the award.

> **Category 2**: Project partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this means DEI activities are ancillary to the purpose of the project. In some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the DEI Restriction Term of Award in Section IV of the Notice of Award, no exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).
>
> o   Action 1: Funding IC must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file.
> o   Action 2: Once the IC and the applicant/recipient have reached an agreement, issue the award and include the DEI Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.
> > ▪   **Note:** If the IC and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award. For ongoing projects, the IC must work with OPERA to negotiate a bilateral termination of the project. Where bilateral termination cannot be reached, the IC must unilaterally terminate the project. Terminated awards (bilaterally or unilaterally) should follow the process identified in Appendix 2.

A0561

**Category 3:** Project does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities & Other Resources' attachment and terminology related to structural racism—this is not all-inclusive).

- o Action 1: Funding IC must request an updated application/RPPR with the DEI language removed.
- o Action 2: Once the language has been removed, the IC may proceed with issuing the award.

**Category 4:** Project does not support any DEI activities
- o Action: IC may proceed with issuing the award.

A0562



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON DEI-RELATED FUNDING

February 10, 2025

The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

These contracts and grants can cause serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to DEI and similar programs are contributing to the serious problems and acute harms DEI initiatives may pose to the Department's compliance with Federal civil rights law as well as the Department's policy of improving the health and well-being of all Americans. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371-372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of DEI and similar programs rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> **Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

1

A0563

NIH_GRANTS_002138

This Directive shall be implemented through the Department's contracts and payment management systems by personnel with responsibility for such systems who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a DEI or similar contract or grant is paused for review, Department personnel shall immediately send such payment to Scott Rowell, Deputy Chief of Staff for Operations, for prompt review to determine whether or not the payment is appropriate and should be made. Payments on paused contracts shall remain paused and already terminated contracts shall remain terminated pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.

Dorothy A. Fink, M.D., Acting Secretary

2

NIH_GRANTS_002139

**Appendix 2 – Guidance for staff to use when terminating awards identified by HHS or the IC.**

- Issue a revised NOA.

    - Change the budget and project period end dates to match the date of the termination letter.

    - Check PMS, determine amount of funds remaining, and deobligate the amount reflected in PMS when revising the NOA. Note: This applies to Multi-Year Funded Awards, as well. Work with FFR-C if you have questions regarding deobligating funds to avoid placing the recipient in debt collection.

    - Remove all future years from the project, where applicable. If the grant is in a no cost extension, and the HHS requests a termination, the project must be terminated

    - Use the following termination term: This award related to [select the appropriate example relevant to your project by choosing one of the highlighted examples DEI, China, or Transgender issues] no longer effectuates agency priorities. It is the policy of NIH not to further prioritize these research programs. Therefore, the award is terminated. [Refer to Appendix 3 for language provided to NIH by HHS.] Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR)) within 120 days of the end of this grant to avoid unilateral closeout.

    - Insert restriction language that allows for the recipients to use a portion of funds to support the health and safety of patients and orderly closeout of the project.

        - Sample language for use: "Funds in the amount of $xxxxxxx [insert $ amount total cost] may be used to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered."

- Appeals language must be used (prior to October 1, 2025):
    - NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2.   This letter represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli.

        Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be postmarked no later than 30 days after the postmarked date of this notice.

- Termination actions taken based on agency priorities do not require appeals language because the action was not based on administrative nor programmatic noncompliance

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports.**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

**Appendix 4 – Approved Term – Use for all Category 2 awards, i.e., renegotiated aims and associated budgets. Approval embedded below. ICs should use this term in the IC specific award conditions**

**Term and Condition of Award**

NIH and the recipient have renegotiated the scope of this award.  Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including Diversity Equity and Inclusion (DEI) research or DEI-related research training activities or programs.  Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes DEI or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

Approval email from Dr. Memoli (Acting Director, NIH) on Friday, February 28, 2025.

A0566

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Bundesen, Liza (NIH/OD) [E] |
| **Cc:** | Bulls, Michelle G. (NIH/OD) [E]; Lankford, David (NIH/OD) [E]; Butler, Benjamin (NIH/OD) [E]; Jacobs, Anna (NIH/OD) [E]; Burklow, John (NIH/OD) [E] |
| **Subject:** | Re: Clean Version of DEI Restriction Term - Final |
| **Date:** | Friday, February 28, 2025 2:54:19 PM |

approved

Matt

Get Outlook for iOS

---

**From:** Bundesen, Liza (NIH/OD) [E] <lbundese@mail.nih.gov>
**Sent:** Friday, February 28, 2025 2:53:21 PM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Cc:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>; Lankford, David (NIH/OD) [E] <lankford@od31tm1.od.nih.gov>; Butler, Benjamin (NIH/OD) [E] <butlerben@mail.nih.gov>; Jacobs, Anna (NIH/OD) [E] <anna.jacobs2@nih.gov>; Burklow, John (NIH/OD) [E] <burklowj@od.nih.gov>
**Subject:** Clean Version of DEI Restriction Term - Final

Hi Matt,

Attached is the term and condition of award for your approval.  Please let us know if you approve and we will implement.

Thank you,
Liza

NIH_GRANTS_002142

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

## NIH Grants Management Staff Guidance –Award Assessments for Alignment with Agency Priorities - March 2025

**Background**

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI).  Terminations that result from science that no longer effectuates NIH's priorities must follow the appeals guidance below. All other terminations for noncompliance require, always, appeal language.

Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities. To avoid issuing awards, in error, that support DEI activities ICs must take care to completely excise all DEI activities using the following categories.

> **Category 1:** The sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that was unpublished as outlined above.
>
> o   Action: ICs must not issue the award.
>
> **Category 2**: Project partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this means DEI activities are ancillary to the purpose of the project. In some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the DEI Restriction Term of Award in Section IV of the Notice of Award, no exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).
>
> o   Action 1: Funding IC must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file.
>
> o   Action 2: Once the IC and the applicant/recipient have reached an agreement, issue the award and include the DEI Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.
>
> > ▪   **Note:** If the IC and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award. For ongoing projects, the IC must work with OPERA to negotiate a bilateral termination of the project. Where bilateral termination cannot be reached, the IC must unilaterally terminate the project. Terminated awards (bilaterally or unilaterally) should follow the process identified in Appendix 2.

A0568

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Category 3:** Project does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities & Other Resources' attachment and terminology related to structural racism—this is not all-inclusive).

- o   Action 1: Funding IC must request an updated application/RPPR with the DEI language removed.
- o   Action 2: Once the language has been removed, the IC may proceed with issuing the award.

**Category 4:** Project does not support any DEI activities
- o   Action: IC may proceed with issuing the award.

A0569



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary
Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON DEI-RELATED FUNDING

February 10, 2025

The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

These contracts and grants can cause serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to DEI and similar programs are contributing to the serious problems and acute harms DEI initiatives may pose to the Department's compliance with Federal civil rights law as well as the Department's policy of improving the health and well-being of all Americans. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371-372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of DEI and similar programs rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> **Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

1

NIH_GRANTS_002145

This Directive shall be implemented through the Department's contracts and payment management systems by personnel with responsibility for such systems who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a DEI or similar contract or grant is paused for review, Department personnel shall immediately send such payment to Scott Rowell, Deputy Chief of Staff for Operations, for prompt review to determine whether or not the payment is appropriate and should be made. Payments on paused contracts shall remain paused and already terminated contracts shall remain terminated pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.


Dorothy A. Fink, M.D., Acting Secretary

A0571

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 2 – Guidance for staff to use when terminating awards identified by HHS or the IC.**

- Issue a revised NOA.

  - Change the budget and project period end dates to match the date of the termination letter.

  - Check PMS, determine amount of funds remaining, and deobligate the amount reflected in PMS. It is very important to notify the FFR-C: OPERAFFRInquiries@od.nih.gov on all IC deoblgiations prior to reducing the award, so the FFR-C can deobligate any remaining 'cents' to avoid challenges with financial closeout.

  - Note: This applies to Multi-Year Funded Awards, as well. Please contact the FFR-C if you have questions regarding deobligating funds to avoid placing the recipient in debt collection.

  - Remove all future years from the project, where applicable. If the grant is in a no cost extension, and the HHS requests a termination, the project must be terminated

  - Use the following termination term: This award related to [select the appropriate example relevant to your project by choosing one of the highlighted examples DEI, China, or Transgender issues] no longer effectuates agency priorities. It is the policy of NIH not to further prioritize these research programs. Therefore, the award is terminated. [Refer to Appendix 3 for language provided to NIH by HHS.] Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant to avoid unilateral closeout.

  - Insert restriction language that allows for the recipients to use a portion of funds to support the health and safety of patients and orderly closeout of the project.

    - Sample language for use: "Funds in the amount of $xxxxxxx [insert $ amount total cost] may be used to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered."

- Appeals language must be used (prior to October 1, 2025):
  - NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2.  This letter represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli.

    Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally,

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

the appeal must be signed by the institutional official authorized to sign award applications and must be postmarked no later than 30 days after the postmarked date of this notice.

- Termination actions taken based on agency priorities do not require appeals language because the action was not based on administrative nor programmatic noncompliance

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports.**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

**Appendix 4 – Approved Term – Use for all Category 2 awards, i.e., renegotiated aims and associated budgets. Approval embedded below. ICs should use this term in the IC specific award conditions**

**Term and Condition of Award**

NIH and the recipient have renegotiated the scope of this award.  Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including Diversity Equity and Inclusion (DEI) research or DEI-related research training activities or programs.  Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review

NIH_GRANTS_002148

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes DEI or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

Approval email from Dr. Memoli (Acting Director, NIH) on Friday, February 28, 2025.



NIH_GRANTS_002149

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Bundesen, Liza (NIH/OD) [E] |
| **Cc:** | Bulls, Michelle G. (NIH/OD) [E]; Lankford, David (NIH/OD) [E]; Butler, Benjamin (NIH/OD) [E]; Jacobs, Anna (NIH/OD) [E]; Burklow, John (NIH/OD) [E] |
| **Subject:** | Re: Clean Version of DEI Restriction Term - Final |
| **Date:** | Friday, February 28, 2025 2:54:19 PM |

approved

Matt

Get Outlook for iOS

---

**From:** Bundesen, Liza (NIH/OD) [E] <lbundese@mail.nih.gov>
**Sent:** Friday, February 28, 2025 2:53:21 PM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Cc:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>; Lankford, David (NIH/OD) [E] <lankford@od31tm1.od.nih.gov>; Butler, Benjamin (NIH/OD) [E] <butlerben@mail.nih.gov>; Jacobs, Anna (NIH/OD) [E] <anna.jacobs2@nih.gov>; Burklow, John (NIH/OD) [E] <burklowj@od.nih.gov>
**Subject:** Clean Version of DEI Restriction Term - Final

Hi Matt,

Attached is the term and condition of award for your approval.  Please let us know if you approve and we will implement.

Thank you,
Liza

A0575

| | |
|---|---|
| **From:** | Bulls, Michelle (NIH/OD) [E] |
| **To:** | Chief GMOs |
| **Cc:** | Bulls, Michelle (NIH/OD) [E]; Ta, Kristin (NIH/OD) [E]; Sass-Hurst, Brian (NIH/OD) [E] |
| **Subject:** | DEI Staff Guidance - Final - March 4 2025 |
| **Date:** | Tuesday, March 04, 2025 11:02:00 AM |
| **Attachments:** | DEI Staff Guidance - Final 3.4.25.pdf |

Good morning,

Attached is staff guidance that includes the DEI term along with details on when the term must be applied. Let's plan to talk through this guidance and note Dr. Memoli has **approved** the DEI term for immediate use. I have also added the process for terminating awards based in DEI as provided to us by HHS. I will follow up with a few of you to pull out the details needed to address terminations that were made yesterday—just to pull the information out and to address specific questions. Finishing up meetings and then, I will that information out to all that were impacted by yesterday's termination list provided to us by HHS/ASA.

Thanks,

Michelle

A0576

## Staff Guidance –Award Assessments for Alignment with Agency Priorities - March 2025

**Background**

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI).  Terminations that result from science that no longer effectuates NIH's priorities must follow the appeals guidance below. All other terminations for noncompliance require, always, appeal language.

Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities. To avoid issuing awards, in error, that support DEI activities ICs must take care to completely excise all DEI activities using the following categories.

> **Category 1:** The sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that was unpublished as outlined above.
>
> o Action: ICs must not issue the award.

> **Category 2**: Project partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this means DEI activities are ancillary to the purpose of the project. In some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the DEI Restriction Term of Award in Section IV of the Notice of Award, no exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).
>
> o Action 1: Funding IC must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file.
>
> o Action 2: Once the IC and the applicant/recipient have reached an agreement, issue the award and include the DEI Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.
>
> > ▪ **Note:** If the IC and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award. For ongoing projects, the IC must work with OPERA to negotiate a bilateral termination of the project. Where bilateral termination cannot be reached, the IC must unilaterally terminate the project. Terminated awards (bilaterally or unilaterally) should follow the process identified in Appendix 2.

A0577

**Category 3:** Project does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities & Other Resources' attachment and terminology related to structural racism—this is not all-inclusive).

- o   Action 1: Funding IC must request an updated application/RPPR with the DEI language removed.
- o   Action 2: Once the language has been removed, the IC may proceed with issuing the award.

**Category 4:** Project does not support any DEI activities
- o   Action: IC may proceed with issuing the award.

NIH_GRANTS_002153



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON DEI-RELATED FUNDING

February 10, 2025

The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

These contracts and grants can cause serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to DEI and similar programs are contributing to the serious problems and acute harms DEI initiatives may pose to the Department's compliance with Federal civil rights law as well as the Department's policy of improving the health and well-being of all Americans. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371-372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of DEI and similar programs rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> **Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

1

This Directive shall be implemented through the Department's contracts and payment management systems by personnel with responsibility for such systems who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a DEI or similar contract or grant is paused for review, Department personnel shall immediately send such payment to Scott Rowell, Deputy Chief of Staff for Operations, for prompt review to determine whether or not the payment is appropriate and should be made. Payments on paused contracts shall remain paused and already terminated contracts shall remain terminated pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.

Dorothy A. Fink, M.D., Acting Secretary

NIH_GRANTS_002155

**Appendix 2 – Guidance for staff to use when terminating awards identified by HHS or the IC.**

- Issue a revised NOA.

    - Change the budget and project period end dates to match the date of the termination letter.

    - Check PMS, determine amount of funds remaining, and deobligate the amount reflected in PMS when revising the NOA. Note: This applies to Multi-Year Funded Awards, as well. Work with FFR-C if you have questions regarding deobligating funds to avoid placing the recipient in debt collection.

    - Remove all future years from the project, where applicable. If the grant is in a no cost extension, and the HHS requests a termination, the project must be terminated

    - Use the following termination term: This award related to [select the appropriate example relevant to your project by choosing one of the highlighted examples DEI, China, or Transgender issues] no longer effectuates agency priorities. It is the policy of NIH not to further prioritize these research programs. Therefore, the award is terminated. [Refer to Appendix 3 for language provided to NIH by HHS.] Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR)) within 120 days of the end of this grant to avoid unilateral closeout.

    - Insert restriction language that allows for the recipients to use a portion of funds to support the health and safety of patients and orderly closeout of the project.

        - Sample language for use: "Funds in the amount of $xxxxxxx [insert $ amount total cost] may be used to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered."

- Appeals language must be used (prior to October 1, 2025):
    - NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2.   This letter represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli.

        Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be postmarked no later than 30 days after the postmarked date of this notice.

- Termination actions taken based on agency priorities do not require appeals language because the action was not based on administrative nor programmatic noncompliance

A0581

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports.**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

**Appendix 4 – Approved Term – Use for all Category 2 awards, i.e., renegotiated aims and associated budgets. Approval embedded below. ICs should use this term in the IC specific award conditions**

**Term and Condition of Award**

NIH and the recipient have renegotiated the scope of this award.  Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including Diversity Equity and Inclusion (DEI) research or DEI-related research training activities or programs.  Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes DEI or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

Approval email from Dr. Memoli (Acting Director, NIH) on Friday, February 28, 2025.

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Bundesen, Liza (NIH/OD) [E] |
| **Cc:** | Bulls, Michelle G. (NIH/OD) [E]; Lankford, David (NIH/OD) [E]; Butler, Benjamin (NIH/OD) [E]; Jacobs, Anna (NIH/OD) [E]; Burklow, John (NIH/OD) [E] |
| **Subject:** | Re: Clean Version of DEI Restriction Term - Final |
| **Date:** | Friday, February 28, 2025 2:54:19 PM |

approved

Matt

Get Outlook for iOS

---

**From:** Bundesen, Liza (NIH/OD) [E] <lbundese@mail.nih.gov>
**Sent:** Friday, February 28, 2025 2:53:21 PM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Cc:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>; Lankford, David (NIH/OD) [E] <lankford@od31tm1.od.nih.gov>; Butler, Benjamin (NIH/OD) [E] <butlerben@mail.nih.gov>; Jacobs, Anna (NIH/OD) [E] <anna.jacobs2@nih.gov>; Burklow, John (NIH/OD) [E] <burklowj@od.nih.gov>
**Subject:** Clean Version of DEI Restriction Term - Final

Hi Matt,

Attached is the term and condition of award for your approval.  Please let us know if you approve and we will implement.

Thank you,
Liza

NIH_GRANTS_002158

## Staff Guidance –Award Assessments for Alignment with Agency Priorities - March 2025

**Background**

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI).  Terminations that result from science that no longer effectuates NIH's priorities must follow the appeals guidance below. All other terminations for noncompliance require, always, appeal language.

Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities. To avoid issuing awards, in error, that support DEI activities ICs must take care to completely excise all DEI activities using the following categories.

> **Category 1:** The sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that was unpublished as outlined above.
>
> o   Action: ICs must not issue the award.

> **Category 2**: Project partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this means DEI activities are ancillary to the purpose of the project. In some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the DEI Restriction Term of Award in Section IV of the Notice of Award, no exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).
>
> o   Action 1: Funding IC must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file.
>
> o   Action 2: Once the IC and the applicant/recipient have reached an agreement, issue the award and include the DEI Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.
>
> > ▪   **Note:** If the IC and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award. For ongoing projects, the IC must work with OPERA to negotiate a bilateral termination of the project. Where bilateral termination cannot be reached, the IC must unilaterally terminate the project. Terminated awards (bilaterally or unilaterally) should follow the process identified in Appendix 2.

A0584

**Category 3:** Project does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities & Other Resources' attachment and terminology related to structural racism—this is not all-inclusive).

- o   Action 1: Funding IC must request an updated application/RPPR with the DEI language removed.
- o   Action 2: Once the language has been removed, the IC may proceed with issuing the award.

**Category 4:** Project does not support any DEI activities
- o   Action: IC may proceed with issuing the award.

NIH_GRANTS_002160

Appendix 1



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON DEI-RELATED FUNDING

February 10, 2025

The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

These contracts and grants can cause serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to DEI and similar programs are contributing to the serious problems and acute harms DEI initiatives may pose to the Department's compliance with Federal civil rights law as well as the Department's policy of improving the health and well-being of all Americans. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371-372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of DEI and similar programs rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> **Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

1

This Directive shall be implemented through the Department's contracts and payment management systems by personnel with responsibility for such systems who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a DEI or similar contract or grant is paused for review, Department personnel shall immediately send such payment to Scott Rowell, Deputy Chief of Staff for Operations, for prompt review to determine whether or not the payment is appropriate and should be made. Payments on paused contracts shall remain paused and already terminated contracts shall remain terminated pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.

Dorothy A. Fink, M.D., Acting Secretary

2

A0587

**Appendix 2 – Guidance for staff to use when terminating awards identified by HHS or the IC.**

- Issue a revised NOA.

    o Change the budget and project period end dates to match the date of the termination letter.

    o Check PMS, determine amount of funds remaining, and deobligate the amount reflected in PMS when revising the NOA. Note: This applies to Multi-Year Funded Awards, as well. Work with FFR-C if you have questions regarding deobligating funds to avoid placing the recipient in debt collection.

    o Remove all future years from the project, where applicable. If the grant is in a no cost extension, and the HHS requests a termination, the project must be terminated

    o Use the following termination term: This award related to [select the appropriate example relevant to your project by choosing one of the highlighted examples DEI, China, or Transgender issues] no longer effectuates agency priorities. It is the policy of NIH not to further prioritize these research programs. Therefore, the award is terminated. [Refer to Appendix 3 for language provided to NIH by HHS.] Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR)) within 120 days of the end of this grant to avoid unilateral closeout.

    o Insert restriction language that allows for the recipients to use a portion of funds to support the health and safety of patients and orderly closeout of the project.

        ▪ Sample language for use: "Funds in the amount of $xxxxxxx [insert $ amount total cost] may be used to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered."

- Appeals language must be used (prior to October 1, 2025):

    o NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2.   This letter represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli.

    Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be postmarked no later than 30 days after the postmarked date of this notice.

- Termination actions taken based on agency priorities do not require appeals language because the action was not based on administrative nor programmatic noncompliance

A0588

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports.**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.


**Appendix 4 – Approved Term – Use for all Category 2 awards, i.e., renegotiated aims and associated budgets. Approval embedded below. ICs should use this term in the IC specific award conditions**

**Term and Condition of Award**

NIH and the recipient have renegotiated the scope of this award.  Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including Diversity Equity and Inclusion (DEI) research or DEI-related research training activities or programs.  Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes DEI or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

Approval email from Dr. Memoli (Acting Director, NIH) on Friday, February 28, 2025.

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Bundesen, Liza (NIH/OD) [E] |
| **Cc:** | Bulls, Michelle G. (NIH/OD) [E]; Lankford, David (NIH/OD) [E]; Butler, Benjamin (NIH/OD) [E]; Jacobs, Anna (NIH/OD) [E]; Burklow, John (NIH/OD) [E] |
| **Subject:** | Re: Clean Version of DEI Restriction Term - Final |
| **Date:** | Friday, February 28, 2025 2:54:19 PM |

approved

Matt

Get Outlook for iOS

---

**From:** Bundesen, Liza (NIH/OD) [E] <lbundese@mail.nih.gov>
**Sent:** Friday, February 28, 2025 2:53:21 PM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Cc:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>; Lankford, David (NIH/OD) [E] <lankford@od31tm1.od.nih.gov>; Butler, Benjamin (NIH/OD) [E] <butlerben@mail.nih.gov>; Jacobs, Anna (NIH/OD) [E] <anna.jacobs2@nih.gov>; Burklow, John (NIH/OD) [E] <burklowj@od.nih.gov>
**Subject:** Clean Version of DEI Restriction Term - Final

Hi Matt,

Attached is the term and condition of award for your approval.  Please let us know if you approve and we will implement.

Thank you,
Liza

## Staff Guidance –Award Assessments for Alignment with Agency Priorities - March 2025

**Background**

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI).  Terminations that result from science that no longer effectuates NIH's priorities must follow the appeals guidance below. All other terminations for noncompliance require, always, appeal language.

Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities. To avoid issuing awards, in error, that support DEI activities ICs must take care to completely excise all DEI activities using the following categories.

> **Category 1:** The sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that was unpublished as outlined above.
>
> o   Action: ICs must not issue the award.

> **Category 2**: Project partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this means DEI activities are ancillary to the purpose of the project. In some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the DEI Restriction Term of Award in Section IV of the Notice of Award, no exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).

> o   Action 1: Funding IC must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file.
>
> o   Action 2: Once the IC and the applicant/recipient have reached an agreement, issue the award and include the DEI Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.
>
> > ▪   **Note:** If the IC and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award. For ongoing projects, the IC must work with OPERA to negotiate a bilateral termination of the project. Where bilateral termination cannot be reached, the IC must unilaterally terminate the project. Terminated awards (bilaterally or unilaterally) should follow the process identified in Appendix 2.

A0591

**Category 3:** Project does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities & Other Resources' attachment and terminology related to structural racism—this is not all-inclusive).

- o   Action 1: Funding IC must request an updated application/RPPR with the DEI language removed.
- o   Action 2: Once the language has been removed, the IC may proceed with issuing the award.

**Category 4:** Project does not support any DEI activities
- o   Action: IC may proceed with issuing the award.

NIH_GRANTS_002167



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary
Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON DEI-RELATED FUNDING

February 10, 2025

The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

These contracts and grants can cause serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to DEI and similar programs are contributing to the serious problems and acute harms DEI initiatives may pose to the Department's compliance with Federal civil rights law as well as the Department's policy of improving the health and well-being of all Americans. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371-372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of DEI and similar programs rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> **Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

1

A0593

NIH_GRANTS_002168

This Directive shall be implemented through the Department's contracts and payment management systems by personnel with responsibility for such systems who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a DEI or similar contract or grant is paused for review, Department personnel shall immediately send such payment to Scott Rowell, Deputy Chief of Staff for Operations, for prompt review to determine whether or not the payment is appropriate and should be made. Payments on paused contracts shall remain paused and already terminated contracts shall remain terminated pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.

Dorothy A. Fink, M.D., Acting Secretary

A0594

**Appendix 2 – Guidance for staff to use when terminating awards identified by HHS or the IC.**

- Issue a revised NOA.

    - Change the budget and project period end dates to match the date of the termination letter.

    - Check PMS, determine amount of funds remaining, and deobligate the amount reflected in PMS when revising the NOA. Note: This applies to Multi-Year Funded Awards, as well. Work with FFR-C if you have questions regarding deobligating funds to avoid placing the recipient in debt collection.

    - Remove all future years from the project, where applicable. If the grant is in a no cost extension, and the HHS requests a termination, the project must be terminated

    - Use the following termination term: This award related to [select the appropriate example relevant to your project by choosing one of the highlighted examples DEI, China, or Transgender issues] no longer effectuates agency priorities. It is the policy of NIH not to further prioritize these research programs. Therefore, the award is terminated. [Refer to Appendix 3 for language provided to NIH by HHS.] Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR)) within 120 days of the end of this grant to avoid unilateral closeout.

    - Insert restriction language that allows for the recipients to use a portion of funds to support the health and safety of patients and orderly closeout of the project.

        - Sample language for use: "Funds in the amount of $xxxxxxx [insert $ amount total cost] may be used to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered."

- Appeals language must be used (prior to October 1, 2025):
    - NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2.   This letter represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli.

        Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be postmarked no later than 30 days after the postmarked date of this notice.

- Termination actions taken based on agency priorities do not require appeals language because the action was not based on administrative nor programmatic noncompliance

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports.**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.


**Appendix 4 – Approved Term – Use for all Category 2 awards, i.e., renegotiated aims and associated budgets. Approval embedded below. ICs should use this term in the IC specific award conditions**

**Term and Condition of Award**

NIH and the recipient have renegotiated the scope of this award.  Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including Diversity Equity and Inclusion (DEI) research or DEI-related research training activities or programs.  Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes DEI or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

Approval email from Dr. Memoli (Acting Director, NIH) on Friday, February 28, 2025.

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Bundesen, Liza (NIH/OD) [E] |
| **Cc:** | Bulls, Michelle G. (NIH/OD) [E]; Lankford, David (NIH/OD) [E]; Butler, Benjamin (NIH/OD) [E]; Jacobs, Anna (NIH/OD) [E]; Burklow, John (NIH/OD) [E] |
| **Subject:** | Re: Clean Version of DEI Restriction Term - Final |
| **Date:** | Friday, February 28, 2025 2:54:19 PM |

approved

Matt

Get Outlook for iOS

---

**From:** Bundesen, Liza (NIH/OD) [E] <lbundese@mail.nih.gov>
**Sent:** Friday, February 28, 2025 2:53:21 PM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Cc:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>; Lankford, David (NIH/OD) [E] <lankford@od31tm1.od.nih.gov>; Butler, Benjamin (NIH/OD) [E] <butlerben@mail.nih.gov>; Jacobs, Anna (NIH/OD) [E] <anna.jacobs2@nih.gov>; Burklow, John (NIH/OD) [E] <burklowj@od.nih.gov>
**Subject:** Clean Version of DEI Restriction Term - Final

Hi Matt,

Attached is the term and condition of award for your approval.  Please let us know if you approve and we will implement.

Thank you,
Liza

| | |
|---|---|
| From: | Bulls, Michelle (NIH/OD) [E] |
| To: | Chief GMOs |
| Cc: | Bulls, Michelle (NIH/OD) [E]; Ta, Kristin (NIH/OD) [E] |
| Subject: | Award Revision Guidance and List of Terminated Grants via letter on 3/12 |
| Date: | Thursday, March 13, 2025 4:03:00 PM |
| Attachments: | Termination Categories 3.13.25.docx |
| | Terminated Grants 3-12_no subprojects.xlsx |

Chiefs,

Attached are two items: 1) updated categories for you to use when issuing NOAs to officially terminate the awards where letters were issued, and 2) the list of termination letters that were issued yesterday. Please revise your NOAs related to the attached list by next **Wednesday, March 13, 2025, cob**. It is extremely important that issue the revised awards timely. If there are delays, please let me know and we can try to help somehow/some way. I appreciate you all.

**Please save this guidance** until we can clear the updated staff guidance, and you will need this to issue revised awards. Note: If your IC is not listed on the attached spreadsheet – no action is required, at this time.

**Guidance** for IC staff to use when terminating awards identified by HHS or the IC due to DEI or other agency priorities.

- Issue a revised NOA.
    1. Change the budget and project period end dates to match the date of the termination letter.
    2. OPERA will place a hard funds restriction on all documents within the excel spreadsheet. Do not deobigate any funds when you issue the revised award to terminate the projects. If there are no animals and humans, FFR-C will deobligate the awards after the Final FFRs are submitted. No deoblgiation actions required from the ICs.
    3. Remove all future years from the project, where applicable. If the grant is in a no cost extension, and HHS requests a termination, the project must be terminated.
    4. Termination Term to be used **DELETE THE OLD TERM RELATED TO DOLLAR AMOUNTS FOR HARD FUNDS RESTRICTIONS – IT IS NO LONGER APPLICABLE**.

