Nos. 25-1611, 25-1612

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

AMERICAN PUBLIC HEALTH ASSOCIATION; IBIS REPRODUCTIVE
HEALTH; INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS (UAW);
BRITTANY CHARLTON; KATIE EDWARDS; PETER LURIE; NICOLE
MAPHIS,

Plaintiffs-Appellees,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, in the official
capacity as Director of the National Institutes of Health; UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F.
KENNEDY, JR., in the official capacity as Secretary of the United States Department
of Health & Human Services,

Defendants-Appellants.

COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA;
STATE OF MARYLAND; STATE OF WASHINGTON; STATE OF ARIZONA;
STATE OF COLORADO; STATE OF DELAWARE; STATE OF HAWAII;
STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY;
STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON;
STATE OF RHODE ISLAND; STATE OF WISCONSIN,

Plaintiffs-Appellees,

v.

ROBERT F. KENNEDY, JR., in the official capacity as Secretary of Health and
Human Services; UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; JAY BHATTACHARYA, in the official capacity as Director
of the National Institutes of Health; NATIONAL INSTITUTES OF HEALTH;
NATIONAL CANCER INSTITUTE; NATIONAL EYE INSTITUTE;
NATIONAL HEART LUNG AND BLOOD INSTITUTE; NATIONAL HUMAN
GENOME RESEARCH INSTITUTE; NATIONAL INSTITUTE ON AGING;
NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM;
NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES;
NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND
SKIN DISEASES; NATIONAL INSTITUTE OF BIOMEDICAL IMAGING
AND BIOENGINEERING; EUNICE KENNEDY SHRIVER NATIONAL
INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT;
NATIONAL INSTITUTE ON DEAFNESS AND OTHER COMMUNICATION

DISORDERS; NATIONAL INSTITUTE OF DENTAL AND CRANIOFACIAL
RESEARCH; NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND
KIDNEY DISEASES; NATIONAL INSTITUTE ON DRUG ABUSE;
NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES;
NATIONAL INSTITUTE OF GENERAL MEDICAL SCIENCES; NATIONAL
INSTITUTE OF MENTAL HEALTH; NATIONAL INSTITUTE ON
MINORITY HEALTH AND HEALTH DISPARITIES; NATIONAL INSTITUTE
OF NEUROLOGICAL DISORDERS AND STROKE; NATIONAL INSTITUTE
OF NURSING RESEARCH; NATIONAL LIBRARY OF MEDICINE;
NATIONAL CENTER FOR ADVANCING TRANSLATIONAL SCIENCES;
JOHN E. FOGARTY INTERNATIONAL CENTER FOR ADVANCED STUDY
IN THE HEALTH SCIENCES; NATIONAL CENTER FOR
COMPLEMENTARY AND INTEGRATIVE HEALTH; NIH CENTER FOR
SCIENTIFIC REVIEW,

Defendants-Appellants.

———————————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————————

**BRIEF FOR APPELLANTS**

———————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

DANIEL TENNY
BENJAMIN C. WEI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7235*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-2875*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD .............................. ix

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ............................................................... 2

STATEMENT OF THE ISSUES .................................................................. 2

STATEMENT OF THE CASE ..................................................................... 3

     A.     Statutory Background ................................................................. 3

     B.     Factual Background ................................................................... 5

     C.     Prior Proceedings ................................................................... 10

SUMMARY OF ARGUMENT ................................................................... 16

STANDARD OF REVIEW ....................................................................... 18

ARGUMENT ......................................................................................... 19

I.     The District Court Improperly Reversed the Termination of Grants .............. 19

II.     The District Court's Judgment Regarding Grant Guidance Should Be Vacated ................................................................................................. 22

     A.     Challenges to the Grant Guidance Are Moot ........................................... 24

     B.     Plaintiffs Lack Standing to Challenge the Grant Guidance Because Their Only Injury Is the Grant Terminations .......................................... 27

     C.     The Grant Guidance Is Not Final Agency Action ................................... 32

     D.     The Grant Guidance Is Lawful ............................................................. 34

i.    The Grant Guidance Is Committed To Agency Discretion
      by Law ........................................................................................... 35

ii.   The Grant Guidance Was Not Arbitrary and Capricious ............. 38

CONCLUSION ............................................................................................... 43

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                         **Page(s)**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ........................................................................... 35

*Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.,*
    357 F.3d 62 (2004) ............................................................................ 20

*Already, LLC v. Nike, Inc.,*
    568 U.S. 85 (2013) ............................................................................ 26

*American Pub. Health Ass'n v. NIH,*
    145 F.4th 39 (1st Cir. 2025) ............................................ 9, 13, 14, 15, 21, 36, 37, 42

*Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.,*
    No. 25-298, 2025 U.S. Dist. LEXIS 127513 (D.D.C. July 6, 2025) ...................... 38

*Atieh v. Riordan,*
    797 F.3d 135 (1st Cir. 2015) ................................................................. 18

*Bennett v. New Jersey,*
    470 U.S. 632 (1985) ....................................................................... 20-21

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................... 32

*BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers,*
    132 F.3d 824 (1st Cir. 1997) ................................................................. 18

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ................................................................. 14, 21, 22

*California v. Texas,*
    593 U.S. 659 (2021) ........................................................................... 27

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ..................................................................... 27, 31

*Columbus Reg'l Hosp. v. United States,*
    990 F.3d 1330 (Fed. Cir. 2021) .............................................................. 21

*Corrigan v. Boston Univ.,*
    98 F.4th 346 (1st Cir. 2024) ................................................................. 26

*Department of Com. v. New York*,
  588 U.S. 752 (2019) ............................................................ 35, 41

*Department of Educ. v. California*,
  604 U.S. 650 (2025) ............................................................ 13, 14

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ...................................................... 38, 39, 40, 41

*Grayscale Invs., LLC v. SEC*,
  82 F.4th 1239 (D.C. Cir. 2023) ..................................................... 42

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002) ................................................................. 21

*Harper v. Werfel*,
  118 F.4th 100 (1st Cir. 2024) ............................................... 32, 33, 34

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ............................................................. 35, 36

*Laird v. Tatum*,
  408 U.S. 1 (1972) ................................................................... 31

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ..................................................... 18, 35, 36, 37

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ................................................................. 20

*McLane v. Mercedes-Benz of N. Am.*,
  3 F.3d 522 (1st Cir. 1993) .......................................................... 26

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ................................................... 20, 21

*Milk Indus. Regul. Off. v. Ruiz*,
  83 F.4th 68 (1st Cir. 2023) ........................................................ 26

*Missouri ex rel. Nixon v. Craig*,
  163 F.3d 482 (8th Cir. 1998) ...................................................... 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................. 39

*National Ass'n of Diversity Officers in Higher Educ. v. Trump*,
   767 F. Supp. 3d 243 (D. Md.), *stay granted*,
   No. 25-1189 (4th Cir. Mar. 14, 2025) ........................................ 41

*National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ........................................................ 42

*National Endowment for the Arts v. Finley*,
   524 U.S. 569 (1998) ........................................................ 41

*National Park Hosp. Ass'n v. Department of the Interior*,
   538 U.S. 803 (2003) ..................................................... 27, 28

*NIH v. American Pub. Health Ass'n*,
   145 S. Ct. 2658 (2025) .................... 1, 15, 16, 19, 23, 29, 30, 32, 38

*Nulankeyutmonen Nkihtaqmikon v. Impson*,
   503 F.3d 18 (1st Cir. 2007) ................................................ 27

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998) ........................................................ 28

*Perry Capital LLC v. Mnuchin*,
   864 F.3d 591 (2017), *cert. denied*,
   583 U.S. 1115 (D.C. Cir. 2018) ........................................... 20

*Reno v. Catholic Soc. Servs., Inc.*,
   509 U.S. 43 (1993) ........................................................ 28

*Sackett v. EPA*,
   566 U.S. 120 (2012) ....................................................... 33

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) ..................................................... 41-42

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
   600 U.S. 181 (2023) ....................................................... 39

*Texas v. United States*,
   523 U.S. 296 (1998) ....................................................... 28

*Trump v. Boyle*,
   145 S. Ct. 2653 (2025) ................................................. 16, 19

*Trump v. New York*,

592 U.S. 125 (2020) .................................................................................. 28

*United States v. Miller*,
145 S. Ct. 839 (2025) .......................................................................... 19

*United States v. Skrmetti*,
145 S. Ct. 1816 (2025) ........................................................................ 40

*University of Med. & Dentistry of N.J. v. Corrigan*,
347 F.3d 57, 69 (3d Cir. 2003) ............................................................. 33

**Statutes:**

Administrative Procedure Act (APA):
5 U.S.C. § 701(a)(2) ............................................................. 11, 34, 35
5 U.S.C. § 702 ........................................................................ 20, 21, 22
5 U.S.C. § 704 ............................................................................... 22, 32
5 U.S.C. § 706(2) ................................................................................ 18
5 U.S.C. § 706(2)(A) ...................................................................... 35, 38

Full-Year Continuing Appropriations and Extensions Act, 2025,
§ 1101(a)(8), Pub L. No. 119-4, div. A, tit. I, 139 Stat. 9, 11....................... 3

Further Consolidated Appropriations Act, 2024,
Pub. L No. 118-47, div. D, tit. II, 138 Stat. 460, 656............................ 3, 36

28 U.S.C. § 1291 ........................................................................................ 2

28 U.S.C. § 1331 ........................................................................................ 2

28 U.S.C. § 1491(a) ................................................................................ 20

42 U.S.C. § 241(a)(1) ................................................................................ 3

42 U.S.C. § 241(a)(3) .............................................................................. 36

42 U.S.C. § 281(b) ..................................................................................... 3

42 U.S.C. § 282(b)(4)(B) ......................................................................... 37

42 U.S.C. § 282(m) .................................................................................. 37

42 U.S.C. § 282a ........................................................................................ 3

42 U.S.C. § 283d ........................................................................ 37

42 U.S.C. § 283p ........................................................................ 37

42 U.S.C. § 284(b)(1)-(2) ............................................................ 3

42 U.S.C. § 284(b)(2) .................................................................. 4

42 U.S.C. § 285f-5(b)(1) ............................................................ 37

**Regulatory Materials:**

*Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*,
  Exec. Order No. 13,985, 86 Fed. Reg. 7009 (Jan. 25, 2021) ................................... 6

2 C.F.R. pt. 200 ........................................................................ 5

2 C.F.R. § 200.340(a)(4) ......................................................... 5, 13, 38, 43

45 C.F.R. pt. 75 ........................................................................ 5

45 C.F.R. § 75.101 ..................................................................... 5

45 C.F.R. § 75.300(a) ................................................................. 5

45 C.F.R. § 75.372(a)(2) ............................................................ 38

45 C.F.R. § 75.374 ..................................................................... 9

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*,
  Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 31, 2025) ................................. 6, 7

*Ending Radical and Wasteful Government DEI Programs and Preferencing*,
  Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 29, 2025) ........................... 5, 6, 40

*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*,
  Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ............................... 7, 40

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ........................................................... 2

Fed. R. Civ. P. 54(b) ........................................................................... 2

**Other Authorities:**

Cal. Gov't Operations Agency, *Diversity, Equity and Inclusion*,
   https://perma.cc/JR3N-YR82 .................................................. 41

Comm. on Health Equity, APHA, *Equity Diversity & Inclusion Survey*
   (Oct. 2021), https://perma.cc/3UFG-JTPE ............................. 41

NIH, *Advancing NIH's Mission through a Unified Strategy*
   (Aug. 15, 2025), https://perma.cc/V5E2-4ED2 ................. 10, 17, 25

NIH, *Grants & Funding* (Oct. 15, 2024),
   https://perma.cc/L93C-KSY4 ............................................... 3, 36

HHS, *Treatment for Pediatric Gender Dysphoria: Review of Evidence
   and Best Practices* (May 1, 2025), https://perma.cc/9LGM-ANGA ........... 17, 25

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The district court entered a partial final judgment that ordered the government to continue funding research contrary to the President's policy priorities and vacated guidance implementing the President's policy priorities. The government respectfully requests that the Court hold oral argument. Argument will aid the Court in resolving the important issues presented by this appeal.

# INTRODUCTION

The district court ordered the National Institutes of Health (NIH) to pay money to plaintiffs (or their instrumentalities or members) based on the government's alleged contractual obligation under certain grant for biomedical research and research training. The court lacked jurisdiction to issue such an order. As the Supreme Court explained in this case, the "Administrative Procedure Act[(APA)]'s 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *NIH v. American Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (second alteration in original).

The district court also erred in vacating NIH's guidance on grant priorities. Plaintiffs' challenge is now moot, as NIH has since updated the guidance to address many of the court's concerns. Moreover, plaintiffs lack standing because they have not suffered any cognizable injury, and the guidance does not constitute final agency action subject to review under the APA. The court avoided these threshold issues by analyzing the guidance and the grant terminations together as part of a "wholesale effort to excise grants." A155. But that approach is no longer viable, as the court lacks jurisdiction over the terminations.

In any event, plaintiffs' challenge to the guidance fails on the merits. Decisions about what grants to fund are generally committed to agency discretion. Absent a violation of statute or regulation, which the district court did not find here, such

decisions are not subject to APA review. The guidance was also appropriately tailored to its intended audience: internal agency experts expected to exercise their professional judgment. It was never intended to have the same level of specificity as rules binding on the public. Moreover, the guidance clearly articulated the interests being advanced and NIH's reasons for its decisions.

## STATEMENT OF JURISDICTION

Plaintiffs brought this action alleging that certain federal grants for biomedical research and research training were improperly terminated. The district court believed it had jurisdiction under 28 U.S.C. § 1331, but the court lacked jurisdiction over the grant terminations for the reasons stated in Part I below. The court issued partial final judgments that vacated NIH guidance and plaintiffs' grant terminations as arbitrary and capricious. A73; A75; *see* Fed. R. Civ. P. 54(b). The United States filed a timely notice of appeal. A550; A553; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court properly granted relief on claims that plaintiffs are entitled to monetary payments under a grant program.

2. Whether the district court properly vacated internal agency guidance on grant funding priorities that has been materially changed by subsequent guidance and only directed a review of existing grants.

## STATEMENT OF THE CASE

### A.    Statutory Background

These cases involve grant terminations at NIH, a subagency of the Department of Health and Human Services (HHS). NIH is made up of two dozen national research institutes and centers (ICs) that focus on specific diseases or body systems, like the National Institute of Allergy and Infectious Diseases. 42 U.S.C. § 281(b). NIH and its ICs have broad authority to award grants to fund research by universities, hospitals, laboratories, individuals, and other research institutions "relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man." *Id.* § 241(a)(1); *see id.* § 284(b)(1)-(2). Congress supports that research via lump-sum appropriations. *See generally id.* § 282a (allocating sums for certain fiscal years "[f]or purposes of carrying out this subchapter"). For example, in 2024 Congress appropriated $6.5 billion for the National Institute of Allergy and Infectious Diseases to carry out the Public Health Service Act "with respect to allergy and infectious diseases." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460, 656; *see* Full-Year Continuing Appropriations and Extensions Act, 2025, § 1101(a)(8), Pub L. No. 119-4, div. A, tit. I, 139 Stat. 9, 11 (carrying forward HHS's 2024 appropriation into 2025).

Because funding is finite, NIH grants are "highly competitive," and the agency approves only 20% of applications. NIH, *Grants & Funding* (Oct. 15, 2024), https://perma.cc/L93C-KSY4. The process begins with a public notice of funding

3

opportunity that outlines the program goals and the conditions for applying. A476-477. Interested entities submit a proposal, which undergoes three layers of review. First, a "study section," which is a group of non-federal scientists with expertise in the relevant field, reviews the proposal and eliminates some grant applications from further consideration and assigns a score to the rest. A477-479. Next, the proposal is reviewed by an advisory council for the relevant IC, which renders one of three decisions: recommended for funding, not recommended for funding, or deferred for re-review by the study section. A480. A recommendation for funding is a prerequisite for any grant of more than $50,000 but does not guarantee that the grant will be funded. 42 U.S.C. § 284(b)(2). Lastly, the proposal is reviewed by the head of the relevant IC, who has the discretion as to whether to fund the grant. A481; A399 (acknowledging that "[f]inal authority to make an award belongs to the Director of the [national research institute] responsible for the grant"); A90 (district court acknowledging same).

Once a grant is selected for award, the grant terms are memorialized in a Notice of Award (NOA)—a formal legal document issued by the funding IC to the recipient. A2451. The NOA sets out "the amount of funds awarded" and the "terms and conditions" of the award, which the recipient accepts "by drawing or requesting funds." A2453-2455.

The NOAs incorporate express caveats that awards can be terminated if they do not support agency objectives or policies. Specifically, all NIH grants incorporate

by reference the NIH Grants Policy Statement, which in turn incorporates Office of Management and Budget (OMB)'s guidance for federal financial assistance in 2 C.F.R. pt. 200. A2449, 2460. OMB's guidance states that a "Federal award may be terminated" by the agency, "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Further, all NIH grants are subject to HHS's uniform administrative requirements for federal awards. 45 C.F.R. § 75.101; *see, e.g.*, A786 (NOA incorporating the NIH Grants Policy Statement and 45 C.F.R. pt. 75). Those HHS requirements mandate that NIH grants be administered "so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with U.S. statutory and public policy requirements," including those "prohibiting discrimination." 45 C.F.R. § 75.300(a).

**B.    Factual Background**

1. Immediately after his inauguration, President Trump issued a trio of executive orders announcing policy directives relevant to the grants at issue in this case.

On January 20, 2025, the President issued Executive Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 29, 2025), titled *Ending Radical and Wasteful Government DEI Programs and Preferencing*, to eliminate "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)" from the government, *id.* § 1, 90 Fed. Reg. at 8339. That Executive Order rescinded President Biden's Executive Order that mandated "an ambitious whole-of-government equity agenda" and

5

instructed federal agencies to "allocate resources to address the historic failure to invest sufficiently, justly, and equally in underserved communities," *i.e.*, "populations sharing a particular characteristic . . . that have been systematically denied a full opportunity to participate in aspects of economic, social, and civic life." *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, Exec. Order No. 13,985, §§ 1, 2, 6, 86 Fed. Reg. 7009, 7009-10 (Jan. 25, 2021). President Trump instead directed "[e]ach agency, department, or commission head" to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts." Exec. Order No. 14,151, § 2(b)(i), 90 Fed. Reg. at 8339.

On January 21, 2025, President Trump issued Executive Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 31, 2025), titled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, "to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.* § 2, 90 Fed. Reg. at 8633. That Executive Order instructs each agency head to "include in every contract or grant award . . . [a] term requiring [the] counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(b)(iv)(B), 90 Fed. Reg. at 8634. And that Order directs the head of the OMB to "[e]xcise references to DEI . . . principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures." *Id.* § 3(c)(ii), 90 Fed. Reg. at 8634.

On January 20, 2025, the President also issued Executive Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 30, 2025), titled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*. That Executive Order affirms "the immutable biological reality of sex" and rejects its replacement "with an ever-shifting concept of self-assessed gender identity" via "'[g]ender ideology.'" *Id.* §§ 1, 2(f), 90 Fed. Reg. at 8615. The Executive Order directs federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e), 90 Fed. Reg. at 8616. And the Order directs agencies to "ensure grant funds do not promote gender ideology." *Id.* § 3(g), 90 Fed. Reg. at 8616.

2. Beginning in February 2025, NIH moved to terminate grants that do not align with the Administration's policy priorities.

To guide this process, the Acting HHS Secretary on February 10, 2025, issued a "Secretarial Directive on DEI-Related Funding." A98-99 (capitalization altered). That directive ordered a review of all HHS payments "related to DEI and similar programs" to ensure that all payments were "consistent with current policy priorities" and "improv[ed] the health and well-being of all Americans." A98. Consistent with that directive, NIH temporarily paused all grants supporting "diversity, equity, and inclusion . . . initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or any other protected characteristic." A103.

On February 21, 2025, the Acting NIH Director directed his staff to ensure that NIH grants "do not fund or support low-value and off-mission research activities

or projects - including DEI and gender identity research activities and programs."
A108-109.  As the Acting Director explained, "based on [his] expertise and
experience" and "consistent with recent Executive Orders," "amorphous equity
objectives[] are antithetical to the scientific inquiry, do nothing to expand our
knowledge of living systems, provide low returns on investment, and ultimately do
not enhance health, lengthen life, or reduce illness."  A108.  Likewise, gender-identity
studies may "ignore . . . biological realities," "are often unscientific, have little
identifiable return on investment, and do nothing to enhance the health of many
Americans."  *Id.*  Accordingly, "it is the policy of NIH not to prioritize such research
programs."  *Id.*

Ensuing guidance documents issued in March and May of 2025 directed NIH
staff to review "the specific aims" of each project for compliance with NIH's
priorities.  A127; A143.  Where "[t]he sole purpose of the project" contradicts those
priorities, like a grant for a conference about "diversity," funding may not issue.
A143.  But if the project only "partially supports" impermissible activities, staff were
directed to negotiate out those terms.  A144-145.  For example, if a scientific
conference limited to specific racial groups sought funding, NIH would ask the
conference hosts to remove the racially restrictive term and open the conference to all
comers.  A146.  If they agreed, the grant could proceed.  *Id.*

Using that guidance as a touchstone, NIH and HHS officials exercised their judgment to identify grants for termination.  A138; A141-142; A153.[1]  NIH sent letters to affected grant recipients explaining that the OMB guidelines incorporated into their grants permit termination "if an award no longer effectuates the program goals or agency priorities."  A124.  The letters identified why the grantees' projects "no longer effectuate[] agency priorities" using standardized language tracking the Acting Director's guidance.  A124-125.  For example, researchers working on DEI-related grants were informed that "it is the policy of NIH not to prioritize such research" because "[r]esearch programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry."  *Id.*  And those studying "[t]ransgender issues" were informed of NIH's conclusion that "[r]esearch programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans."  A125.  The letters explained how the grantees could appeal the decision to the NIH Director or his designee.  *Id.*; *see* 45 C.F.R. § 75.374.

3.  On August 15, 2025, and after the district court issued the order on appeal, the NIH Director issued a new statement on grant priorities that replaced his previous

---

[1]  This Court's stay opinion incorrectly stated "that [Department of Government Efficiency (DOGE)] staffers (who had no affiliation with either NIH or HHS) decided which grants to terminate."  *American Pub. Health Ass'n v. NIH*, 145 F.4th 39, 46 (1st Cir. 2025).  The official was a detailee from DOGE who was employed by HHS.

statement of February 21, 2025.  NIH, *Advancing NIH's Mission through a Unified Strategy* (Aug. 15, 2025), https://perma.cc/V5E2-4ED2 (NIH Director Statement).  In this updated guidance, the Director explained that NIH is committed to "advance[ing] the health of all Americans, regardless of their age, race, ethnicity, sex, sexual orientation, or other characteristics" and that NIH would fund research that employs "specific and measurable concepts," uses "precise language to define [research] participant attributes," and considers "race or ethnicity" only when "scientifically justified."  *Id.*  As an example, "redlining and housing discrimination are clearly defined practices that can measurably impact the health of minority populations" while "broad or subjective claims" like those based on "systemic racism" are not.  *Id.*  The guidance also addressed research on care for "children and teenagers identifying as transgender," explaining that "studies that involve the use of puberty suppression, hormone therapy, or surgical intervention to treat gender dysphoria, gender identity disorder, or gender incongruence in minors" are not supported by the data and citing, in support, a recent literature review.  *Id.*

### C.    Prior Proceedings

1.  Two sets of plaintiffs challenged NIH's grant terminations in the District of Massachusetts.  A80-81.  Research and advocacy organizations, a union, and individual researchers (APHA plaintiffs) filed *American Public Health Ass'n v. NIH*, No. 25-cv-10787 (D. Mass. filed Apr. 2, 2025).  And 16 States (State plaintiffs) filed *Massachusetts v. Kennedy*, No. 25-cv-10814 (D. Mass. filed Apr. 4, 2025), asserting the

rights of their public universities.  Both suits alleged that the grant terminations were arbitrary and capricious in violation of the APA.  A444-447 (APHA); A533-535 (States).  And both sets of plaintiffs sought an injunction to prevent NIH from "terminating any grants" pursuant to the challenged guidance documents and "[o]rder NIH to restore the grant awards, retroactive to the respective termination date."  A455; *accord* A545-546.

2.  The district court informally consolidated the cases and issued a series of decisions:

a.  First, the district court held that it had subject-matter jurisdiction in *Massachusetts*.  A1-28.  The court acknowledged that the Supreme Court in *California* had stayed a district-court decision "enjoining the Department of Education from terminating certain grants" because such contract disputes can likely only be brought in the Court of Federal Claims under the Tucker Act.  A12-13.  But in the court's view, *California* was "not binding on this Court" and "of little assistance to the district courts" because it was "an emergency interlocutory order."  A9, A17, A20.  The court instead "agree[d] with the Supreme Court dissenters" and followed the decision of this Court that was effectively overruled in *California*.  A9, A23.

Separately, the district court rejected the government's argument that NIH funding decisions are committed to agency discretion by law and thus not reviewable under the APA.  A27 (citing 5 U.S.C. § 701(a)(2)).  In the court's view, there was "arguably" law to apply because plaintiffs alleged that the grant terminations "conflict

with authorizing statutes and applicable regulations." *Id.* (citation omitted). But the court did not identify what those statutory or regulatory requirements might be or conclude that the agency had violated them. *Id.*

b. In *American Public Health Ass'n*, the district court construed the parties' preliminary-injunction briefing as a motion to dismiss, which the court denied in relevant part. A29-72. The court rejected the government's Tucker Act argument for "substantially for the same reasons" as in *Massachusetts* and concluded that the organizational plaintiffs had standing. A42; A43-49. On the merits, the court held that plaintiffs had adequately pleaded an arbitrary-and-capricious claim under the APA because the termination notices read "more like a political statement than reasoning about the grants." A59.

c. The district court held a joint hearing and bench trial in the two cases that was limited to plaintiffs' arbitrary-and-capricious claims concerning NIH's termination of awarded grants. A83. The court deferred for "Phase Two" plaintiffs' claims that NIH was unreasonably delaying action on new grants. *Id.* At the end of the hearing the court orally vacated NIH guidance and plaintiffs' grant terminations as arbitrary and capricious and promised that "a full written opinion" would follow. A57. The court issued partial final judgments in both cases reflecting the court's oral ruling, A73-74 (States); A75-76 (APHA), and denied the government's request for a stay pending appeal, A181-186.

d.  In its written decision, the district court relied on Justice Jackson's *California* dissent to conclude that NIH had engaged in "no reasoned decision-making . . . in the 'robotic rollout' of this grant-termination action."  A164 (quoting *Department of Educ. v. California*, 604 U.S. 650, 664 (2025) (Jackson, J., dissenting)).  That conclusion rested on the court's view that NIH had failed to provide a workable definition of "DEI," instead offering what the court characterized as a "purely circular" formulation. A164-172.  The court applied the same critique to NIH's guidance on research concerning "gender identity," while further faulting NIH for supplying no evidentiary support for its determination that such research was not worthwhile.  A170.

The district court also objected to NIH's reliance on OMB guidance permitting termination of grants that "no longer effectuate[] the program goals or agency priorities" because HHS had not yet adopted that guidance as its own.  A176 (quoting 2 C.F.R. § 200.340(a)(4)).  Nonetheless, the court did not dispute that the OMB guidance is incorporated by reference into all NIH grants.  A176-177.  Given its arbitrary-and-capricious holding, the court declined to resolve plaintiffs' statutory challenges to the terminations except for finding that NIH did not violate the statutory requirement for a sexennial plan outlining research priorities and objectives. A178-179.

3.  This Court denied the government's motion for a stay pending appeal. *American Pub. Health Ass'n v. NIH*, 145 F.4th 39 (1st Cir. 2025).  On jurisdiction, this Court treated the district court's vacatur of NIH's guidance and the grant

terminations separately. *Id.* at 50. This Court held that the government had waived any argument that the court lacked jurisdiction to vacate the guidance. *Id.* In any event, this Court held, "the district court clearly had jurisdiction to grant 'prospective relief' that will govern 'the rather complex ongoing relationships'" between the parties. *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988)). This Court acknowledged that the challenges to the grant terminations posed "a closer question," but thought that the claims could proceed because the court provided "declaratory relief that is unavailable in the Court of Federal Claims" and does not "depend on the terms or conditions of any contract." *Id.* at 50-51. This Court distinguished *California* as limited to an order "to pay out past-due grant obligations." *Id.* at 51 (quoting 604 U.S. at 650). In this Court's view, the court here had "simply declared that the Department unlawfully terminated certain grants" without relying on any particular grant terms. *Id.*

This Court also rejected the government's argument that NIH funding allocations are committed to agency discretion by law. *American Pub. Health Ass'n*, 145 F.4th at 52-53. This Court deemed this argument forfeited because the government had not specifically reiterated it in its district-court stay motion. *Id.* at 52. But this Court went on to hold that "numerous statutory provisions" and an HHS regulation provide "'judicially manageable standards'" for review. *Id.* at 53.

Finally, this Court further held that the grant terminations were likely arbitrary and capricious. *American Pub. Health Ass'n*, 145 F.4th at 53-54. This Court saw "no

obvious error" in the district court's conclusion that NIH engaged in an unexplained "about-face" that "entirely ignored significant reliance interests." *Id.* at 54.

4.  The Supreme Court granted in part the government's request for emergency relief and stayed the parts of the district court's order that reversed the grant terminations. *NIH v. American Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025).  As the Court emphasized, the "Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Id.* (alteration in original).

Several Justices explained their votes in separate writings.  Four would have granted the government's application in full, and four would have denied it in full. *NIH*, 145 S. Ct. at 2660.  Justice Barrett, whose approach carried the day, issued a concurring opinion concluding that the government was entitled to a stay of the judgment insofar as it set aside grant terminations, but not as to the vacatur of agency guidance.  *Id.* at 2661-62 (Barrett, J., concurring in the partial grant of the application for stay).  She explained that, although the Tucker Act did not bar the district court from considering claims challenging agency guidance, plaintiffs could not "end-run" the Court of Federal Claims' exclusive jurisdiction over grant-termination challenges "simply by packaging them with a challenge to agency guidance."  *Id.*

Justice Barrett explained that staying the vacatur of agency guidance was unwarranted, however, because the government's "application largely ignores the

guidance, which suggests that this aspect of the judgment causes it no irreparable harm." *NIH*, 145 S. Ct. at 2662 (Barrett, J., concurring in the partial grant of the application for stay). At the same time, she cautioned that "whether claims about the guidance in this case will succeed is another question," noting that "it is not obvious, for instance, that NIH's guidance is final agency action." *Id.* Because those issues had not been fully presented, Justice Barrett underscored that the government "remains free to challenge the District Court's vacatur of the guidance before the First Circuit." *Id.*

## SUMMARY OF ARGUMENT

The district court ordered NIH to reverse the termination of grants that do not advance agency goals or priorities. The court also vacated agency guidance on grant priories. Both were in error.

1. As to the grant terminations, the district court mistakenly determined it had jurisdiction. As the Supreme Court held in this case, the "Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *NIH v. American Pub. Health Ass'n*, No. 145 S. Ct. 2658, 2659 (2025) (alteration in original). That holding "squarely control[s]" here. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). And the Supreme Court's reasoning reflects the longstanding jurisdictional principle that claims premised on, and requiring the government to

comply with, grant agreements are contract claims that must be brought in the Court of Federal Claims.

2.  The district court's vacatur of NIH's grant priorities guidance should be vacated.  As an initial matter, NIH has since updated its guidance, addressing the court's concerns.  For example, the court criticized NIH for not adequately supporting its conclusions on "gender identity" research.  A170.  In response, NIH has now cited a recent literature review as evidentiary support for its position.  NIH Director Statement (citing HHS, *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (May 1, 2025), https://perma.cc/9LGM-ANGA).  As a result, the deficiencies the court identified no longer exist.  It would be inequitable to allow the court's judgment to stand in these circumstances, as doing so could interfere with the government's ability to rely on the updated guidance to the extent that it builds on what the court held to be inadequate.

The order also rests on legal error.  Plaintiffs lacked standing to challenge the guidance at the time they filed suit, as they did not suffer any cognizable injury.  Moreover, the guidance does not constitute final agency action subject to APA review.  The district court bypassed these threshold defects by evaluating the guidance and the grant terminations together as part of the same "wholesale effort to excise grants."  A155.  But that approach is no longer viable in light of the Supreme Court's ruling that the court lacks jurisdiction over the terminations.

17

In any event, plaintiffs' claims fail on the merits. The guidance that informs which grants to fund falls within the agency's discretion when, as here, no statutory or regulatory limits have been violated. *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). In such circumstances, the APA "gives the courts no leave to intrude." *Id.* Even if the guidance were reviewable, it was neither arbitrary nor capricious. NIH offered reasonable justifications, including a shift in policy priorities and a desire to reallocate funds accordingly. The district court's objections regarding the lack of detailed definitions or the possibility of political influence are not reasons why the guidance would be considered unlawful. The APA does not require perfect clarity in discretionary funding decisions, nor does it prohibit political leadership from setting new priorities consistent with the President's agenda.

## STANDARD OF REVIEW

This Court reviews the district court's decision de novo. *See BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers*, 132 F.3d 824, 830 (1st Cir. 1997) (de novo review of whether the district court had jurisdiction); *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (de novo review of merits of APA claim). To the extent it reaches the merits, this Court, like the district court, applies the standard set forth in the APA under which agency action may be overturned only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, such as if it is unsupported by substantial evidence." *Atieh*, 797 F.3d at 138 (quoting 5 U.S.C. § 706(2)). "This standard is quite narrow: a reviewing court may not substitute

18

its judgment for that of the agency, even if it disagrees with the agency's conclusions." *Id.* (quotation marks omitted).

## ARGUMENT

### I.     The District Court Improperly Reversed the Termination of Grants

1. The Supreme Court's stay decision in this case concluded that the district court lacks jurisdiction to vacate the challenged grant terminations. *NIH v. American Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025). The Court explained that the "Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Id.* (alteration in original). That decision was unconditional and would "squarely control[]" even like cases. *Trump v. Boyle*, 145 S. 2653, 2643 (2025). But this is not just a like case; it is the *same* case. This Court therefore must vacate the reversal of the grant terminations for lack of jurisdiction.

2. The Supreme Court's ruling reflects black-letter jurisdictional principles. Given the federal government's sovereign immunity, federal courts generally lack jurisdiction over "suits against the United States absent Congress's express consent." *United States v. Miller*, 145 S. Ct. 839, 849 (2025). The APA provides a limited waiver of sovereign immunity, but "comes with an important carve-out": The waiver does not apply "'if any other statute that grants consent to suit expressly or impliedly

19

forbids the relief which is sought.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).

One such other statute is the Tucker Act, which provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). As such, the "Tucker Act 'impliedly forbids'" bringing "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (2004). To determine which court has jurisdiction, the question is whether "an action is in 'its essence' contractual," *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 618-19 (2017), *cert. denied*, 583 U.S. 1115 (D.C. Cir. 2018), which "depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Both factors point to this case being "in its essence contractual." *Perry Capital LLC*, 864 F.3d at 619 (quotation marks omitted).

More precisely, plaintiffs' core complaint—that their grant agreements were improperly terminated, A381 (APHA); A463 (States)—self-evidently arises from the grant agreements. The same holds true for the reversal of those grant terminations, which is the relief plaintiffs sought and received from the district court. A73-74 (States); A75-76 (APHA). Like "many . . . federal grant programs," these grant agreements take the form of contracts. *See Bennett v. New Jersey*, 470 U.S. 632, 638

(1985); *see also Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) (treating "federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound"). Plaintiffs' challenge to the grant terminations is thus, at its essence, contractual. Such a case is not a challenge to some regulatory action with monetary implications, but rather a suit for "past due sums" from the government that the Tucker Act "impliedly forbids" bringing in federal district court under the APA. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002). Were it otherwise, virtually any contract dispute with the government could be repackaged as an APA claim simply by reframing the relief requested. As the D.C. Circuit has cautioned, "[i]t is hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency error subject to review under the APA." *Megapulse*, 672 F.2d at 967 n.34 (alteration and quotation marks omitted)

As the Supreme Court's stay order makes clear, this Court's stay order misapplied these principles. That order reasoned that the district court had jurisdiction because plaintiffs' claims were analogous to those in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), since both sought only "declaratory relief that is well within the scope of the APA." *American Pub. Health Ass'n v. NIH*, 145 F.4th 39, 50 (1st Cir. 2025). But the analogy fails. *Bowen* did not involve a contract claim and did not address the APA provision in 5 U.S.C. § 702 that bars suits "expressly or impliedly forbid[den]" by another statute. *See Great-West*, 534 U.S. at 212, 215 (emphasizing that

Bowen "did not involve a claim for" breach of contract or any "contractual obligation").

