**Nos. 25-1611, 25-1612**

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

————————————

(No. 25-1611)

AMERICAN PUBLIC HEALTH ASSOCIATION; IBIS REPRODUCTIVE HEALTH; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS (UAW); BRITTANY CHARLTON; KATIE EDWARDS; PETER LURIE; NICOLE MAPHIS,

*Plaintiffs-Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, in his official capacity as Director of the National Institutes of Health; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,

*Defendants-Appellants*.

(Caption continued on inside cover)

————————————

Appeals from the U.S. District Court for the District of Massachusetts

————————————

## PLAINTIFF STATES' RESPONSE BRIEF IN NO. 25-1612

————————————

ROB BONTA
  *Attorney General of California*
455 Golden Gate Avenue
San Francisco, CA 94102

ANTHONY G. BROWN
  *Attorney General of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

NICHOLAS W. BROWN
  *Attorney General of Washington*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104

(Additional counsel listed at pages 67-71)

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
DAVID C. KRAVITZ
  *State Solicitor*
GERARD J. CEDRONE
  *Deputy State Solicitor*
VANESSA A. ARSLANIAN
  *State Trial Counsel*
PHOEBE M. LOCKHART
  *Assistant Attorney General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for the Plaintiff States*

————————————

(No. 25-1612)

COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF MARYLAND; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF WISCONSIN,

*Plaintiffs-Appellees,*

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JAY BHATTACHARYA, in his official capacity as Director of the National Institutes of Health; NATIONAL INSTITUTES OF HEALTH; NATIONAL CANCER INSTITUTE; NATIONAL EYE INSTITUTE; NATIONAL HEART, LUNG, AND BLOOD INSTITUTE; NATIONAL HUMAN GENOME RESEARCH INSTITUTE; NATIONAL INSTITUTE ON AGING; NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM; NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES; NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES; NATIONAL INSTITUTE OF BIOMEDICAL IMAGING AND BIOENGINEERING; EUNICE KENNEDY SHRIVER NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT; NATIONAL INSTITUTE ON DEAFNESS AND OTHER COMMUNICATION DISORDERS; NATIONAL INSTITUTE OF DENTAL AND CRANIOFACIAL RESEARCH; NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES; NATIONAL INSTITUTE ON DRUG ABUSE; NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES; NATIONAL INSTITUTE OF GENERAL MEDICAL SCIENCES; NATIONAL INSTITUTE OF MENTAL HEALTH; NATIONAL INSTITUTE ON MINORITY HEALTH AND HEALTH DISPARITIES; NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE; NATIONAL INSTITUTE OF NURSING RESEARCH; NATIONAL LIBRARY OF MEDICINE; NATIONAL CENTER FOR ADVANCING TRANSLATIONAL SCIENCES; JOHN E. FOGARTY INTERNATIONAL CENTER FOR ADVANCED STUDY IN THE HEALTH SCIENCES; NATIONAL CENTER FOR COMPLEMENTARY AND INTEGRATIVE HEALTH; NIH CENTER FOR SCIENTIFIC REVIEW,

*Defendants-Appellants.*

————————————

# TABLE OF CONTENTS

Introduction ........................................................................................... 1

Statement of the Issues ........................................................................ 2

Statement of the Case .......................................................................... 2

    I.  Background ................................................................................... 2

        A.  NIH's Support for Biomedical Research ........................... 2

        B.  Adoption of the Challenged Directives ............................. 4

            1.  Secretarial Directive ................................................... 4

            2.  Memoli Directive ......................................................... 6

            3.  Subsequent Directives ................................................ 7

        C.  Implementation of the Challenged Directives ................ 9

            1.  Termination of Existing Grants ............................... 10

            2.  Delay and Denial of Applications for New Grants .......... 15

        D.  Harms to the Plaintiff States and Public .............................. 16

    II.  Procedural History ................................................................... 17

        A.  District Court Proceedings ................................................ 17

        B.  Stay Proceedings ............................................................... 21

Summary of the Argument ................................................................ 25

Argument ............................................................................................ 27

    I.  The district court properly vacated the Challenged
        Directives. ................................................................................. 27

        A.  The Challenged Directives are arbitrary and capricious. ........ 28

            1.  The Challenged Directives are not reasonable or
               reasonably explained. ............................................... 28

            2.  Defendants ignored significant reliance interests. ........... 34

        B.  Defendants identify no impediment to judicial review of
           the Challenged Directives. ................................................ 36

            1.  The plaintiff states have standing. ................................... 36

       a.   Defendants' termination of hundreds of existing research grants conferred standing. .............................37

       b.   Defendants' delay and denial of applications for new research grants conferred standing. ...................38

    2.   The parties' dispute is not moot. ........................ 41

    3.   The directives constituted final agency action. ............... 46

    4.   The directives are not committed to agency discretion. ........................................................51

II.  The district court properly set aside discrete termination decisions premised on the Challenged Directives. .....................53

  A.  The Supreme Court's stay decision, while entitled to due weight, is not a final decision on the merits...........................53

  B.  Blackletter jurisdictional principles support the district court's exercise of jurisdiction..................................56

  C.  The parties' complex, ongoing relationship shows that this is an APA suit. .................................................61

  D.  Defendants' arguments would deprive injured parties of prospective relief. ....................................................63

  E.  If this Court reverses on jurisdiction, it should provide clear guidance for subsequent proceedings. ...........................64

Conclusion .............................................................66

# TABLE OF AUTHORITIES

**Cases:**

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1977) .................................................. 48, 49, 50

*Adams v. Bowater Inc.,*
  313 F.3d 611 (1st Cir. 2002) ................................................ 46

*Adarand Constructors, Inc. v. Slater,*
  528 U.S. 216 (2000) ........................................................... 46

*Am. Med. Ass'n v. Reno,*
  57 F.3d 1129 (D.C. Cir. 1995) ............................................ 52

*Am. Pub. Health Ass'n v. NIH,*
  145 F.4th 39 (1st Cir. 2025) ....................... 22, 23, 29, 35, 51

*Am. Sci. & Eng'g, Inc. v. Califano,*
  571 F.2d 58 (1st Cir. 1978) ................................................ 56

*Bennett v. Spear,*
  520 U.S. 154 (1997) ........................................................... 47

*Biden v. Texas,*
  597 U.S. 785 (2022) ...................................................... 48, 50

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ............................... 22, 57, 59, 60, 61, 62

*City of Waltham v. USPS,*
  786 F. Supp. 105 (D. Mass. 1992) ......................................... 5

*Conservation Law Found. v. Evans,*
  360 F.3d 21 (1st Cir. 2004) .......................................... 44, 45

*Crowley Gov't Servs., Inc. v. GSA,*
  38 F.4th 1099 (D.C. Cir. 2022) ........................................... 58

*Dep't of Education v. California,*
  145 S. Ct. 966 (2025) ................................................ 22, 23, 24

*Dep't of Homeland Security v. Regents of the Univ. of
  California,*
  591 U.S. 1 (2020) .................................................... 28, 31, 34

iii

*Dep't of State v. AIDS Vaccine Advocacy Coal.*,
No. 25A269, 2025 WL 2740571 (U.S. Sept. 26, 2025) .................... 27, 54

*Doe v. Shibinette*,
16 F.4th 894 (1st Cir. 2021) ................................................................ 36

*Does 1-3 v. Mills*,
142 S. Ct. 17 (2021) .......................................................................... 54

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502, 515 (2009) ............................................................. 21, 34

*Ferreiro v. United States*,
501 F.3d 1349 (Fed. Cir. 2007) .......................................................... 63

*Firearms Regulatory Accountability Coal., Inc. v.*
*Garland*,
112 F.4th 507 (8th Cir. 2024) ............................................................ 50

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.*
*(TOC), Inc.*,
528 U.S. 167 (2000) ........................................................................... 41

*Great-West Life & Annuity Insurance Co. v. Knudson*,
534 U.S. 204 (2002) ........................................................................... 22

*L.A. County v. Davis*,
440 U.S. 625 (1979) ........................................................................... 44

*Labrador v. Poe*,
144 S. Ct. 921 (2024) ......................................................................... 54

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........................................................................... 52

*Match-E-Be-Nash-She-Wish Band* v. *Patchak*,
567 U.S. 209 (2012) ........................................................................... 60

*Md. Dep't of Hum. Res. v. HHS*,
763 F.2d 1441 (D.C. Cir. 1985) .......................................................... 57

*Me. Cmty. Health Options v. United States*,
590 U.S. 296 (2020) ..................................................................... 62, 63

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ............................................................ 57

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983)................................................................33

*N.H. Lottery Comm'n v. Rosen,*
986 F.3d 38 (1st Cir. 2021) ................................................43

*NIH v. Am. Pub. Health Ass'n,*
145 S. Ct. 2658 (2025)........................27, 37, 38, 49, 53, 54, ...........................................................55, 57, 58, 60, 64, 65

*Ohio v. EPA,*
603 U.S. 279 (2024).............................................................28

*Trump v. Boyle,*
145 S. Ct. 2653 (2025)........................................53, 54, 55, 56

*U.S. Army Corps of Engineers v. Hawkes Co.,*
578 U.S. 590 (2016)......................................................47, 49

*Union of Concerned Scientists v. Wheeler,*
954 F.3d 11 (1st Cir. 2020) ................................................52

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
586 U.S. 9 (2018).........................................................51, 64

**Statutes:**

5 U.S.C. §551 ......................................................................20

5 U.S.C. §551(4) ..................................................................48

5 U.S.C. §551(13) ................................................................47

5 U.S.C. §701(a)(2) .............................................................51

5 U.S.C. §704 ......................................................................50

5 U.S.C. §706(1) .......................................................19, 40, 41

5 U.S.C. §706(2)(A) ................................................19, 20, 21, 50

42 U.S.C. §283p ...................................................................12

42 U.S.C. §284a(a)(3)(A)(ii) ....................................................3

42 U.S.C. §285a-6 ...............................................................11

42 U.S.C. §285t(c) ...............................................................11

42 U.S.C. §289a(a) ....................................................................... 3

**Rules:**

Fed. R. Civ. P. 54(b)........................................................... 19, 21

**Agency Documents:**

NIH Data Book, *Research Project Grants* (last updated
Jan. 2025), https://report.nih.gov/nihdatabook/report/
20................................................................................................ 4

NIH RePORT, No. 1F31DA059262-01A1, *Exploration
of the Unique Neurobehavioral Profile of Sequential
Opioid-Stimulant Polysubstance Use Disorders*,
https://bit.ly/1F31DA059262-01A1 ...................................... 10

NIH RePORT, No. 1K99MD019294-01, *Identifying
Unique Biological Factors as Potential Targets to
Mitigate Colorectal Cancer Health Disparities in
Native Hawaiians*, https://bit.ly/1K99MD019294-01 .......... 12

NIH RePORT, No. 3R01AG077579-02S1,
*Understanding Biological and Lifestyle Contributions
to Alzheimer's Disease Pathology and Clinical Profiles
in Black Women: Defining Prevention Targets in High
Risk Groups*, https://bit.ly/3R01AG077579-02S1................ 12

NIH RePORT, No. 3R01AI169543-01S1, *Rapid
Response for Pandemics: Single Cell Sequencing and
Deep Learning to Predict Antibody Sequences Against
an Emerging Antigen*, http://bit.ly/3R01AI169543-
01S1.......................................................................................... 11