        It is the policy of NIH not to prioritize ==[insert termination category language]==. Therefore, this project is terminated. ==[RECIPIENT NAME]== may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.
        NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a

copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

Thanks,
Michelle

NIH_GRANTS_001958

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

## NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities- March 2025

### Issue Date: March 25, 2025

**Background**

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI).  Terminations that result from science that no longer effectuates NIH's priorities related to DEI, gender identity and other scientific areas must follow the appeals guidance below. All other terminations for noncompliance require, always, appeal language.

Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims/major goals of the project to assess whether the proposed project contains any DEI, gender identity or other research activities that are not an NIH/HHS priority/authority.  To avoid issuing awards, in error, that support these activities ICs must take care to completely excise all non-priority activities using the following categories.

ICs should review the current application/RPPR under consideration, only. ICs should not request retroactive changes to previous RPPRs and competitive applications to modify language related to research that has already been conducted. Categories 1-3 are IC determinations not those ordered by HHS.

**Category 1:** The sole purpose of the project is related to an area that is no longer an NIH/HHS priority/authority (e.g., diversity supplements, diversity fellowships, or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that has been unpublished due to its focus on activities that are no longer an NIH/HHS priority/authority. This applies to all projects, including phased awards, etc.

- o **Action:** ICs must not issue the award (competing or non-competing).
- o For ongoing projects where NIH will not issue the next Type 5 (IC determination not HHS list), the IC must:
  - o Issue a revised award to remove all outyears.
  - o Add the action to the master spreadsheet located at: OD OPERA Grant Action Tracking (access limited to CGMOs).
  - o Include the following term in the revised NOA:

  *Term of Award:*

  It is the policy of NIH not to prioritize research programs related to [insert category from Appendix 3, verbatim]. Therefore, no additional funding will be awarded for this project, and all future years have been removed. [RECIPIENT NAME] may request funds to support patient safety and orderly closeout of the project, and remaining funds will be deobligated. Funds used to support any

A0600

NIH_GRANTS_003216

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

- o Check PMS to determine amount of funds remaining, and if funds are available request a hard funds restriction of all funds except $1 in PMS.

- o **No cost extension requests:** For second and third NCE's, ICs must determine if the sole purpose of the grant was to support research activities that are no longer an NIH/HHS priority/authority and, if so, issue an award to end the grant project (use disapproved extension term below). If the non-NIH/HHS priority/authority research activities are ancillary to the project, approve the extension (use approved extension term below). Reminder – even if a grant project is in an NCE, IC staff must still determine if non-NIH/HHS priority/authority activities are proposed during the extension period. Extensions may only be approved for orderly closeout, and funds may not be used to support any non-NIH/HHS priority/authority research activities.

    - o ICs may use the following term of award when approving/disapproving NCEs:
        - ▪ **Term of Award (approved extension):** The no-cost extension has been approved for this project to support orderly closeout of the project, only. NIH grants funds must not be used to support [insert category – e.g., Diversity, Equity and Inclusion (DEI), gender identity, etc.] research or research training activities or programs. Any funds used to support such activities will result in a disallowance of costs, and funds will be recovered.
        - ▪ **Term of Award (disapproved extension**): The no cost extension request for this project has been denied. Please proceed with orderly closeout of the project. NIH grant funds must not be used to support [insert category – e.g., Diversity, Equity and Inclusion (DEI), gender identity, etc.] research or research training activities or programs.

**Category 2**: Project partially supports non-NIH/HHS priority/authority activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope). This means the non-NIH/HHS priority/authority activities are

A0601

NIH_GRANTS_003217

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

ancillary to the purpose of the project, in some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the Restriction Term of Award in Section IV of the Notice of Award. No exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).

o   Note: Activities required to comply with NIH inclusion policies are not considered DEI activities.

o   **Action 1:** Funding IC must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file.  The recipient/awardee cannot rebudget these funds, they must be recovered by the IC. OPERA is consulting with eRA on options to collect these application updates in a structured format.

■   Sample language for requesting application updates from the AOR: It is the policy of NIH not to prioritize [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa.] [Funding IC] has identified [insert appropriate activity taken from the list above] activities within section [XXXX] of your application. Please work with the PD/PI to update the application sections and adjust the budget as appropriate to remove all [insert appropriate activity] activities and submit these updates to the Program Official and Grants Management Specialist for review and approval.

o   **Action 2:** Once the IC and the applicant/recipient have reached an agreement, issue the award and include the following Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.

**Term of Award (Approved 2/28/2025 – Refer to Appendix 4 for the approval from Dr. Memoli):**

NIH and the recipient have renegotiated the scope of this award.  Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa, etc.] research or related research training activities or programs. Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes

NIH_GRANTS_003218

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

[select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa., etc.] or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

- **Unable to remove activities that are not an NIH/HHS priority/authority:** If the IC and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the non-compliant activities, the IC cannot proceed with the award. For ongoing projects, the IC must work with OPERA to negotiate a bilateral termination of the project. Where bilateral termination cannot be reached, the IC must unilaterally terminate the project. Terminated awards (bilaterally or unilaterally) should follow the process identified in Category 4.
- **Diversity Supplements:** Type 5 Diversity supplements may no longer be awarded. For ongoing awards, ICs must remove the diversity supplement activities prior to issuing the next Type 5 for the parent award and include the DEI Term and Condition of Award in Section IV of the NOA of the parent grant. The IC must revise the Diversity Supplement award to remove all outyears. If diversity supplement outyears were included in the previous NOA, the IC must revise the prior year award to remove references to those outyear commitments.
- **Conference Grants:** If a conference supported by an NIH grant focuses on scientific topics that are unrelated to DEI, but the conference itself is targeted at a specific population (e.g., underrepresented groups), the IC must work with the applicant/recipient to open the conference up to all populations. If a negotiation to broaden the target audience is not feasible, or the conference is no longer viable, then the IC must terminate the award following the process in Category 4.
- **Diversity Reports (e.g., Ts, R25, K12, and any others):** NIH is modifying the application instructions and RPPR instructions to remove requirements for diversity reports (e.g., Trainee Diversity Report). If ICs receive these reports in applications or RPPRs, the IC should not review the report. These reports provide diversity related information, but do not involve specific DEI activities.  ICs must use the following term: "NIH no longer requires the [name of diversity table/plans]. Therefore, NIH did not review the [name of diversity table/plans] provided. NIH funding may not be used to support any diversity, equity or inclusion (DEI) activities". Note: this section applies to diversity related reports, only. Other areas that are no longer NIH/HHS priorities/authority must be addressed under category 2 negotiations.
- **Administrative Supplement Requests:** Administrative supplement applications should be reviewed for any activities that are no longer NIH/HHS priorities/authority and modified as needed. ICs do not need to retroactively review the competitive parent grant application– only the supplement application requires review.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Category 2B:**

Prospective reviews by GM where the DEI language in certain sections of the application has to be removed even though the project itself is not focused on DEI but may have language or have been awarded from a DEI NOFO that is expired/taken down for revision to go back up once the language is appropriately excised.

Examples below, and in these cases, IC should consider using the Category 2 term of award but remove the negotiation language from the term:

- Resource Section
- Biosketch
- RPPRs

**Category 2C:**

Subprojects terminated by HHS.

- OPERA will restrict the funds associated with the project. No action required from the IC.

**Category 3:** Project does not support any DEI activities
- Action: IC may proceed with issuing the award.

**Category 4/HHS Departmental Authority Terminations:**

- OPERA receives a list from the Director, NIH or designee.
- OPERA will issue termination letters on behalf of the IC Chief Grants Management Officers. The IC CGMO will be copied on the email with the termination letter.
  - **Supplements – Parent Award Terminated:** If a terminated award has active supplement(s), all supplement awards must be terminated along with the parent.
  - **Supplement Terminated Only**: If a termination letter references a supplement only, and not the parent award, then the supplement alone must be terminated following the instructions below.
  - **Linked (or equivalent) Awards**: If one linked (or equivalent) award is terminated, the IC is only required to terminate the specific award noted in the letter. The IC must conduct a separate review to determine whether terminating that award will have a structural impact on the scientific design along with associated outcomes and act, as appropriate, to early terminate or allow the remaining awards to continue. Feel free to discuss with OPERA, as needed.
- When a termination letter is received, the IC must:

  - Issue a revised NOA within 3 business days of the date the termination letter was issued to the recipient.
    - Change the budget and project period end dates to match the date of the termination letter.

NIH_GRANTS_003220

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- OPERA will place a hard funds restriction on all PMS subaccounts as termination letters are issued. OPERAs Federal Financial Report Center (FFR-C) will deobligate the remaining funds after the Final FFRs are submitted. There is no deobligation action required from the ICs.
  - Remove all future years from the project, where applicable. If the grant is in a no cost extension, and HHS requests a termination, the project must be terminated even in a no cost extension. If the grant is in a no cost extension, and HHS did not request a termination, follow the NCE guidance above.
  - Include the following Termination Term in the revised NOA:

    It is the policy of NIH not to prioritize [insert termination category language from Appendix 3, verbatim]. Therefore, this project is terminated. [RECIPIENT NAME] may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

    NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

  - Note: Appeals language must be included **prior to** October 1, 2025. After October 1, 2025, when HHS will fully adopt 2 CFR 200, per 2 CFR 200.340, termination actions taken based on agency priorities are not appealable. This is different from terminations based on noncompliance (administrative and programmatic).
- eRA provides OPERA with daily reports on NOAs issued, so ICs do not need to report to OPERA on each action completed.

**Category 5: Awards to Entities in certain foreign countries**

- Additional guidance on awards to foreign entities is forthcoming. At this time, ICs should hold all awards to entities located in South Africa or countries identified on any of the following lists.
  - State Department Countries of Particular Concern
  - State Sponsors of Terrorism
  - Final Rule Restricting Transfer of Personal U.S. Data to Countries of Concern

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- Office of Foreign Assets Control Sanctions List

**Separation of Duties Guidance:**

OPERA has issued a Separation of Duties (SOD) waiver for all CGMOs, specific to the HHS Departmental Authorities termination actions, to allow IC CGMOs to work up and issue termination actions. Copy available in Teams.

A0606

NIH_GRANTS_003222

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary
Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON DEI-RELATED FUNDING

February 10, 2025

The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

These contracts and grants can cause serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to DEI and similar programs are contributing to the serious problems and acute harms DEI initiatives may pose to the Department's compliance with Federal civil rights law as well as the Department's policy of improving the health and well-being of all Americans. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371-372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of DEI and similar programs rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> **Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

1

This Directive shall be implemented through the Department's contracts and payment management systems by personnel with responsibility for such systems who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a DEI or similar contract or grant is paused for review, Department personnel shall immediately send such payment to Scott Rowell, Deputy Chief of Staff for Operations, for prompt review to determine whether or not the payment is appropriate and should be made. Payments on paused contracts shall remain paused and already terminated contracts shall remain terminated pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.

*Dorothy A. Fink*

Dorothy A. Fink, M.D., Acting Secretary

A0608

NIH_GRANTS_003224

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 2 – Guidance for staff to use on specific programs, awards, supplements.**

- **Supplements – Parent Award Terminated:** If a terminated award has active supplement(s), all supplement awards must be terminated along with the parent.
- **Supplement Terminated Only**: If a termination letter references a supplement only, and not the parent award, then the supplement alone must be terminated.
- **Linked (or equivalent) Awards**: If one linked award is terminated, the IC is only required to terminate the specific award noted in the letter. The is should review and determine whether terminating that ward will have a structural impact on the scientific outcome originally intended by the IC and act as appropriate on the remaining awards.
- **Diversity Tables** – Ignore and issue the grant using the term provided above.
- **Diversity Plans** – Ignore and issue the award using the term provided above.

A0609

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports. Use this language for HHS terminations only.**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

- Vaccine Hesitancy: It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria.

- COVID: The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

A0610

NIH_GRANTS_003226

Appendix 4 - Approval email from Dr. Memoli (Acting Director, NIH) on Friday, February 28, 2025.

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Bundesen, Liza (NIH/OD) [E] |
| **Cc:** | Bulls, Michelle G. (NIH/OD) [E]; Lankford, David (NIH/OD) [E]; Butler, Benjamin (NIH/OD) [E]; Jacobs, Anna (NIH/OD) [E]; Burklow, John (NIH/OD) [E] |
| **Subject:** | Re: Clean Version of DEI Restriction Term - Final |
| **Date:** | Friday, February 28, 2025 2:54:19 PM |

approved

Matt

Get Outlook for iOS

---

**From:** Bundesen, Liza (NIH/OD) [E] <lbundese@mail.nih.gov>
**Sent:** Friday, February 28, 2025 2:53:21 PM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Cc:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>; Lankford, David (NIH/OD) [E] <lankford@od31tm1.od.nih.gov>; Butler, Benjamin (NIH/OD) [E] <butlerben@mail.nih.gov>; Jacobs, Anna (NIH/OD) [E] <anna.jacobs2@nih.gov>; Burklow, John (NIH/OD) [E] <burklowj@od.nih.gov>
**Subject:** Clean Version of DEI Restriction Term - Final

Hi Matt,

Attached is the term and condition of award for your approval. Please let us know if you approve and we will implement.

Thank you,
Liza

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 5 – Notice of Funding Opportunity (NOFO) Guidance**

**[pending]**

A0612

NIH_GRANTS_003228

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 6 – Frequently Asked Questions**

1. **When reviewing applications for activities that are no longer an NIH/HHS priority/authority, should ICs review the content of Other Support submissions?**

   Other Support is used to disclose the PIs ongoing activities and support and should not be modified. ICs do not need to review Other Support for alignment with NIH/HHS priorities/authority.

2. **For phased awards where the second phase (i.e., Type 4) will not be awarded due to NIH/HHS priority/authority, how should the IC notify the recipient that the Type 4 will not be issued?**

   OPERA is following up on this question, and will provide additional guidance, when available.

3. **When revising awards to terminate a project, how should the IC respond to red bars in SEAR?**

   The IC should not contact recipients to request any additional information to address SEAR flags, because the project is being terminated. ICs can clear the SEAR flag with a comment that the project is being terminated.

4. **If a project is terminated on an HHS list or a Type 5 is withheld because the project is no longer an NIH/HHS priority/authority, can the IC issue a subsequent Type 2 award?**

   No. If a project has been terminated due to agency priorities, it is no longer eligible for a renewal award.

5. **For recipients of K awards that are terminated due to NIH/HHS priority/authority, will eligibility requirements be modified to allow the individual to apply for another K award?**

   OER is reviewing this policy and will provide additional guidance, when available.

6. **When ICs issue revised NOAs to terminate awards, do they have to use the exact language provided by HHS in the termination term?**

   Yes, ICs must use the exact language provided in Appendix 3, with no edits.

A0613

NIH_GRANTS_003229

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 7 – Managing PMS Hard Funds Restrictions**

OPERA directs PMS to hard funds restrict awards, when termination letter is issued.

Recipients are required to request approval from OPERA before any draw that occurs after the termination. The request must include details related to human subjects or animal welfare. These are the only approvals that will be issued. OPERA will work with the IC to facilitate approvals and facilitate lifting restrictions in PMS. After approval is issued, the recipient can request the drawdown in PMS.

Recipients are required to request approval from OPERA to lift the restriction for payments of costs incurred on or before the date of the termination. For costs on or before the date of the termination, OPERA will work with PMS to lift the restriction as appropriate.

Note: Balances reported to HHS will change, as drawdowns are approved as outlined above. Reports to HHS will be updated as balances are modified. OPERA is responsible for maintaining up to date information for HHS reporting.

A0614

NIH_GRANTS_003230

| | |
|---|---|
| From: | Bulls, Michelle (NIH/OD) [E] |
| To: | Chief GMOs |
| Cc: | Perry Jones, Aretina (NIH/NIDDK) [E]; Rosenberg, Mary (NIH/NIDDK) [E]; Curling, Mitchell (NIH/NIDDK) [E] |
| Subject: | Staff Guidance - Updates Made during GMAC |
| Date: | Wednesday, May 07, 2025 4:04:00 PM |
| Attachments: | NIH Grants Management Staff Guidance - Alignment with Priorities - Draft - 5.7.2025 Updates.pdf |

Updated staff guidance based on discussions...

- Emphasize that whether the NOFO was unpublished or expired naturally, if the sole purpose was DEI or another category that does not effectuate the NIH/HHS priorities, ICO's cannot make the award.
- Updated term language to note that requests for ICO reconsiderations should be sent to the IC Director.
- Updated Category 2 when ICOs are unable to remove activities that are not an NIH/HHS priority. ICOs do not need to work with OPERA on the bilateral termination, rather, OPERA must be notified, for tracking purposes.
- Updated Category 2B. Noted that ICOs should document any changes to the title or abstract in the grant file.
- Category 2:
  - Added term for bilateral terminations.
  - Clarified that for unilateral terminations, the ICO must issue a letter as outlined in Termination Type 3 – ICO determinations
- Category 4: Added a note referencing NOT-oD-25-104. At this time, and until the details of the new foreign collaboration award structure are released, NIH will not issue awards to domestic or foreign entities that include a subaward to a foreign entity.
- Appendix 8: Updated template letter, to be used for ICO determinations, to reflect ICO reconsideration language and IC CGMO as signatory.
- Added FAQ on negotiating with conference grant recipients to remove DEI sessions or activities.

Reminder – we will finalize once we receive the memo from the Director.

A0615

NIH_GRANTS_003547

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

## NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – DRAFT

### Final Issue Date: Pending NIH Director's updated priorities

**Background**

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI).  This guidance seeks to expand the scope of the categories within to include other agency priorities that will be defined by the Director, NIH. The Director will issue a guide notice to publicize the agency's updated priorities in an effort to be transparent as research priorities shift.

**NOFO Guidance**

NIH is required to submit forecast reports to HHS prior to issuing new or reissued Notices of Funding Opportunities (NOFO's) within the NIH Guide for Grants and Contracts and Grants.gov. See Appendix 5 for the workflow.

**Award Guidance**

Prior to issuing all awards (competing and non-competing, monetary and non-monetary (e.g., carryover requests, no-cost extensions, etc.)), ICO's must review the specific aims/major goals of the project to assess whether the proposed project contains any DEI and/or other research activities that are not an NIH/HHS priority/authority.  To avoid issuing awards, in error, that support these activities ICO's must take care to completely excise all non-priority activities using the following categories.

ICO's should review the current application/RPPR under consideration, only. ICO's should not request retroactive changes to previous RPPRs and competitive applications to modify language related to research that has already been conducted.

**Category 1:** The sole purpose of the project is related to an area that is no longer an NIH/HHS priority/authority (e.g., diversity supplements, diversity fellowships, or conference grant where the purpose of the meeting is diversity, etc. after the priorities memo is issued), and/or the application was received in response to a NOFO that has been unpublished due to its focus on activities that are no longer an NIH/HHS priority/authority. Whether the NOFO was unpublished or expired naturally, if the sole purpose was DEI or another category that does not effectuate the NIH/HHS priorities, ICO's cannot make the award.

This applies to all projects, including phased awards, etc. Reminder: CGMOs requested access to the NOFO list, and NIH leadership provided the following interim process: CGMOs must consult with their Division of Extramural Activities (DEA) rep to obtain up to date information on NOFOs.

- o **Action:** ICO's must not issue the award (competing or non-competing).

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- o For ongoing projects where NIH will not issue the next Type 5 (ICO determination not HHS list), the ICO must:
  - o Issue a revised award to end the award ==at the end of the current budget period and== remove all outyears. A termination letter is not required.
  - o Add the action to the master spreadsheet located at: OD OPERA Grant Action Tracking (Access limited to CGMOs. CGMOs may email OPERA leadership to identify a delegate, if needed).
  - o Include the following term in the revised NOA:

    **Term of Award:**

    Effective with this Notice of Award, this project is terminated. [Insert appropriate category from Appendix 3, verbatim]. Therefore, no additional funding will be awarded for this project, and all future years have been removed. If appropriate, [RECIPIENT NAME] may request funds to support patient safety and animal welfare to support an orderly phaseout of the project.

    Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination (with proof of the date), or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

    Please be advised that your organization, as part of the orderly phaseout process, will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within **60** days (non-human subjects and animals) **120** days (human subjects and animals) after the end of this project.

    This action aligns with Termination - 2 C.F.R. § 200.340 (a)(4). This is a final determination. If you wish to seek a reconsideration because you object to the ICO's termination, please submit a reconsideration request to ==[IC Director Name], Director, [IC Name].==

  - o In this instance, ==there is no hard funds restriction required==. The recipient will submit their Final FFR in accordance with the term and conditions, and any remaining funding will be deobligated by the FFR-C upon review and acceptance of the FFR.

  - o NOTE: OPERA recognizes that the closeout letters will be automatically sent, so we are working internally with the closeout support center staff to manage this process. If you receive inquiries, please point the inquirer to: OPERALeadership@nih.gov

  - o **No cost extension requests:** For second and third NCE's, ICO's must determine if the sole purpose of the grant was to support research activities that are no longer an NIH/HHS

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

priority/authority and, if so, issue an award to immediately end the grant project (use disapproved extension term below). If the non-NIH/HHS priority/authority research activities are ancillary to the project, approve the extension (use approved extension term below). Reminder – even if a grant project is in an NCE, ICO staff must still determine if non-NIH/HHS priority/authority activities are proposed during the extension period. Extensions may only be approved for orderly phaseout, and funds may not be used to support any non-NIH/HHS priority/authority research activities.

- o ICO's may use the following term of award when approving/disapproving NCEs:
  - **Term of Award (approved extension):** The no-cost extension has been approved for this project to support an orderly phaseout of the project, no other reasons are allowed. NIH grants funds must not be used to support [insert category – e.g., Diversity, Equity and Inclusion (DEI), COVID 19, etc.] research or research training activities or programs. Any funds used to support such activities will result in a disallowance of costs, and funds will be recovered.
  - **Term of Award (disapproved extension)**: The no cost extension request for this project has been denied. Please proceed with orderly phaseout of the project. NIH grant funds must not be used to support [insert category – e.g., Diversity, Equity and Inclusion (DEI), gender identity, etc.] research or research training activities or programs.

**Category 2**: Project partially supports non-NIH/HHS priority/authority activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope). This means the non-NIH/HHS priority/authority activities are ancillary to the purpose of the project, in some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the Restriction Term of Award (see Action 2) in Section IV of the Notice of Award. No exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).

- o Note: Activities required to comply with NIH inclusion policies are not considered DEI activities.
- o **Action 1:** Funding ICO must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file. The recipient/awardee cannot rebudget these funds, they must be recovered by the IC.
  - After an informal conversation, the ICO must send a written request to the AOR outlining what portion of the aims and budget must be modified to document the renegotiation process:
    - Sample language for requesting application updates from the AOR: It is the policy of NIH not to prioritize [select one of the following: diversity, equity and inclusion (DEI) research programs, or other non-HHS/NIH priorities, or countries of concern]. [Funding IC] has identified [insert appropriate activity taken from the list above] activities within section

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

[XXXX] of your application. Please work with the PD/PI to update the application sections and adjust the budget as appropriate to remove all [insert appropriate activity] activities and submit these updates to the Program Official and Grants Management Specialist for review and approval.

- Once the recipient responds and the ICO and the recipient agree to the changes, the ICO must direct the AOR to submit a revised face page, specific aims and budget via the prior approval module 'Other Request' type. See eRA online help for instructions.
- Once the ICO renegotiates the revised specific aims, the ICO must upload into the Additions for GM section of the grant folder the new aims.  These must be uploaded under the file group "Award Documents: Revised Aims and Abstract".
- If the ICO renegotiates a revised budget, the ICO should update the GM workbook, as appropriate.

o **Action 2:** Once the ICO and the applicant/recipient have reached an agreement, and updated documents are received and properly filed as outlined above, issue the award and include the following Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.

**Term of Award (Approved 2/28/2025 – Refer to Appendix 4 for the approval from Dr. Memoli):**

NIH and the recipient have renegotiated the scope of this award.  Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa, etc.] research or related research training activities or programs. Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes [select one of the following: diversity, equity and inclusion (DEI) research programs, vaccine hesitancy, climate change, etc.] or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- o **Unable to remove activities that are not an NIH/HHS priority:** If the ICO and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the non-compliant activities, the ICO cannot proceed with the award. For ongoing projects, the ICO must notify OPERA (OPERAleadership@nih.gov) and negotiate a bilateral termination of the project. For bilateral terminations, the ICO must Issue a revised award to remove all outyears and include the following term in Section IV of the NOA.

  > NIH is bilaterally terminating this award effective [effective date] in accordance with the request dated [date], because the project does not align with NIH priorities. No additional funding will be awarded for this project, and all future years have been removed. If appropriate, [RECIPIENT NAME] may request funds to support patient safety and animal welfare to support an orderly phaseout of the project.

  > Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination (with proof of the date), or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

  > Please be advised that your organization, as part of the orderly phaseout process, will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within **60** days (non-human subjects and animals) **120** days (human subjects and animals) after the end of this project.

Where bilateral termination cannot be reached, the ICO must unilaterally terminate the project. Unilaterally terminated awards should follow the process identified **Termination Type 3: ICO-Terminations** to send the termination letter and revise the award.

- o **Diversity Supplements:** Type 5 Diversity supplements may no longer be awarded. For ongoing awards, ICO's must remove the diversity supplement activities prior to issuing the next Type 5 for the parent award and include the following term in Section IV of the NOA of the parent grant. The ICO must revise the Diversity Supplement award to remove all outyears. If diversity supplement outyears were included in the previous NOA, the ICO must revise the prior year award to remove references to those outyear commitments.

  > **Term of Award:** The diversity supplement associate with this project, [insert diversity supplement grant number], is being terminated.  No additional funding will be awarded, and all future years have been removed. Research programs

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected classes, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Funds issued for the Diversity Supplement may no longer be utilized and cannot be rebudgeted nor carried over to future years.

o **Conference Grants:** If a conference supported by an NIH grant focuses on scientific top ICO's that are unrelated to DEI, but the conference itself is targeted at a specific population (e.g., underrepresented groups), the ICO must work with the applicant/recipient to open the conference up to all populations. If a negotiation to broaden the target audience is not feasible, or the conference is no longer viable, then the ICO must terminate the award following the process in **Category 1**.

o **Diversity Reports (e.g., Ts, R25, K12, and any others):** NIH is modifying the application instructions and RPPR instructions to remove requirements for diversity reports (e.g., Trainee Diversity Report). If ICO's receive these reports in applications or RPPRs, the IC should not review the report. These reports provide diversity related information, but do not involve specific DEI activities. ICO's must use the following term: "NIH no longer requires the [name of diversity table/plans]. Therefore, NIH did not review the [name of diversity table/plans] provided. NIH funding may not be used to support any diversity, equity or inclusion (DEI) activities". Note: this section applies to diversity related reports, only. Other areas that are no longer NIH/HHS priorities/authority must be addressed under category 2 negotiations.

o **Administrative Supplement Requests:** Administrative supplement applications should be reviewed for any activities that are no longer NIH/HHS priorities/authority and modified as needed. ICO's do not need to retroactively review the competitive parent grant application– only the supplement application requires review.

**Category 2B:**

Prospective reviews by GM where the DEI and/or language in certain sections of the application has to be removed even though the project itself is not focused on DEI but may have language or have been awarded from a DEI NOFO that is expired/taken down for revision to go back up once the language is appropriately excised.

Examples below, and in these cases, ICO should consider using the Category 2 term of award but remove the negotiation language from the term. ICO's do not need to request revised materials from the recipients. However, the project title and/or abstract may need to be updated to remove any language that does not align with NIH/HHS priorities/authority. ==The changes must be noted in the grant file. Reminder: ICOs do not need to modify the historical record to modify language.==

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- Resource Section
- Biosketch
- RPPRs
- Letters of Support

**Category 2C**: Subprojects/cores terminated by HHS.

ICO's do not need to terminate the subprojects/cores. The funds can be restricted and recovered, unless there is a negotiation where a new subproject/core is identified that does not violate the priorities of the agency. The following actions will occur in these cases:

- OPERA will restrict the funds associated with the project and notify the ICO.
- The ICO must revise the award to remove the subproject/core, only and must not issue a termination letter nor termination language within the terms and conditions. ICO
- The revised award must include the following term in Section IV.

    [Insert category from Appendix 3, verbatim]. Therefore, no additional funds may be used to support the activities under [insert subproject or core title], and all activities must cease, effective with the date of this revision. Funds used to support these activities will be disallowed and recovered. Funds issued for this subproject/core may no longer be utilized and cannot be rebudgeted nor carried over to future years.

**Category 3: Project does not support any DEI or other activities that go against the HHS/NIH priorities.**
- o Action: ICO may proceed with issuing the award.

**Category 4: Foreign Awards.**

Note: Effective May 1, and until the details of the new foreign collaboration award structure are released, NIH will not issue awards to domestic or foreign entities (new, renewal or non-competing continuation), that include a subaward to a foreign entity. See NOT-OD-25-104.

4A. Agency priorities:

- South Africa: Note: Currently (April/May 2025), continue to hold award actions related to entities in South Africa until final determinations are made by NIH leadership. This applies to both monetary and non-monetary award actions. ICOs may negotiate with recipients to remove activities in South Africa from ongoing awards as long as the project remains viable. **IMPORTANT NOTE: Funds may only be provided to entities in South Africa to support health and safety of human participants in clinical trials/clinical research.**
- China: Note: Currently (April/May 2025), hold on making awards to entities in China until the final determinations are made by NIH leadership. This applies to both monetary and non-monetary award actions. **IMPORTANT NOTE: ICOs may negotiate with recipients to remove activities in China from ongoing awards as**

**long as the project remains viable, or a suitable domestic replacement is identified. Funds may only be provided to entities in China to support health and safety of human participants in clinical trials.**

4B. Countries of Concern:

- The State Department's countries of concern lists are updated regularly. Therefore, ICOs must check the list annually prior to making new, renewal, and noncompeting continuation awards. Additionally, out of an abundance of caution related to the United States national security threats, if a country is added to either of the two lists below, ICO's must submit a request through FACTs to obtain State Department clearance. If clearance is not received within 14 days, the award cannot be made until it is received (i.e., new, renewal, and noncompeting continuations).
- At this time, ICO's should note in FACTs when awards (new, renewal, non-competing continuation) involve entities on the following State Department lists:
  - Countries in which the government of has engaged in or tolerated "particularly severe violations of religious freedom": State Department Countries of Particular Concern
  - Countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism: State Sponsors of Terrorism
- Awards may only be issued once State Department clearance is obtained. Do not assume approval unless a response is received from the State Department. The staff guidance on FACTS clearance will be updated to reflect this change. This applies to all direct foreign awards and foreign collaborations (monetary and non-monetary).