Instead, Bowen turned on two different provisions: 5 U.S.C. § 702's bar on claims for "money damages," and 5 U.S.C. § 704's requirement that APA review is available only when "no other adequate remedy in a court" exists. The Court held that a State's claim for adjusted Medicaid reimbursement rates was not one for "money damages" merely because it would result in the payment of money, *Bowen*, 487 U.S. at 891-901, and that a Tucker Act suit was not an "adequate remedy" that foreclosed APA review, *id.* at 901-08. But nothing in *Bowen* addressed § 702's distinct prohibition on suits foreclosed by other statutes—the operative issue here.

3. The district court lacked jurisdiction to review the grant terminations, and its judgment must therefore be vacated for that reason. In light of that threshold defect, there is no basis for this Court to address any of the remaining issues concerning the terminations. But even if this Court were to reach the merits, reversal would still be required. The grant terminations, for the same reasons as the guidance that informed those decisions, are committed to agency discretion by law and neither arbitrary nor capricious. *See infra* Part II.D.

## II. The District Court's Judgment Regarding Grant Guidance Should Be Vacated

In addition to reversing certain grant terminations, the district court also purported to vacate seven pieces of guidance outlining NIH's grant priorities. A73

n.1; A76-77.  The Supreme Court's stay decision did not endorse that aspect of the decision; it held only that the vacatur did not necessarily fall within the exclusive jurisdiction of the Court of Federal Claims.  *NIH*, 145 S. Ct. at 2661.  Indeed, Justice Barrett's controlling concurrence made clear that the government could raise other challenges to the vacatur in this Court and expressed skepticism that the guidance constituted final agency action.  *Id.* at 2662 (Barrett, J., concurring in the partial grant of the application for stay).  But this Court should not reach the issues left open by the Supreme Court because the challenge is now moot: NIH has since updated its grant priorities guidance, including revisions directly addressing the concerns that troubled the court.

Other threshold defects also abound.  Plaintiffs lack standing to challenge the directives, as they faced no cognizable injury.  Moreover, the directives are nonbinding guidance, not final agency action reviewable under the APA.  The district court sidestepped these threshold issues by considering the guidance and the grant terminations as part of a "wholesale effort to excise grants."  A155.  That approach is untenable; as explained above, this Court lacks jurisdiction over the grant terminations.  *See supra* Part I.  Finally, the guidance was not unlawful; rather, it reflected a change in policy, and NIH adequately identified, explained, and pursued new funding priorities.

## A.    Challenges to the Grant Guidance Are Moot

The guidance vacated by the district court has since been superseded, and plaintiffs' challenge no longer presents a live controversy.  Although the court nominally referred to seven separate pieces of guidance, A73 n.1; A76-77, it never analyzed them individually.  The court dismissed that approach as only "superficially appealing," A155, and elected instead to treat the guidance "as a whole," A154.  Indeed, the court conflated the guidance with the grant terminations into a single, "wholesale effort to excise grants."  A155.  That framing was problematic for several reasons, including obscuring the fact that plaintiffs could not challenge the grant guidance in isolation.  *See infra* Part II.B-C.  But relevant here, the "whole" of NIH's grant priorities guidance is materially different from what the court reviewed, confirming that no live dispute remains for this Court to resolve.

Since the district court's judgment, NIH has issued updated guidance to which agency officials now refer in making grant decisions.  Some of the guidance documents at issue here have been formally rescinded or superseded.  A568 ("This staff guidance rescinds the guidance provided in the February 13, 2025 . . . ."); A598 (directing staff to "save this guidance until we can clear the updated staff guidance").  And the rest have been effectively overridden or explicated such that the shortcomings that the court perceived in the scheme of guidance as a whole—as noted, the court did not analyze each guidance individually in any event—are plainly no longer an issue.

24

For example, the district court's analysis rested on its view that the prior guidance lacked operative definitions of key terms, such as "DEI," thereby rendering the agency's standards arbitrary.  A165-166.  That concern was addressed by updated guidance issued by the NIH Director on August 15, 2025.  NIH Director Statement.  The new guidance specifies that NIH will support research considering race or ethnicity only when "scientifically justified," such as studies of the measurable health effects of redlining and housing discrimination.  *Id.*  Conversely, NIH will not support projects based on "broad or subjective claims," such as attributing health disparities to poorly measured concepts like systemic racism.  *Id.*  By delineating the scope of permissible research, the updated guidance addresses the very deficiency the court identified.

The revised guidance likewise addresses the district court's concerns about research on "gender identity."  *See* A170.  There, the court faulted the agency for failing to provide evidentiary support for its assessment that "research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans."  *Id.* (emphases and quotation marks omitted).  The updated guidance directly addresses that critique, explaining that studies involving puberty suppression, hormone therapy, or surgical interventions in minors lack a sufficient evidentiary basis and citing a recent literature review.  NIH Director Statement (citing HHS, *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, *supra*.)

Because NIH has superseded the guidance on which the district court relied, plaintiffs' challenge is moot. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Nor can plaintiffs show that they "may be parties to the same sort of dispute in the future." *Missouri ex rel. Nixon v. Craig*, 163 F.3d 482, 485 (8th Cir. 1998) (alteration and quotation marks omitted). "To qualify for this exception," the future conduct must be "sufficiently similar to the past conduct such that it is permissible to say that the challenged conduct continues." *Corrigan v. Boston Univ.*, 98 F.4th 346, 353 (1st Cir. 2024) (alteration and quotation marks omitted). NIH's current grant priorities guidance is materially different from the version considered by the court, and any new challenge would therefore raise an entirely distinct dispute.

Accordingly, this court should vacate the district court's decision on the guidance. *McLane v. Mercedes-Benz of N. Am.*, 3 F.3d 522, 524 n.6 (1st Cir. 1993) ("As a general rule, when a case becomes moot on appeal, we vacate the district court's decision and remand with a direction to dismiss."). Although it was NIH's actions that mooted plaintiffs' challenge, the "conditions and circumstances" of this case warrant vacatur. *See Milk Indus. Regul. Off. v. Ruiz*, 83 F.4th 68, 77 (1st Cir. 2023) (per curiam). The court's imprecision in treating all guidance "as a whole," A154, creates uncertainty as to whether its judgment might be read to restrict reliance on the amended guidance to the extent it incorporates the original. There is no basis to impose that result, particularly because there is no reason to believe NIH would revert to the less-detailed guidance that the court found unlawful. Moreover, the court

never separately determined that vacatur of the guidance was appropriate; rather, it erroneously lumped the guidance together with grant terminations over which it lacked jurisdiction. A164 (referring to a unitary "grant-termination action"). Under these circumstances, the court's judgment should be vacated in relevant part.

### B. Plaintiffs Lack Standing to Challenge the Grant Guidance Because Their Only Injury Is the Grant Terminations

1. Plaintiffs lacked Article III standing to mount a challenge to NIH's grant guidance apart from the grant terminations even at the time they filed their complaint. To establish standing, plaintiffs have the burden to demonstrate (1) that they suffered an injury (2) "fairly traceable to the defendant's allegedly unlawful conduct" and (3) "likely to be redressed by the requested relief." *California v. Texas*, 593 U.S. 659, 669 (2021) (quotation marks omitted). That injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation marks omitted); *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 26-27 (1st Cir. 2007) ("An injury in fact is an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." (quotation marks omitted)).

The related doctrine of ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *National Park Hosp. Ass'n v. Department of the Interior*, 538 U.S. 803, 807 (2003)

(quotation marks omitted).  A claim is unripe for judicial review if it depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam) (*quoting Texas v. United States*, 523 U.S. 296, 300 (1998)).  The Supreme Court has repeatedly held that challenges to intra-governmental directives are not ripe because such a directive, by itself, "does not affect [anyone]'s primary conduct."  *National Park*, 538 U.S. at 810; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998); *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58-61 (1993).  It is, moreover, "too speculative whether the problem [plaintiffs] present[] will ever need solving."  *Texas*, 523 U.S. at 302.  Once divorced from the grant terminations, plaintiffs' challenges to internal NIH guidance on grant priorities raises both standing and ripeness concerns.

The only harm plaintiffs alleged relevant to the phase of the trial that produced the challenged order—claims regarding NIH's alleged delays in awarding new grants having been reserved for "Phase Two," A81—arose from the termination of existing grants.  The State plaintiffs, for example, complained of the "termination of millions of dollars (and counting) in grants already issued to plaintiffs' public institutions." A463.  Likewise, APHA plaintiffs claim they "bring this case because they have been harmed by Defendant's unlawful grant terminations," A381, and are thus "facing the loss of jobs, staff, and income," A384.  And the "concrete injury" APHA claimed gave it standing was the "termination of Plaintiffs' and Members' Project-based and Pipeline Grants."  A309 (Dkt. No. 41 at 13); *see also* A315 (Dkt. No. 79 at 2 (arguing

that "NIH's grant cancellations are causing layoffs and reduced hours and training opportunities among [United Automobile, Aerospace and Agricultural Implement Workers] members")).

Consistent with that understanding, plaintiffs each brought a single arbitrary-and-capricious claim aimed at NIH's guidance and the grant terminations together, on the theory that the guidance led to the termination of their grants (or those of their instrumentalities or members). A443-447 (APHA); A533-535 (States). Thus, apart from the claims of delay reserved for later proceedings, the only injury plaintiffs ever alleged was the termination of grants.

The district court's order reflected the same understanding. In finding a violation of the APA, it faulted the "abruptness in the robotic rollout of this grant termination action." A164 (quotation marks omitted). The guidance itself was, in the court's words, merely the "paper trail" of NIH's broader effort to cancel grants. *Id.* at 78. Accordingly, the court's order did not merely vacate the guidance but also separately reversed the grant terminations. A73-74 (States); A75-77 (APHA). As Justice Barrett explained, "[i]f one simply flowed from the other, the [d]istrict [c]ourt would have needed only" to enjoin the challenged provisions. *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring in the partial grant of the application for stay). The court itself also recognized that the real consequence of its order was the "forthwith [] disbursement of funds both appropriated by the Congress of the United States and allocated heretofore by the defendant agencies." A265. It further denied a stay

29

pending appeal out of concern that funds would be "sequester[ed] (probably forever) during the course of the appeal." A186. As Justice Gorsuch observed, the "alleged legal wrong the district court sought to remedy was the government's failure to pay promised grants." *NIH*, 145 S. Ct. at 2664 n.1 (Gorsuch, J., joined by Kavanaugh, J., concurring in part and dissenting in part). And Justice Jackson agreed, observing that plaintiffs' "injury and right to payment actually stem from the Government's allegedly arbitrary and capricious termination of their grant funding in violation of the APA." *Id.* at 2673 n.2 (Jackson, J. concurring in part and dissenting in part) (emphasis omitted). The grant terminations were thus always the core of this case.

2. Once the challenges to the grant terminations are set aside, no injury remains with respect to NIH's grant-priorities guidance. Nothing in the guidance prohibits or otherwise restricts plaintiffs' ability to research any topic. The only conceivable effect on plaintiffs is the theoretical possibility that NIH might terminate additional grants in the future. But any such injury would be traceable to the subsequent application of guidance to a particular grant, not the guidance. In any event, plaintiffs never allege that this possibility is anything more than speculation. A384 (asserting only that plaintiffs "with grants that have yet to be cancelled wonder if they are soon to receive another vague, boilerplate termination letter"); *see NIH*, 145 S. Ct. at 2665 n.2 (Gorsuch, J., joined by Kavanaugh, J., concurring in part and dissenting in part) ("The only injury that gave respondents standing to obtain that relief was the termination of pre-existing grants. . . . So all claims on which the

30

district court rendered judgment were 'based on' respondents' contracts with the government, and those judgments were thus entered without jurisdiction." (citations omitted)). If plaintiffs believe that a future termination is unlawful, they can challenge it in a concrete factual setting in the appropriate forum. But they cannot establish Article III standing "simply by claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part." *Clapper*, 568 U.S. at 419; *see also Laird v. Tatum*, 408 U.S. 1, 11 (1972) (The plaintiff alleging chilling effect lacks standing where government policy is not "regulatory, proscriptive, or compulsory in nature.").

The absence of any concrete harm from NIH's grant-priorities guidance is evident from the district court's reasoning. The court faulted the guidance precisely because it lacked definitions for the disfavored research areas, such as DEI or "gender identity." A164-171. In the court's view, "[r]eliance on an undefined term of DEI (or any other category) is arbitrary and capricious because it allows the [agency] to arrive at whatever conclusion it wishes without adequately explaining the standard on which its decision is based." A166 (quotation marks omitted). But if the guidance supplied no operative standards, then it could not have dictated which grants were terminated and thus could not have caused any injury. Plaintiffs accordingly lack standing to challenge the grant priorities guidance as an independent matter.

### C.     The Grant Guidance Is Not Final Agency Action

1.  NIH's grant priorities guidance is not final agency action reviewable under the APA.  The APA authorizes review only of "final agency action."  5 U.S.C. § 704. To qualify as "final," agency action must satisfy two conditions: (1) it must "mark the consummation of the agency's decision-making process," and (2) it must be an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).  NIH's guidance meets neither requirement. *NIH*, 145 S. Ct. at 2662 (Barrett, J., concurring in the partial grant of the application for stay) ("It is not obvious, for instance, that NIH's guidance is final agency action.").

First, the grant guidance marked only the commencement, not the consummation, of the agency's decision-making process.  The guidance merely instructed NIH staff to review existing grants for consistency with administration priorities, with the possibility that some might later be terminated.  For example, the February 10, 2025, directive ordered "a review of the overall contracts and grants to determine whether those contracts or grants are . . . consistent with current policy priorities," and noted that "after review," "such contracts may be terminated."  A563. That was also what the Acting NIH Director ordered.  A559 ("NIH personnel shall conduct an internal review . . . .").  Accordingly, the March 25, 2025, guidance instructed NIH institutes and centers to "review the specific aims/major goals of the project to assess whether the proposed project contains any DEI, gender identity or

other research activities that are not an NIH/HHS priority/authority." A600-606.

Consistent with this, NIH's chief grants official testified that staff were expected to

rely on their "scientific background" and program knowledge "to identify DEI

activities." A104 n.8. Unlike guidance that constitutes the agency's last word, *see*

*Sackett v. EPA*, 566 U.S. 120, 127 (2012) (finding final agency action where a

compliance order was "not subject to further Agency review"), NIH's guidance only

started a decision-making process.

　　Second, the guidance did not determine any rights or obligations or impose any

independent legal consequences. It did not prohibit plaintiffs from conducting any

research they wished. Nor did it terminate any grants or otherwise inflict injury on

plaintiffs. *See supra* Part I.B. Indeed, under the district court's view, the guidance

failed to provide any direction at all and was "untethered to anything." A170-171.

The guidance was thus a "preliminary step[,] . . . leading toward the possibility of a

final action in the form of an enforcement or other action." *Harper*, 118 F.4th at 116

(quoting *University of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 69 (3d Cir.

2003)). As this Court has made clear, such "investigatory measures are not final

agency action" because they are "tentative or interlocutory in nature." *Id.* (quotation

marks omitted).

　　2. The district court's analysis underscores that the guidance documents,

standing alone, are not final agency action. The court treated the guidance together

with the grant terminations, explaining that it did not consider the guidance "in

isolation," but only in the "context of a wholesale effort to excise grants in 8 categories over a period of less than 90 days." A155. In that context, the court expressly viewed the guidance as the "paper trail" for the terminations. *Id.* If the guidance was only the justification for other agency decisions, it cannot also be final agency action carrying independent and binding legal effect.

Other aspects of the district court's analysis drive the point home. The court faulted the guidance for permitting the agency "to arrive at whatever conclusion it wishes . . . ." A166. That reasoning confirms that the guidance itself did not establish "rights or obligations" or produce "legal consequences," as required for reviewable final agency action. *Harper*, 118 F.4th at 116 (quotation marks omitted). The notion that the guidance could be treated as final action is particularly untenable here since the court lacked jurisdiction over the only agency actions—the grant terminations—that indisputably carried legal consequences. *See supra* Part I.

### D.    The Grant Guidance Is Lawful

Even if NIH's grant priorities guidance were independently reviewable, it is lawful. The guidance—like the underlying funding decisions it informs—is "committed to agency discretion by law" and not subject to APA review. 5 U.S.C. § 701(a)(2). And even were APA review appropriate, the guidance was manifestly proper under settled APA precedents.

### i.  The Grant Guidance Is Committed To Agency Discretion by Law

1. Consistent with the "'basic presumption of judicial review,'" the APA "instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Department of Com. v. New York*, 588 U.S. 752, 771 (2019) (first quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967); and then quoting 5 U.S.C. § 706(2)(A)).  But that presumption comes with a key caveat:  The APA does not apply when agency action is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  That exception applies when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

One paradigmatic decision "traditionally regarded as committed to agency discretion" is "[t]he allocation of funds from a lump-sum appropriation."  *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).  "After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.*  Lump-sum appropriations thus leave it to the agency to decide how "'resources are best spent'" and "whether a particular program 'best fits the agency's overall policies.'"  *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831).  While Congress may set outer guardrails on "permissible statutory objectives," courts have "no leave to intrude" so long as agencies adhere to those limits in allocating funding.  *Id.*

35

The grant guidance here falls squarely in that exception as it applies to the allocation of funds from lump-sum appropriations. *See* p. 3, *supra*. The relevant statutory limitations extend only to defining broad categories of eligible recipients, *e.g.*, 42 U.S.C. § 241(a)(3) ("universities, hospitals, laboratories, and other public or private institutions"), and requiring that each national research institute spend the money on its assigned topic, like "cancer" or "neurological disorders and stroke," *e.g.*, Pub. L. No. 118-47, 138 Stat. at 656. That level of discretion makes sense given that NIH receives five times as many proposals as it could possibly fund. NIH, *Grants & Funding, supra*. Congress did not decide for itself which studies on "dental and craniofacial diseases" warrant federal support, instead delegating that decision to the unreviewable discretion of the National Institute of Dental and Craniofacial Research. Pub. L. No. 118-47, 138 Stat. at 656. "[T]he 'agency is far better equipped than the courts to deal with the many variables involved in'" prioritizing competing scientific grant applications. *See Lincoln*, 508 U.S. at 193 (quoting *Heckler*, 470 U.S. at 831-32).

2. This Court previously reasoned that NIH's grant funding decisions were not committed to agency discretion because of the "statutory provisions that direct NIH to prioritize or to consider certain research objectives" and regulations providing "an exclusive list of reasons that NIH can unilaterally terminate grants." *American Pub. Health Ass'n*, 145 F.4th at 53. But those provisions could, at most, support claims that specific conditions were not satisfied. What those provisions do not support is an

36

unbounded arbitrary-and-capricious review of NIH's discretionary funding judgments in which the district court engaged.

That conclusion follows directly from *Lincoln*, 508 U.S. 182, where Congress identified broad "permissible statutory objectives" and the Court held that, within those objectives, the agency retained unreviewable discretion to allocate lump-sum appropriations. *Id.* at 193. The same is true here. The district court expressly declined to find any departure from Congress's statutory directives. A178-179 (refusing to "dive into the contours of the statutory overlap"). And the only statutory provision the court did address—the requirement that NIH maintain a sexennial strategic plan under 42 U.S.C. § 282(m)—it found satisfied. *Id.* Thus, NIH operated squarely within the statutory framework and its guidance on which grants to fund is an area into which "§ 701(a)(2) gives the courts no leave to intrude." *Lincoln*, 508 U.S. at 193.

In any event, none of the statutes or regulations invoked by this Court, the district court, or plaintiffs are inconsistent with the guidance. *American Pub. Health Ass'n*, 145 F.4th at 53. The cited statutes only set forth broad programmatic objectives: to disaggregate data by race, sex, and age, 42 U.S.C. § 282(b)(4)(B); to support "basic research" on "pathogens of pandemic concern," *id.* § 285f-5(b)(1); to "develop affordable new and improved vaccines," *id.* § 283d; and, "as appropriate," to encourage research on "sexual and gender minority populations," *id.* § 283p. Similarly, the cited regulation provides only that grant "may be terminated . . . for

37

cause." 45 C.F.R. § 75.372(a)(2). That regulation does not purport to displace NIH's broader termination authority under other regulations, such as 2 C.F.R. § 200.340(a)(4), or to preclude NIH from treating inconsistency with agency priorities as "cause." Those provisions might support judicial review if the guidance directed NIH to not fund any grants on a research institute's assigned topic or to award them to entities flatly ineligible under statute or regulation, but that is not this case. *See Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.*, No. 25-298, 2025 U.S. Dist. LEXIS 127513, at *45 (D.D.C. July 6, 2025) (holding that an agency "has discretion to discontinue its use of the earmarked funds for that specific program" where "no statute or regulation" required continued funding).

### ii.    The Grant Guidance Was Not Arbitrary and Capricious

Even were APA review appropriate, the grant priorities guidance was manifestly proper under settled APA precedents. *See NIH*, 145 S. Ct. at 2665 (Kavanaugh, J., concurring in part and dissenting in part) (observing that "plaintiffs are unlikely to succeed on the merits of their arbitrary and capricious challenge to the guidance").

1. Under the APA, courts set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary-and-capricious "standard is deferential." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The court's only role is to "ensure[] that the

agency has acted within a zone of reasonableness," taking care not to "substitute its own policy judgment for that of the agency." *Id.* So long as the agency action "is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute," the action will be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

The guidance here fell well within that wide band of reasonableness. The Acting Secretary explained that DEI initiatives—which focus on specific groups—"are inconsistent with the Department's policy of improving the health and well-being of *all* Americans." A563 (emphasis added). And the Acting NIH Director explained, "based on [his] expertise and experience," that DEI and gender-identities studies are "low-value and off-mission." A558. He added that the categories underlying DEI can be "artificial and non-scientific" and, at worst, may be "used to support unlawful discrimination on the basis of race and other protected characteristics." *Id.* He further reasoned that gender-identity research does "nothing to enhance the health of many Americans" and ignores "biological realities." *Id.*

Those decisions reflect quintessential policy judgments on hotly contested issues that should not be subject to judicial second-guessing. It is not irrational for agencies to conclude that paeans to "diversity" often conceal invidious racial discrimination. *E.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 258 (2023) (Thomas, J., concurring). And transgender issues are "an evolving field" involving "fierce scientific and policy debates." *United States v. Skrmetti,*

145 S. Ct. 1816, 1837 (2025). The Executive Branch was entitled to take a side on those questions in line with the President's policy pronouncements and clearly articulated disagreement with his predecessor's approach. Exec. Order No. 14,151, § 1, 90 Fed. Reg. at 8339; Exec. Order No. 14,168, § 7, 90 Fed. Reg. at 8617-18.

The guidance reasonably implemented those democratically accountable policy decisions. The guidance described the Administration's general priorities on research funding and instructed implementation on a grant-by-grant basis. A558-559, A651-680. The guidance contemplated that NIH staff would use their "scientific background" and knowledge of "their programs" to identify problematic grants. A104 n.8. Once problematic grants were identified, the guidance directed staff to work with grant recipients to excise impermissible grant terms wherever possible. A127-128. But where the grant solely funded initiatives inconsistent with the agency's stated priorities, the guidance provided that the affected grant recipient would be sent a letter explaining why NIH had chosen not to prioritize that research. A124-125. If any grantee disagreed, the termination notice explained how to pursue an administrative appeal. A125. Such "reasonabl[e] expla[nations]" for the agency's decision are exemplars of *permissible* agency decision-making. *Prometheus Radio*, 592 U.S. at 423.

2. The district court's principal objection was that NIH had not defined "DEI" or provided evidentiary support for its judgments. A164-173. But the APA does not require agencies to define every term in internal guidance, particularly where

the guidance directs highly discretionary judgments about allocating limited resources. Nor does the APA impose a "general obligation on agencies to conduct or commission their own empirical or statistical studies." *Prometheus Radio*, 592 U.S. at 423. Indeed, when another district court declared the President's direction to terminate "equity-related" grants impermissibly vague, the court of appeals stayed that preliminary injunction. *National Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 277-80 (D. Md.), *stay granted*, No. 25-1189 (4th Cir. Mar. 14, 2025). When the government provides "selective subsidies," which frequently rely on subjective criteria, perfect "clarity" "is not always feasible." *National Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). In any event, plaintiffs seem to know what "DEI" is. *E.g.*, Cal. Gov't Operations Agency, *Diversity, Equity and Inclusion*, https://perma.cc/JR3N-YR82; Comm. on Health Equity, APHA, *Equity Diversity & Inclusion Survey* (Oct. 2021), https://perma.cc/3UFG-JTPE.

The district court also cast aspersions on having "partisan appointed public officials" help draft termination letters and identify grants inconsistent with the Administration's priorities. A166. But none of that has anything to do with the guidance. In any event, courts may not set aside agency action under the APA just "because it might have been influenced by political considerations or prompted by an Administration's priorities." *Department of Com.*, 588 U.S. at 781. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020). It is entirely appropriate that politically

accountable officials shift an agency's priorities after a change in Administration to reflect the new President's policy priorities. That the court treated shifting policy preferences and the involvement of political appointees as evidence of an APA violation is itself a ground for reversal.

Lumping the guidance and the grant terminations together, the district court also criticized NIH's use of "boilerplate language" in termination letters. A128, A130, A168. But that actually supports, rather than undermines, the agency's compliance with the APA because it demonstrates that NIH treated like cases alike. *See National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act."); *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1242 (D.C. Cir. 2023) ("It is a fundamental principle of administrative law that agencies must treat like cases alike."). The APA does not require agencies to gratuitously alter verbiage when implementing a uniform policy across multiple cases.

Lastly, this Court opined that the government insufficiently considered grantees' reliance interests. *American Pub. Health Ass'n*, 145 F.4th at 54. But the guidance invited grantees to request transition funds "to support an orderly phaseout of the project," mitigating any reliance concerns. A652. Moreover, there is no valid basis for a claim for reliance interests. The grant contracts authorize termination when "an award no longer effectuates the program goals or agency priorities." 2

C.F.R. § 200.340(a)(4).  Grantees can hardly claim unfair surprise that the agency's priorities changed with a new Administration.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

DANIEL TENNY

*s/*
BENJAMIN C. WEI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7235*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-2875*
  *benjamin.c.wei@usdoj.gov*

September 2025

43

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10567 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

_s/_____
Benjamin C. Wei

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/*
_____
Benjamin C. Wei

**ADDENDUM**

# TABLE OF CONTENTS

Memorandum and Order on
Subject Matter Jurisdiction (25-cv-10814 Dkt. No. 105)...................................A1

Memorandum and Order on
Motion to Dismiss (25-cv-10787 Dkt No. 84)..................................................A29

Partial Final Judgment 25-cv-10814
(25-cv-10814 Dkt. No.151).................................................................................A73

Partial Final Judgment 25-cv-10787
(25-cv-10787 Dkt. No. 138)................................................................................A75

Findings of Fact, Rulings of Law, and
Order for Partial Separate and Final Judgment
(25-cv-10787 Dkt. No. 151) (25-cv-10814 Dkt. No. 163)...............................A78

Order Denying Motion to Stay Pending Appeal
(25-cv-10787 Dkt. No. 147) (25-cv-10814 Dkt. No. 160)............................A181

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF MARYLAND; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; and STATE OF WISCONSIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
|                         Plaintiffs, | ) ) ) | CIVIL ACTION NO. 25-10814-WGY |
|                         v. | ) |  |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JAYANTA BHATTACHARYA, in his official capacity as Director of the National Institutes of Health; NATIONAL INSTITUTES OF HEALTH; NATIONAL CANCER INSTITUTE; NATIONAL EYE INSTITUTE; NATIONAL HEART, LUNG, AND BLOOD INSTITUTE; NATIONAL HUMAN GENOME RESEARCH INSTITUTE; NATIONAL INSTITUTE ON AGING; NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM; NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES; NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES; NATIONAL INSTITUTE OF BIOMEDICAL IMAGING AND BIOENGINEERING; EUNICE KENNEDY SHRIVER NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |

A0001

DEVELOPMENT; NATIONAL INSTITUTE            )
ON DEAFNESS AND OTHER                      )
COMMUNICATION DISORDERS;                   )
NATIONAL INSTITUTE OF DENTAL               )
AND CRANIOFACIAL RESEARCH;                 )
NATIONAL INSTITUTE OF DIABETES             )
AND DIGESTIVE AND KIDNEY                   )
DISEASES; NATIONAL INSTITUTE               )
ON DRUG ABUSE; NATIONAL                    )
INSTITUTE OF ENVIRONMENTAL                 )
HEALTH SCIENCES; NATIONAL                  )
INSTITUTE OF GENERAL MEDICAL               )
SCIENCES; NATIONAL INSTITUTE OF            )
MENTAL HEALTH; NATIONAL INSTITUTE          )
ON MINORITY HEALTH AND HEALTH              )
DISPARITIES; NATIONAL INSTITUTE            )
OF NEUROLOGICAL DISORDERS AND              )
STROKE; NATIONAL INSTITUTE OF              )
NURSING RESEARCH; NATIONAL LIBRARY         )
OF MEDICINE; NATIONAL CENTER FOR           )
ADVANCING TRANSLATIONAL SCIENCES;          )
JOHN E. FOGARTY INTERNATIONAL              )
CENTER FOR ADVANCED STUDY                  )
IN THE HEALTH SCIENCES; NATIONAL           )
CENTER FOR COMPLEMENTARY AND               )
INTEGRATIVE HEALTH; and CENTER             )
FOR SCIENTIFIC REVIEW,                     )
                                           )
                    Defendants.            )
_____  )


YOUNG, D.J.                                    May 12, 2025


## MEMORANDUM AND ORDER
## ON SUBJECT MATTER JURISDICTION

For the reasons stated below, after a full hearing and
carefully considering the parties' submissions and arguments,
the Court rules that it has subject matter jurisdiction over
this action and, as is its duty, exercises that jurisdiction.

[2]

A0002

A case management conference is set for **Tuesday, May 13, 2025 at 2:00 p.m.**

I.   **BACKGROUND**

A.   **Factual Allegations and Relief Sought in the Amended Complaint**

In this civil action, the Commonwealth of Massachusetts along with 15 other States[1] (referred to collectively as "the States", sue the Secretary of Health & Human Services, the Director of the National Institutes of Health ("NIH"), and several of those federal institutes and centers[2] (referred to

_____

[1] In addition to the Commonwealth of Massachusetts, the State of California, the State of Maryland, the State of Washington, the State of Arizona, the State of Colorado, the State of Delaware, the State of Hawai'i, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico; the State of New York, the State of Oregon, the State of Rhode Island; and the State of Wisconsin join as plaintiffs.

[2] Those institutes and centers are: the National Cancer Institute, the National Eye Institute, the National Heart, Lung, and Blood Institute, the National Human Genome Research Institute, the National Institute on Aging, the National Institute on Alcohol Abuse and Alcoholism, the National Institute of Allergy and Infectious Diseases, the National Institute of Arthritis and Musculoskeletal and Skin Diseases, the National Institute of Biomedical Imaging and Bioengineering, the Eunice Kennedy Shriver National Institute of Child Health and Human Development, the National Institute on Deafness and Other Communication Disorders, the National Institute of Dental and Craniofacial Research, the National Institute of Diabetes and Digestive and Kidney Diseases, the National Institute on Drug Abuse; the National Institute of Environmental Health Sciences, the National Institute of General Medical Sciences, the National Institute of Mental Health, the National Institute on Minority Health and Health Disparities, the National Institute of Neurological Disorders and Stroke, the National Institute of Nursing Research, the National Library of Medicine, the National Center for Advancing Translational Sciences, the

[3]

A0003

collectively as "the Public Officials") because all act through those persons in their official capacities. Broadly, the States claim that "[s]ince his inauguration, . . . the President has issued a barrage of executive orders prohibiting federal agencies from supporting any initiatives with a perceived nexus to certain subjects he opposes, such as 'DEI' and 'gender ideology'." Am. Compl. ¶ 4, ECF No. 75. The States allege that the Public Officials "have adopted a series of directives [("the Challenged Directives")] that curtail NIH's support for previously advertised funding opportunities and previously awarded grants relating to these and other blacklisted topics." Id.

The States claim that the Public Officials Challenged Directives and actions, including grant terminations ("Terminated Grants"), violate various sections of the Administrative Procedure Act (Counts 1 - 3, 7), violate the separation of powers of the three co-equal branches of government under the Constitution (Count 4), violate the Constitution's Spending Clause (Count 5), and constitute ultra vires Executive Branch action in excess of Constitutional and statutory authority (Count 6).

---

John E. Fogarty International Center for Advanced Study in the Health Sciences, the National Center for Complementary and Integrative Health, and the Center for Scientific Review.

[4]

The States seek the following relief:[3]

1. an order under the APA "holding unlawful and setting aside the Challenged Directives, and any action taken to enforce or implement the Challenged Directives, on the ground that they are (a) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and/or otherwise not in accordance with governing statutes; (b) not in accordance with governing regulations; and (c) arbitrary and capricious;"

2. a declaration "that the Challenged Directives, and any action taken to enforce or implement the Challenged Directives, are unconstitutional because they violate (a) the separation of powers and (b) the Spending Clause;"

3. issuance of "a preliminary and permanent injunction barring defendants from carrying out the Challenged Directives and any actions to enforce or implement the Challenged Directives, including, without limitation, by directing defendants to: (a) reissue Notices of Funding Opportunities (NOFOs) withdrawn based on the Challenged Directives and to refrain from withdrawing NOFOs based on the Challenged Directives; (b) refrain from denying grant applications or renewal applications based on the Challenged Directives; (c) release reimbursements and other funding for awards that defendants have refused to pay based on the Challenged Directives; (d) rescind the termination of the Terminated Grants and refrain from eliminating funding for awards based on the Challenged Directives; and (e) promptly reschedule and conduct all necessary steps in the review and disposition of plaintiffs' grant applications, including the Delayed Applications and Delayed Renewals;"

4. "an order pursuant to under the APA compelling defendants to undertake: (a) the required unreasonably delayed and unlawfully withheld activities of NIH's advisory councils and study sections, and (b) the required unreasonably delayed and unlawfully withheld prompt review and issuance of a final decision on the Delayed Applications and Delayed Renewals;" and

5.   a declaration "that 2 C.F.R. §200.340(a)(2) (2020) and

---

[3] As a sixth request for relief the States seek catch-all, unspecified "additional relief as interests of justice may require"

[5]

C.F.R. §200.340(a)(4) (2024) do not independently permit or authorize termination of awarded grants based on agency priorities identified after the time of the Federal award."

Am. Compl. 88-89.

### B. Procedural History

On April 14, 2025, the States filed their Amended Complaint, Am. Compl., and Motion for Preliminary Injunction, supported by a memorandum of law. Pls.' Mot. Prelim. Inj., ECF No. 76; Mem. Law. Supp. Pls' Mot. Prelim. Inj. ("Pls.' Mem."), ECF No. 78. The motion is fully briefed. Defs.' Opp'n Pls.' Mot. Prelim. Inj. ("Opp'n"), ECF No. 95; Pls.' Reply Supp. Pls.' Mot. Prelim. Inj. ("Reply"), ECF No. 101.[4]

This action was randomly reassigned to this Session of the Court on May 1, 2025. Elec. Notice Reassignment, ECF No. 99. The Court rescheduled the hearing on the preliminary injunction from May 9, 2025 to May 8, 2025. Elec. Notice Hrg., ECF No. 100.

At the hearing, the Public Officials claimed that most of the case must properly be brought before the Court of Federal

---

[4] The Court also received a submission, ECF No. 86, from amici: the Association of American Medical Colleges, the American Association of State Colleges And Universities, the American Council on Education, the Association of American Universities, The Association Of Governing Boards of Universities And Colleges, the Association of Public and Land-Grant Universities, COGR, and the National Association of Independent Colleges and Universities. The Court is grateful for this helpful submission.

[6]

Claims and the remainder was no longer amenable to adjudication. The Court heard argument on the matter and took it under advisement. This opinion sets forth this Court's reasoning.

## II. ANALYSIS

### A. Standard of Review

"Federal courts . . . are courts of limited jurisdiction." Royal Canin U. S. A., Inc. v. Wullschleger, 604 U.S. 22, 26 (2025) (quoting Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994)). This Court's jurisdiction is "[l]imited first by the Constitution," and also "by statute." Id. Through statute, "Congress determines, through its grants of jurisdiction, which suits those courts can resolve." Id. This Court must therefore satisfy itself as to its subject matter jurisdiction over an action. Calamar Constr. Services, Inc. v. Mashpee Wampanoag Village LP, 749 F. Supp. 3d 241, 242–43 (D. Mass. 2024) (citing McCulloch v. Velez, 364 F.3d 1, 5 (1st Cir. 2004) ("It is black-letter law that a federal court has an obligation to inquire sua sponte into its own subject matter jurisdiction.")); see Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Of course, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995) (quoting Taber Partners, I v.

[7]

A0008

Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993)).  Once
jurisdiction is established, however, this Court has a
"'virtually unflagging obligation' to exercise federal
jurisdiction." AUI Partners LLC v. State Energy Partners LLC,
742 F. Supp. 3d 28, 41 (D. Mass. 2024) (quoting Colorado River
Water Conservation Dist. v. U.S., 424 U.S. 800, 817 (1976)).