NIH RePORT, No. 5R01AI179080-02, *Bacterial and
Molecular Determinants of Mycobacterial
Impermeability*, https://bit.ly/5R01AI179080-02 ................ 11

NIH, *NIAID Research Opportunities for New and "At-
Risk" Investigators to Promote Workforce Diversity*,
pt. 2, §I, https://perma.cc/S83S-H23T .................................. 31

NIH, *Questions and Answers for NIAID and NIDDK Research Opportunities for New and "At-Risk" Investigators to Promote Workforce Diversity*, https://bit.ly/PAR-23-275-FAQ (archived April 5, 2025) ................................. 31

NIH, Statement, *Advancing NIH's Mission Through a Unified Strategy* (Aug. 15, 2025), https://perma.cc/V5E2-4ED2 ........................................................................ 41

**Other Authorities:**

United for Med. Rsch., NIH's Role in Sustaining the U.S. Economy (March 2025), https://bit.ly/UMR-2025 .......................... 3

# GLOSSARY

APA..............................................Administrative Procedure Act

App...............................................Appendix (filed Oct. 9, 2025)

A.R. .............................................Administrative Record

Bhattacharya Statement.........NIH, Statement, *Advancing NIH's Mission Through a Unified Strategy* (Aug. 15, 2025), https://perma.cc/V5E2-4ED2

Challenged Directives .............Memoli Directive, Secretarial Directive, and several other directives described in State Doc. 151, at 1 n. 1

DEI...............................................diversity, equity, and inclusion

DOJ..............................................Department of Justice

HHS .............................................Department of Health and Human Services

Memoli Directive .....................Directive on NIH Priorities (Feb. 21, 2025) (App. 2444-2445)

NIH ..............................................National Institutes of Health

NOFO..........................................notice of funding opportunity

OMB.............................................Office of Management and Budget

Secretarial Directive ...............Secretarial Directive on DEI-Related Funding (Feb. 10, 2025) (App. 1639-1640)

State Doc.....................................document filed in the district court in No. 25-cv-10814 (1st Cir. No. 25-1612)

Supp. App. ................................Supplemental Appendix (filed Nov. 12, 2025)

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The federal government asks this Court to overturn a final judgment in favor of 16 plaintiff states on an issue of significant public importance. Oral argument will materially assist the Court in addressing the federal government's contested legal arguments.

## INTRODUCTION

The agency actions underlying this case are, as the district court found, "breathtakingly arbitrary and capricious." Appendix (App.) 163. In a series of directives with virtually no reasoning, defendants prohibited the National Institutes of Health from supporting any scientific research concerning seven topics. Defendants then executed those directives by canceling hundreds of grants to public universities in the 16 plaintiff states for studies on health conditions as varied as heart disease, HIV/AIDS, and Alzheimer's—all without warning.

Defendants do not appear eager to defend their conduct on the merits. They serve up a smorgasbord of threshold issues that supposedly bar the plaintiff states' APA claims; only in the waning pages of their brief do they argue that their actions were not, in fact, arbitrary and capricious. But defendants have identified no substantial impediment to judicial review, and they fail to rebut the district court's determination that both their upstream policies and downstream grant terminations were unlawful. This Court should affirm that judgment in its entirety.

## STATEMENT OF THE ISSUES

1.    Whether the district court properly vacated a series of NIH policies—the "Challenged Directives"—that defendants promulgated, without reasoning or support, to bar the agency from supporting research on certain subjects.

2.    Whether the district court had jurisdiction to vacate the termination of 846 specific grants to the plaintiff states, where the terminations were premised solely on the Challenged Directives.

## STATEMENT OF THE CASE

### I.    Background

### A.    NIH's Support for Biomedical Research

NIH is the largest public funder of medical research in the world. App. 89.  The agency's work has spurred life-changing advances, from the creation of the rubella vaccine to the discovery of the BRCA mutation responsible for various forms of breast and ovarian cancer.  App. 460 nn. 3-4 (collecting citations).

While NIH conducts some research in-house, most of its support for biomedical research comes in the form of competitive grants to non-federal scientists.  App. 89.  These awards not only support the funded projects themselves, but also contribute to our nation's economic security

and prosperity. NIH-funded projects ensure that the next generation of scientists and researchers is trained—and that tomorrow's medical breakthroughs are discovered—in American laboratories. NIH grants also drive economic activity in communities around the country by supporting jobs and the purchase of research-related goods and services. In Fiscal Year 2024, NIH awarded over $36 billion in outside grants.[1]

To secure one of these grants, a researcher must go through a rigorous application process. This process typically begins with a public "notice of funding opportunity" (NOFO), in which NIH invites specific research proposals. App. 90; *see* State Doc.[2] 77-11, §2.3.5, at I-51. The resulting applications must then survive multiple layers of review, including evaluation by experts in the relevant field, who assess the proposal's scientific merit, and evaluation by outside advisors and agency officials, who weigh programmatic considerations. *See* 42 U.S.C. §289a(a) (describing "technical and scientific peer review"); *id.* §284a(a)(3)(A)(ii) (describing review by NIH's "advisory councils"); App. 90. This process

---

[1] United for Med. Rsch., NIH's Role in Sustaining the U.S. Economy, at 5 (March 2025), https://bit.ly/UMR-2025.

[2] This brief uses "State Doc." to refer to documents filed in the district court in No. 25-cv-10814 (1st Cir. No. 25-1612).

is highly competitive: the "success rate" for reviewed applications has hovered around 20% over the past two decades.[3]

## B.    Adoption of the Challenged Directives

The above-described process for awarding NIH research grants has historically been governed, across presidential administrations, by the apolitical assessment of proposed projects' scientific merit.  That changed earlier this year with defendants' adoption of the Challenged Directives—a suite of policies that prohibited NIH from supporting any projects with a perceived connection to seven ill-defined topics.  The district court described the evolution of these directives in detail.  *See* App. 95-153.  This section reviews the development and content of the directives most pertinent to this appeal.

### 1.    Secretarial Directive

On February 10, the Acting Secretary of Health and Human Services issued a memorandum entitled "Secretarial Directive on DEI-Related Funding" (Secretarial Directive).  App. 1639-1640; *see* App. 97-99.  The directive contained several conclusory statements about "diversity,

_____

[3]  NIH Data Book, *Research Project Grants* (last updated Jan. 2025), https://report.nih.gov/nihdatabook/report/20.

equity, and inclusion ('DEI')"—a term the directive did not define.  For example, the directive stated, without any elaboration, that "grants that support DEI" are "inconsistent with the Department's policy of improving the health and well-being of all Americans."  App. 1639.  The directive also stated—again without any support—that "grants [that support DEI] can cause serious programmatic failures."  *Id.*  Based on these unexplained pronouncements, the directive instructed NIH personnel to pause all payments for grants "related to DEI and similar programs" and advised that "grants may be terminated."  *Id.*

Defendants have certified that the "complete administrative record for [the Secretarial Directive] consists" only of the two-page directive itself.  State Doc. 118-1 (¶7) (attesting that the record for the directive consists of App. 1639-1640); *accord* App. 99.  In other words, defendants admit that they considered no other documents or evidence in promulgating the directive or in reaching the conclusions therein.  *See City of Waltham v. USPS*, 786 F. Supp. 105, 116 (D. Mass. 1992) (explaining that the administrative record must contain "all documents and materials directly or indirectly considered by agency decision-makers").

### 2.    Memoli Directive

On February 21, Acting NIH Director Matthew Memoli issued a memorandum entitled "Directive on NIH Priorities" (Memoli Directive). App. 2444-2445; *see* App. 105-110.  The first half of the directive offered various conclusions about "studies based on diversity, equity, and inclusion (DEI) and gender identity," including:

> Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, DEI studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. . . .

> Likewise, research programs based on gender identity are often unscientific, have little identifiable return on investment, and do nothing to enhance the health of many Americans. Many such studies ignore, rather than seriously examine, biological realities.

App. 2444.  The memorandum gave no support for these factual claims—nor, like the Secretarial Directive, did it explain what qualifies as impermissible "DEI."  As with the Secretarial Directive, the administrative record reveals that the agency considered no other documents or evidence in promulgating the directive.  The document stated in passing that Memoli "issue[d] th[e] directive based on [his] expertise and experience."  *Id.*  But

the record shows, and the district court found, that "much, if not all, of the content" of this directive "was provided to [Acting Director Memoli] by [the Department of Health and Human Services (HHS)]." App. 110; *see* App. 589 (stating that pertinent "[l]anguage [was] provided to NIH by HHS").

The second half of the Memoli Directive operationalized the directive's conclusory statements, "direct[ing]" NIH offices to "conduct an internal review of all . . . existing awards" to "ensur[e]" that they "do not fund or support . . . DEI and gender identity research activities and programs." App. 2445. The directive further instructed that any grants "deemed inconsistent with NIH's mission" would be "subject to funding restrictions, terminated or partially terminated, paused, and/or not continued or renewed." *Id.*

### 3.   Subsequent Directives

Starting in March, several follow-on directives expanded upon and implemented the foregoing policies. *See* App. 561-680, 2126-2245; Supplemental Appendix (Supp. App.) 2705-2707 (collecting the directives referred to below as the "Priorities Directive," "Award Revision Guidance," and various "Revised Priorities Directives"); *see also* App. 126-132, 142-

7

153.  Two aspects of these later directives are relevant to this appeal.

First, these directives expanded the list of prohibited research subjects without explanation.  As just discussed, the Memoli Directive barred NIH from supporting any projects related to "DEI" or "gender identity." Subsequent directives added "Vaccine Hesitancy," "COVID," "Climate Change," and "Influencing Public Opinion" to the list of forbidden topics. App. 670, 2333.[4]  The administrative record does not reveal the origin of, or provide any underlying rationale for, the addition of these new topics.

Second, these additional directives instructed NIH officials to terminate awards with a perceived connection to the offending topics—and even provided the exact language for NIH officials to use in doing so.  *See, e.g.*, App. 565-566, 598-599.  For example, program officials were told to cancel any grant with a perceived connection to "DEI" using the following boilerplate text, lifted almost verbatim from the Memoli Directive:

> "Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness.  Worse, so-called diversity, equity, and inclusion ("DEI") studies are often used to support unlawful

---

[4]  The district court held that plaintiffs lacked standing to challenge a seventh category, "China."  App. 153-154.

> discrimination on the basis of race and other protected char-
> acteristics ICO's [*sic*], which harms the health of Americans.
> Therefore, it is the policy of NIH not to prioritize such re-
> search programs."

App. 670 (quotation marks in original); *see, e.g.*, App. 1670, 1708, 1723,

1732, 1740 (termination letters copying this language).  Program officials

were likewise given text from the Memoli Directive to use when canceling

grants with a perceived connection to gender-identity issues:

> "Research programs based on gender identity are often unsci-
> entific, have little identifiable return on investment, and do
> nothing to enhance the health of many Americans. Many such
> studies ignore, rather than seriously examine, biological real-
> ities. It is the policy of NIH not to prioritize these research
> programs."

App. 670 (quotation marks in original); *see, e.g.*, App. 1672, 1704, 1725,

1771, 1777 (termination letters copying this language).  The directives

provided similar stock language for the rest of the topics, too.  *See* App.

670 (full menu of boilerplate termination language on each topic).

   As with the earlier directives, the record shows that defendants did

not consider any underlying materials or evidence in promulgating these

later directives.