OPERA has not included the Final Rule Restricting Transfer of Personal U.S. Data to Countries of Concern (please consider this list related to sensitive or PII data is involved for clinical trials/clinical research) or Office of Foreign Assets Control Sanctions List, as these are not factors in award decisions.  In all cases, if there are questions contact the Fogarty International Center for expert assistance.

**Termination Types:**

As NIH implements the Director's agency's priorities, NIH will take various measures to integrate these priorities into the Institutes and Centers across the enterprise there are various types of terminations that may take place where the project cannot be renegotiated. As such, there steps that must be taken once the need for termination has been identified and/or provided.

Terminations that result from science that no longer effectuates NIH's priorities related to DEI, gender identity and other scientific areas do not require a formal appeals process. If a recipient requests an ICO to reconsider a termination action, the ICO can work with the recipient to determine whether the action will stand. All other terminations for noncompliance require the agency to include appeals language within the termination letter and NOA - appeal language.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Type 1:  HHS Departmental Authority Terminations.**

- o   OPERA receives a list from the Director, NIH or designee.
- o   OPERA will issue termination letters on behalf of the IC Chief Grants Management Officers. The IC CGMO will be copied on the email with the termination letter.
  - ▪   **Supplements – Parent Award Terminated:** If a terminated award has active supplement(s), all supplement awards must be terminated along with the parent.
  - ▪   **Supplement Terminated Only**: If a termination letter references a supplement only, and not the parent award, then the supplement alone must be terminated following the instructions below.
  - ▪   **Linked (or equivalent) Awards**: If one linked (or equivalent) award is terminated, the ICO is only required to terminate the specific award noted in the letter. The IC must conduct a separate review to determine whether terminating that award will have a structural impact on the scientific design along with associated outcomes and act, as appropriate, to early terminate or allow the remaining awards to continue. Feel free to discuss with OPERA, as needed.
- o   When a termination letter is received, the ICO must:

  - •   Issue a revised NOA within 3 business days of the date the termination letter was issued to the recipient.
    - ▪   Change the budget and project period end dates to match the date of the termination letter.
      - •   OPERA will place a hard funds restriction on all PMS subaccounts as termination letters are issued. OPERAs Federal Financial Report Center (FFR-C) will deobligate the remaining funds after the Final FFRs are submitted. There is no deobligation action required from the ICO's.
    - ▪   Remove all future years from the project, where applicable. If the grant is in a no cost extension, and HHS requests a termination, the project must be terminated even in a no cost extension. If the grant is in a no cost extension, and HHS did not request a termination, follow the NCE guidance above.

    - ▪   Include the following Termination Term in the revised NOA:

      This award is terminated effective [effective date]. [Insert category from Appendix 3, verbatim]. If appropriate, [RECIPIENT NAME] may request funds to support patient safety and animal welfare in support of an orderly phaseout of the project.

      Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination, or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

Please be advised that your organization, as part of the orderly phaseout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within **60** days (non-human subjects) **120** days (human subjects and animals) after the end of this project.

NIH is taking this action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

- Note: Appeals language must be included **prior to** October 1, 2025. After October 1, 2025, when HHS will fully adopt 2 CFR 200, per 2 CFR 200.340, termination actions taken based on agency priorities are not appealable. This is different from terminations based on noncompliance (administrative and programmatic).

o  eRA provides OPERA with daily reports on NOAs issued, so ICO's do not need to report to OPERA on each action completed.
o  When a terminated award must be reinstated, OPERA will notify the IC.
o   ICOs must issue a revised award and **replace** the previous termination language with the following term:
   - Effective with the date of this revised Notice of Award, funding for Project Number [insert grant number] is hereby fully reinstated; therefore, the termination letter dated [insert date] is rescinded without conditions. Funds made available to [insert institution name] used to support [insert the title of the project] are no longer restricted and are available for use in accordance with the terms and conditions of the award.
   - OPERA will coordinate with HHS PMS to lift the hard funds restriction and will copy Alan Whatley on the request to the ICO.

Screenshot: Example of reinstatement. **Note – please make it clear that previous termination term has been deleted or is no longer applicable.**

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**2: OD**

**Type NIH**



**SECTION IV – AI SPECIFIC AWARD CONDITIONS –** ▮▮▮▮▮▮▮▮

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

REVISED AWARD: Effective with the date of this revised Notice of Award, funding for Project Number 1R21▮▮▮▮▮▮▮ is hereby fully reinstated; therefore, the termination letter dated 03/21/2025 is rescinded without conditions. Funds made available to UNIVERSITY ▮▮▮▮▮▮ used to support "A ▮▮▮▮▮▮▮▮▮▮▮▮ are no longer restricted and are available for use in accordance with the terms and conditions of the award.

Supersedes previous Notice of Award dated 03/22/2025. All other terms and conditions still apply to this award.

****

**Directed Terminations.**

- o The Immediate Office of the NIH Director evaluates a program and determines that a program must be terminated due to agency priorities (e.g., COMPASS, FIRST). OPERA receives a list from OD. In such cases, this determination could impact multiple projects and each individual project under the program must be addressed.
- o OPERA will issue termination letters on behalf of the IC Chief Grants Management Officers. The IC CGMO will be copied on the email with the termination letter.
  - **Supplements – Parent Award Terminated:** If a terminated award has active supplement(s), all supplement awards must be terminated along with the parent.
  - **Supplement Terminated Only**: If a termination letter references a supplement only, and not the parent award, then the supplement alone must be terminated following the instructions below.
  - **Linked (or equivalent) Awards**: If one linked (or equivalent) award is terminated, the IC is only required to terminate the specific award noted in the letter. The IC must conduct a separate review to determine whether terminating that award will have a structural impact on the scientific design along with associated outcomes and act, as appropriate, to early terminate or allow the remaining awards to continue. Feel free to discuss with OPERA, as needed.
- o When a termination letter is received, the ICO must:
  - Issue a revised NOA within 3 business days of the date the termination letter was issued to the recipient.
    - Change the budget and project period end dates to match the date of the termination letter.
      - OPERA will place a hard funds restriction on all PMS subaccounts as termination letters are issued. OPERAs Federal Financial Report Center (FFR-C) will deobligate the remaining funds after the Final FFRs are submitted. There is no deobligation action required from the ICO's.
    - Remove all future years from the project, where applicable. If the grant is in a no cost extension, and HHS requests a termination, the project must be

A0626                                                                    NIH_GRANTS_003558

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

terminated even in a no cost extension. If the grant is in a no cost extension, and HHS did not request a termination, follow the NCE guidance above.

- ▪ Include the following Termination Term in the revised NOA:

  This award is terminated effective [insert effective date]. [Insert category from Appendix 3, verbatim]. If appropriate, [RECIPIENT NAME] may request funds to support patient safety and animal welfare in support of an orderly phaseout of the project.

  Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination, or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

  Please be advised that your organization, as part of the orderly phaseout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within **60** days (non-human subjects and animals) **120** days (human subjects and animals) after the end of this project.

  This is a final determination. If you wish to seek a reconsideration because you object to the ICO's termination, please submit a reconsideration request to [IC Director Name], Director, [IC Name].

- o When a terminated award must be reinstated, OPERA will notify the ICO.
- o Once alerted, ICO's must issue a revised award and **replace** the previous termination language with the following term:
  - • Effective with the date of this revised Notice of Award, funding for Project Number [insert grant number] is hereby fully reinstated; therefore, the termination letter dated [insert date] is rescinded without conditions. Funds made available to [insert institution name] used to support [insert the title of the project] are no longer restricted and are available for use in accordance with the terms and conditions of the award.
  - • OPERA will coordinate with HHS PMS to lift the hard funds restriction.

**Tracking Note:**  eRA provides OPERA with daily reports on NOAs issued, so ICO's do not need to report to OPERA on each action completed.

**Type 3: ICO- Terminations.**

- o **ICO conducts a portfolio analysis and determines that a project no longer effectuates the agencies priorities.**

- o **Project cannot be renegotiated. The ICO must a letter to the recipient notifying them that the project will be terminated (see Appendix 8 for sample letter).**
  - Issue a revised NOA within 3 business days of the date the termination letter was issued to the recipient.
    - Change the budget and project period end dates to match the date of the termination letter.
      - The **ICO's** will place a hard funds restriction on all PMS subaccounts as termination letters are issued. OPERAs Federal Financial Report Center (FFR-C) will deobligate the remaining funds after the Final FFRs are submitted. There is no deobligation action required from the ICO's.
    - Remove all future years from the project, where applicable.

    - Include the following Termination Term in the revised NOA:

      This award is terminated effective <span style="color:red">[insert effective date]. [Insert category from Appendix 3, verbatim]</span>. If appropriate, <span style="color:red">[RECIPIENT NAME]</span> may request funds to support patient safety and animal welfare in support of an orderly phaseout of the project.

      Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination, or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

      Please be advised that your organization, as part of the orderly phaseout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within **60** days (non-human subjects and animals) **120** days (human subjects and animals) after the end of this project.

      This is a final determination. If you wish to seek a reconsideration because you object to the ICO's termination, please submit a reconsideration request to <mark>[IC Director Name], Director, [IC Name]</mark>.

**Type 4: Bilateral Terminations.**

The recipient and the ICO agree that the project is no longer viable, and the project cannot be saved upon the removal of the research that no longer aligns with agency's priorities. As such the ICO must:

- o Request a bilateral termination letter from the recipient agreeing to terminate the project on the basis that the project is no longer viable with the aims that need to be negotiated out of the project.

- Issue a letter responding to the recipient's request notifying them that the ICO has accepted the bilateral termination and will issue a revised award to modify the project period end date to the date requested.
- ICO must issue a NOA to the recipient.
  - Change the budget and project period end dates to match the date of the termination letter.
    - The **ICO** will place a hard funds restriction on all PMS subaccounts as termination letters are issued. OPERAs Federal Financial Report Center (FFR-C) will deobligate the remaining funds after the Final FFRs are submitted. There is no deobligation action required from the ICO's.
  - Remove all future years from the project, where applicable. If the grant is in a no cost extension, and HHS requests a termination, the project must be terminated even in a no cost extension. If the grant is in a no cost extension, and HHS did not request a termination, follow the NCE guidance above.

  - Include the following Termination Term in the revised NOA:

    This award is bilaterally terminated effective [insert effective date]. [Insert category from Appendix 3, verbatim]. If appropriate, [RECIPIENT NAME] may request funds to support patient safety and animal welfare in support of an orderly phaseout of the project.

    Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination, or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

    Please be advised that your organization, as part of the orderly phaseout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within **60** days (non-human subjects and animals) **120** days (human subjects and animals) after the end of this project.

**Separation of Duties Guidance:**

OPERA has issued a Separation of Duties (SOD) waiver for all CGMOs, specific to the HHS Departmental Authorities termination actions, to allow IC CGMOs to work up and issue termination actions. Copy available in Teams.

**Impacts on the Biomedical Workforce:**

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- **NRSA Payback:** NIH recognizes that award terminations may prematurely end the training period for NRSA fellows and trainees. Fellows and trainees may not have received sufficient training to be qualified to perform the service requirement before the grant terminated or may be unable to find employment opportunities due to the termination. NIH will accept payback waiver requests from trainees and fellows impacted by terminations. See NIH GPS 11.4.3.4 for instructions on submitting waiver requests.

- **Early-Stage Investigators (ESI):**

    o  Short Term Extension for ESI investigators: NIH will automatically extend the Early-Stage Investigator (ESI) eligibility period by four (4) months for all investigators whose ESI status was active during the period January 1, 2025, to May 31, 2025. NIH is implementing this short-term extension to assist ESI investigators – who are working under strict eligibility timelines – to remain competitive for NIH support. Updated ESI end dates will appear in eRA commons by June 1, 2025.

    o  **Restoring ESI status:** Investigators lose their ESI eligibility when they successfully compete for and receive a substantial independent research award. In the event an investigator's first substantial independent research award is terminated within the first three years of the project period, the investigator can request the reinstatement of ESI status, using the ESI Extensions request tool in eRA commons. To be eligible, an investigator's grant may not have been terminated due to misconduct or ethical violations. See Requesting an Extension for instructions.

- **K award eligibility:** NIH has implemented a temporary exception to the NIH GPS Section 12.3.7, which generally limits eligibility for mentored career development (K) awards to those who have not previously been the recipient of such awards.  NIH will allow individuals whose NIH-funded mentored career development awards were **ended on or after January 1, 2025**, to be eligible to apply for a new mentored career development award, contingent upon all other eligibility requirements being met. Investigators that meet all other NIH eligibility requirements for other mentored career awards may take advantage of applying for such awards to allow for the completion of the years that were remaining at the time the award ended.

**Definition(s):**

- **Gender-affirming care:** An array of services that may include medical, surgical, mental health, and non-medical services for transgender and nonbinary people. This includes, but is not limited to, therapy; mental health care; assistance with elements of a social transition (e.g., new name and pronouns, modification of clothing, voice training); evaluation of persistency of gender dysphoria, emotional and cognitive maturity, and coexisting psychological, medical, or social problems; puberty-suppressing medications; hormone therapy; and surgery.  By way of clarification and not limitation, "gender-affirming care" includes patient care provided as part of research or education grants, including but not limited to routine services, ancillary services, outpatient services, inpatient services, and usual patient care received during the study.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Health Disparities: Pending.**

**Appendix 1 – HHS's Secretarial Directive on DEI-Related Funding – February 10, 2025.**

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**     Office of the Secretary

Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON DEI-RELATED FUNDING

### February 10, 2025

The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

These contracts and grants can cause serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to DEI and similar programs are contributing to the serious problems and acute harms DEI initiatives may pose to the Department's compliance with Federal civil rights law as well as the Department's policy of improving the health and well-being of all Americans. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371-372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of DEI and similar programs rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> **Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

1

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

This Directive shall be implemented through the Department's contracts and payment management systems by personnel with responsibility for such systems who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a DEI or similar contract or grant is paused for review, Department personnel shall immediately send such payment to Scott Rowell, Deputy Chief of Staff for Operations, for prompt review to determine whether or not the payment is appropriate and should be made. Payments on paused contracts shall remain paused and already terminated contracts shall remain terminated pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.

*Dorothy A. Fink*

Dorothy A. Fink, M.D., Acting Secretary

NIH_GRANTS_003565

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 2 – Guidance for staff to use on specific programs, awards, supplements.**

- o **Supplements – Parent Award Terminated:** If a terminated award has active supplement(s), all supplement awards must be terminated along with the parent.
- o **Supplement Terminated Only**: If a termination letter references a supplement only, and not the parent award, then the supplement alone must be terminated.
- o **Linked (or equivalent) Awards**: If one linked award is terminated, the ICO is only required to terminate the specific award noted in the letter. The is should review and determine whether terminating that ward will have a structural impact on the scientific outcome originally intended by the ICO and act as appropriate on the remaining awards.
- o **Diversity Tables** – Ignore and issue the grant using the term provided above.
- o **Diversity Plans** – Ignore and issue the award using the term provided above.



A0634

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports.**

- China: "Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives."

- DEI: "Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics ICO's, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs."

- Gender-Affirming Care: "Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs."  **Reminder: At this time, do not terminate any grants related to gender identify/transgender without clearance from OER.  All such actions must be approved before any terminations.**

- Vaccine Hesitancy: "It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria."

- COVID (to be used for HHS/NIH OD directed terminations only): "The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary."  **Note: ICO's may continue to support projects that funds general biology of coronavirus not linked to COVID-19. As ICO's conduct in-house analysis of project portfolios related to COVID the term may change. Please work with OPERA to develop standard terms based on the outcome of the analysis.**

- Climate Change: "Not consistent with HHS/NIH priorities particularly in the area of health effects of climate change."

- Influencing Public Opinion: "This project is terminated because it does not effectuate the NIH/HHS' priorities; specifically, research related to attempts to influence the public's opinion."

**Appendix 4 – Approved Term – Use for all Category 2 awards, i.e., renegotiated aims and associated budgets. Approval embedded below. ICO's should use this term in the IC specific award conditions.**

Approval email from Dr. Memoli (Acting Director, NIH) on Friday, February 28, 2025.

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Bundesen, Liza (NIH/OD) [E] |
| **Cc:** | Bulls, Michelle G. (NIH/OD) [E]; Lankford, David (NIH/OD) [E]; Butler, Benjamin (NIH/OD) [E]; Jacobs, Anna (NIH/OD) [E]; Burklow, John (NIH/OD) [E] |
| **Subject:** | Re: Clean Version of DEI Restriction Term - Final |
| **Date:** | Friday, February 28, 2025 2:54:19 PM |

approved

Matt

Get Outlook for iOS

---

**From:** Bundesen, Liza (NIH/OD) [E] <lbundese@mail.nih.gov>
**Sent:** Friday, February 28, 2025 2:53:21 PM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Cc:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>; Lankford, David (NIH/OD) [E] <lankford@od31tm1.od.nih.gov>; Butler, Benjamin (NIH/OD) [E] <butlerben@mail.nih.gov>; Jacobs, Anna (NIH/OD) [E] <anna.jacobs2@nih.gov>; Burklow, John (NIH/OD) [E] <burklowj@od.nih.gov>
**Subject:** Clean Version of DEI Restriction Term - Final

Hi Matt,

Attached is the term and condition of award for your approval. Please let us know if you approve and we will implement.

Thank you,
Liza

**Appendix 5 – Workflow for NOFO Forecasts and NOFO Approvals**

- **Prioritization of NOFOs**

| Owner | Action |
|---|---|
| ICO | - Sends a priority list of upcoming NOFOs in two categories:<br>   **1)** those that already have Concept Clearance (Option A)[1].<br>   **2)** those requiring Concept Clearance (Option B).<br><br>Note: This is a temporary step while process is being refined. |
| Guide | - Maintains the data on ICO records, approvals needed (for example concept clearance), and priorities for publication in ICO Guide priorities spreadsheet. |

- **Creation of Forecast Records**

| Owner | Action |
|---|---|
| ICO | - Creates a **forecast** in FOAM for NOFOs prior to concept clearance and at least **6 months** prior to the desired NOFO publication date. Forecast is used for approval of the concept by NIH and HHS. Note: Forecast information will become publicly available in Grants.gov after concept clearance is obtained.<br>   o Create a **Forecast** record.<br>   o Fill in required fields (red asterisks): NOFO type (PAR, PA, etc.), Title, Contact.<br>   o Click "Save".<br>   o Click "Create NOITP" button within the NOFO record.<br>   o Select most recent *Forecast Template*.<br>   o Click "Save".<br>   o Go to *Content* and fill in required fields (red asterisks).<br>   o Title, estimated date, related information (publication, first application, first awards, project start), eligibility – note, activity code not required.<br>   o Note: the forecast *Description* section is what NIH Leadership will be reviewing and requires the appropriate ICO leadership approval.<br>   o Save record and notify the Guide when the forecast is ready for leadership approval (see below).<br>- Sends email to the Guide mailbox when ready for leadership approval<br>   o NIH Guide (NIH/OD) nihguide@OD.NIH.GOV<br>   o Subject: NOITP ###-##-##-###– [IC Name] – [Desired Clearance Date]<br>      ▪ Note: the number is important because of the variety of draft versions in FOAM.<br>      ▪ Plan to implement FOAM task in future to remove dependence on email. |

---

[1] For programmatic concepts that have already undergone concept clearance within the last five years, but the NOFO has not been published (for example, NOFO pending in FOAM or not yet drafted).

A0637

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- **Preparing Forecasts for Leadership Approvals**

| Owner | Action |
|---|---|
| Guide | • Indicates that the forecast is ready for review on the tracking spreadsheet (if not done through FOAM task). |
| Leadership Approval Contact | • Places relevant fields on a leadership approval spreadsheet and the Acting DDER is alerted when entries are ready for review. |

- **(Acting) DDER and NIH Director Approvals**

| Owner | Action |
|---|---|
| (Acting) DDER | • Reviews entries on leadership review spreadsheet and updates with approval outcome. <br> • Notifies ICOs regarding the forecasts that are **not approved.** |
| Leadership Approval Contact | • Monitors the review spreadsheet and adds entries and dates on tracking spreadsheet <br> • Notifies ICOs of **approvals** and indicates next steps. |
| ICO | • Archives the FOAM entries for those not approved. <br> • Uploads the approval document into FOAM. |

- **HHS Approval & Concept Clearance (if needed)**

    **Option A: After NIH Approval for NOFOs not requiring Concept Clearance**

| Owner | Action |
|---|---|
| Guide | • Sets NOITP status to "published" in FOAM once the content has been fully approved. <br> • Notifies **OPERA** of the status via email. |
| OPERA | • Sends **Forecast** report to HHS[2] . <br> • Records forecasting information in Grants.gov (forecast is publicly available at Grants.gov, but not NIH Guide). |
| ICO | • Works on NOFO development: <br>     o Convert to the newest template in FOAM. <br>     o Ensure that the NOFO record indicates in Key Attributes that Concept Clearance has been obtained. <br>     o Check that the approval document(s) has been uploaded in FOAM. <br>     o For NOFOs in various stages of development, follow the standard processes for content development and approvals. <br>     o For NOFOs with previous OER approvals, ICO should upload a "compare documents" of the NOFO drafts into FOAM to verify that the ICO did not change any text except to align with current agency priorities. **Note:** FOAM has a compare documents feature. |

---

[2] Until the Grants.gov Forecast functionality has been deployed in FOAM, OPERA will assist with manual updates of all of NIH's NOFOs to Grants.gov monthly (by the 5th of each month—if the 5th falls on a holiday or weekend, we will act by the next business day).

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

| | o Responds to all approval comments and tasks and indicates that the final NOFO draft is ready for NIH leadership approval. |
|---|---|

**Option B: After NIH Approval for NOFOs requiring Concept Clearance**

| Owner | Action |
|---|---|
| ICO | • After receiving NIH leadership approval, proceed with obtaining Concept Clearance.<br>• Enters the Concept Clearance information in the Key Attributes of the FOAM record. |
| | • If **no changes** to the forecast are required after Concept Clearance, the steps described in Option A should be followed.<br>• If the content of the forecast changes after Concept Clearance, the content must go back through leadership approvals. |

- **NIH Leadership Review of Completed NOFOs**

| Owner | Action |
|---|---|
| Leadership Approval Contact | • Downloads completed NOFOs to a folder (with hyperlinks embedded in the spreadsheet).<br>• Places relevant fields on a NOFO NIH Leadership Approval spreadsheet.<br>• Alerts NIH Leadership when entries are ready for review. |
| (Acting) DDER | • Notifies ICOs regarding the NOFOs that are not approved. |
| Leadership Approval Contact | • Notifies ICO, Guide, OPERA of approvals. |
| Guide | • Enters positive approvals in the FOAM record and publishes the NOFO. |

**Questions:**

Inquiries about the Forecast requirements and processes should be directed to: Division of Grant Systems Integration, Office of Policy for Extramural Research Administration Office of Extramural Research: operasystemspolicy@nih.gov.

Inquiries about FOAM should be directed to the Guide: NIH Guide (NIH/OD) nihguide@OD.NIH.GOV.

A0639

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 6 – Frequently Asked Questions**

1. **When reviewing applications for activities that are no longer an NIH/HHS priority/authority, should ICO's review the content of Other Support submissions?**

   Other Support is used to disclose the PIs ongoing activities and support and should not be modified. ICO's do not need to review Other Support for alignment with NIH/HHS priorities/authority.

2. **For phased awards where the second phase (i.e., Type 4) will not be awarded due to NIH/HHS priority/authority, how should the ICO notify the recipient that the Type 4 will not be issued?**

   In these cases, ICO's must contact OPERA, and OPERA will issue a termination letter. Type 4 awards are subject to the availability of funds and/or agency priorities.

3. **When revising awards to terminate a project, how should the ICO respond to red bars in SEAR?**

   The ICO should not contact recipients to request any additional information to address SEAR flags, because the project is being terminated. ICO's can clear the SEAR flag with a comment that the project is being terminated.

4. **If a project is terminated on an HHS list or a Type 5 is withheld because the project is no longer an NIH/HHS priority/authority, can the ICO issue a subsequent Type 2 award?**

   No. If a project has been terminated due to agency priorities, it is no longer eligible for a renewal award.

5. **For recipients of K awards that are terminated due to NIH/HHS priority/authority, will eligibility requirements be modified to allow the individual to apply for another K award?**

   Yes, NIH will allow recipients of terminated K awards to submit applications for new K awards.

6. **If a PD/PI receives a 'substantial NIH independent research award' and loses ESI status, but the award is terminated, can the PD/PI have their ESI status reinstated?**

   Yes. Investigators can request the reinstatement of ESI status, using the ESI Extensions request tool in eRA commons. See Requesting an Extension for instructions.

7. **When ICO's issue revised NOAs to terminate awards, do they have to use the exact language provided by HHS in the termination term?**

   Yes, ICO's must use the exact language provided in Appendix 3, with no edits.

8. **Can ICO's make awards for applications that came in under a NOFO that has expired (not unpublished) if the NOFO's sole purpose was DEI or another category that does not effectuate the NIH/HHS priorities?**

   No. Whether unpublished or expired, if the sole purpose was DEI or another category that does not effectuate the NIH/HHS priorities, ICO's cannot make the award. For updated information on

NIH_GRANTS_003572

NOFOs, CGMOs must contact their DEA rep.

**9. If a NOFO is taken down for modification, and re-posted, can ICO's issue awards in response to that NOFO?**

Yes. If the NOFO has been modified and reposted, ICO's may proceed with making awards after confirming that the award aligns with agency priorities.

**10. If an ICO is modifying a Type 5 restore full amount, does the ICO need to conduct a review of the project activities as outlined in this guidance?**

Yes. All monetary revisions are subject to this guidance.

**11. Can ICO's approve requests from recipients to modify the project title?**

Requests to change project titles must be submitted as a prior approval request. Changes to titles may only be made in the context of negotiations to remove activities/language that do not align with HHS/NIH priorities/authority. Title changes should only be made alongside associated changes to the abstract and specific aims.

**12. When ICO's receive questions from recipients regarding HHS terminations, what should they do?**

ICO's should not engage in discussions with recipients regarding HHS directed terminations. ICO's must direct recipients to submit any appeals to Dr. Memoli, as outlined in the termination letter.

**13. For terminations where the ICO is making the determination, who is listed as the point of contact for appeals?**

An ICO determination that an award no longer aligns with agency priorities is not appealable. Therefore, appeals language is not included in the termination term. Recipients may contact the IC Director to request a reconsideration of the ICO determination.

**14. What is the difference between an HHS-directed termination vs. and ICO or OD determination to terminate a project?**

For HHS directed terminations, the template letter and appeals language were provided by HHS, and must be used as is. When an ICO or the OD determines that an award no longer aligns with agency priorities, the termination is made in accordance with 2 CFR 200.340(a)(4). This is not a termination for material failure to comply with the terms and conditions of award and is not appealable.

**15. When will the Final RPPR become available for recipients to prepare and submit?**

The F-RPPR link will open once the project period has ended.

16. **Can recipients draw down funds after the stated termination date?**

For activities that were incurred on or before the termination date, with supporting documentation, NIH will approve the payment. For costs after the project period end date, outside of patient safety and animal welfare, costs will not be approved.

17. **When will the Federal Financial Report (FFR) become available in PMS for recipients to submit?**

The FFR will become available once the project period has been updated via a Notice of Award. Recipients should direct any questions to PMS or the OPERA FFRC.

18. **Will recipients have the standard 120-day period following the termination date to submit closeout reports?**

Because there are no new activities after the date of termination, NIH is directing that all closeout reports be submitted within 60 days of the termination unless animals or human subjects are involved.

19. **If an ICO negotiates a change in a foreign site (e.g., South Africa to Nigeria), can the funds be rebudgeted from the original site to a new site?**

Yes. Funds can be rebudgeted to conduct the activities at a new site as long as the site is domestic. All new foreign collaborations will need to follow the new structure once rolled out. If research aims are fully removed from a project, the funds cannot be rebudgeted for another purpose.

20. **For awards that were terminated before the term and condition of award was modified to provide instructions for requesting approval of drawdowns, how should ICO's notify the recipient of the process?**

When ICO's receive questions from recipients about the process for requesting drawdowns, the ICO must notify the recipient that they should contact the OPERA FFRC (OPERAFFRInquiries@od.nih.gov) for prior approval. The request must include details related to human subjects or animal welfare or outline that the costs were incurred prior to the termination date. The recipient must provide supporting documentation.

21. **If a recipient requests prior approval to change a performance site from South Africa to another location, can the ICO approve the change?**

Yes. ICO's may approve change to move activities from South Africa to another site. At this time, awards involving South Africa remain on hold. ICO's should not initiate negotiations or restrict funds.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

22. **Does the COVID category apply to long-COVID and pandemic preparedness research? Or is it focused only on the immediate COVID-19 pandemic response.**

The COVID category relates to awards made to address the immediate COVID-19 pandemic response. Awards to support general biology of coronavirus, long COVID and pandemic preparedness, at this time, may continue.

23. **If a letter of support on a training grant references a university resource for DEI, but the abstract and aims do not include any DEI activities, does the letter of support need to be revised?**

No. Under the concepts outlined in Category 2B, updated documents are not required to modify language when there are no DEI activities under the project.

24. **For diversity fellowships awarded prior to January 20, 2025, are recipients permitted to activate their awards?**

Yes. Recipients may activate the fellowship. ICO's must review these awards in accordance with this staff guidance, and future funds must not be awarded.