### B. This Court Has Subject Matter Jurisdiction

#### 1. The Tucker Act

Speaking of the Supreme Court, Justice Robert Jackson
famously said, "We are not final because we are infallible, but
we are infallible only because we are final." Brown v. Allen,
344 U.S. 443, 540 (1953) (Jackson, J., concurring).  As always,
the determinations of the Supreme Court matter, only here the
most relevant Supreme Court determination is **not** final (at least
not yet) -- and therein lies the problem.  Because the Supreme
Court, on a 5-4 vote, has seen fit to enter an emergency
interlocutory order in a somewhat similar case, its language
provides guidance in other cases but without full precedential
force.

So it is that this Court, after careful reflection, finds
itself in the somewhat awkward position of agreeing with the
Supreme Court dissenters and considering itself bound by the
still authoritative decision of the Court of Appeals of the

[8]

First Circuit (which decision the Supreme Court modified but did not vacate).  Here is this Court's analysis:

"The Court of Claims was established, and the Tucker Act enacted, to open a judicial avenue for certain monetary claims against the United States." United States v. Bormes, 568 U.S. 6, 11 (2012).  Prior to its enactment, "it was not uncommon for statutes to impose monetary obligations on the United States without specifying a means of judicial enforcement." Id.  Thus, "Congress enacted the Tucker Act to 'suppl[y] the missing ingredient for an action against the United States for the breach of monetary obligations not otherwise judicially enforceable.'" Maine Community Health Options v. United States, 590 U.S. 296, 323 (2020) (citing Bormes, 568 U.S. at 12).

Under the Tucker Act, "the United States Court of Federal Claims . . . [has] . . . jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1); Department of Education v. California, 145 S. Ct. 966, 968 (2025) (per curiam) (California II).  "In suits seeking more than $10,000 in damages, the Court of Federal Claims' jurisdiction is exclusive of the federal district courts."

[9]

A0010

Massachusetts v. Natl. Institutes of Health, --- F. Supp. 3d ---
-, No. 25-CV-10338, 2025 WL 702163, at *4 (D. Mass. Mar. 5,
2025) (Kelley, J.) (citing Burgos v. Milton, 709 F.2d 1, 3 (1st
Cir. 1983)).

"The Supreme Court has made clear that 'not every claim
invoking the Constitution, a federal statute, or a regulation is
cognizable under the Tucker Act.'" Massachusetts 2025 WL
702163, at *5 (quoting United States v. Mitchell, 463 U.S. 206,
216) (cleaned up). "The fact that a judicial remedy may require
one party to pay money to another is not a sufficient reason to
characterize the relief as 'money damages.' " Bowen v.
Massachusetts, 487 U.S. 879, 893, (1988). Also, "the mere fact
that a court may have to rule on a contract issue does not, by
triggering some mystical metamorphosis, automatically transform
an action ... into one on the contract and deprive the court of
jurisdiction it might otherwise have." California v. United
States Dept. of Educ., 132 F.4th 92, 96 (1st Cir. 2025)
("California I") (quoting Megapulse, Inc. v. Lewis, 672 F.2d
959, 968 (D.C. Cir. 1982)). "The Claims Court does not have the
general equitable powers of a district court to grant
prospective relief." Bowen, 487 U.S. at 905.

Whether a claim is contractual in nature under the Tucker
Act is based upon a determination of the essence of the action.
"While the First Circuit has not formally adopted the 'rights

[10]

A0011

and remedies' test that is used by several other circuits,[]
courts in this Circuit have adopted the test to determine if the
'essence' of an action is truly contractual in nature,"
Massachusetts, 2025 WL 702163, at *6 (D. Mass. Mar. 5, 2025)
(collecting cases); however, it appears the First Circuit is
open to such analysis, see California II, 132 F.4th at 96-97.
"The 'essence' of an action encompasses two distinct aspects —-
the source of the rights upon which the plaintiff bases its
claim and the type of relief sought (or appropriate)."
Massachusetts, 2025 WL 702163, at *5. (citations and quotations
omitted).  This Court adopts this test to determine whether the
Tucker Act applies here and concludes that it does not.

The States argue that the essence of the claims here do not
sound in contract because the claims attack the broad policies
and actions of the Public Officials. Pls.' Mem. 18; Reply 2-4.
The Public Officials counter that the Public Officials merely
"disguise their claims as APA claims.  Opp'n. 9.

The Public Officials rely on the recent Supreme Court
determination in California II, which granted an emergency stay
of a district court injunction.  In that case, Judge Joun, of
this District, issued a temporary restraining order, enjoining
the Department of Education from terminating certain grants, and
further ordered "the Government to pay out past-due grant
obligations and to continue paying obligations as they

[11]

accrue[d]."  Id.; see California v. U.S. Dept. of Educ., No. CV
25-10548-MJJ, 2025 WL 760825 (D. Mass. Mar. 10, 2025) (Joun,
J.).

The government appealed to the First Circuit to stay the
injunction pending appeal.  California I.  The First Circuit
ruled the Tucker Act did not apply, that the actions were
reviewable under the APA, and that on the merits the Department
of Education had not met its burden to overturn the grant of the
injunction, and therefore a stay pending appeal was not
warranted.  Id. at 96.

The Supreme Court accepted the government's application for
an immediate administrative stay of the injunction, which was
allowed per curiam.  California II, 145 S.Ct. at 969.
Construing the ruling as an "appealable preliminary injunction,"
the Court reasoned that the government was "likely to succeed in
showing the District Court lacked jurisdiction to order the
payment of money under the" Administrative Procedure Act,
because "the APA's limited waiver of immunity does not extend to
orders 'to enforce a contractual obligation to pay money' along
the lines of what the District Court ordered" there. Id. at 968
(quoting Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S.
204, 212 (2002).  Further, according to the Supreme Court, the
Tucker Act likely applied.  Id.  The Court granted the stay

[12]

pending resolution of the appeal by the First Circuit.  <u>Id.</u> at

969.

    Justice Kagan dissented, asserting that it was a "mistake"

to grant the emergency relief, noting among other things that:

> The remaining issue is whether this suit, brought
> under the Administrative Procedure Act (APA), belongs
> in an ordinary district court or the Court of Federal
> Claims.  As the Court acknowledges the general rule
> is that APA actions go to district courts, even when a
> remedial order "may result in the disbursement of
> funds." Ante, at 968 (citing <u>Bowen</u> v. <u>Massachusetts</u>,
> 487 U.S. 879, 910 (1988)).  To support a different
> result here, the Court relies exclusively on <u>Great-
> West Life & Annuity Ins. Co.</u> v. <u>Knudson</u>, 534 U.S. 204,
> 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).  But <u>Great-West</u>
> was not brought under the APA, as the Court took care
> to note. See <u>id.</u>, at 212, 122 S.Ct. 708
> (distinguishing <u>Bowen</u> for that reason).  So the
> Court's reasoning is at the least under-developed, and
> very possibly wrong.

<u>California II</u>, 145 S. Ct. at 969 (Kagan, J. dissenting).

    Justice Jackson (with whom Justice Sotomayor joined), also

dissented asserting, among other things, that presuming the

Court could reach the merits, Judge Joun's assessment that "the

Department's mass grant terminations were probably unlawful is

not unreasonable."  <u>Id.</u> 145 S. Ct. 975 (Jackson, J.,

dissenting).  Indeed, the Department of Education's conduct

could be viewed as arbitrary and capricious under the APA where:

> [A] mere two days after the Acting Secretary
> instructed agency officials to review the TQP and SEED
> grants, the Department started issuing summary grant-
> termination letters that provide a general and
> disjunctive list of potential grounds for

[13]

A0014

cancellation, without specifying which ground led to
the termination of any particular grant. Nor did the
letters detail the Department's decisionmaking with
respect to any individual termination decision. It
also appears that the grant recipients did not receive
any pretermination notice or any opportunity to be
heard, much less a chance to cure, which the
regulations seem to require.  See, e.g., 2 C.F.R. §§
200.339, 200.208(c) (permitting grant termination only
after an agency "determines that noncompliance cannot
be remedied by imposing additional conditions," such
as by "[r]equiring additional project monitoring," by
requiring that the recipient obtain technical or
management assistance, or by "[e]stablishing
additional prior approvals").

    The Department's robotic rollout of its new mass
grant-termination policy means that grant recipients
and reviewing courts are "compelled to guess at the
theory underlying the agency's action." SEC v. Chenery
Corp., 332 U.S. 194, 196-197 (1947).  Moreover, the
agency's abruptness leaves one wondering whether any
reasoned decisionmaking has occurred with respect to
these terminations at all. These are precisely the
kinds of concerns that the APA's bar on arbitrary-and-
capricious agency decisionmaking was meant to address.
See Prometheus Radio Project, 592 U.S. at 423, 141
S.Ct. 1150 (explaining that the APA requires a
reviewing court to ensure that "the agency ... has
reasonably considered the relevant issues and
reasonably explained the decision").

    It also seems clear that at least one of the
items included on the Department's undifferentiated
laundry list of possible reasons for terminating these
grants -- that the entity may have participated in
unspecified DEI practices -- would not suffice as a
basis for termination under the law as it currently
exists. That is because termination is only
permissible for recipient conduct that is inconsistent
with the terms of the grants and the statutes that
authorize them. But the TQP and SEED statutes
expressly contemplate that grant recipients will train
educators on teaching "diverse populations" in
"traditionally underserved" schools, and on improving
students' "social, emotional, and physical
development." 20 U.S.C. §§ 1022e(b)(4), 6672(a)(1),

[14]

A0015

1022a(d)(1)(ii).[]  It would be manifestly arbitrary
and capricious for the Department to terminate grants
for funding diversity-related programs that the law
expressly requires. Cf. Motor Vehicle Mfrs. Assn. of
United States, Inc. v. State Farm Mut. Automobile Ins.
Co., 463 U.S. 29, 43 (1983) (explaining that an agency
acts arbitrarily and capriciously if it relies "on
factors which Congress has not intended it to
consider").

Id. 975-76.  That appeal has since been dismissed, the

underlying motion for preliminary injunction has been withdrawn,

and the action is now proceeding in the ordinary course with a

motion to dismiss anticipated in the near future.  See Status

Report, California, Civ No. 25-10548-MJJ, ECF No. 93.  At a

status conference on April 9, 2025, Judge Joun indicated that

"the Supreme Court stay was of the TRO. . . [and]  . . . the

Court preliminarily weighed in on a couple of issues, but there

[was] no ruling on anything other than granting a stay of the

TRO."  April 9, 2025 Hrg. Tr. 5-6, ECF No. 97.

    The Public Officials argue that this Court ought follow the

Supreme Court's analysis in California II.  In fact, at oral

argument they argued California II is virtually

indistinguishable from the instant case.

    Not so.  California is somewhat different than the claims

presented here.  In that case, "[t]heir only claim was to sums

awarded to them in previously awarded discretionary grants."

[15]

<u>Widakuswara</u> v. <u>Lake</u>, No. 25-5144, 2025 WL 1288817, at *13 (D.C. Cir. May 3, 2025) (Pillard, J. dissenting).

While the Supreme Court's determination in <u>California II</u> may be an indicator of how the Supreme Court **might** someday view the merits, it is not binding on this Court. As Chief Judge McConnell of the District of Rhode Island explained mere days ago facing a similar Tucker Act challenge by the government:

> To start, <u>California</u>'s precedential value is limited . . . [and] . . . does not displace governing law that guides the Court's approach to discerning whether the States' claims are essentially contract claims in order to direct jurisdiction to the Court of Claims.")see also <u>Merrill</u> v. <u>Milligan</u>, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ("The principal dissent's catchy but worn-out rhetoric about the 'shadow docket' is similarly off target. The stay will allow this Court to decide the merits in an orderly fashion—after full briefing, oral argument, and our usual extensive internal deliberations—and ensure that we do not have to decide the merits on the emergency docket. To reiterate: The Court's stay order is not a decision on the merits.").

<u>Rhode Island</u> v. <u>Trump</u>, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868, at *5 (D.R.I. May 6, 2025).

In <u>State of New York</u> v. <u>Trump</u>, 2025 WL 1098966 (D.R.I. Apr. 14, 2025), Chief Judge McConnell has earlier done an extensive analaysis:

> On a surface level, the facts in the <u>California</u> case may appear to be generally analogous to the facts here, as both cases involve states challenging federal agencies' decision-making regarding appropriated federal funds, but the similarities end there. When the Court delves deeper, however, it finds several significant and relevant differences that underscore

[16]

A0017

California's inapplicability to this case. In
California, the First Circuit Court of Appeals
determined that "the terms and conditions of each
individual grant award" were "at issue." California,
132 F.4th 92, 96-97 (1st Cir. 2025). On appeal, the
Supreme Court then granted the Department's
application for a stay because it concluded that the
district court issued an order "to enforce a
contractual obligation to pay money" and "the
Government is likely to succeed in showing the
District Court lacked jurisdiction to order the
payment of money under the APA." California, 2025 WL
1008354, at *1. That is not the case here.
In this case, the terms and conditions of each
individual grant that the States receive from the
Agency Defendants are not at issue. Rather, this case
deals with the Agency Defendants' implementation of a
broad, categorical freeze on obligated funds pending
determinations on whether it is lawful to end
disbursements of such funds. The categorical funding
freeze was not based on individualized assessments of
any particular grant terms and conditions or
agreements between the Agency Defendants and the
States; it was based on the OMB Directive and the
various Executive Orders that the President issued in
the early days of the administration. Therefore, the
Court's orders addressing the categorical funding
freeze were not enforcing a contractual obligation to
pay money.

Id. That Court also observed that the Court of Claims could not

provide the relief requested. Id. at n.2.

Similarly, Judge Woodcock of the District of Maine recently

wrote,

The Supreme Court's [California] decision to vacate
and stay a district court's TRO enjoining the U.S.
Department of Education from terminating various
education-related grants on the ground that the Tucker
Act provided exclusive jurisdiction to the United
States Court of Federal Claims does not change the
Court's determination that it is a proper forum for
this dispute under the APA . . . . While bearing
some similarities to the instant suit, the Supreme

[17]

A0018

Court issued this decision on its emergency docket, without full briefing or hearing, id. at ----, 145 S.Ct. at 969 (Kagan, J., diss.); id. at ----, 145 S.Ct. at 969-978 (Jackson, J., joined by Sotomayor, J., diss.), and its precedential value is thus limited. See Merrill v. Milligan, --- U.S. ----, 142 S. Ct. 879, 879, --- L.Ed.2d ---- (2022) (Kavanaugh, J., concurring).

Maine v. U.S. Dept. of Agric., No. 1:25-CV-00131-JAW, 2025

WL 1088946, at *19 (D. Me. Apr. 11, 2025).[5]  The district courts'

---

[5] But see Massachusetts Fair Hous. Ctr. v. Dep't of Hous. & Urban Dev., No. CV 25-30041-RGS, 2025 WL 1225481 (D. Mass. Apr. 14, 2025)) (Stearns, J.):

The court begins, and ends, its analysis with plaintiffs' second argument (because, if the court likely lacks jurisdiction, there is no longer any likelihood of success on the merits -- at least, not for the purposes of this specific action in this specific forum -- which moots any inquiry into irreparable harm).  Plaintiffs correctly note that, unlike the operative complaint here, the Complaint in California references "the terms of the grant agreements at issue." Id.  What plaintiffs ignore, however, is that these references occur only in the context of buttressing the larger APA-based argument that the Department of Education did not terminate the grants in accordance with any statutory or regulatory authorization (the Department of Education simply cited to 2 C.F.R. § 200.340(a)(4) as authorizing the termination of the grants); the Complaint itself does not assert any independent claim based on the language of the grant agreement.  The Supreme Court nonetheless found that the government was likely to succeed in showing that the plaintiffs in California sought to enforce a contractual obligation to pay money. Because plaintiffs assert essentially the same claim here -- that the agency did not terminate the grant in accordance with statutory or regulatory authority -- it follows that plaintiffs are likewise likely seeking to enforce a contractual obligation to pay money.

[18]

divergent views within the First Circuit of <u>California</u>'s precedential value is not surprising given the unusual interventional posture taken by the Supreme Court.  Indeed, Justice Jackson's dissent observed that the Supreme Court's "attempt to inject itself into the ongoing litigation by suggesting new, substantive principles for the District Court to consider in this case is unorthodox and, in [her] view, inappropriate."  <u>California II</u>, 145 S. Ct. at 978.  Whatever the Supreme Court's motivations or intentions, the <u>California II</u> decision is of little assistance to the district courts in charting the intersection of the APA and the Tucker Act.

The views of the dissenters in <u>California II</u>, as well as the fully developed reasoning of the decisions quoted above are persuasive authority for the course this Court adopts.

Even more compelling is the guidance of the First Circuit in <u>California</u> I.

---

This decision should not be read as an endorsement of the brusque and seemingly insensitive way in which the terminations were announced nor as casting doubt on the First Circuit's assessment that the plaintiffs in the <u>California</u> case may well likely succeed on the merits of at least some of their claims. The court is merely deferring (as it must) to the Supreme Court's unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims.

<u>Id.</u>  That decision is currently on appeal.

[19]

First, the Department claims that the district
court itself lacked jurisdiction to entertain this
lawsuit, which the Department argues belongs in the
Court of Federal Claims. See 28 U.S.C. § 1491(a)(1)
(granting jurisdiction to the Court of Federal Claims
for any action against the government "upon any
express or implied contract with the United States").
The Department points to the fact that each grant
award takes the form of a contract between the
recipient and the government. "But the mere fact that
a court may have to rule on a contract issue does not,
by triggering some mystical metamorphosis,
automatically transform an action ... into one on the
contract and deprive the court of jurisdiction it
might otherwise have." Megapulse, Inc. v. Lewis, 672
F.2d 959, 968 (D.C. Cir. 1982). Here, although the
terms and conditions of each individual grant award
are at issue, the "essence," id., of the claims is not
contractual. Rather, the States challenge the
Department's actions as insufficiently explained,
insufficiently reasoned, and otherwise contrary to law
-- arguments derived from the Administrative Procedure
Act (APA), 5 U.S.C. § 706(2)(A). The States' claims
are, at their core, assertions that the Department
acted in violation of federal law -- not its
contracts. Simply put, if the Department breached any
contract, it did so by violating the APA. And if the
Department did not violate the APA, then it breached
no contract. In the words of the Tenth Circuit, "when
a party asserts that the government's breach of
contract is contrary to federal regulations, statutes,
or the Constitution, and when the party seeks relief
other than money damages, the APA's waiver of
sovereign immunity applies and the Tucker Act does not
preclude a federal district court from taking
jurisdiction." Normandy Apts., Ltd. v. HUD, 554 F.3d
1290, 1300 (10th Cir. 2009); see also Megapulse, 672
F.2d at 968, 970 (upholding a district court's
jurisdiction where "[a]ppellant's position is
ultimately based, not on breach of contract, but on an
alleged governmental infringement of property rights
and violation of the Trade Secrets Act").

Nor do the States seek damages owed on a contract
or compensation for past wrongs. See Megapulse, 672
F.2d at 968-70 (considering, in a Tucker Act analysis,
"the type of relief sought (or appropriate)"). Rather,

[20]

A0021

they want the Department to once again make available
already-appropriated federal funds for existing grant
recipients. And as the Supreme Court has made clear,
"[t]he fact that a judicial remedy may require one
party to pay money to another is not a sufficient
reason to characterize the relief as 'money damages.'
" Bowen v. Massachusetts, 487 U.S. 879, 893, 108 S.Ct.
2722, 101 L.Ed.2d 749 (1988). As a result, we see no
jurisdictional bar to the district court's TRO on this
basis. See id. at 900-01 (holding that a district
court could hear a claim for an injunction requiring
the government to pay certain Medicaid reimbursements
because it was "a suit seeking to enforce the
statutory mandate itself, which happens to be one for
the payment of money," and "not a suit seeking money
in compensation for the damage sustained by the
failure of the Federal Government to pay"); Megapulse,
672 F.2d at 970-71 (explaining, in a Tucker Act case,
that "the mere fact that an injunction would require
the same governmental restraint that specific
(non)performance might require in a contract setting
is an insufficient basis to deny a district court the
jurisdiction otherwise available").

California I, 132 F.4th at 96-97.

In the absence of a decision on the merits from the Supreme
Court, this Court takes to heart the First Circuit's admonition
that its pronouncements of law bind this Court. United States
v. Moore-Bush, 963 F.3d 29, 37 (1st Cir. 2020) (holding "circuit
court decisions control federal district courts in their
circuits" and that the district court is "absolutely bound to
follow vertical precedents."), reh'g en banc granted, opinion
vacated, 982 F.3d 50 (1st Cir. 2020), and on reh'g en banc, 36
F.4th 320 (1st Cir. 2022).

[21]

This Court need not gild the lily: <u>California I</u> presented a closer question than the one before this Court, and the First Circuit did not hesitate to rule that the Tucker Act did not apply there.  The Court is not free to ignore the First Circuit's pronouncement of the law and chart new territory, even though it might not be the law for long -- either by action of the First Circuit itself or ultimately the Supreme Court.  This Court follows <u>California I</u>.

Applied here, the "essence" of this action is not one of contract.  This is not an action for monetary damages against the United States for which the Court of Claims was created.  Rather, at least as alleged, and taking all inferences in the States' favor, it is an action to stop the Public Officials from violating the statutory grant-making architecture created by Congress, replacing Congress' mandate with new policies that directly contradict that mandate, and exercising authority arbitrarily and capriciously, in violation of federal law and the Constitution.  See Am. Compl. ¶ 93 ("This lawsuit arises because [the Public Officials] are flouting the statutory and regulatory rules governing NIH grantmaking" by "adopting a series of directives that blacklist certain topics -- e.g., "DEI," "gender," or "vaccine hesitancy" -- that the Administration disfavors . . . [and by]  . . . adopting, implementing, and enforcing those directives, defendants have

[22]

systematically disrupted the review of pending grant
applications, delayed the annual renewal of already-approved
multi-year awards, and terminated huge tranches of grants in the
middle of the project year. Those disruptions have caused—and
will continue to cause—significant harm to plaintiffs and their
institutions."). The Tucker Act does not divest this Court of
jurisdiction.

Similarly, the Public Officials' sovereign immunity claim
falls flat. The Court need look no further than the First
Circuit's binding guidance again, which, borrowing from the
Tenth Circuit, explains "'when a party asserts that the
government's breach of contract is contrary to federal
regulations, statutes, or the Constitution, and when the party
seeks relief other than money damages, the APA's waiver of
sovereign immunity applies and the Tucker Act does not preclude
a federal district court from taking jurisdiction." California
I, 132 F.4th at 97 (quoting Normandy Apts., Ltd. v. HUD, 554
F.3d 1290, 1300 (10th Cir. 2009)). So it is here. Sovereign
immunity is not a bar to the APA challenges.

### 2. Programmatic attack

Under the APA, a claim is limited to "discrete agency
action that it is required to take," and that "limitation to
discrete agency action precludes the kind of broad programmatic
attack [the Supreme Court] rejected in Lujan v. National

Wildlife Federation, 497 U.S. 871 (1990)." Norton v. South Utah Wilderness All., 542 U.S. 55, 64 (2004).

The Public Officials argue that the States claims constitute a programmatic attack. Opp'n 13-14. The States persuasively counter that "[t]he fact that [the Public Officials] have enforced these directives against hundreds of projects does not make this lawsuit programmatic, even if it is large." Reply 11. The States cite the First Circuit's decision in New York v. Trump, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once.") and this Court's decision in American Association of University Professors v. Rubio, No. CV 25-10685-WGY, 2025 WL 1235084, at *21 (D. Mass. Apr. 29, 2025) (describing plaintiffs' claim as neither a "constellation of independent decisions or a general drift in agency priorities."). The States have the better of it. The APA claim here is not a prohibited programmatic challenge.

### 3. Jurisdiction Over Individual Actions

The Public Officials argue that two Challenged Directives are expired and two did not cause any injuries. Opp'n 15 - 16. The States concede that while "perhaps the administrative record will bear this claim out, . . . the current record shows is that [States] have experienced significant injury from a series of

[24]

overlapping and interlocking blacklisting directives that have caused unprecedented delays and disruptions. The secretive and slapdash nature of these directives, which makes it hard to know which are effective at any given time, is hardly a defense." Reply 8. At this stage, all inferences must be taken in favor of the States, and the States' argument prevails for now.

As for the remaining Challenged Directives, the Public Officials argue that they are not final agency actions and therefore not actionable under the APA. Opp'n 17. The Public Officials characterize their actions as "merely order[ing] a review of the grants to determine whether they were consistent with the agency's priorities." Id.

The States argue that this "misstates the directives' effects." Reply. 7. As the States persuasively argue, the Public Officials' "own [alleged] conduct confirms that the directives are not 'interlocutory': if they were, defendants would not be implementing them by terminating hundreds of grants around the country." Reply 7. Furthermore, the terminations themselves are final agency action. Id.

On balance, and at this stage, the States have the better of it.

### C.  Agency Discretion

Finally, the Public Officials argue that the States APA "claims are unreviewable because they challenge funding

[25]

decisions that are 'committed to the agency discretion by law."
Opp. 19 (citing 5 U.S.C. § 701(a)(2). They argue that their
allocation of funds is committed to their sole discretion. Opp.
19-21 (citing Lincoln v. Vigil, 508 U.S. 182 (1993); Milk Train,
Inc. v. Veneman, 310 F.3d 747 (D.C. Cir. 2002).

The States counter that they are not seeking review of a
funding decision, but rather the Public Officials' "adoption of
enforcement of the overarching Challenged Directives." Reply 8.
The States point out that Lincoln stands for the unremarkable
proposition that review is precluded so "long as the agency
allocates funds from a lump-sum appropriation to meet
permissible statutory objectives." Id. (quoting Lincoln, 508
U.S. at 193). Thus, there is arguably review where the
Challenged Directives "conflict with authorizing statutes and
applicable regulations." Reply 9.

## III. CONCLUSION

As alleged, and at its core, the States' Amended Complaint
alleges conduct similar to what Justice Jackson describes in her
dissent in California II as the "robotic rollout of [a] new mass
grant-termination policy" that has left the States "and
reviewing courts . . . 'to guess at the theory underlying the
agency's action.'" California II, 145 S. Ct. at 975-76 (quoting
SEC v. Chenery Corp., 332 U.S. 194, 196-197 (1947)) (Jackson, J.
dissenting). Assuming the allegations of the Amended Complaint

[26]

as true for purposes of the jurisdictional inquiry, the Public Officials' alleged "abruptness leaves one wondering whether any reasoned decision making has occurred with respect to these terminations at all." Id. Indeed, this Court agrees in principle with Justice Jackson that "[t]hese are precisely the kinds of concerns that the APA's bar on arbitrary-and-capricious agency decision making was meant to address." Id. Whether the States can prove their case -- at summary judgment or a bench trial -- is for another day and the Court expresses no opinion on the merits. For now, the Court rules that subject matter jurisdiction exists in the United States District Court.

A case management conference is set for **Tuesday, May 13, 2025 at 2:00 p.m.**

SO ORDERED.

William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[6]

---

[6] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

[27]

A0028

Case: 25-1612    Document: 00118351669    Page: 87    Date Filed: 10/10/2025    Entry ID: 6757137

```
                                         )
AMERICAN PUBLIC HEALTH ASSOCIATION;)
IBIS REPRODUCTIVE HEALTH;           )
INTERNATIONAL UNION, UNITED         )
AUTOMOBILE, AEROSPACE, AND          )
AGRICULTURAL IMPLEMENT              )
WORKERS (UAW); BRITTANY CHARLTON;   )
KATIE EDWARDS; PETER LURIE; and     )
NICOLE MAPHIS,                      )
                                    )
               Plaintiffs,          )    CIVIL ACTION NO.
          v.                        )    25-10787-WGY
                                    )
NATIONAL INSTITUTES OF HEALTH;      )
JAY BHATTACHARYA, in his official   )
capacity as Director of the         )
National Institutes of Health;      )
UNITED STATES DEPARTMENT OF HEALTH  )
AND HUMAN SERVICES; and ROBERT F.   )
KENNEDY, JR., in his official       )
capacity as Secretary of the        )
United States Department of Health  )
and Human Services,                 )
                                    )
               Defendants.          )
                                    )
```

YOUNG, D.J.                                      May 30, 2025

## MEMORANDUM AND ORDER

This civil action brought by the American Public Health
Association ("APHA"), IBIS Reproductive Health ("Ibis"), the
International Union, United Automobile, Aerospace, and
Agricultural Implement Workers ("UAW"), Dr. Brittany Charlton,
Dr. Katie Edwards, Dr. Peter Lurie, and Dr. Nicole Maphis

A0029

(collectively, "the Plaintiffs") seeks declaratory and injunctive relief against the National Institutes of Health, Director Jay Bhattacharya in his official capacity, and Secretary Robert F. Kennedy, Jr. in his official capacity (collectively, "the Public Officials").  It is one of many lawsuits across the nation that allege that the current Administration's policies have been implemented in an unlawful manner, in violation of the Administrative Procedure Act and the Constitution, by agencies of the Executive Branch.

The Plaintiffs filed a motion for a preliminary injunction, and, consistent with its usual practice, this Court promptly scheduled a hearing and collapsed the motion into a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.  The Court construed the parties' submissions on that motion for preliminary injunction as a motion to dismiss, ECF No. 66, which, for the reasons stated below, is ALLOWED in part as to Counts IV, VI, and VII which are dismissed without prejudice, and DENIED in part as to the remaining Counts.

## I.    INTRODUCTION

### A.    Procedural History

The Plaintiffs filed suit against the Public Officials on April 2, 2025.  See Compl., ECF No. 1.    On April 25, 2025, the Plaintiffs filed a Motion for Preliminary Injunction, which has been fully briefed.  Pls.' Mot. Prelim. Inj., ("Pls.' Mot."),

[2]

A0030

ECF No. 37; Mem. Law Supp. Pls.' Mot. Prelim. Inj. ("Pls.'
Mem."), ECF No. 41; Defs.' Opp'n Pls.' Mot. Prelim. Inj.
("Defs.' Opp'n"), ECF No. 66; Pls.' Reply Supp. Pls.' Mot.
Prelim. Inj. ("Pls.' Reply"), ECF No. 71; Suppl. Br. Standing
Pl. UAW, ECF No. 79.[1]

On May 1, 2025 this action was randomly reassigned to this
session of the Court. Elec. Notice Reassignment, ECF No. 52.
This Court promptly scheduled a hearing on the preliminary
injunction motion for May 22, 2025. Elec. Clerk's Notes, ECF
No. 77. The motion for preliminary injunction was collapsed
into a trial on the merits pursuant to Rule 65(a) of the Federal
Rules of Civil Procedure, the opposition to the motion was
construed as a motion to dismiss, and the Plaintiffs' reply was
construed as an opposition. Id. The parties accepted the
Court's invitation to hear the motion at that time, the Court
heard argument on the motion to dismiss, and it took the matter
under advisement. Id.

**B.   Facts Alleged**

The Court takes the following facts almost verbatim from
the Complaint, and accepts them as true for purposes of the
motion to dismiss. Quotation marks are omitted for readability.

---

[1] The Court also received submissions from amici. See ECF
Nos. 76 and 81. The Court is grateful for these helpful
submissions.

A0031

The Court presumes familiarity with the history of the National
Institutes of Health ("NIH"), the types of grants it awards, and
the grant process, skipping to the salient allegations.  Compl.
¶¶ 26-80.

### 1. Executive Orders 14151, 14168, and 14173

Beginning on January 20, 2025, President Trump issued a
series of executive orders ("EOs").  Compl. ¶ 80.  In the first
EO mentioned in the Complaint, Executive Order No. 14151,
entitled "Ending Radical and Wasteful Government DEI Programs
and Preferencing," the President declared that the prior
administration "forced illegal and immoral discrimination
programs, going by the name 'diversity, equity, and inclusion'
(DEI), into virtually all aspects of the Federal Government, in
areas ranging from airline safety to the military."  See Exec.
Order 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ("EO 14151").  EO
14151 instructs the Attorney General and others to "coordinate
the termination of all discriminatory programs, including
illegal DEI and 'diversity, equity, inclusion, and
accessibility' (DEIA) mandates, policies, programs, preferences,
and activities in the Federal Government, under whatever name
they appear."  Id. ¶ 81 (citing EO 14151).  Additionally, it
directs each federal agency head to "terminate, to the maximum
extent allowed by law, all 'equity-related' grants or contracts"
within 60 days.  Id.

[4]

A0032

On January 21, 2025, President Trump issued Executive Order No. 14173, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." See Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ("EO 14173"). Similar to EO 14151, to address the purported "immoral race- and sex-based preferences under the guise of so-called [DEI] or [DEIA]," the order requires the Director of the OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." Compl. ¶ 82.

With respect to gender, on January 20, 2025, the President also issued Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," directing that "federal funds shall not be used to promote gender ideology," instructing federal agencies to revise grant conditions accordingly, and defining "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." Id. ¶ 83

[5]

A0033

Case: 25-1612    Document: 0011835169    Page: 92    Date Filed: 10/10/2025    Entry ID: 6757137

(quoting Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025)
("EO 14168")).

### 2. OMB Issues Guidance Based Upon the Executive Orders

On January 27, 2025, the Office of Management and Budget
("OMB") issued a memorandum directing all federal agencies --
including the NIH -- to "temporarily pause all activities
related to obligation or disbursement of all Federal financial
assistance, and all other relevant agency activities that may be
implicated by [the Eos, supra], including, but not limited to,
financial assistance for DEI, woke gender ideology, and the
green new deal." Id. ¶ 84

### 3. The NIH Implements the Executive Orders and OMB Guidance

On February 12, 2025, the NIH issued a memorandum stating
that it "is in the process of reevaluating the agency's
priorities based on the goals of the new administration." Id. ¶
87. That memorandum states that the "NIH will effectuate the
administration's goals over time, but given recent court orders,
this cannot be a factor in [Institutions and Centers' ("ICs")]
funding decisions at this time." Id. The memorandum also
indicates that "[a]dditional details on future funding actions
related to the agency's goals will be provided under a separate
memo." Id.

A0034

On February 13, 2025, NIH issued another memorandum to IC chief grant management officers ("February 13 Memo"), that announced "hard funding restrictions" on "awards where the program promotes or takes part in diversity, equity, and includsion [sic] ('DEI') initiatives" with those restrictions applying "to new and continuation awards made on or after February 14, 2025." Id. ¶88. The memorandum also states that, "[i]f the sole purpose of the grant, cooperative agreement, other transaction award (including modifications), or supplement supports DEI activities, then the award must be fully restricted. The restrictions will remain in place until the agency conducts an internal review for payment integrity." Id.

On February 28, 2025, the NIH issued staff "guidance" ("February 28 Guidance") that rescinded the February 13 memorandum, but expanded on its core anti-DEI messaging, stating: "NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI) . . . . Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims[,] assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities." Id. ¶ 92. The memorandum also instructs officials to "completely excise all DEI activities[.]" Id.

A0035

The February 28 Guidance identifies four categories of awards and mandates actions for each category deemed "DEI related":

- "Category 1" - the "sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a [Notice of Funding Opportunities] that was unpublished as outlined above." For projects construed as Category 1, "ICs must not issue the award."

- "Category 2" - the project "partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this [sic] means DEI activities are ancillary to the purpose of the project [sic]. In some cases, not readily visible [sic]." For projects construed as Category 2, "[i]f the IC and the applicant/recipient cannot reach an agreement" to renegotiate the scope of the project, "or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award." For any such ongoing project, "the IC must work.to negotiate a bilateral termination of the project," but "[w]here bilateral termination cannot be reached, the IC must unilaterally terminate the project."

- "Category 3" - the project "does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities and Other Resources' attachment and terminology related to structural racism-this is not all-inclusive)." For projects construed as Category 3, ICs "must request an updated [application or progress report] with the DEI language removed," and only once the language has been removed may the IC "proceed with issuing the award."

- "Category 4" - the project does "not support any DEI activities." ICs "may proceed with issuing the award."

- Category 5 projects are those awarded "to [e]ntities in certain foreign countries." According to that part of the document, "Additional guidance on awards to foreign

[8]

entities is forthcoming.  At this time, ICs should hold all awards to entities located" in certain countries, including South Africa.

Id. ¶ 97.

On March 25, 2025, the NIH issued further guidance ("the March 25 Guidance").  Id. ¶ 96.  The March 25 Guidance also identifies a list of forbidden topics for NIH grants and prescribes language to be included in termination letters, identifying "China," "DEI," and "Transgender issues," "Vaccine Hesitancy" and "COVID-related" research.  Id. ¶¶ 98-99.  Like the February 25 Guidance, the March 25 Guidance directs NIH officials to revise Notices of Award that are terminated pursuant to the Directives, and instructs them to include the following (or substantially similar) language in those revisions: "It is the policy of NIH not to prioritize [insert termination category language from Appendix 3, verbatim]. Therefore, this project is terminated."  Id. ¶ 100.