## C.    Implementation of the Challenged Directives

   In the weeks following the promulgation of the Challenged Direc-

tives, defendants implemented them by launching an unprecedented

mass termination of grants for existing research projects and delaying and denying pending applications for future research projects.

### 1.    Termination of Existing Grants

The termination of an NIH grant has historically been a rare occurrence: before this year, NIH typically canceled only a handful of grants per decade, usually for serious issues like the death of a researcher or gross misconduct.  State Doc. 77-37, ¶¶29-31; State Doc. 77-41, at 44:7-45:23.  Starting in January, however, defendants terminated thousands of grants nationwide—including over 800 grants to the plaintiff states' public universities and other instrumentalities.  State Doc. 151-1.

The terminated grants, which NIH had awarded after robust review of the projects' scientific merit, supported research benefitting a broad swath of the American public.  One University of Washington study, for example, aimed to develop new pharmaceutical treatments by examining how simultaneous use of opioids and stimulants—a "deadl[y] combination[]" that is "increasingly responsible for overdose deaths"—can affect the brain's neural pathways.[5]  A canceled University of

---

[5]    NIH RePORT, No. 1F31DA059262-01A1, *Exploration of the Unique Neurobehavioral Profile of Sequential Opioid-Stimulant Polysubstance Use Disorders*, https://bit.ly/1F31DA059262-01A1.

Massachusetts project, meanwhile, sought to analyze the properties of the tuberculosis bacterium's "cell envelope" to better understand why it is relatively impermeable to drug compounds, with a view to improving treatments for the highly contagious disease.[6] And a terminated University of California study aimed to develop a "rigorously tested and fully automated" AI system capable of "rapidly generat[ing] synthetic antibody candidates" to fight new viruses.[7]

Other canceled grants focused on issues impacting more discrete demographic groups, consistent with Congress's express statutory commands. Congress has instructed NIH to undertake research on, among other things, conditions uniquely or disproportionately affecting racial or ethnic minorities, 42 U.S.C. §285t(c)(2)-(3); various women's health conditions, *id.* §§285a-6, §285b-7a(c); and "the health of sexual and gender

---

[6]    NIH RePORT, No. 5R01AI179080-02, *Bacterial and Molecular Determinants of Mycobacterial Impermeability*, https://bit.ly/5R01AI179080-02. UMass is a subawardee of the primary grantee, UVA. State Doc. 147-1, at 21.

[7]    NIH RePORT, No. 3R01AI169543-01S1, *Rapid Response for Pandemics: Single Cell Sequencing and Deep Learning to Predict Antibody Sequences Against an Emerging Antigen*, http://bit.ly/3R01AI169543-01S1. UC Riverside is a subawardee of the primary grantee, the Keck Graduate Institute. State Doc. 147-1, at 52.

minority populations," *id.* §283p. So, for example, one terminated University of California study examined how inflammation, insulin resistance, and physical activity affect Alzheimer's disease in Black women, a group with "higher rate[s]" and "a more aggressive profile" of the disease than other demographic groups.[8] A terminated University of Hawai'i project, meanwhile, aimed to identify genetic and biological risk factors for colorectal cancer among Native Hawaiians, a population with "increased incidence and mortality rates of" that disease.[9]

Defendants accomplished the mass termination of these grants by dispatching swarms of boilerplate letters to the researchers whose projects were selected for cancellation. Each letter followed the same format, plugging the addressee, grant number, and scripted basis for termination—lifted directly from the Challenged Directives—into a fill-in-the-blank template with no individualized discussion of the relevant project.

---

[8] NIH RePORT, No. 3R01AG077579-02S1, *Understanding Biological and Lifestyle Contributions to Alzheimer's Disease Pathology and Clinical Profiles in Black Women: Defining Prevention Targets in High Risk Groups*, https://bit.ly/3R01AG077579-02S1.

[9] NIH RePORT, No. 1K99MD019294-01, *Identifying Unique Biological Factors as Potential Targets to Mitigate Colorectal Cancer Health Disparities in Native Hawaiians*, https://bit.ly/1K99MD019294-01.

App. 124-125 (blank template); *see, e.g.*, App. 2029-2030 (exemplar of a freestanding termination letter); App. 1848-1849 (exemplar of a "revised" award notice incorporating the termination script).

Defendants issued these terminations with no advance warning, and the administrative record reveals the haste with which defendants carried them out behind the scenes. Throughout March, Acting Director Memoli circulated spreadsheets containing anywhere from a dozen to several hundred grants, demanding that NIH officials terminate the listed projects with extraordinary speed. *E.g.*, App. 2072 ("Please terminate the grants on the attached spreadsheet by COB today."); App. 2097 (demanding termination of 530 grants "by COB next Friday," with "daily evening update[s] on how many were terminated"). The administrative record does not show who selected these awards for termination or what criteria they used. But one thing is clear: Acting Director Memoli did not undertake any independent review. Instead, the record shows that he typically approved terminations within minutes of receiving a list of grants flagged by the agency's black-box process. *See, e.g.*, App. 138 (finding that Memoli approved a list of terminations "within 2 minutes of" receiving it from a staffer).

13

Given defendants' lack of contemporaneous reasoning, it is impossible to glean from the record how defendants decided any *specific* project was related to one of the prohibited topics.  For example, defendants canceled a grant entitled "Faithful Response II: COVID-19 Rapid Test-to-Treat with African American Churches" on the basis that it "focus[ed] on DEI."  Administrative Record (A.R.) 2813, 2817-2818.[10]  (As the termination letter makes clear, defendants did *not* cancel this grant because it involved COVID treatments.  *Id.*)  At the same time, defendants boasted in their briefing below that they spared grants entitled "Church Wellness Coordinator-led Intervention to Improve Hypertension Control in the Black Community" and "Engaging Partners in Caring Communities (EPICC): Building Capacity to Implement Health Promotion Programs in African American Churches."  State Doc. 95-1.  The record does not reveal, and defendants have never explained, why they deemed the first study impermissible "DEI" but view the second and third studies as permissible science.

---

[10]  Electronic copies of A.R. 1-3824 are available on this Court's docket in No. 25-1612 under "Notice of Filing of Courtesy Electronic Copies" (July 8, 2025).  Electronic copies of A.R. 3825-4270 are available at State Docs. 131-6 to -15.

## 2. Delay and Denial of Applications for New Grants

Defendants also enforced the Challenged Directives by delaying and denying pending applications for new research projects.

First, the directives led to extraordinary delay in the grant-award process. As discussed above, NIH follows a rigorous, multi-step process to review applications for research grants. *See supra*, at 3-4. Before the events giving rise to this lawsuit, that process adhered to a predictable timetable with periodic deadlines published well in advance. App. 482 (¶72). Throughout 2025, however, defendants dramatically upended that schedule, systematically delaying the review and disposition of pending applications—including applications that had received favorable marks from the agency's scientific examiners. *See, e.g.*, State Doc. 77-40 fig. 1; State Doc. 77-61, ¶¶5-9; State Doc. 101-3, ¶¶5-11 & figs. As a result of these delays, the plaintiff states were left waiting for the agency to review thousands of applications totaling millions of dollars of potential funding. *See, e.g.*, State Doc. 77-12, ¶¶27-55.

Second, the Challenged Directives caused defendants to deny many grant applications altogether. The plaintiff states have identified— through unrebutted evidence—applications that defendants denied or

"administratively withdrew" as a result of the Challenged Directives. *E.g.*, State Doc. 77-12, ¶56; State Doc. 77-18, ¶52. And in the co-pending case, defendants produced a certification to the private-party plaintiffs on August 19, 2025, admitting that they "administratively withdrew" applications because they had "withdr[awn] the applicable NOFO pursuant to the Challenged Directives." Supp. App. 2772-2799.[11]

## D.　Harms to the Plaintiff States and Public

Defendants' enforcement of the Challenged Directives caused significant and immediate injuries to the plaintiff states. For example, the termination of plaintiffs' grants threatened unrecoverable loss of scientific knowledge. *See* State Doc. 77-36, ¶21 (explaining that, when longitudinal studies are "stop[ped] in full swing, their partial results often lose validity"); State Doc. 77-33, ¶18(c) (describing the suspension of two such studies). Defendants' actions also imposed severe operational burdens on the plaintiff states' institutions. Planning at research universities often occurs years in advance, and universities organize their affairs around the grants they receive. *See, e.g.*, State Doc. 77-49, ¶9. The

---

[11] Defendants have agreed to provide a similar certification to the plaintiff states, *see* State Doc. 180, at 2-6, but their deadline to do so has not yet passed.

16

sudden cancellation and delay of plaintiffs' projects forced them to lay off highly specialized personnel, cut student enrollment, and even withdraw offers of admission.  The University of Massachusetts, for example, was forced to lay off or furlough 209 employees at its medical school and cut the incoming fall 2025 graduate medical class by 86%.  *See* State Doc. 77-45, ¶10; *see also, e.g.*, State Doc. 77-31, ¶18(b); State Doc. 77-59, ¶31; State Doc. 77-45, ¶15.

Defendants' terminations also harmed the public by eliminating patient-facing clinical programs.  For example, a canceled study at San Diego State University had provided clinical care to 85 participants with a history of suicide attempts and current suicidal ideation.  A.R. 2977; State Doc. 77-14, ¶¶78-80.  Similarly, a terminated study at the University of Hawaiʻi had provided advanced screening for HPV, a virus known to cause certain cancers.  State Doc. 77-17, ¶44.  "[T]here are no other options in a clinical setting in Hawaiʻi for this type of important screening." *Id.*

## II. Procedural History

### A. District Court Proceedings

The plaintiff states' operative complaint asserted several claims,

including APA claims arising out of defendants' adoption of the Challenged Directives, termination of plaintiffs' existing research grants, and undue delay in reviewing applications for new grants.  App. 458-549.

On May 12, 2025, the district court (Young, J.) ruled on several threshold issues.  The court rejected defendants' argument that it lacked jurisdiction under the APA and that the Tucker Act required plaintiffs to sue in the Court of Federal Claims.  App. 9-24.  And the court rejected defendants' argument that the challenged decisions were committed to agency discretion.  App. 26-27.

The district court then informally consolidated the plaintiff states' case with that of the private plaintiffs in No. 25-1611 and split further proceedings into two phases.  In the first phase, the court directed the parties to address the legality of both the Challenged Directives and the resulting grant terminations.  App. 733-734 (25:19-26:22).[12]  The court

---

[12] As they did below, defendants argue (Br. 12) that the first phase was "limited" to "NIH's termination of awarded grants"—*i.e.*, that it did not concern the legality of the underlying Challenged Directives. That characterization is wrong, as the district court repeatedly explained.  *See* App. 154 (rejecting "attempts to narrow the action to grant terminations"); App. 745 (6:17-20) ("[T]he defense either misunderstood or mischaracterizes the Court's view.  I do think the very first issue to be considered is . . . the challenged directives."); App. 764 (25:8-11)

reserved for a second phase the issue of whether defendants' delay in reviewing applications for new or renewed research grants violated 5 U.S.C. §706(1).  App. 81, 83, 734 (26:19-22).