25. **For joint NIH-NSF programs, where the initial application came in to NIH via a 'dummy' NOFO, can ICO's negotiate the award to remove any activities that do not align with NIH/HHS priority/authority?**

Yes. These awards must be reviewed, and any unallowable activities must be negotiated out.

26. **If NIH funds were awarded to support conference attendance, and the conference has a session on DEI, can the recipient use the NIH funds to attend?**

No. NIH funds may not be used to pay for participation in a conference that includes DEI sessions or activities.

27. **If a conference proposes a session on DEI (e.g., DEI Power Hour), can the ICO negotiate with the recipient to remove those activities from the conference agenda?**

Yes. The ICO can negotiate with the applicant/recipient to remove the DEI activities.

28. **For programs that have been terminated, in whole (e.g. MOSAIC K99/R00), will there be any central announcement, or should ICO's proceed with revising awards in accordance with the staff guidance.**

In these cases, the NOFO will be unpublished. There will not be any other announcement. ICO's should take action on the awards as outlined in this staff guidance.

A0643

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 7 – Managing PMS Hard Funds Restrictions**

OPERA directs PMS to hard funds restrict awards terminated as a result of agency priorities and HHS authorities.

Recipients are required to request approval from OPERA (OPERAFFRInquiries@od.nih.gov) before any draw that occurs after the termination. The request must include details related to human subjects or animal welfare and provide supporting documentation. These are the only approvals that will be issued. OPERA will work with the ICO to facilitate approvals and facilitate lifting restrictions in PMS. After approval is issued, the recipient can request the drawdown in PMS. Note: Any other costs that are not related to human subject protection or animal welfare will not be approved. No exceptions.

Recipients are also required to request approval from OPERA to lift the restriction for payments of costs incurred on or before the date of the termination. For costs incurred, with supporting documentation, on or before the date of the termination, OPERA will work with PMS to lift the restriction as appropriate.

Note: Balances reported to HHS will change, as drawdowns are approved as outlined above. Reports to HHS will be updated as balances are modified. OPERA is responsible for maintaining up to date information for HHS reporting.

When recipients draw funds in PMS, they normally request funds from multiple awards within a single draw request.  For awards terminated as a result of agency priorities and HHS authorities, recipients cannot request funds from multiple awards within a single draw request.  Each draw request must contain only one terminated award.  If a recipient combines a draw request for a terminated award with any other award, the request will be rejected.

**Entity Restrictions:**

At times, HHS or NIH may place a hard funds restriction on an entity in PMS, at the entity level, during compliance reviews. When this occurs, OPERA will notify ICO's. During the restriction period, ICO's should hold awards to the institution until the restriction is lifted.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 8 – <mark>Template ICO Termination letter.</mark>**

[Address block & date]

[Authorized Organization Representative]:

Funding for Project Number [INSERT] is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement, and 2 C.F.R. § 200.340(a)(4).  This letter serves as a termination notice.

The 2024 Policy Statement applies to your project because NIH approved your grant on [INSERT DATE], and "obligations for federal grants are generally determined by the laws, regulations, and terms in effect at the time the grant was awarded, as outlined in the Notice of Award (NOA) or grant agreement". This "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."

According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."  At the time your grant was issued, 2 C.F.R. § 200.340(a)(4) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This project no longer effectuates agency priorities. [insert termination category language (e.g., DEI) verbatim]. Therefore, there is no modification of the project that would align with agency priorities.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision," no corrective action is possible here.

Costs resulting from financial obligations incurred after termination are not allowable. Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §200.344. However, due to the immediate termination of this project, NIH may require a shortened timeframe to submit closeout reports. Details will be provided in the revised NOA issued by the Grants Management Official.

<mark>This is a final determination. If you wish to seek a reconsideration because you object to the ICO's termination, please submit a reconsideration request to [IC Director Name], Director, [IC Name].</mark>

Sincerely,

<mark>IC CGMO</mark>

**Termination Categories**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs.

- Gender:  Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs.

- Vaccine Hesitancy: It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria.

A0646

 

[Letter Date]

[AOR Name]
[Recipient Name]
[AOR email address]

> **Commented [KG1]:** eRA: OPERA confirmed the Business Official for the award record is fine.

Dear [AOR Name]:

Effective with the date of this letter, funding for Project Number [PROJECT NUMBER] is hereby terminated pursuant to the Fiscal Year [Award FY] National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.[2]

The [Award FY] Policy Statement applies to your project because NIH approved your grant on [Budget Period Start Date], and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The [Award FY] Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards.[4]" According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340.[5]" At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. [Insert reason for termination using language provided (e.g., DEI, gender, China, Vaccine Hesitancy)]

> **Commented [KG2]:** eRA: OPERA will provide the category information for each grant with the list of applications to drive which text should be inserted.

*[If China, insert text below in-line above]*

[Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] NIH Grants Policy Statement at IIA-1.
[5] *Id.* at IIA-155.

1

A0647

contravenes American national-security interests and hinders America's foreign-policy objectives.]

*[If DEI, insert text below in-line <mark>above</mark>]*

[Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.]

*[If Gender, insert text below in-line <mark>above</mark>]*

[Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.]

*[If Vaccine Hesitancy, insert text below in-line <mark>above</mark>]*

[It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.]

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[7] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal

---

[6] NIH Grants Policy Statement at IIA-156.
[7] *See* 2 C.F.R. § 200.343 (2024).

NIH_GRANTS_003580

Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[8]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[9] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[10]

You must submit a request for such review to Dr. Matt Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[11]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[12]

Sincerely,

> **Commented [KG3]:** eRA: Also providing the image file. Please advise if need anything different.

# Michelle G. Bulls -S

Digitally signed by Michelle G. Bulls -S

Michelle G. Bulls, on behalf [IC Chief GMO Name], Chief Grants Management Officer, [IC Name]
Director, Office of Policy for Extramural Research Administration
Office of Extramural Research

> **Commented [KG4]:** eRA: Can we remove is text if OD award?

---

[8] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[9] *See* 45 C.F.R. § 75.374.
[10] See 42 C.F.R. Part 50, Subpart D
[11] 11 *Id.* § 50.406(a)
[12] 12 *Id.* § 50.406(b)

NIH_GRANTS_003581

| | |
|---|---|
| From: | Bulls, Michelle (NIH/OD) [E] |
| To: | Chief GMOs |
| Cc: | EPMC Principals; Curling, Mitchell (NIH/NIDDK) [E] |
| Subject: | Staff Guidance - Updates Made during GMAC - 5/12 |
| Date: | Thursday, May 15, 2025 9:57:00 AM |
| Attachments: | NIH Grants Management Staff Guidance - Alignment with Priorities - Draft - 5.12.2025 Updates.pdf |

**5/15: New Updates from those below:**

- NCE section - addressed second and beyond.
- ICO reconsideration section – removed the CGMO as POC and replaced w/IC Director.

**5/7: Updated staff guidance based on discussions...**

- Emphasize that whether the NOFO was unpublished or expired naturally, if the sole purpose was DEI or another category that does not effectuate the NIH/HHS priorities, ICO's cannot make the award.
- Updated term language to note that requests for ICO reconsiderations should be sent to the IC Director.
- Updated Category 2 when ICOs are unable to remove activities that are not an NIH/HHS priority. ICOs do not need to work with OPERA on the bilateral termination, rather, OPERA must be notified, for tracking purposes.
- Updated Category 2B. Noted that ICOs should document any changes to the title or abstract in the grant file.
- Category 2:
  - Added term for bilateral terminations.
  - Clarified that for unilateral terminations, the ICO must issue a letter as outlined in Termination Type 3 – ICO determinations
- Category 4: Added a note referencing NOT-oD-25-104. At this time, and until the details of the new foreign collaboration award structure are released, NIH will not issue awards to domestic or foreign entities that include a subaward to a foreign entity.
- Appendix 8: Updated template letter, to be used for ICO determinations, to reflect ICO reconsideration language and IC CGMO as signatory.
- Added FAQ on negotiating with conference grant recipients to remove DEI sessions or activities.

Reminder – we will finalize once we receive the memo from the Director.

NIH_GRANTS_003516

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

## NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – DRAFT

## Final Issue Date: Pending NIH Director's updated priorities

**Background**

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI).  This guidance seeks to expand the scope of the categories within to include other agency priorities that will be defined by the Director, NIH. The Director will issue a guide notice to publicize the agency's updated priorities in an effort to be transparent as research priorities shift.

**NOFO Guidance**

NIH is required to submit forecast reports to HHS prior to issuing new or reissued Notices of Funding Opportunities (NOFO's) within the NIH Guide for Grants and Contracts and Grants.gov. See Appendix 5 for the workflow.

**Award Guidance**

Prior to issuing all awards (competing and non-competing, monetary and non-monetary (e.g., carryover requests, no-cost extensions, etc.)), ICO's must review the specific aims/major goals of the project to assess whether the proposed project contains any DEI and/or other research activities that are not an NIH/HHS priority/authority.  To avoid issuing awards, in error, that support these activities ICO's must take care to completely excise all non-priority activities using the following categories.

ICO's should review the current application/RPPR under consideration, only. ICO's should not request retroactive changes to previous RPPRs and competitive applications to modify language related to research that has already been conducted.

**Category 1:** The sole purpose of the project is related to an area that is no longer an NIH/HHS priority/authority (e.g., diversity supplements, diversity fellowships, or conference grant where the purpose of the meeting is diversity, etc. after the priorities memo is issued), and/or the application was received in response to a NOFO that has been unpublished due to its focus on activities that are no longer an NIH/HHS priority/authority. Whether the NOFO was unpublished or expired naturally, if the sole purpose was DEI or another category that does not effectuate the NIH/HHS priorities, ICO's cannot make the award.

This applies to all projects, including phased awards, etc. Reminder: CGMOs requested access to the NOFO list, and NIH leadership provided the following interim process: CGMOs must consult with their Division of Extramural Activities (DEA) rep to obtain up to date information on NOFOs.

> o **Action:** ICO's must not issue the award (competing or non-competing).

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- o For ongoing projects where NIH will not issue the next Type 5 (ICO determination not HHS list), the ICO must:
  - o Issue a revised award to end the award at the end of the current budget period and remove all outyears. A termination letter is not required.
  - o Add the action to the master spreadsheet located at: OD OPERA Grant Action Tracking (Access limited to CGMOs. CGMOs may email OPERA leadership to identify a delegate, if needed).
  - o Include the following term in the revised NOA:

    **Term of Award:**

    Effective with this Notice of Award, this project is terminated. [Insert appropriate category from Appendix 3, verbatim]. Therefore, no additional funding will be awarded for this project, and all future years have been removed. If appropriate, [RECIPIENT NAME] may request funds to support patient safety and animal welfare to support an orderly phaseout of the project.

    Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination (with proof of the date), or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

    Please be advised that your organization, as part of the orderly phaseout process, will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within **60** days (non-human subjects and animals) **120** days (human subjects and animals) after the end of this project.

    This action aligns with Termination - 2 C.F.R. § 200.340 (a)(4). This is a final determination. If you wish to seek a reconsideration because you object to the ICO's termination, please submit a reconsideration request to [IC Director Name], Director, [IC Name].

  - o In this instance, there is no hard funds restriction required. The recipient will submit their Final FFR in accordance with the term and conditions, and any remaining funding will be deobligated by the FFR-C upon review and acceptance of the FFR.
  - o NOTE: OPERA recognizes that the closeout letters will be automatically sent, so we are working internally with the closeout support center staff to manage this process. If you receive inquiries, please point the inquirer to: OPERALeadership@nih.gov
  - o **No cost extension requests:** For all NCE requests, ICO's must determine if the sole purpose of the grant was to support research activities that are no longer an NIH/HHS

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

priority/authority and, if so, issue an award to immediately end the grant project (use disapproved extension term below). If the non-NIH/HHS priority/authority research activities are ancillary to the project, approve the extension (use approved extension term below). Reminder – even if a grant project is in an NCE, ICO staff must still determine if non-NIH/HHS priority/authority activities are proposed during the extension period. Extensions may only be approved for orderly phaseout, and funds may not be used to support any non-NIH/HHS priority/authority research activities.

- o ICO's may use the following term of award when approving/disapproving NCEs:
    - ▪ **Term of Award (approved extension):** The no-cost extension has been approved for this project to support an orderly phaseout of the project, no other reasons are allowed. NIH grants funds must not be used to support [insert category – e.g., Diversity, Equity and Inclusion (DEI), COVID 19, etc.] research or research training activities or programs. Any funds used to support such activities will result in a disallowance of costs, and funds will be recovered.
    - ▪ **Term of Award (disapproved extension)**: The no cost extension request for this project has been denied. Please proceed with orderly phaseout of the project. NIH grant funds must not be used to support [insert category – e.g., Diversity, Equity and Inclusion (DEI), gender identity, etc.] research or research training activities or programs.

**Category 2**: Project partially supports non-NIH/HHS priority/authority activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope). This means the non-NIH/HHS priority/authority activities are ancillary to the purpose of the project, in some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the Restriction Term of Award (see Action 2) in Section IV of the Notice of Award. No exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).

- o Note: Activities required to comply with NIH inclusion policies are not considered DEI activities.
- o **Action 1:** Funding ICO must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file. The recipient/awardee cannot rebudget these funds, they must be recovered by the IC.
    - ▪ After an informal conversation, the ICO must send a written request to the AOR outlining what portion of the aims and budget must be modified to document the renegotiation process:
        - • Sample language for requesting application updates from the AOR: It is the policy of NIH not to prioritize [select one of the following: diversity, equity and inclusion (DEI) research programs, or other non-HHS/NIH priorities, or countries of concern]. [Funding IC] has identified [insert appropriate activity taken from the list above] activities within section

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

[XXXX] of your application. Please work with the PD/PI to update the application sections and adjust the budget as appropriate to remove all [insert appropriate activity] activities and submit these updates to the Program Official and Grants Management Specialist for review and approval.

- Once the recipient responds and the ICO and the recipient agree to the changes, the ICO must direct the AOR to submit a revised face page, specific aims and budget via the prior approval module 'Other Request' type. See eRA online help for instructions.
- Once the ICO renegotiates the revised specific aims, the ICO must upload into the Additions for GM section of the grant folder the new aims.  These must be uploaded under the file group "Award Documents: Revised Aims and Abstract".
- If the ICO renegotiates a revised budget, the ICO should update the GM workbook, as appropriate.

o **Action 2:** Once the ICO and the applicant/recipient have reached an agreement, and updated documents are received and properly filed as outlined above, issue the award and include the following Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.

**Term of Award (Approved 2/28/2025 – Refer to Appendix 4 for the approval from Dr. Memoli):**

NIH and the recipient have renegotiated the scope of this award.  Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa, etc.] research or related research training activities or programs. Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes [select one of the following: diversity, equity and inclusion (DEI) research programs, vaccine hesitancy, climate change, etc.] or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- o **Unable to remove activities that are not an NIH/HHS priority:** If the ICO and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the non-compliant activities, the ICO cannot proceed with the award. For ongoing projects, the ICO must notify OPERA (OPERAleadership@nih.gov) and negotiate a bilateral termination of the project. For bilateral terminations, the ICO must Issue a revised award to remove all outyears and include the following term in Section IV of the NOA.

  > NIH is bilaterally terminating this award effective [effective date] in accordance with the request dated [date], because the project does not align with NIH priorities. No additional funding will be awarded for this project, and all future years have been removed. If appropriate, [RECIPIENT NAME] may request funds to support patient safety and animal welfare to support an orderly phaseout of the project.

  > Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination (with proof of the date), or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

  > Please be advised that your organization, as part of the orderly phaseout process, will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within **60** days (non-human subjects and animals) **120** days (human subjects and animals) after the end of this project.

Where bilateral termination cannot be reached, the ICO must unilaterally terminate the project. Unilaterally terminated awards should follow the process identified **Termination Type 3: ICO-Terminations** to send the termination letter and revise the award**.**

- o **Diversity Supplements:** Type 5 Diversity supplements may no longer be awarded. For ongoing awards, ICO's must remove the diversity supplement activities prior to issuing the next Type 5 for the parent award and include the following term in Section IV of the NOA of the parent grant. The ICO must revise the Diversity Supplement award to remove all outyears. If diversity supplement outyears were included in the previous NOA, the ICO must revise the prior year award to remove references to those outyear commitments.

  > **Term of Award:** The diversity supplement associate with this project, [insert diversity supplement grant number], is being terminated.  No additional funding will be awarded, and all future years have been removed. Research programs

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected classes, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Funds issued for the Diversity Supplement may no longer be utilized and cannot be rebudgeted nor carried over to future years.

o **Conference Grants:** If a conference supported by an NIH grant focuses on scientific top ICO's that are unrelated to DEI, but the conference itself is targeted at a specific population (e.g., underrepresented groups), the ICO must work with the applicant/recipient to open the conference up to all populations. If a negotiation to broaden the target audience is not feasible, or the conference is no longer viable, then the ICO must terminate the award following the process in **Category 1**.

o **Diversity Reports (e.g., Ts, R25, K12, and any others):** NIH is modifying the application instructions and RPPR instructions to remove requirements for diversity reports (e.g., Trainee Diversity Report). If ICO's receive these reports in applications or RPPRs, the IC should not review the report. These reports provide diversity related information, but do not involve specific DEI activities. ICO's must use the following term: "NIH no longer requires the [name of diversity table/plans]. Therefore, NIH did not review the [name of diversity table/plans] provided. NIH funding may not be used to support any diversity, equity or inclusion (DEI) activities". Note: this section applies to diversity related reports, only. Other areas that are no longer NIH/HHS priorities/authority must be addressed under category 2 negotiations.

o **Administrative Supplement Requests:** Administrative supplement applications should be reviewed for any activities that are no longer NIH/HHS priorities/authority and modified as needed. ICO's do not need to retroactively review the competitive parent grant application– only the supplement application requires review.

**Category 2B:**

Prospective reviews by GM where the DEI and/or language in certain sections of the application has to be removed even though the project itself is not focused on DEI but may have language or have been awarded from a DEI NOFO that is expired/taken down for revision to go back up once the language is appropriately excised.

Examples below, and in these cases, ICO should consider using the Category 2 term of award but remove the negotiation language from the term. ICO's do not need to request revised materials from the recipients. However, the project title and/or abstract may need to be updated to remove any language that does not align with NIH/HHS priorities/authority. The changes must be noted in the grant file. Reminder: ICOs do not need to modify the historical record to modify language.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- Resource Section
- Biosketch
- RPPRs
- Letters of Support

**Category 2C**: Subprojects/cores terminated by HHS.

ICO's do not need to terminate the subprojects/cores. The funds can be restricted and recovered, unless there is a negotiation where a new subproject/core is identified that does not violate the priorities of the agency. The following actions will occur in these cases:

- OPERA will restrict the funds associated with the project and notify the ICO.
- The ICO must revise the award to remove the subproject/core, only and must not issue a termination letter nor termination language within the terms and conditions. ICO
- The revised award must include the following term in Section IV.

  [Insert category from Appendix 3, verbatim]. Therefore, no additional funds may be used to support the activities under [insert subproject or core title], and all activities must cease, effective with the date of this revision. Funds used to support these activities will be disallowed and recovered. Funds issued for this subproject/core may no longer be utilized and cannot be rebudgeted nor carried over to future years.

**Category 3: Project does not support any DEI or other activities that go against the HHS/NIH priorities.**
- o Action: ICO may proceed with issuing the award.

**Category 4: Foreign Awards.**

Note: Effective May 1, and until the details of the new foreign collaboration award structure are released, NIH will not issue awards to domestic or foreign entities (new, renewal or non-competing continuation), that include a subaward to a foreign entity. See NOT-OD-25-104.

4A. Agency priorities:

- South Africa: Note: Currently (April/May 2025), continue to hold award actions related to entities in South Africa until final determinations are made by NIH leadership. This applies to both monetary and non-monetary award actions. ICOs may negotiate with recipients to remove activities in South Africa from ongoing awards as long as the project remains viable. **IMPORTANT NOTE:  Funds may only be provided to entities in South Africa to support health and safety of human participants in clinical trials/clinical research.**
- China: Note: Currently (April/May 2025), hold on making awards to entities in China until the final determinations are made by NIH leadership. This applies to both monetary and non-monetary award actions. **IMPORTANT NOTE: ICOs may negotiate with recipients to remove activities in China from ongoing awards as**

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**long as the project remains viable, or a suitable domestic replacement is identified. Funds may only be provided to entities in China to support health and safety of human participants in clinical trials.**

4B. Countries of Concern:

- The State Department's countries of concern lists are updated regularly. Therefore, ICOs must check the list annually prior to making new, renewal, and noncompeting continuation awards. Additionally, out of an abundance of caution related to the United States national security threats, if a country is added to either of the two lists below, ICO's must submit a request through FACTs to obtain State Department clearance. If clearance is not received within 14 days, the award cannot be made until it is received (i.e., new, renewal, and noncompeting continuations).
- At this time, ICO's should note in FACTS when awards (new, renewal, non-competing continuation) involve entities on the following State Department lists:
  - Countries in which the government of has engaged in or tolerated "particularly severe violations of religious freedom": State Department Countries of Particular Concern
  - Countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism: State Sponsors of Terrorism
- Awards may only be issued once State Department clearance is obtained. Do not assume approval unless a response is received from the State Department. The staff guidance on FACTS clearance will be updated to reflect this change. This applies to all direct foreign awards and foreign collaborations (monetary and non-monetary).

OPERA has not included the Final Rule Restricting Transfer of Personal U.S. Data to Countries of Concern (please consider this list related to sensitive or PII data is involved for clinical trials/clinical research) or Office of Foreign Assets Control Sanctions List, as these are not factors in award decisions. In all cases, if there are questions contact the Fogarty International Center for expert assistance.

**Termination Types:**

As NIH implements the Director's agency's priorities, NIH will take various measures to integrate these priorities into the Institutes and Centers across the enterprise there are various types of terminations that may take place where the project cannot be renegotiated. As such, there steps that must be taken once the need for termination has been identified and/or provided.

Terminations that result from science that no longer effectuates NIH's priorities related to DEI, gender identity and other scientific areas do not require a formal appeals process. If a recipient requests an ICO to reconsider a termination action, the ICO can work with the recipient to determine whether the action will stand. All other terminations for noncompliance require the agency to include appeals language within the termination letter and NOA - appeal language.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Type 1:  HHS Departmental Authority Terminations.**

- o  OPERA receives a list from the Director, NIH or designee.
- o  OPERA will issue termination letters on behalf of the IC Chief Grants Management Officers. The IC CGMO will be copied on the email with the termination letter.
   - ▪  **Supplements – Parent Award Terminated:** If a terminated award has active supplement(s), all supplement awards must be terminated along with the parent.
   - ▪  **Supplement Terminated Only**: If a termination letter references a supplement only, and not the parent award, then the supplement alone must be terminated following the instructions below.
   - ▪  **Linked (or equivalent) Awards**: If one linked (or equivalent) award is terminated, the ICO is only required to terminate the specific award noted in the letter. The IC must conduct a separate review to determine whether terminating that award will have a structural impact on the scientific design along with associated outcomes and act, as appropriate, to early terminate or allow the remaining awards to continue. Feel free to discuss with OPERA, as needed.
- o  When a termination letter is received, the ICO must:

   - •  Issue a revised NOA within 3 business days of the date the termination letter was issued to the recipient.
      - ▪  Change the budget and project period end dates to match the date of the termination letter.
         - •  OPERA will place a hard funds restriction on all PMS subaccounts as termination letters are issued. OPERAs Federal Financial Report Center (FFR-C) will deobligate the remaining funds after the Final FFRs are submitted. There is no deobligation action required from the ICO's.
      - ▪  Remove all future years from the project, where applicable. If the grant is in a no cost extension, and HHS requests a termination, the project must be terminated even in a no cost extension. If the grant is in a no cost extension, and HHS did not request a termination, follow the NCE guidance above.

      - ▪  Include the following Termination Term in the revised NOA:

         This award is terminated effective [effective date]. [Insert category from Appendix 3, verbatim]. If appropriate, [RECIPIENT NAME] may request funds to support patient safety and animal welfare in support of an orderly phaseout of the project.

         Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination, or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

Please be advised that your organization, as part of the orderly phaseout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within **60** days (non-human subjects) **120** days (human subjects and animals) after the end of this project.

NIH is taking this action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

- Note: Appeals language must be included **prior to** October 1, 2025. After October 1, 2025, when HHS will fully adopt 2 CFR 200, per 2 CFR 200.340, termination actions taken based on agency priorities are not appealable. This is different from terminations based on noncompliance (administrative and programmatic).

o eRA provides OPERA with daily reports on NOAs issued, so ICO's do not need to report to OPERA on each action completed.
o When a terminated award must be reinstated, OPERA will notify the IC.
o ICOs must issue a revised award and **replace** the previous termination language with the following term:
- Effective with the date of this revised Notice of Award, funding for Project Number [insert grant number] is hereby fully reinstated; therefore, the termination letter dated [insert date] is rescinded without conditions. Funds made available to [insert institution name] used to support [insert the title of the project] are no longer restricted and are available for use in accordance with the terms and conditions of the award.
- OPERA will coordinate with HHS PMS to lift the hard funds restriction and will copy Alan Whatley on the request to the ICO.

Screenshot: Example of reinstatement. **Note – please make it clear that previous termination term has been deleted or is no longer applicable.**

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT



**2: OD**

SECTION IV – AI SPECIFIC AWARD CONDITIONS –  ███████████     **Type NIH**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

REVISED AWARD: Effective with the date of this revised Notice of Award, funding for Project Number 1R21████████ is hereby fully reinstated; therefore, the termination letter dated 03/21/2025 is rescinded without conditions. Funds made available to UNIVERSITY ██████████ used to support "A ████████████ are no longer restricted and are available for use in accordance with the terms and conditions of the award.

Supersedes previous Notice of Award dated 03/22/2025.  All other terms and conditions still apply to this award.

\*\*\*\*

**Directed Terminations.**

- o The Immediate Office of the NIH Director evaluates a program and determines that a program must be terminated due to agency priorities (e.g., COMPASS, FIRST). OPERA receives a list from OD. In such cases, this determination could impact multiple projects and each individual project under the program must be addressed.
- o OPERA will issue termination letters on behalf of the IC Chief Grants Management Officers. The IC CGMO will be copied on the email with the termination letter.
  - **Supplements – Parent Award Terminated:** If a terminated award has active supplement(s), all supplement awards must be terminated along with the parent.
  - **Supplement Terminated Only**: If a termination letter references a supplement only, and not the parent award, then the supplement alone must be terminated following the instructions below.
  - **Linked (or equivalent) Awards**: If one linked (or equivalent) award is terminated, the IC is only required to terminate the specific award noted in the letter. The IC must conduct a separate review to determine whether terminating that award will have a structural impact on the scientific design along with associated outcomes and act, as appropriate, to early terminate or allow the remaining awards to continue. Feel free to discuss with OPERA, as needed.
- o When a termination letter is received, the ICO must:
  - Issue a revised NOA within 3 business days of the date the termination letter was issued to the recipient.
    - Change the budget and project period end dates to match the date of the termination letter.
      - OPERA will place a hard funds restriction on all PMS subaccounts as termination letters are issued. OPERAs Federal Financial Report Center (FFR-C) will deobligate the remaining funds after the Final FFRs are submitted. There is no deobligation action required from the ICO's.
    - Remove all future years from the project, where applicable. If the grant is in a no cost extension, and HHS requests a termination, the project must be

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

terminated even in a no cost extension. If the grant is in a no cost extension, and HHS did not request a termination, follow the NCE guidance above.

- Include the following Termination Term in the revised NOA:

  This award is terminated effective [insert effective date]. [Insert category from Appendix 3, verbatim]. If appropriate, [RECIPIENT NAME] may request funds to support patient safety and animal welfare in support of an orderly phaseout of the project.

  Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination, or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

  Please be advised that your organization, as part of the orderly phaseout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within **60** days (non-human subjects and animals) **120** days (human subjects and animals) after the end of this project.

  This is a final determination. If you wish to seek a reconsideration because you object to the ICO's termination, please submit a reconsideration request to [IC Director Name], Director, [IC Name].

o When a terminated award must be reinstated, OPERA will notify the ICO.
o Once alerted, ICO's must issue a revised award and **replace** the previous termination language with the following term:
  - Effective with the date of this revised Notice of Award, funding for Project Number [insert grant number] is hereby fully reinstated; therefore, the termination letter dated [insert date] is rescinded without conditions. Funds made available to [insert institution name] used to support [insert the title of the project] are no longer restricted and are available for use in accordance with the terms and conditions of the award.
  - OPERA will coordinate with HHS PMS to lift the hard funds restriction.

**Tracking Note:**  eRA provides OPERA with daily reports on NOAs issued, so ICO's do not need to report to OPERA on each action completed.

**Type 3: ICO- Terminations.**

- o **ICO conducts a portfolio analysis and determines that a project no longer effectuates the agencies priorities.**

- o **Project cannot be renegotiated. The ICO must a letter to the recipient notifying them that the project will be terminated (see Appendix 8 for sample letter).**
  - Issue a revised NOA within 3 business days of the date the termination letter was issued to the recipient.
    - Change the budget and project period end dates to match the date of the termination letter.
      - The **ICO's** will place a hard funds restriction on all PMS subaccounts as termination letters are issued. OPERAs Federal Financial Report Center (FFR-C) will deobligate the remaining funds after the Final FFRs are submitted. There is no deobligation action required from the ICO's.
    - Remove all future years from the project, where applicable.

    - Include the following Termination Term in the revised NOA:

      This award is terminated effective [insert effective date]. [Insert category from Appendix 3, verbatim]. If appropriate, [RECIPIENT NAME] may request funds to support patient safety and animal welfare in support of an orderly phaseout of the project.

      Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination, or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

      Please be advised that your organization, as part of the orderly phaseout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 60 days (non-human subjects and animals) **120** days (human subjects and animals) after the end of this project.

      This is a final determination. If you wish to seek a reconsideration because you object to the ICO's termination, please submit a reconsideration request to [IC Director Name], Director, [IC Name].