The March 25 Guidance also features an FAQ section that includes, among other instructions:

> When ICs issue revised [Notices of Award ("NOAs")][ to terminate awards, do they have to use the exact language provided by HHS in the termination term? Yes, ICs must use the exact language provided in Appendix 3, with no edits.

Id. ¶ 101.  In addition, regarding "Notice of Funding Opportunity (NOFO) Guidance," the document has only the following text: "[pending]."  Id. ¶ 102.

[9]

A0037

In sum, the Plaintiffs allege that the Directives --
comprised of the February 28 Guidance, the March 25 Guidance,
and other versions of these documents that articulated areas of
research that purportedly "no longer effectuate[] agency
priorities" -- fail to define critical terms, such as
"diversity, equity, and inclusion" or "DEI"; "artificial and
non-scientific categories"; "amorphous equity objectives";
"[t]ransgender issues"; "gender identity"; or "COVID-related."
Id. ¶ 103.

The Plaintiffs allege that pursuant to the Directives, each
termination notice begins by identifying the project number,
identifying which year's Grants Policy Statement applies to the
grantee's project, and stating that the letter "constitutes a
notice of termination," purportedly pursuant to that Grants
Policy Statement and 2 C.F.R. § 200.340(a)(2). Id. ¶ 106. The
notice also emphasizes that "obligations generally should be
determined by reference to the law in effect when the grants
were made." Id. Citing the pertinent year's Grants Policy
Statement, each notice states, "[a]t the time your grant was
issued, 2 C.F.R. § 200.340(a)(2) permitted termination '[b]y the
Federal awarding agency or pass-through entity, to the greatest
extent authorized by law, if an award no longer effectuates the
program goals or agency priorities.'" Id. ¶ 107.

A0038

Each notice includes one of a few slightly different
scripts stating that the grant "no longer effectuates agency
priorities." Id. ¶ 108. The language in these notices repeats
the mandatory language from the appendices, described above, and
is nearly identical across notices. Id. ¶¶ 108-09. Each notice
outlines the appeals process. Id. ¶ 110.

The Plaintiffs allege that for the vast majority, if not
all, of the grants terminated since February 28, 2025, the
notices: (1) offer no other justifications for termination, (2)
fail to explain how or why the relevant grant fails to
"effectuate agency priorities" or otherwise warrants
termination, and (3) fail to cite any project-specific
information or data, much less any reasons to disregard that
information or data. Id. ¶¶ 111-12. Further, the Plaintiffs
allege that the assertions in the termination notices about the
lack of scientific validity, rigor, or public health benefit of
the studies contradict the conclusions of NIH and the external
scientists who previously reviewed these projects and chose to
award those grants in the first place, including the multiple
panels of experts in the grantees' fields who judged the
proposals based on criteria such as the lead scientist's track
record, the rigor of the study's design, and the project's
likelihood of addressing a pressing biomedical-research issue.
Id. ¶ 112. These notices also purportedly do not address NIH's

[11]

A0039

Case: 25-1612    Document: 0011835I669    Page: 98    Date Filed: 10/10/2025    Entry ID: 6757137

prior assessment that the projects do meet agency priorities and are aligned with the statutory mandate and goals of NIH and the pertinent IC. _Id._ Finally, the Plaintiffs claim the notices reveal that NIH failed to consider any reliance interests at stake for ongoing grants. _Id._ ¶ 113.

For grants that were terminated, the NIH also issued revised NOAs with new end-of-project dates that reflected immediate or near-immediate termination. _Id._ ¶ 114. These revised NOAs included new termination language with statements that were substantively similar to the language included in Appendix 3 of the February 28 Guidance and March 25 Guidance, and made explicit reference to "2 C.F.R. §200.340 as implemented in NIH [Grants Policy Statement] Section 8.5.2" as the regulatory authority for these terminations. _Id._

According to the Plaintiffs, evidence suggests the language in the termination notices did not originate with NIH or the Department of Health and Human Services staff but was instead drafted by staff from the Department of Government Efficiency ("DOGE"). For example, metadata associated with at least one such notice shows it was authored by "JoshuaAHanley," apparently a 2021 law school graduate, who works at DOGE. _Id._ ¶ 115.

#### 4. Results of the Grant Terminations and Delays

The Plaintiffs allege that the terminations cut across diverse topics that NIH is statutorily required to research.

A0040

Case: 25-1612    Document: 00118351669    Page: 99    Date Filed: 10/10/2025    Entry ID: 6757137

Id. ¶ 116.  These terminations purportedly compromise NIH's
ability to fulfill, among other things, its statutory
obligations.  Id. ¶¶ 118-24.  The Plaintiffs provide specific
examples of how the termination of the research funding of the
Individual Plaintiffs, Ibis, and the Associational Plaintiffs'
members affects medical and scientific research.  Id. ¶¶ 125-94.

## II.  ANALYSIS

### A. Standard of Review

Pursuant to Rule 8(a)(2) of the Federal Rules of Civil
Procedure, a complaint "that states a claim for relief must
contain . . . a short and plain statement of the claim showing
that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).
To test the sufficiency of the pleading, a defendant can file a
motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and, to
test the subject matter jurisdiction of the Court, a motion to
dismiss pursuant to Fed. R. Civ. P. 12(b)(1).  "When faced with
motions to dismiss under both 12(b)(1) and 12(b)(6), a district
court, absent good reason to do otherwise, should ordinarily
decide the 12(b)(1) motion first."  Katz v. Pershing, LLC, 806
F. Supp. 2d 452, 456 (D. Mass. 2011) (Stearns, J.) (quoting
Northeast Erectors Ass'n of the BTEA v. Secretary of Labor,
Occupational Safety & Health Admin., 62 F.3d 37, 39 (1st Cir.
1995), aff'd, 672 F.3d 64 (1st Cir. 2012)).  Whether a motion is
brought under Rule 12(b)(1) or 12(b)(6), "the reviewing court

A0041

must take all of plaintiff's allegations as true and must view them, along with all reasonable inferences therefrom, in the light most favorable to plaintiff." Verlus v. Experian Info. Sols., Inc., No. 23-CV-11426-DJC, 2025 WL 836588, at *1 (D. Mass. Mar. 17, 2025) (Casper, J.).  The complaint must include sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Courts "draw every reasonable inference" in favor of the plaintiff, Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000), but they disregard statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (cleaned up).  Accordingly, the Court addresses the jurisdictional issues first, and then proceeds to the merits arguments.

### B. The Motion to Dismiss for Lack of Subject Matter Jurisdiction

As an initial matter, this Court rules that the motion to dismiss for lack of subject matter jurisdiction based on challenges relating to the Tucker Act, sovereign immunity, programmatic attack, jurisdiction over individual actions, and agency discretion, is DENIED substantially for the same reasons set forth in Massachusetts v. Kennedy, No. CV 25-10814-WGY, 2025

WL 1371785, at *5 (D. Mass. May 12, 2025), a related case before
this Court.

That leaves standing.  Just a few weeks ago, this Court
wrote at length about standing in American Ass'n of Univ.
Professors v. Rubio, No. CV 25-10685-WGY, --- F.Supp. 3d ----,
2025 WL 1235084, at *13-18 (D. Mass. Apr. 29, 2025), so much of
this will be familiar.

"As Justice Scalia memorably said, Article III requires a
plaintiff to first answer a basic question: '"What's it to
you?"'"  Food & Drug Admin. v. Alliance for Hippocratic Med.,
602 U.S. 367, 379 (2024) (quoting Antonin Scalia, The Doctrine
of Standing as an Essential Element of the Separation of Powers,
17 Suffolk U. L. Rev. 881, 882 (1983)).  As the Supreme Court
recently explained, "[f]or a plaintiff to get in the federal
courthouse door and obtain a judicial determination of what the
governing law is, the plaintiff cannot be a mere bystander, but
instead must have a 'personal stake' in the dispute," and
"courts do not opine on legal issues in response to citizens who
might 'roam the country in search of governmental wrongdoing.'"
Id. (first quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 423
(2021); and then quoting Valley Forge Christian Coll. v.
Americans United for Separation of Church and State, Inc., 454
U.S. 464, 487 (1982)).  "In particular, the standing requirement
means that the federal courts decide some contested legal

[15]

A0043

Case: 25-1612    Document: 00118351669    Page: 102    Date Filed: 10/10/2025    Entry ID: 6757137

questions later rather than sooner, thereby allowing issues to percolate and potentially be resolved by the political branches in the democratic process," and that "the federal courts may never need to decide some contested legal questions." Id. at 380. Indeed, "'[o]ur system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed.'" Id. (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 227 (1974)).

Here, the Public Officials argue that the APHA and UAW lack associational standing. Defs.' Opp'n 21-22. The Public Officials do not contest that Ibis has standing, and this Court rules that it does.

In order to establish standing, the APHA and UAW must show that they each have suffered an "injury in fact" that is "concrete and particularized," and, if based on future action, "actual or imminent" rather than "conjectural" or "hypothetical"; (2) "fairly traceable" to the alleged conduct of the defendant; and (3) "likely" redressable by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (cleaned up). "The plaintiff 'bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter,'" and "must support each element of standing 'with the manner and degree of evidence required at

the successive stages of the litigation.'" <u>Murthy</u> v. <u>Missouri</u>,
603 U.S. 43, 57 (2024) (alterations in original) (first quoting
<u>Carney</u> v. <u>Adams</u>, 592 U.S. 53, 59 (2020); and then quoting <u>Lujan</u>,
504 U.S. at 561). "'[P]laintiffs must demonstrate standing for
each claim that they press' against each defendant, 'and for
each form of relief that they seek.'" <u>Id.</u> at 61 (quoting
<u>TransUnion LLC</u>, 594 U.S. at 431). "At the pleading stage, [the
Court] 'appl[ies] [to questions of standing] the same
plausibility standard used to evaluate a motion under Rule
12(b)(6)"; the Plaintiffs, therefore, "'need not definitively
prove [their] injury or disprove ... defenses' but need only
'plausibly plead on the face of [their] complaint' facts
supporting standing." <u>In re Fin. Oversight & Mgmt. Bd. for
P.R.</u>, 110 F.4th 295, 307-08 (1st Cir. 2024) (first quoting
<u>Gustavsen</u> v. <u>Alcon Lab'ys, Inc.</u>, 903 F.3d 1, 7 (1st Cir. 2018);
and then quoting <u>Tyler</u> v. <u>Hennepin Cnty.</u>, 598 U.S. 631, 637
(2023)).

Associational standing allows an organization to sue on
behalf of its members when "(a) its members would otherwise have
standing to sue in their own right; (b) the interests it seeks
to protect are germane to the organization's purpose; and (c)
neither the claim asserted nor the relief requested requires the
participation of individual members in the lawsuit." <u>Hunt</u> v.
<u>Washington State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977);

see also In re Fin. Oversight, 110 F. 4th at 308.  The Public

Officials challenge the second and third elements.

The Public Officials argue that "nothing in Plaintiffs'

Complaint . . . or in their PI motion establish that the

interests that organizational Plaintiffs seeks to protect are

germane to their purpose" and that this is so "particularly with

respect to the UAW, a labor union aimed at improving working

conditions for its members."  Defs.' Opp'n. 22 & n. 13.  Not so.

As APHA argues, the mission of APHA is to "[b]uild public health

capacity and promote effective policy and practice."  Decl.

Georges C. Benjamin, M.D. ¶ 2, ECF No. 38-23; see also Compl. ¶

19 (describing APHA as, among other things, "act[ing] to build

capacity in the public health community and champion[ing]

optimal, equitable health and well-being for all.").  The Public

Officials' alleged actions directly interfere with the APHA's

stated mission and core purpose as supported by the allegations

in the Complaint.  This element is therefore easily met.

The UAW argument is more nuanced.  The Public Officials

suggest a distinction between the UAW's core advocacy for

improved working conditions and the circumstances here, where,

as alleged, UAW members have lost grant funding, had previously

approved grants moved into administrative limbo, or had grant

programs they were prepared to apply for abruptly change,

requiring them to leave their current postdoctoral positions or

[18]

A0046

otherwise significantly alter their career paths. Compl. ¶¶
167-178. The UAW briefed this issue for this Court in response
to questioning at the hearing, and argued that the UAW "**exist[s]**
to represent [its] members' interests in relation to their terms
and conditions of employment," pointing to cases where unions
have been held to have associational standing based on their
members' threatened jobs, benefits, or other conditions of
employment. Suppl. Br. Regarding Standing Pl. UAW, ECF No. 79
2-3.

This Court is persuaded by these arguments, and by the
reasoning of these prior decisions. See, e.g., New York v.
McMahon, No. 25-10601, 2025 WL 1463009, at *18 (D. Mass. May 22,
2025) (Joun, J.) (ruling that labor union plaintiffs have
standing to sue on behalf of their members regarding actions
taken to shut down the Department of Education where members
"rely on federal student aid to afford their education and on
positions created through federal work study, without which
Union Plaintiffs' members would be forced to forgo higher
education, default on existing loans, or potentially opt out of
careers in public service"). Although some of the cases cited
by UAW relate to issues with which the plaintiff unions were
more directly involved, see International Union, United Auto.,
Aerospace & Agric. Implement Workers of Am. v. Brock, 477 U.S.
274, 286 (1986) ("paus[ing] only briefly" to find germaneness

A0047

requirement satisfied where UAW had lobbied for the precise benefits at issue in the suit), this Court is reminded that the purpose of the Hunt germaneness test is not to nitpick subtle gradations of harm, but rather to "raise[] an assurance that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary," ensuring "adversarial vigor," United Food & Com. Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 555-56 (1996). The UAW's submissions regarding its purpose and the impact of the challenged actions on its members, and its representations in court, reassure this Court that its plaintiff members will not be prejudiced by a lack of vigor here. See Decl. Neal Sweeney on Behalf of UAW, ECF No. 38-25.

The Public Officials' argument that the organizations' individual members must participate in this lawsuit fares no better. The Public Officials argue that the "sheer number of declarations submitted by the organizational Plaintiffs' members in an attempt to show irreparable harm" demonstrates that those "members must participate to show entitlement to injunctive relief -- particularly if this Court follows the proper practice of limiting any injunction to those that have shown that the Directives will cause them irreparable harm." Defs.' Opp'n 21. The Plaintiffs argue in response that the referenced

A0048

Case: 25-1612    Document: 00118351669    Page: 107    Date Filed: 10/10/2025    Entry ID: 6757137

declarations were submitted not to show standing but "to demonstrate the breadth of devastation that [the Public Officals'] actions are causing the medical community and public health," and the "boilerplate" nature of the Public Officials' reasoning with respect to the challenged terminations.  Pls.' Reply 7-8.  This Court agrees that the Plaintiffs here have challenged sweeping agency actions with, as alleged, virtually indistinguishable reasoning as regards the individual grants affected, and thus that the participation of individual members in this suit is not required.

For these reasons, this Court rules that both the APHA and UAW have associational standing to sue on their members' behalf.

### C. The Motion to Dismiss on the Merits

#### 1. The Administrative Procedure Act and Fifth Amendment Void for Vagueness Claims, Counts I - VI

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., provides that any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  The codified scope of judicial review under this statutory right of judicial review acts as a guardrail against unlawful agency actions under

A0049

Section 706.[2]  The APA was enacted by Congress in 1946 "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices," Loper Bright Enters. v. Raimondo, 603 U.S. 369, 391 (2024) (quoting United States v. Morton Salt Co., 338 U.S. 632, 644 (1950)), and "sets forth the procedures by

---

[2] Section 706 provides in pertinent part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(1)  compel agency action unlawfully withheld or unreasonably delayed; and

(2)  hold unlawful and set aside agency action, findings, and conclusions found to be—

    (A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B)  contrary to constitutional right, power, privilege, or immunity;

    (C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

. . . .

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

A0050

Case: 25-1612    Document: 00118351669    Page: 108    Date Filed: 10/10/2025    Entry ID: 6757137

which federal agencies are accountable to the public and their actions subject to review by the courts," Department of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 16 (2020) (quoting Franklin v. Massachusetts, 505 U.S. 788, 796 (1992)). Broadly, the APA establishes a rebuttable "presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" Id. (alteration in original) (quoting Abbott Lab'ys v. Gardner, 387 U.S. 136, 140 (1967)). The rebuttal of this presumption is made "by a showing that the relevant statute 'preclude[s]' review, § 701(a)(1), or that the 'agency action is committed to agency discretion by law,' § 701(a)(2)."[3] Id. at 17. The first exception is self-explanatory, and the Supreme Court has read the second exception "quite narrowly," applying "it to those rare 'administrative decision[s] traditionally left to agency discretion.'" Id. (alteration in original) (first quoting Weyerhaeuser Co. v. United Staes Fish & Wildlife Serv., 586 U.S. 9, 23 (2018); and then quoting Lincoln v. Vigil, 508 U.S. 182, 191 (1993)); Department of Com. v. New York, 588 U.S.

---

[3] Section 701 provides in pertinent part:

(a) This chapter applies, according to the provisions thereof, except to the extent that--
    (1) statutes preclude judicial review; or
    (2) agency action is committed to agency discretion by law.

5 U.S.C. § 701(a).

A0051

752, 772 (2019) ("[W]e have read the § 701(a)(2) exception for
action committed to agency discretion 'quite narrowly,
restricting it to "those rare circumstances where the relevant
statute is drawn so that a court would have no meaningful
standard against which to judge the agency's exercise of
discretion."'" (quoting Weyerhaeuser Co., 586 U.S. at 23)).
Examples of decisions traditionally left to agency discretion
include "a decision not to institute enforcement proceedings, or
a decision by an intelligence agency to terminate an employee in
the interest of national security." New York, 588 U.S. at 772
(citations omitted).  The Court's review depends upon the type
of claim made.

As to actions brought pursuant Section 706(2)(A), here
Count I of the Complaint, the APA "instructs reviewing courts to
set aside agency action that is 'arbitrary, capricious, an abuse
of discretion, or otherwise not in accordance with law.'"  Id.
at 771 (quoting 5 U.S.C. § 706(2)(A)).  "An agency action
qualifies as 'arbitrary' or 'capricious' if it is not
'reasonable and reasonably explained.'"  Ohio v. Environmental
Prot. Agency, 603 U.S. 279, 292 (2024) (quoting Federal Commc'ns
Comm'n v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)).

Review by the Court under the arbitrary or capricious
standard of Section 706(2)(A) is narrow, because all that is
"required [is for] agencies to engage in 'reasoned

[24]

A0052

decisionmaking.'" Regents of the Univ. of Cal., 591 U.S. at 16

(quoting Michigan v. Environmental Prot. Agency, 576 U.S. 743,

750 (2015)).  To be sure, this Court may not "substitute its

judgment for that of the agency," but rather "must ensure, among

other things, that the agency has offered 'a satisfactory

explanation for its action[,] including a rational connection

between the facts found and the choice made.'" Ohio, 603 U.S.

at 292 (alteration in original) (first quoting Federal Commc'ns

Com. v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009);

and then quoting Motor Vehicle Mfrs. Ass'n of United States,

Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

Said another way, this Court's review "simply ensures that the

agency has acted within a zone of reasonableness and, in

particular, has reasonably considered the relevant issues and

reasonably explained the decision." Prometheus Radio Project,

592 U.S. at 423.

      This Court, as a general proposition, is "ordinarily

limited to evaluating the agency's contemporaneous explanation

in light of the existing administrative record." New York, 588

U.S. at 780.  In the usual course, this is because "further

judicial inquiry into 'executive motivation' represents 'a

substantial intrusion' into the workings of another branch of

Government and should normally be avoided." Id. at 781 (quoting

Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S.

A0053

Case: 25-1612     Document: 00118351669     Page: 112     Date Filed: 10/10/2025     Entry ID: 6757137

252, 268 n.18 (1977)).  Indeed, this Court may neither "reject

an agency's stated reasons for acting simply because the agency

might also have had other unstated reasons" nor "set aside an

agency's policymaking decision solely because it might have been

influenced by political considerations or prompted by an

Administration's priorities."  Id.  This general rule recognizes

the reality that "[a]gency policymaking is not a 'rarified

technocratic process, unaffected by political considerations or

the presence of Presidential power.'"  Id. (quoting Sierra Club

v. Costle, 657 F.2d 298, 408 (D.C. Cir. 1981)).  In fact, every

Administration enjoys the benefit of the bully pulpit, and

agency "decisions are routinely informed by unstated

considerations of politics, the legislative process, public

relations, interest group relations, foreign relations, and

national security concerns (among others)."  Id.  Such routine

decisions are not within the purview of this Court, but rather

appropriately within the exclusive realm of the Executive

Branch.  The general rule presumes rational actors that are

proceeding lawfully, as opposed to using lawful explanations as

a means to unlawful ends.

Nevertheless, the Supreme Court has "recognized a narrow

exception to the general rule against inquiring into the mental

processes of administrative decisionmakers" upon a "strong

showing of bad faith or improper behavior" -- such as a pretext

A0054

-- "where such an inquiry may be warranted" and, in appropriate circumstances, "may justify extra-record discovery." Id. (citations omitted). In particular, "unlike a typical case in which an agency may have both stated and unstated reasons for a decision," when "an explanation for agency action . . . is incongruent with what the record reveals about the agency's priorities and decisionmaking process," the Court is not required to "ignore the disconnect between the decision made and the explanation given." Id. at 784-85. While typically "review is deferential," it does not require the Court to blind itself to reality; it is "not required to exhibit a naiveté from which ordinary citizens are free." Id. at 785 (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). The whole point of "[t]he reasoned explanation requirement of administrative law, after all, is . . . to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." Id. The explanation must be the one invoked contemporaneously at the time of the action, not created in hindsight. Regents of the Univ. of Cal., 591 U.S. at 20-23.

An APA claim that agency action is "not in accordance with law" is a subpart of Section 706(2)(A), alleged here in Count II of the Complaint. In reviewing this claim "a reviewing court must uphold an agency's decision if it is: (1) devoid of legal

[27]

A0055

Case: 25-1612    Document: 00118351669    Page: 114    Date Filed: 10/10/2025    Entry ID: 6757137

errors; and (2) "supported by any rational review of the
record." New York v. Trump, No. 25-CV-39-JJM-PAS, 2025 WL
715621, at *9 (D.R.I. Mar. 6, 2025) (quoting Mahoney v. Del
Toro, 99 F.4th 25, 34 (1st Cir. 2024)).

 An APA action brought under Section 706(2)(C), here Count
III of the Complaint, challenges agency action "in excess of
statutory jurisdiction, authority, or limitations, or short of
statutory right." Id. The "[C]ourt[] must exercise [its]
independent judgment in deciding whether an agency has acted
within its statutory authority." Loper Bright, 603 U.S. at 412.
"[T]he [C]ourt fulfills [its] role by recognizing constitutional
delegations, 'fix[ing] the boundaries of [the] delegated
authority. . .and ensuring the agency has engaged in '"reasoned
decisionmaking"' within those boundaries." Id. at 395 (citation
omitted) (first quoting Henry P. Monaghan, Marbury and the
Administrative State, 83 Colum. L. Rev. 1, 27 (1983); and then
quoting Michigan, 576 U.S. at 750). In sum, "Congress expects
courts to do their ordinary job of interpreting statutes, with
due respect for the views of the Executive Branch. And to the
extent that Congress and the Executive Branch may disagree with
how the courts have performed that job in a particular case,
they are of course always free to act by revising the statute."
Id. at 403.

A0056

A claim brought under Section 706(2)(B), here Count IV, seeks to contest agency action "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). "An analysis of whether agency action violates the APA because it is contrary to constitutional right mirrors the analysis of whether the agency action violates the relevant constitutional provision." National Educ. Ass'n v. United States Dept. of Educ., --- F.Supp. 3d ----, No. 25-CV-091-LM, 2025 WL 1188160, at *27 (D.N.H. Apr. 24, 2025).

Finally, claims seeking to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." Norton v. Southern Utah Wilderness All., 542 U.S. 55, 64 (2004) (emphasis omitted). This is a high standard inasmuch as "[t]he central question in evaluating such a claim is whether the agency's delay 'is so egregious that mandamus is warranted.'" Rezaii v. Kennedy, No. 1:24-CV-10838-JEK, 2025 WL 750215, at *4 (D. Mass. Feb. 24, 2025) (Kobick, J.) (quoting Kokajko v. Federal Energy Regul. Comm'n, 837 F.2d 524, 526 (1st Cir. 1988)).

With this outline of the law in mind, the Court proceeds to the parties' arguments.

The Public Officials first argue that the Section 706(2) claims (Counts I, II, III, IV) fail as matter of law because the

[29]

A0057

Case: 25-1612    Document: 00118351669    Page: 116    Date Filed: 10/10/2025    Entry ID: 6757137

terminations complied with the terms of the agreements.  Defs.'
Opp'n 22.  The Public Officials argue that 2 C.F.R. § 200.340 is
incorporated into each Notice of Award, and that this regulation
permits the Public Officials to terminate an award "if an award
no longer effectuates the program goals or agency priorities."
Id. (citing 2 C.F.R. § 200.340(a)(4)).  The Public Officials
omit the complete sentence, which provides significant context.
Under the cited regulation, an agency can terminate an award
"pursuant to the terms and conditions of the Federal award,
including, **to the extent authorized by law**, if an award no
longer effectuates the program goals or agency priorities."  2
C.F.R. § 200.340 (emphasis added).  This is a distinction with a
difference, because "this regulation only allows agencies to
terminate . . . agreements 'to the extent authorized by law,'"
and "this regulation cannot authorize actions that contravene
statutory requirements, nor does it relieve [the Public
Officials] of [their] duty to follow the law."  Pacito v. Trump,
No. 2:25-CV-255-JNW, 2025 WL 893530, at *9 (W.D. Wash. Mar. 24,
2025) (quoting 2 C.F.R. § 200.340(a)(4)).

    As an initial matter, it is undisputed that this regulation
has not yet been adopted by HHS, and will not be adopted until
October 2025; accordingly, the regulation is apparently
inapplicable here.  The Public Officials counter that the
regulation has been incorporated into the terms and conditions

[30]

A0058

of the grantees' awards. Even if the regulation applied as a contractual term (which this Court need not decide), whether the "award no longer effectuates the programs goals or agency priorities" can **still** be challenged under the APA where the Plaintiffs allege a failure to provide a reasonable explanation. See American Ass'n of Colls. for Tchr. Educ. v. McMahon, No. 1:25-CV-00702-JRR, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025) (ruling that even if termination letters invoked a valid reason to terminate under 2 C.F.R. § 200.340, APA claims survived because the letters "fail[ed] to provide [the plaintiffs] any workable, sensible, or meaningful reason or basis for the termination of their awards"). The Court need go no further at the motion to dismiss stage.

The Public Officials next argue that their explanations were reasoned and reasonable under the circumstances. Defs.' Opp'n 26. At the motion to dismiss stage, the Complaint has plausibly alleged otherwise -- that the explanations are conclusory and vague. The first examples cite to undefined gender identity issues untethered to the specific terminated grants, with what looks more like a political statement than reasoning about the grants, and without any explanation as to why no corrective action is possible:

[31]

A0059

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

ECF No. 38-20 50; and again,

This award no longer effectuates agency priorities. Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs. Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

ECF No. 38-24 37; and again, this time with so-called "DEI"

language,

A0060

This award no longer effectuates agency priorities. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the

health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision."[6] no corrective action is possible here. The premise of Project Number ▮▮▮▮▮▮▮ is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

ECF No. 38-28 146-47, and again,

A0061

> This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

> Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[6] no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

ECF No. 38-32 34-35.  The Public Officials argue that the Plaintiffs are merely disagreeing with actions of the agencies "designed to align with a democratically elected administration."  Defs.' Opp'n. 25-26 & n. 15.  While the Public Officials may prove this at a hearing or trial on the merits with a more fulsome record, taking all inferences in favor of the Plaintiffs, the Court cannot make this conclusion at this stage.  Indeed, another session of this Court, and other courts, have recently found similar, and in some cases almost identical language in a different agency's terminations sufficient to issue a temporary restraining order.  California v. United States Dep't of Educ., No. CV 25-10548-MJJ, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025) (Joun, J.) ("In the absence of any

[34]

A0062

reasoning, rationale, or justification for the termination of
the grants, the Department's action is arbitrary and
capricious."); see also Southern Educ. Found. v. United States
Dep't of Educ., No. CV 25-1079 (PLF), 2025 WL 1453047, at *17
(D.D.C. May 21, 2025) ("The Court finds that the Department's
Termination Letter provides no reasoned explanation for the
grant termination. In fact, the Termination Letter's list of
possible bases 'is so broad and vague as to be limitless; devoid
of import, even.'") (citing McMahon, 2025 WL 833917, at *21)).[4]
The Public Officials' motion to dismiss is denied on this
ground.

Next, the Public Officials argue that their grant
terminations are consistent with the relevant statutes requiring
them to support research into "minority-related topics,"
claiming that there are other "DEI"-related grants that are

_____

[4] The Court observes that neither the EOs, nor any of the
policy statements to follow, nor counsel for the Public
Officials, has, to date, provide a working definition of
Diversity, Equity and Inclusion. The Court pressed this issue
at the hearing on this motion, but no satisfactory answer was
provided by the Public Officials. This is not the first court
to grapple with the absence of a definition of DEI. See
National Ass'n of Diversity Officers in Higher Educ. v. Trump,
No. 1:25-CV-00333-ABA, 2025 WL 573764, at *26 (D. Md. Feb. 21,
2025) ("[N]either [EO 14151] nor [EO 14173] gives guidance on
what the new administration considers to constitute 'illegal DEI
discrimination and preferences,' or '[p]romoting "diversity,"'
or 'illegal DEI and DEIA policies,' or what types of 'DEI
programs or principles' the new administration considers
'illegal' and is seeking to 'deter[.]'" (citations omitted)).

[35]

A0063

Case: 25-1612　　Document: 00118351669　　Page: 122　　Date Filed: 10/10/2025　　Entry ID: 6757137

proceeding.[5]　Defs. Opp'n 27-28.　The Public Officials also point
to continued support of certain grants for the "training and
development of a diverse corp of health science researchers."
Opp'n Mem. 27.[6]　The Plaintiffs attack the substance of the
Public Officials' factual claims, Pls.' Reply 8-9, and at the
motion to dismiss stage, even if true the maintenance of some
so-called "DEI" programs or programs that promoted diversity in
research, does not necessarily mean agency action with respect
to other programs was neither arbitrary nor capricious.

---

[5] The Court observes that Public Officials appear to fold
"minority-related topics" into DEI.　Defs.' Opp'n 27.　The
Plaintiffs also pick up on this definitional disparity.　Pls.'
Reply 8 ("Defendants fail to define 'DEI grants' or how, for
example, a grant that addresses specific challenges related to
kidney health faced by racial minorities constitutes 'DEI.'").
[6] Amici Curiae describe the importance of fostering a
diverse corp of health professionals, describing the
disadvantages of a homogenous research community, and explaining
advantages such as illuminating blind spots and fostering
innovation that a diverse research community brings.　See Br.
Amici Curae Biological and Biomedical Research Societies 6-8,
ECF No. 81.　As Amici posits:

> Science is about solving complex problems, and
> progress in scientific endeavors demands creativity,
> curiosity, and drive. Maintaining a rich and vibrant
> collaboration in science, and bringing different
> perspectives and skillsets to the forefront of
> discovery, is paramount to maintaining America's
> competitive edge in our evolving world.　As Congress—
> and NIH itself—have long understood, "[d]iversity
> enhances excellence and innovation." It does not
> stifle them.

Id.

A0064

The Public Officials also argue that they have complied with the NIH's statutory requirement to develop a six year strategic plan under 42 U.S.C. § 282(m)(1). The point of the six-year plan, is "to provide direction to the biomedical research investments made by the National Institutes of Health, to facilitate collaboration across the institutes and centers, to leverage scientific opportunity, and to advance biomedicine." Id. The Public Officials are correct that, on the one-hand it is not a "six-year straight jacket," but at the same time the Plaintiffs persuasively argue that under a separate subsection of that statute the as the Plaintiffs' argue that the NIH is required to "ensure that the resources of the National Institutes of Health are sufficiently allocated for research projects identified in strategic plans." 42 U.S.C. § 282(b)(6). While it is apparently undisputed that the NIH complied with preparation of a six year plan, whether the Public Officials have thwarted the operations of the statute is at least plausibly pleaded. The Court is persuaded, in part, by Amici's description of the complex, statutorily imposed stability in NIH funding of priorities. See Br. Amici Curiae of the Association of American Medical Colleges et al. 14, ECF 76. At the motion to dismiss stage, the Court credits the allegations of the Complaint, and the motion to dismiss is denied as to this ground.

A0065

The Public Officials then challenge the Plaintiffs' Due Process, void-for vagueness claim, Counts IV and VI, arguing that the void-for-vagueness doctrine applies only to statutes or regulations forbidding or requiring primary conduct, that the Plaintiff's facial challenge fails as matter of law, that the Plaintiffs have alleged no protected liberty or property interest, and that vagueness standards are relaxed in the government funding context. Defs.' Opp'n 29-31. This Court agrees with the Public Officials' first argument. The Plaintiffs point to cases applying the void-for-vagueness doctrine to facially similar but factually distinguishable cases, all of which involve threatened penalties for violating vague standards. See National Educ. Ass'n v. United States Dep't of Educ., No. 25-cv-091, 2025 WL 1188160, at *18 (D.N.H. Apr. 24, 2025) (evaluating letter threatening Title VI enforcement based on vague, DEI-based standard); National Ass'n for Advancement of Colored People v. United States Dep't of Educ., No. 25-cv-1120, 2025 WL 1196212, at *6 (evaluating certification requirement "threaten[ing] serious consequences for schools' failure to comply with vaguely-defined prohibitions on DEI initiatives"). That is not what the Plaintiffs have alleged here. Accordingly, for the reasons stated above, the motion to dismiss is ALLOWED as to Count VI, and as to Count IV, which incorporates the same void-for-vagueness argument.

A0066

Case: 25-1612   Document: 00118351669   Page: 125   Date Filed: 10/10/2025   Entry ID: 6757137

The Public Officials also argue that the Plaintiffs' claim of unlawfully withheld or unreasonably delayed agency action fails as matter of law, because the Plaintiffs have not identified any discrete and mandatory agency action the agency has failed to take, the agency has discretion to defer deciding on grant applications and to hold meetings at its own pace, and any delays that might have occurred have ceased, because, after a brief pause, the agency has resumed meetings and processing applications at a rapid pace.  Defs.' Opp'n 31-34.

As stated above, "a claim under §706(1) can proceed only where a plaintiff asserts that an agency failed to take **discrete** agency action that it is **required to take**," and "broad programmatic attack[s]" will not be entertained.  Norton v. Southern Utah Wilderness All., 542 U.S. 55, 64 (2004).  There is some force to the Public Officials' argument that, as the Supreme Court has put it, "pervasive oversight" over the "manner and pace" of agency action "is not contemplated by the APA," id. at 67, but they do not deal with the entirety of what the Plaintiffs have alleged.  Specifically, the Plaintiffs allege that NIH has not only withheld decisions on pending applications, but also removed submitted applications from study sections and withheld Notices of Award from previously approved submissions.  See Pls.' Mem. 10-11.

A0067

As alleged, the Public Officials have failed, and given some indication that they will continue to fail, to complete their required task of evaluating all grant applications properly submitted and either approving, deferring, or disapproving them.  42 C.F.R. § 52.5 (providing that properly filed applications "**shall** be evaluated" and subject to one of these three dispositions).  This raises a fact issue -- whether NIH is processing affected applications at all, as opposed to something else -- that would be improper for this Court to decide at this stage.  Accordingly, the Public Officials' motion to dismiss is DENIED as to Count V.

### 2. Separation of Powers, Count VII

Repose of power in three separate branches of government -- the separation of powers -- is a check and balance system "designed to preserve the liberty of all the people."  Collins v. Yellen, 594 U.S. 220, 245 (2021).  The doctrine finds its roots right here in the Commonwealth of Massachusetts' Constitution, as recounted by Justice Scalia:

> It is the proud boast of our democracy that we have "a government of laws and not of men."  Many Americans are familiar with that phrase; not many know its derivation. It comes from Part the First, Article XXX, of the Massachusetts Constitution of 1780, which reads in full as follows:
>
> > "In the government of this Commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: The

[40]

A0068

> executive shall never exercise the
> legislative and judicial powers, or either
> of them: The judicial shall never exercise
> the legislative and executive powers, or
> either of them: to the end it may be a
> government of laws and not of men."
>
> The Framers of the Federal Constitution similarly
> viewed the principle of separation of powers as the
> absolutely central guarantee of a just Government . .
> . . Without a secure structure of separated powers,
> our Bill of Rights would be worthless, as are the
> bills of rights of many nations of the world that have
> adopted, or even improved upon, the mere words of
> ours.