Following production of the administrative record, robust briefing, and a bench trial on Phase One, the district court found that the Challenged Directives and resulting grant terminations were arbitrary and capricious under 5 U.S.C. §706(2)(A).  The court announced its decision from the bench on June 16, explaining that the directives were "bereft of reasoning virtually in their entirety" and "unsupported by factual development."  App. 263 (77:15-18).  The court also concluded that the directives arbitrarily ignored "the reliance interests of the many parties affected."  *Id.* (77:19-21).  The court accordingly ruled that the Challenged Directives violated the APA and ordered that the directives and resulting grant terminations be set aside.  App. 264-265 (78:19-79:1).  The court reserved decision on other claims and issues.

The district court entered partial final judgment on this single claim on June 23.  *See* Fed. R. Civ. P. 54(b).  Paragraph I of the judgment

---

("[Defendants] are wrong to say we're only going to talk about the grant terminations, not these directives.").

set aside the Challenged Directives pursuant to §706(2)(A), declaring them "void, illegal, and of no force and effect." App. 74. Paragraph II set aside the "Resulting Grant Terminations" pursuant to §706(2)(A), declaring them likewise "void, illegal, and of no force and effect." *Id.* Paragraph III directed entry of judgment in favor of plaintiffs on Count 3 of the amended complaint—*i.e.*, the plaintiff states' arbitrary-and-capricious claim. *Id.* Paragraph IV noted the court's retention of jurisdiction to enforce the judgment. *Id.* And an attachment to the judgment identified 846 specific grants falling within the definition of "Resulting Grant Terminations." App. 73 n. 2; *see* State Doc. 151-1.

On July 2, the district court issued a written decision further explaining its reasoning. The court held that both the Challenged Directives and "the resultant, downstream individual terminations" constituted "final agency action[s]" under 5 U.S.C. §551. App. 154. On the merits, the court found that the Challenged Directives were propped up by "sparse pseudo-reasoning" and "wholly unsupported statements." App. 164; *see* App. 160-173. For example, there was "not a shred of evidence" to substantiate the directives' statement that "DEI studies are often used to support unlawful discrimination on the basis of race and other

20

protected characteristics." App. 169-170 (quoting App. 2444) (emphasis omitted). The court also saw "no evidence that [defendants] even considered the reliance interests that naturally inure to NIH grant process," despite their obligation to "'take[] into account'" any "'serious reliance interests'" when formulating a "'new policy.'" App. 172 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). The court thus held that "the Challenged Directives are arbitrary and capricious under Section 706(2)(A), as are the concomitant grant terminations." App. 173.[13]

### B.   Stay Proceedings

1.    Defendants moved the district court for a stay pending appeal, raising only their argument that the court lacked jurisdiction. The district court denied the motion. App. 181-186.

2.    This Court likewise denied a stay. *See Am. Pub. Health Ass'n*

---

[13] The remainder of the district court's opinion addressed plaintiffs' claims that defendants violated certain statutory obligations (Count 1), and that defendants' reliance on certain Office of Management and Budget guidance was contrary to law (Count 2). The district court concluded that it mostly did not need to "dive into" Count 1 because it had already "declared [defendants'] actions arbitrary and capricious," although it did rule against plaintiffs on one discrete aspect of that count (concerning NIH's statutory obligation to develop a strategic plan). App. 178-179. The court found for plaintiffs on Count 2. App. 173-177. Neither count is currently before this Court; the Rule 54(b) judgment on appeal encompasses only Count 3, plaintiffs' arbitrary-and-capricious claim.

*v. NIH*, 145 F.4th 39 (2025) (*APHA*).  The Court explained that the district court "clearly had jurisdiction" to set aside the Challenged Directives—indeed, defendants had "not develop[ed] an argument" otherwise. *Id.* at 50.  As for the resulting terminations, the Court held that because plaintiffs' claims did not "depend on the terms or conditions of any contract" and sought "declaratory relief that is unavailable in the Court of Federal Claims," this case was "much closer to *Bowen* [*v. Massachusetts*, 487 U.S. 879 (1988)]," which allowed certain APA claims to proceed in district court, "than *Great-West* [*Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002)]," which held that certain ERISA claims could not proceed in district court.  *APHA*, 145 F.4th at 50.  The Court also explained that this case was distinguishable from *Department of Education v. California*, 145 S. Ct. 966 (2025), because the district court here (1) "did not 'enforce a contractual obligation to pay money,'" and (2) "neither examined any of the plaintiffs' grant terms nor interpreted them in reaching its ruling that the grant terminations must be set aside." *APHA*, 145 F.4th at 52 (quoting *California*, 145 S. Ct. at 968).

The Court next rejected defendants' argument that the challenged grant terminations were committed to agency discretion.  *Id.* at 52-53.

22

As the Court explained, defendants forfeited this argument by failing to raise it in their district-court stay application. *Id.* In any event, the Court explained, plaintiffs' claims did not second-guess discretionary funding decisions, but rather challenged agency decisions using "judicially manageable standards" from statutes and regulations. *Id.* at 53.

As for defendants' likelihood of success on the merits, this Court held that defendants had "failed to carry [their] burden." *Id.* Summarizing the district court's findings, this Court explained that "[defendants'] decisions rested on circular reasoning, included no explanation for the about-face in agency-wide policy, and entirely ignored significant reliance interests." *Id.* at 54.

2.    Defendants sought emergency relief from the Supreme Court, which stayed the district court's vacatur of defendants' grant terminations but left in place the vacatur of the Challenged Directives. *APHA*, 145 S. Ct. at 2660. The Court's unsigned order read, in relevant part:

> The application is granted as to the District Court's judgments vacating the Government's termination of various research-related grants. *See Department of Ed. v. California*, 145 S. Ct. 966 (2025) (*per curiam*). The Administrative Procedure Act's "limited waiver of [sovereign] immunity" does not provide the District Court with jurisdiction to adjudicate claims "based on" the research-related grants or to order relief designed to enforce any "'obligation to pay money'" pursuant

23

to those grants.  *Id.* at 968. . . . The application is otherwise denied.

*Id.* (brackets in original; parallel citations omitted).

Justice Barrett provided the deciding vote for this split disposition. On the one hand, Justice Barrett explained, "the District Court was likely correct to conclude that it had jurisdiction to entertain an APA challenge to the guidance." *Id.* at 2661.  On the other hand, Justice Barrett concluded, "the District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims." *Id.* Justice Barrett acknowledged that her tentative view would mean "[t]wo-track litigation"—*i.e.*, "channeling challenges to the grant terminations and guidance to different forums." *Id.* at 2661-2662.  Nevertheless, she explained, her "preliminary judgment [wa]s that the plaintiffs' challenges to the grant terminations belong[ed] in the CFC, and their APA challenges to the guidance belong[ed] in district court." *Id.* at 2663.

No other justices shared Justice Barrett's reasoning.  Four justices would have denied defendants' application in full.  As the Chief Justice explained, "the District Court's vacatur of the challenged directives . . . ha[d] prospective and generally applicable implications beyond the reinstatement of specific grants," meaning it "f[ell] well within the scope of

the District Court's jurisdiction under the Administrative Procedure Act." *Id.* at 2662-2663. "And if the District Court had jurisdiction to vacate the directives," the Chief Justice reasoned, "it also had jurisdiction to vacate the 'Resulting Grant Terminations.'" *Id.* at 2663. The remaining four justices would have stayed the district court's judgment in full. *See id.* at 2660, 2663-2666.

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's partial final judgment in its entirety.

I.     The district court correctly vacated the Challenged Directives as arbitrary and capricious. As the district court found, the directives were "bereft of reasoning virtually in their entirety" (App. 263) and failed to "even consider[] the reliance interests that naturally inure to NIH grant process" (App. 172). On appeal, defendants fail to overcome those deficiencies. To the extent they address the merits, defendants largely ignore the district court's analysis and instead attack strawmen.

Defendants also raise a host of threshold and procedural objections, but they fail to identify any impediment to judicial review. They argue, for example, that plaintiffs lacked standing to contest the Challenged

Directives, or that this case is now moot. But the directives caused concrete injuries that the judgment below alleviates. And the parties' dispute is still live: defendants have never renounced the pertinent directives, and their conduct makes clear that, but for plaintiffs' success below, they would still be enforcing them. Defendants also contend that the Challenged Directives are unreviewable because they are not "final," or because defendants' decisions are committed to their discretion. But defendants cannot seriously claim that policies that impelled them to cancel hundreds of NIH grants *en masse* were interlocutory, and their committed-to-discretion argument fails for reasons this Court gave at the stay stage.

II.    The district court also correctly vacated hundreds of identified grant terminations that indisputably flowed from the Challenged Directives. Defendants' sole appellate argument is that, even if the terminations were illegal, only the Court of Federal Claims had jurisdiction to provide relief. But because plaintiffs invoked statutory rights, not contract terms—and because they sought vacatur, not damages—review of the terminations belongs in district court under the APA.

To be sure, a majority of the Supreme Court tentatively agreed with

26

defendants' contrary argument, and this Court must give due weight to the Supreme Court's interim order. But that order does not short-circuit the usual appellate process. The Supreme Court recently reiterated that its stay orders "should not be read as a final determination on the merits." *Dep't of State v. AIDS Vaccine Advocacy Coal.*, No. 25A269, 2025 WL 2740571, at *1 (Sept. 26, 2025). That admonition is especially apt here, where no rationale persuaded a majority of justices, and the Court's disposition was determined by a concurrence that spoke only for its author, who characterized her reasoning as "preliminary." *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662 (2025) (*APHA*) (Barrett, J., concurring). This Court still has a duty to determine who is right on this unsettled legal question. For the reasons explained below, it is the plaintiffs.

## ARGUMENT

## I.   The district court properly vacated the Challenged Directives.

The Court should affirm the district court's determination that the Challenged Directives are unlawful. Defendants fail to rebut the district court's finding that those directives were "breathtakingly arbitrary and capricious." App. 163. And their bevy of threshold and procedural objections—from contentions about standing and mootness to arguments

27

about finality and agency discretion—are meritless.[14]

## A.  The Challenged Directives are arbitrary and capricious.

"An agency action qualifies as 'arbitrary' or 'capricious' if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation marks omitted).  An agency's departure from past practice is also arbitrary and capricious if the agency fails to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Security v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020) (*DHS*).  The Challenged Directives fail both of those tests.

### 1.  The Challenged Directives are not reasonable or reasonably explained.

a.  In promulgating the Challenged Directives, defendants failed to "offer[] a satisfactory explanation for [their] action[s], including a rational connection between the facts found and the choice made." *Ohio*, 603 U.S. at 292 (quotation marks omitted).

---

[14]  Defendants begin (Br. 19-22) by discussing grant terminations, but the Challenged Directives preceded—and precipitated—any individual termination decisions.  Consistent with that fact, the plaintiff states' lead argument below focused on the directives (State Doc. 126, at 18-31), and the district court addressed the directives' legality before turning to any specific grant terminations (App. 259-268).

First, nothing backed up the directives' conclusory assertions. As the district court found—and as this Court tentatively agreed at the stay stage—"there was no indication in the record that anyone at NIH performed any analysis to support the conclusion that the forbidden categories of grants . . . were unscientific and/or wasteful." *APHA*, 145 F.4th at 54. Take, for example, the directives' statement that "DEI studies are often used to support unlawful discrimination on the basis of race and other protected characteristics." App. 2444. The record does not contain "a shred of evidence" to substantiate that provocative factual claim. App. 170; *see* App. 246 (60:5-15) (defendants' attorney conceding that, "[b]eyond the statement" itself, "there's nothing" in the record to show "that any particular grant or group of grants [was] used to support unlawful discrimination"). That failure is unsurprising: the record consists almost entirely of the directives and boilerplate letters parroting them. *See supra*, at 5-6, 9, 12-13.