**Type 4: Bilateral Terminations.**

The recipient and the ICO agree that the project is no longer viable, and the project cannot be saved upon the removal of the research that no longer aligns with agency's priorities. As such the ICO must:

- o Request a bilateral termination letter from the recipient agreeing to terminate the project on the basis that the project is no longer viable with the aims that need to be negotiated out of the project.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- Issue a letter responding to the recipient's request notifying them that the ICO has accepted the bilateral termination and will issue a revised award to modify the project period end date to the date requested.
- ICO must issue a NOA to the recipient.
    - Change the budget and project period end dates to match the date of the termination letter.
        - The **ICO** will place a hard funds restriction on all PMS subaccounts as termination letters are issued. OPERAs Federal Financial Report Center (FFR-C) will deobligate the remaining funds after the Final FFRs are submitted. There is no deobligation action required from the ICO's.
    - Remove all future years from the project, where applicable. If the grant is in a no cost extension, and HHS requests a termination, the project must be terminated even in a no cost extension. If the grant is in a no cost extension, and HHS did not request a termination, follow the NCE guidance above.

    - Include the following Termination Term in the revised NOA:

        NIH is bilaterally terminating this award effective [effective date] in accordance with the request dated [date], because the project does not align with NIH priorities. No additional funding will be awarded for this project, and all future years have been removed. If appropriate, [RECIPIENT NAME] may request funds to support patient safety and animal welfare to support an orderly phaseout of the project.

        Requests to draw down funds must be submitted to OPERAFFRInquiries@od.nih.gov for prior approval, before submitting in the HHS Payment Management System. The request must include the drawdown amount, justification, and appropriate supporting documentation. Approval will only be provided for costs incurred prior to the date of termination, or costs for patient safety or animal welfare, in support of an orderly phaseout of the project. Funds used to support any other research activities will be disallowed and recovered.

        Please be advised that your organization, as part of the orderly phaseout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within **60** days (non-human subjects and animals) **120** days (human subjects and animals) after the end of this project.

**Separation of Duties Guidance:**

OPERA has issued a Separation of Duties (SOD) waiver for all CGMOs, specific to the HHS Departmental Authorities termination actions, to allow IC CGMOs to work up and issue termination actions. Copy available in Teams.

A0664

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Impacts on the Biomedical Workforce:**

- **NRSA Payback:** NIH recognizes that award terminations may prematurely end the training period for NRSA fellows and trainees. Fellows and trainees may not have received sufficient training to be qualified to perform the service requirement before the grant terminated or may be unable to find employment opportunities due to the termination. NIH will accept payback waiver requests from trainees and fellows impacted by terminations. See NIH GPS 11.4.3.4 for instructions on submitting waiver requests.

- **Early-Stage Investigators (ESI):**

  o Short Term Extension for ESI investigators: NIH will automatically extend the Early-Stage Investigator (ESI) eligibility period by four (4) months for all investigators whose ESI status was active during the period January 1, 2025, to May 31, 2025. NIH is implementing this short-term extension to assist ESI investigators – who are working under strict eligibility timelines – to remain competitive for NIH support. Updated ESI end dates will appear in eRA commons by June 1, 2025.

  o **Restoring ESI status:** Investigators lose their ESI eligibility when they successfully compete for and receive a substantial independent research award. In the event an investigator's first substantial independent research award is terminated within the first three years of the project period, the investigator can request the reinstatement of ESI status, using the ESI Extensions request tool in eRA commons. To be eligible, an investigator's grant may not have been terminated due to misconduct or ethical violations. See Requesting an Extension for instructions.

- **K award eligibility:** NIH has implemented a temporary exception to the NIH GPS Section 12.3.7, which generally limits eligibility for mentored career development (K) awards to those who have not previously been the recipient of such awards.  NIH will allow individuals whose NIH-funded mentored career development awards were **ended on or after January 1, 2025,** to be eligible to apply for a new mentored career development award, contingent upon all other eligibility requirements being met. Investigators that meet all other NIH eligibility requirements for other mentored career awards may take advantage of applying for such awards to allow for the completion of the years that were remaining at the time the award ended.

**Definition(s):**

- **Gender-affirming care:** An array of services that may include medical, surgical, mental health, and non-medical services for transgender and nonbinary people. This includes, but is not limited to, therapy; mental health care; assistance with elements of a social transition (e.g., new name and pronouns, modification of clothing, voice training); evaluation of persistency of gender dysphoria, emotional and cognitive maturity, and coexisting psychological, medical, or social problems; puberty-suppressing medications; hormone therapy; and surgery.  By way of clarification and not limitation, "gender-affirming care" includes patient care provided as part of research or education grants, including but not limited to routine services, ancillary services, outpatient services, inpatient services, and usual patient care received during the study.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Health Disparities: Pending.**



NIH_GRANTS_003532

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 1 – HHS's Secretarial Directive on DEI-Related Funding – February 10, 2025.**



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON DEI-RELATED FUNDING

### February 10, 2025

The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

These contracts and grants can cause serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to DEI and similar programs are contributing to the serious problems and acute harms DEI initiatives may pose to the Department's compliance with Federal civil rights law as well as the Department's policy of improving the health and well-being of all Americans. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371-372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of DEI and similar programs rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> **Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

1

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

This Directive shall be implemented through the Department's contracts and payment management systems by personnel with responsibility for such systems who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a DEI or similar contract or grant is paused for review, Department personnel shall immediately send such payment to Scott Rowell, Deputy Chief of Staff for Operations, for prompt review to determine whether or not the payment is appropriate and should be made. Payments on paused contracts shall remain paused and already terminated contracts shall remain terminated pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.

*Dorothy A. Fink*

Dorothy A. Fink, M.D., Acting Secretary

NIH_GRANTS_003534

**Appendix 2 – Guidance for staff to use on specific programs, awards, supplements.**

- o **Supplements – Parent Award Terminated:** If a terminated award has active supplement(s), all supplement awards must be terminated along with the parent.
- o **Supplement Terminated Only**: If a termination letter references a supplement only, and not the parent award, then the supplement alone must be terminated.
- o **Linked (or equivalent) Awards**: If one linked award is terminated, the ICO is only required to terminate the specific award noted in the letter. The is should review and determine whether terminating that ward will have a structural impact on the scientific outcome originally intended by the ICO and act as appropriate on the remaining awards.
- o **Diversity Tables** – Ignore and issue the grant using the term provided above.
- o **Diversity Plans** – Ignore and issue the award using the term provided above.



19      DRAFT - NIH GM Staff Guidance – Award Assessments for Alignment with Agency Priorities

A0669

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports.**

- China: "Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world.  On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives."

- DEI: "Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics ICO's, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs."

- Gender-Affirming Care: "Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.  Many such studies ignore, rather than seriously examine, biological realities.  It is the policy of NIH not to prioritize these research programs."  **Reminder: At this time, do not terminate any grants related to gender identify/transgender without clearance from OER.  All such actions must be approved before any terminations.**

- Vaccine Hesitancy: "It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Your project does not satisfy these criteria."

- COVID (to be used for HHS/NIH OD directed terminations only): "The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary." **Note: ICO's may continue to support projects that funds general biology of coronavirus not linked to COVID-19. As ICO's conduct in-house analysis of project portfolios related to COVID the term may change. Please work with OPERA to develop standard based on the outcome of the analysis.**

- Climate Change: "Not consistent with HHS/NIH priorities particularly in the area of health effects of climate change."

- Influencing Public Opinion: "This project is terminated because it does not effectuate the NIH/HHS' priorities; specifically, research related to attempts to influence the public's opinion."

NIH_GRANTS_003536

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 4 – Approved Term – Use for all Category 2 awards, i.e., renegotiated aims and associated budgets. Approval embedded below. ICO's should use this term in the IC specific award conditions.**

Approval email from Dr. Memoli (Acting Director, NIH) on Friday, February 28, 2025.

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Bundesen, Liza (NIH/OD) [E] |
| **Cc:** | Bulls, Michelle G. (NIH/OD) [E]; Lankford, David (NIH/OD) [E]; Butler, Benjamin (NIH/OD) [E]; Jacobs, Anna (NIH/OD) [E]; Burklow, John (NIH/OD) [E] |
| **Subject:** | Re: Clean Version of DEI Restriction Term - Final |
| **Date:** | Friday, February 28, 2025 2:54:19 PM |

approved

Matt

Get Outlook for iOS

**From:** Bundesen, Liza (NIH/OD) [E] <lbundese@mail.nih.gov>
**Sent:** Friday, February 28, 2025 2:53:21 PM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Cc:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>; Lankford, David (NIH/OD) [E] <lankford@od31tm1.od.nih.gov>; Butler, Benjamin (NIH/OD) [E] <butlerben@mail.nih.gov>; Jacobs, Anna (NIH/OD) [E] <anna.jacobs2@nih.gov>; Burklow, John (NIH/OD) [E] <burklowj@od.nih.gov>
**Subject:** Clean Version of DEI Restriction Term - Final

Hi Matt,

Attached is the term and condition of award for your approval. Please let us know if you approve and we will implement.

Thank you,
Liza

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 5 – Workflow for NOFO Forecasts and NOFO Approvals**

- **Prioritization of NOFOs**

| Owner | Action |
|-------|--------|
| ICO | • Sends a priority list of upcoming NOFOs in two categories:<br>   **1)** those that already have Concept Clearance (Option A)[1].<br>   **2)** those requiring Concept Clearance (Option B).<br><br>Note: This is a temporary step while process is being refined. |
| Guide | • Maintains the data on ICO records, approvals needed (for example concept clearance), and priorities for publication in ICO Guide priorities spreadsheet. |

- **Creation of Forecast Records**

| Owner | Action |
|-------|--------|
| ICO | • Creates a **forecast** in FOAM for NOFOs prior to concept clearance and at least **6 months** prior to the desired NOFO publication date. Forecast is used for approval of the concept by NIH and HHS. Note: Forecast information will become publicly available in Grants.gov after concept clearance is obtained.<br>   ○ Create a **Forecast** record.<br>   ○ Fill in required fields (red asterisks): NOFO type (PAR, PA, etc.), Title, Contact.<br>   ○ Click "Save".<br>   ○ Click "Create NOITP" button within the NOFO record.<br>   ○ Select most recent *Forecast Template*.<br>   ○ Click "Save".<br>   ○ Go to *Content* and fill in required fields (red asterisks).<br>   ○ Title, estimated date, related information (publication, first application, first awards, project start), eligibility – note, activity code not required.<br>   ○ Note: the forecast *Description* section is what NIH Leadership will be reviewing and requires the appropriate ICO leadership approval.<br>   ○ Save record and notify the Guide when the forecast is ready for leadership approval (see below).<br>• Sends email to the Guide mailbox when ready for leadership approval<br>   ○ NIH Guide (NIH/OD) nihguide@OD.NIH.GOV<br>   ○ Subject: NOITP ###-##-##-###– [IC Name] – [Desired Clearance Date]<br>     ▪ Note: the number is important because of the variety of draft versions in FOAM.<br>     ▪ Plan to implement FOAM task in future to remove dependence on email. |

---

[1] For programmatic concepts that have already undergone concept clearance within the last five years, but the NOFO has not been published (for example, NOFO pending in FOAM or not yet drafted).

NIH_GRANTS_003538

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- **Preparing Forecasts for Leadership Approvals**

| Owner | Action |
|---|---|
| Guide | • Indicates that the forecast is ready for review on the tracking spreadsheet (if not done through FOAM task). |
| Leadership Approval Contact | • Places relevant fields on a leadership approval spreadsheet and the Acting DDER is alerted when entries are ready for review. |

- **(Acting) DDER and NIH Director Approvals**

| Owner | Action |
|---|---|
| (Acting) DDER | • Reviews entries on leadership review spreadsheet and updates with approval outcome.<br>• Notifies ICOs regarding the forecasts that are **not approved.** |
| Leadership Approval Contact | • Monitors the review spreadsheet and adds entries and dates on tracking spreadsheet<br>• Notifies ICOs of **approvals** and indicates next steps. |
| ICO | • Archives the FOAM entries for those not approved.<br>• Uploads the approval document into FOAM. |

- **HHS Approval & Concept Clearance (if needed)**

    **Option A: After NIH Approval for NOFOs not requiring Concept Clearance**

| Owner | Action |
|---|---|
| Guide | • Sets NOITP status to "published" in FOAM once the content has been fully approved.<br>• Notifies **OPERA** of the status via email. |
| OPERA | • Sends **Forecast** report to HHS[2] .<br>• Records forecasting information in Grants.gov (forecast is publicly available at Grants.gov, but not NIH Guide). |
| ICO | • Works on NOFO development:<br>    o Convert to the newest template in FOAM.<br>    o Ensure that the NOFO record indicates in Key Attributes that Concept Clearance has been obtained.<br>    o Check that the approval document(s) has been uploaded in FOAM.<br>    o For NOFOs in various stages of development, follow the standard processes for content development and approvals.<br>    o For NOFOs with previous OER approvals, ICO should upload a "compare documents" of the NOFO drafts into FOAM to verify that the ICO did not change any text except to align with current agency priorities. **Note:** FOAM has a compare documents feature. |

---

[2] Until the Grants.gov Forecast functionality has been deployed in FOAM, OPERA will assist with manual updates of all of NIH's NOFOs to Grants.gov monthly (by the 5th of each month—if the 5th falls on a holiday or weekend, we will act by the next business day).

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

| | o Responds to all approval comments and tasks and indicates that the final NOFO draft is ready for NIH leadership approval. |
|---|---|

**Option B: After NIH Approval for NOFOs requiring Concept Clearance**

| Owner | Action |
|---|---|
| ICO | • After receiving NIH leadership approval, proceed with obtaining Concept Clearance.<br>• Enters the Concept Clearance information in the Key Attributes of the FOAM record. |
| | • If **no changes** to the forecast are required after Concept Clearance, the steps described in Option A should be followed.<br>• If the content of the forecast changes after Concept Clearance, the content must go back through leadership approvals. |

- **NIH Leadership Review of Completed NOFOs**

| Owner | Action |
|---|---|
| Leadership Approval Contact | • Downloads completed NOFOs to a folder (with hyperlinks embedded in the spreadsheet).<br>• Places relevant fields on a NOFO NIH Leadership Approval spreadsheet.<br>• Alerts NIH Leadership when entries are ready for review. |
| (Acting) DDER | • Notifies ICOs regarding the NOFOs that are not approved. |
| Leadership Approval Contact | • Notifies ICO, Guide, OPERA of approvals. |
| Guide | • Enters positive approvals in the FOAM record and publishes the NOFO. |

**Questions:**

Inquiries about the Forecast requirements and processes should be directed to: Division of Grant Systems Integration, Office of Policy for Extramural Research Administration Office of Extramural Research: operasystemspolicy@nih.gov.

Inquiries about FOAM should be directed to the Guide: NIH Guide (NIH/OD) nihguide@OD.NIH.GOV.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 6 – Frequently Asked Questions**

1. **When reviewing applications for activities that are no longer an NIH/HHS priority/authority, should ICO's review the content of Other Support submissions?**

   Other Support is used to disclose the PIs ongoing activities and support and should not be modified. ICO's do not need to review Other Support for alignment with NIH/HHS priorities/authority.

2. **For phased awards where the second phase (i.e., Type 4) will not be awarded due to NIH/HHS priority/authority, how should the ICO notify the recipient that the Type 4 will not be issued?**

   In these cases, ICO's must contact OPERA, and OPERA will issue a termination letter. Type 4 awards are subject to the availability of funds and/or agency priorities.

3. **When revising awards to terminate a project, how should the ICO respond to red bars in SEAR?**

   The ICO should not contact recipients to request any additional information to address SEAR flags, because the project is being terminated. ICO's can clear the SEAR flag with a comment that the project is being terminated.

4. **If a project is terminated on an HHS list or a Type 5 is withheld because the project is no longer an NIH/HHS priority/authority, can the ICO issue a subsequent Type 2 award?**

   No. If a project has been terminated due to agency priorities, it is no longer eligible for a renewal award.

5. **For recipients of K awards that are terminated due to NIH/HHS priority/authority, will eligibility requirements be modified to allow the individual to apply for another K award?**

   Yes, NIH will allow recipients of terminated K awards to submit applications for new K awards.

6. **If a PD/PI receives a 'substantial NIH independent research award' and loses ESI status, but the award is terminated, can the PD/PI have their ESI status reinstated?**

   Yes. Investigators can request the reinstatement of ESI status, using the ESI Extensions request tool in eRA commons. See Requesting an Extension for instructions.

7. **When ICO's issue revised NOAs to terminate awards, do they have to use the exact language provided by HHS in the termination term?**

   Yes, ICO's must use the exact language provided in Appendix 3, with no edits.

8. **Can ICO's make awards for applications that came in under a NOFO that has expired (not unpublished) if the NOFO's sole purpose was DEI or another category that does not effectuate the NIH/HHS priorities?**

   No. Whether unpublished or expired, if the sole purpose was DEI or another category that does not effectuate the NIH/HHS priorities, ICO's cannot make the award. For updated information on

NIH_GRANTS_003541

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

NOFOs, CGMOs must contact their DEA rep.

9. **If a NOFO is taken down for modification, and re-posted, can ICO's issue awards in response to that NOFO?**

   Yes. If the NOFO has been modified and reposted, ICO's may proceed with making awards after confirming that the award aligns with agency priorities.

10. **If an ICO is modifying a Type 5 restore full amount, does the ICO need to conduct a review of the project activities as outlined in this guidance?**

    Yes. All monetary revisions are subject to this guidance.

11. **Can ICO's approve requests from recipients to modify the project title?**

    Requests to change project titles must be submitted as a prior approval request. Changes to titles may only be made in the context of negotiations to remove activities/language that do not align with HHS/NIH priorities/authority. Title changes should only be made alongside associated changes to the abstract and specific aims.

12. **When ICO's receive questions from recipients regarding HHS terminations, what should they do?**

    ICO's should not engage in discussions with recipients regarding HHS directed terminations. ICO's must direct recipients to submit any appeals to Dr. Memoli, as outlined in the termination letter.

13. **For terminations where the ICO is making the determination, who is listed as the point of contact for appeals?**

    An ICO determination that an award no longer aligns with agency priorities is not appealable. Therefore, appeals language is not included in the termination term. Recipients may contact the IC Director to request a reconsideration of the ICO determination.

14. **What is the difference between an HHS-directed termination vs. and ICO or OD determination to terminate a project?**

    For HHS directed terminations, the template letter and appeals language were provided by HHS, and must be used as is. When an ICO or the OD determines that an award no longer aligns with agency priorities, the termination is made in accordance with 2 CFR 200.340(a)(4). This is not a termination for material failure to comply with the terms and conditions of award and is not appealable.

15. **When will the Final RPPR become available for recipients to prepare and submit?**

    The F-RPPR link will open once the project period has ended.

A0676                                                                NIH_GRANTS_003542

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

16. **Can recipients draw down funds after the stated termination date?**

For activities that were incurred on or before the termination date, with supporting documentation, NIH will approve the payment. For costs after the project period end date, outside of patient safety and animal welfare, costs will not be approved.

17. **When will the Federal Financial Report (FFR) become available in PMS for recipients to submit?**

The FFR will become available once the project period has been updated via a Notice of Award. Recipients should direct any questions to PMS or the OPERA FFRC.

18. **Will recipients have the standard 120-day period following the termination date to submit closeout reports?**

Because there are no new activities after the date of termination, NIH is directing that all closeout reports be submitted within 60 days of the termination unless animals or human subjects are involved.

19. **If an ICO negotiates a change in a foreign site (e.g., South Africa to Nigeria), can the funds be rebudgeted from the original site to a new site?**

Yes. Funds can be rebudgeted to conduct the activities at a new site as long as the site is domestic. All new foreign collaborations will need to follow the new structure once rolled out. If research aims are fully removed from a project, the funds cannot be rebudgeted for another purpose.

20. **For awards that were terminated before the term and condition of award was modified to provide instructions for requesting approval of drawdowns, how should ICO's notify the recipient of the process?**

When ICO's receive questions from recipients about the process for requesting drawdowns, the ICO must notify the recipient that they should contact the OPERA FFRC (OPERAFFRInquiries@od.nih.gov) for prior approval. The request must include details related to human subjects or animal welfare or outline that the costs were incurred prior to the termination date. The recipient must provide supporting documentation.

21. **If a recipient requests prior approval to change a performance site from South Africa to another location, can the ICO approve the change?**

Yes. ICO's may approve change to move activities from South Africa to another site. At this time, awards involving South Africa remain on hold. ICO's should not initiate negotiations or restrict funds.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

22. **Does the COVID category apply to long-COVID and pandemic preparedness research? Or is it focused only on the immediate COVID-19 pandemic response.**

The COVID category relates to awards made to address the immediate COVID-19 pandemic response. Awards to support general biology of coronavirus, long COVID and pandemic preparedness, at this time, may continue.

23. **If a letter of support on a training grant references a university resource for DEI, but the abstract and aims do not include any DEI activities, does the letter of support need to be revised?**

No. Under the concepts outlined in Category 2B, updated documents are not required to modify language when there are no DEI activities under the project.

24. **For diversity fellowships awarded prior to January 20, 2025, are recipients permitted to activate their awards?**

Yes. Recipients may activate the fellowship. ICO's must review these awards in accordance with this staff guidance, and future funds must not be awarded.

25. **For joint NIH-NSF programs, where the initial application came in to NIH via a 'dummy' NOFO, can ICO's negotiate the award to remove any activities that do not align with NIH/HHS priority/authority?**

Yes. These awards must be reviewed, and any unallowable activities must be negotiated out.

26. **If NIH funds were awarded to support conference attendance, and the conference has a session on DEI, can the recipient use the NIH funds to attend?**

No. NIH funds may not be used to pay for participation in a conference that includes DEI sessions or activities.

27. **If a conference proposes a session on DEI (e.g., DEI Power Hour), can the ICO negotiate with the recipient to remove those activities from the conference agenda?**

Yes. The ICO can negotiate with the applicant/recipient to remove the DEI activities.

28. **For programs that have been terminated, in whole (e.g. MOSAIC K99/R00), will there be any central announcement, or should ICO's proceed with revising awards in accordance with the staff guidance.**

In these cases, the NOFO will be unpublished. There will not be any other announcement. ICO's should take action on the awards as outlined in this staff guidance.

NIH_GRANTS_003544

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 7 – Managing PMS Hard Funds Restrictions**

OPERA directs PMS to hard funds restrict awards terminated as a result of agency priorities and HHS authorities.

Recipients are required to request approval from OPERA (OPERAFFRInquiries@od.nih.gov) before any draw that occurs after the termination. The request must include details related to human subjects or animal welfare and provide supporting documentation. These are the only approvals that will be issued. OPERA will work with the ICO to facilitate approvals and facilitate lifting restrictions in PMS. After approval is issued, the recipient can request the drawdown in PMS. Note: Any other costs that are not related to human subject protection or animal welfare will not be approved. No exceptions.

Recipients are also required to request approval from OPERA to lift the restriction for payments of costs incurred on or before the date of the termination. For costs incurred, with supporting documentation, on or before the date of the termination, OPERA will work with PMS to lift the restriction as appropriate.

Note: Balances reported to HHS will change, as drawdowns are approved as outlined above. Reports to HHS will be updated as balances are modified. OPERA is responsible for maintaining up to date information for HHS reporting.

When recipients draw funds in PMS, they normally request funds from multiple awards within a single draw request.  For awards terminated as a result of agency priorities and HHS authorities, recipients cannot request funds from multiple awards within a single draw request.  Each draw request must contain only one terminated award.  If a recipient combines a draw request for a terminated award with any other award, the request will be rejected.

**Entity Restrictions:**

At times, HHS or NIH may place a hard funds restriction on an entity in PMS, at the entity level, during compliance reviews. When this occurs, OPERA will notify ICO's. During the restriction period, ICO's should hold awards to the institution until the restriction is lifted.

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Appendix 8 – Template ICO Termination letter.**

[Address block & date]

[Authorized Organization Representative]:

Funding for Project Number [INSERT] is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement, and 2 C.F.R. § 200.340(a)(4).  This letter serves as a termination notice.

The 2024 Policy Statement applies to your project because NIH approved your grant on [INSERT DATE], and "obligations for federal grants are generally determined by the laws, regulations, and terms in effect at the time the grant was awarded, as outlined in the Notice of Award (NOA) or grant agreement". This "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."

According to the Policy Statement, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."  At the time your grant was issued, 2 C.F.R. § 200.340(a)(4) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This project no longer effectuates agency priorities. [insert termination category language (e.g., DEI) verbatim]. Therefore, there is no modification of the project that would align with agency priorities.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision," no corrective action is possible here.

Costs resulting from financial obligations incurred after termination are not allowable. Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §200.344. However, due to the immediate termination of this project, NIH may require a shortened timeframe to submit closeout reports. Details will be provided in the revised NOA issued by the Grants Management Official.

This is a final determination. If you wish to seek a reconsideration because you object to the ICO's termination, please submit a reconsideration request to [IC Director Name], Director, [IC Name].


Sincerely,

IC CGMO

1

```
 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS (Boston)

 3                            No. 1:25-cv-10814-WGY

 4

 5   COMMONWEALTH OF MASSACHUSETTS, et al,
               Plaintiffs
 6

 7   vs.

 8

 9   ROBERT F. KENNEDY, JR., et al,
               Defendants
10

11                     * * * * * * * * *

12

13                   For Hearing Before:
                   Judge William G. Young
14

15                 Preliminary Injunction

16

17                 United States District Court
                   District of Massachusetts (Boston.)
                   One Courthouse Way
18                 Boston, Massachusetts 02210
                   Thursday, May 8, 2025
19

20                     * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                   Official Court Reporter
23              United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
24                   rhr3tubas@aol.com

25
```

```
 1                   A P P E A R A N C E S

 2

 3    GERARD J. CEDRONE, ESQ.
      KATHERINE B. DIRKS, ESQ.
 4    CHRIS PAPPAVASELIO, ESQ.
      RACHEL M. BROWN, ESQ.
 5    VANESSA AZNIV ARSLANIAN, ESQ.
         Massachusetts Attorney General's Office
 6       One Ashburton Place, 20th Floor
         Boston, MA 02108
 7       (617) 963-2282
         E-mail: Gerard.cedrone@mass.gov
 8    and
      SOPHIA TONNU, ESQ.
 9       Office of the Attorney General
         Healthcare Rights & Access
10       455 Golden Gate Avenue, Suite 11000
         San Francisco, CA 94102
11       (415) 510-3529
         Email: Sophia.tonnu@doj.ca.gov
12       For Plaintiffs

13

14    THOMAS PORTS, JR., ESQ.
         DOJ-Enrd
15       P.O. Box 875
         Ben Franklin Station
16       Washington, DC 20044
         (202) 307-1105
17       Email: Thomas.ports@usdoj.gov
      and
18    ANUJ K. KHETARPAL, ESQ.
         United States Attorney's Office
19       1 Courthouse Way, Suite 9200
         Boston, MA 02210
20       (617) 823-6325
         Email: Anuj.khetarpal@usdoj.gov
21       For Defendants

22

23

24

25
```

A0682

```
 1          P R O C E E D I N G S

 2          (Begins, 11:30 a.m.)

 3          THE CLERK:  The Court will hear Civil Action

 4    25-10814, the Commonwealth of Massachusetts, et al

 5    versus Robert F. Kennedy, Jr., et al.

 6          THE COURT:  Good morning.  The Court has

 7    authorized internet access to these proceedings, and so

 8    I should say, if anyone has accessed the proceedings via

 9    the internet, you must keep your microphone muted, the

10    rules of court remain in full force and effect, and that

11    is to say there is no taping, streaming, rebroadcast,

12    screen shots, or other transcription of these

13    proceedings.

14          With that stated, would counsel introduce

15    themselves, starting with the plaintiffs.

16          MR. CEDRONE:  Good morning, your Honor, Gerard

17    Cedrone from the Massachusetts Attorney General's Office

18    representing the Commonwealth, and I'll be arguing for

19    the plaintiffs today, and I'll let my co-counsel

20    introduce themselves as well.

21          MS. DIRKS:  Good morning, your Honor, Katherine

22    Dirks from the Massachusetts Attorney General's Office.

23          MS. TONNU:  Good morning, your Honor, Sophia TonNu

24    for the State of California.

25          THE COURT:  Good morning to you.
```

A0683

 1          MS. ARSLANIAN:  Good morning, your Honor.  Vanessa

 2    Arslanian also from the Massachusetts Attorney General's

 3    Office.

 4          MR. PAPPAVASELIO:  Good morning, your Honor, Chris

 5    Pappavaselio from the Massachusetts Attorney General's

 6    Office.

 7          MS. BROWN:  Good morning, your Honor, Rachel Brown

 8    from the Massachusetts Attorney General's Office.

 9          THE COURT:  Good morning to you all.

10          MR. PORTS:  Good morning, your Honor, Tom Ports

11    from the U.S. Department of Justice representing all the

12    United States defendants.

13          MR. KHETARPAL:  Good morning, your Honor, Anuj

14    Khetarpal for the United States.

15          THE COURT:  And good morning to you.

16          Um, something off the record first.  Would counsel

17    come up to the sidebar.

18          (Off the record.)