Morrison v. Olson, 487 U.S. 654, 697 (1988) (Scalia, J.,

dissenting). "So whenever a separation-of-powers violation

occurs, any aggrieved party with standing may file a

constitutional challenge." Collins, 594 U.S. at 245. "If the

constitutional structure of our Government that protects

individual liberty is compromised, individuals who suffer

otherwise justiciable injury may object." Bond v. United

States, 564 U.S. 211, 223 (2011). The Public Officials argue

that there is no separation-of-powers issue here because

Congress provides the Executive with broad discretion over grant

termination. Defs.' Opp'n 34-36. The Plaintiffs argue that the

NIH's general discretionary authority is limited by the agency's

statutory mandate, which requires research into certain topics

the agency now labels "DEI." Pls.' Reply 15. The Plaintiffs'

argument in their reply is limited largely to reference to their

APA argument, id., which addresses the many ways they believe

A0069

Case: 25-1612    Document: 00118351669    Page: 128    Date Filed: 10/10/2025    Entry ID: 6757137

the Public Officials have "flouted congressional mandates," id. at 8.

The Plaintiffs' reference to their APA claims on this count is indicative of why this Court declines to analyze exhaustively the potential separation-of-powers issues here.  As another court has observed in a similar context, "plaintiffs' concerns are better addressed by []other count[s] of their complaint," that is, their APA claims, and "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."  Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 40 (D.D.C. 2018) (quoting Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347 (Brandeis, J., concurring)).  "[T]his is a classic APA claim," and, because "judging the constitutionality of action taken by a coequal branch of government is 'the gravest and most delicate duty that this Court is called on to perform,'" this Court "must take care not to transform every claim that an agency action conflicts with a statute into a freestanding separation of powers claim." Id. (quoting Northwest Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 204 (2009)).  This Court declines to do so here.

The essence of the Plaintiffs' claims, broadly, is that the Public Officials have acted contrary to their statutory mandate

A0070

Case: 25-1612    Document: 00118351669    Page: 129    Date Filed: 10/10/2025    Entry ID: 6757137

and in conflict with statutory and regulatory requirements, not that they have seized some general power never before permitted to the Executive Branch. This is the stuff of APA litigation, which appears to provide an avenue for complete relief in this matter. See id. at 40 ("As plaintiffs allege in their substantive APA claim the same infirmities that underlie their separation of powers claim, the Court will be able to consider the allegations fully in that context.").

The First Circuit has suggested, in a very different context, that a separation of powers claim might be viable were an agency "by its actions to repeal an act of Congress or displace a long standing power of the United States." United States v. Lahey Clinic Hosp., Inc., 399 F.3d 1, 14 (1st Cir. 2005), but that is not what the Plaintiffs have alleged here. Instead, they have alleged several ways in which the agency's actions may be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

For these reasons, the motion to dismiss is ALLOWED as to Count VII.

**III. CONCLUSION**

For the reasons stated above, the Motion to Dismiss, ECF No. 66, is ALLOWED in part as to Counts IV, VI, and VII, which

A0071

are dismissed without prejudice, and DENIED in part as to the
remaining Counts.

**SO ORDERED.**

William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[7]

---

[7] This is how my predecessor, Peleg Sprague (D. Mass 1841-
1865), would sign official documents. Now that I'm a Senior
District Judge I adopt this format in honor of all the judicial
colleagues, state and federal, with whom I have had the
privilege to serve over the past 47 years.

[44]

Case: 25-1612    Document: 00118351669    Page: 130    Date Filed: 10/10/2025    Entry ID: 6757137

A0072

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, *et al.*,

       *Plaintiffs,*

   v.

ROBERT F. KENNEDY, JR., *et al.*,

       *Defendants.*

No. 1:25-cv-10814-WGY

## ~~[REVISED PROPOSED]~~ RULE 54(b) FINAL JUDGMENT

For all the reasons stated on the record on June 16, 2025, plaintiffs are entitled to judgment

on their claim that the Challenged Directives[1] and Resulting Grant Terminations[2] are arbitrary and

capricious in violation of the Administrative Procedure Act, 5 U.S.C. §706(2)(A).  Pursuant to

---

[1] The "Challenged Directives" consist of (1) the February 10, 2025, directive entitled "Secretarial Directive on DEI-Related Funding" reproduced at pp. 4–5 of the administrative record; (2) the February 12, 2025, memorandum entitled "NIH Review of Agency Priorities Based on the New Administration's Goals" reproduced at p. 9 of the administrative record; (3) the February 13, 2025, memorandum entitled "Supplemental Guidance to Memo Entitled – NIH Review of Agency Priorities Based on the New Administration's Goals" reproduced at p. 16 of the administrative record; (4) the February 21, 2025, memorandum entitled "Directive on NIH Priorities" and "Restoring Scientific Integrity and Protecting the Public Investment in NIH Awards" reproduced at pp. 2930–2931 of the administrative record; (5) the March 4, 2025, directive entitled "Staff Guidance - Award Assessments for Alignment with Agency Priorities—March 2025" reproduced at pp. 2135–2172 of the administrative record; (6) the March 13, 2025, directive entitled "Award Revision Guidance and List of Terminated Grants via letter on 3/12" reproduced at pp. 1957–1968 of the administrative record; and (7) subsequent revisions to the "Award Assessments for Alignment with Agency Priorities" directive dated March 25 (reproduced at pp. 3216–3230 of the administrative record), May 7 (reproduced at pp. 3547–3581 of the administrative record), May 15 (reproduced at pp. 3516–3546 of the administrative record), and undated (reproduced at pp. 3231–3350 of the administrative record).

[2] The term "Resulting Grant Terminations" refers to any terminations of grants (including subawards) awarded by the National Institutes of Health (including any of NIH's constituent institutes and centers) to any plaintiff state (including any plaintiff state's instrumentalities, public colleges and universities, subdivisions, counties, and municipalities) on the basis of one or more of the Challenged Directives, the Challenged Directives as a whole, or any of the reasoning therein.  For purposes of this definition, a "termination" includes failure to award a non-competing continuation of a grant.  The Resulting Grant Terminations include those specific grant terminations that plaintiffs identified in the spreadsheet submitted to the Court and served upon defendants on June 13, 2025, which spreadsheet it attached hereto as Exhibit A.

Federal Rule of Civil Procedure 54(b), and for all the reasons stated on the record, the Court finds

that there is no just reason to delay entry of judgment on that claim.

It is therefore **ORDERED**, **ADJUDGED**, and **DECREED** that:

I.    The Challenged Directives as a whole are arbitrary and capricious in violation of 5 U.S.C. §706(2)(A). Thus, the Challenged Directives as a whole are void, illegal, and of no force and effect and are hereby vacated and set aside pursuant to §706(2).

II.    The Resulting Grant Terminations are arbitrary and capricious in violation of 5 U.S.C. §706(2)(A). Thus, the Resulting Grant Terminations are void, illegal, and of no force and effect, and are hereby vacated and set aside pursuant to §706(2).

III.    Judgment shall enter in favor of plaintiffs and against defendants on Count 3 of the Amended Complaint.

IV.    The Court retains jurisdiction to enforce this judgment.

The Clerk is directed to enter judgment in conformity with the foregoing forthwith.

June _23_, 2025

_William M. Young_
**HON. WILLIAM G. YOUNG**
Judge of the United States

2

A0074

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN PUBLIC HEALTH
ASSOCIATION; IBIS REPRODUCTIVE
HEALTH; INTERNATIONAL UNION,
UNITED AUTOMOBILE, AEROSPACE,
AND AGRICULTURAL IMPLEMENT
WORKERS (UAW); BRITTANY
CHARLTON; KATIE EDWARDS; PETER
LURIE; and NICOLE MAPHIS,

        *Plaintiffs,*

      v.

NATIONAL INSTITUTES OF HEALTH;
JAY BHATTACHARYA, *in his official
capacity as Director of the National Institutes
of Health*; UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and ROBERT F.
KENNEDY, JR., *in his official capacity as
Secretary of the United States Department of
Health and Human Services,*

        *Defendants.*

Case No. 1:25-cv-10787-WGY

## [PROPOSED] RULE 54(b) PARTIAL FINAL JUDGMENT

For all the reasons stated on the record on June 16, 2025, Plaintiffs American Public Health

Association ("APHA"), Ibis Reproductive Health, International Union, United Automobile,

Aerospace, and Agricultural Implement Workers ("UAW"), Brittany Charlton, Katie Edwards,

Peter Lurie, and Nicole Maphis (collectively, "Plaintiffs") are entitled to judgment on their claim

that the challenged "Directives" (specified below in paragraphs 1(a)-(j)) and "Resulting Grant

A0075

Terminations"[1] are arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Pursuant to Federal Rule of Civil Procedure 54(b), and for all the reasons stated on the record, the Court finds that there is no just reason to delay entry of judgment on that claim.

It is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1. The following Directives from the National Institute of Health ("NIH") and U.S. Department of Health & Human Services ("HHS"), taken as a whole, are **DECLARED** to be final agency action, arbitrary and capricious, and unlawful, in violation of 5 U.S.C. § 706(2)(A):

   a. The February 10, 2025 directive issued by the Acting Secretary of HHS entitled "Secretarial Directive on DEI-Related Funding." AR0004-05.[2]

   b. The February 12, 2025 memorandum entitled "NIH Review of Agency Priorities Based on the New Administration's Goals." AR0009.

   c. The February 13, 2025 memorandum entitled "Supplemental Guidance to Memo Entitled NIH Review of Agency Priorities Based on the New Administration's Goals." AR0016.

   d. The February 21, 2025 "Directive on NIH Priorities" entitled "Restoring Scientific Integrity and Protecting the Public Investment in NIH Awards." AR2930-31.

   e. The March 4, 2025 memorandum issued by NIH, entitled "Staff Guidance – Award Assessments for Alignment with Agency Priorities – March 2025." AR2136-42.

   f. The March 13, 2025 directive issued by Michelle Bulls, entitled "Award Revision Guidance and List of Terminated Grants via letter on 3/12." AR1957-68.

---

[1] The term "Resulting Grant Terminations" refers to any terminations of any grants (including subawards and supplements) of Plaintiffs or members of Plaintiff associations APHA and UAW by the National Institutes of Health (including any of NIH's constituent institutes and centers), on the basis of one or more of the Challenged Directives, the Challenged Directives as a whole, or any of the reasoning therein, but specifically limited to, those specific grant terminations, including non-competitive renewals, that Plaintiffs identified in the spreadsheets submitted to the Court and served upon defendants on May 27, 2025 and June 13, 2025, which spreadsheets are Attached hereto as Exhibits A and Exhibit B, respectively.

[2] References herein to the administrative record produced by Defendants on June 2, 2025 match the page numbers in the record (*e.g.*, "AR0004" corresponds to "NIH_GRANTS_000004").

2

    g.   The March 20, 2025 memorandum issued by Sean R. Keveney, the Acting General Counsel at HHS, entitled "Termination of COVID-19 Grants." AR2591.

    h.   The March 25, 2025 memorandum issued by NIH, entitled "NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – March 2025." AR3218.

    i.   The May 7, 2025 memorandum issued by Michelle Bulls, entitled "NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – DRAFT." AR3547-77.

    j.   The May 15, 2025 memorandum issued by Michelle Bulls, entitled "NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – DRAFT." AR3516-46.

    k.   The undated memoranda titled "NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities – Draft." AR3231-3350.

2.   Pursuant to 5 U.S.C. § 706(2), the Directives set forth in Paragraphs 1(a)-(j) of this Judgment are hereby **OF NO EFFECT, VOID, ILLEGAL, SET ASIDE AND VACATED.**

3.   The Resulting Grant Terminations pursuant to the Directives are **DECLARED** to be unlawful, arbitrary and capricious final agency actions under 5 U.S.C. § 706(2)(A).

4.   Pursuant to 5 U.S.C. § 706(2), the Resulting Grant Terminations are hereby **OF NO EFFECT, VOID, ILLEGAL, SET ASIDE AND VACATED.**

5.   Judgment shall enter in favor of Plaintiffs and against Defendants on Count I.A and I.C of the Complaint.

6.   The Court retains jurisdiction to enforce this Judgment.

The Clerk is directed to enter judgment in conformity with the foregoing forthwith.

June __23__, 2025

                                     *William G. Young*
                                     **HON. WILLIAM G. YOUNG**
                                     Judge of the United States

A0077

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                  )
AMERICAN PUBLIC HEALTH ASSOCIATION;)
IBIS REPRODUCTIVE HEALTH;          )
INTERNATIONAL UNION, UNITED        )
AUTOMOBILE, AEROSPACE, AND         )
AGRICULTURAL IMPLEMENT             )
WORKERS (UAW); BRITTANY CHARLTON;  )
KATIE EDWARDS; PETER LURIE; and    )
NICOLE MAPHIS,                     )
                                   )
                 Plaintiffs,       )   CIVIL ACTION NO.
          v.                       )   25-10787-WGY
                                   )
NATIONAL INSTITUTES OF HEALTH;     )
JAY BHATTACHARYA, in his official  )
capacity as Director of the        )
National Institutes of Health;     )
UNITED STATES DEPARTMENT OF HEALTH )
AND HUMAN SERVICES; and ROBERT F.  )
KENNEDY, JR., in his official      )
capacity as Secretary of the       )
United States Department of Health )
and Human Services,                )
                                   )
                 Defendants.       )
_____  )