Second, defendants failed to explain the meaning of the standards imposed by the directives. For example, a central feature of the directives is a ban on "so-called diversity, equity, and inclusion ('DEI') studies." App. 670. But nothing in the record clarifies what a "DEI study" *is*. And

defendants' attorneys were unable to explain the concept in court—other than by pointing back to the phrase itself. App. 246 (60:16-18) ("THE COURT: . . . So that's as close to a definition as we've got? MR. PORTS: That is the agency's reasoning."). Plaintiffs are not quibbling about a failure to "define every term in internal guidance" (Defs.' Br. 40); they are challenging defendants' failure to define a *key operative term* in the disputed agency policy.

Defendants' failure of explanation leaves both the plaintiff states and the public with unanswered questions. Why, for example, are some health programs centered on Black churches considered "DEI studies" while others are not? *See supra*, at 14. Why is a study of opioids' effect on the brain, or a study of the tuberculosis bacterium's impermeability to pharmaceutical compounds, a "DEI study"? *See supra*, at 10-11. And how is a researcher supposed to comply with NIH's new policy going forward? The record does not clarify.

Before the Supreme Court, defendants suggested, for the first time, that they terminated some of these studies because they were awarded through "program[s] with an explicit racial preference." Supp. App. 2649-2650 & n. 2. Defendants' opening brief in this Court does not repeat that

30

contention, and rightly so: the record contains no indication that defendants canceled any grants for this reason. The Challenged Directives—and the termination letters issued pursuant to the directives—centered on projects' *research aims*, not their *application criteria*. *See supra*, at 4-9, 12-13; *see also, e.g.*, A.R. 1389 (canceling one study discussed above on the ground that it was a "so-called [DEI] stud[y]" without mentioning application criteria). Defendants' argument is thus an "impermissible *post hoc* rationalization[]." *DHS*, 591 U.S. at 22.[15]

b. Defendants fail to overcome the directives' fundamental lack of reasoning. They quote the same oft-repeated language from the directives—for example, that "DEI and gender-identities studies are 'low-

---

[15] Defendants' argument also offers a misleading characterization of the relevant programs' application criteria. The funding notices for these programs "encourage[d]" applications from a broad range of underrepresented groups—including not only certain racial and ethnic groups, but also, for example, first-generation college graduates, individuals with disabilities, and individuals who grew up in rural areas. *E.g.*, NIH, *NIAID Research Opportunities for New and "At-Risk" Investigators to Promote Workforce Diversity*, pt. 2, §I, https://perma.cc/S83S-H23T. None of these programs required applicants to fall into a particular racial or ethnic group. *E.g.*, *id.*, §III-1 (defining "Eligible Applicants" and "Eligible Individuals"); NIH, *Questions and Answers for NIAID and NIDDK Research Opportunities for New and "At-Risk" Investigators to Promote Workforce Diversity*, https://bit.ly/PAR-23-275-FAQ (archived April 5, 2025) ("Eligibility for this NOFO is only based on new investigator and at-risk investigator status.").

value and off mission'" (Br. 39)—but they do not explain how these labels and conclusions address either of the deficiencies discussed above. If anything, defendants' attempted explanations underscore the directives' lack of reasoning. For example, defendants claim that the Secretarial Directive "explained that DEI initiatives—which focus on specific groups—'are inconsistent with the Department's policy of improving the health and well-being of *all* Americans.'" Br. 39 (quoting App. 563, emphasis defendants'). But that statement just raises the same questions as before: why, for example, are some health programs centered on Black churches thought to impermissibly "focus on specific groups," while others are understood to "improv[e] the health and well-being of *all* Americans"? The directives do not say.

Defendants next suggest that the Challenged Directives were reasonable because they contemplated "that NIH staff would use their scientific background . . . to identify problematic grants." Br. 40 (quotation marks omitted). But plaintiffs are not challenging the method by which defendants selected specific projects for termination; they are challenging the upstream directives that blacklisted certain research topics as a matter of overarching agency policy. As a factual matter, moreover, there

is no evidence that NIH experts ever undertook an individualized, science-based assessment of any terminated grants. To the contrary, the administrative record reveals that defendants canceled grants *en masse* at a speed that precluded any meaningful review. *See supra*, at 13.

Pivoting, defendants argue (Br. 39) that perhaps they do not need to provide any reasoning after all: because the directives make "policy judgments" about "hotly contested issues," they say, it is enough for them to simply pick a side. But that is not how agency decisionmaking is supposed to work. The APA requires an agency to "examine the relevant data," "articulate a satisfactory explanation for its action," and draw "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). That standard governs even—and perhaps especially—when an agency is making a contentious policy judgment. *See id.*

Defendants utterly failed to follow that standard here. Consider, again, the directives' factual assertion that "DEI studies are often used to support unlawful discrimination on the basis of race and other protected characteristics." App. 2444. No one is suggesting—contra

33

defendants' strawman (Br. 41)—that defendants were required to conduct "empirical or statistical studies" to establish that fact. But the APA required them to provide *some support* to back it up. Yet across the entire record, there is not a single example of "any particular grant or group of grants . . . being used to support unlawful discrimination on the basis of race." App. 246 (60:5-15). The APA demands more.

Finally, defendants argue (Br. 41-42) that the district court improperly treated "shifting policy preferences and the involvement of political appointees as evidence of an APA violation." Not so. The district court's opinion made clear that the APA violation lay in defendants' changing positions *without reasoned explanation*. App. 165-166. Agency action, whether or not undertaken "to reflect the new President's policy priorities" (Defs.' Br. 42) is subject to the APA's constraints—which defendants flouted.

### 2.    Defendants ignored significant reliance interests.

The Supreme Court has repeatedly held that "[w]hen an agency changes course," it must "take[] into account" any "serious reliance interests" that "longstanding policies may have engendered." *DHS*, 591 U.S. at 30 (quotation marks omitted); *accord Fox*, 556 U.S. at 515. As the

district court found—and, again, as this Court tentatively agreed at the stay stage—"there is no evidence that [defendants] even considered the reliance interests that naturally inure to NIH grant process." App. 172; *see APHA*, 145 F.4th at 54. For that reason, too, the directives are arbitrary and capricious.

Defendants respond (Br. 42) that they did not ignore plaintiffs' reliance interests because the termination letters they sent "invited grantees to request transition funds" to phase out their projects. But that bare invitation "does not account for the broad scope of financial and non-financial interests staked on the grant awards, including years of research and millions of hours of work." *APHA*, 145 F.4th at 54. Plaintiffs' public institutions organize their affairs around grant awards: they hire staff, extend admission offers, buy equipment, recruit study participants, etc.—often years in advance. App. 172-173; *see supra*, at 16-17. Defendants gave no consideration to the fact that shuttering hundreds of projects midstream would waste these efforts. *See APHA*, 145 F.4th at 54.

To excuse this failure, defendants suggest (Br. 42-43) that grantees "have no valid . . . reliance interests" because Office of Management and Budget guidance "authorize[s] termination when 'an award no longer

35

effectuates the program goals or agency priorities.'" Setting aside defendants' misapprehension of OMB's guidance (*see* State Doc. 126, at 27-30; App. 173-177), defendants' argument ignores how significantly they broke from past practice.  Historically, NIH has canceled grants only in extreme circumstances—typically a handful of times per decade.  *See supra*, at 10.  The notion that no one reasonably relies on these awards or the predictable process that has grown up around them is absurd.

For all these reasons, the district court correctly determined that the Challenged Directives were arbitrary and capricious.

## B.    Defendants identify no impediment to judicial review of the Challenged Directives.

Defendants ask the Court to toss plaintiffs' claim on any of four non-merits grounds: standing, mootness, finality, and agency discretion.  The Court should reject each of these attempts to evade review.

### 1.    The plaintiff states have standing.

The doctrine of standing requires a plaintiff to allege a concrete injury that is traceable to the defendant's conduct and redressable by a favorable decision.  *Doe v. Shibinette*, 16 F.4th 894, 901 (1st Cir. 2021).  This case easily clears that bar.  Defendants now argue (Br. 27) that plaintiffs lacked standing "at the time they filed their complaint," but

36

that contention rests on two mistaken premises: that plaintiffs cannot seek review of the Challenged Directives separate from review of the downstream termination of their grants, and that the directives caused plaintiffs no injury aside from those terminations.[16]

### a. Defendants' termination of hundreds of existing research grants conferred standing.

Plaintiffs have standing to seek review of the Challenged Directives because those directives caused the termination of hundreds of research grants for ongoing projects. There is no dispute that the terminations concretely injured the plaintiff states. Nor is there any dispute that the terminations are traceable to the Challenged Directives. *See APHA*, 145 S. Ct. at 2663 (Roberts, C.J., concurring in part and dissenting in part) ("The Government has n[ot] contended that the terminations did not result from the directives[.]"). And there is no dispute that a judicial decision vacating the directives would eliminate the only legal basis for the terminations. On these facts, all the elements of an Article III

---

[16] None of the seven briefs that defendants previously filed in this case suggested that plaintiffs lacked standing to challenge *any aspect* of the directives; defendants only disputed plaintiffs' standing to challenge *discrete components* of the directives (for example, a portion of the directives barring grants for research in China). *E.g.*, State Doc. 125, at 23.

controversy are present.

Defendants counter (Br. 27-31) that if the district court lacked jurisdiction over grant terminations, those terminations cannot confer standing to challenge the underlying directives. As an initial matter, however, the district court *did* have jurisdiction to review the disputed terminations. *See infra*, at 53-66. And even if this Court were to adopt the Supreme Court's interim conclusion on jurisdiction, Justice Barrett's concurrence expressly contemplated "two-track litigation"—*i.e.*, "channeling challenges to the grant terminations and [challenges to the directives] to different forums." 145 S. Ct. at 2661-2662. Justice Barrett never suggested that the plaintiff states lack standing to challenge the directives in district court; that suggestion appears only in Justice Gorsuch's partial dissent, *see id.* at 2665 n. 2—which, of course, did not command a majority of the Court. Thus, even if the Court of Federal Claims is now the appropriate forum for challenging grant terminations, *but see infra*, at 53-66, the district court remains the right forum to challenge the underlying directives.

### b.   Defendants' delay and denial of applications for new research grants conferred standing.

In addition to the termination of plaintiffs' existing grants, the

38

Challenged Directives also led to the delay and denial of plaintiffs' pending applications for new research projects. *See supra*, at 15-16. These unlawful delays and denials are an independent basis for standing.

The harms flowing from these delays and denials satisfy all three of Article III's elements. First, the harms were real and concrete: they involved tangible injuries to plaintiffs' universities, which plaintiffs detailed in numerous unrebutted declarations. *E.g.*, State Doc. 77-18, ¶35 (explaining how delays "forced [the University of Maryland] to implement bridge funding . . . draw[n] from limited discretionary resources"); State Doc. 77-45, ¶12 (explaining how delays contributed to the decimation of the University of Massachusetts's fall 2025 graduate medical program). Second, these delay- and denial-based injuries are traceable to the Challenged Directives. Defendants have conceded that they denied numerous pending applications as a result of the directives, and they have never meaningfully disputed that the directives caused unprecedented delays in NIH's once-orderly grant-review process. *See supra*, at 15. Third, a decision setting aside the Challenged Directives redresses these injuries. Because of the judgment below, defendants can no longer delay or deny plaintiffs' pending applications on the ground that they fail

to comply with the directives.