19          THE COURT:  And I thank counsel.

20          So at the sidebar I mentioned, and everyone

21    recognizes, that in this case there is a significant

22    issue of subject matter jurisdiction, and, um, every

23    court has the inherent power to take the time to

24    determine, in a thoughtful way, whether it has subject

25    matter jurisdiction.

```
 1        It's the plaintiffs who claim that this is the
 2   appropriate court and I think we'll start with the
 3   plaintiffs, 10 minutes a side.  You'll understand I've
 4   read all of the papers that are, I think, germane to
 5   this issue.  And again, as I mentioned at the sidebar,
 6   once this issue is argued, 10 minutes on this
 7   jurisdictional issue per side, I -- we will talk about
 8   whether we take another break.
 9        Mr. Cedrone.
10        MR. CEDRONE:  Good morning, your Honor, and thank
11   you.
12        This Court clearly has jurisdiction to decide the
13   claims in this case.  The plaintiffs are bringing APA
14   claims challenging the government policy and bringing
15   constitutional and ultra vires claims challenging that
16   policy.  Those claims are squarely within this Court's
17   jurisdiction under ordinary jurisdictional principles.
18        THE COURT:  All right.  Real world, what about the
19   order of the Supreme Court to my colleague in another
20   perhaps dissimilar case, but related to this?
21        Go ahead.
22        MR. CEDRONE:  And the *Nken* matter, that is, um, an
23   emergency docket order, it has limited precedential
24   value, but we recognize it's an order of the Supreme
25   Court that this Court has to take seriously.  Our case
```

A0685

```
 1   is different from that case.
 2         As the Supreme Court understood the claims in that
 3   case, the claimants were seeking, among other things, a
 4   payout of the past-due amounts on contract.  We're not
 5   seeking anything of the sort here.
 6         Our argument is --
 7         THE COURT:  But you are as a practical matter.  I
 8   mean this is quite a breathtaking complaint, and I say
 9   that with respect.  One of the questions that I'm going
10   to be asking, if I was to ask it, if I determine that I
11   have jurisdiction, is whether there's an issue of
12   impoundment here, and, um, there's a factual dispute
13   about that.  But, um -- well you go ahead.  I --
14         Don't you agree that that's an issue here?
15         MR. CEDRONE:  I agree that there's a question of
16   whether the actions the defendants have taken, from the
17   policies that we're challenging, are lawful, but we are
18   challenging the policies themselves, and that's what
19   sets this case apart from the Supreme Court's decision.
20   And I would return to the --
21         THE COURT:  When you say they're dragging their
22   feet in doing the things they're supposed to do and
23   going before the appropriate counsel with functionally
24   the fact that they will get by -- I mean these are
25   aggressive allegations, get by subterfuge the result
```

A0686

```
 1    even if their declared purposes are held to be unlawful.
 2    I mean officers of the United States, if I declare their
 3    declared purposes to be unlawful, they drag their feet,
 4    the money isn't spent, October 1 then comes, and it
 5    lapses.
 6         You're concerned about that, right?  Money?
 7         MR. CEDRONE:  That's correct.  And the Supreme
 8    Court has long made clear, going back to the decision in
 9    Bowen, which is still good law, and which the Supreme
10    Court recognized and reaffirmed in that minute order,
11    that just because a case involves money or just because
12    a decision will implicate the payout of money down the
13    line does not transform it into a contract claim.
14         And just to -- I want to be incredibly clear, your
15    Honor mentioned the claims about the federal government
16    dragging its feet.  Those claims are not subject to the
17    Tucker Act argument, there is no argument that --
18         THE COURT:  And that's a problem, I think, for the
19    government officials here.  But we'll deal with that in
20    their argument.  I'm going to say, "Well then where do
21    those things get resolved?"  If those things were true,
22    um, what court is going to hear you?
23         Go ahead.
24         MR. CEDRONE:  I think that's exactly right.  And I
25    think the fact that our undue delay claims and our
```

 1    constitutional claims are "other piece" with our APA

 2    claims, and when I say "APA," I mean not the undue

 3    delay, but the more traditional arbitrary and capricious

 4    Section 706(2) claims.  The fact that they're all "other

 5    piece" demonstrates that the heart of our suit is not a

 6    suit for contractual damages.

 7         And just to give your Honor some comfort about the

 8    Supreme Court's order, we cite, at Footnote 4 of our

 9    reply brief, a number of decisions since the Supreme

10    Court's order that have recognized the government is

11    reading that emergency decision, it's giving that

12    decision far more weight than it can bear.  And so we

13    acknowledge it's a Supreme Court order, it deserves due

14    weight, but the government's placing far too much weight

15    on it.

16         And I would return the Court to the test that the

17    First Circuit recognized, that hasn't been overturned,

18    it originates from a D.C. Circuit case called **Megapulse**,

19    which says the Tucker Act applies -- to determine

20    whether the Tucker Act applies, you look to the source

21    of the rights and you look to the relief being

22    requested.

23         The source of our rights here, for the APA claims

24    -- again I'm putting aside the constitutional claims

25    because there's no argument the Tucker Act applies to

1     those. For the APA claims, the source of our rights is

2     the APA and its demand for reasoned decision-making.

3     The essence of our claims is not that the federal

4     government made a promise to us in contract that it then

5     broke. Your Honor can decide this case and our claims

6     without reading any agreement, without construing the

7     terms of any contract. So that's the source of our

8     rights.

9         And then in terms of the relief that we're

10    seeking, we are not seeking money damages. We're not

11    asking the Court to say "The federal defendants had an

12    agreement with the plaintiffs, they should have paid out

13    $500 million, they did not, therefore I'm awarding

14    damages, a judgment in the amount of $500." We're not

15    seeking that. We're asking the Court to hold that the

16    policy the agency has adopted of blacklisting certain

17    topics and defunding programs related to those topics is

18    arbitrary and capricious, unlawful, and contrary to

19    statute. That may have implications for the grants that

20    have been terminated, but we're not seeking a money

21    judgment in damages.

22         THE COURT: All right, I follow. About 4 more

23    minutes.

24         And again, looking ahead, were it to remain here,

25    I have to say I -- I would be interested. I'm going to

```
 1    have to know what grants, presently extant, it has
 2    implications for, if you're right.
 3            And you agree with that at least?
 4            MR. CEDRONE:  That's correct, that's absolutely
 5    correct.  But *Bowen* makes clear that that fact doesn't
 6    turn this into a contract claim.
 7            So in *Bowen* itself, the agency action at issue was
 8    that -- and it's in this case, I noted that *Bowen* was in
 9    *Massachusetts vs. HHS.*  In that case itself, HHS denied
10    payments of certain Medicaid claims, they "disallowed
11    them" in the language of that statutory regime,
12    Massachusetts brought an Administrative Procedure Act
13    claim, and the Supreme Court held that was not within
14    the scope of the Tucker Act, even though, quite
15    straightforwardly, a decision in that case would result
16    in the payout of money.
17            So the California -- the decision of the
18    *Department of Education vs. California* case doesn't
19    change any of that.  As multiple courts have recognized,
20    right up to earlier this week, in the District of Rhode
21    Island, which is supplemental authority we submitted
22    yesterday.
23            THE COURT:  Those -- not all those courts go your
24    way, though if I were counting courts, the ones who have
25    spoken to it, most do.
```

```
1           What's the status of the decision of the First

2     Circuit after the, um, order of the Supreme Court?

3           MR. CEDRONE:  I think again because the, um --

4     because the Supreme Court's order is an emergency

5     decision which the Supreme Court -- the Supreme Court

6     justices themselves have said has limited precedential

7     value, my argument would be the First Circuit's decision

8     stands except insofar as it, um, directly conflicts with

9     the limited reasoning in that 2-page Supreme Court

10    order.  And even then, I think the Court needs to

11    recognize that that was a request for a stay from the

12    Supreme Court.  So, um, I think the area of direct

13    conflict might be pretty limited because the standard

14    for a stay in the Supreme Court is different from the

15    standard that the First Circuit was applying.

16          THE COURT:  Thank you.

17          All right, I'll hear the United States.

18          MR. PORTS:  Thank you, your Honor.

19          THE COURT:  And maybe -- I really am interested in

20    what is the status of the First Circuit decision after

21    the order of the Supreme Court.  I mean I work for the

22    First Circuit.  I of course work for the Supreme Court.

23    But it's a -- it's a vertical system.  I try to be

24    transparent.

25          I had a case where I read a Supreme Court
```

1  decision, and I thought the decision required probable

2  cause before you could get a pole camera, and I fit it

3  right into the -- into the Supreme Court decision.

4  There's a First Circuit decision which had considered

5  that matter, predating the Supreme Court decision, and

6  expressly excluded it.  I was pretty snappily reversed

7  with language which said "It's a vertical system.

8  Unless we tell you we changed First Circuit law, pay

9  more attention to First Circuit law."  I live and learn.

10       Isn't that the case here?

11       MR. PORTS:  Um, so, your Honor, in that case was

12  it -- I guess was it a reversal by the Supreme Court of

13  a First Circuit ruling?

14       THE COURT:  No, it was I -- I was weaker than

15  that, in that sense.  I'm not so sure I agree that they

16  reversed the First Circuit, they entered an order that

17  is supreme in the circumstances.  No, I built on dicta

18  in a Supreme Court case.

19       MR. PORTS:  Okay, your Honor.

20       THE COURT:  But my decision was weaker and the

21  decision of the First Circuit was more plain.  I'm just

22  saying I learned from it.

23       MR. PORTS:  Understood, your Honor.

24       Here this is a very different situation.  The

25  First Circuit looked at the District Court's ruling,

1    which was assessing the likelihood of success on the

2    merits regarding the Tucker Act argument, and I will

3    say, for starters, that the facts in California and the

4    facts here in what we're looking at really couldn't get

5    much more similar.

6          THE COURT:  Really?

7          MR. PORTS:  But so I'll talk about that a little

8    bit more.

9          THE COURT:  But he says it's a different case.

10         MR. PORTS:  I would respectfully disagree, your

11   Honor.

12         In that case the Department of Education undertook

13   a review, it terminated DEI-related grants, and the

14   plaintiffs filed -- if the Court holds the docket and

15   looks at their brief, um, Docket Number 7 on the docket

16   from the District Court, the Court will see that the

17   brief looks a lot like the brief that is filed here.

18         Now after amending their complaint and refiling

19   the PI, they took out some of the more explicit

20   references to the contract.  They avoid bringing it up

21   in the first motion and they don't have to talk about

22   the contract until it comes up in their reply.  But the

23   only time they talk about the contract in that brief --

24   it focuses on the APA, um, is in the same way that this

25   brief seeks to do.  The only time they talk about it is

 1    to say that the contracts or the agreements do not allow

 2    for termination for these reasons.  That same issue

 3    exists here.  And we talk about it, we talk about it in

 4    the reply, we talk about it in our opposition.  It

 5    doesn't get much more similar than these two claims.  So

 6    I'll start there.

 7         The First Circuit said, looking at that, "We think

 8    it is likely that the plaintiffs will succeed on the

 9    merits."  Looking at the same question, the Supreme

10    Court said "We do not think -- we think it is unlikely

11    -- that they haven't shown that it's likely they're

12    going to succeed on the merits in the Tucker Act claim.

13    It is likely that the Court did not have jurisdiction

14    and that the jurisdiction is in the Court of Federal

15    Claims."

16         THE COURT:  But all the Supreme Court did was stay

17    the order.  You're reading it that broadly, what the

18    Supreme Court said?

19         MR. PORTS:  It looked at -- yes, your Honor, it

20    stayed the order and it said, as its reasoning, that it

21    was unlikely, um, looking at the Tucker Act, and said

22    that the jurisdiction is likely in the Court of Federal

23    Claims.

24         THE COURT:  Where then -- where then are the, um,

25    equitable claims going to be adjudicated?

1          MR. PORTS:  Um -- okay, your Honor.  So to discuss

2     all of the claims overarching I will say one correction

3     for what opposing counsel has said.  The Tucker Act

4     argument applies to all of the claims for -- under the

5     APA, the constitutional claims, and the ultravirus

6     claims.  So these are all based, um, if you look at the

7     relief.

8          So first, plaintiffs want the Court to compel NIH

9     to keep paying on now-terminated grant agreements by

10    setting aside the termination of those agreements.  So

11    on that claim involving existing grants, the Court does

12    not have jurisdiction to issue that because the Tucker

13    Act is the exclusive waiver of sovereign immunity to

14    bring claims on an express or an implied contract.  So

15    that these claims are based on a contract, that's the

16    first part of the **Megapulse** decision, they don't get any

17    money under these grant agreements but for the grant

18    agreements.

19         There's, um -- this is very different from **Bowen**,

20    there was no grant agreements there, that was just

21    focusing on whether a statutory payment was damages or

22    not damages.  That's a different part of the Tucker Act.

23    It's not looking at contracts, it's just saying not all

24    money is money damages.  This part that we're talking

25    about today is about whether this is based on a

1    contract.

2         Here the relevant case is *Ingersoll Rand*.  So

3    there the plaintiff came into the District of D.C. and

4    said, "You arbitrarily and capriciously terminated my

5    contract, I want review of that under the APA."  And the

6    D.C. Circuit said, in *Ingersoll Rand*, "We can't do that,

7    the Tucker Act is the exclusive waiver of sovereign

8    immunity for claims to review a contract termination and

9    it does not allow for specific performance of the

10   contract."

11        Specific performance of the contract -- there is

12   no waiver of sovereign immunity for the specific

13   performance of the contract.  The First Circuit has

14   acknowledged that it is aware of no decision or no

15   waiver of sovereign immunity for the specific

16   performance of the contract.  So any relief that

17   plaintiffs can receive to get performance, or to try and

18   get performance, um, or to get money under their

19   contract, must be decided in the Court of Federal

20   Claims.  So that's one group.

21        Plaintiffs are correct in saying that the Tucker

22   Act is not the reason that we asserted that this Court

23   lacks jurisdiction to consider their 7061 unreasonable

24   delay claim.  So if that's what you're referring to in

25   asking about the equitable claims, the claims for

```
 1   unreasonable delay, we do believe that there is no
 2   jurisdiction to consider those claims, but for different
 3   reasons.
 4           THE COURT:  And?
 5           MR. PORTS:  For those claims we would say this
 6   Court does not have jurisdiction because it's an
 7   improper programmatic challenge, they are not seeking to
 8   compel a discrete or mandatory action, and for
 9   jurisdictional purposes, it's moot.  They didn't sue
10   until after these meetings that they're seeking to
11   compel and these decisions that they're seeking to have
12   made have resumed.  It was -- there was a roughly a
13   2-month pause in communications and --
14           THE COURT:  No, I've read your papers, but they
15   say the clock is ticking now and it's so slow that the
16   money's going to lapse here?
17           MR. PORTS:  Understood, your Honor, that they do
18   say that, um, but if the Court looks at --
19           THE COURT:  Suppose they prove that?
20           MR. PORTS:  Respectfully, your Honor, these
21   documents that they have already submitted in this case
22   disprove that.  But they do prove that a pause occurred
23   and that there is -- they're roughly 2 months behind.
24   But that's --
25           THE COURT:  Are you going to make that up?
```

```
 1        MR. PORTS:  Sorry, your Honor?
 2        THE COURT:  Actually I'm not so sure I can ask the
 3   question because we're talking -- but I'll ask it
 4   anyway.
 5        Are you going to make that up?  Is it all going to
 6   be determined in this fiscal year so that if they are
 7   right, the monies can be expended in accordance with
 8   the, um, appropriations that Congress made?  I mean
 9   could you tell me that?
10        MR. PORTS:  I can make a couple of points and sort
11   of explain broadly where things stand, your Honor, if
12   that would be helpful.
13        I will say, um, as far as can I guarantee that 100
14   percent of the appropriated money available will be
15   appropriated by the end of the fiscal year?  I cannot
16   make that representation.  But I will also say that NIH
17   essentially never appropriates all of the money or
18   allocates all of the money appropriated by Congress by
19   the end of the fiscal year.  That's just not what
20   happens in any given year and it's not an impoundment
21   problem, it is just a practical reality of NIH managing
22   its programs and making decisions about which grants it
23   wants to fund and which ones it doesn't want to fund.
24   But that is very normal, it doesn't create any kind of
25   bigger problems to not get through -- you know, um, that
```

```
 1    whereas here, they're moving forward, they're making
 2    stuff, they are approving grants, but the fact that they
 3    may not appropriate all of the money is not an issue.
 4         So looking at it --
 5         THE COURT:  Well it's an issue, isn't it, if the
 6    -- if this so-called "pause" was illegal, isn't that an
 7    issue?
 8         MR. PORTS:  Is it an issue?
 9         THE COURT:  You just told me, you said there's
10    been a pause, now it's resumed.  Everything's fine.  But
11    in the ordinary course, not all of the appropriated
12    funds are going to be "committed," if that's the right
13    word.  But you say, "Well that happens every year."  I
14    mean I see and I've looked and there's a 5-year plan
15    that's in effect on paper.  But my question to you is
16    suppose this pause was completely unlawful -- suppose,
17    just suppose that, you're saying to me, um, that's
18    without remedy?
19         MR. PORTS:  I would say it is -- it is certainly
20    without remedy where plaintiffs waited until after that
21    pause to even bring a lawsuit, and NIH had resumed its
22    consideration and its holding of meetings and taking all
23    of the actions that the plaintiffs seek to compel.  It's
24    unclear what this Court would do, as far as offering a
25    remedy, where what they're asking for is already
```

```
 1   happening?
 2        THE COURT:  It's on them.  I understand the
 3   argument.  All right, this has been very helpful.
 4        Now, I propose to take a brief recess.  Let me put
 5   to you this issue.  I'm going to take a recess briefly,
 6   um, in any event.
 7        Should I -- to encourage the parties to talk,
 8   should I just simply take this matter under advisement,
 9   stay my hand in expressing any view, um, or should I get
10   deciding it and decide it and we'll see where it comes
11   up?
12        Mr. Cedrone?
13        MR. CEDRONE:  I think a short recess would be
14   useful.  I also know that your Honor typically does not
15   allow reply arguments --
16        THE COURT:  I do not.
17        MR. CEDRONE:  Is there any way I can respond to
18   the --
19        THE COURT:  No.
20        MR. CEDRONE:  Okay.  Thank you, your Honor.
21        THE COURT:  You know I've read your brief.  So the
22   answer is "No."
23        Counsel?
24        MR. PORTS:  Yes, your Honor, we --
25        THE COURT:  The same -- so here's what we're going
```

```
1   to do.  I don't mind -- I need the recess.  I appreciate
2   the argument.
3        We'll stake a 10-minute recess.  I'm coming back
4   on the bench.  My first question is the one I just
5   posed.
6        Do you want to know -- if I were able, and I'm not
7   saying I am, but do you want to know what I think?  Or
8   even if I don't yet know what I think, do you want me to
9   get busy on resolving this?  Or, because talking is a
10  good thing, I urge you to talk, do you want to agree to
11  a longer wait?  And I'm not talking about a great deal
12  of time, like over the weekend, something like that.  Or
13  tell me something else?  I expect an answer as to that
14  and then we'll see what I do.
15       Does that make sense?
16       We'll take a 10-minute recess.  We'll recess.
17       THE CLERK:  All rise.
18       (Recess, 12:00 p.m.)
19       (Resumed, 12:15 p.m.)
20       THE COURT:  What's the answer to the question?
21       MR. CEDRONE:  Our view is that we would like a
22  decision and we'd like to move forward, and that that
23  does not preclude us from talking with the government
24  and hoping to work things out so that --
25       THE COURT:  Of course it does not.  Of course it
```

```
 1   does not.  Well it would take two.  And so here's where
 2   we are.
 3        I'm going to take the matter under advisement.
 4   I'm going to commence work on it at once.  To be
 5   completely transparent, my impression is that the states
 6   have the better of it and that this Court does have
 7   subject matter jurisdiction.  That's not a ruling.  The
 8   matter is sufficiently complex that, as the saying goes,
 9   "I've got to see how it writes."  And I will.  I have
10   the right to take the time to determine this Court's
11   subject matter jurisdiction.
12        If I determine that I am without jurisdiction as
13   to one or both aspects of the case, without further
14   meeting, I will so declare, in a very short order.  If I
15   determine that this Court has subject matter
16   jurisdiction, um, we will meet at 2:00 p.m. on Tuesday
17   of next week for a case-management conference.  Because
18   I will tell you now -- and don't -- please don't think
19   that my mind is made up and therefore that's where we're
20   going, because my mind is not made up.  I thank the, um,
21   all the attorneys, and I thank the government attorneys,
22   the United States government attorneys for their careful
23   presentation.  But this is a motion for a preliminary
24   injunction and expedition, if the Court has subject
25   matter jurisdiction, um, is required.
```

 1        But I don't -- I prefer to deal with matters on
 2   the merits.  And so if at that -- if I think I have
 3   subject matter jurisdiction, at 2:00, Tuesday, my
 4   present intention, if I do, is to collapse further
 5   proceedings on the preliminary injunction with trial on
 6   the merits, and to discuss at that conference the most
 7   expeditious manner of trial proceedings.  My feeling is
 8   that a large portion of this can be handled by summary
 9   judgment or a case-stated, but significantly not all,
10   and, um, a trial is definitely required.
11        To that end, I make three requests.  The first
12   will be helpful to whatever court hears it and I want
13   it -- and this is a request to the states.  I at least
14   would find this very helpful, and by Tuesday at
15   2:00 p.m. I want it.  And I have every reason to believe
16   the Court of Federal Claims will find it helpful too.
17        I want a list -- and I understand there's hundreds
18   of them, but I want a list of the grants actually
19   affected -- really on a spreadsheet, a list of the
20   grants actually affected, not process that may affect
21   other grants.  And then across the top I want -- and you
22   people can encapsulate the grounds why conduct with
23   respect to that -- those grants is wrong.  It's not just
24   arbitrary and capricious, some of them you say flat out
25   violate the governing statutes.  I want to know that.

1          The other two requests are previous and really are

2    not my business unless I have subject matter

3    jurisdiction.  But only in the effort to save time, I

4    make two additional requests, one of the states and one

5    of the federal authorities.

6          The next question to the states -- and I know why

7    you stayed away from the grants, the whole argument,

8    this isn't about contracts, but your proposed

9    preliminary injunction is -- and I say this

10   respectfully, is too great -- it's too general,

11   significantly too general.  I'd like -- although I

12   suggested that my preferred course of conduct is to

13   collapse the hearing for a preliminary injunction with

14   trial on the merits, maybe that trial has some

15   injunctive relief.  So I want something much more

16   specific.

17         I speak with some diffidence.  Look, I'm a

18   transparent person, this subject matter jurisdiction is

19   a big issue.  I'm not past it.  Don't anyone think I am.

20   But I think beyond it.  Maybe it's not for me.  So I ask

21   that.  I'm not looking for that at Tuesday.  But if I

22   keep the case, um, asking for a preliminary injunction

23   when you collapse it with trial on the merits doesn't

24   mean it doesn't go away, it means I much prefer to

25   proceed based on evidence.

1    And the same -- and I ask this with the same

2    diffidence of the federal authorities.  In your

3    presentation -- and it has been very helpful, you

4    mentioned DEI.  I understand the Administration is

5    against DEI.  This is an area, um -- the substantive

6    area here is health care for all Americans.  And so when

7    you use that term, counsel, respectfully I just don't

8    know what you mean?  And this isn't a -- a teasing

9    question.

10    I understand the words mean "Diversity Equity

11    Inclusion."  I think I know what "diversity" means.  I

12    know it's a word with a positive connotation to me.

13    "Equity" is fairness.  There can be many disputes over

14    fairness, cases deal with those all the time.

15    "Inclusion," I -- well I shouldn't characterize the

16    Administration, but I understand that the federal

17    administration has problems with inclusion.  But I just

18    don't know what it means.

19    There has to be some working definition.  And so

20    I'm looking for one.  If I keep the case, I need a

21    working definition.  It's not "The length of the

22    Chancellor's foot."  So what does that mean?

23    What does that mean -- um, you know in the

24    Education cases, that's usually coupled now with a broad

25    reading of *Students for Fair Admissions*, the case about

Case: 25-1612    Case: 1:25-cv-10814-WGY    Document: 00118317517    Document: 440    Filed: 05/12/2025    Page: 26 of 28    Filed 05/29/25    Page 26 of 28    Entry ID: 6754211

26

```
 1    the Harvard admissions process.  I can understand that.

 2    I mean I understand what the decision of the Supreme

 3    Court means.  But this is health care, this is research

 4    to advance health care for all our citizens.  So I don't

 5    know what it means in this circumstance.  And I say that

 6    with complete honesty.  I need to know what it means.

 7    And as one who may be tasked with fair and full

 8    adjudication, it's my responsibility to know what it

 9    means.

10         All right, I'm taking the matter under advisement.

11    We'll stand in recess.  There may or may not be a

12    hearing on Tuesday.  And just as soon as I am confident

13    in my reasoning, I will advise you.

14         MR. CEDRONE:  Just to confirm on your Honor's

15    request, the spreadsheet that you requested we will

16    prepare by?

17         THE COURT:  I want that by Tuesday.

18         MR. CEDRONE:  And the further requests are --

19         THE COURT:  Even if it's a matter of only

20    curiosity to me, I am satisfied that the Court of

21    Federal Claims would like to see something like that.

22    And, um, I'm not looking for a "Thank you" from them,

23    but I want it.  And you're right, I want that 2:00

24    Tuesday.  You're in possession of this data, it's your

25    pleading, I'm asking you to talk about your pleading in
```

```
 1   some more detail.
 2        The other two, um, I do make those requests with
 3   diffidence because we may not be meeting on Tuesday.  If
 4   we meet on Tuesday, I want them.
 5        MR. CEDRONE:  I understand.
 6        THE COURT:  I do express my thanks to you all.
 7   We'll stand in recess.
 8        MR. CEDRONE:  Thank you, your Honor.
 9        MR. PORTS:  Thank you, your Honor.
10        (Ends, 12:30 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                  C E R T I F I C A T E

 2

 3       I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 4    hereby certify that the forgoing transcript of the

 5    record is a true and accurate transcription of my

 6    stenographic notes, before Judge William G. Young, on

 7    Thursday, May 8, 2025, to the best of my skill and

 8    ability.

 9

10

11

12
      /s/ Richard H. Romanow  05-12-25
13    _____
      RICHARD H. ROMANOW   Date
14

15

16

17

18

19

20

21

22

23

24

25
```

A0708

Case: 25-1612   Case D1c:u25m-ecnvt-10814-3W/6G0Y517   DoPcaugmeen t4 310   DFailteedd 0055/1167/2259/P2a0g2e5   1P aogf e31 1E notfr y3 1ID: 6754211

1

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS (Boston)

 3                        No. 1:25-cv-10814-WGY

 4

 5    COMMONWEALTH OF MASSACHUSETTS, et al,
                 Plaintiffs
 6

 7    vs.