_____
                                  )
COMMONWEALTH OF MASSACHUSETTS;    )
STATE OF CALIFORNIA; STATE OF     )
MARYLAND; STATE OF WASHINGTON;    )
STATE OF ARIZONA; STATE OF        )
COLORADO; STATE OF DELAWARE;      )
STATE OF HAWAI'I; STATE OF        )
MINNESOTA; STATE OF NEVADA;       )
STATE OF NEW JERSEY; STATE OF     )
NEW MEXICO; STATE OF NEW YORK;    )
STATE OF OREGON; STATE OF RHODE   )
ISLAND; and STATE OF WISCONSIN,   )
                                  )
```

[1]

A0078

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| v. | ) | 25-10814-WGY |
|  | ) |  |
| ROBERT F. KENNEDY, JR., in his | ) |  |
| official capacity as Secretary of | ) |  |
| Health and Human Services; | ) |  |
| UNITED STATES DEPARTMENT OF | ) |  |
| HEALTH AND HUMAN SERVICES; | ) |  |
| JAYANTA BHATTACHARYA, in his | ) |  |
| official capacity as Director of | ) |  |
| the National Institutes of Health; | ) |  |
| NATIONAL INSTITUTES OF HEALTH; | ) |  |
| NATIONAL CANCER INSTITUTE; | ) |  |
| NATIONAL EYE INSTITUTE; | ) |  |
| NATIONAL HEART, LUNG, AND BLOOD | ) |  |
| INSTITUTE; NATIONAL HUMAN GENOME | ) |  |
| RESEARCH INSTITUTE; NATIONAL | ) |  |
| INSTITUTE ON AGING; NATIONAL | ) |  |
| INSTITUTE ON ALCOHOL ABUSE AND | ) |  |
| ALCOHOLISM; NATIONAL INSTITUTE | ) |  |
| OF ALLERGY AND INFECTIOUS | ) |  |
| DISEASES; NATIONAL INSTITUTE OF | ) |  |
| ARTHRITIS AND MUSCULOSKELETAL AND | ) |  |
| SKIN DISEASES; NATIONAL | ) |  |
| INSTITUTE OF BIOMEDICAL IMAGING | ) |  |
| AND BIOENGINEERING; EUNICE KENNEDY | ) |  |
| SHRIVER NATIONAL INSTITUTE OF | ) |  |
| CHILD HEALTH AND HUMAN | ) |  |
| DEVELOPMENT; NATIONAL INSTITUTE | ) |  |
| ON DEAFNESS AND OTHER | ) |  |
| COMMUNICATION DISORDERS; | ) |  |
| NATIONAL INSTITUTE OF DENTAL | ) |  |
| AND CRANIOFACIAL RESEARCH; | ) |  |
| NATIONAL INSTITUTE OF DIABETES | ) |  |
| AND DIGESTIVE AND KIDNEY | ) |  |
| DISEASES; NATIONAL INSTITUTE | ) |  |
| ON DRUG ABUSE; NATIONAL | ) |  |
| INSTITUTE OF ENVIRONMENTAL | ) |  |
| HEALTH SCIENCES; NATIONAL | ) |  |
| INSTITUTE OF GENERAL MEDICAL | ) |  |
| SCIENCES; NATIONAL INSTITUTE OF | ) |  |
| MENTAL HEALTH; NATIONAL INSTITUTE | ) |  |
| ON MINORITY HEALTH AND HEALTH | ) |  |
| DISPARITIES; NATIONAL INSTITUTE | ) |  |
| OF NEUROLOGICAL DISORDERS AND | ) |  |

A0079

STROKE; NATIONAL INSTITUTE OF        )
NURSING RESEARCH; NATIONAL LIBRARY   )
OF MEDICINE; NATIONAL CENTER FOR     )
ADVANCING TRANSLATIONAL SCIENCES;    )
JOHN E. FOGARTY INTERNATIONAL        )
CENTER FOR ADVANCED STUDY            )
IN THE HEALTH SCIENCES; NATIONAL     )
CENTER FOR COMPLEMENTARY AND         )
INTEGRATIVE HEALTH; and CENTER       )
FOR SCIENTIFIC REVIEW,               )
                                     )
                    Defendants.      )
_____)


YOUNG, D.J.                                    July 2, 2025


**FINDINGS OF FACT, RULINGS OF LAW, AND
ORDER FOR PARTIAL SEPARATE AND FINAL JUDGMENT**

**I.   INTRODUCTION**

These consolidated actions are two of many in this
district, and across the Nation, claiming that current Executive
Branch policies, mostly through Executive Orders, have been
implemented by various agencies in violation of the
Administrative Procedure Act, statutory law, and the
Constitution.  Based upon the evidence presented at the hearing
on the APA claims and bench trial of the remainder, this Court
concludes what has been occurring at the Department of Health
and Human Services ("HHS") and the National Institutes of Health
("NIH") with respect to its disruption of grants, the grant
making process and the pipeline of future scientists by

A0080

forbidding by fiat certain topics, is on this Administrative
Record, illegal under the Administrative Procedure Act ("APA").

After this Court collapsed the separate motions for
preliminary injunctions into a single consolidated trial
pursuant to Rule 65(a), and after hearing on the Administrative
Procedure Act claims and a bench trial on the Constitutional
claims (Phase One), in both actions save -- for the APA delay
claims (Phase Two), the Court provides its findings of fact and
rulings of law pursuant to Rule 52(a) of the Federal Rules of
Civil Procedure as to Phase One.

## II.   PROCEDURAL HISTORY

In American Public Health Association et al. v. the
National Institutes of Health et al., Civ No. 25-10787 ("the
'10787 Action"), the American Public Health Association
("APHA"), Ibis Reproductive Health, the International Union,
United Automobile, Aerospace, and Agricultural Implement
Workers, Dr. Brittany Charlton, Dr. Katie Edwards, Dr. Peter
Lurie, and Dr. Nicole Maphis (collectively, "the APHA
Plaintiffs") seek declaratory and injunctive relief against the
National Institutes of Health ("the NIH"), NIH Director Jay
Bhattacharya in his official capacity, and Secretary of Health
and Human Services Robert F. Kennedy, Jr. in his official
capacity.

[ 4 ]

Similarly, in Commonwealth of Massachusetts et al. v. Kennedy et. al., Civ No. 25-10814 ("the '10814 Action"), the Commonwealth of Massachusetts along with 15 other States[1] (referred to collectively as "the State Plaintiffs"), sue Secretary Kennedy, the Director Bhattacharya, and the federal institutes and centers[2] (in both actions the defendants are referred here collectively as "the Public Officials" and the APHA Plaintiffs and State Plaintiffs referred to collectively as

---

[1]  In addition to the Commonwealth of Massachusetts, the State of California, the State of Maryland, the State of Washington, the State of Arizona, the State of Colorado, the State of Delaware, the State of Hawai'i, the State of Minnesota, the State of Nevada, the State of New Jersey; the State of New Mexico; the State of New York, the State of Oregon, the State of Rhode Island; and the State of Wisconsin join as plaintiffs.

[2]  Those ICs are: the National Cancer Institute, the National Eye Institute, the National Heart, Lung, and Blood Institute, the National Human Genome Research Institute, the National Institute on Aging,  the National Institute on Alcohol Abuse and Alcoholism, the National Institute of Allergy and Infectious Diseases, the National Institute of Arthritis and Musculoskeletal and Skin Diseases, the National Institute of Biomedical Imaging and Bioengineering, the Eunice Kennedy Shriver National Institute of Child Health and Human Development, the National Institute on Deafness and Other Communication Disorders, the National Institute of Dental and Craniofacial Research, the National Institute of Diabetes and Digestive and Kidney Diseases, the National Institute on Drug Abuse; the National Institute of Environmental Health Sciences, the National Institute of General Medical Sciences, the National Institute of Mental Health, the National Institute on Minority Health and Health Disparities, the National Institute of Neurological Disorders and Stroke, the National Institute of Nursing Research, the National Library of Medicine, the National Center for Advancing Translational Sciences, the John E. Fogarty International Center for Advanced Study in the Health Sciences, the National Center for Complementary and Integrative Health, and the Center for Scientific Review.

[5]

A0082

"the Plaintiffs").  Both actions arise from the NIH's newly-minted war against undefined concepts of diversity, equity and inclusion and gender identity, that has expanded to include vaccine hesitancy, COVID, influencing public opinion and climate change.

The actions were randomly reassigned to this Court on May 1, 2025.  Elec. Notice Reassignment, ECF No. 99.  The Court collapsed the motions into a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.[3]  The Court has ruled on jurisdictional issues and a broader motion to dismiss.  See Mem. & Order, '10787 Action, ECF No. 84; Mem. & Order, '10817 Action, ECF No. 105.

The trial was divided into two phases largely based on the APA claims, but each phase including other claims: Phase One, APA Section 706(2) (primarily arbitrary and capricious claims) and concomitant statutory and constitutional claims), and Phase Two, Section 706(1) (primarily the delay claims).

The Court held a full hearing and bench trial as to Phase One.  At the conclusion of the trial of Phase One, the Court

---

[3] The Court acknowledges that its usual process is expeditious, it observes that while this matter has proceeded to trial, injunctive relief has recently issued as to other actions relating to HHS's and the NIH's actions.  See New York v. Kennedy, No. 25-CV-196-MRD-PAS, 2025 WL 1803260, at *13 (D.R.I. July 1, 2025); Massachusetts v. Nat'l Institutes of Health, 770 F. Supp. 3d 277 (D. Mass. 2025) (Kelley, J.), judgment entered, No. 1:25-CV-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025).

[6]

ruled from the bench that the Challenged Directives taken as a
whole, were arbitrary and capricious final agency action, as
well as were the terminations of the grants in accordance
therewith; the Court took the rest of the matter under
advisement.  The Court now provides its complete findings of
fact and rulings of law as to so much of Phase One as pertains
to the APA claims raised therein and addressed from the bench[4] as

---

[4] Time is of the essence in this equity case.  For that
reason, the Court entered a partial judgment under Fed. R. Civ.
P. 54(b) to allow for a prompt appeal of a "clean" decision on
the APA claims.  Partial Final Judgment, '10787 Action, ECF No.
138; Partial Judgment, '10814 Action, ECF No. 151.  Quite
properly, the Public Officials have promptly appealed.  Notice
of Appeal, '10787 Action, ECF No. 139; Notice of Appeal '10814
Action, ECF No. 152.  The Public Officials sought a stay pending
the appeal, which this Court denied.  See Order, '10787 Action,
ECF No. 147; Order, '10814 Action, ECF No. 160.

On the ground, while the HHS continues to repeat its now-
familiar dirge of empty triumphalism, see
https://www.reuters.com/business/healthcare-
pharmaceuticals/federal-judge-says-trump-cuts-nih-grants-are-
illegal-politico-reports-2025-06-16/, the NIH appears to be
working in good faith to reassemble its grant-making machinery.
See e.g., https://www.nytimes.com/2025/06/25/science/nih-grant-
terminations-halted.html;
https://www.science.org/content/article/nih-will-reinstate-900-
grants-response-court-order;
https://www.masslive.com/news/2025/06/20-nih-grants-restored-to-
umass-system-after-judge-rules-against-trump-admin.html

More is required to be done on Phase One.  In addition to
ruling on Constitutional law questions, the Court must address:

**Racial Discrimination – Constitutionally Prohibited**

The Court has found as fact that there was pervasive racial
discrimination in selecting grants for termination.  It needs to

[7]

A0084

_____

fashion a permanent injunction to prevent any continuation of this practice.

### Gender Discrimination – Statutorily Prohibited

Speaking from the bench following closing arguments, the Court had not sufficient time to analyze and reflect on the administrative record such that it could make a finding of gender discrimination.  Now it has.

The Court finds by a fair preponderance of the evidence that the grant terminations here at issue demonstrate an unmistakable pattern of discrimination against women's health issues.  The Court thus needs to afford the parties a chance to present evidence of the harm resulting from such terminations and, in the absence of such evidence, whether this is one of those cases "likely of repetition but evading review."

### LGBTQ+ Discrimination – No Federal Remedy

This Court's factual finding that there has been extensive discrimination against everyone whose lived experience of their sexuality is in any way different from the executive orthodoxy expressed in the President's fiat, see Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025), is fully affirmed.  What changed in the days following this Court's finding is the Supreme Court's teaching concerning these matters.  I had thought the factual finding warranted a more complete equal protection analysis.  The decision in United States v. Skrmetti, 145 S. Ct. 1816, 1832 (2025) quite clearly forecloses such analysis. Justice Barrett's concern about imprecision in language addressing these matters, and the skepticism of Justices Thomas and Alito about the role of science, Id. at 1851 (Barrett, J., concurring); 1852 (Thomas, J., concurring), 1867 (Alito, J., concurring) leads this Court to conclude that, while here there is federal government discrimination based on a person's status, not all discrimination is pejorative.  After all, setting the voting age, excluding felons from the franchise, and regulating a young person's access to obscene material, see Free Speech Coal., Inc. v. Paxton, No. 23-1122, 2025 WL 1773625, at *9 (U.S. June 27, 2025); Simmons v. Galvin, 575 F.3d 24, 42 (1st Cir. 2009), all "discriminate" based upon an individual's status. They all fall within the state's police powers.  This Court is thus not warranted in considering injunctive relief as to an officer of the United States on this ground (despite the fact that these grant determinations were here arbitrary and

[ 8 ]

A0085

required under Rule 52(a) of the Federal Rules of Civil

Procedure.

## III. FINDINGS OF FACT

###     A.    The National Institutes of Health -- The World
             Standard of Research

The HHS is an Executive Agency of the United States.  <u>See</u>

<u>generally</u>, 42 U.S.C. § 3501a <u>et seq.</u>  The National Institutes of

Health is an agency of the HHS, and is comprised of 27 separate

institutes and centers ("ICs") that focus on certain diseases or

human body systems.

The NIH is run by its Director.  Under the Director, there

are five deputy directors: (1) Principal Deputy Director; (2)

Deputy Director for Intramural Research; (3) Deputy Director of

Extramural Research; (4) Deputy Director for Management; and (5)

Deputy Director for Program Coordination, Planning, and

Strategic Initiatives.  <u>See</u> https://www.nih.gov/about-

nih/organization/nih-leadership.

Congress, through the Public Health Service Act ("the

PHSA"), 42 U.S.C. § 201 et seq., mandates that the Secretary of

HHS promote research "relating to the causes, diagnosis,

---

capricious under the APA) because, at least as to puberty
blockers, what is a denial of equal protection of the laws in
some states is sound public policy in Tennessee.
    This Court regrets serving up matters for appeal on a
piecemeal basis but the exigencies of an equitable action and
unfolding reality require it.

A0086

treatment, control, and prevention of physical and mental diseases and impairments," including by, among other things and relevant here, offering "grants-in-aid to universities, hospitals, laboratories, and other public or private institutions, and to individuals." 42 U.S.C. §241(a)(3).  The NIH has similar statutory mandates.  42 U.S.C. §§ 282(b), 284(b).

Congress requires the NIH operate predictably and with stability, not just for its understanding of how the NIH is fulfilling its duties to the American people, but also to provide a predictable path for researchers.  Specifically, Congress by statute requires the NIH to provide a "National Institutes of Health Strategic Plan" (the "Strategic Plan") every six years in order "to provide direction to [the NIH's] biomedical research investments." Id. §282(m)(1).

The Strategic Plan's purpose is manifold: providing direction to NIH's research investment, increasing efficiencies across the ICs, leveraging scientific opportunity, and advancing biomedicine.  Id. [5]

---

[5] Section 282(m)(1) provides:

[A]t least every 6 years . . . the Director of the National Institutes of Health shall develop and submit to the appropriate committees of Congress and post on the Internet website of the National Institutes of Health, a coordinated strategy (to be known as the "National Institutes of Health Strategic Plan") to

[10]

The Strategic Plan forms the foundation of the NIH's work. Indeed, NIH is mandated to "ensure that **scientifically based** strategic planning is implemented in support of research priorities as determined by the agencies of the National Institutes of Health, and through the development, implementation, and updating of" the Strategic Plan.  42 U.S.C. § 282(b)(5) (emphasis added).

The Strategic Plan is required to "identify strategic priorities and objectives in biomedical research" of areas such as assessment of the "state of biomedical and behavioral research" and opportunities therein, "priorities and objectives to advance the treatment, cure and prevention of health conditions," "emerging scientific opportunities,"  "health challenges" and "scientific knowledge gaps."  42 U.S.C. § 282(m)(2)(A).  The Strategic Plan is also required to identify "near-.mid-,and long term scientific needs."  Id.

The Strategic Plan is a statutorily imposed collaboration, requiring the NIH to consult "with the directors of the national

---

**[(1)]** **provide direction** to the biomedical research investments made by the National Institutes of Health, **[(2)]** to **facilitate collaboration** across the institutes and centers, **[(3)]** to **leverage scientific opportunity**, and **[(4)]** to **advance biomedicine.**

42 U.S.C. § 282(m) (emphasis added).

[11]

A0088

research institutes and national centers, researchers, patient
advocacy groups, and industry leaders." 42 U.S.C. § 282(m)(4)

Congress historically has paid close attention to its tax-
dollar investments in medical, health and behavioral research.
In some cases, it has expressed its research priorities directly
in the PHSA, see e.g. Section 283(p). For example, Congress has
by statute created ICs dedicated to certain systems, and
minority populations.

The NIH is the primary source of federal funding for
biomedical research in the United States, and is the largest
public funder of biomedical research in the world. Due to its
operations, NIH has contributed to profound medical
breakthroughs and through its funding trains future generations
of scientists. It is tax-payer investment in the health and
welfare not just of Americans, but humanity. Broadly, the NIH
performs research within federal facilities, also called
"intramural" research. It also supports research through
funding of competitive grants to researchers and institutions
outside the federal system. This is known as "extramural"
research, and is what is at issue in these consolidated actions.

The NIH's process to allocate funding from Congress for
extramural research is covered by several statutes and
regulations. See 42 C.F.R. § 52 et seq.; . The Court presumes
the parties' familiarity with the process, but broadly, with

[12]

respect to extramural research, researchers must apply to the NIH for funding. The NIH, in line with its priorities, invites proposals for grants through what is known as "Notice of Funding Opportunity" ("NOFO"). In simple terms, the applications go through a three-step process: a scientific review group, and if successful, then to the advisory council. If the application is approved by the advisory council, their recommendation proceeds to the IC's director who makes the ultimate funding decision.

Grants are, understandably, oftentimes not a one-time event. Research takes time, often requiring continuation grants or multiple grants. The NIH's framework of stability and predictability has proven itself time and again over the past several decades over multiple administrations. It is one reason the United States, through the support of the hard-working government workers at HHS and the NIH, in partnership with the scientific research community, has been unsurpassed in its contributions to breakthroughs in science that have enhanced our lives. To be sure, there are priorities, as funding is not unlimited, and administrations each have differing views on what those priorities ought be, but the NIH's priority changes have been predictable. What is clear is that Congress intends for the NIH to operate with Congressional oversight and certainly some statutory direction, but by and large leaves the science to the scientists. Indeed, the American people have enjoyed a

[13]

historical norm of a largely apolitical scientific research agency supporting research in an elegant, merit-based approach that benefits everyone.

That historical norm changed on January 20, 2025.  The new Administration began weaponizing what should not be weaponized -- the health of all Americans through its abuse of HHS and the NIH systems, creating chaos and promoting an unreasonable and unreasoned agenda of blacklisting certain topics, that on this Administrative Record, has absolutely nothing to do with the promotion of science or research.

### B. Timeline of Events

### 1. January 20, 2025 – January 21, 2025 -- Executive Orders 14151, 14168, and 14173 are issued.

The Executive Branch decided early on, through Executive Orders, to focus on eradicating anything that it labels as Diversity, Equity and Inclusion ("DEI"), an undefined enemy.  No one has ever defined it to this Court -- and this Court has asked multiple times.  Indeed, as will be demonstrated, while the Executive, HHS, and the NIH certainly identify the acronym DEI and its component words, it's definition is purely circular reasoning: DEI is DEI.  It also is focused on gender identity as a priority, proclaiming through Executive Orders its concerns. The Executive Branch, of course, has every right to espouse its views, and this Court opines on neither their veracity nor

[14]

wisdom.  Nevertheless, the Executive Orders lay the groundwork
for what occurred at HHS and the NIH.

### a.    Executive Order 14151

On January 20, 2025, the President issued Executive Order
No. 14151, entitled "Ending Radical and Wasteful Government DEI
Programs and Preferencing."  Exec. Order 14151, 90 Fed. Reg.
8339 (Jan. 20, 2025) ("EO 14151").  EO 14151 focuses on ending
what the Executive views as a perceived "infiltration" of the
federal government  of "illegal and immoral discrimination
programs of the Biden Administration going by the name
'Diversity, Equity and Inclusion'".  Id.  EO 14151 posits that
DEI is mutually exclusive to "serving every person with equal
dignity and respect." Id.  Under the guise of "making America
great," EO 14151 instructs the Attorney General and others to
"coordinate the termination of all discriminatory programs,
including illegal DEI and 'diversity, equity, inclusion, and
accessibility' (DEIA) mandates, policies, programs, preferences,
and activities in the Federal Government, under whatever name
they appear." Id.  EO 14151 does not define DEI.  Additionally,
and pertinent here, EO14151 directs each federal agency head to
"terminate, to the maximum extent allowed by law, all 'equity-
related' grants or contracts" within 60 days. Id.  This too has
broad, undefined contours.  As one Court recently noted, "'[t]he
vagueness of the term 'equity-related' grants or contracts

[15]

invites arbitrary and discriminatory enforcement and does not

provide sufficient notice to grantees as to what types of speech

or activity they must avoid to prevent termination of their

grants or contracts -- compelling grantees and grant applicants

to steer far too clear of the forbidden area of anything related

to the broad and undefined term of equity.'" San Francisco

A.I.D.S. Found. v. Trump, No. 25-CV-01824-JST, 2025 WL 1621636,

at *21 (N.D. Cal. June 9, 2025) (cleaned up).

### b. **Executive Order 14168**

On January 20, 2025, the President also issued Executive

Order 14168, "Defending Women from Gender Ideology Extremism and

Restoring Biological Truth to the Federal Government."  The

President claims that women need protection from transgender

persons:

> Efforts to eradicate the biological reality of sex
> fundamentally attack women by depriving them of their
> dignity, safety, and well-being.  The erasure of
> sex in language and policy has a corrosive impact not just
> on women but on the validity of the entire American
> system.  Basing Federal policy on truth is critical to
> scientific inquiry, public safety, morale, and trust
> in government itself.

Exec. Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("EO

14168").  The EO goes on to proclaim that "gender ideology"

somehow "replaces the biological category of sex with an ever-

shifting concept of self-assessed gender identity," that it is a

"false claim," and that "includes the idea that there is a vast

[16]

spectrum of genders that are disconnected from one's sex." Id. §2(f). Pertinent here, the Executive seeks to stamp "gender ideology" out: "Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Id. §3(f).

### c. Executive Order 14173

On January 21, 2025, President issued Executive Order No. 14173, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ("EO 14173"). Similar to EO 14151, EO 14173 purportedly seeks to end "immoral race- and sex-based preferences under the guise of so-called [DEI] or [DEIA]," and the order requires the Director of the OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." Id. There is, conspicuously, no definition of DEI.

[17]

    2.    **January 21, 2021, The Pause Directive.**

On January 21, 2025, HHS Acting Secretary Dorothy Fink ("Acting Secretary Fink"), appointed January 20, 2025, ordered an immediate communication pause until February 1, 2025.  R. 1. ("the Pause Directive").

A0095



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

Washington, D.C. 20201

**TO:** Heads of Operating Divisions Head
Heads of Staff Divisions

**THROUGH:** Wilma M. Robinson, Ph.D., Deputy Executive Secretary

**FROM:** Dorothy A. Fink, MD, Acting Secretary

**DATE:** January 21, 2025

**SUBJECT:** Immediate Pause on Issuing Documents and Public Communications – ACTION

As the new Administration considers its plan for managing the federal policy and public communications processes, it is important that the President's appointees and designees have the opportunity to review and approve any regulations, guidance documents, and other public documents and communications (including social media). Therefore, at the direction of the new Administration and consistent with precedent, I am directing that you immediately take the following steps through February 1, 2025:

1. Refrain from sending any document intended for publication to the Office of the Federal Register until it has been reviewed and approved by a Presidential appointee. Please note that the Office of the Executive Secretary (Exec Sec) withdrew from OFR all documents that had not been published in the Federal Register to allow for such review and approval.
2. Refrain from publicly issuing any document (e.g., regulation, guidance, notice, grant announcement) or communication (e.g., social media, websites, press releases, and communication using listservs) until it has been reviewed and approved by a Presidential appointee.
3. Refrain from participating in any public speaking engagement until the event and material have been reviewed and approved by a Presidential appointee.
4. Coordinate with Presidential appointees prior to issuing official correspondence to public officials (e.g., members of Congress, governors) or containing interpretations or statements of Department regulations or policy. Nothing in this guidance is intended to limit an employee's personal correspondence with members of Congress or other third parties, including an employee's whistleblower protected communications.
5. Notify Exec Sec promptly of any documents or communications that you believe should not be subject to the directives in paragraphs 1-4 because they are required by statute or litigation; affect critical health, safety, environmental, financial, or national security functions of the Department; or for some other reason. Please provide the title, a brief summary, the target release date, and the rationale for expedited release to your Exec Sec Policy Coordinator.

The President's appointees intend to review documents and communications expeditiously and return to a more regular process as soon as possible.

1

NIH_GRANTS_000001

A0096

If you identify any actions taken inconsistent with these requests, please know they shall not be considered impliedly ratified. These items should be immediately withdrawn or rescinded to deem them as void and without effect.

Thank you for your assistance in ensuring a smooth transition consistent with our nation's democratic principles.

*Dorothy A. Fink*

Dorothy A. Fink, MD, Acting Secretary

R. 1-2.[6]  Although referenced for completeness, this Challenged

Directive relates to Phase 2 of this Action, so will not be

discussed further at this time.

> 3.    **February 10, 2025 -- The Secretarial Directive -- Challenged Directive 2**

On February 10, 2025, Acting Secretary Fink, issued the

following "Secretarial Directive on DEI-Related Funding" ("the

Secretarial Directive"):

---

[6] Stylistically, this Court usually avoids inserting full documents in its opinions lest bulk substitute for analysis. Here, however, no paraphrasing can replace the originals and convey what was actually going on.

[20]



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                     Office of the Secretary

Washington, D.C. 20201

### SECRETARIAL DIRECTIVE ON DEI-RELATED FUNDING

February 10, 2025

The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

These contracts and grants can cause serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to DEI and similar programs are contributing to the serious problems and acute harms DEI initiatives may pose to the Department's compliance with Federal civil rights law as well as the Department's policy of improving the health and well-being of all Americans. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371-372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of DEI and similar programs rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

**Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.**

1

A0098

This Directive shall be implemented through the Department's contracts and payment management systems by personnel with responsibility for such systems who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a DEI or similar contract or grant is paused for review, Department personnel shall immediately send such payment to Scott Rowell, Deputy Chief of Staff for Operations, for prompt review to determine whether or not the payment is appropriate and should be made. Payments on paused contracts shall remain paused and already terminated contracts shall remain terminated pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.

*Dorothy A. Fink*

Dorothy A. Fink, M.D., Acting Secretary

R. 4-5. In what will be a common theme throughout the agency action, Dr. Fink chose not to define DEI at all, but merely echoed the EOs, lumping DEI -- whatever DEI is -- as somehow "discriminatory" in nature. Id. Presumably, Dr. Fink, a highly educated physician and acclaimed researcher,[7] understood the downstream effects of the absence of definition. There is conspicuously nothing else in the Administrative Record concerning the Secretarial Directive.

---

[7] Dr. Fink is currently Deputy Assistant Secretary for Women's Health and Director of the Office of Women's Health in the Office of the Assistant Secretary for Health at HHS. Her biography is located https://womenshealth.gov/about-us/who-we-are/leadership/dr-dorothy-fink.

[ 22 ]

A0099

4.    **February 12, 2025 -- The Lauer Memoranda**

In the ensuing days, federal courts issued temporary restraining orders against, among others, the NIH.  In response, on February 12, 2025, Dr. Michael S. Lauer ("Dr. Lauer"), then-Deputy Director for Extramural Research at the NIH and Michelle G. Bulls, NIH Chief Grants Management Officer ("CGMO Bulls"), issued to the ICs a memorandum stating that NIH "is in the process of reevaluating the agency's priorities based on the goals of the new administration." R. 9.  That memorandum states that the "NIH will effectuate the administration's goals over time, but given recent court orders, this cannot be a factor in [Institutions and Centers'] funding decisions at this time." Id.  The memorandum also promised "[a]dditional details on future funding actions related to the agency's goals will be provided under a separate memo."  Id.  The memorandum in full:

[23]

A0100



National Institutes of Health
Office of Extramural Research

| | |
|---|---|
| Date: | February 12, 2025 |
| To: | Institute and Center Chief Grants Management Officers (IC CGMOs) |
| From: | Michael S. Lauer, MD   Michael S. Lauer -S Digitally signed by Michael S. Lauer -S Date: 2025.02.12 09:26:03 -05'00' |
| | Deputy Director for Extramural Research, National Institutes of Health (NIH) |
| | Michelle G. Bulls |
| | NIH Chief Grants Management Officer |
| Subject: | NIH Review of Agency Priorities Based on the New Administration's Goals |

NIH is in the process of reevaluating the agency's priorities based on the goals of the new administration. NIH will effectuate the administration's goals over time, but given recent court orders, this cannot be a factor in IC funding decisions at this time. In consultation with NIH leadership and with the Office of General Counsel (OGC), we recognize that NIH programs fall under recently issued Temporary Restraining Orders (*New York et al. v. U.S. Office of Management and Budget* and *Commonwealth of Massachusetts et al. v. National Institutes of Health et al* see attached). Therefore, with this memo, IC CGMOs are authorized, along with their respective grants management staff, to proceed with issuing awards for all competing, non-competing continuation, and administrative supplements (previously cleared through Office of Extramural Research) grants. Until further notice, as awards are issued, ICs must follow their existing FY25 IC funding policies and use the previously approved negotiated indirect cost rates. Additional details on future funding actions related to the agency's goals will be provided under a separate memo.

**Attachments**

1. Temporary Restraining Order, *New York et al. v. U.S. Office of Management and Budget* (Jan. 31, 2025)

2. Court Order Questions – HHS OGC Responses (February 4, 2025)

3. Temporary Restraining Order, *Commonwealth of Massachusetts et al. v. National Institutes of Health et al.,* (February 10, 2025)

4. Order Enforcing TRO, *New York et al. v. U.S. Office of Management and Budget* (February 10, 2025)

5. Office of General Counsel Note, *New York et al. v. U.S. Office of Management and Budget* (February 10, 2025)

R.9. The Court views this memorandum as hardly a ringing endorsement of HHS's Secretarial Directive of the Executive Orders.

[ 24 ]

A0101

Nevertheless, that new guidance came the next day.  On February 13, 2025, Dr. Lauer and CGMO Bulls issued another memorandum to ICs Chief Grant Management Officers, that announced "hard funding restrictions" on "awards where the program promotes or takes part in diversity, equity, and includsion [sic] ('DEI') initiatives" with restrictions applying "to new and continuation awards made on or after February 14, 2025."  R. 16.  The memorandum also states that, "[i]f the sole purpose of the grant, cooperative agreement, other transaction award (including modifications), or supplement supports DEI activities, then the award must be fully restricted.  The restrictions will remain in place until the agency conducts an internal review for payment integrity."  Id.  The February 13, 2025 Memorandum is set forth in full:

A0102



National Institutes of Health
Office of Extramural Research

| | |
|---|---|
| Date: | February 13, 2025 |
| To: | Institute and Center Chief Grants Management Officers (IC CGMOs) |
| From: | Michael S. Lauer, MD  Michael S. Lauer -S  Digitally signed by Michael S. Lauer -S  Date: 2025.02.13 15:06:52 -05'00'  Deputy Director for Extramural Research, National Institutes of Health (NIH) |
| | Michelle G. Bulls  NIH Chief Grants Management Officer |
| Subject: | Supplemental Guidance to Memo Entitled- NIH Review of Agency Priorities Based on the New Administration's Goals |

The Office of Extramural Research is issuing supplemental guidance to the memo, dated February 12, 2025, to Institute and Center (IC) Chief Grants Management Officers (CGMOs) and their respective staff to issue hard funding restrictions on awards and within the Payment Management System (PMS)/Program Support Center (PSC) on awards where the program promotes or takes part in diversity, equity, and includsion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or any other protected characteristics. The restriction requirement applies to new and continuation awards made on or after February 14, 2025. If the sole purpose of the grant, cooperative agreement, other transaction award (including modifications), or supplement supports DEI activities, then the award must be fully restricted. The restrictions will remain in place until the agency conducts an internal review for payment integrity. Such review shall include, but not be limited to a review for fraud, waste, abuse, of all grants, cooperative agreements, and Other Transactions that determines the funding of the activities/program are in the best interest of the government and consistent with current policy priorities.

**Attachments**

1. Memo NIH Review of Agency Priorities Based on the New Administration's Goals, February 12, 2025

2. UPDATE - Temporary Restraining Order in State of New York et al. v. Trump et al., 1:25-cv-00039 (D.R.I.), February 12, 2025

3. Secretarial Directive on DEI Related Funding, February 10, 2025

R. 16.  It is unclear how the NIH could use this document to

determine the contours of DEI, where it does not define the

term, nor how to determine whether something "promotes or takes

[ 26 ]

A0103

part in diversity equity and inclusion . . . initiatives." Id.[8]

Further, it apparently relies upon the Secretarial Directive.

Id.

_____

[8]  Consistent with the Administrative Record, NIH Chief
Grants Management Officer Michelle Bulls testified in another
federal action that she drafted the February 13, 2025 memorandum
with Dr. Lauer and acknowledged that the ICs would determine for
themselves what in fact DEI meant:

Q· · Do you recognize this document?

A· · Yes.

Q· · And you wrote this document, right?

A· · I wrote it with Dr. Lauer, yes.

Q· · Okay.· And what is it?

A     It's the supplemental -- it's the beginning of the
      guidance providing agency - - I mean
      ICs with guidance on how to unpause funding.

Q· · And it does say that there is a Restriction.· What's
      the restriction that it gives guidance about?

A· · On spending funding related to DEI activities on
      grants.

Q     Was there a definition of DEI activities
      provided with this memo?

MS. ANDRAPALLIYAL:· Objection.· To the extent the
      information sought is deliberative and not final, I'm
      instructing the witness not to answer.

BY MR. McGINTY:
Q· · How are ICs supposed to determine if something fell
      within DEI activities?

A· · They have scientific, the scientific background and
      they know their programs, so the Grants Management

[27]

A0104

5.  **February 13, 2025 -- Deputy Director of Extramural Research, Dr. Lauer Resigns and Liza Bundensen is promoted as Acting Extramural Research Director.**

Deputy Director Lauer resigned that same day, effective February 14, 2025.  See Second top NIH official, who oversaw awarding of research grants, departs abruptly, Stat+ https:/, /www.statnews.com/2025/02/13/nih-michael-lauer-deputy-director-departs/.  Liza Bundesen ("Dr. Bundesen") became acting director of Extramural Research of the NIH after Dr. Lauer resigned. That promotion was short-lived, as she resigned less three weeks later on March 5, 2025.  April 3, 2025 Depo. Liza Bundesen 5, State of Washington et al. v. Trump et al. , Civ No. 25-cv-00244, ECF No. 276-8.

6.  **February 21, 2025 -- The Memoli Directive – Challenged Directive 5**

On February 21, 2025, Dr. Matthew Memoli ("Acting Director Memoli"), Acting Director of NIH, appointed by Dr. Fink, from January 22, 2025 through March 31, 2025, see https://www.nih.gov/about-nih/nih-almanac/leadership/nih-

---

officials work with the program officials to identify DEI activities where it's not clear in the statute.

Dep. Michelle Bulls 99-100, Decl. Chris Pappavaselio, Ex. 41, ECF No. 77-41.  When asked about what statute, she assumed that Minority Health Disparity Institute had some language, but ultimately testified she did not know if "it ties directly, but I think that is being used.  And that's an assumption, that's not facts."  Id.

[28]

directors/matthew-j-memoli-md-ms, and currently Principal Deputy

Director of the NIH, sent an email to Nina Schor, Deputy

Director for Intramural Research, Alfred Johnson, Deputy

Director for Management, and Dr. Bundesen, Deputy Director of

Extramural Research:

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Bundesen, Liza (NIH/OD) [E]; Johnson, Alfred (NIH/OD) [E]; Schor, Nina (NIH/OD) [E] |
| **Subject:** | Memo on NIH priorities |
| **Date:** | Friday, February 21, 2025 2:54:40 PM |
| **Attachments:** | 2695_001.pdf |

Hello,

   After working with OGC we determined it was possible to set priorities at an NIH level, which now allows us to proceed with the process of making sure our programs are meeting these goals. I will talk with you individually about the plan of action.

Thanks,
Matt

--
Matthew J. Memoli, MD, MS
Acting Director, National Institutes of Health
9000 Rockville Pike
Bethesda, MD 20892
matthew.memoli@nih.gov

R. 2929. It is unclear what Dr. Memoli told the recipients of

his email about the supposed "plan of action," but on that same

date Dr. Memoli issued a Directive entitled "Restoring

Scientific Integrity and Protecting Public Investment in NIH

A0106

Awards" ("the Memoli Directive"), which was sent out by Deputy

Dr. Bundesen:



| From: | Bundesen, Liza (NIH/OD) [E] |
|---|---|
| To: | Kosub, David (NIH/OD) [E]; Roman, Laurie (NIH/OD) [E]; Bulls, Michelle G. (NIH/OD) [E]; Ta, Kristin (NIH/OD) [E]; Faenson, Inna (NIH/OD) [E]; Corbett, Dawn (NIH/OD) [E]; Boone, Ericka (NIH/OD) [E] |
| Cc: | Jacobs, Anna (NIH/OD) [E]; Bundesen, Liza (NIH/OD) [E]; Schwetz, Tara (NIH/OD) [E]; Joshi, Pritty (NIH/OD) [E] |
| Subject: | URGENT - FW: Memo on NIH priorities |
| Date: | Friday, February 21, 2025 4:19:52 PM |
| Attachments: | 2695_001.pdf |

Hi all,

I'm very sorry to once again be sharing an urgent task on a Friday afternoon (I've already talked to David), but **today**, we have to pull down all of the NOFOs that we previously pulled down and put back up (DEI, gender ideology, environmental justice, etc). The attached memo from the Acting NIH Director provides this directive.  I understand that Matt Memoli discussed this with OGC.

There are other actions that we will need to take to address this memo, but we can discuss those at a calmer pace on Monday.

I have confirmation that this memo can be shared with other OER staff, and I'm sending to this group now because I think you have the most immediate need to know.  Please note that the memo is not to be distributed outside of OER at this time. I will think through how to notify the ICs.

I appreciate you all.

Liza

R. 3823.  The memorandum was attached:

A0107

**Directive on NIH Priorities**

Agency: National Institutes of Health

Office of the Director

Action: Directive

## FOR FURTHER INFORMATION CONTACT:

National Institutes of Health

Office of the Director

EFFECTIVE DATE: February 21, 2025

**Restoring Scientific Integrity and Protecting the Public Investment in NIH Awards**

The National Institutes of Health (NIH) is the largest public funder of biomedical and behavioral research in the world. The public trusts NIH with substantial funds to foster creative discoveries that will improve health and prevent disease in this Country. Accordingly, NIH is committed to promoting only the highest level of scientific integrity, public accountability, and social responsibility in the programs it funds. And NIH promises to prioritize the funding of projects that will generate a high return on the public's investment, so that taxpayer dollars are not going to waste. Every dollar should be used to make Americans live longer, healthier lives.

This mission requires NIH to ensure that it is not supporting low-value and off-mission research programs, including but not limited to studies based on diversity, equity, and inclusion (DEI) and gender identity. While this description of NIH's mission is consistent with recent Executive Orders issued by the President, I issue this directive based on my expertise and experience; consistent with NIH's own obligation to pursue effective, fiscally prudent research; and pursuant to NIH authorities that exist independently of, and precede, those Executive Orders.

Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, DEI studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Likewise, research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs either.

[ 31 ]

A0108

For these reasons and pursuant to, among other authorities, 42 U.S.C. § 282(b) and 45 C.F.R. Part 75 (45 C.F.R. §§ 75.207, 75.210, 75.371–373),[1] the Director of NIH hereby directs:

> NIH personnel shall conduct an internal review of all contract solicitations and notices of funding opportunities; applications pending Type 1 and Type 2 awards; existing awards; cooperative agreements; and other transactions. Such review shall be aimed at ensuring NIH grants, contracts, cooperative agreements, and other transactions do not fund or support low-value and off-mission research activities or projects – including DEI and gender identity research activities and programs. NIH personnel should also ensure grants, contracts, cooperative agreements, and other transactions are free from fraud, abuse, and duplication, and are being implemented consistent with federal law.

This Directive shall be implemented by all relevant NIH personnel, including but not limited to those in the Office of Extramural Research, Office of Intramural Research, and the Division of Program Coordination, Planning, and Strategic Initiatives. Grants, contracts, cooperative agreements, and other transactions deemed inconsistent with NIH's mission may, where permitted by applicable law, be subject to funding restrictions, terminated or partially terminated, paused, and/or not continued or renewed, in compliance with all procedural requirements.

Notwithstanding this Directive, and consistent with any court orders that may apply, no open award disbursements may be paused in reliance upon Office of Management and Budget Memorandum M-25-13 or any Executive Order underlying that Memorandum. Previous instructions ordering the immediate release of such funds remain in effect. Also, consistent with any court orders that may apply, this Directive does not instruct personnel to condition or withhold federal funding pursuant to Section 4 of Executive Order 14,187 (Protecting Children from Chemical and Surgical Mutilation) based on the fact that a healthcare entity or health professional provides care or treatment.

Dated: February 21, 2025

Matthew J. Memoli, M.D.
Acting Director of NIH

R. 3821 – 3822. The Memoli Directive notably picks up gender

identity language for the first time.

[32]

A0109

While Dr. Memoli claimed that this Directive is based upon his "expertise and experience" and attempts to make it appear the NIH was acting "independently" it is obvious that much, if not all, of the content was provided to him by HHS. Indeed, the record reflects that HHS spoon-fed Dr. Memoli exactly what to say in his Directive as later drafts of guidance confirm that certain specific language was provided by HHS, even going so far as to putting it in quotations:

- **DEI:** "Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics ICO's, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs."

- **Gender-Affirming Care:** "Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs." **Reminder: At this time, do not terminate any grants related to gender identify/transgender without clearance from OER. All such actions must be approved before any terminations.**

R. 3280. There is evidence in the record that on that same date, Dr. Memoli was taking advice as to NOFOs that purportedly did not align with the new objectives from Brian M. Smith, an official in the so-called Department of Government Efficiency ("DOGE"). R. 3752-3753.

[33]

7.    **February 22, 2025 -- NOFOs Taken Down**

On Saturday, February 22, 2025, Brad Smith of DOGE sent a
list to Dr. Memoli of NOFOs that in their view did not fall
within the Memoli Directive:

**From:** Smith, Brad M. EOP/DOGE <Brad.M.Smith@doge.eop.gov>
**Date:** Saturday, February 22, 2025 at 11:36 AM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Subject:** [EXTERNAL] NOFOs

Matt,

Thanks so much for your time yesterday.  Per our conversation, below are a number of NOFOs that it
may be worth your team reviewing to make sure they align with your directive and priorities.  We
100% defer to your team on whether each of these align with your directive, but I thought you might
find this list helpful as you consider where to focus your review:

https://grants.nih.gov/grants/guide/pa-files/PAR-23-112.html
https://grants.nih.gov/grants/guide/pa-files/PAR-22-145.html

https://grants.nih.gov/grants/guide/pa-files/PAR-23-309.html
https://grants.nih.gov/grants/guide/pa-files/PAR-23-292.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-077.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-109.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-157.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-158.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-098.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-201.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-237.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-240.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-241.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-317.html
https://grants.nih.gov/grants/guide/pa-files/PAR-26-001.html
https://grants.nih.gov/grants/guide/rfa-files/RFA-MD-24-003.html
https://grants.nih.gov/grants/guide/rfa-files/RFA-NR-25-004.html
https://grants.nih.gov/grants/guide/rfa-files/RFA-MD-24-005.html

Best,
Brad

Dutifully, Dr. Memoli instructed Director Bundesen to remove published NOFOs because of a lack of alignment:

A0112

From: Memoli, Matthew (NIH/OD) [E]
To: Bundesen, Liza (NIH/OD) [E]
Cc: Burklow, John (NIH/OD) [E]
Subject: NOFOS that need to come down
Date: Saturday, February 22, 2025 12:01:32 PM

Hi Liza,

I was sent a list of NOFOs to review that are still up. After my review I have determined these NOFOs in their current form have issues that cause them to not be properly directed at current NIH priorities. Please take these NOFOs down. Some of the projects my be reconsidered after they are modified to address current priorities and definitions.

https://grants.nih.gov/grants/guide/pa-files/PAR-23-112.html
https://grants.nih.gov/grants/guide/pa-files/PAR-22-145.html
https://grants.nih.gov/grants/guide/pa-files/PAR-23-309.html
https://grants.nih.gov/grants/guide/pa-files/PAR-23-292.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-077.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-109.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-157.html
https://grants.nih.gov/grants/guide/pa-files/PAR-24-158.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-098.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-201.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-237.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-240.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-241.html
https://grants.nih.gov/grants/guide/pa-files/PAR-25-317.html
https://grants.nih.gov/grants/guide/pa-files/PAR-26-001.html
https://grants.nih.gov/grants/guide/rfa-files/RFA-MD-24-003.html
https://grants.nih.gov/grants/guide/rfa-files/RFA-NR-25-004.html
https://grants.nih.gov/grants/guide/rfa-files/RFA-MD-24-005.html

Thank you,
Matt

Matthew J. Memoli, MD, MS
Acting Director, NIH

R. 3810. Dr. Memoli then, equally dutifully, reported back to DOGE:

A0113

From: Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
Sent: Saturday, February 22, 2025 12:05 PM
To: Smith, Brad M. EOP/DOGE <Brad.M.Smith@doge.eop.gov>
Subject: Re: NOFOs

Hi Brad,

 After my review these all need to come down.  Some of the projects may be able to be
modified to properly address our current priorities, but in their current form they are not
in line with what NIH would like to be doing right now.  I have instructed OER to take
them all down.

Thanks,
Matt

R. 3751.  DOGE acknowledged the response, providing what this

Court finds to be false deference by DOGE:

From:       Smith, Brad M. EOP/DOGE
To:         Memoli, Matthew (NIH/OD) [E]
Subject:    [EXTERNAL] RE: NOFOs
Date:       Saturday, February 22, 2025 4:34:04 PM

Matt,

Thanks for the update.  We are all very grateful for your leadership.

Best,
Brad

R. 3752.

    8.    **February 28, 2025 – The Grant Terminations Begin**

On February 28, 2025, the first batch-terminations

[ 37 ]

A0114

occurred.  R. 1403.  Dr. Memoli forwarded a spreadsheet to Dr.

Bundesen, who forwarded it to CMGO Bulls.[9]

_____

[9] Consistent with the Administrative Record, Dr. Bundesen
testified that as for decisions on terminations, that DOGE was
involved in selecting the grants to be terminated, apparently
out of the blue:

    Q    How did you first learn that grants were going to
         be terminated on February 28th?

    A    I received a text message over Microsoft Teams
         from James McElroy. He said, Liza - - something to
         the effect of: Liza, can you please get in touch with
         Rachel Riley ASAP, she's been trying to reach you.

         I'm paraphrasing.

    I said, James, I'm sorry, I do not know who Rachel
         Riley is. And then shortly thereafter, James called
         me over a Microsoft Teams video call, and so he was
         there and Rachel Riley was there. She - introduced
         herself as being part of DOGE, who was working with
         HHS.

    And she informed me that a number of grants will need
         to be terminated and that Matt Memoli will be sending
         me an e-mail, a list of grants in an e-mail shortly
         thereafter.

    Q Did she explain why the grants were being
         terminated?

    A No.

    Q Did you ask?

    A She explained that -- excuse me, let me
         clarify.

         She said that the current administration's OGC has a
         different opinion from the previous administration's
         OGC on grant termination and, therefore, we will need
         to terminate grants by the end of the day.

[38]

That email and spreadsheet is part of the record:

| From: | Bundesen, Liza (NIH/OD) [E] |
|---|---|
| To: | Bulls, Michelle G. (NIH/OD) [E]; Jacobs, Anna (NIH/OD) [E] |
| Subject: | FW: Grants for immediate termination today |
| Date: | Friday, February 28, 2025 2:35:58 PM |
| Attachments: | 28 FEB Grants for Cancellation.xlsx |
| | NIH Termination Letter 022625[42].docx |

**From:** Memoli, Matthew (NIH/OD) [E]
**Sent:** Friday, February 28, 2025 2:34 PM
**To:** Bundesen, Liza (NIH/OD) [E]
**Cc:** Smith, Brad M. EOP/DOGE ; Rachel.Riley@hhs.gov; Keveney, Sean (HHS/OGC)
**Subject:** Grants for immediate termination today

Liza,

Please terminate the grants on the attached spreadsheet by COB today. Attached is an OGC cleared termination letter.

Thank you,

Matt

--

Matthew J. Memoli, MD, MS

Acting Director, National Institutes of Health

9000 Rockville Pike

Bethesda, MD 20892

matthew.memoli@nih.gov

---

I did not ask what, you know, what grants because I just literally was a little bit confused and caught off guard. And so I waited to see what I would receive by e-mail.

Q: And then what did you receive by e-mail?

A: I received an e-mail from Matt Memoli that said something to the effect of: Liza, the attached list of grants need to be terminated by COB today. And there was an Excel file attached to the e-mail.

Bundesen Depo. 60 – 61.

[39]

A0116

R. 2295 – 2302.   Recall that Dr. Bundesen oversaw extramural

research.   There is no evidence of any discussion, rather, the

evidence in the Administrative Record that Dr. Bundesen followed

orders that apparently went from Riley to Dr. Memoli to Dr.

Bundesen and on down the chain.   Smith is copied on this email.

    CGMO Bulls's testimony in another case confirms what the

Administrative Record reveals:

    Q· · This is one of those letters that you've been
asked to send that you were just talking about?

    A· · Yes.

    Q· · And you signed this letter, right?

    A· · Yes.

    Q· · Okay.· And why did you send this letter?

    A· · I was asked to send it.

    Q· · Who asked you to send it?

    A    My supervisor.

    Q· · Okay.· And who is that?

    A· · At the time, Liza Bundesen.

      * * *

    Q· · Did she tell you why she was asking you to
send it?

    A· · Yes.

    Q· · Okay.· And what did she say?

    A· · That we were asked to terminate grants.

    Q· · Did she tell you why you were asked to

[40]

A0117

> terminate grants?
>
> A· · She did not.
>
> Q· · Okay.
>
> A· · Can I correct the statement?  The e-mail that I
> received from Liza Bundesen indicated that we needed
> to terminate the grants, and the language in the
> letters were provided so I didn't question, I just
> followed the directive.
>
> Q· · Okay.
>
> A· · She didn't say:· Terminate the grant because of.·
> She said:· The list below.· So I just wanted to be
> clear about that.
>
> * * *
>
> Q· · Okay.· And is that the same list that you
> were talking about earlier that came from Rachel
>     Riley?
>
> A· · That was on the same e-mail, yes.

Depo. Bulls 66-68.  CGMO Bulls describes the letters,

accurately, as "template letters"  Id.  She also testified that

but for her signature on the letters, she did not create any of

the language, which was provided by Rachel Riley, and that she

is unaware whether the NIH undertook any assessment at all as to

whether a particular grant met the criteria being espoused in

the letters.  Id.  The testimony concerning the February 28,

2025 letters comports with the Administrative Record, though the

grant described is not one before this Court:

> Q· · So it says here -- actually, can you read

[41]

the fourth paragraph, the one that starts with, "This award no longer effectuates."

A· · "This award no longer effectuates agency priorities.· NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.· Your project does not satisfy these criteria.· Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans.· Many such studies ignore, rather than seriously examine, biological realities.· It is the policy of NIH not to prioritize these research programs."

Q· · Okay.· And this was part of the template letter that Rachel Riley provided?

A· · Yes.

* * *

· Q· · Was this edited in any way from the template letter that Rachel Riley provided?

A· · No.

Q· · Okay.· It says, "Your project does not satisfy these criteria."· Do you see that there?

A· · Yeah.

Q· · Are you aware of any assessment of Dr. Ahrens' grant in particular that was made to see if her grant satisfied the criteria?

A· · No.

Q· · Would you have been aware of such assessment if one had been made?

A· · I don't know.

Q· · Okay.· Would you have been aware of such an assessment if one had been made by NIH?
A· · Yes.

[42]

Q· · And it says, "Research programs based on
gender identity are often unscientific with little
identifiable return on investment, and do nothing to
enhance the health of many Americans." Did NIH do any
assessment of this particular grant to see if it was
unscientific?

A· I don't know.· The letter was provided and it was
sent.· I don't know what happened before ·8· ·that.

Q· · Well, did NIH do any assessment?

A· · I don't know.

Q· · You don't know if NIH did an assessment to
see if Dr. Ahrens' grant was scientific or not?

A· · Are you talking about -- I don't understand your
question, sorry.

Q· · Well, it says in this letter, and I
understand you didn't write it, but you signed it,
"Research programs based on gender identity are
often unscientific."· And that was the reason this
particular grant was terminated. ·Is that right?

A· · That's what the letter says.

Q· · That's what the letter says.· So I'm trying to
figure out whether or not there was any basis to think
that Dr. Ahrens' grant was unscientific.

A· · I don't know.

Q· · Okay.· And do you know if there was any

assessment to see if it had an identifiable return

on investment?

A· · No, I don't know.

Q· · Do you know if NIH did one?

A· · I don't know.

[43]

· Q· · Okay.· Would you have been aware if NIH
        did one?

A· · I'm not sure.

Q· · Okay.· And it also says, "and do nothing
     to enhance the health of many Americans."  Do you know
     if NIH did any assessment to see if Dr. Ahrens' grant
     would enhance the health of many Americans?

A· · I don't know.

* * *

Q ·  Did Rachel Riley provide any other template letters
     that were sent?

A· · Yes.

Q· · Okay.· What were those template letters about?

A· · In that [February 28, 2025] list, I don't recall.

Q· · How about any list for letters that had been sent?

A· · DEI activities, this language.· I think one on China.·
     I don't know.· That's it that I can recall, and I'm
     sure I'm blanking right now.

Q· · So what you remember is the gender identity language,
     the DEI language, and the China.  Was there language
     on vaccine hesitancy that was used?

A· · In that batch, no.

Bulls Depo. 72 – 74.  CMGO Bulls later testified, again,

consistent with the Administrative Record, that Rachel Riley

provided the following DEI language in template letters:

· · Q    And then it says, "DEI:· Research programs based
         primarily on artificial and non-scientific categories,
         including amorphous equity objectives, are
         antithetical to scientific inquiry, do nothing to
         expand our knowledge of living systems, provides low
         returns on investment, and ultimately do not enhance

[44]

health, lengthen life, or reduce illness.· Worse, so called diversity, equity, and inclusion (DEI) studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans.  Therefore, it is the policy of NIH not to prioritize such research programs." ·That language also was provided by Rachel Riley?

 A  Yes.

Id. 90 - 91.  Consistent with the Administrative Record, CMGO Bulls testified that she was provided lists with the categorical reasons for termination, and she executed based on those lists. She had no input into which grants were terminated or for what reasons:

 Q· · Okay.· But it's your testimony that the reason that the grant is going to be terminated is provided to you.· Is that right?

 A· · That's right.

 Q· · And you don't have any input into that?

 A· · I don't.

 Q· · Okay.· And you're testifying that the template letter for each reason is provided to you.  Is that right?

 A· · Yes.

 Q· · And you don't have any input into that either?
·
 A· · I don't.

Id. 97 - 98.  From January 20, 2025 through April 2025, CMGO Bulls had received "more than five lists" of grants to terminate, and she estimated that at that time between 500 and 1,000 grants had been terminated.  Id. 98 - 99.  While there

[45]

A0122

had been a "handful" of noncompliance terminations of which the NIH had undertaken between 2012 through January 20, 2025, Bulls Depo. 46 ("My testimony is that it doesn't happen often, more than one and probably less than five."), the current type of terminations that were dictated from HHS had occurred only once before during the prior Trump Administration.  Id. 47 -48.  The Administrative Record is replete with a large number of these new, dictated terminations.

The templates for these letters are all variations on a theme, and has been dictated onto the NIH by Riley as a reason-for-termination menu.  A good example is provided in full, but the record is replete with examples of the templates being used:

[ 46 ]

**PRIVILEGED, CONFIDENTIAL, PRE-DECISIONAL**

**FOR GRANTS ISSUED DECEMBER 2022-MARCH 2024 (TO BE DELTED)**

[Address block & date]

[Grant recipient]:

Funding for Project Number [INSERT] is hereby terminated pursuant to the 2022 National Institutes of Health ("NIH") Grants Policy Statement,[13] and 2 C.F.R. § 200.340(a)(2) (2023). This letter constitutes a notice of termination.[14]

The 2022 Policy Statement applies to your project because NIH approved your grant on [INSERT DATE], and "obligations generally should be determined by reference to the law in effect when the grants were made."[15]

The 2022 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[16] According to the Policy Statement, "NIH may ... terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[17] At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria. [INSERT EXPLANATION—EXAMPLES BELOW

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world. On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.
- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the

---

[13] https://grants.nih.gov/grants/policy/nihgps/nihgps_2022.pdf.
[14] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[15] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[16] 2022 Policy Statement at IIA-1.
[17] *Id.* at IIA-153.

PRIVILEGED, CONFIDENTIAL, PRE-DECISIONAL

health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues: Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.]

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[18] no corrective action is possible here. The premise of Project Number [INSERT] is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[19] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov.*[20]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[21] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[22]

You must submit a request for such review to [the NIH Director or his designee] no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, [the NIH Director or his designee] may grant an extension of time.[23]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[24]

Sincerely,

---

[18] 2022 Policy Statement at IIA-154.
[19] *See* 2 C.F.R. § 200.343 (2023).
[20] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[21] *See* 45 C.F.R. § 75.374.
[22] See 42 C.F.R. Part 50, Subpart D.
[23] *Id.* § 50.406(a).
[24] *Id.* § 50.406(b).

R. 2482 - 2483.

> 9.  **March 2025 -- The NIH Priorities Directives Emerge**

Between March 4, 2025, and March 25, 2025 internal staff guidance was issued.  <u>See</u> March 4, 2025 email from CMGO Bulls to Chief GMOs, R. 345.

| | |
|---|---|
| **From:** | Bulls, Michelle (NIH/OD) [E] |
| **To:** | Chief GMOs |
| **Cc:** | Bulls, Michelle (NIH/OD) [E]; Ta, Kristin (NIH/OD) [E]; Sass-Hurst, Brian (NIH/OD) [E] |
| **Subject:** | DEI Staff Guidance - Final - March 4 2025 |
| **Date:** | Tuesday, March 04, 2025 11:02:00 AM |
| **Attachments:** | DEI Staff Guidance - Final 3.4.25.pdf |

Good morning,

Attached is staff guidance that includes the DEI term along with details on when the term must be applied. Let's plan to talk through this guidance and note Dr. Memoli has **approved** the DEI term for immediate use. I have also added the process for terminating awards based in DEI as provided to us by HHS. I will follow up with a few of you to pull out the details needed to address terminations that were made yesterday—just to pull the information out and to address specific questions. Finishing up meetings and then, I will that information out to all that were impacted by yesterday's termination list provided to us by HHS/ASA.

Thanks,

Michelle

The guidance is provided in full:

[49]

## Staff Guidance –Award Assessments for Alignment with Agency Priorities - March 2025

### Background

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI). Terminations that result from science that no longer effectuates NIH's priorities must follow the appeals guidance below. All other terminations for noncompliance require, always, appeal language.

Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims assess whether the proposed project contains any DEI research activities or DEI language that give the perception that NIH funds can be used to support these activities. To avoid issuing awards, in error, that support DEI activities ICs must take care to completely excise all DEI activities using the following categories.

> **Category 1:** The sole purpose of the project is DEI related (e.g., diversity supplements or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that was unpublished as outlined above.
>
> ○ Action: ICs must not issue the award.

> **Category 2:** Project partially supports DEI activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope) this means DEI activities are ancillary to the purpose of the project. In some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the DEI Restriction Term of Award in Section IV of the Notice of Award, no exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).
>
> ○ Action 1: Funding IC must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file.
>
> ○ Action 2: Once the IC and the applicant/recipient have reached an agreement, issue the award and include the DEI Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.
>
> > ■ **Note:** If the IC and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the DEI related activities, the IC cannot proceed with the award. For ongoing projects, the IC must work with OPERA to negotiate a bilateral termination of the project. Where bilateral termination cannot be reached, the IC must unilaterally terminate the project. Terminated awards (bilaterally or unilaterally) should follow the process identified in Appendix 2.

NIH_GRANTS_002152

**Category 3:** Project does not support DEI activities, but may contain language related to DEI (e.g., statement regarding institutional commitment to diversity in the 'Facilities & Other Resources' attachment and terminology related to structural racism—this is not all-inclusive).

- ○ Action 1: Funding IC must request an updated application/RPPR with the DEI language removed.
- ○ Action 2: Once the language has been removed, the IC may proceed with issuing the award.

**Category 4:** Project does not support any DEI activities
- ○ Action: IC may proceed with issuing the award.

R. 2152 –2153. Again, no definition is provided for DEI.
Multiple appendices are provided, simply stating that it is "in accordance with the Secretarial Directive," which is included as an appendix. R. 2154 – 2155. It also includes the boilerplate language regarding DEI, "transgender issues," and China:

A0128

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports.**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world. On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues: Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

**Appendix 4 – Approved Term – Use for all Category 2 awards, i.e., renegotiated aims and associated budgets. Approval embedded below. ICs should use this term in the IC specific award conditions**

**Term and Condition of Award**

NIH and the recipient have renegotiated the scope of this award. Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including Diversity Equity and Inclusion (DEI) research or DEI-related research training activities or programs. Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes DEI or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

Approval email from Dr. Memoli (Acting Director, NIH) on Friday, February 28, 2025.

R. 2157. Notably, Appendix 4 delves into renegotiated awards concerning DEI activities. Anticipating questions about an

[52]

undefined DEI, the NIH invites recipients to inquire before drawing down funds.  Id.  Throughout March 2025, the Priorities directive was modified for certain procedures, but the boilerplate language of the reasons for termination did not substantially vary.

    10.    **Friday, March 7, 2025 -- Deputy Director Bundesen Resigns and Acting Director Memoli Appoints Himself Acting Deputy Director of Extramural Research**

On Friday, March 7, 2025, a mere three weeks after appointment as Acting Deputy Director of Extramural Research, Director Bundesen resigned from the NIH.

    11.    **March 10, 2025**

Dr. Memoli was in the thick of it, and he sent an email to his Deputies and general counsel, expressing that week was going to be busy:

[53]

| From: | Lorsch, Jon (NIH/NIGMS) [E] |
|---|---|
| To: | Bulls, Michelle G. (NIH/OD) [E] |
| Subject: | FW: OER |
| Date: | Monday, March 10, 2025 9:15:25 AM |
| Attachments: | 1VH Termination 3-10-25.xlsx |
| Importance: | High |

Do you want to send this out or do you want me to? I assume it should go to GMAC with CC to EPMC?

Let me know how you would like to proceed.

Thanks.

Jon

**From:** "Memoli, Matthew (NIH/OD) [E]"

**Date:** Monday, March 10, 2025 at 8:37 AM

**To:** "Lorsch, Jon (NIH/NIGMS) [E]" , "Jacobson, Ray (NIH/CSR) [E]" , "Schwetz, Tara (NIH/OD) [E]"

**Cc:** "McElroy, James (NIH/OD) [E]" , "Burklow, John (NIH/OD) [E]" , "Lankford, David (NIH/OD) [E]"

**Subject:** OER

Good morning,

This is going to be a busy week for OER. There will be many actions this week similar to this. Two things this morning:

1. I would like an updated list of all grants terminated so far.
2. I attached al list of 43 grants, OTA, and NOFOs that need to be terminated/taken down, preferably by COB today if possible. These are on the first tab of the spreadsheet. These no longer align with HHS priorities so we can use the termination letters we have been using regarding HHS priorities.

Please have someone confirm with me when this is complete.

Thank you all again for your efforts and taking OER on.

Matt

--

Matthew J. Memoli, MD, MS

Acting Director, National Institutes of Health

9000 Rockville Pike

Bethesda, MD 20892

matthew.memoli@nih.gov

A0131

R. 2352.  He wasn't wrong.

      **a.    The Columbia University Bulk Terminations  --**
               **Another Example of the Weaponization of the NIH**

      Separate to the categorized grant terminations, there is a curious exchange in the Administrative Record concerning the NIH weighing in on the Columbia University campus unrest.  As best the Court can discern, the NIH was being required to come down hard on Columbia University and cancel their grants on the basis of campus unrest.  There is no evidence in the record that this had ever been done before.  Deputy Director Lorsch, perhaps understanding the implications of cancelling all grants to a research university, appeared to be trying to soften the blow recommending to Dr. Memoli to fire a warning shot across Columbia University's bow -- that Columbia be put on notice that NIH "intended" to terminate a list of grants.  Dr. Memoli provided that same recommendation to David Lankford, the NIH's General Counsel:

---

**From:** Memoli, Matthew (NIH/OD) [E]
**To:** Lorsch, Jon (NIH/NIGMS) [E]; Lankford, David (NIH/OD) [E]
**Subject:** Re: One more thought...
**Date:** Monday, March 10, 2025 1:15:45 PM
**Attachments:** NIH Termination Letter_Columbia (2024 Statement)_v3 (signed).docx
Columbia Grants for Suspension or Termination.xlsx

Jon,

  Attached is a termination letter that was drafted. I think the last paragraph is the relevant part we may need to use, but I defer to David and OGC.

David, we would like to send a single letter to the University telling them we intend to terminate the grants listed in the attached spreadsheet.  We will the proceed with orderly terminations through our normal process.

We would like an approved letter sent by close of business today.

Thanks,
Matt

--
Matthew J. Memoli, MD, MS
Acting Director, National Institutes of Health
9000 Rockville Pike
Bethesda, MD 20892
matthew.memoli@nih.gov

**From:** Lorsch, Jon (NIH/NIGMS) [E] <jon.lorsch@nih.gov>
**Date:** Monday, March 10, 2025 at 1:03 PM
**To:** Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Subject:** One more thought...

What if we issued a letter to the VPR at the university saying we "intend to terminate the following awards..." with a list of the awards. That would make the point and then we could follow an orderly procedure for doing it. Perhaps there would be a resolution before that process finished?

---

R. 3462.  The email attached a list of Columbia's grants and a draft letter, dated March 7, 2025.[10]  The draft without the list is set forth in full here:

---

[10] This draft letter date coincides with a March 7, 2025 Department of Justice/HHS, Department of Education and General Services Administration Press Release which stated "GSA will assist HHS and ED in issuing stop-work orders on grants and contracts that Columbia holds with those agencies. These stop-



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

National Institutes of Health
Bethesda, Maryland 20892
www.nih.gov

March 7, 2025

President Katrina Armstrong
The Trustees of Columbia University in the City of New York
202 Low Library
535 W. 116 St.
New York, NY 10027

Dear President Armstrong:

Funding for Project Number [INSERT] is hereby terminated pursuant to the 2024 National Institutes of Health ("NIH") Grants Policy Statement,[1] and 2 C.F.R. § 200.340(a)(2) (2024). This letter constitutes a notice of termination.[2]

The 2024 Policy Statement applies to your project because NIH approved your grant on [INSERT DATE], and "obligations generally should be determined by reference to the law in effect when the grants were made."[3]

The 2024 Policy Statement "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[4] According to the Policy Statement, "NIH may ... terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[5] At the time your grant was issued, 2 C.F.R. § 200.340(a)(2) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

This award no longer effectuates agency priorities. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

NIH is responsible for ensuring that its limited resources are appropriately allocated. NIH policy is that grant dollars should support institutions that foster safe, equal, and healthy working and learning conditions conducive to high-quality research and free inquiry—and should not subsidize institutions that are not built on American values of free speech, mutual respect, and open debate.[6] In this vein, NIH is aware of recent events at Columbia University involving antisemitic action that suggest the institution has a disturbing lack of concern for the safety and wellbeing of Jewish students. Columbia's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students has ground day-to-day campus operations to a halt, deprived Jewish students of learning and research opportunities to which they are entitled, and brought shame upon the University and our nation as a whole. Supporting research in such an

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] 2 C.F.R. § 200.341(a); 45 C.F.R. § 75.373
[3] *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).
[4] 2024 Policy Statement at IIA-1.
[5] *Id.* at IIA-155.
[6] 2024 Policy Statement, Section 4.

---

work orders will immediately freeze the university's access to these funds. Additionally, GSA will be assisting all agencies in issuing stop work orders and terminations for contracts held by Columbia University."  Mar. 7, 2025 Press Release, https://www.hhs.gov/press-room/task-force-cancels-columbia-university-grants.html

[ 57 ]

A0134

environment is plainly inconsistent with NIH's priorities and raison d'etre of funding and championing the very best American research and educational institutions.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[7] no corrective action is possible here. The premise of Project Number [INSERT] is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[8] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[9]

**Administrative Appeal**

You may object and provide information and documentation challenging this termination.[10] NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[11]

You must submit a request for such review to Director Memoli no later than 30 days after the written notification of the determination is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[12]

The request for review must include a copy of the adverse determination, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[13]

Sincerely,

*Mymenioli*

Matthew J. Memoli, M.D., M.S.
Acting Director, NIH

---

[7] 2024 Policy Statement at IIA-156.
[8] *See* 2 C.F.R. § 200.343 (2024).
[9] 2 C.F.R. § 200.341(c); 45 C.F.R. § 75.373(c)
[10] *See* 45 C.F.R. § 75.374.
[11] See 42 C.F.R. Part 50, Subpart D.
[12] *Id.* § 50.406(a).
[13] *Id.* § 50.406(b).

R. 3503–3504.

Drs. Lorsch's and Memoli's softer approach was apparently wholly rejected; the Administrative Record reflects a full termination:

[58]

A0135



**NIH** National Institutes of Health
Office of Extramural Research

March 10, 2025

Angela V. Olinto, Ph.D.
Provost, Columbia University
Email: provost@columbia.edu

Dear Dr. Olinto:

NIH is hereby providing notice that funding for the projects in the attached spreadsheet will be terminated pursuant to the National Institutes of Health ("NIH") Grants Policy Statement (GPS),[1] and 2 C.F.R. § 200.340(a)(4).

As reflected in the Notices of Award for the most recent budget period of these projects, the NIH Grants Policy Statement is incorporated as a term and condition of award. The GPS "includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards."[2] According to the GPS, "NIH may … terminate the grant in whole or in part as outlined in 2 CFR Part 200.340."[3] At the time the Notices of Award were issued for the most recent budget period, 2 C.F.R. § 200.340(a)(4) permitted termination "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

These awards no longer effectuate agency priorities. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

NIH is responsible for ensuring that its limited resources are appropriately allocated. NIH policy is that grant dollars should support institutions that foster safe, equal, and healthy working and learning conditions conducive to high-quality research and free inquiry[4]—and should not subsidize institutions that are not built on American values of free speech, mutual respect, and open debate. In this vein, NIH is aware of recent events at Columbia University involving antisemitic action that suggest the institution has a disturbing lack of concern for the safety and wellbeing of Jewish students. Columbia's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students has ground day-to-day campus operations to a halt, deprived Jewish students of learning and research opportunities to which they are entitled, and brought shame upon the University and our nation as a whole. Supporting research in such an

---

[1] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[2] NIH GPS, Section 3.
[3] *Id.* at Section 8.5.2.
[4] NIH GPS, Section 4.

1

A0136

environment is plainly inconsistent with NIH's priorities and raison d'etre of funding and championing the very best American research and educational institutions.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision,"[5] no corrective action is possible here. The actions described above are incompatible with agency priorities, and no modification of the projects could align the projects with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable.[6] Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 200.344. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.[7]

**Administrative Appeal**

You may object and provide information and documentation challenging these terminations. NIH has established a first-level grant appeal procedure that must be exhausted before you may file an appeal with the Departmental Appeals Board.[8]

You must submit a request for such review to Director Memoli no later than 30 days after this letter is received, except that if you show good cause why an extension of time should be granted, Dr. Memoli may grant an extension of time.[9]

The request for review must include a copy of this decision, must identify the issue(s) in dispute, and must contain a full statement of your position with respect to such issue(s) and the pertinent facts and reasons in support of your position. In addition to the required written statement, you shall provide copies of any documents supporting your claim.[10]

Sincerely,

Michelle G. Bulls
Director, Office Policy for Extramural Administration
Chief Grants Management Officer - National Institutes of Health
Email: michelle.bulls@nih.gov

cc:
William Berger, Assistant Vice President for Sponsored Projects Administration, Columbia University

---

[5] NIH GPS, Section 8.5.2.
[6] *See* 2 C.F.R. § 200.343.
[7] 2 C.F.R. § 200.341(c).
[8] See 42 C.F.R. Part 50, Subpart D.
[9] *Id.* § 50.406(a).
[10] *Id.* § 50.406(b).

R. 3805 – 3806. While the parties do not appear to assert

claims based directly upon this letter, it was included in the

Administrative Record, and in the Court's view is further

evidence of the NIH's grant process being abused as a bludgeon, this time to sanction Columbia University for the Administration's perception of inaction by Columbia with respect to campus unrest.  While the Court takes no position as to the merits of the Executive's perception or of the legality of its action, it is clear that Drs. Memoli and Lorsch at least had some pause as to a wholesale termination of Columbia's grants, numbering in the hundreds.  R. 3807 – 3809.  Indeed, how the scientific and research activities had any connection with unrest issues on Columbia's campus is conspicuously never explained.  The record evidence certainly reveals none.

### 12. **March 10, 2025 Further Terminations**

The record is replete with termination activity.  On March 10, 2025, grants were terminated.  <u>See e.g.</u> R. 794 – 795; 1326 - 1333; 1357 -1363.  On March 11, 2025, Riley sent Dr. Memoli a list of grants to terminate, that were approved by Dr. Memoli within 2 minutes of the email having been sent:

A0138

| From: | Memoli, Matthew (NIH/OD) [E] |
|---|---|
| To: | Riley, Rachel (OS/ASA); Bulls, Michelle G. (NIH/OD) [E] |
| Subject: | Re: Shortlist of SGM for Tonight |
| Date: | Tuesday, March 11, 2025 9:49:35 PM |

All of these grants can be terminated for being unaligned with current NIH /HHS priorities.

Matt

Get Outlook for Mac

**From:** Riley, Rachel (OS/ASA) <Rachel.Riley@hhs.gov>
**Date:** Tuesday, March 11, 2025 at 9:43 PM
**To:** Bulls, Michelle G. (NIH/OD) [E] <michelle.bulls@nih.gov>, Memoli, Matthew (NIH/OD) [E] <matthew.memoli@nih.gov>
**Subject:** Shortlist of SGM for Tonight

Dr. Memoli –

Please see a short list below/attached; I have sent you 6 in case you find an issue with any one. If you are comfortable, the wonderful @Bulls, Michelle G. (NIH/OD) [E] will work to action tonight:

I will then get you an updated combined list for tomorrow!

Thanks,
Rachel

R. 3820.   There is record evidence of template letters being sent on that date.  R. 297 – 298; 653 –654  711- 712; 3508 – 3509; 3585 – 3586.

A0139

### 13. March 12, 2025 -- Further Terminations

On March 12, 2025, Dr. Memoli sent an email to Deputy Director Lorsch and Bulls with a list of grants to terminate. R. 3631 - 3635. Brad Smith of DOGE is copied on the email. Id.



| From: | Memoli, Matthew (NIH/OD) [E] |
|---|---|
| To: | Lorsch, Jon (NIH/NIGMS) [E]; Bulls, Michelle G. (NIH/OD) [E] |
| Cc: | Smith, Brad M. EOP/DOGE; McElroy, James (NIH/OD) [E] |
| Subject: | Terminations |
| Date: | Wednesday, March 12, 2025 2:00:56 PM |
| Attachments: | Terminated Grants 3-12.xlsx |

Good afternoon,

Attached is a list of grants that should be terminated for not being aligned with current HHS/NIH priorities. If possible, please terminate by COB today.

Thank you,

Matt

--

Matthew J. Memoli, MD, MS

Acting Director, National Institutes of Health

9000 Rockville Pike

Bethesda, MD 20892

matthew.memoli@nih.gov

R. 2932-2933; 3631. Terminations were issued on that date. See e.g. R. 651 - 652 709 - 710.

On March 13, 2025, Dr. Memoli sent an email to Deputy Director Lorsch and Bulls, directing them to terminate an additional 530 grants. Brad Smith of DOGE is copied on the email, which is provided in full:

[63]

A0140

| | |
|---|---|
| **From:** | Memoli, Matthew (NIH/OD) [E] |
| **To:** | Lorsch, Jon (NIH/NIGMS) [E] |
| **Cc:** | Cutler, Diane (HHS/IOS); Smith, Brad M. EOP/DOGE; Bulls, Michelle G. (NIH/OD) [E] |
| **Subject:** | New list for termination |
| **Date:** | Thursday, March 13, 2025 9:03:01 AM |
| **Attachments:** | Grants for Termination 3-13 to 3-24-25.xlsx |

Jon,

Here is an additional list of grants for termination There are 530 grants here. I do not expect these to get done today. Please complete these by COB next Friday if possible. A daily evening update on how many were terminated would be appreciated. I want to thank you and Michelle for your diligent work getting this done. Michelle has been doing a lot of heavy lifting and it has not gone unnoticed.

Thank you,
Matt

--

Matthew J. Memoli, MD, MS

Acting Director, National Institutes of Health

9000 Rockville Pike

Bethesda, MD 20892

matthew.memoli@nih.gov

R. 3122 – 3191. There is record evidence of multiple

terminations of grants. See e.g., R. 3593 – 3630; March 14,

2025 (R. 289 – 290); March 18, 2025 (R. 440- 441; 601 – 602);

March 19, 2025 (R. 391 – 392); March 20, 2025 (R. 158 – 159;

449- 450; 745 -746; 1348 -1349; 1371- 1375; 1392 – 1392; 1397-

1398); March 21, 2025 (R. 114 – 116; 152 – 153; 187 – 189; 757 -

759; 771- 773; 782 – 784; 810-814; 859 - 861; 871 – 873; 877 -

878; 995-996; 1195 -1197; 1237 -1242; 1268-1273; 1284 – 1292;

1380 – 1384; 1399 – 1401; 1416- 1421; 1483 – 1484; 1492 -1493;

1668 - 1670; 1689 -1694; 2415 – 2468); March 24, 2025 (R. 689-

[64]

A0141

691; 747 – 749; 844 – 846; 1218 - 1220; 1299 - 1301; 1309 -
1310; 2257 – 2258).

### 14. March 25, 2025 – Staff Guidance (Priorities Directive)

On March 25, 2025, the NIH issued further guidance ("the
March 25 Guidance"). R 3216 -3230. This is a continuation of
the Priorities Directive, which was changing on the fly over
March, though it is not clear whether any grants were terminated
based upon this guidance.

A0142

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

## NIH Grants Management Staff Guidance – Award Assessments for Alignment with Agency Priorities- March 2025

### Issue Date: March 25, 2025

**Background**

This staff guidance rescinds the guidance provided in the February 13, 2025, memo to IC Chief Grants Management Officers entitled Supplemental Guidance – NIH Review of Agency Priorities Based on the New Administration's Goals. In accordance with the Secretarial Directive on DEI Related Funding (Appendix 1), NIH will no longer prioritize research and research training programs that focus on Diversity, Equity and Inclusion (DEI). Terminations that result from science that no longer effectuates NIH's priorities related to DEI, gender identity and other scientific areas must follow the appeals guidance below. All other terminations for noncompliance require, always, appeal language.

Prior to issuing all awards (competing and non-competing) or approving requests for carryover, ICs must review the specific aims/major goals of the project to assess whether the proposed project contains any DEI, gender identity or other research activities that are not an NIH/HHS priority/authority. To avoid issuing awards, in error, that support these activities ICs must take care to completely excise all non-priority activities using the following categories.

ICs should review the current application/RPPR under consideration, only. ICs should not request retroactive changes to previous RPPRs and competitive applications to modify language related to research that has already been conducted. Categories 1-3 are IC determinations not those ordered by HHS.

**Category 1:** The sole purpose of the project is related to an area that is no longer an NIH/HHS priority/authority (e.g., diversity supplements, diversity fellowships, or conference grant where the purpose of the meeting is diversity), and/or the application was received in response to a NOFO that has been unpublished due to its focus on activities that are no longer an NIH/HHS priority/authority. This applies to all projects, including phased awards, etc.

- o **Action:** ICs must not issue the award (competing or non-competing).
- o For ongoing projects where NIH will not issue the next Type 5 (IC determination not HHS list), the IC must:
  - o Issue a revised award to remove all outyears.
  - o Add the action to the master spreadsheet located at: OD OPERA Grant Action Tracking (access limited to CGMOs).
  - o Include the following term in the revised NOA:

  *Term of Award:*

  It is the policy of NIH not to prioritize research programs related to [insert category from Appendix 3, verbatim]. Therefore, no additional funding will be awarded for this project, and all future years have been removed. [RECIPIENT NAME] may request funds to support patient safety and orderly closeout of the project, and remaining funds will be deobligated. Funds used to support any

1

A0143

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

- o Check PMS to determine amount of funds remaining, and if funds are available request a hard funds restriction of all funds except $1 in PMS.

- o **No cost extension requests:** For second and third NCE's, ICs must determine if the sole purpose of the grant was to support research activities that are no longer an NIH/HHS priority/authority and, if so, issue an award to end the grant project (use disapproved extension term below). If the non-NIH/HHS priority/authority research activities are ancillary to the project, approve the extension (use approved extension term below). Reminder – even if a grant project is in an NCE, IC staff must still determine if non-NIH/HHS priority/authority activities are proposed during the extension period. Extensions may only be approved for orderly closeout, and funds may not be used to support any non-NIH/HHS priority/authority research activities.

  - o ICs may use the following term of award when approving/disapproving NCEs:
    - **Term of Award (approved extension):** The no-cost extension has been approved for this project to support orderly closeout of the project, only. NIH grants funds must not be used to support [insert category – e.g., Diversity, Equity and Inclusion (DEI), gender identity, etc.] research or research training activities or programs. Any funds used to support such activities will result in a disallowance of costs, and funds will be recovered.
    - **Term of Award (disapproved extension):** The no cost extension request for this project has been denied. Please proceed with orderly closeout of the project. NIH grant funds must not be used to support [insert category – e.g., Diversity, Equity and Inclusion (DEI), gender identity, etc.] research or research training activities or programs.

**Category 2:** Project partially supports non-NIH/HHS priority/authority activities (i.e., the project may still be viable if those aims or activities are negotiated out, without significant changes from the original peer-reviewed scope). This means the non-NIH/HHS priority/authority activities are

[ 6 7 ]

A0144

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

ancillary to the purpose of the project, in some cases, not readily visible. This category requires a scientific assessment and requires the GM to use the Restriction Term of Award in Section IV of the Notice of Award. No exceptions will be allowed without a deviation from the Office of Policy for Extramural Research Administration (OPERA)/Office of Extramural Research (OER).

- o Note: Activities required to comply with NIH inclusion policies are not considered DEI activities.
- o **Action 1:** Funding IC must negotiate with the applicant/recipient to address the activities that are non-compliant, along with the associated funds that support those activities, obtain revised aims and budgets, and document the changes in the grant file.  The recipient/awardee cannot rebudget these funds, they must be recovered by the IC. OPERA is consulting with eRA on options to collect these application updates in a structured format.
    - Sample language for requesting application updates from the AOR: It is the policy of NIH not to prioritize [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa.] [Funding IC] has identified [insert appropriate activity taken from the list above] activities within section [XXXX] of your application. Please work with the PD/PI to update the application sections and adjust the budget as appropriate to remove all [insert appropriate activity] activities and submit these updates to the Program Official and Grants Management Specialist for review and approval.
- o **Action 2:** Once the IC and the applicant/recipient have reached an agreement, issue the award and include the following Term and Condition of Award in Section IV of the Notice of Award. Hard funds restrictions are not required.

    **Term of Award (Approved 2/28/2025 – Refer to Appendix 4 for the approval from Dr. Memoli):**

    NIH and the recipient have renegotiated the scope of this award.  Pursuant to the revised scope, NIH funds may only be used to support activities within the revised scope of the award. NIH funds may not be used to support activities that are outside the revised scope of the award, including [select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa, etc.] research or related research training activities or programs. Any funds used to support activities outside the scope will result in a disallowance of costs, and funds will be recovered.

    This term is consistent with NIH's ongoing internal review of NIH's priorities and the alignment of awards with those priorities as well as a review of program integrity of awards. Such review includes, but is not limited to, a review for fraud, waste and abuse, and a review of the NIH portfolio to determine whether awards are in the best interests of the government and consistent with policy priorities. If recipients are unclear on whether a specific activity constitutes

3

A0145

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

[select one of the following: diversity, equity and inclusion (DEI) research programs, gender identity, vaccine hesitancy, climate change or countries of concern, e.g., China or South Africa., etc.] or has questions regarding other activities that could be considered outside the scope of the award, refrain from drawing down funds and consult with the funding IC, particularly where the activity may impact the specific aims, goals, and objectives of the project.

- ○ **Unable to remove activities that are not an NIH/HHS priority/authority:** If the IC and the applicant/recipient cannot reach an agreement, or the project is no longer viable without the non-compliant activities, the IC cannot proceed with the award. For ongoing projects, the IC must work with OPERA to negotiate a bilateral termination of the project. Where bilateral termination cannot be reached, the IC must unilaterally terminate the project. Terminated awards (bilaterally or unilaterally) should follow the process identified in Category 4.
- ○ **Diversity Supplements:** Type 5 Diversity supplements may no longer be awarded. For ongoing awards, ICs must remove the diversity supplement activities prior to issuing the next Type 5 for the parent award and include the DEI Term and Condition of Award in Section IV of the NOA of the parent grant. The IC must revise the Diversity Supplement award to remove all outyears. If diversity supplement outyears were included in the previous NOA, the IC must revise the prior year award to remove references to those outyear commitments.
- ○ **Conference Grants:** If a conference supported by an NIH grant focuses on scientific topics that are unrelated to DEI, but the conference itself is targeted at a specific population (e.g., underrepresented groups), the IC must work with the applicant/recipient to open the conference up to all populations. If a negotiation to broaden the target audience is not feasible, or the conference is no longer viable, then the IC must terminate the award following the process in Category 4.
- ○ **Diversity Reports (e.g., Ts, R25, K12, and any others):** NIH is modifying the application instructions and RPPR instructions to remove requirements for diversity reports (e.g., Trainee Diversity Report). If ICs receive these reports in applications or RPPRs, the IC should not review the report. These reports provide diversity related information, but do not involve specific DEI activities. ICs must use the following term: "NIH no longer requires the [name of diversity table/plans]. Therefore, NIH did not review the [name of diversity table/plans] provided. NIH funding may not be used to support any diversity, equity or inclusion (DEI) activities". Note: this section applies to diversity related reports, only. Other areas that are no longer NIH/HHS priorities/authority must be addressed under category 2 negotiations.
- ○ **Administrative Supplement Requests:** Administrative supplement applications should be reviewed for any activities that are no longer NIH/HHS priorities/authority and modified as needed. ICs do not need to retroactively review the competitive parent grant application– only the supplement application requires review.

A0146

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

**Category 2B:**

Prospective reviews by GM where the DEI language in certain sections of the application has to be removed even though the project itself is not focused on DEI but may have language or have been awarded from a DEI NOFO that is expired/taken down for revision to go back up once the language is appropriately excised.

Examples below, and in these cases, IC should consider using the Category 2 term of award but remove the negotiation language from the term:

- Resource Section
- Biosketch
- RPPRs

**Category 2C:**

Subprojects terminated by HHS.

- OPERA will restrict the funds associated with the project. No action required from the IC.

**Category 3:** Project does not support any DEI activities
- Action: IC may proceed with issuing the award.

**Category 4/HHS Departmental Authority Terminations:**

- OPERA receives a list from the Director, NIH or designee.
- OPERA will issue termination letters on behalf of the IC Chief Grants Management Officers. The IC CGMO will be copied on the email with the termination letter.
  - **Supplements – Parent Award Terminated:** If a terminated award has active supplement(s), all supplement awards must be terminated along with the parent.
  - **Supplement Terminated Only:** If a termination letter references a supplement only, and not the parent award, then the supplement alone must be terminated following the instructions below.
  - **Linked (or equivalent) Awards:** If one linked (or equivalent) award is terminated, the IC is only required to terminate the specific award noted in the letter. The IC must conduct a separate review to determine whether terminating that award will have a structural impact on the scientific design along with associated outcomes and act, as appropriate, to early terminate or allow the remaining awards to continue. Feel free to discuss with OPERA, as needed.
- When a termination letter is received, the IC must:
  - Issue a revised NOA within 3 business days of the date the termination letter was issued to the recipient.
    - Change the budget and project period end dates to match the date of the termination letter.

A0147

INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT

- OPERA will place a hard funds restriction on all PMS subaccounts as termination letters are issued. OPERAs Federal Financial Report Center (FFR-C) will deobligate the remaining funds after the Final FFRs are submitted. There is no deobligation action required from the ICs.
- Remove all future years from the project, where applicable. If the grant is in a no cost extension, and HHS requests a termination, the project must be terminated even in a no cost extension. If the grant is in a no cost extension, and HHS did not request a termination, follow the NCE guidance above.
- Include the following Termination Term in the revised NOA:

    It is the policy of NIH not to prioritize [insert termination category language from Appendix 3, verbatim]. Therefore, this project is terminated. [RECIPIENT NAME] may request funds to support patient safety and orderly closeout of the project. Funds used to support any other research activities will be disallowed and recovered. Please be advised that your organization, as part of the orderly closeout process will need to submit the necessary closeout documents (i.e., Final Research Performance Progress Report, Final Invention Statement, and the Final Federal Financial Report (FFR), **as applicable**) within 120 days of the end of this grant.

    NIH is taking this enforcement action in accordance with 2 C.F.R. § 200.340 as implemented in NIH GPS Section 8.5.2. This revised award represents the final decision of the NIH. It shall be the final decision of the Department of Health and Human Services (HHS) unless within 30 days after receiving this decision you mail or email a written notice of appeal to Dr. Matthew Memoli. Please include a copy of this decision, your appeal justification, total amount in dispute, and any material or documentation that will support your position. Finally, the appeal must be signed by the institutional official authorized to sign award applications and must be dated no later than 30 days after the date of this notice.

- Note: Appeals language must be included **prior to** October 1, 2025. After October 1, 2025, when HHS will fully adopt 2 CFR 200, per 2 CFR 200.340, termination actions taken based on agency priorities are not appealable. This is different from terminations based on noncompliance (administrative and programmatic).

o eRA provides OPERA with daily reports on NOAs issued, so ICs do not need to report to OPERA on each action completed.

### Category 5: Awards to Entities in certain foreign countries

- o Additional guidance on awards to foreign entities is forthcoming. At this time, ICs should hold all awards to entities located in South Africa or countries identified on any of the following lists.
    - State Department Countries of Particular Concern
    - State Sponsors of Terrorism
    - Final Rule Restricting Transfer of Personal U.S. Data to Countries of Concern

A0148

**INTERNAL: NOT FOR DISTRIBUTION OUTSIDE THE GOVERNMENT**

- Office of Foreign Assets Control Sanctions List

**Separation of Duties Guidance:**

OPERA has issued a Separation of Duties (SOD) waiver for all CGMOs, specific to the HHS Departmental Authorities termination actions, to allow IC CGMOs to work up and issue termination actions. Copy available in Teams.

The March 25 Guidance settles on an examples list of: "China," "DEI," "Transgender issues," "Vaccine Hesitancy", "COVID-related" research:

A0149

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports. Use this language for HHS terminations only.**

- China: Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world. On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives.

- DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

- Transgender issues: Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs.

- Vaccine Hesitancy: It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria.

- COVID: The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary.

R. 3226.

The March 25 Guidance also features an FAQ section that includes, among other instructions:

[73]

A0150

> **6. When ICs issue revised NOAs to terminate awards, do they have to use the exact language provided by HHS in the termination term?**
>
> Yes, ICs must use the exact language provided in Appendix 3, with no edits.

R. 3229.  In addition, "Notice of Funding Opportunity (NOFO)
Guidance," was listed as "[pending]."  R. 3228.

On May 15, 2025, it appears that Dr. Memoli was provided an
expanded list from the Office of General Counsel

[ 74 ]

A0151

**Appendix 3 – Language provided to NIH by HHS providing examples for research activities that NIH no longer supports.**

- China: "Bolstering Chinese universities does not enhance the American people's quality of life or improve America's position in the world. On the contrary, funding research in China contravenes American national-security interests and hinders America's foreign-policy objectives."

- DEI: "Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics ICO's, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs."

- Gender-Affirming Care: "Research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities. It is the policy of NIH not to prioritize these research programs." **Reminder: At this time, do not terminate any grants related to gender identify/transgender without clearance from OER. All such actions must be approved before terminations.**

- Vaccine Hesitancy: "It is the policy of NIH not to prioritize research activities that focuses gaining scientific knowledge on why individuals are hesitant to be vaccinated and/or explore ways to improve vaccine interest and commitment. NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life. Your project does not satisfy these criteria."

- COVID (to be used for HHS/NIH OD directed terminations only): "The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary." **Note: ICO's may continue to support projects that funds general biology of coronavirus not linked to COVID-19. As ICO's conduct in-house analysis of project portfolios related to COVID the term may change. Please work with OPERA to develop standard terms based on the outcome of the analysis.**

- Climate Change: "Not consistent with HHS/NIH priorities particularly in the area of health effects of climate change."

- Influencing Public Opinion: "This project is terminated because it does not effectuate the NIH/HHS' priorities; specifically, research related to attempts to influence the public's opinion."

R. 3536. Again, usage of this list was mandatory:

A0152

> **7.** When ICO's issue revised NOAs to terminate awards, do they have to use the exact language provided by HHS in the termination term?
>
> Yes, ICO's must use the exact language provided in Appendix 3, with no edits.

3541.

The terminations continued. See March 26, 2025 (R. 1639 - 1641); March 31, 2025 (R. 2488); April 1, 2025 (R. 760-761; 1274-1276; 1376 – 1378; 1394 -1396); April 2, 2025 (R. 35 – 36; 3762 – 3803); April 7, 2025 (R. 1652); April 8, 2025 (R. 1653 - 1667); May 9, 2025 (R. 3452).

## IV. RULINGS OF LAW

### A. This Court Maintains Jurisdiction Save For Category of China which has not Harmed these Plaintiffs

This Court retains jurisdiction. The Public Officials press that the Court has no jurisdiction because their high-level activities are interlocutory and the grant terminations, claiming there is no final agency action under the APA. With the exception of grant terminations on the basis of China, all of these arguments are rejected.

#### 1. The Plaintiffs Have No Standing as to the "China" Category

The parties do not dispute that action has not been taken concerning the category of "China." Accordingly, the Court

A0153

**VACATES** its earlier order solely as to this category, that does not apply.

### 2. **Final Agency Action**

Final agency action "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C.A. § 551 (13), and a "rule" thereunder "means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process. . . -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154 (1997).

The Challenged Directives, as a whole, constitute final agency actions at the macro-level, and the resultant, downstream individual terminations and other effects are also independent final agency action as to each of the affected grants. The Public Officials attempts to narrow the action to grant terminations and characterization of the Priorities Directives

[77]

A0154

by CMGO Bulls "as not independently challengeable"
oversimplifies the record and is a myopic view of the
Administrative Record.

Certainly, taking any particular document in isolation and
out of temporal context is superficially appealing. But the
agency action here occurred in the context of a wholesale effort
to excise grants in 8 categories over a period of less than 90
days. HHS directed NIH to cut without a plan and NIH, with the
assistance of DOGE, made it up as they went along, resulting in
a paper trail of the Challenged Directives. The Public
Officials were trying to comply with an Executive Order 60-day
deadline. See EO 14151 § 2 (B)(i) ("Each agency, department, or
commission head, in consultation with the Attorney General, the
Director of OMB, and the Director of OPM, as appropriate, shall
take the following actions within sixty days of this order: . .
. terminate, to the maximum extent allowed by law, all. .
.equity action plans," 'equity' actions, initiatives, or
programs, 'equity-related' grants or contracts"). Their
expedition in implementation included all of the Challenged
Directives. The Public Officials argue "that this case is
nothing like Biden v. Texas, where the agency directed personnel
to take all necessary actions to shut down an entire program."
Trial Br. 11. (citing Biden v. Texas, 597 U.S. 785, 808-09
(2022). They are correct -- this is worse.

[78]

A0155

The pronouncements of HHS and NIH in the Challenged
Directives are consistent: they are final agency action on their
evolving "eradication" of DEI, gender identity, and other topics
ostensibly under the Executive Orders as quickly as possible.
While the President is not typically subject to the APA,
Franklin v. Massachusetts, 505 U.S. 788, 801 (1992), the
agencies implementing his orders certainly are.  New York v.
Trump, 133 F.4th 51, 70 n.17 (1st Cir. 2025) ("[T]he District
Court did not review the President's actions for consistency
with the APA.  Rather, it reviewed—and ultimately enjoined—the
Agency Defendants' actions under the Executive Orders.").
Indeed, "[t]he APA contains no exception for agency actions . .
. that carry out an executive order."  Orr v. Trump, No. 1:25-
CV-10313-JEK, 2025 WL 1145271, at *15 (D. Mass. Apr. 18, 2025)
(Kobick, J.).

### B.    The Administrative Procedure Act

"[F]ederal courts do not exercise general oversight of the
Executive Branch; they resolve cases and controversies
consistent with the authority Congress has given them."  Trump
v. Casa, Inc., No. 24A884, 2025 WL 1773631, at *15 (U.S. June
27, 2025).[11]  Congress has provided such authority, in part,

---

[11]   Nor should it.  As my colleague Chief Judge McConnell of
the District of Rhode Island recently wrote about our system of
government:

under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. Specifically, the APA provides that any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. It acts "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices," Loper Bright Enters. v. Raimondo, 603 U.S. 369, 391 (2024) (quoting United States v. Morton Salt Co., 338 U.S. 632, 644 (1950)), and "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts," Department of Homeland Sec. v. Regents of the Univ.

---

Our founders, after enduring an eight-year war against a monarch's cruel reign from an ocean away, understood too well the importance of a more balanced approach to governance. They constructed three co-equal branches of government, each tasked with their own unique duties, but with responsibilities over the other branches as a check in order to ensure that no branch overstepped their powers, upsetting the balance of the fledgling constitutional republic. See Kilbourn v. Thompson, 103 U.S. 168, 191 (1880). These concepts of "checks and balances" and "separation of powers" have been the lifeblood of our government, hallmarks of fairness, cooperation, and representation that made the orderly operation of a society made up of a culturally, racially, and socioeconomically diverse people possible.

New York v. Trump, 769 F. Supp. 3d 119, 127–28 (D.R.I. 2025).

[80]

of Cal., 591 U.S. 1, 16 (2020) (quoting <u>Franklin</u> v.

<u>Massachusetts</u>, 505 U.S. 788, 796 (1992)).[12]  Broadly, the APA

establishes a rebuttable "presumption of judicial review [for]

one 'suffering legal wrong because of agency action.'"  <u>Id.</u>

(alteration in original) (quoting <u>Abbott Lab'ys</u> v. <u>Gardner</u>, 387

U.S. 136, 140 (1967)).  The rebuttal of this presumption is made

---

[12] Section 706 provides in pertinent part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

> (1)  compel agency action unlawfully withheld or unreasonably delayed; and

> (2)  hold unlawful and set aside agency action, findings, and conclusions found to be—

>     (A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

>     (B)  contrary to constitutional right, power, privilege, or immunity;

>     (C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

>     . . . .

> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

A0158

"by a showing that the relevant statute 'preclude[s]' review, §
701(a)(1), or that the 'agency action is committed to agency
discretion by law,' § 701(a)(2)."[13]  Id. at 17.  The first
exception is self-explanatory, and the Supreme Court has read
the second exception "quite narrowly," applying "it to those
rare 'administrative decision[s] traditionally left to agency
discretion.'"  Id. (alteration in original) (first quoting
Weyerhaeuser Co. v. United Staes Fish & Wildlife Serv., 586 U.S.
9, 23 (2018); and then quoting Lincoln v. Vigil, 508 U.S. 182,
191 (1993));  Department of Com. v. New York, 588 U.S. 752, 772
(2019) ("[W]e have read the § 701(a)(2) exception for action
committed to agency discretion 'quite narrowly, restricting it
to "those rare circumstances where the relevant statute is drawn
so that a court would have no meaningful standard against which
to judge the agency's exercise of discretion."'" (quoting
Weyerhaeuser Co., 586 U.S. at 23)).  Examples of decisions
traditionally left to agency discretion include "a decision not
to institute enforcement proceedings, or a decision by an

---

[13] Section 701 provides in pertinent part:

(a) This chapter applies, according to the provisions
thereof, except to the extent that--
　　　(1) statutes preclude judicial review; or
　　　(2) agency action is committed to agency discretion by
　　　law.

5 U.S.C. § 701(a).

[82]

intelligence agency to terminate an employee in the interest of national security." <u>New York</u>, 588 U.S. at 772 (citations omitted).

    **C.    The 706(2)(A) Claims -- Arbitrary and Capricious ('10787 Action Count I, '10814 Action Count III)**

Section 706(2)(A) of the APA "instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" <u>Id.</u> at 771 (quoting 5 U.S.C. § 706(2)(A)). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" <u>Ohio</u> v. <u>Environmental Prot. Agency</u>, 603 U.S. 279, 292 (2024) (quoting <u>Federal Commc'ns Comm'n</u> v. <u>Prometheus Radio Project</u>, 592 U.S. 414, 423 (2021)).

Review by the Court under the arbitrary or capricious standard of Section 706(2)(A) is narrow, because all that is "required [is for] agencies **to engage** in 'reasoned decisionmaking.'" <u>Regents of the Univ. of Cal.</u>, 591 U.S. at 16 (quoting <u>Michigan</u> v. <u>Environmental Prot. Agency</u>, 576 U.S. 743, 750 (2015)) (emphasis added). To be sure, this Court may not "substitute its judgment for that of the agency," but rather "must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" <u>Ohio</u>, 603 U.S. at 292 (alteration in original) (first quoting <u>Federal</u>

[83]

A0160

Commc'ns Com. v. Fox Television Stations, Inc., 556 U.S. 502,
513 (2009); and then quoting Motor Vehicle Mfrs. Ass'n of United
States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43
(1983)).  Said another way, this Court's review "simply ensures
that the agency has acted within a zone of reasonableness and,
in particular, has reasonably considered the relevant issues and
reasonably explained the decision."  Prometheus Radio Project,
592 U.S. at 423.

    "Generally, an agency decision is arbitrary and capricious
if 'the agency has relied on factors which Congress has not
intended it to consider, entirely failed to consider an
important aspect of the problem, offered an explanation for its
decision that runs counter to the evidence before the agency, or
is so implausible that it could not be ascribed to a difference
in view or the product of agency expertise.' " Sierra Club v.
United States Dep't of the Interior, 899 F.3d 260, 293 (4th Cir.
2018) (quoting Motor Vehicle Mfrs. Assn. of United States, Inc.
v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct.
2856, 77 L.Ed.2d 443 (1983)).  "Determining whether an agency
action is 'reasonable and reasonably explained' is 'measured by
what [the agency] did, not by what it might have done.'" Green
& Healthy Home Initiatives, Inc. v. Env't Prot. Agency, No. 25-
CV-1096-ABA, 2025 WL 1697463, at *20 (D. Md. June 17, 2025) SEC
v. Chenery Corp., 318 U.S. 80, 93-94 (1943).  "And to this end,

[84]

conclusory statements will not do; an 'agency's statement must be one of reasoning.'" <u>Amerijet Int'l, Inc.</u> v. <u>Pistole</u>, 753 F.3d 1343, 1350 (D.C. Cir. 2014)(quoting <u>Butte Cnty., Cal.</u> v. <u>Hogen</u>, 613 F.3d 190, 194 (D.C.Cir.2010).

This Court, is "ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." <u>New York</u>, 588 U.S. at 780. In the usual course, this is because "further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." <u>Id.</u> at 781 (quoting <u>Arlington Heights</u> v. <u>Metropolitan Hous. Dev. Corp.</u>, 429 U.S. 252, 268 n.18 (1977)). Indeed, this Court may neither "reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons" nor "set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." <u>Id.</u> This general rule recognizes the reality that "[a]gency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.'" <u>Id.</u> (quoting <u>Sierra Club</u> v. <u>Costle</u>, 657 F.2d 298, 408 (D.C. Cir. 1981)). Agency "decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations,

foreign relations, and national security concerns (among others)."  Id.

All that being said, while the Court's "review is deferential," it is certainly "'not required to exhibit a naiveté from which ordinary citizens are free.'"  Dep't of Com. v. New York, 588 U.S. 752, 785 (2019) (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2nd Cir 1977) (Friendly, J.)).

The Public Officials argue as one of their reasons  "[t]he change in democratically accountable leadership with different priorities is not a post hoc rationalization; it is historical fact" and that "[w]ith a new administration comes an appropriate opportunity to assess and reassess the agency's activities." 10787 Action, Defs. Resp. Trial Br. 4, ECF  No. 111.  True enough, but what the Public Officials fail to appreciate is that they have to work within the confines of the law.  That is, a new administration certainly is entitled to make changes -- even unpopular or unwise changes.  What it cannot do is undertake actions that are not reasonable and not reasonably explained. This is where the Public Officials miss the mark.  Even under this narrow scope of review, the Public Officials' actions as evidence under the Challenged Directives are breathtakingly arbitrary and capricious.

A careful review of the Administrative Record confirms to this Court what Justice Jackson wondered aloud three months ago

(albeit from a different agency allegedly doing similar things):
that there is no reasoned decision-making at all with respect to
the NIH's "abruptness" in the "robotic rollout" of this grant-
termination action. Department of Education v. California, 145
S.Ct. 966, 975-76 (Jackson, J. dissenting); see also Thakur v.
Trump, No. 25-CV-04737-RFL, 2025 WL 1734471, at *14 (N.D. Cal.
June 23, 2025) ("The pace of the review and the resulting large
waves of terminations via form letters further suggests a
likelihood that no APA-compliant individualized review occurred.
These are precisely the kinds of concerns that the APA's bar on
arbitrary-and-capricious agency decisionmaking was meant to
address.").

The Court "cannot ignore the disconnect between the
decision made and the explanation given." New York, 588 U.S. at
785. Based upon a fair preponderance of the evidence and on the
sparse administrative record, the Court finds and rules that HHS
and, in turn NIH, are being force-fed unworkable "policy"
supported with sparse pseudo-reasoning, and wholly unsupported
statements.

Starting with DEI, the record is completely devoid of a
definition. This Court has been transparent on this issue, see
American Pub. Health Assn. v. Natl. Institutes of Health, No. CV
25-10787-WGY, 2025 WL 1548611, at *12 (D. Mass. May 30, 2025),

[87]

yet at trial the Public Officials can point only to the
**identification** of DEI, but not the **definition** of DEI:

> • DEI: Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

R. 3226; Tr. 58-59, ECF No. 156 (citing R. 3226).  It is not an
autological concept.  The Court questioned the Public Officials'
counsel in closing arguments: "So that's as close to a
definition [of DEI] as we've got?", to which the Public
Officials' counsel responded: "That is the agency's reasoning."
Id.  The Public Officials' counsel's response while
unsatisfactory in the sense that one would assume that DEI would
be defined somewhere, was accurate and responsive.[14]  The Public
Officials simply have no definition of DEI.

How, then, can the Public Officials **act** on "DEI" if there
is no operative **definition** of "DEI"?  The answer is plain: they
cannot, at least within the confines of the APA.  See Firearms
Regul. Accountability Coal., Inc. v. Garland, 112 F.4th 507, 523

---

[14] The Court observes the Public Officials' counsel have
been consistent and responsive to this Court on this issue.
Id.; see also, May 22, 2025 Hrg Tr. 19-20, ECF No. 82;

(8th Cir. 2024) (rejecting as arbitrary and capricious an agency standard that relies on circular reasoning because it "allow[ed] the ATF to reach any decision is wish[ed] only looking to specific evidence of community misuse [of a weapon] while ignoring any other examples of the community's compliant use"). Reliance on an undefined term of DEI (or any other category) "is arbitrary and capricious because it allows the [Public Officials] to arrive at whatever conclusion it wishes without adequately explaining the standard on which its decision is based." Id. at 525 (cleaned up). Unfortunately, the Public Officials did just that.

The Court need not delve deeply into the rudderless EOs concerning DEI: they do not even attempt to define DEI, but instead set it up as some sort of boogeyman. This lack of clarity was (and is), in the first instance, wholly unfair to the career-HHS and NIH personnel, which must attempt to "align" themselves with the Executive through direction by partisan appointed public officials. Without a definition of DEI, they embarked on a fool's errand resulting in arbitrary and capricious action.

Then-Acting Secretary of Health and Human Services Dr. Dorothy Fink, picked up the mantle first in the Secretarial Directive, equating without any stated-basis still-undefined DEI with "initiatives that **discriminate** on the basis of race, color,

[89]

religion, sex, national origin, or another protected

characteristic." R. 5 (emphasis added). Further, she claims

that "[c]ontracts and grants that support DEI and similar

**discriminatory** programs **can** violate Federal civil rights law and

are inconsistent with the Department's policy of improving the

health and well-being of all Americans." Id. (emphasis added)

What wordsmithing! Of course discriminatory programs, or

initiatives that discriminate, **can** violate federal laws, but

there is absolutely **nothing** in the record that demonstrates this

is a reasonable statement in the context of DEI -- again

undefined -- nor are her statements reasonably explained at all.

The statement, respectfully, is utterly meaningless.

On February 13, 2025, the then-NIH Deputy Director of

Extramural Research, Dr. Lauer, who provided supposed guidance

with respect to still-undefined DEI, using the language of HHS,

lumped in "DEI" with "initiatives that discriminate on the basis

of race, color, religion, sex, national origin, or another

protected characteristic" and advised that if the "sole purpose"

of the grants etc. "supports DEI activities" – again undefined –

– "then the award must be fully restricted." R. 16. Again, this

memorandum and the lack of a definition of DEI or what

supporting DEI activities reveals a reluctance to engage.

Indeed, though not determinative, Dr. Lauer resigned from a long

career in government service the same day he penned the February

[90]

13, 2025 memorandum, effective Valentine's Day.  Notably, his

successor, Ms. Bundesen lasted only 3 weeks after which she too

resigned from government service as well.  While the Court makes

no finding as to Dr. Lauer's or Ms. Bundesen's motivations or

reasons for resigning, it is not lost on the Court that

oftentimes people vote with their feet.[15]

Next, on February 21, 202k, Dr. Fink's appointee, Acting

Director Matthew Memoli took the reins.  This time, there is

evidence that HHS provided him with some circular and

nonsensical boilerplate language that was used almost verbatim

later on in the grant termination letters.  That aside, Dr.

Memoli tripled down on the DEI mystery, and added -- in a truly

hold-my-beer-and-watch-this moment -- "gender identity" to the

mix.  The similar nonsensical phrasing appears.

Like his boss at HHS, and whoever drafted the Executive

Orders for that matter, Dr. Memoli can certainly identify

"diversity, equity and inclusion (DEI)," but is unable (or

unwilling) to define it.  Instead, he follows Dr. Fink's lead,

relegating it to a category "low-value and off-mission research

---

[15] The lack of any demonstrable pushback on these
nonsensical Challenged Directives in the Administrative Record
belies the tremendous bureaucratic pressure at play here.  It is
palpable.  While HHS and the NIH bureaucrats are scientists at
heart, they are trying to keep their jobs.  Scientists cling to
reason, not whim -- merit, not loyalty.

programs", including not only DEI, but also undefined gender identity.

Dr. Memoli then goes back in time, attempting to state that even though his "description of NIH's mission is consistent with recent Executive Orders issued by the President," his directive is "based on my expertise and experience; consistent with NIH's own obligation to pursue effective, fiscally prudent research; and pursuant to NIH authorities that exist independently of, and precede, those Executive Orders." See Memoli Directive.  While intriguing, the regurgitation of the HHS language belies this separation.  Indeed, his description obscures any definition of DEI.  The first sentence is untethered to DEI, and is true in the abstract:

"Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness."  Id.  Simply put, non-scientific research is non-scientific research, and should not be an NIH priority.

Then Dr. Memoli goes on, "**Worse**, **DEI studies** are **often used** to **support** unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans."  Id.

[92]

A0169

What does this mean?  Apparently, by using the transition "worse," the term "DEI studies" -- again DEI is undefined -- are somehow inherently "artificial and non-scientific."  Without citing a single example, Dr. Memoli claims that DEI studies are "often used in support of unlawful discrimination on the basis of race and other protected characteristics," which he connects with harm to the health of Americans.  So, is it the DEI studies that are the problem or how others use them?  Who knows.  There is not a shred of evidence supporting any of these statements in the record.

Dr. Memoli then transitions to "gender identity", the next boogeyman: "**Likewise**, research programs based on gender identity are **often unscientific**, have **little identifiable return on investment**, and **do nothing to enhance the health of many Americans.  Many such studies ignore**, **rather than seriously examine, biological realities**."  R. 3821 (emphasis added). There is not a shred of evidence in the Administrative Record backing this up either.  Phrases like "often unscientific" and "many studies ignore" are unsupported with anything other than (apparently) Dr. Memoli's experience.  Ironically, these kinds of phrases would never survive peer review.

HHS's and the NIH's implementation of the EOs is based literally upon nothing but an undefined term.  Without defining it, DEI becomes whatever DEI means to the Public Officials

[93]

A0170

untethered to anything. This is not reasoned decision-making, in fact it is just the opposite. It is neither reasonable, nor reasonably explained. Indeed, "the fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt them from arbitrary-and-capricious review." Kingdom v. Trump, No. 1:25-CV-691-RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025). The HHS and, in turn the NIH's, best possible (but losing) argument is on this record that they were simply following orders of the Administration (or DOGE), but this is an argument that simply falls flat. Id. ("[I]f an agency could avoid the need to justify its decisions simply by gesturing to an Executive Order and claiming that it was just following the President's directions, the President could unilaterally eviscerate the judicial oversight that Congress contemplated in passing the APA simply by issuing a carbon-copy executive order mandating that an agency act in a particular way before it does so."). That is essentially what has been done here. This is evidenced by the lack of any reasoned decisionmaking at all in the Administrative Record. The Public Officials have decided that they are going to "eradicate" something that they cannot define. That agency action is arbitrary and capricious. Pivoting to gender affirming care, vaccine hesitancy, COVID, Climate Change and Influencing Public Opinion, these terms evolve in the Priorities Directive, evidence that the NIH was

[94]

A0171

trying to figure it out, all the while being tasked with using those same terms to wipe out grants.  None of these terms have a reasonable explanation in the record.  The Public Officials "must show that there are good reasons for the new policy. . . . that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better."  F.C.C. v. Fox Television Studios, 556 U.S. 502, 515 (2009).  In plain terms, "this means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate."  Id.  It must do more when, as here, "for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account."  Id.  The HHS and NIH have not done so here, and with the exception of a scintilla of evidence with respect to potential disruptions of withdrawn NOFOs, there is no evidence that they even considered the reliance interests that naturally inure to NIH grant process. It is "arbitrary or capricious to ignore such matters."  Id.  The Public Officials "fail[ ] to provide an intelligible explanation," which "amount[ ] to a failure to engage in reasoned decisionmaking ..."  Constellation Mystic Power, LLC v. FERC, 45 F.4th 1028, 1057 (D.C. Cir. 2022) (quoting FPL Energy Marcus Hook, L.P. v. FERC, 430 F.3d 441, 448 (D.C. Cir. 2005);

[95]

see Thakur, 2025 WL 1734471, at *15 ("The terminated grants were being used to pay Plaintiffs' and their staff's salaries, and to fund graduate student programs, field research, and community outreach.  These facts indicate significant reliance interests that cannot simply be ignored.").

As the Court has already ruled, the Court -- relying on the Certified Administrative Record -- rules that on a fair preponderance of the evidence that the Challenged Directives are arbitrary and capricious under Section 706(2)(A), as are the concomitant grant terminations, which action are all set aside and vacated.

### D.  Section 706(2)(A) Claims -- Not in Accordance with Law  ('10787 Action Count II; '10814 Action Count II)

The APA claim that agency action is "not in accordance with law" is a subpart of Section 706(2)(A).  In reviewing this claim "a reviewing court must uphold an agency's decision if it is: (1) devoid of legal errors; and (2) "supported by any rational review of the record."  New York v. Trump, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *9 (D.R.I. Mar. 6, 2025) (quoting Mahoney v. Del Toro, 99 F.4th 25, 34 (1st Cir. 2024)).

The Plaintiffs attack the Public officials claim that 2 C.F.R. § 200.340(a)(4) operates as a trump card and permits termination of and award that "no longer effectuates the programs goals or agencies priorities."  Id.

[96]

A0173

Section 340 is part of OMB's guidance, and that is all that is -- nonbinding guidance. See 2 C.F.R. §1.105(b) ("Publication of the OMB guidance in the CFR does not change its nature—it is guidance, not regulation."). That provision falls under the section entitled "Remedies for Noncompliance." Section 200.339 provides "remedies for noncompliance." 2 C.F.R. §

That provision provides in pertinent part:

    (a)  The Federal award may be terminated in part or its entirety as follows:

    (1)  By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

    (2)  By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated;

    (3)  By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

    (4)  By the Federal agency or pass-through entity **pursuant to the terms and conditions of the Federal award, including, to the extent**

[97]

> **authorized by law, if an award no longer
> effectuates the program goals or agency
> priorities.**

2 C.F.R. § 200.340(a).  That provision requires that an agency
"must clearly and unambiguously specify all termination
provisions in the terms and conditions of the Federal award."
Id. at § 200.340(b).  An agency terminating an award "must
provide written notice of termination to the recipient or
subrecipient . . . [which] should include the reasons for
termination, the effective date, and the portion of the Federal
award to be terminated, if applicable.  2 C.F.R. § 200.341
Section 200.340 is an OMB Regulation that provides only guidance
to all agencies, and is not binding.  See 2 C.F.R. §1.105(b)
("Publication of the OMB guidance in the CFR does not change its
nature -- it is guidance, not regulation.")

      As an initial matter, HHS's adoption of the regulation is
not effective until October 2025; accordingly, the regulation is
wholly inapplicable here.  See Health and Human Services
Adoption of the Uniform Administrative Requirements, Cost
Principles, and Audit Requirements for Federal Awards, 89 FR
80055-01 ("HHS will adopt all of the rest of 2 CFR part 200 with
an effective date of October 1, 2025.").  Instead, a different
statue, 45 C.F.R. § 75.372(a) (2024) allows for unilateral
termination only where there is a failure "to comply with the
terms and conditions of the award" or "for cause." 45 C.F.R. §

[98]

A0175

75.372(a)(1) (2024). Plaintiffs argue that "the plain language
of the regulation mandates that these are the exclusive
conditions under which HHS and its sub-agencies may terminate a
grant." ECF 103 28 (citing Pol'y & Rsch., LLC v. United States
Dep't of Health & Human Servs., 313 F. Supp. 3d 62, 76 (D.D.C.
2018); Healthy Teen Network v. Azar, 322 F. Supp. 3d 647, 651
(D. Md. 2018). That in and of itself demonstrates legal error.
Simply put, the Public Officials cannot rely on a regulation
that does not yet apply to their respective agencies in their
template.

But even if it applied, under the cited regulation, an
agency can terminate an award "pursuant to the terms and
conditions of the Federal award, including, **to the extent
authorized by law**, if an award no longer effectuates the program
goals or agency priorities." 2 C.F.R. § 200.340 (emphasis
added). This is a distinction with a difference, because ""this
regulation cannot authorize actions that contravene statutory
requirements, nor does it relieve [the Public Officials] of
[their] duty to follow the law." Pacito v. Trump, No. 2:25-CV-
255-JNW, --- F.Supp. 3d ----, ----, 2025 WL 893530, at *9 (W.D.
Wash. Mar. 24, 2025) (quoting 2 C.F.R. § 200.340(a)(4)).

The Public Officials counter that the regulation has been
incorporated into the terms and conditions of the grantees'
awards. Even if the regulation applied as a contractual term,

[99]

whether the "award no longer effectuates the programs goals or agency priorities" can still be challenged under the APA where the underlying reasons violate the APA.  See Thakur v. Trump, No. 25-CV-04737-RFL, 2025 WL 1734471, at *14 (N.D. Cal. June 23, 2025) ("2 C.F.R. § 200.340, to the extent it applies, does not alter the requirement under the APA that Defendants must provide a reasoned decision for their termination."); American Ass'n of Colls. for Tchr. Educ. v. McMahon, 770 F. Supp. 3d 822, 851 (D. Md. 2025 (ruling that even if termination letters invoked a valid reason to terminate under 2 C.F.R. § 200.340, APA claims survived because the letters "fail[ed] to provide [the plaintiffs] any workable, sensible, or meaningful reason or basis for the termination of their awards").  Reliance on these inapplicable regulation as basis for template letter terminations in conjunction with meaningless descriptions is contrary to law under Section 706(2)(A) of the APA.

## E.   Section 706(2)(C) Claims -- In excess of Statutory Authority ('10787 Action Count III; '10814 Action Count I)

An APA action brought under Section 706(2)(C), challenges agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  Id.  The "[C]ourt[] must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority."  Loper Bright, 603 U.S. at 412.  "[T]he [C]ourt fulfills [its]

[100]

role by recognizing constitutional delegations, 'fix[ing] the boundaries of [the] delegated authority. . .and ensuring the agency has engaged in '"reasoned decisionmaking"' within those boundaries." Id. at 395 (citation omitted) (first quoting Henry P. Monaghan, Marbury and the Administrative State, 83 Colum. L. Rev. 1, 27 (1983); and then quoting Michigan, 576 U.S. at 750).

The Plaintiffs identify a litany of statutes that they claim violate Congress's mandate to the Public Officials to conduct research various areas such as women's health, gender identity, COVID, vaccination. See DEI: 42 U.S.C. §§ 282(b)(4); 282(b)(8)(D)(ii), 282(h), 283o(b)(2), 285a-6; 285b-7a(c)(1), 285t(a), 285t(f)(1)(D); gender identity: 42 U.S.C. §283(p); COVID-19: 42 U.S.C. §285f-5(a); vaccine hesitancy: 42 U.S.C. §283d.  They also contend the DEI provision conflicts with Congress's mandate to embrace diversity. See 42 U.S.C. §§ 282(h), 287d(e), 283o(b)(2), 285(t)(a), 288(a)(4), 285t-1(a), (b).  To be sure the ill-defined categories certainly can be read to overlap these statutes.  Inasmuch as the Court has declared the Public Officials' actions arbitrary and capricious and set them aside on that ground, it need not dive into the contours of the statutory overlap.

As for the Strategic Plan, as the Public Officials correctly argue, they have, in fact, complied with that statute. The Strategic Plan is evidence of how the NIH typically

[101]

proceeds, giving guidance and providing researchers with predictability on which to generally rely. The Court rules that the Challenged Directives do not contravene the statutory requirement under 42 U.S.C. § 282(m) of a Strategic Plan, under Section 706(2)(A), or Section 706(2)(C). At the same time, the Strategic Plan demonstrates that more than a sentence or two is necessary to change priorities that wipe out categories of research.

**V.    CONCLUSION**

Every Administration has political priorities and enjoys the ability to make policy changes. But the agencies that implement those changes have to have a reasoned and reasonable explanation for doing so. The Public Officials are not prohibited from blacklisting a handful of categories of research. They must, however, comply with Congress's mandate as to research and other priorities, and even where the Public Officials have discretion, they must provide a reasoned and reasonable explanation. The Public Officials in their haste to appease the Executive, simply moved too fast and broke things, including the law. As previously ordered, partial separate and final judgments have entered in favor of the Plaintiffs in the '10787 Action, ECF No. 138, and in the '10814 Action, ECF No. 151. This Court was careful to limit the relief, as it must, only to the parties before it. See CASA, Inc., No. 24A884, 2025

WL 1773631, at *15 (U.S. June 27, 2025) ("When a court concludes

that the Executive Branch has acted unlawfully, the answer is

not for the court to exceed its power too.")

**SO ORDERED.**

__/s/ William G. Young__
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[16]

---

[16] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

A0180

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————— )
AMERICAN PUBLIC HEALTH ASSOCIATION; )
IBIS REPRODUCTIVE HEALTH; )
INTERNATIONAL UNION, UNITED )
AUTOMOBILE, AEROSPACE, AND )
AGRICULTURAL IMPLEMENT )
WORKERS (UAW); BRITTANY CHARLTON; )
KATIE EDWARDS; PETER LURIE; and )
NICOLE MAPHIS, )
                                   )
               Plaintiffs,         )    CIVIL ACTION NO.
        v.                         )    25-10787-WGY
                                   )
NATIONAL INSTITUTES OF HEALTH;     )
JAY BHATTACHARYA, in his official  )
capacity as Director of the        )
National Institutes of Health;     )
UNITED STATES DEPARTMENT OF HEALTH )
AND HUMAN SERVICES; and ROBERT F.  )
KENNEDY, JR., in his official      )
capacity as Secretary of the       )
United States Department of Health )
and Human Services,                )
                                   )
               Defendants.         )
———————————————————————— )


———————————————————————— )
COMMONWEALTH OF MASSACHUSETTS;     )
STATE OF CALIFORNIA; STATE OF      )
MARYLAND; STATE OF WASHINGTON;     )
STATE OF ARIZONA; STATE OF         )
COLORADO; STATE OF DELAWARE;       )
STATE OF HAWAI'I; STATE OF         )
MINNESOTA; STATE OF NEVADA;        )
STATE OF NEW JERSEY; STATE OF      )
NEW MEXICO; STATE OF NEW YORK;     )
STATE OF OREGON; STATE OF RHODE    )
ISLAND; and STATE OF WISCONSIN,    )
                                   )
                                   )
                                   )

[1]

A0181