Defendants' only response (Br. 28-29) is that the district court bifurcated the proceedings below: the district court resolved the legality of the Challenged Directives in the first phase of the case (which resulted in this appeal) but reserved, for a second phase, the question of whether NIH's delay in reviewing grant applications violated 5 U.S.C. §706(1). But the fact that the parties have yet to litigate certain issues related to *delay* overlooks the standing conferred by defendants' *denial* of plaintiffs' applications.[17]  Defendants' power to deny future applications based on the Challenged Directives was conclusively adjudicated in Phase One: because the directives have been set aside, defendants cannot use them to deny applications.[18]  That conclusion does not depend on any further proceedings—and for that reason alone, plaintiffs' standing is clear.

Regardless, nothing about the district court's deferral of plaintiffs'

---

[17]  Again, defendants' *denial* of applications for new grants should not be confused with their *termination* of already-awarded grants. *See supra*, at 37-39.

[18]  There are real, non-speculative applications in this category: as discussed above (at 15-16), unrebutted evidence shows, and defendants have admitted, that defendants "administratively withdrew" pending applications because of the Challenged Directives.

§706(1) claim carries Article III implications. The fact that the district court has yet to resolve the particulars of that claim does not require this Court to artificially ignore defendants' injury-causing delay in adjudicating the present standing question. After all, defendants' argument is that plaintiffs lacked standing "at the time they filed their complaint." Br. 27. The district court's post-filing docket-management decisions are irrelevant to that contention.

### 2.    The parties' dispute is not moot.

Defendants next argue (Br. 24-27) that an August 15, 2025, "statement" from NIH's director, Jay Bhattacharya, moots this case. *See* NIH, Statement, *Advancing NIH's Mission Through a Unified Strategy* (Aug. 15, 2025), https://perma.cc/V5E2-4ED2 (Bhattacharya Statement). But a party invoking the doctrine of mootness bears a "heavy burden"—one that is all the more "formidable" when the party claims that its own conduct mooted the case. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189-190 (2000). In those circumstances, the party must "show[] that it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 190 (emphasis added). For several reasons, defendants cannot make that showing.

a.    As an initial matter, defendants' mootness argument is irreconcilable with their own sworn statements.  As discussed above, defendants provided a certification on August 19, 2025, regarding certain research-grant applications then pending before NIH.  *See supra*, at 15-16.  With respect to at least 18 of those applications, defendants represented that "NIH may apply the Challenged Directives to this application, absent further Court order or judgment."  Supp. App. 2772-2799; *see* Supp. App. 2770-2771 (¶¶3-4) (attesting, under penalty of perjury, to the truth and accuracy of these representations).  This unequivocal language—offered under oath on *August 19*—fatally undermines defendants' suggestion that this case became moot on *August 15*.  If the Bhattacharya Statement had superseded the Challenged Directives, defendants obviously would not have subsequently reserved the right to "apply the Challenged Directives" to other projects.[19]

b.    Defendants' prior representations aside, their suggestion of mootness fails because the Bhattacharya Statement did not rescind the

---

[19] Defendants' certification is troubling for yet another reason: it defies the district court's judgment.  By August 19, the district court had long since declared the Challenged Directives "void" and "of no force and effect."  App. 74.  Against that backdrop, it is unclear how defendants could reserve the right to "apply the Challenged Directives."

42

Challenged Directives. In *New Hampshire Lottery Commission v. Rosen*, 986 F.3d 38 (1st Cir. 2021), this Court rejected a similar argument from the federal government that a 2019 Department of Justice memo mooted a challenge to a 2018 opinion issued by DOJ's Office of Legal Counsel. *See id.* at 53. As the Court there explained, "[t]he April 2019 Memo d[id] not rescind . . . the 2018 Opinion," and the government had not otherwise "disclaim[ed], in categorical terms, any intent to enforce" the 2018 opinion. *Id.* at 53-54. The same is true here: nothing in the Bhattacharya Statement repeals or disavows any part of the Challenged Directives.

Defendants' brief all but admits the point. The most defendants can bring themselves to say is that the Challenged Directives "have been *effectively* overridden or explicated." Br. 24 (emphasis added). Under this Court's case law, that is not enough. *N.H. Lottery*, 985 F.3d at 53 (observing that "[t]he government refuse[d] to disavow" its 2018 opinion).

c.    Even if "effectively" overriding a challenged agency policy *could* moot a case, the Bhattacharya Statement does not even accomplish that much. The statement warns (with emphasis in original) that it is "*not an exhaustive list of all agency priorities*." And a side-by-side comparison of the statement and the Challenged Directives shows that the

two are not mutually exclusive.  The bulk of the Bhattacharya Statement consists of discussions about nutrition, artificial intelligence, autism, and other subjects—*i.e.*, discussions that have nothing to do with the seven topics prohibited in the Challenged Directives.  And the few portions of the Bhattacharya Statement that *do* touch on the Challenged Directives' proscribed topics tend to reaffirm the directives' proscriptions.  For example, the Bhattacharya Statement contains language about "research based on ideologies that promote differential treatment of people based on race or ethnicity."  That passage is "largely an extension of" the Challenged Directives' ban on DEI—and so it does nothing to moot the directives' effects.  *Conservation Law Found. v. Evans,* 360 F.3d 21, 25 (1st Cir. 2004); *see id.* at 26 (explaining that a challenge is not moot "where a challenged regulation . . . is only superficially altered by a subsequent regulation").

d.    Defendants' mootness argument fails for yet another reason: even if the Bhattacharya Statement had replaced the Challenged Directives going forward, defendants have not "completely and irrevocably eradicated the [directives' past] effects." *L.A. County v. Davis*, 440 U.S. 625, 631 (1979).  As discussed above (at 10-14), defendants relied on the

Challenged Directives to terminate hundreds of grants to the plaintiff states. Regardless of whether plaintiffs' challenge to those terminations proceeds in district court or must instead go to the Court of Federal Claims (*see infra*, at 53-66), the controversy over these terminations—undertaken pursuant to the directives—confirms that the directives' legality remains a live issue. The same is true of defendants' delay and denial of plaintiffs' applications for new grants: defendants have not unwound those harms, which likewise resulted from the directives. *See supra*, at 15-16, 38-41. The question of whether the directives were lawful is thus still a pertinent one.[20]

e.     Finally, even if the Court harbored doubts, it should resolve them against defendants' mootness claim for two additional reasons.

First, as discussed above, when a government agency voluntarily ceases challenged conduct, the government "must demonstrate that it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Conservation Law*, 360 F.3d at 24 (emphasis

---

[20] Defendants' passing argument (Br. 24) that this case is moot as to two specific directives that were "formally rescinded or superseded" fails for the same reason: even if those directives are no longer in force, defendants have not unwound their past effects.

added). That is especially true in a case, like this one, "that has been litigated up to [the Supreme] Court and back down again." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 224 (2000). Even if defendants had managed to raise a colorable claim of mootness, they have not made "absolutely clear" that their illegal conduct is reasonably unlikely to recur.

Second, this Court has previously held that it may weigh "equitable or other considerations" if a mootness question is close. *Adams v. Bowater Inc.*, 313 F.3d 611, 613-614 (1st Cir. 2002). Here, those considerations decisively favor plaintiffs. Defendants "ha[ve] been persistently unwilling either to admit that [their policy] was unlawful or to say that it will not be reintroduced." *Id.* at 614; *see supra*, at 42 & n. 19 (discussing defendants' reservation of the purported right to "apply the Challenged Directives"). And the risk of irreparable harm is high. *See Adams*, 313 F.3d at 614; *see supra*, at 16-17 (describing harms to the plaintiff states). Thus, even if defendants could overcome the hurdles discussed above, the Court should still reject their suggestion of mootness.

### 3. The directives constituted final agency action.

An agency action is final under the APA if it "mark[s] the consummation of the agency's decisionmaking," and if the action is "one by which

46

rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (quotation marks omitted). That standard does not require a particular measure of formality: the Supreme Court "ha[s] long taken" a "pragmatic approach" to this issue. *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016). The Challenged Directives easily pass this pragmatic test.

a.    Both on their face and in practice, the Challenged Directives memorialized defendants' decision to prohibit research on certain topics. In particular, the directives identified the topics that defendants chose to ban, and they detailed the concrete steps that NIH officials needed to take to operationalize that ban. *See supra*, at 4-9. The Memoli Directive, for example, declared "the policy of NIH not to prioritize" so-called "DEI studies" and "direct[ed] NIH personnel" to "terminate[] or partially terminate[]" any offending projects. App. 2444-2445. That language bears all the hallmarks of final action.

The APA's definitions expressly allow a litigant to challenge an overarching agency action with these characteristics. Under 5 U.S.C. §551, the types of reviewable "agency action" include "the whole or a part

of an agency rule." *Id.* §551(13). A "rule," in turn, broadly encompasses "statement[s] of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *Id.* §551(4); *see Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1977). The Challenged Directives fit this definition to a tee: they prescribe rules of general applicability for future agency conduct.

Controlling precedent confirms the directives' reviewability. In *Biden v. Texas*, 597 U.S. 785 (2022), the Supreme Court held that a memorandum "direct[ing] [agency] personnel to take all appropriate actions to terminate [a federal program]" was final because it "bound [agency] staff by forbidding them to continue the program in any way from that moment on." *Id.* at 793, 808-810 (quotation marks omitted). That reasoning applies with just as much force here: the Challenged Directives compelled agency staff to follow a definitive statement of agency policy. *See supra*, at 4-9.

b.      Defendants nevertheless argue (Br. 32-33) that the directives were "interlocutory" communiqués that "merely instructed NIH staff to review existing grants." But defendants' own words and actions prove

otherwise. Before the Supreme Court, defendants admitted that the Challenged Directives reflected a "uniform policy" with "global[]" application. *APHA*, 145 S. Ct. at 2663 (Roberts, C.J., concurring in part and dissenting in part) (quoting Supp. App. 2629). And the factual record establishes that defendants' termination decisions flowed from the directives—not the other way around. *See id.* (noting that defendants have not "contended that the terminations did not result from the directives"). Indeed, the only way defendants' frenzy of grant terminations in the spring of 2025 makes sense is if defendants viewed the directives as final; otherwise, they canceled hundreds of grants *en masse* based on *non*-final policies.

In characterizing the directives as interlocutory, defendants appear to suggest that an agency policy is nonfinal anytime the relevant agency must take subsequent steps to implement the policy. But ample precedent rejects that view. For example, the Supreme Court has held an agency order "giv[ing] notice of how the [agency] interpret[s] the relevant statute" to be final, even though the interpretation "'would have effect only if and when a particular action was brought'" by the agency. *Army Corps*, 578 U.S. at 600-601 (quoting *Abbott Labs.*, 387 U.S. at 150).