 8

 9    ROBERT F. KENNEDY, JR., et al,
                 Defendants
10

11                    * * * * * * * * *

12

13                  For Hearing Before:
                    Judge William G. Young
14

15              Case Management Conference

16

17                  United States District Court
                    District of Massachusetts (Boston.)
                    One Courthouse Way
18                  Boston, Massachusetts 02210
                    Tuesday, May 13, 2025
19

20                    * * * * * * * *

21

22          REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
23              United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
24                    rhr3tubas@aol.com

25
```

2

```
 1                    A P P E A R A N C E S

 2

 3    KATHERINE B. DIRKS, ESQ.
      RACHEL M. BROWN, ESQ.
 4       Massachusetts Attorney General's Office
         One Ashburton Place, 20th Floor
 5       Boston, MA 02108
         (617) 963-2277
 6       E-mail: Katherine.dirks@mass.gov
     and
 7    DANIEL AMBAR, ESQ.
         Office of the Attorney General
 8       Healthcare Rights & Access
         300 S. Spring Street, Suite 1702
 9       Los Angeles, CA 90013
         (213) 453-3598
10       Email: Daniel.ambar@doj.ca.gov
         For Plaintiffs

11

12    THOMAS PORTS, JR., ESQ.
         DOJ-Enrd
13       P.O. Box 875
         Ben Franklin Station
14       Washington, DC 20044
         (202) 307-1105
15       Email: Thomas.ports@usdoj.gov
     and
16    ANUJ K. KHETARPAL, ESQ.
         United States Attorney's Office
17       1 Courthouse Way, Suite 9200
         Boston, MA 02210
18       (617) 823-6325
         Email: Anuj.khetarpal@usdoj.gov
19       For Defendants

20

21

22

23

24

25
```

A0710

```
1        P R O C E E D I N G S
2        (Begins, 2:00 p.m.)
3        THE CLERK:  The Court will hear Civil Action
4   25-10814, the Commonwealth of Massachusetts, et al
5   versus Robert F. Kennedy, Jr., et al.
6        THE COURT:  Good afternoon.  I have permitted
7   internet access for this hearing, though it's
8   appropriate that I say that if you are attending this
9   hearing via the internet, you must observe all the rules
10  of court, that is to say you must keep your microphone
11  muted, there is to be no taping, streaming, rebroadcast,
12  screen shots, or other transcription of these
13  proceedings.
14        Well, good afternoon, counsel.  You've seen the
15  Court's order, um, and the first order of business is to
16  -- now that I am satisfied that this court has, um,
17  jurisdiction, to entertain the motion for a preliminary
18  injunction.  I do, after some consideration, pursuant to
19  Federal Rule of Civil Procedure 65(a), collapse further
20  hearing on the motion for a preliminary injunction with
21  trial on the merits, and I am going to use this hearing
22  as a, um, really a case management conference.
23        I acknowledge the -- and I appreciate the
24  plaintiff states' listing of the specific grants which
25  are at issue, though this does not preclude them from
```

1    coming up with additional data.  I more carefully

2    reviewed your complaint, and in fact at Paragraph 152

3    you say, "perhaps more than 100" actually.

4        What's the count here?  It's 500 and something,

5    isn't it?

6        MS. DIRKS:  Yes, your Honor.  Katherine Dirks for

7    Massachusetts.  I don't know the final tally, it might

8    have been 563 or so.  But I don't have it in front of

9    me.

10        THE COURT:  Well the exact amount is not

11    important, but our count is roughly the same.

12        Let me take just a moment and try to explain what

13    I'm doing.

14        It has been this Court's practice, when injunctive

15    relief is sought, um, in most cases, to make use of Rule

16    65(a) and, um, move promptly to the merits.  It has been

17    the Court's considered opinion that a trial, with

18    evidence, with all the safeguards of a trial, is to be

19    preferred to affidavits where -- which I have called in

20    other circumstances, "The Potemkin villages of modern

21    American litigation, all lawyer-created flash and no

22    interior architecture."  I am a person who believes in

23    cross-examination.  And, um, because federal court

24    proceedings are unfortunately too slow and too

25    expensive, I think it makes sense to deal with the

 1    actual reality.  So I followed my usual procedure.  And

 2    now -- and I say this candidly, I don't know what to do.

 3         I had another of these cases, spawned by the

 4    actions of the current administration -- and I don't

 5    compare them in any way, and they're completely

 6    separate, but I have a case involving alleged free

 7    speech rights, and I did the same thing.  And to me the

 8    case is a knotty case, but the prima facie proof seems

 9    pretty obvious.  That's not obvious here.  Or rather I'm

10    not sure how to grab hold of this case.

11         This case primarily is an Administrative Procedure

12    Act case.  Such cases proceed usually, though I'm

13    authorized to make modifications, on a record, and, um,

14    the record, um, supplemented by argument, is as close as

15    we get.

16         Here the case is a rather sprawling case, um, I

17    don't mean that critically, that's just the nature of

18    the claims here, that it is this Court's obligation now

19    promptly to address.  So I'm groping for a way to do

20    just that, to address the claims promptly, and I am very

21    much open to advice from counsel.  This is not the only

22    case on the Court's docket.  And I recognize that many

23    other cases have dealt with similar situations by

24    denying or granting preliminary injunctions.  We'll see

25    if I can't get to the merits and, um, work through some

1   of this very promptly.

2       So without committing ourselves in any way, I did

3   want to quote you something really beautiful, that we,

4   um, held the investiture for Magistrate Judge Jessica

5   Hedges last week and she spoke and spoke brilliantly.

6   But there was one phrase that she used that has stuck

7   with me, and I'm sure I will refer to it frequently.

8   She says, "Judges must be brave, meticulous, thoughtful.

9   They are invited to these virtues by lawyers who are

10   brave, meticulous, and thoughtful."  And that, in all

11   candor, is what I invite now.

12       So here's what I'm thinking as a way to start, and

13   I -- this does not deal will all the issues, but it

14   promptly, or as promptly as I can conceive, deals with

15   some.  Now -- and I'll sketch it out.  But don't think

16   I'm wedded to this.  I think I'm being candid.

17       I'm very grateful to the, um, document provided me

18   by the plaintiffs.  Let me say -- this activity in

19   Congress about nationwide injunctions, I'm not one who

20   believed in nationwide injunctions.  I had always

21   thought that you dealt with the parties before you, that

22   you could bind the parties before you, give them relief

23   and enjoin them, if necessary, but nonparties, the

24   government could always -- they can always appeal, the

25   right is to appeal, but the government could, as I

1  learned it in law school, say they don't accede to the

2  decision of the District Court and therefore the

3  decision of the District Court would have effect only to

4  the parties who came before the Court and have their

5  matters adjudicated.  So I approach this case believing

6  that that is the appropriate approach.

7        So this spreadsheet and these 500-and-however-many

8  grants there are pretty much defines -- well, no, it

9  doesn't, because you were asking for relief more

10  prospectively as to what you're thinking comes down the

11  Pike, and I'm not dismissing things.  I guess I do want

12  to say I was told, in one of these hearings, that there

13  were like 800 grants.  Well grants to institutions in

14  states other than the plaintiffs' states, this Court

15  doesn't speak to, doesn't purport to adjudicate, and

16  I -- and any injunction, if ever an injunction were to

17  issue, wouldn't apply, um, save as to specific grants or

18  specific institutions, specific states that are called

19  out.  So here's what I'm thinking, but it's only a first

20  shot.

21        I'm struck by the fact that the letters of

22  termination here are -- they're not all identical, but

23  they're virtually identical, and they were issued in

24  March on or about just a few days.  I mean they all came

25  out in a great blast.  And they set forth, as much as I

1   can understand, the government's position here.  So let

2   me just quote from an exemplar letter and tell you both

3   my concerns and where I think we might fill it.

4        So I'm picking out one issued on March 21st to

5   Ayain Denson, the University of Massachusetts at

6   Amherst, and I'm just picking it out.  After some

7   citations, it, um -- and there's this paragraph, and

8   I'll just go sentence by sentence.

9        "This award no longer affects agency priorities."

10  Well one imagines that that's so, um, and I have some

11  concern for statutory mandates.  But I understand it

12  does not.  I'll accept that it does not.  And then there

13  comes this sentence.

14       "Research programs based on gender identity are

15  often unscientific."  I don't know that.  And there's a

16  comma.  And then it says, "have little identifiable

17  return on investment."  I don't know that.  Maybe that's

18  so.  And then another comma.  "And do nothing to enhance

19  the health of many Americans."  I don't know that.

20       Then the next sentence says, "Many such studies"

21  -- no reference to the particular study at hand here.

22  "Many such standards ignore rather than seriously

23  examine biological realities."  I don't know that.  "It

24  is the policy of NIH not to prioritize these research

25  programs."  Again that's a policy statement.  I don't

1    take issue with it for the moment.

2         The next paragraph.  "Although," and then they're

3    quoting, "NIH generally will suspend rather than

4    immediately terminate a grant and allow a recipient an

5    opportunity to take appropriate correction action before

6    NIH makes a termination decision," closed quote.  "No

7    correction" -- "No corrective action is possible here."

8    I don't see why that's so?  But we could examine that.

9         And then on the next page, and I'm not going to

10   quote this, but there is a reference to an

11   "administrative appeal."  That's one exemplar.

12        Another exemplar, um, has an added sentence, um,

13   to what I've read -- and this one comes from a letter of

14   the same date to a Chake Camara, the University of

15   Massachusetts Medical School in Worcester, and after a

16   couple of the sentences I've read, comes this sentence.

17   "Worse, so-called Diversity, Equity, and Inclusion, DEI

18   studies, are often used to support unlawful

19   discrimination on the basis of race and other protected

20   characteristics, which harms the health of Americans."

21   I didn't know that.  And I don't know it.

22        Now because these letters are common -- and you

23   see where I'm going here, I'm, um, channeling, if you

24   will, Justice Kagan's dissent.  If there's basis for

25   this, maybe so, but if there's no basis for these

1   factual statements -- put aside the ones I term "policy

2   statements," if there's no factual basis for these

3   statements, grant by grant, then it's arguable that they

4   are -- the terminations are arbitrary and capricious,

5   and the Court, on the statements alone, could, um, order

6   an injunction that reinstates the grant, with all its

7   terms and conditions, as though the letter never was

8   issued.

9        Now that doesn't get the plaintiffs entirely where

10  they want to go, but it gets them a significant way

11  there, it seems to me, if that were true.  Congress of

12  course can change the laws, Congress can do that, and

13  maybe they will.  And we're talking only now about a way

14  to start in as to these specific regs.

15       If in fact there are studies that support any of

16  these factual statements, or any internal analysis that

17  support those statements, certainly the NIH, the

18  defendants here, they have to have the full and fair

19  opportunity to lay that analysis out before this Court.

20  The fact they didn't state it doesn't mean that it

21  doesn't exist.

22       Likewise, perhaps it doesn't exist in writing.

23  Perhaps some official looked -- actually looked at a

24  grant or looked at a group of grants and came to this

25  conclusion with some sort of analysis, and, um, the

```
 1    record on which this Court could act should include
 2    affidavits from those individuals.  I have to say, given
 3    the framework here, that while I would accept such
 4    affidavits, I would expect that they be produced to
 5    testify and be cross-examined.
 6         Now that's a -- another part of the record here.
 7    If an appeal has been taken by any of these grant
 8    recipients, the appeal, the results of the appeal, and
 9    any documents that reflect the discussion, um, in the
10    appeal, should be before the Court, and I'm entitled to
11    look at them and see whether any of these grants -- and
12    the grant has to be evaluated on the specifics of the
13    grant.
14         At least my understanding of medical research, but
15    I stand to be corrected, is that it -- it should take
16    account of race and gender.  Sickle-cell anemia is more
17    prevalent in a particular race.  A certain type of
18    cancer is, um, affects Ashkenazi Jews more than other
19    people.  I believe that it is the received medical
20    wisdom that, um, gender differences are significant in
21    providing the best possible medical care.  So it can't
22    be that we're just going to ignore those.
23         And, um, when I look at -- and I've -- you filed
24    it timely, but I've spent the time since it was filed
25    looking at this, it really does seem that, um, many of
```

```
 1    these grants go to study, anyway, vulnerable
 2    populations.  That's how I understand the medicine to
 3    work.  That doesn't seem illogical to this Court, to, um
 4    -- well these are my concerns.
 5         So if we started there -- and in terms of
 6    procedure, if we started there, we created a record for
 7    these, the Court ruled on that record that the actions
 8    were or were not arbitrary and capricious, and then
 9    under Rule 54(d), (1) I'm required to write an opinion,
10    and I expect to, as to each variation that, um, I may
11    have to deal with, but I can immediately -- once I'm
12    satisfied that I've thoroughly reviewed the record, I
13    can immediately enter a partial judgment under Rule
14    54(d) because the interests of justice require it.  If
15    the states lose or a state loses or some states lose as
16    to some grant, I'd enter judgment.  An appeal from an
17    actual record with a decision can take place.
18         And contrary-wise, if I entered any such
19    injunction that a grant, the termination of the grant
20    was arbitrary and capricious, again I'm not going to sit
21    on it, I'm going to enter in a -- in an area where one
22    expects that Congress -- and indeed will expect that the
23    agency may alter its or put out different guidance, this
24    may, um -- it would be permanent only until the legal
25    framework changes.
```

```
 1          And I recognize that I'm groping, but let me start
 2     with the plaintiffs.
 3          Can you think of any way to get at this better?
 4          MS. DIRKS:  Um, your Honor, again Katherine Dirks
 5     from Massachusetts, I'll just preface by saying your
 6     comment about Judge Hedge's statement about lawyers
 7     inviting the bench, the Court to think of things a
 8     different way, that really spoke to me.  I really see
 9     that as my role, and I want to thank you for that, and I
10     think maybe I can apply some of that principle here
11     today.
12          THE COURT:  Thank her.
13          MS. DIRKS:  I will.
14          THE COURT:  There's much other wisdom in what she
15     had to say, but that was the part I was able to quote.
16     And you're right to pick up on it, because it inspired
17     me.
18          Please.
19          MS. DIRKS:  My invitation is as follows, and it
20     calls for hearkening back to how we frame these
21     allegations in our amended complaint.  Which is that we
22     are not alleging that the terminations themselves are
23     the final agency action and we are not asking the Court
24     to conduct an individualized review of termination
25     decisions, or other grant-based decisions, the final
```

Case: 25-1612    Document: 00144843517    Page: 14    Filed: 05/29/2025
Case 1:25-cv-10814-WGY    Document 45-10    Filed 05/16/25    Page 14 of 31    ID: 6754211

14

1   agency actions that we are challenging are the
2   directives, the challenged directives.  And we're
3   seeking ultimately, at the end of the day, for those
4   directives to be vacated, and for the implementation of
5   those directives to be enjoined.
6        Now we realize that the implementation comes in
7   the form of the grants we've listed here and we believe
8   that list will grow as we confirm further details with
9   our clients, and crafting the relief might require some
10  individualized identification of grants, but as to
11  liability and as to the vacatur of the agency action, it
12  is the challenged directives and the decision-making as
13  to those directives that we're seeking to present to the
14  Court.
15       THE COURT:  How do we put together the record on
16  which the Court is going to make its decision?
17       MS. DIRKS:  So we have initiated a conference with
18  the Department of Justice and federal defendants on that
19  question.  As to the administrative record for the
20  challenged directives, that will be a more finite
21  universe because it's a discrete list of directives, and
22  that could be somewhat contained.
23       Now should there -- might there be some need for
24  discovery?  Potentially, yes, your Honor, because of the
25  fact that some of these directives have not been made

1  publicly available, um, and we already have seen some

2  deposition testimony in other cases regarding some of

3  the murkiness behind the development of those directives

4  that might require putting someone in a chair for a

5  30(b)(6) deposition, for instance, and there might be

6  some redesignation of 30(b)(6) witnesses.  But we still

7  think that the universe of discovery there is quite

8  contained, and we could move on a very expedited

9  schedule or a resolution of the challenged directives,

10 both the administrative record and a very very

11 narrowly-tailored set of discovery for those issues that

12 might be encompassed in the administrative record.

13       THE COURT:  How long?

14       MS. DIRKS:  We think that 14 days for the

15 administrative record would be sufficient.  Now we have

16 had conversations with federal defendants there, we

17 think that is not quite what they could live with, and

18 we understand that and will obviously let them have

19 their turn.

20       THE COURT:  Well let me hear from --

21       MS. DIRKS:  But we think 14 days for that, and an

22 additional 14 days for resolving any other fact issues

23 that might not be encompassed in the administrative

24 record.  But that does leave the question of the

25 implementation question, and we can visit that, your

1   Honor.  Um -- and if I could just tag on one piece of it
2   that might not be in the administrative record.

3        Our understanding -- and this is to some extent in
4   the PI papers, is that the ultimate decision as to what
5   grants would be terminated was not granular, it was not
6   on a program-officer basis, rather a blast e-mail went
7   out saying, "Here are the hundreds of grants being
8   terminated today, program officers get your notices
9   out."  And so it really should be a finite list of
10  e-mails.

11       It might not be what, um, will be defined as the
12  "administrative record," because that might post-date
13  the directive itself, but there is a discrete period of
14  time in which the directives were implemented.  And it
15  does not require individual deposition testimony from
16  every program officer, it really is, um, a request for a
17  production of documents that would be very specifically
18  defined and could be produced with a few e-mails, is our
19  understanding.

20       So we would look to a bench trial.  You know we've
21  often discussed summary judgment versus trial and the
22  Court has, um, indicated, at the last hearing, that
23  there might be disputes of fact, and that we're hearing
24  today from the Court that the Court is anticipating some
25  sort of dispute -- some disputes of fact that would

1    require in-court resolution and testimony.  And so our

2    inclination would be to not do summary judgment and

3    instead put this on for trial, trial to resolve as much

4    as we can through proposed findings of fact, so that we

5    identify the short list, hopefully a short list of

6    disputed facts, we can have a condensed bench trial, um,

7    and can move this to a final resolution as quickly as

8    possible.

9              THE COURT:  Thank you.  And that is very helpful.

10             Mr. Ports, what do you think of all this?  You can

11    go back to my meandering as well and, um, give me your

12    thoughts.  I much appreciate it.

13             MR. PORTS:  Yes, your Honor.

14             I'll say the United States' thinking about the

15    case is more aligned with what your Honor seems was

16    describing than what Mr. Dirks described with her --

17    involving discovery and trial and things along those

18    lines.

19             As your Honor stated at the beginning, this is an

20    APA case at core, that the Court has ruled it would be

21    decided as an APA case.  Such cases need to be decided

22    based on the agency's stated reason at the time it took

23    an action and the documents that it considered in taking

24    that action.

25             So there is -- there's a final agency action that

A0725

```
1     plaintiffs fall back in their brief was -- it's the
2     grant terminations, that's what we end up with as the
3     final agency action.  Which although we said can't be
4     challenged, I'll put that aside and not revisit our
5     argument previously on this point.  But, you know, we
6     would agree that that's final, it has a legal
7     consequence.
8          Your Honor mentioned appeals.  Where an appeal is
9     ongoing, there it is not final any longer, although
10    there was a legal consequence with the termination that
11    has reopened the agency's decision-making and the agency
12    has not stated its final position on the matter, it is
13    currently considering it.
14         But so putting aside the appeals that are ongoing,
15    because they've been reopened, whether terminated and
16    have been appealed, looking just at the terminated
17    grants where there is no appeal, as your Honor
18    described, there are a variety of reasons that grants
19    would no longer effectuate agency priorities.
20         It -- we believe that the agency could compile an
21    administrative record for those grant terminations.  As
22    long as the record from each individual grant file
23    could, um, with agreement, include the termination
24    letter itself and the notice of award and the agency
25    could avoid going through the hundreds of additional
```

 1   pages that are in individualized grant files that may

 2   contain sensitive information that can't be disclosed,

 3   if we included the grant termination and the notice of

 4   award to provide those stated reasons of the agency in

 5   terminating a grant, and the background on the grant,

 6   what is the award that was terminated, then we believe

 7   we could compile an administrative record of what the

 8   agency -- the decision-maker considered in terminating

 9   those grants, in 30 days.

10        I will say, your Honor, that's a good deal longer

11   than what plaintiffs had asked for here, but it is after

12   substantial back and forth and consideration within the

13   agency about how fast it could proceed, and it is

14   shorter than the agency would prefer.  And in asking for

15   30 days we are seeking to move quickly and offer the

16   fastest possible time that we could.

17        After, um, you know plaintiffs identify 7

18   challenged directives that they say are the things that

19   they are challenging, um, that the agency would

20   presumably be looking at to compile administrative

21   records for each of those purportedly-filed agency

22   actions -- and that will require looking at what a

23   decision-maker considered, and some of the

24   decision-makers are no longer with the agency, and this

25   will take time and review, and we believe that 30 days

1   is reasonable for that.

2        After that, we believe that the Court is correct,

3   this case could be decided based on cross-

4   motions -- well I won't say "correct."  What I

5   understood the Court was insinuating was that the case

6   could likely be decided on cross-motions for summary

7   judgment after that unless -- unless we were to provide

8   a declaration or some additional justification that is

9   not apparent in a document or on the face of the

10   termination, in which case we understand the Court would

11   want to allow for cross-examination.  But if we did not

12   do that, the Court would be able to review based on the

13   record, and the termination and their justifications

14   would rise and fall based on what is in the

15   administrative record.  And if the Court finds that it

16   is insufficient, then, yes, we believe the Court could

17   make its ruling based on that record.

18        But there is no need or justification for

19   discovery, certainly not before an administrative record

20   has been filed, certainly not before plaintiffs have

21   demonstrated that the administrative record is

22   incomplete, which we would say is a requirement.

23        In order to order discovery, there must first be a

24   finding that the administrative record isn't complete

25   and that one of the very limited circumstances that

1    allows for extra-record discovery exists, um, and that

2    mostly -- that typically happens in the case of pretext.

3    And I don't think there's any allegation that there's

4    pretext for why these grants were terminated, it is

5    clear on the face of the grants why the agency has said

6    to terminate the grants.

7        And so we would propose that we could file the

8    administrative record in 30 days and then the parties

9    could file cross-motions for summary judgment

10   thereafter, and then proceed to a prompt end and proper

11   resolution of this matter in that way.

12       THE COURT:  Well both of you are talking sensibly

13   and I -- we're not going to, um -- neither one of you is

14   going to prevail in their entirety, but that's not

15   surprising.

16       This Court operates on an intentionally-practical

17   and programmatic basis.  I'm starting a significant

18   MS-13 trial on the 2nd of June.  I really think that

19   case is going to go.  I expect that it will go a couple

20   weeks.  That takes us up to the 14th of June, "Flag

21   Day."

22       Whenever that case finishes, um, I'm prepared to

23   address this case, or at least part of this case.  I

24   know the plaintiffs' allegations go further than what

25   either one of us -- what anyone who has spoken is

 1    talking about, and I'm not dismissing anything, though

 2    change could settle or throw it by the boards.

 3         So if I'm going to look for you around the 16th of

 4    June, that's not for filing papers, that's for being

 5    ready to go.  Clearly the NIH was prepared by March to

 6    send out these notices following these directives.  So

 7    it does seem to me that I ought to have a -- now this is

 8    the 13th.  I ought to have -- if we're going to have the

 9    appropriate administrative record, by Monday the 2nd of

10    June, and briefs may be filed simultaneously with reply

11    briefs thereafter.

12         And I'm getting ahead of myself, actually I work

13    for Ms. Belmont.  Let me ask her.

14         Assuming that the case on the 2nd of June runs two

15    weeks, what do we have on the 16th?

16         THE CLERK:  We're free.

17         THE COURT:  Well we're not free now, we're --

18         I propose a hearing on the 16th.  And I'm not one

19    to micromanage.  What the government says, um, makes

20    sense to the Court.  I want to encourage you to work out

21    disputes, and all I can say is I'm not going anywhere.

22    If I set this down for a hearing on the 16th of June, if

23    that hearing is just on the record, because you've

24    worked things out, so be it.  If there's a dispute as to

25    whether I should take evidence starting on the 16th of

1    June, you'll let me know.  And, um, my effort will be --

2    though whatever order happens will happen, and then to

3    follow it up with a written opinion just as rapidly as I

4    can.

5          Now, um, if I left things like that, recognizing

6    that there may be more to this case than we have

7    discussed today, do the plaintiffs have any questions?

8          MS. DIRKS:  Um, yes, your Honor.  Um, not a long

9    list.  I promise.

10          One thing we haven't mentioned or focused on today

11    is our unreasonable delay claim, and that does seem to

12    be the one area that, um, would benefit most from, um,

13    live testimony or where there was the most room for --

14          THE COURT:  I couldn't agree more.

15          MS. DIRKS:  -- and the most room for factual

16    disputes.

17          THE COURT:  But that's going to take some time.

18    So I was positing, um -- you know this idea of cross --

19    I know what the -- how these cases are handled.  If we

20    get an agreed-upon record, I don't know that we -- it's

21    not strictly cross-motions for summary judgment where as

22    to each side I have to lean against their position, if

23    we had an agreed-upon record, then I draw the natural

24    and probable inferences from that record.  I give both

25    sides an equal chance to argue the disputed -- it's a

1    mixed question of law and fact, the arbitrary and

2    capricious issue.  I'm not answering your question, I'm

3    going back.

4         So the reason -- while I agree with you, that's

5    going to take evidence, um, and we've got to start

6    somewhere.

7         Do you want to start that this week or this month?

8         MS. DIRKS:  I guess, your Honor, I -- I stand

9    corrected, with gratitude, that maybe I should ask the

10   more basic question.

11        When you say "briefs," your Honor, are you

12   referring to specifically Rule 56 motions for summary

13   judgment or a legal brief in support of --

14        THE COURT:  A legal -- in support of a final

15   decision on the issue, as you frame it, of whether these

16   directives are unsupportable under the Administrative

17   Procedure Act.  And they will say, "Here is the record.

18   Here are our reasons.  They're all satisfactory reasons,

19   under the Constitution, as the legal framework."  And

20   it's not for me, the Court, to make policy

21   determinations, if policy determinations are

22   permissible.

23        There are some statutory -- at least prior

24   Congresses have instructed the NIH, for example, to be

25   sure that they include women in their research studies,

1　to be sure that they include children in their research

2　studies, and I take it to encompass the science that,

3　um, you want to capture the data on which proper health

4　decisions can be made.  But I don't mean to talk over

5　you.

6　　　When do you want to go on the unreasonable delay?

7　　　MS. DIRKS:  Um, so if I -- I just want to make

8　sure I understand the proposal that I'm reacting to,

9　your Honor.

10　　　So with June 16th, it would be, um, briefing on

11　the, um, the grant terminations piece of the case as to

12　the challenged directives, and without the need to get

13　into individualized, um, grants.  Right?

14　　　THE COURT:  Don't you characterize what I said.

15　We'll see.

16　　　MS. DIRKS:  All right, that's why I wanted to make

17　sure I'm clarifying it, so I can understand what we're

18　briefing.

19　　　THE COURT:  I'm -- really, I'm trying to force you

20　into -- both of you, into an agreed-upon record.

21　There's advantages to having an agreed-upon record.  If

22　you can't, I'll settle it.  I'm not hesitant to settle

23　it.  But I'm always transparent about what I'm thinking.

24　　　So you've corrected me on my idea, my approach,

25　and focused me more on the directives quite right.  NIH

1    counsel properly says, "But really let's look at these

2    directives."  Work that out and, I expect on the 16th,

3    if things work -- if things work on the 16th, I will

4    have an agreed-upon record, I will have, um, briefs, I

5    will hear argument, um, and if I can see my way clear to

6    action -- but I don't promise anything on that day, but

7    then I will take it under advisement.  If I can't get my

8    arms around it, I'll be saying, "But I want this

9    witness" or "You can't really get there from here

10   without something."  I can't see now.  But I respect you

11   both -- I respect you all, and that's what I'm thinking.

12       You then say -- well let's focus on that piece.

13   Without you characterizing it, the -- the terminations

14   and the grant terminations piece, I hope to deal with on

15   the 16th, to be followed by a decision, which is

16   immediately appealable once I get the decision out, and

17   it's based upon an agreed-upon record.  That's where I'm

18   hoping to go.

19       So still sticking with the plaintiffs.  We haven't

20   dealt with unreasonable delay, but are you -- do you

21   understand that and can you work with that at least for

22   today?

23       MS. DIRKS:  Yes, your Honor, with one additional

24   question.  And we welcome this, your Honor, and I want

25   to thank you for the June 16th date, because that

1   reflects our need for urgency.

2        One question.  When the Court said that, um,

3   briefs would be filed simultaneously, was that

4   simultaneously with the administrative record, which

5   would be due June 2nd, or simultaneous with each other?

6        THE COURT:  No, no, no, not simultaneous with the

7   administrative record.  But it's not like you people

8   don't know the other side.  The lawyering has been, and

9   I'm grateful, exemplary.

10        MS. DIRKS:  Thank you, your Honor.

11        THE COURT:  One thing that can be said about the

12   NIH, whether it's the way they express it, I don't know

13   the basis for that, but it's not like they're secretive

14   about what they're doing.  Okay?

15        MS. DIRKS:  Um, that works very well, your Honor.

16   But there's still the question pending about

17   unreasonable delay?  I'm happy to take that up now or

18   later.

19        THE COURT:  No, let's go now to the NIH.

20        My discussion with her is, um, can you work with

21   her in that schedule?

22        MR. PORTS:  Um, yes, your Honor, we will do our

23   absolute best to have a record prepared by the 2nd.

24        THE COURT:  All right.  If you don't, I'm likely

25   to, um, conclude that nothing exists.  But that's

A0735

 1     neither here nor there.  But that's what I expect, on

 2     the 2nd.

 3          Now unreasonable delay.  How do you want to handle

 4     that?

 5          MS. DIRKS:  Um, your Honor, we think it makes

 6     sense to -- we could schedule it now or schedule it at

 7     another time, a second hearing on that case, your Honor.

 8     The reason why I hesitate from committing to doing -- to

 9     tackling that on the June 16th date is because there

10     might be more need for fact-gathering there and more

11     disputed facts that would not be contained within an

12     administrative record because --

13          THE COURT:  I have another hearing at 3:00.

14          MS. DIRKS:  I'm sorry, your Honor.

15          THE COURT:  Again, it's always the practicalities

16     of each day.  Are you suggesting I hold another status

17     conference or are you suggesting that we go forward on

18     the order I've entered now, and as you -- and you are

19     working together, zealous advocates for their own

20     position can work together, and I urge you -- I'm going

21     to depend on it.

22          So what are you suggesting?

23          MS. DIRKS:  Um, either we schedule a hearing now,

24     your Honor, on unreasonable delay and the parties work

25     backwards from there, the alternative would be for the

1    parties to propose a schedule, um, and an earliest date.

2        THE COURT:  Why don't you -- why don't you do that

3    and you don't have to agree on it.  Your schedule may

4    not be their schedule.

5        All I can say is I'm not insensitive to what I've

6    done when I've collapsed further hearing on a

7    preliminary injunction with trial on the merits.  It's

8    imperative that we all step up and give a reasoned, I

9    hope to say, "brave, meticulous, and thoughtful

10   opinion," that resolves what I am responsible for

11   resolving at the earliest possible date.  This wasn't

12   "Okay, I collapse it with trial on the merits, when in

13   the next year are we going to have the trial?"

14       So I'm going to leave you.  I'm not going

15   anywhere.  Get Ms. Belmont, she's wonderful, and, um --

16   and it will be a status conference.  It's not suddenly

17   you come in here and I'm going to say "Well where are

18   the witnesses?"  We'll have a status conference when you

19   know the issues that you think I need to address.  But

20   that can be as early as next week or at such other

21   reasonable time.

22       MS. DIRKS:  That works well, your Honor.  Thank

23   you.

24       THE COURT:  The government?

25       MR. PORTS:  Thank you, your Honor.

```
 1          THE COURT:  Good.  It's good to see you.  I look
 2     forward to working with you.
 3          And again, any case can be settled.  If this case
 4     is settled, a simple phone call to Ms. Belmont is all
 5     that's required.  We'll stand in recess.  Thank you very
 6     much.
 7          (Ends, 2:50 p.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 4      hereby certify that the forgoing transcript of the

 5      record is a true and accurate transcription of my

 6      stenographic notes, before Judge William G. Young, on

 7      Tuesday, May 13, 2025, to the best of my skill and

 8      ability.