```
                    Plaintiffs,    )     CIVIL ACTION NO.
            v.                     )     25-10814-WGY
                                   )
ROBERT F. KENNEDY, JR., in his     )
official capacity as Secretary of  )
Health and Human Services;         )
UNITED STATES DEPARTMENT OF        )
HEALTH AND HUMAN SERVICES;         )
JAYANTA BHATTACHARYA, in his       )
official capacity as Director of   )
the National Institutes of Health; )
NATIONAL INSTITUTES OF HEALTH;     )
NATIONAL CANCER INSTITUTE;         )
NATIONAL EYE INSTITUTE;            )
NATIONAL HEART, LUNG, AND BLOOD    )
INSTITUTE; NATIONAL HUMAN GENOME   )
RESEARCH INSTITUTE; NATIONAL       )
INSTITUTE ON AGING; NATIONAL       )
INSTITUTE ON ALCOHOL ABUSE AND     )
ALCOHOLISM; NATIONAL INSTITUTE     )
OF ALLERGY AND INFECTIOUS          )
DISEASES; NATIONAL INSTITUTE OF    )
ARTHRITIS AND MUSCULOSKELETAL AND  )
SKIN DISEASES; NATIONAL            )
INSTITUTE OF BIOMEDICAL IMAGING    )
AND BIOENGINEERING; EUNICE KENNEDY )
SHRIVER NATIONAL INSTITUTE OF      )
CHILD HEALTH AND HUMAN             )
DEVELOPMENT; NATIONAL INSTITUTE    )
ON DEAFNESS AND OTHER              )
COMMUNICATION DISORDERS;           )
NATIONAL INSTITUTE OF DENTAL       )
AND CRANIOFACIAL RESEARCH;         )
NATIONAL INSTITUTE OF DIABETES     )
AND DIGESTIVE AND KIDNEY           )
DISEASES; NATIONAL INSTITUTE       )
ON DRUG ABUSE; NATIONAL            )
INSTITUTE OF ENVIRONMENTAL         )
HEALTH SCIENCES; NATIONAL          )
INSTITUTE OF GENERAL MEDICAL       )
SCIENCES; NATIONAL INSTITUTE OF    )
MENTAL HEALTH; NATIONAL INSTITUTE  )
ON MINORITY HEALTH AND HEALTH      )
DISPARITIES; NATIONAL INSTITUTE    )
OF NEUROLOGICAL DISORDERS AND      )
STROKE; NATIONAL INSTITUTE OF      )
NURSING RESEARCH; NATIONAL LIBRARY )
```

[2]

A0182

OF MEDICINE; NATIONAL CENTER FOR            )
ADVANCING TRANSLATIONAL SCIENCES;           )
JOHN E. FOGARTY INTERNATIONAL               )
CENTER FOR ADVANCED STUDY                   )
IN THE HEALTH SCIENCES; NATIONAL            )
CENTER FOR COMPLEMENTARY AND                )
INTEGRATIVE HEALTH; and CENTER              )
FOR SCIENTIFIC REVIEW,                      )
                                            )
                        Defendants.         )
_____)

YOUNG, D.J.                                    June 24, 2025

### ORDER

After careful consideration, the Court denies the motions for stay.

**1. This Court has subject matter jurisdiction**

The issue of this Court's subject matter jurisdiction has been fully addressed in its opinion <u>Massachusetts</u> v. <u>Kennedy</u>, No. CV 25-10814-WGY, 2025 WL 1371785, at *3 (D. Mass. May 12, 2025) and it would be superogatory to rehearse it here.

Significantly, the defendants raise no question about the full trial they have been accorded under the Administrative Procedure Act nor about either this Court's findings of fact[1]

_____

[1] *You have to listen to the bastards, Austin. They might just have something.*

                                    -Hon. Franklin H. Ford

                . . .

                Judicial fact-finding is … rigorous.
                Necessarily detailed, judicial fact-finding
                must draw logical inferences from the

[3]

A0183

record, and, after lucidly presenting the
subsidiary facts, must apply the legal
frame-work in a transparent written or oral
analysis that leads to a relevant
conclusion. Such fact-finding is among the
most difficult of judicial tasks. It is
tedious and demanding, requiring the
entirety of the judge's attention, all her
powers of observation, organization, and
recall, and every ounce of analytic common
sense he possesses. Moreover, fact-finding
is the one judicial duty that may never be
delegated to law clerks or court staff.
Indeed, unlike legal analysis, many judges
will not even discuss fact-finding with
staff, lest the resulting conclusions morph
into judgment by committee rather than the
personal judgment of the duly constituted
judicial officer.

Fair and impartial fact-finding is
supremely important to the judiciary…

While trial court legal analysis is
appropriately constrained by statutes and
the doctrine of stare decisis, the true
glory of our trial courts, state and
federal, is their commitment to fair and
neutral fact-finding. Properly done, facts
found through jury investigation or judicial
analysis truly are "like flint."

Yet there has been virtual abandonment
by the federal judiciary of any sense that
its fact-finding processes are exceptional,
or due any special deference. Federal
district court judges used to spend their
time on the bench learning from lawyers in
an adversarial atmosphere, and overseeing
fact-finding by juries or engaging in it
themselves. This was their job and they were
proud of it. Today, judges learn more
reflectively, reading and conferring with
law clerks in chambers. Their primary
challenge is the proper application of the
law to the facts—facts that are either taken
for granted, or sifted out of briefs and
affidavits, and, in the mode of the European
civil justice systems, scrutinized by judges

[4]

upon a comprehension and largely undisputed record of decision nor about this Court's rulings of law.[2]

**2. A stay would cause irreparable harm to the plaintiffs**

This is a case in equity concerning health research already bought and paid for by the Congress of the United States through funds appropriated for expenditure and properly allocated during this fiscal year. Even a day's delay further destroys the unmistakable legislative purpose from its accomplishment.

**3. The balance of the equities strongly militates against a stay.**

Again, it is worth noting that no question is here raised in the motions for stay about the scope of this Court's declarations under the APA. They are limited to the particular grants identified by the parties with standing before this Court which were arbitrarily and capriciously terminated by the defendants.[3]

---

and clerks behind closed doors. While judges do talk to lawyers in formal hearings, these hearings can be short, and usually serve to test and confirm a judge's understanding rather than develop it.

William G. Young, A Lament for What Was Once and Yet Can Be, 32 B.C. Int. & Comp. L. Rev. 312-314 (2009) (footnotes omitted)

[2] The full written decision will soon follow.

[3] Indeed, the Court notes with approbation that the NIH and related defendants appear to be - now that the law is clearly declared – moving quietly and expeditiously (this Court said "forthwith") to restore the specific terminated grants, see https://www.masslive.com/news/2025/06/20-nih-grants-restored-to-umass-system-after-judge-rules-against-trump-admin.html.

[5]

A0185

While the grant of a stay would throw the entire process

into limbo during the course of the appeal, its denial means

only that the executive defendants must comply with the Act of

Congress rather than sequestering funds (probably forever)

during the course of the appeal.

Far, far better were the defendants to seek expedited

briefing and review so that a precedential decision may issue

with ramifications beyond these parties and these grants.

**SO ORDERED.**

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[4]

---

This is how our government ought function without demeaning
injunctive orders.

[4] This is how my predecessor, Peleg Sprague (D. Mass. 1841-
1865), would sign official documents.  Now that I'm a Senior
District Judge I adopt this format in honor of all the judicial
colleagues, state and federal, with whom I have had the
privilege to serve over the past 47 years.

[6]

A0186