Similarly, the Supreme Court concluded that "an FCC regulation announcing a Commission policy that it would not issue a television license to an applicant already owning five such licenses" to be final "even though no specific application [from that applicant] was before the Commission." *Abbott Labs.*, 387 U.S. at 151; *see also Texas*, 597 U.S. at 808-810 (finding a memorandum to be final even though it announced a general policy to be applied later in specific cases). Under this precedent, the Challenged Directives are not deprived of finality merely because the agency carried them out in subsequent termination decisions.

c.    Defendants also argue that the Challenged Directives "cannot be final" because the district court found that they were so poorly explained that they "'allow[ed] [defendants] to arrive at whatever conclusion [defendants] wishe[d].'" Br. 34 (quoting App. 166). But an agency policy can be both *final* under 5 U.S.C. §704 and yet *arbitrary and capricious* under §706(2)(A). *See, e.g.*, *Firearms Regulatory Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 525 (8th Cir. 2024) (finding that an agency policy was final, but was nevertheless "arbitrary and capricious because it allow[ed] the [the agency] to arrive at whatever conclusion it wishe[d] without adequately explaining the standard" (brackets and

50

quotation marks omitted)); App. 166 (citing and quoting that decision). The fact that the Challenged Directives were "breathtakingly arbitrary and capricious," App. 163, does not make them nonfinal.

### 4.    The directives are not committed to agency discretion.

While the APA does not extend to actions "committed to agency discretion by law," 5 U.S.C. §701(a)(2), the Supreme Court has "read [that] exception . . . quite narrowly, restricting it to those rare circumstances" in which "a court would have no meaningful standard" to apply, *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quotation marks omitted).  This case does not present one of those rare circumstances—as this Court tentatively concluded at the stay stage.  *APHA*, 145 F.4th at 53.

Defendants' contrary argument mischaracterizes plaintiffs' claims and the district court's decision.  Defendants suggest (Br. 36-37) that the district court engaged in "unbounded arbitrary-and-capricious review of NIH's discretionary funding judgments."  But plaintiffs did not challenge, and the district court did not review, any discretionary funding decisions. Instead, this case centers on discrete directives—promulgated, as defendants have admitted, to announce a "uniform policy" with "global[]"

51

application.  Supp. App. 2629.  Whatever discretion defendants have to choose among competing grant applicants, they elected to cabin that discretion by promulgating a suite of agencywide policies.  Those policies must satisfy the APA's basic requirements.  *See Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 18 n. 5 (1st Cir. 2020) (recognizing that an agency's discretion over "individual hiring decisions" did not preclude review of "an agency-wide policy").

Citing *Lincoln v. Vigil*, 508 U.S. 182 (1993), defendants suggest (Br. 35-37) that *any* decision affecting the "allocation of funds from lump-sum appropriations" is unreviewable.  But *Vigil* is not nearly so broad.  There, the Court held only that an agency's decision to reallocate funds from one statutorily compliant program to another was committed to the agency's discretion.  508 U.S. at 193-194.  The Court did not consider—much less exempt from APA scrutiny—formal directives announcing agencywide policies that agency staff must apply in future cases.  Those kinds of global policy directives fall within the heartland of the APA's judicial-review provisions.  *See Concerned Scientists*, 954 F.3d at 18 n. 5; *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134-1135 (D.C. Cir. 1995).

For all the foregoing reasons, defendants identify no impediment to

judicial review, and this Court should affirm the vacatur of the Challenged Directives.

## II.    The district court properly set aside discrete termination decisions premised on the Challenged Directives.

Defendants have never disputed that they terminated hundreds of grants to the plaintiff states on the sole ground that the grants violated the now-vacated Challenged Directives.  *See APHA*, 145 S. Ct. at 2663 (Roberts, C.J., concurring in part and dissenting in part).  Instead, defendants object only to the district court's jurisdiction to vacate the terminations.  For the reasons that follow, however, the district court correctly exercised jurisdiction.

### A.    The Supreme Court's stay decision, while entitled to due weight, is not a final decision on the merits.

Defendants argue (Br. 19-20) that the Supreme Court's interim decision effectively compels this Court to vacate the district court's judgment.  As the Supreme Court has repeatedly stated, however, its "interim orders are not conclusive as to the merits."  *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).  Indeed, the Supreme Court reiterated that point even *after* issuing the stay decision in this case, cautioning that its stay orders "should not be read as a final determination on the merits."  *AIDS*

*Vaccine*, 2025 WL 2740571, at *1.

There are several reasons why the Court treats its stay decisions as nonfinal. To start, these orders contain only "probabilistic holdings" about whether a particular argument is "*likely* to succeed," *APHA*, 145 S. Ct. at 2664 (Gorsuch, J., concurring in part and dissenting in part) (emphasis added), rather than a final determination of which argument *actually* prevails. Moreover, the Court reaches these probabilistic conclusions on "a short fuse without benefit of full briefing and oral argument." *Does 1-3 v. Mills*, 142 S. Ct. 17, 18 (2021) (Barrett, J., concurring). And the Court's stay orders typically contain little to no reasoning. *See Labrador v. Poe*, 144 S. Ct. 921, 934 (2024) (Kavanaugh, J., concurring) (explaining that a stay order's limited reasoning helps avoid "predetermin[ing] the case's outcome in the proceedings in the lower courts and hamper[ing] percolation across other lower courts on the underlying merits question"). Thus, while the Supreme Court's stay orders "inform how a [lower] court should exercise its equitable discretion in like cases," *Boyle*, 145 S. Ct. at 2654, they do not relieve a lower court of its obligation to determine which party prevails on the disputed legal question.

This principle applies with even greater force in this case, because

there is a higher than usual likelihood that the Supreme Court's tentative ruling will *not* match its final outcome.  In deciding defendants' stay application, no single rationale commanded the support of a majority of justices; the Court instead splintered 4–1–4.  The bottom-line result—that review of the directives likely belongs in district court, while review of terminations likely belongs in the Court of Federal Claims—was one that no party advanced (or even briefed), that no lower court adopted (or even suggested), and that eight of the nine justices disagreed with.  The one justice who did support the result, meanwhile, cautioned that the disposition reflected only her "preliminary judgment."  *APHA*, 145 S. Ct. at 2662 (Barrett, J., concurring).  In this context, there is good reason to think the Supreme Court's final word on the issue, after full briefing and argument and further percolation, will differ from its interim order.

Defendants counter (Br. 19) that the Supreme Court's recent stay order in *Boyle* compels this Court to treat the interim order in this case as final, but defendants misunderstand what *Boyle* said.  There, the Court explained that its interim orders "inform how a [lower] court should exercise its equitable discretion in like cases."  145 S. Ct. at 2653.  That statement simply means that, once the Supreme Court has issued

55

a stay in one case, a lower court should typically issue a stay (*i.e.*, "exercise its equitable discretion") in "like cases." *Id.* But this case is no longer in a stay posture, and defendants are not asking this Court to "exercise its equitable discretion." Instead, the Court is finally confronted with the merits of the parties' legal dispute. On that question, *Boyle* was clear: the Court's "interim orders are not conclusive as to the merits." *Id.*

Accordingly, this Court has a duty to review the pertinent legal authorities—including, as applicable, any reasoning in the Supreme Court's interim decisions—and decide the merits.

## B. Blackletter jurisdictional principles support the district court's exercise of jurisdiction.

The pertinent legal authorities do not support defendants' narrow conception of jurisdiction. A party injured by an agency decision may sue under the APA for "relief other than money damages" unless another statute "impliedly forbids the relief which is sought." 5 U.S.C. §702. In determining whether the Tucker Act impliedly forbids an APA claim, courts ask whether the claim is "essentially a contract dispute." *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 61 (1st Cir. 1978). To answer that question, courts often examine (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought."

*Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see* Defs.' Br. 20 (adopting that test). Here, both of these elements show that plaintiffs' challenge to the termination of their grants belonged in district court.

First, the source of plaintiffs' rights is noncontractual. In challenging the termination of their grants, plaintiffs did not invoke their rights under any contract clause. Instead, plaintiffs argued that the terminations were based exclusively on agencywide policies that were arbitrary and capricious under the APA. The resolution of that claim in no way "depend[ed] on the terms or conditions of any contract." *APHA*, 145 F.4th at 50. Indeed, defendants did not even include grant agreements for many of the terminated projects in the administrative record—an inexplicable choice if this case "self-evidently arises from the grant agreements." Defs.' Br. 20. Nor did the courts below have to parse any contract terms to resolve plaintiffs' challenge. *See Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (*MDHR*) (Bork, J.) (explaining that claims that "turn[ed] on the interpretation of statutes and regulations rather than on the interpretation of an agreement" were "not contract claims for Tucker Act purposes"); *Bowen*, 487 U.S. at 894-901 (adopting *MDHR*'s reasoning).

The Supreme Court's interim order nevertheless suggested that plaintiffs' APA claims were likely "'based on' [plaintiffs'] research-related grants." 145 S. Ct. at 2660. The Court did not explain why it thought that was so; defendants, for their part, argued that "[w]ithout a grant agreement, [plaintiffs] would have had no right to payment in the first place." Supp. App. 2617. But plaintiffs have never asserted a "right to payment." And the fact that plaintiffs would have no claim *but for* a grant agreement does not mean plaintiffs' claim is *based on* the grant agreement. *See Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1110 (D.C. Cir. 2022) (rejecting "a 'but-for' test for identifying the source of the right"). An employee who brings a Title VII claim alleging that her employer terminated her employment agreement on the basis of a protected characteristic is not bringing a "contract claim," even though the claim would not have existed absent the parties' contractual relationship. So too here. The source of plaintiffs' rights is the APA's guarantee of freedom from arbitrary and capricious agency decisionmaking—not plaintiffs' grant agreements.

Second, the nature of the relief sought and awarded below confirms that plaintiffs' claims are not contractual. The district court's judgment

was declaratory, not injunctive or monetary; it simply set aside the Challenged Directives and resulting grant terminations.  App. 73-74.  That mirrors the relief in *Bowen*.  There, as here, Massachusetts did not receive money "in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated."  487 U.S. at 900.  Instead, as in this case, it obtained "specific relief" setting aside challenged government action—which a district court has jurisdiction to grant.  *Id.* at 895; *see also Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 262 (1999) (explaining that "*Bowen*'s interpretation of § 702 . . . hinged on the distinction between specific relief and substitute relief").

Defendants argue (Br. 21-22) that *Bowen* is inapposite because it "did not involve a contract claim and did not address the APA provision in 5 U.S.C. §702 that bars suits 'expressly or impliedly forbid[den]' by another statute."  But everything the *Bowen* Court said about *why* the Tucker Act was inadequate vis-à-vis the APA—including that the Tucker Act is "tailored" to provide "compensation" for "particular categories of past injuries or labors," 487 U.S. at 904 n. 39—makes clear that the Tucker Act does not contemplate the forward-looking, specific relief awarded here.  And the Supreme Court has since confirmed that a

"statute cannot prevent an APA suit" by implication if it "'is not addressed to the type of grievance which the plaintiff seeks to assert.'" *Match-E-Be-Nash-She-Wish Band v. Patchak*, 567 U.S. 209, 216 (2012) (quoting May 10, 1976, letter of then-A.A.G. Scalia). Thus, *Bowen*'s recognition that the Tucker Act is "addressed to" a different "type of grievance" than the one the plaintiffs here "seek[] to assert," *id.*, defeats defendants' reliance on §702's "impliedly forbids" language.