 9

10

11

12
         /s/ Richard H. Romanow 05-16-25
13       _____
         RICHARD H. ROMANOW  Date
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS (Boston)

 3                              No. 1:25-cv-10814-WGY

 4
    COMMONWEALTH OF MASSACHUSETTS, et al,
 5              Plaintiffs
    vs.
 6
    ROBERT F. KENNEDY, JR., et al,
 7              Defendants

 8
                               No. 1:25-cv-10787-WGY
 9
    AMERICAN PUBLIC HEALTH ASSOCIATION, et al,
10              Plaintiffs
    vs.
11
    NATIONAL INSTITUTES OF HEALTH, et al,
12              Defendants

13
                      * * * * * * * * *
14
                    For Hearing Before:
15                  Judge William G. Young

16
                     Status Conference
17

18                  United States District Court
                    District of Massachusetts (Boston.)
19                  One Courthouse Way
                    Boston, Massachusetts 02210
20                  Tuesday, June 3, 2025

21
                       * * * * * * * *
22

23            REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
24            United States District Court
        One Courthouse Way, Room 5510, Boston, MA 02210
25                    rhr3tubas@aol.com
```

A0740

```
 1                      A P P E A R A N C E S

 2

 3   GERARD J. CEDRONE, ESQ.
     KATHERINE B. DIRKS, ESQ.
 4   PHOEBE LOCKHART, ESQ.
        Massachusetts Attorney General's Office
 5      One Ashburton Place, 20th Floor
        Boston, MA 02108
 6      (617) 963-2282
        E-mail: Gerard.cedrone@mass.gov
 7      For the Commonwealth of Massachusetts plaintiffs
     and
 8   OLGA AKSELROD, ESQ.
     JESSIE J. ROSSMAN, ESQ.
 9      American Civil Liberties Union Foundation
        125 Broad Street
10      New York, NY 10004
        (212) 549-2659
11      Email: Oakselrod@aclu.org
        For the APHA plaintiffs
12

13   THOMAS PORTS, JR., ESQ.
        DOJ-Enrd
14      P.O. Box 875
        Ben Franklin Station
15      Washington, DC 20044
        (202) 307-1105
16      Email: Thomas.ports@usdoj.gov
     and
17   ANUJ K. KHETARPAL, ESQ.
        United States Attorney's Office
18      1 Courthouse Way, Suite 9200
        Boston, MA 02210
19      (617) 823-6325
        Email: Anuj.khetarpal@usdoj.gov
20      For all defendants

21

22

23

24

25
```

```
 1        P R O C E E D I N G S
 2        (Begins, 11:00 a.m.)
 3        THE CLERK:  Civil Matter 25-10787, the American
 4   Public Health Association, et al vs. the National
 5   Institute of Health, et al, and 25-10814, the
 6   Commonwealth of Massachusetts et al, vs. Kennedy, et al.
 7        THE COURT:  Well good morning counsel.  We won't
 8   go through having everyone introduce themselves, but
 9   when you speak, if you could remember to introduce
10   yourself, simply so that the Court Reporter's record is
11   accurate.  Let me tee up what I think I want to do here
12   and, um, where we're going to go.
13        I wanted to have this status conference because
14   there is the second of these two related cases, and I
15   wanted to, um, have a conference where all parties could
16   be present and, um, see the extent and the order in
17   which they could be consolidated.  So that was my
18   purpose in calling this conference.
19        Or I should say, as I have in other such hearings,
20   I have authorized internet access to this conference.
21   Having done so, let me say, if you are attending this
22   conference via the internet, have in mind the rules of
23   court remain in full force and effect, which means
24   there's no taping, streaming, rebroadcast, screen shots,
25   or other transcription of these proceedings.
```

Case: 25-1612   Case 1:25-cv-10814-WGY   Document 121   Filed 06/05/25   Page 4 of 28   Filed 06/05/25   Page 4 of 28    by ID: 6754211

4

```
1        So, um, coincident with my scheduling the
2   conference, um, various things have been done in the, um
3   -- I've been given a proposed schedule for further
4   proceedings in the first of the two cases and, um, in
5   very large measure it makes perfect sense, though I want
6   to make some comments about it, and emendations.  But I
7   am very grateful to the parties for the manner in which
8   you're working together.
9        Second, consistent with the Court's order in the
10  first of the two cases -- or at least in the first of
11  the two cases, the government has, consistent with the
12  Court's order, um, filed the administrative record.
13  Here it is.  You will understand I haven't looked at it
14  since the 2nd of June.  But a question to government
15  counsel.
16        Is this the record as you see it in both cases or
17  just the first?
18        MR. PORTS:  Thank you, your Honor.  Tom Ports for
19  the government.
20        This record is the -- it is the government's
21  position that this is and will be the record for both
22  cases.  I will say that -- and we had some discussion
23  about this earlier, um, all parties met at 9:30 today in
24  the U.S. Attorney's Office.  The United States believed,
25  as the Court previewed the last time, that there are a
```

Case: 25-1612  Case 1:25-cv-10814-WGY  Document #: 121  Filed 06/05/25  Page 5 of 28  Filed 06/05/25  Page 5 of 28  Entry ID: 6754211

5

 1    handful of discrete reasons why grants were terminated.

 2    If you look at the different paragraphs, they tend to

 3    line up across the various terminations.

 4         We have compiled all -- everything considered

 5    directly and indirectly for those reasons.  It does not

 6    include the actual termination documents for all of the

 7    PDFs in the, um, the related case.  So the second-filed

 8    case, we don't have all of the actual termination

 9    documents.  However we believe it is very unlikely that

10    there will be any other reasons or justifications, and

11    therefore this record is sufficient and contains

12    everything directly or indirectly for that case as well.

13         I can represent that what I told the plaintiffs

14    that I would suggest, in the second-filed case, is if

15    plaintiffs would let us know or let the Court know, by

16    the 5th, if there is any other justification that is not

17    included in a termination record in that record, then we

18    can promptly complete the record for the second case

19    with anything in addition, and, um, then everything will

20    be thoroughly complete and we'd be able to proceed with

21    everything by the 16th.  We think that's very unlikely

22    that there are any different reasons.  But, um, it is of

23    course possible.  And we think that is a way to proceed

24    and resolve everything in Phase 1 together.

25         THE COURT:  Thank you, that's a direct answer to

 1  my question and I appreciate it.

 2       Now, um --

 3       MS. AKSELROD:  Your Honor, um --

 4       THE COURT:  Yes?

 5       MS. AKSELROD:  May I respond on behalf of the APHA

 6  plaintiffs with regard to the completeness of the record

 7  or would you like me to wait on that?

 8       THE COURT:  I'd like you to wait.

 9       MS. AKSELROD:  Thank you, your Honor.

10       THE COURT:  Saying I thank you, doesn't mean

11  that's it.  And let's jump right there.

12       In point of fact, um, I've been reflecting on what

13  has been filed thus far and in two respects, um, if --

14  if I don't have this in the record, I expect it by the

15  16th.  So let me start with that.  If it's there, fine.

16       But I read Footnote 1 on this schedule for further

17  proceedings and respectfully, um, the defense either

18  misunderstood or mischaracterizes the Court's view.  I

19  do think the very first issue to be considered is, um,

20  the challenged directives, and so I need a record with

21  respect to the challenged directives.

22       Specifically I expect -- I've come to understand

23  that in this iterative process, the various universities

24  were putting out algorithms about how to write grants

25  and, um, "Stay away from this word," and "Don't say

A0745

1    that," and the like, "if you're seeking a grant."  So

2    one imagines, given the speed with which the defendants

3    acted here, that there was guidance to the people who

4    made the determinations, or the person who made the

5    determination, and I expect it.  I expect to see it.  If

6    there's an algorithm, if there's guidance, wherever it

7    came from, I want to see what it is.  The record to be

8    supplemented in that respect.

9         Second, I've also come across this database called

10   "Grant Watch," which is really rather intriguing, um,

11   and since everybody seems to look at Grant Watch for,

12   um, the data concerning grants from the NIH, recognizing

13   that this case, um, certainly in its Phase 1 is

14   limited -- let me be very clear, is limited to grants

15   terminated, not restored, not expired, that, um, in the

16   first case, and the second case, the list with which

17   we're working -- and to the extent we can pare that list

18   down by settlement or otherwise, that's a good thing.

19   But, um, I think Grant Watch may best qualify, um --

20   save the government's rights, they may want to brief

21   this, but I think it qualifies under Federal Rule of

22   Evidence 80317.  This is like a, um -- like a

23   "Physician's Desk Reference" or something.

24        So the parties are free, because the universe of

25   grants of course goes well beyond the grant that, um,

```
 1    whatever I have to say about the challenged directives,

 2    any relief, if any there is, has to do only with the,

 3    um, grants that are, at least the first phase, that are

 4    listed in the materials already filed.

 5          So let me turn to this document now, which I do

 6    think is very helpful.

 7          So the government, um, has filed its position on

 8    the, um, administrative record, um, and whether or not

 9    the defense agrees with it -- and that's the reason I

10    cut counsel off, the proposal here sets forth very

11    prompt time limits for challenging the completeness of

12    the administrative record.  I'm not going anywhere.  It

13    makes perfect sense.  I seek to hold myself to the --

14    and hold you to the, um, what's set forth on Page 2 in

15    Paragraph, um, 2 and 3 of the proposed schedule.

16          And again, the government has every right to

17    contend that the record is complete and that the

18    supplementation is either irrelevant or, um, it ought

19    not be supplemented.  But I've said what I'm looking for

20    here.

21          Now we're on for the 16th.  I propose to give you

22    -- it's on at 10:00 on the 16th.  I think we can thrash

23    our way through the argument here in the morning, and

24    the morning to me lasts till 1:00 -- um, from 10:00 till

25    1:00, I may need a brief recess, but I think we can
```

A0747

thrash our way through.

Now then we get to this proposed second phase. And I agree that that will be heard thereafter, um, and here I see the parties differ markedly. Let me be as helpful as I can as to what I expect will follow.

You people have shown some amenability to resolving this partially or, one can always hope, wholly, um, with respect to certain or more of the challenged grants, so I want to know, at least in general -- and I recognize this is jury-waived, but I will start off the proceedings at 10:00 on the 16th. And again, I'll do this at the sidebar. The parties can agree to private resolution, and I will say, "Well have you settled any of this, and if so, what?" And you'll tell me. And those conferences will be sealed. We won't get into substance at all. And then we'll spend the rest of the morning talking about, um, really the first phase of the case, the applicable law and what can be discerned from the administrative record.

Then close on to 1:00, I will say -- and maybe it will go faster than that, but maybe not, I will say, "Well, um, now that you've heard me" -- and I've done -- I've followed this technique in other cases, so I want you to know it now. "Now that you've heard my questions and my concerns and how I dealt with the answers and the

1    like, um, you tell me, do you want me to stay my hand

2    for any particular period of time, because you could

3    work out this part of it, or you could work out all of

4    it, or" -- and you'd both have to agree, or you'd say,

5    "No, we want the decision."

6         And then I will say, um -- but I'm giving a range

7    here because I have no idea where we'll be at 1:00 on

8    the 16th, I will say, um -- it goes from nothing, in

9    which I will say, "I'll take the matter under

10   advisement, thank you very much," and that's what you'll

11   hear from me until, at minimum, some order comes out,

12   and at maximum, the full opinion comes out.  That's one

13   end of the spectrum.

14        The other end of the -- well I'm not going to be

15   able to -- I really am looking forward to the 16th.  I

16   have no preconceived notions about this case.  I'm going

17   to tell you the concern I have, but that's downstream.

18        So, um, all I'll say -- a combination like this,

19   it won't be any opinion, but I'll say, "Well, you know I

20   think" -- because I'm very sensitive that this started

21   out with a preliminary injunction collapsed into trial

22   on the merits, I'll say, "I think it's coming out, at

23   least in this area, this way or that way or whatever."

24   And, um, maybe I will be sufficiently confident to enter

25   an order.  Most likely I will not.  But, um, the

1   likelihood probably will be that an order will precede

2   the full opinion, because I will have the full record,

3   I'll have the advantage of your briefs and your

4   arguments, and, um, cases don't -- unlike fine wine,

5   don't get any better with delay.  So they'll be at least

6   a partial order, probably pretty fast, on the first

7   phase of the case.  Unless you tell me the other, you

8   say, "No, stay your hand for a week, two weeks,

9   whatever, maybe we'll work it out."

10          Then, when you see the way I see this case, once

11   that's out there, the rest of it is writing, and it

12   implicates of course the second phase, because if it

13   goes all the government's way, I don't see much to the

14   second phase.  And he tells me there isn't much to the

15   second phase anyway.  Maybe that's right, maybe that's

16   not right.

17          If it goes significantly the plaintiff's way, the

18   second phase is, in my mind, a different consideration.

19   But the schedule that is posited here -- and I have full

20   respect for the government saying that the

21   administrative record is the, um, is appropriate, and

22   only appropriate, um, actually the way you've written it

23   is fully satisfactory to me, because it says -- and I'm

24   now on Page 4 of the government's, I guess -- I take it

25   it's the government's proposal?  Yes, the defendants'

 1   position.  I think their schedule makes good sense.

 2   And, um, at least -- and I propose then to adhere to it.

 3   You said "the conclusion of the Phase 1," I propose to

 4   adopt it, and within 7 days, the motion to dismiss,

 5   within 10 days, etc., as it appears on Page 4.

 6        Now let me stop there and ask for questions and

 7   I'll resolve whatever needs to be resolved, I hope, and

 8   then we'll move to the second of the two cases, which I

 9   hope you will tell me can be resolved on the same

10   schedule, and the first case, we'll agree.  But we

11   haven't had everyone in court until today.

12        So here's my concern.  And my concern is an

13   unformulated concern, because it comes only -- I don't

14   have the advantage of the administrative record, so

15   candidly it comes from these, um, just looking at the

16   initial spreadsheet and the subject matter of these

17   various grants, um, I -- I have real concerns about

18   evenhandedness here.

19        I have concerns about -- and about health care.  I

20   have concerns about black Americans.  I have concerns

21   about women.  I have concerns about, um, legitimate

22   gender issues having to do with health.  But don't any

23   of you take this as prejudging anything.  It isn't.

24   It's just the Court's attempt to be fully transparent

25   and to grapple with the issues that the Court is duty-

1    bound to grapple with.

2         So -- and for the first round, questions?  And

3    we'll start with the plaintiffs, questions on those

4    things?  I had not thought of this as an argument

5    session, which is not to foreclose argument, if it's

6    necessary, but I came prepared for scheduling and not

7    argument.

8         So the plaintiffs, please.

9         MR. CEDRONE:  Good morning, your Honor, Gerard

10   Cedrone for the Massachusetts Attorney General's Office

11   on behalf of the plaintiffs in the states' case.  I

12   wanted to raise two issues related to the scheduling on

13   Phase 2 and react to, um, your Honor's statements about

14   the schedule there.  The first relates to the question

15   of discovery and the second relates to the schedule more

16   generally.

17        First, as we previewed here briefly, we do believe

18   that discovery is appropriate on most claims and that

19   they're not properly limited to the administrative

20   record.  I don't want to -- if your Honor's not

21   expecting argument today, I don't want to launch into an

22   argument, but we do stress that we think that's

23   appropriate and are happy to brief that or argue that

24   today or at another time, because we do think

25   unreasonable delay claims, unlike claims under Section

```
 1   7062, the essence of the claim is there is no final
 2   agency action, and so unlike --
 3          THE COURT:  You're now getting into --
 4          MR. CEDRONE:  I'm straying into argument, yes.
 5          THE COURT:  But I'm following, and so I think I
 6   can make a direct answer.
 7          I'm not surprised by what you're saying.  The
 8   schedule that now I've tentatively adopted, once we're
 9   concluded with the first phase, you can expect they'll
10   move to dismiss.  I'll entertain it.  I'll rule on it.
11   But we'll assume you survive it.  Though I express no
12   opinion.  And as part and parcel of that, one imagines I
13   will hear fully the need for extra-record development.
14   And, um, again, that's his last paragraph in the
15   proposal.  So we will then, to the extent -- don't think
16   I'm with you here, but we're trying to tease out an
17   intelligent way forward, then we'll talk about the
18   schedule to get at that.
19          Does that answer your question?
20          MR. CEDRONE:  It does, your Honor.  And that leads
21   me to the second question or issue that I wanted to
22   highlight with the schedule.  We are concerned that this
23   schedule here, especially for a claim that is grounded
24   in undue-delay risks, moving the resolution of these
25   issues close to the end of the government's fiscal year,
```

1    so this contemplates that after Phase 1 is completed,

2    they'll be a week for them to move to dismiss, and then

3    however long that takes to resolve --

4          THE COURT:  You want it faster?

5          MR. CEDRONE:  I do, I think we should walk and

6    chew gum.  If they have, you know, a motion to dismiss

7    on those claims, they've had our --

8          THE COURT:  You've got a -- (Laughs.)  I think I

9    can walk and chew gum, um, and I don't hear you to

10   suggest otherwise.

11         What schedule do you suggest?

12         MR. CEDRONE:  No, I'm suggesting that the federal

13   government respectfully should walk and chew gum.  We

14   can litigate Phase 1 while I think they file any motion

15   to dismiss that they have, you know, in short order, and

16   produce any administrative record on the second phase in

17   short order.  They've had our complaint since April,

18   they've had a --

19         THE COURT:  Well the logic though is that I ought

20   to hear and in my mind react to Phase 1.  Now -- you

21   know the truth is, now that we've engaged, I'm going as

22   fast as I can, and when I say, "Well maybe I'll make an

23   order" -- orders get revised in the discipline of

24   writing full opinions.  But I, at least conceptually,

25   I'm prepared to take that risk however it comes out.

 1   But, um, maybe I should say that, um, not within 7 days,

 2   but if they have a motion to dismiss as to Phase 2, the

 3   motion to dismiss must be filed, um, coincident with

 4   Phase 1, the 16th?

 5        MR. CEDRONE:  We think at least that would be

 6   appropriate.  And I just want to be clear, I was not

 7   suggesting that --

 8        THE COURT:  Of course you were not.  Of course you

 9   were not.

10        MR. CEDRONE:  (Laughs.)  We appreciate the

11   dispatch with which this Court acts.

12        THE COURT:  As in any case, we're all here

13   together reaching out for justice.  That's my concept of

14   the thing.

15        So to be fair, I'll modify it.  If they want to

16   dismiss, um, the second phase, any motion to dismiss the

17   second phase will be filed no later than -- filed, not

18   entertained on the 16th, but filed no later than the

19   16th.  The rest of it all stands.

20        Doesn't that make sense?

21        MR. CEDRONE:  I think that would be appropriate.

22   And the other, I think, suggestion we would have is that

23   30 days --

24        THE COURT:  If I knock that out, or to the extent

25   I deny it, we'll give them 30 days to prepare the

```
 1    record.

 2          How's that?

 3          MR. CEDRONE:  I think that's a bit long,

 4    respectfully, your Honor.  It's longer than they were

 5    given to produce the record for Phase 1.

 6          THE COURT:  You said he didn't think -- well

 7    actually --

 8          Mr. Ports, you said there wouldn't be much problem

 9    in producing the record for Phase 2, would there?

10          MR. PORTS:  I believe I'm not -- I'm not sure what

11    your Honor is referring to.  We would request 30 days to

12    file the Phase 2 record, um, as we've requested here.  I

13    can also respond to filing it coincident with the

14    hearing on the 16th as well.  If we can do that, if

15    that's the Court's order, we believe there would be some

16    benefit from going through the proceeding, hearing the

17    Court's thinking, and having a sense of the resolution,

18    before we file our motion to dismiss on Phase 2, which

19    is why we propose 7 days, which is, we believe, a very

20    short period of time that would allow us to focus on

21    Phase 1 and get it resolved.  I understand the Court's

22    thinking, to perhaps get a preliminary ruling, um, get a

23    better understanding of Phase 2 at the time we move to

24    dismiss.

25          So we do think that there is a benefit to 7 days
```

```
 1   or at least some period of days after the 16th.
 2         THE COURT:  Okay.  How about this?  How about
 3   this?  We'll have the hearing on the 16th.  I'll do the
 4   best I can, whatever that is.  But that's substantive,
 5   that will be the findings and rulings.  Any motion to
 6   dismiss need not be filed on the 16th, but must be filed
 7   by the 20th.  And then, rather than 30 days, we'll give
 8   you until the, um, 9th of July to file the
 9   administrative record.
10         How's that?
11         MR. PORTS:  Thank you, your Honor, we -- that
12   seems to be --
13         THE COURT:  You really --
14         (Zoom interference.)
15         MR. PORTS:  Yes, your Honor.
16         THE COURT:  Well that's an intelligent and
17   lawyer-like answer.
18         Now, Mr. Cedrone, I -- I'm trying to be fair.
19   That's acceptable to you?
20         MR. CEDRONE:  Thank you, your Honor.  It is.
21         THE COURT:  And I'll again try, um, consistent
22   with other obligations, to address it promptly.
23         Other questions?
24         MR. CEDRONE:  I don't believe so for the state
25   plaintiffs.
```

1          THE COURT:  Yeah.

2          MR. PORTS:  For defendants, we just want to

3     clarify that yesterday we received three deposition

4     notices for next week, requests for production and

5     interrogatory responses related to Phase 2, and we just

6     wanted to make clear that the defendants need not

7     respond to these until -- unless and until there's any

8     motion to complete or supplement the record and a ruling

9     on that in Phase 2 from the Court.

10         THE COURT:  I think that makes sense, but then

11    we're not going to be waiting, so you'd better line

12    those people up, and you'd better be thinking about the

13    answers to interrogatories, because I will give a very

14    short time for discovery.

15         You understand?

16         MR. PORTS:  If the Court orders that discovery is

17    appropriate.

18         THE COURT:  If we get there.

19         MR. PORTS:  Understood, your Honor.

20         THE COURT:  Right.  They told you what they want.

21    Be thinking about it.

22         MR. PORTS:  Yes, your Honor.

23         THE COURT:  All right.

24         Now let's turn to the second case.  And my thought

25    is, um, in view of Mr. Ports saying that but-for

 1    individual notices on the specific grants that you have

 2    now filed, he doesn't anticipate anything else, can we

 3    treat the second case coincident with the first and hear

 4    you on the 16th?

 5        MS. AKSELROD:  Your Honor, Olga Akselrod with the

 6    ACLU on behalf of the APHA plaintiffs.

 7        We are absolutely in favor of consolidating our

 8    proceedings with the June 16th hearing and believe that,

 9    um, the record as to the directives, um, may well decide

10    many many of the issues in this case.  But there is a

11    difference in terms of the record that has been produced

12    in the states' case and the record that has been

13    produced in our case.

14        As you know, in the states' case the individual

15    termination ARs have been produced, and those are set to

16    be produced, um, by the defendants on June 16th in our

17    case.

18        We have, um, proposed that the parties meet and

19    confer on June 5th, um, which would give us enough time

20    to review what has been, um -- what has been provided as

21    to the ARs in the states' case.  The defendants have

22    proposed potential stipulations that may obviate the

23    need for, um, submitting the individual terminations AR

24    in our case, and we just need the parties to have a

25    little more time for us to review the record, um, and

```
 1    also to figure out whether such stipulations would be
 2    sufficient.
 3          THE COURT:  All right.  Yeah, look, I gave them
 4    day for day what I gave the states from your start time.
 5          MS. AKSELROD:  Yes, your Honor.
 6          THE COURT:  I'm not -- I'm not going to revise
 7    that.  I did that having thought it through.  Having
 8    said that, there is so much to be gained by agreement.
 9    And I urge -- but I am not ordering, and I'm not setting
10    interim dates, further agreement.
11          I hear you say that you will -- however it works
12    out, if you don't agree, you want to be heard and argue
13    as to these directives, and, to the extent you can
14    legally, you want to argue as to, um, grant terminations
15    in your case on the 16th.
16          Right?
17          MS. AKSELROD:  Yes, your Honor.
18          THE COURT:  And I propose, in that 3 hours, to
19    hear you.  And I propose -- I intend to hold myself
20    ready for argument in -- I'm calling it the "second
21    case," but only that's because it -- how it emerged into
22    my consciousness.  It's not "second" in any way and I've
23    spoken to it on an individual basis.
24          So I'm simply going to hold you to that.  We'll do
25    the first phase and then we'll see where we are.
```

1        MS. AKSELROD:  Thank you, your Honor.

2        And we would propose that on June 6th, we would be

3   able to provide the Court with a status report as to the

4   parties' discussions and what if any additional ARs may

5   need to be produced, and a proposed sort of

6   supplemental, um, schedule for how to deal with those.

7        THE COURT:  Well you're looking for a court order.

8   You can file anything you want.

9        I do enjoy meeting with you all.  Really that's

10  not a personal thing, there's much to be said for the

11  management and the joint efforts that everyone is

12  putting into these two cases.  At the same time, I'm not

13  big on status conferences.

14        So you file what you want.  I'll do -- I won't say

15  "what I want," but I will enter a due-appropriate order

16  or no order.  I have the case now entrained for argument

17  on the 16th.  I've got a lot of stuff to look at.  I

18  suggested other things I want to look at and I do want

19  to look at them.  And I have legal work to do.  And I

20  intend to give you a full and fair hearing on the 16th.

21        If I hear no other questions, I think we can --

22        MS. AKSELROD:  Your Honor, I do have a few more

23  questions.

24        THE COURT:  Yes, go right ahead.

25        MS. AKSELROD:  So -- well, first of all, I just

```
 1    wanted to raise that the parties, um, did have some
 2    additional discussions over the course of the last two
 3    days on some modification to the schedule that was, um,
 4    proposed by the states and the defendants in that case.
 5    And I understand your Honor has adopted that schedule.
 6    We think that that schedule also makes a lot of sense in
 7    virtually every way.  But the parties have agreed to a
 8    couple of modifications.
 9         THE COURT:  If you agree to them, put them in
10    writing and let me know.
11         MS. AKSELROD:  Perfect.  Thank you, your Honor.
12         Secondly, um, I just wanted to clarify.  So, first
13    of all, of course to the extent that the parties are not
14    able to reach stipulations, um, by June 5th, we would be
15    arguing based on the directives AR, um, and wouldn't
16    have the benefit of being able to make argument with
17    regards to the grant termination AR, which we're not
18    receiving until June 16th.  So I just wanted to clarify
19    that we will be prepared to argue as to the directives
20    AR.  We believe that the grant terminations can be
21    resolved through the directives AR.  If the Court finds
22    that is unlawful, then relief would flow to those.  But
23    we just wanted to be clear that there may be a
24    limitation as to what we argue.
25         THE COURT:  You're making yourself clear.
```

1          MS. AKSELROD:  Perfect.  Thank you, your Honor.

2          And one, um, other clarification that I just

3     wanted to raise with regard to the scope of Phase 2, um,

4     and this is one of the ways that our case differs a

5     little bit with regard to how I think this Court has

6     framed Phase 2, which so far has been about unreasonable

7     delay and 7061.  And I just wanted to raise that in

8     addition to 7061 claims, the APHA plaintiffs have also

9     brought 7062 claims on behalf of the applicant.

10          THE COURT:  I understand.  I've ruled on -- I've

11     treated their argument as a motion to dismiss and I've

12     ruled on it.  Believe me, I understand what your

13     complaint raises.

14          MS. AKSELROD:  Yes, your Honor, thank you.  And

15     that is of course also a difference in the schedule

16     since, um, the motion to dismiss, as you've just noted,

17     has already been heard in our case.

18          I just wanted to also raise that, from our

19     perspective, the June 16th hearing as to the directives,

20     um, could give relief not only as to the grant

21     terminations, but also as to the suspension of applicant

22     processes based on the directives.

23          THE COURT:  I will tell you, in all candor, I had

24     not thought of that.  Now you may be arguing that, but

25     I'm trying to get my hands around this case, and, um,

1   while relief as to people actually -- as to grants

2   actually terminated is potential, that's why I wanted

3   the list.  So -- and that will be the Court's focus.

4        Obviously it's your complaint and you raise any

5   claim you wish.  I've ruled on a motion to dismiss.

6   It's my duty to adjudicate the claims.  Um, but that's

7   my response.

8        I think I'm -- the public officials are wrong to

9   say we're only going to talk about the grant

10  terminations, not these directives.  I want to know all

11  about these directives.  I want to know where they came

12  from.  I want to know why there were no edits.  And this

13  business, which is fulsomely set forth in your

14  complaint, we'll hear at least all about that.  I want a

15  full record as to those directives.  And then I want to

16  see how it plays out in cutting off funding for grants

17  approved.  That's what I thought we were talking about.

18       Now I guess all I can say is that's the Court's

19  focus and it will be the Court's focus on the 16th.  You

20  can feel free to raise anything that the complaint

21  raises.  But when we talk about potential orders and the

22  like, um, I'm limiting it to these plaintiffs, these

23  grant -- Phase 1, these grant terminations.  Now there

24  is a Phase 2.  I'm not expressing any opinion on that.

25       Is that helpful?

 1          MS. AKSELROD:  Yes, your Honor, it is.  I think we

 2     may, um, with the Court's permission, still spend a bit

 3     of time explaining how the directives expressly require

 4     an applicant --

 5          THE COURT:  You will, on the 16th, and you will

 6     not think that I am, um, prejudging it if you spend that

 7     little time towards the end.

 8          MS. AKSELROD:  Thank you, your Honor.

 9          THE COURT:  All right.

10          Any other questions?

11          And again, hope springs eternal.  If you resolve

12     this matter or a significant portion of it, a simple

13     call to Ms. Belmont is all that's necessary.

14          Yes, Mr. Ports?

15          MR. PORTS:  Yes, your Honor.  Thank you.

16          I wanted to clarify regarding the supplementing of

17     guidance about what is contained in the administrative

18     record.

19          Although it is the defendants' position that the

20     grant terminations should be reviewed, the

21     administrative record contains well-challenged

22     directives, um, the -- where the challenged directives

23     were considered, directly or indirectly, in the grant

24     terminations, they're a part of that administrative

25     record.  Where they were not, we have provided separate

```
 1   administrative records for the other, um, challenged

 2   directives, to the extent we have had record IDs.

 3        THE COURT:  You'll appreciate that I haven't

 4   reviewed it, and so if I've misspoken, it's solely

 5   because I have not yet had the chance to review it all.

 6        All right.

 7        MR. CEDRONE:  Your Honor --

 8        THE COURT:  I have another obligation here.

 9        MR. CEDRONE:  I just want to clarify what was just

10   established, which is that, um, having heard your

11   Honor's views and admonitions, that the administrative

12   record in the states' case is complete, um, in the

13   government's view.

14        THE COURT:  He said it was.

15        MR. CEDRONE:  Okay, I just wanted to make sure of

16   that.

17        THE COURT:  While I'm operating -- we talk about

18   "clarifications," um, the question is, um, that

19   "clarifications" all, respectfully, have to go to me.

20   I'm telling you what I think Mr. Ports has represented,

21   that I have a complete administrative record as to the,

22   um, challenged declarations.  That's what I heard him

23   say.  And that -- well I'll stop there.

24        MR. CEDRONE:  Thank you, your Honor.

25        THE COURT:  Lest I clarify my own clarifications.
```

```
 1          Thank you all.

 2          We'll stand in recess.

 3          (Ends, 11:45 a.m.)

 4

 5                    C E R T I F I C A T E

 6

 7          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 8     hereby certify that the forgoing transcript of the

 9     record is a true and accurate transcription of my

10     stenographic notes, before Judge William G. Young, on

11     Tuesday, June 2, 2025, to the best of my skill and

12     ability.

13

14

15

16

17     /s/ Richard H. Romanow 06-05-25
       _____
18     RICHARD H. ROMANOW  Date

19

20

21

22

23

24

25
```