The Supreme Court's interim decision, for its part, suggested that the district court functionally compelled the payment of money. *APHA*, 145 S. Ct. at 2660. But nothing in the judgment below orders the government to disburse any funds—much less "past due sums" (Defs.' Br. 21). Rather, because the district court found that the termination decisions, like the Challenged Directives, were arbitrary and capricious, the court simply vacated the terminations as having "no force and effect," App. 74, thus returning the parties to the status quo ante. To be sure, that vacatur allows the plaintiff states' universities once again to seek reimbursement for their work. But they must do so consistent with the usual rules and regulations for any payments to occur. *E.g.*, A.R. 3987-4025. As *Bowen* makes clear, an "action for specific relief" under the APA

does not seek damages merely because a judgment might "require the payment of money by the federal government."  487 U.S. at 893-894; *see also id.* at 910 (observing that HHS would likely "abide by [the District Court's] declaration and reimburse Massachusetts," but explaining that, "to the extent that the District Court's judgment engender[ed] this result," it was "a mere byproduct of that court's primary function of reviewing [HHS]'s interpretation of federal law").

The Congress that enacted the current version of §702 "understood that [the statute] would authorize judicial review of the administration of Federal grant-in-aid programs."  *Bowen*, 487 U.S. at 898 (quotation marks omitted).  The district court's vacatur of defendants' unlawful terminations was a straightforward exercise of that jurisdiction.

### C.   The parties' complex, ongoing relationship shows that this is an APA suit.

The Supreme Court has also looked to the nature of the parties' relationship to assess whether a claim properly arises under the Tucker Act or the APA.  As the Court recently reiterated, "the Administrative Procedure Act is tailored to managing the relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets, while the Tucker Act is suited to

remedying particular categories of past injuries or labors for which various federal statutes provide compensation." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020) (quotation marks and brackets omitted) (quoting *Bowen*, 487 U.S. at 904 n. 39). So whereas "the litigants' 'complex ongoing relationship'" in *Bowen* supported jurisdiction in the district court, *id.* (quoting *Bowen*, 487 U.S. at 905), the claim for "sums already calculated, past due, and designed to compensate for completed labors" in *Maine Community* "l[ay] in the Tucker Act's heartland," *id.*

That dichotomy confirms that the district court properly exercised jurisdiction here. As in *Bowen*, this case arises out of a "complex ongoing relationship" with "constantly shifting balance sheets" between the plaintiff states and the federal government. *Id.* The University of California, for example, receives thousands of NIH grants every year and, at any given time, has thousands more applications pending. Defendants' adoption and implementation of the Challenged Directives touched virtually every aspect of that dynamic partnership. *See* State Doc. 77-36, ¶¶4-12, State Doc. 77-65, ¶5. And that is just *one* of several public universities in *one* of the 16 plaintiff states. The APA is "tailored" to provide a

uniform answer to the intricate legal issues arising from the Challenged Directives' impact on those relationships. *Me. Cmty.*, 590 U.S. at 327. A multiplicity of separate Tucker Act suits is not. *See id.*

### D. Defendants' arguments would deprive injured parties of prospective relief.

Defendants' contrary arguments not only contradict the governing statutes and established legal tests—they would deprive parties of their ability to seek meaningful relief for arbitrary agency decisionmaking and myriad other forms of illegality external to any contractual relationship. Defendants argue that federal district courts lack the jurisdiction to reinstate unlawfully terminated grants. But they have maintained that the Court of Federal Claims is equally powerless to award that relief. Supp. App. 2645; *see Ferreiro v. United States*, 501 F.3d 1349, 1353 n. 3 (Fed. Cir. 2007). The upshot: on defendants' view, *no* court can reinstate grants canceled in light of an illegal policy.

That has some startling implications. Imagine, for example, that NIH were to cancel all grants to a particular group of politically disfavored researchers—say, Black doctors, or religious colleges, or veterans, or pregnant women, or firearms owners. According to defendants (Supp. App. 2644-2645), those researchers would have no recourse—a result

that violates the APA's "basic presumption of judicial review." *Weyerhaeuser*, 586 U.S. at 22.

For that reason, too, the government's jurisdictional objection is untenable.

### E.    If this Court reverses on jurisdiction, it should provide clear guidance for subsequent proceedings.

For the reasons just discussed, this Court should affirm the district court's judgment with respect to grant terminations. If, however, the Court adopts defendants' jurisdictional arguments, it should provide three important clarifications that are necessary to avoid gamesmanship and ensure meaningful judicial review.

First, and as already discussed, the Court should reiterate that the district court has jurisdiction to review and set aside the Challenged Directives and any other agencywide policies upstream of the agency's termination decisions. *See supra*, at 37-38. Defendants want to avoid that kind of review, but the very opinion on which they rely expressly contemplated "two-track litigation," with the Challenged Directives reviewed in district court. *APHA*, 145 S. Ct. at 2661-2662 (Barrett, J., concurring).

Second, the Court should make clear that vacatur of the Challenged Directives—and other agencywide policies—restores the pre-directive

status quo.  So even if plaintiffs must pursue damages for any "past due sums" in the Court of Federal Claims (Defs.' Br. 21), the vacatur of the directives bars defendants from otherwise implementing or enforcing the directives, including by delaying or denying grant applications or terminating active projects in reliance on the directives.[21]  And if defendants violate that judgment by taking new actions premised on the directives, the district court has tools—including contempt proceedings—to secure compliance.

Third, the Court should clarify that any follow-on damages lawsuit in the Court of Federal Claims is not an opportunity to relitigate the lawfulness of the directives.  The upshot of defendants' position, if adopted, is that "APA challenges to [agencywide policies] belong in district court," while "challenges to the grant terminations belong in the CFC."  *APHA*, 145 S. Ct. at 2662 (Barrett, J., concurring).  The CFC litigation, in other words, is not a second bite at the apple.

---

[21]  Of course, one would expect a federal agency acting in good faith not to wait for a separate action in the Court of Federal Claims.  Upon receipt of a final judgment setting aside a policy that prompted unlawful terminations, an agency operating in good faith would quickly restore grantees to the position they occupied before the wrongful terminations.

***

Again, these clarifications are necessary only if the Court adopts defendants' jurisdictional contentions.  As discussed, however, blackletter principles make clear that the district court properly exercised jurisdiction.  Like the district court's vacatur of the Challenged Directives, therefore, the district court's vacatur of the resulting grant terminations should be affirmed.

## CONCLUSION

The Court should affirm the district court's judgment in full.

November 12, 2025

Respectfully submitted.

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*

*/s/ Gerard J. Cedrone*
DAVID C. KRAVITZ
  *State Solicitor*
GERARD J. CEDRONE
  *Deputy State Solicitor*
VANESSA A. ARSLANIAN
  *State Trial Counsel*
PHOEBE M. LOCKHART
  *Assistant Attorney General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for Massachusetts*

(Listing of counsel continued on next page)

ROB BONTA
  *Attorney General of California*

/s/ *Emilio Varanini*

EMILIO VARANINI
  *Supervising Deputy*
  *Attorney General*
NIMROD PITSKER ELIAS
DANIEL D. AMBAR
SOPHIA TONNU
  *Deputy Attorneys General*
455 Golden Gate Avenue
San Francisco, CA 94102
(415) 510-3541
emilio.varanini@doj.ca.gov

*Counsel for California*

ANTHONY G. BROWN
  *Attorney General of Maryland*

/s/ *Adam D. Kirschner*

JULIA DOYLE
  *Solicitor General*
ADAM D. KIRSCHNER
MICHAEL DREZNER
JAMES C. LUH
  *Senior Assistant Attorneys General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6959
mdrezner@oag.state.md.us

*Counsel for Maryland*

NICHOLAS W. BROWN
  *Attorney General of Washington*

/s/ *Andrew Hughes*

ANDREW HUGHES
  *Assistant Attorney General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
andrew.hughes@atg.wa.gov

*Counsel for Washington*

KRISTIN K. MAYES
  *Attorney General of Arizona*

/s/ *Joshua G. Nomkin*

JOSHUA G. NOMKIN
  *Assistant Attorney General*
2005 N. Central Avenue
Phoenix, AZ 85004
(602) 542-3333
joshua.nomkin@azag.gov

*Counsel for Arizona*

(Listing of counsel continued on next page)

PHILIP J. WEISER
  *Attorney General of Colorado*

 /s/ *Shannon Stevenson*
SHANNON STEVENSON
  *Solicitor General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
shannon.stevenson@coag.gov

*Counsel for Colorado*


KATHLEEN JENNINGS
  *Attorney General of Delaware*

 /s/ *Vanessa L. Kassab*
IAN R. LISTON
  *Director of Impact Litigation*
VANESSA L. KASSAB
  *Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for Delaware*


ANNE E. LOPEZ
  *Attorney General of Hawaiʻi*

 /s/ *Kalikoʻonālani D. Fernandes*
DAVID D. DAY
  *Special Assistant*
   *to the Attorney General*
KALIKOʻONĀLANI D. FERNANDES
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for Hawaiʻi*


KEITH ELLISON
  *Attorney General of Minnesota*

 /s/ *Elizabeth Kramer*
ELIZABETH KRAMER
  *Solicitor General*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1010
liz.kramer@ag.state.mn.us

*Counsel for the State of Minnesota*


(Listing of counsel continued on next page)

69

AARON D. FORD
 *Attorney General of Nevada*

/s/ *Heidi Parry Stern*
HEIDI PARRY STERN
 *Solicitor General*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Counsel for Nevada*

MATTHEW J. PLATKIN
 *Attorney General of New Jersey*

/s/ *Angela Cai*
ANGELA CAI
 *Executive Assistant*
 *Attorney General*
BRYCE K. HURST
 *Deputy Attorney General*
25 Market Street
Trenton, NJ 08611
(609) 414-5954
angela.cai@njoag.gov

*Counsel for New Jersey*

RAÚL TORREZ
 *Attorney General of New Mexico*

/s/ *Amy Senier*
AMY SENIER
 *Senior Counsel,*
 *Impact Litigation Division*
408 Galisteo Street
Santa Fe, NM 87501
(505) 637-1737
asenier@nmdoj.gov

*Counsel for New Mexico*

LETITIA JAMES
 *Attorney General of New York*

/s/ *Judith N. Vale*
JUDITH N. VALE
 *Deputy Solicitor General*
28 Liberty Street
New York, NY 10005
(212) 416-6274
judith.vale@ag.ny.gov

*Counsel for New York*

(Listing of counsel continued on next page)

70

DAN RAYFIELD
  *Attorney General of Oregon*

 /s/ *Robert Koch*
ROBERT KOCH
  *Senior Assistant Attorney General*
1162 Court Street, NE
Salem, OR 97301
(503) 378-4402
robert.a.koch@doj.oregon.gov

*Counsel for Oregon*


JOSHUA L. KAUL
  *Attorney General of Wisconsin*

 /s/ *Lynn K. Lodahl*
LYNN K. LODAHL
  *Assistant Attorney General*
17 West Main Street
P.O. Box 7857
Madison, WI 53707
(608) 264-6219
lynn.lodahl@wisdoj.gov

*Counsel for Wisconsin*

PETER F. NERONHA
  *Attorney General of Rhode Island*

 /s/ *Jordan Broadbent*
JORDAN BROADBENT
  *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2060
jbroadbent@riag.ri.gov

*Counsel for Rhode Island*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limits of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the document exempted by Rule 32(f), it contains 12,981 words.

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word in Century Schoolbook, a proportionally spaced typeface.

November 12, 2025                                    /s/ *Gerard J. Cedrone*